# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF TEXAS

## BEAUMONT DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § § | No. 1:16-CR-26 |
| v. | § § | **CAPITAL 2255 PROCEEDINGS** |
| CHRISTOPHER EMORY CRAMER | § § § § § | HON. MARCIA A. CRONE |

## <u>MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE AND FOR NEW TRIAL PURSUANT TO 28 U.S.C. § 2255</u>

LAURA PAUL
CA Bar No. 329386
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: 213-894-2854
Facsimile: 213-894-0081
Email: Laura_Paul@fd.org

DEVON PORTER
CELESTE BACCHI (AFPD, W.D. PA.)

Attorneys for Defendant
CHRISTOPHER EMORY CRAMER

# TABLE OF CONTENTS

**Page**

I. MOTION FOR COLLATERAL RELIEF.................................................................................1

II. INTRODUCTION.................................................................................................................1

III. FACTUAL AND PROCEDURAL HISTORY ....................................................................3

IV. JURISDICTION...................................................................................................................5

V. CLAIMS FOR RELIEF ........................................................................................................5

LEGAL STANDARDS RELATING TO INEFFECTIVE ASSISTANCE OF COUNSEL.............5

CLAIM 1: CRAMER RECEIVED INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL
DURING THE GUILT PHASE ................................................................................................7

  A.  Legal basis...............................................................................................7

  B.  Factual basis.............................................................................................8

    1.  Counsel refused to utilize available resources to conduct a competent
      investigation. ..................................................................................9

    2.  Counsel failed to raise the available defense of duress....................................12

      a.  Legal basis for raising a duress defense........................................12

      b.  Readily available evidence supporting a duress defense .....................13

        (1)  Government Evidence...............................................16

      c.  Counsel prejudiced Cramer by not presenting a duress defense during
        the guilt phase. ....................................................................27

    3.  Counsel failed to raise the available defense of voluntary intoxication. .........27

    4.  Trial counsel's failure to show that the government blamed Johns for his
      own death was deficient performance. ...............................................28

    5.  Trial counsel's failure to show that BOP officials had foreknowledge of the
      events was deficient performance........................................................29

    6.  Counsel failed to utilize readily available evidence during the guilt phase,
      which prejudiced Cramer ...............................................................30

      a.  The government's witnesses ...................................................30

i

# TABLE OF CONTENTS

**Page**

█ ████████████████████████████████████████

█ ████████████████████████████████████████

█ ████████████████████████████████████████

█ ████████████████████████████████████████

(8) Robert Nylen ...................................................................40

b. Defense witnesses not called ....................................................40

█ ████████████████████████████████████████

█ ████████████████████████████████████████

█ ████████████████████████████████████████

█ ████████████████████████████████████████

█ ████████████████████████████████████████

█ ████████████████████████████████████████

█ ████████████████████████████████████████

█ ████████████████████████████████████████

█ ████████████████████████████████████████

(10) Olajuwon Quarles .......................................................44

(11) Reshay Childress ........................................................45

C. Prejudice ........................................................................................45

CLAIM 2: CRAMER RECEIVED INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL DURING THE PENALTY PHASE .......................................................................................46

A. Counsel ineffectively failed to investigate and present evidence supporting its theories of defense .........................................................................................46

1. Counsel did not develop a coherent and effective investigation plan .............47

2. Failure to prepare witnesses ...............................................................54

a. Family members ...................................................................54

b. Barbara Belbot .....................................................................56

c. Mental health experts ...........................................................57

3. What the jury never heard about Cramer's background ...............................58

# TABLE OF CONTENTS

**Page**

  a. Intergenerational trauma ............................................................58

  b. Cramer's role in SAC ..............................................................60

B. Trial counsel's failure to effectively investigate Cramer's social history, coupled with their failure to retain qualified experts to evaluate Cramer's cognitive dysfunction, led Cramer to be misdiagnosed with antisocial personality disorder (APD). ................................................................................................64

  1. APD – what the jury heard......................................................64

  2. Had counsel done an effective mitigation investigation and retained a qualified expert to evaluate their client, they would have realized that Cramer does not have APD. ......................................................................65

  3. Cramer was prejudiced by counsel's investigative failures and their decision to present a faulty APD diagnosis. ........................................67

C. Counsel failed to present readily available evidence and obtain a jury instruction on the statutory mitigator of duress..........................................................70

  1. Cramer's duress: what the jury never heard .................................70

  2. Counsel's failure to present the duress statutory mitigator was prejudicial....73

D. Counsel failed to effectively challenge the government's case that Cramer posed a future danger. ........................................................................................74

  1. Counsel was ineffective for failing to object to the prosecution's use of acquitted conduct as future danger evidence. ..............................................74

  2. Counsel was ineffective for not challenging the government's use of Cramer's Victorville conviction. .....................................................76

  3. Counsel was ineffective for failing to prepare the defense prison expert to counter the government's claim that ADX could not safely house Cramer. .78

E. Counsel failed to object to repeated and prejudicial instances of trial court error and prosecutorial misconduct..........................................................80

  1. Failure to effectively object to the testimony of government mental health expert Dr. Jill Hayes ........................................................80

  2. Failure to object to the government's improper arguments regarding mitigation evidence ...............................................................83

   a. Improper nexus argument...................................................84

   b. Improper explanation of the jury's role in sentencing.........................85

## TABLE OF CONTENTS

Page

████████████████████████████████████████████████

   ■ ████████████████████████████████████████

      ■ ████████████████████████████████████████

      ■ ████████████████████████████████████████

         ■ ████████████████████████████

         ■ ████████████████████████████

         ■ ████████████████████████████

            ■ ████████████████████

            ■ ████████████████████

   ■ ████████████████████████████████████████

████████████████████████████████████████████████

   ■ ████████████████████████████████████████

      ■ ████████████████████████████████████████

      ■ ████████████████████████████████████████

      ■ ████████████████████████████████████████

CLAIM 5: CRAMER WAS DENIED HIS RIGHT TO CONFLICT-FREE COUNSEL ............ 111

   A.    Legal basis ............................................................................................................ 111

   B.    McElroy's concurrent representation of Elizabeth Rose ................................ 112

      1.    Factual Background ............................................................................ 112

         a.    McElroy represents Elizabeth Rose in her criminal case ................ 112

**TABLE OF CONTENTS**

**Page**

b.    Rose overhears a conversation between Fackrell and Cramer ........ 113

c.    Rose tells her attorney about Cramer's and Fackrell's statements and is interviewed by the FBI .................................................................... 113

d.    McElroy asks to be recused as Rose's counsel but misleads the court about the nature of the conflict.................................................. 113

e.    Rose testifies against Cramer and gets her sentence reduced .......... 115

2.    McElroy's conflict of interest violated Cramer's rights................................ 116

3.    Appellate counsel violated Cramer's rights by failing to raise this claim ..... 117

C.    Barlow and Black's prior representation of Mark Snarr ............................................. 118

CLAIM 6: CRAMER'S CONVICTION AND SENTENCE ARE UNCONSTITUTIONAL BECAUSE HIS JURY WAS NOT DRAWN FROM A FAIR CROSS SECTION OF THE COMMUNITY; TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO RAISE THE ISSUE ................................................................................................................................... 122

A.    Legal basis ................................................................................................................... 122

B.    Black and Hispanic jurors were systematically excluded from Cramer's jury pool .. 123

1.    The number of Blacks and Hispanics was disproportionately low. ............. 124

2.    These discrepancies establish underrepresentation ...................................... 124

3.    The underrepresentation of Blacks and Hispanics in Cramer's jury pool was systematic. ................................................................................................... 125

a.    A disproportionate number of jurors were drawn from counties with low numbers of Black and Hispanic residents. ................................. 125

b.    The "draw" from voter registration lists was non-random. ............. 126

c.    The voter registration lists disproportionately excluded Black and Hispanic residents. .............................................................................. 128

C.    Cramer's trial counsel were ineffective for failing to raise this claim ........................ 129

CLAIM 7: CRAMER WAS DENIED HIS RIGHT TO AN IMPARTIAL JURY .......................... 132

A.    Legal basis ................................................................................................................... 132

B.    Cramer's death sentence is unconstitutional because the trial court improperly denied defense challenges under *Witt* ............................................................................. 133

C.    Cramer's death sentence is unconstitutional because the trial court improperly granted the prosecution's *Witherspoon* challenges ......................................................... 136

**TABLE OF CONTENTS**

**Page**

D.    Cramer's right to an impartial jury was violated because the court failed to excuse biased potential jurors for cause ........................................................ 138

E.    Cramer's death sentence is unconstitutional because the prosecutor used the death-qualification process and his peremptory challenges to assemble a conviction-and death-prone jury ........................................................ 141

F.    Instructions during jury selection were erroneous ...................................... 142

G.    Appellate counsel was ineffective .............................................................. 143

**CLAIM 8: CRAMER WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL DURING VOIR DIRE** ....................................................................................... 143

A.    Legal basis ................................................................................................... 144

B.    Counsel failed to appropriately consult with retained experts .................. 144

C.    Counsel was ineffective for failing to object to the prosecution's use of racially motivated peremptory challenges ................................................... 147

D.    Counsel was ineffective for failing to conduct adequate voir dire ............. 149

**CLAIM 9: THE EXCESSIVE SECURITY PRESENCE AT TRIAL VIOLATED THE DUE PROCESS PRINCIPLES OF *DECK V. MISSOURI*** ............................................... 153

A.    Legal basis ................................................................................................... 153

B.    Factual basis ................................................................................................. 154

C.    The shackling and excessive security presence violated Cramer's rights .................. 156

**CLAIM 10: PROSECUTORIAL MISCONDUCT** ................................................... 158

A.    The government knowingly presented false or misleading testimony about Cramer's rank in SAC and the circumstances surrounding the Johns homicide ..... 158

B.    Government misconduct under *Brady v. Maryland* ...................................... 162

C.    Improper conduct under *Darden v. Wainwright* .............................................. 164

**CLAIM 11: TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO ADEQUATELY ARGUE FOR SEVERANCE** ................................................................................. 165

D.    Legal basis ................................................................................................... 166

E.    Factual basis ................................................................................................. 166

F.    Counsels' failure to competently argue for severance was ineffective assistance of counsel ........................................................................................................ 168

**TABLE OF CONTENTS**

Page

CLAIM 12: BECAUSE CRAMER'S § 924(C) CONVICTION IS INVALID PURSUANT TO THE SUPREME COURT'S DECISION IN *BORDEN V. UNITED STATES*, THIS COURT SHOULD ORDER A NEW SENTENCING PHASE ..................................................................... 171

    A.    Legal basis ........................................................................................................... 171

        1.    The definition of "crime of violence" ............................................... 171

        2.    The categorical approach ..................................................................... 172

        3.    The Supreme Court's decision in *Borden* ........................................ 173

    B.    Cramer's § 924(c) conviction must be vacated under *Borden* ........................ 174

    C.    Cramer's death sentence should be vacated and a new penalty phase ordered ........ 175

CLAIM 13: COUNSEL'S INEFFECTIVENESS AND INSTRUCTIONAL ERROR BY THE TRIAL COURT UNDERMINED THE JURORS' FULL AND FAIR CONSIDERATION OF CRAMER'S CASE FOR LIFE, IN VIOLATION OF 18 U.S.C. §§ 3592 AND 3593 AND THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION ....................................................................................................................... 176

    A.    Ineffective assistance regarding the jury's question about unanimity and the trial court's subsequent instruction .......................................................................... 176

    B.    Instructional error regarding the verdict forms at the penalty phase ........................ 179

        1.    Legal basis .............................................................................................. 180

        2.    Factual basis ........................................................................................... 183

CLAIM 14: JUROR MISCONDUCT UNDERMINES CRAMER'S CONVICTION AND SENTENCE ................................................................................................................................ 186

CLAIM 15: MATERIAL OMISSIONS FROM CRAMER'S TRIAL TRANSCRIPT VIOLATE HIS RIGHTS UNDER THE FIFTH AND EIGHTH AMENDMENTS ....................................... 187

    A.    Legal basis ........................................................................................................... 188

    B.    Conference regarding Elizabeth Rose's testimony ........................................... 188

    C.    Conferences regarding other substantive matters ............................................ 189

    D.    Prior counsel was ineffective for failing to adequately preserve this issue at trial and brief the issue on appeal ............................................................................ 190

CLAIM 16: CRAMER WAS DENIED THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL .................................................................................................................................. 191

    A.    Appellate counsel failed to raise meritorious claims ....................................... 191

**TABLE OF CONTENTS**

**Page**

CLAIM 17: THE FEDERAL DEATH PENALTY ACT AND ITS ADMINISTRATION ARE UNCONSTITUTIONAL ................................................................................................ 197

    A.    Legal basis ................................................................................................ 197

    B.    The FDPA fails to narrow the class of death-eligible offenders in violation of Cramer's Eighth Amendment rights ................................................................ 197

    C.    The death penalty is arbitrary and capricious as applied to Cramer ........................ 198

CLAIM 18: CRAMER'S CONVICTION AND SENTENCE MUST BE VACATED DUE TO THE CUMULATIVE PREJUDICIAL EFFECT OF THE ERRORS IN THIS CASE ................ 201

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Adams v. Texas,*
448 U.S. 38 (1980)..............................................................................................138

*Alcorta v. Texas,*
355 U.S. 28 (1957.).............................................................................................157

*Alexander v. Shannon,*
163 Fed. Appx. 167 (3d Cir. 2006) ...................................................................164

*Ashe v. Swenson,*
397 U.S. 436 (1970)..............................................................................................76

*Atkins v. Virginia,*
536 U.S. 304 (2002)..........................................................................107, 108, 110

*Baldwin v. Blackburn,*
653 F.2d 942 (5th Cir. 1981)..............................................................................178

*Batson v. Kentucky,*
476 U.S. 79 (1986.)............................................................................................144

*Battie v. Estelle,*
655 F.2d 692 (5th Cir. 1981)................................................................................81

*Baze v. Rees,*
553 U.S. 35 (2008)..............................................................................................141

*Berghuis v. Smith,*
559 U.S. 314 (2010).................................................................................... 122, 124

*Bobby v. Van Hook,*
558 U.S. 4 (2009) ...................................................................................................5

*Borden v. United States,*
141 S. Ct. 1817 (2021) .......................................................................171, 172, 173

*Bourgeois v. Watson,*
141 S. Ct. 507 (2020)..........................................................................................108

*Boyde v. California,*
494 U.S. 370 (1990)..................................................................................... 181, 184

*Brady v. Maryland,*
373 U.S. 87 (1963)..............................................................................................160

*Brecht v. Abrahamson,*
507 U.S. 619 (1993)............................................................................................201

## TABLE OF AUTHORITIES

**Page(s)**

*Buchanan v. Kentucky,*
483 U.S. 402 (1987)................................................................................................80

*Buck v. Davis,*
580 U.S. 100 (2017)................................................................. 6, 106, 169, 176

*Capozzi v. United States,*
531 F. Supp. 3d 399 (D. Mass. 2021) ...............................................................174

*Carden v. United States,*
464 F. App'x 839 (11th Cir. 2012) .......................................................................31

*Carden v. United States,*
568 U.S. 954 (2012)...............................................................................................31

*Charles v. Stephens,*
736 F.3d 380 (5th Cir. 2013)................................................................................88

*Cramer v. United States,*
142 S. Ct. 1372 (2022) .............................................................................................5

*Crutsinger v. Thaler,*
2012 U.S. Dist. LEXIS 14710 (N.D. Tx. Feb. 6, 2012)...................................105

*Cuyler v. Sullivan,*
446 U.S. 335 (1980)................................................................................. 111, 116

*Darden v. Wainwright,*
477 U.S. 168 (1986)............................................................................................162

*Deck v. Missouri,*
544 U.S. 622 (2005)........................................................................................*passim*

*Delap v. Dugger,*
890 F.2d 285 (11th Cir. 1989) ...........................................................................75

*Dixon v. United States,*
548 U.S. 1 (2006) .................................................................................................13

*Dobbs v. Zant,*
506 U.S. 357 (1993)............................................................................................188

*Duren v. Missouri,*
439 U.S. 357 (1979)................................................................................. 122, 123

*Eddings v. Oklahoma,*
455 U.S. 104 (1982)................................................................................83, 84, 181

x

# TABLE OF AUTHORITIES

**Page(s)**

*Estelle v. Smith,*
451 U.S. 454 (1981)................................................................................................. 80, 81

*Estelle v. Williams,*
425 U.S. 501 (1976).....................................................................................................153

*Evans v. Sec'y, Dep't of Corr.,*
703 F.3d 1316 (11th Cir. 2013) ...................................................................................105

*Evitts v. Lucey,*
469 U.S. 387 (1985)................................................................................. 132, 133, 135, 191

*Furman v. Georgia,*
408 U.S. 238 (1972).....................................................................................................197

*Gardner v. Florida,*
430 U.S. 349 (1977).....................................................................................................188

*Gardner v. Johnson,*
247 F.3d 551 (5th Cir. 2001).......................................................................................107

*Gideon v. Wainwright,*
372 U.S. 335 (1963)........................................................................................................6

*Giglio v. United States,*
405 U.S. 150 (1972).....................................................................................................157

*Glossip v. Gross,*
576 U.S. 863 (2015).....................................................................................................200

*Godfrey v. Georgia,*
446 U.S. 420 (1980).....................................................................................................197

*Graham v. Collins,*
950 F.2d 1009 (5th Cir. 1992) ................................................................................ 13, 70

*Gray v. Mississippi,*
481 U.S. 648 (1987)................................................................................. 132, 136, 138, 142

*Greer v. Mitchell,*
264 F.3d 663 (6th Cir. 2001)................................................................................... 7, 191

*Gregg v. Georgia,*
428 U.S.153 (1976).....................................................................................................197

*Griffin v. California,*
380 U.S. 609 (1965).....................................................................................................187

**TABLE OF AUTHORITIES**

**Page(s)**

*Hall v. Florida,*
    572 U.S. 701 (2014)................................................................108, 109, 110

*Harris By & Through Ramseyer v. Wood,*
    64 F.3d 1432 (9th Cir. 1995)..................................................................152

*Hendricks v. United States,*
    No. 2004-05, 2015 U.S. Dist. LEXIS 193811 (D.V.I. Sep. 1, 2015) ...............................................163

*Hinton v. Alabama,*
    571 U.S. 263 (2014)................................................................ 130, 146

*Hitchcock v. Dugger,*
    481 U.S. 393 (1987)..................................................................83

*Holberg v. Lumpkin,*
    2023 WL 2474213 (5th Cir. 2023) ...............................................93

*Holbrook v. Flynn,*
    475 U.S. 560 (1986)................................................ 153, 155, 169, 170

*Hughes v. United States,*
    258 F.3d 453 (6th Cir. 2001)..................................................................151

*Illinois v. Allen,*
    397 U.S. 337 (1970.).......................................................154, 156, 169

*Irvin v. Dowd,*
    366 U.S. 717 (1961)..................................................................187

*Jackson v. Calderon,*
    211 F.3d 1148 (9th Cir. 2000) ................................................................63

*Jennings v. McDonough,*
    490 F.3d 1230 (11th Cir. 2007) ................................................................83

*Johnson v. Bagley,*
    544 F.3d 592 (6th Cir. 2008)................................................ 60, 68

*Johnson v. Mississippi,*
    486 U.S. 578 (1988).................................................................83

*Johnson v. Mitchell,*
    585 F.3d 923 (6th Cir. 2009)..................................................................192

*Johnson v. Zerbst,*
    304 U.S. 458 (1938)..................................................................6

**TABLE OF AUTHORITIES**

**Page(s)**

*Jones v. United States,*
    527 U.S. 373 (1999)..................................................................................177

*Kansas v. Cheever,*
    571 U.S. 87 (2013)....................................................................................81

*Kyles v. Whitley,*
    514 U.S. 419 (1995)..................................................................................161

*Littlejohn v. Royal,*
    875 F.3d 548 (10th Cir. 2017) ..................................................................105

*Lockett v. Ohio,*
    438 U.S. 586 (1978)....................................................... 83, 143, 184, 193

*Lockhart v. McCree,*
    476 U.S. 162 (1986)..................................................................................137

*Lopez v. Davis,*
    531 U.S. 230 (2001)..................................................................................182

*Lowenfield v. Phelps,*
    484 U.S. 231 (1988)..................................................................................197

*Marshall v. Cathel,*
    428 F.3d 452 (3rd Cir. 2005) ...................................................................192

*Mata v. Johnson,*
    99 F.3d 1261 (5th Cir. 1996)....................................................................170

*Mattox v. United States,*
    146 U.S. 140 (1892)..................................................................................187

*McFarland v. Scott,*
    512 U.S. 849 (1994)....................................................................................9

*McGinnis v. Johnson,*
    181 F.3d 686 (5th Cir. 1999)............................................................. 123, 127

*McKaskle v. Wiggins,*
    465 U.S. 168 (1984)............................................................................. 153, 169

*Mickens v. Taylor,*
    535 U.S. 162 (2002)..................................................................................111

*Miller v. United States,*
    317 U.S. 192 (1942)............................................................................. 187, 188

**TABLE OF AUTHORITIES**

**Page(s)**

*Mitchell v. United States,*
  526 U.S. 314 (1999) ................................................................................................187

*Moncrieffe v. Holder,*
  133 S. Ct. 1678 (2013.) ..........................................................................................173

*Moncrieffe v. Holder,*
  569 U.S. 184 (2013) ................................................................................................172

*Monge v. California,*
  524 U.S. 721 (1998) ..................................................................................................76

*Mooney v. Holohan,*
  294 U.S. 103 (1935) ................................................................................................157

*Moore v. Texas,*
  581 U.S. 1 (2017) ............................................................................................ 108, 178

*Morgan v. Illinois,*
  504 U.S. 719 (1992) ...........................................................................................*passim*

*Mosley v. Dretke,*
  370 F.3d 467 (5th Cir. 2004) ..................................................................................125

*Mullen v. Blackburn,*
  808 F.2d 1143 (5th Cir. 1987) ................................................................................188

*Napue v. Illinois,*
  360 U.S. 264 (1959) ................................................................................................157

*Neal v. Puckett,*
  286 F.3d 230 (5th Cir. 2002) .......................................................................58, 74, 80

*Nelson v. Davis,*
  952 F.3d 651 (5th Cir. 2020) ..................................................................................143

*Padilla v. Kentucky,*
  559 U.S. 356 (2010) ..................................................................................................88

*Parker v. Dugger,*
  498 U.S. 308 (1991) ................................................................................................191

*Parker v. Gladden,*
  385 U.S. 363 (1966) ........................................................................................ 139, 187

*Paul v. Superintendent,*
  2022 U.S. Dist. LEXIS 136933 (S.D. Ind., Aug. 2, 2022) .............................. 171, 173

## TABLE OF AUTHORITIES

**Page(s)**

*Pena-Rodriguez v. Colorado,*
    580 U.S. 206 (2017)................................................................................................187

*Penry v. Johnson,*
    532 U.S. 782 (2001)................................................................................................186

*Penry v. Lynaugh,*
    492 U.S. 302 (1989)........................................................................... 60, 87, 143, 181

*Perillo v. Johnson,*
    205 F.3d 775 (5th Cir. 2000)...................................................................................112

*Porter v. McCollum,*
    558 U.S. 30 (2009)............................................................................................*passim*

*Reed v. Sec'y, Dep't of Corr.,*
    593 F.3d 1217 (11th Cir. 2010) ................................................................................68

*Rhoades v. Davis,*
    914 F.3d 357 (5th Cir. 2019)....................................................................................83

*Rhoden v. Rowland,*
    172 F.3d 633 (9th Cir. 1999)...................................................................................170

*Riggins v. Nevada,*
    504 U.S. 127 (1992)..................................................................................................83

*Rogers v. Dzurenda,*
    25 F.4th 1171 (9th Cir. 2022) ..................................................................................69

*Rompilla v. Beard,*
    545 U.S. 374 (2005)........................................................................................*passim*

*Ross v. Oklahoma,*
    487 U.S. 81 (1988)...................................................................................133, 139, 140

*Sanborn v. Parker,*
    629 F.3d 554 (6th Cir. 2011)....................................................................................68

*Satterwhite v. Texas,*
    486 U.S. 249 (1988)................................................................................................180

*Schwander v. Blackburn,*
    750 F.2d 494 (5th Cir. 1985)...................................................................188, 189, 190

*Seale v. United States,*
    No. 19-21016, 2022 WL 18024217 (D.N.J. Dec. 30, 2022)....................................174

**TABLE OF AUTHORITIES**

**Page(s)**

*Sears v. Upton,*
 561 U.S. 945 (2010)...................................................................................................104

*Sharp v. Puckett,*
 930 F.2d 450 (5th Cir. 1991)..............................................................................7, 117, 143

*Skipper v. South Carolina,*
 476 U.S. 1 (1986) ................................................................................................ 83, 193

*Smith v. Robbins,*
 528 U.S. 259 (2000)............................................................................................... 7, 191

*Strickland v. Washington,*
 466 U.S. 668 (1984)..........................................................................................*passim*

*Strickler v. Greene,*
 527 U.S. 263 (1999)........................................................................................... 160, 161

*Taylor v. Louisiana,*
 419 U.S. 522 (1975)..................................................................................................122

*Tennard v. Dretke,*
 542 U.S. 274 (2004)..........................................................................................*passim*

*Thomas v. Lumpkin,*
 995 F.3d 432 (5th Cir. 2021)......................................................................................144

*Trevino v. Davis,*
 138 S. Ct. 1793 (2018) ..............................................................................................106

*Trubey v. United States,*
 No. 16-cv-1737, Dkt. 51 (M.D. Fla. Jan. 10, 2023)..........................................................174

*U.S. Brief, Borden v. United States,*
 14 S. Ct. 1817 (2021), 2020 WL 4455245.....................................................................175

*United States v. Agurs,*
 427 U.S. 97 (1976)....................................................................................................158

*United States v. Alvarez,*
 580 F.2d 1251 (5th Cir. 1978) ....................................................................................116

*United States v. Auten,*
 632 F.2d 478 (5th Cir. 1980)......................................................................................159

*United States v. Bagley,*
 473 U.S. 667 (1985)..................................................................................................161

## TABLE OF AUTHORITIES

**Page(s)**

*United States v. Biaggi*,
  909 F. 2d 662 (2nd Cir. 1990).................................................................................125

*United States v. Brummitt*,
  665 F.2d 521 (5th Cir. 1981)..................................................................................129

*United States v. Butler*,
  615 F.2d 685 (5th Cir. 1980)..................................................................................125

*United States v. Cramer*,
  6:09-cr-00064-GFVT, ECF No. 50 (E.D.KY. Apr. 8, 2010) .............................................75

*United States v. Cruzado-Laureano*,
  404 F.3d 470 (1st Cir. 2005) .................................................................................174

*United States v. Davis*,
  139 S. Ct. 2319 (2019) .........................................................................................172

*United States v. Estrada-Monzon*,
  700 F. App'x 323 (5th Cir. 2017) ....................................................................... 12, 45

*United States v. Fackrell*,
  991 F.3d 589 (5th Cir. 2021).................................................................5, 8, 176, 180

*United States v. Fell*,
  372 F. Supp. 2d 766 (D. Vt. 2005)...........................................................................184

*United States v. Fields*,
  761 F.3d 443 (5th Cir. 2014)..................................................................................201

*United States v. Garza*,
  563 F.2d 1164 (5th Cir. 1977) ................................................................................167

*United States v. Holcomb*,
  797 F.2d 1320 (5th Cir. 1986) ......................................................................... 164, 165

*United States v. Johnson*,
  495 F.3d 951 (8th Cir. 2007)....................................................................................83

*United States v. Jones*,
  132 F.3d 232 (5th Cir. 1998)..................................................................................142

*United States v. Leon-Reyes*,
  177 F.3d 816 (9th Cir. 1999)..................................................................................162

*United States v. Mahar*,
  550 F.2d 1005 (5th Cir. 1977) ................................................................................116

## TABLE OF AUTHORITIES

**Page(s)**

*United States v. Maskeny,*
609 F.2d 183 (5th Cir. 1980)............................................................................................125

*United States v. Mitchell,*
502 F.3d 931 (9th Cir. 2007)............................................................................................181

*United States v. Molina-Uribe,*
853 F.2d 1193 (5th Cir. 1988) ...........................................................................................27

*United States v. Posada-Rios,*
158 F.3d 832 (5th Cir. 1998).......................................................................................12, 45

*United States v. Reinhart,*
357 F.3d 521 (5th Cir. 2004)...............................................................................................7

*United States v. Rioux,*
97 F.3d 648 (2d Cir. 1996) ..............................................................................................123

*United States v. Sanchez Guerrero,*
546 F.3d 328 (5th Cir. 2008)............................................................................................116

*United States v. Savage,*
970 F.3d 217 (3d Cir. 2020) .....................................................................................125, 128

*United States v. Smith,*
957 F.3d 590 (5th Cir. 2020)............................................................................................173

*United States v. Snarr,*
704 F.3d 368 (5th Cir. 2013)............................................................................................192

*United States v. Taylor,*
142 S. Ct. 2015 (2022.) ............................................................................................172, 174

*United States v. Waller,*
605 F. App'x 333 (5th Cir. 2015.) ................................................................................12, 13

*United States v. Washington,*
No. 20-2333, Dkt. 36 (3d Cir. Dec. 1, 2022)...................................................................175

*United States v. Williamson,*
183 F.3d 458 (5th Cir. 1999)........................................................................................7, 195

*United States v. Willis,*
38 F.3d 170 (5th Cir. 1994)................................................................................................12

*Vasquez v. Hillery,*
474 U.S. 254 (1986).........................................................................................................124

**TABLE OF AUTHORITIES**

**Page(s)**

*Virgil v. Dretke,*
     446 F.3d 598 (5th Cir. 2006).................................................................................144, 151, 152

*Walbey v. Quarterman,*
     309 F. Appx. 795 (5th Cir. 2009) .....................................................................................69

*Wainwright v. Witt,*
     *469 U.S. 412, 422 (1985)* .............................................................................................132

*Weaver v. Massachusetts,*
     582 U.S. 286 (2017)........................................................................................................149

*White v. Thaler,*
     610 F.3d 890 (5th Cir. 2010).................................................................................................6

*Wiggins v. Smith,*
     539 U.S. 510 (2003)....................................................................................................*passim*

*Williams v. Stirling,*
     914 F.3d 302 (4th Cir. 2019).........................................................................89, 97, 106

*Williams v. Taylor,*
     529 U.S. 362 (2000)............................................................................................. 5, 104

*Williams v. Washington,*
     59 F.3d 673 (7th Cir. 1995)............................................................................................164

*Wingate v. Wainwright,*
     464 F.2d 209 (5th Cir. 1972)............................................................................................76

*Witherspoon v. Illinois,*
     391 U.S. 510 (1968)............................................................................................. 132, 137

*Woods v. Dugger,*
     923 F.2d 1454 (11th Cir. 1991) .....................................................................................169

*Zafiro v. United States,*
     506 U.S. 534 (1993)........................................................................................................164

*Zant v. Stephens,*
     462 U.S. 862 (1983)........................................................................................................197

**State Cases**

*Commonwealth v. Hackett,*
     99 A.3d 11 (Pa. 2014) ......................................................................................................92

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Statutes**

18 U.S.C. § 851 ................................................................................................................. 30

18 U.S.C. § 924(c) ........................................................................................................ *passim*

18 U.S.C. §1001 ............................................................................................................... 33

18 U.S.C. § 1951 ............................................................................................................. 174

18 U.S.C. § 2113(a) ........................................................................... 171, 173, 174, 175

18 U.S.C. § 3582 ............................................................................................................... 27

18 U.S.C. § 3592 ......................................................................................................... *passim*

18 U.S.C. § 3593(c) ....................................................................................... 176, 180, 182

18 U.S.C. § 3595(c)(2) ................................................................................................... 180

28 U.S.C. § 1331 ............................................................................................................... 28

28 U.S.C. § 1861 ............................................................................................................. 129

28 U.S.C. § 2255 ........................................................................................................... 1, 5

U.S. Const., amend V ....................................................................... 80, 82, 165, 186

U.S. Const., amend VI ....................................................................... 82, 186, 187

U.S. Const, amed VIII ....................................................................... 186, 187

U.S. Const., amed XIV ....................................................................... 186

**State Statutes**

Tex. Gov't. Code Ann. § 62.001(a)(2) ......................................................................... 128

**Federal Rules**

Fed. Rule Crim. Proc. 2 ..................................................................................................... 1

Fed. Rule Crim. Proc. 12.2(a) ....................................................................................... 13

Fed. Rule Crim Proc 33 ..................................................................................................... 1

R. of Prof. Conduct 1.06(c)(2) ..................................................................................... 121

**TABLE OF AUTHORITIES**

**Page(s)**

**Other Authorities**

Blume, Garvey & Johnson, *Future Dangerousness in Capital Cases: Always "At Issue,"* 86 Cornell L. Rev. 397, 398 (2001) ...........................................................................................168

Burd L, Deal E, Rios R, Adickes E, Wynne J, Klug MG. Congenital heart defects and fetal alcohol spectrum disorders. Congenit Heart Dis. 2007; 2(4):250–5 ...............................97

Cunningham, Sorensen & Reidy, Capital Jury Decision-Making: The Limitations of Predictions of Future Violence, 15 Psychol., Pub. Policy & L. 223, 234-35, 244-45 & Table 1 (2009) ...........................................................................................................168

*Deconstructing Antisocial Personality Disorder and Psychopathy: A Guidelines-Based Approach to Prejudicial Psychiatric Labels*, Hofstra Law Review: Vol. 42: 2, 6 ...................................... 67, 68

G. Ben Cohen and Robert J. Smith, *The Racial Geography of the Federal Death Penalty*, 85 Wash. L. Rev. 425, 431 (2010.) ...........................................................................................198

Greenspan, S. & Novick Brown, N., *Diagnosing Intellectual Disability in People with FASD*, 40 Behav. Sci. & L. 31, 37 (2021) ...........................................................................109

Mona Lynch & Craig Haney, *Capital Jury Deliberation: Effects on Death Sentencing, Comprehension, and Discrimination*, 33 Law & Hum. Behav. 481, 485 (2009) ....................................142

Nancy J. King, Racial Jurymandering: Cancer or Cure? A Contemporary Review of Affirmative Action in Jury Selection, 68 N.Y.U. L. Rev. 707, 712-13 (1993 ..................................128

O'Leary, et al, Maternal Alcohol Use and Sudden Infant Death Syndrome and Infant Mortality Excluding SIDS, Pediatrics (2013) 131 (3) at 770 .............................................90

Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Colum. L. Rev. 1538, 1560 (1998) .............................................................................83

## I. MOTION FOR COLLATERAL RELIEF

The Movant  Christopher Cramer, through counsel and pursuant to 28 U.S.C. § 2255, Federal Rule of Criminal Procedure 33, and Rule 2 of the Rules Governing Section 2255 Proceedings, requests that this Court grant him a new trial, vacate the judgment entered against him, and/or vacate, set aside or correct the sentence.[1] In making these requests, he asserts the following grounds:

## II. INTRODUCTION

At Christopher Cramer's trial, the government portrayed Cramer as the ruthless general of a white supremacist prison gang at USP Beaumont called the Soldiers of Aryan Culture ("SAC"). The government's theory was that Cramer and his co-defendant Ricky Fackrell had killed Leo Johns, a fellow SAC member, because Johns' drug addiction made him unable to comply with the gang's prohibition on drug use—a supposed embarrassment to SAC and Cramer. The government argued that the facts of the crime, coupled with Cramer's alleged leadership position in SAC, made him a future danger and warranted a death sentence.

Had Cramer's trial counsel performed a minimally competent investigation and formulated an effective trial strategy, the story that the jury would have heard about the crime—and Cramer's life leading up to the crime—would have been starkly different. Cramer's counsel failed to uncover or effectively use evidence showing that ███████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

---

[1] In accordance with Rule 2 of the rules governing Section 2255 proceedings, this Motion sets forth only the facts and claims entitling Movant to relief.

1

███████████████████████████. And counsel could have impeached the government's star witness, Otis Carden, with evidence that Carden himself pressured Cramer to use violence to handle the situation with Johns. Indeed, a wealth of readily available but unpresented evidence countered the allegation that Cramer was a "general" in SAC and instead showed that Cramer was subject to orders from above. With a reasonable investigation, trial counsel could have marshaled evidence demonstrating the extreme pressure Cramer was facing in support of a duress defense to the first-degree murder charge and as persuasive mitigating evidence to show that Cramer's level of culpability did not warrant a death sentence.



███████████████████████████████████████████████ Instead, defense counsel used a mental health expert to explain Cramer's behavior with the inappropriate diagnostic label of "Antisocial Personality Disorder" (APD), often colloquially referred to as sociopathy or psychopathy. Cramer's APD label was not only a misdiagnosis ████████████████████████████████ but it was also highly aggravating and played into the government's argument that Cramer would continue to pose a danger if sentenced to life imprisonment. And while trial counsel presented some evidence of Cramer's deeply traumatic background, what the jury heard was only a "skeletal" version of Cramer's generational and complex trauma experienced by Cramer's multiracial family.

Counsel's failures throughout trial prejudiced Cramer. Even with the limited information that jurors heard, they endorsed multiple mitigating factors during the penalty phase of trial, indicating that they were receptive to mitigating evidence and saw some measure of value in Cramer's life. Their

2

struggle with the sentencing decision is evident from the fact that at the end of their first full day of penalty phase deliberations, they sent a note to the trial judge asking, "What is the process if we are not unanimous with our verdict?" (Dkt. 656 at 2.) If counsel had satisfied the minimum standard of care in their representation, there is a reasonable probability that at least one juror would have been swayed in favor of acquittal or of sparing Cramer's life.

Outside of trial counsel's ineffective guilt and penalty phase presentations, the fundamental fairness of Cramer's trial was also undermined by counsels' substantial conflicts of interest. Attorneys Pat Black and Doug Barlow represented a high-ranking member of SAC in a prior murder case, which severely limited the scope of their investigation into what direct orders or indirect pressure Cramer may have faced from SAC higher-ups in the killing of Leo Johns. In addition, attorney John McElroy concurrently represented both Cramer and a government witness who informed on Cramer to the FBI, and who ultimately testified for the government.

All of these errors were compounded by structural problems with the fairness of Cramer's jury as well as unconstitutional instructions about the jury's role in the penalty phase. The jury that convicted and sentenced Cramer was drawn from a jury wheel created by a non-random selection procedure, resulting in an older, whiter jury pool that systematically excluded Black and Hispanic prospective jurors. That biased jury was then improperly instructed that they could make the legal determination of whether something was a mitigating factor, in violation of the Eighth Amendment's requirement that all mitigating factors approved by the court and proffered by the defense be considered. Due to multiple, pervasive constitutional violations in Cramer's case, this court should vacate Cramer's conviction and death sentence.

### III. FACTUAL AND PROCEDURAL HISTORY

Leo Johns, an inmate at USP Beaumont and a member of SAC, was found dead in his cell from multiple stab wounds on June 9, 2014. Security camera footage revealed fellow SAC

3

members Cramer and Fackrell walking into Johns' cell at the time of the murder. During subsequent FBI interviews, Cramer and Fackrell admitted that they had killed Johns. On November 25, 2014, G. Patrick Black ("Pat Black" or "Black") of the Federal Public Defender office for the Eastern District of Texas was appointed to represent Cramer. (*See* Dkt. 4 (appointing Doug Barlow and reporting Black's appointment date as 11/25/14).) Douglas Barlow ("Doug Barlow" or "Barlow") was appointed as Black's co-counsel on December 16, 2014. (*See* Dkt. 4.) Cramer and Fackrell were indicted for Johns' murder on March 3, 2016. (Dkt. 23.)

Over defense objection, the co-defendants were tried together. (Dkts. 85, 86.) Voir dire began on April 2, 2018, *see* Dkt.  703 (RT), and a jury was empaneled on April 30, 2018. (Dkt. 591 (RT) at 56.) The guilt phase lasted a week. (Dkt. 596.) The government's theory alleged that Cramer was a general in SAC, that SAC prohibited alcohol and drug use among its members, and that Johns' addiction and drug-related debt disrespected Cramer, who then called for Johns to be killed. Cramer's defense sought to negate the premeditation element of first-degree murder. Cramer called no guilt-phase witnesses. The jury found both Cramer and Fackrell guilty of first-degree murder.

After the guilt phase, the court held an eligibility phase during which the government presented evidence of its alleged statutory aggravating factors. (*See* Dkt. 598.) The jury found both Cramer and Fackrell eligible for the death penalty.

The government's penalty phase presentation focused on Cramer's likelihood of being a future danger and the impact of Johns' death on his family. Cramer's case for life included evidence of Cramer's troubled childhood and his antisocial personality disorder. Cramer also attempted to rebut the government's future danger argument with testimony that the BOP could safely house Cramer. The jury returned death verdicts for both Cramer and Fackrell.

On direct appeal, the Fifth Circuit affirmed Cramer's conviction and death sentence. *United States v. Fackrell*, 991 F.3d 589 (5th Cir. 2021). Cramer's Motion for writ of certiorari to the United States Supreme Court was denied on March 23, 2022.[2] *Cramer v. United States*, 142 S. Ct. 1372 (2022).

## IV. JURISDICTION

This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 2255. Cramer is currently in federal custody at USP Terre Haute.

## V. CLAIMS FOR RELIEF

The affidavits and declarations contained in the appendix are incorporated by reference in this motion. The factual basis of each claim is realleged and reincorporated into subsequent ones.

## LEGAL STANDARDS RELATING TO INEFFECTIVE ASSISTANCE OF COUNSEL

Under *Strickland v. Washington*, 466 U.S. 668 (1984), a habeas Movant seeking to establish the ineffective assistance of trial counsel must demonstrate: (1) that counsel's performance fell below "an objective standard of reasonableness," (i.e., deficient performance); and (2) that but for counsel's deficient performance, there is a reasonable probability that the factfinder would have had a reasonable doubt with respect to the defendant's guilt or the appropriate punishment (i.e., prejudice). *Id.* at 688, 695;); *Porter v. McCollum*, 558 U.S. 30, 32 (2009); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005); *Wiggins v. Smith*, 539 U.S. 510, 538 (2003); *Williams v. Taylor*, 529 U.S. 362, 398 (2000).

The American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (hereinafter "*ABA Guidelines*") are guides to determining what professional norms are reasonable. *Wiggins*, 539 U.S. at 522, 524. *See Bobby v. Van Hook*, 558 U.S. 4, 6-17 (2009). (Counsel's representation must be evaluated against the *ABA Guidelines* in effect at the time of trial.) The 2003 ABA Guidelines were in effect at the time of Cramer's trial. Attorneys should also

---

[2] The Motion was timely filed, pursuant to the government's waiver of its rights to raise a statute of limitations defense up to and including the date of this filing (*See* Dkt. 00516250382)

5

ensure, pursuant to the ABA Guidelines, that they receive appropriate training through CLEs. Strategic decisions made in the absence of a complete investigation are reasonable only to the extent that professional norms support the limitations on the investigation. *Wiggins*, 539 U.S. at 528; *Strickland*, 466 U.S. at 690-91.

Cramer is not responsible for his counsel's derelictions. The government is required to provide indigent defendants with counsel, *Gideon v. Wainwright*, 372 U.S. 335, 340 (1963); counsel are required to perform adequately, *Strickland*, 466 U.S. at 693, and the government, not the defendant, bears responsibility for ensuring that adequate counsel is provided, *Johnson v. Zerbst*, 304 U.S. 458, 467-68 (1938).

A Movant need only demonstrate a reasonable probability that, but for counsel's errors, at least one juror would have come to a different result. *Buck v. Davis*, 580 U.S. 100, 137 (2017). For claims related to counsel's ineffectiveness during the sentencing phase of trial, a reasonable probability of a different result is assessed by considering "'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding'—and 'reweighing it against the evidence in aggravation.'" *Porter*, 558 U.S. at 41 (quoting *Williams,* 529 U.S. at 397-98).

Each allegation of ineffective assistance of counsel, standing alone, justifies relief under the standard established in *Strickland*. But *Strickland* also directs courts to consider the errors in totality. *Id.* at 688, 694 (describing the prejudice standard as "but for counsel's unprofessional errors, the result of the proceeding would have been different"); *see also White v. Thaler*, 610 F.3d 890, 906 (5th Cir. 2010). It is when all of counsel's failings are evaluated cumulatively that their full impact becomes clear. And from that vantage point, it is particularly evident that counsel's performance in this case was objectively unreasonable, and that were it not for counsel's ineffective representation, there is a reasonable probability that Christopher Cramer would not have been convicted or would have received a life sentence. *Strickland*, 466 U.S. at 694.

Ineffective assistance of appellate counsel claims are also judged by the *Strickland* standard. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000). A Movant can establish the deficiency of appellate counsel's performance by showing that counsel "fail[ed] to raise or properly brief or argue certain issues on appeal." *Sharp v. Puckett*, 930 F.2d 450, 451 (5th Cir. 1991). Particularly in a capital case, there can be no reasonable strategy for failing to raise a meritorious issue on appeal. *Greer v. Mitchell*, 264 F.3d 663, 679 (6th Cir. 2001) ("[I]n a capital case . . . appellate attorneys must err on the side of inclusion particularly where, as here, there appear to exist a significant number of facts to support the claim."). A habeas Movant establishes prejudice where appellate counsel's errors "undermine[] the result on direct appeal, making the sentence unfair or unreliable." *United States v. Williamson*, 183 F.3d 458, 463 (5th Cir. 1999); *see United States v. Reinhart*, 357 F.3d 521 (5th Cir. 2004) ( habeas relief granted for failure to raise a sentencing error on appeal).

## CLAIM 1: CRAMER RECEIVED INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL DURING THE GUILT PHASE

Cramer's conviction and death sentence were imposed in violation of the Fifth, Sixth, and Eighth Amendments of the Constitution because his counsel performed deficiently, and these errors prejudiced him. Cramer is entitled to a new trial.

### A.      Legal basis

Trial counsel's performance in the guilt phase was prejudicially deficient for several, compelling reasons that are detailed below. But for counsel's deficient performance, there is a reasonable probability that a mistrial would have been declared, that severance should have been revisited, or at least one juror would not have convicted Cramer of capital murder. Separately and cumulatively, these deficiencies in the investigation, the preparation, and presentation of Cramer's defense and challenges to the prosecution's case that are detailed below require that the writ be granted, and Cramer's convictions be vacated. (*See, supra*, § II. Standards relating to IAC.)

7

**B.      Factual basis**

As the Fifth Circuit acknowledged in its opinion affirming Cramer's conviction, "the Government argued that Johns was not responsible for his murder and that Defendants murdered him to maintain their reputations." *United States v. Fackrell,* 991 F.3d 589, 607 (5th Cir. 2021). Indeed, the government's theory throughout the guilt phase repeated time and time again the theme that Johns was a hapless, helpless drug addict, and that Cramer was nothing but a merciless killer. Counsel did little to counteract this portrait of their client. Based on a reading of the sparse closing argument at the end of the guilt phase, the ostensible defense theory centered on negating specific intent for first-degree murder, which would have made Cramer ineligible for the death penalty (*See generally* Dkt. 596 (RT) at 81-100.) Counsel also argued that Johns' bad behavior created a situation which forced Cramer to take violent action against him, but his actions were framed merely as violations of "numerous policies and regulations of SAC." (Dkt. 596 (RT) at 84) And this pitch to the jury was nothing but puffery: the record makes it abundantly clear that counsel did not present evidence to support either argument.

Counsel was prejudicially ineffective in its defense of Cramer, and nearly every instance of error can be connected to counsel's utter failure to conduct an adequate investigation. Counsel gestured at investigating, sending Frank Coffin and Lynn Arceneaux out to interview more than 60 witnesses who could provide information about the guilt phase. But little of the information collected by investigators was followed up with additional interviews, and the defense called no witnesses of its own, despite the useful information they could have provided.

A review of trial counsel's file, the record, and subsequent investigation shows that trial counsel did not have a cohesive theory of defense at any stage in their preparation. It is also apparent that the attorneys did not personally review large swaths of the discovery themselves. Because much of the discovery was subject to protective orders, which counsel ineffectively did not object to, the

8

defense team was forced to review and summarize much of the discovery at the U.S. Attorney's office and were not permitted to make copies of these documents. These documents included the prisoner witnesses' criminal histories and Central BOP files ("C-file"), along with reports by BOP investigators ("SIS" or "SIA") and FBI reports. Any attorney knows that words in reports can be misconstrued or misunderstood and that such documents need to be read more than once so that they can be fully contextualized within the larger investigation; sending an investigator to review documents and rely on one pass at the documents, as was apparently done here, is insufficient to fully digest the evidence available in those documents. What's more, the record at trial makes clear that the attorneys did not closely read the summaries or witness interview memos prepared by the investigators. (Ex. 53). The useful information in those documents was not utilized at trial to impeach government witnesses or to raise available defenses that could have resulted in an acquittal or life sentence. And, to the extent that counsel did not question or call any witnesses because of any existing orders *in limine*, counsel was ineffective for not building the foundation with which to render this evidence admissible. (*See also* Claim 2.)

**1.    Counsel refused to utilize available resources to conduct a competent investigation.**

Capital work is highly specialized and complex. *McFarland v. Scott*, 512 U.S. 849 (1994); *see ABA* Guidelines at 921. Capital defense attorneys are expected to "promptly obtain" any resources or expert guidance needed "to prepare for both phases, including at minimum the assistance of a professional investigator and a mitigation specialist, as well as all professional expertise appropriate to the case." *ABA Guidelines* at 925 and Guideline 10(c).

The Federal Death Penalty Resource Counsel Project ("Project") is a program funded and overseen by the Administrative Office of the U.S. Courts ("AO") since it began in 1992. The function of the Project is to assist trial counsel with "identification of experts, mitigation specialists, and investigators, legal research, drafting pleadings, instructions, and on-site assistance before and during

9

capital trials." (See Ex. 52.) There is no cost to federal defender offices or to CJA attorneys for these services. The Project also responds to inquiries from the courts regarding the defense function in federal capital prosecutions, serves as a liaison to the Department of Justice in capital cases, and responds to Congressional inquiries regarding the death penalty and its administration. The purpose of the Project is to ensure that all capital defense lawyers funded by the CJA Act and their teams have adequate support and resources to provide effective representation at the minimum standard of care in death penalty cases. The Project tracks all federal capital cases and offers its support and assistance to all CJA-funded attorneys assigned to those cases.

On July 20, 2015, trial counsel learned that Project Director Matt Rubenstein and Resource Counsel Judy Clarke had been assigned to assist on the case. (Ex. 65.) Rubenstein and other resource counsel offered their assistance to Pat Black on numerous occasions, and although polite, Black resisted most of these efforts and eventually became hostile to them. (*See*, e.g., Ex. 65; *see also* Claims 2 and 8.)

On April 21, 2016, Rubenstein offered to reinstate his Texas bar license so that he could appear as co-counsel with Black and Barlow; Black expressed interest in having him do this. (Ex. 65.) On August 31, 2016, Rubenstein followed up on the offer, and memorialized a conversation he previously had with Black, who told him that "Judge Crone . . . indicated that she would not permit [Rubenstein] to appear because she believed jurors in EDTX would respond poorly to an out-of-state attorney [Rubenstein] and this would hurt Mr. Cramer." (Ex. 65) Black also told Rubenstein that Judge Crone suggested that she would object because she would not be able to "oversee and control [Rubenstein's] practice in the case." (Ex.65.) This suggests that Black himself felt that Judge Crone was "overseeing and controlling" his practice. It should be noted that Judge Crone herself, in public comments to the Cardone Committee, stated her support for the Project and said, "a resource counsel functions as a valuable resource for the attorneys and judges in this district." (Ex. 20)

Taking Black's assertions at face value, Rubenstein offered to assist, without entering an appearance, "with the investigation and mitigation investigation planning, budgeting, motions and litigation planning, witness preparationbn [sic], 12.2 issues, retaining and working with experts, instructions, etc. I have provided this type of assistance to many federal capital teams . . . [and] given that you have many other administrative obligations, I believe I could provide valuable assistance in these areas." (Ex.65.) Black did not take him up on this offer. While trial counsel did ride the coattails of Fackrell's work with their assigned Resource Counsel Mark Donatelli on some matters, they did not utilize their own Resource Counsel to prepare for the guilt phase. As explained in detail in Claims 2 and 8, the trial team failed to meet with Project attorneys and their jury expert to strategize after daily voir dire; refused to hold regular meetings with team members, including Project staff; and ultimately fired Project Mitigation Specialist Sandy Saberman because she voiced her concerns about counsel's preparation of the case. (Ex. 53.) They finally accepted the Cramer-specific assistance of Resource Counsel Anthony Haughton, but this came on the eve of trial when the team realized it was not fully prepared for its penalty phase presentation. Haughton did not assist in preparing any portion of the guilt phase case. (Ex. 46.)

In addition to unreasonably refusing support that would have lightened the burden of preparing for a capital case, Black, Barlow, and McElroy represented numerous other clients facing serious and complex charges during their representation of Cramer. And Black also had the duty of overseeing the FPD office. They failed in their obligation to limit their caseloads so as to provide effective assistance to Cramer. (*See ABA Guidelines*, Guidelines 6.1 and 10.3)

Trial counsel did not competently investigate the circumstances of the crime or raise available defenses. Had they enlisted the free support of the Project, they would have constructed a coherent theory to defend Cramer in the guilt phase, supported by testimonial and documentary evidence. This likely would have resulted in acquittal, a conviction to a lesser included offense, or, in the event that

Cramer was still convicted of first-degree murder, a coherent guilt-phase presentation would have laid a foundation for a life sentence in the penalty phase. (*See also* Claim 2.)

### 2.    Counsel failed to raise the available defense of duress

In his closing argument for the guilt phase, Cramer's counsel told the jury, "It is undisputed that Mr. Johns violated numerous policies and regulations of SAC. Heroin user, used alcohol, stole property from other SAC members, ran up substantial drug debts. It is undisputed — in fact, all of the government witnesses, or the majority of them, they told you from that witness stand that he had been verbally warned to stop. He did not stop that conduct and activity." (Dkt. 596 (RT) at 84.) This is all he said about the reason Johns was attached to the jury, but there was ample evidence from government documents, government witnesses, and defense witnesses which would have supported a full duress defense.

### a.    Legal basis for raising a duress defense

The elements of an affirmative duress defense are: met where the defendant (1) was under "an unlawful and present, imminent, and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury"; (2) had not "recklessly or negligently placed himself in a situation" where he would likely "be forced to choose the criminal conduct"; (3) had no "reasonable legal alternative to violating the law; a chance both to refuse to do the criminal act and also to avoid the threatened harm"; and (4) could reasonably anticipate a "direct causal relationship. . . between the criminal action taken and the avoidance of the threatened harm." *United States v. Posada-Rios*, 158 F.3d 832, 873 (5th Cir. 1998). The defendant must prove each element by a preponderance of the evidence. *United States v. Willis*, 38 F.3d 170, 179 (5th Cir. 1994). A defendant must present proof of all four elements of the duress defense to establish an issue of duress, and once established, he is entitled to an instruction. *United States v. Estrada-Monzon*, 700 F. App'x 323, 326 (5th Cir. 2017). *United States v. Waller*, 605 F. App'x 333, 337 (5th Cir. 2015.) There is no prohibition in the Fifth Circuit

12

to raising duress as an affirmative defense in a capital murder case. (*See* Fifth Circuit Pattern Jury Instructions, 2015, number 1.38 and comments.)

Evidence of duress is also statutory mitigating factor if the "defendant was under unusual and substantial duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge." 18 U.S.C. 3592(a)(2). And duress can also mitigate the impact of future dangerousness. *See*, *e.g.*, *Graham v. Collins*, 950 F.2d 1009, 1019 (5th Cir. 1992), *aff'd*, 506 U.S. 461, 113 S. Ct. 892, 122 L. Ed. 2d 260 (1993). Here, because the duress was rooted in the facts of the crime, the facts supporting it should have been presented to the jury during the guilt phase.

"Like the defense of necessity, the defense of duress does not negate a defendant's criminal state of mind when the applicable offense requires a defendant to have acted knowingly or willfully; instead, it allows the defendant to 'avoid liability . . . because coercive conditions or necessity negates a conclusion of guilt even though the necessary mens rea was present.'" *Dixon v. United States*, 548 U.S. 1, 7 (2006) (quoting *U.S. v. Bailey*, 444 U.S. 394, 402 (1980).

The defendant has the burden of producing evidence to support the duress defense and to prove it by a preponderance of the evidence. The defendant is not required to provide advance notice of the defense to the government. *Dixon*, 548 U.S. at 12 (". . . Congress has treated the defense of insanity differently from that of duress not only by codifying it but by requiring defendants who intend to rely on an insanity defense to provide advance notice to the Government.) *See* Fed. Rule Crim. Proc. 12.2(a); *Waller*, 605 F. App'x at 336.

### b.      Readily available evidence supporting a duress defense

Cramer faced enormous pressure from all corners of the prison yard to take drastic action against Johns due to the debts that Johns had recklessly incurred. Had counsel fully investigated Johns' debts and fully understood and presented the dynamics of gangs, drugs, debts, and violence in the BOP, they would have been able to show the jury that their client had been under duress for weeks

13

to bring Johns under control and that he had no choice but to act as he did. ███████████

████████████████████████████████████████████████████████

(See Claims 2, 3.)

*Cramer was under "an unlawful and present, imminent, and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury."* Cramer had received multiple, credible threats from other gangs to his own physical safety, and to those of other SAC members, as described more fully below. These threats to his life and safety were imminent because of the environment he was in. (*See* Ex. 102¶ 52.)Prisons are violent places, especially maximum security facilities such as Beaumont. Homicides behind bars often happen when warning signs are ignored, or people are knowingly put in dangerous situations. (*See* Ex. 102.) "There's no excuse for there to be any homicides in a prison," said David Fathi, director of the American Civil Liberties Union National Prison Project. "It's an environment of total surveillance and control." (Ex. 87). And yet, "killings, assaults and other acts of violence are becoming more widespread in the federal Bureau of Prisons (BOP), as the prison population increases and staff-to-prisoner ratios decline." (Ex. 86) Inadequate staffing is part of the problem. In April 2008, Phil Glover, a legislative coordinator with the AFGE (the union which represents BOP staff), testified before Congress about rising levels of violence in the BOP and blamed it on insufficient staffing and resources. According to Glover, the BOP has filled only 87 percent of staffing positions compared to 95 percent during the 1990s. Compounding this staff shortage, BOP facilities are 36 percent over capacity systemwide. (Ex. 86.) The BOP has also recognized the potential for increased violence due to staffing deficiencies. In a March 2008 memo, prison officials estimated that a projected $289 million budget shortfall could force the cutting of guard positions to the point "where safety and security of staff and inmates could be in jeopardy." (Ex. 86).

14

There is another dynamic at work as well. The COs gangs use to maintain order and control in prisons and sometimes take advantage of their authority over prisoners to engage in gang-like behavior themselves. (Ex. 85, 105.)

The problem is more widespread than just statistics can show, however, because the United States generally does a poor job of collecting criminal justice data. Attempts to obtain what data there is through Freedom of Information Act requests can take years, and the documents that are produced are often so heavily redacted that they are useless.[3]

*Cramer did not "recklessly or negligently place himself in a situation" where he would likely "be forced to choose the criminal conduct."* Cramer attempted to resolve the problem Johns had created in multiple ways, including by physically disciplining him and setting him up with a "store" so that he could earn money to pay off his depts. (Ex. 23, 42 at 1234, Ex. 30 at ¶ 9, 11; Ex. 22 at 4-5, 1234; Ex. 64 at 11; Ex. 02 ¶ 51) He had taken every measure he reasonably could have in the circumstances to correct Johns' behavior and avoid retaliation from other inmates against himself, Johns, and the rest of SAC. Although he participated in the gang system, he did not create the prison environment which forced him into joining a gang for his own protection and harming Johns. (Ex. 102)

*Cramer had no "reasonable legal alternative to violating the law; a chance both to refuse to do the criminal act and also to avoid the threatened harm."* ███████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

[3] Undersigned counsel has made over 15 FOIA request; non have been fulfilled as of this filing.

███████████    In fact, the government elicited testimony that would support this aspect of the duress defense. When it called Creech to testify, the government asked him to testify about being beaten by "gang members" as a direct result of being visited by law enforcement and AUSA Craft while at USP Coleman. (Dkt. 594 (RT) at 36-59.) Nevertheless, Johns continued the behavior that was putting other SAC members in danger, effectively backing Cramer into a corner. Cramer was left with no other alternative.

*Cramer could reasonably anticipate a "direct causal relationship . . . between the criminal action taken and the avoidance of the threatened harm."* Cramer's direction from the prison environment all around him was clear: take care of Johns, or you will be killed. (Ex. 102 ¶ 51.) He had no other choice.

### (1)    Government Evidence

███████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████



18

19















        **c.**     **Counsel prejudiced Cramer by not presenting a duress defense during the guilt phase.**

By not presenting the duress defense, Cramer's counsel made a de facto adoption of the government's superficial argument about the motive for the crime, which painted Cramer as a heartless killer. If counsel had presented sufficient evidence to obtain an instruction on duress, then there exists a reasonable probability that at least one juror would have acquitted Cramer of the conduct altogether. And, with or without an instruction, the jury would have had a comprehensive understanding of the crime, and duress as a statutory mitigator under 18 U.S.C. § 3582 would have caused at least one juror to vote for a life sentence. (*See also* Claim 2.)

**3.**     **Counsel failed to raise the available defense of voluntary intoxication.**

Although the government's theory was that Johns was killed over his drug addiction, the idea that SAC was a drug-free gang was easily disproven by evidence known to the government as well as evidence developed in the defense investigation. For example, Carden (Cramer's cellmate) testified that Cramer made alcohol in his cell. (Dkt. 591 at 250-252) and that "80% of the white people" in the BOP use suboxone. (Dkt. 591 at 254.) Indeed, the government itself acknowledges that the failure of the BOP to provide suboxone in prisons causes abuse of that drug as an illicit substance. (Ex. 81.) Crossman observed Cramer drinking (Ex. 30 ¶ 7), and Cramer himself had acknowledged issues with substance abuse. (Exs. 48 and 50.) The government had been told by at least one witness that Cramer had been drinking that morning (Ex. 22.; 647 (RT) at 253-54), and the redacted FBI 302 containing that information confirms that Cramer was seen drinking on surveillance footage.

    Had counsel presented evidence that Cramer was intoxicated when the offense occurred, the jury could have considered whether Cramer had the specific intent to commit 1st-degree murder. *United States v. Molina-Uribe*, 853 F.2d 1193, 1205 (5th Cir. 1988), *overruled on other grounds by United States v. Bachynsky*, 934 F.2d 1349 (5th Cir. 1991). Trial counsel asked the jury to consider Cramer's intent in his closing argument: "I'll submit to you that Mr. Cramer did not deliberately, willfully, and

27

intentionally take the life of Leo Johns. That was not his intent." He could not have had a strategic reason for not developing and presenting this defense.

Had counsel presented and developed this evidence, there is a reasonable likelihood that at least one member of the jury would have voted to convict of second-degree murder. *Strickland,* 466 U.S. at 690-91.

**4. Trial counsel's failure to show that the government blamed Johns for his own death was deficient performance.**

On June 8, 2016, Leo Johns' estate and family filed a federal tort claim pursuant to 28 U.S.C. § 1331 for the wrongful death of Leo Johns. The named defendants were the Warden of USP Beaumont and the guard who had been on duty and subsequently fired after failing to respond to the assault on Johns and his death, Olajuwon Quarles. (*Brianna Johns, et. al. v. Francisco Lara, et. al..* Case No. 1:16CV198 ("*Johns v. Lara*", Dkt. 1.) On October 13, 2016, Defendant/Warden Lara filed a Motion to Dismiss. (*Johns v. Lara,* Dkt. 13.) The suit was dismissed without prejudice and by stipulation of the parties on December 19, 2016. (*Johns v. Lara*, Dkt. 20.) In late 2017, Cramer's counsel successfully moved the court to unseal the record of the case. Within those records were certain declarations and statements made by BOP officials relevant to this claim.

In that Motion, Lara raised the affirmative defense that Johns himself was more than 50% negligent in causing his own death by being in possession of alcohol, in violation of the rules of SAC. (*Johns v. Lara*, Dkt. 13 at 24.) This allegation was supported by a declaration executed by BOP Special Investigative Agent Reshay Childress. (*Johns v. Lara*, Dkt. 13 at Ex. E). The government did not call Childress as a witness at the guilt phase, and counsel raised no objection to the government's motion in limine prohibiting them from remarking on his absence as a witness.

Had they not failed to do one or both of these things, the jury would have had a complete and accurate picture of the circumstances of Johns' death, and at least one juror would have voted to acquit him or, later, vote for a life sentence. (*See also* Claim 2.)

### 5. Trial counsel's failure to show that BOP officials had foreknowledge of the events was deficient performance.

Counsel did not seek to call Childress as a witness to testify about his declaration in the civil suit or any other matter, despite the fact that he had been one of the primary investigators. In fact, as Carden testified, Childress had information about the impending assault and Cramer's involvement in it. (Dkt. 591 (RT) at 157.) In addition, there was evidence that knowledge of the assault was widely known, and the investigation by SIS had been more far-reaching than Carden understood. A staff member by the name of O'Connell, who worked in the laundry, advised SIS that he overheard a conversation about a planned assault; SIS interviewed several inmates about this. (Ex. 21.)

Had they called Childress, or O'Connell, counsel could have elicited testimony that would have damaged the government's case against Cramer. They also could have used both of these witnesses in much the same way they should have used Nylen: as experts regarding matters of prison life, such as how quickly violence can erupt, the impact of owing debts around the yard, the prevalence of tax fraud schemes, drug use in prisons, or the way correctional officers rely on inmates to help maintain order in the facility, all of which would be known to them. (Ex. 43.; *see also* Ex. 102.) Had counsel fully investigated, developed, and presented intoxication defenses, there would have been a foundation for admitting the government's admission and the Childress declaration. If counsel had done all of this, the jury would have understood the BOP's own role in Johns' death, and there is a reasonable likelihood that Cramer would have been acquitted altogether or that at least one juror would have voted for a life sentence. (*See also* Claims 2, 10.)

**6.    Counsel failed to utilize readily available evidence during the guilt phase, which prejudiced Cramer**

Counsel failed to use readily available evidence to impeach government witnesses, undermine government evidence, and challenge the government's theory of liability. This could have been accomplished by making better use of the government's witnesses, and by calling other witnesses they discovered during their own incomplete investigation.

**a.    The government's witnesses**

**(1)    Otis Carden**

Government witness Otis Carden was Cramer's cellmate at the time of the offense and had direct access to Cramer's thoughts on how to handle Johns. At the time of Johns' death, Carden was serving a life sentence for a conviction from the Middle District of Florida. The lead conviction was a methamphetamine trafficking crime and possession of at least 18 firearms and two machine guns by a felon. Because of his prior felony convictions, the government filed a notice under 18 U.S.C. § 851, which resulted in a mandatory life sentence on the trafficking charge; he also received a consecutive sentence of 30 years for the weapons charges. (*United States v. Carden*, 8:08-cr-149-RAL-MAP, Middle District of Florida ("*U.S. v. Carden*"), Dkts. 34, 223.) Yet in exchange for his testimony in this case, he was resentenced to 188 months and released on January 8, 2021. (*U.S. v. Carden*, Dkt. 223.) Incredibly, no one on Cramer's defense team interviewed him or sought to depose him prior to trial. If they had, and if they had properly investigated and prepared for his testimony, they would have been able to impeach and discredit the witness whom both the judge and the jury claimed was one of "the most impactful of the numerous witnesses called in the case." (*U.S. v. Carden*, Dkt. 223.)

Carden was an experienced, savvy, and frequently violent character. Although he was not a gang member, he operated like one and was a self-admitted leader of white inmates at times. (Dkt. 591 (RT) at 209.) After years of violent, drug-related crimes, he was sentenced to life in prison before he turned 30. During his sentencing hearing for the meth trafficking conviction, after hearing evidence

regarding his priors, the judge said, "You sure are calm for — how old are you now?" Carden replied, "27." And the Court continued, "you sure are calm today for a man who faces the rest of his life in a Federal penitentiary." Nonplussed, Carden responded that the only thing left for him to do was start working on his appeals. (Ex. 2.) His conviction became final in 2012. *Carden v. United States*, 568 U.S. 954 (2012). His 2255 was denied in 2012. *Carden v. United States*, 464 F. App'x 839 (11th Cir. 2012). At that point, Carden didn't have any more appeals to press, and he had to look for another way out.

Carden realized that the simmering and dangerous tensions arising in the Beaumont yard from Johns' drug use and widespread debt provided just such an opportunity. In addition to his own testimony supporting this conclusion, other inmates also knew that he encouraged Cramer and Fackrell to take violent action against Johns. (Ex. 17 at 24; Ex. 30 at ¶ 14-17; Ex. 23.)

Carden claimed that when he was first approached by SIS he did not immediately agree to cooperate; he testified that he could not "trust the cops that are asking these questions" because even correctional officers will tell other prisoners about cooperators, which puts the cooperator's life in danger. (Dkt. 592 (RT) at 137-38.) It was not until he was alone with SIA Childress and another staff member that he inquired about moving to a different facility if he agreed to testify. (Dkt. 592 (RT) at 139.) Following his agreement to cooperate, he was placed in the Witness Security Program, which he said was "nice." (Dkt. 591 (RT) at 197.)

At trial, the government relied heavily on Carden to describe for the jury the days and weeks leading up to Johns' death. It was apparent that he was intimately aware of the situation Cramer faced, and that he assisted in ensuring that the offense was committed. He testified that Cramer told him about the plan to kill Wood in the days before the offense. (Dkt. 591 (RT) at 144-45.) He testified that it was "common knowledge" around the prison that Johns was going to be "hit" by his own gang members. (Dkt 591 at 258.) Carden claimed he could not tell Johns about the danger Johns was in because then he (Carden) would be killed. (Dkt 591 at 258-59.) Carden admitted telling SIS that he

31

had told Cramer to "smash" Leo Johns in June 2014, and volunteered to help as an "alternative to killing him." (Dkt. 591 (RT) at 237.) A smash, according to Carden, is when a gang member is beaten out of a gang; once taken out of the gang in this way, there is a "green light" on the ex-member, and you remain vulnerable to being beaten again — or killed — if another gang member can get to you. (Dkt. 591 (RT) at 133.) He communicated messages from Cramer to Fackrell about the problems with Johns. (Dkt. 591 (RT) at 242.) Carden even assisted in ensuring that Johns died by helping procure the knives that were ultimately used to kill Johns. (Dkt. 591 (RT) at 161-162, 207.)

Otis Carden knew that Johns' life was in danger and simply chose to allow the homicide to go forward so that he could benefit by cooperating with law enforcement. And his plan worked: On January 6, 2021, the government filed a Motion for downward departure of his then-life sentence based on his substantial assistance in the Cramer prosecution. (*U.S. v. Carden*, Dkt. 221.)

It was not the first time Carden had testified on behalf of the government for his own benefit. At trial, Carden admitted to testifying in front of a grand jury, in 2006, in the federal district of West Virginia, and that he was not indicted or charged in that case. (Dkt. 591 (RT) at 201.) There is nothing in counsel's files that suggest he knew about Carden's history as a cooperating witness, despite the fact that counsel requested such materials. (See Dkts. 212, 298, 505.) However, there is also no indication in trial counsel's files that the team did any kind of investigation into Carden's criminal or testimonial history. For example, had they interviewed Carden's co-conspirator in his federal criminal case, Terry Gilmore, they would have learned about his willingness to cooperate with the government for his own benefit ahead of trial. (Ex. 8 ¶ 7.) As a result of failing to conduct a reasonable investigation, and because the government did not disclose this information, counsel did not follow up with any questions about the nature of that grand jury testimony. (*See* Claim 10.)

Counsel also missed another easy opportunity to prove that Carden knew Johns was going to be attacked, encouraged it, assisted Cramer and Fackrell in committing it, and did so in order to benefit

32

himself. Carden testified on direct examination that SIS Investigator Childress believed that Cramer might be planning violence because he testified about a "kite" to that effect. The kite had been received several days before Johns was killed. Childress reportedly told Carden that he had put another inmate (Joshua Mason) in the SHU based on this information, saying, "Look, I got a kite that your cellie is going to catch a body over the weekend." (Dkt. 591 (RT) at 157.) Carden, significantly, did not correct Childress, even though he clearly knew who the target was by that time; in fact, he lied about it, saying that "Chris ain't trying to get involved in anything." (Dkt. 591 (RT) at 157.) Counsel did not cross-examine him about the fact that he knew about the crime before it was committed, that he lied to a federal agent about it, and actively helped to conceal it from authorities. All of this could have been conduct charged under 18 U.S.C. §1001, but more importantly, it was clear evidence that Carden allowed Johns to be killed in order to benefit himself; in that, he is as culpable for Johns' death as anyone. Had the jury known this important fact, it would have added to evidence supporting the duress defense, and at least one juror would have voted to acquit Cramer or would have voted for life.

There was no strategic reason for failing to investigate Carden in this way ███████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████ Trial counsel missed Carden's background as a snitch as well as a number of other opportunities to challenge Carden's version of events and undermine his credibility. He did not object to multiple instances of hearsay. For example, Carden testified that "Monk" (Michael Shelton, who did not testify) told him about how he had put handles on the knives used to hurt Johns. This was prejudicial because the government intentionally did not call Shelton, who was charged separately for his role in the offense. (*See, e.g.*, Dkt. 591 (RT) at 161.)

33

Nor did counsel question Carden about his criminal history or his institutional history, which was full of violence. For example, in 2010, Carden and a group of other white prisoners attacked another prisoner reported to be a sex offender. In Carden's words, "[w]e just found out about this guy that morning after breakfast when we were playing cards down under the recreation pavilion." (Ex. 90.) This attack was based on a single rumor, and trial counsel for Cramer could have examined him about how a rumor could turn into a violent brawl very quickly on a prison yard, which would have been a powerful way of showing the jury how volatile a prison yard is. Counsel also could have asked Carden about his attack of Michael Franklin in 2013 at USP Terre Haute, who Carden suspected of being a government cooperator or sex offender, both of which are unacceptable in general population yards in the BOP; he could have testified about what happens to an inmate who does not take violent action against an inmate known to be a cooperator or sex offender. Carden also had "separation" orders (a notation in his BOP file that he cannot be housed near certain inmates for a variety of reasons) from fellow inmates Jason Falin and Carlos Ivan Rosas because Carden asked Rosas to retaliate against Falin on his behalf. (Ex. 22.)

Perhaps most importantly, counsel did not take advantage of the testimony about prison life to press any theory about Cramer being backed into a corner over Johns' bad behavior. This omission was due to counsel's failure to investigate and present evidence of a duress defense. *See supra* part 2. Nevertheless, it should have been evident to trial counsel that since Carden knew about the Johns murder, it is beyond comprehension that he wouldn't also know about why Johns was causing problems. (*See, e.g.* Dkt. 591 (RT) at 203, 225-226, 235 (downplaying Johns' debts); Dkt. 591 (RT) at 203-204; 206, 235-237, 254, 256 (emphasizing drug addiction).) For example, Carden clearly understood the danger of incurring debts in prison when he testified about the inmate who had been incorrectly identified as the target by Childress. Childress told Carden that he had identified Mason as the possible target because, among other things, Childress "got word that he was in debt." (Dkt. 591

(RT) at 156-157.) Counsel's failure to elicit favorable testimony through a government witness, and to challenge the government's core theory about Cramer's character as a cold-blooded killer, was inexcusable, especially when such evidence could and should have been at counsel's fingertips.

Counsel's failure to neutralize Carden was not improved by the brutal and repetitive cross-examination that Fackrell's counsel conducted, which elicited testimony to support Fackrell's narrative about Cramer's leadership and Fackrell's relative lack of involvement, in the offense. This dovetailed with the government's theory that Cramer had killed Johns over the personal affront of Johns' failure to obey Cramer's orders and quit using. (*See, e.g.* Dkt. 591 (RT) at 213, 233-235.) Without having a reasonably competent investigation to rely on, counsel was unable to press Carden on Johns' debts, the problems Johns was causing for fellow SAC members, and the possibility that Johns' failure to pay debts could result in a race riot. Counsel allowed Carden to paint a picture of Cramer as the cold-blooded killer of a hapless drug addict, and to reduce Fackrell's moral, if not actual, culpability. (*See generally* Dkt. 591 (RT) at 102-266; Dkt. 592 (RT) at 136-149.) This is exactly what the government said motivated the crime in its opening statement (Dkt. 591 (RT) at 68) and in its closing ("Leo Johns had been told, 'Don't use any more drugs. Don't use any more alcohol.' . . . And for that crime . . . *Christopher Cramer decided* that Leo Johns had to die." (Dkt. 596 (RT) at 38 (emphasis added).)

And finally, Carden could have served as a prison gang expert if trial counsel had questioned him about his role in the 2013 stand-off with the D.C. Blacks at USP Terre Haute. The standoff developed due to D.C. Blacks' ire over Edgar Branch, an independent white, being on the Terre Haute yard after having killed a D.C. Blacks member in 2007 at USP Pollock.[7] Carden told SIS investigators about the backstory: "I was on the yard with my people (whites). The underlying issue is Branch, the D.C.'s want him off the yard. We tried to talk, but they told us in a disrespectful way he had to go. We

---

[7] Branch killed a D.C. Black member inmate who had just killed Branch's cellmate. After the cellmate was killed in the dayroom, Branch went back to his cell, came out with a shank in each hand, and killed the D.C. Black member. Branch was convicted of second-degree murder. (Ex. 90.)

35

don't like them anyway, so we told them this could be settled on the yard. When we got out there, the D.C.'s didn't want to fight. They tried to strong arm us into checking one of our own in, and we ain't going for it." (Ex. 22.)

Carden had a lot to offer the defense theory in terms of prison life. He testified that "if someone in your car has done any, you know, messed up moves or bad paperwork or whatever, then you have to smash them." (Dkt. 591 (RT) at 105.) And he testified that "[i[t's all of us against all of them. And the politics is what keeps [riots] from happening. That's why you have shot callers and you have people that control their group so that it doesn't come to a riot basically." (Dkt. 591 (RT) at 107.) Trial counsel could have relied on him to testify about the indispensability of organizing into groups — whether in cars or in gangs— for self-protection and order.

36









**(8)    Robert Nylen**

Counsel should have used SIS officer Nylen as his own BOP expert in matters of prison life, such as the impact of owing debts around the yard, ████████████████████████, drug use in prisons, or the way correctional officers rely on inmates to help maintain order in the facility. All of this information would have been known to Nylen. (Ex. 102.)

**b.    Defense witnesses not called**

Counsel did not call a single witness during the guilt phase, despite having sent investigators out to interview more than 60 witnesses, few of whom were followed up by further investigation. All of the witnesses below were either known to defense counsel or would have been discovered had

counsel overseen a competent investigation. Counsel's failure to use these witnesses constitutes deficient performance.



**(3)    Terry Gilmore**

Gilmore was ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████

███        ██████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

███        ████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

42





### (11)    Reshay Childress

Despite his central role in the investigation Childress was not called as a witness by the government, most likely because he had prepared a declaration supporting the government's argument in the Johns civil suit that Johns was responsible for his own death. (*Johns v. Lara*, Dkt. 13 at Ex. E.) The government also filed an unopposed motion in limine prohibiting the defense from remarking on his absence from the government's case-in-chief. Had counsel called him as a witness, they could have elicited testimony supporting a duress defense and the undeveloped theory that the prison had advance warning of the offense.

## C.    Prejudice

All the evidence set forth herein could have been marshaled to present the defense in full, prove the four elements of the defense by a preponderance of the evidence, and obtain an instruction for the jury to consider in the guilt phase deliberations. *Posada-Rios*, 158 F.3d at 87; *Estrada-Monzon*, 700 F. App'x at 326. In the event that this evidence did not convince the jury to acquit Cramer in the guilt phase, he could have continued to develop the duress problem in the penalty phase and used it as a mitigating factor to greater effect. *See* 18 U.S.C. § 3592. Had counsel conducted a reasonable, competent investigation and taken advantage of the free resources offered to them by Resource Counsel, they would have had a coherent and logical defense to present to the jury. It would have enabled them to utilize the government's witnesses to support that defense, through eliciting favorable testimony and impeaching witnesses as described above. Had counsel called the defense witnesses listed above, the jury would have had a better understanding of prison life and the enormous pressure Cramer was under in dealing with the larger problems Johns had created, which went far beyond causing strife between SAC members.

45

 Had counsel done all of this

work, there is a reasonable probability that at least one juror would have voted to acquit Cramer. And,

even if he had still been convicted of first-degree murder, this evidence would have caused at least

one juror to vote for a life sentence in the penalty phase. *Strickland*, 466 U.S. 688.

## CLAIM 2: CRAMER RECEIVED INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL DURING THE PENALTY PHASE

### A.    Counsel ineffectively failed to investigate and present evidence supporting its theories of defense.

Doug Barlow, a longtime capital defense attorney in Texas, spearheaded Cramer's penalty

phase preparation. Barlow and lead counsel Pat Black, who headed up the guilt phase, were familiar

with each other's work: they had previously represented federal death row inmates Shannon Agofsky

and Mark Snarr. (See Claim 5) Black and Barlow were first appointed to the case in 2014.

The defense team's penalty phase strategy focused on three major themes: (1) Cramer's

traumatic past, including the effects of his mother Darla Dillon's troubled history; (2) Cramer's

commitment to the BOP at age 20 and how years of exposure to violence and prison gangs affected

him; and (3) challenging the government's future danger allegations by presenting ADX as an

46

alternative to death row. (Dkt. 646 (RT) at 6-7.) Trial counsel put on seven lay witnesses, two prison experts, and two mental health experts to make their case for life. Unfortunately, trial counsel did not prepare these witnesses. Additionally, counsel failed to effectively investigate and present a wealth of evidence that supported counsel's theory of mitigation. Consequently, Cramer's jury was deprived of a complete understanding of the man they ultimately sentenced to die.



faulty diagnosis, was also typically viewed by juries as aggravating rather than

## 2.     Failure to prepare witnesses

### a.     Family members

Capital Resource Project Counsel Anthony Haughton was assigned to assist the Cramer defense team in 2018, shortly before the trial. (Ex. 46 ¶ 5.) Haughton was new to the Project but had decades of capital experience. (Ex. 46 ¶ 2-4.) He was aware that Cramer's attorneys, though always polite, were usually resistant to offers of assistance from the Project, and as he got to know the team was his experience as well. (Ex. 46 ¶ 5.) Haughton observed about 65-70% of the trial and offered to help in any way he could, but for the most part, he was shut out. (Ex. 46 ¶ 11.)

Haughton educated himself about the case by reviewing the mitigation interviews done by Mayer and Saberman. He knew that the focus of the mitigation case would be Cramer's extraordinary history of trauma and evidence that Cramer did not pose a future danger and could be safely housed at ADX. However, after reading the memos, he was concerned about the lack of thought or preparation that had been put into the penalty phase. (Ex. 46 ¶ 14.) As opposed to the "broad and deep" investigation that is the standard of care in capital cases, the records seemed to only scratch the surface of what Cramer experienced both inside and outside of prison. (Ex. 46 ¶¶ 14-15.) Haughton grew more concerned when he realized that Mayer, with the attorneys' permission, would not be attending the penalty phase but instead going on vacation. (Ex. 46 ¶ 18.) In Haughton's experience, it was incredible that counsel would let the sole mitigation investigator — the one remaining member of the team who was more than surface-level familiarity with Cramer's mitigation story and who had previously met the family witnesses — go on vacation instead of assisting during their client's penalty phase. (Ex. 46 ¶ 18.)

When Haughton realized just how little preparation had been done to prepare Cramer's relatives to testify, Haughton asked Barlow if he could assist. Barlow agreed. (Ex. 46 ¶ 19.) However, Barlow did not set up meetings with the family until the weekend before they were going to testify.

The family flew in Sunday evening, and Barlow told Haughton that they would spend all day Monday prepping the witnesses. Barlow met briefly with the family at the hotel where they were staying for the trial; it appeared to Haughton that Barlow had never met them before. (Ex. 46 ¶ 20.)

On Monday, Barlow told Haughton that he would not be able to prepare the witnesses and asked Haughton to do it on his own. Haughton was stunned and "grave[ly] concerned" about this breach of the most basic duties in capital litigation:

> It is well below the standard of care for the attorney conducting the examination of any critical witness to never meet the witness in person and prepare them directly. This is especially true when the attorney knows that the witness will be discussing sensitive, embarrassing, and painful subjects, which was the case here. Any witness testifying for the defendant in the penalty phase of a capital case can be terribly intimidated by the formality of the courtroom setting, the expected attack by the prosecution, and the pressure of feeling responsible for convincing the jury that their loved one's life is worth saving.

(Ex. 46 ¶ 21.) Haughton did what he could to save the penalty phase presentation. For approximately 15 hours, from 9 a.m. to midnight in a motel room, Haughton individually prepped each family member for their testimony. (Ex. 46 ¶ 26.) As Haughton explains:

> Because it was apparent that there were tranches of mitigation facts that simply had never been developed during the investigation, I was in the untenable position of trying to fill in the blanks as the de facto investigator and to create a cohesive narrative as the de facto attorney, knowing that it would likely not be successful because the trial team had failed to take advantage of the time they had prior to the trial to fully develop and prepare the penalty case.

(Ex. 46 ¶ 26.) Barlow checked in with Haughton once and left a message inquiring how things were going. (Ex. 46 ¶ 27.) When Haughton got a chance to call him back, Barlow said he had missed the window and that Barlow would just "play it be ear" on direct examination the next day. (Ex. 47 ¶ 27)

Predictably, because Barlow was unfamiliar with the family witnesses and everything they had to convey, their testimony was but a shadow of what it could and should have been. According to Haughton, even though he prepared detailed direct examination questions for Barlow to follow, including bullet points of all the topics the witness was prepared to discuss on the stand, Barlow failed

to ask follow up questions to prompt the witness say more. (Ex. 46 ¶ 30.) Barlow's examination of Dillon was particularly abrupt; he cut off his questioning before eliciting much of her most compelling mitigation evidence. (Ex. 46 ¶ 30.) When Haughton questioned Barlow's approach, Barlow said it was because he thought Cramer would not want to hear his mother testify about her trauma. (Ex. 46 ¶ 30.) What Haughton later learned is that Cramer was grateful and humbled that his family came to testify, and he was prepared to hear his mother testify about her traumatic history. (Ex. 46 ¶ 30.) Haughton was not surprised at this glaring misunderstanding between Barlow and Cramer in light of their obviously dysfunctional relationship. (Ex. 46 ¶¶ 9-10) ("Chris's defense team did not engage with him much, and it was clear to me that the attorneys had failed to develop a trusting relationship with their client. Pat and Doug rarely spoke to him in the courtroom. I never saw them sharing anything with him or otherwise demonstrating that they were a team working together in this process that would decide whether Chris lived or died.")

### b.    Barbara Belbot

Dr. Barbara Belbot testified as an expert on prison conditions. Before her work on Cramer's case, she had never consulted for or testified in a criminal case of any kind. When she was retained, trial counsel told her that she would be a mitigation witness for Cramer, but she was never asked to participate in any meetings to discuss mitigation, and the attorneys never discussed Cramer's social or institutional history with her at any length. (Ex. 44r ¶ 6.)

When counsel decided that they wanted Dr. Belbot to interview Cramer in person, she was surprised as she was told her testimony was to focus on her academic research. She also expected Barlow to give her some guidance about what to discuss during the interview, but none came:

> [Counsel] did not give me any direction as to the specific purpose of the visit, the goal of the interview, or what I should expect to learn about Mr. Cramer and his case from the interview that would be relevant to my testimony. . . Therefore, I focused on asking Mr. Cramer very general questions about his disciplinary record while incarcerated and

56

why he joined a prison gang. I did not talk with him about the offense for which he
was being tried.

(Ex. 44, ¶ 8.) At Barlow's direction, Dr. Belbot visited Cramer only once, for about one hour. Cramer

was reluctant to discuss his institutional history, which did not surprise Dr. Belbot, as she knew it

often takes time to build trust with an incarcerated person. It was evident to Dr. Belbot that "Mr.

Cramer had not been told very much about what to expect during my visit and had no idea what the

purpose" of her testimony would be. (Ex. 44 ¶ 8.) In the end, Dr. Belbot believed that visiting with

Cramer did not bring anything useful to her report or testimony because counsel gave her no guidance

about what information she should have gathered and how that would help their case.

Not surprisingly, Dr. Belbot was subjected to a searing cross-examination by the government,

who eviscerated her lack of experience in the BOP, with prison gangs, and with the details of Cramer's

offense and institutional history. Had counsel properly prepared Dr. Belbot, or presented an expert

who *could* explain why Cramer's participation in prison gang culture did not mean he was inevitably a

future danger (*see, e.g.,* Ex. 47 and 102; *see also* Part 3(b), *infra*), it would have significantly strengthened

the defense case for life.

### c.    Mental health experts

The defense's mental health experts for the penalty phase were Dr. Dan Roberts and Dr. John

Fabian. As described in detail in Part B, *infra,* and Claim 3, counsel failed to give them sufficient

information, including about Cramer's multigenerational trauma history and prenatal exposure to

alcohol, "to be able to render a competent mental health diagnosis of Chris." (Ex. 53 ¶ 30.) If they or

another qualified expert had that information, it would have dramatically changed the jury's

understanding of Cramer and his mitigation story. *See* Part B and C and Claim 3.

### 3. What the jury never heard about Cramer's background

#### a. Intergenerational trauma

In her time on the case, Sandy Saberman had developed a trusting relationship with Cramer's mother, Darla Dillon, who had just started to open up about the multigenerational trauma and abuse she and Cramer suffered. The mitigation investigation was by no means complete when Saberman was fired, but trial counsel did not meet with the family again until after the guilt phase had already concluded. As a result, Dillon – the lynchpin witness for the defense's mitigation case – testified about only the most "skeletal" details of her life and the life of the son she begged the jury to save. *Neal v. Puckett*, 286 F.3d 230, 240-41 (5th Cir. 2002).

58





Perhaps the most basic tenet in a capital case is that the jury must be given the tools and mitigating information necessary to make a reasoned, informed, and reliable decision about whether to sentence someone to die. "[E]vidence about the defendant's background and character is relevant" to the sentencing decision "because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse."' *Penry v. Lynaugh*, 492 U.S. 302 (1989) (internal citations omitted). The jurors in Cramer's case were not given the information or the tools they needed to make the kind of reasoned, informed judgment that the constitution demands.

Trial counsel's failure to elicit important mitigating information from witnesses was compounded by the way in which they treated the penalty phase defense exhibits. Counsel prepared huge binders filled with hundreds of pages of social history exhibits that were never discussed in any detail during the testimony of the defense penalty phase witnesses. Although there was some crucial mitigating evidence included in the binders, including information about Cramer's traumatic background and cognitive challenges, counsel simply told the jury to "review all that" during deliberations. (Dkt. 679 (RT) at 211.) Thus, the jury was "given no basis for construing and digesting this information," an approach found ineffective in *Johnson v. Bagley*, 544 F.3d 592 (6th Cir. 2008).

**b.    Cramer's role in SAC**

At trial, the government claimed repeatedly that Cramer was a "general" in SAC and therefore at the top of the gang's military like power structure. As a general, the prosecution argued, Cramer

would continue to wield that power even within the walls of the control unit at ADX. The government sought to portray Cramer as an ambitious, violent gang leader who had worked his way up the SAC hierarchy and enjoyed being a dominant force in prison politics. Therefore, a death sentence was the only way to stop Cramer from being a future danger.

However, as a number of witnesses known to and/or interviewed by the trial team could attest, the reality was quite different.

████████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

█████████████████████████████

███████████████████████████████████

████████████████████████████████

█████████████████████████████████

███████████████████████████████

██████████████████████████████████

█████████████████████████████████

█████████████████████████████████

██████████████████████████████████

███████████████████████████████

██████████████████████████

An expert on white supremacist prison gang culture, like Dr. Pete Simi, could have explained to the jury that the aggression and hyper-masculinity Cramer sometimes displayed stemmed from his "extensive exposure to a series of adverse environmental conditions that began early in his childhood and continued through his adolescence and the 20 years he has spent in prison." (Ex. 47 ¶ 6.) Cramer was vulnerable to seeking the structure of a gang because of his history of trauma, and "[t]he key to [his] long history of misconduct is to understand that his behavior is a *symptom* of environmental and biological adversities, as opposed to an *inherent* psycho-pathological personality disorder." (Ex. 47 ¶

7.) He wasn't born an evil sociopath, as the government wanted the jury to believe. Instead, Cramer spent the vast majority of his life being battered by extreme trauma, and once he was in prison he sought protection and belonging in the only way he felt he could.



Failure to interview and present these "key percipient witness[es] was ineffective." *Jackson v. Calderon*, 211 F.3d 1148, 1160 (9th Cir. 2000). Cramer was prejudiced because their testimony would have undermined the government's future dangerousness argument and helped the jury understand the duress Cramer experienced and the reality of his complicated and emotionally fraught experience at Beaumont.

B.    **Trial counsel's failure to effectively investigate Cramer's social history, coupled with their failure to retain qualified experts to evaluate Cramer's cognitive dysfunction, led Cramer to be misdiagnosed with antisocial personality disorder (APD).**

1.    **APD – what the jury heard**

During the defense case in mitigation, the jury presented the testimony of Dr. Dan Roberts, a clinical psychologist who diagnosed Cramer with antisocial personality disorder (APD). (Dkt. 647 (RT) at 24-100.) As Dr. Roberts testified, APD is "a pervasive personality problem which is characterized by an attitude of disregard for other people and defined by behavior, negative behavior, such as stealing, fighting, taking advantage of people, things like that." (Dkt. 647 (RT) at 38.) Dr. Roberts explained that although APD occurs in only 3% or so of the total population, "[t]he vast majority of the people in all prisons" have been diagnosed with APD. (Dkt. 647 (RT) at 39, 57.) When defense counsel Doug Barlow asked, "And is that likely [] what lands them in prison, is because they exhibit that kind of behavior in the free world?" Dr. Roberts agreed: "Right. Antisocial behavior is against the law, most of it." (Dkt. 647 (RT) at 39.) According to Dr. Roberts, Cramer met the qualifications for APD based on: failure to conform to social norms with respect to lawful behaviors; signs of impulsivity and failure to plan ahead; reckless disregard for the safety of self or others; lack of remorse for his criminal conduct; and evidence of conduct disorder[8], based on Cramer's self-reporting that he committed crimes before the age of 15. (Dkt. 647 (RT) at 52-56.) Dr. Roberts testified that certain things Cramer had experienced in his life, such as "child abuse, neglect, [and] being exposed to criminal activity at home by [his] parents," are factors associated with APD. Additionally, Dr. Roberts explained, "[l]earning disorders and ADHD are often seen together," and people with those diagnoses "are more likely to have trouble in school and subsequently more likely to drop out of school [and]

---

[8] Conduct Disorder is a DSM-5 diagnosis typically assigned to individuals under age 18, who habitually violate the rights of others, and will not conform their behavior to the law or social norms appropriate for their age. (Ex. 67)

64

more likely to have mental health problems, sometimes depression, anxiety, things like that that can contribute to getting into trouble later on." (Dkt. 647 (RT) at 40.) Dr. Roberts did not discuss in any detail about how Cramer's severe trauma history impacted his APD diagnosis except to say that Cramer likely experienced a "lack of attachment" that inhibited his ability to get close to people and "affected" his "perception of reality." (Dkt. 647 at 40-42.)

Not surprisingly, the government capitalized on Dr. Roberts' testimony about APD. Using a chart, the prosecutor led Dr. Roberts through the APD diagnostic criteria and the disorder's most harmful, aggravating traits. Along the way, the government repeatedly (and incorrectly) equated persons with APD as "sociopaths" and "psychopaths." (Dkt. 647 (RT) at 57, 96, 97, 99.) He got Dr. Roberts to agree that people with APD, like Cramer, "consistently show[] no regard for right and wrong," "ignore[] the rights and feelings of others," "tend to antagonize, manipulate, or treat others harshly with callous indifference," and "show no guilt or remorse for their behavior." (Dkt. 647 (RT) at 96.) Dr. Roberts also agreed that people like Cramer "may lie, behave violently or impulsively," "violate the law" and "typically can't fulfill responsibilities related to family, work, or school." (Dkt. 647 (RT) at 97.) In closing, the government challenged the idea of APD as mitigating (Dkt. 679 (RT) at 264.) The last words the jury heard from the government before deliberating whether to sentence Cramer to die highlighted elements of APD that Cramer's own expert testified to on cross:

> These two men have led a life that is characterized by serial and profligate violence. They have worked hard almost from adolescence to be where they are today. They have worked assiduously to earn for themselves the death penalty, and that they have done.

(Dkt. 679 (RT) at 268.)

**2.     Had counsel done an effective mitigation investigation and retained a qualified expert to evaluate their client, they would have realized that Cramer does not have APD.**

█████████████████████████████████████████████████

█████████████████████████████████████████████████

65

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

*No reliable evidence of conduct disorder.* A finding of conduct disorder is required for diagnosing APD. (Ex. 67.) In his report, Dr. Roberts does not make any of the detailed findings the DSM-5 requires for a conduct disorder diagnosis. Instead, he makes the unsupported claim that even though Cramer "was not arrested as a juvenile, his behavior during that period would have been classified as representing a conduct disorder had he been evaluated during his middle teen years." (Dkt. 676-12 at 4.) Such conclusory allegations are insufficient under the DSM-5. (Ex. 67).

Indeed, one of the government's own experts, BOP psychologist Dr. Shara Johnson, specifically *eliminated* APD from her consideration because there was no reliable evidence to support a finding of conduct disorder. (Dkt. 652 (RT) at 34; Ex. 49 at 44.) According to Dr. Johnson, "Inmate Cramer does not report *and records do not evidence* the onset of clinically significant conduct problems prior to age 15 years…rather, his criminal history, gang activity, and extreme violence did not begin until adulthood." (Ex. 49 at 44; *see also* Ex. 49 at 45 (opinion of post-conviction expert Dr. Natalie Novick Brown that "APD is ruled out because there is no reliable evidence of a conduct disorder prior to or following Mr. Cramer's 15th birthday…"). Since the government's own expert didn't diagnose Cramer with APD, it relied on *Dr. Roberts'* diagnosis of APD to argue throughout the penalty phase that Cramer was a "psychopath" and "sociopath" who was always going to be a future danger.

*The impact of Cramer's history of complex trauma and evidence of brain damage.* When personality changes emerge and persist after a person has been exposed to extreme and/or

66

chronic stress, the DSM-5 requires that an alternative diagnosis of PTSD be considered before diagnosing APD.

In this case, there is no question that Cramer has experienced a lifetime of trauma. This trauma was recognized by trial defense expert Dr. Fabian. He did not specifically find that Cramer has APD, though he acknowledged that Cramer exhibited antisocial behaviors or tendencies. (Dkt. 652 (RT) at 34; Dkt. 676-15 at 34.) As the DSM requires, Dr. Fabian explained that Cramer's extraordinary history of trauma and his high ACES score were significant contributing factors to his antisocial behavior, which occurred mostly after he entered the dangerous BOP where "antisocial" behavior is often adaptive behavior used for protection. In contrast, Dr. Roberts completely failed to account for Cramer's complex trauma in his report or his testimony. Similarly, there was evidence in trial counsel's files even before Dr. Roberts' evaluation that Cramer suffered from some kind of brain dysfunction.

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

████████████████████████████████████████ Therefore, counsel was on notice that Dr. Roberts' findings were deeply flawed. Counsel was prejudicially ineffective for allowing their defense expert to testify that Cramer had APD without establishing that he meets the criteria.

> **3.    Cramer was prejudiced by counsel's investigative failures and their decision to present a faulty APD diagnosis.**

APD is often misdiagnosed, deeply controversial in scientific and legal circles, and nearly always prejudicial to the person receiving the diagnosis. Wayland, K., and O'Brien, S. (2013) *Deconstructing Antisocial Personality Disorder and Psychopathy: A Guidelines-Based Approach to Prejudicial Psychiatric Labels*, Hofstra Law Review: Vol. 42: 2, 6 at 521 (hereinafter "*Deconstructing APD*"); *see also* Blume, J., and Voisin, D. (2000) *Avoiding or Challenging a Diagnosis of Antisocial Personality Disorder*,

Champion, 24 Apr. 69 at 2 (hereinafter "*Avoiding APD*"). Long before Cramer's trial, prevailing professional norms in capital defense cautioned against relying on an APD diagnosis in the penalty phase because, "[i]n addition to helping the prosecution establish aggravating, dehumanizing themes, presenting evidence about [APD] and psychopathy can undermine the defense mitigation case in multiple ways." *See, e.g., Deconstructing APD* at 527-28; *Avoiding APD* at 7-8. For example, an APD diagnosis often leads to jurors discounting self-reported and observed symptoms of mental illness or cognitive dysfunction as malingering because antisocial persons can "lie easily." *Deconstructing APD* at 528. Additionally, because many jurisdictions exclude APD from the statutory definition of "mental disease or defect," the diagnosis is used to "exclude the possibility of legally cognizable mental impairment," thereby "significantly harm[ing] [a capital defendant's] chances for survival." *Id.* at 529 & n. 65 (citing capital cases where APD was used to negate mitigating evidence). Therefore, "[b]ecause prosecutors easily turn the defense's [APD] evidence against the defendant, *no competent capital defense attorney would ever pursue a diagnosis of [APD] or label his client a psychopath in mitigation of punishment. . . .* If left unchallenged in a capital case, [APD] and related constructs are quite literally the 'kiss of death.'" *Id.* at 530 (emphasis added)(footnote and citations omitted).

"Defense attorneys . . . are not obligated to shop for the best experts who will testify in the most advantageous way possible." *Johnson v. Bagley*, 544 F.3d 592, 605 (6th Cir. 2008). "But it is unreasonable, after an incomplete investigation, to put an expert on the stand who will directly contradict the sole defense theory and render worthless other helpful testimony." *Id.* That is exactly what the defense did by presenting Dr. Roberts and his testimony about APD. No other mental health diagnosis is as "inherently aggravating" to a defendant's case for life. *See, e.g.*, *Sanborn v. Parker*, 629 F.3d 554, 572 (6th Cir. 2011) (referring to the defense expert's diagnosis of APD as "perhaps even more damning" than the findings of the state's expert); *Reed v. Sec'y, Dep't of Corr.*, 593 F.3d 1217, 1248 (11th Cir. 2010) (evidence of APD is "not good mitigation"). This is especially true when, as here, the

68

government points out in closing that the defense expert's testimony supports the government's allegation that the defendant is a future danger. In fact, Dr. Roberts' diagnosis was quite a boon to the government since BOP psychologist Shara Johnson *excluded* APD as a diagnosis for Cramer due to no evidence of conduct disorder. (Ex. 49 at 13; Dkt. 652 (RT) at 34.) Although Dr. Fabian was more cautious in his discussion of APD, Dr. Roberts' flawed diagnosis remained. As a result, there was only so much Dr. Fabian could do to try and explain how Cramer's other significant mitigation (extreme trauma, learning disability, periodic depression, and likely ADHD) should lead the jury to weigh in favor of life rather than death. Indeed, while jurors credited some of Cramer's mitigation evidence, it is notable that not a single juror gave any mitigating weight to the factors relating to APD. (Dkt. 666 at 8.) And as the Fifth Circuit has held, "counsel can be prejudicially ineffective even if some of the available mitigation evidence is presented and even if there is psychiatric testimony." *Walbey v. Quarterman*, 309 F. Appx. 795, 802 (5th Cir. 2009).

Had counsel followed clear evidence supporting a diagnosis of FASD, the damage to the defense from the government's repeated references to antisocial behavior would have been mitigated. *Cf. Rogers v. Dzurenda*, 25 F.4th 1171, 1193 (9th Cir. 2022) (granting relief where an unpresented schizophrenia diagnosis would have "preempted any diagnosis of [APD]."). If counsel had adequately investigated and prepared before submitting Cramer for a mental health examination with a qualified expert. (*See* Ex. 53 ¶ 30), they would have uncovered persuasive evidence of cognitive disability and complex trauma that would have eliminated APD from consideration. *See Rompilla*, 545 U.S. at 390-91 (granting habeas relief where post-conviction counsel uncovered mitigating evidence (including FASD and chronic trauma) so compelling that virtually no weight was given to the prior APD diagnoses). Counsel's decision to hire an unqualified expert to present a misdiagnosis of APD was prejudicially ineffective, and a new sentencing phase is warranted. *See also* Claims 3 and 4.

**C.      Counsel failed to present readily available evidence and obtain a jury instruction on the statutory mitigator of duress.**

Duress can be raised as a mitigating factor if the "defendant was under unusual and substantial duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge." 18 U.S.C. § 3592(a)(2). Duress can also mitigate the impact of future dangerousness. *See, e.g., Graham*, 950 F.2d at 1019 (5th Cir. 1992). In Cramer's case, counsel failed to investigate, prepare, and present a wealth of available evidence establishing that ███████████████████████████████████

██████████████████████████████████████████████████████████

**1.      Cramer's duress: what the jury never heard**

In Claim 1 (B) (2), *Supra*, Cramer asserts that counsel could and should have raised the defense of duress, both as an affirmative defense at the guilt phase and in preparation for its use as a statutory mitigator in the penalty phase. *See also* 18 U.S.C. § 3592(a)(8). Cramer summarizes the relevant facts here for ease of reference.

The only explanation trial counsel provided for the Johns murder was that Johns "violated numerous policies and regulations of SAC. Heroin user, used alcohol, stole property from other SAC members, ran up substantial drug debts. . . . [T]he majority of [the government witnesses] told you from that witness stand that he had been verbally warned to stop. He did not stop that conduct and activity." (Dkt. 596 (RT) at 84.) The government picked up that theme and ran with it during penalty phase cross-examination and argument, claiming that Johns was a hapless drug addict who just wanted to leave the gang life behind, but because he "disrespected" his leader by breaking SAC rules, he was brutally murdered. (Dkts. 591 (RT) at 69-70; 647 (RT) at 250; 651 (RT) at 254.)

It is true, as trial counsel and the government alleged, that Johns was a drug addict who ran up debts inside the prison. But what the jury didn't hear about is the extent of Johns' debts, the other schemes he was involved with, and the pressure Cramer was under from other gangs to stop these problems before things got much, much worse. ████████████████████████████

70

---

[9] There was also evidence in the government's discovery about Johns owing money to other gangs and Chris being confronted about the problem. (*See* Ex. 64 at 11 (statement of Elizabeth Johns: "At some point recently, Leo Johns had apparently gotten in debt to a Spanish prison gang, possibly called the 'Nortangos' (phonetic) over his heroin use. The Nortangos had complained to 'Chris' about the drug debt.").)

71

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

The jury heard none of this evidence, despite counsel having this information at their fingertips. Investigator Frank Coffin interviewed several inmates who provided information ████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ Whether from

sheer neglect or because they failed to read the investigative memos (Ex. 53, ¶ 21), counsel was deficient in not presenting this important mitigating factor for Cramer.

Having failed to explain to the jury that Cramer's involvement in the crime was due to overwhelming pressure and threats of potentially lethal violence, trial counsel, not surprisingly, also failed to engage or present an expert on their client's susceptibility to duress. ██████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████ Instead, counsel made things worse by arguing that Cramer had antisocial personality disorder, a highly aggravating and, in Cramer's case, incorrect diagnosis that increased the likelihood that the jury would find Cramer killed Johns out of ego rather than fear.

There could have been no strategic reason for counsel's failure to pursue and use the above-discussed evidence of duress, especially where it supported the trial team's main goal in penalty phase: negating the government's future danger case. *See* Part B, *supra*.

### 2. Counsel's failure to present the duress statutory mitigator was prejudicial

Trial counsel knew that countering the government's future dangerousness case would be crucial to Cramer's chances of avoiding a death sentence. Yet having failed to present Cramer's only viable defense, duress, during the guilt/innocence phase of the trial, counsel compounded the error by failing to present duress evidence at sentencing. Instead of alleging the statutory mitigator of duress, defense counsel alleged a variety of non-statutory mitigating factors relating to the impact of Johns' choices. (Dkt. 666 at 14.) Even without duress evidence, jurors were remarkably receptive to the idea that Cramer found himself forced to respond to Johns' actions, with some jurors endorsing the following non-statutory mitigators:

- "Inmate Leo Johns was disrespectful to Christopher Cramer in violation of gang rules. Number of inmates who so find – 5."

- "Inmate Leo Johns provoked the offense on June 9, 2014, by referring to SAC as ("Fuck them Dudes.) Number of inmates who so find – 7."

- "Gang rules required Christopher Cramer to take action against inmate Leo Johns. Number of jurors who so find – 10."

- "Christopher Cramer had to act against Inmate Leo Johns to avoid placing himself in danger. Number of jurors who so find – 6."

(Dkt. 666 at 14.) The facts described herein "would have added to and developed the skeletal evidence" of duress that counsel presented in mitigation before the jury. *Neal v. Puckett*, 286 F.3d 230, 240-41 (5th Cir. 2002). Considering the jurors' receptivity to the pressure Cramer faced, there is a reasonable probability that "the undiscovered mitigating evidence, taken as a whole, might well have influenced the jury's appraisal of [Cramer's] culpability" and tipped the scales toward life. *Rompilla*, 545 U.S. at 393 (cleaned up).

### D.    Counsel failed to effectively challenge the government's case that Cramer posed a future danger.

In addition to counsel's failure to present a complete picture of Cramer's social history and mental health, which would have negated the government's case in aggravation (*see supra* part A and B; *infra* Claim 3), counsel failed to effectively challenge the government's use of prior convictions and acquitted conduct as evidence of future danger.

### 1.    Counsel was ineffective for failing to object to the prosecution's use of acquitted conduct as future danger evidence.

To establish Cramer's likelihood of being a future danger the government introduced evidence of his prior convictions, two of which occurred while he was in prison.[10] (Dkts. 598 (RT) at 23-24; 603 (RT) at 24-28.) One of those cases involved a 2012 brawl at USP McCreary. Cramer was charged with three counts of assault on inmate James Cosgrove and one count of possession of a weapon.

---

[10] In Claim 12, Cramer challenges the use of his 924(c) conviction as a statutory aggravator.

74

Cramer was convicted of the weapon charge, but the jury found that Cramer acted in self-defense and acquitted him of the more serious assault charges. (Dkt. 603 (RT) at 227-56; *See also United States v. Cramer*, 6:09-cr-00064-GFVT, ECF No. 50 (E.D.KY. Apr. 8, 2010).

Nevertheless, the government used this acquitted conduct as evidence of Cramer's future danger. The jurors heard extensive testimony about the 40 stab wounds that Cosgrove received, how the guard who watched the incident on a security video believed that Cramer's actions were unprovoked, and how immediate steps were necessary to save Cosgrove's life or he "would have been USP McCreary's first homicide." The prosecutor told the jurors they would hear evidence that after the Johns incident, Cramer wrote a letter saying that "[he] and four others came up with a big-ass story that made him look like the bad guy and it worked and got me off," thereby implying that Cramer also "came up with a big-ass story" in the McCreary case and that his acquittal was unjustified. (Dkt. 603 (RT) at 226, 234-37, 239-41.) The government's prejudicial and improper arguments continued in summation, where the jurors were told that the McCreary incident was one in a string of stabbings committed by Cramer because of "prison politics," first one stabbing and less than a year later, "he was *convicted* of a stabbing" in the McCreary case. (Dkt. 679 (RT) at 166 (emphasis added).) Then, in rebuttal summation, the prosecutor argued, "As it pertains to Mr. Cramer, there is at least a hundred reasons that the death penalty is justified . . . The first 65 are the 65 holes that he and Ricky Fackrell put in Leo Johns' body. *So, what are the rest of those hundred reasons? Well, let's count up the stab wounds that you saw on Scotty Justice and James Cosgrove. Two or three dozen there.*" (Dkt. 679 (RT) at 259 (emphasis added).)

Counsel did not object to the government's use of the McCreary acquittal or the prosecutor's improper reference to it as a "conviction" in penalty phase closing. As a result, Cramer's death sentence is unreliable because it is based, in part, on acquitted conduct. A capital sentencing jury's reliance on acquitted conduct to impose a death sentence violates double jeopardy. *See Delap v. Dugger*,

890 F.2d 285, 317 (11th Cir. 1989), a*brogated on other grounds by Floyd v. Secretary, Florida Dept. of Corrections*, 638 Fed. Appx. 909 (11th Cir. 2016) (holding that in a capital case, prior acquitted conduct cannot be used as an aggravating factor). These protections are present to protect "a man who has been acquitted from having to 'run the gantlet' a second time." *Ashe v. Swenson*, 397 U.S. 436, 446 (1970). Allowing the government to rest its arguments for a death sentence on acquitted conduct undermines the critical importance of reliability in capital cases. The Supreme Court has explained that reliability is both acutely necessary in capital sentencing proceedings and one of the principal concerns underlying the Double Jeopardy Clause. *Monge v. California*, 524 U.S. 721, 731-32 (1998). Reliability is impaired when the prosecution pursues death based on alleged conduct that a jury has previously rejected.

Here, the jurors may well have believed that Cramer "got a break" once by his acquittal in the McCreary case and that he was therefore undeserving of mercy. The prosecution's argument likely caused them to give more weight to the acquitted conduct and sentence Cramer to death on that basis. Further, the use of such evidence runs afoul of due process and fundamental fairness principles. *Wingate v. Wainwright*, 464 F.2d 209, 215 (5th Cir. 1972) ("fundamentally unfair and totally incongruous with our basic concepts of justice to permit the sovereign to offer proof that a defendant committed a specific crime which a jury of that sovereign has concluded he did not commit."). And even if this court determines that the use of acquitted conduct does not violate double jeopardy, defense counsel should have objected to its use by the government and requested that it be excluded as more prejudicial than probative. No reasonable counsel would have allowed such damaging evidence to go unimpeded to the jury.

**2.      Counsel was ineffective for not challenging the government's use of Cramer's Victorville conviction.**

In support of the prior violent conviction statutory aggravator, the government presented lengthy testimony about Cramer's 2008 conviction for stabbing Scotty Justice over 40 times at USP Victorville. Justice survived the attack. Cramer was sentenced to 20 years' imprisonment, to be served

76

consecutively to his bank robbery sentence. (Dkt. 603 (RT) at 180-212.)  In the penalty phase, the government returned to the Justice case as support for its claim that Cramer's prior convictions, adherence to "prison politics," and "violent actions [that] continued while he was in prison," all showed that he was a future danger. (Dkt. 679 (RT) at 161.) The prosecutor played for the jurors a video of the Justice stabbing, asked them to count the number of times Cramer stabbed Justice, and told them this was emblematic of who Cramer was. (Dkt. 679 (RT) at 162-64.) The government's presentation of the Victorville case left the jury believing that Cramer was a heartless animal who was wrapped up in ego-driven prison politics and willing to protect his reputation in that political system at all costs. ███████████████████████████████████████████████████

███████████████████████████████████████████████

      ███████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████

There was no strategic reason for counsel to fail to call ████ as a witness to counter the government's reliance on the Victorville incident. A key part of the defense presentation at penalty phase was to demonstrate that Cramer was not a future danger. In support of that goal, counsel

presented as a mitigating factor the fact that the BOP was its own unique, violent world where inmates are expected (by other inmates and by staff) to settle disputes among themselves. (Dkt. 666 at 13 (mitigating factors 101-102); Ex. 43.) ███████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ especially when his testimony dovetailed with the defense theory of mitigation. (c.f. Ex. 102)

3.    **Counsel was ineffective for failing to prepare the defense prison expert to counter the government's claim that ADX could not safely house Cramer.**

To counter the government's aggravating allegation that Cramer would threaten the lives and safety of others if not executed, the defense relied mainly on testimony from former BOP associate Warden Roy Timothy Gravette. Gravette was well-versed in prison gang culture, inmate adaptation to prison life, and prison administration, including classification. Gravette opined that Cramer killed Johns because the rules of SAC and prison gang culture in general required him to respond. (Dkt. 647 (RT) at 214-19.) While Gravette did not condone what happened to Johns, it was to be expected because of the way Johns "disrespected" his "general." (Dkt. 647 (RT) at 216-18.) Gravette explained that just like Cramer "has to abide by and obey all orders from his superiors," Johns was expected to do the same. (Dkt. 647 (RT) at 218.)

Gravette also testified that if Cramer received a sentence of life without parole, his case would be reviewed by the most conservative officials in BOP, such that he was exceedingly likely to remain in the ADX control unit (its most restrictive unit) until he was old and gray. According to Gravette, Cramer did not pose a future danger because the BOP could safely manage him at ADX just as it had done in the year before trial. (Dkt. 647 (RT) at 183, 186-87.)

On cross-examination, the prosecutor sought to cast doubt on Gravette's conclusions by questioning him about the violent behaviors of other inmates. (Dkt. 647 (RT) at 234-35, 11207-08.

78

Both Gravette and the government's expert witness, David Berkebile, ultimately agreed that these assaults were the direct result of institutional failures. (Dkt. 647 (RT) at 270-72.) The prosecutor also emphasized Cramer's role as "general" on the yard, and challenged the idea that Cramer had superiors that he needed to answer to or any other pressures that would have led him to murder Johns. (Dkt. 647 (RT) at 262-64.) These themes – that Cramer would always be a future danger because of his role as a general in SAC and his adherence to prison politics; and that officials were powerless to prevent Cramer from being released from ADX – were prominent in the government's closing arguments. The prosecutor told the jurors that "[t]here is no magic to ADX," and whether Cramer was in ADX or back in general population, Cramer would take the "opportunit[y]" to engage in misconduct because he was "immersed prison politics" and gang rules. (Dkt. 679 (RT) at 189.)

However, Gravette never knew about the extent of Johns' harmful conduct, the fact that Cramer was not actually a general in SAC, and the evidence that Cramer killed Johns out of imminent fear of retaliation against him and SAC from others on the yard. (Ex. 102 ¶¶ 41-53.) If counsel had adequately investigated and prepared Gravette for his testimony, he would have been able to provide testimony that directly undermined the government's future danger aggravating evidence. ■

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

As explained above in Part C.2, jurors were receptive to evidence that Cramer was forced to respond to Johns' actions, with some jurors endorsing mitigators related to these pressures. (Dkt. 666 at 14.) If Gravette had been properly prepared by trial counsel, his testimony "would have added to and developed the skeletal evidence" of duress that counsel presented in mitigation before the jury. *Neal*, 286 F.3d at 240-41 (5th Cir. 2002). Considering the jurors' openness toward these non-statutory mitigators, there is a reasonable probability that "the undiscovered mitigating evidence, taken as a whole, might well have influenced the jury's appraisal of [Cramer's] culpability" and tipped the scales toward life. *Rompilla*, 545 U.S. at 393 (cleaned up).

### E.    Counsel failed to object to repeated and prejudicial instances of trial court error and prosecutorial misconduct.

#### 1.    Failure to effectively object to the testimony of government mental health expert Dr. Jill Hayes

The Fifth Amendment limits government mental health examinations and testimony to those issues on which the defendant presents expert evidence at trial. *See Buchanan v. Kentucky*, 483 U.S. 402, 423-24 (1987) (permitting government expert testimony on mental status to rebut defendant's expert testimony); *Estelle v. Smith*, 451 U.S. 454, 468 (1981) (precluding testimony on future dangerousness,

when defendant consented only to competency evaluation); *see also* FRCP Rule 12.2(c)(4). The Supreme Court, in *Kansas v. Cheever*, 571 U.S. 87 (2013), made explicit that this principle draws from and parallels the law governing cross-examination of a testifying defendant, which limits questioning to those topics addressed in direct examination. *See id.* at 94. When the defendant constructively testifies—by "proxy," *Cheever*, 571 U.S. at 94—by granting a diagnostic interview to his own expert about which the expert then testifies, the government is entitled only to similar access and testimony. *See Smith*, 451 U.S. at 468-469; *Battie v. Estelle*, 655 F.2d 692, 702 & n.22 (5th Cir. 1981).

Trial counsel was well aware of Cramer's rights during government expert examinations and the limitations on government expert testimony. Therefore, prior to trial, defense counsel and the government agreed, in writing, to a request that the district court "prohibit the government rebuttal expert from asking Cramer any questions about the offense of conviction in this case." (Dkt. 575 at 2.) This agreement was based in part on trial counsel's representation that Cramer's experts had not asked him anything about the offense. (Dkt. 589.) Based on that representation, the district court ordered that the government's expert was "prohibited" from asking Cramer anything about the crime, and the government agreed to limit its mental health sentencing presentation to "only what is necessary to directly rebut Mr. Cramer's mental health defense." (Dkt. 589.)

As defense counsel had promised pretrial, neither Dr. Roberts nor Dr. Fabian asked Cramer anything about his involvement in the Johns homicide. In other words, the defense offered no statement from Cramer by proxy through his mental health experts that would permit the government's rebuttal expert, Dr. Jill Hayes, to ask Cramer directly or indirectly about the crime. Nor was there any legitimate reason for Dr. Hayes to discuss Cramer's alleged lack of remorse. But the government did not limit Dr. Hayes's questioning to rebutting the defense expert's testimony. Contrary to its pretrial promise and the court's order that its expert would not ask about the crimes

charged, the government elicited prohibited testimony from Dr. Hayes about Cramer's reaction to the Johns murder:

> Q. Did you ask him any questions about whether or not he ever felt any guilt or ever felt sorry **for any of the crimes** that he committed?
>
> A. Yes, I did.
>
> Q. And do you remember specifically what question you asked or if it was more than one?
>
> A. No. I asked him, "Have you ever done anything that made you feel guilty or sorry for what you've done?"
>
> Q. And when you asked him that question, what did he say?
>
> A. "No."

(Dkt. 652 (RT) at 145-46.) The government then highlighted this testimony as the climax of its penalty phase closing statement, arguing Cramer's lack of remorse as the key reason for finding that Cramer was a future danger and should be sentenced to death:

> Remember again what Chris Cramer said to Dr. Jill Hayes. She asked, "Have you ever done anything that made you feel guilty or sorry for what you have done?" "No." He doesn't feel guilty. He doesn't feel sorry about killing Leo Johns. He doesn't feel guilty or sorry about any of the other criminal acts that he engaged in.

(Dkt. 679 (RT) at 205; *see also* at 169 (prosecutor referencing Cramer's lack of remorse during penalty phase opening statement.)

Counsel failed to object to either Dr. Hayes' testimony or the government's argument; this failure was deficient performance. There was no strategic or justifiable reason for trial counsel to stand idly by while the prosecutor elicited such harmful testimony. This is doubly true when testimony and argument about Cramer's feelings about the crime, in addition to violating Cramer's rights under the Fifth and Sixth Amendments and FRCP Rule 12.2, was in direct contravention of a district court order *that the defense requested*.

The government committed misconduct by eliciting Dr. Hayes' statement in the first place, and then capitalized on that misconduct by highlighting the statement during argument to portray Cramer as a remorseless killer who will always be a future danger. Hayes' testimony of Cramer's lack

82

of remorse was highly prejudicial. *See Johnson v. Mississippi,* 486 U.S. 578, 590 & n.8 (1988) (improper reliance on aggravating evidence of prior conviction was not harmless, "because the district attorney argued this particular aggravating circumstance as a reason to impose the death penalty"); *see also Jennings v. McDonough*, 490 F.3d 1230, 1250 & n.15 (11th Cir. 2007). Empirical studies of capital jurors consistently show that their perceptions of whether the defendant bears remorse often determine their votes. *See Riggins v. Nevada*, 504 U.S. 127, 144 (1992) (Kennedy, J., concurring) ("In a capital sentencing proceeding, assessments of . . . remorse may carry great weight and, perhaps, be determinative of whether the offender lives or dies.") (internal citations omitted); s*ee also* Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Colum. L. Rev. 1538, 1560 (1998) (40 percent of jurors who sat on death penalty cases in South Carolina, 40 percent identified lack of remorse as a reason for voting for death). Cramer was prejudiced by counsel's failure to object to clearly improper and harmful testimony.

## 2.    Failure to object to the government's improper arguments regarding mitigation evidence

Under the Eighth Amendment, a capital defendant is entitled to rely on any mitigating factor relating to himself, his background, and his life history that he proffers as the basis for a sentence less than death. *See Hitchcock v. Dugger*, 481 U.S. 393, 398-99 (1987); *Skipper v. South Carolina*, 476 U.S. 1, 4-5 (1986); *Eddings v. Oklahoma*, 455 U.S. 104, 113-14 (1982); *Lockett v. Ohio*, 438 U.S. 586, 605 (1978). Mitigating factors need not relate to the defendant's "culpability to the crime" or have a "nexus" to the crime. *Tennard v. Dretke*, 542 U.S. 274, 285, 287 (2004). Rather, any evidence that "humanizes" the defendant "in the face of [his] criminal history" should be considered by the jury in mitigation. *Rhoades v. Davis*, 914 F.3d 357, 365-66 (5th Cir. 2019). As the Eighth Circuit astutely stated, "The question is not whether evidence in mitigation makes the defendant any less guilty, or the crime any less horrible, but whether it provides a reason why, despite those things, the defendant should not die." *United States*

*v. Johnson*, 495 F.3d 951, 978 n.26 (8th Cir. 2007) (citation omitted).

It is axiomatic that a capital sentencing jury must be correctly instructed concerning its deliberations in penalty phase proceedings, especially with respect to the proffered mitigating factors. Although the range of potential mitigating factors is broad, it is the provenance of the courts to decide, as a matter of law, whether proffered mitigation evidence is irrelevant or trivial and as such can be excluded. *Tennard*, 542 U.S. at 286-87. Once a court has decided that a mitigating factor can go to the jury, and a juror finds that the defense has established the mitigating factor by a preponderance of the evidence, the juror is *required* to include that factor in the weighing process. *See Eddings*, 455 U.S. at 114-15 (sentencers "may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration"); *see also* 18 U.S.C. §§ 3592(a) and (a)(8) (stating that a jury "*shall* consider" statutory and non-statutory mitigating factors proffered by the defense).

In its penalty-phase presentation and closing argument, the government repeatedly violated Cramer's Fifth and Eighth Amendment rights by (1) arguing that the jurors should reject evidence about his upbringing and childhood trauma because that evidence did not explain, excuse, or justify Johns' killing; and (2) asserting that jurors were free to exclude from the weighing process any factor, even if proven by a preponderance of the evidence, that they deemed not to be mitigating.[11] The vast majority of these statements stood unobjected to by trial counsel, in violation of Cramer's Sixth Amendment right to effective representation.

### a.    Improper nexus argument

The government began by correctly stating that mitigation need not be "something that excuses or justifies the crime . . . " (Dkt. 679 (RT) at 197.) But immediately following that statement,

---

[11] *See also infra* Claim 13.B (alleging trial court instructional error for misinforming the jury about their role in sentencing).

the prosecutor gave a hypothetical, based on Cramer's mitigation evidence, inconsistent with that definition:

> This is [Mitigating Factor] Number 54: If Christopher Cramer had been raised in a normally functioning family, he likely would not be in the situation he is facing today.
>
> Well, you may very well find that that's a true statement, that you find that the defense has proven that by a preponderance of the evidence. But does that mean that it mitigates against a sentence of death? Does that mean the fact that if things were different, then he wouldn't have committed the crime or he wouldn't have been in prison? Does that really mitigate against the death penalty? And I would submit to you that it doesn't.

(Dkt. 679 (RT) at 197.) Counsel did not object to this statement. Later, the prosecutor mocked the defendants' penalty phase presentations by arguing, "Now they're telling you, 'Well, yeah, you're right. We stabbed him. But we stabbed him because we had all these problems. We had terrible childhoods.'" (Dkt. 679 (RT) at 261-62.) At that point, attorneys for both Cramer and Fackrell requested a running objection to the prosecutor's "complete and utter lack of understanding of the term 'mitigation' and his linking it improperly to the offense." The court overruled the defense objection. (Dkt. 679 (RT) at 262.) Thereafter, the government's nexus arguments continued unabated throughout its closing, with no objection from trial counsel. (*See*, *e.g.*, (Dkt. 679 (RT) at 258-59.) On rebuttal, trial counsel failed to remind the jury that mitigating evidence need not be tied to or explain the crime in any way.

### b.    Improper explanation of the jury's role in sentencing

Before the penalty phase arguments and outside of the presence of the jury, trial counsel objected to the trial court's Special Verdict Form, which directed the jurors to "indicate in the space provided the number of jurors who find that the defendant has proved by a preponderance of the evidence the existence of [the proposed non-statutory mitigating] factor and that it is mitigating." (Dkt. 679 (RT) at 2469-72.) The court overruled that objection. Then, during closing arguments, the government repeatedly stated that it was the *jury's* role to find a factor mitigating:

- *"And, so, even though you may find that that's something that you think is true, that doesn't necessarily mean that it's a mitigating factor. And if you don't find it to be mitigating, then you don't find it on the verdict form." (Dkt. 679 (RT) at 197-98.)*

- "And remember, was it proven, was – is it mitigating?" (Dkt. 679 (RT) at 199.)

- "And then again you have to consider . . . whether or not any of the factors were actually aggravating – excuse me – mitigator even if you found that they were proven." (Dkt. 679 (RT) at 202.)

While counsel had previously objected to this explanation of the jury's role as described in the special verdict form, that objection occurred outside the presence of the jury. Counsel still had a duty to protect Cramer's Fifth and Sixth Amendment rights by ensuring the jurors were properly instructed about mitigating evidence and their duties in the sentencing process. Defense counsel's failure to object or to use closing argument to correct jurors meant that jurors were left to believe that evidence needed to be related to the crime to be mitigating and that they were free to wholly disregard mitigating evidence if they saw fit. Additionally, the erroneous instruction and argument violated clearly established constitutional principles requiring capital defendants to be sentenced by jurors who are not "mitigation-impaired." *Morgan v. Illinois*, 504 U.S. 719, 739 (1992). There was no strategic or justifiable reason for trial counsel to not object to the prosecution's repeated, clearly erroneous, and prejudicial arguments.

**CLAIM 3: TRIAL COUNSEL VIOLATED CRAMER'S RIGHTS UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS BY FAILING TO EFFECTIVELY INVESTIGATE AND PRESENT EVIDENCE THAT CRAMER SUFFERS FROM FETAL ALCOHOL SPECTRUM DISORDER (FASD).**

86





88





92









97

"







103



104











████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ .

**CLAIM 5: CRAMER WAS DENIED HIS RIGHT TO CONFLICT-FREE COUNSEL**

Cramer's conviction and death sentence were imposed in violation of the Fifth, Sixth, and Eighth Amendments of the Constitution because multiple conflicts of interest precluded trial counsel from providing Cramer with effective assistance. These conflicts include Attorney John McElroy's concurrent representation of a government witness, and his misrepresentations to the court about the nature of this conflict, as well as Attorney Barlow's and Black's prior representation of Mark Isaac Snarr.

**A.    Legal basis**

Trial counsel "owes the client a duty of loyalty, a duty to avoid conflicts of interests." *Strickland*, 466 U.S. at 688. Relief is warranted where the conflict "significantly affected counsel's performance. . . . even though *Strickland* prejudice cannot be shown." *Mickens v. Taylor*, 535 U.S. 162, 173 (2002). Prejudice is presumed when a defendant can establish "that his counsel actively represented conflicting interests." *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980).

As the Fifth Circuit has explained, "[a]n 'actual conflict' exists when defense counsel is compelled to compromise his or her duty of loyalty or zealous advocacy to the accused by choosing

111

between or blending the divergent or competing interests of a former or current client." *Perillo v. Johnson*, 205 F.3d 775, 781 (5th Cir. 2000) (citations omitted). A defendant can establish such an "adverse effect" with "evidence that 'some plausible alternative defense strategy or tactic' could have been pursued, but was not because of the actual conflict impairing counsel's performance." *Id.* (citations omitted). The "guiding principle in this important area of Sixth Amendment jurisprudence . . . is whether counsel's allegiance to the accused was compromised by competing obligations owed to other clients." *Id.* at 798 (internal quotations omitted).

**B.    McElroy's concurrent representation of Elizabeth Rose**

### 1.    Factual Background

Cramer's trial team was composed of three attorneys: Doug Barlow, CJA-appointed counsel; Pat Black, the chief Federal Public Defender in the district; and John McElroy, a Deputy Federal Public Defender working under Black's supervision.

#### a.    McElroy represents Elizabeth Rose in her criminal case

While he was representing Cramer, McElroy also represented another client, Elizabeth Rose, who was facing methamphetamine distribution and weapons charges. (*See United States v. Rose ("U.S. v. Rose")*, Case No. 1:17-cr-00017-MAC-ZJH, Dkt. 2 (Feb. 1, 2017).) McElroy appeared as Rose's counsel of record on February 27, 2017. (*U.S. v. Rose,* Dkts. 22, 24.) With McElroy as her counsel, Rose entered a sealed plea agreement on October 12, 2017. (*U.S. v. Rose,* Dkts. 67 (factual basis signed by McElroy), 68 (sealed agreement).) It later came to the parties' attention, however, that Rose had inadvertently signed the wrong plea agreement: after the parties received a presentence report, "[c]ounsel for Defendant, John D. McElroy, [became] aware that he had presented Rose with the wrong plea documents and that Defendant had pled to a non-binding plea agreement, rather than the intended plea for 235 months, contemplated by all parties." (*U.S. v. Rose,* Dkt. 102 at 2.)

112

### b. Rose overhears a conversation between Fackrell and Cramer

To correct the plea paperwork, Rose was scheduled for a change of plea hearing on Monday, April 30, 2018, at the Beaumont courthouse — the same day that the Cramer trial was set to begin. That morning, Rose was transported to the courthouse and placed in a holding cell next to Cramer and Fackrell. The two men made incriminating statements about their own guilt, presumably unaware that Rose was in the cell next to them and could hear their conversation. (Dkt. 595 (RT) at 229.)

### c. Rose tells her attorney about Cramer's and Fackrell's statements and is interviewed by the FBI

According to Rose's sworn testimony, after she overheard this conversation on April 30, she related what she heard to her attorney. (Dkt. 595 (RT) at 240) ("Q. When you got to court, did you mention what you had heard to your attorney? A. Yes, sir."). At this point in time, Rose's attorney was still John McElroy. (*See U.S. v. Rose,*, Dkt. 102 (Apr. 30, 2018) (Joint Motion to Withdraw Guilty Plea signed and filed by McElroy)).

Rose was subsequently "visited by an FBI agent" who asked her questions, and she told the agent what she had overheard. (Dkt. 595 (RT) at 240.) The record does not reflect who arranged the FBI interview, but because McElroy remained her attorney until *after* the government stated its intention to use her as a witness, and because Rose initiated a proffer to the government through McElroy, it must have been McElroy who initially made Rose's information known to the government.

### d. McElroy asks to be recused as Rose's counsel but misleads the court about the nature of the conflict

On Thursday, May 3, the prosecution notified counsel for Cramer and Fackrell that it intended to call Rose as a witness.[20] (Dkt. 551 at 3.) On the same day, three days after the conflict had arisen, McElroy filed an unopposed motion to withdraw as Rose's counsel, explaining that "there appears to

---

[20] This may have also occurred a day earlier, on Wednesday, May 2; the defense motion recounting the timeline is inconsistent and provides both dates. (Dkt. 551 at 3.) The trial transcript does not reflect which day the prosecution notified counsel and the court of its intent to call Rose.

be an actual conflict of interest" and that "continued representation of (Rose) may give the appearance of impropriety and continued representation would violate the disciplinary rules of the State Bar of Texas." (*U.S. v. Rose,* Dkt. 104, p. 2 (May 3, 2018).) The court granted McElroy's motion and appointed substitute counsel for Rose. (*Id.* (May 3, 2018 oral order).)

In Cramer's criminal case, his attorneys argued that because all three of them had privileged information about Rose, her testimony should be prohibited, or in the alternative, Cramer's attorneys should be permitted to withdraw and a mistrial should be declared. (*See* Dkt. 551.) In their motion, Cramer's attorneys explained that "assistant Federal Defender, John McElroy, has been the attorney assigned to represent and defend Ms. Rose until being relieved by this Court upon notification by the government of its intent to use this surprise witness. . . . Counsel for Mr. Cramer is therefore privy to attorney/client privileged information that could and should be used to cross-examine this surprise government witness." (Dkt. 551 at 3.) Their motion explained that "Mr. Barlow, as co-counsel for Mr. Cramer with Mr. Black and Mr. McElroy, is privy to the same information regarding Ms. Rose."[21] (Dkt. 551 at 3.)

What happened next in the Cramer case is critical and disputed but was not captured contemporaneously for the record. (*See* Claim 15.) Judge Crone held an off-the-record bench conference to discuss whether Rose would be allowed to testify. According to a reconstruction of that conference put together by Cramer's appellate attorneys based on contemporaneous notes, McElroy at that conference misled the court by claiming that he only learned of the conflict of interest after the *government* notified him that they planned to call Rose as a witness. (Dkt. 743 at 1.)

During the bench conference, Black represented that the only privileged information that McElroy and the rest of Cramer's defense team had about Rose's case was "confidential drug

---

[21] Counsel's lax commitment to their duty of confidentiality is explicit in this motion. There is no justification for McElroy or Black revealing privileged information about Rose's case to Barlow, who was not a member of the Federal Defender office.

114

amounts" involved in her underlying drug distribution charge. (Dkt. 743-1 at 3.) But McElroy and the government had signed a stipulated factual basis about the quantity of drugs involved in Rose's case months earlier. (*U.S. v. Rose*, Dkt. 102 (Oct. 12, 2017)) The "confidential drug amount" alluded to as impeachment evidence in the "Motion to Prohibit Testimony" was necessarily different than what Rose had previously admitted to the government, showing that Rose had been dishonest in her proffer—and that McElroy knew it. Neither McElroy nor any other member of Cramer's defense volunteered the fact that Rose had initially disclosed Cramer's incriminating statements to McElroy himself, or that McElroy was likely involved in arranging Rose's interview with the FBI. With this incomplete information, the court denied the defense's motion to preclude Rose's testimony.

Back on the record, Fackrell's counsel objected to Rose's testimony on the basis that it would be more prejudicial than probative. (Dkt. 595 (RT) at 138.) He also renewed his motion to sever the trials of the two defendants. The court overruled Fackrell's motions. There was no further discussion on the record of McElroy's conflict of interest.

### e.    Rose testifies against Cramer and gets her sentence reduced

On May 7, 2018 — a week after allegedly overhearing the conversation between Cramer and Fackrell — Rose testified against them at trial. Specifically, Rose reported overhearing the defendants making comments about the prosecutor's opening statement, the number of times they had stabbed Johns, and other facts of the crime. Rose also testified that she had told her attorney—who at the time was McElroy—about the conversation because the information sounded like something that might help her in terms of getting less time on her sentence. (Dkt. 595 (RT).241-42.) She testified that the government had agreed to file a motion for a reduced sentence pursuant to USSC Guideline 5k1.1 on her behalf. (Dkt. 595 (RT) 242. Although she was sentenced a few weeks later to the original 235-month sentence she agreed to, that sentence was amended on or about March 8, 2019.[22] (*See U.S. v.*

---

[22] The relevant pleadings regarding the § 5k1.1 agreement are under seal.

115

*Rose*, Dkts. 123, 132.) According to the Federal Bureau of Prisons' Inmate Locator, Rose is currently housed in a halfway house and scheduled for release in March of 2024, indicating that she saved more than ten years' of incarceration in exchange for her testimony. (Ex. 27.)

### 2. McElroy's conflict of interest violated Cramer's rights

Cramer's representation was compromised because McElroy "actively represented conflicting interests" by representing both Cramer and Rose. *Cuyler*, 446 U.S. at 350. "Representation of a government witness, testifying in exchange for a reduction in sentence, while also representing the defendant he is testifying against raises serious conflicts of interest." *United States v. Sanchez Guerrero*, 546 F.3d 328, 334 (5th Cir. 2008). The Fifth Circuit has repeatedly found a conflict when defense counsel represents both a criminal defendant and a testifying government witness. *See, e.g.*, *id.* at 803-06 (finding actual conflict where attorney represented both the defendant and a witness testifying against the defendant); *United States v. Alvarez*, 580 F.2d 1251, 1258 (5th Cir. 1978) (finding actual conflict where attorney represented both the defendant and former co-defendant who pled guilty and testified at defendant's trial).

Upon hearing Rose's initial account of what she had overheard, McElroy should have immediately stopped her, told her that he had a conflict and could not continue to represent her, and advised the court that new CJA counsel should be appointed. Instead, McElroy apparently advised Rose to testify against Cramer in order to secure a sentence reduction, which violated his duty to Cramer. *See United States v. Mahar*, 550 F.2d 1005, 1008 (5th Cir. 1977) (finding conflict of interest where defense counsel "advised his other client . . . to agree to testify against [defendant] as part of a plea bargain"). And to complicate matters, McElroy then misled the court about the nature and extent of his conflict of interest by failing to disclose that he had advised Rose to testify against Cramer and that he had arranged for her to proffer information to the government by, at the very least, notifying the government of her desire to cooperate.

116

Rose's testimony was highly prejudicial during both the guilt and penalty phases of Cramer's trial, and Cramer's own attorney was directly responsible for ensuring that it was introduced. The government argued in closing that "any doubts" about Cramer and Fackrell's guilt could be dispelled by Rose's testimony, which "establishes that Christopher Cramer and Ricky Fackrell committed this murder the first time going into that cell when they stabbed Leo Johns over and over and over and over again." (Dkt. 596 (RT) at 80.) Rose's testimony was also prejudicial in the penalty phase of trial. At the start of the penalty phase, Judge Crone instructed jurors that "as we enter this phase, you are going to be able to consider all of the testimony and all of the evidence that was presented . . . at the guilt phase of the trial." (Dkt. 603 (RT) at 12.) In the prosecutor's opening statement during the penalty phase, she referred back to Rose's testimony about Cramer laughing about the crime as evidence that Cramer lacked remorse. (Dkt. 603 (RT) at 19.)

Cramer's counsel actively assisted a government witness in testifying against him, violating his right to conflict-free counsel. His conviction and death sentence should be vacated.

### 3.    Appellate counsel violated Cramer's rights by failing to raise this claim

To the extent that this claim should have been raised on direct appeal, Cramer was also denied his right to effective assistance of appellate counsel. A Movant can establish deficient performance under *Strickland* by establishing the "failure to raise or properly brief or argue certain issues on appeal." *Sharp v. Puckett*, 930 F.2d 450, 451 (5th Cir. 1991). Here, appellate counsel failed to raise the meritorious claim that McElroy's dual representation constituted a conflict of interest and violated Cramer's constitutional rights. Because appellate counsel reconstructed the bench conference discussing McElroy's representation of Rose, they were aware of the issue and should have investigated further by reading Rose's trial testimony and discovering that she had disclosed to McElroy the fact that she overheard Cramer and Fackrell's conversation. The omission of this claim on appeal was not the result of a reasoned, strategic judgment. Cramer was prejudiced by appellate counsel's deficient performance

117

because there is a reasonable probability that he would have prevailed on appeal.

**C.      Barlow and Black's prior representation of Mark Snarr**





**CLAIM 6: CRAMER'S CONVICTION AND SENTENCE ARE UNCONSTITUTIONAL BECAUSE HIS JURY WAS NOT DRAWN FROM A FAIR CROSS SECTION OF THE COMMUNITY; TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO RAISE THE ISSUE**

The presence of "a fair cross section of the community on venires, panels, [or] lists from which petit juries are drawn is essential to the fulfillment of the Sixth Amendment's guarantee of an impartial jury trial in criminal prosecutions." *Taylor v. Louisiana*, 419 U.S. 522, 526 (1975). Statistical analysis shows that Black and Hispanic jurors were significantly underrepresented in Cramer's jury pool.[23] (*See* Ex. 41.) Moreover, those disparities were the result of systematic, non-random procedures that disproportionately excluded jurors from those racial groups. Specifically, (1) more juror questionnaires were sent to counties with low numbers of Black and Hispanic residents; (2) the "draw" from voter registration lists was non-random; and (3) the voter registration lists themselves disproportionately excluded Black and Hispanic residents.

These procedures violated Cramer's right to be tried "by an impartial jury drawn from sources reflecting a fair cross-section of the community." *Berghuis v. Smith*, 559 U.S. 314, 319 (2010). Moreover, because defense counsel was on notice that there were problems with the jury pool but failed to pursue this issue, Cramer was denied his right to effective counsel. Cramer's Sixth Amendment rights were violated, and Cramer's conviction and sentence must be vacated.

A.      **Legal basis**

Under *Duren v. Missouri*, 439 U.S. 357 (1979), a criminal defendant must make the following three showings to establish a prima facie violation of the Sixth Amendment's fair-cross-section requirement: "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is

---

[23] Cramer uses the terms "Black" or "Blacks" and "Hispanic" to reflect the language used on the United States Census and other demographic surveys.

due to systematic exclusion of the group in the jury-selection process." *Id.* at 364. If the defendant makes a prima facie showing under *Duren*, the burden shifts to the state to justify the infringement by demonstrating that the attainment of a fair cross-section is incompatible with a significant state interest. *Id.* at 367-68. A criminal defendant may challenge the exclusion of a distractive group as violating the fair cross-section requirement, "whether or not he is a member of the excluded class." *Duren*, 439 U.S. at 359 n.1.

There are three main ways to measure underrepresentation of a distinctive group. "**Absolute disparity** measures the simple absolute difference between the percentage of that group as represented in the jury pool . . . and the percentage of people in the community who are in the cognizable group. . . ." (Ex. 41 ¶ 20.) To measure how "substantive" the absolute disparity is, "**[r]elative or comparative disparity** is measured by relating (comparing) the absolute disparity to the cognizable group's percentage in the entire jury-eligible community." (Ex. 41 ¶ 21.) Finally, "**[s]tatistical significance** answers the question: What is the probability that we could have randomly drawn a sample" of prospective jurors "from the list of qualified potential jurors . . . and have generated" the absolute disparity seen in this case? (Ex. 41 ¶ 23.)

**B.      Black and Hispanic jurors were systematically excluded from Cramer's jury pool**

Cramer can establish that two distinctive groups were systematically excluded from the jury pool: Black and Hispanic prospective jurors.

"Blacks and Hispanics are unquestionably 'distinctive' groups for the purposes of a fair-cross-section analysis." *United States v. Rioux*, 97 F.3d 648, 654 (2d Cir. 1996); *see McGinnis v. Johnson*, 181 F.3d 686, 689 (5th Cir. 1999) (Blacks are "unquestionably a distinctive group in the community"); *Duren*, 439 U.S. at 364. The first requirement for a *Duren* analysis is met.

Blacks and Hispanics were each underrepresented in Cramer's jury pool to a degree that is not "fair and reasonable in relation to the number of such persons in the community." *Id.*

123

### 1.    The number of Blacks and Hispanics was disproportionately low.

Courts have typically applied three different methods for measuring underrepresentation. *Berghuis*, 559 U.S. at 316. Dr. John Weeks is a statistician and demographer who has reviewed and analyzed the available data related to the composition of Cramer's jury pool. (*See* Ex. 41.) Dr. Weeks has "been involved in work regarding the demographic composition of juries and other population-based statistical issues since 1980," and he has "served as a consultant and/or expert witness in nearly 250 legal cases (criminal and civil)." (Ex. 41 ¶ 4.)

With respect to Black prospective jurors, Weeks found that Blacks made up 22.66% of the jury-eligible population of EDTX at the time of Cramer's trial, but they made up only 16.07% of the jury pool, an absolute disparity of 6.59% and a relative disparity of 29%. (Ex. 41 ¶¶ 20-21; Table 2.) This disparity is significantly worse than levels that the United States Supreme Court previously found unacceptable in the equal protection context. *See Vasquez v. Hillery*, 474 U.S. 254, 268 n.2 (1986) (4.7% disparity). As Dr. Weeks notes, there is less than a .3% chance of this disparity occurring purely by chance. (Ex. 41 ¶ 25.)

With respect to Hispanic prospective jurors, Hispanics made up 9.44% of the jury-eligible population of EDTX at the time of Cramer's trial, but only 7.21% of the jury pool, an absolute disparity of 2.23% and a relative disparity of 24%. (Ex. 41 Table 2 1234.) There is less than 10% probability that this disparity would occur purely by chance. (Ex. 41.)

### 2.    These discrepancies establish underrepresentation.

In *Berghuis*, the Supreme Court expressly declined to adopt a single test for measuring underrepresentation, recognizing that "[e]ach test"—absolute disparity, relative disparity, and statistical significance—"is imperfect." 559 U.S. at 329. Current Fifth Circuit precedent requires an "absolute disparity" of at least 10% in order to establish a prima facie case for a fair cross-section

124

violation where the "distinctive group" makes up at least 10% of the population. [24] *See, e.g.,* U*nited States v. Butler,* 615 F.2d 685, 686 (5th Cir. 1980); *United States v. Maskeny,* 609 F.2d 183, 190 (5th Cir. 1980).

In this case, because Hispanics make up less than 10% of the population, Cramer may use comparative disparity to establish a *Duren* violation with respect to that group. *Mosley v. Dretke*, 370 F.3d 467, 479 n.5 (5th Cir. 2004) ("If the distinctive group at issue makes up less than 10% of the population, comparative disparity may be used."). Although Blacks make up more than 10% of the overall population of the district, the demographic distribution is uneven across counties, and Blacks make up less than 10% of the population in some of the counties from which jurors were disproportionately drawn in this case. (Ex. 41 (Hardin and Orange counties)). Thus, the use of comparative disparity—and the use of statistical significance to confirm the significance of these disparities—is appropriate in this case. *See also United States v. Biaggi*, 909 F. 2d 662, 678-79 (2nd Cir. 1990).

### 3. The underrepresentation of Blacks and Hispanics in Cramer's jury pool was systematic.

#### a. A disproportionate number of jurors were drawn from counties with low numbers of Black and Hispanic residents.

The jury wheel in Cramer's case was composed of voter registration lists from six counties in the district: Hardin, Jasper, Jefferson, Liberty, Newton, and Orange. Jefferson County—which includes the city of Beaumont—has by far the highest percentage of its adult citizen population that is Black (36.52%). (Ex. 41 at Table 3 1234.) It is also the most populous county of the six, with 47% of the total jury-eligible population residing in Jefferson County.

---

[24] Other circuits have declined to adopt a 10% absolute disparity rule, and the Supreme Court has not yet resolved this circuit split. *See, e.g.,* U*nited States v. Savage,* 970 F.3d 217, 257-58 (3d Cir. 2020) (concluding it was "wary of ossifying [10 percentage point thresholds] through a rule when our own precedent requires us to consider comparative disparity as well.")

Yet despite 47% of the jury-eligible population residing in Jefferson County, "only 40% of the [juror qualification questionnaires] were sent to Jefferson County." (Ex. 41 ¶ 31.) This is a "noteworthy" discrepancy because Jefferson County has "by far the largest percent of people who are non-Hispanic Black" [individuals] in the jury-eligible population, and it "helps to explain the fact that among the 1,565 respondents to the [juror qualification questionnaires] who reported their race-ethnicity, only 15% were Black, and only 2% were Hispanic." (Ex. 41 ¶ 31.)

In the end, this discrepancy widened even further, and "only 34 percent" of the 305 prospective jurors who were summoned to the court for voir dire "were drawn from Jefferson County. This suggests a systematic problem in the way in which the court was operating to draw jurors to the courthouse." (Ex. 41 ¶ 28.)

### b. The "draw" from voter registration lists was non-random.

Moreover, the statistical evidence indicates that the pool in Cramer's case was "not a random draw." (Ex. 41 ¶ 32.) Even though Cramer's jury was purportedly drawn from a pool of 309,566 registered voters in the Beaumont Division, a staggering 43% of the prospective jurors in Cramer's case who were sent questionnaires had voter registration numbers that were contiguous, meaning that the numbers were next to each other.[25] (Ex. 41 ¶ 32.) With a random draw, there would be an expected average "gap" of 151 between each number, but in Cramer's case, the average "gap" was just 3. (Ex. 41 ¶ 32.) This large difference indicates that whatever method was used to select voter registration numbers did not do so randomly. (Ex. 41 ¶ 32.) Instead, it appears that some sort of "batch" or other non-random system that favored contiguous numbers was used. There is also evidence, as reflected in the skewed age distribution of people who were sent juror questionnaires, that the draw "started at the lowest number—indicative of lower voter registration numbers, indicating a longer time ago that

---

[25] Voter registration numbers are created at the time a person registers, so "lower voter registration numbers[] indicat[e] a longer time ago that a person had registered." (Ex. 41 ¶ 33.)

a person had registered." (Ex. 41 ¶ 33; *see also* Ex. 41.) It is clear from the available data that Cramer's jury wheel was not drawn randomly from the voter registration lists and thus deviated from the "computer-generated random selection process" required by the Eastern District. (*See* Ex. 58 at 3.)

Anecdotal evidence reported in jury questionnaires provides further evidence that the draw was not random. Based on the questionnaires completed by the 305 summonsed jurors, there are more than 80 instances of people knowing each other. (*See* Ex. 70.) There are 56 instances of people with the same last names, including one married couple. (*See* Ex. 70; Dkt. 707 (RT) at 60 (married couple)). There were additional pairs of jurors who resided on the same street, in some cases living right across the street or just a few houses down. (*See* Ex. 70; Dkt. 710 (RT) at 191.)

Finally, there is evidence that the jury wheel in Cramer's case is not the only one in the Eastern District to have exhibited these problems, suggesting that the non-random procedures in Cramer's case were part of a larger pattern. (Ex. 41 ¶ 34.) Specifically, habeas counsel for Mark Snarr and Edgar Garcia have alleged that the Eastern District "employed a non-random method of selection that produced a non-representative wheel, venire, and jury." *United States v. Garcia*, Case No. 1:13-cv-00723-MAC-CLS, Dkt. 160 at 2. As in Cramer's case, Garcia and Snarr have alleged that the special jury wheel drawn for that case deviated from the random selection procedures prescribed by the Eastern District, instead pulling prospective jurors in order of their voter registration number. *See United States v. Garcia*, Case No. 1:13-cv-00723-MAC-CLS, Dkt. 160 at 3-11 (detailing Garcia's fair cross-section claim); *id.* at Attachment 2 (Declaration of Jeffrey Martin for Snarr and Garcia). This allegation, supported by expert statistical analysis, is strikingly similar to the pattern seen in Cramer's case and thus represents a systemic problem. The fair cross-section violation observed in Cramer's case is not just a "one-time example of underrepresentation," *McGinnis*, 181 F.3d at 690, but rather a repeated problem with how jury wheels were drawn in the Eastern District at the time of Cramer's trial.

127

### c.    The voter registration lists disproportionately excluded Black and Hispanic residents.

Finally, even if the prospective jurors for Cramer's jury wheel had been drawn from the voter registration lists through the use of a purely random draw—which, as detailed above, they clearly were not—those voter registration lists themselves were skewed towards excluding Black and Hispanic prospective jurors.

At the time of Cramer's trial, the Eastern District used only voter registration lists to compose the jury pool. (*See* Ex. 59.) But about a year after Cramer's trial, the district changed its procedures to broaden the pool from which it selected jurors to ensure that a fair cross section of the community would be represented. In amending its procedures, the Eastern District recognized that "it is not clear that voter registration lists . . . alone provide litigants in the divisions in the Eastern District of Texas with a fair cross section of relevant communities." (Ex. 58 at 6 .) The district thus deemed it "necessary . . . to supplement these lists of registered voters with lists of licensed drivers from all counties within each division." (Ex. 58 at 6.) The state of Texas has similarly adopted a jury wheel procedure that draws from both voter lists and driver's license registration lists. *See* Tex. Gov't. Code Ann. § 62.001(a)(2).

As the Eastern District and others have recognized, pools drawn exclusively from voter rolls systematically underrepresent distinctive groups. Consistent with the disparities seen in Cramer's jury pool, "[v]oter registration lists . . . consistently underrepresent African-American and Hispanic citizens who would otherwise be eligible to serve as jurors." Nancy J. King, Racial Jurymandering: Cancer or Cure? *A Contemporary Review of Affirmative Action in Jury Selection*, 68 N.Y.U. L. Rev. 707, 712-13 (1993); *see also United States v. Savage*, 970 F.3d 217, 257-58 (3d Cir. 2020) ("[D]rawing on voter registration lists alone might be actionable under some circumstances when use of those lists over time did have the effect of sizably underrepresenting a particular class or group on the jury venire.").

Although the Fifth Circuit has in the past found insufficient evidence of a fair cross-section violation in a prior challenge to the use of voter registration lists, *see United States v. Brummitt*, 665 F.2d 521, 527-30 (5th Cir. 1981), the expert evidence in this case establishes that Black and Hispanic jurors were significantly underrepresented in Cramer's jury pool. (*See generally* Ex. 41.) Moreover, the exclusion of Black and Hispanic jurors was not only the result of using voter lists: instead, it was the result of a deeply flawed process that started with underrepresentation of Black and Hispanic individuals in the voter lists, used a non-random draw, and sent a disproportionate number of juror questionnaires to counties with lower populations of Black and Hispanic residents. These procedures excluded Black and Hispanic jury-eligible individuals from Cramer's jury pool.

**C.    Cramer's trial counsel were ineffective for failing to raise this claim.**

In 2017, defense counsel retained Jeffrey Martin, a statistical expert, to "analyze statistical issues in the jury selection process for this case and prepare a report or testify on behalf of both Mr. Fackrell and Mr. Cramer." (Ex. 11 ¶ 4.) After reviewing some preliminary records, Martin "emailed Robert Morrow (counsel for Mr. Fackrell) and Doug Barlow (counsel for Mr. Cramer) on November 10, 2017 . . . providing my hourly rates and the work necessary to prepare a report." (Ex. 11 ¶ 5.)

On November 15, 2017, Cramer's counsel filed a Motion to Quash Venire Panel and Stay Proceedings on the basis that the Eastern District's practice of relying exclusively on voter registration lists violated the fair cross-section requirement and the Jury Selection and Service Act, (JSSA), 28 U.S.C. § 1861. (Dkt. 138.) The motion did not discuss any facts specific to the way in which Cramer's jury pool would be drawn or the way in which other Eastern District jury pools were drawn; instead, it generally challenged the practice of relying exclusively on voter rolls. (Dkt. 138.)

On January 11, 2018, Barlow wrote a letter to Martin confirming their "agreement that [Martin] would work as a consultant and expert for both Fackrell and Cramer and analyze statistical issues

regarding the jury selection process." (Ex. 11 ¶ 7, *see also* Attachment 3.) Defense counsel never followed up with Martin, and no work was ever completed. (Ex. 11 ¶ 8.) *See also* Claim 8. B.

Counsel could have no strategic reason for failing to follow up with Martin or to further challenge the composition of the jury pool in this case. Martin is "a highly-qualified expert in this type of analysis" (Ex. 41 ¶ 34); defense counsel affirmatively reached out to Martin to secure his assistance; and counsel was able to secure funding for his work. Counsel cannot have concluded that Martin's work on the case was unpersuasive or of poor quality, because Martin never produced anything for them. And defense counsel was plainly on notice of problems with the jury wheel: counsel filed a motion to quash the venire and they retained an expert. Counsel's performance fell below an objective standard of reasonableness. *Cf. Hinton v. Alabama*, 571 U.S. 263, 275 (2014) (finding deficient performance where counsel's "unreasonable failure to understand the resources that state law made available to him" meant that he did not retain a qualified expert).

Moreover, the underrepresentation of Black and Hispanic jurors was evident even from looking around the room on the first day of voir dire. For example, expert jury consultant Julie Howe, who was sitting at counsel table throughout voir dire, noticed on the first day of voir dire "that the prospective jurors that were in the courtroom appeared to be older than would ordinarily be expected. I also noticed a low number of Hispanic and African American prospective jurors" (Ex. 42 ¶ 16.) Anthony Haughton, who attended portions of the voir dire, was similarly "surprised that the jury pool had so few Black people or other minorities" given the "substantial African American populations" in Beaumont and surrounding cities. Ex. 46 ¶ 8.) The ABA Guidelines in place at the time of Cramer's trial specifically provided that "[c]ounsel should consider . . . whether any procedures have been instituted for selection of juries in capital cases that present particular legal bases for challenge," and "particularly those relating to bias on the basis of race or gender." *ABA Guidelines*, Guideline 10.10.2(A), reprinted in 31 *Hofstra L. Rev.* 913, 1049 (2003). The Guidelines note that "[s]uch

challenges may include challenges to the selection of the grand jury and grand jury forepersons as well as to the selection of the petit jury venire." *Id.* Counsel's failure to act in accordance with the Guidelines by following up on problems with the jury pool—including obviously problems specific to racial composition—constituted deficient performance. *See Wiggins*, 539 U.S. at 522, 524 (2003).

Cramer was prejudiced by counsel's failure to challenge the jury wheel. Because trial counsel failed to timely object to the non-random draw in this case, key records related to the jury wheel were destroyed. (Dkt. 820 Ex. 3 (filed ex parte and under seal).) Specifically, habeas counsel for Fackrell requested certificates of the racial and sex composition of the jury pool, which were required under the jury plan in effect at the time of the Cramer/Fackrell trial. Counsel also requested the certificate detailing the procedures used for "randomly selecting the names pursuant to this Plan," which under the Plan is to be created by "the individual(s) who performed the task" of random selection. (Dkt. 820 Ex. 3 at 2 (filed ex parte and under seal).). The response from the Operations Manager at the Eastern District was that records for both the grand jury master wheel and petit jury wheel were "past their eligibility date for destruction" and that habeas counsel had already been given any files that the court still possessed. (Dkt. 820 Ex. 3 at 1 (filed ex parte and under seal).).

Cramer was also prejudiced because the fair cross-section claim was a meritorious claim that trial counsel failed to raise. If counsel had followed up with Martin, he likely would have uncovered these disparities and the non-random draw that produced them. Because there is a reasonable likelihood that counsel would have been successful in challenging the procedures used to construct Cramer's jury pool, Cramer was prejudiced by counsel's deficient performance.

Because Cramer's Sixth Amendment rights to an impartial jury and his right to the effective assistance of counsel were violated, Cramer's conviction and death sentence must be vacated.

131

**CLAIM 7: CRAMER WAS DENIED HIS RIGHT TO AN IMPARTIAL JURY**

During voir dire, the trial court erroneously denied defense challenges for cause against biased or death-prone jurors and removed qualified life-leaning jurors. These actions deprived Cramer of his Sixth Amendment right to be tried by an impartial jury.

**A.    Legal basis**

To safeguard capital defendants' right to an impartial jury, the Supreme Court has required that prospective jurors be willing to impose either a life or a death sentence after considering all of the evidence presented. *See Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968) (holding that a death sentence is unconstitutional "if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction").

In *Wainwright v. Witt*, the Court clarified that this rule required more than simply excluding jurors who would "automatically" vote for a death sentence. 469 U.S. 412, 422 (1985). Instead, the Court explained that in "determining when a prospective juror may be excluded for cause because of his or her views on capital punishment," the standard that a trial court should apply is "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Witt*, 469 U.S. at 412 (cleaned up); *see also Morgan v. Illinois*, 504 U.S. 719, 739 (1992) (holding that under this standard, "[a]ny juror to whom mitigating factors are likewise irrelevant should be disqualified for cause").

"Because the *Witherspoon-Witt* standard is rooted in the constitutional right to an impartial jury, and because the impartiality of the adjudicator goes to the very integrity of the legal system," error in applying these standards "can never be treated as harmless error." *Gray v. Mississippi*, 481 U.S. 648, 668 (1987). To establish a constitutional violation based on other types of bias, petitioner must typically

132

show that at least one seated juror should have been excused for cause. *Ross v. Oklahoma*, 487 U.S. 81, 85, 88-89 (1988).

**B.      Cramer's death sentence is unconstitutional because the trial court improperly denied defense challenges under *Witt***

The trial court improperly denied at least four defense challenges to prospective jurors who should have been excused for cause based on their views on the death penalty. In doing so, the court frequently cited the wrong legal standard, erroneously concluding that jurors were qualified simply because they wouldn't impose an "automatic" death sentence. The defense was forced to use their limited peremptory strikes to ensure that these individuals would not serve on the jury, in violation of Cramer's rights. (*See* Ex. 66.)

**Prospective Juror 14, Maria M**., said she did not "see any point in leaving [a defendant] in prison for the rest of their lives if they've already committed [a] crime in the prison." (Dkt. 710 (RT) at 216.) She also admitted, when "trying to be honest," that she did not know whether she could be fair to the defendants. (Dkt. 710 (RT) at 216-17, 221.) Although the prosecution tried to rehabilitate Maria M., she never affirmed that she could be fair to Cramer and only said that she would not "automatically" vote for a death sentence without first hearing the evidence and instructions. (Dkt. 710 (RT) at 243-44.) But even jurors who would not be "automatic" votes for death must be disqualified under *Witt* if their views would "prevent or substantially impair the performance of [their] duties." 469 U.S. at 412. Based on Maria M.'s professed inability to be fair and her view that there was no "point" of a life sentence for a defendant like Cramer, the challenge for cause should have been granted. Cramer had to use a peremptory strike to exclude Maria M. (*See* Ex. 66 at 2).

**Prospective Juror 53, Thomas B**., should have been excused for cause because he repeatedly declined to promise that he would consider mitigating evidence and he indicated that he may shift the burden of proof to the defendant. As a general matter, Thomas B. favored the death penalty and thought it ought to be expanded to more non-homicide crimes. (Dkt. 712 (RT) at 85-86.) When asked

133

whether he would "give due consideration" to mitigating evidence in this case, Thomas B. answered that he would "like to say yes" but could not before hearing the evidence. (Dkt. 712 (RT) at 95.) When pressed by Fackrell's counsel as to whether he was "able to promise [counsel] that" he could give due consideration to mitigating evidence, Thomas B.'s answer was, "No, sir." (Dkt. 712 (RT) at 95) Thomas B. was never rehabilitated on this point. In addition, Thomas B. shifted the burden to the defense to persuade him against the death penalty. In response to defense counsel's question whether "it might take something from us to convince you not to give the death penalty?" Thomas B. responded, "That's a possibility." (Dkt. 712 (RT) at 92.) He only backtracked after being coached by the prosecutor. (See Dkt. 712 (RT) at 97 (telling Thomas B. his inclination to burden-shift was "kind of contrary to our system": (Dkt. 712 (RT) at 93 (prosecutor is asked to "stop nodding his head while [the defense is]talking to the juror, indicating an answer to him"); (Dkt. 712 (RT) at 94 (prosecutor crafting detailed questions and Thomas B. repeatedly answering "Yes, sir.").). These obliging replies to the prosecutor's leading questions were not reliable rehabilitation. Cramer was forced to use a peremptory strike to exclude Thomas B. from the jury. (*See* Ex. 66 at 6.) Richard S. Jaffe, Capital Cases: Ten Principles for Individualized Voir Dire on the Death Penalty, 25 CHAMPION 35, 36 (2001) (explaining that questions that call for a socially desirable answer such as "Can you follow the law?" result in death-prone juries because death-favoring venirepersons answer "yes" more often than life-leaning but qualified jurors).

Because Thomas B. was not adequately rehabilitated on his unwillingness to consider mitigating evidence or his burden-shifting the challenge for cause should have been granted. *See Morgan*, 504 U.S. at 739 (jurors who will not consider mitigating factors are excludable for cause).

**Prospective Juror 114**, **Dena C**. also indicated she would burden-shift. She would have "said it's death automatically" after the prosecutor had proven guilt, death eligibility, and aggravation. (Dkt. 716 (RT) at 107.) When asked by the defense: "And you would say that it's death, unless we come [sic]

134

prove it should be life?" she answered, "Right." (Dkt. 716 (RT) at 109) (she "would have to" place the burden to prove a case for life on the defense because she "wouldn't be able to place it on [the prosecution]."). The only way Dena C. could keep an "open mind" would be if the defense proved that the government "withheld evidence" or was not telling the truth. (Dkt. 716 (RT) at 108.) Although the prosecutor was able to partially rehabilitate her by coaching her on legally correct responses, (Dkt. 716 (RT) at 117-120,) her final response was that for certain crimes, such as an intentional killing involving a child, she "wouldn't be able to see past that" to a sentence other than death. (Dkt. 716 (RT) at 136.)

The court improperly denied the defense challenge for cause. In denying the challenge, the court explained that Dena C. did "not indicate that she would automatically vote for the death penalty without regard to any evidence that might be developed at the trial." (Dkt. 716 (RT) at 139.) The court erred by applying the wrong standard: although Dena C.'s death vote may not have been "automatic," her views impaired her ability to serve as an impartial juror. *See Witt*, 469 U.S. at 422. To exclude Dena C. from the jury, Cramer used a peremptory strike. (*See* Ex. 66 at 13.)

**Prospective Juror 186, Gail H.**, should have also been excused for cause because she would shift the burden to the defense. Although she gave contradictory responses to the defense counsel and prosecutor about whether or not she would engage in burden-shifting, she answered "yes" when asked whether she "would put a burden on the defendant . . . to convince you why he should not receive the death penalty?" (Dkt. 707 (RT) at 201.) When asked "You cannot assure [the defense] that you would not put a burden on the defendant once you reach that stage of trial, right?" Gail H. again answered, "Yes." (Dkt. 707 (RT) at 205-06.) It was not until the prosecution asked a series of highly leading questions that Gail H. finally said: "I would keep that burden with the government and not the defendant." (Dkt. 707 (RT) at 211.) The defense challenge for cause was improperly denied given Gail H.'s repeated prior answers that she would place the burden of proof on the defense. Cramer

135

had to use a peremptory strike to exclude Gail H. from the jury. (*See* Ex. 66 at 21.)

The court's failure to excuse Maria M., Thomas B., Dena C., and Gail H. for cause was structural, and Cramer's conviction and death sentence must be vacated. *See Gray*, 481 U.S. at 668.

**C.    Cramer's death sentence is unconstitutional because the trial court improperly granted the prosecution's *Witherspoon* challenges**

The trial court erred in granting the prosecution's for-cause challenges to at least three jurors who stated they were willing to set aside their opposition to the death penalty and follow the law.

**Prospective Juror 10, Dianna C.** stated that she did not "believe in the death penalty" based on her "religious beliefs," but nonetheless repeatedly stated that she could follow her "oath as a juror" and vote for the death penalty if the facts called for it. (Dkt. 710 (RT) at 149.) In the context of weighing aggravating and mitigating factors, or in the absence of any mitigating factors, Barlow asked Dianna C. "would you answer, 'Yes, I believe the aggravating factors outweigh any mitigating factors' and answer truthfully even if a death sentence would be assessed?" (Dkt. 710 (RT) at 148-49.) Dianna C. answered, "Yes, I think I could." When asked again whether she could "answer what you believe to be the true facts in the case even if it led—with the other 11 jurors, even if it led to a death sentence?" Dianna C. answered, "Yes." (Dkt. 710 (RT) at 148-49.) When the prosecutor asked her immediately afterward, "Do you realize you just told Mr. Barlow that you could vote for the death penalty?" Dianna C. answered, "Yes, I did." (Dkt. 710 (RT) at 148-49.) The prosecutor then unsuccessfully tried to get Dianna C. to backtrack by telling her that her "questionnaire . . . is completely opposite of that." Dianna C. tried to explain:

> Well, it isn't that I completely reversed it. I still feel the way I feel . . . and if push comes to shove, on the third phase, under oath, if I had to, you know, impose the death penalty, I guess I would have to vote for it if all the evidence led to [it].

(Dkt. 710 (RT) at 151.) Although she at one point answered "Yes" to the prosecutor's question of whether she "could never vote for the death penalty," (Dkt. 710 (RT) at 154), she later clarified that she "wouldn't say automatically life or death penalty," that she would listen to all the evidence, and

that despite her opposition to the death penalty, she would follow her oath and "would answer truthfully" the questions on the verdict form. (Dkt. 710 (RT) at 158-59.)[26]

Dianna C. was precisely the type of juror contemplated by *Witherspoon* and its progeny: she was "exclude[ed] for cause . . . simply because [she] voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." 391 U.S. at 522. Because Dianna C. "state[d] clearly that [she was] willing to temporarily set aside [her] own beliefs in deference to the rule of law," *Lockhart v. McCree*, 476 U.S. 162, 176 (1986), and impose the death penalty if the evidence led to that conclusion, the court erred in granting the prosecution's challenge for cause.

**Prospective Juror 187, Grace N.** did not oppose the death penalty, (*see* Dkt. 719 (RT) at 60), but she did not "want the responsibility of someone else's life." (Dkt. 719 (RT) at 61, *see* Dkt. 719 (RT) at 63.) However, she repeatedly stated that she could fulfill her duties as a juror and "would do what I'm supposed to do." (Dkt. 719 (RT) at 67.) Although at the beginning of her questioning, she said that she would not "personally" vote for the death penalty if it were "all on me," (Dkt. 719 (RT) at 59), she clarified in subsequent responses that if she were on the jury, she would carry out her duties as required. (*See, e.g.*, Dkt. 719 (RT) at 67 ("[I]f I get picked, I'll do what I'm supposed to do . . ."). When asked point blank whether she would fulfill her duties "even if it lead [sic] to a death sentence," she responded, "Yes, sir." (Dkt. 719 (RT) at 64.) When pressed regarding whether her "feelings about not being the person to make the decision or not wanting to vote for the death penalty, is that something that would prevent you or substantially impair you from voting for the death sentence no matter what the evidence shows?" she answered, "No, ma'am." (Dkt. 719 (RT) at 67.)

The court sustained the prosecutor's challenge because "[s]he was crying up here. I mean, she got emotional just about the questions." (Dkt. 719 (RT) at 73.) But prospective jurors are not

---

[26] To the extent that Dianna C. appeared to waver when questioned by Fackrell's counsel, there were indications that her patience and stamina were flagging. In the record, Bourque says "I don't want to make you mad" and Dianna C. says she is "cold up here." (Dkt. 710 (RT) at 162.)

excludable under *Witherspoon* merely because they express nervousness or emotion stemming from the "potentially lethal consequences of their decision," *Adams v. Texas*, 448 U.S. 38, 49-50 (1980). Because Grace N. repeatedly affirmed that she could carry out her duties as a juror, the court erred in sustaining the prosecution's challenge for cause under *Witherspoon*.

**Prospective Juror 130, Calvin J.** was also improperly struck by the court based on the prosecutor's challenge for cause. Although Calvin J. indicated that he would be "reluctant" to personally impose a death sentence based on his religious beliefs, (Dkt. 716 (RT) at 209), he was not opposed to the death penalty and saw it as an "evil necessity." (Dkt 716 (RT) at 219), (indicating that he felt "a little torn" because he thought "the death penalty is probably something that needs to be around") (Dkt. 716 (RT) at 209.) Although Calvin J. stated that he did not feel "comfortable myself being the one to hand down" a death sentence, (Dkt 716 (RT) at 213), he repeatedly affirmed that he "would try to follow the oath." (Dkt. 716 (RT) at 219) (explaining that "no one can see the future" and that "I could only follow my instructions and follow my oath and try to do what I was instructed to do."). When asked specifically if he could vote for death if "the government has proved . . . that he should be executed," Calvin J. answered, "Yes." (Dkt. 716 (RT) at 217.) Because Calvin J. affirmed that he would follow his oath and could vote for death if the evidence warranted it, the court erred in granting the prosecution's challenge for cause.

Because error under *Witherspoon* is structural, Cramer's conviction and death sentence must be vacated. *See Gray*, 481 U.S. at 668.

**D.     Cramer's right to an impartial jury was violated because the court failed to excuse biased potential jurors for cause**

At Cramer's trial, the court failed to excuse — or even conduct detailed questioning of — a seated juror who was contacted about the trial during voir dire. **Seated juror Melissa W.** reported to the court that when she returned to the law office where she worked after her individual voir dire,

> [S]he was approached by one of the legal secretaries and the lady proceeded to tell her that, "Oh, my dad works at the prison and he wakes up the defendant every morning." . . . Another one of her coworkers stated that her husband works at one of the prisons but she doesn't know his name. And [Melissa W.] just remembered that, also.

(Dkt. 713 (RT) at 115.) Although defense counsel did not request further questioning of Melissa W. or raise any concerns about the juror's conversations with coworkers, the court should have sua sponte conducted additional questioning of Melissa W. or excused her for cause. *See Parker v. Gladden*, 385 U.S. 363 (1966) (finding a Sixth Amendment violation where a bailiff made comments to some jurors about defendant's guilt). Because Melissa W. was empaneled as a juror, Cramer's conviction and death sentence must be set aside. *See Id.* 366 "[P]etitioner was entitled to be tried by 12 . . . impartial and unprejudiced jurors."); *Ross*, 487 U.S. at 86 (1988) ("Any claim that the jury was not impartial" outside the context of *Witt/Witherspoon* violations "must focus . . . on the jurors who ultimately sat").

The court also improperly denied defense challenges for cause against several biased prospective jurors. For example, the defense jointly challenged **Prospective Juror 149, Sharon Q.**, based on bias. Sharon Q. had a brother and brother-in-law who were prison guards; her brother had shared stories about his "very hard job," problems with inmates, and the dangers he would face daily as a correctional officer. (Dkt. 717 (RT) at 229-31, 250-51, 54-55.) By her own spontaneous admission, "[t]o be quite honest . . . it may be a little more difficult for me to be totally unbiased," because the case "does deal with inmates." (Dkt 717 (RT) at 231.) She explained that "I feel I would be biased," and answered "yes" when asked whether she would have a "leaning against evidence coming from the inmates." (Dkt. 717 (RT) at 232-33.) Although she eventually said that she would "listen to both sides and do whatever the law says," she never disavowed her bias against inmates; instead, she reiterated that "[w]hat I was trying to do earlier is just be honest about my feelings." (Dkt. 717 (RT) at 236-37.) The court denied the defense challenge because "she could set [her biases] aside and not have those affect her" and follow the law. (Dkt. 717 (RT) at 257.) Because Sharon Q. clearly stated that she would

139

be biased and was never adequately rehabilitated, the court erred in denying the defense challenge for cause. Defense counsel exercised a peremptory strike against Sharon Q. (*See* Ex. 66 at 17.)

The court also improperly denied the defense's challenge for cause against **Prospective Juror 8, Brandi D.,** on the basis that she would "believe . . . a law enforcement officer simply because it's a law enforcement officer," (Dkt. 710 (RT) at 120); moreover, she "would strongly agree with [the] statement stating that I would be for the death penalty for [the] reason" that murderers "will do it over and over and over again." (Dkt. 710 (RT) at 122). The defense exercised a peremptory strike against Brandi D. (Ex. 66 at 1.)

Similarly, **Prospective Juror 186, Gail H.**, showed clear bias because she was good friends with a federal judge in the Beaumont courthouse and an AUSA from the same office as the prosecutors in Cramer's case. (Dkt. 707 (RT) at 182-83.) Gail H. said that it could "possibly" affect her impartiality, (Dkt. 707 (RT) at 184,) though she later said that she thought she could be impartial so long as those individuals weren't involved in the trial. In addition, Gail H's former classmate was a police officer who was murdered, and she followed his trial; Barlow told her he represented the murderer on appeal. Although Gail H. said that would not influence her, she admitted that "[i]t's still emotional for me sometimes. That went on, you know, the whole night; and the whole scenario, it was emotionally difficult." (Dkt. 707 (RT) at 192-93.) Because Gail H. was good friends with a judge and an AUSA in the same office as the prosecutors, and because Cramer's attorney had represented a defendant who murdered her classmate, Gail H. should have been excused for cause due to bias. (*See also* Section C, *supra* (juror should have been excused for cause under *Witt*).) Defense counsel used a peremptory strike to exclude Gail H. (*See* Ex. 66 at 21.)

Although the Supreme Court has sometimes found harmless errors when biased jurors are not ultimately seated, *see Ross*, 487 U.S. at 85, 88-89, in this case, the collective errors of the court undermined Cramer's right to a fair trial. Here, the court's errors meant that these three biased jurors

should have been excluded for cause; when combined with the court's *Witt* errors, defense counsel was deprived of at least six[27] total peremptory strikes that they had to exercise to exclude biased or unqualified individuals from the jury.

If the defense had not been forced to exercise their peremptory strikes against these biased jurors, Cramer's counsel could have used those strikes to exclude seated jurors who were also conviction-prone and death-leaning but whose bias may not have risen to the level of disqualifying them. For instance, Cramer could have struck **seated juror Linda B.**, who stated that she was more willing to believe law enforcement officers, (Dkt. 719 (RT) at 128), and would "probably" find it hard to separate the evidence of the two defendants, (Dkt. 719 (RT) at 143; *see also* Claim 8.D.) Counsel could have struck **seated juror Jason L.**, who initially stated that he would base his sentencing decision on whether a homicide was intentional or accidental, (*see* Dkt. 707 (RT) at 156-57); would have trouble viewing graphic images, (Dkt. 707 (RT) at 163-65); and had a "Support the Police" bumper sticker, (Dkt. 707 (RT) at 162-63.) These cumulative errors deprived Cramer of his rights to an impartial jury and to a fair trial. (*See also* Claim 6.)

**E.       Cramer's death sentence is unconstitutional because the prosecutor used the death-qualification process and his peremptory challenges to assemble a conviction- and death-prone jury**

Death qualification results in juries that are more conviction- and death-prone than other juries. *See Baze v. Rees*, 553 U.S. 35, 84 (2008) (Stevens, J., concurring) (observing that death qualification is "a procedure that has the purpose and effect of obtaining a jury that is biased in favor of the conviction"); (Ex. 45 ¶ 8) ("[S]cholarship indicates that death-qualified jurors, *i.e.*, those who undergo voir dire to establish whether they can sit on a capital jury, are less receptive to mitigating evidence in general than those who do not.")

---

[27] The court erroneously failed to grant at least four *Witt* challenges and three bias challenges, but Gail H. was challenged on both grounds, so the total number of individual jurors is seven.

Here, the prosecutors improperly and unconstitutionally used the death qualification process and his peremptory challenges to systematically exclude prospective jurors based on their skepticism of the death penalty. They would try to remove life-leaning jurors for cause—challenges which were typically granted—then later used their peremptory challenges to remove any remaining such jurors. For example, prosecutors followed this pattern with Prospective Juror 115, Jessica M., and Prospective Juror 253, Ernestine C. (*See* Dkt. 716 (RT) at 153-55; Dkt. 720 (RT) at 218-20.) By exercising their peremptory challenges in this manner, the prosecutors assembled a jury that was more likely to convict, less likely to consider mitigating evidence, and predisposed to return a death verdict.

Finally, racial minorities, women, and those with firmly held religious beliefs are substantially more likely to be removed during the death qualification process, *see* Mona Lynch & Craig Haney, *Capital Jury Deliberation: Effects on Death Sentencing, Comprehension, and Discrimination*, 33 Law & Hum. Behav. 481, 485 (2009). Death qualification allowed prosecutors to mask their unconstitutional attempts to remove protected classes of people from the jury pool. This deprived Cramer of his rights to an impartial jury and reliable determinations of guilt and penalty and deprived prospective jurors of equal protection. Like Cramer's *Witt* and *Witherspoon* challenges, this claim is not subject to harmless error analysis. *See Gray*, 481 U.S. at 668.

## F.      Instructions during jury selection were erroneous

Compounding the errors in ruling on challenges for cause and other jury selection matters when reviewing defense counsel's proposed PowerPoint presentations that they planned to give to the prospective jurors, the court told defense counsel, "You need to take out the sentence 'No juror is ever required to impose a sentence of death.'" (Dkt. 710 (RT) at 30.) Defense counsel should have been permitted to give this instruction because it was an accurate statement of the law. *See United States v. Jones*, 132 F.3d 232, 244 (5th Cir. 1998) *aff'd* 527 U.S. 373 (1999) (in an FDPA case, finding jury instructions proper that included: "Keep in mind, however, that regardless of your findings with

respect to aggravating and mitigating factors, you are never required to recommend a death sentence."). Telling jurors that they were not required to impose a death sentence gives effect to the Eighth Amendment requirement that capital defendants receive an individualized sentencing determination. *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *see also Penry v. Lynaugh*, 492 U.S. 302, 328, (1989), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002) (1990) (finding error "in the absence of instructions informing the jury that it could consider and give effect to the mitigating evidence" the defendant presented "by declining to impose the death penalty.")

## G.    Appellate counsel was ineffective

To the extent that this claim should have been raised on direct appeal, appellate counsel was ineffective. Although appellate counsel "need not (and should not) raise every nonfrivolous claim," *Nelson v. Davis*, 952 F.3d 651, 672 (5th Cir. 2020), a petitioner can establish deficient performance by establishing the "failure to raise or properly brief or argue certain issues on appeal." *Sharp v. Puckett*, 930 F.2d 450, 451 (5th Cir. 1991). Here, appellate counsel failed to raise the meritorious claim that Cramer's Sixth Amendment rights were violated when the trial court erroneously denied defense challenges for cause against biased or death-prone jurors and removed qualified life-leaning jurors. Cramer was prejudiced by appellate counsel's deficient performance because there is a reasonable probability that this claim would have been successful on appeal.

Because Cramer was denied his Sixth Amendment right to be tried by an impartial jury, his conviction and death sentence must be vacated.

## CLAIM 8: CRAMER WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL DURING VOIR DIRE

The Supreme Court has held that during voir dire in a capital case, "certain inquiries must be made to effectuate constitutional protections." *Morgan v. Illinois*, 504 U.S. 719, 730 (1992.) Indeed, voir dire "plays a critical function in assuring" that a defendant's Sixth Amendment "right to an impartial jury will be honored." *Id.* (cleaned up.) Defense counsel, in this case, failed to ensure that Cramer's

143

rights were protected during voir dire by failing to (1) appropriately use retained experts, (2) object to the government's use of racially-motivated peremptory challenges, and (3) challenge biased potential jurors for cause.

### A.   Legal basis

A defendant has the right to effective counsel during voir dire. *Virgil v. Dretke*, 446 F.3d 598, 610 (5th Cir. 2006). Counsel's duties during voir dire include objecting to biased jurors. *See id.*; *Thomas v. Lumpkin*, 995 F.3d 432, 445 (5th Cir. 2021) ("a counsel's failure to object to the seating of a juror who expressed an inability to be impartial is ineffective assistance.") Counsel should also raise appropriate *Batson*[28] challenges. *See ABA Guidelines*, Guideline 10.10.2 and Commentary, reprinted in 31 Hofstra L. Rev. 913, 1053-54 (2003.)

### B.   Counsel failed to appropriately consult with retained experts

As discussed in Claim 6, *supra*, in late 2017 defense counsel retained Jeffrey Martin, a statistical expert, to analyze the jury pool. After Martin had reviewed some initial records and defense counsel secured funding, the parties confirmed their agreement that Martin would "analyze the statistical issues in the jury selection process for this case and prepare a report or testify on behalf of both Mr. Fackrell and Mr. Cramer." (Ex. 11 ¶ 4, 7.) Defense counsel, however, never followed up with Martin, and no work was ever completed. (Ex. 11 ¶ 8, 9.) If counsel had used Martin as an expert, they would have discovered that the jury pool in Cramer's case did not represent a fair cross section of the community and that the Eastern District did not employ the required random selection procedure to compose Cramer's jury pool. *See generally* Claim 6.C, *supra*.

Counsel also retained Julie Howe, an expert in jury selection, to assist both the Cramer and Fackrell teams. Howe had extensive jury consultation experience in capital trials and had recently

---

[28] *Batson v. Kentucky*, 476 U.S. 79 (1986.)

consulted on a BOP homicide case resulting in a life verdict. (Ex. 42 ¶¶ 1-2.) The trial team, however, failed to make effective use of Howe. To start, counsel did not send her the draft jury questionnaire until after it was already in "final form" and the attorneys indicated there was "zero chance" of making changes. (Ex. 42 ¶ 5.) When Howe works with capital trial teams, she typically comes on board early in the process and is "involved in creating the juror questionnaire" to ensure that it captures questions that would reveal jurors' biases against the defendants. (Ex. 42 ¶ 3.) In this case, Howe was concerned that questions were confusing and key terms left undefined, making it difficult for prospective jurors to answer in a way that conveyed helpful information. (Ex. 42 ¶ 4.) In order to uncover juror biases, Howe also thought it crucial that questions be "specifically tailored to the mitigation evidence that the teams had developed and planned to present at trial." (Ex. 42 ¶ 3.) But when Howe "advised that the attorneys propose edits to the Judge, they told me that it was too late." (Ex. 42 ¶ 5.)

In terms of voir dire preparation, despite multiple offers to meet with defense counsel in advance of trial or to help prepare a practice voir dire, Howe did not meet counsel for the first time until the morning that voir dire began. (Ex. 42 ¶¶ 8, 10.) In Howe's "experience, a practice voir dire is a helpful tool" to prepare for a capital jury selection, and it is "essential to educate the attorneys on the Colorado Method[29] of jury selection, which is the standard of care for all capital trial teams," before jury selection begins. (Ex. 42 ¶ 8.) In this case, no such training or practice occurred.

During voir dire itself, counsel also declined to regularly meet with Howe. In Howe's experience, it is "best practice" to meet both before voir dire begins and daily during the voir dire. (Ex. 42 ¶ 9.) "Meeting prior to jury selection ensures I have a good understanding of the case, defense theories, mitigation, voir dire conditions, and the like. Meeting daily ensures that everyone is on the same page regarding the planned approach for each prospective juror and allows for a discussion of

---

[29] As Howe explains, "[t]he Colorado method is a method of jury selection that focuses on prospective jurors' views on the death penalty and rates those jurors based on their death penalty views." (Ex. 42 ¶ 3.1)

impressions of jurors qualified each day." (Ex. 42 ¶ 9.) Although Howe prepared summary sheets with detailed information about each juror, her summaries "were not discussed as a group to inform an agreed upon approach to the voir dire of each juror as far as I know." (Ex. 42 ¶ 11.) The lack of defined team strategy during voir dire was problematic and meant that Barlow, who led voir dire on behalf of both teams, "asked questions that sometimes worked to qualify the very jurors we suspected would vote for death." (Ex. 42 ¶ 14; *see generally* Claim 8.D, *infra*.)

Ultimately, Howe and Barlow "were the two main people who determined how to use [the] 30 peremptory strikes" that the Fackrell and Cramer teams were to exercise jointly. (Ex. 42 at ¶ 20.) But despite the fact that Howe had created a final spreadsheet and notes, on the night the individual voir dire was complete, the teams "did not fully discuss peremptory challenges until . . . the morning our strikes were due." (Ex. 42 ¶ 20.)

Counsel's failure to adequately consult with Howe during voir dire—particularly after counsel had entirely failed to follow up with Martin regarding whether the jury pool represented a fair cross section of the community—was deficient performance. *Cf. Hinton v. Alabama*, 571 U.S. 263, 275 (2014.) Effective use of Howe would have enabled counsel to better identify biased jurors through written questionnaires and live voir dire, and then challenge those jurors for cause and make effective use of their peremptory strikes. (*See* Ex. 42 ¶ 21 (explaining that in exercising strikes, the team "was sometimes working with incomplete information due to multiple problems that had occurred over the course of jury selection.")

146

**C.      Counsel was ineffective for failing to object to the prosecution's use of racially motivated peremptory challenges**

Counsel was ineffective for failing to object to the government's use of racially motivated peremptory strikes against Hispanic/Latino[30] prospective jurors Lydia B., Theresa W., Andrea G., and Lisa S.

Hispanic people comprised only 7.21% of the jury panel (22[31] of 305.) (Ex. 41 at Table 2); *see generally* Claim 6 (Fair Cross Section.) After agreements to excuse and hardship excusals, only eight Hispanic prospective jurors remained. (Ex. 70 (table of data from juror questionnaires.) One of those eight had too high a juror number to be included in the final jury. (Ex. 66 at 33.) Of the seven remaining Hispanic jurors who could potentially make the jury, the government used their peremptory strikes to exclude a majority of them (four of seven.) These statistics alone create an inference of discrimination. *See, e.g., Miller-El II*, 545 U.S. at 240 (noting that "happenstance" was unlikely to explain prosecutor's use of ten peremptory challenges to remove most of the African American prospective jurors.) At the very least, the prosecution should have been called on to explain their use of peremptory strikes to exclude most of the Hispanic prospective jurors from the jury, particularly where those strikes appeared to be motivated by race because each of these jurors had expressed their ability to be impartial, and some had even expressed pro-law enforcement views during voir dire.

The government struck **Prospective Juror 229, Lydia B.**, even though her voir dire was so unbiased that the government had stated, "Great. You can always tell when the lawyers think that someone is right kind of in the middle and where everybody wants them to be because they don't ask a lot of questions. And I'm pretty much out of my questions here, too." (Dkt. 720 (RT) at 110-11.) She also "believe[d] in the death penalty." (Dkt. 720 (RT) at 101; *see* Ex. 66 at 26 (striking Lydia B).)

---

[30] Jurors self-identified race on their juror questionnaires. Exhibit. 70 provides a summary of juror questionnaire responses relevant to the claims in this Petition.

[31] This includes prospective jurors who identified as biracial and Mexican American.

The government also struck **Prospective Juror 82, Theresa W.**, a school teacher who expressed her ability to be impartial and take jury service very seriously. She was death-qualified, having stated that the death penalty was "there for a reason and it was put in place because there has to be a penalty severe enough in order to deter it and . . . try to keep people from doing those things because of the consequences." (Dkt. 167 (RT) at 167.) She appeared unbiased, explaining that it was her "nature as a teacher to listen to both sides before I make a judgment." (Dkt. 713 (RT) at 166-67.) The government nonetheless chose to use a peremptory strike against her. (Ex. 66 at 10.)

The government also struck two Hispanic jurors with ties to law enforcement who both appeared to be prosecution-friendly jurors. **Prospective Juror 90, Andrea G.**, was struck despite having several family members in law enforcement. (Dkt. 706 (RT) at 94-95; Ex. 66 at 10.) Andrea G. was death-qualified, (*see* Dkt. 706 (RT) at 100-101), and appeared unbiased: in determining whether to impose a death sentence, she explained that it "depends on the crime and—you know, it just depends on all the circumstances." (Dkt. 706 (RT) at 101.) Finally, **Prospective Juror 97, Lisa S.**, was struck by both the government and the defense further underscoring that the prosecution's peremptory strike did not appear to be motivated by any defendant-friendly answers she provided (Ex. 66 at 11.) Lisa S. stated that she "could be impartial . . . listen to everything and do my duty." (Dkt. 706 (RT) at 139.) She had also worked in law enforcement, including as a jailer. (Dkt. 706 (RT) at 133.) The prosecution, however, struck Lisa S. as well.

Counsel should have noticed and objected to this discriminatory pattern of strikes. First, counsel submitted all of their peremptory strikes in a single list (Ex. 42 ¶ 18), so it should have been particularly easy to spot patterns. Second, the trial judge appears to have prompted defense counsel to ask if they had any *Batson*-related concerns after the government submitted their list of peremptory strikes. (*See* Dkt. 747 App. A at 7; *see also* Claim 15.) Neither the official transcript nor the unofficial reconstruction of off-the-record bench conferences reflects defense counsel raising any *Batson*

148

challenges to strikes of non-white jurors, even when affirmatively prompted by the trial judge.

Counsel's failure to challenge the government's peremptory strikes under *Batson* constitutes deficient performance under *Strickland*, 466 U.S. 668. Because there was no objection, the prosecution was never called upon to justify these strikes, and the court never determined whether the strikes were motivated by racial, ethnic, or gender-based stereotypes.[32] The "rule in *Batson* provides an opportunity to the prosecutor to give the reason for striking the juror, and it requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it." *Miller-El,* 545 U.S. at 251-52.

A *Batson* violation renders the proceedings fundamentally unfair. When trial counsel's deficient performance results in a structural error, the prejudice prong of a *Strickland* claim can be presumed. *See Weaver v. Massachusetts*, 582 U.S. 286, 301 (2017) (reaffirming "the Court's precedents determining that certain errors are deemed structural and require reversal" without a showing of prejudice "because they cause fundamental unfairness, either to the defendant in the specific case or by pervasive undermining of the systemic requirements of a fair and open judicial process.") Where, as here, a prima facie case for a *Batson* violation has been made and the record is silent on the trial court's findings, the appropriate remedy is a new trial. *Snyder*, 552 U.S. at 485. At the very least, this Court should "require[] the prosecutor to come forward with a neutral explanation" for his strikes. *Forte*, 865 F.2d at 64 (explaining that the appropriate remedy for ineffectively failing to raise a *Batson* challenge is "to give [the defendant] what he should have gotten in the first place, an explanation from the prosecutor as to why [he] used [his] peremptory challenges and a ruling by the court on whether [the defendant] has established that there was purposeful discrimination.")

**D.      Counsel was ineffective for failing to conduct adequate voir dire**

Counsel's voir dire lacked a defined strategy. Howe, who "was in court for every day of the voir dire proceedings," (Ex. 42 ¶ 12), noted that "[i]t was clear to [her] that Mr. Fackrell and Mr.

---

[32] All of the Hispanic jurors that the government struck were also women.

149

Cramer's attorneys did not always have a coherent plan for their individual voir dire of prospective jurors." (Ex. 42 ¶ 12.) Howe notes that "Mr. Barlow essentially led the voir dire for the defense," (Ex. 42 ¶ 13), and that in her professional opinion, "Mr. Barlow's questioning of prospective jurors was not effective. There were prospective jurors I suspected would not consider a life sentence in this type of case… and who would not give weight to mitigation evidence in this case—and would be subject to a challenge for cause if we could establish that through effective voir dire." (Ex. 42 ¶ 14.) Overall, Howe "was frustrated by what she observed to be ineffective questioning." (Ex. 42 ¶ 14.)

For example, counsel agreed to excuse for hardship a life-leaning juror who had not requested a hardship exemption, and who had not been substantively questioned about any of her views. At the start of her individual voir dire, **Prospective Juror 85, Annette R.**, volunteered that when she had filled out the juror questionnaire, she put that she "believed in the death penalty but I could not give it." (Dkt. 713 (RT) at 50.) She had "thought about that and prayed about it since then" and determined that [i]f the circumstance is right, it would be a serious decision but I could do the death penalty." (Dkt. 713 (RT) at 50.) After this volunteered statement, Fackrell's counsel questioned her only about her mobility status, and Barlow declined to ask her any questions at all. Although Annette R. reported that she used a walker, she said multiple times that she would have "no problem" serving on the jury and making it to court each day, and she did not ask to be excused. (Dkt. 713 (RT) at 51-52.) Despite the repeated affirmations of this life-leaning juror that she would have no problem serving, Barlow inexplicably "agree[d]" that she should be excused for "undue hardship based on her mobility." (Dkt. 713 (RT) at 52.)

Counsel also failed to challenge or effectively question multiple biased prospective jurors. Most importantly, counsel was ineffective for failing to challenge **seated juror Linda B.** for cause or to exercise a peremptory strike against her. Linda B. stated during voir dire that she was more willing to believe law enforcement officers (Dkt. 719 (RT) at 129) and would "probably" find it hard to

150

separate the evidence of the two defendants, (Dkt 719 (RT) at 143.) Counsel should have challenged her for cause. *See Virgil*, 446 F.3d 598 at 609; *see also Hughes v. United States*, 258 F.3d 453, 459 (6th Cir. 2001) Similarly, counsel should have challenged **alternate juror Dennis G.** for cause (or at minimum, struck him using a peremptory) due to his law enforcement and pro-prosecution bias, including the fact that his wife used to work in the prosecutor's office with Cramer's prosecutor, Batte. (*See* Dkt. 720 (RT) at 192-93.)

In addition, counsel's use of peremptory strikes to exclude biased prospective jurors without first attempting to exclude them through agreements or for-cause challenges was deficient performance. For example, Cramer's counsel exercised a peremptory strike on **Prospective Juror 34, Justin C.,** after initially *refusing* to agree to excuse him. (*See* Ex. 66 at 4; Dkt. 711 (RT) at 156-61.) Justin C. had a pending DWI which the court was concerned could disqualify him; the government stated they would agree to excuse him but Cramer's counsel refused. There could be no strategic reason for defense counsel not agreeing to excusing Justin C., but then using one of their limited peremptory strikes to exclude him. (*See also* Ex. 42 ¶ 12 (explaining that defense counsel "did not always have a coherent plan" or goal for each prospective juror).) Similarly, **Prospective Juror 27, Debra G**., could have been excused for cause or hardship because she was concerned about her safety and expressly stated she preferred to be anonymous before the defendants. (Dkt. 711 (RT) at 88-89; *see also* Claim 9 (discussing unconstitutional security measures).) Instead, defense counsel allowed Debra G. to be qualified without challenge and then used a peremptory strike to exclude her. (Ex. 66 at 3.) As Howe summarized, based on her "experience, the attorneys' poor questioning of the jurors meant that we ended up having to waste peremptory strikes on prospective jurors that might otherwise have been removed for cause." (Ex. 42 ¶ 14.)

Defense counsel also should have challenged for cause prospective jurors whose religious beliefs would have impaired their performance. For example, **Prospective Juror 100, Mary W.**, would

have been expressly guided by her religious beliefs in choosing between a life or death sentence: "The Lord is going to put on my heart which way to choose." (Dkt. 714 (RT) at 9.) **Prospective Juror 188, Janette F.**, also clearly indicated during voir dire that her religious beliefs would influence her: she consulted the Bible regarding the death penalty and stated "America was founded as a Christian nation; and . . . I believe that our laws are—and our country, in essence, is divinely established . . ." (*See* Dkt. 707 (RT) at 226-27.) In her juror questionnaire, she wrote that "our leaders are appointed by God and have the authority to make and enforce laws including penalties as did the Jews in the Old Testament." (*See* Dkt. 707 (RT) at 236.) Janette F. and Mary W. could each have been challenged for cause. Instead, defense counsel allowed these jurors to be qualified and chose to exercise two of their limited peremptory strikes against them. (*See* Ex. 66 at 12, 21.) There was no strategic reason for counsel failing to challenge these jurors for cause.

To establish prejudice, a petitioner typically must establish that a biased juror was seated. However, prejudice can also be shown if the cumulative prejudice of defense counsel's deficiencies rendered the proceeding fundamentally unfair, even without a specific showing of juror bias. *See, e.g., Harris By & Through Ramseyer v. Wood*, 64 F.3d 1432, 1438 (9th Cir. 1995) Here, Cramer can establish prejudice because, as detailed above, at least one seated juror and two alternate jurors were biased. Linda B., who was seated on the jury, explicitly stated that she was more willing to believe law enforcement officers and that she would "probably" find it hard to separate evidence for Cramer and his co-defendant. (*See* Dkt. 719 (RT) at 128-31, 143.) Because Linda B. actually served as a juror, Cramer is entitled to relief. (*See* Ex. 66 at 23.) *See Virgil*, 446 F.3d 598 at 609. Taken together, counsel's failures deprived Cramer of the right to an "adequate voir dire," *Morgan*, 504 U.S. at 729 (1992), and prejudiced Cramer. Cramer is entitled to a new trial.

152

**CLAIM 9: THE EXCESSIVE SECURITY PRESENCE AT TRIAL VIOLATED THE DUE PROCESS PRINCIPLES OF *DECK V. MISSOURI***

Cramer's confinement and sentence are illegal, unconstitutional, and void under the Fifth, Sixth, and Eighth Amendments to the United States Constitution because he was shackled and because of the excessive presence of armed law enforcement officers inside the courtroom, inside the courthouse, outside the courthouse, and en route to the courthouse from the prison, all of which likely influenced the verdicts in his trial.

**A.      Legal basis**

"[T]he Constitution forbids the use of visible shackles during the penalty phase, as it forbids their use during the guilt phase unless that use is 'justified by an essential interest'—such as the interest in courtroom security—specific to the defendant on trial." *Deck v. Missouri*, 544 U.S. 622 (2005) (*citing Holbrook v. Flynn*, 475 U.S. 560, 568-69 (1986).) The prohibition of shackling and other visible heightened security measures emphasizes the importance of three fundamental legal principles: the presumption of innocence, the right to counsel, and the ability of judges to maintain a dignified judicial process. *Holbrook*, 475 U.S. at 569; *Deck*, 544 U.S. at 631 (security measures may create unconstitutional trial conditions where they communicate that the defendant is especially dangerous or culpable); *Estelle v. Williams*, 425 U.S. 501, 504-05 (1976) (courtroom practice violates due process where it undermines the presumption of innocence.)

In order to justify an otherwise unconstitutional order for shackling or excessive security presence, the trial court must make an individualized determination as to its necessity. *Deck*, 544 U.S. at 629; *Holbrook*, 475 U.S. at 568-69 (describing shackling as "inherently prejudicial" and the showing of substantial need required to justify it as satisfied only by "an essential state interest specific to each trial"); *McKaskle v. Wiggins*, 465 U.S. 168, 178-79 (1984) ("[T]he courts have recognized that a defendant has a right to be present at all important stages of trial, that he may not normally be forced to appear in court in shackles or prison garb, and that he has a right to present testimony in his own behalf.")

153

As the Supreme Court has recognized, "no person should be tried while shackled and gagged except as a last resort. Not only is it possible that the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant, but the use of this technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold." *Illinois v. Allen*, 397 U.S. 337, 344 (1970.) Trial counsel ineffectively failed to properly object and failed to preserve the record for review. *Strickland*, 466 U.S. 668.

**B.    Factual basis**

On November 14, 2017, Cramer filed a "Motion to Prevent Defendant From Being Shackled in Public." (Dkt. 121.) In that motion, Cramer's counsel cited inapplicable Texas state law and failed to cite either the seminal case on shackling *Deck v. Missouri* or any case published after 1994. (Dkt. 121.) Cramer's motion acknowledged that the "extensive and obvious security measures of the U.S. Marshall's [sic] Service or Court Security Officers" would create the same prejudicial effect on the jury as shackling would, yet did not ask the Court to take any action with regard to the security presence. (Dkt. 121 at 3.) The trial court granted Cramer's shackling motion as well as a similar but better-researched motion filed by Fackrell. (Dkts. 148, 168, 178.) The Court's order found no facts and merely said, "Cramer shall not be shackled during court proceedings before the jury." (Dkt 168 at 1.)

On March 22, 2018, "[i]n view of increased concerns about court security and further consultation with the United States Marshals Service ("USMS")," the court vacated shackling orders and issued a new order requiring ankle restraints and a skirt around counsel tables to hide them from view. (Dkt. 445.) The order did not elaborate on or describe the "increased concerns" which led the court to vacate its previous orders. During a hearing on March 27, 2018, counsel objected to the use of "a large motorcade with flashing lights . . . [and] armed guards at the perimeter of the back of the courthouse, which is where jurors would park." (Dkt. 723 (RT) at 5.) As with the March 22, 2018 shackling order, the court found no specific facts as to why there were "increased" concerns, what

154

those concerns were, or what facts the USMS relied upon in placing armed guards around the courthouse, using a motorcade with flashing lights, or asking the court to shackle Cramer. In fact, the court made clear that whatever the USMS thought was appropriate, she would agree with: "[T]he court wants security around this courthouse and if that requires armed men with guns, so be it. That's the way it is." (Dkt. 723 (RT) at 6.) The court even admitted that it did not know the extent of the security measures the USMS would be employing outside the courthouse. (Dkt. 723 (RT) at 7.) There is nothing in the record showing that the court made the required individualized determination to support either shackling or the use of these other extreme security measures. *See Deck*, 544 U.S. at 629; *Holbrook*, 475 U.S. at 568-69.

The court then asked a representative from the USMS to describe the security presence. An unidentified officer testified that because the van carrying the defendants has tinted windows and because the sallyport was not visible to the public once the doors were closed, the defendants would not be identifiable as being part of the motorcade. (Dkt. 723 (RT) at 7.) The court dismissed counsel's argument that the jury would know who was being transported and discouraged counsel from asking prospective jurors during voir dire if they had noticed the security presence or transport of the defendants into the courthouse. (Dkt. 723 (RT) at 8-11.) The Court then questioned the unidentified officer about the presence of armed officers outside the courthouse. The officer testified that "visibly armed people" would be stationed around the courthouse with AR-15 rifles for "external threats" throughout the duration of the trial. (Dkt. 723 (RT) at 8-9.) The officer proffered no particular threats that had been received, no history of "external threats," and no theory about what those external threats might be. The officer claimed that the AR-15s would not be visible to the public or the jury, but admitted that "discreetly" armed persons would be visible to the jury "around" the courthouse. (Dkt. 723 (RT) at 10.)

155

Counsel's argument against the increased security presence was misguided and futile. Counsel for Fackrell argued that the sight of the AR-15s would be upsetting for jurors, but the Court quickly dismissed this concern by suggesting that Beaumont was a rough town, and therefore the jurors would not be upset. (Dkt. 723 (RT) at 11.) Counsel should not have objected on the grounds that the jurors would be upset, however; he should have objected on the basis that it would prejudice the jury in favor of the government. *Allen*, 397 U.S. at 344.

Furthermore, counsel unreasonably failed to inquire as to the number of officers who would be armed with AR-15s, the number who would be "discreetly" armed, what they would be armed with, whether there would be firearms in the courtroom, or how many officers would be present in the courtroom during the trial proceedings. The court did not engage in any fact-finding regarding the particular necessity of the use of AR-15s, "discreetly" armed officers, or the use of the motorcade with flashing lights hardly unnoticeable to the juror arriving early or lingering late. Nor did the Court seek to ensure that jurors would not see the security presence—it merely speculated that they were not likely to. Speculation does not satisfy the individualized determination required by *Deck*, 544 U.S. at 629.

On April 8, 2018, during voir dire, counsel for Fackrell (joined by counsel for Cramer), advised the court that the defendants had been brought to the courthouse late, that he had seen "the machine gun guys and everything" as they were walking into the courthouse for an 8:30 hearing, and that two jurors had walked in with them. However, counsel did little more than acknowledge the problem, and there was no more apparent inquiry as to what the jurors had seen, nor direction to the Marshals to adhere to the agreed schedule by the Court. (Dkt. 710 (RT) at 5-6.)

## C.   The shackling and excessive security presence violated Cramer's rights

Cramer's constitutional rights were violated by the excessive security presence at trial. First, it is apparent from the record that the trial court did not make an individualized determination as to the

156

"substantial need" or "essential interest" for either shackling Cramer or exposing the jury to the heightened security presence, as required by Supreme Court precedent. *Rhoden v. Rowland*, 172 F.3d 633, 636 (9th Cir. 1999) (9th Cir. 1999.); *Holbrook*, 475 U.S. at 568-69; *McKaskle*, 465 U.S. at 178-79; *Allen*, 397 U.S. at 344.

Second, entrance to the courthouse was subject to extraordinary controls that conveyed an alarming message of danger and presumed guilt. There were officers armed with AR-15 assault rifles positioned outside the courthouse, including on the roof. Cramer was transported to court every day in heavy restraints by a caravan of armed vehicles. And third, there was a very conspicuous presence of armed law enforcement officers in and around the courtroom for the duration of the trial. *See Holbrook*, 475 U.S. at 569; *Woods v. Dugger*, 923 F.2d 1454, 1460 (11th Cir. 1991) (granting habeas relief where large number of uniformed corrections officers attended the trial of an inmate for killing a prison guard); *Mata v. Johnson*, 99 F.3d 1261, 1271 (5th Cir. 1996) (conspicuous presence of armed security personnel in and around the courtroom may be inherently prejudicial), *vacated and remanded sub nom. part*, 105 F.3d 209 (5th Cir. 1997.) This presence inside the courtroom eliminates any argument that the jurors might dissociate the presence of armed officers from Cramer.

Cramer was shackled in the courtroom at the ankles, and there was a curtain around the table (Dkt. 445), but the jury could nonetheless have surmised that Cramer was restrained and likely saw the shackles at least once during the trial. *See Deck*, 544 U.S. at 630, 635, *Rhoden*, 172 F.3d at 636 (9th Cir. 1999.)

All of these facts demonstrate both actual and inherent prejudice from the shackling the excessive security measures and related courtroom atmosphere. *See Holbrook*, 475 U.S. at 570 (inherent prejudice established where circumstances create "an unacceptable risk" of "impermissible factors coming into play.") The jury was necessarily left with the impression that Cramer was and would continue to be a danger to others, which only exacerbated the other inadmissible, unconstitutional

157

evidence and argument by the government regarding Cramer's alleged future dangerousness. (*See also* Claims 1, 2.*)* In this atmosphere, the unwarranted and improper imposition of restraints and the overwhelming presence of armed law enforcement officers undoubtedly denied Cramer his rights to due process, the presumption of innocence, a fair trial, and a reliable determination of guilt and the appropriate penalty, in violation of his Fifth, Sixth, and Eighth Amendment rights under the Constitution. Counsel was ineffective for failing to protect these rights.

## CLAIM 10: PROSECUTORIAL MISCONDUCT

The government violated Cramer's constitutional rights by committing multiple acts of misconduct including (1) withholding exculpatory evidence; (2) presenting false, unreliable, and misleading evidence; (3) improperly questioning witnesses; (4) making inflammatory remarks throughout the trial; (5) denigrating the defense and defense witnesses; (6) seeking to prevent counsel from presenting a defense; (7) denigrating defense counsel; (8) misstating the law; (9) improperly arguing other cases; and (10) making other improper arguments in the penalty phase of the trial. This misconduct violated Cramer's rights to a fair and impartial jury; a fair, reliable and determination of guilt, death eligibility, and penalty; and his right to confront witnesses as guaranteed by the Fifth, Sixth, and Eighth Amendments. Whether evaluated independently or cumulatively, the government's misconduct in this case was material and entitles Cramer to a new trial. Conduct that violated Cramer's rights at his capital trial include but are not limited to the following instances:

**A.** **The government knowingly presented false or misleading testimony about Cramer's rank in SAC and the circumstances surrounding the Johns homicide**

Prosecutors violate due process by presenting material testimony that is false, or creates a false impression, or by allowing false or misleading testimony to stand uncorrected. *See, e.g., Mooney v. Holohan*, 294 U.S. 103 (1935) (presenting knowingly false testimony violates due

158

process); *Giglio v. United States*, 405 U.S. 150 (1972) (failing to correct false testimony violates due process); *Napue v. Illinois*, 360 U.S. 264 (1959) (failing to correct testimony that creates a false impression, though not perjured, violates due process.) Due process is likewise offended by direct statements that are untrue and by testimony which, "taken as a whole," give the jury a "false impression." *Alcorta v. Texas*, 355 U.S. 28, 31 (1957.) A claim of prosecutorial misconduct under this line of cases, has three elements: (1) the testimony in question was false or, taken as a whole, gives a false impression; (2) the government knew or should have known the testimony was false, and (3) the testimony was material. The materiality standard is satisfied if there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976).

Throughout Cramer's trial, the government argued that Cramer and Fackrell murdered Johns in cold blood to maintain their reputations in the aftermath of Johns' "disrespect." This "disrespect" theme undergirded the government's presentation at guilt and penalty phase, beginning with the government's opening statement:

> Now, you might be wondering: What was it that caused the defendants to kill Leo Johns? What was his crime that required their administration of the death penalty? It's pretty simple. They didn't like him. They didn't like Leo Johns because he used drugs…. They didn't like Leo Johns because he used alcohol…. Most of all, they didn't like Leo Johns because he disrespected his gang general, Christopher Cramer. So, he had to die. He had to be killed. And that is just what General Cramer set out to do, kill Leo Johns after he caught him getting drunk one too many times in his, the general's, estimation.

> In the upside-down world of prison gangs, Cramer decided that Leo Johns had to die because he hadn't followed the orders of his general. He disrespected his general.

(Dkt. 591 (RT) at 68-69.) Another illustrative example is the government's characterization of Cramer's use of the phrase "W/R" when signing a letter:

> And in one of the other pages of the exhibit – it's in 11E, page 9—he actually writes it all the way out, and you can see that "W/R" means "with respect." And again that makes

159

sense because we know that Christopher Cramer—to him, respect is very important, apparently important enough to kill somebody over.

(Dkt 596 (RT) at 53.) According to the government, respect was so important to Cramer because he was the "general," or ultimate leader, of SAC, and as such could not risk any harm to his standing among SAC members or leaders of other prison gangs.

Based on BOP records and interviews of witnesses in their discovery, the government knew or should have known that attributing Johns' death to "respect" alone was missing a crucial element: ███████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████

   ███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

   ███████████████████████████████████

████████████████████████████████████████

160

███████████████████████████████████████████ But the government's refusal to pursue material information does not negate the duty to present it. *See United States v. Auten*, 632 F.2d 478, 481 (5th Cir. 1980) ("If disclosure were excused in instances where the prosecution has not sought out information readily available to it, we would be inviting and placing a premium on conduct unworthy of representatives of the United States Government. This we decline to do.")

Without information that Cramer committed the crime under significant duress, the jury was left with the false impression that Cramer's actions were driven solely by ego and pride rather than the very understandable human need to protect himself and the people he cared about. There is a reasonable likelihood that this false evidence and argument affected the jury's decision to convict Cramer of first-degree murder and to sentence him to death. Even without evidence about the direct threats that Cramer faced, a number of jurors were already inclined to find what they heard about the circumstances of the Johns homicide mitigating:

- Ten jurors agreed that "Christopher Cramer joined SAC in need of protection."
- Five jurors agreed that "Inmate Leo Johns was disrespectful to Christopher Cramer in violation of gang rules."
- Seven jurors agreed that "Inmate Leo Johns provoked the offense on June 9, 2014, by referring to SAC as 'Fuck them, Dudes.'"
- Ten jurors agreed that "Gang rules required Christopher Cramer to take action against inmate Leo Johns." and
- Six jurors agreed that "Christopher Cramer had to act against inmate Leo Johns to avoid placing himself in danger."

(Dkt. 666 (RT) at 14.) The jurors were also aware of Cramer's previous experience as a victim of prison violence and his desire to find belonging and safety: Ten jurors found it mitigating that "Christopher Cramer joined [SAC] in need of protection," and five found it mitigating that "Christopher Cramer was himself stabbed while in prison." (Dkt. 666 (RT) at 14.) ████████

161

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████

## B.     Government misconduct under *Brady v. Maryland*

Due Process prohibits the prosecution from withholding "evidence favorable to an accused." *Brady v. Maryland*, 373 U.S. 87 (1963). *Brady* requires relief when (1) the evidence is "favorable to the accused," (2) the "evidence [was] suppressed by the state, either willfully or inadvertently," and (3) "prejudice . . . ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Prejudice is shown if "the net effect of the evidence withheld by the State…raises a reasonable probability that its disclosure would have produced a different result." *Kyles v. Whitley*, 514 U.S. 419, 421-22 (1995). A defendant need not request the material to trigger the prosecution's duty to disclose. *Strickler*, 527 U.S. at 280-81. The duty applies equally to exculpatory and impeachment evidence. *United States v. Bagley*, 473 U.S. 667, 676 (1985); *see also Kyles*, 514 U.S. at 433. Evidence is "material" under *Brady*, establishing prejudice, if "there is a reasonable probability that [the petitioner's] conviction or sentence would have been different had the suppress[ion]" not occurred. *Strickler*, 527 U.S. at 264. When assessing prejudice, courts must look to the "cumulative effect of all such evidence suppressed by the government." *Kyles*, 514 U.S. at 421.

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

162



That information would only have been available to the government. The government should have investigated this, as they knew it would reveal exculpatory information. *See Kyles v. Whitley,* 514 U.S. at 433. This information was material to Cramer's duress defense, and had it been presented, would have created a reasonable likelihood that the verdict at the guilt phase would have been for acquittal, or that at least one juror would have voted for life.

Regarding all of the witnesses called by the government or otherwise listed in discovery, the government failed to disclose cooperation agreements, criminal histories, histories of cooperation with other prosecutions, psychiatric information, and histories of lying or inconsistent statements. ▉

Likewise, Otis Carden had testified to a grand jury in West Virginia (Dkt. 591 (RT) at 201), but this information was not provided to the defense. Without this information, counsel was unable to properly impeach Carden, and could not build a case that Carden was motivated to encourage Cramer to take action, which also would have bolstered Cramer's duress defense.

The government's suppression of these material facts that could have impeached these and other witnesses prejudiced Cramer because it foreclosed an opportunity for him to present a complete

defense and to challenge the government's evidence. Had they had this information, there is a reasonable probability that at least one juror would have voted to acquit or voted for life.

## C. Improper conduct under *Darden v. Wainwright*

Prosecutorial misconduct in the form of remarks that "so infected the trial with unfairness as to make the resulting conviction a denial of due process," or that manipulate or misstate the evidence, warrants federal habeas relief. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal citation and quotation marks omitted.) A prosecutor commits misconduct when he refers to facts not in evidence, mischaracterizes evidence, or misstates the law. *Darden*, 477 U.S. at 181. A prosecutor also may not make "comments calculated to arouse the passions and prejudices of the jury." *United States v. Leon-Reyes*, 177 F.3d 816, 822 (9th Cir. 1999.)

The prosecution engaged in misconduct during trial, including making improper comments or posing improper questions that unfairly prejudiced Cramer in the eyes of the jury. These comments improperly inflamed the passions of the jury throughout the trial, including during opening and closing arguments.



The government manipulated, despite its protestations to the contrary, the timing of Rekonen's plea agreement to prevent him from testifying, and therefore avoid the impeachment of an important witness for Cramer. (Dkt. 548 (RT) at 4-13.) The court had noted, prior to this, that "Cramer 'benefits from convincing the jury that Fackrell is the more violent and more deliberate defendant

164

between the two of them' during a joint trial. Therefore, it is apparent that Cramer has a strong interest in delving into this matter during the cross-examination of Rekonen." (Dkt. 502 (RT) at 4.) (*See also* Claim 3.) The failure to disclose was also prejudicial, because absent this manipulation of witnesses, Cramer would have had stronger support for his duress defense, which had implications for both the guilt and penalty phases of trial.

Counsel was prejudicially ineffective for failing to object or otherwise mitigate the damage done by the government's misconduct against the damaging testimony. "'Unfortunately, when a prosecutor acts unfairly, there is little a defendant can do other than rely on his or her attorney to lodge an appropriate and timely objection.'" *Hendricks v. United States*, No. 2004-05, 2015 U.S. Dist. LEXIS 193811, at *15 (D.V.I. Sep. 1, 2015) (*quoting Hodge v. Hurley*, 426 F.3d 368, 377 (6th Cir. 2005).) "A failure to make such an objection can have devastating consequences for an individual defendant." *Id.* Accordingly, "[a] failure to object to prosecutorial misconduct can constitute ineffective assistance of counsel." *Alexander v. Shannon*, 163 Fed. Appx. 167, 173 (3d Cir. 2006) (citing *Gravley v. Mills*, 87 F.3d 779, 785-86 (6th Cir. 1996).)

For all the same reasons, appellate counsel performed deficiently, to the extent they failed to raise the foregoing errors during Cramer's direct appeal proceedings, and their failure prejudiced Cramer. For the errors that are apparent on the face of the record, appellate counsel were ineffective for failing to raise the issue during Cramer's direct appeal; Cramer can establish prejudice for those failures because these issues are meritorious.

## CLAIM 11: TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO ADEQUATELY ARGUE FOR SEVERANCE

Trial counsel were ineffective for failing to present a reasoned argument – specific to the facts

of Cramer's case and defense – as to why Cramer's trial should be severed from Fackrell's.[33] Cramer

is entitled to a new trial.

### D.    Legal basis

Separate trials for co-defendants are required "if there is a serious risk that a joint trial would

compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable

judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993.) The "prototypical

example" of a case requiring severance would be "a trial in which each of two defendants claims

innocence, seeking to prove instead that the other committed the crime." *United States v. Holcomb*, 797

F.2d 1320, 1324 (5th Cir. 1986.) Defense counsel should seek severance or take other precautions to

protect his client from prejudice when a joint trial would compromise his client's constitutional rights.

*See, e.g., Williams v. Washington*, 59 F.3d 673, 682 (7th Cir. 1995) ("[C]ounsel's failure to consider seeking

a severance . . . was not objectively reasonable.")

### E.    Factual basis

Here, counsel failed to competently present the case for why the court should exercise its

authority under Rule 14 to sever Cramer's trial from Fackrell's. *See* Fed. R. Crim. Pro. 14. Cramer and

Fackrell each moved for severance. (*See* Dkts. 85, 86.) The two defendants, however, filed motions

that were largely verbatim copies of one another, a day apart. Far from trying to situate Cramer's case

in the class of cases with "antagonistic" defenses that might actually merit severance, *see Holcomb*, 797

F.2d at 1324, Cramer's motion for severance focused on the fact that "[i]f the defendants are tried

together, Mr. Cramer anticipates that each will exercise his Fifth Amendment right to remain silent."

(Dkt. 85 at 3.) In fact, both defendants' motions stated that "[t]his is not a case in which one defendant

intends to cast blame upon another." (Dkt. 85 at 13; Dkt. 86 at 10-11.) The fact that the motions were

---

[33] On direct appeal, Cramer argued that the trial court erred in denying his motion for severance. *United States v. Cramer*, No. 18-40590, ECF No. 145 (Apr. 14, 2020). This claim is distinct because it is raised as an ineffective assistance of counsel claim.

166

almost entirely cut and pasted from one another further undermined the defendants' argument that they should be treated separately since counsel were already coordinating their defenses. Moreover, the motion to sever inexplicably failed to argue that the fact that Fackrell committed *another* murder just a few months after the Johns murder—and that BOP was unable to securely house Fackrell to prevent this—was bound to make Cramer appear dangerous by association during penalty phase.[34] Defendants' motions to sever were denied.

During the guilt phase of the joint trial, Cramer's and Fackrell's defenses were at odds. Fackrell's counsel did not ultimately want Rekonen to testify, because they feared Fackrell's involvement in the Griffiths homicide would be revealed. But, as the court found, and discussed in Claim 1, *supra*, if Rekonen had testified during the guilt phase of trial, this testimony could have been helpful in establishing that Fackrell was the more violent of the two, and more importantly, that Cramer was under duress when he attacked Johns. But despite knowing that Rekonen's testimony could only help him, Cramer's counsel did not press for him to testify and cited an aversion to severance or a mistrial as his reason. (Dkt. 493 (RT) at 5.) Fackrell's theory of the case also put the responsibility for planning the Johns killing directly onto Cramer. As Fackrell's attorney summarized in closing: "[W]hat I have come down to is this. Chris Cramer wanted to kill Leo Johns. Ricky Fackrell talked him down off the cliff, 'Come on back down here.' Okay? 'We don't need to kill this guy.'" (Dkt. 596 (RT) at 107.) Fackrell's attorneys argued that it was likely the stab wounds Cramer inflicted that actually killed Johns and that Cramer was the one who went back into Johns' cell to "finish him off." (Dkt. 596 (RT) at 114-19; *see* Dkt. 595 (RT) at 173-80 (eliciting testimony about Cramer going back into Johns' cell alone, and that it could not be proven that Fackrell's stab wounds caused Johns'

---

[34] Cramer's counsel briefly and confusingly argued that evidence of Fackrell committing a second murder would prejudice Cramer during the *guilt* phase of trial, where this evidence presumably would be inadmissible. (Dkt. 85 at 15.) They also failed to renew the motion to sever during a hearing about whether Rekonen could testify at the guilt phase, where the court *acknowledged* that Cramer and Fackrell had divergent interests. *See* Claim 1.

167

death).) This theory blamed Cramer alone for the murder and supported the government's theory that Cramer committed first-degree murder by planning the killing in advance. (*See also* Dkt. 594 (RT) at 28.)

During the penalty phase, the prosecution introduced highly prejudicial evidence against Fackrell that would have been inadmissible against Cramer if the two defendants had had separate trials. Most damaging was evidence that Fackrell had committed the additional, brutal murder of Griffiths *after* the killing of Leo Johns, "stomp[ing] out yet another inmate in the recreation cage . . ." (Dkt. 679 (RT) at 180.) The government also introduced multiple incidents of Fackrell manufacturing weapons after the Johns killing, (Dkt. 679 (RT) at 182-85 (describing Fackrell making hatchets, axes, and weapons from broken pipes).) Fackrell attacking a correctional officer (*see, e.g.* Dkt. 679 (RT) at 184) (playing a video and describing Fackrell "assaulting a corrections officer using one of those hatchets that he's made"); and Fackrell violently destroying his cell on several occasions, (*see, e.g.*, Dkt. 679 (RT) at 181-82.) In contrast to Fackrell, Cramer had been confined at ADX since the Johns murder without any violent incidents. (*See* Dkt. 679 (RT) at 170) The evidence of Fackrell's violent and unpredictable behavior was highly damaging to Cramer, who would have appeared similarly dangerous to the jury merely by his association with Fackrell.

### F. Counsels' failure to competently argue for severance was ineffective assistance of counsel

Counsel was on notice that Fackrell's defense would be antagonistic to Cramer's and that the evidence introduced against Fackrell during the penalty phase would be prejudicial. Once these problems became even more apparent during trial, Cramer's counsel should have made relevant objections, requested specific curative instructions, and renewed their motion for severance. In particular, counsel should have renewed the motion for severance during the penalty phase when evidence of Fackrell's second murder was presented. Cramer's counsel failed to do these things. *Cf. United States v. Garza*, 563 F.2d 1164, 1166 (5th Cir. 1977) (finding no deficient performance for a

failure to move for severance where "the record reveals an active advocate attempting to protect his client" from prejudice in the joint trial, counsel made relevant objections, and counsel "made several motions for cautionary instructions.")

Counsels' failure to effectively argue for severance prejudiced Cramer, particularly during penalty phase. During the penalty phase, the prosecution and witnesses mixed up the two defendants at various points, making it even more likely that the jury would impute some of Fackrell's violent behavior to Cramer. (*See* Dkt. 679 (RT) at 160, 172 (prosecutor mixing up Cramer and Fackrell). Dkt. 652 (RT) at 204 (testimony of government mental health expert Dr. Jill Hayes: "[T]here is no guarantees when I'm sitting here right now and trying to keep the defendants straight. There is absolutely no guarantees").) Further, the government actively encouraged jurors to group the defendants together, discussing Cramer's 152 and Fackrell's 155 mitigating factors collectively: "[W]e've got 300 mitigators that have been listed. . . . You can *group these mitigators* into large categories. *The defendants* had terrible childhoods." (Dkt. 679 (RT) at 266-67.) The record reflects that the jury did, in fact, impute some of Fackrell's behavior to Cramer: on Cramer's verdict form, 10 of 12 jurors endorsed the mitigating factor: "In 15 years of incarceration, Christopher Cramer has never assaulted a prison staff member or corrections officer." (Dkt. 666 at 15.) The jury failed to find this mitigating factor despite hearing uncontroverted testimony that Cramer had never assaulted a prison staff member or correctional officer—*only* Fackrell had. (*See, e.g.*, Dkt. 679 (RT) at 184.) Jurors also failed to endorse the factor that "Christopher Cramer has committed no violent act in prison since the death of Leo Johns on June 9, 2014," (Dkt. 666 at 15) (0 of 12 jurors), even though the government had acknowledged that Cramer had been securely housed at ADX without incident. Jurors' failure to find these mitigating factors strongly suggested that they mixed up the two co-defendants and imputed some of Fackrell's behavior to Cramer.

Ultimately, despite evidence that only *Fackrell* had been violent in the aftermath of the Johns

murder, the jury unanimously found that the government had "proved beyond a reasonable doubt that Defendant Christopher Cramer poses a continuing and serious threat to the lives and safety of others because it is likely that he will commit criminal acts of violence in the future." (Dkt. 666 (RT) at 1.) Academic research has consistently shown that juries' perception of future dangerousness is one of the most powerful factors determining whether a capital defendant will be sentenced to death. *See*, *e.g.*, Blume, Garvey & Johnson, *Future Dangerousness in Capital Cases: Always "At Issue,"* 86 Cornell L. Rev. 397, 398 (2001); Cunningham, Sorensen & Reidy, *Capital Jury Decision-Making: The Limitations of Predictions of Future Violence*, 15 Psychol., Pub. Policy & L. 223, 234-35, 244-45 & Table 1 (2009.) The finding of future dangerousness was particularly powerful in this close case: on the second day of penalty-phase deliberations, the jury sent a note to the judge asking, "What is the process if we are not unanimous with our verdict?" (Dkt. 656 at 2.) This note strongly suggests that the jurors struggled with their sentencing decision, and the evidence of Fackrell's behavior that the jury improperly applied to Cramer was especially likely to be prejudicial. The court's penalty phase instructions—which included the same "multiple defendants" instruction that jurors had heard during the guilt phase. (Dkt. 679 at 33) did not cure the prejudice to Cramer. This directive was a mere two sentences in 136 transcript pages of instructions that took more than two hours to deliver. (Dkt. 679 at 19-155 (instructions began at 11:22 a.m. and ended at 1:36 p.m.).) Moreover, the instructions told jurors that they "may consider *all the evidence* you have heard at all phases of the trial" in determining whether the aggravators—including future dangerousness—had been proven. (Dkt. 679 at 34.) This instruction, far from curing any prejudice, actually suggested to jurors that it would be permissible to consider the evidence that had been introduced against Fackrell in their determination of whether Cramer posed a future danger.

If counsel had effectively argued for severance, there is "a reasonable probability that . . . at least one juror would have harbored a reasonable doubt about whether [Cramer] was likely to be

violent in the future." *Buck* 580 U.S. at 120. Cramer is entitled to relief from his conviction and death sentence.

### CLAIM 12: BECAUSE CRAMER'S § 924(C) CONVICTION IS INVALID PURSUANT TO THE SUPREME COURT'S DECISION IN *BORDEN V. UNITED STATES*, THIS COURT SHOULD ORDER A NEW SENTENCING PHASE

In support of the prior violent crime statutory aggravator (18 U.S.C. § 3592(c)(2)) and to establish Cramer's future dangerousness, the government presented evidence of his 2003 conviction under 18 U.S.C. § 924(c) for use of a firearm in the commission of a violent felony. (Dkt. 30 [SEALED] at 2-3; Dkt. 598 (RT) at 25-27; Dkt. 603 (RT) at 30-78.) Cramer's capital jury found the statutory aggravator proven and also considered the § 924(c) conviction as evidence of Cramer's future dangerousness. (Dkts. 582 at 2, 666 at 1.)

Cramer's § 924(c) charge, however, was invalid.[35] The charge was grounded on his plea of guilty to one count of bank robbery pursuant to 18 U.S.C. § 2113(a.) Recent (and retroactive) Supreme Court caselaw renders Cramer's § 924(c) conviction invalid because his bank robbery conviction under § 2113(a) does not qualify as a crime of violence as a matter of law. *See Borden v. United States*, 141 S. Ct. 1817 (2021.) Because one statutory and one non-statutory aggravator were predicated on an invalid conviction, Cramer's death sentence should be vacated and a new penalty phase ordered. *See, e.g., Paul v. Superintendent*, 2022 U.S. Dist. LEXIS 136933 (S.D. Ind., Aug. 2, 2022) (vacating Paul's § 924(c) conviction and death sentence in light of *Borden.*)

### A.    Legal basis

#### 1.    The definition of "crime of violence"

Section 924(c) makes it a crime to use or carry a firearm during and in relation to, or to possess a firearm in furtherance of, among other things, a "crime of violence" that can be prosecuted in federal

---

[35] Counsel for Cramer intends to file a motion to vacate his invalid § 924(c) conviction.

171

court. 18 U.S.C. § 924(c)(1)(A.) The statute defines a "crime of violence" as "an offense that is a felony" and "has *as an element* the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 924(c)(3)(A) (emphasis added.) That definition is known as the "force clause" or "elements clause."

Section 924(c)'s "crime of violence" definition also contains a so-called "residual clause," covering any additional felony "that by its nature, involves a substantial risk that physical force" may be used. 18 U.S.C. § 924(c)(3)(B). The residual clause, however, was recently invalidated by the Supreme Court in *United States v. Davis* as unconstitutionally vague. *United States v. Davis*, 139 S. Ct. 2319, 2334 (2019) (explaining that the residual clause "provides no reliable way to determine which offenses qualify as crimes of violence" because it may "reach[] offenses, like burglary, that do not have violence as an element" and only "create a substantial risk of violence.")

As a result of *Davis*, whether an offense constitutes a "crime of violence" turns on whether it qualifies under the force clause of § 924(c).

## 2.     The categorical approach

Courts use the "categorical approach" to determine whether an offense qualifies as a "crime of violence" under the force clause. *See United States v. Taylor*, 142 S. Ct. 2015 (2022.) That approach directs a court to examine the elements of the predicate offense and "precludes [] an inquiry into how any particular defendant may commit the crime." *Id.* at 2020. Under the categorical approach, the "only relevant question" is whether the predicate offense "always requires the government to prove—beyond a reasonable doubt, as an element of its case—the use, attempted use, or threatened use of force" against the person or property of another. *Id.* After determining the elements of the predicate statute, a court must presume that a defendant's conviction "rested upon nothing more than the least of the acts criminalized." *Moncrieffe v. Holder*, 569 U.S. 184, 190-91 (2013) (cleaned up). In other words, to determine whether an offense qualifies as a crime of violence, a court must imagine "the *least* serious

172

conduct" that a defendant could engage in and be convicted under the statute, and the court must determine whether that conduct qualifies as a crime of violence. *Borden*, 141 S. Ct. at 1832.

### 3.   The Supreme Court's decision in *Borden*

In *Borden v. United States*, the Supreme Court ruled that a violent felony as defined by 18 U.S.C. § 924(e)(2)(B)(1)—the force clause of the Armed Career Criminal Act ("ACCA")—is not satisfied by the reckless use of violent force. *Borden*, 141 S. Ct. at 1821-22. ACCA's force clause defines a "violent felony" as an offense that "has as an element the use, attempted use, or threatened use of physical force" against another. 18 U.S.C. § 924(e)(2)(B)(i). A plurality of the Court concluded a violent felony under ACCA's force clause "covers purposeful and knowing acts, but excludes reckless conduct." *Id.* Justice Thomas concurred with the plurality's ultimate conclusion, finding that the "use of physical force" applies "only to intentional acts designed to cause harm"; therefore, ACCA's force clause could not be satisfied by mere recklessness. *Id.* at 1835 (Thomas, J., concurring.)

The language of § 924(c)'s force clause, the statute under which Cramer was convicted, is virtually identical to ACCA's force clause. *Compare* § 924(c)(3)(A) (offense qualifies as crime of violence if it "has as an element the use, attempted use, or threatened use of physical force against the person or property of another") with § 924(e)(2)(B)(i) (offense qualifies as a violent felony if it "has as an element the use, attempted use, or threatened use of physical force against the person of another"). Therefore, case law interpreting those clauses applies equally to both statutes. *See, e.g.,* P*aul,* 2022 U.S. Dist. LEXIS 136933, at *19 (2022) ("Indeed, the two provisions are nearly identical, and none of the differences would indicate that § 924(c)(3)(A) includes reckless conduct while § 924(e)(2)(B)(i) does not."); *see also United States v. Smith*, 957 F.3d 590, 593 (5th Cir. 2020) ("The phrase 'physical force' in § 924(e)(2)(B)(i)'s identically worded force clause "means *violent* force—that is, force capable of causing physical pain or injury to another person." (*citing Johnson v. United States (Johnson I)*, 559 U.S. 133, 140 (2010).) Therefore, under the rationale embraced either by the *Borden* plurality or Justice Thomas's

concurrence, a predicate offense does not satisfy § 924(c)'s force clause unless it requires the purposeful or knowing use of violent force as to the "least of th[e] acts criminalized." *Moncrieffe v. Holder*, 133 S. Ct. 1678, 1680 (2013) (2013.) A *mens rea* of recklessness is insufficient to meet the standard.

## B.   Cramer's § 924(c) conviction must be vacated under *Borden*

Cramer pled guilty to one count of violating 18 U.S.C. § 2113(a), which served as the predicate for his guilty plea and conviction under § 924(c). The language of § 2113(a) and case law interpreting it makes clear that the "least of th[e] acts criminalized" in this subsection can be violated by recklessly putting a person in jeopardy or recklessly assaulting a person.

For example, the first paragraph of § 2113(a) penalizes a person who "by force or violence, or by intimidation, takes, or attempts to take, from the person or presence of another" money or property belonging to a bank. This language bundles together attempted and completed robbery and bundles together "force or violence" and "intimidation"; the crime carries the same punishment for both types of conduct. The "least of th[e] acts criminalized" under that paragraph is an attempt to take property through intimidation. Under the rationale employed by the Supreme Court in cases analyzing the force clause in other statutes, attempted bank robbery by intimidation does not have as an element the use, attempted use, or threatened use of force. *See Taylor*, 142 S. Ct. at 2021 (holding that attempted Hobbs Act robbery under 18 U.S.C. § 1951 does not qualify under the force clause of § 924(c) because it can be accomplished by an attempted threat); *Trubey v. United States*, No. 16-cv-1737, Dkt. 51 at 8 (M.D. Fla. Jan. 10, 2023) (holding that attempted robbery under § 2113(a) is not a crime of violence after *Taylor.*)

In addition, a defendant can be convicted under § 2113(a) by obtaining or attempting to obtain money from a bank not by physical violence but "by extortion." Extortion can be accomplished by the wrongful use of actual or threatened force, violence, or fear, including fear of economic loss. *See*

174

*United States v. Cruzado-Laureano*, 404 F.3d 470, 481 (1st Cir. 2005) (1st Cir. 2005.) But threatening economic loss is not a threat of *physical* force against the person or property of another; indeed, "[a] number of recent district court decisions have held that Hobbs Act extortion does not qualify as a crime of violence under § 924(c)'s force clause because of the 'fear' element." *Capozzi v. United States*, 531 F. Supp. 3d 399, 404 (D. Mass. 2021); *see also Seale v. United States*, No. 19-21016, 2022 WL 18024217, at *3 (D.N.J. Dec. 30, 2022) (wherein the government conceded that extortion is not a crime of violence). Moreover, the government has conceded in *Borden* and other cases that the crime of robbery, as defined in § 2113(a) and other statutes, does not meet the *mens rea* requirement of knowing or purposeful use of force. *See, e.g.,* U.S. Brief, *Borden v. United States,* 14 S. Ct. 1817 (2021) (No. 19-5410), 2020 WL 4455245, *16-17 (conceding that robbery can be committed by the reckless use of force); U.S. Brief, *United States v. Washington*, No. 20-2333, Dkt. 36 at 16, 20 (3d Cir. Dec. 1, 2022) (conceding that conviction for attempted bank robbery under § 2113(a) does not qualify as a predicate for § 924(c) after *Taylor* because it requires only that a person "intend to intimidate a bank teller and take a substantial step toward doing so.")

Because *Borden* and other cases make clear that § 2113(a) robbery can be committed through the reckless use of force, through an attempt, or through means that employ economic rather than physical intimidation, the government cannot establish that Cramer's robbery conviction under § 2113(a) required the knowing or purposeful use of violent force. Cramer's conviction under § 924(c) is therefore invalid and should be reversed.

**C.     Cramer's death sentence should be vacated and a new penalty phase ordered**

Because Cramer's § 924(c) conviction is invalid, this Court should reverse Cramer's death sentence and order a new penalty phase. The government relied upon Cramer's § 924(c) conviction to establish its first statutory aggravator, prior violent crime, under 18 U.S.C. § 3592(c)(2). It also used the § 924(c) conviction to support its argument that Cramer would be a future danger. There is

evidence that jurors struggled with whether to sentence Cramer to life or death: on the second day of deliberations, they sent a note to the trial court asking, "What is the process if we are not unanimous with our verdict?" (Dkt. 656 at 2.) This query suggests that the jurors had difficulty with their sentencing decision, and the evidence that Cramer committed a crime of violence using a firearm was especially likely to be prejudicial. (*See* Ex. 44 (explaining that juries who find that a defendant poses a future danger are more likely to impose a death sentence).) Without the § 924(c) conviction, there is "a reasonable probability that . . . at least one juror would have harbored a reasonable doubt about whether [Cramer] was likely to be violent in the future." *Buck*, 580 U.S. at 120.

**CLAIM 13: COUNSEL'S INEFFECTIVENESS AND INSTRUCTIONAL ERROR BY THE TRIAL COURT UNDERMINED THE JURORS' FULL AND FAIR CONSIDERATION OF CRAMER'S CASE FOR LIFE, IN VIOLATION OF 18 U.S.C. §§ 3592 AND 3593 AND THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION**

**A.     Ineffective assistance regarding the jury's question about unanimity and the trial court's subsequent instruction**

`     Cramer's counsel rendered ineffective assistance under the Sixth Amendment by failing to request that the penalty phase instructions inform jurors that if they failed to reach a unanimous sentencing decision, the result would be a mandatory life sentence.[36] Counsel's failure to request such a "non-unanimity instruction" prejudiced Cramer because the penalty phase instructions the jury actually received were confusing, prompting a question from jurors about what the process would be if they could not reach a unanimous verdict. (Dkt. 656 at 2.) Moreover, research shows that juries who are not given a non-unanimity instruction are overwhelmingly likely to return a death verdict. Cramer was prejudiced by counsel's deficient performance, and his sentence should be vacated.

---

[36] On appeal, the Fifth Circuit held that the trial judge did not abuse her discretion in failing to instruct the jury about the consequences of a non-unanimous verdict. *See United States v. Fackrell*, 991 F.3d 589, 611-12 (5th Cir. 2021). Here, Cramer is not challenging the actions of the trial court, but instead alleging that his right to effective counsel under the Sixth Amendment was violated when defense counsel failed to even request that the court include such an instruction at the penalty phase. This is a distinct claim with a different legal basis and standard and is not procedurally barred.

During the penalty phase of trial, "counsel should request jury instructions and verdict forms that ensure that jurors will be able to consider and give effect to all relevant mitigating evidence. Trial counsel should object to instructions or verdict forms that are constitutionally flawed, or are inaccurate, or confusing and should offer alternative instructions." *ABA Guidelines*, Guideline 10.11(K), reprinted in 31 *Hofstra L. Rev.* 913, 1058 (2003.) Counsel must object to any instructions that might confuse or mislead the jury, "even if the instructions are the standard ones given in the jurisdiction." *Id.* at 1069.

Here, defense counsel submitted proposed penalty phase jury instructions, making several suggested additions and deletions to the instructions drafted by the government. (*See generally* Dkt. 631.) Defense counsels' proposed instructions, however, omitted any mention of what would happen if jurors were unable to reach a unanimous verdict in the sentencing phase.[37] This left jurors free to speculate on what might happen if they could not reach a verdict: would the government be required to re-try the whole case, resulting in a possible guilt-phase acquittal for one or both defendants? Would the guilty verdict stand but a new penalty phase be ordered, requiring the victim's family to go through the process of testifying about the death of their loved one all over again?

The Federal Death Penalty Act ("FDPA") answers this question: if jurors can't reach a unanimous verdict, the trial court must sentence the defendant to life imprisonment. *See Jones v. United States*, 527 U.S. 373, 383 (1999.) Defense counsel, however, inexplicably failed to request that jurors be informed of this fact. To preempt improper juror speculation, most federal trial courts provide a non-unanimity instruction. (Ex. 73 ¶ 3.) In fact, in "the thirty-four (34) federal capital trials that [have]

---

[37] Although defense counsel requested that they be permitted to inform prospective jurors about the consequences of non-unanimity during voir dire and the court denied their request, (Dkts. 480, 483), this was a very different matter than informing seated jurors—more than a month later, when they were actually facing the sentencing decision—about the consequences of failing to reach a unanimous verdict. When the time came for counsel to submit proposed instructions, they should have renewed their request to include the consequences of non-unanimity instruction.

proceeded to a jury sentencing since 2010, the Court instructed the jurors that the consequence of a non-unanimous vote on the ultimate issue of life or death was the imposition of a sentence of life imprisonment without release in twenty-seven (27) of these trials (79% of the trials)." Ex. 73 at ¶ 3. Thus, although the Supreme Court has declined to hold that the Eighth Amendment requires such an instruction in every case, *see Jones v. United States*, 527 U.S. 373, 383 (1999), defense counsel should have been well aware that non-unanimity instructions were standard practice among most federal trial courts and that the absence of such an instruction may be "confusing" for jurors. *See ABA Guidelines*, Guideline 10.11(K). Counsel were deficient for failing to request such an instruction.

Counsel's failure to request a non-unanimity instruction was prejudicial. In *Moore v. Maggio*, the Fifth Circuit held that a defendant was not prejudiced by counsel's failure to request a specific non-unanimity instruction because the instructions jurors received "sufficiently informed the jury that if even one member of the jury held out, the trial judge would be required to impose a life sentence." 740 F.2d 308, 319 (5th Cir. 1984); *see Baldwin v. Blackburn*, 653 F.2d 942, 952-53 (5th Cir. 1981). In *Moore*, the instructions included explained that if jurors did not unanimously agree on the statutory aggravating factors, "then life imprisonment without benefit of parole, probation or suspension of sentence is *the only sentence that may be imposed*." *Id.* (emphasis added). In Cramer's case, however, the jury was provided with no such instruction. At the end of their first full day of deliberations, the jury submitted a question to the court asking, "What is the process if we are not unanimous with our verdict?" (Dkt. 656 at 2.) This indicates that the jurors were confused by the penalty phase instructions and that unlike in *Moore*, the instructions they were given did not "sufficiently inform[] the jury that if even one member of the jury held out, the trial judge would be required to impose a life sentence." *Moore*, 740 F.2d at 319.

Moreover, in cases where jurors are not informed of the consequences of non-unanimity, an overwhelming majority of defendants are sentenced to death. Since 2010, 89% of defendants who

were tried by juries who were not given a non-unanimity instruction were sentenced to death. (Ex. 73 ¶ 5.) In stark contrast, in trials where a non-unanimity instruction was given, just 30% of juries sentenced one or more defendants to death. (Ex. 73 ¶ 4.) Counsel's failure was plainly prejudicial.

**B.    Instructional error regarding the verdict forms at the penalty phase**

During the penalty phase, the jurors who sentenced Cramer to death were misinformed by the Court and the government about the nature of their role at sentencing and the boundaries of their authority. Specifically, the Special Verdict form used in this case directed the jurors to follow a two-step analysis when considering Cramer's mitigating factors:

> For each of the following proposed non-statutory mitigating factors, indicate in the space provided the number of jurors who find that the defendant has proved by a preponderance of the evidence the existence of such factor and that it is mitigating.

(Dkt. 666 at 2 (emphasis added).) In other words, the jurors in Cramer's case were instructed to decide *both* whether the evidentiary standard for the proposed mitigator had been met "by a preponderance of the evidence" (a factual determination) and "that it is mitigating" (a legal determination) before they could consider the mitigator in the weighing process. These instructions permitted jurors to believe that even if a factor had been proved by a preponderance of the evidence, they could give it no weight.

Defense counsel for Cramer and Fackrell jointly objected to the jury verdict form, contending that once the jury found either of the defendants had proved, as a factual or historical matter, a mitigating fact, the jury must consider it. (Dkt. 679 (RT) at 5-8; *see also* Dkt. 631.) The trial court overruled the objection, and in doing so revealed a fundamental misunderstanding of the jury's role vis-à-vis mitigating factors in capital sentencing:

> [A]s for the Verdict Form, I think the jury has to find both that the fact exists and that it's mitigating. . . . I mean, some of these things are not on their face mitigating, like 'Ricky Fackrell spends a lot of time reading.' I mean, okay, but I don't know if that's necessarily mitigating; so, I think the jury would have to find that mitigating to consider the issue. And if they do, then they should consider that.

(Dkt. 679 (RT) at 7.) Fackrell's counsel explained how that reasoning was flawed and unconstitutional:

> Judge, our focus of the argument is just that once they find something to be a

179

> mitigating fact, they can't give it no consideration. I understand it's not a matter of semantics. It's a very important constitutional principle that if the fact is found, they must consider it at least to some extent, however slight. So that's really the focus of our objection, is that the way it's set up now, they could fail to consider it as mitigating if they find it as a fact.

(Dkt. 679 (RT) at 7-8.) The court disagreed and dismissed counsels' concerns:

> Well, that is exactly the point. Some of the things are not necessarily mitigating. They may be a fact, but that doesn't mean they are mitigating. So, I think they should consider them only if it's a fact and if it's mitigating. . . . [Y]our objection is overruled.

(Dkt. 679 (RT) at 8.) By instructing the jurors they could ignore mitigating factors proven by the evidence, the district court erred. And the government cannot show, as it must, that the court's instructional error (and the government's frequent argument in the same vein) "did not contribute to the verdict obtained" and were therefore harmless beyond a reasonable doubt. *See Satterwhite v. Texas*, 486 U.S. 249, 257-58 (1988) (internal quotation and citation omitted); 18 U.S.C. § 3595(c)(2). The district court abused its discretion in denying Cramer's challenge to the Special Verdict form and related instructions, and a new penalty phase is warranted.[38]

### 1.    Legal basis

A capital sentencing jury must be correctly instructed concerning its deliberations in penalty phase proceedings, especially with respect to its consideration of the proffered mitigating factors.

---

[38] Cramer's trial counsel objected to the special verdict form and instructions described herein, as did Fackrell's counsel; their objections were denied. (Dkts. 631, 679 (RT) at 5-8.) Appellate counsel both independently challenged the district court's ruling on appeal. (*Cramer v. United States*, Case No. 18-40598, 2020-04-14 Cramer AOB at 177-180; Fackrell AOB at 43.) However, the Fifth Circuit addressed only Fackrell's claim and entirely failed to rule on Cramer's claim. *See United States v. Fackrell*, 991 F.3d 589 (5th Cir. 2021) at part K, "Jury Instructions on Mitigating Evidence" (denying "Fackrell['s] challenge[ to] the district court's penalty-phase jury instructions on mitigating evidence" and finding that "Fackrell preserved his objections to the verdict form.") Because the Fifth Circuit did not address Cramer's argument on appeal, there is no procedural bar and this court can review the claim de novo. To the extent that trial counsel failed to properly preserve the objection at trial, counsel rendered prejudicial ineffective assistance. *See* Claim 3.

The Supreme Court has long held that the standard for relevance with respect to mitigation is broad: "[T]he question is simply whether the evidence is of such a character that it might serve as a basis for a sentence less than death." *Tennard,* 542 U.S. at 287 (internal quotation marks and citation omitted). Although the range of potential mitigators that a capital defendant can proffer is extensive, it is the provenance of the courts to decide, as a matter of law, whether proffered mitigation evidence is trivial or irrelevant and as such can be excluded. *Id.* at 286-87. Conversely, there are certain categories of evidence that the Supreme Court has recognized *always* constitute relevant mitigating evidence as a matter of law—namely, information about a defendant's background and upbringing. Such evidence "is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse." *Penry,* 492 U.S. at 319. Once any juror finds that the defense has established a mitigating factor by a preponderance of the evidence, he or she is required to consider and give the factor whatever weight he or she deems appropriate. *See, e.g.,* B*oyde v. California,* 494 U.S. 370, 377-78 (1990) (the "Eighth Amendment requires that the jury be able to consider and give effect to" a capital defendant's mitigating evidence); *Eddings,* 455 U.S. at 114-15 (sentencers "may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration.")

The FDPA also provides guidance to courts on the presentation and consideration of mitigating evidence. *See* 18 U.S.C. § 3592(a). The starting point for interpreting the FDPA is its plain language. *United States v. Mitchell,* 502 F.3d 931, 948-49 (9th Cir. 2007.) The FDPA states that a jury "*shall* consider any mitigating factor, including the following. . . ." 18 U.S.C. § 3592(a) (emphasis added.) Section 3592(a) then lists seven "statutory" factors. 18 U.S.C. § 3592(a)(1)-(7). An eighth catch-all subsection allows for "nonstatutory" mitigating factors, but consideration of those factors is also mandatory. 18 U.S.C. § 3592(a)(8).

Any reading of the mitigating-factor provision, § 3592(a), must be informed by Congress's treatment of aggravating factors in the same section, § 3592(c). Congress requires that jurors "shall" consider each of the 16 enumerated "statutory" aggravating factors. 18 U.S.C. § 3592(c). Like § 3592(a), § 3592(c) concludes with a catch-all provision. In that provision, Congress uses different, permissive, non-mandatory language: "The jury, or if there is no jury, the court may consider whether any other aggravating factor for which notice has been given exists." 18 U.S.C. § 3592(c) (emphasis added). The differing use of the permissive "may" from the mandatory "shall" in this catch-all provision establishes that, while a jury must consider all mitigating factors and all statutory aggravating factors sufficiently proven, it does not have to consider non-statutory aggravating factors. *See, e.g.,* *Lopez v. Davis*, 531 U.S. 230, 241 (2001) (describing the difference between Congress's use of "may" and "shall").

This reading is reinforced by another provision in the FDPA, § 3593, which establishes the procedure for the jury's consideration of, and response to, the mitigating and aggravating factors. Under that provision, "information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor permitted or required to be considered under section 3592." 18 U.S.C. § 3593(c) (emphasis added.) Thus, under the plain language of the statutory scheme, while a jury can disregard a non-statutory aggravating factor, it cannot disregard a statutory aggravating factor or any mitigating factor.

The district court's instruction in Cramer's case ordered the jury to engage in a permissive two-step analysis under which the jurors were free to exclude from consideration any factor, even if uncontroverted, that they deemed not to be mitigating. This directive ran afoul of constitutional mandates and the plain, mandatory language of the FDPA.

### 2. Factual basis

The jurors were misinformed about their role time and time again during Cramer's trial, where the court and the government encouraged them to believe that they had the choice to decide whether a piece of evidence was mitigating. It started with the government's opening statement during voir dire, when the prosecutor explained the weighing process to the prospective jurors:

> [Y]ou can expect that the defense will put on evidence of mitigating factors. . . . So, the last thing you do is you get your aggravating factors on one side of the scale and your mitigating factors, **if there are any**, on the other side of the scale; and then you make an individual decision on whether or not you think that those aggravating factors sufficient outweigh the mitigating factors **if there are any**, such that in your mind the death penalty is warranted.

(Dkt. 710 (RT) at 48, 50 (emphasis added); *see also* Dkts. 703 at 12, 704 at 12 (repeatedly discussing the jury's role if they find that mitigating factors "exist," rather than saying "if they are proven by a preponderance of the evidence.").) Counsel for Cramer's co-defendant, Ricky Fackrell, similarly misled the prospective jurors during his opening statement at voir dire when discussing "potential mitigating factors": "You know, there are all kinds of things that can be mitigating factors, **but they're only mitigating factors if you find them to be mitigating factors**." (Dkt. 710 (RT) at 70 (emphasis added).)

During penalty phase argument for Cramer, the government informed the jury that during deliberations they needed to "think about three different questions": first, "has the defense proven the mitigating factor" by a preponderance of the evidence; second, "you have to decide **whether or not it's mitigation**"; and only then, "if you do think both of those things are true, then you have to decide what weight you want to assign to that mitigating evidence." (Dkt. 603 (RT) at 22 (emphasis added).) This misstatement of the law was repeated throughout the government's opening statement in Fackrell's case. (*See, e.g.*, Dkt. 604 (RT) at 55 ("So, you have to first decide if you hear any mitigation, was it proven or is it merely a representation of an attorney. . . . And even if it was proven, does the evidence that you heard mitigate?").) The trial court's written instructions, provided to the jury

separate from the verdict form, further underscored the dual decision jurors were charged with making by directing the jury that the mitigation they had just heard about for days of testimony was "proposed mitigating factors" (rather than "proposed by Cramer to have been proven by a preponderance of the evidence.") (Dkt. 665 at 18.)

In this case, the trial court's instructions impermissibly allowed juror nullification with respect to mitigation—that is, rejection of a proffered mitigating factor established by the preponderance of the evidence solely because the juror disagreed that the particular category of evidence constituted legally cognizable mitigation. The faulty instructions given to Cramer's jury have particular significance in the context of capital sentencing because capital defendants are constitutionally required to be sentenced by jurors who do not recognize certain evidence as mitigating. *See Morgan*, 504 U.S. at 739; *United States v. Fell*, 372 F. Supp. 2d 766, 771 (D. Vt. 2005) ("Other jurors may have biases regarding particular forms of mitigating evidence. For example, some jurors may be unable to fairly consider any mitigating evidence relating to the defendant's background or upbringing. Such jurors must be excused for cause as the Supreme Court has emphasized that the sentencer may not refuse to consider evidence relating to the defendant's background or upbringing. *See Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978).")

Despite the fact that the trial court had already decided which of Cramer's proffered mitigating circumstances, *as a matter of law*, must be considered in mitigation (Dkt. 679 (RT) at 272 -73), the jury was repeatedly and improperly advised by the government and instructed by the court that it was up to them whether they believed mitigating circumstances existed at all, and if so, whether they were "actually" mitigating, in violation of constitutional standards. *Tennard*, 542 U.S. at 286-87; *Boyde*, 494 U.S. at 377-78. Given the way Cramer's Special Verdict form was prepared, mitigating factors could be screened out at the second step if a juror determined that the factor was not mitigating. Thus, a juror was likely to fail to" consider and give effect" to a mitigating factor because they improperly

184

concluded at the second step that the factor was not mitigating, i.e., not relevant to whether or not a life sentence was more appropriate than a death sentence. Such error cannot be deemed harmless.

A review of capital verdict forms used in federal capital cases around the country reveals that the instructions used here were both highly unusual and highly likely to result in a death verdict. (Ex. 45.) Professor Meredith Rountree and Professor Mary Rose spearhead an ongoing research project studying jury verdicts in federal capital cases. (Ex. 45 ¶ 3.) Of the 213 verdict forms reviewed as part of this study, only eight verdict forms, or 4%, had the instruction given in Cramer's case. (Ex. 45 ¶ 16(e).) Seven of those defendants, including Cramer and Fackrell, were sentenced to death. (Ex. 45 ¶ 16(e).) These eight cases were presided over by only three judges in two districts: Judges Joseph F. Anderson, Jr. (*Basham* and *Fulks*) and Henry M. Herlong, Jr. (*Hans*) of the United States District Court of the District of South Carolina; and Judge Marcia A. Crone (*Cramer*, *Fackrell*, *Garcia*, and *Snarr*) of the United States District Court of the Eastern District of Texas. (Ex. 45 ¶ 17.) As the Rountree/Rose study shows, the vast majority of verdict forms in federal capital cases did *not* instruct jurors in a manner that would lead them to believe that they should decide whether a mitigating factor "is mitigating," "relevant," or any other legal determinations that are properly within the provenance of the trial court. (Ex. 45 ¶¶ 15-20.)

The harm the trial court's mitigation instruction caused Cramer is also evidenced by the jury's special findings as to non-statutory mitigating factors. (Dkt. 666 at 2-19.) As noted above, as to each of the 152 mitigating factors listed, the jury was directed to "indicate in the space provided the number of jurors who find that the defendant has proved by a preponderance of the evidence the existence of such factor and that it is mitigating." (Dkt. 666 at 2.) Cramer's jury entered "0" for 102 of the listed factors, including factors that were supported by uncontroverted record evidence, expert testimony, the government's discovery, and/or BOP *records and therefore were proven by a preponderance of the evidence.* (*See, e.g.,* Dkt. 666 at 29, "[Cramer] had educational deficits, including being diagnosed with a learning

185

disorder as a child"; 32, "[Cramer's] intellectual ability is in the lower 20% of the population"; 63, "The psychiatric disorders for [Cramer] include specific trauma and related stress disorder with a history of complex trauma"; "116, "[Cramer] did not harm any corrections officers or staff in the commission of the offense").)

Deciding whether a capital defendant should live or die is a balancing process. When considering mitigation, not one factor needs to be dispositive; instead, the jury is to weigh all of the evidence, which includes all mitigating factors proven by a preponderance of the evidence. Here, however, because of the errors in the special verdict form and jury instructions, Cramer's jury was clearly unable to give effect to each of the mitigating factors established by the defense (Dkt. 666.) This violated constitutional principles and harmed Cramer's sentencing outcome. *See Penry v. Johnson*, 532 U.S. 782, 797 (2001) (the most important factor in jury instructions about mitigation "is that the jury be able to consider and give effect to [a defendant's mitigating] evidence in imposing sentence.")There is a strong likelihood that one or more jurors engaged in nullification and impermissibly refused to consider constitutionally relevant mitigating evidence. "[I]t is only when the jury is given a vehicle for expressing its reasoned moral response to that evidence in rendering its sentencing decision that we can be sure that the jury has treated the defendant as a uniquely individual human being and has made a reliable determination that death is the appropriate sentence." *Id.* .

Because trial counsel was ineffective and because the trial court abused its discretion in overruling Cramer's objections and ignoring these well-settled constitutional principles, this court should vacate Cramer's death sentence and order a new penalty phase.

## CLAIM 14: JUROR MISCONDUCT UNDERMINES CRAMER'S CONVICTION AND SENTENCE

Cramer's conviction and death sentence were imposed in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the Constitution due to juror bias and misconduct during both phases of his trial. Cramer alleges that the jury committed misconduct by prematurely deliberating,

186

considering extrinsic evidence[39] (including exposure to pretrial publicity), drawing adverse inferences from Cramer's exercise of his right against self-incrimination, discussing the case or consulting with third parties, failing to follow court instructions not to prejudge the case or Cramer, failing to follow court instructions to consider defendants Cramer and Fackrell separately, allowing bias to influence its decision, allowing considerations of cost to influence its penalty decision, and failing to disclose relevant knowledge and biases. Cramer is entitled to relief. *Irvin v. Dowd*, 366 U.S. 717, 722 (1961); *Pena-Rodriguez v. Colorado*, 580 U.S. 206, 225 (2017); *Mitchell v. United States*, 526 U.S. 314, 328 (1999); *Parker v. Gladden*, 385 U.S. 363, 364-65 (1966); *Griffin v. California*, 380 U.S. 609, 613 (1965); *Mattox v. United States*, 146 U.S. 140, 150 (1892.)

**CLAIM 15: MATERIAL OMISSIONS FROM CRAMER'S TRIAL TRANSCRIPT VIOLATE HIS RIGHTS UNDER THE FIFTH AND EIGHTH AMENDMENTS**

Cramer's conviction and death sentence must be vacated because key portions of the trial proceedings at issue in Cramer's appeal were not recorded or transcribed. During an off-the-record bench conference, the district court heard arguments on the motion to exclude testimony from Elizabeth Rose, a key government witness who was also represented by Cramer's attorney, raising a clear conflict of interest issue. (*See* Claim 5.) The court also held off-the-record conferences regarding penalty phase jury charges; whether there was a *Batson* issue with the jury; security measures at trial; and other substantive issues relevant to claims that Cramer has raised on appeal and in this motion. Taken together, these substantial gaps in the record undermine the constitutional basis for Cramer's conviction and death sentence.

This claim was generally presented in Cramer's Opening Brief, Claim IX, *see United States v. Cramer*, No. 18-40590, ECF No. 145 (Apr. 14, 2020), and in Question 1 of Cramer's Petition for a Writ of Certiorari to the U.S. Supreme Court. Petition for Writ of Certiorari, *United States v. Cramer*,

---

[39] *See also* Claim 7 (discussing external influence on seated juror Melissa W. when her coworkers made comments about the defendants to her during voir dire).

No. 21-5995 (Oct. 14, 2021.)

## A.    Legal basis

The Supreme Court has long recognized the importance of a "proper record on appeal." *Miller v. United States*, 317 U.S. 192, 199 (1942.) In *Mayer v. City of Chicago*, the Court held that the state was constitutionally required to provide indigent defendants appealing their convictions "a record of sufficient completeness to permit proper consideration of [their] claims." 404 U.S. 189, 194 (1971) (internal quotation marks and citations omitted.) "Moreover, where the grounds of appeal . . . make out a colorable need for a complete transcript, the burden is on the State to show that only a portion of the transcript or an 'alternative' will suffice for an effective appeal on those grounds." *Id.* at 195.

In capital cases, in particular, the record must "disclose to the reviewing court the considerations which motivated the death sentence." *Gardner v. Florida*, 430 U.S. 349, 361 (1977.) "Without full disclosure of the basis for the death sentence, [a] capital-sentencing procedure" violates a defendant's right to due process and is "subject to the defects which resulted in the holding of unconstitutionality in *Furman v. Georgia*." *Id.*; *see Dobbs v. Zant*, 506 U.S. 357, 358 (1993.)

To establish a constitutional violation based on an incomplete record, the missing records must be material to Cramer's claims. *See Schwander v. Blackburn*, 750 F.2d 494, 497–98 (5th Cir. 1985) (holding that petitioner was not denied the "right to a meaningful appeal" where "the omitted phases of the trial transcript [were] immaterial to the error alleged" on appeal); *Mullen v. Blackburn*, 808 F.2d 1143, 1146 (5th Cir. 1987.)

## B.    Conference regarding Elizabeth Rose's testimony

Elizabeth Rose was a government witness who testified that she overheard Cramer and Fackrell making incriminating statements while she was detained in a holding cell next to them on the first day of their trial. As explained in greater detail in Claim 5, *supra*, Rose was represented by John McElroy, a member of Cramer's defense team, at the time she overheard these statements. In fact, the

first person Rose told about the statements was McElroy, raising a conflict of interest in McElroy's representation of Cramer. Cramer filed a motion to preclude Rose's testimony based on McElroy's dual representation (*see* Dkt. No. 551 at. 3-4), but the motion failed to disclose that Rose had told McElroy about the conversation she overheard. The discussion of the motion to prohibit Rose's testimony occurred entirely off the record. (*See* Dkt. 743-.)

According to the reconstruction of the conference put together by appellate counsel (based on contemporaneous notes), Cramer's attorneys again failed to inform the court that McElroy had been involved in facilitating Rose's testimony against Cramer. During the conference, Cramer's attorneys explained only that Cramer's attorneys had information about "confidential drug amounts" involved in Rose's case, *id.* at 3, implying that Rose's original public plea agreement contained false statements. *See generally* Claim 5, *supra.*

The missing records regarding McElroy's conflict are plainly material to Cramer's claims. In Claim 5, Cramer alleges that his right to conflict-free counsel was violated when McElroy represented both Cramer and Rose and when he facilitated Rose's testimony against Cramer. What transpired at the bench conference regarding this conflict bears directly on Cramer's conflict of interest claim. *Compare Schwander*, 750 F.2d at 497–98 (no constitutional violation where "the omitted phases of the trial transcript [were] immaterial to the error alleged.") Cramer is entitled to a clear record of what McElroy, Black, and Barlow told the court about their knowledge of Rose's case and McElroy's involvement in securing Rose's testimony for the government.

## C.    Conferences regarding other substantive matters

Cramer and Fackrell's appellate counsel reviewed the record soon after their appointment and determined that multiple trial court proceedings had not been recorded. Counsel made a list of the known unrecorded proceedings. (*See* Dkt. 747, App. B.). In addition, counsel attempted to reconstruct four substantive off-the-record conferences for which they had access to summaries and notes from

189

the attorneys present. *(See* Dkts. 743, 747 Apps. A, B.)

The off-the-record discussions covered multiple substantive, important issues that were relevant to Cramer's claims on appeal and in this motion. For example, during a conference before the jury was seated discussing which prospective jurors had been struck, Judge Crone apparently noted that all of the Black venire persons had been struck. (Dkt. 747 App. A at 6.) She asked, "Do we have a problem?" and the reconstruction indicates that "the government responded that it was not striking jurors because they were Black" but does not note any *Batson* challenge from the defense. This conference is directly relevant to Cramer's claim that defense counsel was ineffective for failing to raise a *Batson* claim during voir dire. (*See* Claim 8.)

At a different unrecorded conference that was reconstructed by appellate counsel, the judge and attorneys discussed the visible security presence at trial and what the Marshals would be wearing, including discussion of how law enforcement personnel would appear to the jury. This discussion bears directly on Cramer's Claim 9 (discussing visible security presence at trial). Other unrecorded conferences discussed key penalty-phase issues, including jury instructions, and how mitigators could be worded, (Dkt. 747 App. A. at 9, App. B at 4.)

Here, "the omitted phases of the trial transcript" were far from "immaterial to the error alleged." *Schwander*, 750 F.2d at 497-98. Rather, these unrecorded conferences discussed substantive issues that affected Cramer's rights. The court must vacate Cramer's conviction and death sentence.

**D.    Prior counsel was ineffective for failing to adequately preserve this issue at trial and brief the issue on appeal**

There is no record of Cramer's trial counsel requesting to place any of the untranscribed proceedings on the record. Counsel were ineffective for failing to ensure that Cramer had an adequate record on appeal.

In addition, appellate counsel was ineffective for failing to adequately raise this claim on appeal. In Cramer's appellate brief, counsel simply incorporated by reference Fackrell's claim regarding

190

the incomplete record. The entirety of Cramer's claim reads: "Point XII: Appellate counsels' and this Court's inability to review substantial and significant portions of the record requires reversal. (Although the heading uses Fackrell's name, the issue applies equally to Cramer.)" AOB at 178. Counsel for Cramer did not provide any additional detail or argument regarding the untranscribed conference concerning Elizabeth Rose, an issue that most directly impacted Cramer (rather than Fackrell) since it implicated Cramer's right to conflict-free counsel.

For the reasons explained above, the failures of trial counsel to preserve the record and of appellate counsel to adequately raise this claim on appeal were prejudicial.

## CLAIM 16: CRAMER WAS DENIED THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

Cramer's appellate counsel was constitutionally ineffective in violation of Cramer's Sixth Amendment rights. First, counsel failed to raise meritorious claims on appeal, and Cramer was prejudiced because there is a reasonable probability that one or more claims would have been successful on appeal. ████████████████████████

████████████████████████

████████████████████████

### A.    Appellate counsel failed to raise meritorious claims

A criminal appellant is entitled to the effective assistance of counsel in his direct appeal. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). Effective appellate counsel in capital cases is especially important because of "the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally." *Parker v. Dugger*, 498 U.S. 308, 321 (1991). Counsel may narrow the issues to "maximize the likelihood of success on appeal." *Id.* at 288. However, particularly in a capital case, there can be no reasonable strategy for failing to raise a meritorious issue on appeal. *See Greer v. Mitchell*, 264 F.3d 663, 679 (6th Cir. 2001) ("[I]n a capital case . . . appellate attorneys must err on the side of inclusion particularly where, as here, there appear to exist a significant number of facts to

191

support the claim."). To establish a Sixth Amendment violation, Cramer must show that appellate counsel rendered deficient performance and that but for appellate counsel's failure to raise an omitted claim, there is a reasonable probability that he would have prevailed on appeal. *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000).

*Failure to argue that the trial court erred in denying Cramer's motion to present execution impact evidence.* To provide effective assistance of counsel in a capital case, defense counsel should seek to present a compelling case for the defendant's life and to present evidence of the value of a defendant's life to his loved ones. *See e.g.*, *Johnson v. Mitchell*, 585 F.3d 923, 942 (6th Cir. 2009) (finding trial counsel ineffective, in part, for failing to present mercy pleas from their client's family, because "without their testimony, the jury was left with no alternative but to believe that [his] own relatives were not supportive enough of him to plead for his life during the proceedings"); *Marshall v. Cathel*, 428 F.3d 452, 470-71 (3rd Cir. 2005) (finding trial counsel ineffective, in part, for failing to develop and present mitigating testimony from the defendant's sons that they wanted him to live despite his having killed their mother). A compelling case for life includes execution impact evidence. *See* American Bar Association, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, Guideline 10.11.F.4, reprinted, 31 Hofstra L. Rev. 913, 1056 (Summer 2003) (instructing that counsel should consider calling "[w]itnesses who can testify about the adverse impact of the client's execution on the client's family and loved ones").

Here, trial counsel filed a "Motion to Introduce the Testimony of Defendant's Family and Friends Regarding Their Feelings on the Prospect of a Death Sentence and the Impact an Execution Would Have on Them." (Dkt. 204.) The trial court denied the motion based on Fifth Circuit precedent holding that although mercy pleas The court found that Fifth Circuit has stated that although mercy pleas from family members "may well impact a jury's decision, they are not mitigating evidence" required to be admitted "since they do not reflect on [the defendant's] personal culpability." (Dkt. 300

192

(citing *Kelly v. Lynaugh*, 862 F.2d 1126, 1133 n.12 (5th Cir. 1988), *cert. denied*, 492 U.S. 925 (1989) and *United States v. Snarr*, 704 F.3d 368, 401 (5th Cir. 2013).

Appellate counsel should raised a claim that the trial court erred in denying Cramer's request to execution impact evidence to the jury. Execution impact evidence is permissible in sentencing proceedings because, under the Eighth Amendment, capital juries shall not be precluded from considering any relevant evidence in support of a sentence less than death. *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *Skipper v. South Carolina,* 476 U.S. 1 (1986). Additionally, as a matter of elemental due process, any capital defendant alleged to pose a future danger has a right to present evidence that he could lead a useful life behind bars. *Skipper*, 476 U.S. at 8. Section 3592(a)(8) of the Federal Death Penalty Act also provides support for this position, as it mandates that a finder of fact "shall consider any mitigation factor, including: . . . [o]ther factors in the defendant's background, record, or character or any other circumstance of the offense that mitigate against imposition of the death sentence." 18 U.S.C. § 3592(a)(8).

Here, Cramer's possible future dangerousness was the primary focus of the government's case for death. To support that non-statutory aggravating factor, the prosecutor relied on the defense expert's diagnosis of antisocial personality disorder (APD) and presented evidence and arguments concerning Cramer's record of criminality and violence both in the free world and in prison. The government described the victim, Leo Johns, and the loss and pain his family suffered from his death. (Dkt. 679 (RT) at 192.) The prosecution dismissed mitigating evidence showing that "Cramer loves his family and they love him" by observing, "I'm going to say most people – most people have people who love them… Does that mitigate against the sentence that should be given here for Christopher Cramer's choices and actions?" (Dkt. 679 (RT) at 200.)

Several of Cramer's relatives testified that they love Cramer and wanted him to live. (Dkt. 646 (RT) at 154-247; 647 at 16-23.) Cramer's mother, Darla Dillon, gave perhaps the most heartrending testimony about her love for her son:

> He's just a kid. He's a good kid and he would do anything and he's very loyal. I know he's a man, and I know he looks like – his outer shell looks like that, but his heart isn't that way. He deserves to live. We all deserve to live, but he deserves to live. He deserves to live; and he deserves to have a chance to get right, you know. He's just lost. He needs to go back – find his way back home.

(Dkt. 647 (RT) at 15.)

As impassioned as her plea was for her son's life, Dillon had more she wanted to say to the jury if she had been given the chance. As she explained in a post-trial declaration:

> At trial, I testified that Chris is a good person who I love with all my heart and who I believe deserves to live. I was not asked to testify about the impact his execution would have on me and my family.
>
> If I had been asked, I would have told the jury and judge that my son being executed would be the worst thing to happen in my life. Chris is so special and important to us. He is my first-born, and still my baby boy. Even though he has been in prison for many years, we have a strong relationship, and he is a precious part of our family.
>
> I have not had an easy life. I have experienced a lot of pain and many losses. But if Chris were put to death, I don't know if I or my family would ever recover.

(Ex. 51, ¶¶ 2-4.)

Under the Eighth Amendment, Cramer was entitled to present such evidence to the jury, and the jury was entitled to hear it. If counsel had presented testimony about the impact that Cramer's execution would have had on his mother Darla and other loved ones, there is a reasonable probability that at least one juror would have voted to spare his life. Indeed, there is evidence that juries find execution impact evidence highly mitigating: Data collected before Cramer's trial showed that federal capital juries found execution impact as a mitigating factor in over 60 cases.[40] Appellate counsel's

---

[40] *Available at* https://fdprc.capdefnet.org/sites/cdn_fdprc/files/Assets/public/project_declarations/mitigation/9-6-13_execution_impact.pdf.

failure raise this claim on appeal was ineffective.

*Other instances of IAAC.* In addition, appellate counsel rendered deficient performance in failing to present or develop all or parts of the following claims: Claims 1, 2, 5, 6, 7, 9, 11, 12, 13, 15, and 17. Cramer incorporates each claim by reference as though fully presented herein.

A habeas petitioner establishes that he was prejudiced by appellate counsel's deficient performance where appellate counsel's errors "undermine[] the result on direct appeal, making the sentence unfair or unreliable." *United States v. Williamson*, 183 F.3d 458, 463 (5th Cir. 1999). As discussed in detail in Claims 1, 2, 5, 6, 7, 9, 11, 12, 13, 15, and 17, Cramer was prejudiced by appellate counsel's deficient performance because there is a reasonable probability that Cramer would have prevailed on one or more of these claims on appeal.

195

**CLAIM 17: THE FEDERAL DEATH PENALTY ACT AND ITS ADMINISTRATION ARE UNCONSTITUTIONAL**

Cramer's death sentence was imposed in violation of the Eighth Amendment because the Federal Death Penalty Act ("FDPA") fails to meaningfully narrow the class of death-eligible homicides, and Cramer's death sentence was imposed in an arbitrary and capricious manner.

**A.      Legal basis**

The Eighth Amendment prohibits the imposition of a death sentence unless the governing statute reasonably justifies the imposition of a more severe sentence on the defendant compared to others found guilty of murder. "To pass constitutional muster, a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder,'" and thereby suitably guide the sentencer's discretion. *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988) (quoting *Zant v. Stephens*, 462 U.S. 862, 877 (1983)); *Furman v. Georgia*, 408 U.S. 238 (1972.)

Since *Furman v. Georgia*, the Supreme Court has required any statute governing imposition of the death penalty to "tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty." *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980.) The statute "must channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance, and that make rationally reviewable the process for imposing a sentence of death." *Id.* (quotations and footnotes omitted); *Gregg v. Georgia*, 428 U.S.153, 192 (1976) (opinion of Stewart, Powell & Stevens, JJ.); *id.* at 222 (opinion of White, J., Burger, C.J., & Rehnquist, J.)

**B.      The FDPA fails to narrow the class of death-eligible offenders in violation of Cramer's Eighth Amendment rights**

Under *Furman*, the Court held that the death penalty could no longer be "wantonly and freakishly impose[d]"; instead, its imposition must "always [be] circumscribed by the legislative

197

guidelines." *Id.* at 206-07. Thus, aggravating factors must be narrowly and precisely defined. *Godfrey*, 446 U.S. at 429; *Zant v. Stephens*, 462 U.S. 862, 877-78 & n.15 (1983.)

Under the FDPA, however, aggravating factors are not narrowly and precisely defined. The FDPA sets forth sixteen statutory aggravating factors that make a wide swath of homicides death-eligible, including felony murder, financial gain from the offense, and prior conviction for two felony drug offenses. In addition to these sixteen statutory aggravators, the FDPA permits consideration of "any other aggravating factor for which notice has been given." 18 U.S.C. § 3592. As a result of the extraordinary breadth of the statute, individual federal prosecutors are afforded virtually unfettered discretion in deciding whether to seek death, creating a substantial risk of arbitrariness. Particularly considering that the FDPA includes a catch-all aggravating factor, virtually any murder could be charged capitally under the FDPA. The FDPA thus unconstitutionally fails to narrow the class of murders for which the death penalty may be imposed.

## C.      The death penalty is arbitrary and capricious as applied to Cramer

While the broadness of the FDPA's aggravating factors means that nearly any federally-charged murder could qualify as a capital offense, in practice, federal death sentences are exceedingly rare. Indeed, "[t]he infrequency of the federal death penalty —with 67 federal death sentences in the face of over 150,000 murders—makes death by lightning strike look positively routine." G. Ben Cohen and Robert J. Smith, *The Racial Geography of the Federal Death Penalty*, 85 Wash. L. Rev. 425, 431 (2010.) Cramer's death sentence was imposed in violation of the Eighth Amendment because it was applied on the basis of arbitrary factors, including the location of Cramer's crime.

The authorization and imposition of death have consistently been a Southern phenomenon. Since 1927, there have been 50 federal executions. Almost half have stemmed from federal prosecutions in the South, and the vast majority of the most recent executions have been from Texas

prosecutions. (*See* Ex. 57) In a study of this issue published in 2010, the authors note:

> Geographic disparities . . . persist. To promote uniformity, United States Attorneys submit all death-eligible federal cases to the United States Attorney General for death authorization. Yet the geography of the federal death penalty is anything but uniform. Six of the ninety-four federal judicial districts account for one-third of death-authorizations. More than half of all death-authorizations come from fourteen federal districts. Seven federal districts are responsible for approximately 40% of the individuals on federal death row. Two-thirds of districts have not sentenced anyone to death.

Cohen & Smith, *The Racial Geography of the Federal Death Penalty*, 85 Wash. L. Rev. at 429-30. Part of this problem stems from certain jurisdictions *seeking* death authorization much more frequently than others, so the centralized review process is unable to effectively counter this source of geographic disparity. As a result, "[n]early one-third of federal districts have not sought a death sentence. Fewer than 20% of federal districts have sentenced more than one person to death." Cohen & Smith, *The Racial Geography of the Federal Death Penalty*, 85 Wash. L. Rev. 425, 429–30 (2010.) Relevant to Cramer, the single federal district that has generated the most death sentences in the modern era is the Eastern District of Texas, accounting for 8 of 79 federal death sentences nationwide. (Ex. 57.)

Because charging practices differ widely across districts and some districts never seek death sentences at all, constitutionally relevant factors such as culpability are not determinative. For example, there are numerous examples of highly aggravated BOP homicides that are never charged capitally. In districts outside the Eastern District of Texas, authorization to seek the death penalty was not sought in the vast majority of BOP homicides, including:[41]

- "[A] BOP inmate killing of a Jewish Defense League member by an alleged Skin Head at FCI Phoenix" (Ex. 76.)

- "[A] drug-related BOP inmate murder of a government witness in a medical unit . . . The three defendants held the victim down and suffocated him with a plastic bag"(Ex. 76.)

---

[41] Summaries of these cases are drawn from a list of "Completed Federal Capital Cases Involving an Inmate" compiled by the Federal Death Penalty Resource Center, included with this filing as Ex. 76

199

- "[A] BOP gang-related inmate stabbing and beating murder on a 30-minute video at USP Coleman" (Ex. 76.)

- "[A] BOP inmate beating murder of an intellectually disabled inmate" related to a gang dispute (Ex. 76.)

The fact patterns of these cases indicate that culpability isn't the driving force in whether a jurisdiction seeks authorization for the death penalty in a particular case. (Ex. 76.)

Another factor that varies widely across districts is jurors' receptiveness to mitigating evidence, a factor that was stacked heavily against Cramer in this case. Academic research has revealed that "juries in the Eastern District of Texas endorse the lowest number of mitigators in BOP homicide cases of any district in the country." (Ex. 45 ¶ 14.) The happenstance of judicial district is especially cruel in cases like Cramer's, where the defendant is a BOP inmate who was assigned to a particular BOP facility in a particular judicial district and had no choice in the matter.

In addition to geography, the race of both the defendant and the victim factors heavily into whether the death penalty is imposed. Defendants who, like Cramer, were convicted of killing a white victim "are more likely to be sentenced to death" than those convicted of killing a black victim. Cohen & Smith, *The Racial Geography of the Federal Death Penalty*, 85 Wash. L. Rev. 425, 428 (2010.) Finally, as more fully explained in Claims 1-16 above, additional arbitrary factors unrelated to Cramer's culpability factored heavily into the sentencing result in this case. For example, the failure of Cramer's counsel to develop mitigating evidence or evidence of Cramer's FASD, to request appropriate jury instructions, and to ensure that the jury was unbiased all influenced the jury's ultimate decision to sentence Cramer to death.

Because geography and other factors unrelated to Cramers' culpability factored so heavily into the determination of his sentence, and because the FDPA fails to meaningfully narrow the class of defendants eligible for the death penalty, the government's administration of the federal death penalty

200

as applied to Cramer is arbitrary and capricious. *See Glossip v. Gross*, 576 U.S. 863, 908-78 (2015) (Breyer, J. dissenting) (constitutionally impermissible factors, such as race and geography, dictate who receives the death penalty, instead of permissible factors like the aggravation of the crime.) Cramer's rights under the Eighth Amendment were violated, and his death sentence must be vacated.

**CLAIM 18: CRAMER'S CONVICTION AND SENTENCE MUST BE VACATED DUE TO THE CUMULATIVE PREJUDICIAL EFFECT OF THE ERRORS IN THIS CASE**

In support of this claim, Cramer incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto. In addition, Cramer re-urges all objections, arguments, and claims of error made at trial and during direct appeal proceedings, and incorporates by reference herein those prior objections, arguments, and claims of error.

Cramer's convictions and sentences are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution, because the cumulative effect of the errors involved in Cramer's trial violated his rights to a fair trial, trial by jury, due process, effective assistance of counsel, presentation of a defense, confront the witnesses against him, a reliable determination of guilt and penalty, fundamental fairness, and to be free of cruel and unusual punishment. *United States v. Fields*, 761 F.3d 443 (5th Cir. 2014).

The cumulative effect of these errors resulted in an abridgment of the fundamental fairness of the trial process during all phases of the trial process. Even if the prejudice flowing from any single claim presented in this Motion fails to justify reversal, the cumulative prejudice that resulted from these errors deprived Cramer of a trial that was fundamentally fair and make it likely that, but for these errors, the outcome of the trial could have been different.

These constitutional violations warrant the granting of this Motion without any determination of whether these violations substantially affected or influenced the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 638 n. 9. Furthermore, these constitutional violations so infected the integrity of the proceedings that the errors cannot be deemed harmless. In any event, these

violations of Cramer's rights had a substantial and injurious effect or influence on the guilt and penalty judgments, rendering them fundamentally unfair. In particular, the imposition of death sentences at the conclusion of a trial as riddled with errors as this one was represents a substantial miscarriage of justice.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: September 21, 2023       By:   /s/ Laura Paul
                                      LAURA PAUL

                                      CA Bar No. 329386
                                      Deputy Federal Public Defenders
                                      321 East 2nd Street
                                      Los Angeles, California 90012-4202
                                      Telephone: 213-894-3217
                                      Facsimile: 213-894-0081
                                      Email: Laura_Paul@fd.org

                                      DEVON PORTER
                                      CELESTE BACCHI

                                      Attorneys for Defendant
                                      CHRISTOPHER EMORY CRAMER

# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF TEXAS

## BEAUMONT DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § § | No.1:16-CR-26 |
| v. | § § § | **CAPITAL 2255 PROCEEDINGS** |
| CHRISTOPHER EMORY CRAMER | § § § § | HON. MARCIA A. CRONE |

## CERTIFICATE OF SERVICE

This is to certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV(a)(3) on this 20th day of September. Any other counsel of record will be served by facsimile transmission and/or first-class mail, return receipt requested, on this 20th day of September.


/s/ Laura Paul
LAURA PAUL