# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF TEXAS

## BEAUMONT DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § § § | No. 1:16-CR-26 |
| | § | **<u>CAPITAL 2255 PROCEEDINGS</u>** |
| v. | § § | HON. MARCIA A. CRONE |
| CHRISTOPHER EMORY CRAMER | § § § § | |

**EXHIBITS IN SUPPORT OF MOTION FOR COLLATERAL RELIEF**

**VOLUME 1**

**EXHIBITS 1-72**

**EXHIBIT INDEX**

1.  *Filed Under Seal*

2.  Transcript of Sentencing Proceedings, *U.S. v. Otis Carden,* Case No. 08-CR-147-T-26MP, January 12, 2009

3.  *Filed Under Seal*

4.  *Filed Under Seal*

5.  *Filed Under Seal*

6.  *Filed Under Seal*

7.  *Filed Under Seal*

8.  Declaration of Terry Oliver Gilmore, March 13, 2023

9.  Declaration of Hortensia White, July 10, 2023

10.  *Filed Under Seal*

11.  Declaration of Jeffrey Martin, March 17, 2023

12.  *Filed Under Seal*

13.  Declaration of John McNicholas, August 29, 2023

14.  Declaration of Ronald McElroy, February 27, 2023

15.  Declaration of Shirley Miller, July 8, 2023

16.  *Filed Under Seal*

17.  *Filed Under Seal*

18.  *Filed Under Seal*

19.  *Filed Under Seal*

20.  Testimony, Judge Marcia Crone, Criminal Justice Act Review, February 4, 2016

21.  *Filed Under Seal*

22.  *Filed Under Seal*

1

23.     *Filed Under Seal*

24.     *Filed Under Seal*

25.     *Filed Under Seal*

26.     *Filed Under Seal*

27.     *Filed Under Seal*

28.     *Filed Under Seal*

29.     *Filed Under Seal*

30.     *Filed Under Seal*

31.     *Filed Under Seal*

32.     *Filed Under Seal*

33.     *Filed Under Seal*

34.     *Filed Under Seal*

35.     *Filed Under Seal*

36.     *Filed Under Seal*

37.     *Filed Under Seal*

38.     *Filed Under Seal*

39.     *Filed Under Seal*

40.     *Filed Under Seal*

41.     Declaration of Dr. John Weeks, September 10, 2023

42.     *Filed Under Seal*

43.     *Filed Under Seal*

44.     Declaration of Dr. Barbara Belbot, September 14, 2023

45.     Declaration of Dr. Meredith Rountree, September 12, 2023

46.     Declaration of Anthony S. Haughton, September 19, 2023

47.     *Filed Under Seal*

48.    *Filed Under Seal*

49.    *Filed Under Seal*

50.    *Filed Under Seal*

51.    Supplemental Declaration of Darla Dillon, September 07, 2023

52.    Article, Federal Death Penalty Resource Counsel

53.    *Filed Under Seal*

54.    *Filed Under Seal*

55.    *Filed Under Seal*

56.    *Filed Under Seal*

57.    Article, *Federal Death Penalty: The federal government can seek death sentence for a limited set of crime, but federal executions are much rare than state executions*, 2023

58.    General Order Adopting The Amended Plan For The Random Selection of Jurors, No. 19-06, April 4, 2019

59.    General Order Amending Local Rules, No. 09-07, March 26, 2009

60.    *Filed Under Seal*

61.    *Filed Under Seal*

62.    *Filed Under Seal*

63.    *Filed Under Seal*

64.    *Filed Under Seal*

65.    *Filed Under Seal*

66.    *Filed Under Seal*

67.    Excerpt of DSM-V, Conduct Disorder, 2013

68.    *Filed Under Seal*:

69.    *Filed Under Seal*

70.    *Filed Under Seal*

71.    *Filed Under Seal*

3

72.    *Filed Under Seal*

73.    Declaration of Matt Rubenstein , September 13, 2023

74.    *Filed Under Seal*

75.    *Filed Under Seal*

76.    *Filed Under Seal*

77.    *Filed Under Seal*

78.    *Filed Under Seal*

79.    *Filed Under Seal*

80.    *Filed Under Seal*

81.    Article, *Federal Prisons Were Told to Provide Addiction Medications. Instead, They Punish People Who Use Them,* December 12, 2022

82.    Intentionally Omitted

83.    *Filed Under Seal*

84.    *Filed Under Seal*

85.    Article, Gangs, Prison Culture and the Role of Prison Staff, February 10, 2022

86.    Article, Violence on the Rise in BOP Facilities, August 15, 2009

87.    Article, Five things to know about one of the deadliest federal prisons, May 31, 2022

88.    *Filed Under Seal*

89.    *Filed Under Seal*

90.    *Filed Under Seal*

91.    *Filed Under Seal*

92.    *Filed Under Seal*

93.    *Filed Under Seal*

94.    *Filed Under Seal*

95.    *Filed Under Seal*

4

96.     *Filed Under Seal*

97.     *Filed Under Seal*

98.     *Filed Under Seal*

99.     *Filed Under Seal*

100.    *Filed Under Seal*

101.    *Filed Under Seal*

102.    *Filed Under Seal*

# Exhibit 1

# Filed under seal

# Exhibit 2

```
                  UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
                       TAMPA DIVISION

UNITED STATES OF AMERICA,    CASE NO: 8:08-CR-149-T-26MAP

          Plaintiff,

VS.                                    Tampa, Florida
                                       November 26, 2008
OTIS CARDEN,                           9:00 a.m.

          Defendant.
_____/

          TRANSCRIPT OF SENTENCING PROCEEDINGS
         BEFORE THE HONORABLE RICHARD A. LAZZARA
              UNITED STATES DISTRICT JUDGE
APPEARANCES:
Counsel for Plaintiff:   JAMES C. PRESTON, JR., ESQUIRE
                         U. S. Attorney's Office
                         400 N. Tampa Street
                         Suite 3200
                         Tampa, Florida  33602
                         813-274-6000
                         james.preston@usdoj.gov
Counsel for Defendant:   VICTOR D. MARTINEZ, ESQUIRE
                         One Urban Centre, Suite 300
                         4830 W. Kennedy Boulevard
                         Tampa, Florida  33609
                         813-289-0600
                         vmartinez@tampa.rr.com


Court Reporter:          CLAUDIA SPANGLER-FRY, RPR, CM
                         Official Court Reporter
                         801 North Florida Avenue
                         15th Floor
                         Tampa, Florida  33602
                         813-301-5575
                         cookiefry@aol.com

    CLAUDIA SPANGLER-FRY, OFFICIAL U. S. COURT REPORTER
```

Exhibit 2 - 1

P R O C E E D I N G S

November 26, 2008

* * * * * *

THE COURT:  Call the case, Madam Clerk.

THE CLERK:  Case Number 8:08-CR-149-T-26MAP, United States of America versus Otis Carden.

Counsel, state your appearances, please.

MR. PRESTON:  Good morning, Your Honor, Jim Preston for the United States.

MR. MARTINEZ:  Good morning, Your Honor, Victor Martinez on behalf Mr. Carden, who is present before the Court.

THE COURT:  Mr. Carden, please stand to be sworn by the Clerk.

Thereupon,

OTIS CARDEN,

having first been duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

THE DEFENDANT:  Yes, ma'am.

THE COURT:  You are Otis Carden?

THE DEFENDANT:  Yes, sir.

THE COURT:  Have a seat, please, sir.

On August 28th of this year, as you know, a jury found you guilty of Count 1 of the Indictment

Exhibit 2 - 2

charging you with conspiracy to possess with the intent to distribute 500 grams or more of methamphetamine, in violation of Federal Law.  The jury also found you guilty of Count 4 charging you with possession with the intent to distribute methamphetamine, in violation of Federal Law.

We are now at the stage of the proceedings where it's my obligation to address questions to you, to your attorney and to the Assistant United States Attorney.

Mr. Martinez, prior to this proceeding, did you have an opportunity to receive and thereafter to review and to discuss with your client the contents of his Pre-Sentence Report?

MR. MARTINEZ:  Yes, Your Honor, and the addendum as well.

THE COURT:  And Mr. Carden, prior to this proceeding, did you have an opportunity to meet with Mr. Martinez and to review and to discuss with him in detail the contents of your Pre-Sentence Report?

THE DEFENDANT:  Yes, sir.

THE COURT:  All right.  I note that there are no objections either to the factual accuracy of the report or the application of the guidelines in the report.  And based on my personal interaction with this

Exhibit 2 - 3

case, having presided over the case and having heard the evidence and testimony, and based on my independent review of the Pre-Sentence Report, I will adopt the factual statements and guideline applications as the Court's own and make the following findings:

The total offense level is 38, the criminal history category is four. Normally, that would bring an advisory guideline range of 324 to 405 months. However, based on the statutory enhancement, he's subject to life imprisonment. He's subject to 10 years of supervised release as to Count 1, and six years as to Count 4. The fine range is 25,000 to $10 million, and there's a $200 mandatory special assessment.

Mr. Martinez, is there any legal reason why I should not now proceed with the imposition of sentence?

MR. MARTINEZ: There's no legal reason, Your Honor.

MR. PRESTON: Your Honor, procedurally, going through Section 851 of Title 21 last evening, I recognized something I hadn't in the past, and that is the procedure in which --

THE COURT: Yes, I know I have to ask if he admits those prior ones, right?

MR. PRESTON: Yes, sir, and also advise him that this is the only time to challenge it. The

Exhibit 2 - 4

Pre-Sentence Report, in fact, provides the Defendant with an opportunity to provide an objection if necessary, but there is still that last provision of 851(b) which says, shall inform the Defendant that any challenge to a prior conviction which is not made before sentence is imposed may not be raised after the -- by any form of attack.

THE COURT:  Mr. Carden.

THE DEFENDANT:  Yes, sir.

THE COURT:  As you know, in your case at Docket 34, on June 26th of this year, the United States, pursuant to Title 21 of the United States Code, Section 851, filed an Information and notice of prior convictions.  And in that particular document, they -- they stated that you were subject to an increased punishment, including an enhancement of the applicable mandatory minimum term of imprisonment under Title 21 of the United States Code, Section 841(b).

And the prior convictions they were relying on was a February 14, 2006 conviction for possession of a controlled substance in the 13th Judicial Circuit of the State of Florida, as well as a May 15, 2006 conviction for possession of methamphetamine with intent to sell or deliver which occurred in the 10th Judicial Circuit of the State of Florida.

Now, in your Pre-Sentence Report, those

Exhibit 2 - 5

convictions appear at paragraph 52 -- at paragraphs 51 and 52.  Were you, in fact, convicted in the 13th Judicial Circuit for possession of a controlled substance in February of 2006?

THE DEFENDANT:  Yes, sir.

THE COURT:  Were you, in fact, convicted in the 10th Judicial Circuit on May 15, 2006, of possession of methamphetamine with intent to sell or deliver?

THE DEFENDANT:  Yes, sir.

THE COURT:  You don't contest that fact?

THE DEFENDANT:  No, sir.

THE COURT:  You understand that this is the time for you to contest the accuracy of those convictions, and if you don't do it now, you can't attack it later on?

THE DEFENDANT:  Yes, sir, I understand.

THE COURT:  All right.  Mr. Martinez, at this juncture, I would ask you to address the statutory factors, but I don't know that there's much that can be said.  I mean, my hands -- you know, the sentence is life.

MR. MARTINEZ:  Your Honor, I've explained to Mr. Carden the legal circumstance, that the Court is without discretion and that there's nothing I can do or say in mitigation, or anything I can file on his behalf

Exhibit 2 - 6

that would change the sentence that the Court is legally obligated to impose. So, we have nothing to say in this regard because of those reasons and simply wish to proceed to sentencing so that we can go forward with our appellate rights.

THE COURT: Okay. Although, Mr. Carden, under the law, I must afford you an opportunity to address me. Anything you care to say?

THE DEFENDANT: No, sir.

THE COURT: You sure are calm for -- how old are you now?

THE DEFENDANT: 27.

THE COURT: You sure are calm today for a man who faces the rest of his life in a Federal penitentiary.

THE DEFENDANT: At this point, there's nothing I can do but start working on my appeal.

THE COURT: Anything the Government cares to say, Mr. Preston?

MR. PRESTON: No, sir.

THE COURT: Any recommendations you wish me to make to the Bureau of Prisons?

MR. MARTINEZ: Yes, Your Honor, if he can be accepted at Coleman, he would like to go to Coleman. If not, he'd like to be housed someplace in the State of Florida.

Exhibit 2 - 7

THE COURT: All right. I'll make that recommendation to the Bureau of Prisons.

THE DEFENDANT: Thank you.

THE COURT: All right. It's the judgment of the Court that the Defendant, Otis Carden, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of life as to Count 1, and a term of 360 months as to Count 4, those terms to run concurrently. Should he be released from imprisonment, he shall serve a 10-year term of supervised release as to Count 1 and a six-year term as to Count 4, all of those terms to run concurrently.

While on supervised release, he shall comply with the standard conditions adopted by the Court in the Middle District of Florida. In addition, he shall comply with the following special conditions:

Having been convicted of a qualifying felony, he shall cooperate in the collection of DNA as directed by his Probation Officer. The mandatory drug testing requirements of the Violent Crime Control Act are imposed. And I will direct that he submit to random drug testing not to exceed 104 tests per year.

Based on his financial status, I'll waive imposition of a fine. I'll direct, however, that he pay the United States a special assessment of $200, which

Exhibit 2 - 8

shall be due immediately.

I previously entered a preliminary forfeiture order.  Based on that order, I will direct that he forfeit to the United States immediately and voluntarily any and all assets and property or portions thereof subject to forfeiture which are in the possession or control of him or his nominees, specifically but not limited to the following:

$2,720 seized from the Defendant on March 20th of 2008, and a money judgment of $360,000.

I've looked at the statutory factors, but as I've indicated earlier, the sentence I must impose is that of life imprisonment.

All right.  Do you have any objections to my sentence or the way I've imposed it, Mr. Martinez?

MR. MARTINEZ:  No objections, Your Honor.

THE COURT:  Mr. Preston?

MR. PRESTON:  No objection, Your Honor.

THE COURT:  I remand him to the custody of the United States Marshal Service to await designation by the Bureau of Prisons.

Mr. Carden, you have a right to appeal from my judgment and sentence within 10 days from today's date. If you fail to appeal within that period of time, that will be a waiver of your right to appeal.

Exhibit 2 - 9

I'll also advise you that you are entitled to the assistance of an attorney in taking an appeal and if you are unable to afford an attorney, one will be provided for you at no charge.

And finally, if you're unable to afford the Clerk's filing fee, I'll direct the Clerk of the Court to accept your notice of appeal without prepayment of that fee.

I'll find that he continues to be indigent for purposes of appeal.  I'll declare him to be indigent. I'll appoint you, Mr. Martinez, to prosecute an appeal on his behalf.  And please go forward and file the notice of appeal within 10 business days of today's date.

MR. MARTINEZ:  Yes, sir.  Your Honor, there was one other housekeeping matter.  There is apparently a keep separate order between Mr. Carden and the co-defendant.  It didn't exist during the course of the trial.  There is no animosity or antagonism between them.

THE COURT:  I never issued a keep separate order.

MR. MARTINEZ:  But -- maybe not, but there is one.  In the Pinellas County Jail where they're both housed, it forces Mr. Carden to be in a different, more secure area of the jail just to keep separate from someone who really isn't a problem.  The Marshals have to

Exhibit 2 - 10

transport them in separate vans.

THE COURT:  Well, I don't know who issued that. I didn't.  But you know, I would assume the Marshal Service did.  Marshal, do you know why there's that --

THE MARSHAL:  I don't.  Maybe just Pinellas County might have done it on their own.  I don't think that we did.

THE COURT:  You know, I'm not going to interfere with security arrangements.  All right.  I didn't issue the order, someone did.  Someone may have had a good faith basis for it.  He's not going -- I suspect they're not going to be housed in the Pinellas County facility much longer.

MR. MARTINEZ:  No, Your Honor.  I just thought it might have been made in error and I thought two vans and whatnot seemed -- that's all.

THE COURT:  All right.  We can take Mr. Carden back now if the Marshal wants to do that.

MR. MARTINEZ:  Thank you, Judge.

(Thereupon, the proceedings concluded.)

******

Exhibit 2 - 11

CERTIFICATE

STATE OF FLORIDA              )
                              SS.
COUNTY OF HILLSBOROUGH )

I, CLAUDIA SPANGLER-FRY, Official Court Reporter for the United States District Court, Middle District, Tampa, Division,

DO HEREBY CERTIFY, that I was authorized to and did, through use of Computer Aided Transcription, report in shorthand the proceedings and evidence in the above-styled cause, as stated in the caption hereto, and that the foregoing pages numbered 1 to 12, inclusive, constitute a true and correct transcription of my shorthand report of said proceedings and evidence.

IN WITNESS WHEREOF, I have hereunto set my hand in the City of Tampa, County of Hillsborough, State of Florida, this 7th day of January, 2009.

CLAUDIA SPANGLER-FRY, Official Court Reporter


BY:  /s/ CLAUDIA SPANGLER-FRY

Exhibit 2 - 12

# Exhibit 3

# Filed under seal

# Exhibit 4

# Filed under seal

# Exhibit 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF EASTERN TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| BRIANNA JOHNS, et al.<br>Plaintiffs,<br><br>v.<br><br>FRANCISCO LARA, et al.,<br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 1:16cv198 |

## DECLARATION OF RESHAY CHILDRESS

In accordance with 28 U.S.C. § 1746, I, Reshay Childress, make the following unsworn declaration, under penalty of perjury, pertinent to the above styled and numbered cause:

1. I have worked for the Federal Bureau of Prisons (BOP) since 1999. I am presently employed as the Special Investigative Agent (SIA) at the Federal Correctional Complex, Beaumont, Texas (FCC Beaumont). I have been in this position since April of 2013. Part of my job responsibilities include investigating allegations of inmates committing either criminal offenses while at this facility, or committing disciplinary infractions.

2. It is my understanding the family members of former inmate Leo Johns, federal register number 11909-091, have filed a lawsuit alleging Warden Francisco Lara and Officer Olajuwon Quarles violated inmate Johns' constitutional rights in connection with his homicide at the hands of two other inmates housed at the United States Penitentiary, Beaumont, Texas on June 9, 2014. Under their theory of the case, a plan was made by inmate Christopher Cramer and inmate Ricky Fackrell, using "look out" inmate Michael Shelton to kill inmate Johns from approximately May 2, 2014 until June 9, 2014, and this plan was known or should have been known by the defendants. The lawsuit claims that if prison officials followed specific, non-

Page **1** of **5**

03129

Exhibit 5 - 1

discretionary directives which were in existence at FCC Beaumont, the death of inmate Johns would have been prevented.

3. In response to these allegations, no one in my office was aware of a specific plan to harm inmate Johns prior to his death on June 9, 2014. The only information the institution received regarding a potential serious assault was on June 5, 2014. A staff member advised my office that he had overheard a conversation about a planned assault on a white inmate at USP Beaumont who had released from the Special Housing Unit (SHU) within the last 30 days (from June 5, 2014). Inmate Johns was in SHU from April 3, 2014 to April 9, 2014, so he did not meet this criteria. The only inmate who met this criteria was placed in SHU pending an investigation into these claims on June 5, 2014.

4. Staff received information at approximately 11:10 a.m. on June 9, 2014 that there had been a possible assault of a white inmate in the shower area of Unit D/A. Officer Quarles was working as the D/A Unit Officer that morning, so he was instructed to begin searching the shower stalls in the unit at that time. At approximately 11:15 a.m. on June 9, 2014, updated information was given to Officer Quarles to begin searching the cells in Unit D/A for a possible assault victim. Officer Quarles located inmate Johns in cell 224 at approximately 11:22 a.m. on June 9, 2014, and made calls for assistance at that time. Inmate Johns was taken to a local hospital, where he was pronounced dead at approximately 12:14 p.m. on June 9, 2014.

5. At the conclusion of my investigation into the matter, I found through review of CCTV footage and witness interviews that inmates Cramer and Fackrell were involved in the murder of inmate Johns. Inmate Shelton served as the "look out" during the incident. This case was then referred to the U.S. Attorney's Office for the Eastern District of Texas. Currently, both inmate Cramer and inmate Fackrell stand indicted on Capital Murder charges.

Page **2** of **5**

Exhibit 5 - 2

6. With regard to issues concerning inmate Johns prior to the homicide, my office received information from the Utah Department of Corrections indicating inmate Johns was a validated member of the Security Threat Group "Soldiers of Aryan Culture (SAC)" since August 19, 2008. One of the tenets of the SAC is that their members will not consume alcohol or drugs. Inmate Johns received Incident Report #2532773 on January 1, 2014. (Attachment 1, true and correct copy of the packet for Incident Report #2532773, p. 4.) In it, staff alleged that while conducting cell searches in Unit DA on December 31, 2013, the officer located a bag that contained fruit pulp that had a smell of alcohol. (*Id.*) Inmate Johns admitted the alcohol was his during the disciplinary hearing conducted on January 8, 2014. (*Id.* at 1, § III.)

7. In addition to this misconduct, inmate Johns was also involved in three separate matters requiring investigation by the Special Investigative Supervisor's (SIS) Department. When inmate Johns arrived at the United States Penitentiary, Tucson, Arizona (USP Tucson), he told staff there that he could not be around sex offenders because he was an active member of the Soldiers of Aryan Culture and he would have to do something to them. It was recommended at the conclusion of the investigation that inmate Johns be moved from USP Tucson due to its unique mission within the BOP. Inmate Johns arrived at USP Beaumont on August 8, 2012.

8. On February 25, 2013, it was alleged inmate Johns and another inmate pushed a wheelchair-bound inmate out of his chair. Later that same day, inmate Johns and his accomplice were seen assaulting an inmate who had come to the aid of the wheelchair-bound inmate. Inmate Johns was issued an incident report for Code 224 – Assault Without Serious Injury, for his involvement in this matter.

Page 3 of 5

03131

Exhibit 5 - 3

9. On May 27, 2013, a white inmate with no confirmed gang affiliations attempted to be placed in protective custody at USP Beaumont. He alleged inmate Johns and several other SAC and Aryan Circle gang members claimed he was influential in running members of their gangs into protective custody at USP McCreary. Nothing was substantiated against inmate Johns; however, the inmate requesting protective custody was transferred.

10. Evidence suggesting inmate Johns created problems between himself and the SAC is in the form of a telephone call placed by former inmate Brian Green on June 16, 2014. Staff monitoring of the Inmate Telephone System revealed inmate Brian Green made a telephone call on June 16, 2014 to Danny Richley, the step-brother of inmate Johns. In the call, inmate Green told Mr. Richley that your brother (Johns) made a deal with the SAC that he was not going to be using drugs or drinking anymore. Inmate Green told Mr. Richley he (Johns) didn't hold up his end of the deal. Mr. Richley replied to inmate Green by stating he (Johns) thought this was going to happen a year ago when he signed his power of attorney. Inmate Green told Mr. Richley that before Johns went out on writ[1] he stole some "shit" from his cellie, who was another member of SAC. And they (SAC) gave him a pass. Inmate Green alleges inmate Johns was "disciplined" for this conduct (beat up) and he was supposed to not drink or use drugs any more. Inmate Green claims inmate Johns disregarded this agreement and continued his behavior. Mr. Richley claims inmate Johns would previously run up large debts with drug dealers on the street and he (Richley) would have to make it right with them. (Attachment 2, true and correct copy of the telephone call by inmate Green, completed on June 16, 2014.)

---

[1]    SENTRY indicates inmate Johns went out on federal writ 2-20-14 - 3-28-14.

Page **4** of **5**

Exhibit 5 - 4

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed on this __4th__ day of October, 2016.

Reshay Childress
Special Investigative Agent
FCC Beaumont

Page **5** of **5**

03133

Exhibit 5 - 5

# Exhibit 6

# Filed under seal

# Exhibit 7

# Filed under seal

# Exhibit 8

## DECLARATION OF TERRY OLIVER GILMORE

I, TERRY OLIVER GILMORE, declare as follows:

1.    My name is Terry Oliver Gilmore. I was born on ▮▮▮▮▮▮, 1973. I am 49 years old. I am currently incarcerated in Ocala, Florida at the Marion Correctional Institution. I am scheduled to be released on March 5, 2025.

2.    I have known Otis Carden since he was a teenager. I considered Otis to be one of my best friends. He was like a brother to me. I know him well enough to know what he is capable of. I know his life philosophies. I have heard him say things like desperate times call for desperate measures. That went along with him saying that when the chips are down you do whatever you need to do. He used to say those things all of the time.

3.    I have seen Otis be really friendly to people and lie to get them over to his house. After they got there, he would beat the shit out of them. That is what you have to do to show strength in the drug business and not be played with or taken advantage of. We were partners in the drug world and sometimes I would go with him to collect and other times I collected on money that someone owed us by myself. Sometimes Otis asked me to "take care" of someone by beating them up. I did it because of our business relationship and our friendship.

4.    I have seen Otis steal. I have seen him rob people. Worse than the robberies and beating, I have seen Otis threaten people more than once with a gun to the head. People thought they were going to die. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

5.    Otis had a terrible reputation before he went to federal prison. People in the drug world were afraid of him because they knew how violent he was, and that he would do violent things to protect his interests. Otis would also lie about anything if it helped him get what he wanted.

1


Initials

Exhibit 8 - 1

6.    When Otis and I were working in the drug business, a friend told me that Otis testified against someone in either Virginia or West Virginia. All my friend told me was that Otis testified in a drug case. The guy Otis testified against owned a hotel. I do not know any more about the case, but I believe my friend was telling the truth. No one makes up things like that, especially my friend. You just don't accuse someone of being a snitch – that's a dangerous thing to say about someone.

7.    I asked Otis about what my friend had told me, but he told me no, that he didn't snitch. He was forceful about it – he kept saying no, no he did not testify. Otis told me that he would never snitch. But I knew he was lying to me because I know Otis so well. I know he would say or do anything to get out of a bad situation.

8.    I have not seen Otis or had any contact with him since we were housed at Pinellas County, a federal holding facility, for a couple of weeks after our 2008 arrest on drug charges in Polk County, Florida.

9.    When we were housed in Pinellas County, Otis came up to me. He took off his shoes. He handed them to me and told me to go home. Otis told me to testify against him because he was going to get life anyway. He told me to testify to whatever I needed to so that I could go home. He told me to say whatever I needed to say to make a deal. I did testify against him in his federal case, ~~and testifying against him helped me avoid a long federal prison sentence~~.

10.    Otis never talked to me about the Cramer case. I knew through a friend that Otis was released because he testified against a guy who had killed someone in prison. I didn't know the guy's name. I have never met Chris Cramer.

2


Initials

Exhibit 8 - 2

11.    On February 24, 2023 and on March 13, 2023, an investigator from the Office of the Federal Public Defender in Los Angeles came to visit me at the Marion Correctional Institution in Ocala, Florida, to discuss the Christopher Cramer case. I agreed to speak with her on both occasions and sign this declaration. If someone from the trial team had come to talk to me, I would have told them the same thing and I would have testified if they had asked me to.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: 3/13/23

_____
TERRY OLIVER GILMORE

3


Initials

Exhibit 8 - 3

# Exhibit 9

DECLARATION OF HORTENSIA R. WHITE

I, HORTENSIA R. WHITE, declare as follows:

1.     My name is Hortensia R. White, I am 66 years old and I currently live in New Mexico. I have known Christopher Cramer (Chris) since around 1988, when Chris was about five years old. Although Chris and I are not blood relatives, Chris is now and has always been like family to me. I met Chris because I was a friend, and later girlfriend, of Lorenzo Hubbard, the man Chris considers his father. I was around Chris from when he was the age of five to when he was about eight years old. During those years, I saw him all the time and frequently helped to take care of him.

2.     I was born in 1956 in Ogden, Utah. My mother, Hortensia, is part Mexican and Native American, and my father, Hersel Richardson, was African American And Native. My parents knew and were good friends with Lorenzo's parents, Gus Hubbard (Buddy) and Joealle Hubbard (Momma Hubbard) and had known each other since before I was born. But I did not meet Lorenzo until 1988, which is around the time I started using drugs. Before that, I worked for the federal government, had my own home, and led a stable life.

3.     I first met Lorenzo through his cousin, Galveston Scott.  When Galveston took me to meet Lorenzo, I knew Lorenzo was a drug dealer. Darla, Chris's mother, was in a relationship with Lorenzo at this time and lived with him. Chris and his baby sister Chaminque also lived there. That was the day I met Chris. I'll never forget meeting him for the first time. Chris was outside playing and he rode up to Galveston on his bike and said, "Knucklehead Cornbread!" Chris said that because every time Galveston saw Chris he would rub Chris's head and call him "Knucklehead Cornbread." Chris knew Galveston well and really liked him.

4.     I would soon find out that Lorenzo and Darla were drug addicts. Both of them liked to inject themselves with speedballs, a combination of heroin and cocaine. Lorenzo was a

1

HW
Initials

Exhibit 9 - 1

functioning addict, but Darla was a heavy user and she also had a serious drinking problem. Darla would inject herself with drugs so much she would develop skin boils all along her arms.

5.    I was friends with Lorenzo for about six months before we got together romantically and I moved in with him. Lorenzo and Darla had broken up by that point, but they remained close and Darla often left her kids with me, Lorenzo, and his family. Chris loved to be with Buddy, Lorenzo's father, and Buddy took him everywhere he went. Chris was a very sweet kid. He was well-behaved. I never had any trouble with him; he was never disrespectful to me. Chris played like any other kid, but he liked to be around adults. He would be the first one to leave the other kids to go with Buddy to the store or do other things adults asked him to do. Chris was very close to Buddy and Momma Hubbard. He respected them and was such a loveable kid to them.

6.    When Buddy died of cancer, it was very hard on Chris. After that, Lorenzo and his son, Ronald McElroy (Ron Ron) a gang member from Los Angeles, moved into Momma Hubbard's home. Momma Hubbard lived in a house right next to the church where John L. Miller was the Pastor. I lived in Momma Hubbard's home for several years. The house had 3 bedrooms, a little Tea Room, which is like a mini-living room, kitchen with an eating area, living room, and one bathroom. Momma Hubbard had her own room, which she barely came out of after Ron Ron moved in. You could hear her in her room praying most of the time. After his father died, Lorenzo was to be the man of the house and look after Momma Hubbard, but that did not happen. Instead, Lorenzo and Ron Ron took over the home and made it their base for selling drugs.

7.    People went in and out of that house all day, buying drugs. Strangers wouldn't use in the house – it wasn't that kind of drug house. But Lorenzo, Ron Ron and his friends  all

2

*Hw*
Initials

Exhibit 9 - 2

smoked weed and did drugs in the house, around the kids. Ron Ron would have his cousins and friends from Los Angeles stay there for days at a time. Ron Ron used crack in the house as well.

8.    When Lorenzo and Darla broke up, Darla's life turned into a whirlwind. She still came around a lot and was in the scene, and she would often leave Chris and his siblings with us for days or weeks at a time. Lorenzo also got out of control and the drug selling and using seemed to increase. It was like Darla would get married with a guy, divorce that guy, end up with another guy, leave that guy, find another, get married and divorce again. I cannot remember the names of all these guys. Darla was a crazy person hooking up with crazy men. In a four-year span, I believe Darla was married 2 or 3 times. Darla married some guy in the south, maybe Mississippi. Of all the men Darla was with, I believe, the only one who was not an addict was Angel's father. All of Darla's partners were drug users or alcoholics or both.

9.    When I lived with Lorenzo at Momma Hubbard's house, several other people lived there as well. At any given time, there was Momma Hubbard, Lorenzo, a couple of his friends, me, Ron Ron, and Doobie, an addict friend of ~~Ron Ron~~ LORENZO Hᵘ's. The kids Chris, Chaminque (Cham) and Angel would also live there every time Darla would just leave them with us and disappear. I cannot remember how many times Darla would just come by and drop off the kids and disappear. It was common. Every time Darla left her kids with us she was high or drunk.

10.    After Buddy passed, Chris became super close to Ron Ron. Chris was always by Ron Ron's side and he knew and saw that Ron Ron was selling drugs. Chris was Ron Ron's shadow. When Darla would leave the kids and be off wherever she went, Ron Ron and Lorenzo kept selling and using drugs in front of the kids. I am sad knowing that Chris, at such a young age, was exposed to all of this drug use and drug sales.

3

Initials

11.    One time I remember that Darla hooked up with a guy named Doug Turner. When Darla ended it with him, she disappeared again. Darla first dropped off the kids with Lorenzo and took off to who knows where. Doug ended up living at Momma Hubbard's already cramped home as well. Doug and ~~Lorenzo~~ *Ron Ron* were out cashing fake checks, using the money on drugs. One day when Chris was living with us, I found Doug overdosed at Momma Hubbard's home Doug's face was blue, and the needle was still in his arm when I found him. Lorenzo forced me to give him CPR. I do not really know CPR but I ended up bringing him back. Two months later Doug died of an overdose.

12.    Another one of Darla's boyfriends was a guy who lived in Brigham City. Darla and this guy would get into knock-out and drag-out fights. When Darla took her kids to live with her and this guy in Brigham City, Lorenzo and I did not see the kids as much.

13.    I liked Darla when I first met her, but she and I had our differences. Every time Darla came around to Momma Hubbard's she was out there showing her butt and acting up. You know, Darla would be making an ass out of herself. Darla would get drunk to the point of blacking out. Darla had lots of black outs. I always thought that Darla was disrespectful making an ass out of herself. At that time, I was using drugs and still thought this about Darla, so Darla must have been way out. But I also sympathized with her, because I was addicted to drugs too and I know how hard it can be to stop.

14.    Darla and I are okay now, but we did get into a fist fight once. Darla told Momma Hubbard she was leaving the kids with her for a while so she could go get cigarettes. This was right after church. Darla disappeared and was gone for many hours. Around 3 am Darla shows up in a car at Momma Hubbard's home, honking and screaming for her kids. Chris and his sisters were sleeping but the commotion woke them up. Momma Hubbard was very elderly, there was

4

*HW*
Initials

Exhibit 9 - 4

no way she was going to respond to this at 3 am. Momma Hubbard came to me and asked that I please go outside and get Darla and tell her to come inside. I went out there to try and calm her down. The car's window was rolled down, so I stuck my head into the car hoping to talk Darla into coming inside. Darla got pissed and pushed open the door knocking me down. Darla got out of the car and we ended up getting into a fist fight. Chris and his siblings knew what happened outside. Darla was very disrespectful in this way. Darla leaves her kids, disappears, then just shows up randomly late at night demanding things. But that's how she was, over and over again.

15.    When Chris was around 8, I ended up going to prison on drug charges. When I was out, at a halfway home. I went by Momma Hubbard's home to pick up clothes I had left there and discovered it was still a drug house. I arrived and saw Chris was the "doorman." This meant that Chris would come to the door when someone came by looking for drugs and see if the police were around. Chris would then walk the buyer back to Lorenzo or Ron Ron. After the purchase was made Chris would lead them out. Chris would have been around 13 or 14 years old at that time. I was angry when I saw this. I could not understand why Chris was doing this and why Darla or any of the adults in this life would put him in that position. It was wrong. I confronted Lorenzo and Ron Ron and asked them why they would allow this to happen. Lorenzo told me that Darla left Chris and his sisters at the house; what else are they supposed to do. I was so mad, but there was nothing I could do because I was on probation and I could not risk violating it by being in a drug house, so I decided to leave.

16.    A couple of weeks after I saw Chris was the doorman at Momma Hubbard's, I came by Momma Hubbard's home a second time and this time I found the home tore up. It turns out the police raided the house and left the home tore up. No one, not even Momma Hubbard, was home. As I stood there, I saw Chris come up from the backyard. He was all alone, left there

5

<span>Initials</span>

Exhibit 9 - 5

by himself, just a teenage boy. Chris looked scared and concerned. By then, I knew Chris was called "Big Country." Chris was not a bad kid; when I saw him, he was still a meek, humble, sweet person, just as he had been when he was a child. I am not sure where Chris stayed or with whom after I left that day. I did not know the details as to what happened, other than it was a police raid. I did not want to know; it was not my life anymore. I was clean and was trying to stay clean. This would be the last time I saw Chris. I believe this is when Darla came to get Chris and took him to California.

17.    I started using drugs at the age of 32; I went from smoking pot with other drug users to smoking crack and using heroin. It is hard to resist the drug temptation as an adult; I cannot imagine how hard it is for a child like Chris. Chris got a raw deal. Chris was such a loveable kid who was full of life. What did you expect to happen to him when he was exposed to all that drug use and drug sales in Momma Hubbard's house and then basically abandoned time and time again by his mother when she was off who knows where with who knows who.

18.    When I heard Chris was facing a serious trial, I was ready to help any way I could. My son Diamante and I met someone from Chris' trial team at a IHOP in Ogden. The person was not an attorney; I think it was an investigator. At this meeting I was asked how I felt about Chris. I was honest and said that I loved Chris and was very fond of him. When I learned about what Chris did it was shocking. I remember crying when I learned the news. I told the person from his trial team that I couldn't believe Chris would do something like the murder willingly; that he was either set-up or acting in self-defense. The person told Diamante and me that Chris refused to speak against his co-defendant and I wasn't surprised to hear that at all. Chris was always a loyal person. This meeting was maybe about 20 minutes.

6

Hw
Initials

Exhibit 9 - 6

19.    My interactions with the Chris' trial team never felt right to me. The night before I was supposed to testify, we all met in a hotel room in Texas. The same person whom we spoke with at the IHOP and an attorney were there. The attorney appeared to be biracial. In the room were my son Diamante, Lorenzo Hubbard Davis (Lil Lorenzo), Chaminque (Cham), Darla and me. This meeting lasted about 30 minutes. I had no other meetings with anyone from Chris' trial team. No one told me what questions would be asked, only that I would say what Chris was like as a kid. No one explained what I should expect.

20.    That was the only time I have ever testified at a trial. No one told me where to sit or what the courtroom would be like. It all happened so fast. I felt rushed. When it was over, I asked myself if that was it. I had so much more to say, like everything that is in this declaration. I was disappointed in the little the attorney asked. I felt they could have done more. I felt Chris' attorneys looked at me and my family as if we were riffraff.

21.    I have no sympathy for this white supremacist gang that they say Chris is in. I have no sympathy for that at all. I was born in 1956 and have seen racism my entire life. But I believe that Chris turned to that in order to survive in prison. I will put my life on it. Down to the bone, this white supremacist thing is not who Chris is. Chris is family. Chris' family has Blacks, Mexicans, and Natives in it. Something inside me tells me that Chris is not a racist. I remember I spoke on the phone with Chris in 2013 or 2014. He was still the same kind, sweet person. The Chris I knew had a heart of gold despite all the trauma he went through. In my eyes, Chris is still a big kid.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: July 10, 2023

_Hortensia R. White_
HORTENSIA R. WHITE

7

_HW_
Initials

Exhibit 9 - 7

# Exhibit 10

# Filed under seal

# Exhibit 11

**DECLARATION OF JEFFREY MARTIN**

The undersigned, Jeffrey Martin, declares as follows:

1. My name is Jeffrey O'Neal Martin. I hold a Bachelor's degree in Mathematics and Economics from Vanderbilt University and a Master's degree in Economics from the University of Chicago.

2. I am employed as a consultant on statistical issues, a consultant on actuarial issues, and as a consultant to political campaigns. I have been qualified as an expert on statistical issues in Federal Courts and State Courts.

3. Since 1997, I have been involved in cases involving challenges to the jury lists in Federal and State Courts. I have worked on over seventy federal cases in over twenty-five federal districts.

4. I was retained in 2017 by counsel for Ricky Fackrell and Christopher Cramer in *United States v. Cramer and Fackrell*, case no. 1:16-cr-00026-MAC-ZJH, in the Eastern District of Texas. I was hired to analyze the statistical issues in the jury selection process for this case and prepare a report or testify on behalf of both Mr. Fackrell and Mr. Cramer.

5. Based on a review of records, I emailed Robert Morrow (counsel for Mr. Fackrell) and Doug Barlow (counsel for Mr. Cramer) on November 10, 2017, referencing a call earlier in the day and providing my hourly rates and the work necessary to prepare a report. In that email, I provided counsel with a list of records that I would need in order to perform a complete analysis. A copy of our email correspondence is attached to this declaration as Attachment 1.

6. On December 12, 2017, Mr. Morrow emailed me to confirm that funding had been approved for me to serve as an expert for both Mr. Fackrell and Mr. Cramer. I responded the next day with "Robert, Great. I look forward to it. If you have any specific scheduled dates or timeline let me know so I can put them on my calendar. Thanks, Jeffrey." A copy of that correspondence is attached to this declaration as Attachment 2.

7. On January 11, 2018, Mr. Barlow wrote me a letter confirming our agreement that I would work as a consultant and expert for both Fackrell and Cramer and analyze statistical issues regarding the jury selection process. A copy of that correspondence is attached to this declaration as Attachment 3.

8. I do not recall any other contact with Mr. Morrow, Mr. Barlow, or anyone connected with the trial of Mr. Fackrell and Mr. Cramer, and I have no record of any such contact.

9. I performed no work for Mr. Morrow, Mr. Barlow, or anyone connected with the trial of Mr. Fackrell and Mr. Cramer. I never submitted a request for payment in connection with the trial of Mr. Fackrell or Mr. Cramer, and I never received any payment in connection with their trial.

10. Based on my experience, the necessary first steps in any challenge to a jury selection process are the request of records and a statistical analysis of the master jury wheel and the population from which jurors are drawn. I am not aware of either Mr. Fackrell or Mr.

Exhibit 11 - 1

Cramer's teams requesting any records or conducting any statistical analysis in connection with a potential challenge to the jury selection process in their trial.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed this 17th day of March 2023

Jeffrey Martin

Exhibit 11 - 2

# ATTACHMENT 1

Exhibit 11 - 3

 Gmail                                    **Douglas Barlow <barlowlawfirm@gmail.com>**

## Cramer and Fackrell - Estimate
1 message

**Jury Challenge Jeffrey Martin** <jurychallenge@mindspring.com>          Fri, Nov 10, 2017 at 12:43 PM
Reply-To: Jury Challenge Jeffrey Martin <jurychallenge@mindspring.com>
To: Robert Morrow <ramorrow15@gmail.com>, Doug Barlow <barlowlawfirm@gmail.com>

Robert,

It was nice talking with you today.

I charge $100 an hour and I'd estimate that 50 hours ($5,000) would get us through the data collection, analysis and report/declaration of findings.  See below.  As always, things change and data may lead to other issues that should be investigated.

The hours are most dependent on the reliability, availability and willingness of the Court to provide information.  Incomplete data and hard copy data adds time and expense.

Responses to the State and any testimony or travel is not included.

Thanks,
Jeffrey

Data collection - 20 hours
Data request
Jury Plan applicable to this case (believed to be as of March 14th, 2014)
Blank Juror Qualification Questionnaire
Blank Juror Summons
Number of summons sent for this case
Data on the summons or actual summons redacted as necessary (Name or Juror Identification Number, Address, Race, Gender, Ethnicity, Date of Birth, Qualification Information, Status, Returned by Post Office, No Response)
Source data (voter registration)
Master Jury Wheel data
Qualified Jury Wheel data
AO-12 Form
Census information used on AO-12 Form
Any other statistical analysis that ensures the policy in Section I is accomplished
Certificate as referenced in Section 6 of the Jury Plan
Number of qualification questionnaires sent
Data on the qualification questionnaires (Name or Juror Identification Number, Address, Race, Gender, Ethnicity, Date of Birth Qualification Information, Status, Returned by Post Office, No Response)

Census analysis - 5 hours
Jury Eligible Population of the division
Hurricane Harvey data

Statistical analysis - 10 hours
Analysis of AO-12 Form
Analysis of Master Jury Wheel data
Analysis of Qualified Jury Wheel data
Analysis of Juror Qualification Questionnaires
Analysis of Juror Summons in this case

Exhibit 11 - 4

Report/Declaration - 15 hours
Summary of Findings
Absolute Disparity
Comparative Disparity
Standard Deviation Analysis
Systematic Factors
Data Description
Data Procedures
Statistical Procedures

Exhibit 11 - 5

# ATTACHMENT 2

Exhibit 11 - 6

**jurychallenge@mindspring.com**

| | |
|---|---|
| **From:** | Jury Challenge Jeffrey Martin <jurychallenge@mindspring.com> |
| **Sent:** | Wednesday, December 13, 2017 10:49 AM |
| **To:** | Robert Morrow; Rachel Davis; Pat Black; Doug Barlow; Gerald Bourque |
| **Subject:** | Re: Cramer/Fackrell case in Texas 2018 |

Robert,

Great.  I look forward to it.

If you have any specific scheduled dates or timeline let me know so I can put them on my calendar.

Thanks,
Jeffrey


----- Original Message -----
**From:** Robert Morrow
**To:** Jury Challenge Jeffrey Martin ; Robert Morrow ; Rachel Davis ; Pat Black ; Doug Barlow ; Gerald Bourque
**Sent:** Tuesday, December 12, 2017 4:54 PM
**Subject:** Cramer/Fackrell case in Texas 2018

Dear Jeffery:

Good news.
Our request for funding has been approved and is now working its way up to Judge Stewart in New Orleans. You will be an expert for both defendants but your billing will be handled by Doug Barlow, one of Mr. Cramer's lawyers.

It's great to have your help. We think we have a unique opportunity here. Rachel Davis will be working with you and all the other lawyers to make sure you have what you need to do your work.

We expect to have some preliminary information right after the first of the year. Is there anything we could do at this time to help move things along? Please let Rachel know. She is copied to this email.

We look forward to working with you.

Robert



--
Robert Morrow
Lawyer
24 Waterway Ave., Suite 660
The Woodlands, Texas 77380
713 201 4876

Exhibit 11 - 7

# ATTACHMENT 3

Exhibit 11 - 8



# DOUGLAS M. BARLOW

ATTORNEY AT LAW

**dougbarlowlaw.com**

January 11, 2018

Mr. Jeffrey O. Martin
jurychallenge@mindspring.com

Re:    United States v. Christopher Emory Cramer
       1:16-CR-26
       Beaumont Division

Dear Mr. Martin:

This letter confirms our agreement that you will be working as a consultant/expert in the case of *United States v. Christopher Cramer* in the Eastern District of Texas. Specifically, you will provide information to Mr. Patrick Black and me detailing the results of your investigation of the facts and issues within your field of expertise regarding Mr. Cramer, and assist us in addressing the statistical issues regarding the jury selection process, including testimony at any hearing as requested. Please note that as our agent in the collecting of information and conducting your work regarding Mr. Cramer, you may not disclose your work product to any person without our prior consent and the prior consent of Mr. Cramer. Please also note that some of the records are sealed and not public record at this point. There is also a protective order in this case that limits the use of certain materials obtained from the government through discovery. Please do not disclose any information that we have obtained from the government to any third party without our express consent in accordance with the order.

At the present time, the budget for your services has been set at no more than $7,500.00 in total fees. I am attaching a redacted portion of the budget order or orders which sets out your approval by the 5th Circuit and the approved payment amount. Please use your time carefully so that you will be available to testify at a hearing, if necessary. I do not anticipate any more funds being allocated for your services so please budget accordingly. The Court has allowed me to release only the redacted copy of the budget orders to you, as you will see from the enclosed email. Please do not disclose the budget information outside your duties in this case. Your payments will be paid pursuant to the terms and conditions of the Criminal Justice Act (CJA ) and the Guidelines for the Administration of the Criminal Justice Act and Related Statutes, Volume VII, Guide to Judiciary Policies and Procedures. The presiding United States District Court Judge and the Chief Judge of the Fifth Circuit must approve all death penalty case budgets and payments. Payments are made by the Administrative Office of the United States Courts. In federal death penalty cases, expenses for

**707 TEXAS AVE. S, SUITE 216D**
**COLLEGE STATION, TEXAS 77840**
**(979) 485-5901**

**485 MILAM AT PARK**
**BEAUMONT, TEXAS 77701**
**(409) 838-4259**

Criminal Law and Criminal Appellate Law
Board Certified • Texas Board of Legal Specialization • State Bar of Texas

Exhibit 11 - 9

investigative, expert or other services are claimed on CJA Form 31and the court must approve the hourly rate, as has been done.  Courts are also authorized to allow interim payments in capital cases, so you should be able to be paid as your work progresses.  To set up your payment account, please contact Ms. Stephanie Crites of the Office of the Federal Defender in Beaumont at (409) 839-2608, Stephanie_T_Crites@fd.org.  She has facilitated the payment for experts so far in this case ,and she is experienced in helping get the vouchers processed.  She will assist you to be designated as a vendor to submit your pay claims on form CJA-31 and will assist to complete the payment process.

If you have any questions regarding your professional services or fees please contact me or Mr.Black. I thank you for agreeing to assist in this serious case and look forward to working with you further.

Cordially yours,

Douglas M. Barlow

DMB/ds

cc:    Patrick Black
       Federal Public Defender, Eastern District of Texas

Exhibit 11 - 10

# Exhibit 12

# Filed under seal

# Exhibit 13

Case 1:23-cv-00355-MAC-ZJH    Document 1-1    Filed 09/21/23    Page 56 of 732 PageID #:  281

## DECLARATION OF JOHN NEIL McNICHOLAS

I, John McNicholas, declare as follows:

1.    I am an attorney licensed in California and Nevada. I have been a criminal defense practitioner for 32 years and a CJA Panel Attorney in the Central District of California and Nevada for 25 years.

2.    I was appointed to represent Christopher E. Cramer in the Central District of California, *United States v. Houston and Cramer*, Case No. 2:10-cr-00078-MWF before the Honorable Gary A. Feess. This case was tried before a jury. At the time I was appointed to represent Chris, it was the only prison case I ever had, despite being on the CJA panel since 1998. It was a very intense, very serious situation, but Chris had a strong self-defense case.

3.    Chris was just a soldier in a small white supremacist organization. Victorville was filled with a bunch of these smaller, white power groups. But Chris wasn't a racist, from what I knew of him. He was raised by his Black stepfather who he loved. He was loyal and loving to his Black siblings and stepsiblings. My understanding is that, like a lot of inmates, he joined a racial gang for protection in prison. Chris told me that he linked up with white groups in order to survive in prison. I recall Chris was nice young man, almost child-like. Everyone liked him. He was nice to the guards and to everyone.

4.    Chris wanted to get rid of his tattoos. He asked that we have a cosmetologist appointed to apply facial makeup each day to cover his tattoos during the trial. He told me that he [insert here anything he said about the tattoos, why he hated them, why he regretted them, etc.] I also discussed this with one of Chris's trial investigators. (Ex. A.) In an effort to ensure that Chris received a fair trial, I moved the Court for leave to hire a makeup artist to cover his facial tattoos during the trial; the court denied the motion. (Exs. B and C.) Despite this, however, Chris and I continued to discuss the impact that the tattoos had on his life.

1

Initials

Exhibit 13 - 1

5.    Based on my conversations with Chris, and with his consent, I sought a referral for tattoo removal from United States District Judge David O. Carter, who is the Coordinating Judge for the Central District of California's Tattoo Removal Program. Judge Carter's program collaborates with the University of California-Irvine Beckman Laser Institute to provide free laser removal of facial and hand tattoos for incarcerated and recently released federal prisoners. (Exs. D and E.) I personally spoke to Judge Carter, who explained that our circumstances were unique because Mr. Cramer was bound to spend the next 2-3 decades in prison even with tattoo removal. Most participants were out of custody and seeking probation. Nonetheless, Judge Carter was hopeful that Cramer could enter into his program.

6.    Chris was encouraged about the possibility of having his facial tattoos removed and expressed to me that he was looking forward to having them gone. However, he changed his mind because he knew he had a lot of prison time to do, and he was afraid that if he didn't keep his tattoos he would be more of a target in general population. I was disappointed for Chris, but I understood his concerns. Chris felt defeated. He knew that if he disassociated himself from SAC that he would likely face retribution from leadership. He just wanted to be left alone. So, he dropped his request.

7.    No one from Chris's trial team, other than Sandy Saberman, interviewed me. Had I been called to testify in his capital trial, I would have testified to everything in this declaration.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: _*August 29, 2023*_                 _JOHN NEIL McNICHOLAS_

2

Initials

Exhibit 13 - 2

# Exhibit A

Exhibit 13 - 3



CONFIDENTIAL ATTORNEY WORK PRODUCT

# Memo

To:     Cramer case file
From:   Sandra Saberman
Re:     John McNicholas – Cramer's prior defense attorney
Date:   April 10, 2017

---

john@mcnicholaslawoffice.com
cell:   702-524-6954
home:   310-545-0780
home/office:   464 Palos Verdes Boulevard, Redondo Beach, CA 90277

On Monday, April 10, 2017, I spoke with John McNicholas over the phone for about 30 minutes. John was Chris' defense attorney on his case out of Victorville USP (assault of Scotty Justice - they got a guilty verdict on 8/4/2011).

Chris' case was very intense, very serious. This was John's only prison case ever – and he has been on the CJA panel since 1998.

The victim (Scotty Justice) was stabbed over 40 times and it was all caught on video. The government's exhibits are extremely gory. The defense did not have their own exhibits, they used the government's. The defense put on a video where they went through point by point, trying to show the jury how it could have been a self-defense case as the victim was handed a weapon on the yard.

John was very surprised to learn that Cramer was put back into general population after his conviction on this case.

Cramer's co-defendant, Houston (Ronnie Lee Houston) was represented by Mike Belter. Belter has done capital work and has more experience with prison cases. Houston was facing two attempted murders, while Cramer was only facing the one. Houston testified and cried like a baby on the stand. He got away with the other attempted murder. Houston did not look as bad as Cramer – he did not have a swastika on his forehead. He was also in a white supremacist gang, but it was a different one than the one that Chris was in. Houston was a big talker – he ran his mouth.

John and Mike went and sat down with a bunch of the white power inmates before the trial. Some of them testified. Some said they would but then backed out. The ones who testified said that they were standing right outside of the rec cage where it happened and could see the victim with a weapon.

1

Exhibit 13 - 4



CONFIDENTIAL ATTORNEY WORK PRODUCT

Chris' mother tried to take care of him during trial. She brought him books and writing materials and other things. John sometimes had to box them up and send them to Chris. Sometimes they were returned by the jail, and sometimes they let him have it. He was housed at the MDC in "8 North," which is the SHU where all the bad guys are. Chris' mother would not have been allowed to visit him there.

Chris was nice. Everyone liked him. He was nice to the guards and to everyone.

Chris wanted to get his tattoos removed. John had done research into a tattoo removal program and was working on getting Chris into it. But then Chris gave up because he still had a lot of prison time to do.

Chris was just a soldier in a small Nazi organization. Victorville was filled up with a bunch of small Nazi organizations.

Chris was raised by his Black step-father. He was not racist.

There was a dirty guard on this case named Halstead. Halstead's job was to defend the Aryan Brotherhood guys. He's the one who claimed that Cramer confessed to him and asked if the victim was still breathing, which the government used to claim that he had no remorse. John thinks Halstead is a liar and that the confession was totally manufactured. Halstead is currently working in Los Angeles at the MDC. John saw him just a couple of weeks ago.

Chris was an expert in making pruno. He shorted the outlets in his cell a couple of times, trying to cook it. He was open to talking about it at length. John believes that he was drinking and probably was using drugs at the time of the trial.

John expressed amazement at the weapons that inmates are able to make. Often times they are blunt instruments and you have to stab someone over and over again to even pierce the skin. They often aim right for the veins or organs to be able to inflict damage.

John filed an appeal for Chris and then quickly got off the case. Thinks the case went to someone in San Diego; said to check PACER.

Cramer wanted John to send everything of his of any value to his friend, James Weston in Mesa, Arizona. John thinks he made copies of everything he sent, and that it was likely photographs and maybe his PSR.

Any Cramer materials he still has are in a storage facility in El Segundo. John is willing to get them and let me copy whatever I want. We made an appointment to meet at his house in Redondo Beach on Friday at 2pm.

2

Exhibit 13 - 5

# Exhibit B

Exhibit 13 - 6

JOHN N. McNICHOLAS, ESQ.
STATE BAR #138304
McNicholas Law Office, LLC
599 33rd Street
Manhattan Beach, CA 90266
(310) 545-0780
(310) 546-6831- FAX
john@mcnicholaslawoffice.com
Attorney for CHRISTOPHER CRAMER

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA



UNITED SATES OF AMERICA,

        Plaintiff,

vs.

CHRISTOPHER CRAMER,

        Defendant.

Case No. CR 10-00078-GAF

**DEFENDANT'S MOTION *in limine* TO ALLOW HIRING OF MAKEUP ARTIST TO COVER ALL FACIAL, NECK, SCALP AND HAND TATTOOS DURING TRIAL, AND PREVENTING THE GOVERNMENT FROM SHOWING PHOTOGRAPHS DEPICTING DEFENDANT'S TATTOOS TO THE JURY**

COMES NOW Defendant, CHRISTOPHER CRAMER, by and through his counsel, JOHN N. McNICHOLAS, who respectfully moves to allow hiring of makeup artist to cover all facial, neck and scalp-area tattoos during trial and preventing the government from showing photographs depicting defendant's tattoos to the jury. This motion is made and

///

///

1

Exhibit 13 - 7

based upon the following memorandum of points and authorities, the declaration of counsel and any further argument which may be heard in this matter.

Dated this 30th day of April, 2011.

McNICHOLAS LAW OFFICE, LLC

By: _____/s/_____

John N. McNicholas, Esq.
599 33rd Street
Manhattan Beach, CA 90266
Attorney for CHRISTOPHER CRAMER

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

In the Indictment, defendant CHRISTOPHER CRAMER (hereinafter referred to as "Cramer") stands accused of assault with intent to commit murder in violation of 18 U.S.C. 113(a)(1), 2(a), assault with intent to commit bodily harm, in violation of 18 U.S.C. 113(a)(3), 2(a), and assault causing serious bodily injury, in violation of 18 U.S.C. 113(a)(6), 2(a). Cramer has pled NOT GUILTY to all allegations. Trial is currently scheduled to commence on June 21, 2011.

### II. FACTS

Mr. Cramer and co-defendant RONNIE LEE HOUSTON are accused of attempting to kill an fellow inmate, SCOTTY DEAN JUSTICE, while housed in an isolated area of the USP Victorville. Cramer's entire body is covered in tattoos as is the victim, co-defendant, and most potential witnesses. Mr. Cramer's entire face, neck and scalp are also covered with similar

2

Exhibit 13 - 8

tattoos. Virtually all tattoos on Cramer's face, head, neck and body would be deemed offensive to a reasonable juror as they show association with white supremacist, Aryan, or Nazi groups, or symbolize the ideologies of those groups.   During the trial in this matter, Cramer wishes to enlist a cosmetologist to cover his facial, scalp, hands  and neck tattoos on each morning before trial.  This is a procedure that similarly situated defendants have requested in different jurisdictions throughout the country[1].  Cramer believes that refusal by the Court to allow him to cover his tattoos would violate his constitutional right to a fair trial.

## III.    LEGAL ARGUMENT

The Fifth Amendment Constitution guarantees every defendant the fundamental, absolute right to a fair trial. *United States v. Farhad*, 190 F.3d 1097, 1102, 1107 (9th Cir. 1999). Precluding Cramer from concealing his multiple  tattoos would undermine his constitutionally guaranteed right to proceed to trial under a presumption of innocence.

Mr. Cramer stands accused of attempting to kill a fellow inmate while both were housed in an isolated area. Mr. Cramer, his co-defendant, and the alleged victim have association with "white supremacist" groups.   This is not a "hate" case involving one gang against another. This is a case where all men involved have similar interests and associations.  Mr. Cramer's entire body is covered in tattoos.  The tattoos on his head, face and neck clearly show his associations with Aryan gangs, associations  or ideology are likely to be considered so

---

[1] State *of Florida v. John Allen Ditullio Jr*. (2010) involved covering swastika, barbed wire and vulgarity tattoos of his face and neck  by cosmetologist daily during trial at the cost of $125.00-$150.00 per day.  In *State of Utah v. Curtis* Allgier (2010), a neo-Nazi skinhead murder defendant sought to cover white supremacist's tattoos on face, neck, hand and head covered even though it would substantially change his appearance from the day he allegedly committed the offense.

3

Exhibit 13 - 9

offensive, intimidated or frightening to a reasonable juror that he could not possibly have a fair trial.  The government will claim that showing tattoos is necessary for Cramer's identification at the time of the alleged offense.  The tattoos are neither relevant to nor probative of any contested issue in the case.   Mr. Cramer can be identified without reference to his tattoos.

In order to ensure Cramer gets a fair trial, the tattoos on Cramer's face, head, neck and hands must be covered, even though that would somewhat change his appearance from what he looked like on the day three years ago when he is accused of committing the crime in the instant case.  Hiding the tattoos could potentially prejudice the government's case, but the prejudice to the government is outweighed by prejudice to Cramer.  The tattoos would be covered by contracting with a cosmetologist or makeup artist who would apply makeup to Cramer's face, neck and scalp each morning prior to the commencement of trial.  Further, the government can identify Cramer without reference to the photographs, as identity is not an issue in this case.

## IV.   CONCLUSION

Wherefore, defendant, CHRISTOPHER CRAMER, respectfully requests that this Court issue an Order directing that Cramer may enlist the services of a makeup artist so that his visible facial, scalp and neck tattoos are covered throughout the duration of this case and

///

///

///

4

Exhibit 13 - 10

preventing the government from showing photographs depicting defendant's tattoos following the alleged crimes in this matter to the jury.

DATED this 30th day of April, 2011.

Respectfully submitted,

McNICHOLAS LAW OFFICE, LLC
By:_____/s/_____
             JOHN N. MCNICHOLAS, ESQ.
             599 33rd Street
             Manhattan Beach, CA 90266
             Attorney for Defendant,
             CHRISTOPHER CRAMER

## DECLARATION OF JOHN N. McNICHOLAS

I, JOHN N. McNICHOLAS, do hereby declare under penalties of perjury that the following is true:

1. I am an attorney, duly licensed in the State of California, admitted to practice in the United States District Court for the Central District of California, and I am the attorney of record for CHRISTOPHER CRAMER in this matter.

2. All representations made herein are true.

3. In regards to the instant motion, I have met and conferred with Assistant United States Attorney JOSEPH AKROTIRIANAKIS, and the government is not willing to stipulate to covering

5

Exhibit 13 - 11

Cramer's tattoos as requested, and preventing showing said tattoos to the jury during trial as the government believes that showing tattoos is necessary for identification of the defendant.

DATED this 30th day of April, 2011 in Manhattan Beach, California.

_____/s/_____

JOHN N. McNICHOLAS

Exhibit 13 - 12

# Exhibit C

Exhibit 13 - 13

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CRIMINAL MINUTES - GENERAL

| Case No. | CR 10-78-GAF | Date | May 23, 2011 |
|---|---|---|---|

Present: The Honorable **GARY ALLEN FEESS**

Interpreter    None

| Renee Fisher | None | Joe Akrotinianakis/Anthony Lewis |
|---|---|---|
| Deputy Clerk | Court Reporter/Recorder, Tape No. | Assistant U.S. Attorney |

| U.S.A. v. Defendant(s): | Present | Cust. | Bond | Attorneys for Defendants: | Present | App. | Ret. |
|---|---|---|---|---|---|---|---|
| (2) Christopher Cramer | √ | √ | | John McNicholas | √ | √ | |

**Proceedings:      (In Chambers) Hearing on Motions in Limine**

## ORDER RE: MOTIONS IN LIMINE

The following sets forth the Court's rulings on Defendant Christopher Cramer's motions in limine.

Motion No. 1:      To Order Retention of Makeup Artist and Allow the Concealment of All Facial, Neck, Scalp and Hand Tattoos During Trial

Defendant asks the Court to permit him, during the course of trial, to utilize a makeup artist to conceal his tattoos from the jury. The artist would be retained with CJA funds. Defendant contends that he will be prejudiced if a jury is permitted to see him as he really is, particularly because the tattoos show his association with white supremacist organizations.

**DENIED.** Defendant has presented no support for this motion. In this assault case, the government must prove the identity of the perpetrator. Post-event photographs and defendant's current appearance, which are the product of his own actions, are relevant to prove that element of the government's case. A comparison of the person in the photographs with the defendant in court will allow the jury to determine whether or not the government has charged the proper person with the crime. The Court will consider a limiting instruction regarding the tattoos, but concludes that photographic evidence taken near the time of the assault, is probative and its value substantially outweighs the potential for prejudice, and that a jury can properly compare that evidence with his current appearance in determining the identity of the perpetrator.

| CR-11 (09/98) | CRIMINAL MINUTES - GENERAL | Page 1 of 3 |
|---|---|---|

Exhibit 13 - 14

# Exhibit D

Exhibit 13 - 15

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CASE NUMBER: |
|---|---|
| PLAINTIFF | |
| v. | |
| | **REFERRAL FOR CONSIDERATION OF PLACEMENT IN THE TATTOO REMOVAL PROGRAM** |
| DEFENDANT. | |

The United States District Court for the Central District of California has partnered with the University of California at Irvine (UCI) - Beckman Laser Institute in the court's Tattoo Removal Program, which provides laser tattoo removal treatment for offenders who voluntarily choose to be considered and are found suitable to participate in the program. The program is for the offender's benefit and not a condition of his supervision term.

The Coordinating Judge for the Tattoo Removal Program is United States District Judge David O. Carter.

Offender _____ may be a suitable candidate for tattoo removal treatment, and is hereby referred to United States District Judge David O. Carter for consideration of placement into the Tattoo Removal Program.

Dated: _____

_____
UNITED STATES DISTRICT JUDGE

cc:  *District Judge David O. Carter*
     *U.S. Probation Office*
     *Kevin Reddick, District Court*

CR-97 (02/09)        REFERRAL FOR CONSIDERATION OF PLACEMENT IN THE TATTOO REMOVAL PROGRAM

Exhibit 13 - 16

# Exhibit E

Exhibit 13 - 17



# LASER

## IN THE NEWS

| | |
|---|---|
| Founder's Column | 2 |
| Honors and Awards | 2 |
| Technology Update | 3 |
| Newsbriefs | 4 |
| Arrivals and Departures | 7 |

## BECKMAN LASER INSTITUTE

**SPRING 2011**

# SUCCESS OF TATTOO REMOVAL PROGRAM RECOGNIZED

In the early 1990s, then Orange County Superior Court Judge David O. Carter approached Beckman Laser Institute (BLI) Co-Founder Michael W. Berns with an idea for a tattoo removal program that would be run by the Probation Department and offer people on probation and gang members a way to have visible stigmatizing tattoos removed at no charge to them. The program would be subsidized by the Probation Department, and BLI would charge a nominal fee for its services. The program was instituted with some success but, due to many challenges, did not continue.

In 2008, Judge Carter, now a United States District Judge, met with UC Irvine Chancellor Michael V. Drake, Executive Vice Chancellor Michael R. Gottfredson, BLI Director Bruce J. Tromberg and BLI Medical Director J. Stuart Nelson to ask that the tattoo removal program be reinstated. He pointed out that patients would gain a much needed boost in confidence and self-esteem. By having tattoos removed, they would not be prejudged, and they would be better able to communicate and get a job. Impressed by Judge Carter's enthusiasm and with the support of Chancellor Drake, Executive Vice Chancellor Gottfredson, and BLI Director Tromberg, Dr. Nelson decided after the meeting that they were in a unique position to help these men and women get a new start with their lives. BLI Ambulatory Practice Manager Andrea Giancarli would manage the day-to-day details, such as appointments and scheduling, to ensure the program would run efficiently. Tattoo removal requires at least 5-6 treatments. All that was needed were participants.



*From left to right: BLI Director Bruce Tromberg, BLI Medical Director J. Stuart Nelson, BLI Ambulatory Practice Manager Andrea Giancarli, U.S. District Court Judge David O. Carter, Assistant Deputy Chief U.S. Probation Officer Michael Terrell.*

By mid-2008, the U.S. District Court's Offender Tattoo Removal Program was in place. Many of Judge Carter's colleagues supported the program by referring men and women who had completed serving their prison time. The U.S. Probation Office was ready to follow through and make sure those on probation would show up for early morning appointments. The court would pay for treatment, and BLI would charge a minimal fee.

Judge Carter has emphasized that it takes courage for someone who has been in prison to decide to better his or her life by getting a job and become a contributing member of the community. By having tattoos removed, this person can be a positive role model. Because this decision indicates a rejection of a former lifestyle and acquaintances, this person might be exposed to possible pressure

and danger.

So far, more than 30 patients have been treated or are still being treated for tattoo removal. In a ceremony that took place on March 8, 2011, at the Ronald Reagan Federal Building and United States Courthouse in Santa Ana, CA, Judge Carter acknowledged the contribution of UC Irvine and the Beckman Laser Institute to the success of the tattoo removal program by presenting a plaque to the Institute and a crystal desk award to Dr. J. Stuart Nelson "in recognition of your dedication and commitment to the U.S. District Court's Offender Tattoo Removal Program. Your gracious investment of time, concern and compassion have all contributed to the successful reintegration of federal offenders into society."

*(Tattoo Removal continued on p. 5)*

Exhibit 13 - 18

Two former patients who have been helped by the program spoke and related how their lives have been changed. The first, a man who formerly had tattoos on his face and neck, said people treat him differently now because they are no longer judging him by how he looks. He has a job in the textile industry. The second patient, a woman, said she is now more positive and has a better relationship with her family. She was so impressed by Dr. Nelson and the BLI staff that she plans to pursue a career in the medical profession.

Attendees of the ceremony included some of the most distinguished representatives of the Central District of California



*Judge David O. Carter (left) with Dr. and Mrs. J. Stuart Nelson after the ceremony.*

Exhibit 13 - 19

# Exhibit 14

## DECLARATION OF RONALD D. MCELROY

I, RONALD D. MCELROY, declare as follows:

1.      My name is Ronald D. McElroy, most in my family know me as Ron Ron or just Ron. I am 56 years old and live in Kent, Washington. I am the older stepbrother of Christopher Emory Cramer. My father, Lorenzo Hubbard, and Chris's mom Darla were in a relationship for seven or eight years, and I was very close with Chris and helped to raise him. Chris and I are not blood relatives, but Chris was family to me.

2.      I was born in 1966. I was my father's first child. I grew up mostly living in California with my mom, Shirley, but I would spend summers with my dad in Utah. I knew from a young age that my father was a pimp and into drugs. He was addicted to heroin, and when I was a kid he served about eight and a half years in prison for distributing heroin.

3.      I turned my life around a long time ago, but when I was younger I was involved with a criminal lifestyle. That kind of thing was normal for me because it's what I saw all the time – my dad sold drugs, and my mom's family were gangbangers. I first started getting in trouble with the law around age 12, when I started dealing drugs and running around with gang members. I eventually became a member of the Crips in Lynwood. Being raised in a family with a single mother and three sisters, I felt responsible being the only male in the house. I watched my mother struggle to raise four children by herself, and I wanted to make things easier for her. I know now that a lot of the decisions I made back then were wrong, but I wanted to take care of my family, so I hustled at a young age. I grew up too fast.

4.      I first met Chris when he was about two years old, I must have been 17 or 18 at the time. Chris's mom Darla was a prostitute, and my dad was her pimp and boyfriend. Darla was seriously addicted to heroin and alcohol throughout the seven or eight years she and my dad were together. For the first few years that Darla and my dad were together, I saw Chris every

1

*Initials*

Exhibit 14 - 1

summer when I would go visit my father and grandparents. Then, when I was 21, I moved to Ogden permanently because I was into selling cocaine at the time and business was good there. So I moved to Ogden and connected with gangs there and continued to sell drugs.

5.    In Ogden I lived with my grandparents, Gus and Joealler Hubbard. We called our grandmother Momma Hubbard, and she was a remarkable woman. My grandparents were married for 65 years. They were very loving and old-fashioned people, and they were devoted to each other. My grandparents never did drugs and didn't even drink. They were very active in their church.

6.    My father and Darla lived in an apartment up the hill from my grandparents. Chris would go back and forth between their house and my grandparents' home. My grandparents' home was small, but we made it work. Gus, Chris, and I slept in one of the bedrooms, and my grandmother slept in the other bedroom. Chris was well taken care of at my grandparents' house – they loved him and we all treated him like family. It didn't matter to us that Chris was white and we were Black. We were just family.

7.    When my younger sister Chaminque was born, she spent a lot of time with me and my grandparents too. We had some stability at my grandparents' house. Mother Hubbard cooked breakfast and dinner every day, with biscuits made from scratch. You had to wash your hands and take your hat off when you came to the table. My grandfather would take Chris everywhere, including fishing trips which Chris really enjoyed. My grandparents never missed a church service and if Chris and I were with them, we went to church too.

8.    My father was a loving person and he did what he could. He loved Chris and always treated him like family, but he was a drug addict and a pimp and he wasn't always capable of being a good father to us. Darla was unstable, addicted to heroin and unreliable. My

2

*AMc*
Initials

Exhibit 14 - 2

father and Darla would go off on drug benders and sometimes just leave Chris and Chaminque behind, or send them to my grandparents' house. With Darla and my father, Chris was exposed to drugs, drug dealers, crime, and prostitution. That was his life, especially once Darla and my dad split up. After that, Darla went from guy to guy. In my opinion, she only cared about drugs and running around. She didn't care about her kids. I don't think she was capable of it then, because of her addiction.

9.     My grandparents were good to Chris and tried to raise him right. I spent a lot of time with Chris and helped raise him too, even though I was young and involved in a criminal lifestyle. Chris had a hard time in school, but I would encourage him to go. In raising Chris I was probably trying to be something I wasn't, but I tried. I was 22 years old and raising Darla's kids. It wasn't right.

10.     I think if Chris had been able to be raised just by my grandparents, he wouldn't have had such a hard time growing up and be where he is now. But that wasn't what happened. I've heard that Darla had a rough life herself growing up, but the fact is she put her kids through hell. After she and my dad split up, Darla went from state to state, always chasing some man. One time, Darla left for Mississippi and left Chris, Chaminque, and her daughter Angel with me and my grandparents. At least that was a good situation for the kids. But Darla would leave her kids with anyone. Darla was simply absent as a mother. She was wild, funky and loose. She was out drugging and whoring, and I was raising her kids. Darla's lifestyle was really hard on Chris and the younger kids.

11.     I spent a lot of time with Chris when he was a child until he moved away from Utah with Darla. After that, I didn't see much of Chris again until he was around 16 years old,

3

Initials

Exhibit 14 - 3

when Chris chose to move back to Utah to live with my dad. From that point on, I spent a lot of time with Chris until he was arrested and sent to jail for the bank robbery.

12.    As long as I've known him, Chris was a follower. When he was a kid, he was shy and not the brightest crayon in the box. He was slow. He tended to stand apart and watch conversations rather than participate in them. He was a follower and not a leader. I gave Chris the nickname "Big Country," because he grew up to be this big, quiet kid who didn't engage much socially. Chris looked up to me. He really respected me and wanted to impress me. I wasn't much to look up to back then. But I was the big brother and I was all that Chris had. I remember when Chris wanted to get a "Big Country" tattoo he came to me and asked for permission, and I said it was fine. That's the kind of respect he had for me.

13.    Chris wanted people to love him. He really cared about me, my dad and my grandparents. We were the closest thing to family he had. Me and my dad were the closest thing he had to role models. When my dad was sick with cancer, Chris went to stay with him for a week in the hospital and take care of him. Chris was devoted to my dad and his family, despite everything.

14.    Chris and I sold drugs together when he moved back to Utah. But eventually we were spending more than we were making. Chris was anxious about us not having money and I think he felt like he was letting me down somehow, like he wasn't doing enough to help out. He had the idea to rob the bank as a way to make it up to me. He told me the day before about his idea, and I told him it was a stupid idea but Chris didn't listen; he went ahead and did it with no planning. Chris could be dumb like that sometimes.

15.    When Chris was arrested, I tried to tell him how to handle himself in prison because I'd been incarcerated before. I told him it was dangerous and he needed to mind his

4


Initials

Exhibit 14 - 4

business in there and keep to himself. But Chris is a follower, and I think prison scared him. When Chris went in, he was a humble, respectful kid. He wasn't violent, and he wasn't some hardened criminal. He wasn't ready for federal prison, especially a place like Florence, which is horrible. Sending him to Florence meant he was never given a chance.

16.    It upset me to hear what Chris did in prison, that he joined a white supremacist gang and got involved in so much violence. That wasn't the Chris I knew, not even close. Despite what happened, I don't believe Chris was or is a racist. He was raised by Black people who loved him and treated him like family, and he loved them back. I have thought about it a lot, and I've forgiven Chris and I understand his situation. He was a follower, and he did what he had to do to survive in a terrible place.

17.    Chris' trial team spoke to me before his trial. I told them what I've stated here for this declaration. I was willing to testify.

On October 30, 2022, two investigators, from the Federal Public Defenders Los Angeles Office arrived at my door in Kent, Washington to discuss Chris and his case. I agreed to speak with them and sign this declaration. I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED ON 2/27/23

RONALD D. MCELROY

5

Initials

Exhibit 14 - 5

# Exhibit 15

DECLARATION OF SHIRLEY B. MILLER

I, SHIRLEY B. MILLER, declare as follows:

1.    My name is Shirley B. Miller, I am 81 years old and am married to Pastor John L. Miller of the Emmanuel Church of God in Christ in Ogden, Utah. I have lived in Ogden, Utah since 1981.

2.    There has been racism in Ogden for a long time, although it is better now. Once I applied for a job at a new rehabilitation center over 20 years ago, and I got an interview after speaking with the man there over the phone. I have a Masters in Counseling from the School of Education at the University of Virginia. The first thing I notice is the man gave me the "Oh, She's black" look. I did not get that job. I ended up getting a job as a clerk typist.

3.    I have known Christopher Cramer for many years. I met Christopher when he was a little boy. He would come to church with Momma Hubbard and her family, most of whom were African American. It was not that common to see a little white child with an African American family but they loved Chris and he fit in well with us. Christopher was a sweet little boy when I met him. Chris always listened to me. When I told him to do something he would do it and he never seemed to get into trouble around me. Chris's mother, Darla, was in our choir when she came to church but I did not have much contact with her. Hearing that Chris is on death row is very hard because I never envisioned him getting into that kind of trouble to cause this.

4.    When I met Christopher, he was living with the Hubbards. Joealle Hubbard was the matriarch known as Momma Hubbard. Momma Hubbard lived in a home that was actually owned by the Emmanuel Church of God in Christ. Unfortunately, the Hubbard household was a bad scene. Lorenzo, Momma Hubbard's son, and Ronald, her grandson, were a bad influence. They sold drugs from the home and I know they went to prison at some point. They took over

1

Initials

Exhibit 15 - 1

her home. Lorenzo and Ronald took advantage of Momma Hubbard and sold drugs from her home. I often noticed a bad smell coming from the house, and I was told the smell was the drugs. Anyone living in the house, like Chris, would have been able to smell the same thing I smelled.

5.      We asked the police to go to the home in hopes of cleaning the drugs out and letting Momma Hubbard and her family, Chris and his siblings, live in peace. That is not what happened. The police went over there and broke down the door, yelled at Momma Hubbard and disrespected her. It was disgraceful how the police treated her. Ever since then I have not trusted the local police.

6.      I still write Chris and keep praying for him. I will always bring up his name to the prayer circle where we pray for him.

7.      A few years ago, two ladies came by. They told me they were part of Chris' trial team. They sat in our home for a long time, asked about Chris, and took several personal pictures from us. After this they never came back, and I never heard from them again. This was extremely rude. I was prepared to assist Chris' trial team in any way I could. I was never asked to testify at Chris's trial, but if they would have asked I would have testified to everything that is in this declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: July 8, 2023      _Shirley B. Miller_
                                              Shirley B. Miller

2

Initials

Exhibit 15 - 2

# Exhibit 16

# Filed under seal

# Exhibit 17

# Filed under seal

# Exhibit 18

# Filed under seal

# Exhibit 19

# Filed under seal

# Exhibit 20



## UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TEXAS
300 WILLOW STREET, SUITE 239
BEAUMONT, TEXAS 77701-2200

CHAMBERS OF
**MARCIA A. CRONE**
UNITED STATES DISTRICT JUDGE

(409) 654-2880

February 4, 2016

Via E-mail:    CJAstudy@ao.uscourts.gov

The Honorable Kathleen Cardone
United States District Judge
Chair, Committee to Review the Criminal Justice Act Program
Thurgood Marshall Federal Judiciary Building
One Columbus Circle, N.E.
Washington, D.C.  20544

**RE:    Birmingham Public Hearing Testimony for the Criminal Justice Act Review**

Dear Judge Cardone and Committee Members:

I write to provide you with my assessment of the 3 topics identified in your letter dated January 7, 2016: death penalty cases, capital habeas units, and the death penalty resource counsel.

I am a United States District Judge in the Eastern District of Texas, Beaumont Division. I was appointed in 2003. Prior to taking the bench in the Eastern District, I was a United States Magistrate Judge in the Southern District of Texas, Houston Division, for 11 years.

As a district judge, I preside over 45% of the criminal cases in the Beaumont Division and 50% of those in the Sherman Division. Currently, this constitutes 104 Beaumont Division cases pending, involving 148 defendants, and 150 Sherman Division cases pending, involving 472 defendants, making a total of 254 criminal cases pending, involving 620 defendants. District wide, there are 756 criminal cases currently pending, involving 1530 defendants. In 2015, I

Exhibit 20 - 1

disposed of cases involving 81 defendants in Beaumont and 312 defendants in Sherman. *See* Attachment A.

In addition to standard criminal cases, I also handle 100% of the murder and capital murder cases arising out of the Beaumont, Sherman, and Lufkin Divisions, which, to date, include all of the capital murder cases filed in the district in the last decade. Over the years, I have presided over 12 capital murder cases, involving a total of 23 defendants. Of those, the government obtained a death sentence for 4 of the defendants. With regard to the remaining defendants, the government did not obtain authorization from the Attorney General of the United States for permission to seek the death penalty and reached some other resolution of the case (e.g., plea agreement to life imprisonment or a term of years). *See* Attachment B (chart reporting capital cases in the Eastern District of Texas since 2005). One case involving 2 defendants is currently unindicted and is pending. I have been assigned 5 state death penalty habeas cases and 3 federal death penalty habeas cases. *See* Attachment C (chart of capital habeas cases assigned to me) and Attachment D (list of capital habeas cases in the Eastern District since 2005).

*Death Penalty Cases*

I.  General Procedure

Federal death penalty cases are unique and differ from standard criminal cases in several respects. The fact that a defendant faces a potential death sentence impacts each phase of the litigation. To manage a capital case effectively, the court and counsel must engage in substantial pretrial planning. To say the least, the process is incredibly time-consuming before and during trial.

2

Exhibit 20 - 2

At the outset of a capital case, the first order of business is the appointment of counsel. As discussed more thoroughly in Section II, the selection and appointment process is more involved than simply selecting a CJA panel attorney. Indeed, an individual facing the death penalty is entitled to 2 attorneys, 1 of whom must be "learned in the law applicable to capital cases." 18 U.S.C. § 3005.

Once appointed, defense counsel proposes a preliminary budget and, subsequently, a trial budget. This is done by way of a sealed *ex parte* motion to the court. The budget includes both an estimate of attorney hours needed (most recently, 1500 hours per attorney) and a request for an investigator and other service providers (such as a mitigation specialist, a psychiatrist, a pathologist, etc.). The district court reviews the proposed budget and approves those amounts it deems reasonable. As explained more fully in Section III, the proposed budgets must be further approved by the Chief Judge of the United States Court of Appeals for the Fifth Circuit.

In every federal capital case, the government is required to obtain authorization from the Attorney General to seek the death penalty. In my experience, this has occurred at different times in the pretrial process. In some cases, the local United States Attorney seeks and obtains such authorization after having secured an indictment. This is not ideal, as any delay on the part of the Attorney General in making a decision can stall the case and result in the expenditure of funds for attorneys' fees and expert witnesses that later prove to be unnecessary if authorization is denied. The current procedure directs the local United States Attorney to seek and obtain such authorization from the Attorney General prior to seeking an indictment, which appears to be a better approach, although delays can still lead to excess expenditures while awaiting the decision. Under this new procedure, the court is notified of the need to appoint counsel during this

3

Exhibit 20 - 3

"preauthorization stage" when the government files a motion advising the court that it plans to prosecute a capital case.

The preauthorization proceedings are confidential and take place at the Department of Justice in Washington, D.C., before the Capital Crimes Review Committee ("CCRC"), a committee, composed of 4 to 5 members, whose task is to evaluate the case and make a recommendation regarding whether the local United States Attorney may seek the death penalty. Both the local United States Attorney and defense counsel are afforded an opportunity to present arguments as to why the defendant should or should not face the death penalty. Because defense counsel are permitted to address the CCRC, they necessarily incur expenses early in the case and undoubtedly need the assistance of investigators and other service providers to provide evidence of mitigating factors in an attempt to persuade the CCRC not to recommend the death penalty. After another level of review, the Attorney General considers all relevant materials and makes a final decision. In my experience, 3 to 4 months to 15 months have elapsed from the time counsel was appointed to the time a decision was made.

Once the death penalty is authorized, the court sets a scheduling conference and consults with the attorneys regarding case management deadlines. *See* Attachment E (Example Scheduling Order). As is apparent from Attachment E, the court's scheduling order in death penalty cases contains a great deal more deadlines than what is required for a normal criminal case. For example, a scheduling order in a capital case should include deadlines for mental health evidence, expert reports, and deadlines for guilt/innocence and punishment issues, to name a few.

The court's schedule reflects the trifurcated nature of a federal death penalty trial:  the guilt/innocence phase, the eligibility phase (where the government must prove that the defendant

4

Exhibit 20 - 4

is eligible under the law to receive the death penalty), and the penalty or selection phase (where the jury determines whether the defendant should receive life imprisonment or death). Separate jury instructions and verdict forms are required for each phase, with the charge often exceeding 20 pages for each defendant in the selection phase alone.

Voir dire is another part of the trial that is vastly different in a capital case. Typically, a very large panel is summoned, as selecting and impaneling a capital jury can be difficult and time-consuming. Indeed, because the death penalty is a controversial topic, many potential jurors hold and express strong views about capital punishment. The clerk's office first creates a specific jury wheel to be used only for the death penalty case. The jury coordinator then mails between 1000 and 1200 standard juror questionnaires. In most cases, approximately 500 to 600 individuals respond. At that point, the jury coordinator and the court identify and excuse individuals who are disqualified from jury service under the law or the district's jury plan. Of the remaining respondents, the court summons approximately 300 individuals to appear. On the first day of voir dire, the jurors complete lengthy juror questionnaires, which are used for screening purposes. The court conducts both general and individual voir dire sessions with the potential jurors. This process alone can take weeks, especially if there is more than 1 defendant standing trial at the same time.

Once the jury is selected and impaneled, the trial commences with the guilt/innocence phase, potentially to be followed by the eligibility phase, and the penalty phase.

5

Exhibit 20 - 5

II.    Appointment of Counsel

A.    Generally

In the Eastern District, the United States Magistrate Judges are responsible for locating and appointing counsel to represent criminal defendants. See Attachment F for a copy of the Eastern District's CJA Plan. Once an individual establishes that he or she is entitled to an appointed lawyer, the magistrate judge appoints either the Federal Public Defender or a CJA panel attorney. Attachment G illustrates the CJA docket by division and reveals the number and percentage of cases handled by the Federal Public Defender as compared to CJA panel attorneys and retained counsel for the period October 1, 2014, to September 30, 2015.

In preparation for this hearing, I consulted with 2 magistrate judges in the Beaumont Division, both of whom are highly experienced in criminal law, and 1 long-serving magistrate judge in the Sherman Division, regarding the appointment of counsel in regular and death penalty cases. When appointing the Federal Public Defender, a specific attorney from that office is not named, as the organization has internal procedures for distributing cases to counsel. In the event there is a conflict of interest in appointing the public defender (e.g., in a multi-defendant conspiracy), a CJA panel attorney will be appointed.

The CJA Panel consists of "A" panel attorneys and "B" panel attorneys. "A" panel attorneys are those with the most experience and receive the lion's share of the appointments. "B" panel attorneys are less experienced, are new to the list, or have stated that they do not wish to handle many appointments. The goal is eventually to "graduate" the latter group to the "A" panel. In practice, however, the magistrate judges almost always appoint from the "A" list, selecting lawyers from the "B" panel when all the attorneys from the "A" panel have been

6

Exhibit 20 - 6

exhausted. As a consequence, "B" panel attorneys are rarely appointed in the Beaumont Division and are utilized only slightly more in the Sherman Division. There is also an "Appeals Only" panel consisting of lawyers who handle only appeals. The "Appeals Only" list is utilized when a defendant does not have appellate counsel and wishes to appeal but does not have the funds to hire an appellate lawyer. While CJA lawyers appointed as trial counsel in the Beaumont Division often serve as the appellate counsel, in the Sherman Division, different appellate counsel are frequently appointed. The public defenders handle their own appeals.

In order to become a CJA panel attorney in this district, one must complete an application. A CJA Panel Committee meets once a year by video conference to review the applications. The committee consists of a criminal defense lawyer "panel representative," the District Clerk, the Federal Public Defender, and several magistrate judges and their courtroom deputies. At the committee meeting, there is a discussion as to which panel applicants should be accepted and which CJA panel members should no longer be on the list. This is done by division, with input coming from committee members in that division or from those who are familiar with the attorney. Submitting an application is by no means an automatic avenue for inclusion in the CJA panel. On the contrary, there are typically many more applications than vacancies. Currently, there is an adequate number of attorneys on the CJA panel to fill the needs for indigent representation in this district. Spanish-speaking applicants are often selected in light of the large number of Spanish-speaking defendants in Texas and the savings effected from not having to pay for a private interpreter. Generally, there is a need for more Spanish-speaking lawyers in both the Beaumont and Sherman Divisions.

7

Exhibit 20 - 7

Appointing a lawyer from the CJA panel to a particular defendant is more an art than a science.  Thus, instead of assigning lawyers in a mechanical fashion, the magistrate judges consider a variety of factors specific to each case:  (1) the complexity and seriousness of the case (by reviewing the indictment and/or bond report); (2) whether the defendant speaks only Spanish; (3) the defendant's residence if he/she is on bond; (4) a rough equalization or "spreading out" of the appointments among the panel members; (5) the availability of an attorney to appear on short notice at pretrial settings; and (6) conflicts in representation with any associated cases.  For instance, for a serious and complex case with a Spanish-speaking defendant who is on pretrial release but lives in Houston, the magistrate judge would appoint an attorney on the list who speaks Spanish, has a great deal of federal experience, and offices in Houston.  This minimizes the cost of the representation because the attorney and defendant can communicate more easily and travel is reduced.  If the defendant speaks English and the person is in custody in Beaumont, an attorney from Beaumont or the surrounding area will be appointed.

B.    Appointment of Counsel in Death Penalty Cases

As previously noted, a defendant charged with any death-eligible offense is entitled to the appointment of 2 attorneys.  Thus, the appointment of counsel in death penalty cases differs from the process outlined above.  Indeed, very few of the attorneys on the CJA panel qualify as "learned counsel" or are willing to accept capital cases.

Typically, when a death penalty eligible case is filed—either by indictment or by the government advising the court of the need for the appointment of counsel—the magistrate judge assigned to the case consults with me and reviews a list issued by the First or Second Administrative Judicial Region of Texas which includes attorneys who have been approved for

8

Exhibit 20 - 8

appointment to death penalty cases in Texas courts for various judicial regions. *See* Attachment H (lists of counsel qualified to represent capital defendants in the First and Second Administrative Judicial Regions of Texas). When possible, the Federal Public Defender is appointed as 1 of the lawyers in capital cases. As will be discussed later, having the Federal Public Defender as counsel in capital cases is highly beneficial from both a knowledge and a cost-savings perspective.

Many times, capital cases involve multiple defendants. Because Beaumont and the surrounding areas contain only a few attorneys willing to accept such appointments (or who qualify as learned counsel), attorneys from Houston are routinely appointed. *See* Attachment B (chart listing the names and locations of counsel appointed to death penalty cases). Despite having to appoint counsel from the Southern District of Texas, Houston Division, which is within 100 miles of the Beaumont Division of the Eastern District of Texas, there is not currently a significant shortage of attorneys in this geographic area of Texas who are qualified and willing to take capital appointments. It should be noted, however, that the same may not be true in some of the rural areas in far West or South Texas. Qualified death penalty attorneys seem to congregate in large metropolitan areas. Further, the qualified death penalty defense bar does not appear to be attracting younger attorneys. Thus, while I have not experienced much difficulty in finding and appointing qualified counsel in death penalty cases to date, as the current lawyers retire or cease representing capital defendants, I anticipate having more trouble locating such counsel in the future. In addition, there appears to be a decrease in the number of death penalty cases being prosecuted in state court, with Texas allowing the imposition of sentences of life without the possibility of parole since 2005. *See* TEX. PENAL CODE § 12.31. Therefore, there are fewer state cases in the system that could provide the necessary training and experience to new lawyers.

9

Exhibit 20 - 9

III.    <u>Costs</u>

A.    <u>Issues Relating to Attorneys' Fees</u>

For services rendered on or after January 1, 2016, the hourly attorney compensation rate in capital cases is $183 per hour. Considering the unique nature and complexity of capital cases and the experience required for quality representation, it is my opinion that the hourly rate should be reassessed. As the Federal Public Defender in my district and the private attorneys who have been appointed in my court can attest, death penalty litigation often persists for many years. Assuming a defendant receives the death penalty, the trial attorneys are not able to complete their involvement in the case (due to working with the habeas attorneys) for an extended period of time following the trial. While the attorneys are compensated only for their work at the trial level, because of the nature of capital cases, they must remain available to assist the habeas attorneys without pay. In this context, $183 per hour appears rather paltry.

Aside from the rate of pay, there are some additional issues pertaining to attorney compensation that bear mentioning. At the outset of every capital case, the standard procedure is for the attorneys to submit a budget. If the case is not yet indicted or is in the preauthorization stage (i.e., the Attorney General has not yet authorized the local United States Attorney to seek the death penalty), defense counsel must submit a preliminary budget request. Once the death penalty is authorized, the attorneys proffer for approval a more comprehensive budget. In either case, at some point, the proposed budget includes attorneys' fees in the form of attorney hours. For example, counsel files a sealed *ex parte* motion asking the district court to approve a certain number of hours (most recently, 1500) per attorney to represent the defendant. Notably, when the Federal Public Defender is appointed as 1 of the 2 defense attorneys, significant funds are

10

Exhibit 20 - 10

saved, as the Public Defender's office absorbs the cost of 1 attorney and some investigative expenses.

With regard to attorneys' fees, the Fifth Circuit adopted a policy in 1998 in response to a request from the Judicial Conference that circuits engage in efforts to ensure that costs in capital cases remain reasonable. *See* Attachment I ("Special Procedures for Reviewing Attorney Compensation Requests in Death Penalty Cases"). The policy provides that in federal capital prosecutions, any request for compensation in excess of $100,000 at the district level and $50,000 at the appellate level is considered presumptively excessive and must be submitted to the Fifth Circuit for further approval.[1] The Chief Appellate Conference Attorney at the Fifth Circuit advised me, however, that there are some important qualifications about the policy's application. First, since the adoption of the policy, the hourly rate has increased to $183 per hour, allowing only 546 hours of work before the $100,000 limit is met. Second, although the "presumptive limits" have not been changed since 1998, they are exceeded with circuit approval in virtually every federal capital prosecution in which the government actually pursues the death penalty and in a large portion of capital habeas cases. Third, the "limits" actually function more as thresholds that trigger circuit involvement in capital cases at a point where the potential for high cost becomes apparent. Thus, the Fifth Circuit uses these limits, together with the need to obtain circuit approval for interim payments, as a mechanism to induce attorneys to think about costs and prepare budgets for cases earlier rather than later. Despite these qualifications, some private attorneys advised me that they often work more hours in capital cases than they claim and, even

---

[1] The policy also includes presumptive limits for other types of cases.

11

Exhibit 20 - 11

then, their vouchers in death penalty cases have been reduced at the circuit level without explanation.

Additionally, in a few of my prior cases, some of the private attorneys appointed to represent capital defendants have not been timely compensated.  For example, 1 attorney informed me that after submitting his CJA voucher, obtaining approval at the district court, and sending it to the Fifth Circuit for additional approval, he was not paid until 11 months later, and then with a reduction from the amount requested.  This same attorney has complained of CJA voucher cutting at the circuit level with no explanation and no opportunity to respond.  As a district judge, unless I am advised by an attorney that he has not been paid, even after I have approved his voucher, I am not aware of whether he has been paid or if his compensation has been reduced by the circuit.  I do not receive reports and do not have ready access to records from the finance department at either the district or circuit level with regard to payments made to attorneys, investigators, or experts.  Although there is apparently voucher cutting occurring at the circuit level, I have been informed by private attorneys and the Federal Public Defender that CJA voucher cutting by district judges in the Eastern District of Texas is rare and is generally not a problem.

The issues surrounding the delay of attorney compensation and voucher cutting are troubling.  In light of the amount of time an attorney must invest to defend a capital defendant, he or she may be forced to turn away other potential clients.  Thus, delays in receiving payment can be particularly detrimental to the practice of these attorneys.  Further, voucher cutting, especially when the attorneys claim less than the hours actually worked, operates to discourage counsel from continuing to accept CJA appointments.  The result may be untenable long-term because the system as it is currently structured necessitates the appointment of panel attorneys on a regular

12

Exhibit 20 - 12

basis in capital cases, multi-defendant cases, and cases where the Federal Public Defender has a conflict of interest.

In some cases, the government does not receive authorization to seek the death penalty or chooses not to seek the death penalty. Once the court is advised of this fact, 1 of the attorneys is removed from the case. From that point forward, the case proceeds as a standard criminal case, and the remaining attorney is directed to bill at the hourly rate set forth for non-capital cases (currently, $129 per hour). *See* Attachment J (Sample Order).

As a final point, it is notable that federal and state capital prosecutions in Texas generally take less time than such prosecutions in other districts and circuits, lasting multiple weeks rather than multiple months. This is likely due to the customs and practices of lawyers in Texas and the experience of the prosecutors and the criminal defense bar. In any event, this circumstance results in cost savings as compared to other jurisdictions in terms of fewer attorney hours expended and less money spent on experts and other service providers. Moreover, hourly rates for local or regional experts tend to be less than those for experts from other geographic areas, yet these experts may be more effective before the jury.

B.    Issues Relating to Service Providers

In light of the seriousness of capital cases, courts must ensure that each defendant obtains the necessary services to prepare an effective defense. Invariably, this includes the assistance of investigators and other experts (such as mitigation specialists, jury consultants, psychiatrists, pathologists, or prison administration experts). As part of the proposed budget, defense counsel asks the court to approve certain amounts to retain such service providers. For example, an attorney may ask the court to approve specific dollar amounts for an investigator, a psychiatrist,

13

Exhibit 20 - 13

or a mitigation specialist. Before these funds are approved, however, the attorney must demonstrate that such services are necessary, that the experts are qualified, and that their hourly rates are reasonable.

Under current CJA guidelines, there is a waivable limit of $7,500 for capital cases. The $7,500 limit applies to the total payment for investigative, expert, and other services in a case rather than to each service individually. *See* Attachment K (Current CJA Rates and Case Compensation Maximums). Consequently, any amounts approved by the district court beyond $7,500 must go to the Chief Judge of the Fifth Circuit for additional approval.

Obtaining further circuit approval for the expenditure of funds for expert services (which the district court finds reasonable and necessary) has been problematic on occasion. When the circuit does not approve the expenditure of funds for expert services to the same extent as the district court, the attorneys and the trial court are placed in a difficult position. To alleviate some of the burden this situation imposes on the attorneys, I have allowed them, with circuit approval, to reallocate funds such that amounts originally requested for 1 type of expert may be shifted to another type of expert, depending on the needs of the case. *See* Attachment L (Redacted Budget Orders). Defense counsel have stated that such flexibility is key when operating within a restricted budget. This type of flexibility is also advantageous from a cost-savings perspective because it allows the attorneys to avoid expending additional attorney hours by coming back to the court repeatedly to amend the budget.

As with attorney compensation, delay in the payment of experts has occasionally been a problem. In 1 instance, I received complaints that a defense expert's payment was delayed at the circuit level for several months after submission of his voucher. The expert reportedly was so

14

Exhibit 20 - 14

angry that he vowed never to work on another federal case and also blogged about his negative experience.

*Capital Habeas Units*

After consulting with the United States Magistrate Judges in my division who are responsible for locating and appointing capital habeas attorneys, the United States Attorney for the Eastern District of Texas, the Federal Public Defender for the Eastern District of Texas, and several private panel attorneys, I am of the opinion that the establishment of a Capital Habeas Unit in the Fifth Circuit would be beneficial. Capital habeas cases require specialized skills, can be highly complex, and often prove difficult to litigate. As a consequence, it is challenging to find experienced attorneys who are willing to accept such appointments. As is apparent from the capital habeas chart attached, many of the attorneys on these cases are from outside the Fifth Circuit and never make personal appearances in court. As a result, I am often unfamiliar with their practices, their skills, and their reputations. This, in turn, makes it far more difficult to review vouchers and determine whether they are submitting reasonable requests than in cases where the lawyers frequently appear before me and I am familiar with their skill levels and professional ethics. Further, the relatively low hourly CJA rate in capital habeas cases, $183 per hour (as compared to what other experienced civil attorneys charge per hour), seemingly would not encourage lawyers to gravitate to this area of the law.

The creation of a Capital Habeas Unit would appear to solve more than 1 problem. By utilizing an organization comprised of salaried federal employees, the process for voucher submission and review would be significantly reduced. Additionally, as with any attorney specializing in a particular area of law, counsel employed by the Capital Habeas Unit would be

15

Exhibit 20 - 15

more efficient, effective, and experienced in dealing with the plethora of issues raised in capital habeas cases.  This would lead to cost savings.

Both the United States Attorney and the Federal Public Defender reported a troubling change in the tenor of capital habeas practice in recent years.  They noted that habeas attorneys tend to engage in more malicious and many times unfounded, sometimes personal, attacks on trial counsel's representation.  This circumstance creates a uncomfortable dynamic where the trial counsel views the habeas counsel as the enemy or opposition.  While both were careful to point out that they do not expect habeas attorneys to "lay down," as arguments regarding the effectiveness of trial counsel are often essential, they referenced extremely lengthy petitions (200 pages or more) challenging every possible decision, tactical and otherwise, made by the trial team.  One attorney very experienced in handling capital cases in this district opined that the formation of a Capital Habeas Unit composed of a small cadre of experienced attorneys who routinely interact with trial counsel would foster a more productive environment.

For these reasons, it is my view, as well as the view of the United States Attorney and the Federal Public Defender in my district, that the establishment of a Capital Habeas Unit would be more cost effective and would produce higher quality representation.

*Federal Death Penalty Resource Counsel Project ("FDPRCP")*

In preparation for this hearing, I consulted with the Eastern District's Federal Public Defender as well as a private attorney frequently appointed in capital murder cases in this district. Both attorneys advised me that their use of the FDPRCP is somewhat limited as compared to the use of this resource in other districts.  Because these attorneys have significant experience in handling federal capital cases, they tend to use the FDPRCP primarily as a consulting service.

16

Exhibit 20 - 16

For example, they have contacted the FDPRCP for assistance in finding a particular type of expert, for information about national trends or practices in death penalty cases, and updates on federal death penalty law.

Personally, I recall contacting resource counsel on 1 or 2 occasions regarding budgets in death penalty cases, and my law clerks have obtained various documents and research materials from them. Thus, to my knowledge, although an attorney from the FDPRCP has never directly represented a capital defendant within the Fifth Circuit, a resource counsel functions as a valuable resource for the attorneys and the judges in this district.

*Conclusion*

In sum, death penalty proceedings in federal court are extremely demanding, costly, and time-consuming for all involved. Post-trial proceedings in most cases persist for years and, generally, the death sentence is never carried out. Putting aside controversial moral issues and considerations of whether pursuing capital cases is worth the effort and expense required, participating in these cases is a huge commitment for the court, the attorneys, the witnesses, and the jurors. I hope that my testimony as outlined in this letter will provide you with more information and assist you in addressing questions that have arisen about the CJA in the context of death penalty litigation.

Sincerely,

*Marcia A. Crone*

Marcia A. Crone
United States District Judge

17

Exhibit 20 - 17

# ATTACHMENT A

Exhibit 20 - 18

Total Cases Assigned to Judge Marcia Crone from 1/1/2000-2/2/2016

Total Number of Cases Reported: 1974
Total Number of Cases Pending on 2/2/2016: 254
Total Number of Pending Defendants Reported: 620
Total Number of Defendants Added during period (1/1/2000 – 2/2/2016): 3826
Total Number of Terminated Defendants Reported: 3214

Judge Crone - Beaumont

Total Number of Cases Reported: 812
Total Number of Cases Pending on 2/2/2016: 104
Total Number of Pending Defendants Reported: 148
Total Number of Defendants Added during period (1/1/2000 – 2/2/2016): 1178
Total Number of Terminated Defendants Reported: 1036

Judge Crone - Lufkin

Total Number of Cases Reported: 23
Total Number of Cases Pending on 2/2/2016: 0
Total Number of Pending Defendants Reported: 0
Total Number of Defendants Added during period (1/1/2000 – 2/2/2016): 31
Total Number of Terminated Defendants Reported: 31

Judge Crone - Sherman

Total Number of Cases Reported: 1139
Total Number of Cases Pending on 2/2/2016: 150
Total Number of Pending Defendants Reported: 472
Total Number of Defendants Added during period (1/1/2000 – 2/2/2016): 2617
Total Number of Terminated Defendants Reported: 2147

Exhibit 20 - 19

# District Court Statistical Reports

## Marcia A. Crone

### Felony Terminations by Nature of Offense

| Office | Month | Total | Marijuana | Other Drugs | Immigration | Firearms | Fraud | Violent Off | Sex Off | Forgery | Larceny | Justice System | Regulatory | Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beaumont | Jan 2015 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Beaumont | Feb 2015 | 11 | 0 | 4 | 0 | 2 | 1 | 1 | 2 | 0 | 0 | 0 | 0 | 1 |
| Beaumont | Mar 2015 | 8 | 0 | 2 | 0 | 5 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Beaumont | Apr 2015 | 15 | 0 | 3 | 0 | 3 | 6 | 2 | 0 | 0 | 0 | 0 | 0 | 1 |
| Beaumont | May 2015 | 8 | 0 | 4 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 |
| Beaumont | Jun 2015 | 7 | 0 | 3 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| Beaumont | Jul 2015 | 6 | 0 | 4 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| Beaumont | Aug 2015 | 3 | 0 | 1 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Beaumont | Sep 2015 | 9 | 0 | 0 | 0 | 0 | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Beaumont | Oct 2015 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| Beaumont | Nov 2015 | 10 | 0 | 1 | 0 | 1 | 6 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Beaumont | Dec 2015 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Totals for Beaumont | | 81 | 0 | 23 | 0 | 12 | 29 | 7 | 3 | 0 | 1 | 2 | 1 | 3 |
| Sherman | Jan 2015 | 28 | 0 | 13 | 1 | 5 | 1 | 0 | 6 | 0 | 0 | 1 | 1 | 0 |
| Sherman | Feb 2015 | 35 | 1 | 23 | 0 | 0 | 6 | 0 | 2 | 1 | 1 | 0 | 0 | 1 |
| Sherman | Mar 2015 | 39 | 5 | 13 | 0 | 4 | 8 | 0 | 2 | 0 | 0 | 2 | 0 | 5 |
| Sherman | Apr 2015 | 46 | 0 | 30 | 0 | 0 | 15 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Sherman | May 2015 | 9 | 2 | 5 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Sherman | Jun 2015 | 3 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| Sherman | Jul 2015 | 22 | 0 | 17 | 0 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 1 | 0 |
| Sherman | Aug 2015 | 10 | 0 | 4 | 0 | 0 | 4 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Sherman | Sep 2015 | 41 | 4 | 24 | 0 | 2 | 6 | 1 | 4 | 0 | 0 | 0 | 0 | 0 |
| Sherman | Oct 2015 | 32 | 0 | 10 | 0 | 4 | 7 | 2 | 6 | 0 | 1 | 0 | 0 | 2 |
| Sherman | Nov 2015 | 30 | 0 | 20 | 0 | 0 | 5 | 0 | 4 | 0 | 0 | 0 | 0 | 1 |

Exhibit 20 - 20

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sherman | Dec 2015 | 17 | 3 | 10 | 0 | 1 | 1 | 0 | 1 | 0 | 1 | 0 | 0 | 0 |
| Totals for Sherman | | 312 | 15 | 169 | 1 | 17 | 58 | 4 | 27 | 1 | 3 | 3 | 3 | 11 |
| Judge Summary | | 393 | 15 | 192 | 1 | 29 | 87 | 11 | 30 | 1 | 4 | 5 | 4 | 14 |

Exhibit 20 - 21

# ATTACHMENT B

Exhibit 20 - 22

**CAPITAL CASES IN THE EASTERN DISTRICT OF TEXAS      2005-2016**                    **February 16, 2016**

| CASE NO. | STYLE | JUDGE | ATTORNEYS | DETAILS | DISPOSITION |
|---|---|---|---|---|---|
| 1:03-CR-173 | USA v. Shannon Wayne Agofsky | Heartfield | AUSA: John Stevens, Joe Batte<br><br>Defense Counsel:<br>Defense Counsel: Doug Barlow (Beaumont, TX) (appointed 9/26/03-6/8/05); FPD EDTX Pat Black (appointed 9/25/03-6/8/05)<br><br>§ 2255 Counsel: Claudia Van Wyk, Billy Nolas, and David Zuckerman (Federal Community Defender Office, Philadelphia, PA), Jennifer Merrigan (Death Penalty Litigation Clinic, Kansas City, MO) | Superseding Indictment 2/19/04:  Count 1: 18 U.S.C. § 1118 (murder by federal prisoner), Count 2: 18 U.S.C. § 1111 (murder)<br><br>2/24/04:  Notice of Intent to Seek Death Penalty (#26)<br><br>Jury Trial: 6/14/04 - 7/12/04 | Guilty verdict both counts<br><br>Amended Judgment 3/30/07: death as to Count 1<br><br>Affirmed by 5th Cir. 1/31/08<br><br>Cert. denied 1/31/07<br><br>§ 2255 case is stayed |

Exhibit 20 - 23

| CASE NO. | STYLE | JUDGE | ATTORNEYS | DETAILS | DISPOSITION |
|---|---|---|---|---|---|
| 1:05-CR-51 (2) & 1:06-CR-51 | USA v. David Lee Jackson | Crone | AUSA: Joe Batte

Defense Counsel:  Doug Barlow (Beaumont, TX) (appointed 6/16/05); FPD EDTX Pat Black (appointed 6/7/05-2/21/06); Robert Morrow (The Woodlands, TX) (appointed 7/18/05)

§ 2255 Counsel:  Morris Mood (Federal Capital Habeas Project), Steve Olson, Chris Hollinger, Christopher Craig, and Steven Bergman (O'Melveny & Myers, San Francisco, CA), James Lohman (Austin, TX) | Indictment 4/20/05

Superseding Indictment 8/16/06: Count 1:  18 U.S.C. §§ 1111 and 2 (murder, aiding and abetting), Count 2:  18 U.S.C. §§ 930(c) and 2 (possession of a weapon with intent to use in crime, aiding and abetting)

01/04/06:  Notice of Intent to Seek Death Penalty (#96)

Jury Trial:  10/02/06-11/13/06 | Guilty verdict both counts

Sentence 1/9/07:  death as to Count 1; life as to Count 2

Affirmed by 5th Cir. 12/11/08

Cert. denied 10/29/09

Amended Judgment by Judge Ron Clark on 03/26/13 on § 2255: life imprisonment |

Exhibit 20 - 24

| CASE NO. | STYLE | JUDGE | ATTORNEYS | DETAILS | DISPOSITION |
|---|---|---|---|---|---|
| 1:05-CR-51 (1) | USA v. Arzell Gulley | Crone | AUSA: Joe Batte<br><br>Defense Counsel: David Cunningham (Houston, TX) (appointed 8/17/05-9/5/06); Gerald Bourque (The Woodlands, TX) (appointed 6/20/05-9/5/06)<br><br>Appellate Counsel: Zack Hawthorn (Beaumont, TX) (appointed 10/03/06) | Indictment 4/20/05: Count 1: 18 U.S.C. §§ 1111(a) and 2 (murder, aiding and abetting), Count 2: 18 U.S.C. §§ 930(c) and 2 (possession of a weapon with intent to use in crime, aiding and abetting)<br><br>01/04/06:  Gov decided not to seek death penalty (#114); case severed from co-defendant Jackson<br><br>Jury Trial:  6/19/06-6/28/06 | Guilty verdict both counts<br><br>Sentence 10/04/06: life imprisonment<br><br>Affirmed by 5th Cir. 5/05/08<br><br>Cert. denied 10/15/08<br><br>*Pro se* § 2255 Petition, denied 9/18/12 |
| 1:06-CR-101 | USA v. Ellis Joseph Mosher | Heartfield | AUSAs: Joe Batte, Malcolm Bales, James O. Jenkins, Jr.<br><br>Defense Counsel: James R. Makin (Beaumont, TX), Jimmy Hamm (Beaumont, TX) | Indictment 7/19/06: Count 1: 18 U.S.C. § 1111 (murder)<br><br>12/11/06:  Notice of Intent to Seek Death Penalty (#23)<br><br>Jury Trial:  1/7/08-2/27/08 | Guilty verdict<br><br>Sentence 2/29/08:  life imprisonment because the jury could not reach a unanimous verdict in the punishment phase<br><br>Appeal withdrawn 10/09/08 |

Exhibit 20 - 25

| CASE NO. | STYLE | JUDGE | ATTORNEYS | DETAILS | DISPOSITION |
|---|---|---|---|---|---|
| 1:07-CR-46 | USA v. Alexis Terry | Crone | AUSA: Michelle Englade; Robert Hobbs<br><br>Defense Counsel: FPD Pat Black (appointed 3/8/07); Zack Hawthorn (appointed 3/15/07) | Indictment 3/07/07: Count 1: 18 U.S.C. § 2119(3) (car-jacking resulting in death), Count 2: 18 U.S.C. § 924(c) (possession of a firearm in furtherance of crime of violence)<br><br>2/7/07: Gov Ex Parte Mtn to Appoint Counsel in Death Penalty Eligible Case | Guilty plea 8/31/07 to Count 1<br><br>Sentence 1/22/08: 480 months' imprisonment<br><br>*Pro se* § 2255 petition filed, denied 1/3/13 |
| 1:07-CR-142 (1) | USA v. Michael Bacote | Crone | AUSA: Joe Batte; John Craft<br><br>Defense Counsel: Gerald Bourque (appointed 4/26/06-11/16/09); David Cunningham (appointed 7/26/07-11/16/09); Zack Hawthorn (appointed 11/16/09) | Indictment 8/15/07: 18 U.S.C. §§ 1111 and 2 (murder, aiding and abetting)<br><br>9/11/07: Notice of Intent to Seek Death Penalty (#30)<br><br>06/05/09: Withdrawal of Notice of Intent to Seek Death (#288) | Guilty plea 6/22/09 to second degree murder<br><br>Sentence 6/22/09: 336 months' imprisonment<br><br>No appeals |

Exhibit 20 – 26

| CASE NO. | STYLE | JUDGE | ATTORNEYS | DETAILS | DISPOSITION |
|---|---|---|---|---|---|
| 1:07-CR-142 (2) & 1:08-CR-36 | USA v. Joseph Ebron | Crone | AUSA: Joe Batte; John Craft<br><br>Defendant: Katherine Scardino (Houston, TX) (appointed 4/26/06-3/19/08); Jimmy Phillips (Angleton, TX) (appointed 10/11/07-3/19/08)<br><br>Appellate Counsel: Jimmy Phillips, Henry J. Bemporad and Donna Coltharp (FPD WDTX)<br><br>§ 2255 Counsel: Claudia VanWyk, Billy Nolas, and Jennifer L. Chiccarino  (Federal Community Defender's Office, Capital Habeas Unit, Philadelphia, PA), Eric Albritton (Longview, TX) | Indictment 8/15/07:  18 U.S.C. § 1111 and 2 (murder, aiding and abetting)<br><br>9/11/07:  Notice of Intent to Seek Death Penalty (#40)<br><br>Jury Selection:  03/23/09 - 04/03/09<br><br>Trial:  4/20/09 - 5/18/09 | Guilty verdict<br><br>Death sentence 6/26/09<br><br>Affirmed by 5th Cir. 8/8/12<br><br>Cert. Denied 11/12/13 |
| 1:07-CR-142 (3) & 1:08-CR-21 | USA v. Charles Sherman | Crone | AUSA: Joe Batte; John Craft<br><br>Defense Counsel:  Doug Barlow (Beaumont, TX) (appointed 11/9/06); FPD Pat Black (appointed 4/26/06) | Indictment 8/15/07:  18 U.S.C. § 1111 and 2 (murder, aiding and abetting) | Indictment dismissed on government's motion 9/04/09 |

Exhibit 20 - 27

| CASE NO. | STYLE | JUDGE | ATTORNEYS | DETAILS | DISPOSITION |
|---|---|---|---|---|---|
| 1:09-CR-15 (1) | USA v. Mark Isaac Snarr | Crone | AUSA: Joe Batte<br><br>Defense Counsel (including appeal): Doug Barlow (appointed 4/2/08); FPD Pat Black (appointed 4/2/08)<br><br>§ 2255 Counsel: Kathryn Nester (FPD Salt Lake City), Robert E. Lee, Jr. (Va. Capital Representation Resource Ctr.) | Indictment 1/21/09: 18 U.S.C. § 1111 and 2 (murder, aiding and abetting)<br><br>2/04/09:  Notice of Intent to Seek Death (#18)<br><br>Jury selection:  04/06/10 - 04/23/10<br><br>Trial:  05/03/10 - 05/24/10 | Guilty verdict<br><br>Death sentence 5/24/10<br><br>Affirmed by 5th Cir. 1/8/13<br><br>Cert. denied 2/24/14 |
| 1:09-CR-15 (2) | USA v. Edgar Baltazar Garcia | Crone | AUSA: Joe Batte<br><br>Defense Counsel (including appeal): Robert Morrow (appointed 04/2/08-5/16/13); Gerald Bourque (appointed 4/2/08 5/16/13)<br><br>§ 2255 Counsel: Christine Lehmann (La. Capital Assistance Ctr.), Jason Hawkins (FPD NDTX) | Indictment 1/21/09: 18 U.S.C. § 1111 and 2 (murder, aiding and abetting)<br><br>2/04/09: Notice of Intent to Seek Death (#19)<br><br>Jury selection: 4/6/10 - 4/26/10<br><br>Trial:  05/03/10 - 05/24/10 | Guilty verdict<br><br>Death sentence 5/24/10<br><br>Affirmed by 5th Cir. 1/8/13<br><br>Cert. denied 2/24/14 |

Exhibit 20 - 28

| CASE NO. | STYLE | JUDGE | ATTORNEYS | DETAILS | DISPOSITION |
|---|---|---|---|---|---|
| 9:09-CR-21 (1) | USA v. Charles Cameron Frazier | Crone | AUSA: Rey Morin<br><br>Defense Counsel: Gerald Bourque (appointed 2/1/10 - 9/28/10); Bobby Mims (Tyler, TX) (appointed 7/24/09) | Superseding Indictment 01/21/10: Count 1: 18 U.S.C. §§ 1959(a)(5) (violent crimes in aid of racketeering activity, conspiracy to murder), Count 2: § 1959(a)(1) (violent crimes in aid of racketeering activity, murder), Count 3: § 924(c) (carrying firearm during and in relation to crime of violence), Count 4: § 1959(a)(1), Count 5: § 924(c), Count 8: § 922(g)(1) (felon in possession of a firearm)<br><br>Attorney General Directive: death not authorized, 9/27/10 | Guilty plea 1/14/10 Counts 2 and 4<br><br>Sentence 6/21/11: life imprisonment<br><br>Amended Judgment 12/18/12: 300 months' imprisonment<br><br>No appeals |

Exhibit 20 - 29

| CASE NO. | STYLE | JUDGE | ATTORNEYS | DETAILS | DISPOSITION |
|---|---|---|---|---|---|
| 9:09-CR-21 (2) | USA v. Brent Stalsby | Crone | AUSA: Rey Morin<br><br>Defense Counsel: Robert Morrow (appointed 2/1/10 - 11/8/10); Zack Hawthorn (appointed 1/22/10) | Superseding Indictment 01/21/10: Count 1: 18 U.S.C. §§ 1959(a)(5) (violent crimes in aid of racketeering activity, conspiracy to murder), Count 2: § 1959(a)(1) (violent crimes in aid of racketeering activity, murder), Count 3: § 924(c) (carrying firearm during and in relation to crime of violence), Count 4: § 1959(a)(1), Count 5: § 924(c), Count 8: § 922(g)(1) (felon in possession of a firearm)<br><br>Attorney General Directive: death not authorized, 11/8/10 | Guilty plea 1/21/11: Counts 2 and 4<br><br>Sentence 5/25/11: life imprisonment<br><br>Amended Judgment 12/18/12: 480 months' imprisonment<br><br>No appeals |

Exhibit 20 – 30

| CASE NO. | STYLE | JUDGE | ATTORNEYS | DETAILS | DISPOSITION |
|---|---|---|---|---|---|
| 9:09-CR-21 (3) | USA v. Carl Richard Carver | Crone | AUSA: Rey Morin<br><br>Defense Counsel: Wayne Hill (Houston, TX) (appointed 2/1/10); Ryan Deaton (Lufkin, TX) (appointed 2/1/10 - 11/8/10) | Superseding Indictment 01/21/10: Count 1: 18 U.S.C. §§ 1959(a)(5) (violent crimes in aid of racketeering activity, conspiracy to murder), Count 2: § 1959(a)(1) (violent crimes in aid of racketeering activity, murder), Count 8: § 922(g)(1) (felon in possession of a firearm)<br><br>Attorney General Directive: death not authorized, 11/8/10 | Guilty plea 1/19/11 to Count 2<br><br>Sentence 6/28/11: life imprisonment<br><br>Amended Judgment 12/18/12: 420 months' imprisonment<br><br>No appeals |
| 9:09-CR-21 (5) | USA v. April Nicole Flanagan | Crone | AUSA: Rey Morin<br><br>Defense Counsel: Doug Barlow (appointed 2/2/10; David Thornton (Friendswood, TX) (appointed 2/2/10 - 9/28/10) | Superseding Indictment 01/21/10: Count 1: 18 U.S.C. §§ 1959(a)(5) (violent crimes in aid of racketeering activity, conspiracy to murder), Count 2: § 1959(a)(1) (violent crimes in aid of racketeering activity, murder), Count 7: 18 U.S.C. § 3 (accessory after the fact)<br><br>Attorney General Directive: death not authorized, 9/27/10 | Guilty plea 11/29/10 to Counts 1 and 7<br><br>Sentence 4/26/11: 180 months' imprisonment<br><br>No appeals |

Exhibit 20 - 31

| CASE NO. | STYLE | JUDGE | ATTORNEYS | DETAILS | DISPOSITION |
|---|---|---|---|---|---|
| 9:09-CR-21 (6) | USA v. Carrie Christine Wood | Crone | AUSA: Rey Morin<br><br>Defense Counsel: Katherine Scardino (Houston, TX) (appointed 2/2/10); Jimmy Phillips, Jr.(appointed 2/2/10 - 9/28/10) | Superseding Indictment 01/21/10: Count 1: 18 U.S.C. §§ 1959(a)(5) (violent crimes in aid of racketeering activity, conspiracy to murder), Count 2: § 1959(a)(1) (violent crimes in aid of racketeering activity, murder)<br><br>Attorney General Directive: death not authorized, 9/27/10 | Guilty plea 7/14/11 to Count 1<br><br>Sentence 7/14/11:  120 months' imprisonment<br><br>Amended Judgment 12/18/12: 72 months' imprisonment<br><br>No appeals |

Exhibit 20 - 32

| CASE NO. | STYLE | JUDGE | ATTORNEYS | DETAILS | DISPOSITION |
|---|---|---|---|---|---|
| 1:10-CR-85 (1) | USA v. Steven Cooke | Crone | AUSA:  Rey Morin<br><br>Defense Counsel:  Doug Durham (Houston, TX) (appointed 8/18/10) and Joe Salhab (Houston, TX) (appointed 8/23/10 - 11/1/11) | Indictment 7/21/10: Count 1: 18 U.S.C. §§ 1959(a)(5) (violent crimes in aid of racketeering activity, conspiracy to murder), Count 2: § 1959(a)(1) (violent crimes in aid of racketeering activity, murder); Count 3: § 924(j) (possession of a firearm in furtherance of a crime of violence resulting in death)<br><br>Attorney General Directive:  death not authorized, 10/31/11 | Guilty plea 11/22/11 to Count 2<br><br>Sentence 5/3/12: life imprisonment<br><br>No appeals |

Exhibit 20 – 33

| CASE NO. | STYLE | JUDGE | ATTORNEYS | DETAILS | DISPOSITION |
|---|---|---|---|---|---|
| 1:10-CR-85 (2) | USA v. David Jason Michels | Crone | AUSA: Rey Morin<br><br>Defense Counsel: David Cunningham (appointed 8/23/10) and Bob Loper (Houston, TX) (appointed 8/18/10 - 8/23/11) | Indictment 7/21/10: Count 1: 18 U.S.C. §§ 1959(a)(5) (violent crimes in aid of racketeering activity, conspiracy to murder), Count 2: § 1959(a)(1) (violent crimes in aid of racketeering activity, murder); Count 3: § 924(j) (possession of a firearm in furtherance of a crime of violence resulting in death)<br><br>Information 3/12/12: Count 1: 18 U.S.C. § 3 (accessory after the fact)<br><br>Attorney General directive: death not authorized, 8/23/11 | Guilty plea 03/20/12 to Count 1 of Information<br><br>Sentence 7/9/12:  144 months' imprisonment<br><br>No appeals |

Exhibit 20 – 34

| CASE NO. | STYLE | JUDGE | ATTORNEYS | DETAILS | DISPOSITION |
|---|---|---|---|---|---|
| 1:11-CR-62 (1) | USA v. Harry Lee Napper | Crone | AUSA:  Joe Batte<br><br>Defense Counsel:  David Cunningham (appointed 5/23/11)<br>Robert Morrow (appointed 9/20/11 - 1/6/12) | Indictment 5/4/11: Count 1: 18 U.S.C. § 1111 and 2 (murder, aiding and abetting); Count 2: 18 U.S.C. § 1117(conspiracy to murder)<br><br>Attorney General Directive: death not authorized, 12/14/11 | Guilty plea 6/20/12 to Count 2<br><br>Sentence 11/16/12:  240 months' imprisonment<br><br>No appeals |
| 1:11-CR-62 (2)<br>1:12-CR-105 | USA v. James Sweeney | Crone | AUSA:  Joe Batte<br><br>Defense Counsel:  Katherine Scardino (appointed 5/12/11) & Jimmy Phillips (appointed 6/24/11 - 12/14/11) | Indictment 5/4/11: Count 1: 18 U.S.C. § 1111 and 2 (murder, aiding and abetting); Count 2: 18 U.S.C. § 1117 (conspiracy to murder)<br><br>Attorney General Directive: death not authorized, 12/14/11 | Indictment dismissed 2/27/13<br><br>Guilty plea to offense from D. Md., 18 U.S.C. § 1962(d) (conspiracy to engage in racketeering activity)<br><br>Sentence 3/1/13:  Life imprisonment<br><br>No direct appeal<br><br>*Pro se* § 2255 petition pending (1:14-CV-112) |

Exhibit 20 – 35

| CASE NO. | STYLE | JUDGE | ATTORNEYS | DETAILS | DISPOSITION |
|---|---|---|---|---|---|
| 1:12-CR-119 | USA v. Kenny Don Stanley | Crone | AUSA: John Ross<br><br>Defense Counsel: David Grove (appointed 12/27/12, Beaumont, TX), David Adler (appointed 1/4/13, Bellaire, TX) | Indictment 11/7/12: Count 1: 18 U.S.C. § 1959(a)(5) (violent crimes in aid of racketeering activity, conspiracy to murder), Count 2: § 1959(a)(1) (violent crimes in aid of racketeering activity, murder), Count 3: § 924(j) (possession and discharge of a firearm in furtherance of a crime of violence resulting in death)<br><br>Superseding indictments filed on 3/7/13 and 8/8/13, adding defendants and non-capital offenses<br><br>Attorney General Directive: death not authorized, 10/25/12 | Guilty plea 6/25/13 to Count 2<br><br>Sentence 10/29/13: life imprisonment<br><br>No appeals |

Exhibit 20 – 36

| CASE NO. | STYLE | JUDGE | ATTORNEYS | DETAILS | DISPOSITION |
|---|---|---|---|---|---|
| 1:12-CR-119 | USA v. Tanner Lynn Bourque | Crone | AUSA: John Ross<br><br>Defense Counsel: Gary Dennison (appointed 1/30/13, Liberty, TX), Ali Fazel (appointed 2/6/13, Houston, TX) | Indictment 11/7/12: Count 1: 18 U.S.C. § 1959(a)(5) (violent crimes in aid of racketeering activity, conspiracy to murder), Count 2: § 1959(a)(1) (violent crimes in aid of racketeering activity, murder), Count 3: § 924(j) (possession and discharge of a firearm in furtherance of a crime of violence resulting in death)<br><br>Superseding indictments filed on 3/7/13 and 8/8/13, adding defendants and non-capital offenses<br><br>Attorney General Directive: death not authorized, 10/25/12 | Guilty plea 7/15/13 to Count 2<br><br>Sentence 1/9/14: life imprisonment<br><br>No appeals |

Exhibit 20 – 37

| CASE NO. | STYLE | JUDGE | ATTORNEYS | DETAILS | DISPOSITION |
|---|---|---|---|---|---|
| 1:12-CR-119 | USA v. Kristopher Leigh Guidry | Crone | AUSA: John Ross<br><br>Defense Counsel: David Barlow (appointed 1/16/13, Beaumont, TX), J. A. Salinas (appointed 1/18/13, Houston, TX) | Indictment 11/7/12: Count 1: 18 U.S.C. § 1959(a)(5) (violent crimes in aid of racketeering activity, conspiracy to murder), Count 2: § 1959(a)(1) (violent crimes in aid of racketeering activity, murder), Count 3: § 924(j) (possession and discharge of a firearm in furtherance of a crime of violence resulting in death)<br><br>Superseding indictments filed on 3/7/13 and 8/8/13, adding defendants and non-capital offenses<br><br>Attorney General Directive: death not authorized, 10/25/12 | Guilty plea 6/11/13 to Count 2<br><br>Sentence 1/9/14: life imprisonment<br><br>No appeals |

Exhibit 20 – 38

| CASE NO. | STYLE | JUDGE | ATTORNEYS | DETAILS | DISPOSITION |
|---|---|---|---|---|---|
| 1:12-CR-119 | USA v. Vicki Stark-Fitts | Crone | AUSA: John Ross<br><br>Defense Counsel: Steven Rosen (retained, Houston, TX) | Indictment 11/7/12: Count 1: 18 U.S.C. § 1959(a)(5) (violent crimes in aid of racketeering activity, conspiracy to murder), Count 2: § 1959(a)(1) (violent crimes in aid of racketeering activity, murder), Count 3: § 924(j) (possession and discharge of a firearm in furtherance of a crime of violence resulting in death)<br><br>Superseding indictments filed on 3/7/13 and 8/8/13, adding defendants and non-capital offenses<br><br>Attorney General Directive: death not authorized, 10/25/12 | Guilty plea 8/22/13 to Count 1<br><br>Sentence: 378 months' imprisonment<br><br>Untimely appeal filed and dismissed 8/25/14<br><br>*Pro se* § 2255 petition filed 3/2/15, currently pending |
| 1:XX-MJ-XXX<br><br>SEALED | USA v. SEALED 1 | Crone | AUSA: John Craft<br><br>Defense Counsel: FPD Pat Black (appointed 12/16/14); Doug Barlow (appointed 12/16/14) | Not yet indicted; death penalty eligible case, 18 U.S.C. §§ 1111(a) and 2 (murder, aiding and abetting) | PENDING |

Exhibit 20 – 39

| CASE NO. | STYLE | JUDGE | ATTORNEYS | DETAILS | DISPOSITION |
|---|---|---|---|---|---|
| 1:XX-MJ-XXX | USA v. SEALED 2 | Crone | AUSA: John Craft<br><br>Defense Counsel: Robert Morrow (appointed 12/16/14); Gerald Bourque (appointed 12/16/14) | Not yet indicted; death penalty eligible case, 18 U.S.C. §§ 1111(a) and 2 (murder, aiding and abetting) | PENDING |

Exhibit 20 - 40

# ATTACHMENT C

Exhibit 20 - 41

**CAPITAL HABEAS CASES ASSIGNED TO JUDGE MARCIA A. CRONE  2005-2016[1]**

February 16, 2016

| CASE NO. & JUDGE | STYLE | ATTORNEYS | DETAILS | DISPOSITION |
|---|---|---|---|---|
| 1:04-CV-367 (Crone) | Joseph Ray Ries *v.* Texas Department of Criminal Justice | Counsel for Petitioner: Charles A. Palmer (Office of the Attorney General, Admin. Law Division, Austin, TX), James M. Terry, Jr. (Attorney at Law, Austin, TX) | 28 U.S.C. § 2254 Petition filed 5/18/05 | Petition denied 10/31/06 District Court affirmed 4/22/08 Cert. Denied 10/21/08 Executed 10/21/08 |
| 1:04-CV-639 (Crone) | John Avalos Alba *v.* Texas Department of Criminal Justice | Counsel for Petitioner: Anthony S. Haughton (Gaithersburg, MD), Anthony S. Haughton (Attorney at Law, Houston, TX) | 28 U.S.C. § 2254 Petition filed 5/24/05 | Petition denied 12/22/08 Certificate of Appealability denied 10/14/09 Cert. Denied 5/17/10 Executed 5/25/10 |
| 1:06-CV-596 (Crone) | Gene Wilford Hathorn, Jr. *v.* Texas Department of Criminal Justice | Counsel for Petitioner: Donald D. Vernay (Attorney at Law, Rio Rancho, NM), David Sergi (David K. Sergi & Associates, PC, San Marcos, TX), Steven C. Barkley (Attorney at Law, Beaumont, TX) | 28 U.S.C. § 2254 Petition filed 3/15/07 | Petition dismissed pursuant to joint motion on 10/21/09 Hathorn pleaded guilty to 3 separate life sentences without the possibility of parole in state court |

[1] This list also includes two capital habeas cases not assigned to Judge Crone.

Exhibit 20 - 42

| CASE NO. & JUDGE | STYLE | ATTORNEYS | DETAILS | DISPOSITION |
|---|---|---|---|---|
| 1:07-CV-511 (Schell) | Shannon Wayne Agofsky v. United States | Counsel for Petitioner: Claudia Van Wyk and David Zuckerman (Federal Community Defender's Office, Capital Habeas Unit, Philadelphia, PA), Jennifer Merrigan (Death Penalty Litig. Clinic, Kansas City, MO) | 28 U.S.C. § 2255 Petition filed 1/17/08 | Case currently stayed while Agofsky challenges an underlying offense |
| 1:09-Cv-1039 (Clark) | David Lee Jackson v. United States | Counsel for Petitioner: Morris Moon (Federal Capital Habeas Project, Houston, TX), Chris Hollinger (O'Melveny & Myers LLP, San Francisco, CA), Christopher Craig (O'Melveny & Myers LLP, Los Angeles, CA), James Lohman (Austin, TX), Steven Bergman (Draper, UT), Doug Barlow (Beaumont, TX), Robert Morrow (The Woodlands, TX) | 28 U.S.C. § 2255 Petition filed 10/5/10 | Joint motion to dismiss petition pursuant to parties' agreement

Amended Judgment by Judge Clark on 03/26/13 for life imprisonment |
| 6:11-CV-135 (Crone) | Randall Wayne Mays v. Texas Department of Criminal Justice | Counsel for Petitioner: Thomas S. Smith (Smith & Smith, Sherman, TX), Jeff L. Haas (Attorney at Law, Tyler, TX), John E. Wright (Attorney at Law, Huntsville, TX) | 28 U.S.C. § 2254 Petition filed 3/03/12 | Petition denied 12/18/13

Certificate of Appealability denied 7/3/14

Cert. Denied 1/12/15

Case currently stayed to determine competency 3/16/15 |

Exhibit 20 - 43

| CASE NO. & JUDGE | STYLE | ATTORNEYS | DETAILS | DISPOSITION |
|---|---|---|---|---|
| 1:13-CV-723 (Crone) | Edgar Baltazar Garcia v. USA | Counsel for Petitioner: Christine M. Lehmann (Louisiana Capital Assistance Ctr., New Orleans, LA), Jason Hawkins (Federal Public Defender, NDTX, Dallas, TX) | Death sentence affirmed by 5th Cir. 1/8/13<br><br>Cert. denied 2/24/14<br><br>Counsel appointed for § 2255 case on 12/18/13 | Case currently stayed |
| 1:13-CV-724 (Crone) | Mark Isaac Snarr v. USA | Counsel for Petitioner:  Robert E. Lee, Jr. (Virginia Capital Representation Resource Center, Charlottesville, VA), Kathryn N. Nester (Office of the Federal Public Defender, Salt Lake City, UT) | Death sentence affirmed by 5th Cir. 1/8/13<br><br>Cert. denied 2/24/14<br><br>Counsel appointed for § 2255 case on 12/18/13 | Case currently stayed |

Exhibit 20 - 44

| CASE NO. & JUDGE | STYLE | ATTORNEYS | DETAILS | DISPOSITION |
|---|---|---|---|---|
| 1:14-CV-539 (Crone) | Joseph Ebron v. USA | Counsel for Petitioner: Claudia VanWyk (Federal Community Defender Office, Capital Habeas Unit, Philadelphia, PA), Jennifer Chiccarino (Federal Community Defender Office, Capital Habeas Unit, Philadelphia, PA), Eric M. Albritton (Albritton Law Firm, Longview, TX) | 28 U.S.C. § 2255 Petition filed 10/27/14 | Case currently stayed while Ebron litigates an underlying murder conviction in Washington, D.C. |
| 6:15-CV-535 (Crone) | Demontrell Miller v. Texas Department of Criminal Justice | Counsel for Petitioner: William Abrams (Steptoe & Johnson LLP, Palo Alto, CA), Boyd T. Cloern (Steptoe & Johnson LLP, Washington, DC), Jason D. Cassel (Albritton Law Firm, Longview, TX), Tremayne M. Norris (Steptoe & Johnson LLP, Washington, DC) | Petition not yet filed | Pending |

Exhibit 20 - 45

# ATTACHMENT D

Exhibit 20 - 46

## Civil Cases Report

### U.S. District Court [LIVE] -- Eastern District of TEXAS
### Filed Report Period: 1/1/2005 - 2/1/2016

| Case Number/ Title | Case Dates | Days Pending | Notes |
|---|---|---|---|
| 1:00-cv-00636-TH **Kelly v. TDCJ-ID** | *Case filed:* 09/20/2000 *Case closed:* 10/28/2002 *Case reopened:* 09/09/2004 *Case closed:* 11/17/2004 *Case reopened:* 05/16/2006 *Case closed:* 02/15/2007 | | *Cause:* 28:2254ex Petition for Writ of Habeas Corpus (Capital) *NOS:* 535 Death Penalty - Habeas Corpus *Office:* Beaumont *Jurisdiction:* Federal Question *Presider:* Thad Heartfield *Jury demand:* None *Case flags:* STAYEX |
| 1:04-cv-00485-RC **Simpson v. Dretke** | *Case filed:* 07/30/2004 *Case closed:* 03/29/2007 *Case reopened:* 09/23/2008 *Case closed:* 01/08/2009 *Case reopened:* 04/15/2009 *Case closed:* 06/12/2009 | | *Cause:* 28:2254ex Petition for Writ of Habeas Corpus (Capital) *NOS:* 535 Death Penalty - Habeas Corpus *Office:* Beaumont *Jurisdiction:* Federal Question *Presider:* Ron Clark *Jury demand:* None *Case flags:* CLOSED,STAYEX |
| 1:05-cv-00202-TH **Scheanette v. Briscoe** | *Case filed:* 03/14/2005 *Case closed:* 07/27/2005 | | *Cause:* 28:2254ex Petition for Writ of Habeas Corpus (Capital) *NOS:* 535 Death Penalty - Habeas Corpus *Office:* Beaumont *Jurisdiction:* U.S. Government Defendant *Presider:* Thad Heartfield *Jury demand:* None *Case flags:* CLOSED,HABEAS,STAYEX |
| 1:06-cv-00507-RC **Henderson v. Quarterman** | *Case filed:* 08/24/2006 *Case closed:* 03/31/2008 *Case reopened:* 12/20/2010 *Case closed:* 09/06/2013 | | *Cause:* 28:2254ex Petition for Writ of Habeas Corpus (Capital) *NOS:* 535 Death Penalty - Habeas Corpus *Office:* Beaumont *Jurisdiction:* Federal Question *Presider:* Ron Clark *Jury demand:* None *Case flags:* CLOSED,STAYEX |
| 1:06-cv-00596-MAC **Hathorn v. Director - Texas Department of Criminal Justice, Institutions Division** | *Case filed:* 10/02/2006 *Case closed:* 10/21/2009 | | *Cause:* 28:2254ex Petition for Writ of Habeas Corpus (Capital) *NOS:* 535 Death Penalty - Habeas Corpus *Office:* Beaumont *Jurisdiction:* Federal Question *Presider:* Marcia A. Crone *Jury demand:* None *Case flags:* CLOSED,STAYED,STAYEX |
| 1:07-cv-00352-TH **Esparza v. Quarterman** | *Case filed:* 06/08/2007 *Case closed:* 07/09/2007 | | *Cause:* 28:2254ex Petition for Writ of Habeas Corpus (Capital) *NOS:* 535 Death Penalty - Habeas Corpus |

Exhibit 20 - 47

| | | | |
|---|---|---|---|
| | | | *Office:* Beaumont<br>*Jurisdiction:* Federal Question<br>*Presider:* Thad Heartfield<br>*Jury demand:* None<br>*Case flags:* CLOSED,HABEAS,STAYEX |
| 1:07-cv-00511-RAS<br>**Agofsky v. United States of America** | *Case filed:* 07/23/2007 | 3115 | *Cause:* 28:2255 Motion to Vacate/Correct Illegal Sentence<br>*NOS:* 535 Death Penalty - Habeas Corpus<br>*Office:* Beaumont<br>*Jurisdiction:* U.S. Government Defendant<br>*Presider:* Richard A. Schell<br>*Jury demand:* None<br>*Case flags:* 2255,STAYED |
| 1:08-cv-00720-TH<br>**Garcia v. Quarterman** | *Case filed:* 11/27/2008<br>*Case closed:* 11/10/2014 | | *Cause:* 28:1651 Petition for Writ of Habeas Corpus<br>*NOS:* 535 Death Penalty - Habeas Corpus<br>*Office:* Beaumont<br>*Jurisdiction:* Federal Question<br>*Presider:* Thad Heartfield<br>*Jury demand:* None<br>*Case flags:* CLOSED,HABEAS,STAYEX |
| 1:09-cv-00135-MAC<br><br>**Ortiz v. Director - Texas Department of Criminal Justice, Correctional Institutions Division** | *Case filed:* 01/28/2009<br>*Case closed:* 02/05/2009 | | *Cause:* 28:2254ex Petition for Writ of Habeas Corpus (Capital)<br>*NOS:* 535 Death Penalty - Habeas Corpus<br>*Office:* Beaumont<br>*Jurisdiction:* Federal Question<br>*Presider:* Marcia A. Crone<br>*Jury demand:* None<br>*Case flags:* CLOSED,STAYEX |
| 1:09-cv-00271-RC<br>**Williams v. Thaler** | *Case filed:* 03/30/2009<br>*Case closed:* 03/26/2013 | | *Cause:* 28:2254ex Petition for Writ of Habeas Corpus (Capital)<br>*NOS:* 535 Death Penalty - Habeas Corpus<br>*Office:* Beaumont<br>*Jurisdiction:* Federal Question<br>*Presider:* Ron Clark<br>*Jury demand:* None<br>*Case flags:* CLOSED,HABEAS,STAYEX |
| 1:09-cv-00419-TH<br>**Roberts v. Quarterman** | *Case filed:* 06/04/2009<br>*Case closed:* 11/07/2011 | | *Cause:* 28:2254ex Petition for Writ of Habeas Corpus (Capital)<br>*NOS:* 535 Death Penalty - Habeas Corpus<br>*Office:* Beaumont<br>*Jurisdiction:* Federal Question<br>*Presider:* Thad Heartfield<br>*Jury demand:* None<br>*Case flags:* CLOSED,HABEAS,STAYEX |
| 1:09-cv-01039-RC<br>**Jackson v. United States of America** | *Case filed:* 07/01/2010<br>*Case closed:* 05/16/2013 | | *Cause:* 28:2255 Motion to Vacate/Correct Illegal Sentence<br>*NOS:* 535 Death Penalty - Habeas Corpus<br>*Office:* Beaumont<br>*Jurisdiction:* U.S. Government Defendant<br>*Presider:* Ron Clark |

Exhibit 20 - 48

| | | | |
|---|---|---|---|
| | | | *Jury demand:* None<br>*Case flags:* 2255,CLOSED |
| 1:10-cv-00610-RC<br>**Gardner v. Director - Texas Department of Criminal Justice, Correctional Institutions Division** | *Case filed:* 09/29/2010 | 1951 | *Cause:* 28:2254ex Petition for Writ of Habeas Corpus (Capital)<br>*NOS:* 535 Death Penalty - Habeas Corpus<br>*Office:* Beaumont<br>*Jurisdiction:* U.S. Government Defendant<br>*Presider:* Ron Clark<br>*Jury demand:* None<br>*Case flags:* HABEAS,STAYEX |
| 1:13-cv-00256-JRG-RSP<br>**Howard v. Director TDCJ-CID** | *Case filed:* 04/29/2013 | 1008 | *Cause:* 28:2254ex Petition for Writ of Habeas Corpus (Capital)<br>*NOS:* 535 Death Penalty - Habeas Corpus<br>*Office:* Beaumont<br>*Jurisdiction:* Federal Question<br>*Presider:* Rodney Gilstrap<br>*Referral:* Roy S. Payne<br>*Jury demand:* None<br>*Case flags:* CASREF,HABEAS,STAYEX |
| 1:13-cv-00723-MAC-KFG<br>**Garcia v. USA** | *Case filed:* 12/18/2013<br>*Case closed:* 03/19/2014<br>*Case reopened:* 06/23/2014<br>*Case closed:* 04/15/2015 | | *Cause:* 28:2255 Motion to Vacate/Correct Illegal Sentence<br>*NOS:* 535 Death Penalty - Habeas Corpus<br>*Office:* Beaumont<br>*Jurisdiction:* U.S. Government Defendant<br>*Presider:* Marcia A. Crone<br>*Referral:* Keith F. Giblin<br>*Jury demand:* None<br>*Case flags:* CASREF,CLOSED,STAYED |
| 1:13-cv-00724-MAC-KFG<br>**Snarr v. USA** | *Case filed:* 12/18/2013<br>*Case closed:* 03/19/2014<br>*Case reopened:* 06/23/2014<br>*Case closed:* 04/15/2015 | | *Cause:* 28:2255 Motion to Vacate/Correct Illegal Sentence<br>*NOS:* 535 Death Penalty - Habeas Corpus<br>*Office:* Beaumont<br>*Jurisdiction:* U.S. Government Defendant<br>*Presider:* Marcia A. Crone<br>*Referral:* Keith F. Giblin<br>*Jury demand:* None<br>*Case flags:* CASREF,CLOSED,STAYED |
| 1:14-cv-00539-MAC-KFG<br>**Ebron v. USA** | *Case filed:* 10/27/2014<br>*Case closed:* 04/02/2015 | | *Cause:* 28:2255 Motion to Vacate/Correct Illegal Sentence<br>*NOS:* 535 Death Penalty - Habeas Corpus<br>*Office:* Beaumont<br>*Jurisdiction:* U.S. Government Defendant<br>*Presider:* Marcia A. Crone<br>*Referral:* Keith F. Giblin<br>*Jury demand:* None<br>*Case flags:* 2255,CASREF,CLOSED,STAYED |
| 2:03-cv-00069-JRG-RSP<br>**Canales v. TDC** | *Case filed:* 03/19/2003<br>*Case closed:* 08/24/2012<br>*Case reopened:* 09/26/2014 | 493 | *Cause:* 28:2241 Petition for Writ of Habeas Corpus (federa<br>*NOS:* 535 Death Penalty - Habeas Corpus<br>*Office:* Marshall<br>*Jurisdiction:* Federal Question |

Exhibit 20 - 49

| | | | |
|---|---|---|---|
| | | | *Presider:* Rodney Gilstrap<br>*Referral:* Roy S. Payne<br>*Jury demand:* None<br>*Case flags:*<br>CASREF,FRC,HABEAS,STAYED,TransWard |
| 2:04-cv-00269-JRG-RSP<br>**Speer v TDC** | *Case filed:* 07/21/2004<br>*Case closed:* 12/14/2012<br>*Case reopened:* 04/09/2015 | 298 | *Cause:* 28:2254ex Petition for Writ of Habeas Corpus (Capital)<br>*NOS:* 535 Death Penalty - Habeas Corpus<br>*Office:* Marshall<br>*Jurisdiction:* Federal Question<br>*Presider:* Rodney Gilstrap<br>*Referral:* Roy S. Payne<br>*Jury demand:* None<br>*Case flags:* APPEAL,CASREF,TransWard |
| 2:06-cv-00166-RAS<br>**Cantu v. Dretke** | *Case filed:* 04/17/2006<br>*Case closed:* 03/17/2009<br>*Case reopened:* 06/07/2012 | 1334 | *Cause:* 28:2254ex Petition for Writ of Habeas Corpus (Capital)<br>*NOS:* 535 Death Penalty - Habeas Corpus<br>*Office:* Marshall<br>*Jurisdiction:* Federal Question<br>*Presider:* Richard A. Schell<br>*Jury demand:* None<br>*Case flags:* HABEAS,REOPEN,STAYEX |
| 2:08-cv-00123-DF<br>**Cobb v. State Of Texas** | *Case filed:* 03/24/2008<br>*Case closed:* 02/15/2011 | | *Cause:* 28:2254ex Petition for Writ of Habeas Corpus (Capital)<br>*NOS:* 535 Death Penalty - Habeas Corpus<br>*Office:* Marshall<br>*Jurisdiction:* Federal Question<br>*Presider:* David Folsom<br>*Jury demand:* None<br>*Case flags:* CLOSED,STAYEX |
| 2:09-cv-00327-JRG-RSP<br>**Roberson v. Quarternan** | *Case filed:* 10/22/2009<br>*Case closed:* 09/30/2014 | | *Cause:* 28:2254ex Petition for Writ of Habeas Corpus (Capital)<br>*NOS:* 535 Death Penalty - Habeas Corpus<br>*Office:* Marshall<br>*Jurisdiction:* Federal Question<br>*Presider:* Rodney Gilstrap<br>*Referral:* Roy S. Payne<br>*Jury demand:* None<br>*Case flags:*<br>CASREF,CLOSED,HABEAS,TransWard |
| 4:06-cv-00469-RAS<br>**Acker v. Director of TDCJ-CID** | *Case filed:* 11/20/2006 | 3360 | *Cause:* 28:2254ex Petition for Writ of Habeas Corpus (Capital)<br>*NOS:* 535 Death Penalty - Habeas Corpus<br>*Office:* Sherman<br>*Jurisdiction:* Federal Question<br>*Presider:* Richard A. Schell<br>*Jury demand:* None<br>*Case flags:* HABEAS,STAYEX |
| 4:07-cv-00479-RAS<br>**Bridgers v. Director** | *Case filed:* 10/15/2007 | 3031 | *Cause:* 28:2254ex Petition for Writ of Habeas Corpus (Capital)<br>*NOS:* 535 Death Penalty - Habeas Corpus |

Exhibit 20 - 50

| | | | |
|---|---|---|---|
| | | | Office: Sherman<br>Jurisdiction: Federal Question<br>Presider: Richard A. Schell<br>Jury demand: None<br>Case flags: HABEAS |
| 4:08-cv-00193-RAS<br>**Saldano v. Director,<br>TDCJ-CID** | Case filed: 06/02/2008<br>Case closed: 09/24/2008<br>Case reopened: 12/19/2008 | 2600 | Cause: 28:2254ex Petition for Writ of Habeas Corpus (Capital)<br>NOS: 535 Death Penalty - Habeas Corpus<br>Office: Sherman<br>Jurisdiction: Federal Question<br>Presider: Richard A. Schell<br>Jury demand: None<br>Case flags: HABEAS |
| 4:08-cv-00456<br>**Garcia v.<br>Quarterman** | Case filed: 11/27/2008<br>Case closed: 11/27/2008 | | Cause: 28:1651 Petition for Writ of Habeas Corpus<br>NOS: 535 Death Penalty - Habeas Corpus<br>Office: Sherman<br>Jurisdiction: Federal Question<br>Presider: Unassigned<br>Jury demand: None<br>Case flags: FILING-ERROR,HABEAS |
| 4:09-cv-00225-RAS<br>**Beatty v. Director,<br>TDCJ-CID** | Case filed: 05/13/2009<br>Case closed: 07/16/2013 | | Cause: 28:2254 Ptn for Writ of H/C - Stay of Execution<br>NOS: 535 Death Penalty - Habeas Corpus<br>Office: Sherman<br>Jurisdiction: Federal Question<br>Presider: Richard A. Schell<br>Jury demand: None<br>Case flags: HABEAS |
| 4:09-cv-00644-MHS<br>**Thomas v. Director<br>TDCJ-ID** | Case filed: 12/27/2009 | 2227 | Cause: 28:2254ex Petition for Writ of Habeas Corpus (Capital)<br>NOS: 535 Death Penalty - Habeas Corpus<br>Office: Sherman<br>Jurisdiction: Federal Question<br>Presider: Michael H. Schneider<br>Jury demand: None<br>Case flags: HABEAS,SA2,STAYED |
| 4:13-cv-00067-LED<br>**Chanthakoummane<br>v. Director TDCJ-<br>CID** | Case filed: 02/05/2013<br>Case closed: 03/20/2015 | | Cause: 28:2254ex Petition for Writ of Habeas Corpus (Capital)<br>NOS: 535 Death Penalty - Habeas Corpus<br>Office: Sherman<br>Jurisdiction: Federal Question<br>Presider: Leonard Davis<br>Jury demand: None<br>Case flags: APPEAL,HABEAS,STAYEX |
| 4:13-cv-00083-ALM<br>**Cortez v. Director<br>TDCJ ID** | Case filed: 02/14/2013 | 1082 | Cause: 28:2254ex Petition for Writ of Habeas Corpus (Capital)<br>NOS: 535 Death Penalty - Habeas Corpus<br>Office: Sherman<br>Jurisdiction: Federal Question<br>Presider: Amos L. Mazzant, III |

Exhibit 20 - 51

| | | | |
|---|---|---|---|
| | | | *Jury demand:* None<br>*Case flags:* HABEAS,STAYEX |
| 4:13-cv-00545-RAS<br>**Milam v. Director,<br>TDCJ-CID** | *Case filed:* 09/19/2013 | 865 | *Cause:* 28:2254ex Petition for Writ of Habeas Corpus (Capital)<br>*NOS:* 535 Death Penalty - Habeas Corpus<br>*Office:* Sherman<br>*Jurisdiction:* Federal Question<br>*Presider:* Richard A. Schell<br>*Jury demand:* None<br>*Case flags:* HABEAS,STAYEX |
| 4:13-cv-00547<br>**Milam v.<br>Livingston** | *Case filed:* 09/19/2013<br>*Case closed:* 09/20/2013 | | *Cause:* 28:2254ex Petition for Writ of Habeas Corpus (Capital)<br>*NOS:* 535 Death Penalty - Habeas Corpus<br>*Office:* Sherman<br>*Jurisdiction:* Federal Question<br>*Presider:* Unassigned<br>*Jury demand:* None<br>*Case flags:* FILING-ERROR |
| 5:96-cv-00353-DF-<br>CMC<br>**Banks v.<br>Quarterman** | *Case filed:* 03/07/1996<br>*Case closed:* 08/18/2000<br>*Case reopened:* 09/22/2004<br>*Case closed:* 04/02/2008<br>*Case reopened:* 10/19/2009<br>*Case closed:* 05/06/2010 | | *Cause:* 28:2254 Petition for Writ of Habeas Corpus (State)<br>*NOS:* 535 Death Penalty - Habeas Corpus<br>*Office:* Texarkana<br>*Jurisdiction:* Federal Question<br>*Presider:* David Folsom<br>*Referral:* Caroline Craven<br>*Jury demand:* None<br>*Case flags:*<br>BENCH,CLOSED,REOPEN,STAYEX |
| 5:05-cv-00029-DF<br>**Chester v. Director,<br>TDCJ-ID** | *Case filed:* 02/11/2005<br>*Case closed:* 04/29/2008 | | *Cause:* 28:2254ex Petition for Writ of Habeas Corpus (Capital)<br>*NOS:* 535 Death Penalty - Habeas Corpus<br>*Office:* Texarkana<br>*Jurisdiction:* Federal Question<br>*Presider:* David Folsom<br>*Jury demand:* None<br>*Case flags:* BENCH,HABEAS,STAYEX |
| 5:05-cv-00070-MHS<br>**Lewis v. Director,<br>TDCJ-CID** | *Case filed:* 04/20/2005<br>*Case closed:* 06/22/2007<br>*Case reopened:* 09/10/2008<br>*Case closed:* 07/20/2011 | | *Cause:* 28:2254ex Petition for Writ of Habeas Corpus (Capital)<br>*NOS:* 535 Death Penalty - Habeas Corpus<br>*Office:* Texarkana<br>*Jurisdiction:* Federal Question<br>*Presider:* Michael H. Schneider<br>*Jury demand:* None<br>*Case flags:*<br>BENCH,CLOSED,HABEAS,REOPEN,STAYEX |
| 5:05-cv-00177-DF<br>**Sigala v. Director,<br>TDCJ-ID** | *Case filed:* 09/13/2005<br>*Case closed:* 03/28/2008 | | *Cause:* 28:2254ex Petition for Writ of Habeas Corpus (Capital)<br>*NOS:* 535 Death Penalty - Habeas Corpus<br>*Office:* Texarkana<br>*Jurisdiction:* Federal Question<br>*Presider:* David Folsom |

Exhibit 20 - 52

| | | | |
|---|---|---|---|
| | | | Jury demand: None<br>Case flags: APPEAL |
| 5:07-cv-00180-MHS<br><br>**Adams v.<br>Livingston** | Case filed: 01/28/2009<br>Case closed: 07/26/2010 | | Cause: 28:2254ex Petition for Writ of Habeas Corpus (Capital)<br>NOS: 535 Death Penalty - Habeas Corpus<br>Office: Texarkana<br>Jurisdiction: Federal Question<br>Presider: Michael H. Schneider<br>Jury demand: None<br>Case flags: CLOSED,HABEAS,STAYED |
| 5:09-cv-00086-MHS<br><br>**Mendoza v.<br>Quarterman et al** | Case filed: 06/17/2009<br>Case closed: 09/28/2012<br>Case reopened: 03/31/2015 | 307 | Cause: 28:2254ex Petition for Writ of Habeas Corpus (Capital)<br>NOS: 535 Death Penalty - Habeas Corpus<br>Office: Texarkana<br>Jurisdiction: Federal Question<br>Presider: Michael H. Schneider<br>Jury demand: None<br>Case flags:<br>APPEAL,CASREF,HABEAS,REOPEN,SA3 |
| 5:12-cv-00036-MHS<br><br>**Adams v. Thaler,<br>Director TDCJ-<br>CID** | Case filed: 04/13/2012<br>Case closed: 04/24/2012 | | Cause: 28:2254ex Petition for Writ of Habeas Corpus (Capital)<br>NOS: 535 Death Penalty - Habeas Corpus<br>Office: Texarkana<br>Jurisdiction: Federal Question<br>Presider: Michael H. Schneider<br>Jury demand: None<br>Case flags: APPEAL,CLOSED,HABEAS |
| 5:14-cv-00146-LED<br>**Murphy v.<br>Stephens Director<br>TDCJ-CID** | Case filed: 11/20/2014<br>Case closed: 11/21/2014 | | Cause: 28:2254ex Petition for Writ of Habeas Corpus (Capital)<br>NOS: 535 Death Penalty - Habeas Corpus<br>Office: Texarkana<br>Jurisdiction: Federal Question<br>Presider: Leonard Davis<br>Jury demand: None<br>Case flags: CLOSED,HABEAS |
| 6:99-cv-00068-TJW<br>**Pondexter v.<br>Director, TDCJ-ID** | Case filed: 02/11/1999<br>Case closed: 09/26/2002<br>Case reopened: 07/05/2006<br>Case closed: 09/27/2006 | | Cause: 28:2254ex Petition for Writ of Habeas Corpus (Capital)<br>NOS: 535 Death Penalty - Habeas Corpus<br>Office: Tyler<br>Jurisdiction: Federal Question<br>Presider: T. John Ward<br>Jury demand: None<br>Case flags: CLOSED,STAYEX |
| 6:00-cv-00086-LED<br>**Mosley v. Director,<br>TDCJ-ID** | Case filed: 02/14/2000<br>Case closed: 03/31/2003<br>Case reopened: 05/28/2009<br>Case closed: 11/15/2010 | | Cause: 28:2254ex Petition for Writ of Habeas Corpus (Capital)<br>NOS: 535 Death Penalty - Habeas Corpus<br>Office: Tyler<br>Jurisdiction: Federal Question<br>Presider: Leonard Davis<br>Jury demand: None<br>Case flags: CLOSED,FRC,REOPEN,STAYEX |

Exhibit 20 - 53

| | | | |
|---|---|---|---|
| 6:03-cv-00224-LED<br>**Moore v. Director, TDCJ-ID** | *Case filed:* 05/12/2003<br>*Case closed:* 07/28/2003<br>*Case reopened:* 06/08/2004<br>*Case closed:* 07/13/2005<br>*Case reopened:* 09/23/2009<br>*Case closed:* 09/28/2009 | | *Cause:* 28:2254ex Petition for Writ of Habeas Corpus (Capital)<br>*NOS:* 535 Death Penalty - Habeas Corpus<br>*Office:* Tyler<br>*Jurisdiction:* Federal Question<br>*Presider:* Leonard Davis<br>*Jury demand:* None<br>*Case flags:* CLOSED,STAYEX |
| 6:06-cv-00140-LED<br>**Wilson v. Dretke** | *Case filed:* 03/28/2006<br>*Case closed:* 03/31/2009 | | *Cause:* 28:2254 Ptn for Writ of H/C - Stay of Execution<br>*NOS:* 535 Death Penalty - Habeas Corpus<br>*Office:* Tyler<br>*Jurisdiction:* Federal Question<br>*Presider:* Leonard Davis<br>*Jury demand:* None<br>*Case flags:* CLOSED,HABEAS |
| 6:06-cv-00344-LED<br>**Woods v. Quarterman** | *Case filed:* 08/03/2006<br>*Case closed:* 08/26/2009 | | *Cause:* 28:2254ex Petition for Writ of Habeas Corpus (Capital)<br>*NOS:* 535 Death Penalty - Habeas Corpus<br>*Office:* Tyler<br>*Jurisdiction:* Federal Question<br>*Presider:* Leonard Davis<br>*Jury demand:* None<br>*Case flags:* CLOSED,HABEAS,STAYEX |
| 6:06-cv-00425-MHS<br>**Swain v. Director, TDCJ-CID** | *Case filed:* 10/02/2006<br>*Case closed:* 03/31/2010 | | *Cause:* 28:2254 Ptn for Writ of H/C - Stay of Execution<br>*NOS:* 535 Death Penalty - Habeas Corpus<br>*Office:* Tyler<br>*Jurisdiction:* Federal Question<br>*Presider:* Michael H. Schneider<br>*Jury demand:* None<br>*Case flags:* HABEAS,STAYEX |
| 6:08-cv-00180-LED<br>**Shuffield v. Director, TDCJ-CID** | *Case filed:* 05/08/2008<br>*Case closed:* 03/26/2014 | | *Cause:* 28:2254ex Petition for Writ of Habeas Corpus (Capital)<br>*NOS:* 535 Death Penalty - Habeas Corpus<br>*Office:* Tyler<br>*Jurisdiction:* Federal Question<br>*Presider:* Leonard Davis<br>*Jury demand:* None<br>*Case flags:* CLOSED,HABEAS,STAYED |
| 6:10-cv-00449-LED<br>**Russeau v. Director, TDCJ-CID** | *Case filed:* 08/31/2010<br>*Case closed:* 12/26/2012 | | *Cause:* 28:2254 Ptn for Writ of H/C - Stay of Execution<br>*NOS:* 535 Death Penalty - Habeas Corpus<br>*Office:* Tyler<br>*Jurisdiction:* Federal Question<br>*Presider:* Leonard Davis<br>*Jury demand:* None<br>*Case flags:* CLOSED,HABEAS,STAYEX |
| 6:11-cv-00135-MAC-ZJH<br>**Mays v. Director,** | *Case filed:* 03/21/2011<br>*Case closed:* 12/18/2013 | | *Cause:* 28:2254ex Petition for Writ of Habeas Corpus (Capital)<br>*NOS:* 535 Death Penalty - Habeas Corpus |

Exhibit 20 - 54

| | | | |
|---|---|---|---|
| **TDCJ** | | | *Office:* Tyler<br>*Jurisdiction:* Federal Question<br>*Presider:* Marcia A. Crone<br>*Referral:* Zack Hawthorn<br>*Jury demand:* None<br>*Case flags:*<br>CASREF,CLOSED,HABEAS,STAYEX |
| 6:12-cv-00065-MHS<br>**Druery v. Director, TDC-CID** | *Case filed:* 02/09/2012<br>*Case closed:* 03/26/2012 | | *Cause:* 28:2254ex Petition for Writ of Habeas Corpus (Capital)<br>*NOS:* 535 Death Penalty - Habeas Corpus<br>*Office:* Tyler<br>*Jurisdiction:* Federal Question<br>*Presider:* Michael H. Schneider<br>*Jury demand:* None<br>*Case flags:* CLOSED,HABEAS |
| 6:12-cv-00456-MHS<br>**Druery v. Director, TDCJ-CID** | *Case filed:* 07/13/2012<br>*Case closed:* 07/19/2012 | | *Cause:* 28:2254 Ptn for Writ of H/C - Stay of Execution<br>*NOS:* 535 Death Penalty - Habeas Corpus<br>*Office:* Tyler<br>*Jurisdiction:* Federal Question<br>*Presider:* Michael H. Schneider<br>*Jury demand:* None<br>*Case flags:* CLOSED,HABEAS,STAYEX |
| 6:15-cv-00535-MAC-ZJH<br>**Miller v. Director, TDCJ-CID** | *Case filed:* 06/04/2015 | 242 | *Cause:* 28:2254ex Petition for Writ of Habeas Corpus (Capital)<br>*NOS:* 535 Death Penalty - Habeas Corpus<br>*Office:* Tyler<br>*Jurisdiction:* Federal Question<br>*Presider:* Marcia A. Crone<br>*Referral:* Zack Hawthorn<br>*Jury demand:* None<br>*Case flags:* STAYEX |
| 9:15-cv-00012<br>**Fuller** | *Case filed:* 01/26/2015<br>*Case closed:* 01/26/2015 | | *Cause:* 28:1651 Petition for Writ of Habeas Corpus<br>*NOS:* 535 Death Penalty - Habeas Corpus<br>*Office:* Lufkin<br>*Jurisdiction:* Federal Question<br>*Presider:* Unassigned<br>*Jury demand:* None<br>*Case flags:* FILING-ERROR |
| 9:15-cv-00013<br>**Fuller** | *Case filed:* 01/26/2015<br>*Case closed:* 01/28/2015 | | *Cause:* 28:2254ex Petition for Writ of Habeas Corpus (Capital)<br>*NOS:* 535 Death Penalty - Habeas Corpus<br>*Office:* Lufkin<br>*Jurisdiction:* Federal Question<br>*Presider:* Unassigned<br>*Jury demand:* None<br>*Case flags:* FILING-ERROR |
| 9:15-cv-00015-RC<br>**Fuller v. Director TDCJ** | *Case filed:* 01/28/2015 | 369 | *Cause:* 28:2254ex Petition for Writ of Habeas Corpus (Capital)<br>*NOS:* 535 Death Penalty - Habeas Corpus |

Exhibit 20 - 55

| | | | *Office:* Lufkin<br>*Jurisdiction:* Federal Question<br>*Presider:* Ron Clark<br>*Jury demand:* None<br>*Case flags:* HABEAS |
|---|---|---|---|

**Total number of cases reported: 55**

### Selection Criteria for Report

| Office | All |
|---|---|
| Case Type | cv |
| Nature of Suit | 535: Death Penalty - Habeas Corpus |
| Presiding Judge | All |
| Referral Judge | All |
| Cause | All |
| Jurisdiction | All |
| JPML | All |
| Filed Date | 1/1/2005 - 2/1/2016 |
| Entered Date | All |
| Closed Date | All |
| Case Flags | All |
| Terminal Digits | All |
| Open Cases | Yes |
| Closed Cases | Yes |
| Reportable Cases | Yes |
| Non-reportable Cases | Yes |
| Sort by | case number |

Exhibit 20 - 56

# ATTACHMENT E

Exhibit 20 - 57

| **UNITED STATES DISTRICT COURT** | **EASTERN DISTRICT OF TEXAS** |
| --- | --- |

| | | |
| --- | --- | --- |
| UNITED STATES OF AMERICA | § | |
| | § | |
| *versus* | § | CRIMINAL ACTION NO. 1:10-CR-85 |
| | § | |
| STEVEN COOKE and DAVID JASON | § | |
| MICHELS | § | |

## SCHEDULING ORDER

The court enters this case specific scheduling order which controls disposition of this action pending further court order. Although the provisions set forth herein are mandatory and binding upon all parties, nothing in this order limits the court's discretion to enhance, supplement, amend, or eliminate any provision in the interest of justice. The parties are advised that the court intends to adhere strictly to the following scheduling deadlines:

| | |
| --- | --- |
| June 22, 2011 | *Brady* disclosure deadline. Deadline for the Government to make disclosures required by *Brady v. Maryland*, 373 U.S. 83 (1963) (evidence which might tend to exculpate a defendant, mitigate punishment, or impeach testimony which may be determinative of a defendant's guilt or innocence). Any exculpatory evidence coming into the possession of the Government after this deadline shall be immediately provided to Defendants. |
| July 27, 2011 | The Government's discovery deadline. Deadline for the Government to comply with all discovery and inspection obligations required by Rule 16(a) of the Federal Rules of Criminal Procedure. |
| August 25, 2011, at 10:00 a.m. | Status Conference. The court will hear testimony from the jury administrator regarding the creation of the master jury wheel and allow counsel to question her so as to make any record regarding the Eastern District Jury Plan they deem appropriate. |

Exhibit 20 - 58

| | |
|---|---|
| September 22, 2011 | Mental health evidence.   Defendants shall give written notice to the Government if they intend to introduce expert evidence or testimony regarding their mental health at any phase of the trial. *See* FED. R. CRIM. P. 12.2.  The notice should be sufficiently explicit to allow the Government to find potential mental health expert witnesses in the same field. |
| September 22, 2011 | Motion to sever Defendants.  Deadline to file electronically a motion to sever Defendants.  The motion and briefing in support thereof should be filed as one document. |
| September 29, 2011 | Response to motion to sever Defendants.  Deadline to file electronically a response to the motion to sever.  The response and briefing in support thereof should be filed as one document. |
| October 5, 2011 | Defendants' discovery deadline. Deadline for Defendants to comply with all discovery and inspection obligations required by Rule 16(b) of the Federal Rules of Criminal Procedure. |
| October 11, 2011 | Guilt/Innocence pre-trial motions.   Deadline to file electronically all guilt/innocence pre-trial motions. Motions and briefing in support thereof should be filed as one document. |
| November 1, 2011 | Responses to guilt/innocence pre-trial motions.  Deadline to file electronically responses to all guilt/innocence pre-trial motions.  Responses and briefing in support thereof should be filed as one document. |
| December 6, 2011, at 10:00 a.m. | Status conference. |
| December 6, 2011 | Juror qualification questionnaire review deadline.  Deadline for counsel to review the juror qualification questionnaires of those persons presumptively inappropriate for inclusion in the master jury wheel because they are disqualified, exempt, or have an excuse.   Counsel should make arrangements with the jury administrator to review the questionnaires prior to this date. |

Exhibit 20 - 59

| | |
|---|---|
| December 13, 2011 | <u>Objections to expert witnesses</u>. Deadline to file any objections or challenges to expert witness testimony pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993). |
| December 21, 2011 | <u>Deadline to file motions in limine and pre-trial motions regarding punishment</u>. |
| December 21, 2011 | <u>Writ deadline</u>. Deadline to file requests for the issuance of any writs of habeas corpus ad testificandum. Requests should be filed under seal. |
| January 5, 2012 | <u>Proposed jury questionnaire</u>. Deadline to file electronically the joint proposed juror questionnaire. The parties shall endeavor to reach an agreement on the form and substance of the questions included. Those portions of the questionnaire that remain in dispute should be identified in boldface type. |
| January 11, 2012 | <u>Deadline for responses to motions in limine and pre-trial motions regarding punishment</u>. |
| January 18, 2012, at 10:00 a.m. | <u>Status conference</u>. |
| January 20, 2012 | <u>Jury information card review</u>. Counsel will jointly convene in the jury impaneling room to review the jury information cards and consider additional disqualifications, hardships, excuses, and requests for deferment. |
| January 20, 2012 | <u>Plea agreement</u>. Deadline to notify the court of any plea agreement. No plea agreement entered into after the deadline shall be recognized by the court absent good cause shown. |
| January 26, 2012 | <u>Mental health examination</u>. Deadline for examination of Defendants by the mental health professional selected by the Government if appropriate. |
| February 2, 2012 | <u>Potential witness lists due</u>. Deadline for the parties to submit to the court potential witness lists identifying the residence (city and state) of each potential witness for the purpose of listing such persons in the jury questionnaire. |

3

Exhibit 20 - 60

| | |
|---|---|
| February 7, 2012 | <u>Jury instructions</u>. Deadline to file proposed agreed jury instructions and proposed opposed instructions with appropriate citations to authority for each. Those instructions that remain in dispute should be identified in boldface type. Any party seeking to file proposed jury instructions after the deadline may do so only with leave of court. |
| February 7, 2012 | <u>Amended witness list due</u>. Deadline to submit to the court any additions, deletions, or corrections to proposed witness lists for the purpose of listing each potential witness in the jury questionnaire. |
| February 7, 2012 | <u>Pre-trial disclosure</u>. The Government shall disclose all *Giglio* and Jencks Acts materials in the Government's possession. Subsequent modifications or additions to such matters shall be provided to Defendants on a continuing basis, but no later than the day prior to the date the Government plans to call the witness to testify. |
| February 10, 2012 | <u>Objections to proposed jury instructions</u>. Deadline to file any written objections to proposed jury instructions. Objections must be written, specific, cite authority, and include any alternate instructions counsel deems appropriate. |
| February 15, 2012 | <u>Exhibit lists due</u>. Deadline to submit to the court exhibit lists and two copies of all exhibits expected to be introduced during trial. All exhibits to be used at trial should be pre-marked numerically and in succession. Groups of exhibits pertaining to the same subject matter may, at counsel's discretion, be numbered and lettered (i.e., 2a, 2b, 2c). |
| February 15, 2012 | <u>The Government shall provide to Defendants a copy of the Indictment and a list of veniremen and witnesses</u>. Pursuant to 18 U.S.C. § 3432, the Government shall provide Defendants with a list of veniremen and the witnesses to be produced at trial, identifying the place of residence (city and state) of each venireman and witness. |
| February 15, 2012, at 10:00 a.m. | <u>Pre-trial conference</u>. The court shall convene a pre-trial conference with counsel to resolve outstanding jury selection issues, pending motions (if any), motions in limine, and trial scheduling matters. |

Exhibit 20 - 61

February 28, 2012, at 10:00 a.m.     General voir dire commences.

March 5, 2012, at 10:00 a.m.     Individual voir dire commences.

March 26, 2012, at 9:00 a.m.     Trial.

SIGNED at Beaumont, Texas, this 24th day of September, 2010.


MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE


5

Exhibit 20 - 62

# ATTACHMENT F

Exhibit 20 - 63

GENERAL ORDER NO. 91-4

F I L E D
U. S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

APR 2 1991

MURRAY L. HARRIS, CLERK
BY
DEPUTY    Joy VanCuren

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

CRIMINAL JUSTICE ACT PLAN

I.   **AUTHORITY**

Pursuant to the Criminal Justice Act of 1964, as amended, (CJA), section 3006A of title 18, United States Code, and the Guidelines for the Administration of the Criminal Justice Act, Volume VII, Guide to Judiciary Policies and Procedures (CJA Guidelines), the judges of the United States District Court for the Eastern District of Texas adopt this Plan for furnishing representation in federal court for any person financially unable to obtain adequate representation in accordance with the CJA.

II.  **STATEMENT OF POLICY**

A.   **Objectives.**

1.   The objective of this Plan is to attain the ideal of equality before the law for all persons. Therefore, this Plan shall be administered so that those accused of crime, or otherwise eligible for services pursuant to the CJA, will not be deprived, because they are financially unable to pay for adequate representation, of any element of representation necessary to an adequate defense.

2.   The further objective of this Plan is to particularize the requirements of the CJA, the Anti-Drug Abuse Act of 1988 (codified in part at section

1

Exhibit 20 - 64

848(q) of title 21, United States Code), and the CJA Guidelines in a way that meets the needs of this district.

B.  Compliance.

1.  The court, its clerk, the Federal Public Defender Organization, the Death Penalty Resource Center, and private attorneys appointed under the CJA shall comply with the CJA Guidelines approved by the Judicial Conference of the United States and/or its Committee on Defender Services and with this Plan.

2.  Each private attorney shall be provided by the clerk of court with a then-current copy of this Plan upon the attorney's first appointment under the CJA or designation as a member of the Panel of Private Attorneys under the Criminal Justice Act (CJA Panel). The clerk shall maintain a current copy of the CJA Guidelines for the use of members of the CJA Panel and shall make known to such attorneys its availability.

III.  DEFINITIONS

A.  "Representation" includes counsel and investigative, expert, and other services.

B.  "Appointed attorney" includes private attorneys, the federal public defender and staff attorneys of the

2

Exhibit 20 - 65

Federal Public Defender Organization, and the Death Penalty Resource Center and staff attorneys of that organization.

IV.  <u>PROVISION OF REPRESENTATION</u>

    A.  <u>Circumstance</u>.

        1.  <u>Mandatory</u>.  Representation <u>shall</u> be provided for any financially eligible person who:

           a.  is charged with a felony or with a Class A misdemeanor;

           b.  is a juvenile alleged to have committed an act of juvenile delinquency as defined in section 5031 of title 18, United States Code;

           c.  is charged with a violation of probation, or faces a change of a term or condition of probation (unless the modification sought is favorable to the probationer and the government has not objected to the proposed change);

           d.  is under arrest, when such representation is required by law;

           e.  is entitled to appointment of counsel in parole proceedings;

           f.  is charged with a violation of supervised release or faces modification, reduction, or enlargement of a condition, or extension or revocation of a term of supervised release;

3

Exhibit 20 - 66

g.  is subject to a mental condition hearing under chapter 313 of title 18, United States Code;

h.  is in custody as a material witness;

i.  is seeking to set aside or vacate a death sentence under sections 2254 or 2255 or title 28, United States Code;

j.  is entitled to appointment of counsel in verification of consent proceedings pursuant to a transfer of an offender to or from the United States for the execution of a penal sentence under section 4109 of title 18, United States Code;

k.  is entitled to appointment of counsel under the Sixth Amendment to the Constitution; or

l.  faces loss of liberty in a case and federal law requires the appointment of counsel.

2.  <u>Discretionary</u>.  Whenever a judge or United States magistrate determines that the interests of justice so require, representation <u>may</u> be provided for any financially eligible person who:

a. is charged with a petty offense (Class B or C misdemeanor, or an infraction) for which a sentence to confinement is authorized;

b. is seeking relief, other than to set aside or vacate a death sentence under sections 2241, 2254, or 2255 of title 28, United States Code;

4

Exhibit 20 - 67

    c. is charged with civil or criminal contempt who faces loss of liberty;

    d. has been called as a witness before a grand jury, a court, the Congress, or a federal agency or commission which has the power to compel testimony, and there is reason to believe, either prior to or during testimony, that the witness could be subject to a criminal prosecution, a civil or criminal proceeding, or face loss of liberty;

    e. is proposed by the United States attorney for processing under a pretrial diversion program;

    f. is held for international extradition under chapter 209 of title 18, United States Code.

Representation may also be furnished for financially eligible persons in ancillary matters appropriate to the proceedings pursuant to subsection (c) of the CJA.

B. <u>When Counsel Shall Be Provided</u>.

Counsel shall be provided to eligible persons as soon as feasible after they are taken into custody, when they appear before a magistrate or judge, when they are formally charged or notified of charges if formal charges are sealed, or when a magistrate or judge otherwise considers appointment of counsel appropriate under the CJA, whichever occurs earliest.

5

Exhibit 20 - 68

C.  Number and Qualifications of Counsel.

    1.  Number.  More than one attorney may be appointed in any case determined by the court to be extremely difficult.  In a capital case, at least two attorneys should be appointed.

    2.  Qualifications.  Except as provided by section 848(q)(7) of title 21, United States Code, at least one attorney appointed in a capital case shall meet the qualification requirements set forth in sections 848(q)(5) and (6) of title 21, United States Code. Pursuant to section 848(q)(7), the presiding judicial officer, for good cause, may appoint an attorney who may not qualify under sections 848(q)(5) and (6), but who has the background, knowledge, and experience necessary to represent the defendant properly in a capital case, giving due consideration to the seriousness of the possible penalty and to the unique and complex nature of the litigation.

D.  Eligibility for Representation.

    1.  Factfinding.  The determination of eligibility for representation under the CJA is a judicial function to be performed by a federal judge or magistrate after making appropriate inquiries concerning the person's financial condition.

Exhibit 20 - 69

2. <u>Disclosure of Change in Eligibility</u>. If, at any time after appointment, counsel obtains information that a client is financially able to make payment, in whole or in part, for legal or other services in connection with his or her representation, and the source of the attorney's information is not protected as a privileged communication, counsel shall advise the court.

V. <u>FEDERAL PUBLIC DEFENDER ORGANIZATION</u>

    a. <u>Establishment</u>.

        1. Pursuant to subsections (g)(1) and (g)(2)(A) of the CJA, the Federal Public Defender Organization for the Eastern District of Texas is hereby established. Upon organization of the federal public defender's office, the federal public defender shall notify this court that he or she is available to accept appointments for representation.

        2. The Federal Public Defender Organization shall be capable of providing legal services throughout the district and shall maintain offices in Tyler and Beaumont, Texas.

    B. <u>Supervision of Defender Organization</u>. The federal public defender shall be responsible for the supervision and management of the Federal Public Defender Organization. Accordingly, the federal public defender shall be appointed in all cases assigned to that

7

Exhibit 20 - 70

organization for subsequent assignment to staff attorneys at the discretion of the federal public defender.

C.   Management of CJA Plan.  The United States District Clerk shall be responsible for the systematic distribution of cases to and for the management of the CJA Panel subject to the provisions of the Plan for the Composition, Administrators, and Management of the Panel of Private Attorneys under the Criminal Justice Act, found at Appendix I of this CJA Plan, until such time as the Chief Judge, in his discretion, shall determine that the federal public defender shall assume such responsibility.

VI.   PRIVATE ATTORNEYS

A.   Establishment of CJA Panel.  The existing, previously established panel of attorneys (CJA panel) who are eligible and willing to be appointed to provide representation under the CJA is hereby recognized.

B.   Organization.  The Plan for the Composition, Administration, and Management of the Panel of Private Attorneys under the Criminal Justice Act is found at Appendix I of this CJA Plan.

Exhibit 20 - 71

C.   <u>Ratio of Appointments</u>.  Where practical and cost effective, private attorneys from the CJA Panel shall be appointed in a substantial proportion of the cases in which the accused is determined to be financially eligible for representation under the CJA. "Substantial" shall usually be defined as approximately 25% of the appointments under the CJA annually throughout the district.

D.   <u>Choice of Counsel by Defendant</u>.  Where counsel is appointed by the court from the CJA Panel, the Court is under no obligation to appoint a particular attorney solely because the defendant desires that attorney.

## VII.   REPRESENTATION IN STATE DEATH PENALTY HABEAS CORPUS PROCEEDINGS UNDER 28 U.S.C. § 2254.

A.   <u>Appointment of Counsel</u>.  The court shall appoint the federal public defender with his or her consent, or other attorney who qualifies for appointment pursuant to section 848(q) of title 21, United States Code to represent financially eligible persons seeking habeas corpus relief in state death penalty proceedings under section 2254 of title 28, United States Code.  The Death Penalty Resource Center may be appointed to assist such other counsel in providing representation; where no other counsel is available, the Death Penalty Resource Center may be appointed as counsel for the petitioner.

9

Exhibit 20 - 72

B.  <u>Death Penalty Resource Center</u>

    1.  <u>Establishment</u>.  The Texas Appellate Practice and Educational Resource Center in Austin, Texas, previously designated as a community defender organization pursuant to the provisions of the CJA, is hereby recognized as the Death Penalty Resource Center for the district.

VIII.  DUTIES OF APPOINTED COUNSEL

A.  <u>Standards</u>.  The services to be rendered a person represented by appointed counsel shall be commensurate with those rendered if counsel were privately employed by the person.

B.  <u>Professional Conduct</u>.  Attorneys appointed pursuant to the CJA shall conform to the highest standards of professional conduct, including but not limited to the provisions of the American Bar Association's <u>Model Rules of Professional Conduct</u> and <u>Model Code of Professional Conduct</u>.

C.  <u>No Receipt of Other Payment</u>.  Appointed counsel may not require, request, or accept any payment or promise of payment or any other valuable consideration for representation under the appointment, unless such payment is approved by order of the court.

D.  <u>Continuing Representation</u>.  Once counsel is appointed under the CJA, counsel shall continue the representation until the matter, including appeals or review by

10

Exhibit 20 - 73

certiorari, is closed; until substitute counsel has filed a notice of appearance; until an order has been entered allowing or requiring the person represented to proceed pro se; or until the appointment is terminated by court order.

IX.    DUTIES OF LAW ENFORCEMENT AND RELATED AGENCIES

A.    Presentation of Accused for Appointment of Counsel.

Federal law enforcement and prosecutorial agencies, probation officers, and pretrial services officers in this district, and those acting on their behalf, shall promptly ask any person who is in custody, or who otherwise may be entitled to counsel under the CJA, whether he or she is financially able to secure representation, and shall, in such cases in which the person indicates that he or she is not able, arrange to have the person promptly presented before a magistrate or judge of this court for determination of financial eligibility and appointment of counsel.

B.    Pretrial Services Interview.

A person in custody shall have the right to appointed counsel at the pretrial services interview.  The probation officer conducting the interview shall notify the person in custody of his right to have an attorney appointed if he is financially unable to afford counsel. If the person in custody states that he desires representation at that time but is unable to afford

11

Exhibit 20 - 74

counsel, the pretrial services interview being conducted shall terminate at that time.  The person in custody shall then be taken before the appropriate judicial officer, who may make a determination as to the financial status of the person in custody and may appoint the Federal Public Defender or counsel from the panel of private attorneys if appointment of counsel is warranted.

C. Notice of Indictment or Criminal Information.  Upon the return or unsealing of an indictment, the filing of a criminal information, or the filing of a petition to modify or revoke probation, the United States attorney or the probation officer, as appropriate, immediately shall mail or otherwise deliver a copy of the document to appointed counsel, or to the defendant if he is without counsel, at the address shown on defendant's bond papers or to the jail in which the defendant is incarcerated.

X. MISCELLANEOUS

A. Forms.  Standard forms, pertaining to the CJA and approved by the Judicial Conference of the United States or its Committee on Defender Services and prescribed and distributed by the Director of the Administrative Office of the United States Courts, shall be used, where applicable, in all proceedings under this Plan.

B. Claims.  Claims for compensation of private attorneys

Exhibit 20 - 75

providing representation under the CJA shall be submitted on the appropriate CJA form, to the office of the clerk of the court. That office shall review the claim form for mathematical and technical accuracy and for conformity with the CJA Guidelines, and, if correct, shall forward the claim form for the consideration of the appropriate judge or magistrate. The court will exert its best effort to avoid delays in reviewing payment vouchers and in submitting them for further processing.

C. <u>Supersession</u>. This Plan supersedes all prior Criminal Justice Act Plans of this court.

XI. <u>EFFECTIVE DATE</u>.

This Plan shall become effective when approved by the Judicial Council of the Fifth Circuit.

APPENDICES:

I. Plan for the Composition, Administration, and Management of the Panel of Private Attorneys under the Criminal Justice Act.

SIGNED this _____ day of _____, 1990, for the Court.

_____
CHIEF JUDGE, U. S. DISTRICT COURT

APPROVED BY THE JUDICIAL COUNCIL OF THE ___FIFTH___ CIRCUIT on February 21, 1991

_____
LYDIA G. COMBERREL, Secretary to the Council

13

Exhibit 20 - 76

APPENDIX I to the Model Criminal Justice Act Plan

## COMPOSITION, ADMINISTRATION AND MANAGEMENT OF THE PANEL OF PRIVATE ATTORNEYS UNDER THE CRIMINAL JUSTICE ACT

### I. COMPOSITION OF PANEL OF PRIVATE ATTORNEYS

A.    CJA PANEL

1.    Approval.  The Court shall establish a panel of private attorneys (hereinafter referred to as the "CJA Panel") who are eligible and willing to be appointed to provide representation under the Criminal Justice Act.  The Court shall approve attorneys for membership on the panel after receiving recommendations from the "Panel Selection Committee," established pursuant to paragraph B. of this Plan.  Members of the CJA Panel shall serve at the pleasure of the Court.

2.    Size.  The Court shall fix, periodically, the size of the CJA Panel.  The panel shall be large enough to provide a sufficient number of experienced attorneys to handle the CJA caseload, yet small enough so that panel members will receive an adequate number of appointments to maintain their proficiency in federal criminal defense work, and thereby provide a high quality of representation.

3.    Eligibility.  Attorneys who serve on the CJA Panel must be members in good standing of the federal bar of this district, and have demonstrated experience in, and knowledge of, the Federal Rules of Criminal Procedure, the Federal Rules of Evidence, and the Sentencing Guidelines.

Subsection (b) of the Act provides, in part, that:

> Counsel furnishing representation under the plan shall be selected from a panel of attorneys designated or approved by the court, or from a bar association, legal aid agency, or defender organization furnishing representation pursuant to the plan.

However, when the district judge presiding over the case, or the chief judge if a district judge has not yet been assigned to the case, determines that the appointment of an attorney, who is not a member of the CJA panel, is in the interest of justice, judicial economy or continuity of representation, or there is some other compelling circumstance warranting his or her appointment, the attorney may be admitted to the CJA panel *pro hac vice* and appointed to represent the CJA defendant. Consideration for preserving the integrity of the panel selection process suggests that such appointments should be made only in exceptional circumstances.  Further, the attorney, who may or may not maintain an office in the district, should possess such

14

Exhibit 20 - 77

qualities as would qualify him or her for admission to the district's CJA panel in the ordinary course of panel selection.

4.    Terms.  The CJA Panel established pursuant to this Plan will consist of those attorneys appointed by the Court.  The term of service on the panel shall be determined by the Court for each attorney at the time of appointment.  The Court may in its discretion appoint an attorney to an indeterminate term of service on the CJA panel.

5.    Reappointment.  A member of the CJA Panel appointed for a specific term of years shall not be eligible for reappointment to the panel for the one year period immediately following expiration of his or her term, unless waiver of this restriction is certified by the Court.

6.    Application.  Application forms for membership on the CJA Panel shall be made available, upon request, by the Clerk of the Court.  Completed applications shall be submitted to the Clerk of the Court who will transmit the applications to the Chairperson of the Panel Selection Committee.


B.    PANEL SELECTION COMMITTEE

1.    Membership.  A Panel Selection Committee shall be established by the Court.  The Committee shall consist of one district judge, one magistrate, one attorney who is a member of the CJA Panel, and the Federal Public Defender.  The Committee shall select its own Chairperson.

2.    Duties.

    a. The Panel Selection Committee shall meet at least once a year to consider applications for the vacancies created by the terms expiring each year.  The Committee shall review the qualifications of applicants and recommend, for approval by the Court, those applicants best qualified to fill the vacancies.

    At its annual meeting, the Committee shall also review the operation and administration of the panel over the preceding year, and recommend to the Court any changes deemed necessary or appropriate by the Committee regarding the appointment process and panel management.  The Committee shall also inquire annually

15

Exhibit 20 - 78

as to the continued availability and willingness of each panel member to accept appointments.

b.   If, at any time during the course of a year, the number of vacancies due to resignation, removal, or death significantly decreases the size of the panel, the Committee shall solicit applications for the vacancies, convene a special meeting to review the qualifications of the applicants, and select prospective members for recommendation to the Court for approval. Members approved by the Court to fill mid-term vacancies shall serve until the expiration of the term that was vacated, and shall be shall be immediately eligible for reappointment notwithstanding the one-year restriction imposed by paragraph A(5) above, if applicable.

### C.   CJA TRAINING PANEL

The Panel Selection Committee may establish a "CJA Training Panel," consisting of attorneys who do not have the experience required for membership on the CJA Panel.  Training Panel members may be assigned, by the Court, to assist members of the CJA Panel in a "second chair" capacity.  Training Panel members are not eligible to receive appointments independently, and shall not be eligible to receive compensation for their services in assisting CJA Panel members.  Prior service on the CJA Training Panel is not a requirement for membership on the CJA Panel, nor will service on the Training Panel guarantee admission of an attorney to the CJA Panel.

## II.   SELECTION FOR APPOINTMENT

### A.   MAINTENANCE OF LIST AND DISTRIBUTION OF APPOINTMENTS

The Clerk of the Court shall maintain a current list of all attorneys included on the CJA Panel, with current office addresses and telephone numbers, as well as a statement of qualifications and experience.  The Clerk shall furnish a copy of this list to each judge and magistrate.  The Clerk shall also maintain a public record of assignments to private counsel, and, when appropriate, statistical data reflecting the proration of appointments between attorneys from the Federal Public or Community Defender office and private attorneys, according to the formula described in the CJA Plan for the District.  The Chief Judge may, in his discretion, assign the responsibilities listed in this paragraph to the Federal Public Defender.

16

Exhibit 20 - 79

B.    METHOD OF SELECTION

Appointments from the list of private attorneys should be made on a rotational basis, subject to the Court's discretion to make exceptions due to the nature and complexity of the case, an attorney's experience, and geographical considerations.  This procedure should result in a balanced distribution of appointments and compensation among the members of the CJA panel, and quality representation for each CJA defendant.

Upon the determination of a need for the appointment of counsel, the judge or magistrate shall notify the Clerk of Court or Federal Public Defender, where appropriate, of the need for counsel and the nature of the case.

The Clerk of Court or Federal Public Defender advise the judge or magistrate as to the status of distribution of cases, where appropriate, as between the Federal Public or Community Defender and the panel of private attorneys.  If the magistrate or judge decides to appoint an attorney from the panel, the Clerk or Federal Public Defender shall determine the name of the next panel member on the list who has handled, or assisted in, a case of equal or greater complexity than the case for which appointment of counsel is required, and who is available for appointment, and shall provide the name to the appointing judge or magistrate.

In the event of an emergency, i.e., weekends, holidays, or other non-working hours of the Clerk of Court's office, the presiding judge or magistrate may appoint any attorney from the list.  In all cases where members of the CJA Panel are appointed out of sequence, the appointing judge or magistrate shall notify the Clerk of Court or Federal Public Defender as to the name of the attorney appointed and the date of the appointment.

### III.    COMPENSATION – FILING OF VOUCHERS

Claims for compensation shall be submitted, on the appropriate CJA form, to the office of the Clerk of the Court. The Clerk of the Court shall review the claim form for mathematical and technical accuracy, and for conformity with the Guidelines for the Administration of the Criminal Justice Act (Volume VII, Guide to Judiciary Policies and Procedures) and, if correct, shall forward the claim form for the consideration and action of the presiding judge or magistrate.

17

Exhibit 20 - 80

# THE JUDICIAL COUNCIL OF THE FIFTH CIRCUIT

_REVIEWING PANEL --- CRIMINAL JUSTICE ACT PLAN_

The attached order, entered December 18, 1990, setting forth a revised Criminal Justice Act Plan for the Eastern District of Texas, having been reviewed by the Reviewing Panel of this Circuit, is approved.

Entered for the Reviewing Panel at New Orleans, Louisiana, this 21st day of February, 1991.

Lydia G. Comberrel
Secretary to the Judicial Council
of the Fifth Circuit

The following judges comprised and acted as the Reviewing Panel:

(a) The Judicial Council of the Fifth Circuit:

Charles Clark
Henry A. Politz
Carolyn D. King
Sam D. Johnson
Will Garwood
E. Grady Jolly
Patrick E. Higginbotham
W. Eugene Davis
Edith H. Jones
Jerry E. Smith
Morey L. Sear
Frank J. Polozola
Tom Stagg
Neal B. Biggers, Jr.
Henry T. Wingate
Mary Lou Robinson
Norman W. Black
William Wayne Justice
H. F. Garcia

(b) United States District Judge:

Robert M. Parker
Chief United States District Judge
Eastern District of Texas

Exhibit 20 - 81

# ATTACHMENT G

Exhibit 20 - 82



Exhibit 20 - 83



Exhibit 20 - 84



Exhibit 20 - 85

# ATTACHMENT H

Exhibit 20 - 86



# FIRST ADMINISTRATIVE JUDICIAL REGION OF TEXAS

### List of Attorneys Qualified to Represent Indigent Defendants in Death Penalty Cases
### As of October 13, 2015[1]

Pursuant to Article 26.052 of the Texas Code of Criminal Procedure, the following attorneys have been approved by the Local Selection Committee for appointment to death penalty cases in the First Administrative Judicial Region:

| Attorney Name | Primary Office Address | Contact Number | Qualified Chair(s) | Counties |
|---|---|---|---|---|
| Cariann V. Abramson | P.O. Box 1683 Forney, Texas 75126 | (972) 552-2240 | Second | All Counties in the Region |
| Catherine Bernhard | P.O. Box 2817 Red Oak, Texas 75154 | (972) 617-5548 | First, Second, Appellate | Dallas, Ellis |
| Paul Brauchle | 4131 N. Central Expressway, Suite 680 Dallas, Texas 75204 | (214) 742-2332 | First, Second | Collin, Dallas, Rockwall |
| Brook Busbee | 703 McKinney, Suite 312 Dallas, Texas 75202 | (214) 754-9090 | First, Second | Dallas |
| Richard E. Carrizales | 100 N. Central Expressway, Suite 800 Richardson, Texas 75080 | (214) 821-6055 | Second | Dallas |
| Jason D. Cassel | 111 West Tyler Street Longview, Texas 75601 | (903) 757-8449 | Second | All Counties in the Region |

---

[1] This List will be updated and re-posted twice annually. For periodic clerical updates and the addition or removal of attorneys from this List, please visit the Region website at www.txcourts.gov/1ajr.

1

Exhibit 20 - 87

| Attorney Name | Primary Office Address | Contact Number | Qualified Chair(s) | Counties |
|---|---|---|---|---|
| Charles "Mac" Cobb | P.O. Box 1134<br>Mount Pleasant, Texas 75456-1134 | (903) 717-8606 | First, Second | All Counties in the Region |
| Robert Cole | 409 N. Fredonia, Suite 101<br>Longview, Texas 75601 | (903) 236-6288 | Second | All Counties in the Region |
| Thomas A. D'Amore | 4144 N. Central Expressway, Suite 512<br>Dallas, Texas 75204 | (972) 347-4411 | Second | Collin, Dallas, Denton, Kaufman, Rockwall |
| Dennis D. Davis | 2900 Lee Street, Suite 102<br>Greenville, Texas 75403 | (903) 454-6050 | First, Second | Hunt |
| Zachary Davis | 121 S. Broadway, Suite 625<br>Tyler, Texas 75702 | (903) 539-5576 | Second | Gregg, Henderson, Smith |
| Leigh DeMasi | 4858 Hazelhurst<br>Dallas, Texas 75227 | (214) 443-3843 | Second | All Counties in the Region |
| Brock H. Duke | 206 S. Kentucky Street, #301<br>McKinney, Texas 75069 | (214) 478-1399 | Second | Collin, Dallas |
| Stephen Evans | 1000 N. Church<br>Palestine, Texas 75801 | (903) 723-3334 | First, Second | All Counties in the Region |
| William J. Fay | 2515 McKinney Avenue, Suite 1400<br>Dallas, Texas 75201 | (214) 237-0837 | Second | All Counties in the Region |
| Roland Fergurson | 1804 Woodbridge Drive<br>Sulphur Springs, Texas 75482 | (903) 885-4308 | First, Second | Delta, Franklin, Hopkins, Hunt, Lamar, Rains, Titus, Wood |
| Richard Franklin | 2150 S. Central Expressway, #200<br>McKinney, Texas 75070 | (214) 695-3507 | First, Second | All Counties in the Region |

2

Exhibit 20 - 88

| Attorney Name | Primary Office Address | Contact Number | Qualified Chair(s) | Counties |
|---|---|---|---|---|
| B. Keith Gore, Jr. | 2301 W. Virginia Parkway McKinney, Texas 75071 | (972) 529-2220 | First, Second | All Counties in the Region |
| Steven R. Green | 209 E. Corsicana Street Athens, Texas 75751 | (903) 675-1802 | First, Second | All Counties in the Region |
| Jeffrey Haas | 908 First Place Tyler, Texas 75702 | (903) 593-8338 | First, Second, Appellate | All Counties in the Region, except Dallas (as trial counsel); All Counties in the Region (as appellate counsel) |
| James R. Hagan | 222 North Fredonia Street Longview, Texas 75606 | (903) 757-9877 | First, Second | Gregg, Marion, Panola, Rusk |
| Jeffrey S. Harrelson | 300 North State Line Avenue Texarkana, Arkansas 71854 | (870) 772-0300 | Second | All Counties in the Region |
| Heath Glen Harris | 1910 Pacific Avenue, Suite 15100 Dallas, Texas 75201 | (214) 742-0708 | Second | Dallas |
| Michael Ray Harris | 6051 Clearwater Ranch Road Wills Point, Texas 75169 | (972) 563-3205 | Second | All Counties in the Region |
| Rick Harrison | 6116 N. Central Expressway, Suite 500 Dallas, Texas 75206 | (972) 533-1603 | First, Second | Collin, Dallas, Ellis, Henderson, Hunt, Kaufman, Rockwall, Van Zandt |
| Phillip Hayes | 3300 Oak Lawn Avenue, Suite 600 Dallas, Texas 75219 | (214) 774-0488 | First, Second | All Counties in the Region |
| David K. Haynes | 2600 West Eldorado Parkway, Suite 220 McKinney, Texas 75070-7518 | (972) 542-1793 | First, Second | Collin |

Exhibit 20 - 89

| Attorney Name | Primary Office Address | Contact Number | Qualified Chair(s) | Counties |
|---|---|---|---|---|
| Craig L. Henry | 723 Main Street<br>Texarkana, Texas 75501 | (903) 792-4645 | First, Second, Appellate | All Counties in the Region |
| Michael Howard | 6060 N. Central Expressway, Suite 500<br>Dallas, Texas 75206 | (214) 296-2221 | Second | Collin, Dallas |
| Wayne Huff | P.O. Box 2334<br>Boerne, Texas 78006 | (210) 488-4440 | First, Second | All Counties in the Region |
| Paul Johnson | 900 Jackson Street, Suite 650<br>Dallas, Texas 75202 | (214) 761-0707 | First, Second | All Counties in the Region |
| William "Karo" Johnson | 3300 Oak Lawn Avenue, Suite 600<br>Dallas, Texas 75219 | (214) 824-9955 | First, Second | Dallas |
| Edwin V. King | 400 S. Zang Boulevard, Suite 105<br>Dallas, Texas 75208 | (214) 704-7332<br>(214) 871-8800 | First, Second | Collin, Dallas, Rockwall |
| Karen Lambert | 6060 N. Central Expressway, Suite 560<br>Dallas, Texas 75206 | (214) 908-5200 | Second | All Counties in the Region |
| Lance Ray Larison | P.O. Box 232<br>Longview, Texas 75606 | (903) 238-8184 | Second | All Counties in the Region |
| Paul E. Mansur | P.O. Box 1300<br>Denver City, Texas 79323 | (806) 215-1025 | Appellate | All Counties in the Region |
| Robbie S. McClung | 2150 S. Central Expressway, #200<br>McKinney, Texas 75070 | (214) 566-6967 | First, Second | All Counties in the Region |
| Steven R. Miears | 211 North Main<br>P.O. Box 736<br>Bonham, Texas 75418 | (903) 640-4963 | First, Second, Appellate | All Counties in the Region |

4

Exhibit 20 – 90

| Attorney Name | Primary Office Address | Contact Number | Qualified Chair(s) | Counties |
|---|---|---|---|---|
| Bobby D. Mims | 216 W. Erwin Street, Suite 300A<br>Tyler, Texas 75702 | (903) 595-2169 | First, Second | Anderson, Cherokee, Collin, Dallas, Gregg, Harrison, Henderson, Nacogdoches, Rusk, Smith, Van Zandt, Wood |
| John W. Moore | 439 North Fredonia<br>Longview, Texas 75601 | (903) 236-3500 | First, Second | All Counties in the Region |
| Michael Mowla | 6500 Greenville Avenue, Suite 444<br>Dallas, Texas 75206 | (972) 795-2401 | Appellate | All Counties in the Region |
| Bernard C. Nwaiwu | 11615 Forest Central Drive, Suite 212<br>Dallas, Texas 75243 | (214) 348-8444 | Second | All Counties in the Region |
| Jack L. Paris, Jr. | 3101 Joe Ramsey Boulevard, Suite 101<br>Greenville, Texas 75402 | (903) 455-5797 | First, Second | Fannin, Hopkins, Hunt, Rains, Rockwall |
| Douglas H. Parks | 321 Calm Water Lane<br>Holly Lake Ranch, Texas 75765 | (903) 769-3120<br>(214) 521-2670 | First, Second, Appellate | All Counties in the Region |
| Lalon C. Peale | 1420 W. Exchange Parkway, Suite 180<br>Allen, Texas 75013 | (214) 969-1937 | First, Second | All Counties in the Region |
| Juan Carlos Sanchez | 1825 Market Center Boulevard, Suite 360<br>Dallas, Texas 75207 | (214) 365-0700 | First, Second | Collin, Dallas |
| Doug Schopmeyer | 5646 Milton Street, Suite 330<br>Dallas, Texas 75206 | (214) 535-4196 | Second | Dallas |
| William Lee Schultz | 2101 Brugge Court<br>Plano, Texas 75025 | (972) 517-1020 | First, Second | Collin, Dallas |

5

Exhibit 20 - 91

| Attorney Name | Primary Office Address | Contact Number | Qualified Chair(s) | Counties |
|---|---|---|---|---|
| John A. Scott | 107 E. Tyler Street Athens, Texas 75751 | (903) 675-8005 | Second | All Counties in the Region |
| Matthew D. Seymour | 6060 N. Central Expressway, Suite 500 Dallas, Texas 75206-5209 | (972) 533-9280 | Second | All Counties in the Region |
| Hilary Sheard | 7301 Burnet Road, Suite 102-328 Austin, Texas 78757 | (512) 524-1371 | Appellate | All Counties in the Region |
| John Tatum | 990 South Sherman Street Richardson, Texas 75087 | (972) 705-9200 | First, Second, Appellate | All Counties in the Region |
| David Waddill | 206 S. Kentucky, Suite 301 McKinney, Texas 75069 | (469) 734-6629 | Second | Collin, Dallas, Fannin, Grayson, Rockwall |
| Kobby T. Warren | 1910 Pacific Avenue, Suite 5010 Dallas, Texas 75201 | (214) 999-9499 | Second | Dallas |
| Mark Watson | 5635 SMU Boulevard Dallas, Texas 75206 | (214) 912-8181 | Second | All Counties in the Region |
| Toby C. Wilkinson | 2815 Wesley Greenville, Texas 75401 | (903) 454-6096 | First, Second, Appellate | Hunt |
| Brady T. Wyatt, III | 3300 Oak Lawn Avenue, Suite 600 Dallas, Texas 75219 | (214) 559-9115 | Second | Collin, Dallas, Ellis, Grayson, Kaufman, Rockwall |

Exhibit 20 - 92

# Second Administrative Judicial Region of Texas

PURSUANT TO ART. 26.052 OF THE TEXAS CODE OF CRIMINAL PROCEDURE, THE FOLLOWING LIST OF ATTORNEYS HAVE BEEN APPROVED BY THE LOCAL SELECTION COMMITTEE FOR APPOINTMENT TO DEATH PENALTY CASES.

| | | | | | |
|---|---|---|---|---|---|
| Michael K. Aduddell | 220 North Thompson, Suite 101 | Conroe, TX | 77301 | 936-539-4113 | First |
| Douglas M. Barlow | 435 Milam at Park | Beaumont, TX | 77701 | 409-838-4259 | Appellate, First and Second |
| Karen A. Barney | 405 Main St., Suite 1120 | Houston, TX | 77002 | 713-523-0579 | Second |
| Frank Blazek | 1414 11th Street | Huntsville, TX | 77340 | 936-294-9784 | First and Second |
| E. Tay Bond | 225 Simonton St. | Conroe, TX | 77301 | 936-539-1007 | Second |
| Gerald E. Bourque | 24 Waterway Ave. Suite 660 | The Woodlands, TX | 77380 | 713-862-7766 | Appellate and First |
| Charles Brown | 708 Main, Suite 790 | Houston, TX | 77002 | 713-222-0733 | First |
| Franklin Bynum | 2814 Hamilton St. | Houston, TX | 77004 | 713-343-8844 | Appellate |
| Don R. Cantrell | 800 Bering Dr, Suite 401 | Houston, TX | 77057 | 713-780-9414 | Appellate, First and Second |
| William Carter | 108 East William Joel Bryan Pkwy | Bryan, TX | 77803 | 979-779-0712 | Appellate, First and Second |
| Lydia Clay-Jackson | 504 W. Lewis St. | Conroe, TX | 77301 | 936-760-2889 | First and Second |
| Mary E. Conn | 801 Congress Ave. Suite 350 | Houston, TX | 77002 | 713-357-4190 | First and Second |
| R. P. Cornelius | 2028 Buffalo Terrace | Houston, TX | 77019 | 713-237-8547 | First and Second |
| James Sidney Crowley | 214 Morton St. | Richmond, TX | 77469 | 713-419-6932 | Appellate, First and Second |
| Neal Davis | 440 Louisiana St. Ste. 200 | Houston, TX | 77002 | 713-223-5575 | Second |
| Stephen Doggett | 201 South 11th St. | Richmond, TX | 77469 | 281-342-3321 | Appellate, First and Second |
| Rudy Duarte | 2016 Main, Suite 103 | Houston, TX | 77002 | 713-650-1240 | Second |
| Jeremy B. Ducote | 911 Front St. | Richmond, TX | 77469 | 832-471-6904 | Second |
| Douglas Durham | 2800 Post Oak Blvd. Suite 4100 | Houston, TX | 77056 | 713-223-0320 | Appellate and First |
| Danny Easterling | 1018 Preston, 6th Floor | Houston, TX | 77002 | 713-228-4441 | Appellate and First |
| Michael Elliott | 905 Front Street | Richmond, TX | 77469 | 832-496-5000 | Second |
| Cary Faden | 77 Sugar Creek Ctr Blvd Ste 230 | Sugar Land, TX | 77478 | 281-491-6182 | Appellate, First and Second |
| Michael P. Fosher | 440 Louisiana, Suite 1200 | Houston, TX | 77002 | 713-221-1810 | First and Second |
| Terrence Gaiser | 2900 Smith Street, Suite 220 | Houston, TX | 77006 | 713-225-0666 | Appellate, First and Second |
| Ryan W. Gertz | 2630 Liberty | Beaumont, TX | 77702 | 409-651-3905 | First and Second |
| Jerome Godinich, Jr. | 929 Preston Street, Suite 200 | Houston, TX | 77002 | 713-237-8388 | Appellate and First |
| Ralph L. Gonzalez | 905 Front Street | Richmond, TX | 77469 | 281-342-0241 | Second |
| Jerald K. Graber | 917 Franklin, Suite 510 | Houston, TX | 77002 | 713-224-2323 | First and Second |

Exhibit 20 – 93

| Name | Address | City | Zip | Phone | Category |
|---|---|---|---|---|---|
| David E. Grove | 595 Orleans, Ste 1007 | Beaumont, TX | 77701 | 409-835-5500 | Second |
| Jimmy D. Hamm | 1900 Broadway | Beaumont, TX | 77701 | 409-813-1004 | First |
| Craig L. Henry | 723 Main Street | Tex Arkana, TX | 75501 | 903-792-4645 | Appellate, First and Second |
| Wayne T. Hill | 4615 Southwest Fwy, Suite 600 | Houston, TX | 77027 | 713-623-8312 | Appellate, First and Second |
| Allen C. Isbell | 202 Travis, Suite 208 | Houston, TX | 77002 | 713-236-1000 | Appellate, First and Second |
| Kristen Jernigan | 905 Front Street | Richmond, TX | 77469 | 832-642-3081 | Appellate |
| John P. Keirnan | 917 Franklin, Suite 550 | Houston, TX | 77002 | 713-236-9700 | First and Second |
| Sharon Kiel | 6235 Sutherland Square | Houston, TX | 77081 | 713-516-3925 | Second |
| Vivian R. King | 440 Louisiana, Suite 800 | Houston, TX | 77002 | 713-222-2019 | First and Second |
| Robert K. Loper | 111 West 15th Street | Houston, TX | 77008 | 713-880-9000 | First and Second |
| Mario Madrid | 440 Louisiana, Suite 1225 | Houston, TX | 77002 | 713-877-9400 | Second |
| James R. Makin | 1900 Broadway | Beaumont, TX | 77701 | 409-833-2827 | First and Second |
| Amy D. Martin | 202 Travis St., Suite 300 | Houston, TX | 77002 | 713-320-3525 | Appellate, First and Second |
| Patrick F. McCann | 909 Texas Avenue, Suite 205 | Houston, TX | 77002 | 713-223-3805 | Appellate, First and Second |
| Shawn McDonald | 77 Sugar Creek Center Blvd. Ste 230 | Sugar Land, TX | 77478 | 713-228-2523 | Fist and Second |
| Mandy Miller | 2910 Commercial Center Blvd, Ste 103-201 | Katy, TX | 77494 | 832-900-9884 | Appellate |
| Tyrone Moncriffe | 1314 Texas Ave., Suite 1112 | Houston, TX | 77002 | 713-224-6628 | First |
| Robert A. Morrow, III | 24 Waterway Ave., Suite 660 | The Woodlands, TX | 77380 | 281-379-6901 | Appellate, First and Second |
| Loretta J. Muldrow | 909 Texas Ave., Suite 205 | Houston, TX | 77002 | 713-222-1919 | First |
| Alvin E. Nunnery | 909 Texas Ave Suite 205 | Houston, TX | 77002 | 713-222-1919 | First |
| Jimmy Ortiz | 1924 Portsmouth St. | Houston, TX | 77098 | 713-759-1800 | Second |
| Anthony Osso | 440 Louisiana, Suite 1125 | Houston, TX | 77002 | 713-225-4444 | First and Second |
| Robert C. Owen | Northwestern Univ. 375 E. Chicago Ave. | Chicago, IL | 60611 | 312-503-0135 | Appellate |
| Windi Akins Pastorini | 440 Louisiana, Suite 800 | Houston, TX | 77002 | 713-236-7300 | First and Second |
| Robert Pelton | 4001 N. Shepherd Dr. #110 | Houston, TX | 77018 | 713-524-8471 | First and Second |
| Jimmy Phillips, Jr. | P.O. Drawer 29 | Angleton, TX | 77516 | 979-849-8511 | Appellate, First and Second |
| Danalynn Recer | 2307 Union St. | Houston, TX | 77007 | 713-869-4722 | First and Second |
| David M. Ryan | 6161 Savoy Dr., Suite 1116 | Houston, TX | 77036 | 713-223-9898 | First |
| Joseph Salhab | 2028 Buffalo Terrace | Houston, TX | 77019 | 716-528-1005 | Appellate and First |
| J. Philip Scardino | 1004 Congress, 3rd Floor | Houston, TX | 77002 | 713-224-3800 | First and Second |
| Katherine Scardino | 3730 Kirby, Suite 1120 | Houston, TX | 77098 | 713-520-5223 | First and Second |
| Robert A. Scardino | 1004 Congress St., 3rd Floor | Houston, TX | 77002 | 713-229-9292 | First |
| Raoul Schonemann | Univ of Texas 727 East Dean Keeton St. | Austin, TX | 78705 | 512-232-9391 | Appellate |
| Robert R. Scott | 5803 Second Street, #101 | Katy, TX | 77493 | 281-391-2141 | First |

Exhibit 20 - 94

| Hilary Sheard | 7301 Burnet Road #102-328 | Austin, TX | 78757 | 512-524-1371 | Appellate |
| James Stafford | 515 Caroline St. | Houston, TX | 77002 | 713-228-3600 | First |
| Allen Tanner | 917 Franklin St., Suite #550 | Houston, TX | 77002 | 281-685-1673 | First |
| Lane D. Thibodeaux | P.O. Box 523 | Bryan, TX | 77806 | 979-775-5700 | First and Second |
| Kurt B. Wentz | 5629 FM 1960 West, Suite 115 | Houston, TX | 77069 | 281-587-0088 | Appellate, First and Second |

Exhibit 20 - 95

# ATTACHMENT I

Exhibit 20 - 96

## THE JUDICIAL COUNCIL OF THE FIFTH CIRCUIT

### SPECIAL PROCEDURES FOR REVIEWING ATTORNEY COMPENSATION

### REQUESTS IN DEATH PENALTY CASES

Consistent with the request of the Judicial Conference of the United States, the Judicial Council of the Fifth Circuit adopts the following amendment to its existing procedures to review requests for attorney compensation in excess of $100,000 in state death penalty habeas corpus cases. This policy shall apply to requests for attorney compensation in federal capital prosecutions under Title 18 or 21 of the United States Code as well as death penalty habeas corpus cases brought into federal court under 28 U.S.C. § 2254 or 28 U.S.C. § 2255.

1) In federal capital prosecutions -

   any request for compensation in excess of $100,000 at the district court level or $50,000 at the appellate level is presumptively excessive.

   In 28 U.S.C. § 2254 or § 2255 cases -

   any request for compensation in excess of $35,000 at the district court level or $15,000 at the appellate level is presumptively excessive.

2) Attorneys' fees billed at a rate in excess of $160 per hour are presumptively excessive.

3) Any attorney's fees request which is presumptively excessive, either because of the hourly rate or the total amount requested, must be justified by the requesting attorney in a written submission filed with the presiding judicial officer in the district court, or in the case of an appeal, to the senior active member of the panel or designee who is an active member of the panel.

4) The judge receiving the request for excess payment will forward the request to the chief judge of the circuit, or designee, with a brief statement recommending approval or denial of the request.

5) The amount of fees to be awarded to the attorney shall be determined by the chief judge of the circuit or his/her designee.

As amended: February 1, 2005[1]

---

[1]Increase from $125 to $160 in the maximum hourly compensation rate pursuant to Consolidated Appropriations Act, 2005 (118 Stat. 2809).

Exhibit 20 - 97

# ATTACHMENT J

Exhibit 20 - 98

| UNITED STATES DISTRICT COURT | EASTERN DISTRICT OF TEXAS |
|---|---|

UNITED STATES OF AMERICA      §

§

*versus*      §

§     **FILED UNDER SEAL**

§

## SEALED *EX PARTE* ORDER
## REGARDING ATTORNEYS' FEES

In light of the Attorney General of the United States' directive, dated

that the Government not seek the death penalty against Defendant                    counsel are

notified that any attorneys' fees incurred after entry of this order will be paid at the hourly rate

set for noncapital cases as set forth in the Criminal Justice Act and that only one attorney may

continue representation of the defendant absent extenuating circumstances.

Exhibit 20 - 99

# ATTACHMENT K

Exhibit 20 - 100



Home » Court Services » CJA Panel Attorneys and Defenders » CJA Rates & Case Compensation Maximums » Current Criminal Justice Act (CJA) Rates and Case Compensation Maximums

# CURRENT CRIMINAL JUSTICE ACT (CJA) RATES AND CASE COMPENSATION MAXIMUMS

**Hourly Rates for CJA Panel Attorneys** (for services on or after 1/1/2016)

| If a case is... | The hourly rate maximum is... |
|---|---|
| Non-Capital | $129 |
| Capital | $183 |
| for service prior to 1/1/2015 | see History of CJA Rates |

**Waivable Case Compensation Maximums for Non-Capital Cases**
[Note that there are no statutory attorney case compensation maximums for capital cases. CJA Guidelines, § 630.10.20)]

Section (d)(2) of the Criminal Justice Act, 18 U.S.C. §3006A, provides that the attorney case compensation maximums increase simultaneously by the aggregate percentage increases in the maximum hourly non-capital rate, rounded to the nearest $100.

| If a case is a... | And services were completed... | | | |
|---|---|---|---|---|
| | On or after January 1, 2010, and before March 1, 2014, the case maximum is ... | On or after March 1, 2014, and before 1/1/2015, the case maximum is... | On or after January 1, 2015, and before 1/1/2016, the case maximum is... | On or after January 1, 2016, the case maximum is... |
| Felony (including pre-trial diversion of alleged felony) | $9,700 | $9,800 | $9,900 | $10,000 |
| Misdemeanor (including pre-trial diversion of alleged misdemeanor) | $2,800 | $2,800 | $2,800 | $2,900 |
| Proceeding under 18 U.S.C. § 4106A | $2,100 | $2,100 | $2,100 | $2,100 |
| Proceeding under 18 U.S.C. §§ 4107 or 4108 (for each verification proceeding) | $2,800 | $2,800 | $2,800 | $2,900 |
| Proceeding under 18 U.S.C. § 983 | $9,700 | $9,800 | $9,900 | $10,000 |
| Post-conviction proceeding under 28 U.S.C. §§ 2241, 2254 or 2255 | $9,700 | $9,800 | $9,900 | $10,000 |
| Proceeding under 28 U.S.C. § 1875 | $9,700 | $9,800 | $9,900 | $10,000 |
| Appeal (from felony, misdemeanor, proceeding under 18 U.S.C. § 4106A ,18 U.S.C. § 983, post-conviction proceeding under 28 U.S.C. §§ 2241, 2254 or 2255, and 28 U.S.C.§ 1875) | $6,900 | $7,000 | $7,100 | $7,200 |
| Other representation required or authorized by the CJA (including, but not limited to probation, supervised release hearing, material witness, grand jury witness) | $2,100 | $2,100 | $2,100 | $2,100 |
| Appeal of other representation | $2,100 | $2,100 | $2,100 | $2,100 |

**Waivable Compensation Maximums for Services other than Counsel (e.g., investigators and experts):**

**Non-Capital Cases:**
[Note: with prior authorization, the maximum applies separately for each service provider; without prior authorization, the maximum applies to the aggregate compensation (excluding expenses) claimed by all services providers combined, not to each service provider individually.]

Services were completed on or after January 1, 2016.

| | | |
|---|---|---|
| With prior court authorization | $2,500 | CJA Guidelines § 310.20.10 |
| Without prior court authorization | $800 | CJA Guidelines § 310.20.20 |

Exhibit 20 - 101

If services were completed before January 1, 2016, the maximum with prior court authorization is $2,400 and without prior court authorization remains at $800.

**Capital Case:**

For capital representations commenced, and capital appeals perfected on or after April 24, 1996, there is a waivable limit of $7,500. The $7,500 limit applies to the total payments for investigative, expert, and other services in a case, not to each service individually.

For services provided in earlier capital cases, please contact the Legal and Policy Division Duty Day Attorney at 202-502-3030.

**Mileage Rates:**

Reimbursement for representation-related travel by privately owned automobile should be claimed at the rate currently prescribed for federal judiciary employees who use a private automobile for conduct of official business, plus parking fees, ferry fares, and bridge, road, and tunnel tolls.

*Last revised December 17, 2015*

FJC Online  |  uscourts.gov

Exhibit 20 - 102

# ATTACHMENT L

Exhibit 20 - 103

| UNITED STATES DISTRICT COURT | EASTERN DISTRICT OF TEXAS |
|---|---|

| UNITED STATES OF AMERICA | § | |
| | § | |
| *versus* | § | |
| | § | **FILED UNDER SEAL** |
| | § | |

### SEALED *EX PARTE* ORDER PARTIALLY APPROVING PROPOSED LITIGATION BUDGET

Pending before the court is                              *Ex Parte* Proposed Initial Case Budget and Memorandum Under Seal        The defendant requests:  (1)        attorney hours covering the period between                              ; (2)        attorney hours                                                              ; (3) for miscellaneous costs; (4)        for travel and lodging expenses; (5)        for a fact investigator; and (6)        for expert services, including        for a mitigation specialist,        for psychiatric evaluation with psychological and neuropsychological testing,        for a ballistics expert,        for a DNA expert,        for a fingerprint expert, and        for a forensic medical expert.  Having carefully considered the representations of counsel and the pending motion, the court finds that the defendant's motion should be GRANTED in part.  Counsel for the defendant are authorized to incur        attorney hours (collectively) for the duration of the case through trial to provide adequate representation. In addition, the court preliminarily approves        [1] for the requested expert and investigative services, with travel and lodging costs as well as miscellaneous expenses to be submitted as incurred, pending final approval by the Chief Judge of the United States Court

---

[1] Counsel for the defendant shall determine how these funds are allocated.

Exhibit 20 - 104

of Appeals for the Fifth Circuit.  The court finds these amounts reasonable and necessary for an adequate defense.

The court further orders that payment of said expenditures shall be made on a timely basis and counsel for the defendant shall submit itemized claims for payment on prescribed CJA forms as soon as is practicable after receiving itemized statements for the services.

The court finds that counsel for the defendant have been diligently representing the defendant from the date of their appointment and have been accruing certain claims for expenditures and attorneys' fees since that date.  The expenditures and fees are approved effective as of the date of the appointment of learned counsel.

The defendant has made a proper showing concerning the need for confidentiality.  The court therefore orders that the budget and motion made the basis of this order, as well as this order, shall be sealed by the Clerk of the Court and not revealed to counsel for the government or any person or entity other than the defendant, his counsel, or his agents, without prior approval of the court.

2

Exhibit 20 - 105

**UNITED STATES DISTRICT COURT**          **EASTERN DISTRICT OF TEXAS**

UNITED STATES OF AMERICA          §
                                  §
versus                            §
                                  §
                                  §

## BUDGET ORDER

By order of                the district court approved in part the proposed budget submitted by defendant          I hereby also approve the budget as modified, and authorize payments within the budget to attorneys, experts and other service providers in excess of the presumptive limits set by the Criminal Justice Act and the Fifth Circuit's Amended Procedures for Reviewing Attorney Compensation in Death Penalty Cases dated December 22, 1998.

At the district court's discretion, interim payments may be made within the approved budget to attorneys, experts and other service providers during the pendency of the case and consistent with the budget without further circuit approval. However, for payments in excess of the presumptive limits, twenty percent of the amount approved for fees must be withheld as retainage. Expenses may be paid in full. The amounts so withheld shall be requested through the final voucher submitted by each attorney, expert, or other service provider, and each final voucher shall be submitted for circuit approval before payment.

Each interim voucher should be accompanied by a statement from counsel setting out the percentage of budgeted time already expended, and a current projection of how the representation may be completed within budget.

The approval of this budget in no way entitles counsel, experts or other service providers to charge or expend beyond what is reasonably necessary to defend the client.

SO ORDERED.

CHIEF JUDGE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

Exhibit 20 - 106

# Exhibit 21

# Filed under seal

# Exhibit 22

# Filed under seal

# Exhibit 23

# Filed under seal

# Exhibit 24

# Filed under seal

# Exhibit 25

# Filed under seal

# Exhibit 26

# Filed under seal

# Exhibit 27

# Filed under seal

# Exhibit 28

# Filed under seal

# Exhibit 29

# Filed under seal

# Exhibit 30

# Filed under seal

# Exhibit 31

# Filed under seal

# Exhibit 32

# Filed under seal

# Exhibit 33

# Filed under seal

# Exhibit 34

# Filed under seal

# Exhibit 35

# Filed under seal

# Exhibit 36

# Filed under seal

# Exhibit 37

# Filed under seal

# Exhibit 38

# Filed under seal

# Exhibit 39

# Filed under seal

# Exhibit 40

# Filed under seal

# Exhibit 41

# Declaration of John R. Weeks, Ph.D.

## In the Case of:

### UNITED STATES OF AMERICA v. CHRISTOPHER EMORY CRAMER,

### 1:16-CR-26-MAC-ZJH

I, JOHN R. WEEKS, Ph.D., under penalty of perjury, affirm as follows:

1. I am Distinguished Professor Emeritus of Geography and Director of the International Population Center at San Diego State University.

2. My qualifications are detailed in the accompanying Curriculum Vitae (Appendix A to this declaration). In brief, I received my A.B. in Sociology from the University of California, Berkeley, in 1966; my M.A. in Demography from the University of California, Berkeley, in 1969; and my Ph.D. in Demography from the University of California, Berkeley, in 1972. I taught at Michigan State University for three years (1971-1974) prior to accepting an appointment at San Diego State University, where I have been since 1974, initially in the Department of Sociology. I was granted tenure, promoted to Associate Professor, and elected Chair of the Department of Sociology in 1978; and was promoted to Full Professor in 1981. I served as Chair until 1985, when I was appointed Director of the International Population Center (a position I still hold). In 1992, I requested and was granted a move to the Department of Geography, where I am now Distinguished Professor Emeritus of Geography. I am also a Senior Fellow of the California Council on Science and Technology, and a Research Associate of the Broom Center for Demography at the University of California, Santa Barbara. In 2011, I was awarded the Albert W. Johnson Research Award and Distinguished Professorship by San Diego State University.

3. I have taught undergraduate and graduate-level courses in demography and statistics since 1971, and I have published more than 200 professional articles, chapters, and books in the field of population studies. In addition, I have presented papers at professional meetings and published reports of professional research. My textbook *Population: An Introduction to Concepts and Issues* is now in its thirteenth edition and is the best-selling text in the field of population studies. Over the past 25 years, I have received several million dollars in research grants from the

Exhibit 41 - 1

National Institutes of Health, the National Aeronautics and Space Administration, the National Science Foundation, and the Andrew Mellon Foundation to fund my demographic research.

4. I have been involved in work regarding the demographic composition of juries and other population-based statistical issues since 1980, and I have served as a consultant and/or expert witness in nearly 250 legal cases (criminal and civil) as of this date. A complete list is provided in my CV in Appendix A. That list includes only those cases in which I was involved before or at the time of trial. I have also participated as an expert in numerous post-conviction habeas cases, such as this one. The vast majority of criminal cases have been capital punishment cases and most of them have involved challenges to the composition of petit and/or grand juries. Although I have usually been designated as an expert by the defense, I have typically worked closely with jury management personnel in each case, and I have been gratified over the years to see that many of my recommendations for change in jury management procedures have been implemented by the respective courts in order to improve jury representativeness. That process first began in Los Angeles County Superior Court in 1987 in People v. Ramirez (the so-called "Nightstalker Case"), and it has continued since then in both state and federal courts. I have served as an expert witness on the demographics of federal juries in several United States District Courts, including the Central, Eastern, Northern, and Southern Districts of California; the Eastern District of Washington; the District of New Mexico; the District of Vermont; and the Western District of Pennsylvania. All of the cases (both criminal and civil) in which I have been involved required the utilization of my expertise in sampling and statistical/demographic analysis. In civil cases, I have been designated as a witness for both plaintiffs and defendants, depending upon individual needs for demographic and/or statistical expertise.

## QUESTIONS PRESENTED, METHODOLOGY, AND CONCLUSIONS

5. I have been asked by habeas counsel for Mr. Cramer to evaluate the representativeness of the jury pool assembled for Mr. Cramer's trial at the Beaumont Courthouse of the Eastern District of Texas in April, 2018. Thus, the first purpose of the analysis is to determine the proportionality of the results of the jury selection procedures.

6. I incorporate calculations into my analysis that address not just the size of disparities with respect to cognizable groups, but also the level of statistical significance of those disparities, as expressed by what is often called "standard deviation analysis." I have been employing this

Exhibit 41 - 2

approach to my analyses of jury representativeness for many years, and in my overview of these methods more than two decades ago, I indicated that "[T]he fact that a disparity is statistically significant does not, in and of itself, command judicial attention. However, a large *relative* disparity that is *statistically significant* should command judicial notice, regardless of the size of the *absolute* disparity."[1]

7. I was also asked to determine whether the jury selection system in the Beaumont Division of the Eastern District of Texas was operating in a random fashion as required by the Jury Selection and Services Act (JSSA) and whether there was compliance with the requirement of section 1863(b)(3) of the Act that the system:

> "shall ensure that names of persons residing in each of the counties, parishes, or similar political subdivisions within the judicial district or division are placed in a master jury wheel; and shall ensure that each county, parish, or similar political subdivision within the district or division is substantially proportionally represented in the master jury wheel for that judicial district, division, or combination of divisions. For the purposes of determining proportional representation in the master jury wheel, either the number of actual voters at the last general election in each county, parish, or similar political subdivision, or the number of registered voters if registration of voters is uniformly required throughout the district or division, may be used."

8. In this declaration I compare the demographics of the population in the Beaumont Division of the Eastern District of Texas with data from 305 prospective jurors who were summoned to the court for this trial. Data have been provided to me by habeas counsel.

9. My analysis in the following paragraphs reveals a large and statistically significant underrepresentation of Blacks and Hispanics in the jury pool in the Beaumont Division of the Eastern District of Texas relative to the area's adult citizen population. I show that this underrepresentation is likely caused by systematic problems in the way the court operated to draw jurors to the courthouse in this case.

---

[1] John R. Weeks, 1999, "Jury Representativeness," Chapter 7 in Walter F. Abbott and John Batt, editors, *A Handbook of Jury Research*, Philadelphia: American Law Institute-American Bar Association: page 7-23; emphasis added.

Exhibit 41 - 3

## The Demographics of the Population
## in the Beaumont Division of the Eastern District of Texas

10. The concept of a "distinctive group" or "identifiable group" refers to what is also commonly called in legal terms a "cognizable group." These are people who bring a particular perspective and point of view to the jury that distinguishes them from others. Cognizable group categories include gender, race, ethnicity, and religion.

11. The Beaumont Division of the Eastern District of Texas encompasses Hardin, Jasper, Jefferson, Liberty, Newton, and Orange counties. I will be using data from the 2018 American Community Survey 5-year data set. The data were collected each year over a 5-year period ending in 2018.[2] Consistent with the definition that is supposed to be used by Federal Courts on the AO 12 forms, I have defined jury-eligible as the citizen population age 18 or older. Note that Table 1 shows the data by county, since differences by county can be important within the Division.

12. An important calculation in Table 1 is the cross-tabulation of race and ethnicity. The Census Bureau asks separately about a person's race and about their ethnic identification as "Hispanic or Latino." These are not mutually-exclusive categories, and the Census Bureau and other government agencies always cross-tabulate them in order to produce mutually exclusive categories. If a person self-identifies as Hispanic, they are assigned to the Hispanic category, no matter what they report their race to be. Thus, some people might respond that their race is "African-American or Black," but if they also respond that they are "Hispanic," they belong only in the "Hispanic" Cognizable Group, and not in the "Black"[3] Cognizable Group. I emphasize this point because the AO 12 forms do not cross-tabulate responses to the two questions of race and ethnicity[4].

---

[2] The 2020 decennial census did not ask a question about citizenship on the 100 percent form. That information—which is required for this analysis—is available only from the American Community Survey.

[3] The term "Black" or "Blacks" is used to reflect the terminology used in the census/other forms.
[4] Note, however, that the court has not provided habeas counsel with completed AO 12 forms as of this date.

Exhibit 41 - 4

| Table 1. Racial/Ethnic Distribution of the Citizen Population Aged 18+ in the Beaumont Division of the Eastern District of Texas in 2018 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Race/Ethnicity | | | | | | | |
| County | Non-Hispanic White | Hispanic | Black | Native American | Asian/Pacific Islander | Other Race/2+ Races | Total Citizens 18+ | Percent of Beaumont Division |
| Hardin | 37,169 | 1,925 | 2,242 | 65 | 127 | 390 | 41,918 | 11 |
| % | 89 | 5 | 5 | 0 | 0 | 1 | | |
| Jasper | 20,697 | 1,058 | 4,203 | 69 | 132 | 193 | 26,352 | 7 |
| % | 79 | 4 | 16 | 0 | 1 | 1 | | |
| Jefferson | 84,432 | 21,408 | 64,286 | 580 | 4,835 | 485 | 176,026 | 47 |
| % | 48 | 12 | 37 | 0 | 3 | 0 | | |
| Liberty | 41,056 | 7,845 | 6,534 | 277 | 297 | 487 | 56,496 | 15 |
| % | 73 | 14 | 12 | 0 | 1 | 1 | | |
| Newton | 8,329 | 265 | 2,181 | 21 | 118 | 187 | 11,101 | 3 |
| % | 75 | 2 | 20 | 0 | 1 | 2 | | |
| Orange | 52,334 | 2,765 | 5,194 | 251 | 453 | 571 | 61,568 | 16 |
| % | 85 | 4 | 8 | 0 | 1 | 1 | | |
| Beaumont Division | 244,017 | 35,266 | 84,640 | 1,263 | 5,962 | 2,313 | 373,461 | 100 |
| % | 65.34 | 9.44 | 22.66 | 0.34 | 1.60 | 0.62 | 100.00 | |

13. Table 1 shows that a jury pool in the Beaumont Division should have 35% (100%-65%) of its members who identify as a member of a race-ethnic cognizable group (something other than Non-Hispanic White). The most numerous of these groups is the Black population, who account for 23 percent of the adult citizen population. The second largest group is Hispanics, who account for 9 percent of the adult citizens. If the demographics of the jury pool are representative of the jury-eligible population, we should find that 23 percent are Black, and 9 percent are Hispanic.

## Demographics of the Jury Pool and Resulting Disparities

14. The Eastern District of Texas uses a multi-step summoning process. In the first step a random sample of names is drawn from the Registrar of Voters list to create a Master Jury Wheel. A random sample is then drawn from the Master Wheel Jury and the selected individuals are sent a Juror Qualification Questionnaire (JQQ). Respondents to the JQQ who are determined to be

Exhibit 41 - 5

qualified to serve on a jury then constitute the Qualified Jury Wheel. A sample of those persons is selected to be summoned to court to be available to serve on a jury.

15. Habeas counsel has provided me with a spreadsheet of data for 317 persons who responded in 2018 to the JQQ. Of these 317, 12 were excused for hardship without having completed the questionnaire, so my analysis is based on data received from 305 prospective jurors.

16. Table 2 shows that 7.21% of the prospective jurors were Hispanic, lower than the expected percentage of 9.44%. At the same time, 16.07% of the prospective jurors were Black, compared to 22.66% in the jury-eligible population. So, it can be seen in Table 2 that disparities exist. In the next few paragraphs I discuss how to interpret the data in Table 2.

| Table 2. Disparities with Respect to Hispanics and Blacks, Beaumont Division, 2018 | | |
|---|---|---|
| | **Hispanics** | **Non-Hispanic Blacks** |
| Jurors of this ethnic group out of the total 305 jurors | 22 | 49 |
| Percent of Ethnic Group in the jury pool | 7.21% | 16.07% |
| Percent of population that is of this ethnic group (Table 1) | 9.44% | 22.66% |
| Absolute Disparity | -2.23 | -6.59 |
| Relative Disparity | -24% | -29% |
| Z-score associated with disparity | -1.33 | -2.75 |
| Probability of the disparity occurring by chance | 0.092 | 0.003 |
| Statistically significant at the p < .10 level? | YES | YES |

17. A variety of approaches have been advanced over the years to help the court decide whether or not a significant underrepresentation of a cognizable group exists in a particular district. A review of case law related to these issues, as well as new literature that has emerged since my own summary of methods to be used in these kinds of cases was published[5], suggests that courts have become increasingly open to a variety of methodological approaches. For example, the United States Supreme Court declined in *Berghuis v. Smith* (2010)[6] to impose a particular method or measure to address representativeness claims in that ruling[7], and expressly observed that

---

[5] Weeks, 1999, ibid.
[6] 559 U.S. 314 (2010).
[7] Id. at 329.

Exhibit 41 - 6

"neither *Duren* nor any other decision of this Court specifies the method or test courts must use to measure the representation of distinctive groups in jury pools." [8]. The Court also noted:

> The State asks us to "adopt the absolute-disparity standard for measuring fair and reasonable representation" and to "requir[e] proof that the absolute disparity exceeds 10%" to make out a prima facie fair-cross-section violation. [Brief for Petitioner 45–46.] Under the rule the State proposes, "the Sixth Amendment offers no remedy for complete exclusion of distinct groups in communities where the population of the distinct group falls below the 10 percent threshold." [Brief for Respondent 35]. We need not reach that issue.[9]

18. I am aware that there continues to be scholarly discussion of the appropriate approach to representativeness calculations and analyses.[10] I have taken into account all relevant current and historical information of which I am aware in providing the analysis in this declaration.

19. Disparity is typically measured by absolute disparity, relative (or comparative) disparity, and by the statistical significance of the disparity (sometimes called the "standard deviation test")[11]. These methods have the advantage of being readily interpretable, although each is in turn more complex to calculate than the preceding one. Other methods of measuring disparity have also been advanced over time, including temporal trends,[12] which I will employ in this declaration, and "disparity of risk"[13] and "absolute impact."[14] The latter two are not widely used and I am not employing them in this analysis. Let me discuss the main approaches aimed at improving our understanding of the extent of disparity. To illustrate the methods, I will discuss the disparity with respect to Blacks, calculated for the comparison between the jury-eligible population

---

[8] Id. at 329.

[9] Id, at 329 n. 4.

[10] See e.g., Joseph L. Gastwirth and Qing Pan, 2011, "Statistical measures and methods for assessing the representativeness of juries: a reanalysis of the data in *Berghuis v. Smith*," 10 Law, *Probability and Risk*: 17–57.

[11] For a detailed discussion of these methods see Rose et al., (2018), ibid., and Weeks (1999), ibid.

[12] Rose et al., ibid.

[13] Peter A. Detre, 1994, "A Proposal for Measuring Underrepresentation in the Composition of the Jury Wheel," 103 *Yale Law Review:* 1913.

[14] Gatswirth and Pan, ibid.

Exhibit 41 - 7

in the Beaumont Division, as shown in Table 1, and the jury pool data for Mr. Cramer's trial (see Table 2). These calculations are summarized in Table 2.

20. **Absolute disparity** measures the simple absolute difference between the percentage of that group as represented in the jury pool, as shown in Table 2, which I will label $v$ (for venire) and the percentage of people in the community who are in the cognizable group (i.e., "Blacks," as shown in Table 2), which I will label $P$ (for population):

Absolute disparity (AD) = $v - P$ = 16.07% − 22.66% = -6.59 percentage points.

As I noted above, courts have in the past tended to demand a fairly high absolute disparity (e.g., 7-10 percentage points) before a claim of underrepresentation was accepted. However, as Paula Hannaford-Agor has discussed in detail,[15] in a situation where the Non-Hispanic White population is a substantial majority (e.g., 65% of the adult citizen population in the Beaumont Division), it may be difficult to have that large an absolute disparity, even if there is other strong evidence of systematic exclusion of one or more cognizable groups. This is an important reason for having other measures of disparity that can be relied upon.

21. **Relative or comparative disparity** is measured by relating (comparing) the absolute disparity to the cognizable group's percentage in the entire jury-eligible community. By showing how big the absolute disparity is in relation to what would be expected based on the community demographics, the relative disparity indicates how substantive the absolute disparity is, even if it may seem relatively small on its own:

Relative disparity (RD or CD) = $\frac{v-P}{P} * 100 = \frac{16.07 - 22.66}{22.66} * 100$ = -29%.

The usefulness of this calculation is that it is readily interpretable: Blacks were 29% underrepresented in the jury pool in the Beaumont Division in 2018. Put another way, we expected 69 Blacks in the jury pool, but observed only 49.

22. If the absolute disparity is large, then there is rarely an issue as to whether that could have happened just by chance, unless the jury venire is small (e.g., less than 100 persons). However, in any situation it is useful to ask whether the disparity is large enough in relation to the number of people in the jury venire that this result is unlikely to have occurred by chance alone. We do this with a standard deviation test (also called a test of statistical significance) in which we

---

[15] Paula Hannaford-Agor, 2011, "Systematic Negligence in Jury Operations: Why the Definition of Systematic Exclusion in Fair Cross Section Claims Must be Expanded," *Drake Law Review* 59:761-798.

Exhibit 41 - 8

test the null hypothesis that there is no real difference between $v$ and $P$—the observed difference is due simply to chance.

23. **Statistical significance** answers the question: What is the probability that we could have randomly drawn a sample of 305 prospective jurors from the list of qualified potential jurors in the Beaumont Division and have generated an absolute disparity of -6.59 percentage points with respect to Blacks? To answer the question, we first calculate what is called a z-score, which is the number of standard deviation units that our sample value is away from the population value. As can be seen above in Table 2, this value is -2.75:

$$\text{z-score} = \frac{v-P}{\sqrt{\frac{P \cdot (1-P)}{(n-1)}}} = \frac{.1607 - .2266}{\sqrt{\frac{.2266 \cdot (1-.2266)}{(305-1)}}} = -2.75.$$

The value of -2.75 indicates that the disparity is 2.75 standard deviation units below the population value in a normal distribution.[16] The z-score is then converted into the more intuitively apparent answer, which is the p-value, or the probability that a result this far below the population value could have occurred just by chance. This value can be found in published tables in the appendices of most statistics textbooks or calculated online at websites such as: http://www.socscistatistics.com/pvalues/normaldistribution.aspx. The p-value in this case is .003. In other words, there are only 3 chances in 1,000 that this was a random finding. Put another way, this is highly statistically significant.

24. There is no single standard by which statistical significance is judged to exist. In scientific research there are several decision rules that are typically applied to determine whether or not a p-value is statistically significant. In critical research such as medical tests, a level of statistical significance of $p < .01$ (less than one chance in a hundred) may be required before the decision is reached that, for example, a health benefit is derived from using a particular drug. A more standard measure is $p < .05$ (less than five chances in a hundred), but in exploratory research and in situations in which samples are smaller in size, a value of $p < .10$ (less than 10 chances in

---

[16] We use the normal distribution because regardless of the distribution of the variable itself, random samples from that distribution (the qualified jury wheel in this case) will approximate the normal distribution. This is known as the Central Limit Theorem, formulated in the early 19th century by the French mathematician Pierre-Simon Laplace (1814), and it is the mathematical centerpiece of the ability to generalize from a sample to the population from which a sample is drawn.

Exhibit 41 - 9

100) is often employed. Those are the three common options. On the other hand, if we followed the standard legal requirement of "more likely than not" used in many civil cases and other legal applications, we would assume that a probability of 49% or less would indicate that the result did not occur by chance (e.g., $p < .50$).

25. Since the p-value for the underrepresentation of Blacks in the jury pool is .003 (3 chances in 1,000), this indicates that the underrepresentation is statistically significant at any of the common cutoffs that would be used by scientists, including even the rigorous $p < .01$ cutoff typically used for medical trials. Thus, the 29% underrepresentation is not only a large disparity, but it is also statistically significant—it almost certainly did not occur by chance. The disparity with respect to Hispanics is lower than that for Blacks, but there is nonetheless a high relative disparity that is statistically significant at the $p < .10$ level.

## Why Does the Disparity Exist?

26. In search of an answer to the question of why there is a disparity, especially with respect to Blacks in the Beaumont Division, I first examined the pattern of disparity by county, to see if the disparity is the same across the six counties that comprise the Division. The data provided to me for the prospective jurors did not include county of residence, but it did include the zip code for each person, which I then linked to the county in which that zip code resides, with the caveat that some zip codes cross county lines, so if one of the zip codes was in a county of the Beaumont Division, I accepted that as a valid zip code.

27. Table 3 (below) shows the disparities by county within the Beaumont Division. In three of the six counties (Jasper, Liberty, and Newton) the percent of prospective jurors who were Black was higher than expected, based on the comparison with the jury-eligible population. In the other three counties (Hardin, Jefferson, and Orange), there were fewer Blacks than expected. In particular, the absolute disparity in Jefferson County is large (-12.25 percentage points), associated with a 34 percent underrepresentation of Blacks. The p-value of .005 tells us that this is a highly statistically significant result. It almost certainly did not occur by chance.

28. It is noteworthy that the largest absolute disparity is found in Jefferson County. This is very important because my calculations show that if the correct percentage of Blacks from Jefferson County had been in the jury pool, there would have been no disparity with respect to the entire Beaumont Division. The deficiency in prospective Black jurors almost certainly stems from

Exhibit 41 - 10

the fact that Jefferson County accounts for 47 percent of the jury-eligible population in the Beaumont Division, but only 34 percent of prospective jurors were drawn from Jefferson County. This suggests a systematic problem in the way in which the court was operating to draw jurors to the courthouse.

| Table 3. Disparities with Respect to Blacks, By County Within the Beaumont Division, 2018 | | | | | | |
|---|---|---|---|---|---|---|
| | Hardin | Jasper | Jefferson | Liberty | Newton | Orange |
| Jurors in Pool | 54 | 44 | 103 | 35 | 10 | 59 |
| Black jurors | 1 | 10 | 25 | 6 | 4 | 3 |
| Percent Blacks in the jury pool | 1.85% | 22.73% | 24.27% | 17.14% | 40.00% | 5.08% |
| Percent Jury-eligible Black in the county (see Table 1) | 5.35% | 15.95% | 36.52% | 11.57% | 19.65% | 8.44% |
| Absolute Disparity | -3.50 | 6.78 | -12.25 | 5.57 | 20.35 | -3.36 |
| Relative Disparity | -65% | 42% | -34% | 48% | 104% | -40% |
| Z-score associated with disparity | -1.13 | 1.21 | -2.57 | 1.02 | 1.54 | -0.92 |
| Probability of the disparity occurring by chance | 0.129 | 0.113 | 0.005 | 0.154 | 0.062 | 0.179 |
| Statistically significant? | NO | NO | YES | NO | YES | NO |

29. There are two zip codes in Jefferson County that are of particular concern for their lack of representation among prospective jurors—77640 and 77701. In both zip codes Blacks comprise a majority of the population. The latter zip code is, in fact, the same one in which the courthouse in Beaumont is located. Yet, there were far fewer qualified jurors from these zip codes than we would have expected. Without additional information about the source list, master jury wheel, and the qualified wheel, it is not possible to discern exactly where the problem lies. However, it does seem that **what happens in Jefferson County is clearly very important in terms of jury representativeness in the Beaumont Division of the Eastern District of Texas.**

Exhibit 41 - 11

30. Habeas counsel has been able to provide me with a file that has information for 2,045 people to whom JQQs were sent in this case. The spreadsheet sent to me does not have participant numbers for 183 of the people to whom questionnaires were sent. Although we know their names, zip codes, and county of residence, we do not have their participant number because we do not have the questionnaire, only a copy of the envelope in which it was sent. Most of these were listed as undeliverable, but we do have participant numbers for many of the undeliverables, so it is not clear why we don't have it for all of them. Of those, 28 did not have a county associated with them, and 81 were sent to a county outside of the Beaumont Division, including several to states other than Texas. Among those for whom we do have a participant number, 15 are duplicates, and one is a triplicate. One of the duplicates represents a duplicate participant number, but the names and zip codes of residence are different. These findings illustrate obvious quality-control issues with the creation of the list.

31. What is particularly noteworthy is that only 40% of the JQQs were sent to Jefferson County, even though the jury-eligible population there is 47% of the Beaumont Division and that county's jury-eligible population has by far the largest percent of people who are non-Hispanic Black, as I noted above. This suggests a clear violation of the proportionality rule, and helps to explain the fact that among the 1,565 respondents to the JQQ who reported their race-ethnicity, only 15% were Black, and only 2% were Hispanic.

32. An analysis of the 1,830 unduplicated participant numbers also indicates that this was not a random draw. The Texas Secretary of State data show that there were 309,566 registered voters in the Beaumont Division in 2018. This is important because the ROV list is the source list for the Jury Master Wheel. If there had been a random draw of 2,045 people from a list of 309,566, the average gap between participant numbers would have been 151 people. In fact, the average gap among the 1,830 unduplicated participant numbers was 2. Indeed, 43% were contiguous (gap = 1), 24% had a gap of 2, and 13% had a gap of 3. Thus, 50% of the participant numbers were within 3 numbers of each other. That was very clearly not a random draw.

33. There is also indirect evidence that the creation of the list of people to whom JQQs were sent was started at the lowest number—indicative of lower voter registration numbers, indicating a longer time ago that a person had registered. This is suggested by the age distribution of the respondents, as shown in Table 4. This is additional evidence that this was not a random draw.

Exhibit 41 - 12

| Table 4. Age Distribution of People to Whom JQQs Were Sent Compared to the Population Age Distribution in the Beaumont Division | | | |
|---|---|---|---|
| Age Group | Jury-Eligible Population | Questionnaire Respondents | Difference |
| 18-29 | 18.5 | 9.9 | -8.6 |
| 30-39 | 18.0 | 9.4 | -8.6 |
| 40-49 | 16.7 | 12.1 | -4.6 |
| 50-59 | 18.5 | 17.5 | -1.0 |
| 60-69 | 14.8 | 22.2 | 7.4 |
| 70+ | 13.5 | 28.9 | 15.4 |
| Total | 100.0 | 100.0 | |

34. There is also evidence that the findings I have presented in this declaration are not temporally unique in the Beaumont Division of the Eastern District of Texas. Habeas counsel have provided me with documents filed in the case of Edgar Garcia (petitioner) v. United States of America (respondent) in the United States District Court, Eastern District of Texas, Beaumont Division—*Case 1:13-cv-00723-MAC-CLS Document 160 Filed 01/25/23*. Mr. Garcia was tried and convicted of first-degree murder in a trial that began in 2009 and in May 2010 he was sentenced to death. A recent review of the jury wheels constructed for his trial, undertaken by Mr. Jeffrey Martin, who is known to me personally to be a highly-qualified expert in this type of analysis, has concluded that the Beaumont Division of the Eastern District created a system in violation of the published Jury Plan, by drawing special wheels for capital cases and then creating the special wheel drawn for Mr. Garcia's pool by selecting names in a non-random fashion (in order of voter identification number), resulting in a jury pool that effectively excluded or substantially underrepresented jurors of color and jurors under the age of 40.

35. The conclusions regarding Mr. Garcia's jury pool are very consistent with what I have found with respect to the creation of Mr. Cramer's specially-drawn jury pool almost ten years later. This suggests a temporal trend, not just a one-off occurrence.

Exhibit 41 - 13

## Conclusion

36. My analysis offers strong statistical evidence that a large and statistically significant underrepresentation of Blacks and Hispanics existed in jury pool of the Beaumont Division of the Eastern District of Texas at the time of Mr. Cramer's trial. Based on the limited data available to me, this appears to be due especially to a much lower than expected number of prospective jurors being drawn from Jefferson County. This was almost certainly a result of jurors having been drawn in a non-random manner from the Registrar of Voter lists. There may also been issues with the Court's lack of follow-up with non-respondents to the Juror Qualification Questionnaires that are sent out as part of the Court's multi-step summoning process, but we do not currently have data that would allow us to address that question.

The foregoing is true and correct and executed under penalty of perjury under the laws of the United States on 8 September 2023.

John R. Weeks, Ph.D.

Exhibit 41 - 14

**APPENDIX A**

**CURRICULUM VITAE OF DR. JOHN R. WEEKS**

Exhibit 41 - 15

---

**JOHN R. WEEKS, Ph.D.**
Distinguished Professor Emeritus of Geography
Director, International Population Center
San Diego State University
San Diego, CA 92182-4493 USA

*email*: john.weeks@sdsu.edu

---

### *CURRICULUM VITAE*
### 2023

---

## EDUCATION

Ph.D. (Demography) University of California, Berkeley, 1972
M.A. (Demography) University of California, Berkeley, 1969
A.B. (Sociology) University of California, Berkeley, 1966

## ACADEMIC POSITIONS

| | |
|---|---|
| 2013 - present | Distinguished Professor Emeritus of Geography, and Director, International Population Center, San Diego State University: https://ipc.sdsu.edu |
| 2012 - present | Research Associate, Broom Center for Demography, University of California, Santa Barbara |
| 2008 -present | Senior Fellow, California Council on Science and Technology |
| 1998 - 2019 | Clinical Professor of Global Public Health, School of Medicine, University of California, San Diego |
| 2010 - 2013 | Distinguished Professor of Geography and Director, International Population Center, San Diego State University |
| 1992 – 2010 | Professor of Geography and Director, International Population Center, San Diego State University |
| 1985 - 1992 | Professor of Sociology and Director, International Population Center, San Diego State University |
| 1981 - 1985 | Professor and Chair, Department of Sociology, San Diego State University |
| 1978 - 1981 | Associate Professor and Chair, Department of Sociology, San Diego State University |
| 1974 - 1978 | Assistant Professor, Department of Sociology, San Diego State University |
| 1971 - 1974 | Assistant Professor of Sociology and Director of Social Science Methods Laboratory, James Madison College, and Assistant Professor of Anthropology (joint appointment), Michigan State University, East Lansing, Michigan |
| 1970 - 1971 | Teaching Assistant, Department of Demography, University of California, Berkeley |

## OTHER PERTINENT PROFESSIONAL EXPERIENCE

Visiting Assistant Research Demographer, International Population and Urban Research, University of California, Berkeley, Summer, 1972
Public Health Statistician, California Department of Public Health, Berkeley, California, 1971
Undergraduate Research Assistant, International Population and Urban Research, University of California, Berkeley, 1964-1966

## RELEVANT HONORS

Recipient of *Lifetime Achievement Award*, American Association of Geographers Population Specialty Group, March 2016
*Commencement Speaker*, College of Arts and Letters, San Diego State University, May 2013.
Recipient of the *Albert W. Johnson Research Award and Distinguished Professorship*, San Diego State University, 2010
Recipient of *Most Influential Professor* Award, Department of Geography (named by Outstanding Graduating Student in Geography), San Diego State University, 2003, 2007
Recipient of San Diego State University Alumni Association *Distinguished Faculty Award in the College of Arts and Letters*, 2003

Exhibit 41 - 16

*Phi Beta Kappa Lecturer*, Nu of California Chapter of Phi Beta Kappa, San Diego State University, 2000

Recipient of *Most Influential Professor* Award, Undergraduate Studies (named by Outstanding Graduating Student in Liberal Studies), San Diego State University, 1996

*Ford Foundation Fellowship in Demography*, Department of Demography, University of California, Berkeley, 1970-1971

*NIH Traineeship in Demography*, Department of Demography, University of California, Berkeley, 1967-1970

*NIMH Traineeship in the Demography of Social Disorganization*, Department of Sociology, University of Southern California, Los Angeles, California, 1966-1967

*California State Scholarship*, University of California, Berkeley, 1962-1966

## PUBLICATIONS

### Books

John R. Weeks, ***Population: Introduction to Concepts and Issues, Thirteenth Edition*** (Boston, MA: Cengage Learning, 2020. [Best-selling textbook in the field of population studies; used in Departments of Demography, Sociology, Geography, Ecology, and related Social and Behavioral Sciences in the United States, Canada, Mexico, the United Kingdom, and elsewhere; earlier editions have been translated into Spanish and Arabic.] The 8th, 9th, and 10th editions are available on audio through http://www.learningally.org. The iPhone app for the 13th edition can be downloaded from the App Store.

John R. Weeks, ***Population: Introduction to Concepts and Issues, Twelfth Edition*** (Boston, MA: Cengage Learning), 2016.

John R. Weeks, Allan G. Hill, and Justin Stoler, Editors, ***Spatial Inequalities: Health, Poverty and Place in Accra, Ghana*** (Dordrecht, The Netherlands: Springer), 2013.

John R. Weeks and Debbie L. Fugate, Editors, ***The Youth Bulge: Challenge or Opportunity?*** (New York: IDEBATE Press), 2012.

John R. Weeks, ***Population: Introduction to Concepts and Issues, Eleventh Edition*** (Belmont, CA: Wadsworth Cengage Learning), 2012.

Gregory B. Weeks and John R. Weeks, ***Irresistible Forces: Explaining Latin American Migration to the United States and Its Effects on the South*** (Albuquerque, NM: The University of New Mexico Press), 2010. (see reviews in *Contemporary Sociology: A Journal of Reviews*, 41:1(110-111), 2012; and *Choice*, September 2011).

John R. Weeks, ***Population: Introduction to Concepts and Issues, Tenth Edition*** (Belmont, CA: Wadsworth Publishing Co.), 2008.

Susan L. Cutter, Margaret Arnold, Deborah Balk, Bela Hovy, Mei-Po Kwan, Jonathan D. Mayer, David R. Rain, Havidan Rodriguez, Barbara Boyle Torrey, Billie L. Turner II, John R. Weeks, and Tukufu Zuberi, ***Tools and Methods for Estimating Populations at Risk From Natural Disasters and Complex Humanitarian Crises*** (Washington, DC: The National Academies Press), 2007.

John R. Weeks, ***Population: Introduction to Concepts and Issues, Ninth Edition*** (Belmont, CA: Wadsworth Publishing Co.), 2005.

John R. Weeks, ***Population: Introduction to Concepts and Issues, Eighth Edition*** (Belmont, CA: Wadsworth Publishing Co.), 2002.

John R. Weeks, ***Population: An Introduction to Concepts and Issues, Seventh Edition*** (Belmont, CA: Wadsworth Publishing Co.), 1999.

John R. Weeks, ***Population: An Introduction to Concepts and Issues, Sixth Edition*** (Belmont, CA: Wadsworth), 1996.

John R. Weeks, ***Population: An Introduction to Concepts and Issues, Updated Fifth Edition*** (Belmont, CA: Wadsworth), 1994.

John R. Weeks, ***Population: An Introduction to Concepts and Issues, Fifth Edition*** (Belmont, CA: Wadsworth), 1992.

John R. Weeks and Roberto Ham-Chande (eds.), ***Demographic Dynamics of the U.S.-Mexico Border*** (University of Texas at El Paso: Texas Western Press), 1992. [Reviewed in *Contemporary Sociology* 22(4) July, 1993; *Foreign Affairs* 73(2) March/April, 1994]

John R. Weeks, ***Population: An Introduction to Concepts and Issues, Fourth Edition*** (Belmont, CA: Wadsworth Publishing Co.), 1989.

John R. Weeks, ***Population: An Introduction to Concepts and Issues, Third Edition*** (Belmont, CA: Wadsworth Publishing Co.), 1986.

John R. Weeks, ***Sociología de la Población*** (Madrid: Alianza Universidad Textos), 1984.

John R. Weeks, ***Aging: Concepts and Social Issues*** (Belmont, CA: Wadsworth Publishing Co.), 1984.

Exhibit 41 - 17

John R. Weeks, *Population: An Introduction to Concepts and Issues, Second Edition* (Belmont, CA: Wadsworth Publishing Co.), 1981.

John R. Weeks, *Population: An Introduction to Concepts and Issues* (Belmont, CA: Wadsworth Publishing Co.), 1978. [Reviewed in *Contemporary Sociology* 8(1):86, 1979].

John R. Weeks, *Teenage Marriages: A Demographic Analysis*, Studies in Population and Urban Demography, Number 2 (Westport, CT:  Greenwood Press), 1976.  [Also made available on tape by Recording for the Blind, Inc., 1979]; [Reviewed in *Population (French Edition)*, Vol. 32, No. 6 (Nov. - Dec., 1977), p. 1316]

John R. Weeks, *Social Statistics: A Competency-Based Workbook* (San Diego: San Diego State University Press), 1975.

## Journal Articles

John R. Weeks, "The Importance of Arthur Getis to Spatial Demography." *Journal of Geographical Systems*, in press.

Shih, H.-C.; Stow, D.A.; Weeks, J.R.; Goulias, K.G.; Carvalho, L.M.V. "The Relative Timing of Population Growth and Land Use Change—A Case Study of North Taiwan from 1990 to 2015." *Land,* 11:2204., 2022.

Holly Shakya, John R. Weeks, Sneha Challa, Paul Fleming, Beniamino Cislaghi, Lotus McDougal, Sabrina Boyce, Anita Raj, and Jay Silverman, "Spatial analysis of individual and village level sociodemographic characteristics associated with age at first marriage among married adolescents in rural Niger," *BMC Public Health*, 20:279, 2020.

Sory I. Touré, John R. Weeks, David López-Carr, and Douglas Stow, "Evaluating links between dynamic urban landscapes and under-five child mortality in Accra, Ghana." *Demographic Research*, Volume 42, Article 20, Pages 589-614, 2020.

Holly Shakya, G. L. Darmstadt, K.M. Barker, John R. Weeks, and Nicholas Christakis, "Social normative and social network factors associated with adolescent pregnancy: a cross-sectional study of 176 villages in rural Honduras." *Journal of Global Health*, 10(1), 2020.

Holly Shakya, John R. Weeks, and Nicholas Christakis, " Do Village-Level Normative and Network Factors Help Explain Spatial Variability in Adolescent Childbearing in Rural Honduras?" *SSM - Population Health* 9 (100371), 2019.

Yu Hsin Tsai, Douglas A. Stow, David López-Carr, John R. Weeks, Keith C. Clarke, and Foster Mensah, "Monitoring Forest Cover Change Within Different Reserve Types in Southern Ghana," *Environmental Monitoring and Assessment*, https://doi.org/10.1007/s10661-019-7450-z, May 2019.

Sory I. Touré, Douglas A. Stow, Keith C. Clarke, and John R. Weeks, "Patterns of Land Cover and Land Use Change within the Two Major Metropolitan Areas of Ghana," *Geocarto International*, https://doi.org/10.1080/10106049.2018.1516244, 2018.

Sory I. Touré, Douglas A. Stow, Hsiao-chien Shih, John R. Weeks, and David López-Carr, "Land Cover and Land Use Change Analysis Using Multi-Spectral Resolution Data and Object-Based Image Analysis," *Remote Sensing of Environment*, 210:259-268, 2018.

Magdalena Benza, John R. Weeks, Douglas A. Stow, David López-Carr, and Keith C. Clarke, "Fertility and Urban Context: A Case Study from Ghana, West Africa, Using Remotely Sensed Imagery and GIS," *Population, Space and Place*, 23(8), 2017.

Lloyd Coulter, Douglas A Stow, Yu-Hsin Tsai, Nicholas Ibanez, Hsiao-chien Shih, Andrew Kerr, Magdalena Benza, John R. Weeks, and Foster Mensah, "Classification and assessment of land cover and land use change in southern Ghana using dense stacks of Landsat 7 ETM+ imagery," *Remote Sensing of Environment*, 184:396-409, 2016.

Magdalena Benza, John R. Weeks, Douglas A. Stow, David López-Carr, and Keith C. Clarke, "A Pattern-Based Definition of Urban Context Using Remote Sensing and GIS," *Remote Sensing of Environment*, 183(15):250-264, 2016.

David López-Carr, Kevin M. Mwenda, Narcisa G. Pricope, Phaedon C. Kyriakidis, Marta M. Jankowska, John Weeks, Chris Funk, Gregory Husak, and Joel Michaelsen, "Climate-Related Child Undernutrition: An Integrated Spatial Analysis Of Health Surveys, NDVI, And Precipitation Data In The Lake Victoria Basin," *IEEE Journal of Selected Topics in Applied Earth Observations and Remote Sensing*, 9(6):2830-2835, 2016.

Steven Crook, Li An, John R. Weeks, and Douglas A. Stow, "Latent Trajectory Modeling of Spatiotemporal Relationships between Land Cover and Land Use, Socioeconomics, and Obesity in Ghana", *Spatial Demography*, 4(3):221-244, 2016.

Douglas Stow, John R. Weeks, Hsiao-chien Shih, Lloyd Coulter, Yu-Hsin Tsai, Andrew Kerr, and Foster Mensah, "Inter-regional pattern of urbanization in southern Ghana in the first decade of the new millennium," *Journal of Applied Geography*, 71:32-43, 2016.

*John R. Weeks, Ph.D.*
*- 3 -*

Exhibit 41 - 18

Sory Touré, Douglas Stow, Hsiang-chien Shih, Lloyd Coulter, John Weeks, Ryan Engstrom and Avery Sandborn, "An object-based temporal inversion approach to urban land use change analysis," *Remote Sensing Letters* 7(5): 503-512, 2016.

Erin E. Conners, Joseph M. Vinetz, John R. Weeks, and Kimberly C. Brouwer, "A global systematic review of Chagas disease prevalence among migrants," *Acta Tropica* 156:68-78, 2016.

Hsiao-chien Shih, Douglas A. Stow, John R. Weeks, and Lloyd Coulter, "Determining the Type and Starting Time of Land Cover and Land Use Change in Ghana Based on Discrete Analysis of Dense Landsat Image Time Series," *IEEE Journal of Selected Topics in Applied Earth Observations and Remote Sensing (JSTARS)*, 9(5):2064-2073, 2015.

Ryan Engstrom, Avery Sandborn, Yu Qin, Jason Burgdorfer, Douglas Stow, John Weeks, and Jordan Graesser, "Mapping slums using spatial features in Accra, Ghana," *Joint Urban Remote Sensing Event (JURSE),* https://doi.org/10.1109/JURSE.2015.7120494, 2015.

Gregory B. Weeks and John R. Weeks, "Immigration and Transnationalism: Rethinking the Role of the State in Latin America," *International Migration*, 53(5):122-134, 2015.

Anna Carla López-Carr, Marta M. Jankowska, Justin Stoler, Caetlin Ofiesh, David Rain, and John R. Weeks, "Agency, Access, and Anopheles: Neighborhood health perceptions and the implications for community health interventions in Accra, Ghana," *Global Health Action*, 8(http://dx.doi.org/10.3402/gha.v8.26492), 2015.

Justin Stoler, John R. Weeks, and Richard Appiah Otoo, "Drinking Water in Transition: A Multilevel Cross-sectional Analysis of Sachet Water Consumption in Accra," *PLOS ONE*, 8(6): e67257. doi:10.1371/journal.pone.0067257, 2013.

Sory Touré, Douglas Stow, John R. Weeks, and Sanil Kumar, "Histogram Curve Matching Approaches for Object-Based Image Classification of Land Cover and Land Use," *Photogrammetric Engineering and Remote Sensing*, 79(5): 433-440, 2013.

Ryan Engstrom, David Rain, Caetlin Ofiesh, Henry Jewell, and John R. Weeks, "Defining Neighborhood Boundaries for Urban Health Research in Developing Countries: A Case Study of Accra, Ghana," *Journal of Maps* (9)1:36-42. 2013.

Stow, Douglas A., John R. Weeks, S. Toure, Christopher Lippitt, Lloyd Coulter, and Eric Ashcroft, "Urban vegetation cover and vegetation change in Accra, Ghana: Connection to housing quality," *Professional Geographer*, Vol. 65 Issue 3, p451-465, 2013.

Marta Jankowska, Magdalena Benza-Fiocco, and John R. Weeks, "Estimating Spatial Inequalities of Urban Child Mortality," *Demographic Research*, 28(2):33-62, 2013.

Günther Fink, John R. Weeks, and Allan G. Hill, "Income and Health in Accra, Ghana: Results from the Time Use and Health Study, *American Journal of Tropical Medicine and Hygiene*, 87(4):608-615, 2012.

Stoler, Justin, John R. Weeks, and Günther Fink, "Sachet drinking water in Ghana's Accra-Tema Metropolitan Area: Past, present, and future," *Journal of Water, Sanitation and Hygiene for Development*, 2(4): 223-240, 2012.

Gregg Verutes, Magdalena Benza-Fiocco, John R. Weeks, and Lloyd L. Coulter, "Health, Poverty, and Place in Accra, Ghana: Mapping Neighborhoods," *Journal of Maps*, Special Issue on Innovative Mapping in Spatial Demography, 8(4):369-373, 2012.

Kimberly C. Brouwer, Melanie L. Rusch, John R. Weeks, Remedios Lozada, Alicia Vera, Carlos Magis-Rodríguez, and Steffanie A. Strathdee, "Spatial Epidemiology of HIV. Among Injection Drug Users in Tijuana, Mexico," *Annals of the Association of American Geographers*, 102(5):1190-1199, 2012.

John R. Weeks, Arthur Getis, Douglas A. Stow, Allan G. Hill, David Rain, Ryan Engstrom, Justin Stoler, Christopher Lippitt, Marta Jankowska, Anna Carla López, Lloyd Coulter, and Caetlin Ofiesh, "Connecting the Dots Between Health, Poverty and Place in Accra, Ghana," *Annals of the Association of American Geographers*, 102(5):932-941, 2012.

Kimberly C. Brouwer, Remedios Lozada, John R. Weeks, Carlos Magis-Rodríguez, Michelle Firestone-Cruz, and Steffanie A. Strathdee, "Intra-Urban Mobility and its Potential Impact on the Spread of Blood-Borne Infections among Drug Injectors in Tijuana, Mexico," *Substance Use and Misuse*, 47(3):244-253, 2012.

Justin Stoler, Dean Daniels, John R. Weeks, Douglas A. Stow, Lloyd L. Coulter, and Brian K. Finch, "Assessing the Utility of Satellite Imagery with Differing Spatial Resolutions for Deriving Proxy Measures of Slum Presence in Accra, Ghana," *GIScience & Remote Sensing*, 49(1):31-52, 2012.

Justin Stoler, Günther Fink, John R. Weeks, Richard Appiah Otoo, Joseph Ampofo, and Allan G. Hill, "When Urban Taps Run Dry: Sachet Water Consumption and Health Effects in Low Income Neighborhoods of Accra, Ghana," *Health & Place*, 18:250-262, 2012.

Marta M. Jankowska, John R. Weeks, and Ryan Engstrom, "Do the Most Vulnerable People Live in the Worst Slums? A Spatial Analysis of Accra, Ghana," *Annals of GIS*, 17(4):221-235, 2011.

Gregory B. Weeks and John R. Weeks, "Latin American Migration to the United States: A Multidisciplinary View," *The Latin Americanist*, 55(4):5-8, 2011.

*John R. Weeks, Ph.D.*
- 4 -

Exhibit 41 - 19

Tsai, Yu Hsin, Douglas Stow, and John R. Weeks, "Comparison of Object-Based Image Analysis Approaches to Mapping New Buildings in Accra, Ghana Using Multi-Temporal QuickBird Satellite Imagery," *Remote Sensing*, 3:2707-2726, 2011.

Justin Stoler, Stephanie K. Brodine, Simeon Bromfield, John R. Weeks, and Henry P. Scarlett, "Exploring the relationships between dengue fever knowledge and Aedes aegypti breeding in St. Catherine Parish, Jamaica: A pilot of enhanced low-cost surveillance, *Research Reports in Tropical Medicine*, 2011(2):1-11, 2011.

John R. Weeks, Justin Stoler, and Piotr Jankowski, "Who's Crossing the Border: New Data on Undocumented Immigrants to the United States," *Population, Space and Place*, 17(1):1-26, 2011.

Joni A. Mayer, Susan I. Woodruff, Donald J. Slymen, James F. Sallis, Jean L. Forster, Elizabeth J. Clapp, Katherine D. Hoerster, Latrice C. Pichon, John R. Weeks, George E. Belch, Martin A. Weinstock, and Todd Gilmer, "Why do teens use indoor tanning? A large-scale evaluation of psychosocial, environmental, and policy level correlates," *American Journal of Public Health*, 101:930-938, 2011. PMID: 21421947

Lola Duque and John R. Weeks, "Towards a Model and Methodology for Assessing Student Learning Outcomes and Satisfaction," *Quality Assurance in Education*, 18(2):84-105, 2010.

Douglas Stow, Chris Lippitt, and John R. Weeks, "Delineation of Neighborhoods of Accra, Ghana Based on QuickBird Satellite Data," *Photogrammetric Engineering and Remote Sensing*, 76(8):907-914, August 2010. PMID: 20689664.

John R. Weeks, Arthur Getis, Allan G. Hill, Samuel Agyei-Mensah, and David Rain, "Neighborhoods and Fertility in Accra, Ghana: An AMOEBA-based Approach," *Annals of the Association of American Geographers*, 100(3):558-578, July 2010. PMCID: PMC3093308.

Justin Stoler, John R. Weeks, Arthur Getis, and Allan G. Hill, "Distance Threshold for the Effect of Urban Agriculture on Elevated Self-reported Malaria Prevalence in Accra, Ghana," *American Journal of Tropical Medicine and Hygiene* 80(4): 547-554, 2009. PMID: 19346373.

Hoerster, K.D., R. L. Garrow, J. A. Mayer, E. J. Clapp, J. R. Weeks, S. I. Woodruff, J. F. Sallis, D. J. Slymen, M. R. Patel, and S. A. Sybert, "Density of indoor tanning facilities in 116 large U.S. cities," *American Journal of Preventive Medicine*, 36(3):243-246, 2009. PMID: 19215849.

Marta Jankowska, Jared Aldstadt, Arthur Getis, John R. Weeks, and Grant Fraley, "An amoeba procedure for visualizing clusters," *Proceedings of GIScience*, 2008.

Douglas A. Stow, Anna Carla López, Christopher Lippitt, Sarah Hinton, and John R. Weeks, "Object-based classification of residential land use within Accra, Ghana based on QuickBird satellite data," *International Journal of Remote Sensing*, 28(22):5167-5173, 2007. PMID: 19424445.

Chris D. Elvidge, P. Cinzano, D. R. Pettit, J. Arvesen, Paul Sutton, Christopher Small, R. Nemani, T. Longcore, C. Rich, J. Safran, John R. Weeks, and S. Ebener, "The Nightsat Mission Concept," *International Journal of Remote Sensing* 28(12):2645-70, 2007.

John R. Weeks, Allan G. Hill, Douglas A. Stow, Arthur Getis, and Debbie Fugate, "Can You Spot a Neighborhood From the Air? Defining Neighborhood Structure in Accra, Ghana," *GeoJournal* 69:9-22, 2007. PMID: 19478993.

Minal R. Patel, Joni A. Mayer, Donald J. Slymen, John R. Weeks, and Ami L. Hurd, "Correlates of Tanning Facility Prevalence within San Diego County, California Census Tracts," *Journal of Community Health* 32:391-400, 2007. PMID: 17940870.

Gregory B. Weeks, John R. Weeks, and Amy J. Weeks, "Latino Immigration to the U.S. South: 'Carolatinos' and Public Policy in Charlotte, North Carolina," *Latino(a) Research Review*, 6:1-2:50-72, 2007.

John R. Weeks, Allan G. Hill, Arthur Getis, and Douglas Stow, 2006, "Ethnic Residential Patterns as Predictors of Intra-Urban Child Mortality Inequality in Accra, Ghana," *Urban Geography* 27(6):526-548. PMCID: PMC2758568.

Tarek Rashed, John R. Weeks, Douglas A. Stow, and Debbie Fugate, "Measuring Temporal Compositions of Urban Morphology through Spectral Mixture Analysis: Toward a Soft Approach to Change Analysis in Crowded Cities," *International Journal of Remote Sensing*, 26(4):699-718, 2005.

John R. Weeks, "What Did He Know, and When Did He Know It?  Putting Glenn Trewartha's Call for Population Geography into Historical Perspective." *Population, Space and Place* 10:279-283, 2004.

John R. Weeks, Arthur Getis, Allan G. Hill, Tarek Rashed, and M. Saad Gadalla, "The Fertility Transition in Egypt: Intra-Urban Patterns in Cairo," *Annals of the Association of American Geographers*, 94 (1):74-93, 2004.

Tarek Rashed, John R. Weeks, Dar Roberts, John Rogan, and Rebecca Powell, "Measuring the Physical Composition of Urban Morphology Using Multiple Endmember Spectral Mixture Models," *Photogrammetric Engineering and Remote Sensing* 69(9): 1111-1120, 2003.

Tarek Rashed and John R. Weeks, "Assessing Vulnerability to Earthquake Hazards Through Spatial Multicriteria Analysis of Urban Areas," International Journal of Geographical Information Science, 17(6):549-578, 2003.

Exhibit 41 - 20

John R. Weeks, "Estimating the Muslim Population in the United States Using Census 2000 Data," *Espaces-Populations-Sociétés*, 2003-1:89-101, 2003.

David L. McIntyre and John R. Weeks, "Environmental Impacts of Illegal Immigration on the Cleveland National Forest in California," *Professional Geographer*, 54(3):392-405, 2002.

Christopher Peak and John R. Weeks, "Does Community Context Influence Reproductive Outcomes of Mexican Origin Women in San Diego, California?", *The Journal of Immigrant Health*, 4(3):125-136, 2002. PMID: 16228756.

Tarek Rashed, John R. Weeks, M. Saad Gadalla, and Allan G. Hill, "Revealing the Anatomy of Cities through Spectral Mixture Analysis of Multispectral Imagery: A Case Study of the Greater Cairo Region, Egypt," *Geocarto International*, 16(4):5-16, 2001.

John R. Weeks, M. Saad Gadalla, Tarek Rashed, James Stanforth, and Allan G. Hill, "Spatial Variability in Fertility in Menoufia, Egypt, Assessed Through the Application of Remote Sensing and GIS Technologies," *Environment and Planning A*, (32):695-714, 2000.

John R. Weeks, Rubén G. Rumbaut, and Norma Ojeda, "Reproductive Outcomes Among Mexico-Born Women in San Diego and Tijuana: Testing the Migration Selectivity Hypothesis," *The Journal of Immigrant Health* 1(2):77-90, 1999. PMID: 16228706.

John R. Weeks, "The Early Years of the PAA," a compilation of Weeks (1996) and Weeks (1997): The Population Association of America--https://www.populationassociation.org/about/our-history

John R. Weeks, "Vignettes of PAA History - Demographics of the Early PAA Board Members," *PAA Affairs* 30(2 - Summer):4, 1997.

John R. Weeks, "Vignettes of PAA History - The Beginnings," *PAA Affairs* 29 (4 - Winter): 3-5, 1996.

Rubén G. Rumbaut and John R. Weeks, "Unraveling a Public Health Enigma: Why do Immigrants Experience Superior Perinatal Health Outcomes?" *Research in the Sociology of Health Care*, 13(B): 337-391, 1996.

Paul Ganster, John R. Weeks, and Roberto Ham-Chande, "Demographic Dynamics of the U.S.-Mexico Border," *International Journal of the Sociology of Language* 114:124-129, 1995

John R. Weeks and Rubén G. Rumbaut, "Infant Mortality Among Ethnic Immigrant Groups," *Social Science and Medicine*, 33(3): 327-334, 1991. PMID: 1925697.

John R. Weeks, "The Binational Survey in San Diego and Tijuana," *Frontera Norte* 2(4): 234-236, 1990.

Rubén G. Rumbaut and John R. Weeks, "Infant Health Among Indochinese Refugees: Patterns of Infant Mortality, Birthweight and Prenatal Care in Comparative Perspective," *Research in the Sociology of Health Care*, Volume 8: 137-196, 1989.

John R. Weeks, Rubén G. Rumbaut, Claire Brindis, Carol Korenbrot, and Donald Minkler, "An Analysis of High Fertility Among Indochinese Refugees," *Public Health Reports*, 104(2): 143-150, 1989. [Abstracted in The Atlantic Monthly, April 1994, pp. 89-90] PMID: 2495548.

John R. Weeks, "The Demography of Islamic Nations," *Population Bulletin* (Population Reference Bureau), 43(4), December, 1988. [Abstracted in International Family Planning Perspectives, 15(2):108-109, 1989; and American Demographics (September, 1989):66; Executive Summary prepared by the Population Reference Bureau in April, 1989, and distributed by the Population Resource Center, Washington, D.C.] PMID: 12281990.

Rubén G. Rumbaut and John R. Weeks, "Fertility and Adaptation Among Indochinese Refugees in the United States," *International Migration Review* 20(2): 428-465, 1986. PMID: 12267858.

John R. Weeks, "Teaching International Demography," *Teaching Sociology* 14: (2):92-101, 1986. PMID: 12268304.

John R. Weeks, "Introduction to Three Papers on Teaching Demography,", *Teaching Sociology* 14(2), 1986.

Sally Koblinsky, John R. Weeks, and Gwen C. Cooke, "Preparation and Practice of Secondary Family Life Education Teachers in Home Economics and Other Disciplines," *Home Economics Research Journal* 13(3):334-344, 1985.

Helen M. Wallace, John R. Weeks, and Earl D. Hollander, "Effects of Proposition 13 on Health Care Services for Mothers and Children in California." *Journal of Public Health Policy* 5(4):458-470, 1984. PMID: 6526934.

Sally A. Koblinsky and John R. Weeks, "Family Life Education in California Secondary Schools," *Journal of School Health* 54(4): 181-184, 1984. PMID: 6564301.

John R. Weeks and Jose B. Cuellar, "Isolation of Older Persons: The Influence of Immigration and Length of Residence," *Research on Aging* 5(4):369- 388, 1983.

Helen M. Wallace, John R. Weeks, and Antonio Medina, "Services for and Needs of Pregnant Teenagers in Large Cities of the United States, 1979-1980," *Public Health Reports* 97(6): 583-588, 1982. PMID: 6890697.

Helen M. Wallace, John R. Weeks, and Antonio Medina, "Changes in the Services and the Needs of Pregnant Teenagers in the Large Cities of the United States: A Follow-up Analysis," *Journal of the American Medical Association* 248(18): 2270-2273, 1982. PMID: 7188595.

John R. Weeks, "An Evaluation of the Use-Effectiveness of Fertility Awareness Methods of Family Planning," *Journal of Biosocial Science* 14(1):32-38, 1982. PMID: 7061541.

Exhibit 41 - 21

John R. Weeks and José B. Cuellar, "The Role of Family Members in the Helping Networks of Older People," *The Gerontologist* 21(4): 388-394, 1981. PMID: 7262568.

José B. Cuellar and John R. Weeks, "Hispanic Elders' Needs, Problems, and Access to Public Benefits and Services," *La  Red/the Net* no. 28, University of Michigan, Institute for Social Research, November, 1980.

John R. Weeks, "Record Linkage in Demography:  History and Application," *Preliminary Papers, Results of Current Research in Demography,* No. 9, Vol.  I, International Population and Urban Research, University of California, Berkeley, February, 1977.

John R. Weeks, "Infant Mortality and Premarital Pregnancy," *Social Science and Medicine* 10(2):165-169, 1976. PMID: 968502.

John R. Weeks, "Urban and Rural Natural Increase in Chile," *Milbank Memorial Fund Quarterly* 48(1):71-89, 1970.

## Chapters in Books

John R. Weeks, "The Future is a Foreign Country: We'll Do Things Differently There," Chapter 7 in Alex Aleinikoff and Alexandra Delano (editors), *New Narratives on the Peopling of America* (Baltimore: Johns Hopkins University Press), 2024.

John R. Weeks, Douglas A. Stow, and Li An, "Demographics, Health Drivers and Impacts on Land-Cover and Land-Use Change in Ghana," in Steven J. Walsh, editor, *Comprehensive Remote Sensing, Volume 9,* pp. 76-89 (Oxford: Elsevier), 2018.

John R. Weeks, "Demographic Transition Theory" in Bryan S. Turner, ed., *The Wiley Blackwell Encyclopedia of Social Theory* (Oxford, UK: Wiley Blackwell Publishing Co.), 2017.

John R. Weeks, "Demography is an Inherently Spatial Science," in Frank M. Howell, Jeremy R. Porter, and Stephen A. Matthews, Editors, *Recapturing Space: New Middle-Range Theory in Spatial Demography* (Dordrecht, The Netherlands: Springer), 2015.

John R. Weeks, "Demographic Transition Theory," and "Malthus, Thomas," in George Ritzer, ed., *The Wiley Blackwell Encyclopedia of Sociology (Updated)* (Oxford, UK: Wiley Blackwell Publishing Co.), 2015.

Gregory B. Weeks and John R. Weeks, "The Train Has Left the Station: Latino Aging in the New South," Chapter 4 in W.A. Vega, K.S. Markides, J.L. Angel, and F.M. Torres-Gil, editors, *Challenges of Latino Aging in the Americas* (Dordrecht: Springer), 2015.

John R. Weeks, "Population Theories and Dynamics," Chapter 5 in Deborah McFarlane, Editor, *Global Population and Reproductive Health* (Burlington, MA: Jones & Bartlett Learning), 2015.

John R. Weeks, "History and Future of World Population," Chapter 2 in Deborah McFarlane, Editor, *Global Population and Reproductive Health* (Burlington, MA: Jones & Bartlett Learning), 2015.

John R. Weeks, "The World Can't Support Its Current Population Without Inequality and Poverty." In *World Geography: Understanding a Changing World* (http://worldgeography2.abc-clio.com/), 2014.

John R. Weeks, Justin Stoler, Allan G. Hill, Alex Zvoleff, "Fertility in Context: Exploring Egocentric Neighborhoods in Accra," Chapter 11 in John R. Weeks, Allan G. Hill, and Justin Stoler, Editors, *Spatial Inequalities: Health Poverty and Place in Accra, Ghana* (Dordrecht, The Netherlands: Springer), 2013.

Alex Zvoleff, Li An, Justin Stoler, John R. Weeks, "What if Neighbors' Neighborhoods Differ: The Influence of Neighborhood Definitions on Health Outcomes in Accra, Chapter 9 in John R. Weeks, Allan G. Hill, and Justin Stoler, Editors, *Spatial Inequalities: Health Poverty and Place in Accra, Ghana* (Dordrecht, The Netherlands: Springer), 2013.

Ryan Engstrom, Caetlin Ofiesh, David Rain, Henry Jewell, and John Weeks, "Defining Neighborhood Boundaries for Urban Health Research: A Case Study of Accra, Ghana," Chapter 4 in John R. Weeks, Allan G. Hill, and Justin Stoler, Editors, *Spatial Inequalities: Health Poverty and Place in Accra, Ghana* (Dordrecht, The Netherlands: Springer), 2013.

John R. Weeks, Allan G. Hill, and Justin Stoler,  "Introduction to the Accra School: An Overview of Health, Poverty, and Place in Accra,"  Chapter 1 in John R. Weeks, Allan G. Hill, and Justin Stoler, Editors, *Spatial Inequalities: Health Poverty and Place in Accra, Ghana* (Dordrecht, The Netherlands: Springer), 2013.

Gregory B. Weeks and John R. Weeks, "The Demographic Fit Between the US and Latin America" Chapter 11 in John R. Weeks and Debbie L. Fugate, Editors, *The Youth Bulge: Challenge or Opportunity?* (New York: IDEBATE Press), 2012.

John R. Weeks, "Why Do Some Countries Have a Demographic Dividend and Others Do Not?" Chapter 10 in John R. Weeks and Debbie L. Fugate, Editors, *The Youth Bulge: Challenge or Opportunity?* (New York: IDEBATE Press), 2012.

John R. Weeks and Debbie L. Fugate, "Introduction: What is the youth bulge and why does it matter?," Chapter 1 in John R. Weeks and Debbie L. Fugate, Editors, *The Youth Bulge: Challenge or Opportunity?* (New York: IDEBATE Press), 2012.

Exhibit 41 - 22

John R. Weeks, "Demographic Transition Theory," and "Malthus, Thomas," in George Ritzer and J. Michael Ryan, eds., *The Concise Encyclopedia of Sociology* (Oxford, UK: Blackwell Publishing Co.), 2011.

John R. Weeks, "Fertility Rate," in Barney Warf, editor, *Encyclopedia of Geography* (Thousand Oaks, CA: Sage Publications), 2010.

John R. Weeks, "Spatial Patterns of Fertility Change in Rural Egypt," Chapter 17 in Luc Anselin and Serge Rey, editors, *Perspectives on Spatial Data Analysis* (New York:  Springer Publishing Co.), 2010.

John R. Weeks, "Defining Urban Areas," Chapter 3 in Tarek Rashed and Carsten Juergens (eds.), *Remote Sensing of Urban and Suburban Areas* (New York: Kluwer Press), 2010.

Kimberly Brouwer, John R. Weeks, Remedios Lozada and Steffanie A. Strathdee, "Integrating GIS into the Study of Contextual Factors Affecting Injection Drug Use Along the Mexico/US Border." Chapter 3 (pp. 27-42) in Yonette F. Thomas, Douglas Richardson, and Ivan Cheung, editors, *Geography and Drug Addiction* (New York: Springer Publishing Co.), 2008.

Tarek Rashed, John R. Weeks, Helen Couclelis, and Martin Herold, "An Integrative GIS and Remote Sensing Model for Place-Based Urban Vulnerability Analysis," Chapter 9 in Victor Mesev, editor, *The Integration of RS and GIS* (New York: John Wiley & Son), 2007.

John Anarfi, George Botchie, Samuel Agyei-Mensah, Nii Ayite Coleman, Raymond Atuguba, Julius Najah Fobil, Allan G. Hill, John R. Weeks, and Jacob Songsore, "Population, Development and Environment in Metropolitan Accra: A Two-Phase Study," in *CICRED Programme International de Rescherche sur les Interactions entre la Population, le Developpement et l'Environnement (PRIPODE)* (Paris: UNESCO), 2007.

John R. Weeks, "Demographic Transition Theory," and "Malthus, Thomas," in George Ritzer, ed., *The Blackwell Encyclopedia of Sociology* (Oxford, UK: Blackwell Publishing Co.), 2006.

John R. Weeks, Dennis Larson, and Debbie Fugate, "Patterns of Urban Land Use as Assessed by Satellite Imagery: An Application to Cairo, Egypt," Chapter 11 in Barbara Entwisle and Paul Stern, editors, *Population, Land Use, and Environment: Research Directions* (Washington, DC: National Academies Press), 2005.

DongMei Chen, John R. Weeks, and John V. Kaiser, "Remote Sensing and Spatial Statistics as Tools in Crime Analysis," Chapter XVI in Fahui Wang, ed., *Geographic Information Systems and Crime Analysis* (Hershey, PA: Idea Group Publishers), 2005.

Ernst C. Griffin and John R. Weeks, "Peopling the Region: San Diego's Population Patterns," in Philip R. Pryde, Editor, *San Diego: An Introduction to the Region, Fourth Edition* (Boston: Pearson Custom Publishing), 2004.

Yuying Li and John R. Weeks, "Marital Status," in Sana Loue and Martha Sajatovic, Editors, *Encyclopedia of Women's Health* (New York: Kluwer Academic/Plenum Publishers), 2004.

Elizabeth Christensen and John R. Weeks, "Maternal Mortality," in Sana Loue and Martha Sajatovic, Editors, *Encyclopedia of Women's Health* (New York: Kluwer Academic/Plenum Publishers), 2004.

James Craine and John R. Weeks, "Life Expectancy," in Sana Loue and Martha Sajatovic, Editors, *Encyclopedia of Women's Health* (New York: Kluwer Academic/Plenum Publishers), 2004.

John R. Weeks and Manuel Miranda, "Mortality," in Sana Loue and Martha Sajatovic, Editors, *Encyclopedia of Women's Health* (New York: Kluwer Academic/Plenum Publishers), 2004.

John R. Weeks, "Morbidity," in Sana Loue and Martha Sajatovic, Editors, *Encyclopedia of Women's Health* (New York: Kluwer Academic/Plenum Publishers), 2004.

John R. Weeks, "Demography" in Kimberly Kempf-Leonard, Editor-in-Chief, *Encyclopedia of Social Measurement* (San Diego: Academic Press), 2004.

John R. Weeks, "The Role of Spatial Analysis in Demographic Research," in Michael F. Goodchild and Donald G. Janelle (eds.), *Spatially Integrated Social Science: Examples in Best Practice* (New York: Oxford University Press), 2004.

John R. Weeks, "Using Remote Sensing and Geographic Information Systems to Identify the Underlying Properties of Urban Environments," Chapter 17 in Tony Champion and Graeme Hugo, eds., *New Forms of Urbanization: Conceptualizing and Measuring Human Settlement in the Twenty-first Century* (London: Ashgate Publishing Limited), 2004, eBook issued in 2017: https://doi.org/10.4324/9781315248073.

John R. Weeks, "Does Night-Time Lighting Deter Crime? An Analysis of Remotely-Sensed Imagery and Crime Data," in Victor Mesev. (ed.), *Remotely-Sensed Cities* (London: Taylor & Francis), 2003.

Tarek Rashed and John R. Weeks, "Exploring the Spatial Association Between Measures from Satellite Imagery and Patterns of Urban Vulnerability to Earthquake Hazards," in *International Archives of the Photogrammetry Remote Sensing and Spatial Information Sciences* (CD-ROM), Regensburg, Germany, June 27-29, 2003, Vol. XXXIV-7/W9:114-152.

John R. Weeks, "Remote Sensing," in Paul Demeny and Geoffrey McNicoll, eds., *Encyclopedia of Population, Revised Edition* (New York: Macmillan Reference USA), 2003.

Exhibit 41 - 23

John R. Weeks, "Population Aging," in David J. Ekerdt, Robert A. Applebaum, Karen C. Holden, Stephen G. Post, Kenneth Rockwood, Richard Schulz, Richard L. Sprott, and Peter Uhlenberg, editors, *Encyclopedia of Aging* (New York: Macmillan Reference USA), 2003.

Rashed, T., J. Weeks, D. Stow, and D. Fugate, "Measuring Temporal Compositions of Urban Morphology through Spectral Mixture Analysis: Toward a Soft Approach to Change Analysis in Crowded Cities," *Proceedings of the Third International Symposium on Remote Sensing of Urban Areas,* Istanbul, Turkey, June 11-13, 2002.

John R. Weeks and Imre E. Quastler, "Population Geographies of Canada and the United States Since 1950," Chapter 4 in Arthur Getis, Judith Getis, and I.E. Quastler, *The United States and Canada: The Land and the People, Second Edition* (New York: McGraw-Hill), 2001.

John R. Weeks, "Jury Representativeness: Challenging the Array," Chapter 7 in Walter F. Abbott and John Batt, eds., *Handbook of Jury Research, Revision 5* (Philadelphia, PA: American Law Institute - American Bar Association), 1999.

Rubén G. Rumbaut and John R. Weeks, "Children of Immigrants: Is Americanization Hazardous to Infant Health?" in Hiram E. Fitzgerald, Barry M. Lester, and Barry Zuckerman, editors, *Children of Color: Research, Health, and Policy Issues* (New York: Garland Publishing), 1999.

John R. Weeks, "Demographic Dynamics of the San Diego-Tijuana Region," Chapter 2 (pp 17-34) in Mark Spalding, editor, *Sustainable Development in San Diego-Tijuana: Environmental, Social and Economic Implications of Interdependence* (La Jolla: Center for US-Mexican Studies, University of California, San Diego), 1999.

John R. Weeks and Karyl Fuller, "Population Distribution and Migration: Components of Housing Demand and Supply," pp. 60-79 in D. Wozniak, T. Shuman, A. Roet, and M. Garrett, editors, *Human Settlements Habitat: Proceedings and Recommendations of the International Symposium on Human Settlements* (San Diego State University: International Institute for Human Resources Development), 1996.

John R. Weeks, "Population Trends Since 1950," Chapter 5 in Arthur Getis and Judith Getis, Editors, *North America: The Land and the People* (Dubuque, IA: W.C. Brown Publishers), 1995.

John R. Weeks, "The Six Pillars of Global Population and Social Change," *Population Research Group Research Paper 95-01* (East Lansing, MI: Michigan State University, Institute for Public Policy and Social Research), 1995.

John R. Weeks, "Population," Chapter 3 in Anthony DeSouza and Frederick Stutz, *A Geography of World Economy* (New York: Macmillan), 1994.

John R. Weeks, "The Changing Demographic Structure of the San Diego Region," in Norris Clement, editor, *San Diego and Tijuana in Transition* (San Diego State University: Institute for Regional Studies of the Californias), 1993.

John R. Weeks, "The Economic and Social Implications of Population Aging in the Context of Internal and International Migration," pp. 143-162 in T. Shuman et al., *Population Aging: International Perspectives: Proceedings and Recommendations of the International Conference of Population Aging* (San Diego State University: University Center on Aging), 1993

John R. Weeks, "Service Provider Attitudes Toward Natural Family Planning," Chapter 6 in L.A. Severy (Editor), *Advances in Population: Psychosocial Perspectives, Volume 1* (London, England: Jessica Kingsley Publishers, Ltd), 1993. PMID: 12159241.

John R. Weeks and Roberto Ham-Chande, "Demographic Dynamics in the Context of the U.S.-Mexico Border," Chapter 15 in John R. Weeks and Roberto Ham-Chande (eds.), *Demographic Dynamics of the U.S.-Mexico Border* (University of Texas at El Paso: Texas Western Press), 1992.

Roberto Ham-Chande and John R. Weeks, "A Demographic Perspective of the U.S.-Mexico Border," Chapter 1 in John R. Weeks and Roberto Ham-Chande (eds.), *Demographic Dynamics of the U.S.-Mexico Border* (University of Texas at El Paso: Texas Western Press), 1992.

John R. Weeks, "Introduction," in Fareed H. Nu'man, *The Muslim Population in the United States: A Brief Statement* (Washington, D.C.: American Muslim Council), 1992.

Manual García y Griego, John R. Weeks, and Roberto Ham-Chande, "Migration to Mexico," in C. Nam, R. Weller, and W. Serow (eds.), *Comparative Handbook of International Migration* (Westport, CT: Greenwood Press), 1990.

John R. Weeks, "Factors Affecting the Choice of Natural Family Planning," pp. 77-84 in *Proceedings of the Fifth National and International Symposium on NFP* (Los Angeles: Los Angeles Regional Family Planning Council), 1990.

John R. Weeks, "How to Influence Fertility: The Experience So Far." Chapter 15 in Lindsey Grant (ed.), *Elephants in the Volkswagen: Facing the Tough Questions about Our Overcrowded Country* (New York: W.H. Freeman Company), 1992. PMID: 12178971.

Exhibit 41 - 24

John R. Weeks, "Asian-American Aged," pp. 49-50 in G. Maddox (ed.), *Encyclopedia of Aging* (New York: Springer Publishing Co.), 1986.

John R. Weeks and Joseph Spielberg Benitez, "The Cultural Demography of Midwestern Chicano Communities," in S.A. West and J. Macklin (eds.), *The Chicano Experience* (Boulder, CO: Westview Press), pp. 229-251, 1979, reissued as an eBook in 2019: https://doi.org/10.4324/9780429051197.

John R. Weeks, "Retirement Homes:  Economic Realities and Implications for Ethnic Minority Elders," in E.P. Stanford (ed.), *Retirement: Concepts and Realities* (San Diego State University:  University Center on Aging) pp. 151-159, 1978.

## Reviews and Other Publications

John R. Weeks, 'The Great Demographic Illusion: Majority, Minority, and the Expanding American Mainstream," *Contemporary Sociology*, November 2023.

Gregory Weeks and John R. Weeks, "The political demography of U.S.-Cuba relations," http://www.washingtonpost.com/blogs/monkey-cage/wp/2014/12/18/the-political-demography-of-u-s-cuba-relations/, 2014.

John R. Weeks, "Review of Mark Baldassare, 'California in the New Millennium: The Changing Social and Political Landscape,' Berkeley, CA: University of California Press, 2000." *Professional Geographer*, 53, 2001.

John R. Weeks, "Review of Charles Hirschman, Philip Kasinitz, and Josh DeWind, editors, 'Handbook of International Aging: The American Experience.' *Journal of Immigrant Health*, 3(3):165-167, 2001.

John R. Weeks, "Review of Donald J. Hernandez and Evan Charney, editors, 'From Generation to Generation: The Health and Well-Being of Children in Immigrant Families,' Washington, DC, National Academy of Sciences Press, 1998," *Contemporary Sociology* 29(2): 399-400, 2000.

John R. Weeks, "Review of 'Fertility in the United States: New Patterns, New Theories,' by Casterline, Lee, and Foote," *Population and Environment* 19(6): 577-580, 1998.

John R. Weeks, "Review of 'Aging and Ethnicity: Knowledge and Services' by Donald Gelfand," *Ageing and Society*, 15(2): 138-139, 1995.

John R. Weeks, "Review of 'Immigration and Ethnicity: The Integration of America's Newest Arrivals' by Barry Edmonston and Jeffrey S. Passel," *Population Research and Policy Review*, 14(2):274-276,1995.

John R. Weeks, "Review of 'Painful Inheritance: Health and the New Generation of Fatherless Families' by Ronald J. Angel and Jacqueline L. Angel," *American Journal of Sociology*, (November): 841-843, 1994.

John R. Weeks, "Review of 'The Fourth Wave' and 'Opening and Closing the Doors'," *Population and Environment*, 15(1): 71-72, 1993.

John R. Weeks, "Review of 'The Fear of Population Decline' by Michael Teitelbaum and Jay M. Winter.'" *Canadian Studies in Population* 15(2): 234-236, 1988.

John R. Weeks, "Review of 'Population and Technological Change: A Study of Long-Term Trends' by Ester Boserup," *The Journal of Developing Areas* 17(4):544-546, 1983.

John R. Weeks, "Review of 'Age and Sex Population Projections of Utah Counties', by Therel Black and James Tarver," *Sociology and Social Research* 51(2):386-388, 1967.

## SELECTED OTHER RESEARCH REPORTS

John R. Weeks, "The Use and Abuse of Sampling and Statistical Methods in Construction Defect Lawsuits," last revised 2023.

John R. Weeks and David M. Eisenberg, "Estimating the Cost to the County of San Diego, California, of Services Delivered to Undocumented Immigrants During FY 2006-07," Final Report to the County of San Diego, 2007.

Tanis Salant, John R. Weeks, Efrat Feferman, Jenna Berman, and David Eisenberg, "Undocumented Immigrants in U.S.-Mexico Border Counties: The Costs of Law Enforcement and Criminal Justice Services," Final Report to the United States/Mexico Border Counties Coalition, 2008, https://www.ncjrs.gov/pdffiles1/nij/grants/223285.pdf

Tanis Salant, Christine Brenner, Nadia Rubaii-Barrett, and John R. Weeks, "Illegal Immigrants in U.S./Mexico Border Counties: The Costs of Law Enforcement, Criminal Justice, and Emergency Medical Services." Final Report to the United States/Mexico Border Counties Coalition, 2001, earthops.org/immigration/bordercounties/frontdocs.pdf

John R. Weeks, John V. Kaiser, Dongmei Chen, and Michael T. Dolan, "Identification of Urban Areas at High Risk for Criminal Activity Through Image Analysis: What are the Possibilities?"  Final Report to NASA Earth Science Enterprise Commercial Remote Sensing Program, Affiliated Research Center, San Diego State University, 2000.

Exhibit 41 - 25

John R. Weeks, "An Analysis of the Sampling and Extrapolation Methods Utilized by Curtis Guy Odom of The Diehl Group Architects, Inc.," prepared in the case of Canyon Rim Townhomes Association v. The Baldwin Company et al., Orange County Superior Court, 1997.

John R. Weeks, "An Analysis of the Sampling and Extrapolation Methods Utilized by Bruck Allen Architects, Inc.," prepared in the case of The Lakes at Carmel Del Mar Condominium Association v. The Baldwin Company et al., San Diego Superior Court, 1996.

John R. Weeks, "The Muslim Population of San Diego County: An Assessment of Pilot Project Methods and Results," Final Report Submitted to the American Muslim Council and Dar al Islam, July 1996.

John R. Weeks, "The Economic Adjustment of Small to Medium Sized Defense Related Firms in San Diego County: With Comparisons of the East, Central, North and South Regions of the County," Prepared for the East County Economic Development Council under contract with the City of San Diego, Economic Development Services, as part of Grant No. CR 9223-94-02 from the Office of Economic Adjustment of the U.S. Department of Defense, December 1995.

John R. Weeks, "The Economic Adjustment of Small to Medium Sized Defense Related Firms in the City of San Diego," Prepared for the East County Economic Development Council under contract with the City of San Diego, Economic Development Services, as part of Grant No. CR 9223-94-02 from the Office of Economic Adjustment of the U.S. Department of Defense, November 1995.

John R. Weeks, "An Evaluation of The Termination of San Diego County's Family Planning Program: Final Report," Prepared for the California Family Planning Council, January, 1995.

John R. Weeks, "The Economic Adjustment of Small Defense Related Firms in the East County Region of San Diego County: Analysis and a Prototype," Prepared for the East County Economic Development Council under contract with the City of San Diego, Economic Development Services, as part of Grant No. CR 9223-94-02 from the Office of Economic Adjustment of the U.S. Department of Defense, December 1994.

John R. Weeks, "Perceptions of Health Care in the East County."  La Mesa, CA: East County Economic Development Council, 1994.

John R. Weeks, "Health Status of American Muslims: A Report of Findings from a Set of Preliminary Questionnaires Administered by the American Muslim Council," Prepared for the American Muslim Council, Washington, D.C., 1994.

John R. Weeks, Editor, "The Demographics of East County" (La Mesa, CA: East County Economic Development Council), 1993.

John R. Weeks, "The Nascent Awareness of Muslims in America," Prepared at the request of the American Muslim Council, Washington, D.C., 1993.

Rubén G. Rumbaut and John R. Weeks, "Perinatal Risks & Outcomes Among Low-Income Immigrants," Final Report for Grant MCJ-060595-01 from the U.S. Bureau of Maternal and Child Health and Resources Development, 1992.

David Feldman and John R. Weeks, "Perceptions of East County: The View from Outside," Report for the East County Economic Development Council, 1991.

John R. Weeks, "The Impact of Jobs on Business: Results of a Study Conducted by the East County Economic Development Council."  Final Report submitted to the East County Economic Development Council, La Mesa, California, 1991.

John R. Weeks, "The Demographics of the East County Judicial District of the San Diego Superior Court," prepared for the case of People v. Vera, San Diego Superior Court, 1989.

John R. Weeks and Roberto Ham-Chande, with Norma Ojeda, "Demographic Interrelatedness of the U.S.-Mexico Border," Final Report submitted to the U.S. Bureau of the Census, Joint Statistical Agreement Project No. 01-70-20-5900-00-258, May 1989.

John R. Weeks, "Factors Affecting the Choice of Natural Family Planning," Final Report submitted to the U.S. Office of Population Affairs, Research Grant No. FPR 000052-01-0, January 1989.

John R. Weeks, "Population Projection Analysis for the Wastewater Program Management Project", prepared for James M. Montgomery, Consulting Engineers, Inc., San Francisco, California, on behalf of the County of San Diego, September 1988.

John R. Weeks and Rubén G. Rumbaut, "Infant Health and Mortality Among Indochinese Refugees in San Diego County: Final Report," Final Report submitted to the Division of Maternal and Child Health, Bureau of Health Care Delivery and Assistance, Research Grant No. MCJ-060551, August 1988.

John R. Weeks, "Report on an Analysis of the Procedures Used to Develop the Master Juror Qualification List in Los Angeles County," prepared for the case of People v. Richard Ramirez, Los Angeles Superior Court, May 1988.

John R. Weeks, "A Comparison of the Demographics of the Pool of Eligible Jurors in the Community with the Demographics of a Sample of Jurors in the Courthouse: Los Angeles Superior Court, Central Judicial District:

Exhibit 41 - 26

August-December 1987," prepared for the case of People v. Richard Ramirez, Los Angeles Superior Court, March 1988.

John R. Weeks, "A Comparison of the Demographics of the Pool of Eligible Jurors in the Community with the Demographics of a Sample of Jurors in the Jury Lounge, San Diego Courthouse, January-February 1988," prepared for the case of People v. Mayer, San Diego Superior Court, 1988.

John R. Weeks, "A Comparison of the Demographics of the Pool of Eligible Jurors in the Community with the Demographics of a Sample of Jurors in the Courthouse: Los Angeles Superior Court, Western (Santa Monica) Judicial District: August 1987-February 1988," prepared for the case of People v. Ware, Los Angeles Superior Court, 1988.

John R. Weeks, "An Analysis of the Demographics of Jury Composition in the Riverside Superior Court, March-April 1987," prepared for the case of People v. Neidiffer and Cruz, Riverside Superior Court, 1987.

John R. Weeks and Roberto Ham-Chande, "Binational Symposium on Population Issues Along the U.S.-Mexico Border," Summary Report of Conference held in Tijuana, Mexico, June 1987.

John R. Weeks, "A Comparison of the Demographics of the Pool of Eligible Jurors with the Demographics of a Sample of Jurors in the Jury Lounge, San Diego Courthouse, March-April 1987," prepared for the case of People v. Lucas, San Diego Superior Court, 1987

John R. Weeks, "The Development of Information Related to U.S. and Mexican Populations," Report to the William and Flora Hewlett Foundation, 1987.

John R. Weeks, "The Disparity Between the Proportion of Blacks in the Population and Proportion of Blacks Surveyed in the Jury Lounges: Vista and San Diego," prepared for the case of People v. Troiani, San Diego Superior Court, 1986.

John R. Weeks, "Teenage Male Attitudes Toward Adolescent Pregnancy," Final Report to the San Diego Community Foundation, 1984.

Helen M. Wallace and John R. Weeks, "Effects of Proposition 13 on Health Care Services for Mothers and Children in California:  Reports of Periodic Monitoring, 1978-1984," Final Report to the Division of Maternal and Child Health, U.S. Department of Health and Human Services, 1984.

John R. Weeks, "The Availability of Members of Potentially Cognizable Groups in the Pool of Prospective Jurors," prepared for the case of People v. Ivory, San Diego Superior Court, 1984.

John R. Weeks, "SDSU Demographics in the Year 2000," Report prepared for the Directions 2000 Committee of the California State University Board of Trustees, 1982

John R. Weeks and Sally A. Koblinsky, "An Assessment of Family Life Education in the 9th and 10th Grades in California," Final Report to the Office of Family Planning, California Department of Human Services, 1982.

José B. Cuellar and John R. Weeks, "Minority Elderly Americans: A Prototype for Area Agencies on Aging," Final Report for Grant No. 90-A-1667 (01) from the Administration on Aging to the San Diego Area Agency on Aging and Allied Home Health Association, 1980.

John R. Weeks, "The Need for In-Home Services in San Diego, Part II, "Final Report for Contract No. 002901 from the San Diego Regional Employment and Training Consortium to Allied Community Services, 1978.

John R. Weeks, "The Need for In-Home Services in San Diego, Part I," Final Report for Contract No. 002401 from the San Diego Regional Employment and Training Consortium to Allied Community Services, 1978.

**RESEARCH SUPPORT**

John R. Weeks, Mentor to Holly Shakya, "Adolescent pregnancy and social networks in rural Honduras," K01HD087551 Grant from the National Institute of Child Health and Human Development, 2016-2023.

John R. Weeks, Co-Principal Investigator, "The Urban Transition in Ghana and Its Relation to Land Cover and Land Use Change Through Analysis of Multi-Scale and Multi-Temporal Satellite Image Data," National Aeronautics and Space Administration (Douglas Stow, PI), 2012-2016 ($900,000).

John R. Weeks, Mentor to Peter Davidson, "A Mixed-Method Study of Injection Drug Use Settings among FSWs in Tijuana", K01DA032443 grant from the National Institute of Drug Abuse, 2012-2017.

John R. Weeks, Mentor to Abby Randolph, "HIV and Substance Abuse Epidemiology among IDUs: Structural and Network Risk Factors", K01DA033879 grant from the National Institute of Drug Abuse, 2012-2017.

John R. Weeks, Principal Investigator, "Doctoral Dissertation Research: Integrating Space and Place into Children's Perceptions of Environmental Health Hazards," Marta Jankowska, Doctoral Student. Grant from the National Science Foundation, 2011-2013 ($11,585).

John R. Weeks, Principal Investigator/Project Director (Allan G. Hill, Arthur Getis, Douglas Stow, David Rain, and Ryan Engstrom, Co-Investigators), "Health, Poverty, and Place: Modeling Inequalities in Accra Using RS and GIS," R01 Grant from the National Institute of Child Health and Human Development, 2007-2012 ($3,000,000); Diversity Post-Doctoral Supplement, 2009-2011 ($167,000); ARRA Administrative Supplement, 2009 ($72,000).

John R. Weeks, Principal Investigator, "Determining the Costs of Emergency Medical Services Provided to Undocumented Immigrants in San Diego County," Contract with the County of San Diego, 2007 ($40,000).

John R. Weeks, Principal Investigator, "Determining the Costs of Illegal Immigrant Criminal Activity in San Diego Imperial, and Yuma Counties in 2006," Grant from the U.S. Department of Justice, through the United States/Mexico Border Counties Coalition, 2007 ($17,500).

John R. Weeks, Arthur Getis, and Douglas Stow, "Summer Award for External Funding Proposal Development," Grant from the SDSU College of Arts and Letters, 2005 ($5,000).

John R. Weeks, Principal Investigator (Allan G. Hill, Arthur Getis, and Douglas Stow, Co-Investigators), "Intraurban Health Assessed by Remote Sensing and GIS," R21 Grant from the National Institute of Child Health and Human Development, 2004-2007 ($320,000).

John R. Weeks, Co-Principal Investigator (with Arthur Getis), "SPACE Workshop," Grant from the University Consortium on Geographic Information Science, 2004 ($26,000).

John R. Weeks, Co-Investigator (Douglas Stow, PI), "Spatial Decision Support for Border Security," Grant from the National Aeronautics and Space Administration (NASA), 2003-2007 ($900,000).

John R. Weeks, Co-Investigator (Joni Mayer, PI), "Multi-Level Assessment of Indoor Tanning Practices," Grant from the National Cancer Institute, 2003-2007 ($1.2 million).

John R. Weeks, Principal Investigator, "Doctoral Dissertation Research: Measuring the Environmental Context of Social Vulnerability to Urban Earthquake Hazards: An Integrative Remote Sensing and GIS Approach," Tarek Rashed, Doctoral Student. Grant from the National Science Foundation, 2001-2003 ($6,400).

John R. Weeks, Principal Investigator (Allan G. Hill, Arthur Getis, Douglas Stow, and Saad Gadalla, Co-Investigators), "Applying Remote Sensing and Geographic Information System Techniques to the Arab Fertility Transition," Grant from the National Science Foundation, 2001-2004 ($360,000).

John R. Weeks, Principal Investigator, "Determining the Costs of Illegal Immigrant Criminal Activity and Use of Emergency Medical Services in San Diego and Imperial Counties," Grant from the U.S. Department of Justice, through the United States/Mexico Border Counties Coalition, 2000-2001 ($45,000).

John R. Weeks, Co-Principal Investigator, "Identification of Urban Areas at High Risk for Criminal Activity Through Image Analysis: What are the Possibilities?" Grant from the National Aeronautics and Space Administration, Commercial Remote Sensing Program to the San Diego State University Department of Geography Affiliated Research Center (Douglas A Stow, Principal Investigator), 1999 ($50,000).

John R. Weeks, Project Director, "Urban Growth and Socio-Spatial Change in Latin America," San Diego State University Faculty Grant-in-Aid, 1998-99 ($7,500).

John R. Weeks, Principal Investigator (with Allan G. Hill, Harvard University, and M. Saad Gadalla, San Diego State University), "Applications of GIS/Remote Sensing to an Analysis of the Arab Fertility Transition," Grant from the Andrew Mellon Foundation, 1998-2000 ($100,000).

John R. Weeks, Project Director, "Enumerating the Muslim Population of Los Angeles," Grant from the American Muslim Council, 1997($50,000).

John R. Weeks, Project Director, "A Census of the Muslim Population in the United States: Pilot Project in San Diego County," Grant from Dar al Islam (private foundation in New Mexico), 1995 ($40,000).

John R. Weeks, Project Director, "A Study of the Needs of Small Defense-Related Firms in San Diego County," Grant from the U.S. Department of Defense, Office of Economic Adjustment to the City of San Diego Economic Development Services and the East County Economic Development Council, 1994-95.

John R. Weeks, Project Director, "Evaluation of the Closing of San Diego County's Family Planning Program," California Family Planning Council, 1994.

John R. Weeks, Project Director, "Outcomes Measures of Perinatal Risks Among Low Income Immigrant Women," San Diego State University Faculty Grant-in-Aid. 1993.

John R. Weeks, Project Director, "Expert Group Meeting on the Enumeration and Sociodemographic Characterization of the American Muslim Population," American Muslim Council, 1992.

John R. Weeks, Project Director, "Coding of Data on Perinatal Risks and Outcomes," SDSU College of Arts and Letters Mini-Grant, 1992.

John R. Weeks, Co-Principal Investigator (with Rubén G. Rumbaut), "Perinatal Risks and Outcomes Among Low-Income Immigrants," grant from the U.S. Public Health Service, Bureau of Maternal and Child Health and Resource Development, 1990-91.

John R. Weeks, Project Director, "Publication of Proceedings of Population Issues Along the U.S.-Mexico Border," grants from the S.H. Cowell Foundation, and the William and Flora Hewlett Foundation, 1990.

John R. Weeks, Project Director, Research, Scholarship, and Creative Activity mini-grant from San Diego State University, Spring, 1990.

John R. Weeks, Project Director, Research, Scholarship, and Creative Activity mini-grant from San Diego State University, Spring, 1989.

Exhibit 41 - 28

John R. Weeks, Principal Investigator, "Demographic Interrelatedness of the U.S. Mexico Border Region," Grant from the S.H. Cowell Foundation, and a Joint Statistical Agreement (JSA) with the U.S. Bureau of the Census, 1988-1989.

John R. Weeks, Principal Investigator, "Factors Affecting the Choice of Natural Family Planning," Grant from the U.S. Office of Population Affairs to the San Diego State University Foundation, 1987-1988.

John R. Weeks, Co-Principal Investigator (with Rubén G. Rumbaut), "An Analysis of Infant Mortality Among Indochinese Refugees," Grant from the U. S. Office of Maternal and Child Health to the San Diego State University Foundation, 1987-1988.

John R. Weeks, Project Director, "Border Issues in Population/Family Planning," Grants from the William and Flora Hewlett Foundation, the Bergstrom Foundation, the S. H. Cowell Foundation, and the Rockefeller Foundation to the San Diego State University Foundation, 1986-1987.

John R. Weeks, Principal Investigator, "Further Analysis of Live Birth Data for San Diego County," Grant for Support of Faculty Research for the Summer of 1985, San Diego State University, 1985.

John R. Weeks, Principal Investigator, "Analysis of Live Birth Data for San Diego County, 1983-1984," Grant from San Diego Urban League to San Diego State University Foundation, 1985.

John R. Weeks, Principal Investigator, Analysis of Survey Data on Male Attitudes Toward Teenage Pregnancy," Grant from San Diego Community Foundation to San Diego State University Foundation, 1984.

John R. Weeks, Co-Principal Investigator (with Helen M. Wallace), "Effects of Proposition 13 on Health Services in California," Grant from the U.S. Office of Maternal and Child Health Services in California," Grant from the U.S. Office of Maternal and Child Health to the San Diego State University Foundation, 1983-1984.

John R. Weeks, Co-Investigator (with Helen M. Wallace), "Maternal and Child Health Project," Grant from the U.S. Office of Maternal and Child Health to the San Diego State University Foundation, 1982-1983.

John R. Weeks, Co-Principal Investigator (with Helen M. Wallace, Gwen C. Cooke, and Sally A. Koblinsky), "The Family Health Education and Training Project," Contract No. 49800365 from the California Office of Family Planning to the San Diego State University Foundation, 1981-1982.

John R. Weeks, Co-Principal Investigator (with José B. Cuellar), "Minority Elderly Americans: Development of a Prototype for Area Agencies on Aging in the Assessment of Equitability of Receipt of Public Benefits in Housing, Employment, Retirement, Income, Health, and Services," Grant No. 90-A-1667 (01) from the U. S. Administration on Aging to the San Diego Area Agency on Aging and Allied Home Health Association, 1979-1980.

John R. Weeks, Principal Investigator, "Client and Population Based Information System for Managing and Evaluating In-Home Services," Contract No. 002901 from the San Diego Regional Employment and Training Consortium to Allied Community Services, 1978.

John R. Weeks, Principal Investigator, "Management Information System for In-Home Service," Contract No. 002401 from the San Diego Regional Employment and Training Consortium to Allied Community Services, 1978.

## PAPERS PRESENTED AT PROFESSIONAL MEETINGS

John R. Weeks, "How Has Teaching Demography Evolved Over Time," presented at the (virtual) annual meeting of the Population Association of America," May 2021.

John R. Weeks, "Educational Level as a Key Predictor of Human Wellbeing," presented at the Wittgenstein Centre Conference, Demographic Aspects of Human Wellbeing, Vienna, Austria, November 2019.

Holly Shakya, John R. Weeks, and Nicholas Christakis, "Individual Social Network Factors Across Disparate Relationships: Social Norms and Their Association with Adolescent Pregnancy in Rural Honduras," presented at the annual meeting of the Population Association of America, Austin, TX, April 2019.

Holly Shakya, John R. Weeks, and Nicholas Christakis, "Village Level Normative: Spatial and Social Network Predictors of Adolescent Pregnancy in Rural Honduras," presented at the annual meeting of the Population Association of America, Denver, April 2018.

Holly Shakya, John R. Weeks, Paul J. Fleming, Lotus McDougal, Anne Scobel, Benjamin Cislaghi, Sabrina Boyce, Anita Raj, and Jay Silverman, "The Association Between Individual and Village-Level Demographic Characteristics and Age at First Marriage Among Married Adolescents in Rural Niger: A Spatial Analysis," presented at the annual meeting of the Population Association of America, Denver, April 2018.

Holly Shakya, John R. Weeks, and Nicholas A. Christakis, "Distribution of adolescent fertility in the Copán region of rural Honduras: Results from a complete census of 176 villages," presented at the annual meeting of the Population Association of America, Chicago, April 2017.

John R. Weeks, "Child mortality along the urban gradient in Ghana," presented at the annual meeting of the American Association of Geographers, Boston, April, 2017.

Exhibit 41 - 29

John R. Weeks and Gregory B. Weeks, "Too Big to Succeed? Demography and Socialist Experiments in Chile and Venezuela," presented at the annual meeting of the Southeastern Council of Latin American Studies (SECOLAS), Charleston, SC, March 2015.

Magdalena Benza, John R. Weeks, Douglas A. Stow, Keith C. Clarke, and David López-Carr, "Fertility and Urban Context: A Case Study from West Africa Using Remotely Sensed Imagery and GIS," presented at the Annual Meeting of the Population Association of America, San Diego, April 2015.

John R. Weeks and Allan G. Hill, "Inequalities in health, morbidity and mortality in Accra, Ghana," presented at the European Health, Morbidity and Mortality Working Group, and British Society for Population Studies Workshop on "The continuing Importance of Inequality in Health and Mortality Analyses," London School of Economics, London, England, September 2014.

John R. Weeks, Douglas A. Stow, David López-Carr, Ryan Engstrom, Lloyd Coulter, Sory Toure, Nicholas Ibanez, Foster Mensah, and Sean Taugher, "Environmental Drivers of Internal Migration in Ghana," presented at the Annual Meeting of the Association of American Geographers, Miami, April, 2014.

Douglas Stow, Lloyd Coulter, John R. Weeks, Magdalena Benza-Fiocco, Sory Toure, and Nicholas Ibanez, "The Urban Transition in Ghana and Its Relation to Land Cover and Land Use Change Through Analysis of Multi-scale and Multi-temporal Satellite Image Data," presented at the Annual Meeting of the American Society of Photogrammery and Remote Sensing, Louisville, March, 2014.

Anna Carla Lopéz, David Lopéz-Carr, Laura Grant, and John R. Weeks, "The Spaces and Places of Food Security: Learning from Spatial, Hierarchical, and Econometric Models in Urban Data-poor Areas," presented at the General Meeting of the International Union for the Scientific Study of Population (IUSSP), Busan, Korea, August, 2013.

Allan G. Hill, John R. Weeks, and Magdalena Benza Fiocco, "Towards The Demography Of Ill-Health: Comparing the Geographical Distributions Of Mortality and Health in Ghana," presented at the Annual Meeting of the British Society for Population Studies, Nottingham, UK, September, 2012.

John R. Weeks, Justin Stoler, Allan G. Hill, and Alex Zvoleff, "Fertility in Context: Exploring Egocentric Neighborhoods in Accra, Ghana," Presented at the Annual Meeting of the Association of American Geographers, New York, NY, February 2012; and at the Annual Meeting of the Population Association of America, San Francisco, May, 2012.

John R. Weeks, "Connecting the Dots Between Health, Poverty and Place in Accra, Ghana," Presented at the Annual Meeting of the Association of American Geographers, Seattle, WA, April, 2011.

John R. Weeks, Samuel Agyei-Mensah, George Owusu, Allan G. Hill, and Magdalena Benza-Fiocca, "Ethnic Assimilation in Accra, Ghana," Presented at the Annual Meeting of the Population Association of America, Washington, DC, April, 2011.

Charles F. Westoff and John R. Weeks, "Religiousness and Reproduction in Muslim Countries," Presented at the Annual Meeting of the Population Association of America, Dallas, April, 2010.

John R. Weeks, Allan G. Hill, Arthur Getis, David Rain, Ryan Engstrom, Douglas A. Stow, Livia Montana, Kenneth Hill, and Mark Montgomery, "Modeling Spatial Inequalities in Health in Cities of Developing Countries: The Case of Accra, Ghana," Presented at the Annual Meeting of the Association of American Geographers, Las Vegas, March 2009; and revised versions presented at the Annual Meeting of the Population Association of America, Detroit, May 2009, and the General Meeting of the International Union for the Scientific Study of Population (IUSSP), Marrakech, Morocco, October, 2009.

Gregory B. Weeks and John R. Weeks, "Immigration and Transnationalism: Rethinking the Role of the State in Latin America," Presented at the Annual Meeting of the Southeastern Council of Latin American Studies, New Orleans, LA, April, 2009.

John R. Weeks, Allan G. Hill, Arthur Getis, and Sarah Hinton, "Do Slums Promote High Urban Fertility? Neighborhood Differences in Fertility in Accra, Ghana," Presented at the Annual Meeting of the Population Association of America, New York, March, 2007, and at the Annual Meeting of the Association of American Geographers, San Francisco, April, 2007.

John R. Weeks, Allan G. Hill, Arthur Getis, Douglas Stow, and Debbie Fugate, "The Impact of Neighborhood Structure on Health Inequalities in Accra, Ghana," Presented at the Annual Meeting of the Population Association of America, Los Angeles, March, 2006.

John R. Weeks, Allan G. Hill, Douglas Stow, and Arthur Getis, "Can We Spot a Neighborhood From the Air?," Presented at the Annual Meeting of the Association of American Geographers, Chicago, March, 2006.

Gregory B. Weeks and John R. Weeks, "The Political Demography of Latin American Migration," Presented at the LASA2006 Congress, San Juan, Puerto Rico, March 2006.

Chase-Dunn, Christopher, Alexis Alvarez, Andrew Jorgenson, Richard Niemeyer, Daniel Pasciuti and John Weeks, "Global City Networks in World Historical Perspective." Presented at the annual meeting of the American Sociological Association, Montreal, August 2006.

*John R. Weeks, Ph.D.*
*- 15 -*

Exhibit 41 - 30

John R. Weeks, Allan G. Hill, Arthur Getis, Douglas Stow, Sam Agyei-Mensah, and John K. Anarfi, "Intra-urban Differentials in Poverty and Health in Accra, Ghana," Presented at the General Meeting of the International Union for the Scientific Study of Population, Tours, France, July 2005.

John R. Weeks, Allan G. Hill, Arthur Getis, and Douglas Stow, "Residential Segregation as a Predictor of Intra-Urban Health Inequality in Accra, Ghana." Presented at the Annual Meeting of the Association of American Geographers, Denver, April 2005.

John R. Weeks, "Family Demographic Histories," Presented at the Workshop on Teaching Undergraduate Demography, Annual Meeting of the American Sociological Association, San Francisco, August 2004.

Stow, D., D. Fugate, T., Rashed, J., Weeks, and A. Getis, "Validation of Satellite Derived End-Member Fraction Maps of Cairo, Egypt Using Quickbird Imagery," presented at the Annual Meeting of the Association of American Geographers, Philadelphia, March 2004.

John R. Weeks, Arthur Getis, Douglas Stow, Debbie Fugate, and Anna Carla López, "Neighborhood Predictors of Fertility Levels in Amman, Jordan, Combining RS and Census Data into a GIS," presented at the Annual Meeting of the Association of American Geographers, Philadelphia, March 2004.

John R. Weeks, "Pace and Space: The Geography of Fertility Change in Egypt," Harvard Center for Population and Development Studies Working Group on Health Healing and Ritual Practice, Cambridge, MA, March 2004.

Christopher Chase-Dunn and John R. Weeks, "Global Cities and Suburban Sprawl: An Analysis using GIS and Remote Sensing," Specialist Meeting on Globalization in the World System: Mapping Change over Time, University of California, Riverside, February 2004.

John R. Weeks, "Patterns of Urban Land Use as Assessed by Satellite Imagery: Applications in Egypt and Jordan," presented at the Workshop on Research on Population, Land Use, and Environment, Panel on New Research in Population and Environment, Committee on the Human Dimensions of Global Change, National Research Council, Irvine, California, January 2004.

John R. Weeks and Debbie Fugate, "Neighborhood Context as a Determinant of Child Health in Cairo, Egypt: The Application of GIS and Remote Sensing to a Study of Intra-Urban Variability in Health," presented at Second International Conference on Urban Health, New York City, October 2003 (abstract published in *Journal of Urban Health* 80: Supplement 2, p. 13, 2003).

John R. Weeks, "The Creation and Application of an Urban Gradient Index," presented at the Conference on Migration, Urbanization and Health, Princeton University, September 2003.

Tarek Rashed and John R. Weeks, "Exploring the Spatial Association Between Measures from Satellite Imagery and Patterns of Urban Vulnerability to Earthquake Hazards," presented at the 4th International Symposium on Remote Sensing of Urban Areas, Regensburg, Germany, 2003.

John R. Weeks, Dennis Larson, and Tarek Rashed, "Contrast or Continuum? The Creation and Application of an Urban Gradient Index," presented at the Annual Meeting of the Association of American Geographers, New Orleans, March 2003; also presented at the Annual Meeting of the Population Association of America, Minneapolis, May 2003.

John R. Weeks, "What did he know, and when did he know it? Putting Glenn Trewartha's call for population geography into historical perspective," presented at the Plenary Session of the Population Specialty Group, Annual Meeting of the Association of American Geographers, New Orleans, March 2003.

John R. Weeks, "Is Americanization Bad for Your Health? Lessons Learned From Studying Reproductive Outcomes of Immigrant Women," Opening Plenary Address at the U.S. Centers for Disease Control Eighth Annual Maternal and Child Health Epidemiology Conference, Clearwater Beach, Florida, December 2002.

John R. Weeks, Dennis Larson, Douglas A. Stow, and Tarek Rashed, "Conceptualizing the Urban-Rural Continuum: The Potential Contribution of Remotely-Sensed Imagery," presented at the International Conference on Population Geographies, University of St. Andrews, St. Andrews, Scotland, July 2002.

Tarek Rashed, John R. Weeks, Douglas Stow, and Debbie Fugate, "Measuring Temporal Compositions of Urban Morphology Through Spectral Mixture Analysis: Toward a Soft Approach to Change Analysis in Crowded Cities," presented at the Third International Symposium on Remote Sensing of Urban Areas, Istanbul, Turkey, June 2002.

John R. Weeks, Arthur Getis, Douglas Stow, Tarek Rashed, Xiaoling Yang, and M. Saad Gadalla, "Spatial Patterns as Predictors of Fertility in Cairo, Egypt," presented at the Annual Meeting of the Population Association of America, Atlanta, GA, May 2002

John R. Weeks, Xiaoling Yang, Arthur Getis, M. Saad Gadalla, and Allan G. Hill, "Spatial Patterns as Predictors of Fertility Change in Rural Egypt," presented at the Annual Meeting of the Population Association of America, Atlanta, GA, May 2002

John R. Weeks, "Using Remote Sensing and Geographic Information Systems to Identify the Underlying Properties of Urban Environments," presented at the conference on "New Forms of Urbanization: Conceptualizing and Measuring Human Settlement in the Twenty-first Century," organized by the IUSSP Working Group on

Exhibit 41 - 31

Urbanization and held at the Rockefeller Foundation's Study and Conference Center, Bellagio, Italy, March 2002.

John R. Weeks, Arthur Getis, Douglas Stow, Tarek Rashed, Xiaoling Yang, Saad Gadalla, and Allan Hill, "Spatial Patterns as Predictors of Fertility in Cairo, Egypt," presented at the Annual Meetings of the Association of American Geographers, Los Angeles, March 2002.

Mark McGinnis, Richard Wright, and John R. Weeks, "Predicting the Spatial Pattern of Urban Growth in San Diego County: An Application of the Clarke Urban Growth Model," presented at the Annual Meetings of the Association of American Geographers, Los Angeles, March 2002.

Christine Thurlow Brenner, Nadia Rubaii-Barrett, Tanis Salant, and John R. Weeks, "Criminal Undocumented Immigrants: The Cost to U.S. Counties on the Mexican Border for Law Enforcement, Criminal Justice and Emergency Health Care Services," presented at the Annual Meeting of the Association for Borderlands Studies, Reno, NV, April 2001.

Christopher Peak and John R. Weeks, "Does Community Context Influence Reproductive Outcomes of Mexican Origin Women in San Diego, California? Presented at the Annual Meeting of the Population Association of America, Washington, DC, March 2001.

John R. Weeks, M. Saad Gadalla, and Allan G. Hill, "The Environmental Context of Fertility in Egypt: Evidence from Demographic and Health Surveys," presented at the Annual Meeting of the Association of American Geographers, New York City, March 2001 (also presented at the Annual Meeting of the Population Association of America, Washington, DC, March 2001).

John R. Weeks, John V. Kaiser, Dongmei Chen, Milan Mueller, and Michael T. Dolan, "Exploring the Role of Remote Sensing and Crime," Presented at Wheredunit? Investigating the Role of Crime and Criminality: The Fourth Annual International Crime Mapping Research Conference, San Diego, CA, December 2000.

John R. Weeks, John V. Kaiser, Dongmei Chen, Milan Mueller, and Michael T. Dolan, "Identification of Urban Areas at High Risk for Criminal Activity Through Image Analysis: What are the Possibilities?" Presented at the ESRI Users Conference, San Diego, CA, June 2000.

John R. Weeks, Tarek Rashed, M. Saad Gadalla, and Allan G. Hill, "The Environmental Context of Reproduction in Rural Menoufia, Egypt," presented at the Annual Meeting of the Association of American Geographers, Pittsburgh, April 2000.

John R. Weeks, Tarek Rashed, M. Saad Gadalla, and Allan G. Hill, "Measuring the Environmental Context of Urban Fertility in Arab Countries: A 'Top-Down' Approach to Fertility in Cairo, Egypt," presented at the Annual Meeting of the Population Association of America, Los Angeles, March 2000.

John R. Weeks, "GIS for the Demography of the Border," presented at the Taller Demográfica de la Frontera México - Estados Unidos, El Colegio de la Frontera Norte, Tijuana, Mexico, October, 1999.

John R. Weeks, M. Saad Gadalla, Tarek Rashed, James Stanforth, and Allan G. Hill, "Spatial Variability in Fertility in Menoufia, Egypt, Assessed Through the Application of Remote-Sensing and GIS Technologies," presented at the Annual Meeting of the Population Association of America, New York, March 1999.

John R. Weeks, Allan G. Hill, and M. Saad Gadalla, "Applications of Remote-Sensing and GIS to the Fertility Transition in Rural Egypt," presented at the 1998 Annual North American Meeting of the Regional Science Association International, Santa Fe, New Mexico, November 1998.

John R. Weeks, "Demographic Dynamics of the San Diego-Tijuana Region," presented at the Conference on "Sustainable Development in San Diego-Tijuana: Environmental and Social Consequences of Economic Integration," UCSD Center for US-Mexican Studies, San Diego, May, 1997.

John R. Weeks and Laura M. Makey, "Fertility Along and Across the US-Mexico Border," presented at the 1997 Annual Meeting of the Population Association of American (Washington, DC, March 1997); and at the 1997 Annual Meeting of the Association of American Geographers (Forth Worth, Texas, April 1997).

John R. Weeks, "New Methods of Estimating the Muslim Population in the United States," presented at the annual meeting of the Population Association of America, New Orleans, 1996.

John R. Weeks, "The Census of Muslims in the United States," presented at the annual meeting of the Association of American Geographers, Charlotte, NC, 1996.

John R. Weeks and Karyl Fuller, "Population Distribution and Migration: Components of Housing Demand and Supply," presented at the International Symposium on Human Settlements, Habitat II, "From Cairo to Istanbul," San Diego, CA 1996.

John R. Weeks, Rubén G. Rumbaut, and Norma Ojeda, "Are Mexico-Born Women Giving Birth in San Diego Healthier Than Women Giving Birth in Tijuana?" presented at the 123rd Annual Meeting of the American Public Health Association, San Diego, CA, 1995.

Rubén G. Rumbaut and John R. Weeks, "Unraveling a Public Health Enigma: Why do Immigrants Experience Superior Perinatal Health Outcomes?" presented at the 122nd Annual Meeting of the American Public Health Association, Washington, DC, 1994. [Abstracted in the ***Journal of the American Medical Association***, the ***New York Times***, and the ***Wall Street Journal***].

*John R. Weeks, Ph.D.*
*- 17 -*

Exhibit 41 - 32

John R. Weeks and Rubén G. Rumbaut, "How Important is Migration Selectivity as a Factor in the Perinatal Health of Hispanics?" presented at the annual meeting of the Population Association of America, Miami, FL, 1994.

I. Douglas Sheres and John R. Weeks, "The Geodemographics of Major League Baseball," presented at the annual meeting of the Association of American Geographers, San Francisco, 1994. [Abstracted in *American Demographics*, October 1994, pp 9-11].

John R. Weeks and Robert Schlesinger, "Fertility Along the Two Sides of the U.S.-Mexico Border," presented at the annual meeting of the Association of American Geographers, San Francisco, 1994.

Rubén G. Rumbaut and John R. Weeks, "Ethnicity, Nativity, and the Paradox of Perinatal Health and Morbidity: An Analysis of Sociocultural and Biomedical Causal Factors," presented at the annual meeting of the American Sociological Association, Miami, FL, 1993.

John R. Weeks and Rubén G. Rumbaut, "Why do Immigrant Asian and Hispanic Women Experience Superior Perinatal Health Outcomes?," presented at the annual meeting of the Population Association of American, Cincinnati, OH, 1993. [also presented at the Eighth Annual San Diego Biostatistics and Epidemiology Applications Conference, University of California, San Diego, April, 1993].

John R. Weeks, "The Demographic Dynamics of the U.S.-Mexico Border and the Implications for NAFTA," presented to the Congressional Sunbelt Caucus, the Congressional Border Caucus, and the National Governor's Association, Washington, D.C., sponsored by the Population Resource Center, 1993. [Repeated for members of the Texas State Legislature, Austin, Texas, 1993].

John R. Weeks, "The Economic and Social Implications of Population Aging in the Context of Internal and International Migration," Presented at the International Conference of Population Aging, San Diego, CA, 1992.

John R. Weeks, "The Role of Incentives and Disincentives in Stabilizing Population Growth," presented at the National Carrying Capacity Issues Conference, Washington, D.C., 1992.

John R. Weeks, "Demographic Trends in the Middle East," presented at a Congressional Briefing and a private U.S. State Department Briefing, sponsored by the Population Resource Center and the Population Association of America, Washington, D.C., 1991.

John R. Weeks and Rubén G. Rumbaut, "Ethnicity, Maternal Risk Factors, and Pregnancy Outcomes," presented at the annual meeting of the Population Association of America, Washington, D.C., 1991.

John R. Weeks, "The Demographic Distinctiveness of the U.S.-Mexico Border Region," presented at the IV. Reunión Nacional de la Sociedad Mexicana de Demografía (SOMEDE), El Colegio de México, México, D.F., April, 1990.

John R. Weeks, "Household Structure and Fertility at the U.S.-Mexico Border," presented at the Annual Meeting of the Association of Borderland Scholars, Tijuana, Mexico, 1990.

John R. Weeks and Rubén G. Rumbaut, "Infant Mortality Among Indochinese Refugees," presented at the Second Annual Regional Conference on Maternal and Child Health Research, Rockville, Maryland, 1989.

Rubén G. Rumbaut and John R. Weeks, "Infant Health Among Indochinese Refugees: Patterns of Infant Mortality, Birthweight and Prenatal Care in Comparative Perspective," presented at the annual meeting of the American Sociological Association, San Francisco, 1989.

John R. Weeks and Rubén G. Rumbaut, "Infant Mortality Among Indochinese Refugees in San Diego County," presented at the annual meeting of the Population Association of America, Baltimore, 1989.

John R. Weeks and Tam Trinh, "Factors Affecting the Choice of Natural Family Planning: A Research Progress Report," Fifth National and International Symposium on Natural Family Planning, Los Angeles, 1988.

John R. Weeks, "Factors Affecting the Choice of Natural Family Planning," 16th Annual Psychosocial Workshop, New Orleans, 1988.

Rubén G. Rumbaut and John R. Weeks, "Indochinese Refugees: Infant Health and Cultural Adaptation," National Association of Social Workers, San Diego Health Council, 1988.

John R. Weeks, "Business Demography: Sociological Approaches," Expert Panel on Business Demography, Midwest Sociological Society, Minneapolis, 1988.

John R. Weeks, "Population and Contemporary Issues," Teaching Workshop at the Annual Meeting of the American Sociological Association, Chicago, 1987.

John R. Weeks, "Un Resumen Sobre Niveles de Fecundidad y Planificación Familiar a lo Largo de la Frontera Norte de México," presented at the Third Meeting of Sociedad Mexicana de Demografía, Mexico City, 1986.

John R. Weeks, Rubén G. Rumbaut, Claire Brindis, Carol Korenbrot, and Donald Minkler, "An Analysis of High Fertility Among Indochinese Refugees," presented at the Annual Meetings of the Population Association of America, San Francisco, California, 1986.

John R. Weeks, "Life Satisfaction and Support Networks Among Elder Immigrants," presented at the National Institute of Mental Health Workshop on Immigration and Mental Health, San Diego State University, 1985.

Rubén G. Rumbaut and John R. Weeks, "Fertility and Adaptation Among Indochinese Refugees," presented at the Psychosocial Workshop of the Annual Meetings of the Population Association of America, Boston, Massachusetts, 1985.

Exhibit 41 - 33

John R. Weeks, and Mohamed El-Assal, "Implications of Current Fertility Trends for the Future Development of Egypt," presented at the Egypt in the Year 2000 Conference, Cairo, Egypt, 1982.

Helen M. Wallace, John R. Weeks, Charlotte S. Jones, and Nelaufa Perera-Merrill, "Effects of Proposition 13 on Health Care of Mothers in California," presented at the Annual Meetings of the American Public Health Association, Los Angeles, California, 1982.

José B. Cuellar, John R. Weeks, Solomon Jacobson, Jesse McClure, Rudy Arrieta, and David Guttman, "Distribution of Public Benefits Among the Minority Elderly," presented at the Annual Meetings of the Gerontological Society of America, San Diego, California, 1980.

John R. Weeks and José B. Cuellar, "The Role of Family Members in the Helping Networks of Older People," presented at the Annual Meetings of the California Council on Family Relations, Santa Barbara, California, 1980.

John R. Weeks and José B. Cuellar, "The Influence of Immigration and Length of Residence on the Isolation of Older Persons," presented at the Annual Meetings of the Population Association of America, Denver, 1980.

José B. Cuellar and John R. Weeks, "A Strategy and Tool for the Assessment of Needs and Barriers to Benefits for Minority Elderly," presented at the Annual Meetings of the Western Gerontological Society, Anaheim, California, 1980.

John R. Weeks, "Critique of Research on Psychosocial Aspects of Natural Family Planning," presented at the Research Workshop on NFP:  Reality and Potential, sponsored by the National Institute of Child Health and Human Development, Bethesda, Maryland, 1979.

John R. Weeks, "Income Distribution as a Factor in Coale's Preconditions for a Fertility Decline:  Evidence from Mexico," presented at the Annual Meetings of the Population Association of America, Atlanta, Georgia, 1978.

John R. Weeks, "Retirement Homes:  Economic Realities and Implications for Ethnic Minority Elders, presented at the Annual Institute on Minority Aging, San Diego, California, 1978.

John R. Weeks, "Social Psychological Correlates of Fertility Expectations," Presented at the Annual Meetings of the Pacific Sociological Association, Victoria, British Columbia, 1975.

John R. Weeks and Joseph Spielberg Benitez, "The Ethnodemography of Midwestern Chicano Communities," presented at the Annual Meetings of the Population Association of America, New Orleans, 1973.

John R. Weeks, "Fertility and Family Structure in Chile," presented at the Annual Meetings of the Pacific Sociological Association, Long Beach, California, 1967.


## OTHER RELATED PROFESSIONAL ACTIVITIES

Organizer and Chair, "PAA Presidential Address Topics: Where are they Now? Volume III" Webinar of the Population Association of America, January 2022; available at: https://www.youtube.com/watch?v=oGzTE5OWBkE&list=PLNFXEhCaegwYi6Uz36cYy_Vc5d7hX3Nl9&index=14

Invited Presenter, "Global and Regional Demographic Trends," Webinar of the GEOINT Tradecraft Speaker Series, National Geospatial-Intelligence Agency, November 2021.

Organizer and Chair, "PAA Presidential Address Topics: Where are they Now? Volume II" Webinar of the Population Association of America, April 2021; available at: https://www.youtube.com/watch?v=7k9Y-LJwkWU&t=204s

Organizer and Chair, "PAA Presidential Address Topics: Where are they Now?" Webinar of the Population Association of America, December 2020; available at: https://www.youtube.com/watch?v=JZ9s1OfMMug&t=208s

Invited Speaker, "The Future is a Foreign Country: We'll Do Things Differently There," New Narratives on the Peopling of America, University of California, Berkeley, December 2019.

Discussant, Session on "Spatial Effects on Reproductive Health and Fertility," Annual Meeting of the Population Association of America, Austin, April, 2019.

Organizer and Chair, Sessions on "Health, Poverty, and Place in Ghana," Annual Meeting of the American Association of Geographers, Boston, April, 2017.

Panelist, Session on "Population Geography and the Environment: Special Session in Honor of Clark Gray and David López-Carr," Annual Meeting of the American Association of Geographers, Boston, April, 2017.

Participant, Session on "Population Specialty Group: Lifetime Achievement Award for John Weeks," Annual Meeting of the Association of American Geographers, San Francisco, CA, March 2016.

Panelist, Session on "Mapping Secondary Cities for Resiliency and Emergency Preparedness," Annual Meeting of the Association of American Geographers, San Francisco, CA, March 2016.

Chair, Session on "International Migration," Annual Meeting of the Association of American Geographers, San Francisco, CA, March 2016.

Exhibit 41 - 34

Panelist, Session on "Global health and the environment I: Research," Annual Meeting of the Association of American Geographers, San Francisco, CA, March 2016.

Invited Presenter, "The Power of Pixels: Using Imagery to Understand Spatial Inequalities in Health," University of North Carolina, Charlotte Departments of Geography and Political Science, March 2016.

Organizer and Chair, Session on "Spatial Analysis of Population and the Environment," Annual Meeting of Population Association of America, San Diego, CA, May 2015.

Invited Presenter, "The Power of Pixels: Using Imagery to Understand Spatial Inequalities in Health," University of Miami Departments of Geography, Sociology, and the Center for Latin American Studies, Miami, FL, February 2015.

Invited Presenter, "Too Big to Succeed? Demography and Socialist Experiments in Chile and Venezuela," University of Miami Departments of Geography, Sociology, and the Center for Latin American Studies, Miami, FL, February 2015.

Keynote Speaker, "North of the Border: The Changing Demographics of San Diego," Annual Meeting of the Western Regional Science Association, San Diego, CA, February 2014.

Panelist, Session on "The Use and Abuse of Sampling and Extrapolation in Construction Defect Lawsuits," West Coast Casualty's Construction Defect Seminar, Anaheim, CA, May 2013.

Organizer and Chair, Sessions on "Economic Change and Migration," Annual Meeting of the Population Association of America, San Francisco, May 2012.

Organizer and Chair, Sessions on "Health, Poverty, and Place in Ghana I, II, and III," Annual Meeting of the Association of American Geographers, New York, NY, February 2012.

Keynote Address, "Why Should You Care About the Census, and How Will it Affect Education Planning?" 35th Annual Conference of the California Association for Institutional Research, San Diego, November 2010.

Organizer and Instructor, "Advanced Spatial Analysis," GIS in Population Science Workshop, Center for Spatially Integrated Social Science, University of California, Santa Barbara, July 2010.

Invited Presenter, "Why Should You Care About the Census?," Distinguished Lecture Series, Osher Lifelong Learning Institute, University of California, San Diego, June 2010.

Organizer and Instructor, "Advanced Spatial Analysis," GIS in Population Science Workshop, Center for Spatially Integrated Social Science, University of California, Santa Barbara, July 2008.

Organizer and Chair, "Panel Discussion: PAA: How Did We Get Here and Where Are We Going?" and Discussant, Session on "Spatial Demography," Annual Meeting of the Population Association of America, New Orleans, April 2008.

Invited Presenter, "Do Slums Promote High Urban Fertility: Neighborhood Differences in Accra, Ghana," Social Science in Place (SSIP): GIS and Spatial Concepts Seminar Series, Survey Research Center, University of California, Berkeley, November 2007; and in the Winter 2008 Seminar Series of the Initiative in Population Research at The Ohio State University, February, 2008; and at the Graduate Student Seminar Series, Office of Population Research, Princeton University, March, 2008.

Invited Keynote Speaker, "Putting Place and Space into Demographic Analysis," GIS and Population Science Workshop, Center for Spatially Integrated Social Science, University of California, Santa Barbara, July 2006.

Panelist, "Democracy in the Middle East: Prospects, Problems and Promises," Annual Meeting of the Association of American Geographers, Chicago, March 2006.

Invited presenter, "It Takes Money to Make Money: Educating South County," presented to the South County 15th Annual Economic Summit, San Diego, October 2005.

Invited Keynote Speaker, "Putting Place and Space into Demographic Analysis," GIS and Population Science Workshop, Center for Spatially Integrated Social Science, University of California, Santa Barbara, June 2005.

Invited Keynote Speaker, "The Silent Storm: Or, How Population Growth Impacts Everything We Do," Colloquium on Populations Growing: Public Health Responses to Global Impacts, SDSU Graduate School of Public Health, April 2005.

Invited Presenter, "Patterns of Intra-Urban Fertility in Cairo, Egypt and Amman, Jordan," presented to the Department of Geography, University of Ghana, Accra, Ghana, January 2005.

Invited Presenter, "Patterns of Intra-Urban Fertility in Cairo, Egypt and Amman, Jordan," presented to the Rostock Demographic Colloquium, Max Planck Institute for Demographic Research, Rostock, Germany, November 2004.

Invited Presenter, "Changing Hispanic Demographics," presented to the Council of State Governments-West, San Diego, October 2004.

Participant, "Workshop on Systematic Population Estimation," Sponsored by the Office of External Research, Bureau of Intelligence and Research, U.S. Department of State, Arlington, Virginia, May 2004.

Panelist, PSG Session in Honor of the AAG Centennial: Overlaying GIS and Population Geography, Annual Meeting of the Association of American Geographers, Philadelphia, March 2004.

*John R. Weeks, Ph.D.*
*- 20 -*

Exhibit 41 - 35

Organizer and Chair, Session on "Spatial Models," Annual Meeting of the Population Association of America, Boston, March 2004.

Presenter, "Demographics of East County," Board of Directors of the East County Economic Development Council, September 2003.

Chair and Discussant, "Population Processes," Regular Session of the Annual Meeting of the American Sociological Association, Atlanta, August 2003.

Instructor, "An Introduction to Spatial Pattern Analysis in a GIS Environment," Center for Spatially Integrated Social Science Summer Workshop Series, University of California, Santa Barbara, July 2003.

Presenter, "Can You Spot a City From the Air? Using Remote Sensing and GIS to Improve our Understanding of Urban Places," Program on Global Studies, 2003 Colloquium Series, Institute for Research on World-Systems, University of California, Riverside, April 2003.

Presenter, "Measuring the Ecological Context of Urban Vulnerability to Earthquake Hazards Through an Integrative Remote Sensing and GIS Approach," Congressional Briefing organized by the University Consortium for Geographic Information Science (UCGIS), Washington, DC, February 2003.

Panelist, "Is Population Growth Good or Bad for San Diego's Economy?" presented at the 2003 San Diego Economic Roundtable (County of San Diego), San Diego, January 2003 (available on video).

Organizer and Chair, "Fertility: Individual Level Concepts" and Organizer and Discussant, "Fertility: Policy Level Contexts," Regular Sessions of the Annual Meeting of the American Sociological Association, Chicago, August 2002.

Instructor, "An Introduction to Spatial Pattern Analysis in a GIS Environment," Center for Spatially Integrated Social Science Summer Workshop Series, University of California, Santa Barbara, July 2002.

Presenter, "2010 Roundtable," City of San Diego Year 2000 Redistricting Commission, San Diego, CA, December 2001.

Presenter, "Workshop on Finding Statistically Significant Crime Hot Spots," US Department of Justice, Fifth Annual International Crime Mapping Research Conference, Dallas, TX, December 2001.

Instructor, "An Introduction to Spatial Pattern Analysis in a GIS Environment," Center for Spatially Integrated Social Science Summer Workshop Series, University of California, Santa Barbara, August 2001.

Invited Lecturer, "Population Growth as a Ponzi Scheme," Thirty-Sixth Phi Beta Kappa Lecture, San Diego State University, November, 2000.

Instructor, "An Introduction to Spatial Pattern Analysis in a GIS Environment," Center for Spatially Integrated Social Science Summer Workshop Series, University of California, Santa Barbara, August 2000.

Invited Discussant, "Census 2000 Users' Conference on Public Use Microdata Sample (PUMS) Files," U.S. Bureau of the Census, Washington, DC, May 2000.

Organizer and Chair, Session on "Demographic Applications of GIS and Remote Sensing," Annual Meeting of the Association of American Geographers, Pittsburgh, April 2000.

Presenter, "External Demographics," Districtwide Strategic Planning Committee of the Grossmont-Cuyamaca Community College District, El Cajon, CA, October 1999.

Co-Organizer, Taller Demográfica de la Frontera México-Estados Unidos, El Colegio de la Frontera Norte, Tijuana, Mexico, October, 1999.

Speaker, "The Changing Demographics of San Diego County," Turning Point 2000 Summit of the Grossmont Union High School District, San Diego, March 1999.

Panelist, "Changing Demographics," 1999 San Diego Economic Roundtable (County of San Diego), San Diego, January 1999 (available on video).

Presenter, Seminario de Temas Selectos sobre Salud Reproductiva, "Reproductive Outcomes Among Mexico-Born Women in San Diego and Tijuana: Testing the Migration Selectivity Hypothesis," El Colegio de la Frontera Norte, Tijuana, Mexico, June 1998.

Panelist, Session on "Making Census Data Accessible for College Classes: the SSDAN Network," Annual Meeting of the Association of American Geographers, Fort Worth, April, 1997.

Chair, AAG Presidential Special Topic Session on "The Demography of Texas and the Southwest," Annual Meeting of the Association of American Geographers, Fort Worth, April, 1997.

Discussant, Session on "Major Directions in Population Geography," Annual Meeting of the Association of American Geographers, Fort Worth, April, 1997.

Presenter, "Demo-Facts for the US-Mexico Border Region," Summit Foundation, Washington, DC, March, 1997.

Contributor/Interviewee, "Populations and Communities," Part 24 of Biology Telecourse, "Cycles of Life," Produced by KOCE-TV, Huntington Beach, CA, 1996.

Invited Presenter, "Major Trends in Population Growth in San Diego County," Presented to the Board of Trustees of the Grossmont-Cuyamaca Community College District, 21 November 1995.

Consultant to the East County Economic Development Council on its subcontract from the San Diego Economic Development Corporation to provide data on defense related firms in San Diego County, 1995.

Exhibit 41 - 36

Invited Presenter, "San Diego Town Meeting on Defense Conversion," Co-sponsored by the San Diego Economic Development Corporation, the East County Economic Development Council, and the San Diego Economic Conversion Council; San Diego County Administration Center, November 1995.

Keynote Speaker, "The Six Pillars of Global Population and Social Change." Conference on Global Population and Social Change, Michigan State University, April 1995.

Invited Presenter, "The Defense Conversion and Adjustment Needs of East County Firms," Semi-Annual Meeting of the East County Economic Development Council, Santee, CA, January, 1995.

Consultant, "The Impact of Medicaid Managed Care on STD/HIV. Clinical and Preventive Services in San Diego County," San Diego State University Graduate School of Public Health (Rob Seidman, Project Director), November 1994-October 1995.

Invited Presenter, "Up, Down, and Sideways: Fertility Along the US-Mexico Border." Graduate Colloquium Series of the Department of Geography, University of California at Santa Barbara, November, 1994.

Consultant, "Maquiladora Family Planning and Child Care Survey," San Diego State University Institute for Regional Studies of the Californias (Paul Ganster, Project Director), September-December, 1993.

Keynote Speaker, "East County in Transition," Annual Meeting of the East County Economic Development Council, El Cajon, CA, June 1993.

Invited Presenter, "The Changing Demographic Structure of the San Diego Region," SDSU-COLEF Binational Symposium of San Diego and Tijuana in Transition, Tijuana, Mexico, April 1993.

Invited Participant, "California Population Studies," Meeting convened by the California Policy Seminar (a Joint Program of the University of California and State Government), Sacramento, California, January, 1992.

Moderator, Session on "Dollars and Pesos: Funding Joint Ventures," Joint Ventures in Family Planning: A U.S./Mexico Perspective, Binational Conference on Family Planning Along the Border, Co-sponsored by Planned Parenthood of San Diego and Riverside Counties and MexFam, Tijuana, Mexico, September 1991.

Chair, "Demografía Historica: Siglo XVIII-XIX," VIII Conference of Mexican and North American Historians, San Diego, October 1990.

Invited Guest Lecturer, "The Demography of Paradise," I & R Network Conference, Harbor Island, San Diego, January, 1990.

Invited Participant, "II Simposio Binacional Sobre la Población de la Frontera México-Estados Unidos," El Paso, Texas, November, 1989.

Invited Guest Lecturer, "The Demography of the U.S.-Mexico Border," Population Research Laboratory, University of Southern California, Los Angeles, November, 1989.

Invited Guest Lecturer, "The Demographic Interrelatedness of the U.S.-Mexico Border," Population Research Center, University of Texas, Austin, November, 1989.

Invited Guest Lecturer, "The Demographics of San Diego," International Studies Education Project of San Diego Retreat, Mission San Luis Rey, Oceanside, CA, November 1989

Member of Review Panel for "America in the 21st Century: A Global Perspective," Population Reference Bureau, Washington, D.C., August, 1989.

Invited Lecturer, "Demography and Destiny: The Case of Islamic Nations," presented to the Northern California World Affairs Council, San Francisco, April, 1989.

Organizer, Session on "The United States and Mexico: Demographic and Economic Relationships at the Border," Annual Meetings of the Population Association of America, New Orleans, 1988.

Invited Witness, California Legislature's Joint Committee on Refugee Resettlement, International Migration and Cooperative Development, Hearing on the Impact of the Immigration Reform and Control Act of 1986 on the border region of California, San Diego, December, 1987.

Invited Participant, "Southwest Symposium on U.S. Population Policy,"The Woodlands Center for Growth Studies, Houston, Texas, October 1987.

Invited Participant, "Simposio Binacional Sobre la Politica de Poblacion," Universidad Autonoma de Chihuahua, Ciudad Juarez, Mexico, September, 1987.

Member, General Planning Committee, "Bridging the Pacific." Conference sponsored by the United Nations Association of Southern California, University of San Diego, April, 1987.

Director, "Intensive Training Program for Family Planning and Related Health Professionals," International Population Center, San Diego State University, April-May, 1987.

Invited Participant, "Seminar on Southeast Asian Issues," University of California, Irvine, March, 1987.

Discussant, Session on "Later Phases of the Family Life Cycle," Annual Meetings of the Population Association of America, San Francisco, April, 1986.

Consultant re computerizing data for Zimbabwe National Family Planning Council, Harare, Zimbabwe, September, 1984.

Invited Speaker, "Who Lit the Fuse on the Population Bomb?" Earth Day Celebration [the inaugural one], Fresno State College, Fresno, CA, April 1970.

*John R. Weeks, Ph.D.*
*- 22 -*

Exhibit 41 - 37

## COURSES TAUGHT AT SAN DIEGO STATE UNIVERSITY

Population and the Environment
Seminar in GeoDemographics
Seminar in Spatial Demography
Spatial Data Analysis
Advanced Quantitative Analysis in Geography
Seminar in Geographic Research Design
People, Places & Environment
Population and Contemporary Issues
Seminar in Demographic Analysis
Seminar in Population Geography
Seminar in Population and Demography
Demography of Latin America
Elementary Social Statistics
Principles of Cultural Geography
Seminar in Human Geography
Sociology of Aging
Social Psychology
Contemporary Social Problems
Introductory Sociology

## GRADUATE ADVISEES

PhD Committees: Chair (10); Second member (8); Outside member (4)
MA/MS Committees: Chair (32); Second member (17); Outside member (8)
MPH Committees: Outside member (11)

## CONSULTING EXPERIENCE

### *Demographic and Statistical Expert Witnessing and Research in the following legal cases:*

State of Arizona v. Frank C. Garcia, Jr. (2023); Maricopa County Superior Court, Arizona
Smart Efficient Solutions, LLC v . Heritage Property & Casualty Insurance Company (2023): Circuit Court of the 20th Judicial District in and for Collier County, Florida (*)
Mayes v. La Sierra University, et al. (2023): Riverside County Superior Court
Ernesto Herrera v. General Atomics et al. (2022): U.S. District Court, Southern District of California (+)
American/BCEGZV v. Shores LLC (2021); Los Angeles County Superior Court (*)
United States v. Robert Bowers (2020): U.S. District Court, Western District of Pennsylvania
De Navarro et al. v. City of South Pasadena et al. (2020): Los Angeles County Superior Court
Tsang v. Candlewood Country Club, et al. (2020); Los Angeles County Superior Court
Zimmerer v. Capistrano Unified School District; YMCA of Orange County (2020): Orange County Superior Court
Aboukhalil v. U.S. Home (2020): Clark County, Nevada Superior Court
People v. E.M. Alfaro (2019): Marin County Superior Court (*)
Victoria Brown v. Parking Concepts, etc., et al. (2019): Orange County Superior Court
Solair v. Starline Windows (2019): Los Angeles County Superior Court
People v. Vincent Martinez et al. (2018): Maricopa County Superior Court, Arizona
The Vue re Starline Windows (2018): Los Angeles County Superior Court
Pepper Lane Owners Association v. Pulte Home Company, LLC (2018): San Francisco Superior Court
Grande South Owners v. Starline Windows Inc. (2018); San Diego County Superior Court
United States v. Alfonzo Williams et al. (2018); U.S. District Court, Northern District of California
Bayside v. Bosa (2017); San Diego County Superior Court
Sapphire Tower Owners Association v. Swinerton (2017); San Diego County Superior Court
People v. Dmitry Shubov. (2017); Stanislaus County Superior Court
United States v. Donald Fell (2017); U.S. District Court, District of Vermont (*)
People v. Anthony Lemar Jones (2016); Solano County Superior Court (*)
2999 California St. HOA v. Axis Services, Inc. (2016); San Francisco County Superior Court
Antelope v. Greystone and US Home (2015); Las Vegas, Nevada

*John R. Weeks, Ph.D.*
*- 23 -*

Exhibit 41 - 38

Town Green Village Association v. Orrin Thiessen, Terri Thiessen & Town Green Village LP (2015); Sonoma County Superior Court

People v. Kiyon Twyman (2015); San Diego County Superior Court

Gerald Atkins, et al. v. Del Webb Communities (2015); Las Vegas, Nevada

Campaña v. D.R. Horton (2015); San Diego County Superior Court (+)

The Mark Condominiums Owners Association v. The Mark Condominiums LLC (2014); San Diego County Superior Court (*)

La Posada Homeowners Association v. Brussel Consulting & Construction Mgmt (2014); Las Vegas, Nevada

Solana Del Mar v. Centex Homes (2014); Las Vegas, Nevada

Tomlinson v. U.S. Home (2014); Las Vegas, Nevada

350 W. Ash Association v. 350 W. Ash Urban Homes et al. (2014); San Diego County Superior Court (*)

Mills at Cortez Hill HOA v. Cortez Hill (2014); San Diego County Superior Court

Newport Bluffs v. Western National Construction (2014); Orange County Superior Court

Miller v. Embassy Suites Management, LLC et al. (2014); Orange County Superior Court

Montefaro Owners Associations v. Centex Homes (2014); San Diego County Superior Court

Grand Canyon Village HOA v. Grand Canyon Condominiums, LLC (2014); Las Vegas, Nevada (*)

The Verandas at Escala Assoc. v. Shea Homes (2013); San Diego County Superior Court (*)

Aragon Townhomes v. Hill Contracting (2013): San Diego County Superior Court

Ochoa (Desert Canyon) v. US Home Corporation (2013); Las Vegas, Nevada

Courts at Aliante v. D.R. Horton (2013): Las Vegas, Nevada (*)

Dorrell Square v. D.R. Horton (2013): Las Vegas, Nevada (*)

Slaughter et al. v. Uponor (2013); Las Vegas, Nevada

Serene v. Desert Plastering (2013); Las Vegas, Nevada

Borges v. McMillin et al. (2013); County of Imperial—El Centro Superior Court (*)

1100 Wilshire Property Owners Association v. 1100 Wilshire Associates LLC et al. (2013); Los Angeles County Superior Court

Hass et al. v. Bivins Construction (Eagle View) (2012); Las Vegas, Nevada (*)

Acqua Vista HOA v. K Hovnanian at Acqua Vista LLC (2012); San Diego County Superior Court (*)

Horsley v. Skyhawk (2012); Las Vegas, Nevada (*)

People v. Charfarous, Luangrath, and Ortiz (2012); San Diego County Superior Court (*)

People v. Padilla (2012); San Diego County Superior Court (*)

Desert Plastering v. Copper Creek LLC (2012); Las Vegas, Nevada

People v. Scott Evans (2012); Orange County Superior Court

United States v. McCluskey (2012); U.S. District Court, District of New Mexico

Cosio et al. v. McMillin et al. (2012); County of Imperial—El Centro Superior Court (*)

Desert Princess HOA v. Kennedy-Wilson, Inc., et al. (2012); Riverside County Superior Court

Shelton et al. v. Banning 144 LLC et al. (2011); Riverside County Superior Court

Aztech Plastering, Inc. adv. Environment for Living (Serenity HOA) (2010); Las Vegas, Nevada

People v. Marc Jernigan (2010); San Diego County Superior Court (*)

People v. Eddie Montañez (2010); San Diego County Superior Court

Rancho Lake (re Desert Plastering) (2010); Las Vegas, Nevada

Rock Springs Vista III v. Zuraff Construction (2009); Las Vegas, Nevada (*)

People v. Johannes Mehserle (2009); Alameda County Superior Court

Bahhur et al. v. Pardee Homes et al. (2009); Ventura County Superior Court

People v. Derlyn Ray Threats (2009); San Diego County Superior Court

Pacific Windows v. ADCO (2008); Riverside County Superior Court (*)

First Light HOA v. D.R. Horton (2008); Las Vegas, Nevada (*)

IPEX Fitting Litigation (2008); Las Vegas, Nevada

Bobier v. McMillin (2008); San Diego County Superior Court

John Allen et al. v. Pacific Coast Communities, Inc. et al. (2008); San Diego County Superior Court

People v. Jean Pierre Rices (2008); San Diego County Superior Court

Del Webb v. IPEX USA LLC (2008); Las Vegas, Nevada (*)

People v. Columbus Allen (2007); Stanislaus County Superior Court

People v. Randolph Kling (2007); Ventura County Superior Court (*)

Adapon v. McMillin (2007); San Diego County Superior Court

Allstate Insurance Company et al. v. IPEX (2007); Las Vegas, Nevada

Simpson v. Wexford et al. v. Atrium Door & Window et al. (2007); Las Vegas, Nevada

People v. Richard Garcia (2007); San Diego County Superior Court

Serena, David et al. v. Yolo County Grand Jury et al. (2006); U.S. District Court, Eastern District of California (*)

People v. Paris and Alberran (2006); San Diego County Superior Court (*)
People v. Edward Thomas (2006); San Diego County Superior Court
Kendall Creek HOA v. Saxton, Inc. (2006); Las Vegas, Nevada
People v. Reggie Cole (2006); Imperial County Superior Court
People v. Mark Jeffrey Brown (2006); San Diego County Superior Court (*)
Dakota Condominium v. Covington Crossing (2006); Las Vegas, Nevada
Galleria Villas COA v. Gray Castle Land, Inc. (2006); Las Vegas, Nevada (*)
People v. DeShawn Campbell (2006); Santa Clara County Superior Court
Centex Rodgers v. Catholic Healthcare West (2005); Arbitration, Los Angeles County Superior Court
Wayne R. & Leah J. Carlson et al. v. Syncon Homes et al. (2005); Ninth Judicial District Court of State of Nevada
People v. Frank Daniels (2004); Santa Barbara County Superior Court
People v. Michael Jackson (2004); Santa Barbara County Superior Court
Onyegbule v. Shapell (2004); San Diego County Superior Court
United States v. Raimundo (2004); United States District Court for the Southern District of California
People v. Noriega (2003); Santa Barbara County Superior Court
United States v. Soewin Chan (2003); United States District Court for the Northern District of California
Erickson et al. v. Brehm Homes et al. (2003); San Diego County Superior Court
People v. Ballesteros et al. (2003); Santa Barbara County Superior Court (*)
Spectrum Community Association v. Bristol House Partnership, Ltd et al. (2003); Orange County Superior Court
People v. Stuart Alexander (2002); Alameda County Superior Court (*)
17161 Alva Road , etc., v. Zanderson, Inc. et al. (2002); San Diego County Superior Court
United States v. John That Luong (2002); United States District Court for the Eastern District of California
United States v. Rubalcaba et al (re Cervantes) (2002); United States District Court for the Northern District of California
People v. David Ziesmer (2002); Ventura County Superior Court (*)
Allen et al. v. Bramalea California, Inc. et al. (2002); Orange County Superior Court
People v. Michael Schultz (2001); Ventura County Superior Court (*)
Duncan v. Vasquez (2001); United States District Court for the Central District of California
Farshchian v. Ahmanson Development (2001); Los Angeles County Superior Court
People v. Ranjel (2001); San Francisco County Superior Court (*)
Altman v. Cayman Developers (2000); Orange County Superior Court
People v. Wayne Adam Ford (2000); San Bernardino County Superior Court (*)
Monarch Hills v. Bowers Construction, Inc. (2000); San Diego County Superior Court
Sheila A. Delancy et al. v. Ranchland Portola Development et al. (2000); Orange County Superior Court
People v. John Ter Zakarian et al. (2000); Los Angeles County Superior Court
PGA West II Residential Association v. Sunrise Desert Partners et al. (2000); Riverside County Superior Court
Marshall et al. v. Baldwin Builders et al. (2000); San Diego County Superior Court (*)
Abraham et al v. Baldwin Builders et al. (2000); Orange County Superior Court
Village at Majorca HOA v. Leisure Technology, Inc. (2000); San Diego County Superior Court
Bateman el al. v. The William Lyon Company et al. (2000); Orange County Superior Court (*)
People v. Mares (2000); Los Angeles County Superior Court
Lomas de Oro HOA v. Robin Hood Homes, Inc. et al. (1999); San Diego County Superior Court
Corte Melina Maintenance Corporation v. Corte Melina Partners et al (1999); Orange County Superior Court
Costa Brava HOA v. Domain Developers (1999); Orange County Superior Court
Deborah Jo Berg et al. v. The Baldwin Company et al. (1999); San Diego County Superior Court (*)
People v. Iman Kennedy et al. (1999); Marin County Superior Court
People v. James Ary (1999); Contra Costa County Superior Court (*)
Reece et al. v. Premier Group (1999); Riverside County Superior Court
Summit Renaissance HOA v. Anaheim Summit et al. (1999); Orange County Superior Court
Spitz et al v. Brighton et al (1999); Orange County Superior Court (*)
People v. Mark Chin (1999); U.S. District Court, Northern District of California (San Francisco)
Casafina v. William Lyon Company et al. (1999); Orange County Superior Court
Fisher et al., v. Glendale Federal Bank et al. (1999); Orange County Superior Court (*)
People v. Boswell (1999); Monterey County Superior Court
Renaissance Capri HOA v. California Pacific Homes et al. (1999); San Diego County Superior Court
Bishop et al. v. Marblehead and the Lusk Company (1999); Orange County Superior Court (+)
The Masters Series of Seacliff on the Greens Homeowners Association et al. v. Cayman Development Company et al. (1998); Orange County Superior Court
Sausalito Maintenance v. Barratt American Incorporated et al. (1998); Orange County Superior Court (*)

*John R. Weeks, Ph.D.*
*- 25 -*

Exhibit 41 - 40

Summit Court Homeowners Association v. Baldwin Building Contractors et al. (1998); Orange County Superior Court (*)

Barkdull v. Fargo Industries et al. (1998); San Diego County Superior Court

Oxford Court HOA v. J.M. Peters Company (1998); Orange County Superior Court

Mission Greens I Maintenance Assoc v. The William Lyon Company (1998); Orange County Superior Court (+)

Spinazolla v. Tierrasanta ("Bella Vista") (1998); San Diego County Superior Court

Kate v. Osborne Development ("Vista Estrella") (1998); Los Angeles County Superior Court

State Farm, etc., v. Newhall Land and Farming et al. ("The Stratford Collection") (1998); Los Angeles County Superior Court

The Glen at Hillsborough Assoc v. The William Lyon Company (1998); Orange County Superior Court

Belflora v. William Lyon Company et al. (1998); Orange County Superior Court

Seacove Place Homeowners Association v. Laguna Audubon II et al. (1998); Orange County Superior Court (*)(+)

Kerner v. Rancho Cielo Association (1998); Orange County Superior Court (*)

Rancho Villas v. Showcase Homes et al. (1998); San Diego County Superior Court

Monarch Villas v. Shapell Industries et al. (1998); San Diego County Superior Court

Villa Point Homeowners Association v. The Irvine Company (1998); Orange County Superior Court

PGA West v. Sunrise Development (1998); Riverside Superior Court (*)

Provence d'Aliso Community Association v. Jess L. Frost et al. (1998); Orange County Superior Court (+)

Cabo Vista Maintenance Corporation v. Fieldstone Trabuco Partners et al. (1998); Orange County Superior Court

Windsong Community Association v. Windsong Partners (1998); Orange County Superior Court

Montecido at Portola Hills Association v. Baldwin Building Contractors (1998); Orange County Superior Court

Mission Del Oro v. Robinhood Homes et al. (1998); San Diego County Superior Court

Schmidt v. Skandia Scene, Inc et al. (1998): San Diego County Superior Court

Angulo et al v. Broadmoor et al. (1998); San Diego County Superior Court

Jacqueline Ames et al. v. Rancon Development Fund VI et al. (Promenade) (1998); San Diego County Superior Court (+)

Cueto v. Pardee Construction (1998); San Diego County Superior Court

Palm Valley v. Sunrise Development (1997); Riverside County Superior Court

Sharpe v. Carmel Mountain (1997); San Diego County Superior Court

Gillis v. Fonelo Construction (1997); Los Angeles County Superior Court

Scripps Townhomes COA v. California Pacific Homes (1997); San Diego County Superior Court

Canyon Rim Townhomes Assn v. The Baldwin Company et al. (1997); Orange County Superior Court (*)

Desert Horizons Owners Assn v. Desert Horizons et al. (1997); San Diego County Superior Court (*)

Edward and Helen Law et al. v. Signal Landmark et al. (Port Royale) (1997); San Diego County Superior Court (+)

Corarito v. Donald F. Sammis (1997); San Diego County Superior Court

United States v. Sigifredo Robles et al. (1996); U.S. District Court, Northern District of California

Elysian Community Association v. RGC-M Associates (1996); San Diego County Superior Court

Brown et al., v. F & M Associates (1996); San Diego County Superior Court

Fairway Villas at Eastlake Green Assoc v. Century American Corporation et al. (1996); San Diego County Superior Court

Belsera v. Tierrasanta (1996); San Diego County Superior Court

Alexander v. J.M. Peters (1996); San Diego County Superior Court

Cimarron HOA v. Home Capital Corp (1996); San Diego County Superior Court

People v. Mendes Stanley Brown (1996); San Francisco County Superior Court (*)

Ocean Hills Country Club HOA v. Leisure Technology Inc. (1996); San Diego County Superior Court

Scripps Nob Hill v. The Presley Companies (1996); San Diego County Superior Court

Arborlake v. Baldwin et al. (1996); San Diego County Superior Court (*)

Kennedy v. Santa Fe Ridge (1996); San Diego County Superior Court (*)

Mesquite Country Club Condominium HOA v. Mesquite Country Club (1996); Riverside County Superior Court

United States v. Reese (1996 retrial); U.S. District Court, Southern District of California

The Lakes at Carmel Del Mar v. Baldwin Company et al. (1995); San Diego County Superior Court

United States v. Rubio (1995); U.S. District Court, Southern District of California

Cape la Jolla OA v. Brehm Communities et al. (1995); San Diego County Superior Court

Zaslow v. The Baldwin Company (1995); San Diego County Superior Court

Fisher et al., Pacific Sun/West (1995); San Diego County Superior Court

Halcyon Community Assoc. v. Del Mar Associates et al. (1995); San Diego County Superior Court

Arnold v. Baldwin et al. (1995); San Diego County Superior Court (*)

United States v. Elizarra (1995); U.S. District Court, Southern District of California

People v. Cunningham (1995); San Bernardino County Superior Court (*)

Exhibit 41 - 41

Pardee Construction v. Astra Flooring (1995); San Diego County Superior Court (*)
La Costa Alta v. Newport Pacific (1994); San Diego County Superior Court (*)
People v. Ramirez (1994); San Francisco County Superior Court
Vintage Townhomes HOA v. Northwoods-Rancho Cucamonga, Ltd et al. (1994); Riverside County Superior Court
Terraces at Scripps West v. Foote Development (1994); San Diego County Superior Court
City Scene v. Brehm Communities (1994); San Diego County Superior Court (*)
People v. Chan et al. (1993); Orange County Superior Court (*)
People v. Burney (1993); Orange County Superior Court (*)
United States v. Reese et al. (1993); U.S. District Court, Southern District of California
United States v. Roaches (1993); U.S. District Court, Central District of California
Casa de Las Companas v.  The Law Company et al. (1993); San Diego County Superior Court
United States v. Valera-Calderon (1993); U.S. District Court, Southern District of California
Ranchwood Park Property Owners Assoc v. Ranchwood Community (1993); San Diego County Superior Court
People v. Strother (1993); Los Angeles County Superior Court (*)
People v. Weaver (1993); San Diego County Superior Court
Courtyards v. Shapell (1992); San Diego County Superior Court
Creekwood Condominium Association v. Douglas Allred Co. (1992); San Diego County Superior Court
North Rim Homeowners Association v. Douglas Allred Co. et al. (1992); San Diego County Superior Court
People v. Hines (1992); San Diego County Superior Court
People v. Chaidez (1992); Santa Barbara County Superior Court (*)
People v.  Cabrera et al. (1991); San Diego County Superior Court (*)
United States v. Sainz (1991); U.S. District Court, Southern District of California (*)
People v. Bell (1991); San Diego County Superior Court
County of San Diego, et al., v. Jesse M. Unruh, et al. (1990); San Diego County Superior Court (*)(+)
People v. Isaquirre (1990); San Diego County Superior court
People v. Roberts (1990); San Diego County Superior Court
People v. Butler (1990); San Diego County Superior Court
People v. Pearce (1990); San Diego County Superior Court
People v. Sixto (1989); Kern County Superior Court
People v. Moffett (1989); San Diego County Superior Court
People v. Vera (1989); San Diego County Superior Court (*)
People v. Agrio (1989); San Diego County Superior Court
People v. Bustamonte (1988); Imperial County Superior Court
United States v. Valencia-Garcia (1988); U.S. District Court, Southern District of California
United States v. Martinez-Gonzalez (1988); U.S. District Court, Southern District of California
Ramos  v. Ragu Foods (1988); San Francisco County Superior Court
People v. Miller (1988); Riverside County Superior Court
People v. Maier (1988); San Diego County Superior Court
People v. Ware (1987); Los Angeles County Superior Court [Crim Case No. A-739-760 (1988)] (*)
People v. Ramirez (1987); Los Angeles County Superior Court (*)
People v. Samayoa (1987); San Diego County Superior Court (*)
People v. Cosby (1987); San Diego County Superior Court
People v. Carpenter (1987); San Diego County Superior Court
People v. Ayala (1987); San Diego County Superior Court
People v. Moreno (1987); San Diego County Superior Court
People v. Neidiffer and Cruz (1986); Riverside County Superior Court (*)
People v. Lucas (1986); San Diego County Superior Court (*)
People v. Troiani (1986); San Diego County Superior Court (*)
People v. Herrera (1985); San Diego County Superior Court (*)
People v. Dier (1985); San Diego County Superior Court
People v. Dumas (1985); San Diego County Superior Court (*)
People v. O'Hare (1985); San Diego County Superior Court
People v. Ivory (1984); San Diego County Superior Court (*)
People v. Washington (1984); San Diego County Superior Court (*)
People v. Alexander (1983); San Diego County Superior Court (*)
People v. Silva (1982); San Diego County Superior Court (*)
People v. Marshall (1980); San Diego County Superior Court (*)

(*) *Includes Court Testimony and/or Deposition*

*John R. Weeks, Ph.D.*
*- 27 -*

Exhibit 41 - 42

*(+) Indicates work for Plaintiff*

**Other Professional Consulting:**

Federal Public Defender, Central District of California, Los Angeles, CA (2013 - present)
Habeas Corpus Resource Center, San Francisco, CA (2007-present)
Capital Post-Conviction Project of Louisiana (2021-2022)
East County Economic Development Council (1986-2010)
United Nations Food and Agriculture Organization (FAO-CGIAR Centers) (2002-2005)
Center for Behavioral Epidemiology and Child Health, San Diego State University (2000-2005)
Center for Research on Child and Adolescent Mental Health Services, Children's Hospital, San Diego (1998-2000)
Pacific Biometrics, Inc. (1998 - 1999)
Dick & Patel Associates, Inc. (1998)
Quidel Corporation (1997)
Federal Defenders of San Diego, Inc. (1997)
Sullivan/Luallin Healthcare Consulting (1996-98)
Grossmont-Cuyamaca Community College District (1996)
City of San Diego Economic Development Services (1996)
San Diego Economic Development Corporation (1995)
Calgaro Insurance Services, Inc. (1993)
Cuyamaca Bank (1992)
Los Angeles Regional Family Planning Council (1985-1990)
James M. Montgomery, Consulting Engineers, Inc. (1988)
Encyclopedia Britannica Educational Corporation (1982)
Council on Pilipino-American Organizations (1978-81)
Allied Community Services/Allied Community Health (1978-80)

**PROFESSIONAL MEMBERSHIPS AND RELATED RECOGNITION**

Population Association of America (PAA)
    PAA Historian and Chair, PAA History Committee, 1994-present
        (https://www.populationassociation.org/about/our-history)
    Member, Memorial Service Committee, 2009-2011 (Chair in 2011)
    Chair of Local Arrangements Committee, 1982
Member, **World Commission on Forced Displacement Project Steering Committee**, Chumir Foundation
    for Ethics in Leadership, 2016 to 2019.
American Association of Geographers (AAG)
    Member of Board of Directors of Population Geography Specialty Group (1996-2000), President (2000-2001),
        Immediate Past President (2001-2002)
    Reviewer for *The Annals of the Association of American Geographers,* and the *Professional Geographer*
    Editorial Board, **Annals of the Association of American Geographers** (2010-2014).
American Sociological Association (ASA)
    Member of Section on Population;
    Member of Section on International Migration;
    Guest Editor of Special Issue of *Teaching Sociology,* 1986
    Reviewer for the *American Sociological Review*
International Union for the Scientific Study of Population (IUSSP)
Southern Demographic Association
Association of Borderland Scholars
Sociedad Mexicana de Demografía
The Society for the Study of Social Biology
Editorial Board, **Journal of Immigrant Health** (1996-present).
Editorial Board, **GeoJournal** (2007-2017).
External reviewer for the European Research Council, 2014-2015.
Permanent Member, Social Sciences and Population B (SSPB) Study Section, Center for Scientific Review, National
    Institutes of Health, 2012-2013.
Member, SaniPath International Advisory Board, Rollins School of Public Health, Emory University (2012-2014)

Exhibit 41 - 43

Member, Advisory Committee, "GIS Training in Population Sciences," Awarded to Stephen Matthews (PI) by the National Institute of Child Health and Human Development, 2004-2013.

External Member, Study Section for Social Science and Population Studies, *Eunice Kennedy Shriver* National Institute of Child Health and Human Development, 2005-2011.

International Institute for Applied Systems Analysis (IIASA), Population and Society Site Evaluation Team Member, Vienna, Austria, January 2007.

National Research Council, Committee on the Effective Use of Data, Methodologies and Technologies to Estimate Sub-National Populations at Risk, Member 2005-2007

Panelist, National Science Foundation Review Panel for Biocomplexity in the Environment: Dynamics of Coupled Natural and Human Systems, Washington, DC, March 2004.

*Ad hoc* reviewer for the National Science Foundation

Member, Educators Who Care Executive Committee, Population Institute (Washington, DC), 1999-2008)

**UNIVERSITY SERVICE**

Member, Review Panel for Gerontology Program, SDSU, 2013

Chair, Student Outcomes Assessment Committee, Department of Geography, 2000-2013

Member, University Student Learning Outcomes Assessment Committee, 2011-2013

Member, University Research Council, 2010-2013

Academic Advisor, Certificate in Environmental Studies, 1997-2013

Faculty Advisor, SDSU Over 60 Program, 1994 - 2013

Member, Personnel Committee, Department of Geography, 1996-2013 (chair 1993-94, 2001-02)

Member, Ph.D. Advising Committee, Department of Geography, 1998-2005, 2007-2010

Member, Research Committee of the College of Arts and Letters, 2008-2009.

Member, Policy Advisory Committee, Department of Geography, 1993-1995, 1997-98 (Chair), 1999-2001, 2008-2009 (Chair).

Member, Global Health Joint Doctoral Program (SDSU-UCSD) Steering Committee, 2007

Member, Curriculum Committee, Department of Geography, 2005-2006

Member, Search Committee for the Dean of the College of Health and Human Services, 2004-2005

Member, Hiring Committee, Department of Geography, 2000-2005

Member, College of Arts and Letters Budget and Resource Planning Committee, 2003-2004

Member, University Faculty Honors and Awards Committee, 2003

Member, Building Advisory Committee, College of Arts and Letter, 2002-03

Member, Search Committee for the Director of the University Center on Aging, SDSU, 2002-2003

Member, Search Committee for the Harold Simon Endowed Chair in International Health and Cross-Cultural Medicine, UCSD School of Medicine, 2000-2003

Member, University Center on Aging, Steering Committee for BA Program, 1995-2003

Member, Search Committee for Tenure-Track Assistant Professor in Gerontology, SDSU, 2000-2001

Member, M.A. Advising Committee, Department of Geography, 1993-99

Member, Search Committee for Dean of the College of Health and Human Services, 1993-94

Member, College of Arts and Letters Research and Professional Leaves Committee, 1989-1990; 1992-1994.

Founding Member of San Diego State University Chapter of Phi Beta Delta Honor Society for International Scholars, 1989.

Member, Department of Sociology Graduate Committee, 1986-1987, 1990-1992.

Member, Department of Sociology Personnel/Recruitment Committee, 1990-1992 (Chair, 1990-1991).

External Member, College of Business Administration Peer Review Committee, 1990-1991.

Member, Advisory Committee of the Program in Cross-Cultural Nursing, College of Health and Human Services, 1987-91.

Member, Planning Committee of the University Center on Aging, 1978 to 1990 (Chair of Committee from 1980-1985).

Member, Ad Hoc Committee on Development of a Joint Doctorate in Applied Social Science Research, 1986-89.

Member, College of Arts and Letters Personnel Committee, 1987-1988.

Member, Department of Sociology Curriculum Committee, 1986-1987.

Chair, Department of Sociology Promotion, Tenure, and Retention Committee, 1986-1987

Member, San Diego State University Senate (Senator from the College of Arts and Letters), 1980-1986.

**RELEVANT COMMUNITY SERVICE**

San Diego Association of Governments (SANDAG) - Member of Regional Growth Forecast Expert Review Panel, 1990 - 2012, 2017 – 2018, 2022.

Exhibit 41 - 44

Southern California Association of Governments (SCAG) - Member of Forecast Expert Panel, 2021.

Member, UCSD Center for US-Mexican Studies Fellowship Selection Committee, 1997.

Member, East County Regional Prosperity Strategy Task Force, 1994.

Member, Economic Advisory Board Task Force, County of San Diego, 1993-94.

Planned Parenthood of San Diego and Riverside Counties - Member of Binational Affairs Committee, 1988 to 1992; Member of Board of Directors, 1991-92.

**MEDIA INTERVIEWS:**

05/28/2023, "Homeownership in San Diego loses ground in last decade, especially for minorities and younger, middle-aged households." San Diego Union-Tribune: https://www.sandiegouniontribune.com/business/story/2023-05-28/homeownership-in-san-diego-loses-ground-in-last-decade-especially-for-minorities-and-younger-middle-aged-households?utm_id=99221&sfmc_id=2407999

01/20/2019, "Declining birth rates in the U.S." KUSI-TV: https://www.kusi.com/san-diego-people-us-cancer-rate-drops-for-25th-straight-year/

07/23/2018, "Pushed out by high prices, these San Diegans left for greener pastures," San Diego Union-Tribune: http://www.sandiegouniontribune.com/business/real-estate/sd-fi-leaving-san-diego-20180723-story.html.

01/15/2018, "By the Numbers: San Diego County's Most Diverse Neighborhoods," KPBS Midday Edition: http://www.kpbs.org/news/2018/jan/15/numbers-san-diego-countys-most-diverse-neighborhoo/

09/18/2015, "Median Income Climbs; Poverty Persists," San Diego Union-Tribune (Page A1): http://sandiegouniontribune.ca.newsmemory.com/?token=df352adb229611da5c5a1c3e1a268f54_55fc468f_4eb59fe&selDate=20150918

05/01/2015, "San Diego growing at healthy pace," San Diego Union-Tribune: http://www.utsandiego.com/news/2015/may/01/san-diego-population-growths-healthy-pace/

01/08/2015, live interview re low fertility in Japan on KPCC (Southern California Public Radio) on AirTalk with Larry Mantle: http://www.scpr.org/programs/airtalk/2015/01/07/41011/japan-s-shrinking-population-highlights-greater-gl/

12/17/2014, live interview re California demographics on KOGO radio (San Diego, CA) on "News with Cliff Albert."

12/15/2014, live interview re California demographics on KABC radio (Los Angeles, CA) on "McIntyre in the Morning."

12/12/2014, "Improving Economy Boosts Calif. Population," San Diego Union-Tribune (Page A1): http://www.utsandiego.com/news/2014/dec/11/california-demographics-population-state-births/

10/16/2014, "By the Numbers: How diverse is your neighborhood?" Inewsource.org: https://inewsource.org/2014/10/16/diversity-in-san-diego/

6/15/2014, "Ethnic Mosaic a Stroll in Normal Heights," San Diego Union-Tribune (Page SD1): http://www.utsandiego.com/news/2014/Jun/15/tp-ethnic-mosaic-a-stroll-in-normal-heights/?#article-copy

12/13/2013, "Immigrants Drive CA's Higher Growth Rate," San Diego Union-Tribune (Page A2): http://www.utsandiego.com/news/2013/dec/12/california-population-growth-immigrant-immigration/

12/01/2013, "Hardships Still Keep Young Adults at Home," San Diego Union-Tribune: (Page A2) http://www.utsandiego.com/news/2013/Dec/01/tp-hardships-still-keep-young-adults-at-home/?#article-copy

11/7/2013, "Including Cost of Living, State Tops Poverty List," San Diego Union-Tribune (Page A1): http://www.utsandiego.com/news/2013/nov/06/california-census-supplemental-poverty-measure/

9/24/2013, "Report: Migration Numbers Set to Rise Again," San Diego Union-Tribune (Page A1): http://www.utsandiego.com/news/2013/sep/24/tp-report-migration-numbers-set-to-rise-again/

9/1//2013, "No Big Changes for Region's Poverty, Income Rates," San Diego Union-Tribune: http://www.utsandiego.com/news/2013/sep/19/poverty-sandiego-income-census-food/

5/01/2013, "Little Baghdad, California," The Progressive (May 2013 issue): http://progressive.org/little-baghdad-california

1/31/2013, "State Becoming Equal Parts Hispanic and White," San Diego Union-Tribune (Page A1): http://www.utsandiego.com/news/2013/jan/31/california-population-hispanic-white/

1/05/2013, "Population expected to slow to rate unseen since depression," San Diego Union-Tribune (Page A1): http://www.utsandiego.com/news/2013/jan/05/population-expected-to-slow-to-rate-unseen-since/

9/29/2012, "Census may change race, ethnicity terms," San Diego Union-Tribune: http://www.utsandiego.com/news/2012/sep/29/census-looking-to-the-future/?page=1#article

Exhibit 41 - 45

6/25/2012, "Interstate 8 Divide May Lead To San Diego Political Gridlock," KPBS (and played on NPR): http://www.kpbs.org/news/2012/jun/25/interstate-8-divide-may-lead-san-diego-political-g/

5/17/2012, "State, county long ahead of national non-white birth trend, San Diego Union-Tribune: http://www.utsandiego.com/news/2012/may/17/a-first-births-of-babies-of-color-tops-50-percent/?page=1#article

12/08/2011, "Snapshot of How We Live," San Diego Union-Tribune (page A3)

11/30/2011, "Senior Population Grows," San Diego Union-Tribune (page A1): http://www.signonsandiego.com/news/2011/nov/30/number-of-seniors-65-at-record-high-in-2010/?page=1#article

11/15/2011, "Census: Fewer on the Move in America," San Diego Union-Tribune (page A1): http://www.signonsandiego.com/news/2011/nov/15/record-number-americans-staying-put/

10/28/2011, "Are we facing a crisis of overpopulation?" Aljazeera: http://english.aljazeera.net/indepth/features/2011/10/2011107161744294439.html

9/13/2011, "U.S. Census - More Americans Living In Poverty," Midday Edition, KPBS Radio: http://www.kpbs.org/news/2011/sep/13/us-census-more-americans-living-poverty/

8/09/2011, "Envision San Diego: Changing Face of America," KPBS-TV: http://www.kpbs.org/news/2011/aug/09/envision-san-diego-changing-face-america/

7/29/2011, "Young and Restless can be a Volatile Mix," Science, Vol. 333:552-554, http://www.sciencemag.org/content/333/6042/552

7/15/2011, "Births Fuel Hispanic Growth," Wall Street Journal (page A3), http://online.wsj.com/article/SB10001424052702304521304576446232406979972.html?mod=WSJ_hps_sections_news

6/27/2011, "Hispanic Population Growth Has Big Effect," San Diego Union-Tribune (page A1), http://www.signonsandiego.com/news/2011/jun/27/hispanic-population-growth-has-big-effect/

6/23/2011, "Census Chronicles Housing's Downturn," San Diego Union-Tribune (Page A1), http://www.signonsandiego.com/news/2011/jun/22/homeownership-fell-in-fast-growing-suburbs-census/

4/20/2011, "Cutting Services to Illegal Immigrants Isn't Easy," San Diego Union-Tribune, http://www.signonsandiego.com/news/2011/apr/19/cutting-services-to-illegal-immigrants-isnt-easy/

3/25/2011, KUSI-TV,  "2010 Census: San Diego population now a minority-majority," http://www.kusi.com/story/14324842/lenderman-pkg

3/25/2011, "Census shows dynamic populations in San Diego, U.S," San Diego Union-Tribune, http://www.signonsandiego.com/news/2011/mar/25/census-shows-dynamic-populations-in-san-diego-us/

3/18/2011, Guest on "San Diego Week," KPBS-TV, http://www.kpbs.org/news/san-diego-week/

3/09/2011, "Region's Growth Eases," San Diego Union-Tribune.

3/08/2011, "U.S. Census: More Minorities Than Whites In San Diego County," KPBS, http://www.kpbs.org/news/2011/mar/08/census-more-minorities-whites-san-diego-county/

2/18/2011, "Census decennial roll-out ongoing, not yet California," San Diego Union-Tribune

2/16/2011, "Connecting the Dots: What Happens Halfway Around the World Affects Americans, Too," SDSU 360 Magazine, http://newscenter.sdsu.edu/360/news.aspx?s=72772

12/21/2010, Guest interview on CNN International "Connect the World," http://www.cnn.com/CNNI/Programs/connect.the.world/

12/21/2010, "As U.S. becomes more diverse, Hispanics flourish," Reuters News Agency, http://www.reuters.com/article/idUSTRE6BK2UC20101221?pageNumber=1

12/15/2010, "Census Confirms Growth of Minority Groups," San Diego Union-Tribune.

6/13/2010, "Iraqi Refugees, Desperately Seeking English," Chronicle of Higher Education.

4/12/2010, "English classes can't meet demand," San Diego Union-Tribune.

9/20/2009, "Immigrant population declines in California," San Diego Union-Tribune.

7/01/2009, "New federal population estimates differ sharply from state's," North County Times.

5/14/2009, "County not go-to spot for Latinos in region," San Diego Union-Tribune.

12/19/2008, "County bucks trend with 1.5% population gain," San Diego Union-Tribune.

6/25/2008, "Who are the Lucky Few?," USA Today.

3/24/2008, "D.A. says jury pool falls short of Latinos;  Office offers plan to boost numbers," San Diego Union-Tribune.

3/20/2008, "County residents are staying put: Housing slump puts brakes on migration," San Diego Union-Tribune.

2/12/2008, "Immigration projected to drive America's population growth," San Diego Union-Tribune.

1/28/2008, "Analysis: Downtown Juries Lack Hispanics," San Diego Union-Tribune.

*John R. Weeks, Ph.D.*
*- 31 -*

Exhibit 41 - 46

9/17/2007, KPBS-Radio, These Days with Tom Fudge, "Birth Rates Shape the Future of San Diego County," http://www.kpbs.org/radio/these_days;id=9638.

9/08/2007, "Official Defends Study on Immigrants," San Diego Union-Tribune.

9/08/2007, "Report estimates county's illegal immigrant cost at $256 million in 2006," North County Times.

6/28/2007, "Growth robust in outlying suburbs," San Diego Union-Tribune.

9/14/2006, "Ruling Lets Lawyers Study Jury Recruitment," San Diego Union-Tribune.

8/17/2006, Panel on Voice of America, Talk to America, "China, Inc."

8/15/2006, "Kids' English Fluency Flourishes," San Diego Union-Tribune.

8/04/2006, "County's diversity up; Growth levels off," San Diego Union-Tribune.

7/11/2006, Panelist on Voice of America, Talk to America, "World Population Day."

3/25/2006, "Numbers Down at Schools," San Diego Union-Tribune.

1/08/2006, "Santa Barbara changes a system one judge said was flawed," Ventura County Star.

1/23/2005, "Where Latinos live," San Diego Union-Tribune.

5/20/2004, "County's whites to lose their majority," San Diego Union-Tribune.

4/09/2004, "Thousands in S.D. get a move on," San Diego Union-Tribune.

11/13/2003, "County jury pools ruled unconstitutional," Santa Barbara News-Press.

9/27/2003, "Latino jury controversy may delay second trial," Santa Barbara News-Press.

9/22/2003, "Report says county short on Latinos in jury pools," Santa Barbara News-Press.

5/15/2002, "County's immigration surge outstrips region," San Diego Union-Tribune.

4/29/2002, "Babies and immigrants fuel growth of county," San Diego Union-Tribune.

4/7/2002, "Slow progress: More Latinos joining the ranks of homeowners," San Diego Union-Tribune.

5/23/2001, "North County aging, growing more diverse," North County Times.

4/8/2001, "Region grows slower than nation, state for first time in 100 years," North County Times.

3/30/2001, "Despite gains, county slips to No. 3 in state," San Diego Union.

2/14/2001, "Repayment sought for processing of migrants," San Diego Union, http://www.signonsandiego.com/news/metro/20010214-9999_6m14illegal.html.

2/9/2001, "Study tallies cost of illegal immigration," Los Angeles Times/

2/6/2001, "County spent $50 million on immigrants in '99, study finds," San Diego Union.

2/3/2001, "Imperial County Spent $5.4 million in 1999 to provide services to illegal immigrants," Imperial Valley Press.

10/2000, Victor Sherman and Janet Sherman, "Institutional Racism in the Los Angeles County Grand Jury System," Verdict, Vol. 6, No. 4, pp.3-10.

6/12/2000, San Diego Union-Tribune, "Changing Demographics Challenge Public Schools to Give More Tutoring and Bilingual Support; Hispanic Student Population Soared in the Past 10 Years"

4/25/2000, National Public Radio, Morning Edition, "L.A. Grand Jury"

4/25/2000, Los Angeles Times, "Choices for County Grand Jury Again Include Few Latinos"

4/17/2000, Los Angeles Times, "Gap in Census Leaves Need for Religious Data"

3/26/2000, Los Angeles Times, "Special Report: They're Gaining Clout Everywhere in the Region, But a Legal Challenge Contends That Because of a Flawed Selection Process Latinos are Underrepresented on County Grand Jury"

2/27/2000, San Diego Union-Tribute, "Brake Lights Ahead: Housing Prices Driving Force Behind Slowing Growth and Slowing Traffic"

1/2/2000, San Diego Union-Tribune, "Future of Growth"

9/15/1999, San Diego Union-Tribune, "'90s growth is attributed to minorities"

1/18/1999, San Diego Business Journal, "Economists: 1999 looks healthy for San Diego"

1/9/1999, San Diego Union-Tribune, "Experts foresee San Diego's growth moderating a bit"

9/27/1998, San Diego Union-Tribune, "County's growth measured in millions"

8/31/1998, KGTV. Channel 10 News, interview re U.S. illegitimacy rates

1/30/1998, San Diego Union-Tribune, "S.D. County population growth amazes experts"

5/18/1997, San Diego Union-Tribune, "Experts warn of a leveling-off in decline in Mexico's birth rate"

5/15/1997, KNSD Channel 7/39 News. interview re Nutrition, population growth, and size of humans

4/20/1997, San Diego Union-Tribune, "S.D. County grows, but not by much"

8/11/1996, San Diego Union-Tribune, "Who we are: migration is putting new face on San Diego County"

5/4/1996, San Diego Union-Tribune, "San Diego is No. 1 in growth in the state"

4/14/1996, San Diego Union-Tribune, "Growth up smallest amount in two decades"

2/9/1996, San Diego Union-Tribune, "Fear may keep exact Muslim population a mystery"

11/21/1995, KUSI Channel 9/51 News, interview re defense conversion study

4/20/1995, The Daily Californian, "Military downsizing a bane to small businesses"

2/9/1995, Houston Chronicle, "Infant mortality linked more to morality than to socio-economic status"

2/1/1995, Wall Street Journal, "Infant mortality, mother's morality"

1/31/1995, The Daily Californian, "Pundit: all not lost with peso fall"

11/21/1994, American Medical News, "Poor immigrants have healthier infants than U.S.-born"

11/9/1994, New York Times, "Health Watch: Study finds healthier pregnancy for refugees"

9/4/1994, The Daily California, "East County spins its wheels when it comes to mass transit"

8/30/1994, San Diego Union-Tribune, "Millions in motion: driven by population growth, volume of migration is unprecedented"

6/6/1994, San Diego Union-Tribune, "Not all show decline in bacterial disease passed during sex"

5/29/1994, San Diego Union-Tribune, "San Diego leads state in growth"

2/27/1994, San Diego Union-Tribune, "Economy's slowdown means more people leave than move here in '93"

9/23/1993, San Diego Union-Tribune, "Study shows strengths of immigrants"

9/21/1993, The Daily Californian, "Development council pitches itself"

6/27/1993, San Diego Union-Tribune, "Linked Destiny: border cities in transition as old engines of growth stall"

6/27/1993, San Diego Union-Tribune, "Demographics take West out of East County"

6/25/1993, The Daily Californian, "Data reveals upward trend"

5/6/1993, San Diego Union-Tribune, "Population increase at 22-year low"

5/1/1993, San Diego Union-Tribune, "Analysts paint bleak picture for S.D., Tijuana"

4/28/1993, The Daily Californian, "NAFTA would aid San Diego economy"

4/22/1993, The Daily Californian, "Days of plenty fading for many local residents"

9/1/1992, Los Angeles Times, San Diego Edition, "Glee and gloom as University classes begin"

7/18/1992, The Daily Californian, "Lifestyle trends mean change in lunch program"

5/25/1992, Los Angeles Time, San Diego Edition, "SDSU: Narrow, deep cuts cause anguish at University"

5/19/1992, San Diego Union, "San Diego Census: 1990, National City hit hardest by poverty"

5/12/1992, The Daily Californian, "Figures show growing gap between rich, poor"

5/11/1992, San Diego Union, "County census portrait alarming"

11/21/1991, San Diego Evening Tribune, "In courts here, death deals a dark hand: Capital punishment shows distinct racial patterns"

11/18/1991, San Diego Evening Tribune, "Shadow of segregation haunts city"

8/27/1991, New York Times, "Hmong refugees resist adopting birth control"

3/15/1991, Boston Globe, "Population explosion heightens pressures"

2/23/1991, San Diego Union, "Kuwaiti waits anxiously for chance to return home"

5/28/1990, San Diego Union, "Punishment for women who kill said more severe"

2/11/1990, San Diego Union, "Hidden San Diego: Experts focus on special groups to study how society is changing"

5/2/1989, San Diego Daily Transcript, "ECEDC study indicates new East County employees continue living elsewhere"

3/1/1989, San Diego Tribune, "Does Islam "bomb' have sizzling fuse"

2/17/1989, San Diego Tribune, "San Diego population experts say Islam is the world's fastest growing religion"

11/20/1988, Los Angeles Times, "Lack of young jurors spurs legal tussle"

9/3/1988, The Daily Californian, "Staying ahead of the trends is his job: Weeks' services are sought all over the world"

7/7/1987, Riverside Press-Enterprise, "Riverside judge rules jury pool an uneven mix"

6/15/1987, Excelsior (Mexico City), "Frontera Norte: Estudios de Población"

1/29/1987, The Reader, "Borderline figures: just how many people live in Tijuana today?"

12/8/1986, San Diego Union, "Divorces outnumbered marriages in county last year"

10/14/1986, Los Angeles Times, "Defense Challenges D.A.'s Standard for Seeking Death Penalty"

9/4/1986, San Diego Union, "Statistics don't match the charge against Troiani"

8/28/1986, San Diego Union, "Study says race not a factor in seeking death penalty"

10/24/1985, USA Today, "Elder boom: strange mix of problems"

11/9/1979, San Diego Tribune, "Motivation called natural birth control key"

10/25/1973, Michigan State News, "Two professors give new theory of population, social relationships"

*Rev: 09/06/2023*

Exhibit 41 - 48

**APPENDIX B**

Exhibit 41 - 49

## Documents Reviewed
## Re Christopher Cramer

1.  Juror Questionnaires, *U.S. v Christopher Cramer, Case No. 1:16-CR-26*

2.  Jury demographics spreadsheet

3.  Transcript excerpts, Status Conference on October 31, 2016, pp. 3-8

4.  Petitioners' Joint Motion and Incorporated Memorandum for Leave to Conduct Discovery Regarding Recusal,  January 25, 2023, *Edgar Garcia v. U.S.*, Case No. 1:13-CV-723

5.  Petitioners' Joint Motion and Memorandum Support of Motion for Recusal, January 25, 2023, *Edgar Garcia v. U.S.*, Case No. 1:13-CV-723

6.  **Court Qualification Questionnaires from USB-TX Court**
    *   Disqualified Questionnaires Redacted
    *   Excused Mental Physical Disability Redacted
    *   Final Strike List 80 jurors
    *   Individual Voir Dire Days Cramer & Jury List
        Jurors Disqualified Unable to Speak English or understand English Redacted
    *   Jurors Excused over 70F-P Redacted
    *   Jurors Excused over 70P-Z Redacted
    *   Jurors Excused PhyMental Disability redacted
    *   Jurors Excused Physical or Mental Disability Redacted
    *   Jurors Exempted Redacted Military Police Occupation
    *   Jurors General Hardship Redacted
    *   Jurors Marked Deceased Redacted
    *   Jurors Over 70a Redacted
    *   Jurors Over 70A-F-Redacted
    *   Jurors Over 70b Redacted
    *   Jurors Over 70c Redacted
    *   Moved Out of District Redacted
    *   Qualified P-W Redacted
    *   Qualified A-D Redacted
    *   Qualified D-H Redacted
    *   Qualified H-L Redacted
    *   Qualified Jurors A-F Redacted
    *   Qualified Jurors G-J Redacted
    *   Qualified Jurors J-0 Redacted
    *   Qualified M-R Redacted
    *   Qualified S-Y Redacted
    *   Questionnaires put back into beta kedupat Voir Dire Redacted
    *   Selected Jurors  Attendance Lists 116cr26
    *   Strike List 317 jurors Cramer
    *   Undeliverable Redacted

7.  Court Qualification Questionnaires Data (*Original Excel Chart & PDF*)

8.  Summonsed Juror Data (*Original Excel Chart & PDF*)

9.  Link to mapping data
    https://www.google.com/maps/d/edit?mid=1cMN2Ozf1k0cjymA5YEZghd9S18ywEjw&usp=sharing

Exhibit 41 - 50

# Exhibit 42

# Filed under seal

# Exhibit 43

# Filed under seal

# Exhibit 44

## DECLARATION OF BARBARA BELBOT, J.D. Ph.D.

I, Barbara Belbot, declare as follows:

1.      My name is Barbara Belbot. I am a retired Professor of Criminal Justice. I hold a Ph.D. from Sam Houston State University. I hold a J.D. from University of Houston Law Center. My resume is attached as Exhibit A.

2.      I was hired to consult about prison conditions on behalf of Christopher Cramer in January 2018. I had never consulted for or testified in a criminal case of any kind before. Specifically, Mr. Cramer's attorneys told me that they wanted me to assist them in preparing the mitigation presentation of their trial. When I was hired, they told me that I would be one of several witnesses testifying in the mitigation phase of Mr. Cramer's trial and that my role would be to prepare a written report and to testify about the academic research related to prison society, essentially how prisoners adapt to confinement. I was not given any further suggestions or directions about the nature of the research I was to include in the report.

3.      Mr. Cramer's lawyers sent me a collection of documents, which is attached as Exhibit B. I specifically requested Mr. Cramer's disciplinary records, and they provided me with additional records as well. I reviewed all these records with the expectation that we would discuss them and how they would fit into my testimony.

4.      Mr. Cramer's lawyers gave me little direction about what they wanted me to testify about. I did not have any one-on-one contact with any person associated with the case other than Doug Barlow. My contact with him included several emails and a few phone calls.

5.      I am an expert in prison conditions, and I have done field research in prisons all over the state of Texas. I have interviewed hundreds of prisoners about what their lives are like in prison, but strictly from a social science research perspective. I have done statistical research

1

Initials

Exhibit 44 - 1

and studied data about prisons. But I have never represented a client in a criminal matter. I have never conducted a mitigation investigation.

6.     Mr. Cramer's lawyers wanted me to interview Mr. Cramer in person. I expected that Doug Barlow would give me some guidance regarding what they wanted me to ask during the interview. However, they did not give me any direction as to the specific purpose of the visit, the goal of the interview, or what I should expect to learn about Mr. Cramer and his case from the interview that would be relevant to my testimony. They did not tell me what topics they wanted me to discuss with Mr. Cramer. I did not have a roadmap of how they thought my research and their case would intersect. Therefore, I focused on asking Mr. Cramer very general questions about his disciplinary record while incarcerated and why he joined a prison gang. I did not talk with him about the offense for which he was being tried.

7.     In preparation for my meeting with Mr. Cramer and my testimony, his attorneys did not discuss his social or institutional history at length with me. I did not participate in any team meetings or meet with a mitigation specialist. They did not ask me specifically to help them mitigate his institutional history, or even explain to me how that could be done, as I had never done that before. If they had asked me to do that, I would have requested additional guidance.

8.     At the attorney's direction, I visited him only one time and sat with him for only a little over one hour. When I tried to talk to Mr. Cramer about his institutional history, he was reluctant to discuss this with me, which is not unusual. In my experience of interviewing prisoners, I know that it often takes time to build trust with an incarcerated person. It was apparent to me that Mr. Cramer had not been told very much about what to expect during my visit and had no idea what the purpose of my testimony would be. That was another impediment to having a productive interview. I believe that, had someone prepared him for my visit by telling

2

Initials

Exhibit 44 - 2

him what my role was in the case, we would have had a more productive visit that would have helped the attorneys with their presentation. Again, I am not trained as a mitigation specialist.

9.  I prepared a report for the attorneys, as they requested. I have been advised that it was submitted to the jury as Defendant's Exhibit 15. It is attached as Exhibit C. My report focused on presenting a summary of academic research about prison culture, and how Mr. Cramer's experience in prison mirrored the research. I believe that visiting Mr. Cramer did not help me prepare for my written report or for my testimony because counsel gave me no guidance about what information I should have gathered during that visit that would help their case.

10.  I met Doug Barlow for the first time in person at a meeting held a few weeks before the trial started. Before that, my only communication with him had been via telephone and email. The meeting was attended by the attorneys representing Mr. Cramer, along with several other witnesses who were to testify during the mitigation phase of the trial. I do not know if there was a mitigation specialist at this meeting. The meeting lasted over 4 hours and occurred several weeks prior to trial. My testimony as a mitigation witness was not addressed in any specific detail or at any length, and I left the meeting without an understanding of what my academic research was to accomplish during the mitigation phase.

11.  I was not prepared in any way for what to expect and how to handle cross examination. When I was cross-examined by the government, I was asked many questions about things I did not testify about on direct, including my knowledge of specific BOP facilities and my knowledge of Mr. Cramer's criminal history. I also believe that Mr. Cramer's lawyers were unprepared to rehabilitate me following what seemed to me a devastating cross examination.

12.  For example, the government asked me a lot of questions about the Department of Justice research summarized in "Report and Recommendations Concerning the Use of

3

Initials

Exhibit 44 - 3

Restrictive Housing" published in January 2016. This report details the many problems that arise in long-term restrictive housing, particularly when it comes to the overuse of solitary confinement and, paradoxically, double-celling. The report concludes that restrictive housing cannot be used as a substitute for individualized inmate management; it essentially makes recommendations about refining the use of restrictive housing to prevent and reverse its use as a way to warehouse inmates who present supervision problems.

13.    Mr. Cramer's counsel presented the ADX program as a unit which could safely house Mr. Cramer and the one he would likely go to if sentenced to life. The government's questions to me about the 2016 Restrictive Housing report made it seem as though ADX was going to be dismantled in the near future. I knew this resulted in a misrepresentation of the report's content. I was disappointed that Mr. Cramer's counsel did not conduct a redirect examination of me to repair what I had perceived as damage done. It is apparent that they were not familiar with the research I cited in my report and were not prepared to challenge the government on the false narrative elicited through their cross examination. Had counsel taken a recess to talk to me about the cross examination, I would have encouraged them to ask me about the report's findings and recommendations in greater detail.

I declare under penalty of perjury that the foregoing is true and correct.

DATED:  September 15, 2023

_Barbara Belbot_
Barbara Belbot, J.D., Ph.D.

4

Initials

Exhibit 44 - 4

# Exhibit A

Exhibit 44 - 5

# BARBARA A. BELBOT

Department of Criminal Justice
University of Houston - Downtown
Room 340
Commerce Building                    Office: (713) 221-8983
Houston, Texas  77002

## EDUCATION

| | | |
|---|---|---|
| Ph.D. | 1995 | Sam Houston State University (Criminal Justice) |
| M.P.H. | 1986 | University of Texas Health Science Center |
| J.D. | 1980 | University of Houston |
| B.A. | 1974 | Xavier University (History) |

## ACADEMIC AND PROFESSIONAL APPOINTMENTS

| | |
|---|---|
| 2021- present | Adjunct Professor of Criminal Justice, University of Houston Downtown |
| 2017- 2021 | Professor, Department of Criminal Justice & Social Work, University of Houston Downtown |
| 2012 – 2017 | Professor, Department of Criminal Justice & Social Work, University of Houston Downtown and Department Chair |
| 1996 - present | Associate Professor, Department of Criminal Justice, University of Houston - Downtown. **Tenured Fall 1998** |
| 1995-1996 | Assistant Professor, Department of Justice Sciences, University of Alabama at Birmingham |
| 1993- 1995 | Assistant Professor, Department of Criminal Justice, University of Houston-Downtown |
| Spring 1993 | Lecturer, Department of Criminal Justice, University of Houston-Downtown |
| 1990-1992 | Doctoral Fellow, College of Criminal Justice, Sam Houston State University |
| 1986-1990 | Court-appointed attorney in the Office of the Special Master, *Ruiz v. Estelle* prison reform litigation, Houston, Texas.  One of several attorneys appointed to monitor the compliance of the Texas Department of Criminal Justice - Institutional Division with numerous court orders and stipulations. |
| 1985-1986 | Assistant Attorney General for the State of Texas (part-time) |

Exhibit 44 - 6

Consumer Protection Division, Houston, Texas.

1982- 1984    Associate attorney in the insolvency and creditors' section, Woodard, Hall, and Primm, P.C., Houston, Texas

1980-1982    Law clerk for the Honorable William M. Schulz, U. S. Bankruptcy District Court Judge, Southern District of Texas

## GRANTS

Fall 2009    UHD Faculty Development Grant, with two other professors in the Criminal Justice Department and two in the Social Sciences Department, for tuition to enroll in the Master Online Certification Teacher Certificate Program at the University of Illinois at Springfield.

Spring 2009    UHD Technology Teaching & Learning Center Grant to revise an online course, CJ 3312 Institutional-Based Corrections, $2500.

1992-1994    Assessing Current Prisoner Classification Systems: Legal Developments and Technical Developments. Barbara Belbot, Universityof Houston - Downtown, James Marquart and Steve Cuvelier, Sam Houston State University.  National Institute of Justice, $225,000.

## COURSES TAUGHT

**Undergraduate Courses**
CJ 1301 Crime, Law & Society
CJ 2302 Criminal Court Systems
CJ 2303 Correctional Systems
CJ 3301 Criminology Online
CJ 3304 Criminal Law
CJ 3305 Criminal Evidence & Procedure
CJ 3309 Security & the Law
CJ 3311 Ethics of Social Control
CJ 3312 Institutional-Based Corrections
CJ 3312 Institutional Corrections Online
CJ 3313 Community-Based Corrections
CJ 3313 Community-Based Corrections Online
CJ 3319 Legal Research
CJ 4307 Legal Rights of the Convicted
CJ 4312 Research Topics
CJ 4314 Women & the Criminal Justice System
CJ 4370 Senior Seminar

CJ 4390 Special Topics in Criminal Justice – the Death Penalty
UHD 1308 Freshman Seminar

**Graduate Courses**
Masters in Criminal Justice
CJ 6310 CJ Issues in Criminal Justice
CJ 6311 Legal Liabilities in Criminal Justice
CJ 6312 Law & Society
CJ 6313 Issues in Corrections
CJ 6350 Criminal Justice Policy Analysis
CJ 6360 Death Penalty
CJ 6342 Correctional Programming (ITV)
CJ 6370 Independent Study

Masters in Security Management
CJ 6364 Legal Aspects of Security Management

Exhibit 44 - 7

## PUBLICATIONS

### Books

Belbot, Barbara A., Craig Hemmens, & Michael Cavanaugh (2015) The Legal Rights of the Convicted (2d ed.). LFB Scholarly Publishing: El Paso.

Craig Hemmens, Barbara Belbot, & Katherine Bennett (2013). Significant Cases in Corrections (2d ed.). Oxford University Press: New York.

Belbot, Barbara A. & Craig Hemmens, (2010) The Legal Rights of the Convicted . LFB Scholarly Publishing: El Paso.

Belbot, Barbara A. (2005). Guide to Criminal Law for Texas (3d ed.). Wadsworth Publishing Company: Belmont, CA.

Craig Hemmens, Barbara Belbot, & Katherine Bennett (2004). Significant Cases in Corrections. Roxbury Publishing Company: Los Angeles.

Belbot, Barbara A. (1999). Guide to Criminal Law for Texas. Wadsworth Publishing Company: Belmont, California.

### Referred Journals

Belbot, Barbara A. (2004) "Report on the PLRA: what have the courts decided so far?" *The Prison Journal* 84(3) pp. 290-316.

Belbot, Barbara A. and James Marquart (1998) "The political community model and prisoner litigation: can we afford not to consider a better way?" *The Prison Journal* 78(3), pp. 299-329.

Belbot, Barbara A. (1998). "Where can a prisoner find a liberty interest these days? The pains of imprisonment escalate." *New York Law School Law Review* 42:1, pp. 1-69.

Kathryn D. Morgan, Barbara A. Belbot, & John Clark (1997). "Liability issues affecting probation and parole supervision." *Journal of Criminal Justice* 25(3), pp. 211-222.

Belbot, Barbara A. (1991)."Whistleblowing and lawyers." *Journal of Contemporary Criminal Justice*, 7 (3), pp. 154-166.

Belbot, Barbara A. and Rolando V. del Carmen (1991). "AIDS in prison: legal issues." *Crime and Delinquency*, 37 (1), pp.135-152.

Exhibit 44 - 8

## Book Chapters

Belbot, Barbara (2012). *"Prisoner Constitutional Rights and Related Litigation."* In Blackburn, A., Fowler, S. & Pollock, J. (eds). Prisons: Today and Tomorrow (3rd ed). Jones and Bartlett: Sudbury, MA.

Belbot, Barbara (2012). *"The Sentencing Revolution."* In F. Reddington and G. Bonham (eds.) Flawed Criminal Justice Policies: At the Intersection of the Media, Public Fear and Legislative Response. Carolina Academic Press: Durham, NC.

Belbot, Barbara A. (2007). *"Inmate Litigation and the Constitution,"* In C. Hemmens (ed.) Current Legal Issues in Criminal Justice. Roxbury Publishing Company: Los Angeles.

Belbot, Barbara A. (2007). *"Mandatory Treatment: Issues and Myths,"* In M. McShane & F. Williams (eds) Youth Violence and Delinquency Interventions: Monsters and Myths. Praeger Press: Westport, Connecticut.

Belbot, Barbara A. (1996). *"Prisoner classification litigation."* In J. Sorensen and J. Marquart (eds.), Correctional Contexts: Contemporary and Classical Readings. Los Angeles: Roxbury Publishing Co.

Belbot, Barbara A. and Rolando V. del Carmen (1993). "Legal issues in classification." In Classification - A Tool for Managing Today's Offenders. American Correctional Association.

Belbot, Barbara A. (1993). "Corporate Criminal Liability." In M. Blankenship (ed.) Understanding Corporate Criminality. New York: Garland Press.

## Encyclopedia Entries

Belbot, Barbara A. (2007). *"Prisoners" and "Hudson v. Palmer, 468 U.S. 517 (1984)"* In W. Staples (ed.) Encyclopedia of Privacy. Greenwood Press: Westport, Connecticut.

Belbot, Barbara A. (2005). *"Eastern State Penitentiary" and "Dr. Benjamin Rush"* In M. Bosworth (ed.) Encyclopedia of Prisons and Correctional Facilities (2 vols.), Sage Publications.

Belbot, Barbara A. (2002). *"Restorative Justice Programs,"* In F. Williams and M. McShane (eds.) Encyclopedia of Juvenile Justice, Thousand Oaks: Sage Publications.

Belbot, Barbara A. (1996). *"Administrative Segregation."* In M. McShane and F. Williams (eds.) The Encyclopedia of American Prisons. New York: Garland Press

Exhibit 44 - 9

## Instructors' Manuals

Belbot, Barbara. A. (2011). Instructors' Resource Manual and Test Bank for *Criminal Procedure* (8th ed) by Joel Samaha. Wadsworth/Cengage Learning.

Belbot, Barbara. A. (2009). Instructors' Resource Manual and Test Bank for *Criminal Law* (10th ed) by Thomas Gardner & Terry M. Anderson. Wadsworth/Cengage Learning.

Belbot, Barbara A. (2008). Instructors' Resource Manual and Test Bank for *Criminal Procedure* (7th ed) by Joel Samaha. Thomson/Wadsworth..

Belbot, Barbara A. (2008). Instructors' Resource Manual and Test Bank for *Criminal Law* (9th ed) by Joel Samaha. Thomson/Wadsworth.

## Book Reviews

Belbot, Barbara (2017). Review of White, Michael D. & Henry F. Fradella, Stop and frisk: The use and abuse of a controversial policing tactic. New York: New York University Press in *Journal of Criminal Justice and Law* 1 (1), pp. 67-70.
\
Belbot, Barbara (2007). Review of Federman, Cary, The body and the state: habeas corpus and American jurisprudence. Albany: State University of New York Press in *Criminal Law Bulletin* 43 (4), pp. 630-632.

Belbot, Barbara (1998). Review of Anechiarico, Frank & James B. Jacobs (1996). The pursuit of absolute integrity: how corruption control makes government ineffective. Chicago: The University of Chicago Press in *ACJS Today* 52(2) Sept/Oct 1998, pp. 21-23.

# PRESENTATIONS

## Professional Conferences

Belbot, Barbara A. Presenter for "What Texas Is Not Doing: *Moore v. Texas*." Southwestern Association of Criminal Justice, Houston, Texas 2019.

Belbot, Barbara A. & Larry Karson. Presenter for "Legal Formalism and a 1930 Houston Homicide." Southwestern Association of Criminal Justice, San Antonio, Texas 2018.

Belbot, Barbara A. Panelist and presenter for "An Annual Review of Recent Supreme Court Decisions Related to Criminal Justice." Academy of Criminal Justice Sciences, Kansas City 2017.

Exhibit 44 - 10

Belbot, Barbara A. Panelist and presenter for "An Annual Review of Recent Supreme Court Decisions Related to Criminal Justice." Academy of Criminal Justice Sciences, Denver 2016.

Belbot, Barbara A., Karson, L., Saulsbury, R, & Slate, C. Roundtable: Literature in the Criminology Classroom. American Society of Criminology, Fan Francisco, 2014.

Belbot, Barbara A. Panelist and presenter for "An Annual Review of Recent Supreme Court Decisions Related to Criminal Justice." Academy of Criminal Justice Sciences, Dallas, 2013.

Belbot, Barbara A. Panelist and presenter for "An Annual Review of Recent Supreme Court Decisions Related to Criminal Justice." Academy of Criminal Justice Sciences, New York, 2012.

Belbot, Barbara A. Discussant for Roundtable Session, "The Supreme Court and Criminal Justice: Where Do We Go from Here?" American Society of Criminology, Washington, D.C., 2011.

Belbot, Barbara A. Panelist and presenter for "An Annual Review of Recent Supreme Court Decisions Related to Criminal Justice." Academy of Criminal Justice Sciences, Toronto, Canada 2011.

Belbot, Barbara A. Panelist and presenter for "An Annual Review of Recent Supreme Court Decisions Related to Criminal Justice." Academy of Criminal Justice Sciences, Boston, Massachusetts 2009.

Williams, Frank, Barbara Belbot, Marilyn McShane, & L. Thomas Winfree "The Criminalization of Hoarding." Annual Meeting of the Pacific Sociological Organization, Portland, Oregon April 2008.

Belbot, Barbara A. Panelist and presenter for "An Annual Review of Recent Supreme Court Decisions Related to Criminal Justice." Academy of Criminal Justice Sciences, Cincinnati, Ohio 2008

Belbot, Barbara A. Panelist and presenter for "An Annual Review of Recent Supreme Court Decisions Related to Criminal Justice." Academy of Criminal Justice Sciences, Seattle, Washington 2007.

Belbot, Barbara A. Panelist and presenter for "An Annual Review of Recent Supreme Court Decisions Related to Criminal Justice." Academy of Criminal Justice Sciences, Baltimore, Maryland 2006.

Belbot, Barbara A. Panelist and presenter for "An Annual Review of Recent Supreme Court Decisions Related to Criminal Justice." Academy of Criminal Justice Sciences, Chicago, Illinois March 2005.

Exhibit 44 - 11

Belbot, Barbara A. "Grand Jury Selection Process." Southwestern Association of Criminal Justice. Houston, Texas October 2004.

Belbot, Barbara A. Panelist and presenter for "An Annual Review of Recent Supreme Court Decisions Related to Criminal Justice." Academy of Criminal Justice Sciences, Las Vegas, Nevada March 2004.

Belbot, Barbara A. Chair/Discussant of Panel on Courts and Law: Creating Justice. Southwestern Association of Criminal Justice. Houston, Texas, October 2003.

Belbot, Barbara A. "Report on the PLRA." Southwestern Association of Criminal Justice. San Antonio, Texas October 2002.

Belbot, Barbara A. Panelist and presenter for "An Annual Review of Recent Supreme Court Decisions Related to Criminal Justice." Academy of Criminal Justice Sciences, Anaheim, California. March 2002.

Belbot, Barbara A. Panelist and presenter for "An Annual Review of Recent Supreme Court Decisions Related to Criminal Justice." Southwestern Association of Criminal Justice. San Antonio, Texas October 2001.

Belbot, Barbara A. "Reforming the Criminal Justice System: The New Reform Movement." Academy of Criminal Justice Sciences, Washington, D.C. March 2001.

Belbot, Barbara A. Panelist and presenter for "An Annual Review of Recent Supreme Court Decisions Related to Criminal Justice." Academy of Criminal Justice Sciences, Washington, D.C. March 2001.

Belbot, Barbara A. "The Faith-Based Social Movement in Corrections." Academy of Criminal Justice Sciences, New Orleans, Louisiana 2000.

Belbot, Barbara A. Panelist and presenter for "An Annual Review of Recent Supreme Court Decisions Related to Criminal Justice." Academy of Criminal Justice Sciences, Orlando, Florida 1999.

Belbot, Barbara A. Panelist and presenter for "An Annual Review of Recent Supreme Court Decisions Related to Criminal Justice." Academy of Criminal Justice Sciences, Albuquerque, New Mexico 1998.

Belbot, Barbara A., "Legal Issues Related to Prison Gangs" National Major Gang Task Force Conference, Colorado Springs, Colorado 1996.

Exhibit 44 - 12

Belbot, Barbara A. "Attorney Misconduct." Academy of Criminal Justice Sciences, Boston, Massachusetts 1996.

Belbot, Barbara A. Panelist and presenter for "An Annual Review of Recent United States Supreme Court Decisions Related to Criminal Justice." Academy of Criminal Justice Sciences, Boston, Massachusetts 1996.

Belbot, Barbara A. "Inmate Classification: New Legal Issues." Annual meeting of the Alabama Council on Crime and Delinquency, Inc. Gulf Shores, Alabama, 1995.

Marquart, James, Steven Cuvelier, Velmer Burton, and Barbara Belbot. "National Survey of Prisoner Classification Systems." Academy of Criminal Justice Sciences, Chicago, Illinois 1994.

Belbot, Barbara A. "Legal Trends and Issues in Inmate Classification." Academy of Criminal Justice Sciences, Chicago, Illinois 1994.

Belbot, Barbara A. "AIDS in Prison - An Update." American Society of Criminology, New Orleans, Louisiana 1992.

Belbot, Barbara A. "Social Control and Institutional Reform," Academy of Criminal Justice Sciences, Pittsburgh, Pennsylvania 1992.

Farnworth, Margaret, Barbara A. Belbot, and Raymond Teske. "Gender Differences in the Court Processing of Typical and Atypical Female Crimes," Academy of Criminal Justice Sciences, Pittsburgh, Pennsylvania 1992.

Belbot, Barbara A. "Whistleblowing and Lawyers." Academy of Criminal Justice Sciences, Nashville, Tennessee 1991.

Belbot, Barbara A. "Sanctioning Corporate Criminals." Southwestern Association of Criminal Justice Educators, El Paso, Texas 1990.

**Other Presentations**

Presenter at the Spring Tech Fair, April 22, 2009, sponsored by the UHD Information Technology Department

Presented closing remarks to the UH-Downtown Criminal Justice Training Center, classes of August 30, 2006 and March 29 and May 4, 2007

Exhibit 44 - 13

Organized and moderated "Debate on the War on Terrorism" on April 12, 2006, featuring panelists: U.S. Assistant Attorney Abe Martinez, Chief of the Terrorism & National Security Section of the U.S. Attorney's Office in the Southern District of Texas, Alamdar S. Hamdani, partner in the law firm Borunda & Hamdani, and Sandra Guerra Thompson, Professor of Law at UH Law Center

Panel participant at UH Downtown on September 9, 2006: "Why is the Constitution Important Today," along with UHD professors Michael James and Jason Caro (Political Science) and Gene Preuss (History).

Participant in Criminal Justice Summit Meeting, January 21, 2005, at UH Law Center, sponsored by the Criminal Justice Institute at the Law Center, organized by Professor Sandra Guerra Thompson

Panel participant in April 21, 2005 presentation to doctoral class at College of Criminal Justice at Sam Houston State University.

Organized UHD October 19, 2004 panel presentation: William Harper, author of *Eleven Days in Hell: The 1974 Carrasco Prison Siege in Huntsville, Texas*, University of North Texas Press (2004), several Texas Department of Criminal Justice officials who witnessed the siege, Cal Thomas, host of FOX News and former reporter who covered the siege.

Guest speaker April 16, 2002 meeting of the Houston Police Department's North Division Positive Interaction Program

## SERVICE – since Fall 1998

### University Service

- Member of the College of Public Service Search Committee: 2018-2019
- Full Professors Committee: 2017 -
- UHD Distinguished Faculty Award Committee: 2018-2019
- Academic Policy Committee: 2017-2018
- Center for Teaching and Learning Excellence – Course Innovation Subcommittee – 2017-2018
- University Curriculum Committee: 2012-2016
- Faculty Development Projects Committee: 2011-2012
- University Rank & Tenure Committee: 1999-2000; 2000-2001 (**recording secretary**); 2002-2003 (**Chair**); 2010-2011
- Academic Affairs Committee: 2010- 2011, term ends 2012, **Chair** 2011-2012
- Academic Affairs Council: 2003-2004; 2004-2005; 2008- 2010
- Faculty Affairs Committee: 2003-2004; 2004-2005; 2006-2007 (**Secretary**); 2007-2008

Exhibit 44 - 14

- Faculty Grievance Focus Subcommittee: 2000-2001; 2002-2003 (**Subcommittee Chair**); 2005-2006 (**Subcommittee Chair**); 2006-2007
- Grievance Committee (under revised policy): 2009-2011, 2011-2012
- **Faculty Senate Vice-President**: April 2008- April 2010
- Strategic Planning Oversight Committee: 2008-2010
- Search and Screening Committee for the Dean of the College of Public Service: 2004
- UHD Provost Search Committee: both the 2009- 2010 and 2010-2011 search
- President Castillo's Strategic Planning Committee: 2007-2008 (**Chair** of the Scholarship Subcommittee)
- President Flores' UHD Leadership Group: 2009-2010, included participating in several leadership workshops
- Member of committee preparing for visit from the Substantive Change Committee of the Commission for the Southern Association of Colleges & Schools: 2000-2001
- Graduate Education Task Force Committee: 2000-2001
- Organized Research Committee: 1999-2000; 2000-2001; 2002-2003; 2004-2005; 2005-2006
- Faculty Awards Committee: 1999-2000; 2000-2001; 2002-2003
- University Funded Faculty Leave Committee: 2004-2005; 2005-2006; 2006-2007
- General Education Advisory Committee:  2007-2008
- Department representative to the State Employees Charitable Campaign: 2006-2007; 2007-2008; 2008-2009; 2009-2010
- Red Rose Scholarship Committee: 2005-2006
- Sociology Faculty Search Committee: 1998-1999
- Academic Assessment Committee: 1999-2000; 2002-2003; 2003-2004
- UHD Study Abroad Awards Committee: 2008-2009; 2009-2010, 2011-2012
- UHD Name Change Exploration Group: Fall 2008

## Department & College Service

- Chair, Department Rank and Tenure Committee: 2018-2019
- Dean of the College of Public Service Search Committee: 2018-2019
- Chair, Department Curriculum Committee: 2017-2018
- **Coordinator of the CJ Graduate Program:** 1999-2000; 2000-2001; 2001-Summer 2002; Spring 2003-2004; 2004-2005
- Graduate Admissions Committee: as Coordinator of the program, I also served as **Chair** of the Admission Committee - 1999 – 2000; 2000-2001; 2001-Summer 2002; Spring 2003-2004; 2004-2005; 2005-2006; committee member only: 2006-2007
- Department Rank & Tenure Committee: member since 1998; served as **Chair**: 1999-2000; 2000-2001; 2002-2003; 2018-2019
- CJ Faculty Search Committee: 1998-1999; 1999-2000; 2006-2007 (**Chair**); 2008-2009, 2019-2020 (**Chair**)

Exhibit 44 - 15

- Criminal Justice Institute Director/Faculty Search Committee: 2000-2001
- **Chair** of Criminal Justice Majors' Day – April 2003
- Faculty Development & Research Committee: 2006-2007; 2007-2008 **(Chair)**
- Department Curriculum Committee: 1999-2000; 2000- 2001; 2002-2003;
- 2005-2006 **(Chair)**; 2006-2007 **(Chair)**
- Department Unit Based Budgeting Committee: 1999-2000; 2005-2006; 2006-2007
- Department Undergraduate Schedule Development Committee: 2005-2006
- Department Graduate Schedule Development Committee: 2004-2005
- Department Scholarship Committee: 2004-2005
- Department Organized Research Committee: 1999-2000; 2002-2003 **(Chair)**
- Department Handbook & Catalog Revision Committee: 2002-2003
- Department Adjunct Review Committee: 2006-2007; 2010-2011 **(Chair)**
- **Faculty Advisor to the UHD Chapter of Alpha Phi Sigma**, the Criminal Justice National Honor Society: 2003-2004; 2004-2005; 2005-2006; 2007-2008

## Service to the Profession & Community

Professional Association Membership & Activities:

Academy of Criminal Justice Sciences (ACJS)

- Member of the ACJS Program Committee and organized panels for the topic area "Legal Issues in Criminal Justice": 2009 national conference
- Member of the ACJS William L. Simon/Anderson Publishing Outstanding Student Paper Award Committee, selecting the student paper to receive the award at the March 2009 ACJS national conference
- Member of the ACJS Publications Committee: 2008
- Member of the ACJS Constitution and Bylaws Committee: 2006-2008 **(Chair** in 2008)
- Member of the ACJS Awards Committee: 2005 ACJS national conference awards
- Served as an Executor Counselor to the ACJS Law, Courts & Human Rights Section – 1999

Other Service to the Profession

Prisoner representative on two Institutional Review Boards at the University of Houston

- "CHOICES -- TEEN: A Bundled Risk Reduction Intervention for Juvenile Justice Females": Spring 2012
- "At Risk Hispanic Gangs: Long Term Consequences for HIV, Hepatitis and STI": October/November 2008 and after revisions in May 2010

Exhibit 44 - 16

- An application involving a survey of juvenile males who had been adjudicated in Harris County, Texas for sexually abusive conduct: July 2009
- Appointed for a **three year term as the "prison expert"** for the Committee for the Protection of Human Subjects at the University of Houston: term begins 2010 and expires August 2013.

**2007-2009 National Advisor to Alpha Phi Sigma**, the Criminal Justice National Honor Society: elected 2 year term

2002: Expert witness in Civil Action No. 01-CV155, *Rafael Martinez v. State of Texas, David Forrest, and Wackenhut Corrections Corporation*

Manuscript Review

BOOKS

- 2017: *Courting the Community* for Temple University Press
- 2007: *Female Offenders: Critical Perspectives and Effective Interventions, Second Edition* by Ruth T. Zaplin Jones & Bartlett Publishers
- 2007: *Through the Looking Glass: A Reader on Our Wonderland of Corrections*: McGraw Hill
- 2006: *Criminal Courts and Criminal Justice: A Behavioral and Institutional Perspective*: Roxbury Publishing Co
- 2005: Revisions to *Law, Justice, and Society: A Sociological Introduction* by Anthony Walsh and Craig Hemmens: Oxford University Press
- 2003: *The Correctional Key: In/Out Lock 'Em Up and Throw Away the Key*: Pearson/Prentice Hall
- 2002: (untitled) a criminal procedure text: Allyn & Bacon
- 2002: *The Politics of Injustice:* Sage Publications

ARTICLES
- 2011: "Inside the Pyramid of Disputes: Naming Problems and Filing Grievances in California Prisons," *Social Problems*
- 2004-2007: Member of Editorial Board of the *Journal of Criminal Justice Education*: reviewed several submitted articles
- 2007: "Understanding Dismissals in American Courts: Court Theories Revisited" for *Criminal Justice Review*
- 2007: "Countering the 'Contagion of Inmate Nonamenability: Prison Specialization and Recidivism" for *Western Criminology Review*
- 2002: Reviewer for special issue of *Journal of Contemporary Criminal Justice*, vol. 19 (2)

Community Activities

Exhibit 44 - 17

- Volunteer at The Beacon Day Center for the Homeless
- 2006-2012: Board member of Park Memorial Homeowners' Association

Exhibit 44 - 18

# Exhibit B

Exhibit 44 - 19

# Exhibit B

| File Title: |
|---|
| 000824-CC-CramerPsychRecords-BOP - Copy.pdf |
| 000824-CC-CramerPsychRecords-BOP.pdf |
| 001058-CC-2014BudgetJustification.pdf |
| 001115-CC-DeadlyConsequencesofSolitary.pdf |
| 001253-CC-SHUResponseToAudit.pdf |
| 001259-CC-SHUReviewAndAssessment (1).pdf |
| 001259-CC-SHUReviewAndAssessment.pdf |
| 001536-CC-USPFlorenceBackground.pdf |
| ADX updated 012618 (1).pdf |
| ADX updated 012618.pdf |
| BOP Records 1 (CRAMER1146-1545).pdf |
| BOP Records 2 (CRAMER1546-2311).pdf |
| Criminal History Chronology (1).pdf |
| Criminal History Chronology.pdf |
| Disciplinary History (CRAMER001-005).pdf |
| DOJ Assignment History Report (2791-2793).pdf |
| FBI 302 (85-122; 668-679; 750-753; 761-773; 980-982; 1028-029).pdf |
| Lieutenant Daily Logs (1001-1006).pdf |
| Lieutenant Daily Logs (1956-1961).pdf |
| Lieutenant Log Book 060714-060814 (CRAMER5604).pdf |
| Officer Handwritten Logs (1954-1955).pdf |
| OIA Investigative Report Officer Quarles (1921-1940).pdf |
| OIA Investigative Report Officer Quarles (1921-1940; 2001).pdf |
| SHU Records (CRAMER2247-2293).pdf |
| SHU Reviews (CRAMER4208-4215).pdf |
| SHU Reviews (USP Allenwood) ( ).pdf |
| SHU Reviews (USP Florence ) ( ).pdf |
| SHU Reviews (USP Lewisburg) ( ).pdf |
| SHU Reviews (USP McCreary) ( ).pdf |
| SHU Reviews (USP Victorville) ( ).pdf |
| USP BMT Investigative Report (0008-0061).pdf |
| USP BMT Post Orders (1962-2000).pdf |
| **Folder: federal case 2018** |
| 000824-CC-CramerPsychRecords-BOP.pdf |
| 001058-CC-2014BudgetJustification.pdf |
| 001115-CC-DeadlyConsequencesofSolitary.pdf |
| 001253-CC-SHUResponseToAudit.pdf |
| 001536-CC-USPFlorenceBackground (1).pdf |
| 001752-CC-USPLewisburgBackground.pdf |
| Adaptation to prison.docx |
| ADX updated 012618 (1).pdf |

Exhibit 44 - 20

| |
|---|
| BOP Records 1 (CRAMER1146-1545).pdf |
| BOP Records 2 (CRAMER1546-2311).pdf |
| Disciplinary History (CRAMER001-005).pdf |
| DOJ Assignment History Report (2791-2793).pdf |
| FBI 302 (85-122; 668-679; 750-753; 761-773; 980-982; 1028-029).pdf |
| Interview with Christopher Cramer at FCI Beaumont Medium.docx |
| INVOICE.docx |
| Lieutenant Daily Logs (0930-0935).pdf |
| Lieutenant Daily Logs (1001-1006).pdf |
| Lieutenant Daily Logs (1956-1961).pdf |
| Lieutenant Log Book 060714-060814 (CRAMER5604).pdf |
| notes from articles May 2018.docx |
| Officer Handwritten Logs (1954-1955).pdf |
| OIA Investigative Report Officer Quarles (1921-1940).pdf |
| OIA Investigative Report Officer Quarles (1921-1940; 2001).pdf |
| Post Order Signature Sheet (1962-1963).pdf |
| Proposed questions.docx |
| SHU Records (CRAMER2247-2293).pdf |
| SHU Reviews (CRAMER4208-4215).pdf |
| SHU Reviews (USP Allenwood) ( ).pdf |
| SHU Reviews (USP Florence ) ( ).pdf |
| SHU Reviews (USP Lewisburg) ( ).pdf |
| SHU Reviews (USP McCreary) ( ).pdf |
| SHU Reviews (USP Victorville) ( ).pdf |
| USP BMT Investigative Report (0008-0061).pdf |
| USP BMT Post Orders (1962-2000).pdf |

Exhibit 44 - 21

# Exhibit C

Exhibit 44 - 22

DEFENDANT'S EXHIBIT

CASE NO. 1:16 CR 26

EXHIBIT NO. 15

## Barbara Belbot

- Graduated with a J.D. from UH Law Center in 1980
- Clerked for U.S. Bankruptcy Judge, William Schultz, in the Southern District of Texas
- Practiced bankruptcy law with Woodard, Hall, & Primm, followed by a short stint in the Texas Attorney General's Office in Houston, Consumer Protection Division.
- Completed a Masters in Public Health at University of Texas Health Science Center 1986
- In 1986, joined the Special Master's Office created by the Honorable William Wayne Justice, E.D. Texas, in the prison reform lawsuit, *Ruiz v. Estelle*. After issuing extensive orders and approving numerous consent decrees, Judge Justice oversaw the case from 1980 through the early 1990s.
- From 1986- 1990, employed as a Monitor, working under the supervision of Mr. Vince Nathan, the court-appointed Special Master. Monitors were assigned to monitor the Texas Department of Correction's progress toward complying with the court orders and consent decrees. Monitors visited prisons throughout Texas with authority to enter any unit any time of day, interview any inmate or official, and review all inmate and agency files. Monitors reported their findings to the court and for review by Plaintiff's counsel and the State Attorney General's Office.
- My monitoring assignments: inmate disciplinary system, conditions in and placement procedures for administrative segregation, conditions in solitary confinement and on death row. Spent significant time on cellblocks and observing disciplinary hearings.
- Completed a Ph.D. in Criminal Justice from Sam Houston State University in 1995
- Teaching criminal justice courses in the Department of Criminal Justice and Social Work at the University of Houston-Downtown since 1992. Served as Department Chair from 2012-2017, currently a Full Professor.
- Publications include:

  Belbot, Barbara A, Craig Hemmens, & Michael Cavanaugh(2015). *The Legal Rights of the Convicted* (2nd ed.), LFB Scholarly Publishing

  Craig Hemmens, Barbara Belbot, & Katherine Bennett (2013). *Significant Cases in Correction* (2nd ed.) Oxford University Press.

  Belbot, Barbara (2013). "Prisoner Constitutional Rights and Related Litigation." In Blackburn, A., Fowler, S. & Pollock, J. (eds). *Prisons: Today and Tomorrow* (3rd ed.) Jones & Bartlett Learning.

  Belbot, Barbara (2012). "The Sentencing Revolution." In F. Reddington and G. Bonham (eds.) *Flawed Criminal Justice Policies: At the Intersection of the Media, Public Fear and Legislative Response*. Carolina Academic Press

  Belbot, Barbara A. (2007). "Inmate Litigation and the Constitution," In C. Hemmens (ed.) *Current Legal Issues in Criminal Justice*. Oxford University Press.

  Belbot, Barbara A. (2007). "Mandatory Treatment: Issues and Myths," In M. McShane & F. Williams (eds.) *Youth Violence and Delinquency Interventions: Monsters and Myths*. Praeger Press

  Belbot, Barbara A. (2005). *Guide to Criminal Law for Texas* (3d ed.).

  Belbot, Barbara A. (2004) "Report on the PLRA: what have the courts decided so far?" *The Prison Journal* 84(3) pp. 290-316.

1

18-40598.22817

Exhibit 44 - 23

## Introduction

To understand Christopher Cramer's conduct while incarcerated in the Federal Bureau of Prisons, it's essential to understand the prison culture in which he's lived since his commitment in 2003. Section I of this report addresses the body of research that helps explain the prison culture and how prisoners adapt. There is a significant body of research about prison culture because understanding inmates' behavior helps officials develop sound management policies and practices. Section II of the report discusses Prisoner Cramer.

## I. Living in Prison: The Prison Culture

### Deprivation and/or Importation Research

Prison is described as a "total institution" that envelopes the lives of inmates 24-hour a day, regulating all of their activities - sleeping, eating, working, and recreating – all of which takes place within the same facility (Goffman 1961).

In 1958, Gresham Sykes explained the deprivation model and how it formed prison culture in his famous study, *The Society of Captives*. Sykes described the deprivations that prisoners experience, which are unique to imprisonment and which constitute what he termed the "pains of imprisonment." Those deprivations included loss of liberty, which includes not only being confined in an institution but also being confined within an institution. Although some prisoners have more freedom of movement than others, no inmate is free to move around a correctional facility as they wish. Inmates have very restricted access to goods and services. Unless, they live in a prison system that permits limited conjugal visits (few do), they are deprived of heterosexual relationships. They have little autonomy and are governed by a set of formal rules and regulations that address almost every aspect of their daily lives. Their lives follow a strict routine where every day resembles the day before. Finally, they live in an environment that deprives them of a sense of security. There is violence in prison, which can be

2

18-40598.22818

Exhibit 44 - 24

exacerbated by overcrowded facilities and prison management that sometimes does not adequately address security concerns. The deprivation model posits that prisoners adapt to incarceration and forma prison culture as a result of the deprivations. Over time, as prisoners adapt to the deprivations, they can become socialized to their  environment. They develop ways to alleviate the "pains of imprisonment." For many inmates this includes engaging in a certain amount of prison misconduct.

The deprivation model is not the only model that describes how prisoners adapt to their environment. Irwin and Cressey (1962) concluded that inmates are not shaped exclusively by the deprivations they experience, as Gresham argued, they also import into prison the norms and values they developed before incarceration. They argued that there is a link between an inmate's street culture and the prison culture they enter.  Prisoners bring their pre-prison experiences, traits, and attitudes into the institution, including a broader criminal subculture.

Contemporary research integrates the two models and recognizes that prison culture is actually a product of both the deprivation and the importation models. Prisoners experience stress from the deprivations of prison, which shapes prison culture. Prison culture is also shaped by the values and behaviors that prisoners import from their lives before incarceration. The imported values contribute to shaping prison culture and impact how an inmate adapts.

For inmates serving lengthy sentences, adapting to the prisoner culture often leads to "prisonization," whereby inmates learn to accept the culture and lifestyle of prison society (Clemmer 1940). Prisoners lose interest in the outside world and come to view prison as their home. Their identity is defined by the total institution in which they live (MacKenzie and Goodstein 1985).

3

18-40598.22819

Exhibit 44 - 25

## The Inmate Code and Prison Culture

Perhaps the most important aspect of prison culture is what's referred to as the "inmate code." The code is a product of both the deprivation and importation models and explains a lot about how prisoners make the choices they do and how they evaluate what is in their own best interests while they're serving time. Although the inmate code has been the subject of research as early as the 1960s (Sykes and Messinger 1960), recent research confirms that the code is still alive in America's correctional institutions (Trammel 2008). As much as living conditions have improved in our institutions over the last 40 years and the profile of the prison population has changed, the inmate code continues to influence inmate conduct (Trammel 2008). The code is not a formal set of rules. It has more influence in some institutions and less in others. Some inmates are more dedicated to the code then others, although research supports that some version of the code affects all prisoners in one way or the other, as they decide how to interact with other inmates and staff (Trammell 2008). The code can best be described as a group of informal norms or values that control prisoner behavior. Prisoners learn how to conform their conduct to the code whether they personally agree with the code's requirements or accept it as representing their own personal values. If required by the code, in certain circumstances, inmates will engage in activities that are detrimental to them. The code seeks to structure life inside an institution and has several tenets: inmates should do their own time and stay out of the business of other inmates; don't fight with other inmates unless it's necessary, don't steal from other inmates, keep your promises, and pay your debts, be a man and be tough; don't cooperate with the prison staff and under no circumstances snitch to the authorities on other inmates.

Not all prisoners abide by the code in full. Prisoners who regularly abide by the code are often referred to as "convicts." Prisoners who don't regularly abide by it are referred to as "inmates." Those with strong allegiance to the code develop a reputation for being worthy of respect and believe it's important to defend their honor, with violence if necessary, in response to what they perceive as

4

18-40598.22820

Exhibit 44 - 26

disrespect. Their tough reputation also protects them from victimization (Copes, Brookman, Brown 2013).

Some experts argue that the inmate code became less influential beginning in the late 1970s when the prison population in this country exploded as a result of sentencing laws that impose more severe sanctions on many offenders. Prisons became far more racially and ethnically diverse. Younger, less experienced inmates flooded into the institutions. Overcrowding became a serious problem. The code that had governed how inmates conduct themselves was weakened, and daily life in prison became less predictable. Gangs that govern the conduct of small, racially homogeneous groups stepped in to augment the inmate code (Skarbek 2014.)

### Violence and Prison Culture: What We Know

There is a significant amount of violence in prisons, although the amount of violence differs from institution to institution (Ricciardelli 2014). Violence impacts how prisoners adapt to prison culture. Fear of victimization causes prisoners to react in different ways. Some prisoners elect to keep to themselves, as much as is possible, by avoiding certain areas in a facility, remaining in their cells, or seeking protective custody. Some prisoners turn to violence or the threat of violence to avoid victimization (McCorkle 1992). Other prisoners seek support from fellow inmates or let it be known that they have access to weapons (Bottoms 1999). Prisoners report engaging in- cell fights to avoid resorting to more serious altercations. Prisoners describe having to fight other inmates over non serious issues because it's not acceptable to back down in the prison environment (Flanagan 1981). Prisoner violence is used to control the prison environment and impress upon other inmates the advisability of following the inmate code (Trammell 2008).   As Frank Porporino (1986, p. 213) notes, "Violence and the threat of violence are persuasive features of life in prisons."

Research shows that the rates of prison violence are higher in maximum-security prisons than in less secure facilities. That's not surprising considering that more disruptive prisoners are likely to be

5

18-40598.22821

Exhibit 44 - 27

assigned to maximum security.  Studies that have controlled for other variables which might explain the rate of violence in high security levels and have found that higher security levels is the variable most closely associated with greater levels of violence  (Bottoms 1999). Exacerbating the situation is that federal prisons are overcrowded.  As of March 2013, they were 37-54% over rated capacity on average. Most significantly, according to the FY 2014 Congressional Budget Report, U.S. Department of Justice for the Federal Bureau of Prisons, at the end of FY 2012, 94% of high security inmates were double-celled. As already mentioned, overcrowding has been found to be a factor contributing to violence.

Research is very clear that younger prisoners are responsible for a disproportionate percentage of prison violence, including homicides, assaults, and collective violence (Porporino 1986).  As Griffin and Hepburn's research (2006, p. 421) shows, violence in prison is "calculated risk-taking" and risk-taking is related to age, making age a consistent predictor of violent misconduct.  Younger inmates are more willing to solve their conflicts in ways that "advertise toughness and strength" (Adams 1992, p.302). Studies indicate that as prisoners age, the likelihood they will engage in misconduct decreases (Cihan, Davidson, & Sorenson 2017).  These findings are consistent with a large and well-established body of research showing that criminal offenders generally "age out" of crime (National Institute of Justice , from Juvenile Delinquency to Young Adult Offenders , accessed February 21, 2018 https://www.nij.gov/topics/crime/Pages/delinquency-to-adult-offending.aspx).

Related to the research linking prison violence with younger inmates, are studies finding that prisoners serving lengthy sentences are less likely to engage in misconduct and violence (Sorenson, Wrinkle, & Gutierrez 1998; Flanagan 1981).  Recently, researchers have focused on the misconduct and violent conduct of inmates serving the ultimate long-term penalty of life without the possibility of parole (LWOP).  This group of prisoners has no hope for release and, arguably, have nothing to lose in engaging in violent and disruptive conduct. Sorenson and Wrinkle (1996) studied the disciplinary conduct history of a sample of male inmates in the Missouri Department of Corrections who were serving either death

6

18-40598.22822

Exhibit 44 - 28

or life without the possibility of parole for the crime of first degree murder. They compared that group's conduct with the conduct records of a group of prisoners convicted of second-degree murder who were eligible for parole. They concluded that death-sentenced and LWOP inmates are no more likely to be a threat to others than inmates not committed to death or LWOP. The fact that they can never be released did not result in them posing more danger to the institution. Cunningham, Sorenson, and Reidy conducted a slightly different study in 2005 and compared the disciplinary histories of male LWOP inmates in the Missouri Department of Corrections to parole-eligible inmates in that system and concluded that LWOP prisoners were half as likely to have been cited for violent behavior as were parole-eligible inmates. Sorenson and Cunningham (2006) compared the conduct of male LWOP prisoners in the Florida Department of Corrections to the conduct of high-security inmates not serving LWOP. They found that the LWOP inmates were not a major threat to other prisoners or staff.

Gaes, Wallace, Gilman, Kelin-Saffran, and Suppa (2002) studied the disciplinary conduct records of gang-affiliated prisoners, specifically their violent conduct - homicide and attempted homicide, aggravated and simple assault, setting a fire, possessing a dangerous weapon, rioting and encouraging others to riot, taking hostages, possessing a dangerous tool, fighting, threatening bodily harm, extortion or blackmail, and using martial arts or boxing skills. Although the researchers found that compared to non-gang affiliated inmates, gang members are more likely to engage in misconduct, including violence, the study also found that the longer an inmate remained a gang member, their use of violence decreased.

7

18-40598.22823

Exhibit 44 - 29

## II. Christopher Cramer

### Gang Membership

Christopher Cramer was 21 years old when he entered USP Florence in 2003, a high security institution, with a 10 year sentence.  Although Cramer had served short stints of county jail time in Utah, this was his first commitment to prison.  County jails are significantly smaller institutions than prisons with far fewer inmates.  The jail population changes almost daily because inmates are serving short sentences or are awaiting trial.  High security facilities (penitentiaries) in the Federal Bureau of Corrections have the highest staff-to-prisoner ratio of all federal correctional institutions.  They house offenders who have committed serious offenses and/or have been disruptive while incarcerated.  In my interview with him, Mr. Cramer explained that soon after he arrived at USP Florence, he met prisoners from his home state of Utah, several of whom had lived in parts of Utah close by where he had lived.  His fellow Utah prisoners quickly became the prisoners who introduced him to prison culture in Florence and the inmate code.  Several of them were also members of the Soldiers of Aryan Culture (SAC).  The Utah inmates not only introduced Mr. Cramer to the prison culture, they also introduced him to the prison gang culture.  He explained to me that the Utah inmates provided camaraderie, a group he could depend on inside prison.  This was especially important because as a 21 year-old, serving his first prison sentence in a maximum security setting, in Mr. Cramer's eyes a 10 year sentence was a lifetime.  As he said, he wasn't able to see an end to a 10 year term.

### Institutional Disciplinary History

Mr. Cramer's disciplinary record as it relates to non-violent infractions is not extensive for a prisoner who has spent, to date 15 years of incarceration, all of them in high security institutions.  There are dozens of prison regulations that govern almost every aspect of a prisoner's life.  While the rules are essential for the safe operation of prison facilities, it's not unusual for prisoners, over the course of their

8

18-40598.22824

Exhibit 44 - 30

incarceration, to violate rules. They are under close supervision, regular cell searches, regular pat-down searches, and are regularly counted several times a day. They have little privacy. It's not unusual for prisoners to find ways to ameliorate the severe restrictions they live under or relieve the frustrations that the restrictions cause, in ways that sometimes violate prison regulations. An example of how frustration can lead to a disciplinary infraction, in 2014, Mr. Cramer engaged in a group demonstration and refused the order to stop when he and 21 other inmates in a Special Housing Unit (SHU) refused to return their food trays after a meal was completed. Inmates in SHU don't eat in a "mess hall." Their meals are delivered to them in their cells. Food becomes extremely important in prison, especially for inmates who live in restrictive housing and eat in their cells. Refusing to return food trays is a common form of protest when prisoners want more food or better food.

Investigative reports by the Bureau of Prisons establish that all of Mr. Cramer's serious violent assaults grew out of conflicts among the various white supremacist prison gangs in the Bureau of Prisons. His violence occurred in high security, crowded institutions where he was often double-celled. Mr. Cramer has had no disciplinary charges for assaulting or threatening correctional officials. His disciplinary record also shows he did not commit a violation infraction between November 29, 2008 and June 9, 2014, a five-year period. His only infractions during those five years were nonviolent and committed in 2012: refusing a physical test/exam, possessing an unauthorized item, and abuse of the telephone. During that five-year period, Mr. Cramer was in restrictive housing at various institutions. Before being recently transferred to the Beaumont Medium facility in anticipation of this trial, where he is single-celled, he was housed for a year at the Florence ADX facility in the Control Unit. The Control Unit is the most restrictive placement in the federal correctional system. Since 2014, Mr. Cramer's only disciplinary infraction was for abuse of the telephone in 2015.

9

18-40598.22825

Exhibit 44 - 31

## Summary and Conclusion

Mr. Cramer's adjustment to prison culture is not atypical. Young inmates, new to the prison environment, entering a high security (maximum) institution find more experienced inmates to educate them about their new lives. From another perspective, more experienced inmates find young inmates to teach them the ropes. Mr. Cramer's "teachers" were members of the Soldiers of Aryan Culture, but they were also from his home state. He quickly identified with them, formed a bond that provided both camaraderie and protection, and eventually joined the gang. His non-violent disciplinary record is fairly clear for an inmate with a long sentence who is under close supervision. He has been involved in several assaults on other inmates, all of which related to conflicts with other white supremacists gangs or within his own gang. He has not harmed or threatened correctional staff. During the five years he was assigned to restrictive housing from 2008-2014, he had no violent offenses. Since 2014, he has had no violent offenses.

Prison gang members can be and are often successfully placed in restrictive housing. According to the 2016 National Institute of Justice report, *Restrictive Housing in the U.S.: Issues, Challenges, and Future Directions*, David Pyrooz noted that correctional leaders across the United States view restrictive housing as the most effective management strategy to deal with gang affiliated inmates. In two different surveys of prison wardens/officials, the majority of the respondents agreed that restrictive housing is the best placement for gang members.

Daryl Fischer(2002) completed an extensive evaluation of the Arizona Department of Corrections Security Threat Group program. Arizona assigns confirmed gang members to the state's most secure facility where they are single-celled and remote controls result in little contact with other inmates or staff. Fischer tracked the conduct of 431 gang members before they were assigned to the state's supermax and their conduct while housed in supermax. He found that placement in supermax

10

16-40598.22826

Exhibit 44 - 32

had a significant incapacitation effect on the violent and disruptive behavior of gang inmates housed there.

According to the U.S. Department of Justice's *Report and Recommendations Concerning the Use of Restrictive Housing Final Report*, January 2016, USP Administrative Maximum (ADX) in Florence, Colorado houses inmates who require the strictest controls and supervision. It's the only federal prison where all inmates are single-celled. Its rated capacity is 490 inmates with a relatively stable population of 400 to 450 inmates. As of November 2015, a sample of the ADX population consisted of:

- 98 of the ADX inmates were leaders, members, or associates of security threat groups
- 67 had murdered another inmate,
- 62 were leaders, members, or associates of disruptive groups,
- 34 were international terrorists, and
- 19 were members of Al Qaeda

The ADX operates four different programs. The Control Unit houses the most violent and dangerous inmates assigned to the ADX. It typically houses inmates who have killed staff or other inmates or were involved in an escape. Control Unit inmates are restricted to only 7 hours of out-of-cell activity per week, they eat their meals in the cell, and programming is made available via closed circuit television in the cells. Only inmates who have permission from the Assistant Director of the Correctional Program Division have permission to recreate in groups. Prisoners are visited in their cells by case managers, counselors, and medical staff.

The ADX Florence placement is capable of housing Mr. Cramer safely and securely, as is demonstrated by the DOJ's 2015 report that provides a sample of the type of dangerous inmates who are already housed there successfully. Mr. Cramer volunteered in my interview with him that he is "institutionalized" and adapted to living in the ADX Control Unit setting and understands that a life without parole sentence might well mean that the ADX, and perhaps the Control Unit with the ADX, will be a permanent custody assignment. His gang activities will be severely restricted as a result of the extremely close supervision that is the hallmark of the Control Unit's mission. Bureau officials will

11

18-40598.22827

Exhibit 44 - 33

evaluate his conduct regularly, and they will decide if he can ever be released from the Control Unit to a less restrictive placement within the ADX . Inmates who are permitted to move into less restrictive ADX placement go through a lengthy four part structured step-down program. All levels of custody in ADX are significantly more restrictive than other Bureau institutions.

My conclusion that Mr. Cramer can be safely and securely housed within the Federal Bureau of Prisons has several bases that include the academic research and the official reports of the U.S. Department of Justice that I've discussed, my own research, my interview with Mr. Cramer, and in consultation with the other experts in this field. The three years I worked in the Special Masters Office monitoring the prison disciplinary system and administrative segregation allowed me to interview and research the institutional records of hundreds of prisoners housed in very restrictive settings. I also reviewed Mr. Cramer's records, both before and after his confinement in the Bureau of Prisons, and all the other documentation that were provided through discovery. My review is ongoing, and I anticipate reviewing the reports from the other experts and investigators involved in this case.

12

16-40598.22828

Exhibit 44 - 34

# References

Bottoms, Anthony (1999). Interpersonal violence and social order in prisons. *Crime and Justice* ,vol. 26, pp. 205-281.

Cihan, Abdullah, Davidson, Megan, and Soreson, Jonathan (2017). Analyzing the heterogeneous behavior: Trajectories of prison misconduct. *The Prison Journal*, vol. 97 (4), pp. 431-450.

Copes, Heath, Brook, Fiona, and Brown, Anastasia (2013). Accounting for violations of the convict code. *Deviant Behavior* , vol. 34, pp. 841-858.

Clemmer, Donald (1940:1958). *The Prison Community.* Harcourt Brace College Publishers.

Cunningham, Mark, Sorenson, Jon, and Reidy, Thomas (2005). Is death obsolete? A decade of mainstreaming death-sentenced inmates in Missouri. *Behavioral Sciences and the Law.* Vol. 23 (3), pp. 307-320.

Fischer, Darryl (2002). Arizona Department of Corrections: Security Threat Group (STG) Program Evaluation.   Office of Research and Evaluation of the U.S. Department of Justice.

Gaes, Gerald, Wallace, Susan, Gilman, Evan, Klein-Saffran, Jody, and Suppa, Sharon (2002).  The influence of prison violence affiliation on violence and other prison misconduct. *The Prison Journal* , vol. 82 (3), pp. 359-385.

Goffman, Erving (1961*). Asylum: Essays on the Social Situation of Mental Patients and Other Inmates.* New York: Doubleday.

Griffin, Marie and Hepburn, John (2006). The effect of gang affiliation on violent misconduct among inmates during the early years of confinement. *Criminal Justice and Behavior*, vol. 33 (4), pp. 419-448.

Irwin, John and Cressey, Donald (1962). Thieves, convicts, and the inmate culture. Social Problems, vol. 10 (2), pp. 142-155.

Flanagan, Timothy (1980). Time served and institutional misconduct: Patterns of involvement in disciplinary infractions among long-term and short-term inmates. *Journal of Criminal Justice*, vol. 8, pp. 357-367.

McCorkle, Richard (1993). Fear of victimization and symptoms of psychopathology among prison inmates. *Journal of Offender Rehabilitation* vol. 9 (1/2), pp. 27-41.

MacKenzie, Doris & Goodstein, Lynn (1985). Long-term incarceration impacts and characteristics of long-term offenders: an empirical analysis.  *Criminal Justice and Behavior*, vol. 12 (4), p. 395-414.

Porporino, Frank (1986). Managing violent individuals in correctional settings. *Journal of Interpersonal Violence* vol. 1 (2), pp. 213-237.

18-40598.22829

Exhibit 44 - 35

Ricciardelli, Rosemary (2014). Coping Strategies: Investigating how male prisoners manage the threat of victimization in federal prisons. *The Prison Journal*, vol. 94 (4), pp. 411-434.

Skarbek, David (2014). *The Social Order of the Underworld: How Prison Gangs Govern the American Penal System*. NY: Oxford University Press.

Sorenson, Jon, Wrinkle, Robert, and Gutierrez, April (1998). Patterns of rule-violating behaviors and adjustment to incarceration among murderers. *The Prison Journal*, vol. 78 (3), pp. 222-231.

Sorenson, Jon and Wrinkle, Robert (1996). No hope for parole: Disciplinary infractions among death-sentenced and life-without parole inmates. *Criminal Justice and Behavior*. Vol. 23 (4), pp. 542-552.

Sykes, Gresham (1958), *The Society of Captives: A Study of Maximum Security Prison*. Princeton, NJ: University Press.

Sykes, Gresham and Sheldon Messenger (1960). "The Inmate Social System." pp. 5-19. In *Theoretical Studies in Social Organization of the Prison*, edited by R.A. Cloward, D.R. Cressey, G.H. Glosser, R. McCleary, L.E. Ohlin, G.M. Sykes and S. Messenger. NY: Social Science Research Council.

Trammell, Rebecca (2008). Values, rules, and keeping the peace: How men describe order and the inmate code in California prisons. *Deviant Behavior*, vol. 30, pp. 746-771.

U.S. Department of Justice (2016). *Report and Recommendations Concerning the Use of Restrictive Housing Final Report USP Administrative Maximum (ADX) in Florence, Colorado.*

U.S. Department of Justice, National Institute of Justice, *From Juvenile Delinquency to Young Adult Offenders*, accessed February 21, 2018 at https://www.nij.gov/topics/crime/Pages/delinquency-to-adult-offending.aspx).

U. S. Department of Justice, National Institute of Justice (2016), *Restrictive Housing in the U.S.: Issues, Challenges, and Future Directions.*

14

Exhibit 44 - 36

Case 1:16-cr-00026-MAC-ZJH   Document 676-13   Filed 06/13/18   Page 15 of 16 PageID #: 10372

| Date of Incident | Facility | Description of violation |
|---|---|---|
| 5/11/2004 | USP Florence | #313 false statement to staff |
| 5/21/2004 | USP Florence | #224 assault with minor injury |
| 7/20/2004 | USP Florence | #405 tatooing |
| 7/26/2006 | USP Florence | #329 destroying government property at $100 or less |
| 7/26/2006 | USP Florence | #218 destroying life-saving devices regardless of value |
| 12/10/2006 | USP Florence | #306 refusing to accept a program assignment |
| 3/22/2007 | USP Victorville | #104 possession of a weapon |
| 5/31/2007 | USP Victorville | #223 refusing a breathalyzer |
| 12/12/2007 | USP Victorville | #101A attempting to assault |
| 2/9/2008 | USP Victorville | #101/104 assault with serious injury and possession of a weapon |
| 9/30/2008 | FCI 1 Victorville | #218 destroying government property in excess of $100 |
| 11/28/2008 | USP McCreary | #222 possession of intoxicants |
| 11/29/2008 | USP McCreary | #101/104 assault with serious injury and possession of a weapon |
| 3/1/2012 | USP McCreary | #227 refused a physical test/exam |
| 7/23/2012 | USP Lewisburg | #305 possession of unauthorized item |
| 10/12/2012 | USP Lewisburg | #297/328 abuse of the telephone/giving anything of value to another inmate |
| 6/9/2014 | USP Beaumont | #100 killing |
| 11/5/2014 | USP Beaumont | #212/307 engaging in group demonstration & refusing to obey an order |
| 11/13/2015 | | #397 abuse of the telephone |

15

18-40598.22831

Exhibit 44 - 37

16

18-40598.22832

Exhibit 44 - 38

# Exhibit 45

**DECLARATION OF MEREDITH MARTIN ROUNTREE, J.D., PH.D.**
*United States v. Christopher Emory Cramer*, **Case No. 1:16-cr-26-MAC-ZJH**

I, MEREDITH MARTIN ROUNTREE, J.D., Ph.D., declare and affirm as follows:

1.      I am a Senior Lecturer at Northwestern Pritzker School of Law. I earned a *juris doctor* degree from Georgetown University Law Center in 1991 and a Ph.D. in Sociology from the University of Texas at Austin in 2012. Before joining Northwestern, I taught at the University of Texas School of Law and helped found the Capital Punishment Center there. I also co-directed UT School of Law's Capital Punishment Clinic. Before turning to academic research, I represented people facing the death penalty in Arizona, Washington, and Texas.

2.      I joined the faculty of the Northwestern Pritzker School of Law in Fall of 2013. My research focuses on the empirical study of law with particular attention to questions relating to capital punishment. My work has been published in the *Journal of Criminal Law and Criminology*, the *American Journal of Criminal Law*, and the *Law & Society Review*, among others.

3.      My most longstanding ongoing research project involves a study of jury verdicts in federal capital cases. My collaborator and co-author on this project is Mary R. Rose, Professor of Sociology at the University of Texas at Austin. Because federal verdict forms provide unusually rich detail, Professor Rose and I believed that, if systematized, they might offer new insight into jury decision making.

4.      The Federal Defender Program Resource Counsel has uploaded to its website (https://fdprc.capdefnet.org/verdict-forms) nearly all of the publicly available sentencing verdict forms in federal death penalty cases tried from 1991 to 2018. Where necessary, we have contacted death penalty counsel for verdict forms not posted on the website. In all, our dataset includes 224 verdict forms, covering 227 defendants (in three cases, a single file presented juries' assessment of two different defendants). We excluded from the dataset 21 forms because the form(s) variously were not sentencing forms (one form); stemmed from a bench trial (two forms), did not ask the jury to vote on mitigators (three forms); contained no mitigation votes because the jury was not unanimous on a statutory aggravator (nine forms); did not reveal the vote tally (e.g., the form listed mitigators but did not provide lines for votes, or instructions permitted jurors to not reveal their votes and they did not; six forms). The resulting database consisted of 206 verdict forms from 172 unique juries (i.e., some juries judged multiple defendants). This database has been updated to include the mitigators from the verdict forms in *United States v. Saipov*, but not yet from *United States v. Bowers.*

5.      The verdict forms generally follow a common structure, first asking the jurors to decide whether the defendant was eligible for the death penalty and then to vote on statutory and non-statutory aggravating factors. Jurors are then asked to review items submitted to them as mitigation. Each item typically has a space for the jurors to record their votes. Across all forms and counts, jurors voted on 7713 mitigators. In multicount cases, the mitigators tended to repeat across counts. To avoid double-counting, we analyzed only the juror responses to the top charge.

Rountree Declaration - 1

Exhibit 45 - 1

Therefore, when considering only a single count in each case, there were 4940 unique mitigating factors listed on the forms.

6.      Trained coders read the forms and classified the content of each enumerated mitigating factor. This process identified broad domains of mitigation. Domain I included "parent/guardian/socialization factors," Domain II, "mental and emotional states," Domain III, "crime and sentencing context/specifics of decision," and Domain IV, "jurors' own mitigators." Tests of inter-rater reliability for this assessment were excellent (kappa = 0.95–0.96 across tests). Professor Rose and I also independently checked all verdict forms to ensure that we did not miss any mitigators jurors may have written onto the verdict form.

7.      We reported findings in two published articles, "The Complexities of Conscience: Reconciling Death Penalty Law with Capital Jurors' Concerns," 69 BUFF. L. REV. 1237 (2021) and "The Focal Concerns of Jurors Evaluating Mitigation: Evidence from Federal Capital Jury Forms," 56 LAW & SOC'Y REV. 213 (2022).

**Mitigation endorsement in BOP capital murder cases**

8.      One finding from the federal capital verdict project is particularly relevant to this case, namely that jurors are remarkably open to mitigation in capital cases arising from homicides committed in the federal Bureau of Prisons. I describe this openness as "remarkable" because substantial empirical scholarship indicates that death-qualified jurors, *i.e.*, those who undergo voir dire to establish whether they can sit on a capital jury, are less receptive to mitigating evidence in general than those who do not. Jurors qualified to serve on death penalty cases are also more likely to be punitive and identify more with victims and less with defendants (about whom they hold unfavorable attitudes). In addition, not only are death-qualified individuals less likely to endorse mitigators, death-qualified individuals in these studies also find them less mitigating—and sometimes even find them aggravating—when compared to non-death-qualified individuals. *See, e.g.,* Logan A. Yelderman, Monica K. Miller & Clayton D. Peoples, "Capitalizing Jurors: How Death Qualification Relates to Jury Composition, Jurors' Perceptions, and Trial Outcomes," in ADVANCES IN PSYCHOLOGY AND LAW 37-38 (B.H. Bornstein & M.K. Miller eds., 2016) (summarizing death qualification literature).

9.      In other words, there is no reason to believe these that jurors serving on a federal capital prison homicide trial would be unusually open to, or solicitous of, mitigating evidence. In fact, empirical research predicts just the opposite.

10.     We also found that jurors responded to two distinct themes in the BOP homicide cases in our dataset. First, they voted for mitigators that fell within the *Lockett/Eddings*[1] paradigm, *i.e.*, mitigators that involved the defendant's background and character or the circumstances of the offense. In addition, jurors responded to evidence indicating that Bureau of Prison failures had contributed to the homicide. Indeed, the mitigators about Bureau of Prisons errors had average vote totals that were consistent with other mitigators on the form (2.92 votes vs. 2.46 votes, respectively) and the difference was not statistically significant (p < .47). This

---

[1] *See Lockett v. Ohio*, 438 U.S. 586 (1978); *Eddings v. Oklahoma*, 455 U.S. 104 (1982).

Rountree Declaration - 2

Exhibit 45 - 2

means that jurors tended to endorse these mitigators just as much as any other mitigator on the form.

11.    Across the BOP homicide cases, jurors considered whether a specific BOP failure mitigated the offense thirty-eight times. Nearly two-thirds (63%) of specific prison negligence mitigators received at least one vote. Further, in individual cases, jurors were sometimes more receptive to mitigation related to government failure than to *Lockett*/*Eddings* evidence of personal moral culpability. Only 8% of mitigators relevant to Edgar Garcia's personal background garnered any juror votes at all; forty-nine out of fifty-three mitigators had zero votes. *United States v. Edgar Baltazar Garcia* , No. 1:09-CR-15 (E.D.TX), *Verdict of the Jury – Phase Three*, Document 350-1, pp. 2- 11.

12.    By contrast, the five mitigators that cited specific government failures averaged 5.6 votes, with each of these mitigators attracting at least two votes, and as many as ten. *United States v. Edgar Baltazar Garcia* , No. 1:09-CR-15 (E.D.TX), *Verdict of the Jury – Phase Three*, Document 350-1, pp. 2-11 (mitigators 73 (failure to properly shackle) (seven votes); 74 (failure to properly escort) (10 votes); 75 (failure to keep defendant separate) (four votes); 76 (failure to follow policies contributed to offense) (five votes); 78 (offense would not have occurred if policies followed) (two votes)).

13.    On verdict forms that permitted jurors to write in their own mitigators, some jurors even wrote in mitigators pertaining to government failure.

    a.  In *United States v. Rudy Sablan*, jurors wrote onto the verdict form and eight jurors voted for this mitigator: "The BOP didn't do their job by faulty logic of putting William and Rudy in the same cell." Additionally, seven jurors endorsed the write-in, "Joey died because the guards failed to do 30 minute rounds." *United States v. Rudy Sablan*, No. 00-CR-00531 (D. CO), *Special Findings Form*, pp. 9.

    b.  In *United States v. Ulysses Jones*, jurors wrote onto the verdict form and six jurors voted for this mitigator: "BOP lack of consideration for his previous crimes for housing placements." *United States v. Ulysses Jones*, No. 10-03090 (W.D.MO), *Special Verdict Form for Count One (Murder in the First Degree in the Death of Timothy Baker) and Count Two (Murder by a Federal prisoner in the Death of Timothy Baker)*, Document 436, p. 16.

14.    In addition to our published research, we have run a few additional analyses to try to understand how jurors serving in the capital Bureau of Prisons homicide cases in the Eastern District of Texas responded to mitigation as compared to jurors in other districts. Our research showed that juries in the Eastern District of Texas endorse the lowest number of mitigators in BOP homicide cases of any district in the country.

    a.  Except for the Western District of Missouri, in all other non-Eastern District of Texas BOP homicide cases, jurors in each of those cases cast at least one vote for 70% or more of the mitigators. In the Central District of California, 89% of the mitigators earned

Rountree Declaration - 3

Exhibit 45 - 3

at least one vote; the District of Colorado, 71%; the Middle District of Pennsylvania, 82%; the Northern District of Georgia, 81%; the Western District of Virginia, 73%.

b.   The Western District of Missouri endorsed the second-lowest number of mitigators, with a 37% rate of endorsement.

c.   By contrast, the Eastern District of Texas cast one or more votes for only 33% of the mitigators. Therefore, in the Eastern District of Texas, jurors on average voted "zero" on about two-thirds of mitigators.

**Jury instructions on mitigation**

15.   Mr. Cramer's case is an outlier in another respect, namely how the jury was instructed with respect to voting on the mitigating factors. In Mr. Cramer's case, the jury was given the unusual instruction that in order to vote "yes" on a given mitigator, jurors must decide (1) whether a given mitigating factor had been factually established, **and** (2) whether that factor was actually mitigating. As described below, this type of instruction appeared on only 3.6% of verdict forms.

16.   A research assistant recorded verbatim the instructions on the verdict forms in our database and I added the verdict form instructions from *United States v. Saipov* and *United States v. Bowers*. Across the 213[2] verdict forms we reviewed in which jurors reached mitigation, the instructions to the jury regarding mitigation took essentially five forms. Where relevant, I have reproduced illustrative examples, emphasizing key language.

a.   Eight verdict forms (4%) had no instruction.

b.   The most common formulation in our dataset – used in 166, or 78%, of the forms – focused on the preponderance of the evidence standard. Most of the verdict forms in this category also described mitigating factors as being proved, established, found, and/or existing (emphases mine). While 38% of all cases reviewed received a death sentence, 36% (60) of the defendants who received this instruction were sentenced to death:

> Please answer each of the following questions, respecting the mitigating factors alleged by the defendant, "YES" or "NO." A "YES" answer must be recorded if one juror believes the mitigating factor to have been **established** by the defendant **by a preponderance of the evidence**. For each of the following, you also must indicate, in the space provided, the number of jurors who have found the **existence** of that mitigating factor **to be proven** by a preponderance of the evidence." *--new paragraph—*"A **finding** with respect to a mitigating

---

[2] This includes the 206 verdicts forms analyzed in the mitigation database, six forms where the jury reached but did not provide numerical votes on the mitigating factors, and the verdict from *United States v. Bowers.*

Rountree Declaration - 4

Exhibit 45 - 4

factor may be made by one or more of the members of the jury. Any member of the jury who finds a mitigating factor proven by a preponderance of the evidence, whether or not specifically argued by defense counsel, may consider such a factor in determining whether a sentence of death shall be imposed. This is true even if no other juror concurs that **the factor has been proved**. Any juror may find more than one mitigating factor.

One form made the evidentiary nature of the inquiry clear in including this language its verdict form instruction: "You are instructed that all of these factors below are mitigating factors, the question is whether one or more of you find them to be factually true by a preponderance of the evidence." *United States v. Anh The Duong, et al.*, CR 01-20154-JF (N.D. CA), Document 1492, p. 6.

c. Twenty-six (or 12% of the forms) had essentially the following instruction, but included a normative, rather than evidentiary, instruction in the last sentence ("even if he or she did not also find that factor to be mitigating"). The jury agreed on a death sentence in eight (31%) of these cases.

For each of the following mitigating factors, you have the option to indicate, in the space provided, the number of jurors who have **found the existence of that mitigating factor to be proven by a preponderance of the evidence**. If you choose not to make these written findings, cross out each page of Section V with a large "X" and then continue your deliberations in accordance with the instructions of the court." *--new paragraph--* "A finding with respect to a mitigating factor may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor **may consider such a factor established** in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who agree that the factor has been established. Further, any juror may also weigh a mitigating factor found by another juror**, even if he or she did not also find that factor to be mitigating:**

d. Five (2% of forms) used the instruction in paragraph 16.c., but added a sentence at the end redirecting jurors to the evidentiary question. The jury agreed on a death sentence in two (40%) of the five cases.

For each of the following mitigating factors, you have the option to indicate, in the space provided, the number of jurors who **have found the existence of that mitigating factor to be proven by a preponderance of the evidence**. If you choose not to make these written findings, cross out each page of Section V with a large "X" and then continue your deliberations in accordance with the instructions of the court. *--new paragraph--* A finding with respect to a mitigating factor may be made by one or more of the members of

Rountree Declaration - 5

Exhibit 45 - 5

the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who agree that the factor has been established. Further, any juror may also weigh a mitigating factor found by another juror, **even if he or she did not also find that factor to be mitigating. In the space provided, please indicate the number of jurors who have found the existence of that mitigating factor to be proven by a preponderance of the evidence:**

e.    Only eight (4% of forms) had the instruction given in Mr. Cramer's case, and seven of those defendants, including Mr. Cramer and his co-defendant, Ricky Fackrell, were sentenced to death. While 38% of all cases received a death sentence, 87.5% of the defendants who received the following instruction were sentenced to death:

> For each of the following proposed non-statutory mitigating factors, indicate in the space provided the number of jurors who find that the defendant has proved by a preponderance of the evidence the existence of such factor **and that it is mitigating.**

17.    In addition to Mr. Cramer's case, the instruction in paragraph 16.e was given in *United States v. Basham* (D.S.C. 2004), *United States v. Fulks* (D.S.C. 2004), *United States v. Hans* (D.S.C. 2007), *United States v. Ebron* (E.D.TX 2009), *United States v. Garcia* (E.D.TX 2010), *United States v. Snarr* (E.D.TX 2010), and *United States v. Fackrell* (E.D.TX  2018). Jurors voted for the death penalty for each of these defendants, except for Eric Hans, about whose sentence the jury could not agree.

18.    These eight cases were presided over by only three judges: Judges Joseph F. Anderson, Jr. (*Basham* and *Fulks*) and Henry M. Herlong, Jr. (*Hans*) of the United States District Court of the District of South Carolina; and Judge Marcia A. Crone (*Cramer, Fackrell, Garcia, and Snarr*) of the United States District Court of the Eastern District of Texas. Further, four of these defendants, namely Garcia and Snarr and then Fackrell and Cramer, were tried jointly.

19.    The most common formulation of mitigation instructions, as set forth in paragraph 16.b, asks the jurors to make an evidentiary determination as to whether the defendant had met his or her burden of proof. The formulation in paragraph 16.c mixes the evidentiary determination question by tagging the phrase "even if he or she did not also find that factor to be mitigating" at the end, rather than the more conventional "factor has been proved", while the instruction in paragraph 16.d substantially tracks the language in the instruction in paragraph 16.c. but redirects the jurors to the evidentiary question ("please indicate the number of jurors who have found the existence of that mitigating factor to be proven by a preponderance of the evidence").

Rountree Declaration - 6

Exhibit 45 - 6

20.     In contrast, the jurors in Mr. Cramer's case were explicitly instructed to decide *both* whether the evidentiary standard had been met (a factual determination) and whether the evidence was mitigating (a legal determination).


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 12th day of September, 2023.

_____

MEREDITH MARTIN ROUNTREE, J.D., PH.D.

Exhibit 45 - 7

# APPENDIX A

Exhibit 45 - 8

Meredith Martin Rountree, J.D., Ph.D.                    Northwestern University
Senior Lecturer & Curriculum Advisor                   Pritzker School of Law
375 East Chicago Ave., Chicago, IL 60611
meredith.rountree@law.northwestern.edu
(312) 503-0227

## Education

University of Texas, Austin, Texas                                      Ph.D., 2012
    Department of Sociology

Georgetown University Law Center, Washington, D.C.                       J.D., 1991
    Managing Editor, *Georgetown Journal of Legal Ethics*

Yale College, New Haven, Connecticut                                    A.B., 1986

## Selected Publications & Works in Progress

"Justice Delayed: The Complex System of Delays in Criminal Court," forthcoming in volume 4 of *Loyola University Chicago Law Journal* (2022) (co-authored with Maria Hawilo, Kat Albrecht, and Thomas Geraghty) (by invitation).

"The Focal Concerns of Jurors Evaluating Mitigation: Evidence from Federal Capital Jury Forms," forthcoming in volume 56 of *Law & Society Review* (2022)) (co-authored with Mary R. Rose).

"How Culture Impacts Courtrooms: An Empirical Study of Alienation and Detachment in the Cook County Court System," 112 *Journal of Criminal Law & Criminology* (2022) (co-authored with Maria Hawilo, Kat Albrecht, and Thomas Geraghty) (lead article).

"The Complexities of Conscience: Reconciling Death Penalty Law with Capital Jurors' Concerns," 69 *Buffalo Law Review* 1237 (2021) (co-authored with Mary R. Rose) (lead article & rated "recommended" by Legal Theory Blog).

"Execution 'Volunteers': Psychological and Legal Issues," chapter in <u>Living on Death Row: The Psychology of Waiting to Die</u>, edited by Hans Toch, James R. Acker, & Vincent Martin Bonventre, APA Books (2018) (winner of Association of American Publishers' 2019 PROSE Award in Psychology).

"Criminals Get All the Rights: The Sociolegal Construction of Different Rights to Die," 105 *Journal of Criminal Law & Criminology* 149 (2015).

"Law and Loss: Notes on the Legal Construction of Pain," 41 *American Journal of Criminal Law* 133 (2014).

"Volunteers for Execution: Directions For Further Research on the Influence of Mental Distress, Self-Blame, And Legal Structures on Decisions to Hasten Death," 82 *University of Missouri-Kansas City Law Review* 295 (2014) (cited in *Glossip v. Gross* (2015) (Breyer, J., dissenting)).

"Overlooked Guidelines: Using the Guidelines to Address the Defense Need for Time and Money," 41 *Hofstra Law Review* 623 (2014) (co-authored with Robert C. Owen).

---

Exhibit 45 - 9

"'I'll Make Them Shoot Me': Accounts of Death Row Prisoners Advocating for Execution," 46 *Law & Society Review* 589 (2012).

## Academic Grants, Fellowships, and Honors

2022   Nominated for the Law School's Robert Childres Memorial Award for Teaching Excellence

2020   One of four finalists for Best 1L Professor Award & nominated for Outstanding Professor of a Small Class Award

2016-2018   Nominated for both the Law School's Robert Childres Memorial Award for Teaching Excellence and Outstanding Professor of a Small Class Award

2015-2020   Participant in MacArthur Foundation-funded research group regarding Cook County felony court adjudication

2014   Proteus Action League research grant

2012   Co-winner, American Bar Foundation Hetlage Prize for Best Doctoral Fellow Article

2011   American Bar Foundation Doctoral Fellow; Proteus Action League research grant; University of Texas Graduate Student Professional Development Award

2010   Harry E. and Bernice M. Moore Dissertation Fellowship, awarded by the Hogg Foundation for Mental Health; Texas State University Predoctoral Fellow; 2010 University of Texas Graduate Dean's Prestigious Fellowship Supplement; 2010 Selected for Law and Society Association Graduate Student Workshop

2007   University of Texas Liberal Arts Graduate Research Fellowship

2006   University of Texas Preemptive Fellowship; Graduate Steering Committee Fellowship

## Academic Experience

2013-present   Northwestern Pritzker School of Law
Senior Lecturer (2017-present); Visiting Assistant Professor of Law (2013-2017)

**JD Courses**:  Criminal Law; Constitutional Criminal Procedure; Criminal Process; the American Death Penalty; Cook County Criminal Justice; Mass Incarceration; Law & Society; Advanced Appellate Advocacy. **Non-JD**: Constitutional Criminal Procedure in the Executive LLM Seoul and Tel Aviv Programs; mini-course on Corporate Criminal Law in the Master of Science in Law program.

2012-2013   University of Texas School of Law
Capital Punishment Center Fellow

2006-2010   University of Texas at Austin, Department of Sociology

Teaching Assistant: Sociology of Death and Dying; Life and Death Decisions; Criminology; Criminal Justice; Deviance; Introduction to Sociology; Lab Instructor: Research Methods.

2004-2006   University of Texas School of Law
Co-Director, Capital Punishment Clinic

Courses:  Mental Health Topics in the Death Penalty; Capital Punishment Clinic.

**Professional Experience**

1991-2011    Engaged in civil and criminal litigation in New York, Arizona, Washington, and Texas, including with Owen & Rountree, L.L.P., the Texas Resource Center, and Sidley & Austin.

Primarily focused on representing clients facing the death penalty on appeal and in state and federal post-conviction. Investigated legal claims, examined witnesses in evidentiary hearings, drafted pleadings and appellate briefs in state and federal court, and presented oral argument in trial and appellate court.

Active in a range of incarceration issues: member of working group on Texas death row mental health care; consulted with the Texas Youth Commission's independent ombudsman on health care issues; took part in health services audit of youth detention facility for the Annie E. Casey Foundation's Harris County Juvenile Detention Alternatives Initiative; and served on the final plaintiffs' counsel team for the *Ruiz* prison conditions lawsuit addressing segregation of prisoners with mental illness, prisoner sexual assault, and staff uses of force.

2001-2004    American Civil Liberties Union of Texas

Founded and directed *pro bono* the Prison and Jail Accountability Project of the ACLU of Texas. Through public education, legislative work, and litigation, led efforts to reduce sexual assault in prison, improve the quality of prisoners' health care, and challenge privatization of correctional facilities.

**Selected Academic Conference Presentations and Activities**

Ad hoc reviewer, *Law and Social Inquiry*, *American Journal of Sociology*, *Justice Research & Policy*, among others.

Invited Speaker, "Volunteerism: Death-Sentenced Prisoners Abandoning Appeals," University of Texas Law School's Capital Punishment Center, 2022 Annual Symposium.

Presenter, "Unraveling Capital Jurors' Response to Mental Health Evidence," 2021 CrimFest conference.

Invited Speaker, "Preliminary Qualitative Case Processing Analysis," MacArthur Foundation, Safety and Justice Challenge Research Roundtable (Cook County) (2019).

Invited speaker, "Paradoxes of Connection: Volunteers and Social Ties," University of Texas Law School's Capital Punishment Center, 2019 Annual Symposium.

Presenter, "Jury Decision Making in Federal Death Penalty Trials," 2019 Midwest Sociological Society Annual Meeting.

Invited Speaker, "Empirical Assessments of What 'Works' in Mitigation," University of Texas Law School's Capital Punishment Center, 2018 Annual Symposium.

Invited Speaker, "Outliers: The Unintended Consequences of the American Death Penalty," American Bar Foundation Fellows CLE Research Seminar, 2017 ABA Midyear Meeting.

Exhibit 45 - 11

Invited Speaker, "The Death Penalty's Numbered Days?" *Journal of Criminal Law and Criminology*, 2016 Annual Symposium.

Co-organizer, American Bar Association's Criminal Justice Section Roundtable on proposed revisions to the ABA Criminal Justice Standards on Mental Health and ethical issues in representing clients with mental health issues, 2016.

Co-organizer and presenter, National Conference and Training on Clinical Legal Education, Addis Ababa University School of Law, 2015.

Invited speaker, *New Legal Realism 10th Anniversary Conference: Future Directions for Legal Empiricism* (co-sponsored by University of California, Irvine School of Law and the American Bar Foundation), 2014.

Symposium contributor and speaker, *The 10th Anniversary of the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases:  Implementing the ABA Guidelines to Achieve Justice* (co-sponsored by Hofstra Law and the American Bar Association Death Penalty Representation Project), 2013.

*Law & Society Association Annual Meetings*
"Unraveling Capital Jurors' Response to Mental Health Evidence," 2021.
"Between Punitiveness and Compassion in Public Opinion" (discussant), 2021
"Explaining Justice: How Capital Jurors Account for their Sentencing Decisions," 2019.
"New Legal Realism (Part I): Historical, Theoretical, and Empirical Approaches" panel (discussant), 2019.
"New Legal Realism (Part II): Roundtable Discussion," (participant), 2019.
"With the Jury in Mind: A Look at Evidence and Participation Decisions in Capital Punishment Trials" panel (chair), 2019.
"Peña-Rodriguez and the rule of jury secrecy: Talk inside and outside of deliberations" panel (discussant), 2017.
"Paper, Practice, Power, and Numbers" panel (chair and discussant), 2015.
"Constructing the Meaning of "Just" Punishment: Theory, History, and Empiricism" panel (chair and discussant), 2015.
"Re-Examining the Role of Serious Mental Illness in Murder Verdicts," 2014.
"Against Justice: The Death Penalty" panel (chair and discussant), 2011.
"Giving Up: Who Volunteers for Execution?," 2010.
"Prison Health: Examining Barriers to Care," 2008.
"Death Row Inmates in Cyberspace," (co-presenter with Robert C. Owen), 2007.
"Killing With a Vengeance: Prison Conditions as Part of Death Sentence," 2004.

*American Sociological Association Annual Meetings* (papers competitively selected)
"Instruments of Self-Destruction: A Sociolegal Examination of Different Rights to Die," 2012.
"'I'll Make Them Shoot Me': Accounts of Death Row Prisoners Advocating for Execution," 2011.

*American Criminology Society Annual Meetings*
"Capital Punishment in the U.S.: Trends and Implications" panel (chair), 2012.

---

Meredith Martin Rountree
Page 4

Exhibit 45 - 12

"Is Hastening Execution a Form of Prison Suicide?," November 2012.

"Seeking Death: A Sociolegal Comparison of Consensual Executions and Assisted Suicide," 2011.

"Who 'Volunteers' for Execution?  Study of Texas Death-Sentenced Prisoners," 2010.

"Prison Health Care: An Unfinished Revolution in Texas Penology," 2009.

*Other Presentations*

"Mental Illness and Death Row," University of Chicago Law School student chapter of the American Constitution Society, 2015.

"Mental Health in Prisons," Northwestern Law student chapter of the American Civil Liberties Union, 2015.

"Current Research on Mass Incarceration," Northwestern Law student chapter of the American Constitution Society, 2015.

"*The New Jim Crow* and Reconceptualizing the Criminalization of Mental Illness," Southeastern Association of Law Schools, 2015.

"Criminals Get All the Rights: Condemned Prisoners and Their Decisions to Hasten Death," Association for the Study of Law, Culture & the Humanities, 2012.

"Giving Up: A Sociolegal Examination of Consensual Executions," American Bar Foundation Fellows Research Advisory Committee, 2011.

## Dissertation Committee Service

Dissertation committee member for Lisa L. Bell Holleran, "Future Dangerousness in Texas Death Penalty: A Content Analysis," Texas State University, School of Criminal Justice, 2016.

Dissertation committee member for Amanda Gvozden, "Ritual, Gender, and the Death Penalty." Northwestern University, Department of Religious Studies.

## Academic Affiliations

Association of American Law Schools
Law and Society Association

## Selected Other Professional Presentations and Activities

Invited Speaker, "Beyond Lockett/Eddings:  Recent Empirical Evidence of What Jurors Finding Mitigating," Texas Habeas Assistance and Training Project, 2022.

Invited speaker, "What Influenced Death Penalty Jurors' Moral Decisionmaking," webinar with Robert Dunham, Executive Director of the Death Penalty Information Center, 2022.

Invited planner and participant (pilot meeting (2019) and full-scale training (deferred from 2020 due to the pandemic)) of l'Institut Makwayane, an intensive skills and community-building workshop for death penalty lawyers practicing in Francophone Africa, organized by Cornell Law School's Center on the Death Penalty Worldwide.

Invited speaker, "Has the Death Penalty Become an Anachronism? A Discussion of Changing Laws, Practices and Religion on Our Standards of Decency," Section of Civil Rights and Social Justice, American Bar Association, 2018.

Meredith Martin Rountree
Page 5

Exhibit 45 - 13

Invited speaker, American Bar Association Death Penalty Due Process Review Project Summit on Severe Mental Illness and the Death Penalty, 2016.

Invited speaker, "Severe Mental Illness: The Next Exclusion?," Capital Habeas Unit National Conference, 2015.

Invited speaker, "Developing Prison-Based Mitigation," Fourth Annual Training For Counsel Representing Capital Clients In Section 2255 Proceedings, Administrative Office of the U.S. Courts, Office of Defender Services, Training Branch, 2010.

Invited speaker, "Mental Impairments in Prison," Third Annual Training For Counsel Representing Capital Clients In Section 2255 Proceedings, Administrative Office of the U.S. Courts, Office of Defender Services, Training Branch, 2009.

**Bar Memberships, Activities, and Honors**

Admitted to practice in the Supreme Court of the United States; the United States Courts of Appeals (Fifth and Ninth Circuits); United States District Courts in Arizona, Texas, and Washington; and the state courts of Arizona (inactive), New York, Texas, and Washington (inactive).

American Bar Association Death Penalty Due Process Review Project, Steering Committee member, 2017-present.

National Association of Criminal Defense Lawyers, Member, Corrections Committee, 2009-present.

American Bar Association Corrections Committee, Prisoner health subcommittee, 2016-2017.

**Languages**

French (fluent)
German (advanced (CEFR level C1))

Meredith Martin Rountree
Page 6

Exhibit 45 - 14

# APPENDIX B

Exhibit 45 - 15

**APPENDEIX B - DOCUMENTS REVIEWED**
*U.S. v. CHRISTOPHER CRAMER - 1:16-CR-26*

1.  FOIA records request to Bureau of Prisons (Institutional), April 25, 2022

2.  FOIA records request to Department of Justice, May 5, 2022

3.  FOIA records request to Bureau of Prisons (Records), May 5, 2022

4.  Trial testimony, Alexander Fetters

5.  Trial testimony, Andrew Creech

6.  Trial testimony, Bradley Wasson

7.  Trial testimony, Jason Scoggan

8.  Trial testimony, Jason Thompson

9.  Trial testimony, Larry Devereaux

10. Trial testimony, Oscar Arvizo

11. Trial testimony, Otis Carden

12. Trial testimony, Robert Nylen

13. Trial testimony, Travis Blodgett

14. Trial testimony, Zeus Arco

15. Prosecutor Opening Statement

16. Jury Instructions, Phase 2, May 10, 2018

17. Jury Instructions, Phase 3, June 11, 2018

18. Guilt Phase Jury Notes 1-3

19. Guilt Phase Jury Note 4

20. Guilt Phase Jury Notes 5-6

21. Penalty Phase Jury Notes 1-3

22. Penalty Phase Jury Note 4

23. Guilt Phase Jury Verdict Form

24. Jury Verdict Phase 2, May 10, 2018

25. Jury Verdict Phase 3, June 13, 2018

1

Exhibit 45 - 16

# Exhibit 46

<u>DECLARATION OF ANTHONY S. HAUGHTON</u>

I, Anthony S. Haughton, declare as follows:

1.      My name is Anthony S. Haughton. I am the Deputy Director of the Capital Resource counsel Project ("the Project"). I started working with the Project in March of 2018. Later that same month, I was asked to observe the Cramer/Fackrell trial as part of my orientation for the Project. I was later asked by the Project to try to become part of the team for Christopher Cramer's 2018 capital trial. *United States v. Cramer and Fackrell*, Case No. 1:16-cr-00026-MAC-ZJH. Looking back now, I would say that the role I played is that of Resource counsel. After Chris' conviction, I was a member of his appellate legal team and worked on his appeal. I have remained in contact with Chris in the years since.

2.      I have been an attorney since 1989. Prior to my work with the Project, I served in various roles at Thurgood Marshall School of Law ("TMSL") from 2008 to 2018. I began as an Adjunct Professor teaching appellate litigation. In 2011, I started working full time: first as the Associate Director for the Earl Carl Institute running their Innocence Project; then as the Co-Director of all TMSL's clinics. I also taught additional classes including the foundational 1L Criminal Law course. I was fortunate enough to serve on the Texas Forensic Science Commission, and other local criminal law related committees, and was able to set up the Juvenile Life Without Parole Clinic that is still taught at TMSL. My legal career also includes two stints at the Public Defender Service for Washington, DC, most recently as the Chief of the Trial Division.

3.      I first started doing capital cases with the Texas Resource Center. I think I started there in late 1990 or early 1991, and I have been doing capital work pretty much continually since. At the Resource Center I was initially tasked with direct representation of capitally

1

Initials

Exhibit 46 - 1

convicted prisoners and later as Resource counsel where the Center was able to recruit outside counsel to assist with these cases. My cases with the most notoriety at the Resource Center were the innocence case of Gary Graham, and the case of James ("Bobby") Moore that ultimately set the standard for treatment of intellectual disability cases. At various times I have managed my own firm where I continued to do primarily capital work. In private practice my most impactful case was that of John Alba. In Alba we were the first of the defendants to recognize and file the race claim based on the work of Dr. Walter Quijano, that ultimately led to relief in multiple cases in Collin County, and then the Harris County case of Duane Buck. And most recently before joining the Project, we were able to secure punishment phase relief for Rodney Rachal and Roger McGowen and a parole-able sentence on re-trial for McGowen.

4.    During my time at the Texas Resource Center, I attended capital death penalty CLEs and conferences at least annually, and sometimes several times a year. I began presenting at CLEs and conferences around 1993, and have been presenting at conferences since then, including local, state and national conferences, and the more intensive "bring your own case" type of conference where customized guidance is given to capital teams.

5.    As noted above, I became involved in Chris's case in March 2018, shortly after I had started with the Capital Resource counsel Project. My supervisor, Matthew Rubenstein, and Mark Donatelli, the Project's "BOP" specialist suggested that I sit in on the Cramer/Fackrell trial to learn more about the role of resource counsel. Mark Donatelli was already serving as resource counsel for the Fackrell team. Initially my role was that of an observer, but over time I was directed to try to become part of the Cramer team. I was told that the Cramer team, though always polite, were resistant to Project overtures of assistance, and I also found that to be true in

2


Initials

Exhibit 46 - 2

my interactions with Chris' attorneys, Pat Black and Doug Barlow. I did not have many interactions with John McElroy.

6.     The Cramer/Fackrell trial was not my only professional obligation at that time, so as a result I would estimate that I observed approximately 65 to 70% of voir dire and trial.

<u>Voir Dire and Guilt Phase</u>

7.     At some point after I came on to assist the Cramer team, I believe during voir dire, I was asked by Doug Barlow to work on a severance motion. I completed the motion and submitted it to them, but am unsure whether anything was filed.

8.     I attended portions of the voir dire. I was surprised that the jury pool had so few Black people or other minorities. My understanding is that Beaumont and several other cities in the area have substantial African-American populations.

9.     While observing the trial, I noticed that Chris seemed removed from the whole process and isolated from all involved, except his co-defendant Ricky. I thought it was a defensive posture of a client who did not trust that his case was going to be properly presented and fairly decided. It was almost as if a death sentence was a foregone conclusion in his mind. The only time I saw Chris really engaged was when his family testified. After they testified, it seemed to me that he began to take the process more seriously.

10.     Chris's defense team did not engage with him much, and it was clear to me that the attorneys had failed to develop a trusting relationship with their client.  Pat and Doug rarely spoke to him in the courtroom. I never saw them sharing anything with him or otherwise demonstrating that they were a team working together in this process that would decide whether Chris lived or died.

3


Initials

Exhibit 46 - 3

11.    I remember that Chris and Ricky talked inappropriately at some points in the trial. Their antics looked like bravado, yet I did not see Chris's attorneys intervening or trying to engage with Chris when this happened. From my experience, that kind of behavior by clients never happens if counsel have developed the type of trusting relationship described in the ABA Guidelines. A trust-based relationship is necessary to any effective representation, and especially so in a capital case. And where it is in place, you rarely see acting out by clients at trial, even with severely mentally ill clients. Moreover, where you have this type of relationship, you can show the jury that the trust is mutual by engaging with the client often, sharing notes with them, reading instructions together and other actions that show that both counsel and client are engaged in the defense of their case. These types of behaviors by the attorney also show the jury that the attorney is not afraid of the client, a vital showing in any case where the client's "dangerousness" is at issue.   Overall, I thought the problems in the attorney client relationship gave a direct and negative impression of Chris to the jury.

12.    I never participated in any bench conferences or went back into chambers when the attorneys were discussing matters with Judge Crone. The attorneys generally did not discuss trial strategy with me or invite me to meetings. In fact, I was never officially introduced to Chris. I did not speak to him for the first time until after the trial. I wanted to do more for the team and tried to assist, but for the most part the attorneys declined my offers. It's hard to underestimate how little I did in Chris's trial – at least, until right before the penalty phase began.

Penalty Phase

13.    I continued to make clear that I was open to helping the team in any way they thought useful.  I recall that their reaction was always polite, but they told me that they didn't need my assistance.

4



Initials

Exhibit 46 - 4

14.    At some point, I began to review the mitigation memos prepared by the trial team's mitigation investigator, Katherine Mayer, as well as the work done by Sandy Saberman, a mitigation specialist who was loaned out to the trial team through the Project. I did not know Ms. Saberman at the time but got to know her better when she assisted me on a SD TX capital cases.

15.    I learned that Sandy had been let go from the team by Pat Black before I was involved with the case. So, Katherine was the only mitigation investigator on the team for trial. In the lead-up to the penalty phase, I was concerned that it didn't seem like much thought or preparation had been put into the presentation of the penalty phase witnesses. It is a standard of practice in capital cases for there to be multiple interviews of family members and a complete collection of their records, particularly medical, or social records that may shed even the remotest details of the client's life story or impact on the punishment presentation. The saying goes that a proper mitigation investigation is both broad and deep:  Broad in the sense that it covers at least three generations of family history and all of the people who can shed light on the client, and deep in the sense that it involves multiple interviews of the people closest to the client to obtain the true story of the client's life and the witness' life. The most valuable information usually can only be obtained after a trusting relationship has been developed. Therefore, in my experience in capital cases, the defense team needs to work over many months and have multiple meetings with family members and others who know the defendant well in order to develop trust and draw out a complete mitigation story to present to the jury. Not only does a team need to draw out that information, but the team also has to work with witnesses to make sure they can effectively convey that information on the stand.

5


Initials

Exhibit 46 - 5

16.     From what I could tell from the memos, the investigators had some initial meetings with Chris's family members but had not uncovered the information I would have expected from a thorough mitigation investigation.

17.     After trial one day, I remember hearing someone say that Chris' older brother Ron Ron was not going to come and testify at the punishment phase of the trial. Often, older siblings are critical witnesses in capital cases, and that seemed true of Ron Ron based on the information gathered by Sandy and Katherine. When I heard that he did not want to attend, it raised concerns about why. So, I asked the team if I could fly out to see Ron Ron and try to persuade him to testify. The initial response was a polite no. I asked why he had not been subpoenaed, and I think Pat or Doug said they did not want any witnesses who did not want to testify. This response surprised me, as it is standard practice to subpoena important witnesses, including family witnesses. Whenever you have a witness who has what you think is critical information for your case, you have to subpoena them to make sure your client has the benefit of their testimony. It took some convincing, as I recall, but Pat and Doug finally agreed that I could at least try.

18.     When I met with Ron Ron, he told me that he had been under the impression that in order to testify, he would have to pay his own way for his flight and hotel and be reimbursed later, which he could not afford to do. I told him that was not true. Ron Ron, who is African American, also expressed some concern that Chris had become part of a white prison gang, and that the murder may have been racially motivated. I corrected that notion too by explaining that Chris did not buy into the racism, and that prison is racially divided to an extreme. The life story Ron Ron shared in the limited time I was with him seemed important to telling Chris' life story, so I continued to try to convince him to come to trial, and he initially said he would. Ultimately, Ron Ron never testified at the penalty phase, though I am not sure of the reason why. He was

6



Initials

Exhibit 46 - 6

never put under a subpoena. As I saw it, if Ron Ron had been subpoenaed, he would have shared information that would have been critical for the mitigation presentation and would have helped contextualize Chris' childhood and teenage years for the jury.

19.    I think it was after meeting Ron Ron that Katherine Mayer asked me if she needed to be there during the trial. I was surprised by the question as it is standard practice for the mitigation specialist to be at trial, at least for the punishment phase. They are often the defense team members who have the most trusting relationships with the mitigation witnesses and know them and their story best. Still, since I thought of myself primarily as an observer, I suggested that she ask the team to be sure. I learned later that they told her that she didn't need to be there, so she went on a two-week vacation during the penalty phase. She missed the entire penalty phase presentation, and I never saw her during trial.  What surprised me even more than Katherine's question was the fact that the defense attorneys allowed their sole mitigation investigator – the person who was most deeply familiar with Chris's mitigation story and the witnesses who could tell that story – to go on a planned vacation during the penalty phase of Chris's trial.

20.    As the penalty phase approached, it did not seem like preparations were being made to prepare the penalty phase witnesses, and so I asked if the team would let me assist in that regard.  Doug told me he was going to do all the direct examinations of family members and agreed to let me help him with their preparation.

21.    I recall that it was Memorial Day weekend. Chris's family members flew in that Sunday. I helped pick some of the family up at the airport and then drove them to the motel where the defense was putting them up. There was an initial meeting that evening, where Doug, Pat and, I think, the defense investigator Lynn Arceneaux, and myself met the family. I can't



Initials

Exhibit 46 - 7

remember if John McElroy was there, I think he was, but I am not sure. Before the family arrived, Doug told me that we could spend all day Monday preparing them for their testimony. At that point, neither Doug nor I had spoken with any of Chris's family members about the substance of their testimony. And I got the sense that Doug had never met them before.

22.     At the last minute, Doug told me that he wouldn't be able to make it to prepare the witnesses, and he asked me to do it on my own. This caused me grave concern. It is well below the standard of care for the attorney conducting the examination of any witness you're going to put on to never meet the witness in person and prepare them directly. This is especially true when the attorney knows that the witness will be discussing sensitive, embarrassing, and painful subjects, which was the case here. Any witness testifying for the defendant in the penalty phase of a capital case can be terribly intimidated by the formality of the courtroom setting, the expected attack by the prosecution, and the pressure of feeling responsible for convincing the jury that their loved one's life is worth saving.

23.     I met separately with Chris's mom Darla, his half-sisters Chaminque and Angel, his step-brothers Lorenzo and Diamante, and Diamante's mom Hortensia. Everyone was cooperative and wanted to help Chris as best they could. The room where I had to prepare the witnesses was an ordinary hotel room at the motel. This is certainly not the standard of care because it was not conducive to preparing witnesses to testify, especially witnesses who have experienced as much trauma as Chris's mother and sisters. Preparing in essentially a hotel bedroom created an unprofessional situation and made building trust with these witnesses even more difficult.

24.     For example, Darla Dillon, Chris's mother, was being asked to share her deepest failures, her regrets, and her own history of physical, emotional, and sexual trauma to a roomful

8


Initials

Exhibit 46 - 8

of strangers. Because Doug had never spoken to her about all of this, she was essentially being questioned by a stranger. In this case, I recall Darla asking me on the way to the courthouse if I could be the one to do their direct examinations instead, and several other family members saying that they would prefer this as well. Darla explained that she felt comfortable talking with me because we had already gone through her testimony together.

25.     I didn't go into those meetings with much information about the witnesses before I met with them. I had read the memos that Sandy Saberman or Katharine Mayer had prepared, but those were initial interview memos, and there wasn't anything else for me to go on. Very early on in those conversations, it became apparent that there was much more information that these witnesses could share beyond what I had read in the memos: what I saw from these witnesses was a rich, deep mitigation story about Chris's trauma and their own. I know from my own experience doing capital work that this is the kind of information that can convince a jury to save a client's life. The investigation that was done was incomplete, and well below the standard of care in capital cases. I can't help but wonder in this case, where the jury seemed to be so close to coming back with a verdict that would have meant life, if these things would have made a difference.

26.     For example, based on the information I had read about Darla and my initial conversation with her, I thought all the mitigating information we could get from her as a witness was just that she was largely absent during Chris's life and was not a very good mother to him. After speaking with her for a little longer, though, I realized that the impression left by the incomplete investigation didn't paint the full picture at all: instead, there was a complex story of the trauma Darla herself had faced, as well as a deep love between Darla -- who wanted to care for her children but was in the throes of addiction -- and Chris, who had stepped up to protect his

9


Initials

Exhibit 46 - 9

mom from abuse when he was just a young boy. Chaminque struck me as a very compelling witness, and Lorenzo and Diamante also each had their own moving stories to tell about Chris. Diamante and Lorenzo are both Black, and I recall one of them describing Chris's racist tattoos to me as just "a mask" that Chris used to protect himself while in prison. With Hortensia, I got the sense that there was a compelling story of redemption that could have been developed. Much of this information that I was able to glean from the family was not in the interview notes that I had read.

27.     I worked with the family from about 9:00am to midnight, and I spent about 2 or 3 hours with each witness. I met with them one at a time; the other family members were not in the room. Because it was apparent that there were tranches of mitigation facts that simply had never been developed during the investigation, I was in the untenable position of trying to fill in the blanks as the de facto investigator and to create a cohesive narrative as the de facto attorney, knowing that it would be problematic because the trial team had failed to take advantage of the time they had prior to the trial to fully develop and prepare the penalty case. And of course, there was no mitigation investigator to contrast what was known with what was presented and whether there was any supporting documentation that would have made the witness' testimony all the more real.

28.     I got a message from Doug at some point that day asking how things were going, but when I called him back, Doug told me I had missed his window and said I shouldn't worry and he would just "play it by ear" tomorrow. This is not the standard of care when preparing a penalty phase presentation in a federal capital trial.

29.     After I had finished speaking with the family members, I stayed up all night writing out an outline for a direct examination that would allow Doug to present as much of the

10


Initials

Exhibit 46 - 10

salient information as possible. The outline was essentially a question and then bullet points of the information that Doug should expect to elicit from each witness. I think it was about 6:00 am Tuesday morning when I got the outline to Doug.

30.    There were times during the examination of witnesses where the witness did not answer with all the information in their bullet points that I had laid out for Doug to get. This was especially true for Darla's testimony. When that happened, Doug would just move on, rather than ask additional questions to get the bullet points that I thought were critical for the jury to hear. I think this failure to get all the mitigation evidence from each witness was in large part due to the lack of familiarity between Doug and the witness and Doug's lack of understanding of the extent of the evidence they had to share. As one of the family members reiterated later, they wished I had done their direct examinations because they knew me and felt comfortable with me.

31.    Much of the critical information the family members had to present concerned trauma and abuse. Because the mitigation investigation was incomplete, and because Doug was not involved in preparing the witnesses for their testimony, the jury did not hear a lot of their compelling evidence. As an example, Doug seemed to abruptly cut off his questioning of Darla, before eliciting much of the evidence that would have shown the struggle and trauma that beset her life from the time she was a young child. When I asked Doug later why he didn't ask follow up questions to elicit more of Darla's powerful mitigation story, he told me it was because he thought Chris would get upset if the full picture of his mother's trauma was exposed to the jury. I later learned that Chris was actually moved that his family were trying to save his life and would have had no problem with his mom's full story being told. Chris knew about this trauma and was prepared for his mother to share those painful memories.

11



Initials

Exhibit 46 - 11

32.     I was not present for every day of penalty phase testimony, but I recall hearing testimony from a defense mental health expert who opined that Chris had antisocial personality disorder (APD). I did not know this was going to be part of the defense theory for Chris until I heard the expert testify, and I was very surprised when I learned about it. It is below the standard of care for a defense team to present an APD diagnosis, especially without the context of a fully developed social history, because jurors tend to see a defendant with APD as a dangerous psychopath who feels no compassion for others and needs to be incapacitated. Simply, they see the client as a broken person who cannot be fixed.

33.     More importantly though, the diagnosis just didn't square with my impression of Chris from speaking with his family members, who described him as a loving and devoted brother and son, one who would often sacrifice himself to help them. None of them described him as being manipulative, deceitful, reckless, or as someone who had no care for other people's feelings. Even from my limited involvement in the case at that time, I knew from speaking with Chris's family that Chris's social history was replete with trauma and multi-generational mental illness and addiction, but also deep love and compassion. That was the story that should and could have been presented to the jury so they could understand who Chris was as a person. His brothers and sisters told stories of how he would feed and care for them before he would eat himself, even if it meant he would go hungry. They also told stories of how he would try to protect them and their mother, even though he was very young and would end up getting hurt for his efforts. Their experience of him was a story of love, not hate.

34.     The APD diagnosis also supports my sense of the inadequacy of the mitigation investigation in Chris's case. A thorough mitigation investigation would have uncovered all of the stories from Chris' life that would call into question an APD diagnosis. For example, on my

12

Initials

Exhibit 46 - 12

very first meeting with Chris, after the trial, as we were preparing for his appeal, he told me a story about helping a family of ducks. Chris said that he was riding his bike when he saw a duck crossing the road in front of him. The duck was followed by a line of baby ducks who started falling into the sewer grate as they crossed the street. He rode over to them, jumped off his bike, and managed to get the grate up and rescue several of the ducks. By that time the mother duck was gone. So, Chris cradled the rescued baby ducks and took them to the local police station, where he was told they could do nothing for the ducks and that they needed a veterinarian. Chris told me that it took him an hour to ride across town to get the ducks to the vet, and how glad he was to be able to leave them in a safe place. I'm not a mental health professional, but I know from my experience as an attorney that individuals with APD often present with histories of harming animals during their childhoods, and the stories about Chris's empathy as a child struck me as being very different from that typical profile.

35.    I was surprised Chris asked me to help him after his trial ended, because I hadn't really met him during the trial. I think once I gave him a head nod when I went to counsel table to tell Doug something. I got the impression that Chris appreciated the work I had done with his family and that I had earned his trust and respect by spending time with them, answering their questions, and helping them to tell their stories. I thought it was a shame that Chris's trial attorneys were not able to build that same kind of trust with Chris.

The vast majority of the work on Chris's appeal was done by Anita Aboagye-Agyeman and Sean Bolser from the Federal Death Penalty Appellate Project. My role in the appeal was to help identify issues and help edit what Sean and Anita wrote.

13

Initials

Exhibit 46 - 13

Exhibit 46 - 14

I declare under penalty of perjury that the foregoing is true and correct.


DATED: September 19, 2023

ANTHONY S. HAUGHTON

14

Initials

Exhibit 46 - 14

# Exhibit 47

# Filed under seal

# Exhibit 48

# Filed under seal

# Exhibit 49

# Filed under seal

# Exhibit 50

# Filed under seal

# Exhibit 51

## SUPPLEMENTAL DECLARATION OF DARLA DILLON

I, DARLA DILLON, declare as follows:

1.      My name is Darla Dillon. This is a supplement to a declaration that I signed and submitted on behalf of my son, Christopher Emory Cramer, on February 8, 2023. I continue to stand by what I attested to in that declaration. I am submitting this declaration to provide the following additional information:

2.      At trial, I testified that Chris is a good person who I love with all my heart and who I believe deserves to live. I was not asked to testify about the impact his execution would have on me and my family.

3.      If I had been asked, I would have told the jury and the judge that my son being executed would be the worst thing to happen in my life. Chris is so special and important to us. He is my first-born, and still my baby boy. Even though he has been in prison for many years, we have a strong relationship, and he is a precious part of our family.

4.      I have not had an easy life. I have experienced a lot of pain and many losses. But if Chris were put to death, I don't know if I or my family would ever recover.

I declare under penalty of perjury that the foregoing is true and correct. Executed on the 07 day of September, 2023.

Darla Dillon
Darla Dillon

Initials

1

Exhibit 51 - 1

# Exhibit 52

Federal Death Penalty Resource Counsel                                    https://fdprc.capdefnet.org/overview/about-us

Member Login

# FEDERAL DEATH PENALTY RESOURCE COUNSEL

[                    ]    <u>Search</u>

Overview      Statutes      Notices of Intent      DOJ Activity      Declarations

Seminars      Other Useful Info      Verdict Forms      Contact Us

| Overview |
|---|
| <u>About Us</u> |
| <u>ABA Guidelines</u> |
| <u>Appointment of Counsel</u> |
| <u>DOJ Authorization</u> |
| <u>Federal Capital Trial Projects</u> |
| <u>Federal Death Penalty Resource Counsel & Capital Resource Counsel</u> |
| <u>Federal Capital Appellate Resource Counsel</u> |
| <u>National Mitigation Coordinator</u> |
| <u>Defense Victim Outreach Coordinator</u> |

## Federal Death Penalty Resource Counsel & Capital Resource Counsel

The Federal Death Penalty Resource Counsel Project (FDPRCP) is a program of the Defender Services Office of the Administrative Office of the United States Courts (AOUSC) designed to assist the federal courts, federal defenders, and appointed counsel in connection with matters relating to the defense function in federal capital cases at the trial level. Capital Resource Counsel (CRC) serve as full-time assistant federal defenders with the principal responsibility of focusing on federal capital cases assigned to federal defender organizations, including training their staff, consulting on cases, and serving as co-counsel in a limited number of cases.

Since early 1992, the Project has monitored all federal death penalty cases and has collected information which might be useful to both lawyers and judges involved in federal capital cases. The Project assists trial counsel with telephone consultation, identification of experts, mitigation specialists and investigators, legal research, drafting pleadings, instructions, and on-site assistance before and during capital trials. The Project is also available to respond to inquiries from the courts regarding the defense function in federal capital prosecutions. The Project has also been involved with:

- identification and recruitment of defense counsel "learned in the law applicable to capital cases" for possible appointment under 18 U.S.C. Section 3005;
- assisting the Defender Services Office, AOUSC, in responding to judicial inquiries concerning the defense function, case management, and case budgeting in federal capital cases;
- development of capital litigation training programs and materials to assist federal defenders and court-appointed private counsel;
- responding to Congressional inquiries directed to the federal defender system concerning proposed capital punishment

Exhibit 52 - 1



Life Support Project

legislation, and
- maintaining a liaison between the federal public defender system and the Department of Justice regarding the administration of federal death penalty statutes.

# Federal Capital Appellate Resource Counsel

The Federal Capital Appellate Resource Counsel Project was created by the Defender Services Committee of the Judicial Conference in 2008. The Project's mission is to help courts and federal defenders identify qualified counsel for federal death-penalty appeals, train and consult with assigned counsel, and provide direct representation in some cases. In addition, the Project helps FDPRC and CRC consult with trial lawyers in federal capital cases on legal issues. The Federal Capital Appellate Resource Counsel is Barry Fisher.  The Project's other attorneys are Sean Bolser and Jerome Del Pino.

# National Mitigation Coordinator

The National Mitigation Coordinator provides mitigation assistance to CJA panel attorneys, the courts, and federal defenders in identifying mitigation specialists, providing referrals to capital  counsel in capital habeas and capital prosecution cases, participating in mitigation training programs, and consulting with defense teams who need guidance in relation to mitigation.

# Defense Victim Outreach Coordinator

The Victim Outreach Coordinator provides victim outreach assistance to federal capital cases nationwide, assisting Federal Defender offices, FDPRC, CRC, 2254 & 2255 projects by consulting, providing referrals of victim liaisons, conducting victim outreach trainings and continuing to educate capital defense attorneys about the values and principles of defense-initiated victim outreach.

# Life Support Project

The Life Support Project assists capital defense teams in working with difficult clients, who are reluctant to have mitigation investigated, reluctant to seek life sentences, or reluctant to take plea bargains for sentences less than death.  Created in 2008, staffed by Wilbert Rideau and other carefully selected people -- all of whom have made meaningful lives serving time in prison – the project has since succeeded in helping clients choose life paths in most of the cases in which it has been involved.

Home        About Us        Contact Us

© 2017 Federal Death Penalty Resource Counsel Project



Capdefnet is a joint project of
the Federal Death Penalty Resource Counsel (FDPRC)
the Habeas Assistance and Training (HAT)
and the Federal Capital Habeas (§2255) Projects

Member Login

# Federal Death Penalty Resource Counsel

[ Search field ]    Search

Overview      Statutes      Notices of Intent      DOJ Activity      Declarations

Seminars      Other Useful Info      Verdict Forms      Contact Us

# Federal Capital Trial Projects

The Federal Death Penalty Resource Counsel project ("FDPRC") and the Capital Resource Counsel project ("CRC") (the "Trial Projects") are Projects of the Defender Services Office of the Administrative Office of the United States Courts. They assist the federal courts, federal defenders, and appointed counsel in matters related to the defense function in federal capital prosecutions.

Established in early 1992, the Trial Projects assist federal defenders and courts by identifying and recommending qualified "learned counsel" and co-counsel for defendants facing capital-eligible charges. The Projects also monitor all federal death penalty cases and serve as a national clearinghouse for information which might be helpful to defense counsel appointed in federal capital cases.

The FDPRC consist of part-time veteran capital defense attorney contractors. The CRC are full time salaried federal defender attorneys who are available to be appointed as learned counsel in capital cases. CRC also has a training director, mitigation specialist, and two full time paralegals as part of their Project. The FDPRC and CRC Projects work hand-in-hand in performing their duties.

A core function of the Trial Projects is to assign a resource counsel who will provide consulting assistance to every defense team representing a federal death-eligible defendant in the country. This Trial Project lawyer provides telephone, video-conference, and on-site consultation which can include: assistance in identifying and utilizing qualified learned counsel; making referrals to mitigation specialists, investigators, paralegals, defense victim outreach specialists, mental health and other experts, and other defense team members to create a diverse and culturally competent team; assistance with pleadings and legal research, budgeting, preparing written and oral presentations addressing the government's decision whether or not to seek the death penalty including settlement efforts; and, if necessary, trial preparation, jury selection assistance and courtroom litigation.

Resource Counsel responsibilities also include:

- Development of capital litigation training programs and materials to assist federal defenders

Exhibit 52 - 4

and court-appointed CJA counsel;

- Responding to judicial inquiries concerning appointment of counsel, case budgeting, and the defense function in federal capital cases;
- Responding to Congressional inquiries directed to the federal defender system relating to proposed capital punishment legislation; and
- Maintaining a liaison between the federal public defender system and responsible officials of the Department of Justice regarding the administration of federal death penalty statutes.

The Trial Project produces a vast array of materials related to defending federal capital prosecutions, beginning with the authorization process, available on the secure side of the Project's website. The Project provides, for example, model pleadings on recurring issues such as defense funding, continuance, jury voir dire, discovery, government mental status exams, severance, penalty phase instructions, etc. These materials are made available at no cost to appointed counsel.

Home        About Us        Contact Us

© 2017 Federal Death Penalty Resource Counsel Project



Capdefnet is a joint project of
the Federal Death Penalty Resource Counsel (FDPRC)
the Habeas Assistance and Training (HAT)
and the Federal Capital Habeas (§2255) Projects

9/17/2023, 2:27 PM

Exhibit 52 - 5

# **Exhibit 53**

# **Filed under seal**

# Exhibit 54

# Filed under seal

# Exhibit 55

# Filed under seal

# Exhibit 56

# Filed under seal

# Exhibit 57

STATE & FEDERAL INFO

## Federal Death Penalty

The federal government can seek death sentences for a limited set of crimes, but federal executions are much rarer than state executions.

# Overview

The federal death penalty applies in all 50 states and U.S. territories but is used relatively rarely. About 41 prisoners are on the federal death row, most of whom are imprisoned in Terre Haute, Indiana. Sixteen federal executions have been carried out in the modern era, all by lethal injection, with 13 occurring in a six-month period between July 2020 and January 2021.

The federal death penalty was held unconstitutional following the Supreme Court s opinion of *Furman v. Georgia* in 1972. Unlike the quick restoration of the death penalty in most states, the federal death penalty was not reinstated until 1988, and then only for a very narrow class of offenses. The Federal Death Penalty Act of 1994 greatly expanded the number of eligible offenses to about 60.

The use of the federal death penalty in jurisdictions that have themselves opted not to have capital punishment—such as Washington, D.C., Puerto Rico, and many states—has raised particular concerns about federal overreach into state matters.

### Defendants Sentenced to Death Under Federal Death Penalty Statute



No. of Defendants Sentenced to Death

79

© 2023 Mapbox © OpenStreetMap

Exhibit 57 - 1



Jul 06, 2021

## Department of Justice Formally Pauses Federal Executions to Review Trump Death-Penalty Regulations

In a memorandum that left to Congress the task of addressing systemic questions of arbitrariness, racial discrimination, and wrongful convictions affecting the administration of the federal death penalty, U.S. Attorney General Merrick Garl...

**NEWS & DEVELOPMENTS**

Exhibit 57 - 2

**MENTAL ILLNESS**

*Sep 07, 2023*

### 9/11 Victims' Family Members, Members of Congress Urge Biden Administration to Abandon Plea Negotiations with Guantanamo Detainees

Family members of some of the victims of 9/11 have asked the Biden Administration to abandon current plea negotiations with Guantánamo detainees that would remove the possibility of death sentences for the men accused of planning the 9/11 terror a...



---

**FEDERAL DEATH PENALTY**

*Aug 03, 2023*

### Jurors Sentence Robert Bowers to Death for 2018 Synagogue Shooting

On August 1, 2023, death-qualified federal jurors unanimously recommended a sentence of death for Robert Bowers, who they had earlier convicted of killing 11 Jewish worshippers at a Pittsburgh synagogue in October 2018...



---

**FEDERAL DEATH PENALTY**

*Jul 13, 2023*

### Jury Finds Defendant Eligible for Federal Death Penalty in Pittsburgh Synagogue Trial

The jury that found Richard Bowers guilty of all 63 federal charges he faces in connection with the 2018 Pittsburgh synagogue shooting found him eligible for the death penalty on July 13, 2023. Jurors deliberated for about two hours before finding...



---

**SECRECY**

*Jun 21, 2023*

### 70 Years After Their Executions, Rosenberg Sons Still Looking to Clear Mother's Name

Seventy years after the executions of Julius and Ethel Rosenberg, their sons, Michael and Robert Meeropol, have renewed their efforts to clear their mother s name. Just ten and six years old when their parents were executed for federal charges of ...

Exhibit 57 - 3



---

**VICTIMS FAMILIES**

*May 30, 2023*

## Victims' Families are Divided Over Death Penalty as Bowers Trial Begins

On May 25, 2023, 12 death-qualified jurors and six alternates were selected in the federal capital trial of Robert Bowers, who is charged with killing 11 worshippers at a Pittsburgh synagogue in 2018. Prosecutors struck all the Black, Hispanic, an...



---

**RELIGION**

*Apr 12, 2023*

## EDITORIALS: The Pittsburgh Post–Gazette Calls on the Justice Department to 'Drop the Death Penalty' in Synagogue Shooting

On April 9, 2023, the Pittsburgh Post-Gazette called upon Attorney General Merrick Garland to withdraw the government s pursuit of the death penalty and accept a plea deal for a mandatory life sentence in the mass shooting at a synagogue in Pittsb...



---

**SENTENCING DATA**

*Mar 22, 2023*

## Federal Government Announces Withdrawal of Intent to Seek Death in North Dakota Case

On March 14, 2023, at the direction of Attorney General Merrick Garland (pictured), the U.S. Attorney for the District of North Dakota withdrew the notice of intent to seek a death sentence for Alfonso Rodriguez, Jr., who had been convicted in 200...

Exhibit 57 - 4



---

**FEDERAL DEATH PENALTY**

*Mar 13, 2023*

### Federal Jury Returns a Life Verdict in New York for Sayfullo Saipov

On March 13, 2023, a jury in the federal death penalty prosecution of Sayfullo Saipov in New York City concluded its deliberations without coming to a unanimous decision regarding sentencing. As a result, Saipov will be sentenced to life in prison…



---

**FEDERAL DEATH PENALTY**

*Feb 02, 2023*

### Penalty Phase Scheduled to Begin in Federal Capital Trial of Sayfullo Saipov

Sayfullo Saipov (pictured) was found guilty in federal court on January 26, 2023 of killing eight people on a New York City bike path in 2017 by driving a truck into a crowd of people. He will now likely be the first person to face a federal capit…



---

**HUMAN RIGHTS**

*Jan 19, 2023*

### Lawsuit Alleges Federal Death–Row Conditions Violate U.S. Constitution and Human Rights Treaties

A Russian national on the U.S. federal death row has filed a civil rights lawsuit challenging the constitutionality of the federal government s use of automatic and prolonged solitary confinement to house individuals sentenced to death. T…

Exhibit 57 - 5



VIEW MORE

**NEWS**
9/11 Victims  Family Members, Members of Congress Urge Biden Administration to Abandon Plea Negotiations with Guantanamo Detainees

**STORIES**
Capital Case Roundup — Death Penalty Court Decisions the Week of March 15, 2021

**IN THIS SECTION**

Background on the Federal Death Penalty

List of Federal Death Row Prisoners

Case Summaries for Modern Federal Death Sentences

Executions Under the Federal Death Penalty

Additional Resources

**REPORT**
The Federal Government Restarts Federal Executions Amid Procedural Concerns and a Pandemic

READ MORE



Exhibit 57 - 6

## 2020 and 2021 Federal Executions Updates

*Litigation updates for the scheduled federal executions*

## Geographic Disparity in the Federal Death Penalty

**DPIC IN-DEPTH REPORTS**

Racial Disparities in Federal Death Penalty Prosecutions 1988 – 1994

READ MORE



Exhibit 57 - 7



Exhibit 57 - 8

# Join our mailing list

*Enter your email address*

**SUBSCRIBE**





| POLICY ISSUES | ⌄ |
|---|---|
| **FACTS & RESEARCH** | ⌄ |
| **EXECUTIONS** | ⌄ |
| **DEATH ROW** | ⌄ |
| **STATE & FEDERAL INFO** | ⌄ |
| **ABOUT** | ⌄ |

**FOR THE MEDIA**

| RESOURCES | ⌄ |
|---|---|
| **FOR EDUCATORS** | ⌄ |

**FACT SHEET**

**DONATE**

Death Pena ty Information Center

1701 K Street NW, Suite 205

Washington, DC 20006

Phone: 202-289-2275

Emai : dpic@deathpena tyinfo.org

Privacy Po icy    ©2023 Death Pena ty Information Center

Exhibit 57 - 9

# Exhibit 58



APR - 4 2019

Clerk, U.S. District Court
Texas Eastern

General Order No. 19-06

**THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS**

## GENERAL ORDER ADOPTING THE AMENDED PLAN FOR THE RANDOM SELECTION OF JURORS

It is hereby ORDERED that the attached Amended Plan for the Random Selection of Jurors, having been approved by the judges of the court, is ADOPTED. The Plan as amended, shall now be forwarded to the Fifth Circuit Judicial Counsel for review and approval.

**So ORDERED and SIGNED this 4th day of April, 2019.**

RODNEY GILSTRAP
Chief Judge

Exhibit 58 - 1

## THE JUDICIAL COUNCIL OF THE FIFTH CIRCUIT

*REVIEWING PANEL --- JURY SELECTION PLAN*

The Eastern District of Texas adopted amendments to its Jury Selection Plan. The amended Plan, having been reviewed by the Reviewing Panel of this Circuit, is approved.

Entered for the Reviewing Panel at New Orleans, Louisiana, this 14th day of May 2019.

Theodore P. Cominos
Secretary to the Judicial Council
of the Fifth Circuit

The following judges comprised and acted as the Reviewing Panel:

(a)    The Judicial Council of the Fifth Circuit:

Carl E. Stewart
Priscilla R. Owen
Edith H. Jones
Jerry E. Smith
Catharina Haynes
James E. Graves, Jr.
Stephen A. Higginson
Don R. Willett
James C. Ho
Stuart Kyle Duncan
Carl J. Barbier
John W. deGravelles
Elizabeth E. Foote
Debra M. Brown
Halil S. "Sul" Ozerden
David C. Godbey
Lee H. Rosenthal
Rodney Gilstrap
Philip R. Martinez

(b)    United States District Judge:

Rodney Gilstrap
Chief United States District Judge
Eastern District of Texas

Exhibit 58 - 2

Revised April 4, 2019



**THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
AMENDED PLAN FOR THE RANDOM SELECTION
OF JURORS IN ALL DIVISIONS**

Pursuant to the Jury Selection and Service Act of 1968, as amended, 28 U.S.C. § 1861 et seq. ("the Act"), the following Amended Plan ("the Plan") for the Random Selection of Jurors is adopted by this Court superseding the plan now in effect, subject to approval of this Plan by a reviewing panel of members of the Fifth Judicial Circuit Council and to such rules and regulations as many as may be adopted from time to time by the Judicial Conference of the United States.

*Plan for the Random Selection of Jurors*                                        Page **1** of **15**

Exhibit 58 - 3

Revised April 4, 2019

## TABLE OF CONTENTS

Section 1. Declaration of Policy ................................................................................. 3

Section 2. Application of Plan ................................................................................... 3

Section 3.  Management and Supervision of Jury Selection Process ........................... 4

Section 4.  Source of Names of Prospective Jurors ................................................... 4

Section 5. Selecting of Names of Prospective Jurors from Source Lists………………………4

Section 6.  Master Jury Wheels.................................................................................. 5

Section 7.  Qualification for Service.......................................................................... 6

    a.      Disqualified for Jury Service ....................................................... 7

    b.      Exemptions from Jury Service (Barred From Service)....................... 8

    c.      Excuses from Jury Service ........................................................ 8

    d.      Individual Excuses from Jury Service.......................................... 9

    e.      Jurors Excluded by the Court .................................................... 9

Section 8. Qualified Jury Wheel ............................................................................. 10

Section 9.  Drawing of Names from Qualified Jury Wheels; The Issuance of Summonses and
Disclosure of Names ............................................................................................. 11

    a.      Drawing of Names ................................................................. 11

    b.      Issuance of Summonses .......................................................... 11

    c.      Petit Jury Panels ................................................................... 11

    d.      Grand Jury Panels.................................................................. 12

    e.      Disclosure of Names .............................................................. 13

Section 10.  General Provisions ............................................................................. 15

Exhibit 58 - 4

Revised April 4, 2019

## Section 1. Declaration of Policy

It is the policy of this Court that all litigants in this Court entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes.  It is further the policy of this Court that all citizens shall have the opportunity to be considered for service on grand and petit juries and shall have an obligation to serve as jurors when summoned for that purpose.

No citizen shall be excluded from service as a grand or petit juror in this Court on account of race, color, religion, sex, national origin, or economic status.

## Section 2. Application of Plan

The Eastern District of Texas is hereby divided for jury selection purposes into six jury divisions.  Each county within the district is included in one of the following jury divisions:

Beaumont Division:        Hardin, Jasper, Jefferson, Liberty, Newton and Orange Counties.

Lufkin Division:          Angelina, Houston, Nacogdoches, Polk, Sabine, San Augustine, Shelby, Trinity and Tyler Counties.

Marshall Division:        Camp, Cass, Harrison, Marion, Morris and Upshur Counties.

Sherman Division:         Delta, Fannin, Hopkins, Lamar, Collin, Cooke, Denton and Grayson Counties.

Texarkana Division:       Red River, Bowie, Franklin and Titus Counties.

Tyler Division:           Anderson, Cherokee, Gregg, Henderson, Panola, Rains, Rusk, Smith, Van Zandt, and Wood Counties.

*Plan for the Random Selection of Jurors*                                        Page **3** of **15**

Exhibit 58 - 5

Revised April 4, 2019

**Section 3.  Management and Supervision of Jury Selection Process**

The Clerk of Court shall manage the jury selection process.  The Clerk shall act under the supervision and control of the judges of this district.

The district, by adoption of this Plan, has elected to operate the jury selection process under a fully automated, electronic data processing system.

**Section 4.  Source of Names of Prospective Jurors**

Texas law provides for a statutory registration of voters of the age of 18 years and upwards, which is uniform in all of the counties.  Because it is not clear that voter registration lists (the Master Registration Lists maintained by the Secretary of the State of Texas of all persons registered to vote in the most recent federal general election) alone provide litigants in the divisions in the Eastern District of Texas with a fair cross section of relevant communities (divisions), the Court finds that in order to foster the statutory policies of 28 U.S.C. §§ 1861 and 1862 in this district, it is necessary pursuant to 28 U.S.C. § 1862(b)(2) to supplement these lists of registered voters with lists of licensed drivers from all counties within each division (aka "licensed drivers lists") using an automated system that will eliminate, as reasonably as possible, any name duplications.

Accordingly, the names of all grand and petit jurors serving on or after the time provided in this plan shall be selected at random from master jury wheels which are filled using names from this combined source list (Master Source List).

**Section 5.  Selecting of Names of Prospective Jurors from Source Lists**

Random selections for filling divisional master jury wheels from the Master Source Lists may be made using a computer-generated random selection process to select the required number of names from the Master Source List in order to insure that (a), each

*Plan for the Random Selection of Jurors*                                    Page **4** of **15**

Exhibit 58 - 6

Revised April 4, 2019

county within the division is substantially proportionally represented in the divisional master jury wheel, based on the number of registered voters in each county; (b), that the mathematical odds of any single name being picked are substantially equal, and (c), that the possibility of human discretion or choice affecting the selection of any individual's name is eliminated.

## Selection 6.  Master Jury Wheels

The Clerk or any other person authorized by the Court shall establish and maintain one Master Jury Wheel for each jury division.  The physical form of records on which names for the Master Jury Wheel are kept may include such electronic data storage devices as magnetic tapes or magnetic disk files.   The Master Jury Wheel shall contain the names, or numbers corresponding to names on file, of those persons selected at random for prospective jury duty.

The minimum number of names, or numbers corresponding to names, to be placed in each Master Wheel shall be at least one thousand.  The Clerk shall insure that at all times a sufficient number of names are contained in each of the wheels so that grand and petit jury panels may be drawn at any time required by the Court.  Such additional names shall be selected at random from the Master Source Lists in compliance with the Act and this Plan.

Each master jury wheel shall be emptied and refilled every two years, following federal general elections, as soon as complete and current voter registration and licensed drivers lists are available from the Secretary of the State of Texas and the Texas Department of Motor Vehicles following such federal general elections.  The emptying (removal) of unused names in the wheels shall be accomplished by July 1 following the general election unless the Court should find it necessary to authorize the Clerk to extend that time.

*Plan for the Random Selection of Jurors*                                                    Page **5** of **15**

Exhibit 58 - 7

Revised April 4, 2019

As required by the Judicial Conference of the United States, a report shall be prepared after each periodic refilling of each master jury wheel giving general data relating to master jury wheels with an analysis of race and sex of prospective jurors based on juror qualification forms returned during the qualifying process.  Such report shall not be made until six months after summoning the first panels from the jury wheels in order to provide sufficient data to complete the analysis.  For the purposes of comparing jury wheel demographics with Bureau of Census data, the most recent estimates of citizen population provided by the Administrative Office of the Untied States Courts shall be used.  The Clerk shall have the capacity to prepare an alphabetical list of the names drawn, which list shall not be disclosed to any person(s) except pursuant to this Plan and the Act.

Upon completion of the random selection of names for the divisions' master jury wheels, the individual(s) who performed the task of randomly selecting the names pursuant to this Plan shall prepare and execute a certificate detailing their procedures and reporting on the performance and completion of the assignment and transmit promptly to the Chief Judge of the district.

**Section 7.  Qualification for Service**

Any judge of this district shall determine whether a person is disqualified, exempt, excused, or excluded from inclusion on a jury panel or from service as a juror while presiding over his or her docket.  The Clerk and other authorized deputy clerks of this Court in the management of the jury selection process and by compliance with the criteria set out below in this Plan shall determine at the time the qualified wheels are being established whether a person is disqualified, exempt, or excused from inclusion on the qualified wheels.  Such determinations

Revised April 4, 2019

shall be made on the basis of information provided on the juror qualification form and other competent information.

Whenever a person is disqualified, excused, exempt, or excluded from jury service, the Clerk shall note in the space provided on the juror qualification form the specific reason therefor. If a person did not appear in response to a summons, such fact shall be noted on therefor.  If a person did not appear in response to a summons, such fact shall be noted on the juror list.

a.  Disqualified for Jury Service

Any person shall be deemed qualified to serve on grand and petit juries in this district court unless he or she—

(1)    is not a citizen of the United States eighteen years old who has resided for a period of one year within the judicial district;

(2)    is unable to read, write, and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form;

(3)    is unable to speak the English language;

(4)    is incapable by reason of mental or physical infirmity to render satisfactory jury service;

(5)    has a charge pending against him or her, or has been convicted in a state or federal court of record, of a crime punishable by imprisonment for more than one year and his or her civil rights have not been restored.

*Plan for the Random Selection of Jurors*                                                  Page **7** of **15**

Exhibit 58 - 9

Revised April 4, 2019

b.  Exemptions from Jury Service (Barred From Service)

Under the provisions of 28 U.S.C. § 1863(b)(6), the Court hereby finds that exemptions from jury service of the following groups of persons is in the public interest and would not be inconsistent with 28 U.S.C. §§ 1861 and 1862.  Accordingly, persons employed on a full-time basis in any of the following groups are barred from jury service:

(1)    members in active service in the Armed Forces of the United States;

(2)    members of the fire or police departments of any state, district, territory, possession, or subdivision thereof;

(3)    public officers in the executive, legislative, or judicial branches of the Government of the United States, or any state, district, territory, or possession or subdivision thereof, who are actively engaged in the performance of official duties.  "Public officer" shall mean a person who is either elected to a public office or who is directly appointed by a person elected to public office.

c.  Excuses from Jury Service

This District Court, pursuant to 28 U.S.C. § 1863(b)(5)(A), and by adoption of this Plan, finds that the following persons must be excused from jury service upon individual request:

(1)    a person who is over 70 years of age;

(2)    a person who has served in federal court as a grand or petit juror within the last two years, 28 U.S.C. § 1866(3);

(3)    a person who serves as a volunteer (without compensation) in an official capacity as a firefighter or a member of a rescue squad or ambulance crew for a public agency, 28 U.S.C. § 1865(b)(5)(B).  A "public agency" for this

*Plan for the Random Selection of Jurors*                                              Page **8** of **15**

Exhibit 58 - 10

Revised April 4, 2019

purpose means the United States, any state of the United States, the District of Columbia, Puerto Rico, the Virgin Islands, Guam, American Samoa, or other territory of the United States, or any unit of local government, department, or instrumentality of any of the foregoing; and

(4)    a full-time student in a secondary school, college, university or technical school.

d.   Individual Excuses from Jury Service

In addition to the members of classes or groups subject to excuse from jury service for the life of the jury wheel, any person summoned for jury service may be temporarily excused from service during the session for which the juror was summoned based upon a showing of undue hardship or extreme inconvenience.  28 U.S.C. § 1866(c)(1).

The names of those jurors who have been excused from a reporting on a panel as summoned due to hardship or extreme inconvenience reasons will be put back in the qualified jury wheel where they will be subject to subsequent random selection, unless the Court should rule otherwise at the time of granting the excuse and order that the juror be summoned again for jury service on a future date.

e.   Jurors Excluded by the Court

Pursuant to the provisions of 28 U.S.C. § 1866, any juror who has been summoned for jury service may be excluded by the judge in open court upon the following ground:

(1)    that such person may be unable to render impartial jury service or that his or her service as a juror would be likely to disrupt the proceedings; or

(2)    excluded upon peremptory challenge as provided by law; or

(3)    excluded pursuant to the procedure specified by law upon a challenge by any

party for good cause shown; or

(4)    excluded upon determination by the Court that his or her service as a juror would be likely to threaten the secrecy of the proceedings, or otherwise adversely affect the integrity of jury deliberations.

Any person excluded from a particular jury under clause (1), (2), (3) of this section shall be eligible to sit on another jury if the basis for the person's initial exclusion would not be relevant to the person's ability to serve on such other jury.

**Section 8. Qualified Jury Wheel**

The Clerk shall maintain or cause to be maintained a separate qualified jury wheel for each jury division in this district, and shall place in such wheels the names of all persons drawn from the Master Jury Wheel of the relevant jury division who are found not disqualified, exempt, or excused pursuant to this Plan. The Clerk shall insure that at all times a sufficient number of names are contained in each of such wheels so that grand and petit jury panels may be drawn at any time required by the Court.

Each time a division's master wheel is refilled, the qualified wheel then in use shall be emptied as soon as the process of qualifying jurors from the new Master Wheel has produced a sufficient number of qualified jurors to begin supplying the Court's needs.

The emptying (removal) of unused names in the qualified wheels shall be accomplished by July 1 unless the Court should find it necessary to authorize the Clerk to extend that time, so long as in no event shall the Court place qualified jurors from the old qualified wheel under summons once the Court begins the random selection of names from the new master jury wheel for qualification.

Exhibit 58 - 12

Revised April 4, 2019

**Section 9.  Drawing of Names from Qualified Jury Wheels; The Issuance of Summonses and Disclosure of Names**

a.    Drawing of Names

As and when jurors are required by the Court, the Clerk shall draw at random from the qualified jury wheel of the relevant division(s), the required number of names to serve on a petit or grand jury panel.  Each name as it is drawn shall be counted in sequence, starting with number one, until the number of names required to fill the panel are drawn.  These names shall then be arranged alphabetically on a list.  The list may be printed or retained on a computer for future use.  Each list shall also include the person's number, mailing address, and county.  Such a list shall be prepared for each jury panel.

b.    Issuance of Summonses

The Clerk shall cause to be mailed to every person whose name is drawn from the master jury wheel a juror qualification form accompanied by instructions to fill out and return the form duly signed and sworn, to the Clerk by mail within ten days.  Procedures as set forth in the Act, section 1864, shall be followed in securing returns of the completed questionnaires.

Each person drawn for jury service will be served a summons by first-class mail addressed to such person at his or her usual residence or business address.

c.    Petit Jury Panels

Names of all petit jurors drawn to fill a panel as provided in this Plan who are not disqualified, excluded, exempt or excused and who report for jury duty at a session of court, shall be randomly selected by the Clerk for each jury case tried during the session as directed by the Court.

*Plan for the Random Selection of Jurors*                                      Page **11** of **15**

Exhibit 58 - 13

Revised April 4, 2019

When there is an unanticipated shortage of available petit jurors drawn from the qualified jury wheel, the Court may require the marshal to summon a sufficient number of petit jurors selected at random from the Master Source Lists in a manner ordered by the Court consistent with sections 1861 and 1862 of the Act.

d.  Grand Jury Panels

There will ordinarily be three grand juries sitting in the Eastern District of Texas; the Beaumont grand jury ordinarily hears cases arising from Hardin, Jasper, Jefferson, Liberty, Newton, Orange, Polk, Sabine, San Augustine, Trinity and Tyler Counties; the Sherman grand jury ordinarily hears cases arising from Collin, Cook, Delta, Denton, Fannin, Grayson, Hopkins, Lamar and Red River Counties; and the Tyler grand jury ordinarily hears cases arising from Anderson, Angelina, Bowie, Camp, Cass, Cherokee, Franklin, Gregg, Harrison, Henderson, Houston, Marion, Morris, Nacogdoches, Panola, Rains, Rusk, Shelby, Smith, Titus, Upshur, Van Zandt, and Wood Counties.  When a particular grand jury is not in session but one of the other grand juries is, the Court may direct that business which would normally come before the grand jury not in session will be handled by a grand jury currently in session.  In the interest of achieving administrative economics, the Court may at any time direct that one grand jury panel comprised of jurors drawn from the qualified jury wheel of only one grand jury division shall serve the entire judicial district.

The Clerk, upon Court order, will assemble a grand jury panel by randomly drawing or causing to be drawn, names from the appropriate qualified wheel(s) for a grand jury.  The same selection process as outlined above for petit jury panels shall be used for grand jury panels. When a grand jury panel is drawn from the qualified wheels of more than one jury division, names shall be drawn in a proportion to each division's percentage of registered voters in the

*Plan for the Random Selection of Jurors*                                 Page **12** of **15**

Exhibit 58 - 14

district as a whole.  No list shall contain less than three names from each appropriate division.

When there is an unanticipated shortage of available grand jurors drawn from the qualified jury

wheel(s), the Court may require the marshal to summon a sufficient number of grand jurors

selected at random from the Master Source Lists in a manner ordered by the Court consistent

with sections 1861 and 1862 of the Act.

   e.   <u>Disclosure of Names</u>

The lists of all names drawn from any qualified wheel to fill a petit or grand jury panel

shall not be disclosed and made available to parties and the public until jurors have been

summoned, have responded, and have been found to be qualified and available to serve based on

information secured from the qualification form sent with the summonses.  28 U.S.C. §

1863(b)(7).

   (1)   <u>Disclosure of Petit Jury Lists</u>

The lists of names of prospective petit jurors shall be disclosed only by the courtroom

deputy at the time of voir dire proceedings, and not prior to that time.  All such lists shall be

returned to the courtroom deputy at the conclusion of such voir dire proceedings.

These restrictions shall not limit the authority of the Chief Judge of this district, or any

judicial officer of this district while presiding over his or her respective docket, to release any

such list of names at an earlier time where such earlier release is consistent with this Plan or

other pertinent statute.

   (2)   <u>Grand Jury Panels</u>

The list of names of persons summoned to any court in this district for prospective

grand juror service shall remain confidential.

Revised April 4, 2019

The names of the persons chosen to serve as grand jurors in this district shall remain confidential in the interest of justice until otherwise ordered by the Court. 28 U.S.C. § 1863(b)(7).

(3)    Disclosure of Juror Information to the Media and the Public

A request for disclosure of juror names to the media or public may be made of the judge to whom the case is assigned in accordance with the above provisions relating to the timing of the release of juror information.  The Clerk shall not release juror names to the media or public unless specifically authorized by the assigned judge.

(4)    Disclosure of Jury Selection Records Under 28 U.S.C. § 1867(f)

The contents of records or papers used by the jury commission or Clerk in connection with the jury selection process shall not be disclosed, except pursuant to the District Court Plan or as may be necessary in the preparation or presentation of a motion under subsection (a), (b), or (c) of this section, until after the master jury wheel has been emptied and refilled pursuant to section 1863(b)(4) of this title and all persons selected to serve as jurors before the master wheel was emptied have completed such service.  The parties in a case shall be allowed to inspect, reproduce, and copy such records or papers at all reasonable times during the preparation and pendency of such a motion.  Any person who discloses the contents of any record or paper in violation of this subsection may be fined not more than $1,000 or imprisoned not more than one year, or both.

Revised April 4, 2019

**Section 10.  General Provisions**

There is incorporated herein by reference as an integral portion of this Plan, the provisions of Section 1861 and 1871, both inclusive, and Section 1878 of Title 28, United States Code, together with all amendments of said sections which may hereafter be made, and all laws hereafter enacted related to grand and petit juries, and trial by jury in the United States.

# Exhibit 59

GENERAL ORDER 09-7

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS

### GENERAL ORDER AMENDING LOCAL RULES

Based on public commentary received regarding General Order 09-6 and the recommendations of the Local Rules Advisory Committee, the Local Rules are amended as follows[1]:

1.    **LOCAL RULE CV-7          Motions Practice**

* * * * *

(f) **Reply Briefs.** Unless otherwise directed by the presiding judge, a party who has filed an opposed motion may serve and file a reply brief responding to issues raised in the response within 5 days from the date the response is served. <u>See Local Rule CV-6 (three days added to the prescribed period)</u>. A surreply responding to issues raised in the reply may be served and filed within 5 days from the date the reply is served. <u>See Local Rule CV-6 (three days added to the prescribed period)</u>. The court need not wait for the reply or sur-reply before ruling on the motion. Absent leave of court, no further submissions on the motion are allowed..

2.    **LOCAL RULE CV-30          Depositions** Upon **Oral Examination**

In cases where there is a neutral non-party witness or a witness whom all parties must examine, the time limit shall be divided equally among plaintiffs and defendants. Depositions may be taken after 5:00 p.m., on weekends, or holidays with approval of a judge or by agreement of counsel. Unless permitted by Fed.R.Civ.P. ~~30(d)(1)~~ <u>30(c)(2)</u>, a party may not instruct a deponent not to answer a question. Objections to questions during the oral deposition are limited to "Objection, leading" and "Objection, form." Objections to testimony during the oral deposition are limited to "Objection, nonresponsive." These objections are waived if not stated as phrased during the oral deposition. All other objections need not be made or recorded during the oral deposition to

---

[1]New language appears in <u>underlined</u> text; deleted language appears in ~~strikeout~~ text.

1

Exhibit 59 - 1

be later raised with the court.  The objecting party must give a clear and concise explanation of an objection if requested by the party taking the oral deposition, or the objection is waived.

3.    **LOCAL RULE CV-63**    **Inability of a Judge to Proceed; Reassignment of Actions after Recusal or Disqualification**

The amendments to Local Rule CV-63(b) specified in General Order 09-6 have been withdrawn by the court.

The public notice and comment period for General Order 09-6 has expired.  Therefore, the local rule amendments contained in General Order 09-6[2] and this general order are effective as of the date of this order.

Signed this  26  day of March, 2009.

DAVID FOLSOM
Chief Judge

---

[2]As mentioned above, the approved amendments in General Order 09-6 do not include any changes to Local Rule CV-63(b).

2

Exhibit 59 - 2

**Appendix E**

## PLAN FOR THE RANDOM SELECTION OF JURORS

## U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF TEXAS

as amended March 26, 2009

Pursuant to the Jury Selection and Service Act of 1968, as amended, 28 U.S.C. § 1861 et seq.("the Act"), the following Plan for the Random Selection of Jurors is adopted by this Court superseding the plan now in effect, subject to approval of this Plan by a reviewing panel of members of the Fifth Judicial Circuit Council and to such rules and regulations as may be adopted from time to time by the Judicial Conference of the United States.

1

Exhibit 59 - 3

Section 1.    Declaration of Policy
Section 2.    Application of Plan
Section 3.    Management and Supervision of Jury Selection Process
Section 4.    Source of Names of Prospective Jurors
Section 5.    Selecting of Names of Prospective Jurors from Source Lists
Section 6.    Master Jury Wheels
Section 7.    Qualification for Service
    a.    Disqualified for Jury Service
    b.    Exemptions from Jury Service (Barred from Service)
    c.    Excuses from Jury Service
    d.    Individual Excuses from Jury Service
    e.    Jurors Excluded by the Court
Section 8.    Qualified Jury Wheel
Section 9.    Drawing of Names from Qualified Wheels; The Issuance of Summonses; and Disclosure of Names
    a.    Drawing of Names
    b.    Issuance of Summonses
    c.    Petit Jury Panels
    d.    Grand Jury Panels
    e.    Disclosure of Names
Section 10.    Definitions and General Provisions

* * * * *

## Section 1.  Declaration of Policy

It is the policy of this Court that all litigants in this Court entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes. It is further the policy of this Court that all citizens shall have the opportunity to be considered for service on grand and petit juries and shall have an obligation to serve as jurors when summoned for that purpose.

No citizen shall be excluded from service as a grand or petit juror in this Court on account of race, color, religion, sex, national origin, or economic status.

## Section 2.  Application of Plan

The Eastern District of Texas is hereby divided for jury selection purposes into six jury divisions. Each county within the District is included in one of the following jury divisions:

Beaumont Division:    Hardin, Jasper, Jefferson, Liberty, Newton and Orange Counties.

Marshall Division:    Camp, Cass, Harrison, Marion, Morris and Upshur Counties.

Sherman Division:    Delta, Fannin, Hopkins, Lamar, Collin, Cooke, Denton and Grayson Counties.

2

Exhibit 59 - 4

Texarkana Division:   Red River, Bowie, Franklin and Titus Counties.

Tyler Division:   Anderson, Cherokee, Gregg, Henderson, Panola, Rains, Rusk, Smith, Van Zandt and Wood Counties.

Lufkin Division:   Angelina, Houston, Nacogdoches, Polk, Sabine, San Augustine, Shelby, Trinity and Tyler Counties.

Section 3.  Management and Supervision of Jury Selection Process

The clerk of the court shall manage the jury selection process.  The clerk shall act under the supervision and control of the judges of this district.

This district, by adoption of this plan, has elected to operate the jury selection process under a fully automated, electronic data processing system.

Section 4.  Source of Names of Prospective Jurors

Texas law provides for a statutory registration of voters of the age of 18 years and upwards, which is uniform in all of the counties. Voter registration lists represent a fair cross section of the community in the Eastern District of Texas. Accordingly, the names of all grand and petit jurors serving on or after the time provided in this plan shall be selected at random from the Master Registration Lists maintained by the Secretary of the State of Texas of all persons registered to vote in the most recent federal general election held every two years.

The court finds that it is not necessary in this district to prescribe some other source or sources of names in addition to the official lists of registered voters in order to foster the policy and protect the rights secured by the provisions of the Act.

Section 5.   Selecting of Names of Prospective Jurors from Source Lists

For each jury division, names of prospective jurors shall be determined by the following procedure.  The voter registration lists shall be arranged numerically by voter certificate number within the county and the counties shall be arranged alphabetically to form one continuous list of names for each division.  Each name shall then be numbered consecutively to form a Master Source List.

Random selections from the Master Source Lists may be made using a computer-generated random selection process to select the required number of names from the Master Source List in order to insure that (a), any group of names chosen will represent, in substantially correct proportions, the names on all voter registration lists of all counties comprising the master jury wheel; (b), that the mathematical odds of any single name being picked are substantially equal, and (c), that the possibility of human discretion or choice affecting the selection of any individual's name is eliminated.

Section 6.   Master Jury Wheels

The clerk or any other person authorized by the court shall establish and maintain one

3

Exhibit 59 - 5

Master Jury Wheel for each jury division. The physical form of records on which names for the Master Jury Wheel are kept may include such electronic data storage devices as magnetic tapes or magnetic disk files. The Master Jury Wheel shall contain the names, or numbers corresponding to names on file, of those persons selected at random for prospective jury duty.

The minimum number of names, or numbers corresponding to names, to be placed in each Master Jury Wheel shall be at least one thousand. The clerk shall insure that at all times a sufficient number of names are contained in each of the wheels so that grand and petit jury panels may be drawn at any time required by the court. Such additional names shall be selected at random from voter registration lists in compliance with the Act and this Plan.

Each master jury wheel shall be emptied and refilled every two years, immediately following federal general elections and as soon as complete and current voter registration lists are available from the Secretary of the State of Texas following such federal general elections. The emptying (removal) of unused names in the wheels shall be accomplished by July 1 unless the court should find it necessary to authorize the clerk to extend that time.

As required by the Judicial Conference of the United States, a report shall be prepared after each periodic refilling of each master jury wheel giving general data relating to the master jury wheel with an analysis of race and sex of prospective jurors based on juror qualification forms returned during the qualifying process. Such report shall not be made until six months after summoning the first panels from the jury wheels in order to provide sufficient data to complete the analysis. For the purposes of determining proportional representation in the master jury wheels, data from the most recent Bureau of Census information shall be used for comparisons. The clerk shall have the capacity to prepare an alphabetical list of the names drawn, which list shall not be disclosed to any person except pursuant to this Plan and the Act.

Upon completion of the random selection of names for the divisions' master jury wheels, the individual(s) who performed the task of randomly selecting the names pursuant to this Plan shall prepare and execute a certificate detailing their procedures and reporting on the performance and completion of the assignment and transmit the same promptly to the chief judge of the district.

A general notice shall be posted in the clerk's office and on the court's website that explains the process by which names for jury wheels are randomly and periodically drawn.

Section 7.    Qualification for Service

Any judge of this district shall determine whether a person is disqualified, exempt, excused, or excluded from inclusion on a jury panel or from service as a juror while presiding over his or her docket. The clerk and other authorized deputy clerks of this court in the management of the jury selection process and by compliance with the criteria set out below in this Plan shall determine at the time the qualified wheels are being established whether a person is disqualified, exempt, or excused from inclusion on the qualified wheels. Such determinations shall be made on the basis of information provided on the juror qualification form and other competent information.

Whenever a person is disqualified, excused, exempt, or excluded from jury service, the

4

Exhibit 59 - 6

clerk shall note in the space provided on the juror qualification form the specific reason therefor. If a person did not appear in response to a summons, such fact shall be noted on the juror list.

a.    Disqualified for Service

Any person shall be deemed qualified to serve on grand and petit juries in this district court unless he or she—

(1)    is not a citizen of the United States;

(2)    is unable to read, write, and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form;

(3)    is unable to speak the English language;

(4)    is incapable, by reason of mental or physical infirmity, to render satisfactory jury service;

(5)    has a charge pending against him or her, or has been convicted in a State or Federal court of record of a crime punishable by imprisonment for more than one year and his or her civil rights have not been restored;

(6)    is under eighteen years of age; or

(7)    has not been a resident of the judicial district for at least a year.

b.    Exemptions from Jury Service (Barred from Service)

Under the provisions of 28 U.S.C. § 1863 (b)(6), the court hereby finds that exemption of the following groups of persons is in the public interest and would not be inconsistent with 28 U.S.C. §§ 1861 and 1862. Accordingly, members of the following groups are barred from jury service:

(1)    members in active service in the Armed Forces of the United States;

(2)    members of the fire or police departments of any State, district, territory, possession, or subdivision thereof;

(3)    public officers in the executive, legislative, or judicial branches of the Government of the United States, or any State, district, territory, or possession or subdivision thereof, who are actively engaged in the performance of official duties. "Public officer" shall mean a person who is either elected to a public office or who is directly appointed by a person elected to public office.

c.    Excuses from Jury Service

This district court, pursuant to 28 U.S.C. § 1863 and by adoption of this Plan, finds that

5

Exhibit 59 - 7

the following persons must be excused from jury service upon individual request:

    (1)    A person who is over 70 years of age;

    (2)    A person who has served in federal court as a grand or petit juror within the last two years (see 28 U.S.C. § 1866(e));

    (3)    A person who serves as a volunteer (without compensation) in an official capacity as a firefighter or a member of a rescue squad or ambulance crew for a public agency. A "public agency" for this purpose means the United States, any State of the United States, the District of Columbia, Puerto Rico, the Virgin Islands, Guam, American Samoa, or other territory of the United States, or any unit of local government, department, or instrumentality of any of the foregoing; and

    (4)    A full-time student in a secondary school, college, university or technical school.

d.    <u>Individual Excuse from Jury Service</u>

In addition to the members of classes or groups subject to excuse from jury service, any person summoned for jury service may be excused from service during the session for which the juror was summoned by the judge presiding over his or her respective docket or by the clerk based upon a showing of undue hardship or extreme inconvenience.

The names of those jurors who have been excused from a panel for hardship or extreme inconvenience reasons will be put back in the qualified jury wheel where they will be subject to subsequent random selection, unless the court should rule otherwise at the time of granting the excuse.

e.    <u>Jurors Excluded by the Court</u>

Pursuant to the provisions of 28 U.S.C. § 1866, any juror who has been summoned for jury service may be excluded by the judge in open court upon the following grounds:

    (1)    that such person may be unable to render impartial jury service or that his or her service as a juror would be likely to disrupt the proceedings; or

    (2)    excluded upon peremptory challenge as provided by law; or

    (3)    excluded pursuant to the procedure specified by law upon a challenge by any party for good cause shown; or

    (4)    excluded upon determination by the court that his or her service as a juror would be likely to threaten the secrecy of the proceedings, or otherwise adversely affect the integrity of jury deliberations.

Any person excluded from a particular jury under clause (1), (2), or (3) of this section

Exhibit 59 - 8

shall be eligible to sit on another jury if the basis for the person's initial exclusion would not be relevant to the person's ability to serve on such other jury.

Section 8.  Qualified Jury Wheel

The clerk shall maintain or cause to be maintained a separate qualified jury wheel for each jury division in the district, and shall place in such wheels the names of all persons drawn from the Master Jury Wheel of the relevant jury division who are found not disqualified, exempt, or excused pursuant to this Plan.  The clerk shall insure that at all times a sufficient number of names are contained in each of such wheels so that grand and petit jury panels may be drawn at any time required by the court.

Each time a jury division's master wheel is refilled, the qualified wheel then in use shall be emptied as soon as the process of qualifying jurors from the new Master Wheel has produced a sufficient number of qualified jurors to begin supplying the court's needs.  The emptying (removal) of unused names in the qualified wheels shall be accomplished by July 1 unless the court should find it necessary to authorize the clerk to extend that time.

Section 9.    Drawing of Names from Qualified Jury Wheels: The Issuance of Summonses: and Disclosure of Names

a.    Drawing of Names

As and when jurors are required by the court the clerk shall draw at random from the qualified jury wheel of the relevant jury division(s), the required number of names to serve on a petit or grand jury panel.  Each name as it is drawn shall be counted in sequence, starting with number one, until the number of names required to fill the panel are drawn.  These names shall then be arranged alphabetically on a list.  The list may be printed or retained on a computer for future use.  Each list shall also include the person's number, mailing address, and county.  Such a list shall be prepared for each jury panel.

b.    Issuance of Summonses

The clerk shall cause to be mailed to every person whose name is drawn from the master jury wheel a juror qualification form accompanied by instructions to fill out and return the form duly signed and sworn, to the clerk by mail          within ten days.  Procedures as set forth in the Act, section 1864, shall be followed in securing returns of the completed questionnaires.

Each person drawn for jury service will be served a summons by first-class mail addressed to such person at his or her usual residence or business address.

c.    Petit Jury Panels

Names of all petit jurors drawn to fill a panel as provided in this Plan who are not disqualified, excluded, exempt or excused and who report for jury duty at a session of court, shall be randomly selected by the clerk for each jury case tried during the session as directed by the court.

7

Exhibit 59 - 9

When there is an unanticipated shortage of available petit jurors drawn from the qualified jury wheel, the court may require the marshal to summon a sufficient number of petit jurors selected at random from the voter registration lists in a manner ordered by the court consistent with sections 1861 and 1862 of the Act.

d.    Grand Jury Panels

There will ordinarily be three grand juries sitting in the Eastern District of Texas; the Beaumont grand jury ordinarily hears cases arising from the counties of Hardin, Jasper, Jefferson, Liberty, Newton, Orange, Polk, Sabine, San Augustine, Trinity, and Tyler counties; the Sherman grand jury ordinarily hears cases arising from the counties of Collin, Cook, Delta, Denton, Fannin, Grayson, Hopkins, Lamar and Red River counties; and the Tyler grand jury ordinarily hears cases arising from the remaining counties of the district. When a particular grand jury is not in session but one of the other grand juries is, the court may direct that business which would normally come before the grand jury not in session will be handled by a grand jury currently in session. In the interest of achieving administrative economies, the court may at any time direct that one grand jury panel comprised of jurors drawn from the qualified jury wheel of only one jury division shall serve the entire judicial district.

The clerk, upon court order, will assemble a grand jury panel by randomly drawing or causing to be drawn, names from the appropriate qualified wheel(s) for a grand jury. The same selection process as outlined above for petit jury panels shall be used for grand jury panels. When a grand jury panel is drawn from the qualified wheels of more than one jury division, names shall be drawn in a proportionately appropriate number depending on the number of names of registered voters on the source list when the wheels were first filled. No list shall contain less than three names from each appropriate division.

When there is an unanticipated shortage of available grand jurors drawn from the qualified jury wheel(s), the court may require the marshal to summon a sufficient number of grand jurors selected at random from the voter registration lists in a manner ordered by the court consistent with sections 1861 and 1862 of the Act.

e.    Disclosure of Names

The lists of all names drawn from any qualified wheel to fill a petit or grand jury panel shall not be disclosed and made available to parties and the public until jurors have been summoned, have responded, and have been found to be qualified and available to serve based on information secured from the qualification form sent with the summonses.

(1)    Disclosure of Petit Jury Lists.  The lists of names of prospective petit jurors shall be disclosed only by the Courtroom Deputy at the time of voir dire proceedings, and not prior to that time. All such lists shall be returned to the Courtroom Deputy at the conclusion of such voir dire proceedings. These restrictions shall not limit the authority of the Chief Judge of this District, or any judicial officer of this District while presiding over his or her respective docket, to release any such list of names at an earlier time where such earlier release is consistent with this Plan or other pertinent statute.

(2)    Grand Jury Panels. The list of names of persons summoned to any court in this

8

Exhibit 59 - 10

District for prospective grand juror service shall remain confidential. The names of persons chosen to serve as grand jurors in this District shall remain confidential in the interest of justice until otherwise ordered by the Court 28 U.S.C. § 1863(b)(7).

(3)      Disclosure of Juror Information to the Media and the Public. A request for disclosure of juror names to the media or public may be made of the judge to whom the case is assigned in accordance with the above provisions relating to the timing of the release of juror information. The clerk shall not release juror names to the media or public unless specifically authorized by the assigned judge.

Section 10.      Definitions and General Provisions

There is incorporated herein by reference as an integral portion of this Plan, the provisions of Sections 1861 to 1871, both inclusive, and Section 1878 of Title 28, United States Code, together with all amendments of said sections which may hereafter be made, and all laws hereafter enacted related to grand petit juries, and trial by jury in the United States.

9

Exhibit 59 - 11

# Exhibit 60

# Filed under seal

# Exhibit 61

# Filed under seal

# Exhibit 62

# Filed under seal

# Exhibit 63

# Filed under seal

# Exhibit 64

# Filed under seal

# Exhibit 65

# Filed under seal

# Exhibit 66

# Filed under seal

# Exhibit 67



# DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS

FIFTH EDITION

## DSM-5™

AMERICAN PSYCHIATRIC ASSOCIATION

Exhibit 67 - 1

6. Has stolen while confronting a victim (e.g., mugging, purse snatching, extortion, armed robbery).

7. Has forced someone into sexual activity.

**Destruction of Property**

8. Has deliberately engaged in fire setting with the intention of causing serious damage.

9. Has deliberately destroyed others' property (other than by fire setting).

**Deceitfulness or Theft**

10. Has broken into someone else's house, building, or car.

11. Often lies to obtain goods or favors or to avoid obligations (i.e., "cons" others).

12. Has stolen items of nontrivial value without confronting a victim (e.g., shoplifting, but without breaking and entering; forgery).

**Serious Violations of Rules**

13. Often stays out at night despite parental prohibitions, beginning before age 13 years.

14. Has run away from home overnight at least twice while living in the parental or parental surrogate home, or once without returning for a lengthy period.

15. Is often truant from school, beginning before age 13 years.

B. The disturbance in behavior causes clinically significant impairment in social, academic, or occupational functioning.

C. If the individual is age 18 years or older, criteria are not met for antisocial personality disorder.

*Specify* whether:

**312.81 (F91.1) Childhood-onset type:** Individuals show at least one symptom characteristic of conduct disorder prior to age 10 years.

**312.82 (F91.2) Adolescent-onset type:** Individuals show no symptom characteristic of conduct disorder prior to age 10 years.

**312.89 (F91.9) Unspecified onset:** Criteria for a diagnosis of conduct disorder are met, but there is not enough information available to determine whether the onset of the first symptom was before or after age 10 years.

Exhibit 67 - 2

*Specify* if:

**With limited prosocial emotions:** To qualify for this specifier, an individual must have displayed at least two of the following characteristics persistently over at least 12 months and in multiple relationships and settings. These characteristics reflect the individual's typical pattern of interpersonal and emotional functioning over this period and not just occasional occurrences in some situations. Thus, to assess the criteria for the specifier, multiple information sources are necessary. In addition to the individual's self-report, it is necessary to consider reports by others who have known the individual for extended periods of time

(e.g., parents, teachers, co-workers, extended family members, peers).

**Lack of remorse or guilt:** Does not feel bad or guilty when he or she does some-

thing wrong (exclude remorse when expressed only when caught and/or facing

punishment). The individual shows a general lack of concern about the negative

consequences of his or her actions. For example, the individual is not remorseful

after hurting someone or does not care about the consequences of breaking rules.

**Callous—lack of empathy:** Disregards and is unconcerned about the feelings of

others. The individual is described as cold and uncaring. The person appears more

concerned about the effects of his or her actions on himself or herself, rather than

their effects on others, even when they result in substantial harm to others.

Conduct Disorder

**471**

**Unconcerned about performance:** Does not show concern about poor/problem-

atic performance at school, at work, or in other important activities. The individual

does not put forth the effort necessary to perform well, even when expectations are

clear, and typically blames others for his or her poor performance.

**Shallow or deficient affect:** Does not express feelings or show emotions to others, except in ways that seem shallow, insincere, or superficial (e.g., actions contradict the emotion displayed; can turn emotions "on" or "off" quickly) or when emotional expressions are used for gain (e.g., emotions displayed to manipulate or intimidate others).

*Specify* current severity:

Exhibit 67 - 3

**Mild:** Few if any conduct problems in excess of those required to make the diagnosis are present, and conduct problems cause relatively minor harm to others (e.g., lying,

truancy, staying out after dark without permission, other rule breaking).

**Moderate:** The number of conduct problems and the effect on others are intermediate between those specified in "mild" and those in "severe" (e.g., stealing without confronting a victim, vandalism).

**Severe:** Many conduct problems in excess of those required to make the diagnosis are present, or conduct problems cause considerable harm to others (e.g., forced sex, physical cruelty, use of a weapon, stealing while confronting a victim, breaking and entering).

Subtypes

Three subtypes of conduct disorder are provided based on the age at onset of the disorder.

Onset is most accurately estimated with information from both the youth and the care-

giver; estimates are often 2 years later than actual onset. Both subtypes can occur in a mild, moderate, or severe form. An unspecified-onset subtype is designated when there is insufficient information to determine age at onset.

In childhood-onset conduct disorder, individuals are usually male, frequently display

physical aggression toward others, have disturbed peer relationships, may have had op-

positional defiant disorder during early childhood, and usually have symptoms that meet full criteria for conduct disorder prior to puberty. Many children with this subtype also have concurrent attention-deficit/hyperactivity disorder (ADHD) or other neurodevelopmental difficulties. Individuals with childhood-onset type are more likely to have persistent conduct disorder into adulthood than are those with adolescent-onset type. As

compared with individuals with childhood-onset type, individuals with adolescent-onset

conduct disorder are less likely to display aggressive behaviors and tend to have more

normative peer relationships (although they often display conduct problems in the com-

pany of others). These individuals are less likely to have conduct disorder that persists into adulthood. The ratio of males to females with conduct disorder is more balanced for the adolescent-onset type than for the childhood-onset type.

Specifiers

A minority of individuals with conduct disorder exhibit characteristics that qualify for the

"with limited prosocial emotions" specifier. The indicators of this specifier are those that have often been labeled as callous and unemotional traits in research. Other personality features, such as thrill seeking, fearlessness, and insensitivity to punishment, may also distinguish those with characteristics described in

Exhibit 67 - 4

the specifier. Individuals with characteristics described in this specifier may be more likely than other individuals with conduct disorder to engage in aggression that is planned for instrumental gain. Individuals with conduct disorder of any subtype or any level of severity can have characteristics that qualify for the specifier "with limited prosocial emotions," although individuals with the specifier are more likely to have childhood-onset type and a severity specifier rating of severe.

**472**

Disruptive, Impulse-Control, and Conduct Disorders

Although the validity of self-report to assess the presence of the specifier has been supported in some research contexts, individuals with conduct disorder with this specifier may not readily admit to the traits in a clinical interview. Thus, to assess the criteria for the specifier, multiple information sources are necessary. Also, because the indicators of the specifier are characteristics that reflect the individual's typical pattern of interpersonal and emotional functioning, it is important to consider reports by others who have known the individual for extended periods of time and across relationships and settings (e.g., parents, teachers, co-workers, extended family members, peers).

Diagnostic Features

The essential feature of conduct disorder is a repetitive and persistent pattern of behavior in which the basic rights of others or major age-appropriate societal norms or rules are violated (Criterion A). These behaviors fall into four main groupings: aggressive conduct that causes or threatens physical harm to other people or animals (Criteria A1–A7); non-aggressive conduct that causes property loss or damage (Criteria A8–A9); deceitfulness or theft (Criteria A10–A12); and serious violations of rules (Criteria A13–A15). Three or more characteristic behaviors must have been present during the past 12 months, with at least one behavior present in the past 6 months. The disturbance in behavior causes clinically significant impairment in social, academic, or occupational functioning (Criterion B). The behavior pattern is usually present in a variety of settings, such as home, at school, or in the community. Because individuals with conduct disorder are likely to minimize their

conduct problems, the clinician often must rely on additional informants. However, informants' knowledge of the individual's conduct problems may be limited if they have inad-

equately supervised the individual or the individual has concealed symptom behaviors.

Individuals with conduct disorder often initiate aggressive behavior and react aggres-

sively to others. They may display bullying, threatening, or intimidating behavior (including bullying via messaging on Web-based social media) (Criterion A1); initiate frequent physical fights (Criterion A2); use a weapon that can cause serious physical harm (e.g., a bat, brick, broken bottle, knife, gun) (Criterion A3); be physically cruel to people (Criterion A4) or animals (Criterion A5); steal while confronting a victim (e.g., mugging, purse snatching, extortion, armed robbery) (Criterion A6); or force someone into sexual activity (Criterion A7).

Physical violence may take the form of rape, assault, or, in rare cases, homicide. Deliberate destruction of others' property may include deliberate fire setting with the intention of causing serious damage (Criterion A8) or deliberate destroying of other people's property in other ways (e.g., smashing car

Exhibit 67 - 5

windows, vandalizing school property) (Criterion A9). Acts of deceitfulness or theft may include breaking into someone else's house, building, or car (Criterion A10); frequently lying or breaking promises to obtain goods or favors or to avoid debts or obligations (e.g., "conning" other individuals) (Criterion A11); or stealing items of nontrivial value without confronting the victim (e.g., shoplifting, forgery, fraud) (Criterion A12).

Individuals with conduct disorder may also frequently commit serious violations of

rules (e.g., school, parental, workplace). Children with conduct disorder often have a pattern, beginning before age 13 years, of staying out late at night despite parental prohibitions (Criterion A13). Children may also show a pattern of running away from home

overnight (Criterion A14). To be considered a symptom of conduct disorder, the running

away must have occurred at least twice (or only once if the individual did not return for a lengthy period). Runaway episodes that occur as a direct consequence of physical or sexual abuse do not typically qualify for this criterion. Children with conduct disorder may often be truant from school, beginning prior to age 13 years (Criterion A15).

Associated Features Supporting Diagnosis

Especially in ambiguous situations, aggressive individuals with conduct disorder fre-

quently misperceive the intentions of others as more hostile and threatening than is the Conduct Disorder

**473**

case and respond with aggression that they then feel is reasonable and justified. Personality features of trait negative emotionality and poor self-control, including poor frustration tolerance, irritability, temper outbursts, suspiciousness, insensitivity to punishment, thrill seeking, and recklessness, frequently co-occur with conduct disorder. Substance

misuse is often an associated feature, particularly in adolescent females. Suicidal ideation, suicide attempts, and completed suicide occur at a higher-than-expected rate in individuals with conduct disorder.

Prevalence

One-year population prevalence estimates range from 2% to more than 10%, with a median

of 4%. The prevalence of conduct disorder appears to be fairly consistent across various countries that differ in race and ethnicity. Prevalence rates rise from childhood to adolescence and are higher among males than among females. Few children with impairing con-

duct disorder receive treatment.

Development and Course

The onset of conduct disorder may occur as early as the preschool years, but the first significant symptoms usually emerge during the period from middle childhood through

Exhibit 67 - 6

middle adolescence. Oppositional defiant disorder is a common precursor to the child-

hood-onset type of conduct disorder. Conduct disorder may be diagnosed in adults, how-

ever, symptoms of conduct disorder usually emerge in childhood or adolescence, and

onset is rare after age 16 years. The course of conduct disorder after onset is variable. In a majority of individuals, the disorder remits by adulthood. Many individuals with conduct disorder—particularly those with adolescent-onset type and those with few and milder

symptoms—achieve adequate social and occupational adjustment as adults. However, the

early-onset type predicts a worse prognosis and an increased risk of criminal behavior, conduct disorder, and substance-related disorders in adulthood. Individuals with conduct disorder are at risk for later mood disorders, anxiety disorders, posttraumatic stress disorder, impulse-control disorders, psychotic disorders, somatic symptom disorders, and

substance-related disorders as adults.

Symptoms of the disorder vary with age as the individual develops increased physical

strength, cognitive abilities, and sexual maturity. Symptom behaviors that emerge first tend to be less serious (e.g., lying, shoplifting), whereas conduct problems that emerge last tend to be more severe (e.g., rape, theft while confronting a victim). However, there are wide differences among individuals, with some engaging in the more damaging behaviors

at an early age (which is predictive of a worse prognosis). When individuals with conduct disorder reach adulthood, symptoms of aggression, property destruction, deceitfulness,

and rule violation, including violence against co-workers, partners, and children, may be exhibited in the workplace and the home, such that antisocial personality disorder may be considered.

Risk and Prognostic Factors

Temperamental.

Temperamental risk factors include a difficult undercontrolled infant

temperament and lower-than-average intelligence, particularly with regard to verbal IQ.

Environmental.

Family-level risk factors include parental rejection and neglect, inconsis-

tent child-rearing practices, harsh discipline, physical or sexual abuse, lack of supervision, early institutional living, frequent changes of caregivers, large family size, parental criminality, and certain kinds of familial psychopathology (e.g., substance-related disorders). Community-level risk factors include peer rejection, association with a delinquent peer group, and neighborhood exposure to violence. Both types of risk factors tend to be more common and severe among individuals with the childhood-onset

Exhibit 67 - 7

subtype of conduct disorder.

**474**

Disruptive, Impulse-Control, and Conduct Disorders

Genetic and physiological.

Conduct disorder is influenced by both genetic and envi-

ronmental factors. The risk is increased in children with a biological or adoptive parent or a sibling with conduct disorder. The disorder also appears to be more common in children of biological parents with severe alcohol use disorder, depressive and bipolar disorders, or schizophrenia or biological parents who have a history of ADHD or conduct disorder.

Family history particularly characterizes individuals with the childhood-onset subtype of conduct disorder. Slower resting heart rate has been reliably noted in individuals with conduct disorder compared with those without the disorder, and this marker is not characteristic of any other mental disorder. Reduced autonomic fear conditioning, particularly low skin conductance, is also well documented. However, these psychophysiological findings are not diagnostic of the disorder. Structural and functional differences in brain areas associated with affect regulation and affect processing, particularly frontotemporal-limbic connections involving the brain's ventral prefrontal cortex and amygdala, have been consistently noted in individuals with conduct disorder compared with those without the disorder. However, neuroimaging findings are not diagnostic of the disorder.

Course modifiers.

Persistence is more likely for individuals with behaviors that meet

criteria for the childhood-onset subtype and qualify for the specifier "with limited prosocial emotions". The risk that conduct disorder will persist is also increased by co-occurring ADHD and by substance abuse.

Culture-Related Diagnostic Issues

Conduct disorder diagnosis may at times be potentially misapplied to individuals in settings where patterns of disruptive behavior are viewed as near-normative (e.g., in very threatening, high-crime areas or war zones). Therefore, the context in which the undesirable behaviors have occurred should be considered.

Gender-Related Diagnostic Issues

Males with a diagnosis of conduct disorder frequently exhibit fighting, stealing, vandalism, and school discipline problems. Females with a diagnosis of conduct disorder are more likely to exhibit lying, truancy, running away, substance use, and prostitution. Whereas males tend to exhibit both physical aggression and relational aggression (behavior that harms social relationships of others), females tend to exhibit relatively more relational aggression.

Functional Consequences of Conduct Disorder

Exhibit 67 - 8

Conduct disorder behaviors may lead to school suspension or expulsion, problems in

work adjustment, legal difficulties, sexually transmitted diseases, unplanned pregnancy, and physical injury from accidents or fights. These problems may preclude attendance in ordinary schools or living in a parental or foster home. Conduct disorder is often associated with an early onset of sexual behavior, alcohol use, tobacco smoking, use of illegal substances, and reckless and risk-taking acts. Accident rates appear to be higher among individuals with conduct disorder compared with those without the disorder. These func-

tional consequences of conduct disorder may predict health difficulties when individuals reach midlife. It is not uncommon for individuals with conduct disorder to come into contact with the criminal justice system for engaging in illegal behavior. Conduct disorder is a common reason for treatment referral and is frequently diagnosed in mental health facilities for children, especially in forensic practice. It is associated with impairment that is more severe and chronic than that experienced by other clinic-referred children.

Differential Diagnosis

Oppositional defiant disorder.

Conduct disorder and oppositional defiant disorder are

both related to symptoms that bring the individual in conflict with adults and other au-Conduct Disorder

**475**

thority figures (e.g., parents, teachers, work supervisors). The behaviors of oppositional defiant disorder are typically of a less severe nature than those of individuals with conduct disorder and do not include aggression toward individuals or animals, destruction of

property, or a pattern of theft or deceit. Furthermore, oppositional defiant disorder includes problems of emotional dysregulation (i.e., angry and irritable mood) that are not included in the definition of conduct disorder. When criteria are met for both oppositional defiant disorder and conduct disorder, both diagnoses can be given.

Attention-deficit/hyperactivity disorder.

Although children with ADHD often exhibit

hyperactive and impulsive behavior that may be disruptive, this behavior does not by itself violate societal norms or the rights of others and therefore does not usually meet criteria for conduct disorder. When criteria are met for both ADHD and conduct disorder, both diagnoses should be given.

Depressive and bipolar disorders.

Irritability, aggression, and conduct problems can

occur in children or adolescents with a major depressive disorder, a bipolar disorder, or disruptive mood dysregulation disorder. The behaviorial problems associated with these

Exhibit 67 - 9

mood disorders can usually be distinguished from the pattern of conduct problems seen in conduct disorder based on their course. Specifically, persons with conduct disorder will display substantial levels of aggressive or non-aggressive conduct problems during periods in which there is no mood disturbance, either historically (i.e., a history of conduct problems predating the onset of the mood disturbance) or concurrently (i.e., display of some conduct problems that are premeditated and do not occur during periods of intense

emotional arousal). In those cases in which criteria for conduct disorder and a mood disorder are met, both diagnoses can be given.

Intermittent explosive disorder.

Both conduct disorder and intermittent explosive dis-

order involve high rates of aggression. However, the aggression in individuals with intermittent explosive disorder is limited to impulsive aggression and is not premeditated, and it is not committed in order to achieve some tangible objective (e.g., money, power, intimidation). Also, the definition of intermittent explosive disorder does not include the non-aggressive symptoms of conduct disorder. If criteria for both disorders are met, the diagnosis of intermittent explosive disorder should be given only when the recurrent impul-

sive aggressive outbursts warrant independent clinical attention.

Adjustment disorders.

The diagnosis of an adjustment disorder (with disturbance of con-

duct or with mixed disturbance of emotions and conduct) should be considered if clinically significant conduct problems that do not meet the criteria for another specific disorder develop in clear association with the onset of a psychosocial stressor and do not resolve within 6 months of the termination of the stressor (or its consequences). Conduct disorder is diagnosed only when the conduct problems represent a repetitive and persistent pattern that is associated with impairment in social, academic, or occupational functioning.

Comorbidity

ADHD and oppositional defiant disorder are both common in individuals with conduct

disorder, and this comorbid presentation predicts worse outcomes. Individuals who show

the personality features associated with antisocial personality disorder often violate the basic rights of others or violate major age-appropriate societal norms, and as a result their pattern of behavior often meets criteria for conduct disorder. Conduct disorder may also co-occur with one or more of the following mental disorders: specific learning disorder, anxiety disorders, depressive or bipolar disorders, and substance-related disorders. Academic achievement, particularly in reading and other verbal skills, is often below the level expected on the basis of age and intelligence and may justify the additional diagnosis of specific learning disorder or a communication disorder.

**476**

Exhibit 67 - 10

Disruptive, Impulse-Control, and Conduct Disorders

Antisocial Personality Disorder

Criteria and text for antisocial personality disorder can be found in the chapter "Personality Disorders." Because this disorder is closely connected to the spectrum of "externalizing" conduct disorders in this chapter, as well as to the disorders in the adjoining chapter

"Substance-Related and Addictive Disorders," it is dual coded here as well as in the chapter "Personality Disorders."

Pyromania

Diagnostic Criteria

**312.33 (F63.1)**

A. Deliberate and purposeful fire setting on more than one occasion.

B. Tension or affective arousal before the act.

C. Fascination with, interest in, curiosity about, or attraction to fire and its situational contexts (e.g., paraphernalia, uses, consequences).

D. Pleasure, gratification, or relief when setting fires or when witnessing or participating in their aftermath.

E. The fire setting is not done for monetary gain, as an expression of sociopolitical ideology, to conceal criminal activity, to express anger or vengeance, to improve one's living circumstances, in response to a delusion or hallucination, or as a result of impaired

judgment (e.g., in major neurocognitive disorder, intellectual disability [intellectual developmental disorder], substance intoxication).

F. The fire setting is not better explained by conduct disorder, a manic episode, or antisocial personality disorder.

Diagnostic Features

The essential feature of pyromania is the presence of multiple episodes of deliberate and purposeful fire setting (Criterion A). Individuals with this disorder experience tension or affective arousal before setting a fire (Criterion B). There is a fascination with, interest in, curiosity about, or attraction to fire and its situational contexts (e.g., paraphernalia, uses, consequences) (Criterion C). Individuals with this disorder are often regular "watchers" at fires in their neighborhoods, may set off false alarms, and derive pleasure from institutions, equipment, and personnel associated with fire. They may spend time at the local fire department, set fires to be affiliated with the fire department, or even become firefighters. Individuals with this disorder experience pleasure, gratification, or relief when setting the fire, witnessing its effects, or participating in its aftermath (Criterion D). The fire setting is not done for monetary gain, as an

Exhibit 67 - 11

# Exhibit 68

# Filed under seal

# Exhibit 69

# Filed under seal

# Exhibit 70

# Filed under seal

# Exhibit 71

# Filed under seal

# Exhibit 72

# Filed under seal

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF TEXAS

## BEAUMONT DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § § § | No. 1:16-CR-26 |
| | § | **CAPITAL 2255 PROCEEDINGS** |
| v. | § § | HON. MARCIA A. CRONE |
| CHRISTOPHER EMORY CRAMER | § § § § § | |

## EXHIBITS IN SUPPORT OF MOTION FOR COLLATERAL RELIEF

## VOLUME 2

## EXHIBITS 73-102

**EXHIBIT INDEX**

1.  *Filed Under Seal*

2.  Transcript of Sentencing Proceedings, *U.S. v. Otis Carden,*
    Case No. 08-CR-147-T-26MP, January 12, 2009

3.  *Filed Under Seal*

4.  *Filed Under Seal*

5.  *Filed Under Seal*

6.  *Filed Under Seal*

7.  *Filed Under Seal*

8.  Declaration of Terry Oliver Gilmore, March 13, 2023

9.  Declaration of Hortensia White, July 10, 2023

10.  *Filed Under Seal*

11.  Declaration of Jeffrey Martin, March 17, 2023

12.  *Filed Under Seal*

13.  Declaration of John McNicholas, August 29, 2023

14.  Declaration of Ronald McElroy, February 27, 2023

15.  Declaration of Shirley Miller, July 8, 2023

16.  *Filed Under Seal*

17.  *Filed Under Seal*

18.  *Filed Under Seal*

19.  *Filed Under Seal*

20.  Testimony, Judge Marcia Crone, Criminal Justice Act Review, February 4, 2016

21.  *Filed Under Seal*

22.  *Filed Under Seal*

1

23.     *Filed Under Seal*

24.     *Filed Under Seal*

25.     *Filed Under Seal*

26.     *Filed Under Seal*

27.     *Filed Under Seal*

28.     *Filed Under Seal*

29.     *Filed Under Seal*

30.     *Filed Under Seal*

31.     *Filed Under Seal*

32.     *Filed Under Seal*

33.     *Filed Under Seal*

34.     *Filed Under Seal*

35.     *Filed Under Seal*

36.     *Filed Under Seal*

37.     *Filed Under Seal*

38.     *Filed Under Seal*

39.     *Filed Under Seal*

40.     *Filed Under Seal*

41.     Declaration of Dr. John Weeks, September 10, 2023

42.     *Filed Under Seal*

43.     *Filed Under Seal*

44.     Declaration of Dr. Barbara Belbot, September 14, 2023

45.     Declaration of Dr. Meredith Rountree, September 12, 2023

46.     Declaration of Anthony S. Haughton, September 19, 2023

47.     *Filed Under Seal*

2

48.    *Filed Under Seal*

49.    *Filed Under Seal*

50.    *Filed Under Seal*

51.    Supplemental Declaration of Darla Dillon, September 07, 2023

52.    Article, Federal Death Penalty Resource Counsel

53.    *Filed Under Seal*

54.    *Filed Under Seal*

55.    *Filed Under Seal*

56.    *Filed Under Seal*

57.    Article, *Federal Death Penalty: The federal government can seek death sentence for a limited set of crime, but federal executions are much rare than state executions*, 2023

58.    General Order Adopting The Amended Plan For The Random Selection of Jurors, No. 19-06, April 4, 2019

59.    General Order Amending Local Rules, No. 09-07, March 26, 2009

60.    *Filed Under Seal*

61.    *Filed Under Seal*

62.    *Filed Under Seal*

63.    *Filed Under Seal*

64.    *Filed Under Seal*

65.    *Filed Under Seal*

66.    *Filed Under Seal*

67.    Excerpt of DSM-V, Conduct Disorder, 2013

68.    *Filed Under Seal*:

69.    *Filed Under Seal*

70.    *Filed Under Seal*

71.    *Filed Under Seal*

3

72.     *Filed Under Seal*

73.     Declaration of Matt Rubenstein , September 13, 2023

74.     *Filed Under Seal*

75.     *Filed Under Seal*

76.     *Filed Under Seal*

77.     *Filed Under Seal*

78.     *Filed Under Seal*

79.     *Filed Under Seal*

80.     *Filed Under Seal*

81.     Article, *Federal Prisons Were Told to Provide Addiction Medications. Instead, They Punish People Who Use Them,* December 12, 2022

82.     Intentionally Omitted

83.     *Filed Under Seal*

84.     *Filed Under Seal*

85.     Article, Gangs, Prison Culture and the Role of Prison Staff, February 10, 2022

86.     Article, Violence on the Rise in BOP Facilities, August 15, 2009

87.     Article, Five things to know about one of the deadliest federal prisons, May 31, 2022

88.     *Filed Under Seal*

89.     *Filed Under Seal*

90.     *Filed Under Seal*

91.     *Filed Under Seal*

92.     *Filed Under Seal*

93.     *Filed Under Seal*

94.     *Filed Under Seal*

95.     *Filed Under Seal*

4

96.     *Filed Under Seal*

97.     *Filed Under Seal*

98.     *Filed Under Seal*

99.     *Filed Under Seal*

100.    *Filed Under Seal*

101.    *Filed Under Seal*

102.    *Filed Under Seal*

5

# Exhibit 73

DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A
NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF
LIFE IMPRISONMENT OR DEATH

1.    I serve as the Director of the Capital Resource Counsel project. The Capital Resource Counsel ("CRC") project and the Federal Death Penalty Resource Counsel ("FDPRC") project are the federal capital trial projects (commonly referred together as the "Trial Projects")[1] of the Defender Services Office of the Administrative Office of the United States Courts. The two projects are staffed by expert federal capital litigators who work in close coordination providing consultation, training, and assistance to courts and counsel to improve the quality of representation and cost-effectiveness of defense services in federal capital prosecution cases. The CRC attorneys are full-time salaried federal defender staff available to be appointed to represent federal capital defendants and the FDPRC resource counsel are part-time contractors who do not appear as counsel of record in their role with the Project.

2.    The Trial Projects' responsibilities include the monitoring of all federal capital prosecutions throughout the United States to assist in the delivery of high-quality defense services to indigent capital defendants. This effort includes overseeing the collection of data on the initiation and prosecution of federal capital cases.

3.    In my review of the thirty-four (34) federal capital trials that proceeded to a jury sentencing since 2010, the Court instructed the jurors that the consequence of a non-unanimous

---

[1]    The work of the Trial Projects is described in a report prepared by the Subcommittee on Federal Death Penalty Cases, Committee on Defender Services, Judicial Conference of the United States, *Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation* (May 1998), at 28 – 30, http://www.uscourts.gov/sites/default/files/original_spencer_report.pdf [Perma.cc archive: https://perma.cc/SU25-GWMV]. The Subcommittee report "urges the judiciary and counsel to maximize the benefits of the Federal Death Penalty Resource Counsel Project . . . , which has become essential to the delivery of high quality, cost-effective representation in death penalty cases . . . ." *Id.* at 50. An update to the Report states: "Many judges and defense counsel spoke with appreciation and admiration about the work of Resource Counsel. Judges emphasized their assistance in recruiting and recommending counsel for appointments and their availability to consult on matters relating to the defense, including case budgeting. Defense counsel found their knowledge, national perspective, and case-specific assistance invaluable." *Report to the Committee on Defender Services, Judicial Conference of the United States, Update on the Cost and Quality of Defense Representation in Federal Death Penalty Cases* (September 2010) at 63. https://www.uscourts.gov/sites/default/files/fdpc2010.pdf [Perma.cc archive: https://perma.cc LPH6-K8QB].

Exhibit 73 - 1

vote on the ultimate issue of life or death was the imposition of a sentence of life imprisonment without release in twenty-seven (27) of these trials (79% of the trials).[2][3]

4.      In the twenty-seven (27) trials in which the instruction was given, eight trials (8) resulted in one or more unanimous death sentences (30% of the trials resulted in one or more sentences of death).[4] This data establishes that fears about giving a jury "'an open invitation to . . . avoid its responsibility and to disagree,'" *Jones*, 527 U.S. at 384 (quoting *Justus v. Virginia*, 266 S.E.2d 87, 92-93 (Va. 1980)), are unfounded.

5.      Furthermore, in the seven (7) trials in which the Court did *not* instruct the jurors of the consequence of a non-unanimous vote on the ultimate issue of life or death, the jury sentenced every defendant except one to death (eight (8) of the nine (9) defendants; 89% of the sentences were for death).[5]

6.      In the two capital trials occurring in the Eastern District of Texas since 2010, the instruction addressing the consequences of non-unanimity was *not* given and all four (4) defendants were sentenced to death (each trial involved two (2) codefendants).

7.      I am aware of only one other case, *United States v. Taylor*, 814 F.3d 340, 371 (6th Cir. 2016), in which a jury asked about the consequences of a non-unanimous decision and the court declined to inform the jury that a non-unanimous vote for life imprisonment without release

---

[2]      The list of these twenty-seven (27) trials is attached as *Exhibit A*. Extracts of relevant language from the jury instructions and verdict forms is attached as *Exhibit B*.

[3]      A total of forty-one (41) defendants were tried during this period (five (5) of these thirty-four (34) trials involved one or more co-defendants).

[4]      The trials in which the consequences of non-unanimity instruction was given that resulted in one or more death sentences included: (1) *United States v. Azibo Aquart*, No. 3:06-CR-00160-SRU (D. Conn. 2011), (2) *United States v. Kaboni Savage, et al.*, No. 2:04-cr-00269-MAK (E.D. Pa. 2012), (3) *United States v. Thomas Sanders*, No. 1:10-cr-00351-DDD-JDK (W.D. La. 2014), (4) *United States v. Wesley Coonce, et al.*, No. 6:10-cr-03029-GAF (W.D. Mo. 2014), (5) *United States v. Dylann Storm Roof*, No. 2:15-cr-00472 (D.S.C. 2016), (6) *United States v. Gary Lee Sampson*, No. 1:01-cr-10384-LTS (D. Mass. 2016), (7) *United States v. Brandon Council*, No. 4:17-cr-00866-RBH (D.S.C. 2019), and (8) *United States v. Robert Bowers*, No. 2:18-cr-00292-RJC (W.D. Pa. 2023).

[5]      The defendants sentenced to death included: (1) *U.S. v. Alejandro Umana*, No. 3:08-cr-00134-RJC (W.D.N.C. 2010), (2 & 3) *U.S. v. Mark Snarr & Edgar Garcia*, No. 1:09-cr-00015-MAC-KFG (E.D. Tex. 2010), (4) *U.S. v. Ronell Wilson*, No. 1:04-cr-01016-NGG (E.D.N.Y. 2013), (5) *U.S. v. Jorge Torrez*, No. 1:11-cr-00115-LO (E.D. Va. 2014), (6) *U.S. v. Dzhokhar Tsarnaev* (D. Mass. 2015), and (7 & 8) *U.S. v. Christopher Cramer & Ricky Fackrell*, No. 1:16-cr-00026-MAC-ZJH (E.D. Tex. 2018). The one life sentence was returned in *U.S. v. Vincent Basciano*, No. 1:05-cr-00060-NGG (E.D.N.Y. 2011).

DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS
OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE
IMPRISONMENT OR DEATH
(August 31, 2023)                                                                                                          Page 2

Exhibit 73 - 2

or death would result in a life sentence.[6] In my experience, this situation is extremely unusual in capital trials.

I declare under penalty of perjury under the laws of the United States of America, 28 U.S.C. §1746, that the foregoing is true and correct. Executed this 31st day of August, 2023.

/s/ Matthew Rubenstein
Matthew Rubenstein

---

[6]    I have conducted a comprehensive review of the thirty-four (34) federal capital trials that proceeded to a jury sentencing since 2010 and have consulted with capital appellate and trial resource counsel regarding earlier trials.

DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)                                                                 Page 3

Exhibit 73 - 3

Exhibit A

List of Federal Capital Cases Tried Since 2010 in which the
Court Instructed the Jurors that the Consequence of a Non-Unanimous
Vote on the Ultimate Issue of Life or Death was the
Imposition of a Sentence of Life Imprisonment Without Release

1.  *United States v. Robert Bowers*, No. 2:18-cr-00292-RJC (W.D. Pa. 2023, Colville, J.) (voir dire began April 24, 2023)

2.  *United States v. Sayfullo Habibullaevic Saipov*, No. 1:17-cr-00722 (S.D.N.Y 2023, Broderick, J.) (voir dire began October 11, 2022)

3.  *United States v. Brandon Council*, No. 4:17-cr-00866-RBH (D.S.C. 2019, Harwell, J.) (voir dire began September 9, 2019)

4.  *United States v. Brendt Christensen*, No. 2:17-cr-20037-JES (C.D. Ill. 2019, Shadid, J.) (voir dire began June 3, 2019)

5.  *United States v. Ulysses Jones*, No. 6:10-cr-03090-DGK (W.D. Mo. 2017, Kays, J.) (voir dire began September 25, 2017)

6.  *United States v. Jesse Con-Ui,* No. 3:13-cr-00123-ARC (M.D. Pa. 2017, Caputo, J.) (voir dire began April 24, 2017)

7.  *United States v. Dylann Storm Roof*, No. 2:15-cr-00472 (D.S.C. 2016, Gergel, J.) (voir dire began November 28, 2016)

8.  *United States v. Gary Lee Sampson*, No. 1:01-cr-10384-LTS (D. Mass. 2016, Sorokin, J.) (voir dire began September 14, 2016)

9.  *United States v. Juan Briseno*, No. 2:11-cr-00077 (N.D. Ind. 2015, Simon, J.) (voir dire began January 12, 2015)

10. *United States v. Thomas Sanders*, No. 1:10-cr-00351-DDD-JDK (W.D. La. 2014, Drell, J.) (voir dire began August 18, 2014)

11. *United States v. Wesley Coonce, et al.*, No. 6:10-cr-03029-GAF (W.D. Mo. 2014, Fenner, J.) (voir dire began March 28, 2014)

12. *United States v. Naeem Williams*, No. 1:06-cr-00079-JMS-KSC (D. Haw. 2014, Seabright, J.) (voir dire began January 28, 2014)

13. *United States v. John McCluskey,* No. 1:10-cr-02734-JCH (D.N.M. 2013, Herrera, J.) (voir dire began July 22, 2013.)

Exhibit 73 - 4

14. *United States v. Ahmed Salad, et al.*, No. 2:11-cr-00034-RBS (E.D. Va. 2013, Smith, J.) (voir dire began June 4, 2013)

15. *United States v. Xavier Jimenez-Bencevi*, No. 3:12-cr-00221-JAF (D.P.R. 2013, Fusté, J.) (voir dire began April 15, 2013)

16. *United States v. LaShaun Casey*, No. 3:05-CR-00277-ADC (D.P.R. 2013, Delgado-Colon, J.) (voir dire began February 4, 2013)

17. *United States v. Alexis Candelario-Santana*, No. 3:09-cr-00427-JAF-1 (D.P.R. 2013, Fusté, J.) (voir dire began January 28, 2013)

18. *United States v. Kaboni Savage, et al.*, No. 2:04-cr-00269-MAK (E.D. Pa. 2012, Surrick, J.) (voir dire began November 5, 2012)

19. *United States v. Edison Burgos-Montes*, No. 3:06-cr-00009-JAG (D.P.R. 2012, Garcia-Gregory, J.) (voir dire began April 16, 2012)

20. *United States v. Brian Richardson*, No. 1:08-cr-00139-CC (N.D. Ga. 2012, Cooper, J.) (voir dire began February 27, 2012)

21. *United States v. Larry Lujan*, No. 2:05-cr-00924-RB (D.N.M. 2011, Brack, J.) (voir dire began June 20, 2011)

22. *United States v. Azibo Aquart*, No. 3:06-CR-00160-SRU (D. Conn. 2011, Underhill, J.) (voir dire began April 6, 2011)

23. *United States v. Timothy O'Reilly*, No. 2:05-cr-80025-VAR-1 (E.D. Mich. 2010, Roberts, J.) (voir dire began June 8, 2010)

24. *United States v. George Lecco*, No. 2:05−cr−00107 (S.D.W. Va. 2010, Copenhaver, Jr., J.) (voir dire began April 5, 2010)

25. *United States v. Anh The Duong*, No. 01-cr-20154-JF (N.D. Cal. 2010, Fogel, J.) (voir dire began February 23, 2010)

26. *United States v. Antonio Argueta*, No. 8:05-CR-00393-DKC (D. Md. 2010, Chasanow, J.) (voir dire began January 12, 2010)

27. *United States v. Maurice Phillips*, No. 2:07-cr-00549-JCJ (E.D. Pa. 2010, Joyner, J.) (voir dire began January 4, 2010)

Exhibit 73 - 5

Exhibit B


Relevant Portions of Extracts from Sentencing Trial
(Penalty Phase) Jury Instructions and Verdict Forms

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Exhibit 73 - 6

## Sentencing Trial (Penalty Phase) Jury Instructions and Verdict Form Extracts

**US v. Robert Bowers (W.D. Pa. 2023)**   **1**

    2023 Bowers (W.D. Pa. 2023) excerpts penalty phase final charge   2

        consequences of non-unanimity   3

        consequences of non-unanimity   5

    2023 Bowers (W.D. Pa. 2023) Verdict Form   6

**US v. Sayfullo Habibullaevic Saipov (S.D.N.Y. 2023)**   **8**

    2023 Saipov (S.D.N.Y.) excerpts Juror Questionnaire   9

        consequences of non-unanimity   10

        consequences of non-unanimity   11

    2023 Saipov (S.D.N.Y.) excerpts Voir Dire   13

        consequences of non-unanimity   14

        consequences of non-unanimity   15

    2023 Saipov (S.D.N.Y.) excerpts penalty phase final charge   17

        consequences of non-unanimity   19

    2023 Saipov (S.D.N.Y.) Court Exhibit #14 - Deliberations began March 8, 2023 (Tr at 3625); note from jury rec'd March 13, 2023   20

**US v. Brandon Council (D.S.C. 2019)**   **21**

    2019 Council (D.S.C. ) excerpts preliminary final sentencing trial instruction   22

        consequence of non-unanimity   23

    2019 Council (D.S.C. ) excerpts closing sentencing trial instruction   24

        consequence of non-unanimity   25

    2019 Council (D.S.C. ) Verdict Form   26

        consequence of non-unanimity   27

**US v. Brendt Christensen (C.D. Ill. 2019)**   **29**

    2019 Christensen (C.D. Ill.) Special Verdict Form   30

        non-unanimity   31

    2019 Christensen (C.D. Ill.) instruction given to jury in response to note   32

        consequence of non-unanimity   33

**US v. Ulysses Jones (W.D. Mo. 2017)**   **35**

    2017 Jones (W.D. Mo.) excerpts final sentencing trial instruction   38

        consequence of non-unanimity   40

**US v. Jesse Con-Ui (M.D. Pa. 2017)**   **41**

Exhibit 73 - 7

2017 Con-Ui (M.D. Pa.) excerpts final sentencing trial instruction    42

    consequence of non-unanimity    44

    consequence of non-unanimity    45

2017 Con-Ui (M.D. Pa.) excerpts sentencing verdict form    46

    consequence of non-unanimity    47

    non-unanimity    48

**US v. Dylann Storm Roof (D.S.C. 2016)**    **51**

2017 Roof (D.S.C) excerpts final sentencing trial instruction    52

    consequence of non-unanimity    56

2017 Roof (D.S.C) excerpts sentencing verdict form    57

    non-unanimity    59

**US v. Gary Lee Sampson (D. Mass. 2017)**    **60**

2017 Sampson (D. Mass. ) excerpts final sentencing trial instruction    61

    consequence of non-unanimity    65

2017 Sampson (D. Mass. ) excerpts sentencing verdict form    67

    consequence of non-unanimity    68

**US v. Juan Briseno (N.D. Ind. 2015)**    **69**

2015 Briseno (N.D. Ind) excerpts final sentencing trial instruction    70

    consequence of non-unanimity    74

2015 Briseno (N.D. Ind) excerpts sentencing verdict form    76

    consequence of non-unanimity    77

**US v. Thomas Steven Sanders (W.D. La. 2014)**    **86**

2014 Sanders (W.D. La.) excerpts final sentencing trial instruction    87

    consequence of non-unanimity    88

    consequence of non-unanimity    89

    consequence of non-unanimity    92

2014 Sanders (W.D. La.) excerpts sentencing verdict form    93

    non-unanimity    94

**US v. Wesley Paul Coonce, et al. (W.D. Mo. 2014)**    **95**

2014 Coonce, Wesley Paul (W.D. Mo.) excerpts penalty phase jury instructions    96

    consequence of non-unanimity    97

**US v. Naeem J. Williams (D. Haw. 2014)**    **98**

2014 Williams, Naeem (D. Haw.) excerpts final sentencing trial instruction    99

    consequence of non-unanimity    100

Exhibit 73 - 8

2014 Williams, Naeem (D. Haw.) excerpts sentencing verdict form .......... 101

    consequence of non-unanimity .......... 102

    non-unanimity .......... 103

    consequence of non-unanimity .......... 106

**US v. John McCluskey (D.N.M. 2103)** .......... **107**

    2013 McCluskey (D.N.M.) excerpts final sentencing trial instruction .......... 108

        consequence of non-unanimity .......... 109

        non-unanimity .......... 111

    2013 McCluskey (D.N.M.) excerpts sentencing verdict form .......... 112

        consequence of non-unanimity .......... 113

        consequence of non-unanimity .......... 115

**US v. Ahmed M. Salad, et al. (E.D. Va. 2013)** .......... **116**

    2013 Salad (E.D. Va.) excerpts sentencing instructions

        consequence of non-unanimity .......... 117

        non-unanimity .......... 118

        consequence of non-unanimity (gov proposed instruction) .......... 121

        consequence of non-unanimity (gov proposed instruction) .......... 123

**US v. Xavier Jimenez-Bencevi (D.P.R. 2013)** .......... **124**

    2013 Jimenez-Bencevi (D.P.R.) excerpts preliminary sentencing trial instruction .......... 125

        consequence of non-unanimity .......... 126

**US v. LaShaun Casey (D.P.R. 2013)** .......... **127**

    2013 Casey (D.P.R.) excerpts sentencing verdict form .......... 128

        consequence of non-unanimity .......... 129

**US v. Alexis Candelario-Santana (D.P.R. 2013)** .......... **131**

    2013 Candelario (D.P.R.) excerpts final sentencing trial instruction .......... 132

        consequence of non-unanimity .......... 133

        consequence of non-unanimity .......... 135

    2013 Candelario (D.P.R.) excerpts sentencing verdict form .......... 136

        consequence of non-unanimity .......... 137

**US v. Kaboni Savage, et al. (E.D. Pa. 2013)** .......... **153**

    2013 Savage (E.D. Pa.) excerpts final sentencing trial instruction .......... 154

        non-unanimity .......... 155

        consequence of non-unanimity .......... 156

        consequence of non-unanimity .......... 157

    2013 Savage (E.D. Pa.) excerpts sentencing verdict form .......... 158

Exhibit 73 - 9

consequence of non-unanimity 159

**US v. Edison Burgos-Montes (D.P.R 2012)** **172**

2012 Burgos-Montes (D.P.R) excerpts sentencing verdict form 173

consequence of non-unanimity 174

consequence of non-unanimity 175

**US v. Brian Richardson (N.D. Ga. 2012)** **178**

2012 Richardson (N.D. Ga.) excerpts final sentencing trial instrucion 180

consequence of non-unanimity 182

2012 Richardson (N.D. Ga.) excerpts sentencing verdict form 186

consequence of non-unanimity 190

**US v. Larry Lujan (D.N.M. 2011)** **191**

2011 Lujan (D.N.M.) excerpts final sentencing trial instruction 192

consequence of non-unanimity 193

2011 Lujan (D.N.M.) excerpts sentencing verdict form 195

consequence of non-unanimity 196

consequence of non-unanimity 197

consequence of non-unanimity 199

**US v. Azibo Aquart (D. Conn. 2011)** **200**

2011 Aquart (D. Conn.) excerpts final sentencing trial instruction 201

consequence of non-unanimity 202

2011 Aquart (D. Conn.) excerpts sentencing verdict form 208

non-unanimity 209

**US v. Timothy O'Reilly (E.D. Mich. 2010)** **211**

2010 O'Reilly (E.D. Mich.) excerpts final sentencing trial instruction 212

consequence of non-unanimity 213

2010 O'Reilly (E.D. Mich.) excerpts sentencing verdict form 214

non-unanimity 219

**US v. George Lecco (S.D. W.Va. 2010)** **220**

2010 Lecco (S.D. W.Va.) excerpts final sentencing trial instruction 221

consequence of non-unanimity 222

2010 Lecco (S.D. W.Va.) excerpts sentencing verdict form 223

non-unanimity 225

**US v. Anh The Duong (N.D. Cal. 2010)** **228**

2010 Duong (N.D. Cal.) excerpts final sentencing trial instruction 229

non-unanimity 230

2010 Duong (N.D. Cal.) excerpts sentencing verdict form 232

Exhibit 73 - 10

consequence of non-unanimity                                                    233
**US v. Antonio Argueta (D. Md. 2010)**                                          **235**
2010 Argueta (D. Md.) excepts final sentencing phase instructions               236
consequence of non-unanimity                                                    238
**US v. Maurice Phillips (E.D. Pa. 2010)**                                       **239**
2010 Phillips (ED PA) excerpts final sentencing trial instruction               240
non-unanimity                                                                   241
non-unanimity                                                                   242
consequence of non-unanimity                                                    244

Exhibit 73 - 11

*United States v. Robert Bowers*
No. 2:18-cr-00292-RJC (W.D. Pa.)
Judge Presiding: The Hon. Robert J. Colville
(Voir dire began April 24, 2023.)

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 1

Exhibit 73 - 12

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

vs.                          Criminal No. 18-292

ROBERT BOWERS

Transcript of Jury Trial held on Monday, July 31, 2023, in the United States District Court, 700 Grant Street, Pittsburgh, Pennsylvania 15219, before Honorable Robert J. Colville, United States District Judge.

APPEARANCES:

For the Government:      U.S. Attorney's Office
                        Soo C. Song, Esquire
                        Troy Rivetti, Esquire
                        Eric G. Olshan, Esquire
                        Nicole A. Vasquez Schmitt, Esquire
                        Mary J. Hahn, Esquire

For the Defendant:      Federal Public Defender
                        Elisa A. Long, Esquire
                        Michael J. Novara, Esquire
                        Ashwin Cattamanchi, Esquire
                                and
                        Clarke, Johnston, Thorp & Rice, PC
                        Judy Clarke, Esquire
                                and
                        Law Office of Michael Burt
                        Michael N. Burt, Esquire

Court Reporter:         Noreen A. Re, RMR, CRR

Proceedings recorded by mechanical stenography;
transcript produced by computer-aided transcription.

VOLUME 35

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 2

Exhibit 73 - 13

54

decision before you separately as to each count and, of course, with an open mind. I cannot stress to you enough the importance of your giving careful and thorough consideration to all the evidence.

And regardless of any opinion you may have as to what the law may or should be, it would be a violation of your oaths as jurors to base your sentencing decision upon any view of the law other than that which is given to you in these instructions.

As we begin this process, I remind you that a juror is never required to vote for a sentence of death. And I'll explain this in more detail later in these instructions. The law provides you with guidance in making your sentencing decision, but your decision on this question of life imprisonment without the possibility of release or death is a uniquely individual moral judgment that the law in the final analysis leaves up to each of you.

Further, a sentence of death is only imposed if all 12 jurors unanimously agree that death is the appropriate sentence. On the other hand, if one or more jurors find that a sentence of life imprisonment without the possibility of release is the more appropriate sentence for Mr. Bowers, the Court will impose a sentence of life imprisonment without possibility of release. You should understand, though, that if the jury unanimously votes to impose the death penalty as

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 3

Exhibit 73 - 14

55

to any count, the death sentence will be imposed, regardless of a life sentence you might vote to impose as to any other count or counts.

There is no parole in the federal system. Life without possibility of release means just that. If you determine that Mr. Bowers should be sentenced to death or sentenced to life imprisonment without possibility of release, the Court is required to impose that sentence.

Members of the jury, you have seen and heard all the evidence and the arguments of the lawyers. Once again, I have gotten this backwards. You will soon hear -- you have seen all the evidence. You will soon hear all the arguments of the lawyers. I am now instructing you on the law.

You have two duties as a jury. Your first duty is to decide the facts from the evidence that you have heard and seen in court during this trial. That is your job and your job alone. I play no part in finding the facts. You should not take anything I may have said or done during the trial as indicating what I think of the evidence or what I think that your verdict should be.

Your second duty is to apply the law that I give you to the facts. My role now is to explain to you the legal principles that must guide you in your decisions. You must apply my instructions carefully. Each of the instructions is important and you must apply all of them. You must not

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 4

Exhibit 73 - 15

94

mitigating factors such that the death penalty should be imposed.

Again, each juror is to individually decide what weight or value is to be given to any particular aggravating or mitigating factor in the decisionmaking process.  Bear in mind, of course, that in order to find that a sentence of death is appropriate for a particular count, the jurors must be unanimous in their conclusion that the aggravating factors proven as to that count sufficiently outweigh any mitigating factors found or, in the absence of any mitigating factors, that the aggravating factors alone are sufficient to justify a sentence of death.

If, after weighing the aggravating and mitigating factors, you unanimously determine that a sentence of death shall be imposed, then the Court is required to sentence Mr. Bowers to death.  Otherwise, whether the jury is unanimous for life or not unanimous, the sentence will be life in prison without the possibility of release.

If the jury determines a sentence of death shall be imposed for any one or more of the capital counts, even if the juror returns a sentence of life imprisonment for one or more other capital counts, the Court will impose a sentence of death upon Mr. Bowers.

The process by which you must reach your decision requires that you make and record certain findings in a

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 5

Exhibit 73 - 16

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ROBERT BOWERS | Criminal No. 18-292 |

## SENTENCE SELECTION PHASE VERDICT FORM

**Section I: Counts to Consider** .......................................................................................2

**Section II: Non-Statutory Aggravating Factors**.......................................................... 4

**Section III: Mitigating Factors** ...................................................................................... 7

**Section IV: Determination of Sentence**........................................................................ 23

**Section V: Justice Without Discrimination** ................................................................ 26

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 6

Exhibit 73 - 17

Section IV.C: Mixed determination of sentences: After considering whether the aggravating factors found to exist as to each count sufficiently outweigh the mitigating factor or factors found to exist for that count to justify a death sentence or, in the absence of any mitigating factors, whether the aggravating factors alone are sufficient to justify a death sentence:

a. _____ We, the jury, unanimously find that death is the appropriate sentence for Robert Bowers with regard to each of the following capital counts only (identify each count by number):

_____

_____

b. _____ We, the jury, unanimously find that life in prison without the possibility of release is the appropriate sentence for Robert Bowers with regard to each of the following capital counts only (identify each count by number):

_____

_____

_____ **Failure to Reach Unanimous Decision.** We, the jury, are unable to reach a unanimous decision on any capital count regarding whether life imprisonment without the possibility of release or death is the appropriate sentence in this case.

<u>Directions</u>: After you have completed your sentence determination in this section (regardless of what determination was made), continue on to Section V.

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 7

Exhibit 73 - 18

*United States v. Sayfullo Habibullaevic Saipov*
No. 1:17-CR-00722-VSB (S.D.N.Y.)
Judge Presiding: The Hon. Vernon S. Broderick
(Voir dire began on October 11, 2022.)

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 8

Exhibit 73 - 19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA <br><br> -v.- <br><br> SAYFULLO HABIBULLAEVIC SAIPOV, <br><br> Defendant. | S1-17-CR-722 (VSB) |

## JUROR QUESTIONNAIRE

**JUROR NUMBER: _____**

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Exhibit 73 - 20

90.    Under the law, if the jury is unanimous for a death sentence, that sentence will be imposed. If the jurors are not unanimous about the appropriate punishment, then a sentence of life imprisonment without the possibility of release is imposed. In other words, if one juror votes to impose a sentence of life imprisonment without the possibility of release that sentence will be imposed.  Whether you agree or disagree with this principle, if you are chosen as a juror you must apply this principle.  Would you have difficulty applying this principle?

☐ Yes        ☐ No

Please explain: _____

_____

91.    If you are chosen as a juror in this case, the judge will instruct you that possible punishments are not to be considered during the guilt/innocence phase of trial, at which the jury must determine if the defendant is guilty or not guilty of the offenses charged in the indictment.  Will you be able to follow this instruction and, at the guilt/innocence phase of trial, consider whether the defendant is guilty or not guilty of the offenses charged in the indictment without consideration of the possible punishments?

☐ Yes        ☐ No

IF NO, please explain:

_____

_____

_____

Exhibit B. DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 10

Exhibit 73 - 21

## SECTION 10:  QUESTIONS CONCERNING PUNISHMENT

### INTRODUCTION

In a case where jurors may have to decide between lifetime incarceration or death as possible punishments, it is important that we know your opinions and feelings regarding punishment.

If there is a punishment phase of the trial, it will be the jurors' responsibility to determine whether Sayfullo Saipov will be sentenced to life imprisonment without the possibility of release or sentenced to the death penalty. In the federal system there is no parole; therefore, if Defendant Saipov is sentenced to life imprisonment he will spend the rest of his life in prison and never be released.

The decision whether to impose a sentence of life imprisonment without the possibility of release or death is one the law leaves entirely up to the jurors. Each juror must ultimately make a unique individual judgment about whether to sentence a defendant to life imprisonment without the possibility of release or to death.

If, and only if, all twelve jurors unanimously find that death is the only appropriate sentence for Sayfullo Saipov, will a death sentence be imposed. On the other hand, if one or more jurors find that a sentence of life imprisonment without the possibility of release is the appropriate sentence for Defendant Saipov, the judge will impose a sentence of life imprisonment without the possibility of release.

During a punishment phase, jurors consider certain evidence referred to in the law as "aggravating factors," and "mitigating circumstances." Aggravating factors are factors that could support a sentence of death. In order for an aggravating factor to be considered, all twelve jurors must agree that the factor has been proved by the government beyond a reasonable doubt. Jurors may not consider anything else as an aggravating factor.

Mitigating factors pertain to the circumstances of the offense, or the personal traits, character, or background of the Defendant, or anything else relevant to the sentencing decision that would suggest, for any individual juror, that life imprisonment without the possibility of release rather than death is the appropriate punishment. Mitigating circumstances do not excuse or justify the crime and the law does not require that there be a connection between the mitigating circumstances and the crime committed.

The sentence imposed by the jury, whether a unanimous vote for life, a non-unanimous vote for life or a unanimous vote for death, is final. The judge must follow the jury's sentencing determination.

This is only an overview of the law about jurors' consideration of life imprisonment without the possibility of release and the death penalty. If this case requires a punishment phase, the judge will instruct jurors in greater detail about their duties.

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 11

Exhibit 73 - 22

By asking these questions about punishment, the Court is not suggesting in any way that the defendant is guilty, or that you will in fact be called upon to decide a penalty in this case. The Court must know, however, whether you could be fair to both the prosecution and the defense on the issue of punishment if you reach that issue.

With the above overview in mind, please answer the following questions completely and honestly, always remembering that there are no right or wrong answers.

## SENTENCING QUESTIONS

113.    In general, what are your views on the death penalty?

_____

_____

_____

_____

_____

_____

114.    Please CIRCLE below the number from 1 - 10 that best reflects your overall opinion regarding the death penalty, with "1" being strongly opposed and "10" being strongly in favor:

Strongly Opposed                                        Strongly in favor

    1    2    3    4    5    6    7    8    9    10

115.    Which of the following best describes your view (please check only one):

☐ If a person is convicted of a crime for which the death penalty is authorized, I will always vote to impose it, regardless of the facts and law in the case, and could not vote for a life sentence under those circumstances.

☐ I am strongly in favor of the death penalty and would have a difficult time voting against it if a person is convicted of a capital crime, regardless of the facts and law in the case.

☐ I generally favor the death penalty, but I would base a decision to impose it on the facts and the law in the case.

☐ I do not have strong opinions either for or against the death penalty, and I would consider both alternatives and base a decision to impose it on the facts and law in the case.

☐ I am generally opposed to the death penalty, but I believe I can put aside my feelings against the death penalty and impose it if is called for by the facts and the law in the case.

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 12

Exhibit 73 - 23

1

MABNSAIVD1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

          v.                                    17 Cr. 722 (VSB)

SAYFULLO HABIBULLAEVIC SAIPOV,

           Defendant.
                                Voir Dire
------------------------------x
                                New York, N.Y.
                                October 11, 2022
                                10:50 a.m.

Before:

                  HON. VERNON S. BRODERICK,

                                District Judge

                      APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  AMANDA L. HOULE
     JASON A. RICHMAN
     ALEXANDER N. LI
     ANDREW S. DEMBER
     Assistant United States Attorneys

DAVID E. PATTON
     Federal Defenders of New York, Inc.
     Attorney for Defendant
BY:  DAVID E. PATTON
     SYLVIE J. LEVINE
     ANDREW J. DALACK
     ANNALISA MIRON
     -and-
ROTHMAN, SCHNEIDER, SOLOWAY & STERN, LLP
BY:  DAVID M. STERN
     -and-
RUHNKE & BARRETT
BY:  DAVID A. RUHNKE

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)          Page 13

Exhibit 73 - 24

31

MABNSAIVD3                    Voir Dire

jurors agree unanimously, at the conclusion of the penalty phase if all 12 jurors unanimously find that life imprisonment without the possibility of release is appropriate, then a sentence of life imprisonment without the possibility of release will be imposed.

If, and only if, all 12 jurors unanimously find that death is the only appropriate sentence will a death sentence be imposed.  If one or more jurors find that a sentence of life imprisonment without the possibility of release is the appropriate sentence, then the jury is not unanimous in its decision regarding punishment.  Then the Court will impose a sentence of life imprisonment without the possibility of release.

The sentence imposed by the jury, whether a unanimous vote for life imprisonment, a unanimous vote for death, a nonunanimous vote for life is final.  I must follow the jury's sentencing determination.

This is only an overview of the law to provide you some context to answer our questions today.  At trial, I will instruct jurors in greater detail about their duties.  I want to thank you again for taking part in this important process and for returning to the courthouse today.

This completes my preliminary remarks, ladies and gentlemen.  I will now ask my deputy clerk Leyni Rodriguez to readminister the oath that will be govern your participation in

Exhibit 73 - 25

84

MABNSAIVD5                    Voir Dire

JUROR:  Not if it's proven that he did what he did.

THE COURT:  Now, in connection with Question 129, "Guided by the Court's instructions and the evidence presented, each juror ultimately makes the life or death sentencing decision for themselves based on the juror's own unique individual moral judgment.  If you serve as a juror in this case, will you respect the right of each juror to arrive at an individual decision even if you disagree with any of that juror's sentencing decision?"

And you responded, "Yes."

Now, as a follow-up, do you think this principle is important?

JUROR:  Yes.

THE COURT:  And why do you think it's important?

JUROR:  Because we all have a voice and we all have the -- or deserve the opportunity to share our voice and why we feel the way we feel.  And there should be no blocking or discouraging of that.

THE COURT:  Okay.  Now, in Question 90 it asks, "Under the law, if the jury is unanimous for a death sentence, the sentence will be imposed.  If jurors are not unanimous about the appropriate punishment, then a sentence of life imprisonment without the possibility of release is imposed.  In other words, if one juror votes to impose a sentence of life imprisonment without the possibility of release that sentence

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 15

Exhibit 73 - 26

MABNSAIVD5                    Voir Dire

will be imposed.  Whether you agree or disagree with this principle, if you are chosen as a juror you must apply this principle.  Would you have difficulty applying this principle?"

And you responded, "No."

Each juror is ultimately called upon to make the life or death sentencing decision for him or herself based on the juror's own unique individual moral judgment.  At the end of the day you may by your individual vote be responsible for deciding whether Mr. Saipov lives or dies.  Can you share with us how having this responsibility makes you feel.

JUROR:  I can't say it makes me feel good or bad either way.  Again, if it's proven without -- it's proven beyond a shadow of a doubt that he did it.

THE COURT:  Now, just another question.  You may hear from Mr. Saipov's family, who are practicing Muslims, some of whom live here and some of whom will come from Uzbekistan. They include women in Mr. Saipov's family who will appear in traditional covered dress.  How do you feel about that?

JUROR:  No, no difference.  Indifference.

THE COURT:  That doesn't impact you one way or the other?

JUROR:  No.

THE COURT:  Do you think it would create any conscious or unconscious bias as you think about punishment?

JUROR:  No.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Exhibit 73 - 27

3542

N388SAI1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x
UNITED STATES OF AMERICA,

                v.                          17 Cr. 722 (VSB)

SAYFULLO HABIBULLAEVIC SAIPOV,

                Defendant.
                                            Trial
-------------------------------x
                                            New York, N.Y.
                                            March 8, 2023
                                            10:50 a.m.

Before:

                    HON. VERNON S. BRODERICK,

                                    District Judge
                                    -and a Jury-

                        APPEARANCES

DAMIAN WILLIAMS
        United States Attorney for the
        Southern District of New York
BY:    AMANDA L. HOULE
        JASON A. RICHMAN
        ALEXANDER N. LI
        ANDREW S. DEMBER
        Assistant United States Attorneys

DAVID E. PATTON
        Federal Defenders of New York, Inc.
        Attorney for Defendant
BY:    DAVID E. PATTON
        SYLVIE J. LEVINE
        ANDREW J. DALACK
        ANNALISA MIRON
        -and-
ROTHMAN, SCHNEIDER, SOLOWAY & STERN, LLP
BY:    DAVID M. STERN
        -and-
RUHNKE & BARRETT
BY:    DAVID A. RUHNKE

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)                                                    Page 17

Exhibit 73 - 28

3609

N38MSAI4                    Charge

question, the law relies on each of you to determine what is sufficient outweighing to make the death penalty rather than life imprisonment without the possibility of release the more appropriate sentence.

Each juror is individually to decide what weight or value, if any, is to be given to a particular aggravating or mitigating factor in the decision-making process. Bear in mind, however, that in order to find that a sentence of death is justified for a particular count, the jurors must be unanimous in their conclusion that the aggravating factor or factors proven as to that count sufficiently outweigh any mitigating factors found to justify a sentence of death.

Determination of sentence.

Each juror is entitled to his or her opinion. Each should, however, exchange views with his or her fellow jurors. That is the very purpose of jury deliberation, to discuss and consider the evidence, to listen to arguments of fellow jurors, to present your individual views, to consult with one another, and to reach an agreement based solely and wholly on the evidence. But each juror must ultimately make the sentencing decision for themselves based on the juror's unique individual moral judgment. Thus, each juror must respect the right of every or juror to arrive at an individual decision. This means that each juror must treat every other juror with respect and dignity and not intimidate, coerce, or bully any other juror

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)                                                        Page 18

Exhibit 73 - 29

3610

N38MSAI4                          Charge

about a vote one way or another about any factor or the

ultimate punishment decision, if they disagree.

        If you unanimously determine that that all the

aggravating factor or factors found to exist sufficiently

outweigh all the mitigating factor or factors found to exist to

justify a sentence of death, or in the absence a mitigating

factor, that the aggravating factor or factors alone are

sufficient to justify a sentence of death, please mark the

appropriate box provided in Section VI of the special verdict

form for the count you are considering.  If you unanimously

find that Mr. Saipov should be sentenced to life imprisonment

without the possibility of release, please mark the appropriate

box provided in Section VI of the special verdict form for the

count you are considering.

        As I have told you, you should unanimously decide --

as I told you, should you unanimously decide to impose the

death or to impose life imprisonment without the possibility of

release, I am required by law to abide by your decision and to

sentence Mr. Saipov accordingly.  In the event that you do not

unanimously decide to sentence Mr. Saipov to death or

unanimously decide to sentence Mr. Saipov to life imprisonment

without the possibility of release for a particular count, the

Court will sentence Mr. Saipov to life imprisonment without the

possibility of release.

        If you have concluded that you are unable to reach a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 19

Exhibit 73 - 30

JUDGE BRODERICK,

WE HAVE CONCLUDED
WE ARE UNABLE TO REACH A
UNANIMOUS DECISION.

JUROR #1

Court Exhibit #14

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 20

Exhibit 73 - 31

*United States v. Brandon Council*
No. 4:17-cr-00866-RBH (D.S.C.)
Judge Presiding: The Hon. R. Bryan Harwell
(Voir Dire began on September 9, 2019.)

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 21

Exhibit 73 - 32

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| United States of America, | ) | Criminal No.: 4:17-cr-00866-RBH |
| | ) | |
| v. | ) | **JURY INSTRUCTIONS** |
| | ) | **PENALTY PHASE - OPENING INSTRUCTIONS** |
| Brandon Michael Council, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Members of the jury, this morning we begin the second phase of this trial, the penalty phase. As I told you at the beginning of the first phase of the trial, the purpose of this hearing is to determine whether the defendant should be sentenced to life imprisonment without the possibility of release or sentenced to death for his commission of certain crimes charged by the government.

Now that you have been sworn as the jury to try the penalty phase of this case, I want to give you some preliminary instructions. What I will say is intended to serve as an introduction to the sentencing proceeding that you will be participating in. I want to describe how the sentencing proceeding will be conducted and to explain the roles of the major participants in this case. At the end of this phase, I will give you more detailed guidance on how you are to go about reaching your decision.

You have unanimously found the defendant guilty of both counts in the indictment, which are capital offenses. There are two forms of punishment possible under the law for these offenses. Number one, life imprisonment without the possibility of release, which means just what those words imply. The defendant would serve the rest of his natural life in prison with no possibility of being released under any circumstances. Or, number two, the death penalty, which

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 22

Exhibit 73 - 33

present which, in that juror's mind, is not outweighed by the aggravating factors proven, then, of course, your verdict could not be unanimous because of that juror's position. Separate considerations must be given to aggravating and mitigating factors in each count.

If, after weighing the aggravating and mitigating factors, you unanimously recommend a sentence of life imprisonment without the possibility of release, the court is required to sentence the defendant to life in prison without the possibility of release. If, on the other hand, after weighing the aggravating and mitigating factors, you unanimously recommend that a sentence of death be imposed, then the court is required to sentence the defendant to death. If you cannot unanimously agree that the defendant should be sentenced to death, I will sentence the defendant to life in prison without the possibility of release.

This concludes my preliminary instructions as to the procedure to be followed for the penalty phase of this case.

15

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 23

Exhibit 73 - 34

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| United States of America, | ) | Criminal No.: 4:17-cr-00866-RBH |
| | ) | |
| v. | ) | **JURY INSTRUCTIONS** |
| | ) | **PENALTY PHASE - CLOSING INSTRUCTIONS** |
| Brandon Michael Council, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Now that you have heard all of the evidence in the case and the arguments of the attorneys, it is my duty to instruct you on the rules of law that you must follow in arriving at your decision as to whether the defendant, Brandon Michael Council, should be sentenced to life in prison without the possibility of release, or sentenced to death. Your unanimous finding of guilt in the previous guilt phase of this trial ensures that he will be punished with one of the two most severe punishments available under law.

As you know, the defendant has been found guilty of both counts of the indictment, which are capital offenses. You will have to decide the appropriate punishment and return individual verdicts for each of the two death-penalty-eligible counts. The instructions that I give you today apply equally to both counts that you must decide. I remind you that, at the time you were selected as jurors, each of you assured me that you would follow the law as I told you it applied. It is imperative that you do that.

Regardless of any opinion you may have as to what the law is, or should be, it would be a violation of your oaths, as jurors, to base your verdict upon any other view of the law than what I give you in these instructions. You and you alone will decide whether the defendant should be sentenced to life in prison without possibility of release or sentenced to death. The law does not

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 24

Exhibit 73 - 35

determination in Section VI.

If you cannot unanimously agree on either a death sentence or a life sentence, you should indicate that on Section VI on the special verdict form and I will impose a sentence of life imprisonment without possibility of release upon the defendant. That will conclude the case.

## DUTY TO DELIBERATE

Remember, at all times, you are not partisans. Your sole interest is to speak the truth from the evidence in the case and reach an appropriate judgment within the legal framework as I have described it for you. When you are in the jury room, please discuss all aspects of these sentencing issues among yourselves with candor, frankness, and a due regard for the opinions of one another. It is your duty, as jurors, to discuss the case with one another in an effort to reach an agreement, if you can do so. Each of you must decide the case for yourself, but only after full consideration of the evidence with the other members of the jury. While you are discussing the case, do not hesitate to re-examine your opinion and change your mind if you become convinced that you were wrong. But do not give up your honest beliefs solely because the others think differently or merely to get the case over with.

Remember that the parties and the court are relying upon you to give full, careful, and mature consideration to this sentencing issue. By so doing, you carry out, to the fullest, your oaths as jurors to try the issues of this case well and truly and to render a just result. Be truthful to the oath that you have taken by taking time to understand the instructions I have given to you and thoroughly and thoughtfully discuss the evidence you have heard to be sure that the decision you make is yours and yours alone. Your verdict should be one which you feel justice dictates after calm and deliberate consideration of all the evidence.

28

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 25

Exhibit 73 - 36

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| United States of America, | ) | Criminal No.:  4:17-cr-00866-RBH |
| | ) | |
| v. | ) | **SPECIAL VERDICT FORM** |
| | ) | |
| Brandon Michael Council, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COUNT 1 – BANK ROBBERY RESULTING IN DEATH

I.    AGE OF DEFENDANT

Do you unanimously find that the government has established beyond a reasonable doubt that Brandon Michael Council was eighteen (18) years of age or older at the time of the offense? *(Mark your response with an "X" below)*

__X__ YES              ____ NO

*Instructions*:    *If you answered "YES" to the question above, proceed below to Section II.*

*If you answered "NO" to the question above, stop your deliberations, skip over Sections II, III, IV, V, and VI of this form, and proceed to Section VII. Each juror should carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which each juror reached his or her decision. You should then advise the court that you have reached a decision*

Page 1 of 14

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 26

Exhibit 73 - 37

2.    **SENTENCE OF LIFE IMPRISONMENT WITHOUT THE POSSIBILITY OF RELEASE**

    A.    **Unanimous Decision for Life Imprisonment**

    We, the jury, unanimously conclude that a sentence of life imprisonment without the possibility of release shall be imposed as to Count One.

                                 _____
                                 FOREPERSON(Signature & Juror Number)

                                 Date:_____

    B.    **Unable to Reach Any Unanimous Decision**

    We, the jury, are unable to come to a unanimous decision in favor of a life sentence without the possibility of release or in favor of a death sentence as to Count One. We understand that the Court will impose a sentence of life imprisonment without the possibility of release as to Count One.

                                   _____
                                 FOREPERSON(Signature & Juror Number)

                                 Date:_____

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

                                                          Page 27

Exhibit 73 - 38

2.    **SENTENCE OF LIFE IMPRISONMENT WITHOUT THE POSSIBILITY OF RELEASE**

A.    **Unanimous Decision for Life Imprisonment**

We, the jury, unanimously conclude that a sentence of life imprisonment without the possibility of release shall be imposed as to Count Two.

_____

FOREPERSON(Signature & Juror Number)

Date:_____

B.    **Unable to Reach Any Unanimous Decision**

We, the jury, are unable to come to a unanimous decision in favor of a life sentence without the possibility of release or in favor of a death sentence as to Count Two. We understand that the Court will impose a sentence of life imprisonment without the possibility of release as to Count Two.

_____

FOREPERSON(Signature & Juror Number)

Date:_____

Page 13 of 14

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 28

Exhibit 73 - 39

*United States v. Brendt Christensen*
No. 2:17-cr-20037-JES (C.D. Ill.)
Judge Presiding: The Hon. James E. Shadid
(Voir Dire began on June 3, 2019.)

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 29

Exhibit 73 - 40

2:17-cr-20037-JES-JEH   # 481   Page 1 of 21

E-FILED
Thursday, 18 July, 2019 04:24:07 PM
Clerk, U.S. District Court, ILCD

FILED

JUL 1 8 2019

CLERK OF COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT COURT
DISTRICT OF ILLINOIS

## SPECIAL VERDICT FORM

I have prepared a form entitled "Special Verdict Form" to assist you during your deliberations. You are required to record your decisions on the Special Verdict Form. Section I of the Special Verdict Form is where you will record your findings on the defendant's Age. Section II is where you will record your findings on the Threshold Intent Factors. Section III is where you will record your findings on Statutory Aggravating Factors. Section IV is where you will record your findings on Non-Statutory Aggravating Factors. Section V is where you will record your findings on Mitigating Factors. Section VI is where you will record your sentence determinations. Finally, Section VII contains the non-discrimination certification each juror must read and sign. You are each required to sign the Special Verdict Form.

Once you have finished your deliberations and filled in, signed, and dated the Special Verdict Form, you will advise the Court that you have reached a verdict.

1

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 30

Exhibit 73 - 41

## SECTION VI. DETERMINATION OF SENTENCE

*Instructions*: Consider whether the Aggravating Factor or Factors found to exist sufficiently outweigh any Mitigating Factor or Factors found to exist, or in the absence of any Mitigating Factors, whether the Aggravating Factor or Factors are themselves sufficient to justify a sentence of death, and whether death is therefore the appropriate sentence in this case. A sentence of death shall only be imposed if your decision in favor of it is unanimous. Based upon that consideration, check one of the following:

**_____ We, the jury, unanimously find that the aggravating factor or factors found to exist sufficiently outweigh the mitigating factor or factors found to exist or, in the absence of any mitigating factors, that the aggravating factor or factors alone are sufficient so that death is the appropriate sentence for Brendt Christensen.**

**_____ We, the jury, unanimously find that a sentence of life in prison without the possibility of release is the appropriate sentence for Brendt Christensen.**

**X\_\_\_\_ Based upon our consideration of the evidence, and in accordance with the court's instructions, after making all reasonable efforts, we, the jury, are unable to reach a unanimous decision in favor of a life sentence or in favor of a death sentence.**

After answering the above question, each juror should sign his or her name below and the date should be filled in. Once each juror has signed proceed to Section VII of this Special Verdict Form.

19

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Exhibit 73 - 42

*United States v. Brendt Christensen*, No. 2:17-cr-20037-CSB-EIL (C.D. Ill. 2019) (Doc. 487 at 7)

**Note from the jury on July 18, 2019, at 1:30 p.m.**

E-FILED
Monday, 22 July, 2019 09:01:31 AM
Clerk, U.S. District Court, ILCD

We need help — the jury
would like the to know
what the results are from if
there is no unanimous
decision.    Section VII #3
page 19 is not clear,

s/ juror

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 32

Exhibit 73 - 43

**Instruction from the Court on July 18, 2019, at 1:58 p.m.**

I refer you back to page 30 instruction 16 Duty to Deliberate for your review.

Having said that, if after weighing the aggravating and mitigating factors as instructed, you are still unable to unanimously agree as to a sentence of life without possibility of release, or a sentence of death, and you so inform the Court of that, the Court will impose a sentence of life without the possibility of release.

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 33

Exhibit 73 - 44

**Note from the jury on July 18, 2019 at 2:08 p.m.**

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 34

Exhibit 73 - 45

*United States v. Ulysses Jones*
No. 6:10-cr-03090-DGK (W.D. Mo.)
Judge Presiding: The Hon. Greg Kays
(Voir dire began September 25, 2017.)

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 35

Exhibit 73 - 46

**Query     Reports     Utilities     Help     Log Out**

CLOSED

# U.S. District Court
## Western District of Missouri (Springfield)
## CRIMINAL DOCKET FOR CASE #: 6:10-cr-03090-DGK-1

Case title: USA v. Jones

Date Filed: 11/08/2010
Date Terminated: 03/19/2018

---

Assigned to: District Judge Greg Kays

### Defendant (1)

**Ulysses Jones, Jr**
*TERMINATED: 03/19/2018*

represented by **Shane Paul Cantin**
Carver, Cantin and Mynarich, LLC
901 East St. Louis Street
Suite 1600
Springfield, MO 65806
(417) 831-6363
Fax: (417) 831-7373
Email: shane@carvercantin.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Thomas D. Carver**
Carver, Cantin and Mynarich, LLC
901 East St. Louis Street
Suite 1600
Springfield, MO 65806
417-831-6363
Fax: 417-831-7373
Email: tom@carvercantin.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

### Pending Counts

MURDER, FIRST DEGREE
(1s)

### Disposition

The defendant was found guilty on counts

EXHIBIT B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Exhibit 73 - 47

| | | Lambrecht, 816-512-5623. (Strodtman, Tracy) (Entered: 10/11/2017) |
|---|---|---|
| 10/11/2017 | 425 | Minute Entry for proceedings held before Chief District Judge Greg Kays: Jury Trial - DAY 12 - Death Penalty Phase as to Ulysses Jones, Jr held on 10/11/2017, Time in court: 8:19 a.m. to 4:22 p.m. To order a transcript of this hearing please contact Reggie Lambrecht, 816-512-5623. (Strodtman, Tracy) (Entered: 10/11/2017) |
| 10/11/2017 | 426 | NOTICE of filing *Defendant's Requested Additional Penalty Phase Instruction* by Ulysses Jones, Jr (Cantin, Shane) (Entered: 10/11/2017) |
| 10/11/2017 | 427 | Counter PROPOSED JURY INSTRUCTIONS to Doc. 426 by USA as to Ulysses Jones, Jr (Peterson, James) Modified on 10/12/2017 creating document link (Siegert, Karen). (Entered: 10/11/2017) |
| 10/11/2017 | 428 | DRAFT PROPOSED PENALTY PHASE JURY INSTRUCTIONS. (Strodtman, Tracy) (Entered: 10/12/2017) |
| 10/12/2017 | 429 | Minute Entry for proceedings held before Chief District Judge Greg Kays: Jury Trial - DAY 13 - Death Penalty Phase as to Ulysses Jones, Jr held on 10/12/2017. Time in court: 8:19 a.m. to 11:56 a.m. To order a transcript of this hearing please contact Reggie Lambrecht, 816-512-5623. (Strodtman, Tracy) (Entered: 10/12/2017) |
| 10/12/2017 | 430 | MOTION in limine *To Prevent or Limit Government Intended Rebuttal Testimony* by Ulysses Jones, Jr. Suggestions in opposition/response due by 10/26/2017 unless otherwise directed by the court. (Cantin, Shane) (Entered: 10/12/2017) |
| 10/13/2017 | 431 | SUGGESTIONS in opposition by USA as to Ulysses Jones, Jr re 430 MOTION in limine *To Prevent or Limit Government Intended Rebuttal Testimony* . Reply suggestions due by 10/27/2017 unless otherwise directed by the court. (Peterson, James) (Entered: 10/13/2017) |
| 10/13/2017 | 432 | ORDER concerning final jury instructions. Signed on October 13, 2017, by Chief District Judge Greg Kays. Any substantive objections to these instructions should be filed in writing by Saturday, October 14, 2017, at 5 p.m. If either party finds any typographical errors, he or it may simply email the Court's law clerk. (Attachments: # 1 Special Verdict Form) (Law clerk) (Entered: 10/13/2017) |
| 10/13/2017 | 433 | Minute Entry for proceedings held before Chief District Judge Greg Kays: Jury Trial - DAY 14 - Death Penalty Phase as to Ulysses Jones, Jr held on 10/13/2017. Time in court: 8:16 a.m. to 6:24 p.m. To order a transcript of this hearing please contact Reggie Lambrecht, 816-512-5623. (Strodtman, Tracy) (Entered: 10/16/2017) |
| 10/16/2017 | 434 | PENALTY PHASE JURY INSTRUCTIONS GIVEN. (Strodtman, Tracy) (Entered: 10/16/2017) |
| 10/16/2017 | 435 | Minute Entry for proceedings held before Chief District Judge Greg Kays: Jury Trial - DAY 15 - Death Penalty Phase as to Ulysses Jones, Jr held on 10/16/2017. Time in court: 8:16 p.m. to 3:16 p.m. To order a transcript of this hearing please contact Reggie Lambrecht, 816-512-5623. (Strodtman, Tracy) (Entered: 10/16/2017) |
| 10/16/2017 | 436 | SPECIAL VERDICT FORMS as to Ulysses Jones Jr (1). (Strodtman, Tracy) (Entered: 10/16/2017) |

EXHIBIT B - DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Exhibit 73 - 48

## Instruction No. 37

Concerning Counts One and Two, if you find unanimously and beyond a reasonable doubt that the defendant was eighteen years of age or older when he committed the offense; that he acted with the requisite intent; and that the government proved the existence of at least one statutory aggravating factor; and after you then determine whether or not the government proved the existence of a non-statutory aggravating factor submitted to you, and whether or not the defendant proved the existence of any mitigating factors, you will then engage in a weighing process. In determining the appropriate sentence, all of you must weigh the aggravating factor that you unanimously found to exist—whether statutory or non-statutory—and each of you must weigh any mitigating factors that you individually found to exist, and may weigh any mitigating factors that another or others of your fellow jurors found to exist. In engaging in the weighing process, you must avoid any influence of passion, prejudice, or undue sympathy. Your deliberations should be based upon the evidence you have seen and heard and the law on which I have instructed you.

Again, whether or not the circumstances in this case justify a sentence of death is a decision that the law leaves entirely to you.

The process of weighing aggravating and mitigating factors against each other in order to determine the proper punishment is not a mechanical process. In other words, you should not simply count the number of aggravating and mitigating factors and reach a decision based upon which number is greater; you should consider the weight and value of each factor.

The law contemplates that different factors may be given different weights or values by different jurors. Thus, you may find that one mitigating factor outweighs all aggravating factors combined, or that the aggravating factor proved does not, standing alone, justify imposition of a sentence of death. If one or more of you so find, you must return a sentence of life in prison without possibility of release. Similarly, you may unanimously find that a particular aggravating factor sufficiently outweighs all mitigating factors combined to justify a sentence of death. You are to decide

Exhibit 73 - 49

what weight or value is to be given to a particular aggravating or mitigating factor in your decision-making process.

If you unanimously conclude as to one or both counts that the aggravating factor or factors found to exist sufficiently outweigh any mitigating factor or factors which any of you found to exist to justify a sentence of death, and that therefore death is an appropriate sentence in this case, you must record your determination that a sentence of death shall be imposed in Section VI(A), of the Special Verdict Form for that particular count.

If you determine that death is not justified for one or both counts, you must complete Section VI(A) of the Special Verdict Form and record your determination that the defendant be sentenced to life imprisonment without possibility of release in Section VI(B) on the Special Verdict Form for that particular count.

You are reminded that you are to make a separate determination for each count.

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

434   Filed 10/16/17   Page 16 of 22

Page 39

Exhibit 73 - 50

**Instruction No. 38**

At the end of your deliberations, if you unanimously determine that the defendant should be sentenced to death, or to life imprisonment without possibility of release, the court is required to impose that sentence.

If you cannot unanimously agree whether under Counts One and Two the defendant should be sentenced to death or life imprisonment without possibility of release, the court will sentence the defendant to life imprisonment without the possibility of release. There is no parole in the federal system.

Again, you are reminded that you are to make a separate determination for each count.

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS          Page 40
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Case 6:10-cr-03090-DGK    Document 434    Filed 10/16/17    Page 17 of 22

Exhibit 73 - 51

*United States v. Jessie Con-Ui*
No. 3:13-cr-00123-ARC (M.D. Pa.)
Judge Presiding: The Hon. A. Richard Caputo
(Voir dire began April 24, 2017.)

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 41

Exhibit 73 - 52

1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA :
                        :
        vs              :        3:13-CR-00123
                        :
JESSIE CON-UI           :
                        :

        BEFORE:      THE HONORABLE A. RICHARD CAPUTO

        PLACE:       COURTROOM NO. 1

        PROCEEDINGS: PENALTY TRIAL

        DATE:        THURSDAY, JULY 7, 2017


APPEARANCES:

For the United States:

FRANCIS P. SEMPA, ESQ.
ROBERT J. O'HARA, ESQ.
U.S. ATTORNEY'S OFFICE
235 NORTH WASHINGTON AVENUE
3RD FLOOR
SCRANTON, PA 18503

ROBERT J. FEITEL, ESQ.
UNITED STATES DEPARTMENT OF JUSTICE
1331 F. STREET, NW
WASHINGTON, DC 20530


For the Defendant:

DAVID A. RUHNKE, ESQ.
RUHNKE & BARRETT
47 PARK STREET
MONTCLAIRE, NJ 07042

JAMES A. SWETZ, ESQ.
711 SARAH STREET
STROUDSBURG, PA 18360

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 42

Exhibit 73 - 53

165

with regard to each of the two counts, counts one and two for each -- for which each of you have found at least one gateway factor and at least one statutory aggravating factor. Each juror must individually decide whether the facts and circumstances in the case as to each count call for the -- for death as the appropriate sentence.

In determining the appropriate sentence, all of you must weigh the aggravating factor or factors that you unanimously found to exist whether they are statutory or non-statutory, and each of you must weigh and mitigating factors or factors you individually found to exist and may weigh any mitigating factors that your fellow jurors found to exist. In engaging in the weighing process, you must avoid any influence of passion, prejudice or undue sympathy.

Your deliberations should be based upon the evidence that you have seen and heard and the law on which I have instructed you. Again, whether or not the circumstances of this case justify a sentence of death is a decision that the law leaves entirely to you. The law never requires the imposition of a sentence of death and never assumes that any defendant found guilty of committing capital murder must be sentenced to death.

In carrying out this weighing and balancing process, the members of the jury are not mere fact finders. Instead jurors are called upon to make a unique individualized personal

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 43

Exhibit 73 - 54

166

moral judgment about the appropriateness of sentencing another human being to death. This is not a mechanical process. Neither is the decision determined by raw numbers. Members of a death penalty jury do not simply count factors.

Instead individual jurors consider such factors qualitatively assessing the weight and value of each factor. The law contemplates different factors may be given different weights or values by different jurors. Thus, any single mitigating factor may outweigh several aggravating factors. On the other hand, one aggravating factor proved may outweigh several mitigating factors. In short what is called for in weighing the various factor is not an arithmetic calculation but an individual juror's careful considered and mature judgment as to the weight to be given to the aggravating and mitigating factors present in this case.

It's up to you how much weight you individually assign to each particular mitigating factor. You can give it a lot of weight, a little weight or something in between. You may not give an established mitigating factor no weight. In the event you unanimously find that the balancing process leads you to the conclusion that a death sentence is called for as to the particular capital count you are considering, please mark the appropriate space on the special verdict form.

If after engaging in the balancing process you do not unanimously find the defendant should be sentenced to death,

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 44

Exhibit 73 - 55

167

then you may not impose the death penalty. In that event, the defendant will be sentenced to life imprisonment without the possibility of release.

Consequences of deliberations. At the end of your deliberations if you unanimously determine that the defendant should be sentenced to death or life imprisonment without the possibility of release, the Court is required to impose that sentence. If you cannot unanimously agree on whether the defendant should be sentenced to death, the Court will sentence the defendant to life imprisonment without the possibility of release.

Justice without discrimination. In your consideration of whether the death sentence is justified, you must not consider the race, color, religious beliefs, national origin or sex of either the defendant or the victim. You are not to return a sentence of death unless you would return a sentence of death for the crime in question without regard to race, color, religious beliefs, national origin or sex of either the defendant or the victim. To emphasize the importance of this consideration, section seven of the special verdict form on each count contains a certification statement.

Each juror should carefully read the statement and sign in the appropriate place if the statement accurately reflects the manner in which each of you reached your decision.

Special verdict. I have prepared a special form

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 45

Exhibit 73 - 56

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | **CRIMINAL NO. 3:CR-13-123** |
| | * | |
| JESSIE CON-UI, | * | |
| Defendant | * | |

## SPECIAL VERDICT FORM
### PENALTY PHASE

## COUNT I: First Degree Murder

1

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 46

Exhibit 73 - 57

**Special Verdict Form: COUNT I**

## SECTION VI. <u>DETERMINATION OF SENTENCE</u> FOR COUNT I

<u>Instructions</u>: In Section VI, enter your determination of the defendant's sentence with regard to Count I.

Based upon consideration of whether the Aggravating Factor or Factors found to exist sufficiently outweigh any Mitigating Factor or Factors found to exist to justify a sentence of death:

A.    We, the jury, determine, by unanimous vote, that a sentence of death shall be imposed on the defendant, JESSIE CON-UI, for Count I: First Degree Murder.

YES _____ NO ____✓____

B.    We, the jury, determine, by unanimous vote, that a sentence of life imprisonment without the possibility of release shall be imposed on the defendant, JESSIE CON-UI, for Count I: First Degree Murder.

YES _____ NO ____✓____

C.    We, the jury, are unable to reach a unanimous verdict. We understand that the consequence of this is that the defendant, JESSIE CON-UI, will be sentenced to life imprisonment without the possibility of release for Count I: First Degree Murder.

YES ____✓____ NO _____

21

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Exhibit 73 - 58

**Special Verdict Form: COUNT I**

Instructions: After entering your determination of the defendant's sentence with regard to Count I, each juror must sign his or her name below in the spaces provided, indicating that the above sentence determination reflects the jury's decision, whether unanimous or not:

The Foreperson shall indicate the date of signing:

Date: _July 10, 2017_

Instructions: Upon completion of Section VI (regardless of the sentence determination made), proceed to Section VII, which follows.

22

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 48

Exhibit 73 - 59

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. 3:CR-13-123** |
| | * | |
| **JESSIE CON-UI,** | * | |
| **Defendant** | * | |

## SPECIAL VERDICT FORM
## PENALTY PHASE

## COUNT II: First Degree Murder of a United States Corrections Officer

24

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Exhibit 73 - 60

### Special Verdict Form: COUNT II

Instructions: After entering your determination of the defendant's sentence with regard to Count II, each juror must sign his or her name below in the spaces provided, indicating that the above sentence determination reflects the jury's decision, whether unanimous or not:

_____

_____

FOREPERSON

The Foreperson shall indicate the date of signing:

Date: *July 10, 2017*

Instructions: Upon completion of Section VI (regardless of the sentence determination made), proceed to Section VII, which follows.

46

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 50

Exhibit 73 - 61

*United States v. Dylann Storm Roof*
No. 2:15-cr-00472-RMG (D.S.C.)
Judge Presiding: The Hon. Richard Mark Gergel
(Voir dire began November 28, 2016.)

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 51

Exhibit 73 - 62

779

IN THE DISTRICT COURT OF THE UNITED STATES
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION


UNITED STATES OF AMERICA,        )        2:15-cr-00472-RMG
                                 )
            Plaintiff,           )
                                 )
VS                               )
                                 )        Charleston,
DYLANN STORM ROOF,               )        South Carolina
                                 )        January 10, 2017
            Defendant.           )        Volume V


TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE RICHARD M. GERGEL,
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:        JULIUS NESS RICHARDSON
                          Assistant U.S. Attorney
                          U.S. Attorneys Office
                          1441 Main Street, Suite 500
                          Columbia, South Carolina 29201

                          MARY J. HAHN
                          Assistant U.S. Attorney
                          U.S. Department of Justice
                          601 D Street NW, Room 5200
                          Washington, DC 20003

                          NATHAN STUART WILLIAMS
                          Assistant U.S. Attorney
                          U.S. Attorneys Office
                          P.O. Box 876
                          Charleston, South Carolina


                          RICHARD E. BURNS
                          Assistant U.S. Attorney
                          U.S. Department of Justice
                          1331 F Street NW, Suite 625
                          Washington, DC 20530

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 52

KARR OFFICIAL COURT REPORTER

Exhibit 73 - 63

JURY CHARGE                              865

the weighing process, you must avoid any influence of passion, prejudice, or undue sympathy.  Your deliberations should be based upon the evidence you have seen and heard and the law on which I have instructed you.

You must -- you may not consider as an aggravating factor any matter not asserted by the Government as a statutory or nonstatutory aggravating factor.  Moreover, you may not consider as an aggravating factor any statutory or nonstatutory factor asserted by the Government that was not proven unanimously and beyond a reasonable doubt in sections 3 and 4.

The process of weighing aggravating and mitigating factors against each other in order to determine the proper punishment is not a mechanical process.  In other words, you should not simply count the number of aggravating and mitigating factors and reach a decision based on which number is greater.  You should instead consider the weight and value of each factor to make a unique, individualized, and reasoned moral judgment about the appropriateness of the death penalty as a punishment for each capital offense.

The law contemplates that different factors may be given different weights or values by different jurors.  Thus, you may find that one mitigating factor outweighs all the aggravating factors combined or that the aggravating factors proven do not justify imposition of a sentence of death

VANCE RR OFFICIAL COURT REPORTER

Exhibit 73 - 64

JURY CHARGE                                    866

rather than a sentence of life imprisonment without release. On the other hand, you may unanimously find a particular aggravating factor sufficiently outweighs all mitigating factors combined to justify a sentence of death rather than a sentence of life imprisonment without release.

Each juror must decide what weight or value should be given to a particular aggravating or mitigating factor in the decision-making process.  In other words, it is not an arithmatic analysis, but a qualitative weighing and a reasoned, moral judgment.  Whether or not the circumstances in this case justify a sentence of death rather than a sentence of life imprisonment without release is a decision that the law leaves entirely to you.

You will note that at section 6 of the verdict form provides you several options which differ from the format earlier in the verdict form.  You are given four options: Number one, a determination of a death sentence on all capital counts.

Two, a determination of life imprisonment without the possibility of release on all capital counts.

Three, a mixed determination in which the death sentence is imposed on some counts and life imprisonment without the possibility of release on other counts.

And, four, a determination that the jury is unable to reach a unanimous verdict.

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

____ CORR  OFFICIAL  COURT  REPORTER

Exhibit 73 - 65

JURY CHARGE                              867

Again, whether or not the circumstances of this case justify a sentence of death rather than a sentence of life imprisonment without release is a decision the law leaves to you the jury.

You do not take anything I have said or done during the guilt phase or this penalty phase as indicating what I think of the evidence or what I think your decision should be.

Let's turn to the third section of our charge, and we are getting towards the end here.  Thank goodness for my voice and your ears.

Duty to deliberate and consequences of deliberations:  When you retire to the jury room, you should discuss the case with your fellow jurors to reach agreement if you can do so.  Any verdict imposing a death sentence must be unanimous.  Each of you must decide the case for yourself, but you should do so only after you have considered all the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.  Do not be afraid to change your opinion if the discussion persuades you that you should.  But do not come to a decision simply because other jurors think it is right.  It is important that you attempt to reach a unanimous verdict, but, of course, only if each of you can do so having made your own conscientious decision.  Do not change an honest belief about

_____ CARR  OFFICIAL  COURT  REPORTER

Exhibit 73 - 66

JURY CHARGE                                                    868

the weight and effect of the evidence simply to reach a verdict. Remember at all times that you are not partisans. You are judges, judges of the facts.

If after due deliberation, you cannot unanimously agree on the appropriate punishment, I will sentence the defendant to life imprisonment without the possibility of release.

Separate consideration of each count. The indictment in this case charges 18 offenses that carry the death penalty as a possible punishment, Counts 13 through 21, and 25 through 33, and the Government has given notice of its intent to seek the death penalty based on each of those counts. Each capital count charges a separate crime. You must consider each count and the evidence relating to it separate and apart from every other count. That is, you must decide separately what the evidence in the case shows about the defendant and the appropriate sentence to each count. Your verdict on any count should not control your verdict on any other count.

Now, justice without discrimination, section 7 of the verdict form. Finally, in your sentencing deliberations you must not consider race, color, religious beliefs, national origin, or gender of either the defendant or any victim. Whatever decision you return, each of you is required by law to sign the certification section 7 there,

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS          Page 56
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

RR  OFFICIAL  COURT  REPORTER

Exhibit 73 - 67

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 2:15-CR-00472-RMG |
| | ) | |
| v. | ) | |
| | ) | |
| DYLANN STORM ROOF | ) | |
| | ) | |

## SENTENCING PHASE VERDICT FORM

Section I: Age of Defendant .................................................................. 1

Section II: Gateway Intent Factors ......................................................... 4

Section III: Statutory Aggravating Factors .............................................. 7

Section IV: Non-Statutory Aggravating Factors ...................................... 10

Section V: Mitigating Factors .............................................................. 14

Section VI: Determination of Sentence ................................................. 17

Section VII: Justice Without Discrimination .......................................... 19

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Exhibit 73 - 68

Section VI: Determination of Sentence

## **Section VI: Determination of Sentence**

General directions for Section VI:

- As used in this section, the term "capital count(s)" refers only to those counts for which you found the defendant was eighteen years of age or older at the time of the offense charged in the count in Section I, and at least one gateway factor in Section II, and at least one statutory aggravating factor in Section III. You may not impose a sentence of death on a particular count unless you have first found with regard to that count, unanimously and beyond a reasonable doubt, that the defendant was eighteen years of age or older at the time of the offense charged in the count in Section I, and at least one gateway intent factor in Section II, and at least one statutory aggravating factor in Section III.

- In this section, enter your determination of the defendant's sentence with regard to each of the capital counts.

  Based upon consideration of whether the aggravating factor or factors found to exist for each count sufficiently outweigh the mitigating factor or factors found to exist for that count to justify a sentence of death:

Section VI.A:  Determination of death sentence for all capital counts:

_____✓_____ We, the jury, unanimously find for all the capital counts, that the aggravating factor or factors found to exist sufficiently outweigh the mitigating factor or factors found to exist so that death is the appropriate sentence for the defendant.  We vote unanimously that the defendant shall be sentenced to death separately as to each count.

Section VI.B:  Determination of life imprisonment without the possibility of release for all capital counts:

_____ We, the jury, unanimously find that a sentence of life in prison without the possibility of release is the appropriate sentence for the defendant for all of the capital counts.  We vote unanimously that the defendant shall be sentenced to life imprisonment without the possibility of release separately as to each count.

17

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Exhibit 73 - 69

Section VI: Determination of Sentence

Section VI.C:  Mixed determination of sentences:

> After considering whether the aggravating factor or factors found to exist as to each count sufficiently outweigh the mitigating factor or factors found to exist for that count to justify a death sentence:

a. _____ We, the jury, unanimously find that death is the appropriate sentence for the defendant with regard to each of the following capital counts only (*identify each count by count number*):

_____

_____

b. _____ We, the jury, unanimously find that life in prison without the possibility of release is the appropriate sentence for the defendant with regard to each of the following capital counts only (*identify each count by count number*):

_____

_____

Section VI.D: Unable to reach any unanimous decision:

_____ After considering whether the aggravating factor or factors found to exist as to each count sufficiently outweigh the mitigating factor or factors found to exist for that count to justify a death sentence, we, the jury, are unable to reach a unanimous verdict in favor of a life sentence or in favor of a death sentence for any of the capital counts.

Directions:

After you have completed your sentence determination in this section (regardless of what determination was made), continue on to Section VII.

18

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 59

Exhibit 73 - 70

*United States v. Gary Lee Sampson*
No. 1:01-cr-10384-LTS (D. Mass.)
Judge Presiding: The Hon. Leo T. Sorokin
(Voir dire began September 14, 2016.)

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS                    Page 60
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Exhibit 73 - 71

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal Action No. 01-10384-LTS |
| | ) | |
| GARY LEE SAMPSON | ) | |

<u>FINAL JURY INSTRUCTIONS</u>

January 4, 2017

Ladies and Gentlemen of the jury, you have heard all of the evidence in this case.  I will

now instruct you as to the law you must follow in deciding the sole question before you: whether

Gary Sampson should be sentenced to death for either or both of the crimes to which he has pled

guilty, or instead sentenced to life imprisonment without the possibility of release.  As I will

explain in more detail, first you will decide whether the government has proven beyond a

reasonable doubt to each one of you that Mr. Sampson is eligible for the death penalty as to one

or both offenses.  Even when a defendant is eligible for the death penalty, though, the law never

requires you to impose a sentence of death.  So you will then have to consider whether the

government also has proved beyond a reasonable doubt that the death penalty is justified.  Your

decisions on these questions will determine whether Mr. Sampson will live or die.  Your

decisions will be binding on the Court, and I will sentence Mr. Sampson according to your

choices.

My instructions this afternoon will be in three basic parts: first, general rules and

concepts that control your duties as jurors and your consideration of the evidence you have

heard; second, specific definitions and legal principles related to the decision-making process

you must follow in making the sentencing determination required of you in this case; and third,

Exhibit 73 - 72

Each juror must decide individually whether the facts and circumstances in this case as to an offense call for death as the appropriate sentence. In determining the appropriate sentence for an offense, each of you must independently weigh the statutory and non-statutory aggravating factor or factors that you unanimously found to exist with regard to that offense, each of you must independently weigh any mitigating factors that you individually or with others have found to exist, and any of you may independently weigh any mitigating factors found by other jurors. As I have said, you may consider only those aggravating factors which you unanimously found were proven beyond a reasonable doubt; if eleven of you concluded that a particular aggravating factor was proven, but one of you did not agree, then none of you may consider that factor in your weighing. However, any of you may consider and weigh a mitigating factor that any one juror found was proven, even if few or no other jurors agreed.

You are not to consider in this weighing process any of the levels of intent you considered as to the second gateway eligibility factor and found in answering questions 1(b) and 2(b). In the weighing process, you must avoid any influence of bias, passion, prejudice, or any other arbitrary considerations. Your deliberations must be based on your reasoned evaluation of the evidence as you have seen it and heard it, and on the law which I am explaining to you now. You may consider whether it is appropriate to treat Mr. Sampson with mercy, but any desire to be merciful may not prevent you from considering the other things that the law requires you also to consider.

You have been selected to decide this case because you committed to be fair and impartial in all respects, to give fair consideration to all of the evidence offered by both sides, to be open to the possibility of imposing either of the two available sentences in this case, and to remain open throughout the trial. You made your oath or affirmation to that effect. It is for you

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Exhibit 73 - 73

alone, the fair-minded jurors, to decide the appropriate punishment in this case based on your careful evaluation of the evidence that you have heard and seen in this courtroom.

I want to caution you that you are not to consider any possible financial costs to the government that may be involved in carrying out either the death penalty or life imprisonment without the possibility of release. This is so for two reasons: first, whether one sentence may be more expensive than another is simply not a legally permissible basis upon which to decide a matter as important as this; and second, even if it were permissible to consider cost savings in selecting a sentence, there is no evidence before you as to which sentence, if either, is actually more expensive to carry out. For both of these reasons, it would be improper for you to base any part of your decision on the notion that the government could save money by imposing one sentence rather than another. That is a subject that you should not even discuss in the jury room.

Whether the circumstances in this case call for a sentence of death is a decision that the law leaves entirely to you. All twelve jurors must agree that death is the appropriate sentence in order for it to be imposed as to either offense. No juror is ever required to impose a sentence of death. The decision is yours, as individuals, to make. I know this is a formidable responsibility, and one which you will take very seriously. However, as I told you when this trial began in November, you were carefully selected as jurors to hear this case, and no judge or other group of people is better equipped to make this profound decision than you are.

The process of weighing aggravating and mitigating factors against each other, or weighing the aggravating factors alone if you find no mitigating factors exist, in order to determine the proper punishment is not a mathematical or mechanical process. In other words, you should not simply count the total number of proven aggravating factors and proven mitigating factors and reach a decision based on which number is greater. Rather, you should

47

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 63

Exhibit 73 - 74

consider the weight and significance of each factor.  In assigning weights to the factors, you might determine that the significance of certain factors is diminished because they are part of, or related to, another more significant factor.  Remember that the existence of a given factor is distinct from its weight.  In carefully weighing these factors, you are called upon to make a unique, individual judgment about the sentence Mr. Sampson should receive.

The law contemplates that different factors may be given different weights or values by different jurors.  Thus, you may find that one aggravating factor sufficiently outweighs all proven mitigating factors combined so as to justify a sentence of death.  Conversely, you may find that a single mitigating factor outweighs all proven aggravating factors combined, or that the proven aggravating factors do not, standing alone, justify the imposition of a sentence of death.

Each juror is to individually decide what weight or value is to be given to any particular aggravating or mitigating factor in the decision-making process.  Any one of you is free to decide that a sentence of life imprisonment without the possibility of release should be imposed so long as, based on the evidence and your sense of justice, you conclude that the proven aggravating factors do not sufficiently outweigh the mitigating factors such that the death penalty should be imposed.

Bear in mind that in order to find a sentence of death is appropriate for a particular offense, all of you must be unanimous in concluding that the government has proven beyond a reasonable doubt that the aggravating factor or factors established as to that offense sufficiently outweigh any mitigating factors found or, in the absence of any mitigating factors, that the aggravating factors alone are sufficient to call for a sentence of death.  The law does not define what is "sufficient" to justify a death sentence.  As to that question, the law relies on each of you to consult your conscience and determine what you believe is sufficient to justify sentencing Mr.

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Exhibit 73 - 75

Sampson to death.  What is sufficient for one of you to impose the death penalty might not be sufficient for another.  This is a personal moral choice.

In the event that you unanimously find as to either offense that the aggravating factor or factors found to exist sufficiently outweigh the mitigating factor or factors found to exist or, in the absence of any mitigating factors, that the aggravating factor or factors alone are sufficient to justify a sentence of death, then you will indicate that as to the relevant offense by answering "Yes" in the appropriate space in question 5(a).

In the event that you unanimously find as to either offense that a sentence of life imprisonment without the possibility of release is the appropriate sentence for Mr. Sampson – that is, that the aggravating factor or factors proven as to that offense do not sufficiently outweigh any mitigating factors found, or that the aggravating factors standing alone are insufficient, to justify a sentence of death – then you will indicate that as to the relevant offense by answering "Yes" in the appropriate space in question 5(b).

In the event that you are unable to reach a unanimous verdict as to either offense, then you will indicate that as to the relevant offense in the appropriate space in question 5(c).  If the government fails to prove to any one of you that the death penalty is both an option in this case, and the appropriate penalty for at least one of the offenses, Mr. Sampson will be sentenced to life imprisonment without the possibility of release.  You will not be a "hung jury."  But, before you reach any conclusion based on a lack of unanimity on an offense, you should continue your discussions until you are fully satisfied that no further discussion will lead to a unanimous decision.

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Exhibit 73 - 76

When you have finished the weighing process, your decision as to any offense for which you have found Mr. Sampson eligible for death should be reflected in your response to question 5(a), (b), or (c), but, you should respond "yes" to only one of the three subparts of question 5.

After you have completed the weighing process and marked your sentence determination as appropriate in question 5, regardless of what your decision is, you must continue on to question 6 and complete the certificate regarding the determination of sentence.  The signatures of each of you in that section will certify that your response or responses to all preceding questions accurately reflect your sentencing decision.

In your consideration of whether the death sentence is appropriate or not, you must not consider the race, color, religious beliefs, national origin, or sex of either Mr. Sampson or of the victims.  Whatever sentence you return must be imposed without regard to the race, color, religious beliefs, national origin, or sex of either Mr. Sampson or of the victims.  To emphasize the importance of this consideration, question 7 on the verdict form asks each of you to read and sign a certification statement.  When your deliberations have concluded, each juror should carefully read that statement and sign his or her name in the appropriate place if the statement accurately reflects the manner in which each of you reached your individual decision.

III.    Guidelines for Deliberations

That brings us to the end of the verdict form, and almost to the end of these instructions. I'll just conclude with a few brief remarks about the deliberation process.  The importance of your deliberations should be obvious.  I remind you that you can return a decision sentencing Mr. Sampson to death only if all twelve of you are unanimously persuaded both that Mr. Sampson eligible for the death penalty and that the death penalty is, in fact, appropriate.  And, again, I remind you that no jury – and no juror – is ever required by law to impose a sentence of death.

50

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 66

Exhibit 73 - 77

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )    Criminal Action No. 01-10384-LTS |
| | ) |
| GARY LEE SAMPSON | ) |
| | ) |

## SENTENCING VERDICT FORM

**Definitions:** For purposes of all questions on this Verdict Form, "Offense 1 (McCloskey)" is the carjacking resulting in the death of Philip McCloskey, and "Offense 2 (Rizzo)" is the carjacking resulting in the death of Jonathan Rizzo.

### QUESTION 1: Eligibility – Offense 1 (McCloskey)

(a) <u>Age</u>: Do you unanimously find that the government has proven beyond a reasonable doubt that Gary Sampson was eighteen (18) years of age or older at the time of the offense?

____✓____ Yes          _____ No

*Proceed to (b) only if you answered "Yes" to (a). Otherwise, proceed to (d).*

(b) <u>Level of Intent</u>:

1) In committing the offense, do you unanimously find that the government has proven beyond a reasonable doubt that Gary Sampson intentionally killed Philip McCloskey?

____✓____ Yes          _____ No

*Proceed to (b)(2) regardless of your answer to (b)(1)*

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)



Exhibit 73 - 78

QUESTION 5: Determination of Sentence

Answer each subpart of this Question only as to the offense or offenses for which you have found Mr. Sampson "Eligible" for the death penalty. In other words, answer this question as to Offense 1 (McCloskey) only if you answered "Eligible" in Question 1(d), and answer this question as to Offense 2 (Rizzo) only if you answered "Eligible" in Question 2(d).

If Mr. Sampson is eligible for the death penalty for Offense 1 (McCloskey), then, in answering this question, each juror must consider all aggravating factors for which the jury answered "Yes" in Question 1(c) and, as to Offense 1 (McCloskey), in Question 3; must consider all mitigating factors for which he or she answered "Yes" as to Offense 1 (McCloskey) in Question 4; and may consider any mitigating factors which any other juror found in Question 4 as to Offense 1 (McCloskey).

If Mr. Sampson is eligible for the death penalty for Offense 2 (Rizzo), then, in answering this question, each juror must consider all aggravating factors for which the jury answered "Yes" in Question 2(c) and, as to Offense 2 (Rizzo), in Question 3; must consider all mitigating factors for which he or she answered "yes" as to Offense 2 (Rizzo) in Question 4; and may consider any mitigating factors which any other juror found in Question 4 as to Offense 2 (Rizzo).

To determine that death is the appropriate sentence for either offense, you must unanimously agree that the government has proven beyond a reasonable doubt that the aggravating factor or factors found to exist sufficiently outweigh any mitigating factors found to exist to justify a sentence of death (or, in the absence of any mitigating factors, that the aggravating factor or factors alone justify a sentence of death).

(a) Have you unanimously determined that a sentence of death shall be imposed?

Offense 1 (McCloskey)          Offense 2 (Rizzo)

_____ Yes    __✓__ No          __✓__ Yes    _____ No

(b) Have you unanimously determined that a sentence of life imprisonment without possibility of release shall be imposed?

Offense 1 (McCloskey)          Offense 2 (Rizzo)

_____ Yes    __✓__ No          _____ Yes    __✓__ No

(c) After due deliberation, have you been unable to come to unanimous agreement on the issue of punishment, understanding that a sentence of life imprisonment without possibility of release will therefore be imposed?

Offense 1 (McCloskey)          Offense 2 (Rizzo)

__✓__ Yes    _____ No          _____ Yes    __✓__ No

---

**Proceed to read and sign the certifications in Questions 6 and 7.**

---

27

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 68

Exhibit 73 - 79

*United States v. Juan Briseno*
No. 2:11-cr-00077 (N.D. Ind.)
Judge Presiding: The Hon. Philip P. Simon
(Voir dire began January 12, 2015.)

Exhibit B  DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 69

Exhibit 73 - 80

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# HAMMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | 2:11-cr-00077 |
| | ) | |
| JUAN BRISENO | ) | |

## COURT'S FINAL INSTRUCTIONS TO THE JURY
## (FOLLOWING PENALTY-PHASE EVIDENCE)

Dated: March 6, 2015.


/s/ Philip P. Simon
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Exhibit 73 - 81

## COURT'S INSTRUCTION NO. 11

### Weighing Aggravating and Mitigating Factors

With respect to the capital count you are considering, if you unanimously find that the government proved beyond a reasonable doubt: 1) that the defendant was over 18 years of age at the time of the crime; and 2) the existence of at least one intent factor, and 3) the existence of at least one Statutory Aggravating Factor; and after you then decide whether the Government proved beyond a reasonable doubt the existence of the alleged Non-Statutory Aggravating Factors submitted to you with respect to that count, and whether the defendant proved the existence of any Mitigating Factors by a preponderance of the evidence, you will then engage in a weighing process.

In determining the appropriate sentence for each count, all of you must weigh the Aggravating Factor or Factors that you unanimously found proved beyond a reasonable doubt for that count, and each of you must weigh any Mitigating Factor or Factors that you individually found to exist for that count, and may weigh any Mitigating Factors that another fellow juror found to exist. Whether or not the circumstances of each count in this case make death the appropriate sentence is a decision that the law leaves entirely to you.

Although I have previously instructed you that you will not consider a death sentence for any count unless you first unanimously find the age requirement and at least one threshold intent factor proven beyond a reasonable doubt, I instruct you now that the age requirement and threshold intent factors **shall not** be considered when

26

Exhibit 73 - 82

USDC IN/ND case 2:11-cr-00077-PPS-APR   document 1528   filed 03/06/15   page 28 of 35

weighing the Aggravating and Mitigating Factors. You must weigh only the Statutory and Non-Statutory Aggravating Factors that you unanimously find to exist for a particular count against any Mitigating Factors that any juror individually, or with others, finds to exist for that count.

In engaging in the weighing process, you must avoid any influence of passion, prejudice, or undue sympathy. Your deliberations should be based upon the evidence you have seen and heard and the law on which I have instructed you.

The process of weighing Aggravating and Mitigating Factors against each other in order to determine the proper punishment is not a mechanical process. In other words, you should not simply count the number of Aggravating and Mitigating Factors and reach a decision based on which number is greater. You should instead consider the weight and value of each factor to make a unique, individualized, and reasoned judgment about the sentence this defendant should receive for each capital offense.

The law contemplates that different Factors may be given different weights or values by different jurors. Thus, you may find that one Mitigating Factor outweighs one or more Aggravating Factors. Or you may find, even if you have found no Mitigating Factors, that the Aggravating Factor or Factors proved do not, standing alone, justify imposition of a sentence of death. On the other hand, you may unanimously find that a particular Aggravating Factor sufficiently outweighs all Mitigating Factors combined to make a sentence of death the appropriate sentence. Each juror must decide what weight or value is to be given to a particular Aggravating or Mitigating Factor in the

27

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 72

Exhibit 73 - 83

decision-making process.

Again, whether or not the circumstances in any particular count justify a sentence of death is a decision that the law leaves entirely to you. You are never required to impose a death sentence.

28

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 73

Exhibit 73 - 84

## COURT'S INSTRUCTION NO. 12

### Determination of Sentence (Section VI of Special Verdict Form)

You will be asked the following question for each capital count: "Do you, the jury, **unanimously** find that a sentence of death shall be imposed on the defendant JUAN BRISENO, aka Tito, as punishment" for the murder you are considering? You will answer that question either "Yes" or "No." In answering this question, you must unanimously decide whether the Aggravating Factor or Factors sufficiently outweigh the Mitigating Factor or Factors such that a sentence of death is the most appropriate sentence. If you answer "Yes" the Court will then be required to impose a death sentence for that count.

If you cannot unanimously agree that a sentence of death should be imposed, you should answer the question "No" and the Court will sentence Mr. Briseno to a life sentence without the possibility of release for the count you are considering. In the federal system, a sentence of life imprisonment without the possibility of release means just that — the defendant will never be released from prison. There is no parole in the federal system.

It is your duty as jurors to discuss all aspects of these sentencing issues with one another frankly and candidly in an effort to reach agreement, if you can reach agreement. Each of you must decide these questions for yourselves and not go along with the conclusions of your fellow jurors, but only after full consideration of the evidence with the other members of the jury and due respect for one another's opinions.

29

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 74

Exhibit 73 - 85

While you are discussing this matter, do not hesitate to re-examine your own opinion, and to change your mind if you become convinced that you are wrong. But do not give up your honest beliefs as to the weight or the effect of the evidence solely because others think differently or simply to reach a verdict.

30

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 75

Exhibit 73 - 86

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

UNITED STATES OF AMERICA     )
                                )
vs.                   )     2:11-cr-00077
                                )
JUAN BRISENO            )

## COURT'S VERDICT FORM (PENALTY PHASE)

### (Completed Form To Be Filed Under Seal)

### COUNT 9 (Murder of Luis Ortiz aka "Manolo")

Dated: March 6, 2015.

/s/ Philip P. Simon
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 76

Exhibit 73 - 87

## SECTION VI. DETERMINATION OF SENTENCE

*Instructions:* Consider whether the Aggravating Factor or Factors found to exist sufficiently outweigh any Mitigating Factor or Factors found to exist, or in the absence of any Mitigating Factors, whether the Aggravating Factor or Factors are themselves sufficient to justify a sentence of death, and whether death is therefore the appropriate sentence in this case. A sentence of death shall only be imposed if your decision in favor of it is **unanimous.** Based upon that consideration, answer the following question:

Do you, the jury, **unanimously** find that a sentence of death shall be imposed on the defendant JUAN BRISENO aka Tito as punishment for the murder of Luis Ortiz?

YES _____       NO _____

**Note:** If you cannot unanimously agree that a sentence of death should be imposed, you should answer the above question "No," and the Court will sentence Mr. Briseno to a life sentence without the possibility of release for the murder of Mr. Ortiz.

After answering the above question, each juror should sign his or her name below, and the date should be filled in. Once each juror has signed proceed to Section VII of this Special Verdict Form.

_____       _____

_____       _____

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 77

Exhibit 73 - 88

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

UNITED STATES OF AMERICA )
)
vs. )                           2:11-cr-00077
)
JUAN BRISENO )

**COURT'S VERDICT FORM (PENALTY PHASE)**

**(Completed Form To Be Filed Under Seal)**

**COUNT 13 (Murder of Michael Sessum)**

Dated: March 6, 2015.

/s/ Philip P. Simon
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Exhibit 73 - 89

## SECTION VI. DETERMINATION OF SENTENCE

*Instructions:* Consider whether the Aggravating Factor or Factors found to exist sufficiently outweigh any Mitigating Factor or Factors found to exist, or in the absence of any Mitigating Factors, whether the Aggravating Factor or Factors are themselves sufficient to justify a sentence of death, and whether death is therefore the appropriate sentence in this case. A sentence of death shall only be imposed if your decision in favor of it is **unanimous**. Based upon that consideration, answer the following question:

Do you, the jury, **unanimously** find that a sentence of death shall be imposed on the defendant JUAN BRISENO aka Tito as punishment for the murder of Michael Sessum?

YES _____    NO __✓____

**Note:** If you cannot unanimously agree that a sentence of death should be imposed, you should answer the above question "No," and the Court will sentence Mr. Briseno to a life sentence without the possibility of release for the murder of Mr. Sessum.

After answering the above question, each juror should sign his or her name below, and the date should be filled in. Once each juror has signed proceed to Section VII of this Special Verdict Form.



VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Exhibit 73 - 90

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | 2:11-cr-00077 |
| | ) | |
| JUAN BRISENO | ) | |

**COURT'S VERDICT FORM (PENALTY PHASE)**

**(Completed Form To Be Filed Under Seal)**

**COUNT 15 (Murder of Miguel Mejias aka "King Nelly")**

Dated: March 6, 2015.

/s/ Philip P. Simon
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Exhibit 73 - 91

## SECTION VI. DETERMINATION OF SENTENCE

*Instructions:* Consider whether the Aggravating Factor or Factors found to exist sufficiently outweigh any Mitigating Factor or Factors found to exist, or in the absence of any Mitigating Factors, whether the Aggravating Factor or Factors are themselves sufficient to justify a sentence of death, and whether death is therefore the appropriate sentence in this case. A sentence of death shall only be imposed if your decision in favor of it is **unanimous**. Based upon that consideration, answer the following question:

Do you, the jury, **unanimously** find that a sentence of death shall be imposed on the defendant JUAN BRISENO aka Tito as punishment for the murder of Miguel Mejias?

YES _____    NO __✓_____

**Note:** If you cannot unanimously agree that a sentence of death should be imposed, you should answer the above question "No," and the Court will sentence Mr. Briseno to a life sentence without the possibility of release for the murder of Mr. Mejias.

After answering the above question, each juror should sign his or her name below, and the date should be filled in. Once each juror has signed proceed to Section VII of this Special Verdict Form.



(August 31, 2023)

Exhibit 73 - 92

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

UNITED STATES OF AMERICA )
)
vs. )            2:11-cr-00077
)
JUAN BRISENO )

COURT'S VERDICT FORM (PENALTY PHASE)

(Completed Form To Be Filed Under Seal)

COUNT 19 (Murder of Miguel Colon aka "Migs")

Dated: March 6, 2015.

/s/ Philip P. Simon
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 82

Exhibit 73 - 93

## SECTION VI. DETERMINATION OF SENTENCE

*Instructions:* Consider whether the Aggravating Factor or Factors found to exist sufficiently outweigh any Mitigating Factor or Factors found to exist, or in the absence of any Mitigating Factors, whether the Aggravating Factor or Factors are themselves sufficient to justify a sentence of death, and whether death is therefore the appropriate sentence in this case. A sentence of death shall only be imposed if your decision in favor of it is **unanimous**. Based upon that consideration, answer the following question:

Do you, the jury, **unanimously** find that a sentence of death shall be imposed on the defendant JUAN BRISENO aka Tito as punishment for the murder of Miguel Colon?



YES _____        NO __✓____

**Note:** If you cannot unanimously agree that a sentence of death should be imposed, you should answer the above question "No," and the Court will sentence Mr. Briseno to a life sentence without the possibility of release for the murder of Mr. Colon.

After answering the above question, each juror should sign his or her name below, and the date should be filled in. Once each juror has signed proceed to Section VII of this Special Verdict Form.



VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Exhibit 73 - 94

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | 2:11-cr-00077 |
| | ) | |
| JUAN BRISENO | ) | |

**COURT'S VERDICT FORM (PENALTY PHASE)**

**(Completed Form To Be Filed Under Seal)**

**COUNT 21 (Murder of Latroy Howard)**

Dated: March 6, 2015.

/s/ Philip P. Simon
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 84

Exhibit 73 - 95

## SECTION VI. DETERMINATION OF SENTENCE

*Instructions:* Consider whether the Aggravating Factor or Factors found to exist sufficiently outweigh any Mitigating Factor or Factors found to exist, or in the absence of any Mitigating Factors, whether the Aggravating Factor or Factors are themselves sufficient to justify a sentence of death, and whether death is therefore the appropriate sentence in this case. A sentence of death shall only be imposed if your decision in favor of it is **unanimous.** Based upon that consideration, answer the following question:

Do you, the jury, **unanimously** find that a sentence of death shall be imposed on the defendant JUAN BRISENO aka Tito as punishment for the murder of Latroy Howard?

YES _____        NO _____

**Note:** If you cannot unanimously agree that a sentence of death should be imposed, you should answer the above question "No," and the Court will sentence Mr. Briseno to a life sentence without the possibility of release for the murder of Mr. Howard.

After answering the above questions, each juror should sign his or her name below, and the date should be filled in. Once each juror has signed proceed to Section VII of this Special Verdict Form.

_____        _____

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 85

Exhibit 73 - 96

*United States v. Thomas Steven Sanders*
No. 1:10-cr-00351-DDD-JDK (W.D. La.)
Judge Presiding: The Hon Dee D Drell (Chief Judge)
(Voir dire began August 18, 2014.)

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 86

Exhibit 73 - 97

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. 10-000351 |
| -vs- | JUDGE DRELL |
| THOMAS STEVEN SANDERS | MAGISTRATE JUDGE KIRK |

## FINAL JURY INSTRUCTIONS
## PENALTY PHASE

### Members of the Jury:

Now that you have heard all of the evidence in this case, it is my duty to give you instructions regarding the law applicable to the very serious question of whether Thomas Steven Sanders should be sentenced for his conviction on Counts One and Two to death or life imprisonment without the possibility of release.

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 87

Exhibit 73 - 98

factors alleged and proved by the Government and cited in these instructions.

Only if you are unanimously persuaded that the aggravating factor(s) found to exist sufficiently outweigh the mitigating factor(s) found to exist may you return a decision in favor of the death penalty.

Each individual juror must decide whether the defendant should be sentenced to death on a particular count. If even one juror finds that the aggravating factor(s) you have unanimously agreed to exist do not sufficiently outweigh one or more mitigating factors which that juror has found to exist, then the jury may not sentence the

53

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 88

Exhibit 73 - 99

defendant to death. The same is true if no mitigating factor(s) are found and one juror finds that the proven aggravating factor(s) are not themselves sufficient to justify a sentence of death.

I also remind you again that, whatever findings you make with respect to the aggravating and mitigating factors, you are never required to impose a death sentence. For example, if you do not unanimously determine that the defendant should be sentenced to death, I will sentence the defendant to life in prison without the possibility of release. Federal law has abolished parole and,

54

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 89

Exhibit 73 - 100

therefore, if the defendant is sentenced to life imprisonment, he will never be released.

As I have said, this determination must be made as to both counts individually.

I remind you that this penalty phase of the trial differs from the guilt phase, where I instructed you to deliberate with the goal of reaching a unanimous decision one way or the other, as to whether the Government had proved the defendant guilty beyond a reasonable doubt of the crimes charged against him in the Superceding Indictment.

In this penalty phase, at the end of your deliberations, all jurors deliberating must

55

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 90

Exhibit 73 - 101

have told you, you must follow the definitions I have given you in reaching your verdict.

I instruct you that unanimity is required for only three purposes in the penalty phase: (1) to find that the defendant was at least eighteen years of age at the time of the offenses; (2) to find at least one Gateway Factor and at least one aggravating factor; and (3) to impose the sentence of death. In this regard, this second phase of the trial differs from the first.

In the first phase, I instructed you to deliberate with the goal of reaching a unanimous decision one way or the other, as to whether the Government had proved the defendant guilty

Exhibit 73 - 102

beyond a reasonable doubt of the crimes charged against him in the Superceding Indictment. However, in the penalty phase, if you are not unanimous as to the defendant's age, or existence of a Gateway or aggravating factor, you have made a decision and you should not find that factor.

Similarly, if you are not unanimous in favor of imposing a sentence of death, you will have made a decision against imposing a sentence of death and in favor of imposing a sentence of life imprisonment without the possibility of release.

Consistent with the law applicable to the first phase of the trial, the defendant does not have to prove to you that Gateway or aggravating factors

60

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Exhibit 73 - 103



Exhibit 73 - 104

## IX. Determination

Based upon consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of any mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death, and whether death is therefore the appropriate sentence in this case:

We determine, by unanimous vote, that a sentence of death shall be imposed upon Thomas Steven Sanders for the offense described in Count One of the Superceding Indictment.

_____ NO        _____X_____ YES

*If you answer "Yes" or "No," the foreperson must sign here, and you must then proceed to Section X on page 22.*

_____
FOREPERSON

Date: _____

21

Exhibit 73 - 105

*United States v. Wesley Paul Coonce, et al.*
No. 6:10-cr-03029-GAF (W.D. Mo.)
Judge Presiding: The Hon. Gary A. Fenner
(Voir dire began March 28, 2014.)

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 95

Exhibit 73 - 106

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 10-03029-CR-S-GAF |
| | ) | |
| WESLEY PAUL COONCE, JR. | ) | |
| and CHARLES MICHAEL HALL, | ) | |
| | ) | |
| Defendants. | ) | |

## PENALTY PHASE JURY INSTRUCTIONS

1

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 96

Case 6:10-cr-03029-GAF   Document 807   Filed 05/30/14   Page 1 of 83

Exhibit 73 - 107

## INSTRUCTION NO. 19

At the end of your deliberations, if you unanimously determine that Defendant Coonce and Defendant Hall should be sentenced to death or to life imprisonment without the possibility of release, the court is required to impose that sentence.

Under Counts I and II as to Defendant Coonce, and under Count I as to Defendant Hall, if you cannot unanimously agree whether the Defendants should be sentenced to death or life imprisonment without the possibility of release, the court will sentence the Defendants to life imprisonment without the possibility of release.  There is no parole in the federal system.

Again, you are reminded that you are to make a separate determination for each Defendant and for each count for which he is charged

42

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Case 6:10-cr-03029-GAF    Document 807    Filed 05/30/14    Page 42 of 83

Exhibit 73 - 108

*United States v. Naeem J. Williams*
No. 1:06-cr-00079-JMS-KSC (D. Haw.)
Judge Presiding: The Hon. J. Michael Seabright
(Voir dire began January 28, 2014.)

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 98

Exhibit 73 - 109

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Crim. No. 06-00079 JMS-KSC |
| | ) |
| Plaintiff, | ) JURY INSTRUCTIONS FOR |
| | ) SENTENCING PHASE |
| vs. | ) |
| | ) |
| NAEEM J. WILLIAMS, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

### <u>JURY INSTRUCTIONS FOR SENTENCING PHASE</u>

The court's jury instructions for the sentencing phase in the numerical

order as read to the jury on June 6, 2014 are attached hereto as Exhibit A.

Attached as Exhibit B is a list of statutory and non-statutory mitigating factors

proffered by the government and the mitigating factors proffered by the Defendant,

which the parties agreed to provide the jury.

DATED:  Honolulu, Hawaii, June 6, 2014.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 99

Exhibit 73 - 110

## COURT'S INSTRUCTION NO. 2

You unanimously found the Defendant guilty of the offenses of child abuse murder, and murder in the perpetration of a pattern and practice of assault and torture against a child, as charged in Count 1 and Count 2 of the Indictment. In these instructions, the court refers to these two Counts collectively as "the offense." You have also unanimously found the Defendant eligible for the death penalty for this offense.

This offense is punishable by death or by imprisonment for life without possibility of release. There is no parole in the federal system so a life sentence means exactly that -- if so sentenced, the Defendant will spend the rest of his life in prison without the possibility of parole or release.

The choice between these alternatives is left exclusively to you. In order to impose a sentence of death, all twelve jurors must agree that death is the appropriate sentence. If one or more jurors does not conclude that death is the appropriate sentence, the death penalty will not be imposed. That is, if you cannot unanimously agree on the appropriate punishment, I will sentence the Defendant to life imprisonment without possibility of release. Your decision will be binding on the court, and I will impose sentence on the Defendant according to your choice.

2

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 100

Exhibit 73 - 111

ORIGINAL

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

JUN 27 2014

at __9__ o'clock and __40__ min __A__ M.
SUE BEITIA, CLERK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 06-00079 JMS |
| | ) | |
| Plaintiff, | ) | SPECIAL FINDINGS FORM |
| | ) | REGARDING PENALTY |
| vs. | ) | SELECTION |
| | ) | |
| NAEEM WILLIAMS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## SPECIAL FINDINGS FORM REGARDING PENALTY SELECTION

### I.   Findings Regarding Justification for a Death Sentence

#### A.   Non-Statutory Aggravating Factors

The government has alleged that the following non-statutory aggravating factors are present in this case. For each factor listed below, answer "yes" or "no" as to whether you unanimously find that the government proved the existence of the factor beyond a reasonable doubt:

1.   After committing the final act of physical abuse against Talia Williams, the Defendant intentionally waited before seeking medical attention for Talia Williams, with such delay reducing the possibility that Talia Williams could have been medically treated and saved.

   YES  ✓        NO  _____

2.   The Defendant intentionally endeavored to impede the investigation into the murder of Talia Williams by washing her blood from her bedroom wall as charged in Count 4 of the Indictment.

   YES  ✓        NO  _____

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 101

Exhibit 73 - 112

## C.    Weighing Process

To determine that the death sentence is appropriate, you must be in unanimous agreement that the proved aggravating factors sufficiently outweigh the proved mitigating factors to justify a sentence of death (or, in the absence of any mitigating factors, that the proved aggravating factors alone justify a sentence of death).  Answer each question below.

### 1.    Death Sentence

We determine, by unanimous vote, that a sentence of death shall be imposed.

YES _____          NO _✓__

### 2.    Sentence of Life in Prison Without Possibility of Release

We determine, by unanimous vote, that a sentence of life imprisonment without possibility of release shall be imposed.

YES _____          NO _✓__

### 3.    Unable to Come to Unanimous Decision

After due deliberation, we are unable to come to unanimous agreement on the issues of punishment.  We understand that the court will impose a sentence of life imprisonment without the possibility of release.

YES _✓__          NO _____

Proceed to the next section (II) of this Form.

35

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 102

Exhibit 73 - 113

## II.   Imposition of Sentence

This is the last step in your deliberations.  You must record your verdict.

If you have unanimously concluded that a sentence of death is justified and therefore should be imposed on the Defendant (that is, in Section I-C, question 1, the jury answered "YES"), record your decision in Section II-A, Verdict -- Sentence of Death below, sign the verdict, read and sign the certification that follows in Section III, and notify the court that you have reached a decision.

If you have unanimously concluded that a sentence of life imprisonment without the possibility of release is justified and therefore should be imposed on the Defendant (that is, in Section I-C, question 2, the jury answered "YES"), record your decision in Section II-B, Verdict -- Life Imprisonment below, sign the verdict, read and sign the certification that follows in Section III, and notify the court that you have reached a decision.

If you were unable to reach a unanimous determination as to the Defendant's sentence (that is, in Section I-C, question 3, the jury answered "YES"), record your decision in Section II-C, Verdict -- Unable to Reach Unanimous Verdict below, sign the verdict, read and sign the certification in Section III, and notify the court that you have reached a decision.

36

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 103

Exhibit 73 - 114

## II-A.  VERDICT -- SENTENCE OF DEATH

Based upon our consideration of the evidence and in accordance with the court's instructions, we find by unanimous vote that a sentence of death shall be imposed on the Defendant.

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

                           Foreperson

                           Date: _____

37

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Exhibit 73 - 115

## II-B.  VERDICT -- LIFE IMPRISONMENT

Based upon our consideration of the evidence and in accordance with the court's instructions, we unanimously find that a sentence of life imprisonment without release should be imposed on the Defendant.

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____
                                        Foreperson

                                        Date: _____

38

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 105

Exhibit 73 - 116

## II-C.  VERDICT -- UNABLE TO REACH UNANIMOUS VERDICT

Based upon our consideration of the evidence and in accordance with the court's instructions, all twelve members of the jury were unable to reach a unanimous verdict. We understand that in this event, the court will impose the mandatory sentence of life imprisonment without release.

**REDACTED**

Foreperson

Date: 06-26-2014

39

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 106

Exhibit 73 - 117

*United States v. John McCluskey*
No. 1:10-cr-02734-JCH (D.N.M.)
Judge Presiding: The Hon. Judith C. Herrera
(Note that this questionnaire was approved by the Court,
and prospective jurors filled it out in 2012;
however, the trial was continued and
voir dire began July 22, 2013.)

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 107

Exhibit 73 - 118

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                             No. CR 10-2734 JCH

JOHN CHARLES McCLUSKEY,

       Defendant.

## **SELECTION PHASE JURY INSTRUCTIONS**

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 108

Exhibit 73 - 119

Members of the jury, you unanimously found the defendant, John Charles McCluskey, guilty of the offenses of carjacking resulting in death, as charged in Counts 2 and 3 of the indictment, witness killing, as charged in Counts 4 and 5 of the indictment, and causing death through the use of a firearm during and in relation to a crime of violence, as charged in Counts 9 through 18 of the indictment. Each of these offenses is punishable by death or by imprisonment for life without possibility of release. You have also unanimously found the defendant eligible for a sentence of death for these offenses. The choice between a sentence of death or life imprisonment is left exclusively to you. Your unanimous decision will be binding on the court, and I will impose sentence on the defendant according to your choice. If you cannot unanimously agree on the appropriate punishment, I will sentence the defendant to life imprisonment without possibility of release. There is no parole in the federal system, so a life sentence means that the defendant will spend the rest of his life in prison without the possibility of release. You must approach the sentencing decision before you separately as to each count.

3.01

2

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 109

Exhibit 73 - 120

After completing your findings regarding aggravating and mitigating factors, you must engage in a weighing process to determine whether a sentence of death is justified. In this process, you must consider only those aggravating factors, statutory and non-statutory, that you unanimously found to exist. Each of you must also consider any mitigating factors that you individually found to exist, and you each may consider any mitigating factors found by any of the other jurors. For each capital offense, you must determine whether the proven aggravating factor[s] sufficiently outweigh any proven mitigating factor[s] to justify a sentence of death. If the proved aggravating factors do not sufficiently outweigh the proved mitigating factors, or if the proved aggravating factors are equal in weight to the proved mitigating factors, a sentence of life imprisonment without possibility of release must be imposed.

The task of weighing aggravating and mitigating factors against each other, or weighing aggravating factors alone if there are no mitigating factors, is not a mechanical process. You should not simply count the number of factors, but consider the particular character of each, which may be given different weight or value by different jurors. What constitutes sufficient justification for a sentence of death in this case is exclusively left to you. Your role is to make a reasoned moral judgment. Whatever aggravating and mitigating factors are found, a jury is never required to conclude the weighing process in favor of a sentence of death. But your decision must be a reasoned one, free from the influence of passion, prejudice, or arbitrary consideration.

The law contemplates that different factors may be given different weights or values by different jurors. Thus, you may find that one mitigating factor outweighs all aggravating factors combined, or that the aggravating factors proved do not, standing alone, justify imposition of a sentence of death. Similarly, you may instead find that a single aggravating factor sufficiently

29

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Exhibit 73 - 121

outweighs all mitigating factors combined so as to justify a sentence of death. Each juror is individually to decide what weight or value is to be given to a particular aggravating or mitigating factor in the decision-making process.

If (1) you do not unanimously find that the aggravating factors sufficiently outweigh the mitigating factors to justify a sentence of death, or (2) in the absence of any mitigating factor, you do not unanimously find that the aggravating factors, considered alone, justify a sentence of death, or (3) you find that the proved aggravating factors are equal in weight to the proved mitigating factors; then answer "no" in Section I-C of the Special Findings Form, record your decision on and sign Section II-B, Verdict—Life Imprisonment, and certify your decision as described in Section III of the Form, which will end your deliberations.  If you unanimously find that the comparative weight of the aggravating factor[s] is sufficient to justify a sentence of death, answer "yes" in Section I-C of the Special Findings Form, record your decision on and sign Section II-A, Verdict—Sentence of Death, and certify your decision as described in Section III of the Form.

Complete this process for each capital count listed in the Special Findings Form.

3.11

30

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Exhibit 73 - 122

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                    No. CR 10-2734 JCH

JOHN CHARLES McCLUSKEY,

      Defendant.

### SPECIAL FINDINGS FORM FOR SELECTION PHASE

**I.    Findings Regarding Justification for a Death Sentence**

#### A.  Non-Statutory Aggravating Factors

The Government has alleged that the following non-statutory aggravating factors are present in this case. For each factor, answer "yes" or "no" according to whether you unanimously find that the Government proved the existence of the factor beyond a reasonable doubt.

##### 1.  Victim Impact

Do you unanimously find that the Government has proved beyond a reasonable doubt that as demonstrated by the victim's personal characteristics as an individual human being and the impact of the death upon the victim and the victim's family and friends, the defendant caused injury, harm, and loss to the victim and the victim's family and friends: Cathy Byus, Vivian Haas, Linda Rook, Sandra Roden Morgan, Talford Perkins, Erma Patrick, Jay Dee Patrick, Steve Walker, and Sheila Walker?

Gary Haas:    YES  ✓      NO  _____

Linda Haas:  YES  ✓      NO  _____

##### 2.  Contemporaneous Serious Criminal Acts

Do you unanimously find that the Government has proved beyond a reasonable doubt that the defendant killed each victim during a contemporaneous and continuing episode of serious criminal activity: the July 30, 2010, escape from Arizona State Prison - Kingman; the July 31, 2010, robbery and kidnapping of Prahbjeet Bains and Gurdeep Singh; and the August 11, 2010, armed robbery of the Kut and Kurl hair salon in Gentry, Arkansas?

Gary Haas:    YES  ✓      NO  _____

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 112

Exhibit 73 - 123

## II.    Imposition of Sentence

This is the last step in your deliberations.  You must record your verdict for each count that is listed.  If you have unanimously concluded that a sentence of death is justified and therefore must be imposed on the defendant, record your decision in Section II-A, Verdict—Sentence of Death below, sign the verdict, sign the certification that follows in Section III, and notify the court that you have reached a decision.  If you have not unanimously concluded that a sentence of death is justified and therefore must be imposed, record your decision in Section II-B, Verdict—Life Imprisonment below, sign the verdict, sign the certification in Section III, and notify the court that you have reached a decision.

Page 27

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Exhibit 73 - 124

## II-A.  VERDICT—SENTENCE OF DEATH

Based upon our consideration of the evidence and in accordance with the Court's instructions, we find by unanimous vote that a sentence of death shall be imposed on the defendant for the following counts (circle those counts that apply, if any):

**Gary Haas**     **Linda Haas**

Count 2     Count 3

Count 4     Count 5

Count 9     Count 10

Count 11     Count 12

Count 13     Count 14

Count 15     Count 16

Count 17     Count 18

*9 names redacted*

_____          _____
Foreperson

Date: _____

Page 28

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 114

Exhibit 73 - 125

## II-B.  VERDICT—LIFE IMPRISONMENT

Based upon our consideration of the evidence and in accordance with the Court's instructions, we find that a sentence of life imprisonment without release shall be imposed on the defendant for the following counts (circle those that apply, if any):

Gary Haas       Linda Haas

Count 2         Count 3

Count 4         Count 5

Count 9         Count 10

Count 11        Count 12

Count 13⁻       Count 14

Count 15        Count 16

Count 17        Count 18

*3 names redacted*

Date: 11 DEC 13

Page 29

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 115

Exhibit 73 - 126

*United States v. Ahmed M. Salad, et al.*
No. 2:11-cr-00034-RBS (E.D. Va.)
Judge Presiding: The Hon. Rebecca Beach Smith
(Voir dire began June 4, 2013.)

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 116

Exhibit 73 - 127

*United States v. Ahmed M. Salad, et al.,* No. 2:11-cr-00034-RBS (E.D. Va. 2013)(J. Rebecca Beach Smith) (Voir dire began June 4, 2013).

Note: The jury instructions have not been publicly filed on ECF, however, the relevant portions of the sentencing trial instructions are excerpted below. These instructions are consistent with the instructions requested by the government. *See* Docket 808 at 11-12 (copied and bookmarked below in this *Salad* section).

**JURY INSTRUCTION NO. 15 - UNANIMITY REQUIRED FOR SENTENCE**

. . . .

BUT IF ANY OF YOU -- EVEN A SINGLE JUROR -- IS **NOT** PERSUADED THAT THE AGGRAVATESIG FACTORS SUFFICIENTLY OUTWEIGH ANY MITIGATING FACTORS SUCH THAT A SENTENCE OF DEATH IS JUSTIFIED, THEN THE ENTIRE JURY MAY NOT RECOMMEND IMPOSITION OF A SENTENCE OF DEATH ON THE VERDICT FORM AS TO THAT DEFENDANT ON THAT COUNT. IN SHORT, IF YOU FIND, AFTER THOROUGH DELIBERATION AND THE CONSIDERATION OF THE VIEWS OF YOUR FELLOW JURORS ON THE AGGRAVATMG AND MITIGATING FACTORS, THAT YOU ARE NOT UNANIMOUS IN YOUR CONCLUSION TO IMPOSE THE DEATH PENALTY, YOU HAVE NEVERTHELESS REACHED A DECISION -- NAMELY, THAT THE GOVERNMENT HAS NOT MET ITS BURDEN AND THE APPROPRIATE PENALTY IS A PENALTY OTHER THAN DEATH AS TO THAT COUNT OF CONVICTION.

**JURY INSTRUCTION NO. 16 - CONSEQUENCES OF DELIBERATION**

AT THE END OF YOUR DELIBERATIONS, IF YOU UNANIMOUSLY RECOMMEND THAT A SENTENCE OF DEATH SHALL BE IMPOSED, THEN, AS I PREVIOUSLY INSTRUCTED YOU, THE COURT IS REQUIRED TO SENTENCE THE DEFENDANT TO DEATH. HOWEVER, IF YOU DO NOT UNANIMOUSLY RECOMMEND THAT A SENTENCE OF DEATH SHALL BE IMPOSED, THEN THE COURT IS REQUIRED TO IMPOSE A SENTENCE OTHER THAN DEATH AS AUTHORIZED BY LAW.

FEDERAL LAW PROVIDES THAT AN ALTERNATIVE SENTENCE TO THE CHARGES CONTAINED IN COUNTS 1-5, 7-19 AND 22-25 IS A TERM OF LIFE IMPRISONMENT.

FEDERAL LAW HAS ABOLISHED PAROLE AND THEREFORE THERE IS NO POSSIBILITY THAT THE DEFENDANT WILL BE PAROLED EARLY FROM THE SENTENCE IMPOSED.

Exhibit 73 - 128

**JURY INSTRUCTION NO. 21 - CONCLUDING INSTRUCTION**

. . . .

THE IMPORTANCE OF YOUR DELIBERATIONS SHOULD BE OBVIOUS. I REMIND YOU THAT YOU CAN RETURN A DECISION SENTENCING A DEFENDANT TO DEATH ONLY IF ALL TWELVE OF YOU ARE UNANIMOUSLY PERSUADED, BEYOND A REASONABLE DOUBT, THAT A SENTENCE OF DEATH IS IN FACT APPROPRIATE.

Exhibit 73 - 129

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 2:11cr34 |
| | ) | |
| AHMED MUSE SALAD, | ) | |
| a/k/a "Afmagalo," | ) | |
| | ) | |
| ABUKAR OSMAN BEYLE, | ) | |
| | ) | |
| SHANI NURANI SHIEKH ABRAR, | ) | |
| | ) | |
| Defendants. | ) | |

GOVERNMENT'S PROPOSED JURY INSTRUCTIONS FOR SELECTION PHASE

COMES NOW the United States of America, by undersigned counsel, and respectfully submits the following revised and additional proposed instructions for the Selection Phase in the above referenced matter. The United States previously submitted the majority of these instructions, along with proposed instructions for the guilt and eligibility phases, on May 28, 2013. (ECF No. 683). The United States has made minor typographic corrections and stylistic changes to some of these instructions to conform with the jury's findings in the guilt and eligibility phases of trial. For consistency and comparison, the United States has kept the same numbering system used in its previously filed proposed instructions with respect to those submitted herein.

Additionally, the United States submits two new instructions: Instruction No. 99A, related to liability for the acts of others for aggravating factors[1]; and Instruction No. 103A,

_____

[1]Proposed Instruction 99A is identical to previously proposed Instruction 94 that was submitted on May 28th in connection with the Eligibility Phase. The content of this instruction was also provided by the Court in the Eligibility Phase as Instruction No. 17.

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 119

Exhibit 73 - 130

related to videotaped and other interviews made not under oath.

Respectfully submitted,

NEIL H. MACBRIDE
UNITED STATES ATTORNEY

By: _____/s/_____

Benjamin L. Hatch
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, Virginia 23510
Office Number (757) 441-6331
Facsimile Number (757) 441-6689
E-Mail Address - Benjamin.Hatch@usdoj.gov

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 120

Exhibit 73 - 131

JURY INSTRUCTION NO. 98

## UNANIMITY REQUIRED FOR SENTENCE

IN THIS REGARD, THIS SENTENCING PHASE OF THE TRIAL DIFFERS FROM THE FIRST GUILT PHASE.  IN THE FIRST PHASE, I INSTRUCTED YOU TO DELIBERATE WITH THE GOAL OF REACHING A UNANIMOUS DECISION ONE WAY OR THE OTHER, AS TO WHETHER THE GOVERNMENT HAD PROVEN THE DEFENDANTS GUILTY BEYOND A REASONABLE DOUBT OF THE CRIMES CHARGED AGAINST THEM IN THE SUPERSEDING INDICTMENT.

IN THIS PHASE, AT THE END OF YOUR DELIBERATIONS ALL TWELVE JURORS MUST UNANIMOUSLY AGREE THAT THE AGGRAVATING FACTORS SUFFICIENTLY OUTWEIGH ANY MITIGATING FACTORS OR, IN THE ABSENCE OF MITIGATING FACTORS, THAT THE AGGRAVATING FACTORS ARE THEMSELVES SUFFICIENT TO JUSTIFY A SENTENCE OF DEATH.  BUT IF ANY OF YOU -- EVEN A SINGLE JUROR -- IS **NOT** PERSUADED THAT THE AGGRAVATING FACTORS SUFFICIENTLY OUTWEIGH ANY MITIGATING FACTORS SUCH THAT A SENTENCE OF DEATH IS JUSTIFIED, THEN THE ENTIRE JURY MAY NOT RECOMMEND THE DEATH PENALTY ON THE VERDICT FORM.  IN SHORT, IF YOU FIND, AFTER THOROUGH DELIBERATION AND THE CONSIDERATION OF THE VIEWS OF YOUR FELLOW JURORS, THAT YOU ARE NOT UNANIMOUS IN YOUR VIEWS, YOU HAVE NEVERTHELESS REACHED A DECISION -- NAMELY, THAT THE GOVERNMENT HAS NOT MET ITS BURDEN AND THE APPROPRIATE PENALTY IS A PENALTY OTHER THAN THE DEATH PENALTY AS TO THAT COUNT OF CONVICTION.  THEN, YOU MUST ENDEAVOR TO REACH A UNANIMOUS DECISION ON LIFE WITHOUT THE

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 121

Exhibit 73 - 132

POSSIBILITY OF RELEASE OR SOME OTHER LESSER SENTENCE AS APPROPRIATE

TO THAT COUNT OF CONVICTION.

NOW, THE DEFENDANTS AT THIS HEARING DO NOT HAVE TO PRESENT ANY

EVIDENCE.  A DEFENDANT DOES NOT HAVE TO PROVE TO YOU THAT HE SHOULD

NOT BE SENTENCED TO DEATH.  EACH DEFENDANT WAS, HOWEVER, ENTITLED

TO PRESENT ANY MITIGATING FACTS TO YOU.

AUTHORITY: Instruction as given by Chief Judge Rebecca Beach Smith in United States v. Runyon, 4:08cr16, itself modified from instruction given by Judge James R. Spencer in United States v. Tipton, No. 93-4005-07,09 & 10 (E.D. Va. 1993), itself based on instruction given in United States v. Pitera, No. 90 CR424 (RR) (S.D.N.Y. 1992).

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 122

Exhibit 73 - 133

JURY INSTRUCTION NO. 107

## CONSEQUENCES OF DELIBERATION

AT THE END OF YOUR DELIBERATIONS, IF YOU UNANIMOUSLY RECOMMEND THAT A SENTENCE OF DEATH SHALL BE IMPOSED, THEN THE COURT IS REQUIRED TO SENTENCE THE DEFENDANT TO DEATH.  HOWEVER, IF YOU DO NOT UNANIMOUSLY RECOMMEND THAT A SENTENCE OF DEATH SHALL BE IMPOSED, THEN THE COURT IS REQUIRED TO IMPOSE A SENTENCE OTHER THAN DEATH AS AUTHORIZED BY LAW.

FEDERAL LAW PROVIDES THAT THE ALTERNATIVE SENTENCE TO THE CHARGES CONTAINED IN COUNTS 1-5, 7-10 AND 16-19 IS A MANDATORY LIFE TERM OF IMPRISONMENT.

FEDERAL LAW PROVIDES THAT THE ALTERNATIVE SENTENCE TO THE CHARGES CONTAINED IN COUNTS 11-15 AND 22-25  IS IMPRISONMENT FOR ANY NUMBER OF YEARS UP TO LIFE.  FEDERAL LAW HAS ABOLISHED PAROLE AND THEREFORE THERE IS NO POSSIBILITY THAT THE DEFENDANT WILL BE PAROLED EARLY FROM THE SENTENCE THE COURT IMPOSES.

AUTHORITY: Instruction given by Chief Judge Rebecca Beach Smith in United States v. Runyon, 4:08cr16, as provided in modified instruction given by Judge Robert E. Payne in United States v. Beckford, 3:96cr66.

Exhibit 73 - 134

*United States v. Xavier Jimenez-Bencevi*
No. 3:12-cr-00221-JAF (D.P.R.)
Judge Presiding: The Hon. José A. Fusté (former Chief Judge)
(Voir dire began April 15, 2013.)

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 124

Exhibit 73 - 135

UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

    Plaintiff,

    v.

XAVIER JIMÉNEZ-BENCEVÍ (1),

    Defendant.

Criminal No. 12-221 (JAF)

## PRELIMINARY INSTRUCTIONS – PENALTY PHASE

### I.

### INTRODUCTION

You will remember that when we were in the process of selecting jurors for this case, I told you that if Defendant Xavier Jiménez-Benceví was found guilty by the jury of any death-penalty eligible count, we would hold a second phase where the jury decides the sentence to be imposed, that is, life imprisonment without the possibility of release, or the death penalty.

A jury's decision in this second phase to sentence a defendant to life imprisonment without the possibility of release or to death is binding on the judge.  That means that if the jury determines in this second phase that Defendant Xavier Jiménez-Benceví should be sentenced to life in prison without release, such is the sentence I am required to impose.  By the same token, if the jury determines that Defendant Xavier Jiménez-Benceví should be sentenced to death, I am required by law to impose that sentence.  In

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 125

Exhibit 73 - 136

Criminal No. 12-221 (JAF)                                                                           -9-

However, if, after weighing the **aggravating and mitigating factors**, the jury cannot **unanimously** find that the sentence of death is justified, the jury shall enter a decision on the special verdict form to this effect and the court shall thereafter impose upon the defendant a sentence of life imprisonment without the possibility of release.

You should not take anything I may say or do during this sentencing hearing as indicating what I think of the evidence or what I think your decision should be.

## **DEFINITION OF TERMS**

Two terms that you have already heard and will hear throughout this sentencing hearing are "**aggravating factors** of two kinds, either **statutory** or **non-statutory**," and "**mitigating factors**."

The word "**aggravate**" means "to make worse or more offensive" or "to intensify." The word "**mitigate**" means "to make less severe" or "to moderate." An **aggravating factor**, then, is a fact or circumstance which would tend to support imposition of the death penalty. A **mitigating factor** is any aspect of a defendant's character, background, or record, any circumstance of the offenses, or any other relevant fact or circumstance which might indicate that the defendant should be sentenced to life imprisonment without the possibility of release.

Congress has identified a number of **aggravating factors** and they are listed in the federal death-penalty statute. These are called **statutory aggravating factors**. As I instructed you earlier, before the jury may consider imposition of the death penalty, it must find that the government proved **at least one** of the **threshold factors** and **at least one** of the **statutory aggravating factors** specifically listed in the federal death penalty statute, and the jury's finding **must be unanimous and beyond a reasonable doubt**.

Exhibit 73 - 137

*United States v. LaShaun Casey*
3:05-CR-00277-ADC (D.P.R.)
Judge Presiding: The Hon. Aida M. Delgado-Colon
(Voir dire began February 4, 2013.)

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 127

Exhibit 73 - 138

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF PUERTO RICO**

**UNITED STATES OF AMERICA,**
Plaintiff,

v.

**LASHAUN CASEY,**
Defendant.

CRIM. NO. 05-277 (ADC)

## SPECIAL VERDICT FORM

### I.    DEFENDANT'S AGE AT THE TIME OF THE OFFENSES

Do you, the jury, unanimously find beyond a reasonable doubt that LASHAUN CASEY was at least 18 years of age on August 1, 2005?

A.    <u>Count One (Carjacking Resulting in Death)</u>

YES **X**

NO ____

B.    <u>Count Two (Use of a Firearm in Relation to a Crime of Violence Resulting in Death)</u>

YES **X**

NO ____

If your finding is "YES" as to Counts One or Two, move on to the Threshold Intent/Gateway Factors in Section II for that count. If your finding is "NO" as to all counts, stop your deliberations and complete SectionVII.

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 128

Exhibit 73 - 139

## VI.    SENTENCE

<u>COUNT ONE – (Carjacking Resulting in Death)</u>

As to Count One, based upon consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or, in the absence of any mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death, and whether death or life in prison without the possibility of release is the appropriate sentence in this case, we determine as follows:

1. Death Sentence

   We determine, by unanimous vote, that a sentence of death shall be imposed:

   YES _____          NO __✗__

2. Life Imprisonment Without Possibility of Release

   We determine, by unanimous vote, that a sentence of life imprisonment without the possibility of release shall be imposed:

   YES _____          NO __✗__

3. Unable to Reach Unanimous Decision

   After due deliberation, we are unable to come to a unanimous agreement on the issue of punishment. We understand that the Court will impose a sentence of life imprisonment without the possibility of release.

   YES __✗__          NO _____

   NOTE: the jury must mark "YES" as to one, and only one, of the choices.

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Exhibit 73 - 140

Case 3:05-cr-00277-ADC    Document 1070    Filed 04/11/13    Page 10 of 11

COUNT TWO- (Murder with a Firearm in Relation to a Crime of Violence)

As to Count Two, based upon consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or, in the absence of any mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death, and whether death or life in prison without the possibility of release is the appropriate sentence in this case, we determine as follows:

1. Death Sentence
   We determine, by unanimous vote, that a sentence of death shall be imposed:

   YES _____                     NO __✗__

2. Life Imprisonment Without Possibility of Release
   We determine, by unanimous vote, that a sentence of life imprisonment without the possibility of release shall be imposed:

   YES _____                     NO __✗__

3. Unable to Reach Unanimous Decision
   After due deliberation, we are unable to come to a unanimous agreement on the issue of punishment. We understand that the Court will impose a sentence of life imprisonment without the possibility of release.

   YES __✗__                          NO _____

   NOTE: the jury must mark "YES" as to one, and only one, of the choices.

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 130

Exhibit 73 - 141

*United States v. Alexis Candelario-Santana*
No. 3:09-cr-00427-JAF-1 (D.P.R.)
Judge Presiding: The Hon. José A. Fusté (former Chief Judge)
(Voir dire began January 28, 2013.)

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 131

Exhibit 73 - 142

1

UNITED

DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

        Plaintiff,

v.                          Docket No. 09-427

                            San Juan, Puerto Rico
ALEXIS CANDELARIO SANTANA, and    March 22, 2013
DAVID OQUENDO RIVAS,

        Defendants.

_____

JURY TRIAL

BEFORE THE HONORABLE JUDGE JOSÉ A. FUSTÉ,

UNITED STATES DISTRICT JUDGE.

_____

APPEARANCES:

For the Government:    Mr. Bruce Hegyi, AUSA
                       Ms. Maria Dominguez Victoriano, AUSA
                       Ms. Marcela Mateo, AUSA


For the Defendants:    Mr. David Arthur Ruhnke, PHV
                       Mr. Francisco Rebollo Casalduc, Esq.
                       Mr. Jose R. Aguayo, Esq.

Proceedings recorded by stenography.  Transcript produced by CAT.

1

INDEX

WITNESSES:                              PAGE

    None offered.



EXHIBITS:

    None offered.

San Juan, Puerto Rico

March 22, 2013

At or about 9:06 AM

                *    *    *

THE COURT:  Members of the jury, what we're going to do now is we're going to hear the closing arguments.  And after that, I will instruct you on the applicable law to this phase of the case.

So we will do it the same way we did it before.  The Government starts, followed by defendant, followed by Government's rebuttal.

Very well.  Who's going to go first?  Mr. Hegyi, please.

MR. HEGYI:  May I proceed, Your Honor?

THE COURT:  Please.

MR. HEGYI:  Ladies and gentlemen, the job left to you in this case is to determine the just, right and proper sentence for Alexis Candelario Santana.  When it comes down to it, it's really just as simple as that.  It's not an easy job.  It's not a joyful job.  But it's a job, a duty that only you can do.

There are times in the life of any civilized society when reasonable, rational, mature and compassionate people have to rise up, they have to draw a line in the sand, and they have to say no more, not ever again.  This is such a case.

When we first met one another during the voir dire process that must seem like a lifetime ago to each of you, we learned that each of you was indeed a reasonable, rational, mature, compassionate individual.  If you hadn't been, you wouldn't be sitting in this jury box, not the regular jurors, not the alternates.  Each of you promised that under the right circumstances, you could vote for the death penalty.

You know that under the law, a person who's guilty of even a single murder, just one, under the right circumstances, could properly be sentenced to death.  Not necessarily would, but could.

During the voir dire process, we learned some of your thoughts about the death penalty, when you thought the death penalty might or might not be appropriate.  We heard from some of you, for instance, that they felt the death penalty might be appropriate for somebody who killed more than one person.  Some of you felt that if someone killed an innocent person, or innocent people.  Others felt that if women were the target and had been killed, children, old people, persons that were unable to defend themselves.  Perhaps a person who killed indiscriminately, maybe that would be an appropriate time to impose the death penalty.

Some of you mentioned the idea of an individual who had killed before, gone to prison to have an opportunity to

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 132

Exhibit 73 - 143

129

reasonable doubt the defend. time of the murders of these persons that I mentioned by name, and that at least one statutory aggravating factor and at least one threshold intent factor was found, unanimously and beyond a reasonable doubt, to apply to any one or more of the offenses arising from these murders, you will then proceed to weigh all of the aggravating and mitigating factors you have found as to those offenses.

In determining the appropriate sentence, all of you must weigh the aggravating factor or factors that you unanimously found to exist beyond a reasonable doubt, whether statutory or non-statutory. And each of you must weigh any mitigating factor that you individually or others found to exist.

Although I have previously instructed you, you must unanimously find at least one of the threshold intent factors proven beyond a reasonable doubt for the defendant to be eligible for a sentence of death. I instruct you now that the threshold intent factors shall not be considered when weighing the aggravating and mitigating factors. Once again, you must weigh only aggravating factors proven unanimously and beyond a reasonable doubt, whether statutory or not, and each of you must weigh any mitigating factor that you individually or collectively with others find to exist.

In engaging in the weighing process, you must not be

129

swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feelings. Your decision should be based upon the evidence you have seen and heard and the law which we are instructing you about now.

Again, whether or not the circumstances in this case justify a sentence of death or life imprisonment without the possibility of release or parole as it's technically referred to, is a decision that the law leaves entirely up to you. The process of weighing aggravating and mitigating factors against each other in order to determine the proper punishment is not a mechanical process. In other words, you should not simply count factors, aggravating and mitigators, and reach a decision based on which one number is greater.

You have to consider the weight and the value of these factors, the quality of the factors. The law also contemplates that different factors may be given different weights or valued by different jurors differently. Thus you may find that one mitigating factor outweighs all aggravating factors combined or that the aggravating factors proven do not standing alone justify the imposition of a sentence of death. Similarly, you may unanimously find that a particular aggravating factor sufficiently outweighs all mitigating factors combined to justify a sentence of death.

Each juror must decide what weight or value is to be given to any particular aggravating or mitigating factor in

nd you again that the weighing process requires a unique, individualized, highly responsible assessment using your intelligence, your common sense, and your good judgment about the appropriateness of a sentence of death against a defendant.

Let's talk about the determination of a sentence of death. If you determine beyond a reasonable doubt that the aggravating factor or factors found to exist sufficiently outweigh any mitigating fact or factors found to exist to justify a sentence of life for a given capital offense, you will enter your determination as to whether death is justified in the corresponding section of the verdict form — sentence of life. If you unanimously determine that the aggravating factor or factors do not exist, do not sufficiently outweigh any fact or factors that exist to justify a sentence of death, you will enter your determination as to whether the defendant be sentenced to life imprisonment without possibility of release in the pertinent section of the verdict form.

However, if you are unable to come to agreement of an unanimous nature on the issue of punishment, after following the instruction number two, which is entitled duty to deliberate, I will impose a sentence of life imprisonment without the possibility of release. There is a space in your verdict form addressing this outcome.

At the end of your deliberations, if you unanimously

131

determine that the defendant should be sentenced to death or to life imprisonment without the possibility of release, the Court is required to impose that sentence. Your verdict must be based solely on the evidence and the law as I have given it to you, and you have heard this before in these instructions. However, nothing I may have said or done is intended to indicate, nor should be taken by you as to what your verdict should be. Your verdict is entirely up to you to make or to decide.

Each item under consideration requires independent consideration. The same way that in the beginning you have to consider each defendant for each particular count, here you have to give separate, individual consideration to each issue that is before you. And what you decide on one doesn't necessarily control on the other. There has to be a separate decision for each of the particular counts.

The capital counts of the Third Superseding Indictment are Counts II through IX, which charge violations of Title 18, United States Code, Section 1959 and Section Two; and Counts XI through XVIII, which charge violations of Title 18, United States Code, Sections 924(j)(1) and two.

Each capital count charges a separate crime. You must consider each count separately. That is, you must decide separately the evidence in each case and what it shows about the defendant as to each particular count.

132

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 133

Exhibit 73 - 144

In your considerat[ion] justified, you must not consider race, color, religious beliefs, national origin or sex of either the defendant or of any victim. You are not to return a sentence of death unless you would return a sentence of death for the crime in question without regard to race, color, religious beliefs, national origin, or sex of either the defendant or any victim.

To emphasize the importance of this consideration, there is a section in the special verdict form that contains a certification statement to the effect that you are not considering race, color, religious beliefs, et cetera in your deliberations. Each juror should carefully read the statement and sign it in the appropriate place if the statement accurately reflects the manner in which you have reached your decision. Remember that since the jury is anonymous, you must individually sign the certification with the juror number in your own handwriting, not with your regular signature.

Let's talk about the special verdict form. Let's leave the verdict form for last.

Note taking. I allowed you to take notes. I see that you have your notebooks with you. Remember that the notes that you took are your individual notes as to what you wanted to remember in particular. Your notes are not binding upon the others in other words. Your notes are your aid in recollecting what you thought you had to put down in hand —

133

in black and white to remember. That's it. Nothing else.

So remember that the notes that one took are not necessarily the collective memory of the others. It is the collective memory of everybody that works here, is what really counts, not the particular notes of juror one, two or three.

Let's talk about the special verdict form. It's long, but it's very logical. And it's a good guide to follow. The first question is age of the defendant. And the purpose of that question is for you to decide, find whether it can be done unanimously and without — beyond a reasonable doubt what was his age at the time of the commission of the offenses.

Then we deal with threshold intent factors. Remember, there were two. And what we are asking you to do is to consider whether you find each of those threshold intent factors proven to your unanimous satisfaction beyond a reasonable doubt regarding the different individuals that are named in the verdict form, and regarding the particular count in which that person is named.

Example, Tina Marie Rodriguez Otero is mentioned in Counts IX and Count XVIII. So it's in relation to these Counts IX and XVIII that you have to answer yes or no regarding the particular threshold intent factors, and so on and so forth regarding through the remaining other individuals. And the same way regarding the other threshold intent factor that is also a possibility. And once again

nvolved as victims, and in the specific counts in which they are mentioned. It's extremely logical the way it's written.

Then we go into the statutory aggravating factors, assuming that you have found threshold intent factors. And then here we go factor by factor. I'll give you an example of the first one. And I'll read them all again. Do you the jury unanimously find that the Government has established beyond a reasonable doubt that Alexis Candelario Santana was previously convicted of a state offense punishable by a term of imprisonment of more than one year involving the use of, attempted or threatened use of a firearm against another person? You have to answer yes or no. And so on and so forth.

And then you go once again, person by person, Tina Marie Rodriguez Otero; Joan Manuel Class Guzman; et cetera, et cetera, by count. It is here spelled out, the counts that apply to that particular victim or person killed.

Then we do the same with the non-statutory aggravating factors. And I'll read the second one to read one. Do you the jury unanimously find that the Government has established beyond a reasonable doubt that Alexis Candelario committed the offense in the course of engaging in a continuing criminal enterprise? You answer yes or no.

Then once you have done that, you go into the

135

victims. For example, do you the jury unanimously find that the Government has established beyond a reasonable doubt that Alexis Candelario Santana caused injury, harm and loss to the families of X, Y, and Z. Go like that, and you will answer those particular questions regarding those factors.

Then you go into the mitigating factors, and for the mitigating factors the process is a bit different, because remember that the mitigating factors can be proven with a different burden, proven — they must be proven that they are more likely so than not so, more likely true than not true. That means by preponderance of the evidence.

And remember that it doesn't have to be unanimous either. So, for example, you will see that that section of the verdict form has a blank for you to tell us the number of jurors that found a particular mitigating factor existed.

Let's take one. Let me just take one, the first one. David Oquendo will not face the death penalty for his role in the murders of La Tombola. If three of you found that that is a mitigating factor, you will put number of jurors that so found, three. If nobody found that factor, zero. If only one found it, one. If 12 found it, 12. That's it. One by one. Factor by factor. Mitigation.

And then since I told you that you could find other mitigating factors as long as they are related to the character, background or record or any circumstance of the

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Exhibit 73 - 145

offenses or any other rele[v]
might indicate the defendant should be sentenced to life and
not to death, then I gave you spaces to insert the particular
mitigating factor that you found that we haven't talked about
and the number of jurors who so found.

And I gave you actually 12 spaces for you to decide
what you want to do with it. If you find none, just cross out
that section. If somebody -- whichever, three, four, five,
ten, 12, zero, whichever, you also indicate that result. And
then you come into the process of weighing your
determinations.

And I'll read you one of the determination questions
in the verdict form. Let's take Joan Manuel Class Guzman as
an example. It tells you in parentheses, Counts I and III,
XI, as to Count II, based upon consideration of whether the
aggravating factors found to exist sufficiently outweigh any
mitigating factor or factors found to exist or whether the
mitigating factors outweigh the aggravating factors or in the
absence of any mitigating factors whether the aggravating
factors are themselves sufficient to justify a sentence of
death, and whether death or life in prison without the
possibility of release is the appropriate sentence in this
case, we determine as follows: Death sentence, we determine
by unanimous vote that the sentence of death shall be imposed,
yes or no. Second option, sentence of life in prison without

137

possibility of release. We determine by unanimous vote the
sentence of life in prison without the possibility of release,
yes or no. Third option, unable to come to a unanimous
decision. After due deliberation, we are unable to come to a
decision on the issue of punishment. We understand the Court
will impose a sentence of life imprisonment without
possibility of release. And the answer is once again, yes or
no.

And we go victim by victim and count by count with
the same kind of questions asked. And the last part that you
have to fill in is the certification. The certification is
the one that I mentioned in the instructions that tells you —
tells us, the receivers of the verdict here, that when you
made these deliberations, you are certifying that you didn't
consider impermissible factors such as race, national origin,
things of the sort, religious beliefs, things of the sort.
And then each one of you has to sign that certification. But
since you are an anonymous juror, you will sign it with your
number in your own handwriting.

So you will see that we have actually here 11 spaces,
and the 12th space would be for the foreperson. That's it.
This is the verdict form. It's extremely easy to follow.
It's logically developed to be followed that way.

You're going to take with -- strike that. Before we
continue, when you are in the jury room, you are going to

ncing issues among
yourselves with candor, maturity, frankness, integrity, and
respect for the opinion of one another.

Each one of you must decide these matters for
yourself and not merely go along with the conclusion of your
fellow jurors. In the course of your deliberations, you must
never surrender your honest, conscientious belief of what is
the truth or what is the weight or effect of the evidence and
what should be the outcome determined by each juror
individually in the evaluation of the case.

Remember that the parties and the Court are relying
upon you to give full, considered, and mature consideration to
this sentencing process. By doing so, you carry out your oath
as jurors, that you will well and truly try the issues of this
case and render a just verdict.

If it becomes necessary during your deliberations to
communicate with the Court, you know what the process is. You
grab a piece of paper. You write a note to me. You never
tell me what is going on in detail. You simply ask me a
question, whatever it may be, and I will take it upon myself
to show it to the lawyers. That's why I tell you, do not tell
me any intimate voting details in the note. And I will then
tell you whether I decide I should answer in a written note or
whether I should bring you in and tell you the answer in
person.

139

Remember, if you send me a note, it's entirely
possible it may take me a little bit of time to figure it out
and call the lawyers in and discuss it with them. So if you
send a note, don't think for a minute it's going to be two
minutes. It could take ten minutes, 15 minutes depending what
it is.

You remember that Mr. Villavicencio took an oath
before. That oath is still valid. That oath has been taken
by all the Court Security Officers and all the Marshals. And
the oath is to the effect that the persons who are taking care
of you in deliberations are not part of the jury obviously,
and that they are prohibited from communicating with you on
any subject touching upon the merits of the case. That is a
given.

Bear in mind, you are never to reveal to any person
how -- not even me, how the jury stands numerically or
otherwise on the matters under consideration until after you
have reached a verdict.

And each one of you is going to get a copy of the
verdict form and the instructions. This is for you. You are
going to be able to have with you the exhibits from the guilt
phase if you want to see them. If you want to see them, you
can have them. If at some point in time you need to see any
particular other exhibit from the previous phase, you let me
know and I'll let you know whether you can have it or not.

Page 135    140

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Exhibit 73 - 146

UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

    Plaintiff,

    v.

ALEXIS CANDELARIO-SANTANA (1),

    Defendant.

Criminal No. 09-427 (JAF)



**SPECIAL VERDICT FORM**

## I.  AGE OF DEFENDANT

Instructions: Answer "YES" or "NO"

1.  Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that:

    Alexis Candelario Santana was eighteen years (18) of age or older at the time of the offenses charged under Counts Two through Nine, and Eleven through Eighteen of the Third Superseding Indictment (October 17, 2009).

    YES   ✓  

    NO     

Instructions: If you answered "NO" with respect to the determination in this section, then stop your deliberations, cross out Sections II, III, IV, V and VI of this form, and proceed to Section VII. Each juror should then carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the court that you have reached a decision.

If you answered "YES" with respect to the determination in this Section I, proceed to Section II which follows.

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 136

Exhibit 73 - 147

Criminal No. 09-427 (JAF)                                                13 of 29

## VI. DETERMINATION

### A. Joan Manuel Class-Guzmán (Counts Two and Eleven)

**Count Two**: As to Count Two, based upon consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or whether the mitigating factors outweigh the aggravating factors, or in the absence of any mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death, and whether death or life in prison without the possibility of release is the appropriate sentence in this case we determine as follows:

### 1. Death Sentence

We determine, by unanimous vote, that a sentence of death shall be imposed.

YES _____

NO _____

### 2. Sentence of Life in Prison Without Possibility of Release

We determine, by unanimous vote, that a sentence of life imprisonment without possibility of release shall be imposed.

YES _____

NO _____

### 3. Unable to Come to Unanimous Decision

After due deliberation, we are unable to come to unanimous agreement on the issues of punishment. We understand that the Court will impose a sentence of life imprisonment without the possibility of release.

YES _____

NO _____

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)                    Page 137

Exhibit 73 - 148

Criminal No. 09-427 (JAF)                                                        14 of 29

**Count Eleven**: As to Count Eleven, based upon consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or whether the mitigating factors outweigh the aggravating factors, or in the absence of any mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death, and whether death or life in prison without the possibility of release is the appropriate sentence in this case we determine as follows:

### 1. Death Sentence

We determine, by unanimous vote, that a sentence of death shall be imposed.

YES _____

NO _____

### 2. Sentence of Life in Prison Without Possibility of Release

We determine, by unanimous vote, that a sentence of life imprisonment without possibility of release shall be imposed.

YES _____

NO _____

### 3. Unable to Come to Unanimous Decision

After due deliberation, we are unable to come to unanimous agreement on the issues of punishment. We understand that the Court will impose a sentence of life imprisonment without the possibility of release.

YES _____

NO _____

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 138

Exhibit 73 - 149

Criminal No. 09-427 (JAF)                                                                 15 of 29

**B.     Pedro Semprit-Santana (Counts Three and Twelve)**

**Count Three:** As to Count Three, based upon consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or whether the mitigating factors outweigh the aggravating factors, or in the absence of any mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death, and whether death or life in prison without the possibility of release is the appropriate sentence in this case we determine as follows:

### 1. Death Sentence

We determine, by unanimous vote, that a sentence of death shall be imposed.

YES _____

NO _____✓_____

### 2. Sentence of Life in Prison Without Possibility of Release

We determine, by unanimous vote, that a sentence of life imprisonment without possibility of release shall be imposed.

YES _____

NO _____✓_____

### 3. Unable to Come to Unanimous Decision

After due deliberation, we are unable to come to unanimous agreement on the issues of punishment.  We understand that the Court will impose a sentence of life imprisonment without the possibility of release.

YES _____✓_____

NO _____

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 139

Exhibit 73 - 150

Criminal No. 09-427 (JAF)                                                    16 of 29

**Count Twelve:** As to Count Twelve, based upon consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or whether the mitigating factors outweigh the aggravating factors, or in the absence of any mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death, and whether death or life in prison without the possibility of release is the appropriate sentence in this case we determine as follows:

### 1. Death Sentence

We determine, by unanimous vote, that a sentence of death shall be imposed.

YES _____

NO _____

### 2. Sentence of Life in Prison Without Possibility of Release

We determine, by unanimous vote, that a sentence of life imprisonment without possibility of release shall be imposed.

YES _____

NO _____

### 3. Unable to Come to Unanimous Decision

After due deliberation, we are unable to come to unanimous agreement on the issues of punishment. We understand that the Court will impose a sentence of life imprisonment without the possibility of release.

YES _____

NO _____

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Exhibit 73 - 151

Criminal No. 09-427 (JAF)                                                   17 of 29

### C.    José Angel Hernández-Martínez (Counts Four and Thirteen)

**Count Four:** As to Count Four, based upon consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or whether the mitigating factors outweigh the aggravating factors, or in the absence of any mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death, and whether death or life in prison without the possibility of release is the appropriate sentence in this case we determine as follows:

### 1. Death Sentence

We determine, by unanimous vote, that a sentence of death shall be imposed.

YES _____

NO _____✓_____

### 2. Sentence of Life in Prison Without Possibility of Release

We determine, by unanimous vote, that a sentence of life imprisonment without possibility of release shall be imposed.

YES _____

NO _____✓_____

### 3. Unable to Come to Unanimous Decision

After due deliberation, we are unable to come to unanimous agreement on the issues of punishment. We understand that the Court will impose a sentence of life imprisonment without the possibility of release.

YES _____✓_____

NO _____

**Count Thirteen**: As to Count Thirteen, based upon consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or whether the mitigating factors outweigh the aggravating

Exhibit 73 - 152

Criminal No. 09-427 (JAF)                                                                        18 of 29

factors, or in the absence of any mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death, and whether death or life in prison without the possibility of release is the appropriate sentence in this case:

## 1. Death Sentence

We determine, by unanimous vote, that a sentence of death shall be imposed.

YES _____

NO _____

## 2. Sentence of Life in Prison Without Possibility of Release

We determine, by unanimous vote, that a sentence of life imprisonment without possibility of release shall be imposed.

YES _____

NO _____

## 3. Unable to Come to Unanimous Decision

After due deliberation, we are unable to come to unanimous agreement on the issues of punishment. We understand that the Court will impose a sentence of life imprisonment without the possibility of release.

YES _____

NO _____

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 142

Exhibit 73 - 153

Criminal No. 09-427 (JAF)                                                        19 of 29

**D.    John Henry García-Martínez (Counts Five and Fourteen)**

**Count Five:** As to Count Five, based upon consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or whether the mitigating factors outweigh the aggravating factors, or in the absence of any mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death, and whether death or life in prison without the possibility of release is the appropriate sentence in this case we determine as follows:

### 1. Death Sentence

We determine, by unanimous vote, that a sentence of death shall be imposed.

YES _____

NO _____

### 2. Sentence of Life in Prison Without Possibility of Release

We determine, by unanimous vote, that a sentence of life imprisonment without possibility of release shall be imposed.

YES _____

NO _____

### 3. Unable to Come to Unanimous Decision

After due deliberation, we are unable to come to unanimous agreement on the issues of punishment. We understand that the Court will impose a sentence of life imprisonment without the possibility of release.

YES _____

NO _____

**Count Fourteen:** As to Count Fourteen, based upon consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or whether the mitigating factors outweigh the aggravating factors, or in the absence of any mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death, and whether death or life in prison without the possibility of release is the appropriate sentence in this case we

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS                    Page 143
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Exhibit 73 - 154

Criminal No. 09-427 (JAF)                                    20 of 29

determine as follows:

### 1. Death Sentence

We determine, by unanimous vote, that a sentence of death shall be imposed.

YES _____

NO _____✓_____

### 2. Sentence of Life in Prison Without Possibility of Release

We determine, by unanimous vote, that a sentence of life imprisonment without possibility of release shall be imposed.

YES _____

NO _____✓_____

### 3. Unable to Come to Unanimous Decision

After due deliberation, we are unable to come to unanimous agreement on the issues of punishment. We understand that the Court will impose a sentence of life imprisonment without the possibility of release.

YES _____✓_____

NO _____

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 144

Exhibit 73 - 155

Criminal No. 09-427 (JAF)                                              21 of 29

### E.    Elisa del Carmen Ocasio (Counts Six and Fifteen)

**Count Six:** As to Count Six, based upon consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or whether the mitigating factors outweigh the aggravating factors, or in the absence of any mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death, and whether death or life in prison without the possibility of release is the appropriate sentence in this case we determine as follows:

### 1. Death Sentence

We determine, by unanimous vote, that a sentence of death shall be imposed.

YES _____

NO _____

### 2. Sentence of Life in Prison Without Possibility of Release

We determine, by unanimous vote, that a sentence of life imprisonment without possibility of release shall be imposed.

YES _____

NO _____

### 3. Unable to Come to Unanimous Decision

After due deliberation, we are unable to come to unanimous agreement on the issues of punishment. We understand that the Court will impose a sentence of life imprisonment without the possibility of release.

YES _____

NO _____

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 145

Exhibit 73 - 156

Criminal No. 09-427 (JAF)                                         22 of 29

**Count Fifteen:** As to Count Fifteen, based upon consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or whether the mitigating factors outweigh the aggravating factors, or in the absence of any mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death, and whether death or life in prison without the possibility of release is the appropriate sentence in this case we determine as follows:

### 1. Death Sentence

We determine, by unanimous vote, that a sentence of death shall be imposed.

YES _____

NO _____✓_____

### 2. Sentence of Life in Prison Without Possibility of Release

We determine, by unanimous vote, that a sentence of life imprisonment without possibility of release shall be imposed.

YES _____

NO _____✓_____

### 3. Unable to Come to Unanimous Decision

After due deliberation, we are unable to come to unanimous agreement on the issues of punishment. We understand that the Court will impose a sentence of life imprisonment without the possibility of release.

YES _____

NO _____

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)                                   Page 146

Exhibit 73 - 157

Criminal No. 09-427 (JAF)                                                      23 of 29

### F.    Samuel Ruiz-Martínez (Counts Seven and Sixteen)

**Count Seven:** As to Count Seven, based upon consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or whether the mitigating factors outweigh the aggravating factors, or in the absence of any mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death, and whether death or life in prison without the possibility of release is the appropriate sentence in this case we determine as follows:

### 1. Death Sentence

We determine, by unanimous vote, that a sentence of death shall be imposed.

YES _____

NO _____

### 2. Sentence of Life in Prison Without Possibility of Release

We determine, by unanimous vote, that a sentence of life imprisonment without possibility of release shall be imposed.

YES _____

NO _____

### 3. Unable to Come to Unanimous Decision

After due deliberation, we are unable to come to unanimous agreement on the issues of punishment. We understand that the Court will impose a sentence of life imprisonment without the possibility of release.

YES _____

NO _____

**Count Sixteen:** As to Count Sixteen, based upon consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or whether the mitigating factors outweigh the aggravating

Exhibit 73 - 158

Criminal No. 09-427 (JAF)                                                    24 of 29

factors, or in the absence of any mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death, and whether death or life in prison without the possibility of release is the appropriate sentence in this case we determine as follows:

### 1. Death Sentence

We determine, by unanimous vote, that a sentence of death shall be imposed.

YES _____

NO _____

### 2. Sentence of Life in Prison Without Possibility of Release

We determine, by unanimous vote, that a sentence of life imprisonment without possibility of release shall be imposed.

YES _____

NO _____

### 3. Unable to Come to Unanimous Decision

After due deliberation, we are unable to come to unanimous agreement on the issues of punishment. We understand that the Court will impose a sentence of life imprisonment without the possibility of release.

YES _____

NO _____

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Exhibit 73 - 159

Criminal No. 09-427 (JAF)                                              25 of 29

### G.    Rafael Angel Ramos-Rivera (Counts Eight and Seventeen)

**Count Eight:** As to Count Eight, based upon consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or whether the mitigating factors outweigh the aggravating factors, or in the absence of any mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death, and whether death or life in prison without the possibility of release is the appropriate sentence in this case we determine as follows:

### 1. Death Sentence

We determine, by unanimous vote, that a sentence of death shall be imposed.

YES _____

NO _____

### 2. Sentence of Life in Prison Without Possibility of Release

We determine, by unanimous vote, that a sentence of life imprisonment without possibility of release shall be imposed.

YES _____

NO _____

### 3. Unable to Come to Unanimous Decision

After due deliberation, we are unable to come to unanimous agreement on the issues of punishment. We understand that the Court will impose a sentence of life imprisonment without the possibility of release.

YES _____

NO _____

**Count Seventeen:** As to Count Seventeen, based upon consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or whether the mitigating factors outweigh the aggravating factors, or in the absence of any mitigating

Exhibit 73 - 160

Criminal No. 09-427 (JAF)                                            26 of 29

factors, whether the aggravating factors are themselves sufficient to justify a sentence of death, and whether death or life in prison without the possibility of release is the appropriate sentence in this case we determine as follows:

### 1. Death Sentence

We determine, by unanimous vote, that a sentence of death shall be imposed.

YES _____

NO _____ ⌐____

### 2. Sentence of Life in Prison Without Possibility of Release

We determine, by unanimous vote, that a sentence of life imprisonment without possibility of release shall be imposed.

YES _____

NO _____ ⌐____

### 3. Unable to Come to Unanimous Decision

After due deliberation, we are unable to come to unanimous agreement on the issues of punishment. We understand that the Court will impose a sentence of life imprisonment without the possibility of release.

YES _____ ⌐____

NO _____

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 150

Exhibit 73 - 161

Criminal No. 09-427 (JAF)                                                                27 of 29

### H.    Tina Marie Rodríguez-Otero (Counts Nine and Eighteen)

**Count Nine:** As to Count Nine, based upon consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or whether the mitigating factors outweigh the aggravating factors, or in the absence of any mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death, and whether death or life in prison without the possibility of release is the appropriate sentence in this case we determine as follows:

#### 1. Death Sentence

We determine, by unanimous vote, that a sentence of death shall be imposed.

YES _____

NO _____✓_____

#### 2. Sentence of Life in Prison Without Possibility of Release

We determine, by unanimous vote, that a sentence of life imprisonment without possibility of release shall be imposed.

YES _____

NO _____✓_____

#### 3. Unable to Come to Unanimous Decision

After due deliberation, we are unable to come to unanimous agreement on the issues of punishment. We understand that the Court will impose a sentence of life imprisonment without the possibility of release.

YES _____✓_____

NO _____

**Count Eighteen:** As to Count Eighteen, based upon consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or whether the mitigating factors outweigh the aggravating

Exhibit 73 - 162

Criminal No. 09-427 (JAF)                                                                28 of 29

factors, or in the absence of any mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death, and whether death or life in prison without the possibility of release is the appropriate sentence in this case we determine as follows:

### 1. Death Sentence

We determine, by unanimous vote, that a sentence of death shall be imposed.

YES _____

NO _____

### 2. Sentence of Life in Prison Without Possibility of Release

We determine, by unanimous vote, that a sentence of life imprisonment without possibility of release shall be imposed.

YES _____

NO _____

### 3. Unable to Come to Unanimous Decision

After due deliberation, we are unable to come to unanimous agreement on the issues of punishment. We understand that the Court will impose a sentence of life imprisonment without the possibility of release.

YES _____

NO _____

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 152

Exhibit 73 - 163

*United States v. Kaboni Savage, et al.*
No. 2:04-cr-00269-MAK (E.D. Pa.)
Judge Presiding: The Hon. R. Barclay Surrick
(Voir dire began November 5, 2012.)

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 153

Exhibit 73 - 164

1 - 165

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          :   CRIMINAL NUMBER

V.

KABONI SAVAGE                     :   07-00550

THURSDAY, 5-30-13
COURTROOM 8A
PHILADELPHIA, PA 19106

-----------------------------------------------------------
BEFORE THE HONORABLE R. BARCLAY SURRICK, J.
-----------------------------------------------------------
SENTENCING PHASE - DAY 6
-----------------------------------------------------------

APPEARANCES:

DAVID TROYER, ESQUIRE              FOR THE GOVERNMENT
JOHN GALLAGHER, ESQUIRE
ASSISTANT UNITED STATES ATTORNEYS
615 CHESTNUT STREET, SUITE 1250
PHILADELPHIA, PA 19106

SUZANNE R. WHITE, RPR, FCRR, CM
OFFICIAL COURT REPORTER
FIRST FLOOR U. S. COURTHOUSE
601 MARKET STREET
PHILADELPHIA, PA 19106
(215)627-1882

PROCEEDINGS RECORDED BY STENOTYPE-COMPUTER,
TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 154

Exhibit 73 - 165

50

TOTAL NUMBER OF AGGRAVATING FACTORS AND REACH A DECISION BASED UPON THE NUMBER -- A NUMBER WHICH IS GREATER. RATHER, YOU SHOULD CONSIDER AND WEIGH THE VALUE OF EACH FACTOR AND CAREFULLY WEIGH THESE VARIOUS FACTORS. LADIES AND GENTLEMEN, YOU ARE CALLED UPON TO MAKE A UNIQUE, INDIVIDUAL JUDGMENT ABOUT THE SENTENCE THAT THIS DEFENDANT SHOULD RECEIVE.

THE LAW CONTEMPLATES THAT DIFFERENT FACTORS MAY BE GIVEN DIFFERENT WEIGHTS OR VALUES BY DIFFERENT JURORS. SO IF YOU MAY FIND THAT ONE MITIGATING FACTOR OUTWEIGHS ALL AGGRAVATING FACTORS OR THAT THE AGGRAVATING FACTORS PROVEN DO NOT, STANDING ALONE, JUSTIFY THE IMPOSITION OF A SENTENCE OF DEATH BEYOND A REASONABLE DOUBT, YOU MAY INSTEAD FIND THAT A SINGLE AGGRAVATING FACTOR SUFFICIENTLY OUTWEIGHS, BEYOND A REASONABLE DOUBT, ALL MITIGATING FACTORS COMBINED SO AS TO JUSTIFY A SENTENCE OF DEATH.

LADIES AND GENTLEMEN, ANY ONE OF YOU IS FREE TO DECIDE THAT A DEATH SENTENCE SHOULD NOT BE IMPOSED SO LONG AS, BASED ON THE EVIDENCE AND YOUR SENSE OF JUDGMENT, YOU CONCLUDE THAT THE PROVEN AGGRAVATING FACTORS DO NOT SUFFICIENTLY OUTWEIGH THE MITIGATING FACTORS SUCH THAT THE DEATH PENALTY SHOULD BE IMPOSED. EACH JUROR HAS TO INDIVIDUALLY DECIDE WHAT WEIGHT OR VALUE IS TO BE GIVEN TO A PARTICULAR AGGRAVATING OR

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 155

Exhibit 73 - 166

51

MITIGATING FACTOR IN THIS DECISION MAKING PROCESS.

YOU SHOULD BEAR IN MIND, HOWEVER, THAT IN ORDER TO FIND THAT A SENTENCE OF DEATH IS APPROPRIATE FOR A PARTICULAR COUNT, THE JURORS MUST BE UNANIMOUS IN THEIR CONCLUSION, BEYOND A REASONABLE DOUBT, THAT THE AGGRAVATING FACTOR OR FACTORS PROVEN AS TO THAT COUNT SUFFICIENTLY OUTWEIGH THE MITIGATING FACTORS FOUND OR IN THE ABSENCE OF MITIGATING FACTORS THAT THE AGGRAVATING FACTORS ALONE ARE SUFFICIENT TO JUSTIFY A SENTENCE OF DEATH.

NOW IN THE EVENT THAT YOU UNANIMOUSLY FIND BEYOND A REASONABLE DOUBT THAT THE BALANCING PROCESS LEADS YOU TO CONCLUDE THAT A SENTENCE OF DEATH IS CALLED FOR AS TO A PARTICULAR COUNT, PLEASE SO INDICATE ON SECTION 6 OF THE SPECIAL VERDICT FORM.  IF, AFTER ENGAGING IN THE BALANCING PROCESS THAT I HAVE JUST DISCUSSED WITH YOU, ALL 12 MEMBERS OF THE JURY DO NOT UNANIMOUSLY FIND BEYOND A REASONABLE DOUBT THAT THE DEFENDANT SHOULD BE SENTENCED TO DEATH ON A PARTICULAR COUNT, THEN YOU MAY NOT IMPOSE THE DEATH PENALTY ON THAT COUNT.  IN THAT EVENT, LADIES AND GENTLEMEN, CONGRESS HAS PROVIDED THAT LIFE IN PRISON WITHOUT THE POSSIBILITY OF RELEASE IS THE ONLY ALTERNATIVE SENTENCE AVAILABLE. IF YOU CAN NOT UNANIMOUSLY AGREE WHETHER THE DEFENDANT SHOULD BE SENTENCED TO DEATH OR TO LIFE IN PRISON

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 156

Exhibit 73 - 167

52

WITHOUT THE POSSIBILITY OF RELEASE, THE COURT WILL SENTENCE THE DEFENDANT TO LIFE IN PRISON WITHOUT THE POSSIBILITY OF RELEASE.

NOW, LADIES AND GENTLEMEN, BEFORE YOU REACH ANY CONCLUSION BASED ON A LACK OF UNANIMITY ON ANY COUNT, YOU SHOULD CONTINUE YOUR DISCUSSIONS UNTIL YOU ARE FULLY SATISFIED THAT NO FURTHER DISCUSSION WILL LEAD TO A UNANIMOUS DECISION.  IF YOU ARE SATISFIED THAT YOU CANNOT REACH A UNANIMOUS DECISION, PLEASE SO INDICATE THIS FINDING ON THE SPECIAL VERDICT FORM.  AS I HAVE TOLD YOU, SHOULD YOU UNANIMOUSLY DECIDE TO IMPOSE THE DEATH PENALTY OR TO IMPOSE LIFE IN PRISON WITHOUT THE POSSIBILITY OF RELEASE, I AM REQUIRED BY LAW TO ABIDE BY YOUR DECISION AND TO SENTENCE THE DEFENDANT ACCORDINGLY.

NOW, LADIES AND GENTLEMEN, IN YOUR CONSIDERATION OF WHETHER THE DEATH SENTENCE IS APPROPRIATE, YOU MUST NOT CONSIDER THE RACE, COLOR, RELIGIOUS BELIEFS, NATIONAL ORIGIN OR SEX OF EITHER THE DEFENDANT OR THE VICTIMS.  LADIES AND GENTLEMEN, YOU ARE NOT TO RETURN A SENTENCE OF DEATH UNLESS YOU WOULD RETURN A SENTENCE OF DEATH FOR THE CRIME IN QUESTION WITHOUT REGARD TO RACE, COLOR, RELIGIOUS BELIEFS, NATIONAL ORIGIN OR SEX OF EITHER THE DEFENDANT OR THE VICTIM.

LADIES AND GENTLEMEN, TO EMPHASIZE THE

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 157

Exhibit 73 - 168

COPY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA      :

                                 :     CRIMINAL ACTION

     v.                            :

                                   :     NO. 07-550-03

KABONI SAVAGE                 :

### SPECIAL VERDICT FORM FOR PENALTY PHASE

This special verdict sheet is supplied to you because you have found Kaboni Savage guilty of counts in the indictment which carry a possible penalty of death. Therefore, this form applies to your findings on Count 2 (murder of Kenneth Lassiter in aid of racketeering), Count 3 (murder of Mansur Abdullah in aid of racketeering), Count 4 (murder of Carlton Brown in aid of racketeering), Count 5 (murder of Barry Parker in aid of racketeering), Count 6 (murder of Tyrone Toliver in aid of racketeering), Count 7 (murder of Tybius Flowers in aid of racketeering), Count 10 (murder of Marcella Coleman in aid of racketeering), Count 11 (murder of Tameka Nash in aid of racketeering), Count 12 (murder of Sean Anthony Rodriguez in aid of racketeering), Count 13 (murder of Tajh Porchea in aid of racketeering), Count 14 (murder of Khadijah Nash in aid of racketeering), Count 15 (murder of Damir Jenkins in aid of racketeering), and Count 16 (retaliating against a witness, victim, or an informant, which resulted in the deaths of Marcella Coleman, Tameka Nash, Sean Anthony Rodriguez, Tajh Porchea, Khadijah Nash, and Damir Jenkins). This form is organized by count. For each count, you are asked to make your findings on the defendant's age, intent, and what, if any, statutory aggravating factors apply to that count.

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 158

Exhibit 73 - 169

## Section VI - Determination of Sentences

**Section VI - Determination of Sentence for Count 2:  The Murder of Kenneth Lassiter**

*In this section, enter your determination of the defendant's sentence with regard to Count 2. Your vote as a jury must be unanimous with regard to each question in this section.*

Based upon consideration of whether the statutory and non-statutory aggravating factors which were proved in this case beyond a reasonable doubt sufficiently outweigh any mitigating factors that have been found to exist, or, in the absence of any mitigating factors, the aggravating factor(s) alone is/are sufficient to justify a sentence of death:

_____✓_____    We vote unanimously that Kaboni Savage shall be sentenced to death.

_____    We vote unanimously that Kaboni Savage shall be sentenced to life imprisonment without the possibility of release.

_____    We cannot reach a unanimous decision regarding the appropriate punishment in this case. One or more of us believes that death by execution is the appropriate punishment, and one or more of us believes that life in prison without any possibility of release is the appropriate punishment. We understand that because we do not unanimously agree, the Court will sentence Kaboni Savage to life in prison without any possibility of release.

*Each juror must sign his/her juror number below, indicating that the above sentence determination reflects the jury's unanimous decision:*

| | |
|---|---|
| 1 | 4 |
| 5 | 12 |
| 9 | 6 |
| 2 | 11 |
| 3 | 10 |
| 8 | 7 |

FOREPERSON  2013 jurors

Date: 5/31/2013

60

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Exhibit 73 - 170

**Section VI - Determination of Sentence for Count 3:  The Murder of Mansur Abdullah**

*In this section, enter your determination of the defendant's sentence with regard to Count 3. Your vote as a jury must be unanimous with regard to each question in this section.*

Based upon consideration of whether the statutory and non-statutory aggravating factors which were proved in this case beyond a reasonable doubt sufficiently outweigh any mitigating factors that have been found to exist, or, in the absence of any mitigating factors, the aggravating factor(s) alone is/are sufficient to justify a sentence of death:

    ✓    We vote unanimously that Kaboni Savage shall be sentenced to death.

        We vote unanimously that Kaboni Savage shall be sentenced to life imprisonment without the possibility of release.

        We cannot reach a unanimous decision regarding the appropriate punishment in this case. One or more of us believes that death by execution is the appropriate punishment, and one or more of us believes that life in prison without any possibility of release is the appropriate punishment. We understand that because we do not unanimously agree, the Court will sentence Kaboni Savage to life in prison without any possibility of release.

*Each juror must sign his/her juror number below, indicating that the above sentence determination reflects the jury's unanimous decision:*

| | |
|---|---|
| 1 | 4 |
| 5 | 12 |
| 9 | 6 |
| 2 | 11 |
| 3 | 10 |
| 8 | 7 |

FOREPERSON

Date: 5/31/2013

61

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 160

Exhibit 73 - 171

## Section VI - Determination of Sentence for Count 4: The Murder of Carlton Brown

*In this section, enter your determination of the defendant's sentence with regard to Count 4. Your vote as a jury must be unanimous with regard to each question in this section.*

Based upon consideration of whether the statutory and non-statutory aggravating factors which were proved in this case beyond a reasonable doubt sufficiently outweigh any mitigating factors that have been found to exist, or, in the absence of any mitigating factors, the aggravating factor(s) alone is/are sufficient to justify a sentence of death:

_____✓_____     We vote unanimously that Kaboni Savage shall be sentenced to death.

_____     We vote unanimously that Kaboni Savage shall be sentenced to life imprisonment without the possibility of release.

_____     We cannot reach a unanimous decision regarding the appropriate punishment in this case. One or more of us believes that death by execution is the appropriate punishment, and one or more of us believes that life in prison without any possibility of release is the appropriate punishment. We understand that because we do not unanimously agree, the Court will sentence Kaboni Savage to life in prison without any possibility of release.

*Each juror must sign his/her juror number below, indicating that the above sentence determination reflects the jury's unanimous decision:*

| | |
|---|---|
| 1 | 4 |
| 5 | 12 |
| 9 | 6 |
| 2 | 11 |
| 3 | 10 |
| 8 | 7 |

FOREPERSON

Date: 5/31/2013

62

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 161

Exhibit 73 - 172

## Section VI - Determination of Sentence for Count 5: The Murder of Barry Parker

*In this section, enter your determination of the defendant's sentence with regard to Count 5. Your vote as a jury must be unanimous with regard to each question in this section.*

Based upon consideration of whether the statutory and non-statutory aggravating factors which were proved in this case beyond a reasonable doubt sufficiently outweigh any mitigating factors that have been found to exist, or, in the absence of any mitigating factors, the aggravating factor(s) alone is/are sufficient to justify a sentence of death:

_____✓_____    We vote unanimously that Kaboni Savage shall be sentenced to death.

_____    We vote unanimously that Kaboni Savage shall be sentenced to life imprisonment without the possibility of release.

_____    We cannot reach a unanimous decision regarding the appropriate punishment in this case. One or more of us believes that death by execution is the appropriate punishment, and one or more of us believes that life in prison without any possibility of release is the appropriate punishment. We understand that because we do not unanimously agree, the Court will sentence Kaboni Savage to life in prison without any possibility of release.

*Each juror must sign his/her juror number below, indicating that the above sentence determination reflects the jury's unanimous decision:*

| | |
|---|---|
| _1_ | _4_ |
| _5_ | _12_ |
| _9_ | _6_ |
| _2_ | _11_ |
| _3_ | _10_ |
| _8_ | _7_ |

FOREPERSON

Date: _5_/_31_/_2013_

63

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 162

Exhibit 73 - 173

## Section VI - Determination of Sentence for Count 6: The Murder of Tyrone Toliver

*In this section, enter your determination of the defendant's sentence with regard to Count 6. Your vote as a jury must be unanimous with regard to each question in this section.*

Based upon consideration of whether the statutory and non-statutory aggravating factors which were proved in this case beyond a reasonable doubt sufficiently outweigh any mitigating factors that have been found to exist, or, in the absence of any mitigating factors, the aggravating factor(s) alone is/are sufficient to justify a sentence of death:

    ✓     We vote unanimously that Kaboni Savage shall be sentenced to death.

    _____     We vote unanimously that Kaboni Savage shall be sentenced to life imprisonment without the possibility of release.

    _____     We cannot reach a unanimous decision regarding the appropriate punishment in this case. One or more of us believes that death by execution is the appropriate punishment, and one or more of us believes that life in prison without any possibility of release is the appropriate punishment. We understand that because we do not unanimously agree, the Court will sentence Kaboni Savage to life in prison without any possibility of release.

*Each juror must sign his/her juror number below, indicating that the above sentence determination reflects the jury's unanimous decision:*

| | |
|---|---|
| 1 | 4 |
| 5 | 12 |
| 9 | 6 |
| 2 | 11 |
| 3 | 10 |
| 8 | 7 |

FOREPERSON

Date: 5/31/2013

64

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 163

Exhibit 73 - 174

**Section VI - Determination of Sentence for Count 7: The Murder of Tybius Flowers**

*In this section, enter your determination of the defendant's sentence with regard to Count 7. Your vote as a jury must be unanimous with regard to each question in this section.*

Based upon consideration of whether the statutory and non-statutory aggravating factors which were proved in this case beyond a reasonable doubt sufficiently outweigh any mitigating factors that have been found to exist, or, in the absence of any mitigating factors, the aggravating factor(s) alone is/are sufficient to justify a sentence of death:

_____✓_____ We vote unanimously that Kaboni Savage shall be sentenced to death.

_____ We vote unanimously that Kaboni Savage shall be sentenced to life imprisonment without the possibility of release.

_____ We cannot reach a unanimous decision regarding the appropriate punishment in this case. One or more of us believes that death by execution is the appropriate punishment, and one or more of us believes that life in prison without any possibility of release is the appropriate punishment. We understand that because we do not unanimously agree, the Court will sentence Kaboni Savage to life in prison without any possibility of release.

*Each juror must sign his/her juror number below, indicating that the above sentence determination reflects the jury's unanimous decision:*

| | |
|---|---|
| 1 | 4 |
| 5 | 12 |
| 9 | 6 |
| 2 | 11 |
| 3 | 10 |
| 8 | 7 |

FOREPERSON

Date: 5|31|2013

65

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 164

Exhibit 73 - 175

## Section VI - Determination of Sentence for Count 10: The Murder of Marcella Coleman

*In this section, enter your determination of the defendant's sentence with regard to Count 10. Your vote as a jury must be unanimous with regard to each question in this section.*

Based upon consideration of whether the statutory and non-statutory aggravating factors which were proved in this case beyond a reasonable doubt sufficiently outweigh any mitigating factors that have been found to exist, or, in the absence of any mitigating factors, the aggravating factor(s) alone is/are sufficient to justify a sentence of death:

_____✓_____ We vote unanimously that Kaboni Savage shall be sentenced to death.

_____ We vote unanimously that Kaboni Savage shall be sentenced to life imprisonment without the possibility of release.

_____ We cannot reach a unanimous decision regarding the appropriate punishment in this case. One or more of us believes that death by execution is the appropriate punishment, and one or more of us believes that life in prison without any possibility of release is the appropriate punishment. We understand that because we do not unanimously agree, the Court will sentence Kaboni Savage to life in prison without any possibility of release.

*Each juror must sign his/her juror number below, indicating that the above sentence determination reflects the jury's unanimous decision:*

| | |
|---|---|
| 1 | 4 |
| 5 | 12 |
| 9 | 6 |
| 2 | 11 |
| 3 | 10 |
| 8 | 7 |

FOREPERSON

Date: 5/31/2013

66

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Exhibit 73 - 176

## Section VI - Determination of Sentence for Count 11: The Murder of Tameka Nash

*In this section, enter your determination of the defendant's sentence with regard to Count 11. Your vote as a jury must be unanimous with regard to each question in this section.*

Based upon consideration of whether the statutory and non-statutory aggravating factors which were proved in this case beyond a reasonable doubt sufficiently outweigh any mitigating factors that have been found to exist, or, in the absence of any mitigating factors, the aggravating factor(s) alone is/are sufficient to justify a sentence of death:

_____✓_____      We vote unanimously that Kaboni Savage shall be sentenced to death.

_____      We vote unanimously that Kaboni Savage shall be sentenced to life imprisonment without the possibility of release.

_____      We cannot reach a unanimous decision regarding the appropriate punishment in this case. One or more of us believes that death by execution is the appropriate punishment, and one or more of us believes that life in prison without any possibility of release is the appropriate punishment. We understand that because we do not unanimously agree, the Court will sentence Kaboni Savage to life in prison without any possibility of release.

*Each juror must sign his/her juror number below, indicating that the above sentence determination reflects the jury's unanimous decision:*

| | |
|---|---|
| _____1_____ | _____4_____ |
| _____5_____ | _____12_____ |
| _____9_____ | _____6_____ |
| _____2_____ | _____11_____ |
| _____3_____ | _____10_____ |
| _____8_____ | _____7_____ |

FOREPERSON

Date: _5/31/2013_

67

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 166

Exhibit 73 - 177

**Section VI - Determination of Sentence for Count 12: The Murder of Sean Anthony Rodriguez**

*In this section, enter your determination of the defendant's sentence with regard to Count 12. Your vote as a jury must be unanimous with regard to each question in this section.*

Based upon consideration of whether the statutory and non-statutory aggravating factors which were proved in this case beyond a reasonable doubt sufficiently outweigh any mitigating factors that have been found to exist, or, in the absence of any mitigating factors, the aggravating factor(s) alone is/are sufficient to justify a sentence of death:

_____✓_____    We vote unanimously that Kaboni Savage shall be sentenced to death.

_____    We vote unanimously that Kaboni Savage shall be sentenced to life imprisonment without the possibility of release.

_____    We cannot reach a unanimous decision regarding the appropriate punishment in this case. One or more of us believes that death by execution is the appropriate punishment, and one or more of us believes that life in prison without any possibility of release is the appropriate punishment. We understand that because we do not unanimously agree, the Court will sentence Kaboni Savage to life in prison without any possibility of release.

*Each juror must sign his/her juror number below, indicating that the above sentence determination reflects the jury's unanimous decision:*

| | |
|---|---|
| 1 | 4 |
| 5 | 12 |
| 9 | 4 |
| 2 | 11 |
| 3 | 10 |
| 8 | 7 |

FOREPERSON

Date: 5/31/2013

68

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 167

Exhibit 73 - 178

## Section VI - Determination of Sentence for Count 13: The Murder of Tajh Porchea

*In this section, enter your determination of the defendant's sentence with regard to Count 13. Your vote as a jury must be unanimous with regard to each question in this section.*

Based upon consideration of whether the statutory and non-statutory aggravating factors which were proved in this case beyond a reasonable doubt sufficiently outweigh any mitigating factors that have been found to exist, or, in the absence of any mitigating factors, the aggravating factor(s) alone is/are sufficient to justify a sentence of death:

_____✓_____    We vote unanimously that Kaboni Savage shall be sentenced to death.

_____    We vote unanimously that Kaboni Savage shall be sentenced to life imprisonment without the possibility of release.

_____    We cannot reach a unanimous decision regarding the appropriate punishment in this case. One or more of us believes that death by execution is the appropriate punishment, and one or more of us believes that life in prison without any possibility of release is the appropriate punishment. We understand that because we do not unanimously agree, the Court will sentence Kaboni Savage to life in prison without any possibility of release.

*Each juror must sign his/her juror number below, indicating that the above sentence determination reflects the jury's unanimous decision:*

| | |
|---|---|
| 1 | 4 |
| 5 | 12 |
| 9 | 6 |
| 2 | 11 |
| 3 | 10 |
| 8 | 7 |

FOREPERSON

Date: 5/31/2013

69

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 168

Exhibit 73 - 179

## Section VI - Determination of Sentence for Count 14: The Murder of Khadijah Nash

*In this section, enter your determination of the defendant's sentence with regard to Count 14. Your vote as a jury must be unanimous with regard to each question in this section.*

Based upon consideration of whether the statutory and non-statutory aggravating factors which were proved in this case beyond a reasonable doubt sufficiently outweigh any mitigating factors that have been found to exist, or, in the absence of any mitigating factors, the aggravating factor(s) alone is/are sufficient to justify a sentence of death:

_____✓_____   We vote unanimously that Kaboni Savage shall be sentenced to death.

_____   We vote unanimously that Kaboni Savage shall be sentenced to life imprisonment without the possibility of release.

_____   We cannot reach a unanimous decision regarding the appropriate punishment in this case. One or more of us believes that death by execution is the appropriate punishment, and one or more of us believes that life in prison without any possibility of release is the appropriate punishment. We understand that because we do not unanimously agree, the Court will sentence Kaboni Savage to life in prison without any possibility of release.

*Each juror must sign his/her juror number below, indicating that the above sentence determination reflects the jury's unanimous decision:*

| | |
|---|---|
| 1 | 4 |
| 5 | 12 |
| 9 | 6 |
| 2 | 11 |
| 3 | 10 |
| 8 | 7 |

FOREPERSON

Date: 5/31/2013

70

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 169

Exhibit 73 - 180

**Section VI - Determination of Sentence for Count 15: The Murder of Damir Jenkins**

*In this section, enter your determination of the defendant's sentence with regard to Count 15. Your vote as a jury must be unanimous with regard to each question in this section.*

Based upon consideration of whether the statutory and non-statutory aggravating factors which were proved in this case beyond a reasonable doubt sufficiently outweigh any mitigating factors that have been found to exist, or, in the absence of any mitigating factors, the aggravating factor(s) alone is/are sufficient to justify a sentence of death:

_____√_____    We vote unanimously that Kaboni Savage shall be sentenced to death.

_____    We vote unanimously that Kaboni Savage shall be sentenced to life imprisonment without the possibility of release.

_____    We cannot reach a unanimous decision regarding the appropriate punishment in this case. One or more of us believes that death by execution is the appropriate punishment, and one or more of us believes that life in prison without any possibility of release is the appropriate punishment. We understand that because we do not unanimously agree, the Court will sentence Kaboni Savage to life in prison without any possibility of release.

*Each juror must sign his/her juror number below, indicating that the above sentence determination reflects the jury's unanimous decision:*

| | |
|---|---|
| 1 | 4 |
| 5 | 12 |
| 9 | 6 |
| 2 | 11 |
| 3 | 10 |
| 8 | 7 |

FOREPERSON

Date: 5/31/2013

71

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Exhibit 73 - 181

**Section VI - Determination of Sentence for Count 16:  Retaliation Against A Witness By Committing The Murders Of Marcella Coleman, Tameka Nash, Sean Anthony Rodriguez, Tajh Porchea, Khadijah Nash, and Damir Jenkins**

*In this section, enter your determination of the defendant's sentence with regard to Count 16. Your vote as a jury must be unanimous with regard to each question in this section.*

Based upon consideration of whether the statutory and non-statutory aggravating factors which were proved in this case beyond a reasonable doubt sufficiently outweigh any mitigating factors that have been found to exist, or, in the absence of any mitigating factors, the aggravating factor(s) alone is/are sufficient to justify a sentence of death:

_____✓_____    We vote unanimously that Kaboni Savage shall be sentenced to death.

_____    We vote unanimously that Kaboni Savage shall be sentenced to life imprisonment without the possibility of release.

_____    We cannot reach a unanimous decision regarding the appropriate punishment in this case. One or more of us believes that death by execution is the appropriate punishment, and one or more of us believes that life in prison without any possibility of release is the appropriate punishment. We understand that because we do not unanimously agree, the Court will sentence Kaboni Savage to life in prison without any possibility of release.

*Each juror must sign his/her juror number below, indicating that the above sentence determination reflects the jury's unanimous decision:*

| | |
|---|---|
| 1 | 4 |
| 5 | 12 |
| 9 | 6 |
| 2 | 11 |
| 3 | 10 |
| 8 | 7 |

FOREPERSON

Date: 5/31/2013

72

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 171

Exhibit 73 - 182

*United States v. Edison Burgos-Montes*
No. 3:06-cr-00009-JAG (D.P.R.)
Judge Presiding: The Hon. Jay A. Garcia-Gregory
(Voir dire began April 16, 2012.)

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 172

Exhibit 73 - 183

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,
Plaintiff,

v.

EDISON BURGOS MONTES,                      /
Defendant.                                  /

Crim. No. 06-09(JAG)

------------------------------------------------------------

**SPECIAL VERDICT FORM**

### I.    AGE OF DEFENDANT

Instructions; Answer "YES" or "NO."

1.    Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that:

Edison Burgos Montes was eighteen years (18) of age or older at the time of the offenses charged under Counts Three and Four.

YES __X__

NO _____

REDACTED _____

Foreperson

Instructions: If you answered "NO" with respect to the determination in this section, then stop your deliberations, cross out Sections II, III, IV and V of this form, and proceed to Sections VI B. and VII. Each juror should then carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the court that you have reached a decision.

If you answered "YES" with respect to the determination in this Section I, proceed to Section II which follows.

1

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Exhibit 73 - 184

## VI.    DETERMINATION

**Count Three**: As to Count Three, based upon consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or whether the mitigating factors outweigh the aggravating factors, or in the absence of any mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death, and whether death or life in prison without the possibility of release is the appropriate sentence in this case:

A.          Death Sentence

We determine, by unanimous vote, that a sentence of death shall be imposed.

YES _____

NO ____X____

If you answer "YES," the foreperson must sign here, and you must then proceed to Count Four below. If you answer "NO," the foreperson must sign, and you must then proceed to Question B immediately below.

**REDACTED** _____

Foreperson

B.          Sentence of Life in Prison Without Possibility of Release

We determine, by unanimous vote, that a sentence of life imprisonment without possibility of release shall be imposed.

YES _____

NO ____X____

If you answer "YES," the foreperson must sign here, and then you must proceed to Count Four below. If your answer is "NO", the foreperson must sign and you must then proceed to Question C immediately below.

**REDACTED** _____

Foreperson

C.          Unable to Reach a Unanimous Decision

After deliberations consistent with Jury Instruction #2, we are unable to reach a unanimous vote as to a sentence of death or a sentence of life imprisonment. We

9

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 174

Exhibit 73 - 185

**CRIM. NO. 06-~~ ~~~~**                                                                                10

understand that the Court will impose a sentence of life imprisonment without possibility of release.

YES __ X̶ __

If you answer "YES" the foreperson must sign here.

**REDACTED**
Foreperson

10

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Exhibit 73 - 186

**Count Four**: As to Count Four, based upon consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or whether the mitigating factors outweigh the aggravating factors, or in the absence of any mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death, and whether death or life in prison without the possibility of release is the appropriate sentence in this case:

### A.    Death Sentence

We determine, by unanimous vote, that a sentence of death shall be imposed.

YES _____

NO \_\_\_ X \_\_\_\_

If you answer "YES," the foreperson must sign here. If you answer "NO," the foreperson must sign, and you must then proceed to Question B immediately below.

**REDACTED**
_____
Foreperson

### B.    Sentence of Life in Prison Without Possibility of Release

We determine, by unanimous vote, that a sentence of life imprisonment without possibility of release shall be imposed.

YES _____

NO \_\_\_ X \_\_\_\_

If you answer "YES," the foreperson must sign here. If your answer is "NO", the foreperson must sign and you must then proceed to Question C immediately below.

**REDACTED**
_____
Foreperson

### C.    Unable to Reach a Unanimous Decision

After deliberations consistent with Jury Instruction #2, we are unable to reach a unanimous vote as to a sentence of death or a sentence of life imprisonment. We understand that the Court will impose a sentence of life imprisonment without possibility of release.

11

Exhibit 73 - 187

**CRIM. NO. 06-09 (JAG)**                                                                    12

YES ___X___

If you answer "YES" the foreperson must sign here.

**REDACTED**

_____    ___    _____ Foreperson

After completing section VI, please proceed to section VII.

1 **REDACTED**

2 **REDACTED**

3 **-REDACTED**

4 **REDACTED**

5 **REDACTED**

6. **REDACTED**

7. **REDACTED**

8 **-REDACTED**

9 **REDACTED**

10. **REDACTED**

11 — **REDACTED**

12. **REDACTED**

12

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Exhibit 73 - 188

*United States v. Brian Richardson*
No. 1:08-cr-139-CC (N.D. Ga.)
Judge Presiding: The Hon. Clarence Cooper
(Voir dire began February 27, 2012.)

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 178

Exhibit 73 - 189

                    IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF GEORGIA
                           ATLANTA DIVISION


      UNITED STATES OF AMERICA,         )
                                        )
                                        )
      -vs-                              ) Indictment No. 1:08-CR-139-CC
                                        )
                                        ) Excerpt:   Jury Charge
      BRIAN RICHARDSON,                 )            Penalty Phase
                Defendant.              )


                  Transcript of the Jury Charge Proceedings
                    Before the Honorable Clarence Cooper,
                  United States District Court Senior Judge
                             April 24, 2012
                            Atlanta, Georgia



      APPEARANCES OF COUNSEL:

      On behalf of
      the Government:        William L. McKinnon, Esq.
                             Richard Moultrie, Esq.
                             Tasheika Hinson, Esq.
                             Assistant United States Attorneys

                             Robert E. Burns,
                             Department of Justice

      On behalf of
      the Defendant:         Stephanie A. Kearns, Esq.
                             Brian Mendelsohn, Esq.
                             Thomas J. Waldrop, Esq.
                             Kimberly Sharkey, Esq.




      Amanda Lohnaas, RMR, CRR
      Official Court Reporter
      United States District Court
      Atlanta, Georgia
      (404) 215-1546

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 179

Exhibit 73 - 190

factors against each other or weighing aggravating factors alone, if there are no mitigating factors, in order to determine the proper punishment is not a mechanical process. In other words, you should not simply count the number of aggravating and mitigating factors and reach a decision based on which number is greater; you should instead consider the weight and value of each factor.

The law contemplates that different factors may be given different weights or values by different jurors. Thus, you may find that one mitigating factor outweighs all aggravating factors combined, or that the aggravating factors proven do not, standing alone, justify imposition of a sentence of death. Similarly, you may unanimously find that a particular aggravating factor sufficiently outweighs all mitigating factors combined so as to justify a sentence of death. Each juror must decide what weight or value to be given a particular aggravating or mitigating factor in the decision-making process. In other words, it is not arithmetic -- it is not an arithmetic analysis but a qualitative weighing.

Ladies and gentlemen, in addition, you have the discretion to temper justice with mercy. Any one of you is free to decide that a death sentence should not be imposed in this case for any relevant, mitigating reason you see fit.

Ladies and gentlemen of the jury, you can consider all

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 180

Exhibit 73 - 191

the evidence that was presented in the guilt phase of the trial as well as the sentencing phase of the trial in deciding on the penalty.

You will decide the credibility of the witnesses as you did in the guilt phase of the trial, in accordance with the same instructions I gave you then.  You must consider all of the evidence but you need not accept all of the evidence as true or accurate.

Ladies and gentlemen of the jury, if you unanimously determine that the aggravating factor or factors found to exist sufficiently outweigh the mitigating factor or factors, or in the absence of any mitigating factors, that the aggravating factor or factors alone are sufficient to justify a sentence of death, you shall record your determination that death is justified on the special verdict form.

Ladies and gentlemen of the jury, if you unanimously determine that the aggravating factor or factors found to exist do not sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death, or in the absence of any mitigating factors, that the aggravating factor or factors alone are not sufficient to justify a sentence of death, you shall record your determination that the defendant be sentenced to life imprisonment without the possibility of release on the special verdict form.  In the federal system, a sentence of

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 181

Exhibit 73 - 192

life imprisonment without the possibility of release means just that:  the defendant will never be released from prison. There is no parole in the federal system.

Ladies and gentlemen, if all 12 members of the jury cannot unanimously find either that defendant should be sentenced to life imprisonment without possibility of release or to death, then you should indicate this circumstance on the special verdict form.  Before you reach any conclusion based on lack of unanimity, you should continue your discussions until you are fully satisfied that no further discussions will lead to a unanimous decision.

Ladies and gentlemen of the jury, at the end of your deliberations, if you unanimously determine that the defendant should be sentenced to death, or to life imprisonment without possibility of release, the Court is required by law to abide by your decision and to impose that sentence.

I also remind you, ladies and gentlemen, that you are never required to vote for a death sentence.  The decision whether the sentence should be death or life imprisonment without possibility of release must be the decision of each juror.

In the event that you cannot unanimously determine either that defendant should be sentenced to death or to life imprisonment without possibility of release, Congress has

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 182

Exhibit 73 - 193

40

provided that the Court will impose the mandatory sentence of life imprisonment without any possibility of release.

Ladies and gentlemen of the jury, finally, in your deliberations as to the sentence, you must not consider the race, color, religious beliefs, national origin, or sex of either the defendant or the victim.  Whatever decision you return, each of you is required by law to sign a certification attesting to the fact that you have followed this instruction.  You must be convinced in your own mind that you would have reached the same decision regarding the sentence regardless of the race, color, religious beliefs, national origin, or sex of either the defendant or the victim.

You will be asked to individually certify such with your signature at the end of the special verdict form.  Each juror should carefully read the certification statement and sign your name in the appropriate place if the statement accurately reflects the manner in which each of you reached your individual decision.

Ladies and gentlemen of the jury, I have prepared a form entitled Special Verdict Form to assist you during your deliberations.  You are required to record your decisions on this form.

Section I of the Special Verdict Form contains space to record your findings on the defendant's age; Section II

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 183

Exhibit 73 - 194

41

contains space to record your findings on the requisite intent factor; Section III contains space to record your finding on statutory aggravating factors; Section IV contains space to record your findings on nonstatutory aggravating factors; Section V contains space to record your findings on mitigating factors; Section VI contains space to record your sentence determination; and Section VII contains a nondiscrimination certification each juror must read and sign.  You are each required to sign the Special Verdict Form.

Ladies and gentlemen of the jury, if you should desire to communicate with me at any time during your deliberations, please write down your message or question and pass the note to the court security officer, who will bring it to my attention.

I shall respond as promptly as possible, either in writing or by having you return to the courtroom so that I can address you orally.

I caution you, however, concerning any message or question you might send, that you should not tell me any details of your deliberations or how many of you are voting a particular way on any issue.

When you have reached a decision, send me a note signed by your foreperson that you have completed your deliberations.  Do not indicate what your determination is in

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 184

Exhibit 73 - 195

42

the note.

Whichever of the possible sentencing determinations you reach, the foreperson must complete the Special Verdict Form accordingly and be prepared to report to the Court the jurors' findings as to the intent, aggravating and mitigating factors, and the sentencing decision.  The foreperson will sign where indicated; all jurors will sign the sentence determination and the certification sections.

Ladies and gentlemen of the jury, let me remind you again that nothing that I have said in these instructions, and nothing that I have said or done during the trial, has been said or done to suggest to you what I think your decision should be.  What the decision should be is your exclusive duty and responsibility.

Ladies and gentlemen of the jury, at this time you may retire to the jury room to begin your deliberations.

                         *  *  *  *  *

                        (End of excerpt.)

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 185

Exhibit 73 - 196

FILED IN OPEN COURT
U.S.D.C  Atlanta

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

APR 26 2012

JAMES N. ___
By___ Deputy Clerk

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | CRIMINAL ACTION |
| | ) | NO. 1:08-CR-139 (CC) |
| | ) | |
| BRIAN RICHARDSON | ) | |

## VERDICT

**Part I. FINDINGS ON AGE OF DEFENDANT**

(A)   We the jury unanimously find beyond a reasonable doubt that
the defendant, Brian Richardson, was at least 18 years-old on
July 8, 2007.

_____
Foreperson

OR

(B)   We the jury unanimously find beyond a reasonable doubt that
the defendant, Brian Richardson,  was not at least 18 years-
old on July 8, 2007.

_____
Foreperson

(If you do find that the government has not proven that Mr.
Richardson was at least 18 years-old on July 8, 2007, report this
to the Court and your deliberations are concluded.)

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 186

Exhibit 73 - 197

PART VI.    DECISION FORMS

14

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Exhibit 73 - 198

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL ACTION |
| | ) | NO. 1:08-CR-139 (CC) |
| | ) | **DECISION FORM FOR** |
| BRIAN RICHARDSON | ) | **UNANIMOUS SENTENCE OF** |
| | ) | **DEATH** |

We, the jury, as to BRIAN RICHARDSON, unanimously find that BRIAN RICHARDSON shall be sentenced to death.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

FOREPERSON

_____

Date

15

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 188

Exhibit 73 - 199

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL ACTION |
| | ) | NO. 1:08-CR-139 (CC) |
| | ) | **DECISION FORM FOR** |
| BRIAN RICHARDSON | ) | **UNANIMOUS SENTENCE OF** |
| | ) | **LIFE WITHOUT RELEASE** |

We, the jury, as to BRIAN RICHARDSON, do unanimously agree that BRIAN RICHARDSON should be sentenced to life imprisonment without possibility of release. Therefore, we hereby decide that BRIAN RICHARDSON should be sentenced to life imprisonment without possibility of release.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____
FOREPERSON

_____
Date

16

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 189

Exhibit 73 - 200

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL ACTION |
| | ) | NO. 1:08-CR-139 (CC) |
| | ) | **DECISION FORM FOR** |
| BRIAN RICHARDSON | ) | **NON-UNANIMOUS SENTENCE OF** |
| | ) | **LIFE WITHOUT RELEASE** |

We, the jury, having considered and evaluated the evidence presented in light of the instructions of the Court, are not unanimously persuaded on the appropriate sentence.



FOREPERSON

4/26/2012
Date

17

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 190

Exhibit 73 - 201

*United States v. Larry Lujan*
No. 2:05-cr-00924-RB (D.N.M.)
Judge Presiding: The Hon. Robert C. Brack
(Voir dire began June 20, 2011.)

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 191

Exhibit 73 - 202

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**FILED**
UNITED STATES DISTRICT COURT
LAS CRUCES, NEW MEXICO

OCT - 5 2011

@ 5:00 m

MATTHEW J. DYKMAN
CLERK

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| vs. | ) NO. CR 05-0924 RB |
| LARRY LUJAN, | ) |
| Defendant. | ) |

## COURT'S JURY INSTRUCTIONS

## PENALTY SELECTION PHASE

*[signature]*
10. 04. 11

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 192

Exhibit 73 - 203

## INSTRUCTION NO. 11

After completing your findings regarding aggravating and mitigating factors, you must engage in a weighing process to determine whether a sentence of death is justified. In this process, you must consider only those aggravating factors, statutory and non-statutory, that you unanimously found to exist. Each of you must also consider any mitigating factors that you individually found to exist, and you each may consider any mitigating factors found by any of the other jurors. You must determine whether the proven aggravating factor or factors sufficiently outweigh any proven mitigating factor or factors to justify a sentence of death.

The task of weighing aggravating and mitigating factors against each other, or weighing aggravating factors alone if there are no mitigating factors, is not a mechanical process. You should not simply count the number of factors, but consider the particular character of each, which may be given different weight or value by different jurors. What constitutes sufficient justification for a sentence of death in this case is exclusively left to you. Your role is to make a reasoned moral judgment. Whatever aggravating and mitigating factors are found, a jury is never required to conclude the weighing process in favor of a sentence of death. But your decision must be a reasoned one, free from the influence of passion, prejudice, or arbitrary consideration.

If you do not unanimously find that the aggravating factor or factors sufficiently outweigh the mitigating factor or factors to justify a sentence of death – or in the absence of any mitigating factor, that the aggravating factor or factors, considered alone, justify a sentence of death – answer "no" on the Special Findings Form, sign Verdict - Life

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 193

Exhibit 73 - 204

Imprisonment, and certify your decision as described in Section V of the Form, which will end your deliberations. If you unanimously find that the comparative weight of the aggravating factor or factors is sufficient to justify a sentence of death, answer "yes" on the Special Findings Form, sign Verdict - Sentence of Death, and certify your decision as described in Section V of the Form.

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 194

Exhibit 73 - 205

**FILED**
UNITED STATES DISTRICT COURT
LAS CRUCES, NEW MEXICO

OCT -5 2011
5:00pm

MATTHEW J. DYKMAN
CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA, )
)
    Plaintiff, )
)    **Criminal No. 05-924 RB**
vs. )
)
LARRY LUJAN, )
)
    Defendant. )

Redacted

**SPECIAL FINDINGS FORM FOR**
**SELECTION PHASE**

## I. Non-Statutory Aggravating Factors

The government has alleged that the following non-statutory aggravating factors are present in this case. For each factor, answer "yes" or "no" according to whether you unanimously find that the government proved the existence of the factor beyond a reasonable doubt:

### A. Future Dangerousness

Do you unanimously find that the government has proved beyond a reasonable doubt that the defendant represents a continuing danger to the lives and safety of other persons and is likely to commit criminal acts of violence in the future that would constitute a continuing and serious threat to the lives and safety of others, as evidenced by at least one or more of the following?

YES ✓          NO \_\_\_\_\_

### 1. Continuing Pattern of Violence

Do you unanimously find that the defendant has engaged in a continuing pattern of violence, attempted violence, and threatened violence, based upon your earlier finding of guilt on

Exhibit 73 - 206

_Issues, for example, his children's welfare_

When you have completed your findings regarding mitigation, proceed to the next Section (III) of this Form, where you will weigh the aggravating factors with the mitigating factors, if any, that you have found to be present in this case.

### III.   Weighing Process

The question you must answer at this stage of your deliberations is whether the proven aggravating factors sufficiently outweigh the proven mitigating factors and information to justify a sentence of death or, if you have not found any mitigation present, whether the aggravating factors considered alone justify a death sentence. If you unanimously find that the weight of the aggravating factors is sufficient to justify a sentence of death, answer "yes" below, record your verdict on the attached Verdict – Sentence of Death, certify your decision as described in Section V, and notify the court that you have reached a decision. If you do not unanimously find that a death sentence is justified, answer "no" below, stop your deliberations, sign the attached Verdict – Life Imprisonment, certify your decision as described in section V, and notify the court that you have reached a decision.

YES _____          NO  ✓

### IV.   Imposition of Sentence

This is the last step in your deliberations. If you have made all of the findings necessary and have unanimously concluded that a sentence of death is justified and therefore must be imposed on the defendant, record your decision by collectively signing the verdict set out in Verdict – Sentence of Death below, sign the certification that follows in Section V, and notify the court that you have reached a decision. If you do not unanimously conclude that a sentence of

Exhibit 73 - 207

death is justified and therefore must be imposed, sign the verdict for life imprisonment set out in Verdict – Life Imprisonment below, sign the certification in Section V, and notify the court that you have reached a decision.

## V.    Certification

By signing below, each juror certifies that consideration of the race, color, religious beliefs, national origin, or gender of the defendant or the victim was not involved in reaching his or her individual decision, and that the individual juror would have made the same decision regarding the appropriate sentence for the offense in question regardless of the race, color, religious beliefs, national origin, or gender of the defendant or the victim.

FOREPERSON

Date: _____10/5/11_____

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 197

Exhibit 73 - 208

## VERDICT – SENTENCE OF DEATH

Based upon our consideration of the evidence and in accordance with the court's

instructions, we find by unanimous vote that a sentence of death shall be imposed on the

defendant.

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____
                                                          FOREPERSON

                                          Date: _____

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 198

Exhibit 73 - 209

## VERDICT – LIFE IMPRISONMENT

Based upon our consideration of the evidence and in accordance with the court's instructions, we find that a sentence of life imprisonment without release shall be imposed on the defendant.

*Let it be known that this verdict was not unanimous*

FOREPERSON

Date: _____10/5/11_____

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Exhibit 73 - 210

*United States v. Azibo Aquart*
3:06-CR-00160-SRU (D. Conn.)
Judge Presiding: The Hon. Stefan R. Underhill
(Voir dire began April 6, 2011.)

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 200

Exhibit 73 - 211

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| United States of America | Criminal No. 3:06cr160 (JBA) |
|---|---|
| *v.* Azibo Aquart. | |

## PENALTY PHASE JURY INSTRUCTIONS

INTRODUCTION............................................................... 1

    Burden of Proof............................................................ 2

    Evidence. ................................................................. 5

    Expert Witnesses. ......................................................... 6

DELIBERATIVE PROCESS. ................................................... 7

    Finding as to Defendant's Age................................................ 9

    Finding a Threshold Mental State Factor....................................... 10

    Statutory Aggravating Factors. ............................................... 13

    Non–Statutory Aggravating factors............................................ 23

    Mitigating Factors. ........................................................ 28

    Weighing Aggravation and Mitigation......................................... 33

    Determination of Sentence.................................................. 36

DUTY TO DELIBERATE...................................................... 37

JUSTICE WITHOUT DISCRIMINATION........................................ 38

SPECIAL VERDICT FORM. .................................................. 39

CONCLUSION.............................................................. 40

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 201

Exhibit 73 - 212

Although Congress has left it wholly to you, the jury, to decide Defendant Azibo Aquart's punishment, it has narrowed and channeled your discretion in specific ways, by requiring that you consider and weigh any "aggravating" and "mitigating" factors proved in this case. These factors have to do with the circumstances of the crime, the personal traits, character, or background of Defendant Azibo Aquart, or anything else relevant to the sentencing decision. "Aggravating factors" are those that would tend to support imposition of the death penalty. By contrast, "mitigating factors" are those that suggest that life in prison without the possibility of release is the appropriate sentence in this case.

Your task is not simply to decide what aggravating and mitigating factors have been shown to exist. Rather, you are called upon to evaluate any such factors and to make a unique, individualized choice between the death penalty and life in prison without the possibility of release. The law does not assume that any defendant such as Azibo Aquart found guilty of premeditated murder should be sentenced to death. Thus, your decision on the question of his punishment is a uniquely personal, moral judgment which the law leaves up to each of you. However, the decision to impose the death sentence on Defendant Azibo Aquart must be a unanimous decision. If all twelve of you do not unanimously agree that a sentence of death should be imposed on a particular count, then the sentence will be life imprisonment without the possibility of release on that count.

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 202

Exhibit 73 - 213

### 6. Weighing Aggravation and Mitigation

If, and only if, you unanimously find that the Government has proven beyond a reasonable doubt the existence of a threshold mental state factor and at least one statutory aggravating factor, with regard to any count, and after you have considered whether the Government has proved any non-statutory aggravating factor, and after you have determined whether Azibo Aquart has proven by a preponderance of the evidence the existence of any mitigating factors, *then* you must engage in a weighing process. This weighing process asks whether you are unanimously persuaded, beyond a reasonable doubt, that the aggravating factors sufficiently outweigh any mitigating factors or, in the absence of any mitigating factors, that the aggravating factors are in and of themselves sufficient to justify a sentence of death. Each juror must individually decide whether under all the facts and circumstances in this case a sentence of death has been proved justified.

You are to conduct this weighing process separately with regard to each of the counts for which you have found the mental state element and at least one statutory aggravating factor. The specific offenses in the counts for which you are considering the sentence are not aggravating factors and thus may not be considered themselves as aggravating factors in your weighing process. This means, for example, that the fact that Count Two charges a murder in aid of racketeering while Count Five charges a drug-related murder are not aggravating factors to be weighed in the balancing to decide what the sentence should be on those two counts since both counts relate to the death of Tina Johnson.

33

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 203

Exhibit 73 - 214

You must independently weigh the aggravating factor or factors that you unanimously found to exist, and each of you must weigh any mitigating factors that you individually or with others found to exist. Remember, you are not to weigh the threshold mental state factors as any part of this process, nor any aggravating factor you did not find proved, nor the nature of the specific counts of conviction. In engaging in the weighing process, you must avoid any influence of passion, prejudice, or any other arbitrary consideration. Your deliberations should be based on the evidence you have seen and heard, and the law on which I have instructed you.

The process of weighing aggravating and mitigating factors, or weighing aggravating factors alone if you find no mitigating factors, in order to determine if a death sentence is justified, is by no means a mechanical process. In other words, you should not simply count the total number of aggravating and mitigating factors and reach a decision based on which number is greater; rather, you should consider the weight and value of each factor.

The law contemplates that different factors may be given different weights or values by different jurors. Thus, you may find that one mitigating factor outweighs all aggravating factors combined, or that the aggravating factors proved do not, standing alone, justify imposition of a sentence of death beyond a reasonable doubt. Similarly, you may instead find beyond a reasonable doubt that a single aggravating factor sufficiently outweighs all mitigating factors combined so as to justify a sentence of death. Each juror is to decide individually what weight or value is to be given to a particular aggravating or mitigating factor in the decision-making process. If you do not unanimously determine

34

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 204

Exhibit 73 - 215

beyond a reasonable doubt that the aggravating factors sufficiently outweigh mitigating factors so as to justify a death sentence as to any count, you may not consider the death penalty for that count. You will reflect your determination in Section VI.

Remember that even a finding that the aggravating factor(s) sufficiently outweigh the mitigating factors to *justify* a sentence of death does not *require* that you impose a sentence of death; there is never any requirement that a death sentence be imposed. Your determination of what sentence shall be imposed will be the result of your carefully weighing these various factors, and making a unique, individual judgment about the sentence that is appropriate for Defendant Azibo Aquart.

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 205

Exhibit 73 - 216

### 7. Determination of Sentence

Whether or not the circumstances in this case persuade you that a sentence of death is called for is a decision that the law leaves entirely to you. Remember that before a sentence of death can be imposed, all 12 jurors must agree that beyond a reasonable doubt death is in fact the appropriate sentence, knowing as I have told you, no juror is ever required by the law to impose a death sentence. The decision is yours as individuals to make. Any one of you may decline to impose a death sentence. You do not have to give a reason for your decision. The law has given each of you the discretion to temper justice with mercy.

Bear in mind that in order to find that a sentence of death should be imposed on Defendant Azibo Aquart, the jurors must first have unanimously concluded that beyond a reasonable doubt a death sentence is justified because the aggravating factor or factors sufficiently outweigh any mitigating factors, as I discussed earlier. However, once it is imposed, I cannot change it. I will have no discretion, and I must then sentence the Defendant to death.

If you unanimously determine that Defendant Azibo Aquart shall be sentenced to life imprisonment without possibility of release, record that determination in Section VII of the Special Verdict Form; if you unanimously determine that Defendant Azibo Aquart shall be sentenced to death, record that determination in Section VII of the Special Verdict Form.

36

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 206

Exhibit 73 - 217

**Duty to Deliberate**

It is your duty as jurors to discuss the issue of punishment with one another in an effort to reach agreement, if you can do so.  However, each of you must decide the question of punishment for yourselves, but only after full consideration of the evidence with the other members of the jury and respectful consideration of their views.  While you are discussing this matter, do not hesitate to re-examine your own opinion, and to change your mind if you become convinced that you are wrong.  But do not give up your honest beliefs as to the weight or the effect of the evidence or the appropriate sentence for Azibo Aquart solely because others think differently, or simply to get the case over with.

37

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 207

Exhibit 73 - 218

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| |
|---|
| United States of America |
| v. |
| Azibo Aquart. |

Criminal No. 3:06cr160 (JBA)

**SPECIAL VERDICT FORM (Penalty Phase)**

**Section I:     Finding as to Defendant's Age**

Do you, the jury, unanimously find beyond a reasonable doubt that Defendant Azibo Aquart was at least 18 years of age on August 24, 2005?

YES ☒                    NO ☐

*If you indicated "yes," proceed to Section II.*

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Exhibit 73 - 219

**Section VII:   Determination of Sentence**

### Count Two (Tina Johnson)

__X__   We, the jury, unanimously find that Defendant Azibo Aquart should be sentenced to death.

_____   We, the jury, unanimously find that Defendant Azibo Aquart should be sentenced to life imprisonment without the possibility of release.

### Count Five (Tina Johnson)

__X__   We, the jury, unanimously find that Defendant Azibo Aquart should be sentenced to death.

_____   We, the jury, unanimously find that Defendant Azibo Aquart should be sentenced to life imprisonment without the possibility of release.

### Count Three (James Reid)

_____   We, the jury, unanimously find that Defendant Azibo Aquart should be sentenced to death.

_____   We, the jury, unanimously find that Defendant Azibo Aquart should be sentenced to life imprisonment without the possibility of release.

__X__   *We are unable to reach a unanimous verdict in favor of a death sentence or a life sentence.*

### Count Six (James Reid)

_____   We, the jury, unanimously find that Defendant Azibo Aquart should be sentenced to death.

_____   We, the jury, unanimously find that Defendant Azibo Aquart should be sentenced to life imprisonment without the possibility of release.

__X__   *We are unable to reach a unanimous verdict in favor of a death sentence or a life sentence.*

12

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 209

Exhibit 73 - 220

### Count Four (Basil Williams)

_X_   We, the jury, unanimously find that Defendant Azibo Aquart should be sentenced to death.

_____   We, the jury, unanimously find that Defendant Azibo Aquart should be sentenced to life imprisonment without the possibility of release.

### Count Seven (Basil Williams)

_X_   We, the jury, unanimously find that Defendant Azibo Aquart should be sentenced to death.

_____   We, the jury, unanimously find that Defendant Azibo Aquart should be sentenced to life imprisonment without the possibility of release.

_Each juror must sign his or her name and juror number below, indicating that the above sentence determinations reflect the jury's unanimous decisions:_





_The foreperson shall indicate the date of signing:_

June **15**, 2011

_Go to Section VIII._

13

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Exhibit 73 - 221

*United States v. Timothy O'Reilly*
No. 2:05-cr-80025-VAR-1 (E.D. Mich.)
Judge Presiding: The Hon. Victoria A. Roberts
(Voir dire began June 8, 2010.)

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 211

Exhibit 73 - 222

2:05-cr-80025-VAR-RSW   Doc # 746   Filed 05/26/11   Pg 1 of 98   Pg ID 11274          1

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION


UNITED STATES OF AMERICA,

                                              Case No. 05-80025

        -vs-

TIMOTHY DENNIS O'REILLY,                       Detroit, Michigan

           Defendant.                          August 24, 2010

------------------------------/

              TRANSCRIPT OF TRIAL - VOLUME 25

        BEFORE THE HONORABLE VICTORIA A. ROBERTS

     UNITED STATES DISTRICT COURT JUDGE, and a Jury.


APPEARANCES:


For the Government:            MARK CHASTEEN, Esq.

                               KENNETH CHADWELL, Esq.

                               MARGARET SMITH, Esq.

For the Defendant:             RICHARD KAMMEN, Esq.

                               HAROLD GUREWITZ, Esq.

                               AMY PAREKH, Esq.


Proceedings taken by mechanical stenography, transcript

produced by computer-aided transcription


JANICE COLEMAN, CSR/RPR
OFFICIAL FEDERAL COURT REPORTER
(313) 964-5066

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)                                              Page 212

Exhibit 73 - 223

Similarly, you may unanimously find that a particular statutory or nonstatutory aggravating factor sufficiently outweighs all mitigating factors combined to justify a sentence of death.  Each juror must decide what weight or value to give to a particular factor in the weighing process.

After each of the jurors -- after each juror individually engages in the weighing process, the Jury should then vote on whether Mr. O'Reilly should be sentenced to death or to life in prison without the possibility of release. If you unanimously find that the aggravating factor sufficiently outweighs any mitigators to justify a sentence of death, the Court will impose the death penalty.

In the absence of my mitigating factors, if you unanimously find that the aggravators alone justify a sentence of death, the Court will impose the death penalty. If any of you, even a single juror is not persuaded that the aggravating factors sufficiently outweigh any mitigating factor such that  a sentence of death is justified, Mr. O'Reilly will be sentenced to life in prison without the possibility of release.

If you find after thorough deliberation and the consideration and the views of your fellow jurors that you are not unanimous in your views, you have nevertheless reached a verdict and that verdict is that the Government did not meet its burden and the death penalty is not justified.  In that case, the Court will sentence Mr. O'Reilly to life in prison without the possibility of release.

Ladies and gentlemen, regardless of your findings regarding aggravating or mitigating factors you are never required to impose the death penalty.  Indeed, you may decline to impose the death penalty without giving a reason for that decision.  A jury is never required to conclude the weighing process in favor of a sentence of death, but your decision must be a reasoned one free from the influence of passion, prejudice or arbitrary consideration.

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Exhibit 73 - 224

2:05-cr-80025-VAR-RSW  Doc # 635  Filed 08/25/10  Pg 1 of 29  Pg ID 5805



**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

UNITED STATES OF AMERICA,

               **Plaintiff(s),**

v.

**D-1 TIMOTHY DENNIS O'REILLY,**

               **Defendant(s).**

                                       /

**CASE NUMBER: 05-80025**
**HONORABLE VICTORIA A. ROBERTS**

## SPECIAL VERDICT FORM

### SECTION I:  AGE OF THE DEFENDANT

Do you, the jury, unanimously find that the Government proved beyond a reasonable doubt that:

TIMOTHY O'REILLY was at least 18 years old at the time he committed the offenses charged in Counts 2 and 3 of the Second Superseding Indictment?

Because the parties stipulated to this fact, you must answer "YES," and proceed to Section II.

YES  ✓

NO  _____

1

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 214

Exhibit 73 - 225

2:05-cr-80025-VAR-RSW    Doc # 635    Filed 08/25/10    Pg 24 of 29    Pg ID 5828

## SECTION VI - A: RECOMMENDATION TO SENTENCE TIMOTHY O'REILLY TO LIFE IN PRISON WITHOUT THE POSSIBILITY OF RELEASE

As to TIMOTHY O'REILLY, we, unanimously find that the proven aggravating factor(s) do(es) not sufficiently outweigh the mitigating factor(s) found to exist; or, in the absence of any mitigating factors, we, unanimously find that the aggravating factors in themselves do not justify a sentence of death. Therefore, we unanimously recommend that TIMOTHY O'REILLY be sentenced to life in prison without the possibility of release.

Count 2

YES _____

NO _____ ✓/ _____

Count 3

YES _____

NO _____ ✓ _____

Instructions: If you answer "YES," you must sign here and proceed to Section VII. If you answer "NO," you must proceed to Section VI - B.

So say we all, this _____ day of _____, 2010.

Name: _____    Name: _____

Name: _____    Name: _____

Name: _____    Name: _____

24

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 215

Exhibit 73 - 226

---

**Name:**

**Name:**

**Name:**

**Name:**

**Name:**

**Name:**

25

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 216

Exhibit 73 - 227

2:05-cr-80025-VAR-RSW   Doc # 635   Filed 08/25/10   Pg 26 of 29   Pg ID 5830

## SECTION VI - B: RECOMMENDATION TO SENTENCE TIMOTHY O'REILLY TO DEATH

As to TIMOTHY O'REILLY, we, unanimously find that the proven aggravating factor(s) sufficiently outweigh(s) the mitigating factor(s) found to exist; or, in the absence of mitigating factors, we unanimously find that the aggravating factors themselves justify a sentence of death. Therefore, we unanimously recommend that a death sentence be imposed on TIMOTHY O'REILLY.

### Count 2
YES _____

NO ___✓_____

### Count 3
YES _____

NO ___✓_____

Instructions: If you answer "YES," you must sign here and proceed to Section VII. If you answer "NO," you must proceed to Section VI - C.

So say we all, this _____ day of _____, 2010.

Name: _____

Name: _____

Name: _____

Name: _____

Name: _____

Name: _____

26

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 217

Exhibit 73 - 228

2:05-cr-80025-VAR-RSW   Doc # 635   Filed 08/25/10   Pg 27 of 29   Pg ID 5831

Name: _____          Name: _____

Name: _____          Name: _____

Name: _____          Name: _____

27

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 218

Exhibit 73 - 229

## SECTION VI - C: NO UNANIMOUS SENTENCING RECOMMENDATION

We, the jury, are unable to reach a unanimous sentencing recommendation either in favor of a sentence of life in prison without the possibility of release, or in favor of a death sentence.

### Count 2

YES _____✓_____

NO _____

### Count 3

YES _____✓_____

NO _____

Instructions: If you answer "YES," you must sign here and proceed to Section VII.

So say we all, this 25th day of August, 2010.

**S/Jury Foreperson**
In compliance with the Privacy Policy Adopted by the Judicial Conference, the verdict form with the original signature has been filed under seal

**S/Juror**
In compliance with the Privacy Policy Adopted by the Judicial Conference, the verdict form with the original signature has been filed under seal

**S/Juror**
In compliance with the Privacy Policy Adopted by the Judicial Conference, the verdict form with the original signature has been filed under seal

**S/Juror**
In compliance with the Privacy Policy Adopted by the Judicial Conference, the verdict form with the original signature has been filed under seal

**S/Juror**
In compliance with the Privacy Policy Adopted by the Judicial Conference, the verdict form with the original signature has been filed under seal

**S/Juror**
In compliance with the Privacy Policy Adopted by the Judicial Conference, the verdict form with the original signature has been filed under seal

**S/Juror**
In compliance with the Privacy Policy Adopted by the Judicial Conference, the verdict form with the original signature has been filed under seal

**S/Juror**
In compliance with the Privacy Policy Adopted by the Judicial Conference, the verdict form with the original signature has been filed under seal

**S/Juror**
In compliance with the Privacy Policy Adopted by the Judicial Conference, the verdict form with the original signature has been filed under seal

**S/Juror**
In compliance with the Privacy Policy Adopted by the Judicial Conference, the verdict form with the original signature has been filed under seal

**S/Juror**
In compliance with the Privacy Policy Adopted by the Judicial Conference, the verdict form with the original signature has been filed under seal

**S/Juror**
In compliance with the Privacy Policy Adopted by the Judicial Conference, the verdict form with the original signature has been filed under seal

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 219

28

Exhibit 73 - 230

*United States v. George Lecco*
No. 2:05-cr-00107 (S.D. W.Va.)
Judge Presiding: The Hon. John T. Copenhaver, Jr.
(Voir dire began April 5, 2010.)

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 220

Exhibit 73 - 231

1315

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

---------------------------------x
UNITED STATES OF AMERICA,        :
                                 :   CRIMINAL NO. 2:05-00107
     v.                          :
                                 :   APRIL 30, 2010
GEORGE M. LECCO,                 :   MAY 3, 2010
                                 :
          Defendant.             :   VOLUME IX
---------------------------------x

              TRANSCRIPT OF PROCEEDINGS
     BEFORE THE HONORABLE JOHN T. COPENHAVER, JR.
            UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE UNITED STATES:        USA CHARLES T. MILLER
                              AUSA R. GREGORY McVEY
                              U.S. Attorney's Office
                              P.O. Box 1713
                              Charleston, WV  25336

                              RICHARD BURNS
                              Department of Justice
                              950 Pennsylvania Avenue, NW
                              Washington, D.C.  20530

FOR THE DEFENDANT:            AFPD GERALD T. ZERKIN
                              AFPD AMY L. AUSTIN
                              Office of the Federal Public Defender
                              830 East Main Street, Suite 1100
                              Richmond, VA  23219

                              FPD BRIAN J. KORNBRATH
                              230 West Pike Street, Suite 360
                              Clarksburg, WV  26301

COURT REPORTER:               BARBARA STEINKE, RMR
                              Post Office Box 75025
                              Charleston, WV  25375
                              (304) 347-3151

These proceedings were reported with use of a stenographic machine and transcribed with use of computer-aided transcription.

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Exhibit 73 - 232

*4/30/1*                                                                        1388

innocence/guilt phase.  In the innocence/guilt phase, I instructed you to deliberate with a goal of reaching a unanimous decision one way or the other, as to whether the government had proven the defendant guilty beyond a reasonable doubt of the crimes charged in the indictment.  However, in the sentencing phase, if you are not unanimous as to the existence of a threshold or aggravating factor, you have made a decision and you should not find that factor.  Similarly, if you are not unanimous as to imposing a sentence of death on a particular count, you will have made a decision against imposing a sentence of death as to that count.

Again, as was true in the first phase of the trial, the defendant at this hearing does not have to present any evidence. The defendant does not have to prove to you that threshold or aggravating factors do not exist or that he should not be sentenced to death.

If you unanimously determine that the aggravating factor or factors found to exist sufficiently outweigh any mitigating factor or factors found to exist to justify a sentence of death, or in the absence of any mitigating factors, that the aggravating factor or factors alone are sufficient to justify a sentence of death, you are to record your unanimous determination that death is justified in the Special Verdict Form.

If you unanimously determine that the aggravating factor or

Exhibit B: DECLARATION REGARDING THE BALANCE OF THE COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

*BARBARA SOTELINK, COURT REPORTER*                    Page 222

Exhibit 73 - 233

**FILED**

**NOV - 3 2010**

TERESA L. DEPPNER, CLERK
U.S. District Court
Southern District of West Virginia

## UNITED STATES DISTRICT COURT FOR THE
### SOUTHERN DISTRICT OF WEST VIRGINIA
#### CHARLESTON

UNITED STATES OF AMERICA

v.                                            CRIMINAL NO. 2:05-00107-01

GEORGE M. LECCO

### SPECIAL VERDICT FORM
### AS TO DEFENDANT GEORGE M. LECCO

### MURDER OF CARLA COLLINS BY DEFENDANT GEORGE M. LECCO

#### AGE REQUIREMENT

#### COUNTS NINE, TEN, AND ELEVEN CONSIDERED SEPARATELY

We, the jury, unanimously find that the defendant was more than 18 years of age at the time of the offense.

*yes*

~~YES~~ or NO

#### SECTION I.   THRESHOLD INTENT FACTORS

**General Instructions for Section I:**   For each of the following, indicate "YES" or "NO" after the appropriate finding by the jury.

#### COUNTS NINE, TEN, AND ELEVEN CONSIDERED SEPARATELY

#### First Threshold Intent Factor:

1.   Do you unanimously find that the United States has established beyond a reasonable doubt that the defendant GEORGE M. LECCO intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than a participant in the offense, and the victim Carla Collins died as a direct result of the act?



*yes*

~~YES~~ or NO

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 223

Exhibit 73 - 234



35. _____

NUMBER OF JURORS WHO SO FIND _____

36. _____

NUMBER OF JURORS WHO SO FIND _____

37. _____

NUMBER OF JURORS WHO SO FIND _____

As to your separate deliberations on Counts Nine, Ten, and Eleven, do you make the foregoing findings as to all Counts?



(YES) or NO

If you responded "NO" above, please explain below:

_____

_____

**General Instructions for Section IV:** When you have completed Section IV above, proceed to Section V **and** Section VI which follow.

### V. DETERMINATION OF SENTENCE

**General Instructions for Section V:** Based upon consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist -- or in the absence of any mitigating factors, whether the aggravating factor(s) so found are themselves sufficient to justify a sentence of death -- we choose as follows between Option A and Option B below:

10 of 13

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 224

Exhibit 73 - 235

**Option A.   Death Sentence**

We the jury determine, by unanimous vote, that a sentence of death shall be imposed as to Count Nine.

_____NO_____
YES or (NO)

We the jury determine, by unanimous vote, that a sentence of death shall be imposed as to Count Ten.

_____NO_____
YES or (NO)

We the jury determine, by unanimous vote, that a sentence of death shall be imposed as to Count Eleven.

_____NO_____
YES or (NO)

If you indicate "YES" as to any or all counts, sign your name here, and then proceed as appropriate to either Option B on the next page or Section VI.  If you indicate "NO" as to all counts the foreperson alone should sign, and you should proceed to Option B:

_____    _____    _____
FOREPERSON

_____    _____    _____

_____    _____    _____

_____    _____    _____

Date: __5-3-10_____

11 of 13

Exhibit 73 - 236

## Option B. Sentence of Life in Prison Without Possibility of Release

We the jury determine, by unanimous vote, that a sentence of life imprisonment without possibility of release shall be imposed as to Count Nine.

YES or (NO)

We the jury determine, by unanimous vote, that a sentence of life imprisonment without possibility of release shall be imposed as to Count Ten.

YES or (NO)

We the jury determine, by unanimous vote, that a sentence of life imprisonment without possibility of release shall be imposed as to Count Eleven.

YES or (NO)

If you indicate "YES" as to any or all counts, sign your name here, and then proceed to Section VI. If you indicate "NO" as to all counts the foreperson alone should sign, and you should proceed to Section VI:

_Bobbi Jo Measel_
FOREPERSON

Date: _5-3-10_

12 of 13

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 226

Exhibit 73 - 237

## VI.   CERTIFICATION

By signing below, each juror certifies that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or the victim was not involved in reaching his or her individual decision, and that the individual juror would have made the same recommendation regarding a sentence for the crime or crimes in question regardless of  the race, color, religious beliefs, national origin, or sex of the defendant, or the victim(s).

FOREPERSON

Nathan L. Davis

Date:   5-3-10

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 227

Exhibit 73 - 238

*United States v. Anh The Duong*
No. 01-cr-20154-JF (N.D. Cal.)
Judge Presiding: The Hon. Jeremy Fogel
(Voir dire began February 23, 2010.)

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 228

Exhibit 73 - 239

FILED

DEC 1 4 2010

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION**

UNITED STATES,

        Plaintiff,

    v.

ANH THE DUONG, et al.,

        Defendants.

Action No.    CR 01-20154 JF

**PENALTY PHASE JURY
INSTRUCTIONS**

## I.    Introduction:

Members of the jury, it is again my duty to instruct you on the law. This time it is the law applicable to the sentencing phase of this trial. In these instructions I will sometimes use the term "you" to refer to the jury as a whole, and at other times will use it to refer to an individual juror. You can tell from the context how I am using it.

Your task will be to choose between our two most severe penalties. They are a sentence of death or a sentence of life in prison without the possibility of release. If you determine that the defendant should be sentenced to life in prison without the possibility of release or to death, the Court is required to impose whichever sentence you choose. There is no parole in the federal system, so life without the possibility of release means exactly that. The defendant will spend the rest of his life in prison. If you choose death, federal law does not give me the authority to overrule your decision. I will sentence Mr. Duong to death and he will be executed.

In the guilt phase of the trial you found Mr. Duong guilty of offenses which by statute carry the potential of a death sentence. However, it is still the Government's burden to prove certain facts before the death penalty becomes a possible sentence for these offenses. Only if these facts are proved unanimously and beyond a reasonable doubt does the offense become one for which the death penalty may be imposed. I will later provide further explanation of these findings, but in sum they are:

1.    That Mr. Duong was eighteen years of age or older at the time of the offense for which the death penalty is sought;

- 1 -

Exhibit 73 - 240

unanimity. This results from the fact that that not all jurors might have agreed which Mitigating Factors have been factually proved, and what weight is to be given to those factors. Depending on each juror's findings with regard to the existence of Mitigating Factors, jurors may be weighing different sets of Mitigating Factors with different levels of weight against the Aggravating Factors found by all jurors. This results in the individual nature of the decision. Whether or not the circumstances in this case persuade you that a sentence of death is justified is a decision that the law leaves entirely to you.

You should record your decision as to whether you have unanimously decided whether the Aggravating Factors so sufficiently outweigh the Mitigating Factor to justify a sentence of death with respect to each of the homicides in Section VI of the Special Verdict Form and follow the instructions there.

## XI.    Sentence

Even if you have unanimously found that the Aggravating Factors sufficiently outweigh the Mitigating Factors that a death sentence is justified in one or more of the murders, each of you must still determine whether to in fact impose that sentence. No juror is ever required by the law to impose a death sentence. The decision is yours as individuals to make. Any one of you may decline to impose a death sentence, even where your findings make imposition of the death penalty possible. You do not have to give a reason for your decision. You may decline to impose a death sentence because of mercy or for any reason you deem to be relevant. It is an individual and personal decision that is each juror's alone. The law has given each of you the discretion to temper justice with mercy.

A death sentence shall be imposed only if it is the unanimous decision of the jury. That is, only if all the jurors make the individual decision that death is in fact the appropriate sentence.

Even though a death sentence is never mandatory, once it is imposed, I cannot change it. I will have no discretion, and I must then sentence Anh Duong to death even if you have imposed that sentence for only one of the three homicides. You must record your determination of the sentence with respect to each homicide in Section VII of the Special Verdict Form. If all twelve members of the jury cannot unanimously agree on the sentence, I must impose the

- 15 -

Exhibit 73 - 241

mandatory sentence of life imprisonment without possibility of release. There will be no retrial.

**XII.    Duty to Deliberate:**

It is your duty as jurors to discuss the issue of punishment with one another in an effort to reach agreement if you can do so. But each of you, after full consideration of the evidence, must decide the question of punishment for yourselves.

**XIII.    Justice Without Discrimination:**

In your consideration of whether the death penalty is appropriate, you must not consider the race, color, religious beliefs, national origin, or gender of either Mr. Duong or the homicide victims. You are not to return a sentence of death unless you would return a sentence of death for the crime in question without regard to these factors. To emphasize the importance of this consideration, Section VIII of the Special Verdict Form contains a certification statement. Each juror should carefully read the statement, and sign your name in the appropriate place if the statement accurately reflects the manner in which each of you reached your individual decision.

**XIV.    Special Verdict Form:**

As referenced throughout these instructions, a "Special Verdict Form" has been prepared to assist you during your deliberations. You are required to record your decisions on this form.

Section I of the Special Verdict Form contains space to record your finding as to the defendant's age. Section II of the Special Verdict Form contains space to record your findings on the Gateway Mental State. Section III contains space to record your findings on Statutory Aggravating Factors. Section IV contains space to record your findings on the Non-Statutory Aggravating Factors. Section V contains space to record your findings on Mitigating Factors. Section VI contains space to record your findings as a result of the weighing process. Section VII of the Special Verdict Form contains space to record your determination of the sentence. Section VIII of the Special Verdict Form contains a certification statement.

Each of you are required to sign the Special Verdict Form in Section VII to reflect your sentencing determination, and in Section VIII to reflect your certification that your decision was not based on race, color, religious beliefs, national origin, or gender. Your foreperson must sign a second time to certify the date of your decision.

- 16 -

Exhibit 73 - 242

**FILED**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

DEC 15 2010

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

| | |
|---|---|
| UNITED STATES, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| ANH THE DUONG, et al., | ) |
|  | ) |
| Defendants. | ) |

Action No.    CR 01-20154 JF

**SPECIAL VERDICT FORM**

### I.    FINDING AS TO DEFENDANT'S AGE:

**Instructions**:

The parties have stipulated that Mr. Duong was eighteen years or older at the time of the offenses for which he has been convicted. You must accept that fact. Mark the box below indicating that finding and continue to Section II, below.

Do you, the jury, unanimously find that the defendant was eighteen years of age or older at the time of the homicides of Chau Quach, Hsu-Pin Tsai, and Josefino Cambosa has been proved beyond a reasonable doubt?

YES __X__          NO _____

### II.    GATEWAY MENTAL STATES:

A defendant convicted of murder may not be considered for the death penalty unless you agree unanimously that the Government also proved beyond a reasonable doubt that at the time of the homicide the defendant acted with at least one or more of the four Gateway Mental States I have explained to you.

**Instructions**:

For each of the following answer "YES" or "NO."

1.    Do you, the jury, unanimously find that the Government has established beyond a reasonable doubt that the defendant intentionally killed the victim named in the corresponding count?

Counts Six and Seven, Chau Quach:

YES _____          NO __X__

Counts Eighteen and Nineteen, Hsu-Pin Tsai:

YES _____          NO __X__

Counts Twenty-Eight and Twenty-Nine, Josefino Cambosa:

YES _____          NO __X__

Exhibit 73 - 243

## VI.    WEIGHING:

This section asks each of you to individually weigh the Aggravating Factor or Factors that were unanimously found to have been proved beyond a reasonable doubt against the Mitigating Factor or Factors that each of you has individually found to have been proved by a preponderance of the evidence.

1.    We unanimously find that the proved Aggravating Factors outweigh the Mitigating Factors so sufficiently to justify a sentence of death.

Counts Six and Seven, Chau Quach:

YES _____        NO __X__

Counts Eighteen and Nineteen, Hsu-Pin Tsai:

YES _____        NO __X__

Counts Twenty-Eight and Twenty-Nine, Josefino Cambosa:

YES _____        NO __X__

## VII.    SENTENCING DECISION

**Directions**:

If you have not unanimously found that the Aggravating Factors so sufficiently outweigh the Mitigating Factors so as to justify a sentence of death for any of the homicides, proceed to Section VIII, below, follow the directions there, and return this Verdict Form to the Court. The defendant will be, as required by law, sentenced to life in prison without the possibility of release.

If you have unanimously found that the Aggravating Factors so sufficiently outweigh the Mitigating Factors to justify a sentence of death for one or more of the homicides, you may still sentence the defendant to life in prison without the possibility of release. A sentence of death will be imposed only if all twelve jurors make the individual decision that death is in fact the appropriate sentence. Proceed to the next question below, to determine the sentence. Disregard the sentencing determination for any homicide where you did not unanimously find that the Aggravating Factors so sufficiently outweighed the Mitigating Factors.

For each capital homicide, you will now determine the sentence that shall be imposed: death or life in prison without the possibility of release. If you have unanimously found that a sentence of death is justified on any one of the homicides, a sentence of death will be imposed, and Mr. Duong shall be executed.

**Counts Six and Seven, Chau Quach**:

_____ Even though we have unanimously found that the Aggravating Factors outweigh the Mitigating Factors so sufficiently to justify a sentence of death, we do not unanimously agree that a sentence of death should be imposed. A sentence of life imprisonment without the possibility of release results by law.

- 10 -

Exhibit B: DECLARATION REGARDING THE
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 233

Exhibit 73 - 244

_____ We have unanimously found that the Aggravating Factors so sufficiently outweigh the Mitigating Factors that a sentence of death rather than life in prison without the possibility of release is justified, and we unanimously find a sentence of death shall be imposed. Mr. Duong shall be sentenced to death and shall be executed.

**Counts Eighteen and Nineteen, Hsu-Pin Tsai:**

_____ Even though we have unanimously found that the Aggravating Factors outweigh the Mitigating Factors so sufficiently to justify a sentence of death, we do not unanimously agree that a sentence of death should be imposed. A sentence of life imprisonment without the possibility of release results by law.

_____ We have unanimously found that the Aggravating Factors so sufficiently outweigh the Mitigating Factors that a sentence of death rather than life in prison without the possibility of release is justified, and we unanimously find a sentence of death shall be imposed. Mr. Duong shall be sentenced to death and shall be executed.

**Counts Twenty-Eight and Twenty-Nine, Josefino Cambosa:**

_____ Even though we have unanimously found that the Aggravating Factors outweigh the Mitigating Factors so sufficiently to justify a sentence of death, we do not unanimously agree that a sentence of death should be imposed. A sentence of life imprisonment without the possibility of release results by law.

_____ We have unanimously found that the Aggravating Factors so sufficiently outweigh the Mitigating Factors that a sentence of death rather than life in prison without the possibility of release is justified, and we unanimously find a sentence of death shall be imposed. Mr. Duong shall be sentenced to death and shall be executed.

Each juror must sign below, indicating that the above sentence determination reflects the decision of the jury and the decision of each individual juror, or, if no unanimous decision was reached that each juror agrees that was the result of deliberations.

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

The foreperson shall indicate the date of signing:

Dated: _____        _____

- 11 -

Exhibit B: DECLARATION REGARDING THE IMBALANCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 234

Exhibit 73 - 245

*United States v. Antonio Argueta*
No. 8:05-CR-00393-DKC (D. Md.)
Judge Presiding: The Hon. Deborah K. Chasanow
(Voir dire began January 12, 2010.)

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 235

Exhibit 73 - 246

*United States v. Argueta*, No. 8:05-cr-00393-DKC (D.M.D. 2010)(Chasanow, J.)

Note: The concluding instructions from the sentencing trial have not been publicly filed on ECF, however, the relevant portions of the sentencing trial instructions were provided to me by defense counsel Teresa Whalen.

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 236

Exhibit 73 - 247

Members of the jury, you have now heard all of the evidence in the case. It again becomes my duty, therefore, to instruct you on the rules of law that you must follow and apply in arriving at your decision as to the question of whether the Defendant, Roberto Antonio Argueta, should be sentenced to death or to life imprisonment without the possibility of parole or release. No other lesser sentence is authorized under the law for the offenses of which the Defendant has been convicted. Regardless of any opinion you may have as to what the law may be—or should be—it would be a violation of your oaths as jurors to base your verdict upon any other view of the law than that which I give to you in these instructions.

Some of the legal principles that you must apply to this sentencing decision duplicate those you followed in reaching your verdict in the first part of this trial. Others are different. I have prepared a full set of instructions on the applicable law in order to ensure that you are clear in your duties at this stage of the case. You will have a copy of these instructions for use during deliberations. You will also receive a form that details the findings that you are asked to make in this phase of the

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 237

Exhibit 73 - 248

After consideration of the aggravating and mitigating factors, you must unanimously determine whether the Defendant should be sentenced to death or to life imprisonment without possibility of release on each count. You should indicate your determinations regarding the sentence in Part VI of the Verdict Form.

If, after weighing the aggravating and mitigating factors, you unanimously determine that a sentence of death shall be imposed, then the Court is required to sentence the Defendant to death. If you unanimously determine that a sentence of life imprisonment without the possibility of release shall be imposed, then the Court is required to sentence the Defendant to life imprisonment without the possibility of release. If you cannot unanimously agree whether the Defendant should be sentenced to death or life imprisonment without the possibility of release, the Court will sentence the Defendant to life imprisonment without the possibility of release.

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 238

Exhibit 73 - 249

Exhibit 73 - 250

*United States v. Maurice Phillips*
No. 2:07-cr-00549-JCJ (E.D. Pa.)
Judge Presiding:  The Hon. J. Curtis Joyner
(Voir dire began January 4, 2010.)

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 239

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
---

UNITED STATES OF AMERICA          :    CRIMINAL ACTION
                                  :
     vs.                          :
                                  :
MAURICE PHILLIPS,                 :
DAVID GARCIA,                     :
SHERMAN KEMP                      :    NO. 07-549


PHILADELPHIA, PENNSYLVANIA
APRIL 26, 2010
BEFORE HONORABLE J. CURTIS JOYNER
TRIAL - DAY 39


APPEARANCES:


FOR THE GOVERNMENT:    U.S. ATTORNEY'S OFFICE
                       BY:  LINWOOD C. WRIGHT, ESQUIRE
                       MAUREEN McCARTNEY, ESQUIRE
                       615 Chestnut Street, Suite 1250
                       Philadelphia, Pennsylvania 19106


FOR MAURICE PHILLIPS: RUHNKE & BARRETT
                       BY:  JEAN D. BARRETT, ESQUIRE
                       47 Park Street
                       Montclair, New Jersey 07042

                       LAW OFFICES OF THOMAS R. ASHLEY
                       BY: THOMAS R. ASHLEY, ESQUIRE
                       50 Park Place, Suite 1400
                       Newark, New Jersey 07102




GREGG B. WOLFE, RPR, CM
Official Court Reporters
601 Market Street, Room 1234
Philadelphia, Pennsylvania 19106
(215) 925-6409


Gregg B. Wolfe, RPR, CM
215-460-1511

Exhibit 73 - 251

case as to each count calls for death as the appropriate sentence. In determining the appropriate sentence for the capital count you are considering, all of you must independently weigh the aggravating factor or factors that you unanimously found to exist with regard to that count, whether statutory or non-statutory, and each of you must weigh any mitigating factors that you individually or with others found to exist. You are not to weigh the preliminary factors I mentioned previously as part of this process. In engaging in the weighing process, you must avoid any influence of passion, prejudice or any other arbitrary consideration.

Your deliberation should be from the evidence that you have seen and heard and on the law on which I have instructed you, members of the jury. Again, whether or not the circumstances in this case call for a sentence of death is a decision that the law leaves entirely to you.

Remember, that all 12 jurors must agree beyond a reasonable doubt that death is, in fact, the appropriate sentence, but that no juror is ever required by the law to impose a

Gregg B. Wolfe, RPR, CM
215-460-1511

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 241

Exhibit 73 - 252

death sentence.  The decision is yours as individuals to make.  As stated earlier, if even a single juror is not persuaded that death is the appropriate punishment, the death penalty will not be imposed.

The process of weighing aggravating and mitigating factors against each other is by no means a mechanical process.  In other words, you should not simply count the total number of aggravating and mitigating factors and reach the decision based upon which number is greater. Rather, you should consider the weight and the value of each factor.  In carefully weighing these various factors, members of the jury, are not mere fact-finders.  Instead, you are called upon as individuals to make a unique individualized judgment about the sentence this defendant should receive.

Ladies and gentlemen, the law contemplates that different factors may be given different weight or value by different jurors. Thus, you may find that one mitigating factor outweighs all the aggravating factors combined or that the aggravating factors proven do not standing alone justify imposition of a sentence

Gregg B. Wolfe, RPR, CM
215-460-1511

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 242

Exhibit 73 - 253

of death.  Similarly, you may instead find that a single aggravating factor sufficiently outweighs all mitigating factors combined so as to justify a sentence of death.

Ladies and gentlemen, each juror is individually to decide what weight or value is to be given to a particular aggravating or mitigating factor in the decision-making process.  Bear in mind, however, that in order to find that a sentence of death is appropriate for a particular count, the jurors must be unanimous in their conclusions beyond a reasonable doubt that the aggravating factor or factors proven as to that count sufficiently outweigh any mitigating factors found such that a sentence of death is warranted.

Ladies and gentlemen, dealing with section number six, the determination of sentence.  In the event that you unanimously find beyond a reasonable doubt that the balancing process leads you to the conclusion that a sentence of death is called for as to the particular capital count you are considering, please mark the appropriate line provided on the special verdict form for the count that you are

Gregg B. Wolfe, RPR, CM
215-460-1511

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS
INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS
VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH
(August 31, 2023)

Page 243

Exhibit 73 - 254

considering.  If after engaging in the balancing process I have described to you, all 12 members of the jury do not unanimously find that the defendant should be sentenced to death on any of the capital counts, then you may not impose the death penalty for that.

As I told you, should you unanimously decide to impose the death penalty or to impose life imprisonment without any possibility of release, I am required by law to abide by your decision and to sentence the defendant accordingly.  Thus, you are free to agree or disagree.

Ladies and gentlemen, as you see in section seven, there is a certification.  I must instruct you that in your consideration of whether the death sentence is appropriate, you must not consider the race, color, religious beliefs, national origin or sex of either the defendant or the victims.  You are not to return a sentence of death unless you would return a sentence of death for the crime in question without regard to race, color, religious belief, national origin or sex of either the defendant or any victim.

Gregg B. Wolfe, RPR, CM
215-460-1511

Exhibit B: DECLARATION REGARDING THE PREVALENCE OF TRIAL COURTS INSTRUCTING JURORS OF THE CONSEQUENCE OF A NON-UNANIMOUS VOTE ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (August 31, 2023)

Page 244

Exhibit 73 - 255

# Exhibit 74

# Filed under seal

# Exhibit 75

# Filed under seal

# Exhibit 77

# Filed under seal

# Exhibit 78

# Filed under seal

# Exhibit 80

# Filed under seal

# Exhibit 81

**NEWS**

# Federal Prisons Were Told to Provide Addiction Medications. Instead, They Punish People Who Use Them.

*Congress directed the Bureau of Prisons to make Suboxone and other medications widely available, but only a small fraction of those who need the help have received it.*



12.12.2022

By BETH SCHWARTZAPFEL and KERI BLAKINGER

Timothy York knows what works to treat his decades-long opioid addiction: Suboxone, a medication that effectively quiets cravings.

Since York arrived in federal prison in 2008, he has been held in a series of facilities awash with contraband drugs and violence. He's spent tens of thousands of dollars buying the medication illicitly from prison dealers because Suboxone enables him to think and communicate clearly, he

Exhibit 81 - 1

said. But he hasn't been able to get it consistently.

This article was published in partnership with NBC News. In 2019, he was relieved to learn that the federal Bureau of Prisons was starting a program to expand access to Suboxone, and the following year, a pharmacist at the federal prison in Sumterville, Florida, said he was "priority #1" for treatment, according to his medical records.

He's still waiting.

In the meantime, he's been punished for using Suboxone without a prescription. Last year, after York, 46, was caught with the medication, he spent a month in solitary confinement and had his visitor privileges revoked for a year, according to his disciplinary log. He lost access to phone calls and email for four months. And he lost the chance to be released more than a month early.

York is not alone.

The Marshall Project spoke to more than 20 people struggling with addictions in federal prison, and they described the dire consequences of being unable to safely access a treatment that Congress has instructed prisons to provide.

Some have overdosed. Many have gotten involved in dangerous and illicit money-making schemes to pay for Suboxone, which costs about $20 for a small fraction of a daily dose on the illegal market, several prisoners said. Many, like York, have lost phone or visiting privileges or been sent to solitary confinement because they were caught taking the medication. Last year, the Bureau of Prisons disciplined more than 500 people for using Suboxone without a prescription, according to data obtained from the agency by The Marshall Project through a public records request.

"Believe me, 100% I recognize the irony there," said a bureau administrator familiar with the agency's addiction treatment programs, who spoke on the condition of anonymity because they are not authorized to speak to the press. "It's maddening."

Congress passed the First Step Act four years ago, requiring, among other things, that the Bureau of Prisons offer more prisoners addiction medications, the most common of which is Suboxone. The medications can quiet opioid cravings and reduce the risk of relapse and overdose.

Yet the federal prisons are treating only a fraction — less than 10% — of the roughly 15,000 prisoners who need it, according to the bureau's estimates.

At the end of October, 21 prisons were not offering any prisoners addiction medication, and

Exhibit 81 - 2

another 59 were treating 10 or fewer people — in many cases, just one person, according to bureau data obtained through a Freedom of Information Act request. The rest of the 121 facilities nationwide were each treating a few dozen people at most.

The Bureau of Prisons declined an interview request and would not comment on individual cases. But spokesperson Emery Nelson said in a statement that addiction medicines in combination with therapy and other supports (often referred to as medication-assisted treatment) are the "gold standard" for treatment, and "the Bureau's goal is to provide high-quality, comprehensive, and accessible medication-assisted treatment at all Bureau locations."

The bureau would not discuss the barriers to rolling out the program more widely, but prisoners and people who work in the system described a widespread misperception among prison staff that Suboxone substitutes one addiction for another. There's broad discretion among prison staff about who qualifies for treatment. The bureau also requires patients to get approval from multiple health care providers, and each step has its own lengthy waitlist.

To be sure, the Bureau of Prisons is treating increasingly more people since it launched its opioid medication program. In 2019, 41 people were receiving addiction medications. As of October, that had risen to 1,035 people; more than 80% of them are receiving Suboxone.

"That's great progress," said Sally Friedman, an attorney with the Legal Action Center, which has been involved in several opioid medication lawsuits against criminal justice agencies. "But BOP cannot rest until it complies with its constitutional mandate to ensure that every single incarcerated person with opioid use disorder has the opportunity to receive life-saving treatment."

The bureau's delay in providing more widespread addiction medication has consequences not only for prisoners but for its employees as well: It "creates an avenue for contraband to flow into the institution through other avenues," said Aaron McGlothin, union president at the federal prison in Mendota, California. "The BOP is breaking the law" by not providing Suboxone, he said.

For years, the Bureau of Prisons fought in court to prevent people entering the system from staying on the addiction medications they were prescribed by doctors in the community. That began to change in 2018, when the First Step Act was passed and prisons and jails across the country began losing lawsuits from prisoners who argued it was cruel and unusual to deny them the addiction medicine they'd been taking before they were incarcerated.

In 2019, the bureau released internal guidance saying that "all eligible inmates" at all of its facilities would have access to addiction medications. But what constitutes "eligible" leaves a lot of room for

Exhibit 81 - 3

interpretation.

Prisoners need to overcome several administrative hurdles before they can begin medication, obtaining clearance from psychological services, then health services, before seeing a prescriber. A records request from early this year showed more than 2,000 prisoners were caught somewhere in the process, waiting to move from one stage to another.

Some say the issues stem from a culture at the bureau that is skeptical of addiction medication and pits staff against prisoners.

One top bureau administrator who has worked in more than 10 federal prisons said he was once a Suboxone skeptic who thought it was just a "crutch."

"Once I found a doctor that supported it, and started giving inmates Suboxone, my SHU count went down," he said, referring to the special housing unit, the name for one type of solitary confinement. "There were less fights. There were less debts. The drug dealers on the compound went out of business." This administrator, who spoke on the condition of anonymity because he's not authorized to speak to the press, added, "I bought into it because I've seen it work."

When he moved to another prison, the administrator discovered that though the bureau's official policy is to make addiction medications widely available to those who need them, staff at local institutions have tremendous discretion about who begins treatment and who doesn't. Some facilities only give one medication and not others. In other cases, facilities refused to give people any of the medications until they were nearing release, he said.

"Once I started inquiring, what I keep getting told is, 'Well, it's only for inmates who are close to their release date,' or, 'We don't have enough resources,'" he said. "I've only got so much reach. I can't direct a doctor to prescribe a medication. I'm way out of my lane on that."

Federal law treats use of any narcotics without a prescription in federal prison — including Suboxone — as a "greatest severity level prohibited act," allowing officials to punish prisoners by delaying their release date, confiscating their property, taking away their visiting or phone privileges and holding them for up to six months in solitary confinement — which human rights groups have described as torture. Experts say even a few days in solitary can exacerbate the mental illness that is often the cause of, or closely linked to, drug addiction.

The lack of Suboxone treatment comes amid a rise in drug-related deaths behind bars. A variety of substances are routinely smuggled into prisons and jails through mail, drone drops, visitors or

Exhibit 81 - 4

corrections officers and other staff. In the last two decades, federal data shows that fatal overdoses increased by more than 600% inside prisons and more than 200% inside jails.

Forty-seven incarcerated people died of overdoses in federal prison from 2019 through 2021, according to internal bureau data released via a public records request. The data does not specify how many of these overdose deaths were caused by opioids and could have been prevented by medications like Suboxone. However, other bureau data offers some clue: During the same period, correctional staff administered Narcan — a drug that reverses opioid overdoses — almost 600 times in federal prisons.

"It's not easy being surrounded by drugs and expected not to use them," said Linda Wainwright, who spent five months in solitary confinement and lost the chance she had earned to go home nine months early as punishment for using smuggled Suboxone when prison officials wouldn't provide her with a prescription. "I begged them to help me," Wainwright said.

At FCI Fort Dix, a low-security prison in New Jersey, Tyler Scher's prison psychologist wrote to him saying that he was "shocked" and "at a loss" that Scher was repeatedly denied access to Suboxone, records show. In response to a grievance Scher filed, the warden at his prison said the purpose of the Suboxone program was to prevent "relapse, overdose, and death" among those scheduled "for imminent release from the institution."

Scher — who is serving a 20-year term for charges related to his girlfriend's overdose death — had complained of withdrawal symptoms and said that he couldn't stop using drugs without medication. He'd been written up twice for drug use, he said, and even sent to solitary. At one point, the prison offered him a different medication that he'd tried before and found it didn't work. When he pushed for Suboxone, officials told him, "You may resubmit a new request closer to your release."

When prescribed, Suboxone typically comes as a strip of film that patients dissolve under the tongue. On the illegal market behind bars, a strip is cut into 16 or 32 pieces, each of which sells for $20.

To pay for that with paltry prison wages, prisoners get both creative and desperate.

"You wash clothes for people, run around, wash tennis shoes, you have sex with people," said one man incarcerated in a federal prison that was providing Suboxone prescriptions to less than 1% of the people there as of October, according to Bureau of Prisons data. This man, who asked not to be named because he feared retaliation by bureau officials, said in a phone interview and letters to

9/11/2023, 12:23 PM

Exhibit 81 - 5

The Marshall Project that he had his jaw broken by another prisoner and had to spend time in protective custody because "I've run up bills and I can't pay for the stuff, telling people lies."

The Marshall Project spoke to several people who said they'd endured violence or physical danger resulting from Suboxone debts.

Michael Swain had been trying to get on the Bureau of Prisons' program for eight months when he almost died of an overdose. He'd served four years of an eight-year sentence for a bank robbery that he said he committed to fund his addiction. He was using an underground supply of Suboxone at USP-Coleman, the federal prison in Florida where he was incarcerated, but it was erratic.

Last July, he turned to a much more dangerous drug: K2, a synthetic chemical also known as Spice, which varies widely in potency and purity and can cause everything from a mild buzz to death.

"I started projectile vomiting, real bad sweats and passed out," Swain said in a phone interview.

Medical staff later told him that he had lain in the infirmary for over an hour, mumbling incoherently and begging them to not let him die, he said. They finally called an ambulance, which brought him to a nearby hospital where, medical records show, he learned he'd had a seizure. "If I had been going to get a regular dose of Suboxone, I would have never seeked the K2," Swain said.

Even now, every time he asks the medical staff for an update on his request to receive Suboxone to treat his addiction, he said he's told the same thing: "You have been accepted, and you are on the waiting list."

Exhibit 81 - 6

# Exhibit 82

# Intentionally Omitted

# Exhibit 83

# Filed under seal

# Exhibit 84

# Filed under seal

# Exhibit 85

9/15/23, 5:11 PM                    Gangs, Prison Culture and the Role of Prison Staff | by More Than Our Crimes | An Injustice!

Open in app

Sign up      Sign In

    🔍  Search Medium



# Gangs, Prison Culture and the Role of Prison Staff

An examination of the consequences of modern-day slavery

 **More Than Our Crimes** · **Follow**
Published in An Injustice!
9 min read  ·  Feb 10, 2022

 Listen      ⬆ Share



Photo credit: Cribb Visuals

By Pam Bailey

Exhibit 85 - 1

When the news broke that the federal Bureau of Prisons (FBOP) had <u>locked down all 122</u> of its prisons in response to a gang fight at an institution in Texas, I was outraged — like most other activists, family members, and loved ones of the people inside. After all, lockdowns have become depressingly common in the federal "gulag," imposed for everything from staffing shortages to much more minor fights.

### Fight? Holiday? Low Staffing? Lockdown!

Lockdowns don't keep the peace in prison, but they seem to be the only mode of operation

aninjusticemag.com

But as I talked to my recently released friends about the dynamics of gang influence in federal prisons, I began to realize that while lockdowns as a standard practice are — quite simply — wrong, this particular instance is a bit more complicated to judge. It also offers a very instructive view of the perverse incentive in life inside.

## What happened?

Here's what little we know: Two individuals were killed and two others were injured on Jan. 31 during an altercation between two rival gangs at the federal penitentiary in Beaumont, Texas. The gangs involved were MS-13 (which originally sprang up in Los Angeles in the 1970s to protect Salvadoran immigrants from other gangs, then evolved into a more traditional criminal organization) and the Sureños (known as the foot soldiers for the Mexican Mafia).

The Bureau of Prisons immediately responded by locking down every institution in the system — meaning its more than 150,000 "residents" were confined to their cells, unable to participate in what little programming exists or communicate with the outside world. Why?

"When two large, known groups face-off like this, it can have severe consequences," notes Jeremiah Mungo, released this year after nearly 25 years in the federal system. "It's very plausible that one of the leaders will put out the word, 'blood for blood,' and that can spread from prison to prison — because a lot of facilities have members of

Exhibit 85 - 2

those gangs. Word spreads fast. So, what the BOP is trying to do is quell what could literally turn into a war."

That doesn't mean Jeremiah condones the pervasive use of lockdowns, and he's quick to point out that the BOP doesn't do what it could to help prevent these fights. But once the riot broke out, he notes, the bureau likely found itself backed into a corner.

"They don't want it to get worse before they can 'fix' it, by talking to the shot callers [leaders — literally those who call the shots] and transferring people to different prisons," says Earlie Henderson, just released back to DC after 27 years. "When I was at the USP (U.S. penitentiary) in Lee County (Virginia), there was a big fight. And even a lot of the guys who weren't a part of the riot were shipped out. In fact, they weren't even outside on the yard or in those units when it happened, but they got transferred to Colorado, Texas... all different prisons. Probably because of their jackets [files] and the BOP wanting to change the makeup of the prison."

The bottom line, he says: "They're trying to put a band-aid on a problem that should have never existed. And lockdowns are the FBOP's go-to solution for almost everything."

## The evolution of prison gangs

In "Beating the Code Dilemma: How to Overcome Prisonization, Prevent PTSD and Emerge a Better Person," J.D. MacBean describes the "prison code" as "a set of rules governing prisoner behavior to maintain stability." Those rules are mediated by a complex network of gangs (of which the commanding officers could be classified as one).

MacBean explains that throughout the 1940s, '50s, and '60s, the federal prison population was made up mostly of white males incarcerated for tax evasion, organized crime, and associated murder, treason, and kidnapping. They were a homogenous group, coming primarily from the same socioeconomic and racial background; thus, they focused less on their differences and more on fighting a common enemy: prison staff. Prison staff was "the other."

That began to change in the mid to late 1970s with the advent of the War on Drugs. Quite quickly and dramatically, the prison population doubled, fed by an influx of

Exhibit 85 - 3

Blacks and Hispanics. It was no longer Us vs. Them. Now, prison life was Us vs. Them vs. Them. "This disintegration of unity stemmed largely from multiple social groups all vying to become the ingroup and control prison resources. Even worse, subgroups formed within each social group," writes MacBean. Among them are gangs such as the Bloods and Crips; Black Guerilla Family; Dead Men, Inc.; Dirty White Boys; Aryan Brotherhood...and MS-13 and Sureños. "Imagine, if you will: What if thousands of people — of different racial and socioeconomic backgrounds — suddenly moved into your neighborhood?" asks MacBean.

Earlie notes the difference between the state prison system he experienced and the feds: "I was in the Virginia state system for 11 and a half years. Then I came to the BOP. There weren't a lot of gangs in the state prison, but the feds were totally different. I think it's the mix of mentalities, cultures, and races from all over the country."

Jeremiah explains what happens this way: "Let's say you're from Detroit. When you arrive at a prison, you're asked, 'Okay, what time you on? Are you on Blood time or you on Detroit time?' If you say you on Blood time, that means you sit with the Bloods, and whatever argument or confrontation comes up, you have to roll with the Bloods, even against your Detroit buddies. Even though your Detroit buddies are the people you grew up with."

Kenard Johnson, who is in the midst of transitioning back home from federal prison, picks up from there: "Nobody in the BOP is really an individual, although it's easier in lower-security institutions. Gangs, whether formal or informal, are needed for protection."

Jeremiah agrees: "At the bottom of it, it's fear-based. If I come into an institution, and I say, 'Man, give me a knife,' it's because I want to protect myself. Why? Because I understand I'm vulnerable."

Kenard continues: "If you're what they call a civilian or a solo, you may be subject to somebody trying to take advantage of you. Sure, some people say, 'I'm on man time,' meaning 'I'm not affiliated with any particular group.' But that's really just talking, because when things get violent, they haul ass to a particular group."

Exhibit 85 - 4

And the thing about prisons, as MacBean points out, is that unlike in society at large, there are no lawyers who can sue if you've been hurt, or a trusted police force to turn to. Instead, the governing force among the incarcerated is the street code they brought with them from their 'hoods. That code has three tenets: 1) You must fight for your place in the world. 2) To survive, you must be prepared to force others to respect you with violence. And 3) Within the "community," you may see but must also not see (no snitching).

"A simple fistfight is a rarity in federal prison," says Jeremiah. "It's always with knives or a lock in a sock."

## The role of prison staff

The prison administration reinforces the division.

"I heard an officer say once, 'As long as they're not hurting us, we all right. Let them kill each other,'" recalls Earlie. So, "they classify us. They put numbers on your shirt that immediately let it be known where you're from. [For example, an 007 at the end signals D.C.] So, if I get off the bus when I arrive at a new prison, I got this number on my shirt and I'm categorized from the get-go."

Jeremiah agrees: "It's divide and conquer. If I can divide, I can conquer. Imagine if everyone incarcerated united together! Look, it's the inmate population that runs a prison. They cook the food, clean the institution, teach some of the programs. They put us down, but they also need us."

Dan Manville, director of the Michigan State University Civil Rights Clinic and formerly incarcerated himself, wrote a self-help prison litigation manual in which he explains how the division among residents gives the administration greater control. "And that holds true today," observes Kenard. "The administration deliberately exacerbates and feeds into our division. They know that if we decided not to prey on each other if we instead all started writing them up to hold them accountable legally for the many ways they violate our rights, it would be a real problem for them. Think about it: If we all decided one day to say, 'I'm not going to have a problem with this white guy, I'm going to have a problem with this CO who just beat another white guy up and I'm going to help him'...they'd be in serious trouble. We outnumber them."

Exhibit 85 - 5

Plus, there is another dynamic at work: The prison COs act as a gang themselves.

## Prison Is Just a Continuation of 'Thug Life' — with the Guards Among the Worst

Were we sent to prison for rehabilitation or retaliation?

aninjusticemag.com

Jeremiah offers an example: "Picture this: An officer, for any one of all sorts of reasons, enters a guy's cell and throws his property on the floor, tearing up his pictures, photos he kept of relatives who have died but are close to him. Maybe the CO pours juice on his mother's pictures. So, he says, 'fuck this shit, man.' And he hits the CO in his head or stabs him. Boom! Once he does that, a bunch of the COs is going to beat that guy to within an inch of his life. Then they'll ship him to another institution. Once the officers there look in his jacket [record], they'll say, 'You assaulted one of our officers?' They'll put him in the worst block, play games with his property. It's a brotherhood, a blue wall of silence. It's the same culture found among police on the street, but behind closed doors without any body cameras. The COs do all types of things, like giving inmates knives to retaliate against inmates they don't like."

So, it's obvious why many COs and wardens aren't promoting a less divisive environment, such as through productive, desirable programming.

Kenard recounts one example: "We started an interfaith dialogue at FCI Beckley. Once a month, we tried to bring all of the religious groups together to meet in the chapel, regardless of race, and just talk about being men. The administration put a stop to it."

Sometimes, a progressive warden comes in and sets a different tone, as was the case when Carlisle Holder was in charge at USP Coleman 1. He allowed Mutulu Shakur, who was incarcerated there at the time, to bring in all sorts of speakers and activities that the other guys really wanted. As a result, recounts James Carpenter, who was there at the time, "Everybody pretty much worked together under Dr. Shakur's watch. When we knew we had an upcoming event, everybody was on high alert, working to keep violence down because we didn't want to be locked down; we wanted the talk, the performance, or whatever it was to happen. So, for example, if it was September and

Exhibit 85 - 6

the function was in November when we saw somebody about to do something like getting in a fight, people would intervene, saying, 'Hold up, man. You know we got the function coming up, man. Don't do that.' There was actually a feeling of optimism instead of the usual negative cloud over the place all the time."

### Mutulu Shakur: Proof That a Different Kind of Prison is Possible

He helped us and paid with his life

aninjusticemag.com

But all that came to an end when word got out. Holder was fired and Doc Shakur was shipped out to a high-security discipline facility.

"Every time a warden leaves and a new officer gets promoted, he comes in with his own crew and his own policy," explains Jeremiah. "And (unlike Holder), they typically don't add anything to the prison; instead, they take away. They use negative reinforcement instead of positive: "Y'all can't have any more canned sodas. We're taking sugary candy from the commissary. We're not allowing this type of movie to be played or this type of channel because it costs us too much. We want to save money. We're locking y'all in." That's what happens. It's basically another form of slavery. Dangling things in front of us, then taking them away. It may be hundreds of years since slavery was outlawed, but the practices are still there."

*Note: As of today, the system-wide lockdown is starting to ease. But we all know it won't be long before there's another reason to lock people down, just not dramatically enough to get media attention.*

### An Injustice!

A new intersectional publication, geared towards voices, values, and identities!

aninjusticemag.com

Exhibit 85 - 7

# Exhibit 86

You have 2 more free articles available this month. **Subscribe today** (**/subscribe/digital/**).                                                                    ✕

# �davra (/subscribe/digital/) Violence on the Rise in BOP Facilities

Loaded on AUG. 15, 2009 by Brandon Sample (/news/author/brandon-sample/) published in Prison Legal News August, 2009 (/news/issue/20/8/), page 10

Filed under: Gang Policies (/search/?selected_facets=tags:Gang%20Policies), Prison Rebellion (/search/?selected_facets=tags:Prison%20Rebellion), Criminal Prosecution (/search/?selected_facets=tags:Criminal%20Prosecution), Crime (/search/?selected_facets=tags:Crime), Failure to Protect (General) (/search/?selected_facets=tags:Failure%20to%20Protect%20%28General%29), Staffing (/search/?selected_facets=tags:Staffing), Lockdowns (/search/?selected_facets=tags:Lockdowns), Failure to Protect (Wrongful Death) (/search/?selected_facets=tags:Failure%20to%20Protect%20%28Wrongful%20Death%29), Guards/Staff (/search/?selected_facets=tags:Guards/Staff), Assaults on Staff (/search/?selected_facets=tags:Assaults%20on%20Staff), Guard Unions (/search/?selected_facets=tags:Guard%20Unions). Location: United States of America (/search/?selected_facets=locations:998).

Killings, assaults and other acts of violence are becoming more widespread in the federal Bureau of Prisons (BOP), as the prison population increases and staff-to-prisoner ratios decline. Fifteen prisoner-on-prisoner BOP homicides occurred in 2008 compared with 12 in 2007. Serious assaults on staff increased to 82 in 2008 from 72 in 2007, following a decline in previous years.

The BOP operates 115 facilities that house over 205,000 prisoners. Most of the violence is relegated to U.S. Penitentiaries (USPs), which typically hold high-security offenders serving lengthy sentences.

On April 20, 2008, for example, a massive 30-minute riot at the USP in Florence, Colorado broke out in the recreation yard. The incident began after white supremacist prisoners celebrating Adolf Hitler's birthday began yelling racial epithets at black prisoners. The white supremacists were drinking hooch, a form of homemade wine, and were armed with rocks and improvised weapons. Approximately 200 prisoners were involved in the melee.

To quell the riot, guards fired more than 200 M-16 rounds, 300 pepper balls and almost a dozen tear gas canisters, plus sting grenades. Two prisoners, Brian Scott Kubik and Phillip Lee Hooker, were shot to death by tower guards. Although the BOP initially reported that five other prisoners had been hurt, it was later learned that 30 prisoners and one staff member were injured during the incident.

Frank Sims, a prisoner allegedly involved in the riot, described the scene on the yard as "lil' Baghdad." Ken Shatto, president of the American Federal of Government Employees Local 1302 (AFGE), which represents BOP workers at the prison complex, remarked "It's the craziest thing in 15 years I've seen with the Bureau."

Outsiders like Mark Potok of the Southern Poverty Law Center, an organization that tracks hate

Exhibit 86 - 1

groups, were surprised that white supremacist prisoners were allowed to congregate in the yard that day. "I'm not an expert in keeping prisons calm, but it certainly does seem like dangerous business to allow groups of white supremacist criminals to congregate on Hitler's birthday," said Potok. "The truth is, it is an iconic day in the white supremacist calendar."

Leann LaRiva, a spokesperson for USP Florence, said prisoners are not separated by race on Hitler's birthday or any other anniversary. "We don't discriminate on race or ethnicity or segregate," she said. Not even, apparently, to prevent riots that result in prisoners being shot to death.

Union officials have long called for increased staffing to help prevent such violent outbreaks – and, of course, to boost their membership ranks. In April 2008, just weeks before the riot occurred, Phil Glover, a legislative coordinator with the AFGE, testified before Congress about rising levels of violence in the BOP. Glover blamed the violence on insufficient staffing and resources.

According to Glover, the BOP has filled only 87 percent of staffing positions compared to 95 percent during the 1990s. He stated that staffing levels in federal prisons may drop as low as 76 percent if budget shortfalls continue. Compounding this staff shortage, BOP facilities are 36 percent over capacity systemwide.

The BOP has recognized the potential for increased violence due to staffing deficiencies. In a March 2008 memo, prison officials estimated that a projected $289 million budget shortfall could force the cutting of guard positions to the point "where safety and security of staff and inmates could be in jeopardy."

Immediately following the USP Florence riot, then-U.S. Senator Ken Salazar contacted Attorney General Michael Mukasey and requested that additional guards be sent to the facility. Salazar has also called on the BOP to release reports about the riot to the public.

"The people of Colorado, especially those in the communities surrounding the USP, deserve the assurance that the BOP is taking the steps necessary to improve security at the facility and prevent terrible incidents like this in the future," Salazar wrote to BOP Director Harley Lappin. Despite Salazar's requests, the BOP refused to release details regarding the riot, citing an ongoing investigation. The FBI is also conducting a review.

Amazingly, just three months after the riot, the warden of USP Florence, Sara Revell, received an Excellence in Prison Management award. According to Felcia Ponce, a BOP spokesperson, the award "recognizes outstanding contributions by a warden in the overall management of staff, inmates, and general population." The BOP did not comment on why Revell was given the award following a major riot.

On August 10, 2008, just weeks after Revell was recognized for her excellence in prison management, USP Florence was again placed on lockdown due to a prisoner-on-prisoner homicide.

Exhibit 86 - 2

Violence at USP Florence has even extended to the visiting room. In November 2008, days after visitation was restarted at the institution, a prisoner attacked two visitors. An unidentified BOP guard claimed the prisoner tried to stab his wife and mother-in-law. "It was some type of paper, folded or rolled really tight with a blade in the end of it," the guard said. "He managed to cut his wife's neck and then tried to cut up the mother a little bit." The visitors were taken to a hospital and released.

The BOP is in the process of separating outside recreation yards at all USPs into smaller, more manageable areas. While the timing of the change may seem related to the Florence riot, BOP officials said it was part of a nationwide move following the June 20, 2008 murder of Jose Rivera, a guard at USP Atwater in California.

Rivera was stabbed at least 28 times with an 8" ice pick-like weapon; he was unarmed, had no protective equipment, and other prison employees were delayed in coming to his rescue due to a locked door. The two prisoners accused of stabbing Rivera to death, Jose Cabrera Sablan and James Ninete Leon Guerrero, who are both serving life sentences, are scheduled to go to trial on murder charges in September 2010. They face the death penalty.

USP Atwater was placed on lockdown for three months after Rivera was killed. Once the lockdown was lifted, the prison was plagued by numerous fights – including a dozen stabbings over a one-week period – which resulted in another lockdown. In November 2008 the BOP replaced Atwater warden Dennis Smith, who was transferred to a medium-security facility.

A subsequent BOP report found that weapons were commonly available at USP Atwater and prisoners were able to get drunk on homemade alcohol. The prisoners who killed Rivera were reportedly drunk at the time. Between 2005 and 2007 the number of prisoner-on-staff assaults at Atwater had quadrupled from 13 to 57 per year. This included assaults involving prisoners spitting or throwing urine on guards, and attacking them with fists or food trays. Half of the reported assaults took place in the facility's Special Housing Unit.

The AFGE sharply criticized the BOP over Rivera's murder, calling for the resignation of top BOP officials and demanding that prison guards be provided with stab-proof vests and Tasers, pepper spray and other self-defensive equipment.

"We have lost all faith in the BOP management," stated AFGE president John Gage. "It's incredible to us that the Bureau is making this a labor dispute, that they refuse to give these basic, common-sense tools to our officers. We feel, in the Rivera case, if these simple things we are asking had been granted, he would be alive today."

Violence in the BOP has not been confined to USP Florence and Atwater. USP Pollock in Louisiana was the leader in prisoner-on-prisoner homicides in 2007. Two prisoners, Tyrone Johnson and Derrick Sparks, were killed in April 2007 after being stabbed with homemade weapons. Three

Exhibit 86 - 3

months later another two prisoners were stabbed in the stomach. In November 2007, prisoners William Bullock and Donald Till were murdered by other prisoners. USP Pollock rang in the new year in January 2008 with the killing of prisoner Peter Avalos Gutierrez, 55, barely a month after he was transferred to the facility. He was stabbed to death with a shank.

Other institutions with high levels of violence include USP Beaumont, better known as "Bloody Beaumont." In November 2007, prisoner Gabriel N. Rhone was stabbed to death; a guard received 13 puncture wounds during the attack, which involved two other prisoners.

USP Lee is another honorable mention. On September 30, 2008, prisoner Quentin Corniel died after sustaining multiple stab wounds. He was less than a year away from his release date.

The Metropolitan Correctional Center (MCC) in Chicago, Illinois; the Federal Correctional Institution (FCI) in Three Rivers, Texas; and the FCI in Phoenix, Arizona round out the top-ranked BOP facilities for levels of violence.

Jason Katz, serving a nine-month sentence, was beaten to death at the MCC in March 2008 by fellow prisoner Jason Tolen, 20, who was indicted on second-degree murder charges. At FCI Three Rivers, a prisoner was killed during a fight in March 2008. And a brawl involving three prisoners at FCI Phoenix in January 2008 resulted in one prisoner suffering stab wounds to the head.

Other BOP facilities have experienced their own share of violence. On January 25, 2009, a "large-scale fight" at Federal Correctional Complex (FCC) Coleman, located about 50 miles northwest of Orlando, Florida, left eight prisoners hospitalized with stab or gunshot wounds. One of the prisoners was shot by guards "to prevent possible loss of life," stated Rita Teel, a BOP spokeswoman.

Another major fight broke out at the facility in March 2009 that involved dozens of prisoners and left 14 prisoners with serious injuries. Eleven were airlifted to hospitals.
FCC Coleman was placed on lockdown, and the incident is under investigation. "It was a busy day, to say the least," said Jim Judge, director of Lake-Sumter Emergency Medical Services.

Two separate fights at the USP in Tucson, Arizona on May 28, 2009 sent three prisoners to the hospital with stab wounds. Most recently, FCI Victorville was placed on lockdown on June 6, 2009 following an attack by prisoners in which four staff members suffered minor injuries, and on June 11 a prisoner was shot by guards at USP Terre Haute during a fight with another prisoner on a recreation yard. Both prisoners were hospitalized.

On June 18, 2009, the U.S. House of Representatives passed an appropriations bill that includes $71 million for hiring 745 new BOP guards; the bill still must be approved by the Senate. It is hoped that an increase in staffing levels will reduce violence in federal prisons. The BOP has taken additional steps to confront increasing levels of violence, including transferring high-security offenders to other facilities and prosecuting prisoners involved in fights.

Exhibit 86 - 4

In October 2008, the BOP created a new security level – dangerous prisoners at USP Atwater will be sent to USP Lewisburg in Pennsylvania, a high-security prison. "What we've seen is some very positive steps and progress. We are going to see a change in the entire federal penitentiary system," stated U.S. Rep. Dennis Cardoza, after touring Atwater.

Rep. Cardoza introduced federal legislation in 2008 that would have required the BOP to provide stab-resistant vests to all federal prison guards, who would have to wear them while on duty (H.R. 6462). The bill, titled the "Jose Rivera Correctional Officer Protection Act," failed to pass; however, the BOP has been distributing vests to BOP staff who request them.

In regard to prosecutions, in October 2008 two FCC Terre Haute prisoners, Michael S. Vaught and Whitney H. Smith, were indicted on charges of assault with intent to commit murder and assault resulting in serious bodily injury, resulting from a May 27, 2008 razor attack on another prisoner. In August 2008, FCC Coleman prisoners Gerardo Martinez and Osbaldo Farias were charged with conspiracy to commit murder in connection with the October 2007 death of Orlando Yazzie, who was beaten and stabbed to death in a recreation cage.

On June 4, 2009, USP Big Sandy prisoner Manuel Cardosa, 28, was convicted of attacking and stomping fellow prisoner Marvin Fontenette, leaving him paralyzed and half-blind. While prison officials may not be able to prevent violence at BOP facilities, that doesn't stop them from prosecuting violent offenders after the fact.

Meanwhile, in June 2009, the mother of slain prison guard Jose Rivera filed a lawsuit against federal officials, including BOP Director Harley Lappin and former Atwater warden Dennis Smith. The suit alleges that BOP officials "willingly and knowingly participated in the creation of dangerous conditions that resulted in [Rivera's] death." See: Rivera v. Lappin, U.S.D.C. (E.D. Cal.), Case No. 1:09-cv-00954-LJO-SMS.

According to Mark J. Peacock, the attorney representing Rivera's family, "Officer Rivera's death highlights the complete and utter breakdown of the prison's management in protecting their employees. This can't be allowed to continue."

The same can be said about the inability of BOP officials to protect prisoners from increasing levels of violence, which also cannot be allowed to continue.

Sources: Colorado Independent, Rocky Mountain News, Denver Post, Associated Press, Channel 13 KRDO, Corpus Christi Caller-Times, Beaumont Enterprise, Arizona Republic, Chicago Tribune, Bristol Herald Courier, www.thetowntalk.com, KSWT, http://corspecops.com
As a digital subscriber to Prison Legal News, you can access full text and downloads for this and other premium content.

Exhibit 86 - 5

Subscribe today (/subscribe/digital/)

Already a subscriber?  Login (/users/login/)

# Related legal case

## Rivera v. Lappin

| | |
|---|---|
| **Year** | 2009 |
| **Cite** | U.S.D.C. (E.D. Cal.), Case No. 1:09-cv-00954-LJO-SMS |
| **Level** | District Court |
| **Injunction Status** | N/A |

Exhibit 86 - 6

# Exhibit 87

9/15/23, 5:10 PM                    Key takeaways from our investigation into federal prison deaths at Thomson : NPR





**n p r**                                                                                          **DONATE**

INVESTIGATIONS

# Five things to know about one of the deadliest federal prisons

May 31, 2022 · 6:00 AM ET

By Christie Thompson, The Marshall Project



The federal Bureau of Prisons announced in 2018 that it was moving a special unit that had been plagued with violence to a new federal prison complex in Illinois. Some hoped it would be a fresh start and a chance to improve conditions. But things only got worse.

*Charles Rex Arbogast/AP*

The Marshall Project and NPR investigated how the newest federal prison — the penitentiary in Thomson, Ill. — has quickly become one of the deadliest. The story is the latest in our years-long coverage of the dangers of "double-celled solitary confinement" — putting two people on lockdown in a small cell — as well as the use of force in federal prisons.

Exhibit 87 - 1

Here are five takeaways from our investigation.

## Officials moved a notorious double-celled prison program to a new facility. The problems followed.

The "Special Management Unit" is a high security prison program meant for some of the most dangerous people in federal custody (though many have ended up there who don't fit that description). Volatile people are often locked down in pairs for nearly 24 hours a day in a cell roughly the size of a parking space, forced to eat, sleep and defecate just feet from each other. In 2016, NPR and The Marshall Project wrote about violence and abuse in that unit when it was housed in the penitentiary in Lewisburg, Pa.

After our stories ran, the federal Bureau of Prisons announced in 2018 that it was moving the unit to a new federal penitentiary in Illinois. Some hoped it would be a fresh start and a chance to improve conditions. But things only got worse. There have been five suspected homicides at Thomson since it opened — among the most of any federal prison in that time.

## Restraints are supposed to be a last resort. At this prison, men say they're used frequently — often as punishment.

Prison guards are only supposed to use restraints to subdue someone who is actively dangerous to themselves or others, and for as short a time as possible. But dozens of men incarcerated at Thomson reported in letters, lawsuits and interviews that officers there use these restraints frequently, and leave people in chains for hours or days at a time. NPR and The Marshall Project heard many of the same complaints in 2016, when the Special Management Unit was housed at Lewisburg.



INVESTIGATIONS

**How the newest federal prison became one of the deadliest**

INVESTIGATIONS

**Doubling Up Prisoners In 'Solitary' Creates Deadly Consequences**

Exhibit 87 - 2





INVESTIGATIONS

**Inside Lewisburg Prison: A Choice Between A Violent Cellmate Or Shackles**

"Ambulatory restraints" are ankle cuffs and handcuffs that are chained to a strap around the torso.. Even more intense are "four-point restraints," where each limb is chained to a concrete bed, leaving someone splayed and immobile. Many held at Thomson said they often weren't allowed to eat or drink while in restraints, and were sometimes forced to urinate on themselves. Some said restraints were applied so tightly that they left scars — what men there call "the Thomson tattoo."

A Bureau of Prisons spokesperson told NPR and The Marshall Project that he couldn't comment on pending lawsuits, but that "restraints are not used as a method of punishing an inmate or in any manner which restricts blood circulation or obstructs the inmate's airways or in a manner that causes unnecessary physical pain or extreme discomfort." Any allegation of staff abuse would be investigated, he said.

## This level of violence is preventable.

Prisons can be violent places, especially maximum security facilities such as Thomson. But homicides behind bars often happen when warning signs are ignored, or people are knowingly put in dangerous situations. "There's no excuse for there to be any homicides in a prison," said David Fathi, director of the American Civil Liberties Union National Prison Project. "It's an environment of total surveillance and control."

Matthew Phillips — a Jewish man with a Star of David tattooed on his chest — was killed after Thomson corrections officers locked him in a recreation cage with two members of a white supremacist gang. Bobby Everson was killed at Thomson after he had been writing to his family for months, saying he felt officers were purposefully housing him with violent men.

Exhibit 87 - 3

Lawmakers say persistent understaffing is a part of the problem. And attorneys say many people held at Thomson report not getting the mental health care they need, or are denied their psychiatric medication. The Special Management Unit has been sued for this before.

A Bureau of Prisons spokesperson said in an email that prison officials consider gang affiliation, geography, religion and past incident reports when deciding whom to cell together. Any instance of an officer intentionally ignoring a valid threat would be treated as misconduct and investigated, he said.

## Federal prisons across the country are under fire right now for mistreatment.

The Bureau of Prisons has had one scandal and crisis after another. COVID-19 killed hundreds of people in federal prisons.



INVESTIGATIONS

**As COVID spread in federal prisons, many at-risk inmates tried and failed to get out**

The Associated Press recently revealed how hundreds of prison employees have been arrested since the start of 2019, and how guards sexually abused women at a federal prison in California. And understaffing escalated during the pandemic, forcing everyone from cooks to counselors to work as guards and increasing risks for staff and incarcerated people alike.

In response, the Senate has formed a new group to investigate federal prison operations, and Bureau of Prisons Director Michael Carvajal announced his resignation in January. The agency has yet to name his successor.

## Prison abuse and violence have widespread ripple effects.

"Lewisburg was not only a violence factory, it was a homicide factory," said Mark Donatelli, a defense lawyer who works on death penalty cases out of prisons. Donatelli said he knows of at least seven people who were involved in homicides after getting

Exhibit 87 - 4

out of the Special Management Unit at Lewisburg. The violence endured in one prison begets more in the future, he said.



**INVESTIGATIONS**

**When A Prisoner Returns Home With A Brain Injury, Freedom Isn't So Free**

For the people who survive such conditions, the impact lasts long after their release date. In 2019, NPR and The Marshall Project followed Chuck Coma when he came home from federal prison, after he nearly died from a prison assault at Lewisburg. He returned to his family with a traumatic brain injury and post-traumatic stress disorder exacerbated by the violence he witnessed inside.

A prisoner identified only as John Doe said in a federal lawsuit that being attacked by cellmates and being left in restraints at Thomson caused "extreme permanent mental anguish."

Sebastian Richardson was housed at Lewisburg from 2010 to 2012, and sued the prison for leaving him in shackles for nearly a month when he tried to refuse a dangerous cell assignment. A decade later, he still has searing pain, swelling and numbness in his hands as a result of the cuffs, and has trouble trusting authority. "You come out with a lot of anger, and they create that," he said.

## Your mission, should you accept it...

Story by story, we are creating a more informed public. Grassroots support from you is essential. We invest every gift into funding reporters, amplifying essential stories, and more. If that is a mission you can get behind, signal that you are all in by donating today.

♥ YES, I'LL DONATE

Exhibit 87 - 5

# Exhibit 88

# Filed under seal

Case 1:23-cv-00355-MAC-ZJH     Document 1-1     Filed 09/21/23     Page 718 of 732 PageID #:  943

# Exhibit 89

# Filed under seal

Case 1:23-cv-00355-MAC-ZJH     Document 1-1     Filed 09/21/23     Page 719 of 732 PageID #:  944

# Exhibit 90

# Filed under seal

# Exhibit 91

# Filed under seal

# Exhibit 92

# Filed under seal

# Exhibit 93

# Filed under seal

# Exhibit 94

# Filed under seal

# Exhibit 95

# Filed under seal

# Exhibit 96

# Filed under seal

# Exhibit 97

# Filed under seal

# Exhibit 98

# Filed under seal

# Exhibit 99

# Filed under seal

# Exhibit 100

# Filed under seal

# Exhibit 101

# Filed under seal

# Exhibit 102

# Filed under seal