# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF TEXAS

# BEAUMONT DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § § | No. 1:23-cv-355 |
| v. | § § | **CAPITAL 2255 PROCEEDINGS** |
| CHRISTOPHER EMORY CRAMER | § § § | HON. MARCIA A. CRONE |
| | § § | |

## MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE

## TRIAL PURSUANT TO 28 U.S.C. § 2255

LAURA PAUL (CA Bar No. 329386)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: 213-894-2854
Facsimile: 213-894-0081
Email: Laura_Paul@fd.org

DEVON PORTER
CELESTE BACCHI (AFPD, W.D. PA.)

Attorneys for Defendant
CHRISTOPHER EMORY CRAMER

## TABLE OF CONTENTS

                                                                                                          **Page**

I. MOTION FOR COLLATERAL RELIEF.................................................................................1

II. INTRODUCTION...............................................................................................................1

III. FACTUAL AND PROCEDURAL HISTORY ...................................................................3

IV. JURISDICTION.................................................................................................................4

V. CLAIMS FOR RELIEF .....................................................................................................4

LEGAL STANDARDS RELATING TO INEFFECTIVE ASSISTANCE OF COUNSEL ............4

CLAIM 1: CRAMER RECEIVED INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL
DURING THE GUILT PHASE. ........................................................................................6

    A.    Deficient performance.........................................................................................6

        1.    Counsel refused to utilize available resources to conduct a competent
                investigation .......................................................................................7

        2.    Counsel failed to raise the available defense of duress.......................9

            a.    Legal basis for raising a duress defense.................................9

            b.    Readily available evidence supporting a duress defense .....................10

                (1)    Government evidence supporting a duress defense...............12

                (2)    ██████████████████████████

        3.    Counsel failed to raise the available defense of voluntary intoxication ..........20

        4.    Counsel failed to show that the government blamed Johns for his own death
                .........................................................................................................21

        5.    Counsel failed to present evidence that BOP officials had foreknowledge of
                the Johns assault...............................................................................22

        6.    Counsel failed to utilize readily available evidence to challenge the
            government's case for capital murder .................................................23

            a.    The government's witnesses .................................................23

                (1)    Otis Carden.................................................23

                (2)    █████████████████████

                (3)    █████████████████████

                (4)    █████████████████████

                (5)    █████████████████████

i

# TABLE OF CONTENTS

**Page(s)**

(6) ████████████████████████████

(7) ████████████████████████████

(8)    SIA Robert Nylen ..................................................................32

b.    Defense witnesses not called ...............................................32

(1) ████████████████████████████

(2) ████████████████████████████

(3) ████████████████████████████

(4) ████████████████████████████

(5) ████████████████████████████

(6) ████████████████████████████

(7) ████████████████████████████

(8) ████████████████████████████

(9) ████████████████████████████

(10)    Olajuwon Quarles ..................................................36

(11)    Reshay Childress ...................................................36

B.    Prejudice ............................................................................36

CLAIM 2: CRAMER RECEIVED INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL DURING THE PENALTY PHASE ...............................................................................38

A.    Counsel ineffectively failed to investigate and present evidence supporting its theories of defense ...........................................................................38

1. ████████████████████████████

2.    Failure to prepare witnesses .................................................44

a.    Family members ......................................................44

b.    Barbara Belbot ........................................................46

c.    Mental health experts ..............................................47

3.    What the jury never heard about Cramer's background ...................48

a.    Intergenerational trauma .........................................48

b.    Cramer's role in SAC ..............................................50

**TABLE OF CONTENTS**

**Page(s)**

B.   Trial counsel's failure to effectively investigate Cramer's social history, coupled with their failure to retain qualified experts, led Cramer to be misdiagnosed with antisocial personality disorder (APD)........................................................53

    1.   APD–what the jury heard........................................................53

    2.   Had counsel conducted an effective mitigation investigation and retained a qualified expert to evaluate their client, they would have realized that Cramer does not have APD ........................................................55

    3.   Cramer was prejudiced by counsel's investigative failures and their decision to present a faulty APD diagnosis ........................................................57

C.   Counsel failed to present readily available evidence and obtain a jury instruction on the statutory mitigator of duress........................................................59

    1.   Cramer's duress: what the jury never heard........................................................59

    2.   Counsel's failure to present the duress statutory mitigator was prejudicial....62

D.   Counsel failed to effectively challenge the government's case that Cramer posed a future danger ........................................................63

    1.   Counsel was ineffective for failing to object to the prosecution's use of acquitted conduct as future danger evidence ........................................................63

    2.   Counsel was ineffective for not challenging the government's use of Cramer's Victorville conviction ........................................................65

    3.   Counsel was ineffective for failing to prepare the defense prison expert to counter the government's claim that ADX could not safely house Cramer..66

E.   Counsel failed to object to repeated and prejudicial instances of trial court error and prosecutorial misconduct........................................................68

    1.   Failure to effectively object to the testimony of government mental health expert Dr. Jill Hayes ........................................................68

    2.   Failure to object to the government's improper arguments regarding mitigation evidence ........................................................71

        a.   Improper nexus argument........................................................72

        b.   Improper explanation of the jury's role in sentencing........................................................73

CLAIM 3: ██████████████████████████████████

A.   ██████████████████████████████████

## TABLE OF CONTENTS

**Page(s)**

1.  █████████████████████████████

2.  █████████████████████████████

    a.  ███████████████████████

    b.  ███████████████████████

    c.  ███████████████████████

        (1)  ███████████████████

        (2)  ███████████████████

B.  ███████████████████████████████

CLAIM 4: ████████████████████████████████

  A.  █████████████████████████████

  B.  █████████████████████████████

  C.  █████████████████████████████

CLAIM 5: CRAMER WAS DENIED HIS RIGHT TO CONFLICT-FREE COUNSEL. ..............96

  A.  Legal basis.................................................................................96

  B.  McElroy's concurrent representation of Elizabeth Rose................................97

    1.  Factual Background ...........................................................97

        a.  McElroy represents Elizabeth Rose in her criminal case ...................97

        b.  Rose overhears a conversation between Fackrell and Cramer ...........98

        c.  Rose tells McElroy about Cramer's and Fackrell's statements and is interviewed by the FBI .................................................................98

        d.  McElroy asks to be recused as Rose's counsel but misleads the court about the nature of the conflict.........................................................98

        e.  Rose testifies against Cramer and gets her sentence reduced .......... 100

**TABLE OF CONTENTS**

**Page(s)**

    2.    McElroy's conflict of interest violated Cramer's rights ................................. 101

    3.    Appellate counsel violated Cramer's rights by failing to raise this claim ..... 102

C. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

CLAIM 6: CRAMER'S CONVICTION AND SENTENCE ARE UNCONSTITUTIONAL BECAUSE HIS JURY WAS NOT DRAWN FROM A FAIR CROSS SECTION OF THE COMMUNITY; TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO RAISE THE ISSUE. ...................................................................................................................... 106

A.    Legal basis ................................................................................................. 107

B.    Cramer's jury pool meets the *Duren* standards for a fair-cross section challenge .... 107

    1.    Black people and Hispanics are distinctive groups in the community ......... 107

    2.    The number of Blacks and Hispanics was disproportionately low .............. 108

    3.    The underrepresentation of Black and Hispanic people was systematic ..... 109

        a.    A disproportionate number of jurors were drawn from counties with low numbers of Black and Hispanic residents ................................. 109

        b.    The "draw" from voter registration lists was non-random .............. 110

        c.    Voter registration lists disproportionately excluded Black and Hispanic residents ................................................................. 111

C.    Cramer's trial counsel were ineffective for failing to raise this claim ........................ 113

CLAIM 7: CRAMER WAS DENIED HIS RIGHT TO AN IMPARTIAL JURY. ......................... 115

A.    Legal basis ................................................................................................. 115

B.    The trial court improperly denied defense challenges under *Witt* .............................. 116

C.    The trial court improperly granted the prosecution's *Witherspoon* challenges ........... 118

D.    The court failed to excuse biased jurors for cause ......................................... 120

E.    The prosecutor used voir dire to assemble a conviction–and death-prone jury ...... 123

F.    The trial court's instructions during jury selection were erroneous ........................... 123

G.    Appellate counsel was ineffective for failing to raise these claims on appeal ........... 123

CLAIM 8: CRAMER WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL DURING VOIR DIRE. ...................................................................................................... 124

A.    Counsel failed to appropriately consult with retained experts .................................. 124

**TABLE OF CONTENTS**

**Page(s)**

B.    Counsel was ineffective for failing to object to the prosecution's use of racially-motivated peremptory challenges ................................................................... 126

C.    Counsel was ineffective for failing to conduct adequate voir dire ............................. 128

CLAIM 9: THE EXCESSIVE SECURITY PRESENCE AT TRIAL VIOLATED DUE PROCESS; COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT. ............................ 131

A.    Legal basis ................................................................................................................ 131

B.    Factual basis ............................................................................................................. 132

C.    The shackling and excessive security presence violated Cramer's rights .................. 134

CLAIM 10: PROSECUTORIAL MISCONDUCT ................................................................. 135

A.    The government knowingly presented false or misleading testimony about Cramer's rank in SAC and the circumstances of the Johns homicide ...................... 136

B.    Government misconduct under *Brady v. Maryland* ......................................................... 139

C.    Improper conduct under *Darden v. Wainwright* ............................................................. 141

CLAIM 11: COUNSEL WAS INEFFECTIVE FOR FAILING TO ADEQUATELY ARGUE FOR SEVERANCE ............................................................................................................... 142

A.    Legal basis ................................................................................................................ 142

B.    Factual basis ............................................................................................................. 142

CLAIM 12: BECAUSE CRAMER'S § 924(C) CONVICTION IS INVALID, THIS COURT SHOULD ORDER A NEW SENTENCING PHASE. ....................................................... 146

A.    Legal basis ................................................................................................................ 147

    1.    The definition of "crime of violence" ............................................................ 147

    2.    The categorical approach .............................................................................. 147

    3.    The Supreme Court's decision in *Borden* ..................................................... 148

B.    Cramer's § 924(c) conviction must be vacated under *Borden* .................................. 149

C.    Cramer's death sentence should be vacated and a new penalty phase ordered ........ 150

CLAIM 13: COUNSEL'S INEFFECTIVENESS AND INSTRUCTIONAL ERROR BY THE TRIAL COURT UNDERMINED THE JURORS' FULL AND FAIR CONSIDERATION OF CRAMER'S CASE FOR LIFE, IN VIOLATION OF 18 U.S.C. §§ 3592 AND 3593 AND THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION. ................................................................................................................. 151

A.    Ineffective assistance regarding the jury's question about unanimity ...................... 151

**TABLE OF CONTENTS**

**Page(s)**

B.      Instructional error regarding the verdict forms at the penalty phase........................ 153

CLAIM 14: JUROR MISCONDUCT UNDERMINES CRAMER'S CONVICTION AND SENTENCE. ................................................................................................................. 159

CLAIM 15: MATERIAL OMISSIONS FROM CRAMER'S TRIAL TRANSCRIPT VIOLATE HIS RIGHTS UNDER THE FIFTH AND EIGHTH AMENDMENTS. .................................... 160

A.      Legal basis.................................................................................................... 160

B.      Conference regarding Elizabeth Rose's testimony ...................................... 161

C.      Conferences regarding other substantive matters........................................ 162

D.      Prior counsel was ineffective for failing to adequately preserve this issue at trial and brief the issue on appeal............................................................................ 163

CLAIM 16: CRAMER WAS DENIED THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL. ................................................................................................................. 164

A.      Appellate counsel failed to raise meritorious claims.................................... 164

B.      ███████████████████████████████████████████

CLAIM 17: THE FEDERAL DEATH PENALTY ACT IS UNCONSTITUTIONAL................ 167

A.      Legal basis.................................................................................................... 167

B.      The FDPA fails to narrow the class of death-eligible offenders ................ 167

C.      The death penalty is arbitrary and capricious as applied to Cramer.......... 168

CLAIM 18: CRAMER'S CONVICTION AND SENTENCE MUST BE VACATED DUE TO THE CUMULATIVE PREJUDICIAL EFFECT OF THE ERRORS IN THIS CASE. ............... 169

CERTIFICATE OF SERVICE ............................................................................................. 171

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Adams v. Texas,*
    448 U.S. 38 (1980) ......................................................................................................120

*Alcorta v. Texas,*
    355 U.S. 28 (1957) ......................................................................................................136

*Alexander v. Shannon,*
    163 Fed. Appx. 167 (3d Cir. 2006) ............................................................................142

*Ashe v. Swenson,*
    397 U.S. 436 (1970) ......................................................................................................64

*Atkins v. Virginia,*
    536 U.S. 304 (2002) ..................................................................................93, 94, 95, 96

*Batson v. Kentucky,*
    476 U.S. 79 (1986) ......................................................................................................124

*Battie v. Estelle,*
    655 F.2d 692 (5th Cir. 1981) .......................................................................................69

*Baze v. Rees,*
    553 U.S. 35 (2008) ......................................................................................................123

*Berghuis v. Smith,*
    559 U.S. 314 (2010) ....................................................................................106, 107, 108

*Borden v. United States,*
    141 S. Ct. 1817 (2021) ........................................................................................147, 148

*Bourgeois v. Watson,*
    141 S. Ct. 507 (2020) ....................................................................................................94

*Brady v. Maryland,*
    373 U.S. 87 (1963) ......................................................................................................139

*Buchanan v. Kentucky,*
    483 U.S. 402 (1987) ......................................................................................................68

*Buck v. Davis,*
    580 U.S. 100 (2017) .......................................................................... 5, 92, 146, 151

*Capozzi v. United States,*
    531 F. Supp. 3d 399 (D. Mass. 2021) ........................................................................150

*Carden v. United States,*
    464 F. App'x 839 (11th Cir. 2012) ..............................................................................24

## TABLE OF AUTHORITIES

**Page(s)**

*Carden v. United States*,
568 U.S. 954 (2012) ............................................................................................................... 24

*Charles v. Stephens*,
736 F.3d 380 (5th Cir. 2013) ................................................................................................. 75

*Cramer v. United States*,
142 S. Ct. 1372 (2022) ............................................................................................................. 4

*Crutsinger v. Thaler*,
2012 U.S. Dist. LEXIS 14710 (N.D. Tx. Feb. 6, 2012) ........................................................ 91

*Cuyler v. Sullivan*,
446 U.S. 335 (1980) ........................................................................................................ 97, 101

*Darden v. Wainwright*,
477 U.S. 168 (1986) ............................................................................................................. 141

*Deck v. Missouri*,
544 U.S. 622 (2005) ............................................................................................... 131, 134, 135

*Delap v. Dugger*,
890 F.2d 285 (11th Cir. 1989) ............................................................................................... 64

*Dobbs v. Zant*,
506 U.S. 357 (1993) ............................................................................................................. 161

*Duren v. Missouri*,
439 U.S. 357 (1979) ........................................................................................................ 107, 108

*Eddings v. Oklahoma*,
455 U.S. 104 (1982) ........................................................................................................ 71, 154

*Estelle v. Smith*,
451 U.S. 454 (1981) ............................................................................................................... 69

*Estelle v. Williams*,
425 U.S. 501 (1976) ............................................................................................................. 131

*Evitts v. Lucey*,
469 U.S. 387, 396 (1985) ..................................................................................................... 164

*Gardner v. Florida*,
430 U.S. 349 (1977) ............................................................................................................. 161

*Gardner v. Johnson*,
247 F.3d 551 (5th Cir. 2001) ................................................................................................. 92

x

## TABLE OF AUTHORITIES

**Page(s)**

*Giglio v. United States,*
    405 U.S. 150 (1972)..................................................................................................136

*Glossip v. Gross,*
    576 U.S. 863 (2015) (Breyer, J. dissenting)..............................................................169

*Godfrey v. Georgia,*
    446 U.S. 420 (1980)........................................................................................ 167, 168

*Graham v. Collins,*
    950 F.2d 1009 (5th Cir. 1992) ......................................................................... 10, 59

*Gray v. Mississippi,*
    481 U.S. 648 (1987)........................................................................................ 116, 118

*Greer v. Mitchell,*
    264 F.3d 663 (6th Cir. 2001)................................................................................5

*Griffin v. California,*
    380 U.S. 609 (1965)..................................................................................................160

*Hall v. Florida,*
    572 U.S. 701 (2014)...........................................................................................93, 94, 95

*Harris By & Through Ramseyer v. Wood,*
    64 F.3d 1432 (9th Cir. 1995)..................................................................................131

*Hendricks v. United States,*
    No. 2004-05, 2015 U.S. Dist. LEXIS 193811 (D.V.I. Sep. 1, 2015) ..............................142

*Hinton v. Alabama,*
    571 U.S. 263 (2014)........................................................................................ 113, 126

*Holberg v. Lumpkin,*
    2023 WL 2474213 (5th Cir. 2023) ........................................................................81

*Holbrook v. Flynn,*
    475 U.S. 560 (1986)...........................................................................................131, 134, 135

*Hughes v. United States,*
    258 F.3d 453 (6th Cir. 2001)..................................................................................129

*Irvin v. Dowd,*
    366 U.S. 717 (1961)..................................................................................................160

*Jackson v. Calderon,*
    211 F.3d 1148 (9th Cir. 2000) ................................................................................53

**TABLE OF AUTHORITIES**

**Page(s)**

*Jennings v. McDonough*,
  490 F.3d 1230 (11th Cir. 2007) ...........................................................................70

*Johnson v. Bagley*,
  544 F.3d 592 (6th Cir. 2008)................................................................... 50, 58

*Johnson v. Mississippi*,
  486 U.S. 578 (1988)................................................................................70

*Johnson v. Mitchell*,
  585 F.3d 923 (6th Cir. 2009)...........................................................................164

*Jones v. United States*,
  527 U.S. 373 (1999)........................................................................... 152, 153

*Kansas v. Cheever*,
  571 U.S. 87 (2013)................................................................................69

*Kyles v. Whitley*,
  514 U.S. 419 (1995)........................................................................... 139, 140

*Littlejohn v. Royal*,
  875 F.3d 548 (10th Cir. 2017) ...........................................................................91

*Lockett v. Ohio*,
  438 U.S. 586 (1978)...........................................................................71, 123, 164

*Lockhart v. McCree*,
  476 U.S. 162 (1986)...........................................................................119

*Lopez v. Davis*,
  531 U.S. 230 (2001)...........................................................................154

*Lowenfield v. Phelps*,
  484 U.S. 231 (1988)...........................................................................167

*Marshall v. Cathel*,
  428 F.3d 452 (3rd Cir. 2005) ...........................................................................164

*Mata v. Johnson*,
  99 F.3d 1261 (5th Cir. 1996)...........................................................................135

*Mattox v. United States*,
  146 U.S. 140 (1892)...........................................................................160

*McFarland v. Scott*,
  512 U.S. 849 (1994)...........................................................................7

**TABLE OF AUTHORITIES**

**Page(s)**

*McGinnis v. Johnson,*
  181 F.3d 686 (5th Cir. 1999).................................................................... 107, 111

*McKaskle v. Wiggins,*
  465 U.S. 168 (1984)............................................................................. 131, 134

*Mickens v. Taylor,*
  535 U.S. 162 (2002)...................................................................................97

*Miller v. United States,*
  317 U.S. 192 (1942)............................................................................. 160, 161

*Miller-El v. Dretke,*
  545 U.S. 231 (2005)............................................................................. 126, 128

*Mitchell v. United States,*
  526 U.S. 314 (1999)..................................................................................160

*Moncrieffe v. Holder,*
  569 U.S. 184 (2013)............................................................................. 148, 149

*Monge v. California,*
  524 U.S. 721 (1998)...................................................................................64

*Mooney v. Holohan,*
  294 U.S. 103 (1935)..................................................................................136

*Moore v. Texas,*
  581 U.S. 1 (2017) ............................................................................... 94, 153

*Morgan v. Illinois,*
  504 U.S. 719 (1992)...................................................................................74

*Mosley v. Dretke,*
  370 F.3d 467 (5th Cir. 2004)..........................................................................109

*Napue v. Illinois,*
  360 U.S. 264 (1959)..................................................................................136

*Neal v. Puckett,*
  286 F.3d 230 (5th Cir. 2002)................................................................. 48, 63, 68

*Padilla v. Kentucky,*
  559 U.S. 356 (2010)...................................................................................75

*Parker v. Gladden,*
  385 U.S. 363 (1966)............................................................................. 121, 160

**TABLE OF AUTHORITIES**

**Page(s)**

*Paul v. Superintendent*,
  2022 U.S. Dist. LEXIS 136933 (S.D. Ind., Aug. 2, 2022) ...................................................... 147, 148

*Pena-Rodriguez v. Colorado*,
  580 U.S. 206 (2017) ..................................................................................................................... 160

*Penry v. Johnson*,
  532 U.S. 782 (2001) ..................................................................................................................... 159

*Penry v. Lynaugh*,
  492 U.S. 302 (1989) ........................................................................................................ 50, 74, 154

*Perillo v. Johnson*,
  205 F.3d 775 (5th Cir. 2000) ................................................................................................ 97, 105

*Porter v. McCollum*,
  558 U.S. 30 (2009) ........................................................................................................ 5, 74, 75, 92

*Reed v. Sec'y, Dep't of Corr.*,
  593 F.3d 1217 (11th Cir. 2010) ..................................................................................................... 58

*Rhoades v. Davis*,
  914 F.3d 357 (5th Cir. 2019) .......................................................................................................... 71

*Riggins v. Nevada*,
  504 U.S. 127 (1992) ....................................................................................................................... 71

*Rogers v. Dzurenda*,
  25 F.4th 1171 (9th Cir. 2022) ........................................................................................................ 58

*Rompilla v. Beard*,
  545 U.S. 374 (2005) ................................................................................................................ *passim*

*Ross v. Oklahoma*,
  487 U.S. 81 (1988) ............................................................................................................... 121, 122

*Sanborn v. Parker*,
  629 F.3d 554 (6th Cir. 2011) .......................................................................................................... 58

*Satterwhite v. Texas*,
  486 U.S. 249 (1988) ..................................................................................................................... 156

*Schwander v. Blackburn*,
  750 F.2d 494 (5th Cir. 1985) .......................................................................................... 161, 162, 163

*Seale v. United States*,
  No. 19-21016, 2022 WL 18024217 (D.N.J. Dec. 30, 2022) ........................................................ 150

**TABLE OF AUTHORITIES**

**Page(s)**

*Sears v. Upton,*
    561 U.S. 945 (2010) ..................................................................................................90

*Sharp v. Puckett,*
    930 F.2d 450 (5th Cir. 1991) ....................................................................5, 102, 124

*Skipper v. South Carolina,*
    476 U.S. 1 (1986) ............................................................................................ 164, 165

*Smith v. Robbins,*
    528 U.S. 259 (2000) .......................................................................................... 5, 164

*Snyder v. Louisiana,*
    552 U.S. 472 (2008) ................................................................................................128

*Strickland v. Washington,*
    466 U.S. 668 (1984) ...........................................................................................*passim*

*Strickler v. Greene,*
    527 U.S. 263 (1999) ................................................................................................139

*Taylor v. Louisiana,*
    419 U.S. 522 (1975) ................................................................................................106

*Tennard v. Dretke,*
    542 U.S. 274 (2004) .................................................................................71, 154, 158

*Thomas v. Lumpkin,*
    995 F.3d 432 (5th Cir. 2021) .................................................................................125

*Trevino v. Davis,*
    138 S. Ct. 1793 (2018) ..................................................................................... 91, 92

*Trubey v. United States,*
    No. 16-cv-1737, Dkt. 51 (M.D. Fla. Jan. 10, 2023) ...........................................149

*U.S. Brief, Borden v. United States,*
    14 S. Ct. 1817 (2021), 2020 WL 4455245 ..........................................................150

*United States v. Agurs,*
    427 U.S. 97 (1976) ..................................................................................................136

*United States v. Alvarez,*
    580 F.2d 1251 (5th Cir. 1978) ...............................................................................101

*United States v. Auten,*
    632 F.2d 478 (5th Cir. 1980) .................................................................................138

## TABLE OF AUTHORITIES

**Page(s)**

*United States v. Bagley*,
    473 U.S. 667 (1985)................................................................................139

*United States v. Biaggi*,
    909 F. 2d 662 (2nd Cir. 1990)................................................................109

*United States v. Brummitt*,
    665 F.2d 521 (5th Cir. 1981)...................................................................112

*United States v. Butler*,
    615 F.2d 685 (5th Cir. 1980)...................................................................109

*United States v. Cramer*,
    6:09-cr-00064-GFVT, ECF No. 50 (E.D.KY. Apr. 8, 2010) ..................63

*United States v. Cruzado-Laureano*,
    404 F.3d 470 (1st Cir. 2005) ..................................................................149

*United States v. Davis*,
    139 S. Ct. 2319 (2019) ...........................................................................147

*United States v. Estrada-Monzon*,
    700 F. App'x 323 (5th Cir. 2017) ..................................................... 10, 37

*United States v. Fackrell*,
    991 F.3d 589 (5th Cir. 2021)....................................................... 4, 6, 156

*United States v. Fell*,
    372 F. Supp. 2d 766 (D. Vt. 2005)........................................................157

*United States v. Fields*,
    761 F.3d 443 (5th Cir. 2014)..................................................................169

*United States v. Garza*,
    563 F.2d 1164 (5th Cir. 1977) ...............................................................144

*United States v. Holcomb*,
    797 F.2d 1320 (5th Cir. 1986) ...................................................... 142, 143

*United States v. Johnson*,
    495 F.3d 951 (8th Cir. 2007)....................................................................71

*United States v. Jones*,
    132 F.3d 232 (5th Cir. 1998)..................................................................123

*United States v. Leon-Reyes*,
    177 F.3d 816 (9th Cir. 1999)..................................................................141

## TABLE OF AUTHORITIES

**Page(s)**

*United States v. Mahar,*
    550 F.2d 1005 (5th Cir. 1977) .........................................................................................101

*United States v. Maskeny,*
    609 F.2d 183 (5th Cir. 1980)............................................................................................109

*United States v. Molina-Uribe,*
    853 F.2d 1193 (5th Cir. 1988) .............................................................................................21

*United States v. Posada-Rios,*
    158 F.3d 832 (5th Cir. 1998)..........................................................................................9, 36

*United States v. Rioux,*
    97 F.3d 648 (2d Cir. 1996) ..............................................................................................107

*United States v. Sanchez Guerrero,*
    546 F.3d 328 (5th Cir. 2008)............................................................................................101

*United States v. Savage,*
    970 F.3d 217 (3d Cir. 2020) .....................................................................................109, 112

*United States v. Smith,*
    957 F.3d 590 (5th Cir. 2020)............................................................................................148

*United States v. Taylor,*
    142 S. Ct. 2015 (2022) .............................................................................................148, 149

*United States v. Washington,*
    No. 20-2333, Dkt. 36 (3d Cir. Dec. 1, 2022).................................................................150

*United States v. Williamson,*
    183 F.3d 458 (5th Cir. 1999)................................................................................................5

*United States v. Willis,*
    38 F.3d 170 (5th Cir. 1994)................................................................................................10

*Vasquez v. Hillery,*
    474 U.S. 254 (1986).........................................................................................................108

*Virgil v. Dretke,*
    446 F.3d 598 (5th Cir. 2006)..........................................................................124, 129, 131

*Virgin Islands v. Forte,*
    865 F.2d 59 (3d Cir. 1989) ..............................................................................................128

*Wainwright v. Witt,*
    469 U.S 412 (1985)....................................................................................115, 116, 118

## TABLE OF AUTHORITIES

**Page(s)**

*Walbey v. Quarterman,*
    309 F. Appx. 795 (5th Cir. 2009) ......................................................................................58

*Weaver v. Massachusetts,*
    582 U.S. 286 (2017) ...........................................................................................................128

*White v. Thaler,*
    610 F.3d 890 (5th Cir. 2010) ..............................................................................................6

*Wiggins v. Smith,*
    539 U.S. 510 (2003) ...............................................................................................5, 75, 114

*Williams v. Stirling,*
    914 F.3d 302 (4th Cir. 2019) ..................................................................................76, 78, 92

*Williams v. Taylor,*
    529 U.S. 362 (2000) ...........................................................................................................5, 90

*Williams v. Washington,*
    59 F.3d 673 (7th Cir. 1995) ..............................................................................................142

*Wingate v. Wainwright,*
    464 F.2d 209 (5th Cir. 1972) ............................................................................................65

*Witherspoon v. Illinois,*
    391 U.S. 510 (1968) ...................................................................................................115, 119

*Woods v. Dugger,*
    923 F.2d 1454 (11th Cir. 1991) .......................................................................................134

*Zafiro v. United States,*
    506 U.S. 534 (1993) ...........................................................................................................142

*Zant v. Stephens,*
    462 U.S. 862 (1983) ...........................................................................................................168

**State Cases**

*Commonwealth v. Hackett,*
    99 A.3d 11 (Pa. 2014) .......................................................................................................80

**Federal Statutes**

18 U.S.C. § 924 ..............................................................................................................*passim*

18 U.S.C. §1001 ...................................................................................................................26

18 U.S.C. § 1951 .................................................................................................................149

18 U.S.C. § 2113 ........................................................................................................149, 150

# TABLE OF AUTHORITIES

**Page(s)**

18 U.S.C. § 3592 ............................................................................................................*passim*

18 U.S.C. § 3593 ........................................................................................................................151

18 U.S.C. § 3595 ........................................................................................................................156

28 U.S.C. § 1331 ..........................................................................................................................21

28 U.S.C. § 1861 ........................................................................................................................113

28 U.S.C. § 2255 ........................................................................................................................1, 4

Fed. R. Crim. Pro. Rule 2 ..............................................................................................................1

Fed. R. Crim. Pro. Rule 12.2 ................................................................................................69, 70

Fed. R. Crim. Pro. Rule 14 .........................................................................................................142

Fed. R. Crim. Pro. Rule 33 ............................................................................................................1

U.S. Const., Amend V ............................................................................................................*passim*

U.S. Const., Amend VI ..........................................................................................................*passim*

U.S. Const., Amend VIII ....................................................................................................159, 160

U.S. Const., Amend XIV ............................................................................................................159

**State Statutes**

Tex. Gov't. Code Ann. § 62.001(a)(2) ........................................................................................112

Tex. Disc. R. of Prof. Conduct 1.06(c)(2) ..........................................................................105, 106

**Other Authorities**

*ABA Guidelines* ......................................................................................................................*passim*

Blume, Garvey & Johnson, *Future Dangerousness in Capital Cases: Always "At Issue,"* 86
   Cornell L. Rev. 397, 398 (2001) ..........................................................................................146

███████████████████████████████████
███████████████████████████████████
███████████████████████████████████

Cunningham, Sorensen & Reidy, *Capital Jury Decision-Making: The Limitations of
   Predictions of Future Violence*, 15 Psychol., Pub. Policy & L. 223, 234-35, 244-45 &
   Table 1 (2009) .......................................................................................................................146

## TABLE OF AUTHORITIES

**Page(s)**

Wayland, K., and O'Brien, S. (2013) *Deconstructing Antisocial Personality Disorder and Psychopathy: A Guidelines-Based Approach to Prejudicial Psychiatric Labels, Hofstra Law Review: Vol. 42: 2, 6 at 521* ...............................................................................57

G. Ben Cohen and Robert J. Smith, *The Racial Geography of the Federal Death Penalty*, 85 Wash. L. Rev. 425, 429-30 (2010) ...................................................................... 168, 169

Nancy J. King, Racial Jurymandering: Cancer or Cure? *A Contemporary Review of Affirmative Action in Jury Selection*, 68 N.Y.U. L. Rev. 707, 712-13 (1993) .......................................112

Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Colum. L. Rev. 1538, 1560 (1998)...............................................................................71

## I. MOTION FOR COLLATERAL RELIEF

The Movant Christopher Cramer, through counsel and pursuant to 28 U.S.C. § 2255, Federal Rule of Criminal Procedure 33, and Rule 2 of the Rules Governing Section 2255 Proceedings, requests that this Court grant him a new trial, vacate the judgment entered against him, and/or vacate, set aside, or correct the sentence.[1] In making these requests, he asserts the following grounds:

## II. INTRODUCTION

At Cramer's trial for the murder of Leo Johns, the government portrayed Cramer as the ruthless general of the Soldiers of Aryan Culture ("SAC"), a white supremacist prison gang at USP Beaumont. The government's theory was that Cramer and his co-defendant Ricky Fackrell killed Johns, a fellow SAC member because Johns embarrassed Cramer and SAC by using drugs in violation of SAC rules. The government argued that the facts of the crime, coupled with Cramer's alleged leadership position in SAC, made him a future danger and warranted a death sentence.

The actual circumstances of what led to Johns' murder were starkly different from what the jury heard. Cramer's counsel failed to uncover or effectively use evidence showing that ██████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████ And counsel could have impeached the government's star witness, Otis Carden, with evidence that Carden himself pressured Cramer to use violence to handle the situation with Johns. In addition, a wealth of readily available but unpresented evidence countered the allegation that Cramer was a

---

[1] In accordance with Rule 2 of the rules governing Section 2255 proceedings, this Motion sets forth only the facts and claims entitling Movant to relief.

"general" in SAC and instead showed that Cramer was subject to orders from above. With a reasonable investigation, counsel could have marshaled evidence demonstrating the extreme pressure Cramer faced in support of a duress defense to the first-degree murder charge and as persuasive mitigating evidence showing that Cramer's level of culpability did not warrant a death sentence.

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████ Instead, counsel used a mental health expert with no expertise in trauma or █████ who incorrectly diagnosed Cramer with Antisocial Personality Disorder (APD). Cramer's APD label was not only wrong but was also highly aggravating and played into the government's argument that he would pose a danger if sentenced to life imprisonment. And while trial counsel presented some evidence of Cramer's background, the jury heard only a "skeletal" version of the generational and complex trauma experienced by Cramer and his multiracial family.

Counsel's failures throughout trial prejudiced Cramer. Even with the limited information presented during penalty phase, jurors endorsed multiple mitigating factors, indicating that they were receptive to mitigating evidence and saw some measure of value in Cramer's life. Their struggle is evidenced by a note sent to the judge asking, "What is the process if we are not unanimous with our verdict?" (Dkt. 656 at 2.) If counsel had performed effectively, there is a reasonable probability that at least one juror would have been swayed in favor of life.

The fundamental fairness of Cramer's trial was also undermined by counsels' substantial conflicts of interest. Attorneys Pat Black and Doug Barlow represented a high-ranking member of SAC in a prior murder case, which severely limited the scope of their investigation into direct orders or indirect pressure Cramer faced from SAC higher-ups regarding Johns. In addition, attorney John

2

McElroy concurrently represented Cramer and a government witness who informed on Cramer to the FBI, and who ultimately testified for the government.

These prejudicial errors were compounded by serious problems that unconstitutionally compromised the fairness of Cramer's jury. The jury that convicted and sentenced Cramer to death was drawn from a jury wheel created by a non-random selection procedure, resulting in an older, whiter jury pool that systematically excluded Black and Hispanic prospective jurors. That biased jury was then improperly instructed that they could make the legal determination whether a factor proffered by the defense was mitigating, in violation of the Eighth Amendment's requirement that all mitigating factors approved by the court be considered. Due to multiple, pervasive constitutional violations in Cramer's case, this court should vacate Cramer's conviction and death sentence.

### III. FACTUAL AND PROCEDURAL HISTORY

SAC member Leo Johns was found dead from multiple stab wounds on June 9, 2014. Security camera footage revealed fellow SAC members Cramer and Fackrell walking into Johns' cell at the time of the murder. During subsequent FBI interviews, Cramer and Fackrell admitted that they had killed Johns. On November 25, 2014, G. Patrick Black ("Pat Black" or "Black") of the Federal Public Defender for the Eastern District of Texas was appointed to represent Cramer. (Dkt. 4.) Douglas Barlow ("Doug Barlow" or "Barlow") was appointed as Black's co-counsel on December 16, 2014. (Dkt. 4.) Cramer and Fackrell were indicted for Johns' murder on March 3, 2016. (Dkt. 23.)

Over defense objection, the co-defendants were tried together. (Dkts. 85, 86.) Voir dire began on April 2, 2018 (Dkt. 703 (RT)), and a jury was empaneled on April 30, 2018. (Dkt. 591 (RT) at 56.) The guilt phase lasted a week. (Dkt. 596.) The government's theory alleged that Cramer was a general in SAC, that SAC prohibited alcohol and drug use among its members, and that Johns' addiction and drug-related debt disrespected Cramer, who then called for Johns to be killed. Cramer's defense sought

3

to negate the premeditation element of first-degree murder. Cramer called no guilt-phase witnesses. The jury found both Cramer and Fackrell guilty of first-degree murder.

After a jury finding that both Cramer and Fackrell were eligible for the death penalty (Dkt. 598), the government's penalty phase presentation focused on Cramer's likelihood of being a future danger and the impact of Johns' death on his family. Cramer's case for life included evidence of Cramer's troubled childhood and a diagnosis of antisocial personality disorder. Cramer also attempted to rebut the government's future danger argument with testimony that the BOP could safely house him. The jury returned death verdicts for both Cramer and Fackrell. (Dkts. 666, 668.)

On direct appeal, the Fifth Circuit affirmed Cramer's conviction and death sentence. *United States v. Fackrell*, 991 F.3d 589 (5th Cir. 2021). Cramer's Motion for writ of certiorari to the United States Supreme Court was denied March 21, 2022.[2] *Cramer v. United States*, 142 S. Ct. 1372 (2022).

## IV. JURISDICTION

This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 2255. Cramer is currently in federal custody at USP Terre Haute.

## V. CLAIMS FOR RELIEF

The affidavits and declarations contained in the appendix are incorporated by reference in this motion. The factual basis of each claim is realleged and reincorporated into all claims.

### LEGAL STANDARDS RELATING TO INEFFECTIVE ASSISTANCE OF COUNSEL

Under *Strickland v. Washington*, 466 U.S. 668 (1984), a habeas Movant seeking to establish the ineffective assistance of trial counsel must demonstrate that: (1) counsel's performance fell below "an objective standard of reasonableness," (i.e., deficient performance); and (2) but for counsel's deficient performance, there is a reasonable probability that the factfinder would have had a reasonable doubt with respect to the defendant's guilt or the appropriate punishment (i.e., prejudice). *Id.* at 688, 695; *see*

---

[2] The Motion was timely filed, pursuant to the government's waiver of its rights to raise a statute of limitations defense up to and including the date of this filing (*See* Dkt. 00516250382)

*also Porter v. McCollum*, 558 U.S. 30, 32 (2009); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005); *Wiggins v. Smith*, 539 U.S. 510, 538 (2003); *Williams v. Taylor*, 529 U.S. 362, 398 (2000). Strategic decisions made in the absence of a complete investigation are reasonable only to the extent that professional norms support the limitations of the investigation. *Wiggins*, 539 U.S. at 528. The American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases ("ABA Guidelines") set forth reasonable professional norms, and counsel's representation should be evaluated against the ABA Guidelines in effect at the time of trial. The 2003 ABA Guidelines were in effect at the time of Cramer's trial and provide guidance for this Court.

To establish prejudice, a Movant need only demonstrate a reasonable probability that, but for counsel's errors, at least one juror would have come to a different result. *Buck v. Davis*, 580 U.S. 100, 137 (2017). For claims related to counsel's ineffectiveness during sentencing, a reasonable probability of a different result is assessed by considering "'the totality of the available mitigation evidence–both that adduced at trial, and the evidence adduced in the habeas proceeding'–and 'reweighing it against the evidence in aggravation.'" *Porter*, 558 U.S. at 41 (quoting *Williams,* 529 U.S. at 397-98).

Ineffective assistance of appellate counsel claims are also judged by the *Strickland* standard. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000). A Movant can establish the deficiency of appellate counsel's performance by showing that counsel "fail[ed] to raise or properly brief or argue certain issues on appeal." *Sharp v. Puckett*, 930 F.2d 450, 451 (5th Cir. 1991). Particularly in a capital case, there can be no reasonable strategy for failing to raise a meritorious issue on appeal. *Greer v. Mitchell*, 264 F.3d 663, 679 (6th Cir. 2001). A habeas Movant establishes prejudice where appellate counsel's errors "undermine[] the result on direct appeal, making the sentence unfair or unreliable." *United States v. Williamson*, 183 F.3d 458, 463 (5th Cir. 1999).

While any individual claim of ineffective assistance of counsel justifies relief under the Sixth Amendment, courts must also consider errors in their totality. If the cumulative effect of counsel's

5

errors prejudiced a defendant, the defendant is entitled to relief under *Strickland*. 466 U.S. at 688, 694; *see White v. Thaler*, 610 F.3d 890, 906-07 (5th Cir. 2010).

**CLAIM 1: CRAMER RECEIVED INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL DURING THE GUILT PHASE.**

Cramer's conviction was imposed in violation of his Sixth Amendment right to the effective assistance of counsel. But for counsel's deficient performance, there is a reasonable probability that a mistrial would have been declared, that severance would have been granted, or that at least one juror would have voted not to convict Cramer of first-degree murder. Separately and cumulatively, these deficiencies in the investigation, preparation, and presentation of Cramer's defense prejudiced him, and require that the writ be granted and Cramer's convictions vacated. (*See supra* pp.4-6.)

**A.     Deficient performance**

As the Fifth Circuit acknowledged in its opinion affirming Cramer's conviction, the Government's theory of the case was that "Johns was not responsible for his murder and that Defendants murdered him to maintain their reputations." *Fackrell,* 991 F.3d at 607. Indeed, the government's theory throughout the guilt phase repeated the theme that Johns was a hapless, helpless drug addict, and that Cramer was nothing but a merciless killer. Counsel did little to counteract this portrait of their client. The ostensible defense theory, as summarized in counsel's sparse guilt phase closing, centered on negating specific intent for first-degree murder, which would have made Cramer ineligible for the death penalty. (Dkt. 596 (RT) at 81-100.) Counsel also argued that Johns' bad behavior created a situation which forced Cramer to take violent action, but Johns' behavior was minimized as mere violations of "numerous policies and regulations of SAC (Dkt. 596. (RT) at 84.) And as the record makes abundantly clear, counsel presented little evidence to support either argument.

Nearly every instance of counsel's deficient performance can be connected to the failure to conduct an adequate investigation and develop a cohesive theory of defense. Counsel gestured at

investigating, sending investigators out to interview more than 60 witnesses who provided information relevant to the guilt phase. But counsel often did not read the summaries or witness interview memos prepared by the investigators (Ex. 53), and little of that information collected by investigators was used or followed up on. The defense called no witnesses of its own, despite the useful information multiple witnesses could have provided. Moreover, trial counsel did not personally review large swaths of the discovery themselves, instead outsourcing this work to investigators. Because much of the discovery was subject to protective orders–which counsel ineffectively did not object to. As a result, the defense team was forced to review and summarize much of the discovery at the U.S. Attorney's office and was not permitted to make copies. These documents, which included prisoner witnesses' criminal histories and Central BOP files ("C-file"), reports by BOP investigators, and FBI reports, were key documents that could be used in the defense investigation and cross-examination at trial. Sending an investigator to review and summarize records on a single occasion was insufficient to digest the evidence available. As described below, highly relevant evidence in those documents was not utilized at trial to impeach government witnesses or to raise available defenses that could have resulted in an acquittal or life sentence. And, to the extent that counsel did not question or call witnesses because of any orders *in limine*, counsel was ineffective for not building the foundation to render this evidence admissible. (*See also* Claim 2.)

      **1.    Counsel refused to utilize available resources to conduct a competent investigation**

Capital work is highly specialized and complex. *McFarland v. Scott*, 512 U.S. 849 (1994); *see ABA Guidelines* at 921. Capital defense attorneys are expected to "promptly obtain" any resources or expert guidance needed "to prepare for both phases, including at minimum the assistance of a professional investigator and a mitigation specialist, as well as all professional expertise appropriate to the case." *ABA Guidelines* at 925 and Guideline 10(c).

7

8



The assistance of experienced Project attorneys is invaluable in any capital case. But it is especially necessary when trial counsel carry heavy caseloads. Black, Barlow, and McElroy represented numerous other clients facing serious and complex charges during their representation of Cramer. And Black also had the duty of overseeing the FPD office. By unreasonably refusing valuable support from the Project, counsel failed in their obligation to avail themselves of resources and expertise to provide effective assistance to Cramer. *See ABA Guidelines*, Guidelines 6.1 and 10.3.

### 2. Counsel failed to raise the available defense of duress

#### a. Legal basis for raising a duress defense

A duress defense can be raised where the defendant (1) was under "an unlawful and present, imminent, and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury"; (2) had not "recklessly or negligently placed himself in a situation" where he would likely "be forced to choose the criminal conduct"; (3) had no "reasonable legal alternative to violating the law; a chance both to refuse to do the criminal act and also to avoid the threatened harm"; and (4) could reasonably anticipate a "direct causal relationship. . . between the criminal action taken and the avoidance of the threatened harm." *United States v. Posada-Rios*, 158 F.3d 832, 873 (5th Cir.

9

1998). The defendant must prove each element by a preponderance of the evidence and is entitled to an instruction once the elements are established. *United States v. Willis*, 38 F.3d 170, 179 (5th Cir. 1994); *United States v. Estrada-Monzon*, 700 F. App'x 323, 326 (5th Cir. 2017). Duress may be raised in capital murder cases. (*See* Fifth Circuit Pattern Jury Instructions, 2015, number 1.38 and comments.)

Moreover, if the "defendant was under unusual and substantial duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge," this constitutes a statutory mitigating factor. 18 U.S.C. 3592(a)(2). And duress can mitigate the impact of future dangerousness. *See, e.g., Graham v. Collins*, 950 F.2d 1009, 1019 (5th Cir. 1992), *aff'd*, 506 U.S. 461 (1993). Here, because the duress was rooted in the facts of the crime, evidence of duress should have been initially presented to the jury during the guilt phase and could have been used again during the penalty phase.

#### b.    Readily available evidence supporting a duress defense

In his guilt phase closing, Black's sole argument to the jury as to why Johns was attacked was: "It is undisputed that Mr. Johns violated numerous policies and regulations of SAC. Heroin user used alcohol, stole property from other SAC members, ran up substantial drug debts. . . . [A]ll of the government witnesses, or the majority of them, they told you from that witness stand that he had been verbally warned to stop. He did not stop that conduct and activity." (Dkt. 596 (RT) at 84.) ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*See* Claims 2, 3.)

**Cramer was under an unlawful and present, imminent, and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury.** ▮▮▮▮

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████ Despite prison being "an environment of total surveillance and control," violence and killings were on the rise in the BOP at the time of Johns' death "as the prison population increases, and staff-to-prisoner ratios decline." (Ex. 86.) In a March 2008 memo, prison officials estimated that a projected $289 million budget shortfall could force the cutting of guard positions to the point "where safety and security of staff and inmates could be in jeopardy." (Ex. 86). Another dynamic at work was the COs' tendency to use to prison gangs to maintain order and control, which sometimes led to COs using their authority over prisoners to engage in gang-like behavior themselves. (Ex. 85, 105.) Because the federal government generally does a poor job of collecting criminal justice data, the scourge of BOP violence is more widespread than just statistics can show. Attempts to obtain what data there is through Freedom of Information Act (FOIA) requests can take years and the documents that are produced are often so heavily redacted that they are useless.[3]

████████████████████████████████████████

█████████████████████████  █████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████

---

[3] Undersigned counsel has made over 15 FOIA requests; none have yet been completed.



(1)

13

14











### 3.    Counsel failed to raise the available defense of voluntary intoxication

Although the government's theory was that Johns was killed over his drug addiction, the idea

that SAC was a drug-free gang was easily disproven by evidence known to the government as well as

20

evidence developed in the defense investigation. For example, Carden (Cramer's cellmate) testified that Cramer made alcohol in his cell (Dkt. 591 at 250-52) and that "80% of the white people" in the BOP use suboxone. (Dkt. 591 at 254.) Crossman observed Cramer drinking (Ex. 30 ¶ 7), and Cramer himself had acknowledged issues with substance abuse. (Exs. 48 and 50.) The government was told by at least one witness that Cramer had been drinking the morning of the crime (Ex. 22.; Dkt. 647 (RT) at 253-54), and the redacted FBI 302 containing this information confirms that Cramer was seen drinking on surveillance footage.

Had counsel presented evidence that Cramer was intoxicated when the offense occurred, the jury could have considered whether he had the specific intent to commit first-degree murder. *United States v. Molina-Uribe*, 853 F.2d 1193, 1205 (5th Cir. 1988), *overruled on other grounds by United States v. Bachynsky*, 934 F.2d 1349 (5th Cir. 1991). Because counsel specifically argued during closing that "Mr. Cramer did not deliberately, willfully, and intentionally take the life of Leo Johns" (Dkt. 596 (RT) at 1482), he could not have had a strategic reason for failing to develop and present such evidence. Absent this failure, there is a reasonable likelihood that at least one member of the jury would have voted to convict of second-degree rather than first-degree murder. *Strickland,* 466 U.S. at 690-91.

4.    **Counsel failed to show that the government blamed Johns for his own death**

On June 8, 2016, Leo Johns' estate and family filed a wrongful death civil suit pursuant to 28 U.S.C. § 1331. Among the named defendants were the Warden of USP Beaumont and Olajuwon Quarles, the guard who had been on duty and subsequently fired after failing to respond to the Johns assault. (*Brianna Johns, et. al. v. Franscisco Lara, et. al.* Case No. 1:16CV198 ("*Johns v. Lara*", Dkt. 1.) On October 13, 2016, Defendant/Warden Lara filed a Motion to Dismiss (*Johns v. Lara*, Dkt. 13.) In that Motion, Lara raised the affirmative defense that Johns was more than 50% negligent in causing his own death by being in possession of alcohol, in violation of the rules of SAC. (*Johns v. Lara*, Dkt. 13 at 24.) This allegation was supported by a declaration executed by SIA Childress. (*Johns v. Lara*, Dkt.

21

13 at Ex. E.) The suit was ultimately dismissed without prejudice and by stipulation of the parties on December 19, 2016. (*Johns v. Lara*, Dkt. 20.)

In late 2017, Cramer's counsel successfully moved the court to unseal the record of the civil case. Within those records were certain declarations and statements made by BOP officials relevant to this claim. Although the trial court restricted the defense's use of evidence from the civil case, there were two avenues left to counsel to try to show the jury that the government's narrative about Johns in Cramer's criminal trial was very different from the narrative the government presented when they were sued for Johns' wrongful death. First, counsel did not call Childress as a witness, and second, they raised no objection to the government's motion in limine prohibiting the defense from remarking on Childress's absence as a government witness during the guilt phase. Had they pursued either of those actions, the jury would have had a complete picture of the circumstances of Johns' death, and at least one juror would have voted to acquit him or, later, vote for a life sentence. (*See also* Claim 2.)

### 5. Counsel failed to present evidence that BOP officials had foreknowledge of the Johns assault

Counsel did not seek to call SIA Childress as a witness to testify about his declaration in the civil suit or any other matter, despite the fact that he had been one of the primary investigators. In fact, as Carden testified, Childress had information about the impending assault and Cramer's involvement in it. (Dkt. 591 (RT) at 157.) In addition, there was evidence that knowledge of the assault was widely known, and the investigation by SIA's had been more far-reaching than Carden understood. A staff member by the name of O'Connell, who worked in the laundry, advised SIA's that he overheard a conversation about a planned assault; SIA's interviewed several inmates about this. (Ex. 21.)

Had they called Childress, or O'Connell, counsel could have elicited testimony that would have damaged the government's case against Cramer. They also could have used both of these witnesses in much the same way they should have used SIA Nylen (*see infra* Part B(6)(a)(8)): as experts

22

regarding matters of prison life, such as how quickly violence can erupt, the impact of owing debts around the yard, ▮▮▮▮▮▮▮▮▮▮ drug use in prisons, or the way correctional officers rely on inmates to help maintain order in the facility. (Ex. 43.; *see also* Ex. 102.) Had counsel fully investigated, developed, and presented available defenses, there would have been a foundation for admitting the government's admission and the Childress declaration. If counsel had done all of this, the jury would have understood the BOP's own role in Johns' death, and there is a reasonable likelihood that Cramer would have been acquitted or that at least one juror would have voted for a life sentence. (*See also* Claims 2, 10.)

### 6.    Counsel failed to utilize readily available evidence to challenge the government's case for capital murder

Counsel failed to use readily available evidence to impeach government witnesses, undermine government evidence, and challenge the government's theory of liability. This could have been accomplished by making better use of the government's witnesses, and by calling other witnesses they discovered during their own incomplete investigation.

### a.    The government's witnesses
### (1)    Otis Carden

Carden was Cramer's cellmate at the time of the offense and had direct access to Cramer's thoughts on the problems Johns was causing on the yard. At the time of Johns' death, Carden was serving time for multiple offenses, including methamphetamine trafficking and possession of at least 18 firearms and two machine guns by a felon. Because of his prior felony convictions, Carden received a mandatory life sentence on the trafficking charge; he also received a consecutive sentence of 30 years for the weapons charges. (*United States v. Carden*, 8:08-cr-149-RAL-MAP, M.D. Fla. ("*U.S. v. Carden*", Dkts. 34, 223.) Considering the seriousness of those charges, Carden received an extraordinary benefit for his testimony in Cramer's case: he was resentenced to 188 months and released on January 8, 2021. (*U.S. v. Carden*, Dkt. 223.) Incredibly, no one on Cramer's defense team interviewed or sought to

depose Carden prior to trial. If they had, they would have been able to impeach and discredit the witness whom both the judge and the jury claimed was one of "the most impactful of the numerous witnesses called in the case." (*U.S. v. Carden*, Dkt. 223.)

Carden was an experienced, savvy, and frequently violent character. Although he was not a gang member, he operated like one and was a self-admitted leader of white inmates at times. (Dkt. 591 (RT) at 209.) After years of violent, drug-related crimes, he was sentenced to life in prison before he turned 30. During his sentencing hearing for the meth trafficking conviction, after hearing evidence regarding his priors, the judge said, "You sure are calm for–how old are you now?" Carden replied, "27." And the Court continued, "You sure are calm today for a man who faces the rest of his life in a Federal penitentiary." Nonplussed, Carden responded that the only thing left for him to do was start working on his appeals. (Ex. 2.) His conviction became final in 2012. *Carden v. United States*, 568 U.S. 954 (2012). His 2255 was denied in 2012. *Carden v. United States*, 464 F. App'x 839 (11th Cir. 2012). At that point, Carden didn't have any more appeals to press, and he had to look for another way out. Carden realized that the simmering and dangerous tensions arising in the Beaumont yard from Johns' drug use and widespread debt provided just such an opportunity.

The government relied heavily on Carden to describe for the jury the days and weeks leading up to Johns' death. It was apparent that he was intimately aware of the situation Cramer faced, and that he assisted in ensuring that the offense was committed. Carden admitted as much in his own testimony. (See, e.g., Dkt. 591 239-241; 259; 262.) Other inmates also knew that Carden encouraged Cramer and Fackrell to take violent action against Johns. (Ex. 17 at 24; Ex. 30 at ¶ 14-17; Ex. 23.) Carden testified that Cramer told him about the plan to kill Johns in the days before the offense and that it was "common knowledge" around the prison that Johns was going to be "hit" by his own gang members. (Dkt. 591 (RT) at 144-45, 258.) He communicated messages from Cramer to Fackrell about the problems with Johns. (Dkt. 591 (RT) at 242.) Carden admitted telling SIS that he had told Cramer

to "smash"[6] Johns in June 2014, and volunteered to help as an "alternative to killing him." (Dkt. 591 (RT) at 237.) Carden even helped to ensure Johns died by procuring the knives used to kill Johns. (Dkt. 591 (RT) at 161-62, 207; 262.)

Carden testified that when he was first approached by SIS he did not immediately agree to cooperate because correctional officers often told other prisoners about cooperators, which put the cooperator's life in danger. (Dkt. 592 (RT) at 137-38.) But once he was alone with SIA Childress and another staff member, he immediately inquired about moving to a different facility if he agreed to testify. (Dkt. 592 (RT) at 139.) Following his agreement to cooperate, he was placed in the Witness Security Program, which he said was "nice." (Dkt. 591 (RT) at 197.) In the end, Carden knew that Johns' life was in danger and simply chose to allow the homicide to go forward so he could benefit by cooperating with law enforcement. And his plan worked: On January 6, 2021, the government filed a Motion for downward departure of Carden's then-life sentence based on his substantial assistance in the Cramer prosecution, and he is now on supervised release. (*U.S. v. Carden*, Dkt. 221.)

It was not the first time Carden had testified on behalf of the government for his own benefit. At trial, Carden admitted to testifying in front of a grand jury, in 2006, in the federal district of West Virginia, and that he was not indicted or charged in that case. (Dkt. 591 (RT) at 201.) There is nothing in counsel's files that suggests they knew about Carden's history as a cooperating witness, despite the fact that counsel requested such materials. (See Dkts. 212, 298, 505.) However, there is also no indication in counsel's files that the team did any kind of investigation into Carden's criminal or testimonial history. For example, had they interviewed Carden's co-conspirator in his federal criminal case, Terry Gilmore, they would have learned about his willingness to cooperate with the government

---

[6] A smash, according to Carden, is when a gang member is beaten out of a gang; once taken out of the gang in this way, there is a "green light" on the ex-member, and you remain vulnerable to being beaten again–or killed–if another inmate can get to you. (Dkt. 591 (RT) at 133.)

for his own benefit ahead of trial. (Ex. 8 ¶ 7.) As a result of failing to conduct a reasonable investigation, and because the government did not disclose this information, counsel did not follow up with any questions about the nature of that grand jury testimony. (*See* Claim 10.)

Counsel also missed another easy opportunity to prove that Carden knew Johns was going to be attacked, encouraged it, assisted Cramer and Fackrell in committing it, and did so in order to benefit himself. Carden testified on direct examination that SIA Childress believed Cramer might be planning violence because he testified about a kite to that effect. The kite had been received several days before Johns was killed. Childress reportedly told Carden that he had put another inmate ████████ in the SHU based on this information, saying, "Look, I got a kite that your cellie is going to catch a body over the weekend." (Dkt. 591 (RT) at 157.) Carden, significantly, did not correct Childress, even though he clearly knew who the target was by that time; in fact, he lied about it, saying "Chris ain't trying to get involved in anything." (Dkt. 591 (RT) at 157.) Counsel did not cross-examine him about the fact that he knew about the crime before it was committed, that he lied to a federal agent about it, and actively helped to conceal it from authorities. All of this could have been conduct charged under 18 U.S.C. §1001, but more importantly, it was clear evidence that Carden allowed Johns to be killed in order to benefit himself; in that, he is as culpable for Johns' death as anyone. Had the jury understood this important fact, it would have added to evidence supporting the duress defense, and at least one juror would have voted to acquit Cramer or would have voted for life.

There was no strategic reason for failing to investigate Carden in this way. ████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████ Counsel missed Carden's background as a cooperator as well as a number of other opportunities to challenge Carden's version of events and undermine his credibility. To make matters worse, counsel failed to object to

26

multiple instances of hearsay. For example, Carden testified that "Monk" (Michael Shelton, who did not testify) told him about how he had put handles on the knives used to hurt Johns.

Nor did counsel question Carden about his criminal history or his institutional history, which included several violent attacks on rumored sex offenders and snitches and separation orders for threats and violent retaliation. (Exs. 22, 90.) Based on Carden's history, counsel could have questioned him about how a rumor could turn into a violent brawl very quickly, which would have been a powerful way of showing the jury how volatile a prison yard is. Counsel also could have asked Carden about what happens to an inmate who does not take violent action against an inmate known to be a cooperator or sex offender. Carden had a lot to offer the defense theory in terms of prison life. He testified that "if someone in your car has done any, you know, messed up moves or bad paperwork or whatever, then you have to smash them." (Dkt. 591 (RT) at 105.) And he testified that "[i[t's all of us against all of them. And the politics is what keeps [riots] from happening. That's why you have shot callers and you have people that control their group so that it doesn't come to a riot basically." (Dkt. 591 (RT) at 107.) Counsel could have used him to testify about the need to organize into groups–in cars or in gangs–for self-protection and order, and that the prison benefited.

27











### (8)    SIA Robert Nylen

Counsel should have used Nylen as a BOP expert in matters of prison life, such as the impact of owing debts around the yard, ████████████████████ drug use in prisons, or the way correctional officers rely on inmates to help maintain order in the facility. (Ex. 102.)

### b.    Defense witnesses not called

Despite defense interviews of more than 60 witnesses, few were the subject of further investigation, and not a single witness was called by the defense during the guilt phase. The witnesses below were either known to defense counsel or would have been discovered had counsel overseen a competent investigation. Counsel's failure to use these witnesses constitutes deficient performance.

32









### (10) Olajuwon Quarles

Counsel did not interview Quarles, who was the officer responsible for the unit in which Johns was killed. The government filed a motion in limine to prevent trial counsel from remarking on his absence from the government's case-in-chief. (Dkt. 107.) Had counsel called him as a witness, they could have elicited testimony showing that the prison had advanced knowledge of the attack, thereby supporting a duress defense as well as Cramer's mitigation presentation in the penalty phase.

### (11) Reshay Childress

Despite his central role in the investigation, Childress was not called as a witness by the government, most likely because he had prepared a declaration supporting the government's argument in the Johns civil suit that Johns was responsible for his own death. (*Johns v. Lara*, Dkt. 13 at Ex. E.) The government also filed an unopposed motion in limine prohibiting the defense from remarking on his absence from the government's case-in-chief. Had counsel called him as a witness, they could have elicited testimony supporting a duress defense and the undeveloped theory that the prison had advance warning of the offense.

## B. Prejudice

Had counsel conducted a reasonable, competent investigation, they would have had a coherent and logical defense to present to the jury. All the evidence set forth herein could have been marshaled to present a duress defense, prove the four elements of the defense by a preponderance of the evidence, and obtain an instruction for the jury to consider in the guilt phase deliberations. *Posada-*

*Rios*, 158 F.3d at 87; *Estrada-Monzon*, 700 F. App'x at 326. By not presenting the duress defense, Cramer's counsel *de facto* adopted the government's specious argument about the motive for the crime, which painted Cramer as a heartless killer. If counsel had presented the evidence of duress, there is a reasonable probability that at least one juror would have acquitted Cramer of capital murder. Similarly, had counsel called the defense witnesses listed above, the jury would have had a better understanding of ███████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████   ███████

████████████████████████████████████████████████████████████████████████

would also have supported this defense. Counsel should also have raised an intoxication defense, and if the duress claim had not supported an acquittal, the jury would have been able to consider a second-degree murder conviction, thereby removing the mandatory minimum sentence of life or a death sentence altogether. And, had counsel fought to show that the BOP knew the offense was going to occur beforehand and deliberately hid their admission that Johns brought his violent death on by his own actions, there is a reasonable probability that at least one juror would have been more convinced to acquit under the duress theory.

Even if this evidence did not result in acquittal, counsel could have marshalled it at the penalty phase to persuade at least one juror to vote for life. Evidence of duress is a statutory mitigating factor, *see* 18 U.S.C. § 3592, and the additional evidence about the circumstances of the crime would have given the jury crucial additional context to reduce Cramer's degree of culpability. There is a reasonable probability that, had counsel set the stage for an effective penalty phase presentation by conducting a competent guilt-phase investigation and presenting a cohesive theory of the crime, at least one juror would have voted for a live sentence in the penalty phase. *Strickland,* 466 U.S. 688. (*See also* Claim 2.)

37

**CLAIM 2: CRAMER RECEIVED INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL DURING THE PENALTY PHASE.**

**A.    Counsel ineffectively failed to investigate and present evidence supporting its theories of defense**

Pat Black and Doug Barlow were first appointed to Cramer's case in 2014. Barlow, a longtime capital defense attorney in Texas, spearheaded Cramer's penalty phase preparation. Barlow and lead counsel Black, who headed up the guilt phase, were familiar with each other's work: they had previously represented federal death row inmates Shannon Agofsky and Snarr. (*See* Claim 5.). Counsel's penalty phase strategy focused on three major themes: (1) Cramer's traumatic past, including the effects of his mother Darla Dillon's troubled history; (2) Cramer's commitment to the BOP at age 20 and how years of exposure to violence and prison gangs affected him; and (3) challenging the government's future danger allegations by presenting ADX as an alternative to death row. (Dkt. 646 (RT) at 6-7.) Counsel put on seven lay witnesses, two prison experts, and two mental health experts to make their case for life. In addition to ineffective witness preparation, counsel failed to investigate and present a wealth of evidence that supported the defense theory of mitigation. Consequently, Cramer's jury was deprived of a complete understanding of the man they ultimately sentenced to die.

38



40

41

42



43



### 2.   Failure to prepare witnesses

#### a.   Family members

Capital Resource Project Counsel Anthony Haughton was assigned to assist the Cramer defense team in 2018, shortly before the trial. (Ex. 46 ¶ 5.) Haughton was new to the Project but had decades of capital experience. (Ex. 46 ¶ 2-4.) He was aware that Cramer's attorneys, though always polite, were usually resistant to offers of assistance from the Project, and as he got to know the team that was his experience as well. (Ex. 46 ¶ 5.) Haughton observed about 65-70% of the trial and offered to help in any way he could, but for the most part, he was shut out. (Ex. 46 ¶ 11.)

Haughton educated himself about the case by reviewing the mitigation interviews done by Mayer and Saberman. He knew that the focus of the mitigation case would be Cramer's extraordinary history of trauma and evidence that Cramer could be safely housed at ADX. However, after reading the memos, he was concerned about the lack of preparation that had been put into the penalty phase. As opposed to the "broad and deep" investigation that is the standard of care in capital cases, the records only scratched the surface of what Cramer experienced both inside and outside of prison. (Ex. 46 ¶¶ 14-15.) Haughton grew more concerned when he realized that Mayer, with the attorneys' permission, would not be attending the penalty phase but instead going on vacation. (Ex. 46 ¶ 18.) In

his experience, it was incredible that counsel would let the one remaining member of the team who had a relationship with the family and more than surface-level familiarity with Cramer's mitigation story go on vacation instead of assisting with Cramer's penalty phase. (Ex. 46 ¶ 18.)

When Haughton realized just how little preparation had been done to prepare Cramer's relatives to testify, Haughton asked Barlow if he could assist. Barlow agreed. (Ex. 46 ¶ 19.) However, Barlow did not set up meetings with the family until the weekend before they were going to testify. The family flew in Sunday evening, and Barlow told Haughton that they would spend all day Monday prepping the witnesses. Barlow met briefly with the family at the hotel where they were staying for the trial; it appeared to Haughton that Barlow had never met them before. (Ex. 46 ¶ 20.) Then, on Monday, Barlow told Haughton that he would not be able to prepare the witnesses and asked Haughton to do it on his own. Haughton was stunned and "grave[ly] concerned" about this breach of the most basic duties in capital litigation. As Haughton explained, "It is well below the standard of care for the attorney conducting the examination of any critical witness to never meet the witness in person and prepare them directly." (Ex. 46 ¶ 21.) This is especially true when the witness will be testifying to "sensitive, embarrassing, and painful subjects, which was the case here," not to mention "the pressure of feeling responsible for convincing the jury that their loved one's life is worth saving." (Ex. 46 ¶ 21.)

Haughton did what he could to save the penalty phase presentation. For approximately 15 hours, from 9 a.m. to midnight in a motel room, Haughton individually prepped each family member for their testimony the following day. (Ex. 46 ¶ 26.) "Because it was apparent that there were tranches of mitigation facts that simply had never been developed during the investigation," Haughton was "in the untenable position of trying to fill in the blanks as the de facto investigator and to create a cohesive narrative as the de facto attorney, knowing that it would likely not be successful because the trial team had failed to take advantage of the time they had prior to the trial to fully develop and prepare the penalty case." (Ex. 46 ¶ 26.) Barlow checked in with Haughton only once, leaving a voicemail to

45

inquire how things were going. (Ex. 46 ¶ 27.) When Haughton got a chance to call him back, Barlow told him he had missed the window and that Barlow would just "play it by ear." (Ex. 47 ¶ 27)

Predictably, because Barlow was unfamiliar with the family witnesses and everything they had to convey, their testimony was but a shadow of what it could and should have been. According to Haughton, even though he prepared detailed direct examination questions for Barlow to follow, including bullet points of all the topics the witness was prepared to discuss on the stand, Barlow failed to ask follow-up questions to prompt the witness to say more. (Ex. 46 ¶ 30.) Barlow's examination of Dillon was particularly abrupt; he cut off his questioning before eliciting much of her most compelling mitigation evidence. (Ex. 46 ¶ 30.) When Haughton questioned Barlow's approach, Barlow said it was because he thought Cramer would not want to hear his mother testify about her trauma. (Ex. 46 ¶ 30.) What Haughton later learned is that Cramer was grateful, humbled, and prepared to hear his family testify. (Ex. 46 ¶ 30.) Haughton was not surprised at this glaring misunderstanding considering the obviously dysfunctional relationship between counsel and client. (Ex. 46 ¶¶ 9-10) ("Chris's defense team did not engage with him much, and it was clear to me that the attorneys had failed to develop a trusting relationship with their client. Pat and Doug rarely spoke to him in the courtroom. I never saw them sharing anything with him or otherwise demonstrating that they were a team working together in this process that would decide whether Chris lived or died.")

### b.    Barbara Belbot

Dr. Barbara Belbot testified as an expert on prison conditions. Before her work on Cramer's case, she had never consulted for or testified in a criminal case of any kind. When she was retained, counsel told her that she would be a mitigation witness for Cramer, with a focus on her academic research. She was never asked to participate in any meetings to discuss mitigation, and the attorneys never discussed Cramer's social or institutional history with her at any length. (Ex. 44 ¶ 6.) When counsel decided that they wanted Dr. Belbot to interview Cramer in person, she was surprised

46

since she had been led to believe her testimony would focus exclusively on her academic work. She expected Barlow to give her some guidance about the specific purpose of the visit and what she should expect to learn about Cramer and his case that would be relevant to her testimony, but none came. In the hour she had with Cramer, Dr. Belbot focused on asking very general questions about his prison disciplinary record and why he joined a prison gang. (Ex. 44, ¶ 8.) Cramer was reluctant to discuss his institutional history, which did not surprise Dr. Belbot, as she knew it often takes time to build trust with an incarcerated person. It was evident to Dr. Belbot that "Mr. Cramer had not been told very much about what to expect during my visit and had no idea what the purpose" of her testimony would be. (Ex. 44 ¶ 8.) In the end, Dr. Belbot believed that visiting with Cramer did not bring anything useful to her report or testimony because counsel gave her no guidance about what information she should have gathered and how that would help their case.

Not surprisingly, Dr. Belbot was subjected to a searing cross-examination by the government, who eviscerated her lack of experience in the BOP, with prison gangs, and with the details of Cramer's offense and institutional history. Had counsel properly prepared Dr. Belbot or presented an expert who *could* explain why Cramer's participation in prison gang culture did not mean he was inevitably a future danger (*see, e.g.,* Ex. 47 and 102; *see also* Part 3(b), *infra*), it would have significantly strengthened the defense case for life.

### c.    Mental health experts

The mental health experts for the penalty phase were Dr. Dan Roberts and Dr. John Fabian. Counsel failed to give them sufficient information, including about Cramer's multigenerational trauma history and prenatal exposure to alcohol, "to be able to render a competent mental health diagnosis of Chris." (Ex. 53 ¶ 30.) If they or another qualified expert had that information, it would have dramatically changed the jury's understanding of Cramer and his mitigation story. Counsel's failure to prepare their mental health experts is discussed in detail in Parts B and C and Claim 3, *infra*.

47

**3.      What the jury never heard about Cramer's background**

**a.      Intergenerational trauma**

In her time on the case, Sandy Saberman had developed a trusting relationship with Cramer's mother, Darla Dillon, who had just started to open up about the multigenerational trauma and abuse she and Cramer suffered. The mitigation investigation was by no means complete when Saberman was fired, but trial counsel did not meet with the family again until after the guilt phase had already concluded. As a result, Dillon–the lynchpin witness for the defense's mitigation case–testified about only the most "skeletal" details of her life and the life of the son she begged the jury to save. *Neal v. Puckett*, 286 F.3d 230, 240-41 (5th Cir. 2002).

48



████████████████████████████████████████████████

████████████████████████████████

Counsel's failure to elicit important mitigating information from witnesses was compounded by the way in which they treated the penalty phase defense exhibits. Counsel prepared huge binders filled with hundreds of pages of social history exhibits that were never discussed in any detail during the testimony of the penalty phase witnesses. Although there was some crucial mitigating evidence included in the binders, including information about Cramer's traumatic background and cognitive challenges, counsel simply told the jury to "review all that" during deliberations. (Dkt. 679 (RT) at 211.) Thus, the jury was "given no basis for construing and digesting this information," an approach found ineffective in *Johnson v. Bagley*, 544 F.3d 592 (6th Cir. 2008).

Perhaps the most basic tenet in a capital case is that the jury must be given the tools and mitigating information necessary to make a reasoned, informed, and reliable decision about whether to sentence someone to die. "[E]vidence about the defendant's background and character is relevant" to the sentencing decision "because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.'" *Penry v. Lynaugh*, 492 U.S. 302 (1989) (internal citations omitted). The jurors in Cramer's case were not given the information or the tools they needed to make the kind of reasoned, informed judgment that the constitution demands.

### b.    Cramer's role in SAC

At trial, the government claimed repeatedly that Cramer was a "general" in SAC and therefore at the top of the gang's military-like power structure. As a general, the prosecution argued, Cramer would continue to wield that power even within the walls of the control unit at ADX. The government sought to portray Cramer as an ambitious, violent gang leader who had worked his way up the SAC hierarchy and enjoyed being a dominant force in prison politics. Therefore, a death sentence was the

only way to stop Cramer from being a future danger.

However, as many witnesses known to and/or interviewed by the trial team could attest, the reality was quite different.

51

An expert on white supremacist prison gang culture, like Dr. Pete Simi, could have explained to the jury that the aggression and hyper-masculinity Cramer sometimes displayed stemmed from his "extensive exposure to a series of adverse environmental conditions that began early in his childhood and continued through his adolescence and the 20 years he has spent in prison." (Ex. 47 ¶ 6.) Cramer was vulnerable to seeking the structure of a gang because of his history of trauma, and "[t]he key to [his] long history of misconduct is to understand that his behavior is a *symptom* of environmental and biological adversities, as opposed to an *inherent* psycho-pathological personality disorder." (Ex. 47 ¶ 7.) He wasn't an evil sociopath, as the government wanted the jury to believe. Instead, Cramer spent the vast majority of his life being battered by extreme trauma, and once he was in prison and exposed to even more trauma, he sought protection and belonging in the only way he felt he could.

52



Failure to interview and present these "key percipient witness[es] was ineffective." *Jackson v. Calderon*, 211 F.3d 1148, 1160 (9ᵗʰ Cir. 2000). Cramer was prejudiced because their testimony would have undermined the government's future dangerousness argument and helped the jury understand the duress Cramer experienced and the reality of his complicated experience at Beaumont.

**B.    Trial counsel's failure to effectively investigate Cramer's social history, coupled with their failure to retain qualified experts, led Cramer to be misdiagnosed with antisocial personality disorder (APD)**

**1.    APD–what the jury heard**

During penalty phase, counsel presented the testimony of Dr. Dan Roberts, a clinical psychologist who diagnosed Cramer with antisocial personality disorder (APD). (Dkt. 647 (RT) at 24-100.) As Dr. Roberts testified, APD is "a pervasive personality problem which is characterized by an attitude of disregard for other people and defined by behavior, negative behavior, such as stealing, fighting, taking advantage of people, things like that." (Dkt. 647 (RT) at 38.) According to Dr. Roberts, Cramer met the qualifications for APD based on: failure to conform to social norms with respect to lawful behaviors; signs of impulsivity and failure to plan ahead; reckless disregard for the safety of self

53

or others; lack of remorse for his criminal conduct; and evidence of conduct disorder[7] based on Cramer's self-reporting that he committed crimes before the age of 15. (Dkt. 647 (RT) at 52-56.) Dr. Roberts testified that certain things Cramer had experienced in his life, such as "child abuse, neglect, [and] being exposed to criminal activity at home by [his] parents," are factors associated with APD. Additionally, Dr. Roberts explained, "[l]earning disorders and ADHD are often seen together," and people with those diagnoses "are more likely to have trouble in school and subsequently more likely to drop out of school [and] more likely to have mental health problems, sometimes depression, anxiety, things like that that can contribute to getting into trouble later on." (Dkt. 647 (RT) at 40.) Dr. Roberts did not discuss in any detail about how Cramer's severe trauma history impacted his APD diagnosis except to say that Cramer likely experienced a "lack of attachment" that inhibited his ability to get close to people and "affected" his "perception of reality." (Dkt. 647 at 40-42.)

Not surprisingly, the government capitalized on Dr. Roberts' testimony about APD. Using a chart, the prosecutor led Dr. Roberts through the APD diagnostic criteria and the disorder's most harmful, aggravating traits. Along the way, the government repeatedly (and incorrectly) equated persons with APD as "sociopaths" and "psychopaths." (Dkt. 647 (RT) at 57, 96, 97, 99.) He got Dr. Roberts to agree that people with APD, like Cramer, "consistently show[] no regard for right and wrong," "ignore[] the rights and feelings of others," "tend to antagonize, manipulate, or treat others harshly with callous indifference," and "show no guilt or remorse for their behavior." (Dkt. 647 (RT) at 96.) Dr. Roberts also agreed that people like Cramer "may lie, behave violently or impulsively," "violate the law" and "typically can't fulfill responsibilities related to family, work, or school." (Dkt. 647 (RT) at 97.) In closing, the government challenged the idea of APD as mitigating (Dkt. 679 (RT) at 264.) The last words the jury heard from the government before deliberating whether to sentence

---

[7] Conduct Disorder is a DSM-5 diagnosis typically assigned to individuals under age 18, who habitually violate the rights of others, and will not conform their behavior to the law or social norms appropriate for their age. (Ex. 67)

Cramer to die highlighted elements of APD that Cramer's own expert testified to on cross:

> These two men have led a life that is characterized by serial and profligate violence. They have worked hard almost from adolescence to be where they are today. They have worked assiduously to earn for themselves the death penalty, and that they have done.

(Dkt. 679 (RT) at 268.)

### 2. Had counsel conducted an effective mitigation investigation and retained a qualified expert to evaluate their client, they would have realized that Cramer does not have APD



**No reliable evidence of conduct disorder.** A finding of conduct disorder is required for diagnosing APD. (Ex. 67.) In his report, Dr. Roberts does not make any of the detailed findings the DSM-5 requires for a conduct disorder diagnosis. Instead, he makes the unsupported claim that even though Cramer "was not arrested as a juvenile, his behavior during that period would have been classified as representing a conduct disorder had he been evaluated during his middle teen years." (Dkt. 676-12 at 4.) Such conclusory allegations are insufficient under the DSM-5. (Ex. 67).

Indeed, one of the government's own experts, BOP psychologist Dr. Shara Johnson, specifically *eliminated* APD from her consideration because there was no reliable evidence to support a finding of conduct disorder. (Dkt. 652 (RT) at 34; Ex. 49 at 44.) According to Dr. Johnson, "Inmate Cramer does not report *and records do not evidence* the onset of clinically significant conduct problems

prior to age 15 years…rather, his criminal history, gang activity, and extreme violence did not begin until adulthood." (Ex. 49 at 44; *see also* Ex. 49 at 45 (opinion of post-conviction expert Dr. Natalie Novick Brown that "APD is ruled out because there is no reliable evidence of a conduct disorder prior to or following Mr. Cramer's 15th birthday…").) Since the government's own expert didn't diagnose Cramer with APD, it relied on *Dr. Roberts'* diagnosis of APD to argue throughout the penalty phase that Cramer was a "psychopath" and "sociopath" who was always going to be a future danger.

**The impact of Cramer's history of complex trauma and evidence of brain damage.** When personality changes emerge and persist after a person has been exposed to extreme and/or chronic stress, the DSM-5 requires that an alternative diagnosis of PTSD be considered before diagnosing APD. In this case, there is no question that Cramer has experienced a lifetime of trauma. This trauma was recognized by trial defense expert Dr. Fabian. He did not specifically find that Cramer has APD, though he believed that Cramer exhibited some antisocial behaviors or tendencies. (Dkt. 652 (RT) at 34; Dkt. 676-15 at 34.) As the DSM requires, Dr. Fabian explained that Cramer's extraordinary history of trauma and his high ACES score were significant contributing factors to his antisocial behavior, which occurred mostly after he entered the dangerous BOP where "antisocial" behavior is often adaptive behavior used for protection. In contrast, Dr. Roberts completely failed to account for Cramer's complex trauma in his report or his testimony.

Therefore, counsel was on notice that Dr. Roberts' findings were deeply flawed.

Counsel was prejudicially ineffective for allowing their defense expert to testify that Cramer had APD without establishing that he meets the criteria.

> **3. Cramer was prejudiced by counsel's investigative failures and their decision to present a faulty APD diagnosis**

APD is often misdiagnosed, deeply controversial in scientific and legal circles, and nearly always prejudicial to the person receiving the diagnosis. Wayland, K., and O'Brien, S. (2013) *Deconstructing Antisocial Personality Disorder and Psychopathy: A Guidelines-Based Approach to Prejudicial Psychiatric Labels*, Hofstra Law Review: Vol. 42: 2, 6 at 521 (hereinafter "*Deconstructing APD*"); *see also* Blume, J., and Voisin, D. (2000) *Avoiding or Challenging a Diagnosis of Antisocial Personality Disorder*, Champion, 24 Apr. 69 at 2 (hereinafter "*Avoiding APD*"). Long before Cramer's trial, prevailing professional norms in capital defense cautioned against relying on an APD diagnosis in the penalty phase because, "[i]n addition to helping the prosecution establish aggravating, dehumanizing themes, presenting evidence about [APD] and psychopathy can undermine the defense mitigation case in multiple ways." *See, e.g., Deconstructing APD* at 527-28; *Avoiding APD* at 7-8. For example, an APD diagnosis often leads to jurors discounting self-reported and observed symptoms of mental illness or cognitive dysfunction as malingering because antisocial persons can "lie easily." *Deconstructing APD* at 528. Additionally, because many jurisdictions exclude APD from the statutory definition of "mental disease or defect," the diagnosis is used to "exclude the possibility of legally cognizable mental impairment," thereby "significantly harm[ing] [a capital defendant's] chances for survival." *Id.* at 529 & n. 65 (citing capital cases where APD was used to negate mitigating evidence). Therefore, "[b]ecause prosecutors easily turn the defense's [APD] evidence against the defendant, *no competent capital defense attorney would ever pursue a diagnosis of [APD] or label his client a psychopath in mitigation of punishment. . . .* If left unchallenged in a capital case, [APD] and related constructs are quite literally the 'kiss of death.'" *Id.* at 530 (emphasis added) (footnote and citations omitted).

"Defense attorneys . . . are not obligated to shop for the best experts who will testify in the

most advantageous way possible." *Johnson v. Bagley*, 544 F.3d 592, 605 (6th Cir. 2008). "But it is unreasonable, after an incomplete investigation, to put an expert on the stand who will directly contradict the sole defense theory and render worthless other helpful testimony." *Id.* That is exactly what the defense did by presenting Dr. Roberts and his testimony about APD. No other mental health diagnosis is as "inherently aggravating" to a defendant's case for life. *See, e.g., Sanborn v. Parker*, 629 F.3d 554, 572 (6th Cir. 2011) (referring to the defense expert's diagnosis of APD as "perhaps even more damning" than the findings of the state's expert); *Reed v. Sec'y, Dep't of Corr.*, 593 F.3d 1217, 1248 (11th Cir. 2010) (evidence of APD is "not good mitigation"). This is especially true when, as here, the government points out in closing that the defense expert's testimony supports the government's allegation that the defendant is a future danger. In fact, Dr. Roberts' diagnosis was quite a boon to the government since BOP psychologist Shara Johnson *excluded* APD as a diagnosis for Cramer due to no evidence of conduct disorder. (Ex. 49 at 13; Dkt. 652 (RT) at 34.) Although Dr. Fabian was more cautious in his discussion of APD, Dr. Roberts' flawed diagnosis remained. As a result, there was only so much Dr. Fabian could do to try and explain how Cramer's other significant mitigation (extreme trauma, learning disability, periodic depression, and likely ADHD) should lead the jury to weigh in favor of life rather than death. Indeed, while jurors credited some of Cramer's mitigation evidence, it is notable that not a single juror gave any mitigating weight to the factors relating to APD. (Dkt. 666 at 8.) And as the Fifth Circuit has held, "counsel can be prejudicially ineffective even if some of the available mitigation evidence is presented and even if there is psychiatric testimony." *Walbey v. Quarterman*, 309 F. Appx. 795, 802 (5th Cir. 2009).



### C.    Counsel failed to present readily available evidence and obtain a jury instruction on the statutory mitigator of duress

Duress can be raised as a mitigating factor if the "defendant was under unusual and substantial duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge." 18 U.S.C. § 3592(a)(2). Duress can also mitigate the impact of future dangerousness. *See, e.g., Graham*, 950 F.2d at 1019 (5th Cir. 1992). In Cramer's case, counsel failed to investigate, prepare, and present a wealth of available evidence establishing that ██████████████████████████████

██████████████████████████████████████████████████

### 1.    Cramer's duress: what the jury never heard

In Claim 1(B)(2), *supra*, Cramer asserts that counsel could and should have raised the defense of duress, both as an affirmative defense at the guilt phase and in preparation for its use as a statutory mitigator in the penalty phase. Cramer summarizes the relevant facts here for ease of reference.

The only explanation trial counsel provided for the Johns murder was that Johns "violated numerous policies and regulations of SAC" by using drugs and running up debts related to his drug use, and when he didn't stop, he was killed. (Dkt. 596 (RT) at 84.) The government picked up that theme and ran with it during penalty phase cross-examination and argument, portraying Johns as a hapless addict who just wanted to leave the gang life behind, but was brutally murdered because he "disrespected" his leader. (Dkts. 591 (RT) at 69-70; 647 (RT) at 250; 651 (RT) at 254.)

59

It is true that Johns was a drug addict who ran up debts inside the prison. But what the jury

didn't hear about █████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████ ████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

_____

████████████████████████████████████████████████████████

██████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

      The jury heard none of this evidence, despite counsel having the information at their fingertips. Investigator Frank Coffin interviewed several inmates who provided information ████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████ Whether from

61

sheer neglect or because they failed to read the investigative memos (Ex. 53, ¶ 21), counsel was deficient in not presenting this important mitigating factor for Cramer.

Having failed to explain to the jury that Cramer's involvement in the crime was due to overwhelming pressure and threats of potentially lethal violence, counsel, not surprisingly, also failed to engage or present an expert on their client's ███████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████ Instead, counsel made things worse by arguing that Cramer had antisocial personality disorder, a highly aggravating and, in Cramer's case, incorrect diagnosis that increased the likelihood that the jury would find Cramer killed Johns out of ego rather than fear.

There could have been no strategic reason for counsel's failure to pursue and use the above-discussed evidence of duress, especially where it supported the trial team's main goal in penalty phase: negating the government's future danger case. *See* Part B, *supra.*

### 2.    Counsel's failure to present the duress statutory mitigator was prejudicial

Counsel knew that countering the government's future dangerousness case would be crucial to Cramer's chances of avoiding a death sentence. Having failed to present a duress defense during the guilt/innocence phase of the trial, counsel compounded the error by failing to allege the statutory mitigator of duress at sentencing. Instead, defense counsel alleged a variety of non-statutory mitigating factors relating to the impact of Johns' choices. (Dkt. 666 at 14.) Even without duress evidence, jurors were remarkably receptive to the idea that Cramer found himself forced to respond to Johns' actions, with some jurors endorsing the following non-statutory mitigators:

- "Inmate Leo Johns was disrespectful to Christopher Cramer in violation of gang rules. Number of inmates who so find–5."

- "Inmate Leo Johns provoked the offense on June 9, 2014, by referring to SAC as 'Fuck them Dudes.' Number of inmates who so find–7."

- "Gang rules required Christopher Cramer to take action against inmate Leo Johns.

Number of jurors who so find–10.”

- “Christopher Cramer had to act against Inmate Leo Johns to avoid placing himself in danger. Number of jurors who so find–6.”

(Dkt. 666 at 14.) The facts described herein “would have added to and developed the skeletal evidence” of duress that the jury heard. *Neal*, 286 F.3d at 240-41. Considering the jurors’ receptivity to the pressure Cramer faced, there is a reasonable probability that “the undiscovered mitigating evidence, taken as a whole, might well have influenced the jury’s appraisal of [Cramer’s] culpability” and tipped the scales toward life. *Rompilla*, 545 U.S. at 393 (cleaned up).

### D.    Counsel failed to effectively challenge the government’s case that Cramer posed a future danger

#### 1.    Counsel was ineffective for failing to object to the prosecution’s use of acquitted conduct as future danger evidence

During the penalty phase, the government introduced evidence of Cramer’s prior convictions, two of which occurred while he was in prison.[9] (Dkts. 598 (RT) at 23-24; 603 (RT) at 24-28.) One of those cases involved a 2012 brawl at USP McCreary. Cramer was convicted of one count of possession of a weapon, but was acquitted of the more serious assault charges after the jury found he acted in self-defense. *United States v. Cramer*, 6:09-cr-00064-GFVT, ECF No. 50 (E.D.KY. Apr. 8, 2010).

The government used this acquitted conduct as evidence of Cramer’s future danger. The jurors heard extensive testimony about the 40 stab wounds that inmate James Cosgrove received, how the guard who watched the incident on a security video believed that Cramer’s actions were unprovoked, and how immediate steps were necessary to save Cosgrove’s life or he “would have been USP McCreary’s first homicide.” The prosecutor told the jurors they would hear evidence that after the Johns incident, Cramer wrote a letter saying that “[he] and four others came up with a big-ass story,” thereby implying that Cramer also “came up with a big-ass story” in the McCreary case and that his acquittal was unjustified. (Dkt. 603 (RT) at 226, 234-37, 239-41.) The government’s prejudicial and

---

[9] In Claim 12, Cramer challenges the use of his 924(c) conviction as a statutory aggravator.

improper arguments continued unabated in summation, where the jurors were told that the McCreary incident was one in a string of stabbings committed by Cramer because of "prison politics," first one stabbing and less than a year later, "he was *convicted* of a stabbing" in the McCreary case. (Dkt. 679 (RT) at 166 (emphasis added).) Then, in rebuttal summation, the prosecutor argued, "As it pertains to Mr. Cramer, there is at least a hundred reasons that the death penalty is justified . . . The first 65 are the 65 holes that he and Ricky Fackrell put in Leo Johns' body. *So, what are the rest of those hundred reasons? Well, let's count up the stab wounds that you saw on Scotty Justice and James Cosgrove. Two or three dozen there.*" (Dkt. 679 (RT) at 259 (emphasis added).)

Counsel did not object to the government's use of the McCreary acquittal or the prosecutor's improper reference to it as a "conviction" in penalty phase closing. As a result, Cramer's death sentence is unreliable because it is based, in part, on inflammatory argument and acquitted conduct. A capital sentencing jury's reliance on acquitted conduct to impose a death sentence violates double jeopardy. *See Delap v. Dugger*, 890 F.2d 285, 317 (11th Cir. 1989), *abrogated on other grounds by Floyd v. Secretary, Florida Dept. of Corrections*, 638 Fed. Appx. 909 (11th Cir. 2016) (holding that in a capital case, prior acquitted conduct cannot be used as an aggravating factor). These protections are present to protect "a man who has been acquitted from having to 'run the gantlet' a second time." *Ashe v. Swenson*, 397 U.S. 436, 446 (1970). Allowing the government to rest its arguments for a death sentence on acquitted conduct undermines the critical importance of reliability in capital cases, which is both acutely necessary in capital sentencing proceedings and one of the principal concerns underlying the Double Jeopardy Clause. *Monge v. California*, 524 U.S. 721, 731-32 (1998). Reliability is impaired when the prosecution pursues death based on alleged conduct that a jury has previously rejected. *Id.*

Here, the jurors may well have believed that Cramer "got a break" with his acquittal in the McCreary case and that he was therefore undeserving of mercy. The prosecution's inflammatory argument likely caused them to give more weight to the acquitted conduct and sentence Cramer to

64

death on that basis. The use of such evidence violates due process and fundamental fairness principles. *Wingate v. Wainwright*, 464 F.2d 209, 215 (5th Cir. 1972) ("[it is] fundamentally unfair and totally incongruous with our basic concepts of justice to permit the sovereign to offer proof that a defendant committed a specific crime which a jury of that sovereign has concluded he did not commit."). Even if this court determines that the use of acquitted conduct does not violate double jeopardy, counsel should have objected and requested that it be excluded as more prejudicial than probative. No reasonable counsel would have allowed such damaging evidence to go unimpeded to the jury.

### 2. Counsel was ineffective for not challenging the government's use of Cramer's Victorville conviction

In support of the prior violent conviction statutory aggravator, the government presented lengthy testimony about Cramer's 2008 conviction for stabbing Scotty Justice over 40 times at USP Victorville. Cramer was sentenced to 20 years' imprisonment, to be served consecutively to his bank robbery sentence. (Dkt. 603 (RT) at 180-212.) In the penalty phase, the government returned to the Justice case as support for its claim that Cramer's prior convictions, adherence to "prison politics," and "violent actions [that] continued while he was in prison," all showed that he was a future danger. (Dkt. 679 (RT) at 161.) The prosecutor played a video of the Justice stabbing, asked jurors to count the number of times Cramer stabbed Justice, and argued this was emblematic of who Cramer was. (Dkt. 679 (RT) at 162-64.) The jury was left to believe that Cramer was a heartless animal who was wrapped up in prison politics and willing to protect his reputation in that political system at all costs.



There was no strategic reason for counsel to not present ▇▇▇ to counter the government's reliance on the Victorville incident. A key part of the defense presentation at penalty phase was to demonstrate that Cramer was not a future danger. In support of that goal, counsel presented evidence that the BOP was its own unique, violent world where inmates are expected to settle disputes among themselves. (Dkt. 666 at 13 (mitigating factors 101-102); Ex. 43.)▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇ No effective attorney would have neglected to put ▇▇▇ on the stand when his testimony dovetailed with the defense theory of mitigation. (*c.f.* Ex. 102.)

### 3. Counsel was ineffective for failing to prepare the defense prison expert to counter the government's claim that ADX could not safely house Cramer

To counter the government's future danger allegations, the defense relied mainly on testimony from former BOP Associate Warden Roy Timothy Gravette. Gravette was well-versed in prison gang culture, inmate adaptation to prison life, and prison administration, including classification. Gravette opined that Cramer killed Johns because the rules of SAC and prison gang culture in general required him to respond. (Dkt. 647 (RT) at 214-19.) While Gravette did not condone what happened to Johns, it was to be expected because of the way Johns "disrespected" his "general." (Dkt. 647 (RT) at 216-18.) Gravette explained that just like Cramer "has to abide by and obey all orders from his superiors," Johns was expected to do the same as a matter of yard safety and harmony. (Dkt. 647 (RT) at 218.)

66

Gravette also testified that if Cramer received a sentence of life without parole, his case would be reviewed by the most conservative officials in BOP, making it exceedingly likely he would remain in the most restrictive ADX unit until he was old and gray. According to Gravette, Cramer did not pose a future danger because the BOP could safely manage him at ADX just as it had done in the year before trial. (Dkt. 647 (RT) at 183, 186-87.)

On cross-examination, the prosecutor sought to cast doubt on Gravette's conclusions by questioning him about the violent behaviors of other inmates. (Dkt. 647 (RT) at 234-35, 11207-08.) Both Gravette and the government's expert witness, David Berkebile, ultimately agreed that these assaults were the direct result of institutional failures. (Dkt. 647 (RT) at 270-72.) The prosecutor also emphasized Cramer's role as "general" on the yard, and challenged the idea that Cramer had superiors that he needed to answer to or any other pressures that would have led him to murder Johns. (Dkt. 647 (RT) at 262-64.) These themes were prominent in the government's closing arguments. The prosecutor told the jurors that "[t]here is no magic to ADX," and whether Cramer was in ADX or back in general population, Cramer would take the "opportunit[y]" to engage in misconduct because he was "immersed prison politics" and gang rules. (Dkt. 679 (RT) at 189.)

However, Gravette never knew about the extent of Johns' harmful conduct, the fact that Cramer was not actually a general in SAC, and the evidence that Cramer killed Johns out of imminent fear of retaliation against him and SAC from others on the yard. (Ex. 102 ¶¶ 41-53.) If counsel had adequately investigated and prepared Gravette, he would have been able to provide testimony that directly undermined the government's future danger allegations. ██████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

As explained above in Part C.2, jurors were receptive to evidence that Cramer was forced to respond to Johns' actions, with some jurors endorsing mitigators related to these pressures. (Dkt. 666 at 14.) If Gravette had been properly prepared by trial counsel, his testimony "would have added to and developed the skeletal evidence" of duress that counsel presented in mitigation before the jury. *Neal*, 286 F.3d at 240-41 (5th Cir. 2002). Considering the jurors' openness toward these non-statutory mitigators, there is a reasonable probability that "the undiscovered mitigating evidence, taken as a whole, might well have influenced the jury's appraisal of [Cramer's] culpability" and tipped the scales toward life. *Rompilla*, 545 U.S. at 393 (cleaned up).

    **E.**    **Counsel failed to object to repeated and prejudicial instances of trial court error and prosecutorial misconduct**

        **1.**    **Failure to effectively object to the testimony of government mental health expert Dr. Jill Hayes**

The Fifth Amendment limits government mental health examinations and testimony to those issues on which the defendant presents expert evidence at trial. *See Buchanan v. Kentucky*, 483 U.S. 402, 423-24 (1987) (permitting government expert testimony on mental status to rebut defendant's expert

68

testimony); *Estelle v. Smith*, 451 U.S. 454, 468 (1981) (precluding testimony on future dangerousness, when defendant consented only to competency evaluation); *see also* FRCP Rule 12.2(c)(4). The Supreme Court, in *Kansas v. Cheever*, 571 U.S. 87 (2013), made explicit that this principle draws from and parallels the law governing cross-examination of a testifying defendant, which limits questioning to those topics addressed in direct examination. *See id.* at 94. When the defendant constructively testifies–by "proxy," *Cheever*, 571 U.S. at 94–by granting a diagnostic interview to his own expert about which the expert then testifies, the government is entitled only to similar access and testimony. *See Smith*, 451 U.S. at 468-469; *Battie v. Estelle*, 655 F.2d 692, 702 & n.22 (5th Cir. 1981).

Counsel was well aware of Cramer's rights during government expert examinations and the limitations on government expert testimony. Therefore, prior to trial, the parties agreed, in writing, to a request that the trial court "prohibit the government rebuttal expert from asking Cramer any questions about the offense of conviction in this case." (Dkt. 575 at 2.) This agreement was based in part on counsel's representation that Cramer's experts had not asked him anything about the offense. (Dkt. 589.) Based on that representation, the trial court granted the request, and the government agreed to limit its mental health sentencing presentation to "only what is necessary to directly rebut Mr. Cramer's mental health defense." (Dkt. 589.)

As counsel promised, neither Dr. Roberts nor Dr. Fabian asked Cramer anything about his involvement in the Johns homicide. In other words, the defense offered no statement from Cramer by proxy through his mental health experts that would permit the government's rebuttal expert, Dr. Jill Hayes, to ask Cramer directly or indirectly about the crime. Nor was there any legitimate reason for Dr. Hayes to discuss Cramer's alleged lack of remorse. But the government did not limit Dr. Hayes's questioning to rebutting the defense expert's testimony. Contrary to its pretrial promise and the court's order that its expert was prohibited from asking about the crimes charged, the government elicited testimony from Dr. Hayes about Cramer's reaction to the Johns murder:

69

Q. Did you ask him any questions about whether or not he ever felt any guilt or ever felt sorry **for any of the crimes** that he committed?

A. Yes, I did.

Q. And do you remember specifically what question you asked or if it was more than one?

A. No. I asked him, "Have you ever done anything that made you feel guilty or sorry for what you've done?"

Q. And when you asked him that question, what did he say?

A. "No."

(Dkt. 652 (RT) at 145-46.) The government highlighted this testimony as the climax of its penalty phase closing statement, arguing Cramer's lack of remorse as the key reason Cramer was a future danger and should be sentenced to death: "Remember again what Chris Cramer said to Dr. Jill Hayes. She asked, "Have you ever done anything that made you feel guilty or sorry for what you have done?" "No." He doesn't feel guilty. He doesn't feel sorry about killing Leo Johns. He doesn't feel guilty or sorry about any of the other criminal acts that he engaged in. (Dkt. 679 (RT) at 205; *see also* at 169 (prosecutor referencing Cramer's lack of remorse during penalty phase opening statement).)

Counsel failed to object to either Dr. Hayes' testimony or the government's argument; this failure was deficient performance. There was no strategic or justifiable reason for counsel to allow prohibited testimony and argument regarding Cramer's feelings about the crime. In addition to violating Cramer's rights under the Fifth and Sixth Amendments and FRCP Rule 12.2, the government's actions were in direct contravention of a court order *that the defense requested.* Counsel stood idly by while the government improperly elicited Dr. Hayes' statement and then capitalized on that misconduct by arguing that Cramer is a remorseless killer who will always be a future danger. Such conduct was highly prejudicial. *See Johnson v. Mississippi,* 486 U.S. 578, 590 & n.8 (1988) (improper reliance on aggravating evidence of prior conviction was not harmless, "because the district attorney argued this particular aggravating circumstance as a reason to impose the death penalty"); *see also Jennings v. McDonough*, 490 F.3d 1230, 1250 & n.15 (11th Cir. 2007). Empirical studies of capital jurors

consistently show that their perceptions of whether the defendant bears remorse often determine their votes. *See Riggins v. Nevada*, 504 U.S. 127, 144 (1992) (Kennedy, J., concurring) ("In a capital sentencing proceeding, assessments of . . . remorse may carry great weight and, perhaps, be determinative of whether the offender lives or dies.") (internal citations omitted); *see also* Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Colum. L. Rev. 1538, 1560 (1998). Cramer was prejudiced by counsel's failure to object to clearly improper and harmful testimony.

2.    **Failure to object to the government's improper arguments regarding mitigation evidence**

Under the Eighth Amendment, a capital defendant is entitled to rely on any mitigating factor relating to himself, his background, and his life history that he proffers as the basis for a sentence less than death. *See, e.g., Eddings v. Oklahoma*, 455 U.S. 104, 113-14 (1982); *Lockett v. Ohio*, 438 U.S. 586, 605 (1978). Mitigating factors need not relate to the defendant's "culpability to the crime" or have a "nexus" to the crime. *Tennard v. Dretke*, 542 U.S. 274, 285, 287 (2004). Rather, any evidence that "humanizes" the defendant "in the face of [his] criminal history" should be considered by the jury in mitigation. *Rhoades v. Davis*, 914 F.3d 357, 365-66 (5th Cir. 2019). As the Eighth Circuit astutely stated, "The question is not whether evidence in mitigation makes the defendant any less guilty, or the crime any less horrible, but whether it provides a reason why, despite those things, the defendant should not die." *United States v. Johnson*, 495 F.3d 951, 978 n.26 (8th Cir. 2007) (citation omitted).

It is axiomatic that a capital sentencing jury must be correctly instructed concerning its penalty-phase deliberations, especially with respect to the proffered mitigating factors. Although the range of potential mitigating factors is broad, it is the provenance of the courts to decide, as a matter of law, whether proffered mitigation evidence is irrelevant or trivial and as such can be excluded. *Tennard*, 542 U.S. at 286-87. Once a court has decided that a mitigating factor can go to the jury, and a juror finds that the defense has established the mitigating factor by a preponderance of the evidence, the juror is *required* to include that factor in the weighing process. *See Eddings*, 455 U.S. at 114-15 (sentencers "may

71

determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration"); *see also* 18 U.S.C. §§ 3592(a) and (a)(8) (a jury "*shall* consider" all mitigating factors proffered by the defense).

In its penalty-phase presentation and closing argument, the government repeatedly violated Cramer's Fifth and Eighth Amendment rights by (1) arguing that the jurors should reject evidence about his upbringing and childhood trauma because that evidence did not explain, excuse, or justify Johns' killing; and (2) asserting that jurors were free to exclude from the weighing process any factor, even if proven by a preponderance of the evidence, that they deemed not to be mitigating.[10] The vast majority of these statements stood unobjected to by trial counsel, in violation of Cramer's Sixth Amendment right to effective representation.

### a.    Improper nexus argument

The government began by correctly stating that mitigation need not be "something that excuses or justifies the crime." (Dkt. 679 (RT) at 197.) But immediately following that statement, the prosecutor presented a hypothetical totally inconsistent with that definition:

> This is [Mitigating Factor] Number 54: If Christopher Cramer had been raised in a normally functioning family, he likely would not be in the situation he is facing today.
>
> Well, you may very well find that that's a true statement, that you find that the defense has proven that by a preponderance of the evidence. But does that mean that it mitigates against a sentence of death? Does that mean the fact that if things were different, then he wouldn't have committed the crime or he wouldn't have been in prison? Does that really mitigate against the death penalty? And I would submit to you that it doesn't.

(Dkt. 679 (RT) at 197.) Counsel did not object. Later, the prosecutor mocked the defendants' penalty phase presentations by arguing, "Now they're telling you, 'Well, yeah, you're right. We stabbed him. But we stabbed him because we had all these problems. We had terrible childhoods.'" (Dkt. 679 (RT)

---

[10] *See also infra* Claim 13.B (alleging trial court instructional error for misinforming the jury about their role in sentencing).

at 261-62.) At that point, attorneys for both Cramer and Fackrell requested a running objection to the prosecutor's "complete and utter lack of understanding of the term 'mitigation' and his linking it improperly to the offense." The court overruled the defense objection. (Dkt. 679 (RT) at 262.) Thereafter, the government's nexus arguments continued unabated throughout its closing, with no objection from trial counsel. (*See*, *e.g.*, (Dkt. 679 (RT) at 258-59.) On rebuttal, counsel failed to remind the jury that mitigating evidence need not be tied to or explain the crime in any way.

### b.      Improper explanation of the jury's role in sentencing

Before the penalty phase arguments and outside of the presence of the jury, counsel objected to the trial court's Special Verdict Form, which directed the jurors to "indicate in the space provided the number of jurors who find that the defendant has proved by a preponderance of the evidence the existence of [the proposed non-statutory mitigating] factor and that it is mitigating." (Dkt. 679 (RT) at 2469-72.) The court overruled that objection. Then, during closing arguments, the government repeatedly stated that it was the *jury's* role to find a factor mitigating:

- "And, so, even though you may find that that's something that you think is true, that doesn't necessarily mean that it's a mitigating factor. And if you don't find it to be mitigating, then you don't find it on the verdict form." (Dkt. 679 (RT) at 197-98.)

- "And remember, was it proven, was–is it mitigating?" (Dkt. 679 (RT) at 199.)

- "And then again you have to consider . . . whether or not any of the factors were actually aggravating–excuse me–mitigator even if you found that they were proven." (Dkt. 679 (RT) at 202.)

While counsel had previously objected to this explanation of the jury's role as described in the special verdict form, that objection occurred outside the presence of the jury. Counsel still had a duty to protect Cramer's Fifth and Sixth Amendment rights by ensuring the jurors were properly instructed about mitigating evidence and their duties in the sentencing process. Counsel's failure to object or to use closing argument to clarify the law for the jury meant that jurors were left to believe that evidence needed to be related to the crime to be mitigating and that they were free to wholly disregard mitigating evidence if they saw fit. Additionally, the erroneous instruction and argument violated clearly

73

established constitutional principles requiring capital defendants to be sentenced by jurors who are not "mitigation-impaired." *Morgan v. Illinois*, 504 U.S. 719, 739 (1992). There was no strategic reason for counsel to not object to the prosecution's repeated, clearly erroneous, and prejudicial arguments.

**CLAIM 3:** ████████████████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████









79



81





84



87



89





**CLAIM 4:**



94





## CLAIM 5: CRAMER WAS DENIED HIS RIGHT TO CONFLICT-FREE COUNSEL.

Cramer's conviction and death sentence were imposed in violation of the Fifth, Sixth, and Eighth Amendments of the Constitution because multiple conflicts of interest precluded counsel from providing Cramer with effective assistance. These conflicts include McElroy's concurrent representation of a government witness, and his misrepresentations to the court about the nature of this conflict, as well as Barlow's and Black's prior representation of SAC member Snarr.

### A.    Legal basis

Trial counsel "owes the client a duty of loyalty, a duty to avoid conflicts of interests." *Strickland*, 466 U.S. at 688. Relief is warranted where the conflict "significantly affected counsel's performance"

96

even when *Strickland* prejudice cannot be shown. *Mickens v. Taylor*, 535 U.S. 162, 173 (2002). Prejudice is presumed when a defendant can establish "that his counsel actively represented conflicting interests." *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980). As the Fifth Circuit has explained, "[a]n 'actual conflict' exists when defense counsel is compelled to compromise his or her duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests of a former or current client." *Perillo v. Johnson*, 205 F.3d 775, 781 (5th Cir. 2000) (citations omitted). A defendant can establish such an "adverse effect" with "evidence that 'some plausible alternative defense strategy or tactic' could have been pursued, but was not because of the actual conflict impairing counsel's performance." *Id.* (citations omitted). The "guiding principle in this important area of Sixth Amendment jurisprudence… is whether counsel's allegiance to the accused was compromised by competing obligations owed to other clients." *Id.* at 798 (internal quotations omitted).

**B.    McElroy's concurrent representation of Elizabeth Rose**

### 1.    Factual Background

Cramer's trial team was composed of three attorneys: Doug Barlow, CJA-appointed counsel; Pat Black, the chief Federal Public Defender in the district; and John McElroy, a Deputy Federal Public Defender working under Black's supervision.

#### a.    McElroy represents Elizabeth Rose in her criminal case

While he was representing Cramer, McElroy also represented another client, Elizabeth Rose, who was facing methamphetamine distribution and weapons charges. (*See United States v. Rose ("U.S. v. Rose")*, Case No. 1:17-cr-00017-MAC-ZJH, Dkt. 2 (Feb. 1, 2017).) McElroy appeared as Rose's counsel of record on February 27, 2017. (*U.S. v. Rose,* Dkts. 22, 24.) With McElroy as her counsel, Rose entered a sealed plea agreement on October 12, 2017. (*U.S. v. Rose,* Dkts. 67 (factual basis signed by McElroy), 68 (sealed agreement).) It later came to the parties' attention, however, that Rose had inadvertently signed the wrong plea agreement: after the parties received a presentence report, "[c]ounsel for Defendant, John D. McElroy, [became] aware that he had presented Rose with the

97

wrong plea documents and that Defendant had pled to a non-binding plea agreement, rather than the intended plea for 235 months, contemplated by all parties." (*U.S. v. Rose,* Dkt. 102 at 2.)

### b. Rose overhears a conversation between Fackrell and Cramer

To correct the plea paperwork, Rose was scheduled for a change of plea hearing on Monday, April 30, 2018, at the Beaumont courthouse–the same day that the Cramer trial was set to begin. That morning, Rose was transported to the courthouse and placed in a holding cell next to Cramer and Fackrell. The two men made incriminating statements about their own guilt, presumably unaware that Rose was in the cell next to them and could hear their conversation. (Dkt. 595 (RT) at 229.)

### c. Rose tells McElroy about Cramer's and Fackrell's statements and is interviewed by the FBI

According to Rose's sworn testimony, after she overheard this conversation on April 30, she related what she heard to her attorney. (Dkt. 595 (RT) at 240.) At this point in time, Rose's attorney was still John McElroy. (*See U.S. v. Rose,,* Dkt. 102 (Apr. 30, 2018) (Joint Motion to Withdraw Guilty Plea signed and filed by McElroy)). Rose was subsequently "visited by an FBI agent" who asked her questions, and she told the agent what she had overheard. (Dkt. 595 (RT) at 240.) The record does not reflect who arranged the FBI interview, but because McElroy remained her attorney until *after* the government listed her as a witness, and because Rose initiated a proffer to the government through McElroy, it must have been McElroy who initially made Rose's information known to the government.

### d. McElroy asks to be recused as Rose's counsel but misleads the court about the nature of the conflict

On May 3, 2017, the prosecution notified counsel for Cramer and Fackrell that it intended to call Rose as a witness.[19] (Dkt. 551 at 3.) On the same day, three days after the conflict had arisen, McElroy filed an unopposed motion to withdraw as Rose's counsel, explaining that "there appears to

---

[19] This may have also occurred a day earlier, on Wednesday, May 2; the defense motion recounting the timeline is inconsistent and provides both dates. (Dkt. 551 at 3.) The trial transcript does not reflect which day the prosecution notified counsel and the court of its intent to call Rose.

be an actual conflict of interest" and that "continued representation of (Rose) may give the appearance of impropriety and continued representation would violate the disciplinary rules of the State Bar of Texas." (*U.S. v. Rose,* Dkt. 104, p. 2 (May 3, 2018).) The court granted McElroy's motion and appointed substitute counsel for Rose. (*Id.* (May 3, 2018 oral order).)

In Cramer's criminal case, his attorneys argued that because all three of them had privileged information about Rose, her testimony should be prohibited, or in the alternative, Cramer's attorneys should be permitted to withdraw and a mistrial should be declared. (*See* Dkt. 551.) In their motion, counsel explained that "assistant Federal Defender, John McElroy, has been the attorney assigned to represent and defend Ms. Rose until being relieved by this Court upon notification by the government of its intent to use this surprise witness…. Counsel for Mr. Cramer is therefore privy to attorney/client privileged information that could and should be used to cross-examine this surprise government witness." (Dkt. 551 at 3.) Their motion explained that "Mr. Barlow, as co-counsel for Mr. Cramer with Mr. Black and Mr. McElroy, is privy to the same information regarding Ms. Rose."[20] (Dkt. 551 at 3.)

What happened next in the Cramer case is critical and disputed but was not captured contemporaneously for the record. (*See* Claim 15.) Judge Crone held an off-the-record bench conference to discuss whether Rose would be allowed to testify. According to a summary of the conference based on contemporaneous notes taken by Cramer's appellate attorneys, McElroy misled the court by claiming that he only learned of the conflict of interest after the *government* notified him that they planned to call Rose as a witness. (Dkt. 743 at 1.) During the bench conference, Black represented that the only privileged information McElroy and the rest of Cramer's defense team had about Rose's case was "confidential drug amounts" involved in her underlying drug distribution charge. (Dkt. 743-1 at 3.) But McElroy and the government had signed a stipulated factual basis about

---

[20] Counsel's lax commitment to their duty of confidentiality is explicit in this motion. There is no justification for McElroy or Black to reveal privileged information about Rose's case to Barlow, who was not a member of the Federal Defender office.

the quantity of drugs involved in Rose's case months earlier. (*U.S. v. Rose*, Dkt. 102 (Oct. 12, 2017).) The "confidential drug amount" alluded to as impeachment evidence in the "Motion to Prohibit Testimony" was necessarily different than what Rose had previously admitted to the government, showing that Rose had been dishonest in her proffer–and that McElroy knew it. Neither McElroy nor any other member of Cramer's defense volunteered the fact that Rose had initially disclosed Cramer's incriminating statements to McElroy himself, or that McElroy was likely involved in arranging Rose's interview with the FBI. Based on incomplete information, the court denied the defense's motion to preclude Rose's testimony.

Back on the record, Fackrell's counsel objected to Rose's testimony on the basis that it would be more prejudicial than probative. (Dkt. 595 (RT) at 138.) He also renewed his motion to sever the trials of the two defendants. The court overruled Fackrell's motions. There was no further discussion on the record of McElroy's conflict of interest.

### e.    Rose testifies against Cramer and gets her sentence reduced

On May 7, 2018–a week after allegedly overhearing the conversation between Cramer and Fackrell–Rose testified against them at trial. Specifically, Rose reported overhearing the defendants make comments about the prosecutor's opening statement, the number of times they had stabbed Johns, and other facts of the crime. Rose also testified that she had told her attorney–who at the time was McElroy–about the conversation because the information sounded like something that might help her in terms of getting less time on her sentence. (Dkt. 595 (RT) 241-42.) She testified that the government had agreed to file a motion for a reduced sentence pursuant to USSC Guideline 5k1.1 on her behalf. (Dkt. 595 (RT) 242. Although she was sentenced a few weeks later to the original 235-month sentence she agreed to, that sentence was amended on or about March 8, 2019.[21] (*See U.S. v. Rose*, Dkts. 123, 132.) According to the Federal Bureau of Prisons' Inmate Locator, Rose is currently

---

[21] The relevant pleadings regarding the § 5k1.1 agreement are under seal.

housed in a halfway house and scheduled for release in March of 2024, indicating that she was saved from more than ten years' of incarceration in exchange for her testimony. (Ex. 27.)

### 2.     McElroy's conflict of interest violated Cramer's rights

Cramer's representation was compromised because McElroy "actively represented conflicting interests" by representing both Cramer and Rose. *Cuyler*, 446 U.S. at 350. "Representation of a government witness, testifying in exchange for a reduction in sentence, while also representing the defendant he is testifying against raises serious conflicts of interest." *United States v. Sanchez Guerrero*, 546 F.3d 328, 334 (5th Cir. 2008). The Fifth Circuit has repeatedly found a conflict when defense counsel represents both a criminal defendant and a testifying government witness. *See, e.g.*, *id.* at 803-06 (finding actual conflict where attorney represented both the defendant and a witness testifying against the defendant); *United States v. Alvarez*, 580 F.2d 1251, 1258 (5th Cir. 1978) (finding actual conflict where attorney represented both the defendant and former co-defendant who pled guilty and testified at defendant's trial).

Upon learning from Rose what she had overheard, McElroy should have immediately stopped her, told her that he had a conflict and could not continue to represent her, and advised the court that new CJA counsel should be appointed. Instead, McElroy apparently advised Rose to testify against Cramer to secure a sentence reduction, which violated his duty to Cramer. *See United States v. Mahar*, 550 F.2d 1005, 1008 (5th Cir. 1977) (finding conflict of interest where defense counsel "advised his other client . . . to agree to testify against [defendant] as part of a plea bargain"). McElroy then misled the court about the nature and extent of his conflict of interest by failing to disclose that he had advised Rose to testify against Cramer and that he had arranged for her to proffer information to the government by, at the very least, notifying the government of her desire to cooperate.

Rose's testimony was highly prejudicial during both the guilt and penalty phases of Cramer's trial, and Cramer's own attorney was directly responsible for ensuring that it was introduced. The

101

government argued in the guilt phase closing that "any doubts" about Cramer and Fackrell's guilt could be dispelled by Rose's testimony, which "establishes that Christopher Cramer and Ricky Fackrell committed this murder the first time going into that cell when they stabbed Leo Johns over and over and over and over again." (Dkt. 596 (RT) at 80.) Rose's testimony was also prejudicial in the penalty phase, when the prosecutor relied on Rose's testimony that Cramer laughed about the crime as evidence that he lacked remorse. (Dkt. 603 (RT) at 19.) In short, Cramer's counsel actively assisted a government witness in testifying against him, violating his right to conflict-free counsel. His conviction and death sentence should be vacated.

3.    **Appellate counsel violated Cramer's rights by failing to raise this claim**

To the extent that this claim should have been raised on direct appeal, Cramer was also denied his right to effective assistance of appellate counsel. A Movant can establish deficient performance under *Strickland* by alleging the "failure to raise or properly brief or argue certain issues on appeal." *Sharp*, 930 F.2d at 451. Here, appellate counsel failed to raise the meritorious claim that McElroy's dual representation constituted a conflict of interest and violated Cramer's constitutional rights. Because appellate counsel reconstructed the bench conference discussing McElroy's representation of Rose, they were aware of the issue and should have investigated further by reading Rose's trial testimony and discovering that she had disclosed to McElroy the fact that she overheard Cramer and Fackrell's conversation. The omission of this claim on appeal was not the result of a reasoned, strategic judgment. Cramer was prejudiced by appellate counsel's deficient performance because there is a reasonable probability that he would have prevailed on appeal.





███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████ ▪

**CLAIM 6: CRAMER'S CONVICTION AND SENTENCE ARE UNCONSTITUTIONAL BECAUSE HIS JURY WAS NOT DRAWN FROM A FAIR CROSS SECTION OF THE COMMUNITY; TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO RAISE THE ISSUE.**

The presence of "a fair cross section of the community on venires, panels, [or] lists from which petit juries are drawn is essential to the fulfillment of the Sixth Amendment's guarantee of an impartial jury trial in criminal prosecutions." *Taylor v. Louisiana*, 419 U.S. 522, 526 (1975). Statistical analysis shows that Black and Hispanic jurors were significantly underrepresented in Cramer's jury pool.[23] (*See* Ex. 41.) Those disparities were the result of systematic, non-random procedures that disproportionately excluded jurors from those racial groups. Specifically, (1) more juror questionnaires were sent to counties with low numbers of Black and Hispanic residents; (2) the "draw" from voter registration lists was non-random; and (3) the voter registration lists themselves disproportionately excluded Black and Hispanic residents. These procedures violated Cramer's right to be tried "by an impartial jury drawn from sources reflecting a fair cross-section of the community." *Berghuis v. Smith*, 559 U.S. 314, 319 (2010). Because defense counsel was on notice that there were problems with the jury pool but failed to pursue this issue, Cramer was denied his right to effective counsel. Cramer's Sixth Amendment rights were violated, and Cramer's conviction and sentence must be vacated.

---

████████████████████████████████████████████████

[23] Cramer uses the terms "Black" or "Blacks" and "Hispanic" to reflect the language used on the United States Census and other demographic surveys.

106

A.      **Legal basis**

Under *Duren v. Missouri*, 439 U.S. 357 (1979), to establish a prima facie violation of the Sixth Amendment's fair-cross-section requirement a defendant must show: "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Id.* at 364. The burden then shifts to the state to justify the infringement by demonstrating that the attainment of a fair cross-section is incompatible with a significant state interest. *Id.* at 367-68. A criminal defendant may raise a fair-cross section challenge based on the exclusion of a distinctive group "whether or not he is a member of the excluded class." *Id.* at 359 n.1.

Courts have typically applied three different methods for measuring underrepresentation. *Berghuis*, 559 U.S. at 316. "**Absolute disparity** measures the simple absolute difference between the percentage of that group as represented in the jury pool . . . and the percentage of people in the community who are in the cognizable group." (Ex. 41 ¶ 20.) To measure how "substantive" the absolute disparity is, "**[r]elative or comparative disparity** is measured by relating (comparing) the absolute disparity to the cognizable group's percentage in the entire jury-eligible community." (Ex. 41 ¶ 21.) Finally, "**[s]tatistical significance** answers the question: What is the probability that we could have randomly drawn a sample" of prospective jurors "from the list of qualified potential jurors . . . and have generated" the absolute disparity seen in this case? (Ex. 41 ¶ 23.)

B.      **Cramer's jury pool meets the *Duren* standards for a fair-cross section challenge**
       1.      **Black people and Hispanics are distinctive groups in the community**

Cramer can establish that two distinctive groups were systematically excluded from the jury pool: Black and Hispanic prospective jurors. "Blacks and Hispanics are unquestionably 'distinctive' groups for the purposes of a fair-cross-section analysis." *United States v. Rioux*, 97 F.3d 648, 654 (2d Cir. 1996); *see McGinnis v. Johnson*, 181 F.3d 686, 689 (5th Cir. 1999); *Duren*, 439 U.S. at 364. The first

107

requirement for a *Duren* analysis is met.

      **2.      The number of Blacks and Hispanics was disproportionately low**

Next, Cramer can show that Black people and Hispanics were each underrepresented in his jury pool to a degree that is not "fair and reasonable in relation to the number of such persons in the community." *Id.* at 364.

Dr. John Weeks is a statistician and demographer who has reviewed and analyzed the available data related to the composition of Cramer's jury pool. (*See* Ex. 41.) Dr. Weeks has "been involved in work regarding the demographic composition of juries and other population-based statistical issues since 1980," and he has "served as a consultant and/or expert witness in nearly 250 legal cases (criminal and civil)." (Ex. 41 ¶ 4.) With respect to Black prospective jurors, Weeks found that Black people made up 22.66% of the jury-eligible population of EDTX at the time of Cramer's trial, but they made up only 16.07% of the jury pool, an absolute disparity of 6.59% and a relative disparity of 29%. (Ex. 41 ¶¶ 20-21; Table 2.) This disparity is significantly worse than levels that the United States Supreme Court previously found unacceptable in the equal protection context. *See Vasquez v. Hillery*, 474 U.S. 254, 268 n.2 (1986) (4.7% disparity). As Dr. Weeks notes, there is less than a .3% chance of this disparity occurring purely by chance. (Ex. 41 ¶ 25.) With respect to Hispanic prospective jurors, Hispanics made up 9.44% of the jury-eligible population of EDTX at the time of Cramer's trial, but only 7.21% of the jury pool, an absolute disparity of 2.23% and a relative disparity of 24%. (Ex. 41 Table 2.) There is less than 10% probability that this disparity would occur purely by chance. (Ex. 41.)

Such discrepancies establish underrepresentation. In *Berghuis*, the Supreme Court expressly declined to adopt a single test for measuring underrepresentation, recognizing that "[e]ach test"–absolute disparity, relative disparity, and statistical significance–"is imperfect." 559 U.S. at 329. Current Fifth Circuit precedent requires an "absolute disparity" of at least 10% in order to establish a prima facie case for a fair cross-section violation where the "distinctive group" makes up at least 10% of the

population. [24] *See, e.g.,* U*nited States v. Butler,* 615 F.2d 685, 686 (5th Cir. 1980); *United States v. Maskeny,* 609 F.2d 183, 190 (5th Cir. 1980).

In this case, because Hispanics make up less than 10% of the population, Cramer may use comparative disparity to establish a *Duren* violation with respect to that group. *Mosley v. Dretke,* 370 F.3d 467, 479 n.5 (5th Cir. 2004) ("If the distinctive group at issue makes up less than 10% of the population, comparative disparity may be used."). Although Black people make up more than 10% of the district's overall population, the demographic distribution is uneven across counties, such that Black people make up less than 10% of the population in some of the counties from which jurors were disproportionately drawn in this case. (Ex. 41 (Hardin and Orange counties).) Thus, the use of comparative disparity–and the use of statistical significance to confirm the significance of these disparities–is appropriate here. *See United States v. Biaggi,* 909 F. 2d 662, 678-79 (2nd Cir. 1990).

**3.**    **The underrepresentation of Black and Hispanic people was systematic**

**a.**    **A disproportionate number of jurors were drawn from counties with low numbers of Black and Hispanic residents**

The jury wheel in Cramer's case was composed of voter registration lists from six counties in the district: Hardin, Jasper, Jefferson, Liberty, Newton, and Orange. Jefferson County–which includes the city of Beaumont–has by far the highest percentage of Black adult citizens (36.52%). (Ex. 41 at Table 3 1234.) It is also the most populous county of the six, with 47% of the total jury-eligible population residing in Jefferson County. Yet despite 47% of the jury-eligible population residing in Jefferson County, "only 40% of the [juror qualification questionnaires]" were sent there. (Ex. 41 ¶ 31.) This is a "noteworthy" discrepancy because Jefferson County has "by far the largest percent of people who are non-Hispanic Black" [individuals] in the jury-eligible population, and it "helps to explain the

---

[24] Other circuits have declined to adopt a 10% absolute disparity rule, and the Supreme Court has not yet resolved this circuit split. *See, e.g.,* U*nited States v. Savage,* 970 F.3d 217, 257-58 (3d Cir. 2020) (concluding it was "wary of ossifying [10 percentage point thresholds] through a rule when our own precedent requires us to consider comparative disparity as well.")

fact that among the 1,565 respondents to the [juror qualification questionnaires] who reported their race-ethnicity, only 15% were Black, and only 2% were Hispanic." (Ex. 41 ¶ 31.) In the end, this discrepancy widened even further, and only 34% of the 305 prospective jurors summoned to the court for voir dire "were drawn from Jefferson County. This suggests a systematic problem in the way in which the court was operating to draw jurors to the courthouse." (Ex. 41 ¶ 28.)

### b.   The "draw" from voter registration lists was non-random

Moreover, the statistical evidence indicates that the pool in Cramer's case was "not a random draw." (Ex. 41 ¶ 32.) Even though Cramer's jury was purportedly drawn from a pool of 309,566 registered voters in the Beaumont Division, a staggering 43% of the prospective jurors in Cramer's case who were sent questionnaires had voter registration numbers that were contiguous, meaning that the numbers were next to each other.[25] (Ex. 41 ¶ 32.) With a random draw, there would be an expected average "gap" of 151 between each number, but in Cramer's case, the average "gap" was just 3. (Ex. 41 ¶ 32.) This large difference indicates that whatever method was used to select voter registration numbers did not do so randomly. (Ex. 41 ¶ 32.) Instead, it appears that some sort of "batch" or other non-random system that favored contiguous numbers was used. There is also evidence, as reflected in the skewed age distribution of people who were sent juror questionnaires, that the draw "started at the lowest number–indicative of lower voter registration numbers, indicating a longer time ago that a person had registered." (Ex. 41 ¶ 33; *see also* Ex. 41.) It is clear from the available data that Cramer's jury wheel was not drawn randomly from the voter registration lists and thus deviated from the "computer-generated random selection process" required by the Eastern District. (*See* Ex. 58 at 3.)

Anecdotal evidence reported in jury questionnaires further demonstrates that the draw was not random. Of the 305 summonsed jurors, there are more than 80 instances of people knowing each

---

[25] Voter registration numbers are created at the time a person registers, so "lower voter registration numbers[] indicat[e] a longer time ago that a person had registered." (Ex. 41 ¶ 33.)

other. (*See* Ex. 70.) There are 56 instances of people with the same last names, including one married couple. (*See* Ex. 70; Dkt. 707 (RT) at 60). And additional pairs of jurors resided on the same street, in some cases right across the street or just a few houses down. (*See* Ex. 70; Dkt. 710 (RT) at 191.)

Finally, there is evidence that the jury wheel in Cramer's case is not the only one in the Eastern District to have exhibited these problems, suggesting that the non-random procedures in Cramer's case were part of a larger pattern. (Ex. 41 ¶ 34.) Specifically, 2255 counsel for Snarr and Garcia have alleged that the Eastern District "employed a non-random method of selection that produced a non-representative wheel, venire, and jury." *United States v. Garcia*, Case No. 1:13-cv-00723-MAC-CLS, Dkt. 160 at 2. Like Cramer, Garcia and Snarr have alleged that the special jury wheel drawn for their case deviated from the random selection procedures prescribed by the Eastern District, instead pulling prospective jurors in order of their voter registration number. *See United States v. Garcia*, Case No. 1:13-cv-00723-MAC-CLS, Dkt. 160 at 3-11 (detailing Garcia's fair cross-section claim); *id.* at Attachment 2 (Declaration of Jeffrey Martin for Snarr and Garcia). This allegation, supported by expert statistical analysis, is strikingly similar to the pattern seen in Cramer's case, demonstrating that the fair cross-section violation alleged here is not just a "one-time example of underrepresentation," *McGinnis*, 181 F.3d at 690, but rather a repeated problem with how jury wheels were drawn in the Eastern District at the time of Cramer's trial.

### c. Voter registration lists disproportionately excluded Black and Hispanic residents

Finally, even if the prospective jurors for Cramer's jury wheel were drawn from voter registration lists using a purely random draw–which, as detailed above, they clearly were not–the lists themselves were skewed towards excluding Black and Hispanic prospective jurors.

At the time of Cramer's trial, the Eastern District used only voter registration lists to compose the jury pool. (*See* Ex. 59.) But about a year after Cramer's trial, the district changed its procedures to broaden the pool from which it selected jurors to ensure that a fair cross section of the community

111

would be represented. In amending its procedures, the Eastern District recognized that "it is not clear that voter registration lists . . . alone provide litigants in the divisions in the Eastern District of Texas with a fair cross section of relevant communities." (Ex. 58 at 6 .) The district thus deemed it necessary to supplement registered voter lists with lists of licensed drivers from all counties within each division. (Ex. 58 at 6.) The state of Texas has similarly adopted a jury wheel procedure that draws from both voter lists and driver's license registration lists. *See* Tex. Gov't. Code Ann. § 62.001(a)(2).

As the Eastern District and others have recognized, pools drawn exclusively from voter rolls systematically underrepresent distinctive groups. Consistent with the disparities seen in Cramer's jury pool, "[v]oter registration lists . . . consistently underrepresent African-American and Hispanic citizens who would otherwise be eligible to serve as jurors." Nancy J. King, Racial Jurymandering: Cancer or Cure? *A Contemporary Review of Affirmative Action in Jury Selection*, 68 N.Y.U. L. Rev. 707, 712-13 (1993); *see also United States v. Savage*, 970 F.3d 217, 257-58 (3d Cir. 2020) ("[D]rawing on voter registration lists alone might be actionable under some circumstances when use of those lists over time did have the effect of sizably underrepresenting a particular class or group on the jury venire.").

Although the Fifth Circuit has in the past found insufficient evidence of a fair cross-section violation in a prior challenge to the use of voter registration lists, *see United States v. Brummitt*, 665 F.2d 521, 527-30 (5th Cir. 1981), the expert evidence in this case establishes that Black and Hispanic jurors were significantly underrepresented in Cramer's jury pool. (*See generally* Ex. 41.) Moreover, the exclusion of Black and Hispanic jurors was not only the result of using voter lists: instead, it was the result of a deeply flawed process that started with underrepresentation of Black and Hispanic individuals in the voter lists, used a non-random draw, and sent a disproportionate number of juror questionnaires to counties with lower populations of Black and Hispanic residents. These procedures excluded Black and Hispanic jury-eligible individuals from Cramer's jury pool.

**C.    Cramer's trial counsel were ineffective for failing to raise this claim**

In 2017, counsel retained Jeffrey Martin, a statistical expert, to "analyze statistical issues in the jury selection process for this case and prepare a report or testify on behalf of both Mr. Fackrell and Mr. Cramer." (Ex. 11 ¶ 4.) After reviewing some preliminary records, Martin "emailed Robert Morrow (counsel for Mr. Fackrell) and Doug Barlow (counsel for Mr. Cramer) on November 10, 2017 . . . providing my hourly rates and the work necessary to prepare a report." (Ex. 11 ¶ 5.)

On November 15, 2017, Cramer's counsel filed a Motion to Quash Venire Panel and Stay Proceedings on the basis that the Eastern District's practice of relying exclusively on voter registration lists violated the fair cross-section requirement and the Jury Selection and Service Act, (JSSA), 28 U.S.C. § 1861. (Dkt. 138.) The motion did not discuss any facts specific to the way in which Cramer's jury pool would be drawn or the way in which other Eastern District jury pools were drawn; instead, it generally challenged the practice of relying exclusively on voter rolls. (Dkt. 138.)

On January 11, 2018, Barlow wrote a letter to Martin confirming their "agreement that [Martin] would work as a consultant and expert for both Fackrell and Cramer and analyze statistical issues regarding the jury selection process." (Ex. 11 ¶ 7, *see also* Attachment 3.) However, counsel never followed up with Martin, and no work was ever completed. (Ex. 11 ¶ 8.) *See also* Claim 8. B.

Counsel could have no strategic reason for failing to follow up with Martin or to further challenge the composition of the jury pool in this case. Martin is "a highly-qualified expert in this type of analysis" (Ex. 41 ¶ 34); defense counsel affirmatively reached out to him to secure his assistance; and counsel was able to secure funding for his work. Counsel cannot have concluded that Martin's work on the case was unpersuasive or of poor quality, because Martin never produced anything for them. And defense counsel was plainly on notice of problems with the jury wheel: counsel filed a motion to quash the venire and they retained an expert. Counsel's performance fell below an objective standard of reasonableness. *Cf. Hinton v. Alabama*, 571 U.S. 263, 275 (2014) (finding deficient

113

performance where counsel's "unreasonable failure to understand the resources that state law made available to him" meant that he did not retain a qualified expert).

Moreover, the underrepresentation of Black and Hispanic jurors was evident just from looking around the room on the first day of voir dire. Expert jury consultant Julie Howe, who was sitting at counsel table throughout voir dire, noticed "that the prospective jurors that were in the courtroom appeared to be older than would ordinarily be expected. I also noticed a low number of Hispanic and African American prospective jurors." (Ex. 42 ¶ 16.) Anthony Haughton, who attended portions of the voir dire, was similarly "surprised that the jury pool had so few Black people or other minorities" given the "substantial African American populations" in Beaumont and surrounding cities. (Ex. 46 ¶ 8.) The ABA Guidelines in place at the time of Cramer's trial specifically provided that "[c]ounsel should consider . . . whether any procedures have been instituted for selection of juries in capital cases that present particular legal bases for challenge," and "particularly those relating to bias on the basis of race or gender." *ABA Guidelines*, Guideline 10.10.2(A), reprinted in 31 *Hofstra L. Rev.* 913, 1049 (2003). The Guidelines note that "[s]uch challenges may include challenges to the selection of the grand jury and grand jury forepersons as well as to the selection of the petit jury venire." *Id.* Counsel's failure to act in accordance with the Guidelines by following up on obvious problems with the jury pool–including problems specific to racial composition–constituted deficient performance. *See Wiggins*, 539 U.S. at 522, 524 (2003).

Cramer was prejudiced by counsel's failure to challenge the jury wheel. Because trial counsel failed to timely object to the non-random draw in this case, key records related to the jury wheel were destroyed. (Dkt. 820, Ex. 3 (filed ex parte and under seal).) Specifically, habeas counsel for Fackrell requested certificates of the racial and sex composition of the jury pool, which were required under the jury plan in effect at the time of trial. Habeas counsel also requested the certificate detailing the procedures used for "randomly selecting the names pursuant to this Plan," which under the Plan is to

114

be created by "the individual(s) who performed the task" of random selection. (Dkt. 820 Ex. 3 at 2 (filed ex parte and under seal).). The response from the Operations Manager at the Eastern District was that records for both the grand jury master wheel and petit jury wheel were "past their eligibility date for destruction" and that habeas counsel had already been given any files that the court still possessed. (Dkt. 820 Ex. 3 at 1 (filed ex parte and under seal).).

Cramer was also prejudiced because the fair cross-section claim was a meritorious claim that trial counsel failed to raise. If counsel had followed up with Martin, he likely would have uncovered these disparities and the non-random draw that produced them. Because there is a reasonable likelihood that counsel would have been successful in challenging the procedures used to construct Cramer's jury pool, Cramer was prejudiced by counsel's deficient performance.

Because Cramer's Sixth Amendment rights to an impartial jury and his right to the effective assistance of counsel were violated, Cramer's conviction and death sentence must be vacated.

## CLAIM 7: CRAMER WAS DENIED HIS RIGHT TO AN IMPARTIAL JURY.

### A.    Legal basis

A death sentence is unconstitutional "if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *See Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968). The rule requires more than simply excluding jurors who would "automatically" vote for a death sentence. Instead, when "determining when a prospective juror may be excluded for cause because of his or her views on capital punishment," the trial court must decide "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt,* 469 U.S. at (412) (cleaned up); *see also Morgan*, 504 U.S. at 739 (holding that under this standard, "[a]ny juror to whom mitigating factors are likewise irrelevant should be disqualified for cause"). "Because the *Witherspoon-Witt* standard is rooted in the constitutional right to an impartial jury, and because the impartiality of the adjudicator

goes to the very integrity of the legal system," misapplication of the standard "can never be treated as harmless error." *Gray v. Mississippi*, 481 U.S. 648, 668 (1987).

## B.    The trial court improperly denied defense challenges under *Witt*

The trial court denied at least four defense challenges to prospective jurors who should have been excused for cause based on their views on the death penalty. In doing so, the court frequently cited the wrong legal standard, erroneously concluding that jurors were qualified simply because they wouldn't impose an "automatic" death sentence. The defense was forced to use peremptory strikes to ensure that these individuals would not serve on the jury. (*See* Ex. 66.)

**Prospective Juror 14, Maria M.,** said she did not "see any point in leaving [a defendant] in prison for the rest of their lives if they've already committed [a] crime in the prison." (Dkt. 710 (RT) at 216.) She also admitted, when "trying to be honest," that she did not know whether she could be fair to the defendants. (Dkt. 710 (RT) at 216-17, 221.) Although the prosecution tried to rehabilitate Maria M., she never affirmed that she could be fair to Cramer and said only that she would not "automatically" vote for a death sentence without first hearing the evidence and instructions. (Dkt. 710 (RT) at 243-44.) But even jurors who would not be "automatic" votes for death must be disqualified under *Witt* if their views would "prevent or substantially impair the performance of [their] duties." 469 U.S 412 (1985). Based on Maria M.'s professed inability to be fair and her view that there was no "point" of a life sentence for a defendant like Cramer, the challenge for cause should have been granted. Cramer had to use a peremptory strike to exclude Maria M. (*See* Ex. 66 at 2).

**Prospective Juror 53, Thomas B.,** should have been excused for cause because he repeatedly declined to promise that he would consider mitigating evidence and indicated that he would shift the burden of proof to the defendant. As a general matter, Thomas B. favored the death penalty and thought it ought to be expanded to more non-homicide crimes. (Dkt. 712 (RT) at 85-86.) When asked whether he would "give due consideration" to mitigating evidence in this case, Thomas B. answered

116

that he would "like to say yes" but could not before hearing the evidence. (Dkt. 712 (RT) at 95.) When pressed by Fackrell's counsel as to whether he was "able to promise [counsel] that" he could give due consideration to mitigating evidence, Thomas B.'s answer was, "No, sir." (Dkt. 712 (RT) at 95.) Thomas B. was never rehabilitated on this point. In response to defense counsel's question whether "it might take something from us to convince you not to give the death penalty?" Thomas B. responded, "That's a possibility." (Dkt. 712 (RT) at 92.) He only backtracked after being coached by the prosecutor. (*See* Dkt. 712 (RT) at 97 (telling Thomas B. his inclination to burden-shift was "kind of contrary to our system"); (Dkt. 712 (RT) at 93 (trial court orders prosecutor to discontinue using body language to influence juror answers); (Dkt. 712 (RT) at 94 (Thomas B. repeatedly answering "Yes, sir" to prosecutor's leading questions).) These obliging replies to the prosecutor's leading questions were not reliable rehabilitation. Questions that call for a socially desirable answer such as "Can you follow the law?" result in death-prone juries because death-favoring venirepersons answer "yes" more often than life-leaning but qualified jurors. *See* Richard S. Jaffe, Capital Cases: Ten Principles for Individualized Voir Dire on the Death Penalty, 25 CHAMPION 35, 36 (2001). Because Thomas B. was not adequately rehabilitated the challenge for cause should have been granted. *See Morgan*, 504 U.S. at 739 (jurors who will not consider mitigating factors are excludable for cause). Cramer was forced to use a peremptory strike to exclude Thomas B. from the jury. (*See* Ex. 66 at 6.)

**Prospective Juror 114, Dena C.,** would have "said it's death automatically" after the prosecutor had proven guilt, death eligibility, and aggravation. (Dkt. 716 (RT) at 107.) She also indicated she would burden-shift unless the defense could prove it should be life. (Dkt. 716 (RT) at 109) (she "would have to" place the burden to prove a case for life on the defense because she "wouldn't be able to place it on [the prosecution].").) The only way Dena C. could keep an "open mind" would be if the defense proved that the government "withheld evidence" or was not telling the truth. (Dkt. 716 (RT) at 108.) After the prosecutor's attempts to rehabilitate her by coaching her on

legally correct responses (Dkt. 716 (RT) at 117-120), her final response was that for certain crimes, she "wouldn't be able to see past that" to a sentence other than death. (Dkt. 716 (RT) at 136.) The court improperly denied the defense challenge for cause by holding that Dena C. did "not indicate that she would automatically vote for the death penalty without regard to any evidence that might be developed at the trial." (Dkt. 716 (RT) at 139.) The court applied the wrong standard: although her death vote may not have been "automatic," her views impaired her ability to serve as an impartial juror. *Witt*, 469 U.S 412 (1985). Cramer used a peremptory strike to exclude Dena C. (Ex. 66 at 13.)

**Prospective Juror 186, Gail H.,** should have also been excused for cause because she would shift the burden to the defense. Although she gave contradictory responses to about whether or not she would engage in burden-shifting, she answered "yes" when asked if she "would put a burden on the defendant . . . to convince you why he should not receive the death penalty?" (Dkt. 707 (RT) at 201.) When asked for assurance that she would not put the burden on the defense, Gail H.. stated that she could not. (Dkt. 707 (RT) at 205-06.) It was only after the prosecution asked a series of highly leading questions that Gail H. finally agreed that she would "keep that burden with the government." (Dkt. 707 (RT) at 211.) Cramer had to use a peremptory strike to exclude Gail H. (*See* Ex. 66 at 21.)

Because the court's failure to excuse Maria M., Thomas B., Dena C., and Gail H. for cause was structural error, Cramer's conviction and death sentence must be vacated. *Gray*, 481 U.S. at 668.

**C.      The trial court improperly granted the prosecution's *Witherspoon* challenges**

The trial court erred in granting the prosecution's for-cause challenges to at least three jurors who were willing to set aside their opposition to the death penalty and follow the law. Because these errors are structural, Cramer's conviction and death sentence must be vacated. *Gray*, 481 U.S. at 668.

**Prospective Juror 10, Dianna C.,** stated that she did not "believe in the death penalty" based on her "religious beliefs," but also repeatedly stated that she could follow her "oath as a juror" and vote for the death penalty if the facts called for it. (Dkt. 710 (RT) at 149.) In the context of weighing

aggravating and mitigating factors, or in the absence of any mitigating factors, Barlow asked Dianna C., "would you answer, 'Yes, I believe the aggravating factors outweigh any mitigating factors' and answer truthfully even if a death sentence would be assessed?" (Dkt. 710 (RT) at 148-49.) Dianna C. answered, "Yes, I think I could." When asked again whether she could "answer what you believe to be the true facts in the case even if it led … to a death sentence?" Dianna C. answered, "Yes." (Dkt. 710 (RT) at 148-49.) When the prosecutor asked her immediately afterward, "Do you realize you just told Mr. Barlow that you could vote for the death penalty?" Dianna C. answered, "Yes, I did." (Dkt. 710 (RT) at 148-49.) The prosecutor then unsuccessfully tried to get Dianna C. to backtrack by telling her that her "questionnaire . . . is completely opposite of that." Dianna C. maintained that she could impose the death penalty "if all the evidence led to [it]." (Dkt. 710 (RT) at 151.) Although she at one point answered "Yes" to the prosecutor's question of whether she "could never vote for the death penalty," (Dkt. 710 (RT) at 154), she later clarified that she "wouldn't say automatically life or death penalty," that she would listen to all the evidence, and that she would follow her oath and "answer truthfully" the questions on the verdict form. (Dkt. 710 (RT) at 158-59.)

Dianna C. was precisely the type of juror contemplated by *Witherspoon* and its progeny: she was "exclude[d] for cause … simply because [she] voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." 391 U.S. at 522. Because Dianna C. "state[d] clearly that [she was] willing to temporarily set aside [her] own beliefs in deference to the rule of law," *Lockhart v. McCree*, 476 U.S. 162, 176 (1986), and impose the death penalty if the evidence led to that conclusion, the court erred in granting the prosecution's challenge for cause.

**Prospective Juror 187, Grace N.,** did not oppose the death penalty (*see* Dkt. 719 (RT) at 60), but she did not "want the responsibility of someone else's life." (Dkt. 719 (RT) at 61, 63.) However, she repeatedly stated that she could fulfill her duties as a juror and "would do what I'm supposed to do." (Dkt. 719 (RT) at 67.) Although at the beginning of her questioning, she said that she would not

119

"personally" vote for the death penalty if it were "all on me" (Dkt. 719 (RT) at 59), she clarified in subsequent responses that if she were on the jury, she would carry out her duties as required. (*See, e.g.*, Dkt. 719 (RT) at 67.) When asked point blank whether she would fulfill her duties "even if it lead [sic] to a death sentence," she responded, "Yes, sir." (Dkt. 719 (RT) at 64.) When pressed regarding whether her "feelings about not being the person to make the decision" would prevent or substantially impair her from voting for death "no matter what the evidence shows?" she answered, "No, ma'am." (Dkt. 719 (RT) at 67.) The court ignored Grace N.'s clear and repeated statements that she could follow the law and instead sustained the prosecutor's challenge because "[s]he was crying up here. I mean, she got emotional just about the questions." (Dkt. 719 (RT) at 73.) Prospective jurors are not excludable merely because they express nervousness or emotion stemming from the "potentially lethal consequences of their decision." *Adams v. Texas*, 448 U.S. 38, 49-50 (1980). Grace N. repeatedly affirmed that she could follow her duties as a juror and the cause challenge should have been denied.

**Prospective Juror 130, Calvin J.,** was also improperly excused for cause. He indicated that he would be "reluctant" to impose death based on his religious beliefs, but was not opposed to the death penalty and saw it as "probably something that needs to be around" and an "evil necessity." (Dkt. 716 (RT) at 209, 219.) Although he did not feel "comfortable" with the idea of handing down a death sentence, he repeatedly affirmed that he follow the instructions and his oath. (Dkt. 716 (RT) at 213, 219.) When asked if he could vote for death if "the government has proved . . . that he should be executed," he answered, "Yes." (Dkt. 716 (RT) at 217.) Because he affirmed that he would follow his oath, the court erred in granting the prosecution's challenge for cause.

### D.   The court failed to excuse biased jurors for cause

At Cramer's trial, the court failed to excuse–or even conduct detailed questioning of–a seated juror who discussed the case with co-workers during voir dire. **Seated juror Melissa W.** reported to the court that when she returned to the law office where she worked after her individual voir dire, she

was informed by a co-worker that the co-worker's father was a guard at the prison and "wakes up the defendant every morning." Another of Melissa W.'s co-workers told her that her husband works at one of the prisons, but Melissa W. did not know his name. (Dkt. 713 (RT) at 115.) Although defense counsel did not request further questioning or raise any concerns about Melissa W.'s conversations with co-workers, the court should have conducted additional questioning of Melissa W. or excused her for cause. *See Parker v. Gladden*, 385 U.S. 363 (1966) (finding a Sixth Amendment violation where a bailiff made comments to some jurors about defendant's guilt). Because Melissa W. was empaneled as a juror, Cramer's conviction and death sentence must be set aside. *See id.* at 366 ("[P]etitioner was entitled to be tried by 12 . . . impartial and unprejudiced jurors."); *Ross v. Oklahoma*, 487 U.S. 81, 86 (1988) ("Any claim that the jury was not impartial" outside the context of *Witt/Witherspoon* violations "must focus . . . on the jurors who ultimately sat").

The court also improperly denied defense challenges for cause against several biased prospective jurors. For example, the defense jointly challenged **Prospective Juror 149, Sharon Q.,** based on bias. Sharon Q. had a brother and brother-in-law who were prison guards; her brother had shared stories about his "very hard job," problems with inmates, and the dangers he would face daily as a correctional officer. (Dkt. 717 (RT) at 229-31, 250-51, 254-55.) She explained, "I feel I would be biased," and answered "yes" when asked whether she would have a "leaning against evidence coming from the inmates." (Dkt. 717 (RT) at 232-33.) Although she eventually said that she would "listen to both sides and do whatever the law says," she never disavowed her bias against inmates; instead, she reiterated that her initial statements were her "honest" feelings. (Dkt. 717 (RT) at 236-37.) The court denied the defense challenge because "she could set [her biases] aside and not have those affect her" and follow the law. (Dkt. 717 (RT) at 257.) Because Sharon Q. clearly stated that she would be biased and was never adequately rehabilitated, the court erred in denying the defense challenge for cause. Defense counsel exercised a peremptory strike against Sharon Q. (*See* Ex. 66 at 17.)

The court also improperly denied the defense's challenge for cause against **Prospective Juror 8, Brandi D.,** on the basis that she would believe a law enforcement officer "simply because it's a law enforcement officer." (Dkt. 710 (RT) at 120.) She also "strongly agree[d]" with the statement "I would be for the death penalty" because murderers "will do it over and over and over again." (Dkt. 710 (RT) at 122.) The defense exercised a peremptory strike against Brandi D. (Ex. 66 at 1.)

Similarly, **Prospective Juror 186, Gail H.,** showed clear bias because she was good friends with a federal judge in the Beaumont courthouse and an AUSA from the same office as Cramer's prosecutors. (Dkt. 707 (RT) at 182-83.) Gail H. said that it could "possibly" affect her impartiality (Dkt. 707 (RT) at 184), though she later said that she thought she could be impartial so long as those individuals weren't involved in the trial. In addition, Gail H's former classmate was a police officer who was murdered, and she had followed his trial; Barlow told her he represented the murderer on appeal. Although Gail H. said that would not influence her, she admitted that "[i]t's still emotional for me sometimes." (Dkt. 707 (RT) at 192-93.) Because Gail H. was good friends with a judge, as well as an AUSA in the same office as the prosecutors, and because Cramer's attorney had represented a defendant who murdered her classmate, Gail H. should have been excused for cause due to bias. (*See also* Section C, *supra* (juror should have been excused for cause under *Witt*).) Defense counsel used a peremptory strike to exclude Gail H. (*See* Ex. 66 at 21.)

Although the Supreme Court has sometimes found harmless error when biased jurors are not ultimately seated, *see Ross*, 487 U.S. at 85, 88-89, in this case, the court's collective errors undermined Cramer's right to a fair trial. When coupled with the court's erroneous *Witt* rulings, defense counsel was forced to use at least six peremptory strikes to exclude biased or unqualified individuals from the jury. If the defense had not been deprived of those peremptory strikes, counsel could have excluded seated jurors who were also conviction-prone and death-leaning but whose bias may not have risen to the level of disqualification. For instance, Cramer could have struck **seated juror Linda B.,** who was

122

more willing to believe law enforcement officers and would "probably" find it hard to separate the evidence of the two defendants. (Dkt. 719 (RT) at 128, 143; *see also* Claim 8.D.) Counsel also could have struck **seated juror Jason L.,** who stated that he would base his sentencing decision on whether a homicide was intentional or accidental, had a "Support the Police" bumper sticker, and would have trouble viewing graphic images. (Dkt. 707 (RT) at 156-57, 162-65.) These cumulative errors deprived Cramer of his rights to an impartial jury and to a fair trial. (*See also* Claim 6.)

**E.      The prosecutor used voir dire to assemble a conviction–and death-prone jury**

Death qualification results in juries that are more conviction- and death-prone than other juries. *See Baze v. Rees*, 553 U.S. 35, 84 (2008) (Stevens, J., concurring). (*See also* Ex. 45 ¶ 8.) Here, the government successfully moved to exclude a number of life-leaning jurors for cause and used their peremptory challenges to remove any remaining such jurors. (*See* Dkt. 716 (RT) at 153-55 (Prospective Juror 115) and Dkt. 720 (RT) at 218-20 (Prospective Juror 253.) By exercising their peremptory challenges in this manner, the prosecutors assembled a jury that was more likely to convict, less likely to consider mitigating evidence, and predisposed to return a death verdict.

**F.      The trial court's instructions during jury selection were erroneous**

When reviewing the defense PowerPoint presentations for voir dire, the court ordered counsel to remove the sentence "No juror is ever required to impose a sentence of death." (Dkt. 710 (RT) at 30.) Counsel should have been permitted to give this instruction because it is an accurate statement of the law which gives effect to the Eighth Amendment requirement for individualized sentencing determinations. *See United States v. Jones*, 132 F.3d 232, 244 (5th Cir. 1998) *aff'd* 527 U.S. 373 (1999); *Lockett*, 438 U.S. at 604.

**G.      Appellate counsel was ineffective for failing to raise these claims on appeal**

Appellate counsel failed to raise the meritorious claim that Cramer's Sixth Amendment rights were violated when the trial court denied defense challenges for cause against biased or death-prone jurors and removed qualified life-leaning jurors. Cramer was prejudiced by appellate counsel's deficient

123

performance because there is a reasonable probability that this claim would have been successful on appeal. *Sharp*, 930 F.2d at 451. Cramer's conviction and death sentence must be vacated.

## CLAIM 8: CRAMER WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL DURING VOIR DIRE.

A defendant has the right to effective counsel during voir dire. *Virgil v. Dretke*, 446 F.3d 598, 610 (5th Cir. 2006). Because voir dire "plays a critical function" in protecting a defendant's Sixth Amendment right to an impartial jury, "certain inquiries must be made to effectuate constitutional protections." *Morgan*, 504 U.S. at 730. (cleaned up.) Counsel's duties during voir dire include objecting to biased jurors. *See id.*; *Thomas v. Lumpkin*, 995 F.3d 432, 445 (5th Cir. 2021). Counsel should also raise appropriate *Batson*[26] challenges. *See ABA Guidelines*, Guideline 10.10.2 and Commentary, reprinted in 31 Hofstra L. Rev. 913, 1053-54 (2003). In this case, Cramer's right to an impartial jury was violated because counsel failed to (1) appropriately use retained experts, (2) object to the government's use of racially motivated peremptory challenges, and (3) challenge biased potential jurors for cause.

### A.    Counsel failed to appropriately consult with retained experts

As discussed in Claim 6, *supra*, in late 2017 counsel retained Jeffrey Martin, a statistical expert, to analyze the jury pool. After Martin reviewed some initial records and counsel secured funding, the parties agreed that Martin would "analyze the statistical issues in the jury selection process for this case and prepare a report or testify on behalf of both Mr. Fackrell and Mr. Cramer." (Ex. 11 ¶ 4, 7.) Counsel never followed up with Martin, and no work was ever completed. (Ex. 11 ¶ 8, 9.) If counsel had used Martin as an expert, they would have confirmed that the jury pool in Cramer's case did not represent a fair cross section of the community and that the Eastern District did not employ the required random selection procedure to create Cramer's jury pool. *See generally* Claim 6.C, *supra*.

Counsel also retained Julie Howe, an expert in jury selection, to assist both the Cramer and Fackrell teams. Howe had extensive jury consultation experience in capital trials and had recently

---

[26] *Batson v. Kentucky*, 476 U.S. 79 (1986).

consulted on a BOP homicide case resulting in a life verdict. (Ex. 42 ¶¶ 1-2.) Nevertheless, counsel failed to make effective use of Howe. When Howe works with capital trial teams, she is typically "involved in creating the juror questionnaire" to ensure that it includes questions that will reveal bias. (Ex. 42 ¶ 3.) Counsel did not include her in drafting the juror questionnaires. (Ex. 42 ¶ 5.) When Howe reviewed the questionnaires, she was concerned that the questions were confusing and left key terms undefined, making it difficult to elicit helpful information. (Ex. 42 ¶ 4.) Howe thought it was crucial that questions be "specifically tailored to the mitigation evidence that the teams had developed and planned to present at trial" in order to uncover juror biases. (Ex. 42 ¶ 3.) But when Howe "advised that the attorneys propose edits to the Judge, they told me that it was too late." (Ex. 42 ¶ 5.)

In Howe's experience, "a practice voir dire is a helpful tool" to prepare for a capital jury selection, and it is "essential to educate the attorneys on the Colorado method of jury selection, which is the standard of care for all capital trial teams," before jury selection begins. (Ex. 42 ¶ 8.) Howe made multiple offers to meet with defense counsel to help prepare and practice voir dire, but counsel refused. Howe met them for the first time on the morning voir dire began. (Ex. 42 ¶¶ 8, 10.)

Counsel also declined to accept Howe's advice that it is "best practice" to meet regularly before and during voir dire. (Ex. 42 ¶ 9.) "Meeting prior to jury selection ensures I have a good understanding of the case, defense theories, mitigation, voir dire conditions, and the like. Meeting daily ensures that everyone is on the same page regarding the planned approach for each prospective juror and allows for a discussion of impressions of jurors qualified each day." (Ex. 42 ¶ 9.) Howe prepared summary sheets with detailed information about each juror, but her summaries "were not discussed as a group to inform an agreed upon approach to the voir dire of each juror as far as I know." (Ex. 42 ¶ 11.) The lack of defined strategy meant that Barlow "asked questions that sometimes worked to qualify the very jurors we suspected would vote for death." (Ex. 42 ¶ 14; *see generally* Claim 8.C, *infra.*) Ultimately, Howe and Barlow "were the two main people who determined how to use [the] 30 peremptory strikes"

125

that the Fackrell and Cramer teams were to exercise jointly. (Ex. 42 at ¶ 20.) Howe created a final spreadsheet and notes on the night individual voir dire ended. However, the teams did not fully discuss the peremptory strikes until the morning they were due. (Ex. 42 ¶ 20.) As a result, the team "was sometimes working with incomplete information due to multiple problems that had occurred over the course of jury selection." (Ex. 42 ¶ 21.)

Effective use of Howe would have enabled counsel to better identify biased jurors through written questionnaires and live voir dire, and then challenge those jurors for cause and make effective use of their peremptory strikes. Counsel's failure to adequately consult with Howe–particularly after counsel had entirely failed to follow up with Martin regarding whether the jury pool represented a fair cross section of the community–was deficient performance. *Cf. Hinton*, 571 U.S. at 275.

**B.    Counsel was ineffective for failing to object to the prosecution's use of racially-motivated peremptory challenges**

Counsel was ineffective for failing to object to the government's racially motivated peremptory strikes against Hispanic/Latino[27] prospective jurors Lydia B., Theresa W., Andrea G., and Lisa S.

Hispanic people comprised only 7.21% of the jury panel (22 of 305.) (Ex. 41 at Table 2); *see generally* Claim 6. After agreements to excuse and hardship excusals, only eight Hispanic prospective jurors remained. (Ex. 70.) One of those eight had too high a juror number to be included in the final jury. (Ex. 66 at 33.) Of the seven remaining Hispanic jurors who could potentially be seated, the government used peremptory strikes to exclude a majority of them (four of seven). These statistics alone create an inference of discrimination. *See, e.g., Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) ("happenstance" was unlikely to explain prosecutor's use of ten peremptory challenges to remove most of the African American prospective jurors). The prosecution should have been called upon to explain their use of peremptory strikes to exclude most of the Hispanic prospective jurors from the

---

[27] Jurors self-identified race on their juror questionnaires. (*See* Ex. 70.)

jury, particularly where those strikes appeared to be motivated by race: Each of the jurors listed below said they would be impartial, and some even expressed pro-law enforcement views.

**Prospective Juror 229, Lydia B.,** was struck even though she "believe[d] in the death penalty" and her voir dire was so unbiased that the prosecutor stated, "Great. You can always tell when the lawyers think that someone is right kind of in the middle and where everybody wants them to be because they don't ask a lot of questions. And I'm pretty much out of my questions here, too." (Dkt. 720 (RT) at 101, 110-11.) *See also* Ex. 66 at 26.

**Prospective Juror 82, Theresa W.,** expressed her ability to be impartial and take jury service very seriously. She was death-qualified, having stated that the death penalty was "there for a reason" and served as a deterrent. (Dkt. 167 (RT) at 167.) She appeared unbiased, explaining that it was her "nature as a teacher to listen to both sides before I make a judgment." (Dkt. 713 (RT) at 166-67.) The government nonetheless chose to use a peremptory strike against her. (Ex. 66 at 10.)

The government also struck two Hispanic jurors with ties to law enforcement who both appeared to be prosecution-friendly jurors. **Prospective Juror 90, Andrea G.,** was struck despite having several family members in law enforcement. (Dkt. 706 (RT) at 94-95; Ex. 66 at 10.) Andrea G. was death-qualified and appeared unbiased: regarding whether to impose a death sentence, she explained it "depends on the crime and–you know, it just depends on all the circumstances." (Dkt. 706 (RT) at 100-01.) Finally, **Prospective Juror 97, Lisa S.,** stated that she "could be impartial" and "listen to everything and do my duty." (Dkt. 706 (RT) at 139.) She had also worked in law enforcement, including as a jailer. (Dkt. 706 (RT) at 133.) She was struck by both the government and the defense, indicating that the prosecution's peremptory strike did not appear to be motivated by any defendant-friendly answers she provided. (Ex. 66 at 11.)

Counsel should have noticed and objected to this discriminatory pattern of strikes. First, counsel submitted all of their peremptory strikes in a single list (Ex. 42 ¶ 18), so it should have been

particularly easy to spot patterns. Second, the trial judge appears to have prompted counsel to ask if they had any *Batson*-related concerns after the government submitted their list of peremptory strikes. (*See* Dkt. 747 App. A at 7; *see also* Claim 15.) Neither the official transcript nor the unofficial reconstruction of off-the-record bench conferences reflects counsel raising any *Batson* challenges to strikes of non-white jurors, even when affirmatively prompted by the trial judge. Counsel's failure to challenge the government's peremptory strikes under *Batson* constitutes deficient performance under *Strickland*, 466 U.S. 668. Because there was no objection, the prosecution was never called upon to justify these strikes, and the court never determined whether the strikes were motivated by racial, ethnic, or gender stereotypes.[28] The "rule in *Batson* provides an opportunity to the prosecutor to give the reason for striking the juror, and it requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it." *Miller-El*, 545 U.S. at 251-52.

Because a *Batson* violation is structural error, the prejudice prong of a *Strickland* claim is presumed once deficient performance is established. *See Weaver v. Massachusetts*, 582 U.S. 286, 301 (2017). Where, as here, a prima facie case for a *Batson* violation has been made and the record is silent on the trial court's findings, the appropriate remedy is a new trial. *Snyder v. Louisiana*, 552 U.S. 472, 485 (2008). At the very least, the Court should "require[] the prosecutor to come forward with a neutral explanation" for his strikes and a court determination on whether Cramer established purposeful discrimination. *Virgin Islands v. Forte*, 865 F.2d 59, 64 (3d Cir. 1989).

## C.    Counsel was ineffective for failing to conduct adequate voir dire

Counsel's voir dire lacked a defined strategy. To Howe, who "was in court for every day of the voir dire proceedings," counsel "did not always have a coherent plan for their individual voir dire of prospective jurors." (Ex. 42 ¶ 12.) Howe notes that Barlow's "questioning of prospective jurors was not effective. There were prospective jurors I suspected would not consider a life sentence in this

---

[28] All of the Hispanic jurors that the government struck were also women.

type of case… and who would not give weight to mitigation evidence in this case–and would be subject to a challenge for cause if we could establish that through effective voir dire." (Ex. 42 ¶ 14.)

For example, counsel agreed to excuse for hardship a life-leaning juror who had not requested a hardship exemption, and who had not been substantively questioned about any of her views. At the start of her individual voir dire, **Prospective Juror 85, Annette R.,** volunteered that when she had filled out the juror questionnaire, she put that she "believed in the death penalty but I could not give it." (Dkt. 713 (RT) at 50.) She had "thought about that and prayed about it since then" and determined that [i]f the circumstance is right, it would be a serious decision but I could do the death penalty." (Dkt. 713 (RT) at 50.) After this volunteered statement, Fackrell's counsel questioned her only about her mobility status, and Barlow declined to ask any questions at all. Although Annette R. used a walker, she said multiple times she would have "no problem" serving on the jury and making it to court each day, and she did not ask to be excused. (Dkt. 713 (RT) at 51-52.) Despite repeated affirmations by this life-leaning juror that she would have no problem serving, Barlow inexplicably "agree[d]" that she should be excused for "undue hardship based on her mobility." (Dkt. 713 (RT) at 52.)

Counsel also failed to challenge or effectively question multiple biased prospective jurors. Most importantly, counsel was ineffective for failing to challenge **seated juror Linda B.** for cause or to exercise a peremptory strike against her. Linda B. stated during voir dire that she was more willing to believe law enforcement officers and would "probably" find it hard to separate the evidence of the two defendants. (Dkt 719 (RT) at 129, 143.) Counsel should have challenged her for cause. *See Virgil*, 446 F.3d 598 at 609; *see also Hughes v. United States*, 258 F.3d 453, 459 (6th Cir. 2001). Similarly, counsel should have challenged **alternate juror Dennis G.** for cause (or at minimum, struck him using a peremptory) due to his law enforcement and pro-prosecution bias, including the fact that his wife used to work in the prosecutor's office with Cramer's prosecutor, Batte. (Dkt. 720 (RT) at 192-93.)

In addition, counsel's use of peremptory strikes against biased prospective jurors without first

129

attempting to exclude them through agreements or for-cause challenges was deficient performance. **Prospective Juror 34, Justin C.,** had a pending DWI which the court was concerned could disqualify him, and the government agreed to excuse him. Cramer's counsel refused, but later used one of their limited peremptory strikes to exclude him. (Ex. 66 at 4; Dkt. 711 (RT) at 156-61.) There could be no strategic reason for this haphazard approach. (Ex. 42 ¶ 12 (explaining that counsel "did not always have a coherent plan" or goal for each prospective juror).) Similarly, **Prospective Juror 27, Debra G.,** could have been excused for cause or hardship because she was concerned about her safety and expressly stated she preferred to be anonymous before the defendants. (Dkt. 711 (RT) at 88-89; *see also* Claim 9.) Instead, counsel allowed Debra G. to be qualified without challenge and then used a peremptory strike to exclude her. (Ex. 66 at 3.) As Howe summarized, based on her "experience, the attorneys' poor questioning of the jurors meant that we ended up having to waste peremptory strikes on prospective jurors that might otherwise have been removed for cause." (Ex. 42 ¶ 14.)

Counsel also should have challenged for cause prospective jurors whose religious beliefs would have impaired their performance. For example, **Prospective Juror 100, Mary W.,** stated she would be expressly guided by her religious beliefs in choosing between a life or death sentence: "The Lord is going to put on my heart which way to choose." (Dkt. 714 (RT) at 9.) **Prospective Juror 188, Janette F.,** also indicated that her religious beliefs would influence her: she consulted the Bible regarding the death penalty, claimed American laws were "divinely established," and believed government leaders were "appointed by God and have the authority to make and enforce laws including penalties as did the Jews in the Old Testament." (Dkt. 707 (RT) at 226-27, 236.) Instead of challenging Janette F. and Mary W. for cause, counsel ineffectively allowed them to be qualified and later exercised two of their limited peremptory strikes against them. (Ex. 66 at 12, 21.)

While prejudice is typically established by a biased juror being seated, prejudice can also be shown if the cumulative impact of counsel's deficiencies rendered the proceeding fundamentally

130

unfair, even without a specific showing of juror bias. *See, e.g.*, *Harris By & Through Ramseyer v. Wood*, 64 F.3d 1432, 1438 (9th Cir. 1995). Here, Cramer can establish prejudice because at least one seated juror (Linda B.) and two alternate jurors were biased. *See Virgil*, 446 F.3d 598 at 609. Taken together, counsel's failures deprived Cramer of the right to an "adequate voir dire," *Morgan*, 504 U.S. at 729, and prejudiced Cramer. Cramer is entitled to a new trial.

**CLAIM 9: THE EXCESSIVE SECURITY PRESENCE AT TRIAL VIOLATED DUE PROCESS; COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT.**

Cramer's confinement and sentence are illegal, unconstitutional, and void under the Fifth, Sixth, and Eighth Amendments to the United States Constitution because his shackles and the excessive presence of armed law enforcement officers inside the courtroom, inside and outside the courthouse, and en route to the courthouse from the prison, likely influenced the verdicts in his trial.

**A.     Legal basis**

"[T]he Constitution forbids the use of visible shackles during the penalty phase, as it forbids their use during the guilt phase unless that use is 'justified by an essential interest'–such as the interest in courtroom security–specific to the defendant on trial." *Deck v. Missouri*, 544 U.S. 622 (2005) (*citing Holbrook v. Flynn*, 475 U.S. 560, 568-69 (1986).) The prohibition on shackling and other visible heightened security measures emphasizes the importance of three fundamental legal principles: the presumption of innocence, the right to counsel, and the ability of judges to maintain a dignified judicial process. *Holbrook*, 475 U.S. at 569; *Deck*, 544 U.S. at 631 (security measures may create unconstitutional trial conditions where they communicate that the defendant is especially dangerous or culpable); *Estelle v. Williams*, 425 U.S. 501, 504-05 (1976) (courtroom practice violates due process where it undermines the presumption of innocence.)

Shackling and/or an excessive security presence is "inherently prejudicial" and the trial court must make an individualized determination as to its necessity. *Id.* at 629; *Holbrook*, 475 U.S. at 568-69; *McKaskle v. Wiggins*, 465 U.S. 168, 178-79 (1984). Because that did not happen in this case, and because

131

trial counsel ineffectively failed to properly object and failed to preserve the record for review, Cramer's Due Process and Sixth Amendment rights were violated. *Strickland*, 466 U.S. 668.

**B.      Factual basis**

On November 14, 2017, Cramer filed a "Motion to Prevent Defendant From Being Shackled in Public." (Dkt. 121.) In that motion, Cramer's counsel cited inapplicable Texas state law and failed to cite either *Deck* (the seminal case on shackling) or any case published after 1994. (Dkt. 121.) Cramer's motion acknowledged that the "extensive and obvious security measures of the U.S. Marshall's [sic] Service or Court Security Officers" would create the same prejudicial effect on the jury as shackling would yet did not ask the Court to take any action with regard to the security presence. (Dkt. 121 at 3.) The trial court granted Cramer's shackling motion as well as a similar but better-researched motion filed by Fackrell. (Dkts. 148, 168, 178.) The Court's order found no facts and merely said, "Cramer shall not be shackled during court proceedings before the jury." (Dkt 168 at 1.)

On March 22, 2018, "[i]n view of increased concerns about court security and further consultation with the United States Marshals Service ("USMS")," the court vacated shackling orders and issued a new order requiring ankle restraints and a skirt around counsel tables to hide them from view. (Dkt. 445.) The order did not elaborate on or describe the "increased concerns" which led the court to vacate its previous orders. During a hearing on March 27, 2018, counsel objected to the use of "a large motorcade with flashing lights . . . [and] armed guards at the perimeter of the back of the courthouse, which is where jurors would park." (Dkt. 723 (RT) at 5.) As with the March 22, 2018, shackling order, the court found no specific facts as to why there were "increased" concerns, what those concerns were, or what facts the USMS relied upon in placing armed guards around the courthouse, using a motorcade with flashing lights, or asking the court to shackle Cramer. In fact, the court made clear that whatever the USMS thought was appropriate, she would agree with: "[T]he court wants security around this courthouse and if that requires armed men with guns, so be it. That's the

132

way it is." (Dkt. 723 (RT) at 6.) The court even admitted that it did not know the extent of the security measures the USMS would be employing outside the courthouse. (Dkt. 723 (RT) at 7.) There is nothing in the record showing that the court made the required individualized determination under *Deck* to support either shackling or the use of these other extreme security measures.

The court then asked a representative from the USMS to describe the security presence. An unidentified officer testified that because the van carrying the defendants has tinted windows and because the sallyport was not visible to the public once the doors were closed, the defendants would not be identifiable as being part of the motorcade. (Dkt. 723 (RT) at 7.) The court dismissed counsel's argument that the jury would know who was being transported and discouraged counsel from asking prospective jurors during voir dire if they had noticed the security presence or transport of the defendants into the courthouse. (Dkt. 723 (RT) at 8-11.) Regarding the presence of armed officers outside the courthouse, the officer testified that "visibly armed people" would be stationed around the courthouse with AR-15 rifles for "external threats" throughout the duration of the trial. (Dkt. 723 (RT) at 8-9.) The officer proffered no particular threats that had been received, no history of "external threats," and no theory about what those external threats might be. The officer claimed that the AR-15s would not be visible to the public or the jury, but admitted that "discreetly" armed persons would be visible to the jury "around" the courthouse. (Dkt. 723 (RT) at 10.)

Counsel's argument against the increased security presence was misguided and futile. Counsel for Fackrell argued that the sight of the AR-15s would be upsetting for jurors, but the Court quickly dismissed this concern by suggesting that Beaumont was a rough town, and therefore the jurors would not be upset. (Dkt. 723 (RT) at 11.) Counsel should not have objected on the grounds that the jurors would be upset, however; he should have objected on the basis that it would prejudice the jury in favor of the government. *Allen*, 397 U.S. at 344. Furthermore, counsel unreasonably failed to inquire as to the number of officers who would be armed with AR-15s, the number who would be "discreetly"

armed, what they would be armed with, whether there would be firearms in the courtroom, or how many officers would be present in the courtroom during the trial proceedings. The court did not engage in any fact-finding regarding the particular necessity of the use of AR-15s, "discreetly" armed officers, or the use of the motorcade with flashing lights hardly unnoticeable to the juror arriving early or lingering late. Nor did the Court seek to ensure that jurors would not see the security presence–it merely speculated that they were not likely to. Speculation does not satisfy the individualized determination required by *Deck*, 544 U.S. at 629.

On April 8, 2018, during voir dire, counsel for Fackrell (joined by counsel for Cramer), advised the court that the defendants had been brought to the courthouse late, that he had seen "the machine gun guys and everything" as they were walking into the courthouse for an 8:30 hearing, and that two jurors had walked in with them. However, counsel did little more than acknowledge the problem, and there was no further inquiry as to what the jurors had seen, nor direction to the Marshals to adhere to the agreed schedule by the Court. (Dkt. 710 (RT) at 5-6.)

**C.    The shackling and excessive security presence violated Cramer's rights**

Cramer's constitutional rights were violated by the excessive security presence at trial. First, it is apparent from the record that the trial court did not make an individualized determination as to the "substantial need" or "essential interest" for shackling Cramer or exposing the jury to the heightened security presence, as required by Supreme Court precedent. *Holbrook*, 475 U.S. at 568-69; *McKaskle*, 465 U.S. at 178-79; *Allen*, 397 U.S. at 344. Second, entrance to the courthouse was subject to extraordinary controls that conveyed an alarming message of danger and presumed guilt. There were officers armed with AR-15 assault rifles positioned outside the courthouse, including on the roof. Cramer was transported to court every day in heavy restraints by a caravan of armed vehicles. And third, there was a very conspicuous presence of armed law enforcement officers in and around the courtroom for the duration of the trial. *See Holbrook*, 475 U.S. at 569; *Woods v. Dugger*, 923 F.2d 1454,

134

1460 (11th Cir. 1991) (granting habeas relief where large number of uniformed corrections officers attended the trial of an inmate for killing a prison guard); *Mata v. Johnson*, 99 F.3d 1261, 1271 (5th Cir. 1996) (conspicuous presence of armed security personnel in and around the courtroom may be inherently prejudicial), *vacated and remanded sub nom. part*, 105 F.3d 209 (5th Cir. 1997.) This presence inside the courtroom eliminates any argument that the jurors might dissociate the presence of armed officers from Cramer. Furthermore, Cramer was shackled in the courtroom at the ankles, and there was a curtain around the table (Dkt. 445), but the jury could nonetheless have surmised that Cramer was restrained and likely saw the shackles at least once during the trial. *See Deck*, 544 U.S. at 630, 635, *Rhoden*, 172 F.3d at 636 (9th Cir. 1999.)

All of these facts demonstrate both actual and inherent prejudice from the shackling and excessive security measures. *See Holbrook*, 475 U.S. at 570 (inherent prejudice established where circumstances create "an unacceptable risk" of "impermissible factors coming into play.") The jury was necessarily left with the impression that Cramer was and would continue to be a danger to others, which only exacerbated the other inadmissible, unconstitutional evidence and argument by the government regarding Cramer's alleged future dangerousness. (*See also* Claims 2, 10.) In this atmosphere, the unwarranted and improper imposition of restraints and the overwhelming presence of armed law enforcement officers undoubtedly denied Cramer his rights to due process, the presumption of innocence, a fair trial, and a reliable determination of guilt and the appropriate penalty. Counsel was ineffective for failing to protect these rights.

## CLAIM 10: PROSECUTORIAL MISCONDUCT

The government violated Cramer's constitutional rights by committing multiple acts of misconduct including (1) withholding exculpatory evidence; (2) presenting false, unreliable, and misleading evidence; (3) improperly questioning witnesses; (4) making inflammatory remarks throughout the trial; (5) denigrating the defense and defense witnesses; (6) seeking to prevent

135

counsel from presenting a defense; (7) denigrating defense counsel; (8) misstating the law; (9) improperly arguing other cases; and (10) making other improper arguments in the penalty phase of the trial. This misconduct violated Cramer's rights to a fair and impartial jury; a fair, reliable and determination of guilt, death eligibility, and penalty; and his right to confront witnesses as guaranteed by the Fifth, Sixth, and Eighth Amendments. Whether evaluated independently or cumulatively, the government's misconduct was material and entitles Cramer to a new trial. Such conduct includes but is not limited to the following instances:

**A. The government knowingly presented false or misleading testimony about Cramer's rank in SAC and the circumstances of the Johns homicide**

Prosecutors violate due process by presenting material testimony that is false, or creates a false impression, or by allowing false or misleading testimony to stand uncorrected. *See, e.g.,* 294 U.S. 103 (1935); *Giglio v. United States*, 405 U.S. 150 (1972); *Napue v. Illinois*, 360 U.S. 264 (1959). Due process is likewise offended by direct statements that are untrue and by testimony which, "taken as a whole," give the jury a "false impression." *Alcorta v. Texas*, 355 U.S. 28, 31 (1957). A claim of prosecutorial misconduct under this line of cases has three elements: (1) the testimony in question was false or, taken as a whole, gives a false impression; (2) the government knew or should have known the testimony was false, and (3) the testimony was material. False testimony is material if there is "any reasonable likelihood" that it "could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976).

Throughout Cramer's trial, the government argued that Cramer and Fackrell murdered Johns in cold blood to maintain their reputations in the aftermath of Johns' "disrespect." This "disrespect" theme undergirded the government's presentation at guilt and penalty phase, beginning with the government's opening statement:

> Now, you might be wondering: What was it that caused the defendants to kill Leo Johns? What was his crime that required their administration of the death penalty? It's pretty simple. They didn't like him. They didn't like Leo Johns because he used drugs…. They

136

> didn't like Leo Johns because he used alcohol…. Most of all, they didn't like Leo Johns because he disrespected his gang general, Christopher Cramer. So, he had to die. He had to be killed. And that is just what General Cramer set out to do, kill Leo Johns after he caught him getting drunk one too many times in his, the general's, estimation.
>
> In the upside-down world of prison gangs, Cramer decided that Leo Johns had to die because he hadn't followed the orders of his general. He disrespected his general.

(Dkt. 591 (RT) at 68-69.) Another illustrative example is the government's characterization of Cramer's use of the phrase "W/R," or "with respect," when signing a letter. According to the government, the fact that he used that term in his letters indicated that respect was "very important" to him as the "general" of SAC, "apparently important enough to kill somebody over." (Dkt 596 (RT) at 53.)

Based on BOP records and witness interviews, the government knew or should have known that attributing Johns' death to "respect" alone was missing a crucial element: ███████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████



But the government's refusal to pursue material information does not negate the duty to present it. *See United States v. Auten*, 632 F.2d 478, 481 (5th Cir. 1980) ("If disclosure were excused in instances where the prosecution has not sought out information readily available to it, we would be inviting and placing a premium on conduct unworthy of representatives of the United States Government. This we decline to do.")

Without information that Cramer committed the crime under significant duress, the jury was left with the false impression that Cramer's actions were driven solely by ego and pride rather than the very understandable human need to protect himself and the people he cared about. There is a reasonable likelihood that this false evidence and argument affected the jury's decision to convict Cramer of first-degree murder and to sentence him to death. Even without evidence about the direct threats that Cramer faced, a number of jurors were already inclined to find what they heard about the circumstances of the Johns homicide mitigating:

- Ten jurors agreed that "Christopher Cramer joined SAC in need of protection."

- Five jurors agreed that "Inmate Leo Johns was disrespectful to Christopher Cramer in violation of gang rules."

- Seven jurors agreed that "Inmate Leo Johns provoked the offense on June 9, 2014, by referring to SAC as 'Fuck them, Dudes.'"

- Ten jurors agreed that "Gang rules required Christopher Cramer to take action against inmate Leo Johns." and

- Six jurors agreed that "Christopher Cramer had to act against inmate Leo Johns to avoid placing himself in danger."

(Dkt. 666 (RT) at 14.) The jurors were also aware of Cramer's previous experience as a victim of

138

prison violence and his desire to find belonging and safety: Ten jurors found it mitigating that "Christopher Cramer joined [SAC] in need of protection," and five found it mitigating that "Christopher Cramer was himself stabbed while in prison." (Dkt. 666 (RT) at 14.) ██████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████ With that knowledge, there is a reasonable probability that at least one of the jurors would have voted to spare Cramer's life.

**B.       Government misconduct under *Brady v. Maryland***

Due Process prohibits the prosecution from withholding "evidence favorable to an accused." *Brady v. Maryland*, 373 U.S. 87 (1963). *Brady* requires relief when (1) the evidence is "favorable to the accused," (2) the "evidence [was] suppressed by the state, either willfully or inadvertently," and (3) "prejudice . . . ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Prejudice is shown if "the net effect of the evidence withheld by the State…raises a reasonable probability that its disclosure would have produced a different result." *Kyles v. Whitley*, 514 U.S. 419, 421-22 (1995). A defendant need not request the material to trigger the prosecution's duty to disclose. *Strickler*, 527 U.S. at 280-81. The duty applies equally to exculpatory and impeachment evidence. *United States v. Bagley*, 473 U.S. 667, 676 (1985); *see also Kyles*, 514 U.S. at 433. Evidence is "material" and prejudice is established if "there is a reasonable probability that [the petitioner's] conviction or sentence would have been different had the suppress[ion]" not occurred. *Strickler*, 527 U.S. at 264. When assessing prejudice, courts must look to the "cumulative effect of all such evidence suppressed by the government." *Kyles*, 514 U.S. at 421.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

139



That information would only have been available to the government. The government should have investigated this, as they knew it would reveal exculpatory information that was material to Cramer's defense. *See Kyles,* 514 U.S. at 433.

Regarding all witnesses called by the government or otherwise listed in discovery, the government failed to disclose cooperation agreements, criminal histories, histories of cooperation with other prosecutions, psychiatric information, and histories of lying or inconsistent statements.

Likewise, Otis Carden testified to a grand jury in West Virginia (Dkt. 591 (RT) at 201), but this information was not provided to the defense. Without this information, counsel was unable to properly impeach Carden, and could not build a case that Carden was motivated to encourage Cramer to take action, which also would have bolstered Cramer's duress defense. The government's suppression of these material facts that could have impeached these and other witnesses prejudiced Cramer because it foreclosed an opportunity for him to present a complete defense and to challenge the government's evidence. Had they had this information, there is a reasonable probability that at least one juror would have voted to acquit or voted for life.

140

## C.    Improper conduct under *Darden v. Wainwright*

Prosecutorial misconduct in the form of remarks that "so infected the trial with unfairness as to make the resulting conviction a denial of due process," or that manipulate or misstate the evidence, warrants federal habeas relief. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal citation and quotation marks omitted.) A prosecutor commits misconduct when he refers to facts not in evidence, mischaracterizes evidence, or misstates the law. *Darden*, 477 U.S. at 181. A prosecutor also may not make "comments calculated to arouse the passions and prejudices of the jury." *United States v. Leon-Reyes*, 177 F.3d 816, 822 (9th Cir. 1999).

The prosecution engaged in misconduct during trial, including making improper comments or posing improper questions that unfairly prejudiced Cramer in the eyes of the jury. These comments inflamed the passions of the jury throughout the trial, including during opening and closing arguments.

Despite its protestations to the contrary, the government manipulated the timing of Rekonen's plea agreement to prevent him from testifying, Even the trial court recognized that "Cramer 'benefits from convincing the jury that Fackrell is the more violent and more deliberate defendant between the two of them' during a joint trial" and therefore "has a strong interest in delving into this matter during the cross-examination of Rekonen." (Dkt. 502 (RT) at 4.) (*See also* Claim 3.) The failure to disclose was prejudicial because absent this manipulation of witnesses, Cramer would have had stronger support for his duress defense, which had implications for both the guilt and penalty phases of trial.

141

As discussed in Claim 1, counsel was prejudicially ineffective for failing to object or otherwise mitigate the damage done by the government's misconduct. "Unfortunately, when a prosecutor acts unfairly, there is little a defendant can do other than rely on his or her attorney to lodge an appropriate and timely objection." *Hendricks v. United States*, No. 2004-05, 2015 U.S. Dist. LEXIS 193811, at *15 (D.V.I. Sep. 1, 2015) (internal quotations omitted). Therefore, failure to object "can constitute ineffective assistance of counsel." *Alexander v. Shannon*, 163 Fed. Appx. 167, 173 (3d Cir. 2006). For all the same reasons, appellate counsel performed deficiently, to the extent they failed to raise errors that are apparent on the face of the record. Cramer can establish prejudice for those failures because these issues are meritorious.

## CLAIM 11: COUNSEL WAS INEFFECTIVE FOR FAILING TO ADEQUATELY ARGUE FOR SEVERANCE.

Counsel was ineffective for failing to present a reasoned argument, specific to the facts of Cramer's case, as to why his trial should be severed from Fackrell's.[29] Cramer is entitled to a new trial.

**A.      Legal basis**

Separate trials for co-defendants are required "if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993); *see also United States v. Holcomb*, 797 F.2d 1320, 1324 (5th Cir. 1986). Defense counsel should seek severance or take other precautions to protect his client from prejudice when a joint trial would compromise his client's constitutional rights. *See, e.g., Williams v. Washington*, 59 F.3d 673, 682 (7th Cir. 1995).

**B.      Factual basis**

Here, counsel failed to competently present the case for why the court should exercise its authority to sever Cramer's trial from Fackrell's. *See* Fed. R. Crim. Pro. 14. Cramer and Fackrell each

---

[29] On direct appeal, Cramer argued that the trial court erred in denying his motion for severance. *United States v. Cramer*, No. 18-40590, ECF No. 145 (Apr. 14, 2020). This claim is distinct because it is raised as an ineffective assistance of counsel claim.

142

moved for severance, but their motions, filed one day apart, were largely verbatim copies of one another and failed to include crucial information about Cramer's divergent interests and "antagonistic" defenses relative to Fackrell. (*See* Dkts. 85, 86). *Holcomb*, 797 F.2d at 1324. Instead, Cramer's motion admitted that "[i]f the defendants are tried together, Mr. Cramer anticipates that each will exercise his Fifth Amendment right to remain silent" (Dkt. 85 at 3.) and "[t]his is not a case in which one defendant intends to cast blame upon another." (Dkt. 85 at 13; Dkt. 86 at 10-11.) And the fact that the motions were virtually identical–evidence that counsel were *coordinating* their defenses–further undermined the defendants' argument that they should be treated separately. Perhaps the most damaging omission in Cramer's motion was counsel's failure to argue that Fackrell's commission of *another* murder just a few months after the Johns homicide was bound to make Cramer appear dangerous by association during the penalty phase.[30] Defendants' motions to sever were denied.

Counsel's failure to effectively litigate the motion to sever resulted in evident prejudice to Cramer during the joint trial. For example, in the guilt phase, Cramer and Fackrell's defenses were clearly at odds. Fackrell's counsel did not want Rekonen to testify, because they feared Fackrell's involvement in the Griffiths homicide would be revealed. But, as the court found (*see* Claim 1, *supra*), if Rekonen had testified during the guilt phase of trial, his testimony could have established that Fackrell was the more violent of the two, and more importantly, that Cramer was under duress when he attacked Johns. Despite knowing that Rekonen's testimony could only help their client, Cramer's counsel did not press for him to testify and cited an aversion to severance or a mistrial as the reason. (Dkt. 493 (RT) at 5.) Fackrell's theory of the case also put the responsibility for planning the Johns killing directly onto Cramer. As Fackrell's attorney summarized in closing: "[W]hat I have come down

---

[30] Cramer's counsel briefly and confusingly argued that evidence of Fackrell committing a second murder would prejudice Cramer during the *guilt* phase of trial, where this evidence presumably would be inadmissible. (Dkt. 85 at 15.) They also failed to renew the motion to sever during a hearing about whether Rekonen could testify at the guilt phase, where the court *acknowledged* that Cramer and Fackrell had divergent interests. *See* Claim 1.

to is this. Chris Cramer wanted to kill Leo Johns. Ricky Fackrell talked him down off the cliff, 'Come on back down here.' Okay? 'We don't need to kill this guy.'" (Dkt. 596 (RT) at 107.) Fackrell's attorneys argued that it was likely the stab wounds Cramer inflicted that actually killed Johns and that Cramer was the one who went back into Johns' cell to "finish him off." (Dkt. 596 (RT) at 114-19; *see* Dkt. 595 (RT) at 173-80 (eliciting testimony about Cramer going back into Johns' cell alone, and that it could not be proven that Fackrell's stab wounds caused Johns' death).) This theory blamed Cramer alone for the murder and supported the government's theory that Cramer committed first-degree murder by planning the killing in advance. (*See also* Dkt. 594 (RT) at 28.)

Prejudice to Cramer was also evident during the penalty phase, where the prosecution introduced highly prejudicial evidence against Fackrell that would have been inadmissible against Cramer if the two defendants had had separate trials. Most damaging was evidence that Fackrell had committed the additional, brutal murder of Griffiths *after* the killing of Leo Johns, "stomp[ing] out yet another inmate in the recreation cage . . ." (Dkt. 679 (RT) at 180.) The government also introduced multiple incidents of Fackrell manufacturing weapons after the Johns killing, (Dkt. 679 (RT) at 182-85 (describing Fackrell making hatchets, axes, and weapons from broken pipes)); Fackrell attacking a correctional officer with a homemade hatchet (*see, e.g.* Dkt. 679 (RT) at 184); and Fackrell violently destroying his cell on several occasions, (*see, e.g.*, Dkt. 679 (RT) at 181-82.) In contrast to Fackrell, Cramer had been confined at ADX since the Johns murder without any violent incidents. (*See* Dkt. 679 (RT) at 170.) Fackrell's volatile behavior was highly damaging to Cramer, who was made to seem more violent merely by his association with Fackrell. Counsel should have renewed the motion for severance during the penalty phase when evidence of Fackrell's second murder was presented, but they failed to do so. *Cf. United States v. Garza*, 563 F.2d 1164, 1166 (5th Cir. 1977) (finding no deficient performance for a failure to move for severance where "the record reveals an active advocate attempting to protect his client" from prejudice in the joint trial, counsel made relevant objections,

144

and counsel "made several motions for cautionary instructions.")

Prejudice to Cramer continued during the penalty phase as the prosecution and witnesses mixed up the two defendants at various points, making it even more likely that the jury would impute some of Fackrell's violent behavior to Cramer. (*See* Dkt. 679 (RT) at 160, 172 (prosecutor mixing up Cramer and Fackrell). Dkt. 652 (RT) at 204 (testimony of government mental health expert Dr. Jill Hayes: "[T]here is no guarantees when I'm sitting here right now and trying to keep the defendants straight. There is absolutely no guarantees").) Further, the government actively encouraged jurors to group the defendants together, discussing Cramer's 152 and Fackrell's 155 mitigating factors collectively: "[W]e've got 300 mitigators that have been listed. . . . You can *group these mitigators* into large categories. *The defendants* had terrible childhoods." (Dkt. 679 (RT) at 266-67.) The record reflects that the jury did, in fact, impute some of Fackrell's behavior to Cramer: on Cramer's verdict form, 10 of 12 jurors endorsed the mitigating factor: "In 15 years of incarceration, Christopher Cramer has never assaulted a prison staff member or corrections officer." (Dkt. 666 at 15.) The jury failed to find this mitigating factor despite hearing uncontroverted testimony that Cramer had never assaulted a prison staff member or correctional officer–*only* Fackrell had. (*See, e.g.*, Dkt. 679 (RT) at 184.) Jurors also failed to endorse the factor that "Christopher Cramer has committed no violent act in prison since the death of Leo Johns on June 9, 2014," (Dkt. 666 at 15) (0 of 12 jurors), even though the government had acknowledged that Cramer had been securely housed at ADX without incident. Jurors' failure to find these mitigating factors strongly suggested that they mixed up the two co-defendants and imputed some of Fackrell's behavior to Cramer.

Ultimately, despite evidence that only *Fackrell* had been violent in the aftermath of the Johns murder, the jury unanimously found that the government had "proved beyond a reasonable doubt that Defendant Christopher Cramer poses a continuing and serious threat to the lives and safety of others because it is likely that he will commit criminal acts of violence in the future." (Dkt. 666 (RT)

at 1.) Academic research has consistently shown that juries' perception of future dangerousness is one of the most powerful factors determining whether a capital defendant will be sentenced to death. *See, e.g.*, Blume, Garvey & Johnson, *Future Dangerousness in Capital Cases: Always "At Issue,"* 86 Cornell L. Rev. 397, 398 (2001); Cunningham, Sorensen & Reidy, *Capital Jury Decision-Making: The Limitations of Predictions of Future Violence*, 15 Psychol., Pub. Policy & L. 223, 234-35, 244-45 & Table 1 (2009.) The finding of future dangerousness was particularly powerful in this close case: on the second day of penalty-phase deliberations, the jury sent a note to the judge asking, "What is the process if we are not unanimous with our verdict?" (Dkt. 656 at 2.) This note strongly suggests that the jurors struggled with their sentencing decision, and the evidence of Fackrell's behavior that the jury improperly applied to Cramer was especially likely to be prejudicial. The court's penalty phase instructions–which included the same "multiple defendants" instruction that jurors had heard during the guilt phase (Dkt. 679 at 33) did not cure the prejudice to Cramer. This directive was a mere two sentences in 136 transcript pages of instructions that took more than two hours to deliver. (Dkt. 679 at 19-155 (instructions began at 11:22 a.m. and ended at 1:36 p.m.).) Moreover, the instructions told jurors that they "may consider *all the evidence* you have heard at all phases of the trial" in determining whether the aggravators– including future dangerousness–had been proven. (Dkt. 679 at 34.) This instruction, far from curing any prejudice, suggested that it would be permissible for the jurors to consider evidence introduced against Fackrell in their determination of whether Cramer posed a future danger.

If counsel had effectively argued for severance, there is "a reasonable probability that at least one juror would have harbored a reasonable doubt about whether [Cramer] was likely to be violent in the future." *Buck*, 580 U.S. at 120. Cramer is entitled to relief from his conviction and death sentence.

**CLAIM 12: BECAUSE CRAMER'S § 924(C) CONVICTION IS INVALID, THIS COURT SHOULD ORDER A NEW SENTENCING PHASE.**

In support of the prior violent crime statutory aggravator and to establish Cramer's future dangerousness, the government presented evidence of his 2003 conviction under 18 U.S.C. § 924(c)

146

for use of a firearm in the commission of a bank robbery. (Dkt. 30 at 2-3; Dkt. 598 (RT) at 25-27; Dkt. 603 (RT) at 30-78.) Cramer's capital jury considered the § 924(c) conviction as statutory and non-statutory aggravation. (Dkts. 582 at 2, 666 at 1.) Recent (and retroactive) Supreme Court caselaw now renders Cramer's § 924(c) conviction invalid[31] because his bank robbery conviction does not qualify as a crime of violence as a matter of law. *See Borden v. United States*, 141 S. Ct. 1817 (2021). Because one statutory and one non-statutory aggravator were predicated on an invalid conviction, Cramer's death sentence should be vacated and a new penalty phase ordered. *See, e.g., Paul v. Superintendent*, 2022 U.S. Dist. LEXIS 136933 (S.D. Ind., Aug. 2, 2022).

## A.    Legal basis
### 1.    The definition of "crime of violence"

Section 924(c) makes it a crime to use or carry a firearm during and in relation to, or to possess a firearm in furtherance of, among other things, a "crime of violence" that can be prosecuted in federal court. 18 U.S.C. § 924(c)(1)(A.) A "crime of violence" is defined as "an offense that is a felony" and "has as an element the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 924(c)(3)(A). That definition is known as the "force clause."

Section 924(c)'s "crime of violence" definition also contains a so-called "residual clause," covering any felony "that by its nature, involves a substantial risk that physical force" may be used. 18 U.S.C. § 924(c)(3)(B). The Supreme Court recently invalidated the residual clause as unconstitutionally vague because it may "reach[] offenses, like burglary, that do not have violence as an element" and only "create a substantial risk of violence." *United States v. Davis*, 139 S. Ct. 2319, 2334 (2019). Post-*Davis*, an offense constitutes a "crime of violence" only if it qualifies under the force clause of § 924(c).

### 2.    The categorical approach

Courts use the "categorical approach" to determine whether an offense qualifies as a "crime

---

[31] Counsel for Cramer intends to file a motion to vacate his invalid § 924(c) conviction.

of violence" under the force clause. *See United States v. Taylor*, 142 S. Ct. 2015 (2022). That approach directs a court to examine the elements of the predicate offense and "precludes [] an inquiry into how any particular defendant may commit the crime." *Id.* at 2020. The "only relevant question" is whether the predicate offense "always requires the government to prove–beyond a reasonable doubt, as an element of its case–the use, attempted use, or threatened use of force" against the person or property of another. *Id.* After determining the elements of the predicate statute, a court must presume that a defendant's conviction "rested upon nothing more than the least of the acts criminalized." *Moncrieffe v. Holder*, 569 U.S. 184, 190-91 (2013) (cleaned up). In other words, a court must imagine "the *least* serious conduct*" that a defendant could engage in and be convicted under the statute, and then determine whether that conduct qualifies as a crime of violence. *Borden*, 141 S. Ct. at 1832.

### 3.    The Supreme Court's decision in *Borden*

In *Borden*, the Supreme Court ruled that a violent felony as defined by 18 U.S.C. § 924(e)(2)(B)(1)–the force clause of the Armed Career Criminal Act ("ACCA")–is not satisfied by the reckless use of violent force. *Borden*, 141 S. Ct. at 1821-22. ACCA's force clause defines a "violent felony" as an offense that "has as an element the use, attempted use, or threatened use of physical force" against another. 18 U.S.C. § 924(e)(2)(B)(i). A plurality of the Court concluded a violent felony under ACCA's force clause "covers purposeful and knowing acts, but excludes reckless conduct." *Id.* Justice Thomas concurred with the plurality's ultimate conclusion, finding that the "use of physical force" applies "only to intentional acts designed to cause harm"; therefore, ACCA's force clause could not be satisfied by mere recklessness. *Id.* at 1835 (Thomas, J., concurring.)

The language of § 924(c)'s force clause, the statute under which Cramer was convicted, is virtually identical to ACCA's force clause. *Compare* § 924(c)(3)(A) with § 924(e)(2)(B)(i). Therefore, case law interpreting those clauses applies equally to both statutes. *See, e.g., Paul*, 2022 U.S. Dist. LEXIS 136933, at *19; *see also United States v. Smith*, 957 F.3d 590, 593 (5th Cir. 2020). Under the rationale

embraced either by the *Borden* plurality or Justice Thomas's concurrence, a predicate offense must require the purposeful or knowing use of violent force as to the "least of th[e] acts criminalized." *Moncrieffe*, 569 U.S. at 190-91. A *mens rea* of recklessness is insufficient to meet the standard.

**B.      Cramer's § 924(c) conviction must be vacated under *Borden***

Cramer pled guilty to one count of bank robbery, 18 U.S.C. § 2113(a), which served as the predicate for his guilty plea and conviction under § 924(c). The language of § 2113(a) and case law interpreting it makes clear that the "least of th[e] acts criminalized" in this subsection can be violated by recklessly putting a person in jeopardy or recklessly assaulting a person. For example, § 2113(a) penalizes a person who "by force or violence, or by intimidation, takes, or attempts to take, from the person or presence of another" money or property belonging to a bank. This language bundles together attempted and completed robbery and bundles together "force or violence" and "intimidation"; the crime carries the same punishment for both types of conduct. The "least of th[e] acts criminalized" under that paragraph is an attempt to take property through intimidation. Under the rationale employed by the Supreme Court in cases analyzing the force clause in other statutes, attempted bank robbery by intimidation does not have as an element the use, attempted use, or threatened use of force. *See Taylor*, 142 S. Ct. at (2021) (holding that attempted Hobbs Act robbery under 18 U.S.C. § 1951 does not qualify under the force clause of § 924(c) because it can be accomplished by an attempted threat); *Trubey v. United States*, No. 16-cv-1737, Dkt. 51 at 8 (M.D. Fla. Jan. 10, 2023) (holding that attempted robbery under § 2113(a) is not a crime of violence after *Taylor*.)

In addition, a defendant can be convicted under § 2113(a) by obtaining or attempting to obtain money from a bank not by physical violence but "by extortion." Extortion can be accomplished by the wrongful use of actual or threatened force, violence, or fear, including fear of economic loss. *See United States v. Cruzado-Laureano*, 404 F.3d 470, 481 (1st Cir. 2005). But threatening economic loss is not a threat of *physical* force against the person or property of another; indeed, "[a] number of recent

149

district court decisions have held that Hobbs Act extortion does not qualify as a crime of violence under § 924(c)'s force clause because of the 'fear' element." *Capozzi v. United States*, 531 F. Supp. 3d 399, 404 (D. Mass. 2021); *see also Seale v. United States*, No. 19-21016, 2022 WL 18024217, at *3 (D.N.J. Dec. 30, 2022) (wherein the government conceded that extortion is not a crime of violence). Moreover, the government has conceded in *Borden* and other cases that the crime of robbery, as defined in § 2113(a) and other statutes, does not meet the *mens rea* requirement of knowing or purposeful use of force. *See, e.g.,* U.S. Brief, *Borden v. United States,* 14 S. Ct. 1817 (2021) (No. 19-5410), 2020 WL 4455245, *16-17 (conceding that robbery can be committed by the reckless use of force); U.S. Brief, *United States v. Washington*, No. 20-2333, Dkt. 36 at 16, 20 (3d Cir. Dec. 1, 2022) (conceding that conviction for attempted bank robbery under § 2113(a) does not qualify as a predicate for § 924(c) after *Taylor* because it requires only that a person "intend to intimidate a bank teller and take a substantial step toward doing so.")

Because *Borden* and other cases make clear that § 2113(a) robbery can be committed through the reckless use of force, through an attempt, or through means that employ economic rather than physical intimidation, the government cannot establish that Cramer's robbery conviction under § 2113(a) required the knowing or purposeful use of violent force. Cramer's conviction under § 924(c) is therefore invalid and should be reversed.

## C.    Cramer's death sentence should be vacated and a new penalty phase ordered

Because Cramer's § 924(c) conviction is invalid, this Court should reverse Cramer's death sentence and order a new penalty phase. The government relied upon Cramer's § 924(c) conviction to establish its first statutory aggravator, prior violent crime, under 18 U.S.C. § 3592(c)(2). It also used the § 924(c) conviction to support its argument that Cramer would be a future danger. On the second day of deliberations, jurors sent a note to the trial court asking, "What is the process if we are not unanimous with our verdict?" (Dkt. 656 at 2.) Because this query suggests that they struggled with

their sentencing decision, evidence that Cramer committed a crime of violence using a firearm was especially likely to be prejudicial. (*See* Ex. 44 (juries who find a defendant poses a future danger are more likely to impose a death sentence).) Without the § 924(c) conviction, there is "a reasonable probability that . . . at least one juror would have harbored a reasonable doubt about whether [Cramer] was likely to be violent in the future." *Buck*, 580 U.S. at 120.

**CLAIM 13: COUNSEL'S INEFFECTIVENESS AND INSTRUCTIONAL ERROR BY THE TRIAL COURT UNDERMINED THE JURORS' FULL AND FAIR CONSIDERATION OF CRAMER'S CASE FOR LIFE, IN VIOLATION OF 18 U.S.C. §§ 3592 AND 3593 AND THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

**A.    Ineffective assistance regarding the jury's question about unanimity**

Cramer's counsel rendered ineffective assistance under the Sixth Amendment by failing to request that the penalty phase instructions inform jurors that if they failed to reach a unanimous sentencing decision, the result would be a mandatory life sentence. Counsel's failure to request such a "non-unanimity instruction" prejudiced Cramer because the penalty phase instructions the jury actually received were confusing, prompting a question from jurors about what the process would be if they could not reach a unanimous verdict. (Dkt. 656 at 2.) Moreover, research shows that juries who are not given a non-unanimity instruction are overwhelmingly likely to return a death verdict. Cramer was prejudiced by counsel's deficient performance, and his sentence should be vacated.

During the penalty phase of trial, "counsel should request jury instructions and verdict forms that ensure that jurors will be able to consider and give effect to all relevant mitigating evidence. Trial counsel should object to instructions or verdict forms that are constitutionally flawed, or are inaccurate, or confusing and should offer alternative instructions." *ABA Guidelines*, Guideline 10.11(K), reprinted in 31 *Hofstra L. Rev.* 913, 1058 (2003). Counsel must object to any instructions that might confuse or mislead the jury, even if they are standard ones given in the jurisdiction. *Id.* at 1069.

Here, counsel submitted proposed penalty phase jury instructions, making several suggested additions and deletions to the instructions drafted by the government. (*See generally* Dkt. 631.)

Counsels' proposed instructions, however, omitted any mention of what would happen if jurors were unable to reach a unanimous verdict in the sentencing phase, leaving jurors free to speculate about what might happen if they could not reach a verdict: would the government be required to re-try the whole case, resulting in a possible guilt-phase acquittal for one or both defendants? Would the guilty verdict stand but a new penalty phase be ordered, requiring the victim's family to go through the process of testifying about the death of their loved one all over again? Although defense counsel requested permission to inform prospective jurors about the consequences of non-unanimity during voir dire and the court denied their request (Dkts. 480, 483), this was a very different matter than informing seated jurors–more than a month later, when they were actually facing the sentencing decision–about the consequences of failing to reach a unanimous verdict. When the time came for counsel to submit proposed instructions, they should have renewed their request to include the consequences of non-unanimity instruction.

The Federal Death Penalty Act ("FDPA") answers this question: if jurors can't reach a unanimous verdict, the trial court must sentence the defendant to life imprisonment. *See Jones v. United States*, 527 U.S. 373, 383 (1999). To preempt improper juror speculation, most federal trial courts provide a non-unanimity instruction. (Ex. 73 ¶ 3.) In fact, in "the thirty-four (34) federal capital trials that [have] proceeded to a jury sentencing since 2010, the Court instructed the jurors that the consequence of a non-unanimous vote on the ultimate issue of life or death was the imposition of a sentence of life imprisonment without release in twenty-seven (27) of these trials (79% of the trials)." Ex. 73 at ¶ 3. Counsel inexplicably failed to request that jurors be informed about what the FDPA clearly requires. Although the Supreme Court has declined to hold that the Eighth Amendment requires such an instruction in every case, *see Jones v. United States*, 527 U.S. 373, 383 (1999), counsel should have been aware that non-unanimity instructions are standard practice among most federal trial courts and that the absence of such an instruction may be "confusing" for jurors. *See ABA*

152

*Guidelines*, Guideline 10.11(K). Counsel was deficient for failing to request such an instruction.

Counsel's failure to request a non-unanimity instruction was prejudicial. In *Moore v. Maggio*, the Fifth Circuit held that a defendant was not prejudiced by counsel's failure to request a specific non-unanimity instruction because the instructions jurors received "sufficiently informed the jury that if even one member of the jury held out, the trial judge would be required to impose a life sentence." 740 F.2d 308, 319 (5th Cir. 1984). The instructions in *Moore* explained that if the jurors unanimously agree on the statutory aggravating factors, "then life imprisonment without benefit of parole, probation or suspension of sentence is *the only sentence that may be imposed*." *Id.* (emphasis added). In Cramer's case, however, the jury was provided with no such instruction. At the end of their first full day of deliberations, the jury submitted a question to the court asking, "What is the process if we are not unanimous with our verdict?" (Dkt. 656 at 2.) This indicates that the jurors were confused by the penalty phase instructions and that unlike in *Moore*, the instructions they were given did not sufficiently inform the jury that even one holdout juror would result in a life sentence. *Moore*, 740 F.2d at 319.

Prejudice is also established based on data showing that in cases where jurors are not informed of the consequences of non-unanimity, an overwhelming majority of defendants are sentenced to death. Since 2010, 89% of defendants tried by juries who did not receive a non-unanimity instruction were sentenced to death; in stark contrast, where a non-unanimity instruction was given, just 30% of juries sentenced one or more defendants to death. (Ex. 73 ¶¶ 4-5.)

**B.      Instructional error regarding the verdict forms at the penalty phase**

A capital sentencing jury must be correctly instructed during penalty phase proceedings, especially with respect to its consideration of the proffered mitigating factors. The range of potential mitigators that a capital defendant can present is extensive, and it is the provenance of the courts to decide, as a matter of law, whether proffered mitigation is trivial or irrelevant and as such can be excluded. *Id.* at 286-87. The Supreme Court has long held that the standard for relevance with respect

to mitigation is broad: "[T]he question is simply whether the evidence is of such a character that it might serve as a basis for a sentence less than death." *Tennard,* 542 U.S. at 287 (internal quotation marks and citation omitted). And there are certain categories of evidence that *always* constitute relevant mitigating evidence as a matter of law–namely, information about a defendant's background and upbringing. Such evidence "is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse." *Penry,* 492 U.S. at 319. Once any juror finds that the defense has established a mitigating factor by a preponderance of the evidence, he or she is required to consider and give the factor whatever weight he or she deems appropriate. Sentencers "may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration." *Eddings,* 455 U.S. at 114-15.

The FDPA also provides guidance to courts on the presentation and consideration of mitigating evidence. *See* 18 U.S.C. § 3592(a). The plain language of the FDPA states that a jury "*shall* consider any mitigating factor," including the seven statutory factors listed, as well as any relevant non-statutory mitigation. 18 U.S.C. § 3592(a)(1)-(8) (emphasis added). Additionally, any reading of the mitigating-factor provision, § 3592(a), must be informed by Congress's treatment of aggravating factors under the statute. Congress requires that jurors "shall" consider each of the 16 enumerated "statutory" aggravating factors. 18 U.S.C. § 3592(c). Like § 3592(a), § 3592(c) concludes with a catch-all provision–but compared to the mitigation catch-all in § 3592(a)(8), Congress uses different, permissive, non-mandatory language when discussing non-statutory aggravation: "The [factfinder] *may* consider whether any other aggravating factor for which notice has been given exists." 18 U.S.C. § 3592(c) (emphasis added). The differing use of the permissive "may" from the mandatory "shall" establishes that, while a jury must consider all mitigating factors and all statutory aggravating factors sufficiently proven, it does not have to consider non-statutory aggravating factors. *See, e.g., Lopez v.*

*Davis*, 531 U.S. 230, 241 (2001) (describing the difference between "may" and "shall"). Thus, under the plain language of the statutory scheme, while a jury can disregard a non-statutory aggravating factor, it cannot disregard a statutory aggravating factor or any mitigating factor.

Cramer's jury were misinformed about their role at sentencing and the boundaries of their authority as established by Supreme Court jurisprudence and the plan language of the FDPA. The Special Verdict form used in this case directed the jurors to follow a two-step analysis when considering Cramer's mitigating factors: "For each of the following proposed non-statutory mitigating factors, indicate in the space provided the number of jurors who find that the defendant has proved by a preponderance of the evidence the existence of such factor *and that it is mitigating.*" (Dkt. 666 at 2 (emphasis added).) In other words, the jurors in Cramer's case were instructed to decide *both* whether the evidentiary standard for the proposed mitigator had been met "by a preponderance of the evidence" (a factual determination) and "that it is mitigating" (a legal determination) before they could consider the mitigator in the weighing process. These instructions led jurors to believe that even if a factor was proved by a preponderance of the evidence, they were allowed to give it no weight–i.e., that they "may" consider relevant mitigation rather than that they "shall" consider relevant mitigation.

Counsel for Cramer and Fackrell jointly objected to the jury verdict form, contending that once the jury found either of the defendants had proved, as a factual or historical matter, a mitigating fact, the jury must consider it. (Dkt. 679 (RT) at 5-8; *see also* Dkt. 631.) The trial court overruled the objection, and in doing so revealed a fundamental misunderstanding of the jury's role vis-à-vis mitigating factors in capital sentencing:

> [A]s for the Verdict Form, I think the jury has to find both that the fact exists and that it's mitigating. . . . I mean, some of these things are not on their face mitigating, like 'Ricky Fackrell spends a lot of time reading.' I mean, okay, but I don't know if that's necessarily mitigating; so, I think the jury would have to find that mitigating to consider the issue. And if they do, then they should consider that.

(Dkt. 679 (RT) at 7.) Fackrell's counsel explained how that reasoning was flawed and unconstitutional:

> [O]nce they find something to be a mitigating fact, they can't give it no consideration…. [I]t's not a matter of semantics. It's a very important constitutional principle that if the fact is found, they must consider it at least to some extent, however slight. So that's really the focus of our objection, is that the way it's set up now, they could fail to consider it as mitigating if they find it as a fact.

(Dkt. 679 (RT) at 7-8.) The court disagreed and dismissed counsels' concerns.

By instructing the jurors they could ignore mitigating factors proven by the evidence, the trial court abused its discretion. And the government cannot show, as it must, that the court's instructional error (and the government's frequent argument in the same vein) "did not contribute to the verdict obtained" and were therefore harmless beyond a reasonable doubt. *See Satterwhite v. Texas*, 486 U.S. 249, 257-58 (1988) (internal quotation and citation omitted); 18 U.S.C. § 3595(c)(2).[32] This is because the jurors were misinformed about their role time and time again during Cramer's trial. It started with the government's opening statement during voir dire, when the prosecutor explained the weighing process to the prospective jurors:

> [Y]ou can expect that the defense will put on evidence of mitigating factors. . . . So, the last thing you do is you get your aggravating factors on one side of the scale and your mitigating factors, *if there are any*, on the other side of the scale; and then you make an individual decision on whether or not you think that those aggravating factors sufficient outweigh the mitigating factors *if there are any*, such that in your mind the death penalty is warranted.

(Dkt. 710 (RT) at 48, 50 (emphasis added); *see also* Dkts. 703 at 12, 704 at 12.) Fackrell's counsel similarly misled the prospective jurors during his opening statement at voir dire. Rather than explaining that proffered mitigation was in fact mitigating, and the only thing the jury needed to do was determine

---

[32] Cramer's counsel objected to the special verdict form and instructions described herein, as did Fackrell's counsel; their objections were denied. (Dkts. 631, 679 (RT) at 5-8.) Appellate counsel independently challenged the trial court's ruling on appeal. (*Cramer*, Case No. 18-40598, 2020-04-14 Cramer AOB at 177-180; Fackrell AOB at 43.) However, the Fifth Circuit addressed only Fackrell's claim and entirely failed to rule on Cramer's claim. *See Fackrell*, 991 F.3d 589 at part K, "Jury Instructions on Mitigating Evidence." Because the Fifth Circuit did not address Cramer's argument on appeal, this court can review the claim de novo. To the extent that trial counsel failed to properly preserve the objection at trial, counsel rendered prejudicial ineffective assistance. *See* Claim 2.

whether it was established by a preponderance of the evidence, Fackrell's attorney said, "You know, there are all kinds of things that can be mitigating factors, **but they're only mitigating factors if you find them to be mitigating factors**." (Dkt. 710 (RT) at 70 (emphasis added).)

During penalty phase argument for Cramer, the government told the jury that they needed to "think about three different questions" during deliberations: first, "has the defense proven the mitigating factor" by a preponderance of the evidence; second, "you have to decide **whether or not it's mitigation**"; and only then, "if you do think both of those things are true, then you have to decide what weight you want to assign to that mitigating evidence." (Dkt. 603 (RT) at 22 (emphasis added).) This misstatement of the law was repeated throughout the government's opening statement in Fackrell's case. (*See, e.g.*, Dkt. 604 (RT) at 55 ("So, you have to first decide if you hear any mitigation, was it proven or is it merely a representation of an attorney. . . . And even if it was proven, does the evidence that you heard mitigate?").)

Finally, the trial court's written instructions, provided to the jury separate from the verdict form, further underscored the dual decision jurors were charged with making by directing the jury that the mitigation they had just heard about for days of testimony was "proposed mitigating factors" (rather than "proposed by Cramer to have been proven by a preponderance of the evidence.") (Dkt. 665 at 18.) The court's instructions impermissibly allowed juror nullification with respect to mitigation–that is, rejection of a proffered mitigating factor established by the preponderance of the evidence solely because the juror disagreed that the particular category of evidence constituted legally cognizable mitigation. The faulty instructions given to Cramer's jury have particular significance in the context of capital sentencing because capital juries may not refuse to consider relevant mitigating evidence. *See Morgan*, 504 U.S. at 739; *United States v. Fell*, 372 F. Supp. 2d 766, 771 (D. Vt. 2005) (jurors who refuse to consider relevant evidence must be excused for cause).

Despite the fact that the trial court had already decided which of Cramer's proffered mitigating

circumstances, *as a matter of law*, must be considered in mitigation (Dkt. 679 (RT) at 272 -73), the jury was repeatedly and improperly advised by the government and instructed by the court that it was up to them whether they believed mitigating circumstances existed at all, and if so, whether they were "actually" mitigating, in violation of constitutional standards. *Tennard*, 542 U.S. at 286-87; *Boyde*, 494 U.S. at 377-78. Given the way Cramer's Special Verdict form was prepared, mitigating factors could be screened out at the second step if a juror determined that the factor was not mitigating. Thus, a juror was likely to fail to" consider and give effect" to a mitigating factor because they improperly concluded at the second step that the factor was not mitigating, i.e., not relevant to whether or not a life sentence was more appropriate than a death sentence. Such error cannot be deemed harmless.

A review of capital verdict forms used in federal capital cases around the country reveals that the instructions used here were both highly unusual and highly likely to result in a death verdict. (Ex. 45.) Professor Meredith Rountree and Professor Mary Rose spearhead an ongoing research project studying jury verdicts in federal capital cases. (Ex. 45 ¶ 3.) Of the 213 verdict forms reviewed as part of this study, the vast majority of verdict forms in federal capital cases did *not* instruct jurors in a manner that would lead them to believe that they should decide whether a mitigating factor "is mitigating," "relevant," or any other legal determinations that are properly within the provenance of the trial court. (Ex. 45 ¶¶ 15-20.) Only eight verdict forms, or 4%, had the instruction given in Cramer's case, and seven of those defendants, including Cramer, were sentenced to death. (Ex. 45 ¶ 16(e).) Strikingly, these eight cases were presided over by only three judges in two districts–one of whom is Judge Marcia A. Crone of the Eastern District of Texas, who presided over the death sentences of Cramer, Fackrell, Garcia, and Snarr: (Ex. 45 ¶ 17.)

The harm caused by the court's faulty instruction is also evidenced by the jury's special findings regarding non-statutory mitigating factors. (Dkt. 666 at 2-19.) As noted above, for each of the 152 mitigating factors listed, the jury was directed to "indicate in the space provided the number of jurors

158

who find that the defendant has proved by a preponderance of the evidence the existence of such factor and that it is mitigating." (Dkt. 666 at 2.) Cramer's jury entered "0" for 102 of the listed factors, including those supported by uncontroverted evidence, expert testimony, the government's discovery, and/or BOP records *and therefore were proven by a preponderance of the evidence*. (*See, e.g.*, Dkt. 666 at 29 ("[Cramer] had educational deficits, including being diagnosed with a learning disorder as a child"); 32 ("[Cramer's] intellectual ability is in the lower 20% of the population"); 63 ("The psychiatric disorders for [Cramer] include specific trauma and related stress disorder with a history of complex trauma"); 116 ("[Cramer] did not harm any corrections officers or staff in the commission of the offense").)

Deciding whether a capital defendant should live or die is a balancing process. When considering mitigation, the jury is to weigh all of the evidence, including all mitigating factors proven by a preponderance of the evidence. Here, however, because of the errors in the special verdict form and jury instructions, Cramer's jury was clearly unable to give effect to each of the mitigating factors established by the defense (Dkt. 666.) This violated constitutional principles and harmed Cramer's sentencing outcome. *See Penry v. Johnson*, 532 U.S. 782, 797 (2001) (the most important aspect of penalty phase instructions "is that the jury be able to consider and give effect to [a defendant's mitigating] evidence in imposing sentence.") There is a reasonable probability that one or more jurors engaged in nullification by refusing to consider constitutionally relevant mitigating evidence, thereby prejudicing Cramer and rendering his death sentence unconstitutionally unreliable. Because counsel was ineffective and because the trial court abused its discretion by ignoring these well-settled constitutional principles, this court should vacate Cramer's death sentence and order a new penalty phase.

## CLAIM 14: JUROR MISCONDUCT UNDERMINES CRAMER'S CONVICTION AND SENTENCE.

Cramer's conviction and death sentence were imposed in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the Constitution due to juror bias and misconduct during both phases of his trial. Cramer alleges that the jury committed misconduct by prematurely deliberating,

159

considering extrinsic evidence[33] (including exposure to pretrial publicity), drawing adverse inferences from Cramer's exercise of his right against self-incrimination, discussing the case or consulting with third parties, failing to follow court instructions not to prejudge the case or Cramer, failing to follow court instructions to consider defendants Cramer and Fackrell separately, allowing bias to influence its decision, allowing considerations of cost to influence its penalty decision, and failing to disclose relevant knowledge and biases.[34] Cramer is entitled to relief. *Irvin v. Dowd*, 366 U.S. 717, 722 (1961); *Pena-Rodriguez v. Colorado*, 580 U.S. 206, 225 (2017); *Mitchell v. United States*, 526 U.S. 314, 328 (1999); *Parker v. Gladden*, 385 U.S. 363, 364-65 (1966); *Griffin v. California*, 380 U.S. 609, 613 (1965); *Mattox v. United States*, 146 U.S. 140, 150 (1892).

**CLAIM 15: MATERIAL OMISSIONS FROM CRAMER'S TRIAL TRANSCRIPT VIOLATE HIS RIGHTS UNDER THE FIFTH AND EIGHTH AMENDMENTS.**

Cramer's conviction and death sentence must be vacated because key portions of trial proceedings at issue in his appeal were not recorded or transcribed. During an off-the-record bench conference, the district court heard arguments on the motion to exclude testimony from Elizabeth Rose, a key government witness who was also represented by Cramer's attorney, raising a clear conflict of interest issue. (*See* Claim 5.) The court also held off-the-record conferences regarding penalty phase jury charges; whether there was a *Batson* issue with the jury; security measures at trial; and other substantive issues relevant to claims that Cramer has raised on appeal and in this motion. Taken together, these substantial gaps in the record undermine the constitutional basis for Cramer's conviction and death sentence.

**A.    Legal basis**

The Supreme Court has long recognized the importance of a "proper record on appeal." *Miller*

---

[33] *See also* Claim 7 (discussing external influence on seated juror Melissa W. when her coworkers made comments about the defendants to her during voir dire).

[34] Cramer intends to seek leave to interview jurors pursuant to L.R. CR-24 and will thereafter amend this petition as required.

*v. United States*, 317 U.S. 192, 199 (1942). In *Mayer v. City of Chicago*, the Court held that the state was constitutionally required to provide indigent defendants appealing their convictions "a record of sufficient completeness to permit proper consideration of [their] claims." 404 U.S. 189, 194 (1971) (internal quotation marks and citations omitted.) "Moreover, where the grounds of appeal . . . make out a colorable need for a complete transcript, the burden is on the State to show that only a portion of the transcript or an 'alternative' will suffice for an effective appeal on those grounds." *Id.* at 195.

In capital cases, in particular, the record must "disclose to the reviewing court the considerations which motivated the death sentence." *Gardner v. Florida*, 430 U.S. 349, 361 (1977). "Without full disclosure of the basis for the death sentence, [a] capital-sentencing procedure" violates a defendant's right to due process and is "subject to the defects which resulted in the holding of unconstitutionality in *Furman v. Georgia.*" *Id.*; *see Dobbs v. Zant*, 506 U.S. 357, 358 (1993).

To establish a constitutional violation based on an incomplete record, the missing records must be material to Cramer's claims. *See Schwander v. Blackburn*, 750 F.2d 494, 497–98 (5th Cir. 1985) (holding that petitioner was not denied the "right to a meaningful appeal" where "the omitted phases of the trial transcript [were] immaterial to the error alleged" on appeal.)

**B.      Conference regarding Elizabeth Rose's testimony**

Elizabeth Rose was a government witness who testified that she overheard Cramer and Fackrell making incriminating statements while she was detained in a holding cell next to them on the first day of their trial. As explained in greater detail in Claim 5, *supra*, Rose was represented by John McElroy, a member of Cramer's defense team, at the time she overheard these statements. In fact, the first person Rose told about the statements was McElroy, raising a conflict of interest in McElroy's representation of Cramer. Cramer filed a motion to preclude Rose's testimony based on McElroy's dual representation (*see* Dkt. No. 551 at. 3-4), but the motion failed to disclose that Rose had told McElroy about the conversation she overheard. The conference addressing the motion to prohibit

Rose's testimony occurred entirely off the record. (*See* Dkt. 743). According to the reconstruction of the conference prepared by appellate counsel, Cramer's attorneys again failed to inform the court that McElroy had been involved in facilitating Rose's testimony against Cramer. Instead, counsel claimed that they had information about "confidential drug amounts" involved in Rose's case, *id.* at 3, implying that Rose's original public plea agreement contained false statements. *See generally* Claim 5, *supra*.

In Claim 5, Cramer alleges that his right to conflict-free counsel was violated when McElroy represented both Cramer and Rose and when he facilitated Rose's testimony against Cramer. What transpired at the bench conference regarding this conflict bears directly on this claim. *Compare Schwander*, 750 F.2d at 497–98 (no constitutional violation where "the omitted phases of the trial transcript [were] immaterial to the error alleged.") Cramer is entitled to a clear record of what McElroy, Black, and Barlow told the court about their knowledge of Rose's case and McElroy's involvement in securing Rose's testimony for the government.

## C.    Conferences regarding other substantive matters

Cramer and Fackrell's appellate counsel reviewed the record soon after their appointment and determined that multiple trial court proceedings had not been recorded. Counsel made a list of the known unrecorded proceedings. (*See* Dkt. 747, App. B.). In addition, counsel attempted to reconstruct four substantive off-the-record conferences for which they had access to summaries and notes from the attorneys present. *(See* Dkts. 743, 747 Apps. A, B.) The off-the-record discussions covered multiple substantive issues that were relevant to Cramer's claims on appeal and in this motion. For example, during a pretrial conference discussing which prospective jurors had been struck, Judge Crone apparently noted that all of the Black venire persons had been struck. (Dkt. 747 App. A at 6.) She asked, "Do we have a problem?" and the reconstruction indicates that "the government responded that it was not striking jurors because they were Black" but does not note any *Batson* challenge from the defense. This conference is directly relevant to Cramer's claim that defense counsel was ineffective

162

for failing to raise a *Batson* claim during voir dire. (*See* Claim 8.)

At another unrecorded conference, the judge and attorneys addressed the visible security presence at trial and what the Marshals would be wearing, including discussion of how law enforcement personnel would appear to the jury. This conference bears directly on Cramer's Claim 9 (discussing visible security presence at trial). Other unrecorded conferences discussed key penalty-phase issues, including jury instructions, and how mitigators could be worded. (Dkt. 747 App. A. at 9, App. B at 4.) In all of these instances, "the omitted phases of the trial transcript" were far from "immaterial to the error alleged," *Schwander*, 750 F.2d at 497-98, but instead discussed substantive issues affecting Cramer's rights. The court must vacate Cramer's conviction and death sentence.

**D. Prior counsel was ineffective for failing to adequately preserve this issue at trial and brief the issue on appeal**

It does not appear that counsel requested any of the untranscribed proceedings be placed on the record. Counsel was ineffective for failing to ensure that Cramer had an adequate record on appeal. In addition, appellate counsel was ineffective for failing to adequately raise this claim on appeal. In Cramer's appellate brief, counsel simply incorporated by reference Fackrell's claim regarding the incomplete record. The entirety of Cramer's claim reads: "Point XII: Appellate counsels' and this Court's inability to review substantial and significant portions of the record requires reversal. (Although the heading uses Fackrell's name, the issue applies equally to Cramer.)" AOB at 178. Counsel for Cramer did not provide any additional detail or argument regarding the untranscribed conference concerning Elizabeth Rose, an issue that most directly impacted Cramer (rather than Fackrell) since it implicated Cramer's right to conflict-free counsel. For the reasons explained above, the failures of trial counsel to preserve the record and of appellate counsel to adequately raise this claim on appeal were prejudicial.

163

**CLAIM 16: CRAMER WAS DENIED THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL.**

**A.        Appellate counsel failed to raise meritorious claims**

The Sixth Amendment entitles a criminal appellant to the effective assistance of counsel in his direct appeal. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). (*See supra* pp. 4-6) To establish a Sixth Amendment violation, Cramer must show that appellate counsel rendered deficient performance and that but for appellate counsel's failure to raise an omitted claim, there is a reasonable probability he would have prevailed on appeal. *Smith*, 528 U.S. at 285-86.

*Failure to argue that the trial court erred in denying Cramer's motion to present execution impact evidence.* To provide effective assistance in a capital case, defense counsel should present evidence of the value of a defendant's life to his loved ones. *See Johnson v. Mitchell*, 585 F.3d 923, 942 (6th Cir. 2009) (finding trial counsel ineffective and explaining that without family pleas for mercy, "the jury was left with no alternative but to believe that [his] own relatives were not supportive enough of him to plead for his life during the proceedings"); *Marshall v. Cathel*, 428 F.3d 452, 470-71 (3rd Cir. 2005). A compelling case for life includes execution impact evidence. *See* ABA Guideline 10.11.F.4. Here, counsel filed a "Motion to Introduce the Testimony of Defendant's Family and Friends Regarding Their Feelings on the Prospect of a Death Sentence and the Impact an Execution Would Have on Them." (Dkt. 204.) The trial court denied the motion based on Fifth Circuit precedent holding that while mercy pleas from family members "may well impact a jury's decision, they are not mitigating evidence" required to be admitted "since they do not reflect on [the defendant's] personal culpability." (Dkt. 300.)

Appellate counsel should have alleged trial court error for denying Cramer's request to present execution impact evidence. Contrary to the trial court's ruling, such evidence is permissible in sentencing proceedings because, under the Eighth Amendment, capital juries shall not be precluded from considering *any* relevant evidence in support of a sentence less than death. *See Lockett*, 438 U.S. at 604; *Skipper v. South Carolina,* 476 U.S. 1 (1986). Additionally, as a matter of due process, any capital

164

defendant alleged to pose a future danger has a right to present evidence that he could lead a useful life behind bars. *Skipper*, 476 U.S. at 8. The FDPA also supports this position. 18 U.S.C. § 3592(a)(8).

Here, Cramer's possible future dangerousness was the primary focus of the government's case for death. To support that non-statutory aggravating factor, the prosecutor relied on the defense expert's diagnosis of antisocial personality disorder (APD) and Cramer's criminal and disciplinary records. The government also presented a sympathetic portrait of Leo Johns and the loss and pain his family suffered from his death. (Dkt. 679 (RT) at 192.) But the prosecution dismissed mitigating evidence showing that "Cramer loves his family and they love him" by observing, "I'm going to say most people–most people have people who love them… Does that mitigate against the sentence that should be given here for Christopher Cramer's choices and actions?" (Dkt. 679 (RT) at 200.)

Several of Cramer's relatives testified that they love Cramer and wanted him to live. (Dkt. 646 (RT) at 154-247; 647 at 16-23.) Cramer's mother, Darla Dillon, gave perhaps the most heartrending testimony about her love for her son:

> He's just a kid. He's a good kid and he would do anything and he's very loyal. I know he's a man, and I know he looks like–his outer shell looks like that, but his heart isn't that way. He deserves to live. We all deserve to live, but he deserves to live. He deserves to live; and he deserves to have a chance to get right, you know. He's just lost. He needs to go back–find his way back home.

(Dkt. 647 (RT) at 15.)  As impassioned as her plea was for her son's life, Dillon had more she wanted to say to the jury if she had been given the chance. As she explained in a post-trial declaration:

> At trial, . . . I was not asked to testify about the impact [Chris'] execution would have on me and my family. If I had been asked, I would have told the jury and judge that my son being executed would be the worst thing to happen in my life. Chris is so special and important to us. He is my first-born, and still my baby boy. Even though he has been in prison for many years, we have a strong relationship, and he is a precious part of our family. I have not had an easy life. I have experienced a lot of pain and many losses. But if Chris were put to death, I don't know if I or my family would ever recover.

(Ex. 51, ¶¶ 2-4.) Under the Eighth Amendment, Cramer was entitled to present such evidence to the jury, and the jury was entitled to hear it. If counsel had presented testimony about the impact that

165

Cramer's execution would have had on his mother Darla and other loved ones, there is a reasonable probability that at least one juror would have voted to spare his life. Indeed, there is evidence that juries find execution impact evidence highly mitigating: Data collected before Cramer's trial showed that federal capital juries found execution impact as a mitigating factor in over 60 cases.[35] Appellate counsel's failure raise this claim on appeal was ineffective.

**Other instances of IAAC.** In addition, appellate counsel rendered deficient performance in failing to present or develop all or parts of the following claims: Claims 1, 2, 5, 6, 7, 9, 11, 12, 13, 15, and 17. Cramer incorporates each claim by reference as though fully presented herein. Cramer was prejudiced by appellate counsel's deficient performance because there is a reasonable probability that Cramer would have prevailed on one or more of these claims on appeal.



---

[35] *Available at* https://fdprc.capdefnet.org/sites/cdn_fdprc/files/Assets/public/project_declarations/mitigation/9-6-13_execution_impact.pdf.

166



deficient performance contributed to the failure to raise meritorious claims on appeal, Cramer was prejudiced. Cramer is entitled to habeas relief.

## CLAIM 17: THE FEDERAL DEATH PENALTY ACT IS UNCONSTITUTIONAL.

### A.    Legal basis

The Eighth Amendment prohibits the imposition of a death sentence unless the governing statute justifies the imposition of a more severe sentence on the defendant compared to others found guilty of murder. *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988) (quoting *Zant v. Stephens*, 462 U.S. 862, 877 (1983)); *Furman*, 408 U.S. 238. Since *Furman*, the Supreme Court has required states to "tailor and apply [their] law[s] in a manner that avoids the arbitrary and capricious infliction of the death penalty." *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980). A capital statute "must channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance, and that make rationally reviewable the process for imposing a sentence of death." *Id.* (cleaned up).

### B.    The FDPA fails to narrow the class of death-eligible offenders

The *Furman* Court held that the death penalty must not be "wantonly and freakishly impose[d]"; instead, its imposition must "always [be] circumscribed by the legislative guidelines." *Id.*

167

at 206-07. Thus, aggravating factors must be narrowly defined. *Godfrey*, 446 U.S. at 429; *Zant*, 462 U.S. at 877-78 & n.15. The FDPA sets forth sixteen statutory aggravating factors, but also permits consideration of "any other aggravating factor for which notice has been given," which allows virtually any murder to be charged capitally. 18 U.S.C. § 3592. As a result, prosecutors are afforded unfettered discretion in deciding whether to seek death, creating a substantial risk of arbitrariness.

## C.    The death penalty is arbitrary and capricious as applied to Cramer

The authorization and imposition of death is consistently a Southern phenomenon. Since 1927, there have been 50 federal executions. Almost half have stemmed from prosecutions in the South, and the vast majority of recent executions have arisen from Texas. (*See* Ex. 57) A 2010 study of this significant geographic disparity reveals that six of the 94 federal judicial districts account for one-third of death authorizations; more than half of all death authorizations come from 14 districts; and seven districts are responsible for approximately 40% of individuals on federal death row. G. Ben Cohen and Robert J. Smith, *The Racial Geography of the Federal Death Penalty*, 85 Wash. L. Rev. 425, 429-30 (2010). The single federal district that has generated the most death sentences in the modern era is the Eastern District of Texas, accounting for 8 of 79 federal death sentences nationwide. (Ex. 57.)

Because charging practices differ widely across, constitutionally relevant factors such as culpability are not determinative. For example, there are numerous examples of highly aggravated BOP homicides that are never charged capitally. In districts outside the Eastern District of Texas, authorization to seek the death penalty was not sought in the vast majority of BOP homicides, including the killing of a Jewish Defense League member by an alleged Skin Head at FCI Phoenix; a drug-related BOP inmate murder of a government witness; a gang-related murder at USP Coleman; and the murder of an intellectually disabled inmate related to a gang dispute. (Ex. 76.) In addition to geography, race factors heavily into whether the death penalty is imposed. Relevant to this case, defendants of any race who are convicted of killing a white victim "are more likely to be sentenced to

death" than those convicted of killing a black victim. Cohen & Smith, *The Racial Geography of the Federal Death Penalty*, 85 Wash. L. Rev. 425, 428 (2010). And, as more fully explained in Claims 1-16 above, additional factors unrelated to Cramer's culpability factored heavily into the sentencing result. For example, counsel's failure to develop mitigating evidence or evidence of Cramer's ▮▮▮▮ to request appropriate jury instructions, and to ensure that the jury was unbiased all influenced the jury's ultimate decision to sentence Cramer to death. Finally, another factor that varies widely across districts is jurors' receptiveness to mitigating evidence, a factor that was stacked heavily against Cramer. Academic research shows that "juries in the Eastern District of Texas endorse the lowest number of mitigators in BOP homicide cases of any district in the country." (Ex. 45 ¶ 14; *see also* Claim 13(B).)

Because factors unrelated to culpability factored heavily into Cramer's sentence, and because the FDPA fails to meaningfully narrow the class of death-eligible defendants, the government's administration of the federal death penalty as applied to Cramer is arbitrary and capricious, and his sentence must be vacated. *See Glossip v. Gross*, 576 U.S. 863, 908-78 (2015) (Breyer, J. dissenting.)

**CLAIM 18: CRAMER'S CONVICTION AND SENTENCE MUST BE VACATED DUE TO THE CUMULATIVE PREJUDICIAL EFFECT OF THE ERRORS IN THIS CASE.**

Cramer's convictions and sentences are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution, because the cumulative effect of the errors involved in Cramer's trial violated his rights to a fair trial, trial by jury, due process, effective assistance of counsel, presentation of a defense, confront the witnesses against him, a reliable determination of guilt and penalty, fundamental fairness, and to be free of cruel and unusual punishment. *United States v. Fields*, 761 F.3d 443 (5th Cir. 2014). In support of this claim, Cramer incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto. In addition, Cramer re-urges all objections, arguments, and claims of error made at trial and during direct appeal proceedings, and incorporates by reference herein those prior objections, arguments, and claims of error. Even if the prejudice flowing from any single claim

169

fails to justify reversal, cumulative prejudice deprived Cramer of a fair trial and make it likely that, but for these errors, the outcome of the trial could have been different. In particular, the imposition of death sentences at the conclusion of a trial as riddled with errors as this one represents a substantial miscarriage of justice.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: September 20, 2023    By:    /s/ Laura Paul

LAURA PAUL (CA Bar No. 329386)
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: 213-894-3217
Facsimile: 213-894-0081
Email: Laura_Paul@fd.org

DEVON PORTER
CELESTE BACCHI

Attorneys for Defendant
CHRISTOPHER EMORY CRAMER

170

**CERTIFICATE OF SERVICE**

This is to certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV(a)(3) on this 8th day of December 2023. Assistant U.S. Attorney Traci Kenner has also been served electronic copies of the pleadings only via email, as the exhibits, which were served previously, remained unchanged.

/s/ *Laura Paul*
LAURA PAUL