<u>**FILED UNDER SEAL**</u>

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

CHRISTOPHER EMORY CRAMER          §
                                  §
V.                                §    Civil No. 1:23-CV-355
                                  §    Criminal No. 1:16-CR-26(01)
UNITED STATES OF AMERICA          §

**GOVERNMENT'S REPSONSE IN OPPOSITION
TO MOTION FOR COLLATERAL RELIEF
PURSUANT TO 28 U.S.C. § 2255**

## Table of Contents

Table of Authorities .................................................................................................................v

Offense Conduct and Procedural History ...............................................................................1

Procedures for Section 2255 Proceedings...............................................................................4

      A. Section 2255 Procedures, the Relation-back Doctrine, and Discovery .........................4

      B. Verification of the Section 2255 Motion.......................................................................6

      C. Affidavits or Declarations From Former Counsel..........................................................7

General Law on Federal Collateral Review of Criminal Judgments .......................................8

      A. Cognizable Claims ........................................................................................................8

      B. Claims Raised on Direct Appeal and Procedurally Defaulted Claims...........................9

      C. New Rule of Criminal Procedure .................................................................................10

      D. Harmless Error .............................................................................................................11

RESPONSE TO CRAMER'S CLAIMS.....................................................................................11

CLAIM 1: Cramer's lawyers were not constitutionally ineffective during the guilt phase of his
      trial. ..................................................................................................................................11

CLAIM 2: Cramer's allegations that his lawyers were ineffective at the eligibility and
      selection phases are moot...................................................................................................43

CLAIM 5: Cramer's conflict of interest claim is procedurally barred and otherwise
      meritless. ...........................................................................................................................48

CLAIM 6: Cramer has procedurally and statutorily defaulted his fair cross section claim
      regarding the venire. Moreover, the claim lacks merit, and his lawyers were not
      ineffective .........................................................................................................................58

CLAIM 7: Cramer's claims that the court erred during jury selection are procedurally

barred; four of his five subclaims are moot and substantively without merit; his remaining subclaim is meritless; and his allegation of ineffective assistance of appellate counsel lacks merit ...................................................................................67

CLAIM 8: Cramer's lawyers were not constitutionally ineffective during voir dire ...................78

CLAIM 9: Cramer's complaint that courthouse security denied him a fair trial is barred and substantively meritless ...................................................................................86

CLAIM 10: Cramer's allegations of prosecutorial misconduct are procedurally barred and substantively frivolous. ...................................................................................94

CLAIM 11: Cramer fails to show that his lawyers were constitutionally ineffective in seeking a severance...................................................................................103

CLAIM 12: Cramer's argument that bank robbery is not a crime of violence as defined in 18 U.S.C. § 924(c)(3)(a) is moot ...................................................................................106

CLAIM 13: Cramer's claim regarding ineffective assistance of counsel and instructional error during the sentencing phase is moot ...................................................................................106

CLAIM 14: Cramer fails to identify any facts supporting his speculative allegations of juror misconduct ...................................................................................107

CLAIM 15: Cramer's claims regarding recording informal in camera meetings is procedurally barred and otherwise meritless ...................................................................................108

CLAIM 16: Cramer fails to meet his burden for showing that his appellate counsel was constitutionally ineffective with respect to the guilt phase...................................................................................111

CLAIM 17: Cramer's claim the Federal Death Penalty Act is unconstitutional is moot ...........114

CLAIM 18: Cramer cannot rely on the cumulative error doctrine because there are no errors to cumulate and, even if there were, any error would be harmless ......................114

Conclusion ...................................................................................115

Certificate of Service ...................................................................................116

**Table of Authorities**

**Federal Cases:**

*Amador v. Quarterman*, 458 F.3d 397 (5th Cir. 2006) ................................................... 68

*Anderson v. Kelley*, 938 F.3d 949 (8th Cir. 2019) ........................................................ 47

*Aranda v. Lumpkin*, No. 20-70008, 2021 WL 5627080, *4 (5th Cir. Nov. 30, 2021)............ 65, 67

*Avila v. Quarterman*, 560 F.3d 299 (5th Cir. 2009) ................................................... 100

*Batson v. Kentucky*, 476 U.S. 79 (1986) .......................................................... 80, 85, 97

*Baze v. Rees*, 553 U.S. 35 (2008)........................................................................ 70

*Berghuis v. Smith*, 559 U.S. 314 (2010) ................................................................ 64

*Bigby v. Dretke*, 402 F.3d 551 (5th Cir. 2005) ................................................... 100, 101

*Bousley v. United States*, 523 U.S. 614 (1998) .......................... 52, 56, 59, 60, 61, 68, 81, 90, 94

*Brady v. Maryland*, 373 U.S. 83 (1963) ................................................................ 99

*Brown v. Kinney Shoe Corp.*, 237 F.3d 556 (5th Cir. 2001)........................................... 81

*Carmichael v. Chappius*, 848 F.3d 536 (2d Cir. 2017)................................................ 83

*Chamberlin v. Fisher*, 885 F.3d 832 (5th Cir. 2018) ............................................. 82, 83

*Clark v. Collins*, 19 F.3d 959 (5th Cir. 1994)....................................... 52, 56, 78, 91, 95

*Coble v. Quarterman*, 496 F.3d 430 (5th Cir. 2007) ............................................. 27, 36

*Coleman v. Thompson*, 501 U.S. 722 (1991)....................... 52, 56, 59, 60, 61, 68, 81, 90, 94

*Darden v. Wainwright*, 477 U.S. 168 (1986)...................................................... 102, 103

*Davis v. United States*, 417 U.S. 333 (1974) ..................................................... 9, 109

*Deck v. Missouri*, 544 U.S. 622  (2005)............................................................. 91

*Derden v. McNeel*, 978 F.2d 1453  (5th Cir. 1992) ................................................ 114

*Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)................................................... 103

*Duren v. Missouri*, 439 U.S. 357 (1979).......................................................... 64, 67

*Ellis v. Lynaugh*, 873 F.2d 830 (5th Cir. 1989) ...................................... 69, 91, 97, 112

*Estelle v. Williams*, 425 U.S. 501 (1976). ............................................................................... 92, 93

*Evitts v. Lucey*, 469 U.S. 387 (1985) ............................................................................................ 111

*United States v. Fackrell*, 991 F.3d 589 (5th Cir. 2021) ........ 51, 94, 104, 105, 106, 109, 110, 111

*United States v. Frady*, 456 U.S. 152 (1982). ................. 52, 56, 59, 60, 61, 68, 76, 81, 90, 94, 109

*Garza v. Stephens*, 738 F.3d 669 (5th Cir. 2013) ......................................................................... 84

*Giglio v. United States*, 405 U.S. 150 (1972) ............................................................................... 99

*Goodwin v. Johnson*, 132 F.3d 162 (5th Cir. 1997) ...................................................................... 111

*Gregory v. Thaler*, 601 F.3d 347 (5th Cir. 2010) ......................................................... 30, 34, 40, 42

*Hardee v. Kuhlman*, 581 F.2d 330 (CA2 1978) ............................................................................ 93

*Harrington v. Richter,* 562 U.S. 86 (2011) ................................................................................... 100

*Hebert v. Rogers*, No. 15-4950, 2016 WL 8291110 (E.D. La. Nov. 14, 2016) ...................... 82, 84

*Holbrook v. Flynn*, 475 U.S. 560 (1986) ................................................................................. 92, 93

*Hudson v. Blackburn*, 601 F.2d 785 (5th Cir. 1979) ..................................................................... 96

*Hughes v. Johnson*, 191 F.3d 607 (5th Cir. 1999) ................................................. 94, 99, 103, 107

*Johnson v. Mitchell*, 585 F.3d 923 (6th Cir. 2009) ...................................................................... 99

*Johnson v. McCaughtry*, 92 F.3d 585 (7th Cir. 1996) ................................................................. 65

*Jones v. Barnes*, 463 U.S. 745 (1983) ......................................................................... 69, 91, 112

*Jones v. Davis*, 890 F.3d 559 (5th Cir. 2018) .............................................................................. 93

*Kennedy v. Cardwell*, 487 F.2d 101 (CA6 1973) ......................................................................... 93

*King v. Davis*, 883 F.3d 577 (5th Cir. 2018) ................................................................................ 36

*Kutzner v. Cockrell*, 303 F.3d 333 (5th Cir. 2002) .............................................................. 100, 101

*Kyles v. Whitley*, 514 U.S. 419 (1995) ................................................................................... 96, 99

*Lang v. United States*, 474 F.3d 348 (6th Cir. 2007) ................................................................. 109

*Little v. Butler*, 848 F.2d 73 (5th Cir.1988) ................................................................................. 96

*Livingston v. Johnson*, 107 F.3d 297 (5th Cir. 1997) ................................................................. 114

*Lockhart v. McCotter*, 782 F.2d 1275 (5th Cir. 1986)......................................................... 36

*Lombard v. Lynaugh*, 868 F.2d 1475 (5th Cir. 1989)............................................................ 111

*Luna v. Davis*, 793 F. App'x 229 (5th Cir. 2019)................................................................ 68

*Massaro v. United States*, 538 U.S. 500 (2003) ................................ 52, 56, 59, 60, 68, 81, 90, 94

*Mayle v. Felix*, 545 U.S. 644 (2005)................................................................................ 108

*Miller-El v. Dretke*, 545 U.S. 231 (2005) ........................................................................ 82

*Moore v. Johnson*, 225 F.3d 495 (5th Cir. 2000)............................................................... 80

*Mosley v. Dretke*, 370 F.3d 467 (5th Cir. 2004) ............................................................... 66

*Mu'Min v. Virginia*, 500 U.S. 415 (1991)...................................................................... 72, 79

*Murphy v. Johnson*, 205 F.3d 809 (5th Cir. 2000)................................................ 94, 99, 103, 107

*Murray v. Maggio*, 736 F.2d 279 (5th Cir. 1984).............................................................. 36

*Napue v. Illinois*, 360 U.S. 264 (1959) ........................................................................... 95

*Perillo v. Johnson*, 205 F.3d 775 (5th Cir. 2000) ............................................................. 52

*Prystash v. Davis*, 854 F.3d 830 (5th Cir. 2017) .............................................................. 81

*Reynolds v. United States*, 98 U.S. 145 (1879)........................................................... 72, 77, 78

*Reynolds v. Dunn*, No. 4:18-CV-00236-RDP, 2022 WL 895947 (N.D. Ala. Mar. 25, 2022)...... 71

*Ristaino v. Ross*, 424 U.S. 589 (1976) ............................................................................ 79

*Rompilla v. Beard*, 545 U.S. 374 (2005).......................................................................... 47

*Ross v. Oklahoma*, 487 U.S. 81 (1988)............................................................................ 72

*Ruiz v. Davis*, 819 F. App'x 238 (5th Cir. 2020) ............................................................. 96

*Sawyer v. Whitley*, 505 U.S. 333 (1992).................................................................... 48, 62

*Sayre v. Anderson*, 238 F.3d 631 (5th Cir. 2001) ............................................................. 36

*Schlup v. Delo*, 513 U.S. 298 (1995) ........................................................................ 48, 62

*Scott v. Hubert*, 610 F. App'x 433 (5th Cir. 2015) ........................................................... 84

*Sheppard v. Davis*, 967 F.3d 458 (5th Cir. 2020).............................................................. 83

*Snarr v. United States*, 134 S.Ct. 1274 (2014)............................................................ 54, 60, 63, 64

*Strickland v. Washington*, 466 U.S. 668 (1984) .................. 30, 31, 38, 43, 44, 47, 48, 61, 99, 101

*Tabler v. Lumpkin*, 543 F. Supp. 3d 461 (W.D. Tex. 2021) ........................................................ 84

*Teague v. Scott*, 60 F.3d 1167 (5th Cir. 1995)............................................................................ 84

*Trevino v. Davis*, 829 F.3d 328 (5th Cir. 2016).................................................... 30, 34, 36, 40, 42

*United States v. Age*, No. 16-cr-32, 2021 WL 2227244 (E.D. La. June 2, 2021)........................ 65

*United States v. Age*, No. 22-30656, 2025 WL 1201973 (5th Cir. Apr. 25, 2025)...................... 65

*United States v. Agofsky*, 516 F.3d 280 (5th Cir. 2008)............................................................. 98

*United States v. Agurs*, 427 U.S. 97 (1976) .......................................................................... 96, 100

*United States v. Aichele*, 941 F.2d 761 (9th Cir. 1991) ............................................................. 96

*United States v. Bagley*, 473 U.S. 667 (1985) ........................................................................... 99

*United States v. Banegas*, 600 F.3d 342 (5th Cir. 2010) ........................................................... 91

*United States v. Bearden*, 659 F.2d 590 (5th Cir. 1981)............................................................ 63

*United States v. Bello*, 532 F.2d 422 (5th Cir. 1976)................................................................. 31

*United States v. Bernard*, 762 F.3d 467 (5th Cir. 2014)............................... 27, 30, 31, 36, 37, 114

*United States v. Bernard,* 299 F.3d 467 (5th Cir. 2002) ..................................................... 68, 106

*United States v. Bieganowski*, 313 F.3d 264 (5th Cir. 2002).................................................... 106

*United States v. Blackburn*, 9 F.3d 353 (5th Cir. 1993).............................................................. 95

*United States v. Blue Thunder*, 604 F.2d 550 (8th Cir. 1979) .................................................... 98

*United States v. Brown*, 650 F.3d 581 (5th Cir. 2011)............................................................... 99

*United States v. Brummitt*, 665 F.2d 521 (5th Cir. 1981) .................................................... 59, 67

*United States v. Burns*, 526 F.3d 852 (5th Cir. 2008)....................................................... 52, 53, 58

*United States v. Butler*, 615 F.2d 685 (5th Cir.1980) ................................................................ 66

*United States v. Caro*, 461 F. Supp. 2d 478 (W.D. VA 2006)................................................... 100

*United States v. Churchwell*, 807 F.3d 107 (5th Cir. 2015)...................................................... 102

*United States v. Culverhouse*, 507 F.3d 888 (5th Cir. 2007) ............................................ 52, 53, 58

*United States v. Davis*, No. 01-282, 2003 WL 21088097 (E.D. La. May 9, 2003) .......... 87, 88, 90

*United States v. DeAlba-Conrado*, 481 F.2d 1266 (5th Cir. 1973) ............................................ 63

*United States v. Delgado*, 672 F.3d 320 (5th Cir. 2012) .......................................................... 114

*United States v. Dillman*, 15 F.3d 384 (5th Cir. 1994) ............................................................. 31

*United States v. Dovalina*, 262 F.3d 472 (5th Cir. 2001) ............................................ 69, 111, 112

*United States v. Ebron*, 683 F.3d 105 (5th Cir. 2012) ......................................................... 43, 115

*United States v. Endicott*, 869 F.2d 452 (9th Cir. 1989) ............................................................ 96

*United States v. Fields*, 761 F.3d 443 (5th Cir. 2014) ........................................................... 5, 114

*United States v. Fields*, 483 F.3d 313 (5th Cir. 2007) ..................................................... 43, 97, 115

*United States v. Flores*, 135 F.3d 1000 (5th Cir. 1998) ...................................................... 100, 102

*United States v. Garcia-Jasso*, 472 F.3d 239 (5th Cir. 2006) .................................................... 52

*United States v. Gonzalez*, 592 F.3d 675 (5th Cir. 2009) ........................................................ 108

*United States v. Gonzalez*, 493 F. App'x 541 (5th Cir. 2012) ............................................... 6, 113

*United States v. Hill*, 63 F.4th 335 (5th Cir. 2023) .................................................................... 91

*United States v. Infante*, 404 F.3d 376 (5th Cir. 2005) ............................................................. 52

*United States v. Jackson*, 53 F.3d 1282 (5th Cir. 1995) ................................. 52, 56, 78, 91, 112

*United States v. Jenkins*, 442 F.2d 429 (5th Cir. 1971) ............................................................ 110

*United States v. Jones*, 459 F. App'x 379 (5th Cir. 2012) ........................................................ 79

*United States v. Kennedy*, 548 F.2d 608 (5th Cir. 1977) ........................................................... 63

*United States v. Lghodaro*, 967 F.2d 1028 (5th Cir. 1992) .................................................. 6, 113

*United States v. Lopez*, 248 F.3d 427 (5th Cir. 2001) ........................................................ 10, 109

*United States v. Martinez-Salazar*, 528 U.S. 304 (2000) ........................................................ 76

*United States v. Maskeny*, 609 F.2d 183 (5th Cir. 1980) ..................................................... 65, 76

*United States v. Meinster*, 619 F.2d 1041 (4th Cir. 1980) ........................................................ 96

*United States v. Montes*, 602 F.3d 381 (5th Cir. 2010) ................................................................ 34

*United States v. Moreno*, 540 F. App'x 276 (5th Cir. 2013) ....................................................... 67

*United States v. O'Keefe*, 128 F.3d 885 (5th Cir. 1997)....................................................... 95, 97

*United States v. Ongaga*, 820 F.3d 152 (5th Cir. 2016) ........................................................ 80, 81

*United States v. Placente*, 81 F.3d 555 (5th Cir. 1996) ........................................................ 9, 113

*United States v. Porter*, 907 F.3d 374 (5th Cir. 2018)................................................................ 44

*United States v. Price*, 566 F.3d 900 (9th Cir. 2009)................................................................ 99

*United States v. Reed*, 719 F.3d 369 (5th Cir. 2013) ............................................................ 52, 56

*United States v. Saenz*, 282 F.3d 354 (5th Cir. 2002)............................................................. 108

*United States v. Sanders*, 133 F. 4th 341 (5th Cir. 2025) ..................................................... 65, 68

*United States v. Scruggs*, 691 F.3d 660 (5th Cir. 2012) .......................................................... 109

*United States v. Seyfert*, 67 F.3d 544 (5th Cir. 1995)........................................................... 9, 109

*United States v. Sillemon*, No. 3:04-CV-2637-H, 2006 WL 2252061 (N.D. Tex. Aug. 7, 2006) 81

*United States v. Skilling*, 561 U.S. 358 (2010) ..................................................... 68, 72, 76, 79, 85

*United States v. Snarr*, 704 F.3d 368 (5th Cir. 2013) ................................................ 42, 53, 54, 57, 64, 68

*United States v. Stephens*, 571 F.3d 401 (5th Cir. 2009)......................................................... 114

*United States v. Taylor*, 942 F.3d 205 (4th Cir. 2019).............................................................. 100

*United States v. Thompson*, 482 F.3d 781 (5th Cir. 2007)................................................... 102, 103

*United States v. Tsarnaev*, 595 U.S. 302 (2022)....................................................................... 79

*United States v. Turner*, 674 F.3d 420 (5th Cir. 2012) ............................................................. 92

*United States v. Walker*, 559 F.3d 365 (5th Cir. 1977)............................................................ 100

*United States v. Webster*, 162 F.3d 308 (5th Cir. 1998) .................................................... 68, 72, 76

*United States v. Williams*, 264 F.3d 561 (5th Cir. 2001) ...................................................... 66, 67

*United States v. Wood*, 299 U.S. 123 (1936) ........................................................................... 79

*United States v. Yanez*, 136 F.3d 1329, 1998 WL 4454 n.4 (5th Cir. 1998) ............................... 65

*Uttecht v. Brown*, 551 U.S. 1 (2007)....................................................................... 70, 81, 87, 88, 90

*Virgil v. Dretke*, 446 F.3d 598 (5th Cir. 2006) ................................................................ 84

*Wainwright v. Witt*, 469 U.S. 412 (1985) ................................................................ 67, 70

*Williams v. Stirling*, 914 F.3d 302 (4th Cir. 2019) ................................................................ 47

*Wilson v. United States*, No. W-16-CV-416-LY, 2017 WL 11426574 (WD Tex. Apr. 7, 2017)  84

*Witherspoon v. Illinois*, 391 U.S. 510 (1968) ................................................................ 67, 71

*Yates v. Evatt*, 500 U.S. 391 (1991)...................................................................... 96

*Yohey v. Collins*, 985 F.2d 222 (5th Cir. 1993) ...................................................... 114

## Federal Statutes:

18 U.S.C. § 924(C)(3)(A) ...................................................................................... 106

18 U.S.C. § 1111...................................................................................... 54, 98

28 U.S.C. § 1861...................................................................................... 59

28 U.S.C. § 1867...................................................................................... 62

## Federal Rules:

Fed. R. Civ. P. 15(c) ...................................................................................... 107

Fed. R. Crim. P. 15(a)(1) ...................................................................................... 31

Fed. R. Evid. 608(b)...................................................................................... 38

## OFFENSE CONDUCT AND PROCEDURAL HISTORY

On June 9, 2014, inmates Christopher Emory Cramer and Ricky Fackrell brutally stabbed their fellow prison gang member, Leo Johns, to death in a cell at the United States Penitentiary in Beaumont, Texas (USP-Beaumont).  *See United States v. Fackrell*, No. 18-40598, 2020 WL 4048268, at *4-*10 (5th Cir. Jul. 15, 2020) (U.S. Br. description of crime).  In December 2014, more than a year before Cramer was indicted, the Court appointed two lawyers with significant experience in capital litigation, George Patrick Black, the highly respected Federal Public Defender for this district, and the equally respected Douglas M. Barlow.  Trl. Doc. 4.[1]

On March 3, 2016, a federal grand jury for this district indicted Cramer and Fackrell for first degree murder and aiding and abetting, in violation of 18 U.S.C. §§ 1111 and 2 (Count One), and conspiracy to commit murder, in violation of 18 U.S.C. § 1117 (Count Two).  Trl. Doc. 23.  The indictment included a notice of special findings in support of a death sentence.  *Id*. Three months later, the grand jury returned a superseding indictment that did not change the substantive charges.  Trl. Doc. 47.  After jury selection, the government moved to dismiss Count Two, and the Court granted the motion.  Trl. Doc. 523, 527.

The guilt phase of the three-phase trial began on April 30, 2018, and ended with convictions for both defendants.  Trl. Doc. 529, 566, 569.  The jury found Cramer and Fackrell eligible for the death penalty, Trl. Doc. 576, 582 (eligibility phase), and, after a 13-day selection

---

[1]  The government refers to documents in the criminal case, No. 1:16-CR-26(01), by "Trl. Doc." and docket number or date of entry.  Transcripts from the trial are referred to by docket number and the page number assigned by the court reporter, *i.e.*, "Trl. Doc. 679 at 2465" cites the first page of the transcript for June 11, 2018.  Trial exhibits are cited by number, if possible.

Citations to documents filed in this Section 2255 proceeding, are prefaced with "2255 Doc." Cramer's Section 2255 motion is referred to by "Mtn." and page number.  The exhibits to his motion are referred to by "Mtn. Ex." and the exhibit number and page or paragraph number.  If an exhibit does not have page numbers, the page numbers assigned by the PDF viewer are used.

phase, selected sentences of death for both on June 13, 2018, Trl. Doc. 657, 666.  The Court

imposed the sentence that day.  Trl. Doc. 681 at 2797-800; Trl. Doc. 671 (judgment).

Cramer filed a notice of appeal.  Trl. Doc. 688.  To represent Cramer on appeal, the Court

appointed Barlow, who is board certified in criminal appellate law, *see*

https://www.dougbarlowlaw.com/, and Anthony S. Haughton[2], who worked with the Federal

Death Penalty Resource Counsel (resource counsel).[3]  Trl. Doc. 691.  Although he did not enter

an appearance until shortly before oral argument, Sean J. Bolser[4], another resource counsel,

---

[2]  According to the Federal Death Penalty Resource Counsel's website:

> During his almost 30 years as an attorney, Mr. Haughton has worked consistently
> in the representation of the indigent accused.  His experience includes: working as
> both a resource and direct representation attorney at the Texas Resource Center;
> Six years at the Public Defender Service (PDS) of Washington, D.C., where he
> served in many roles, ultimately serving as the Chief of the Trial Division; and in
> private practice, where he worked primarily on serious felony and capital cases in
> both state and federal courts.

https://fdprc.capdefnet.org/project-staff/anthony-haughton (Oct. 22, 2024).

[3]  The Federal Death Penalty Resource Counsel and the Capital Resource Counsel Project, which
is part of the Federal Defenders' offices, work in tandem.  Indeed, one of the Capital Resource
Counsel Project's lawyers has the following beneath his signature: "The Capital Resource
Counsel Project is a project of the Defender Services Office of the Administrative Office of the
United States Courts working in coordination with the Federal Death Penalty Resource Counsel
Project."  Mtn. Ex. 65 at 1.  This response refers to both as "resource counsel."

[4]  According to the Federal Death Penalty Resource Counsel's website, Bosler

> graduated from Harvard College and from the New York University School of
> Law, where he was an Arthur Garfield Hays Fellow and recipient of the Eric
> Dean Bender Prize for public interest work.  He clerked for the Hon. Stephen
> Reinhardt of the United States Court of Appeals for the Ninth Circuit.  Sean's
> capital defense practice has run the gamut from state and federal trial-support and
> appellate representation through state post-conviction and federal habeas corpus
> proceedings.  From 2000 through 2005, he worked as a deputy defender with the
> New York Capital Defender Office.  After the New York Court of Appeals
> invalidated New York's death penalty statute, he served, from 2005 to 2009, as a

**Response to Section 2255 Motion, Page 2**

claims that his "work on the case …, began much earlier, starting around the time the Notice of Appeal was filed." Mtn. Ex. 55. Bosler claims that he and his "colleague" Anita Aboagye-Agyeman[5]—who never entered an appearance and did not sign the brief—"did the overwhelming bulk of the work on the case, including meeting with the client, reviewing and compiling the record on appeal, motion practice in the District Court and in the Circuit, identifying issues to brief, researching and drafting Mr. Cramer's opening and reply briefs and the petition for rehearing en banc in the Fifth Circuit, and the petition for certiorari and reply filed in the United States Supreme Court." Mn. Ex. 55.

The Fifth Circuit affirmed Cramer's conviction and sentence, *United States v. Fackrell*, 991 F.3d 589 (5th Cir. 2021), and the Supreme Court denied his petition for writ of certiorari, *Cramer v. United States*, 142 S. Ct. 1372 (2022); Trl. Doc. 772.

In March 2022, the Court appointed Deputy Federal Public Defenders Celeste Bacchi, Laura Paul, and Devon Porter (writ counsel), all with the Public Defender's Office for the Central District of California, to represent Cramer in this proceeding under 28 U.S.C. § 2255.[6] Trl. Doc. 766-770; 2255 Doc. 6, 9. After a brief agreed waiver of the statute of limitations, Trl. Doc. 814, Cramer filed a motion to vacate, set aside, or correct sentence under Section 2255 on

---

deputy federal public defender in the Capital Habeas Unit of the Office of the Federal Public Defender in Los Angeles, California.

https://fdprc.capdefnet.org/project-staff/sean-bolser (Nov. 21, 2024).

[5] Aboagye-Agyeman, is an "Appellate Assistant Federal Public Defender" in the District of New Jersey, where she is identified as "Assistant-in-Charge of Mitigation Specialists." https://nj.fd.org/employees/Anita-Aboagye-Agyeman-Assistant-charge-Mitigation-Specialists (Nov. 21, 2024).

[6] Bacchi later transferred to Federal Public Defender's Office in the Western District of Pennsylvania, so that office was added. Trl. Doc. 790. The government has been informed that Porter is no longer assigned to the case, but he has not moved to withdraw.

September 21, 2023, Trl. Doc. 825; 2255 Doc. 3.  The Court ordered him to reduce the number of pages, and Cramer filed a compliant motion on December 8, 2023.  2255 Doc. 7, 11, 12.  Cramer raised eighteen numbered claims, most with multiple subclaims or underlying theories.

The Court ordered the government to respond, 2255 Doc. 13, and after receiving an extension, the government's response was due on February 4, 2025.  But on December 23, 2024, then-President Joseph R. Biden, Jr., commuted Cramer's death sentence to life imprisonment without the possibility of parole.  Trl. Doc. 827; 2255 Doc. 20.  On January 5, 2025, the Court ordered Cramer to identify any claims in his Section 2255 motion that were not moot or to file a notice of voluntary dismissal under to Fed. R. Civ. P. 41(a).  2255 Doc. 21.  The Court further directed the government to submit a reply within 21 days after Cramer's filing.  2255 Doc. 21.

Cramer responded to the Court's order, identifying 13 claims that he contended were viable in whole or part after clemency.  2255 Doc. 25.  After reviewing the response, the government agreed that—to the extent the identified claims challenge Cramer's conviction instead of his sentence—they are not moot.  2255 Doc. 26.

That said, the government opposes relief.  All of Cramer's claims lack merit.  Additionally, some are procedurally barred; some are substantively foreclosed; some are belied by the record; and some are based on speculation that is untethered to any factual support.

## PROCEDURES FOR SECTION 2255 PROCEEDINGS

### A.    Section 2255 Procedures and Discovery

Rule 2(b) of the Rules Governing Section 2255 Cases provides that "The motion must … (1) specify all the grounds for relief available to the moving party [and] (2) state the facts supporting each ground."  In another Section 2255 proceeding from a death-penalty case, the Court laid out the procedure for considering Section 2255 motions in a capital case:

> [Defendants'] motions are governed by the Rules Governing Section 2255 Cases. The Rules provide for the orderly progression of § 2255 proceedings.  Rule 3 provides for the filing of the motion and service.  Rule 4 provides for a preliminary consideration of the motion by a court.  If a motion is not dismissed at that juncture, then Rule 5 provides for an answer and reply.  The court will then review the answer and reply to determine whether the case should proceed.  If the motion is not dismissed at that juncture, then Rule 6 provides for discovery. Discovery is permitted only on a showing of good cause.

*Garcia v. United States*, No. 1:13-CV-723, at 1 (E.D. Tex. Jan. 23, 2017) (ECF Doc. 79, order denying motion for discovery).

Further, discovery in a Section 2255 proceeding—if any is allowed—is limited.  In the *Garcia* Section 2255 order cited above, the Court correctly noted the limited nature of discovery in a Section 2255 proceeding: "A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course."  *Garcia v. United States*, No. 1:13-CV-723, at 2 (E.D. Tex. Jan. 23, 2017) (quoting *Bracy v. Gramley*, 520 U.S. 899, 904 (1997)). Rule 6 provides that a "judge may, *for good cause*, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law," but the "party requesting discovery must provide reasons for the request" and the "request must also include any proposed interrogatories and requests for admission, and must specify any requested documents."  Rules Governing Section 2255 Cases 6(a) and (b) (emphasis added).  These requirements apply in Section 2255 proceedings from capital cases:

> "A federal habeas court must allow discovery and an evidentiary hearing *only* where a factual dispute, if resolved in the petitioner's favor, would entitle him to relief...."  *Ward v. Whitley*, 21 F.3d 1355, 1367 (5th Cir. 1994).  *Conclusional allegations are insufficient to warrant discovery*; the petitioner must set forth specific allegations of fact.  *Id.* (citing *Willie v. Maggio*, 737 F.2d 1372 (5th Cir.1984)).

*United States v. Webster*, 392 F.3d 787, 801-02 (5th Cir. 2004) (emphasis added) (denial of request for certificate of appealability).

**Response to Section 2255 Motion, Page 5**

In another federal capital case, the Fifth Circuit made clear that "fishing expeditions" are not permitted under the guise of discovery. *United States v. Fields*, 761 F.3d 443, 478-79 (5th Cir. 2014), *as revised* (Sept. 2, 2014) (citing *Ward*, 21 F.3d at 1367).  "A petitioner demonstrates 'good cause' under Rule 6(a) 'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is ... entitled to relief.'"  *Id.* (quoting *Bracy*, 520 U.S. at 908-09).

**B.    Lack of Verification of the Section 2255 Motion**

Rule 2(b)(5) of the Rules Governing Section 2255 Cases provides that the motion must "be signed under penalty of perjury by the movant or by a person authorized to sign it for the movant," and the form accompanying the rules contains a straightforward verification: "I declare .(or certify, verify, or state) under penalty of perjury that the foregoing is true and correct."  The verification is important because unsworn allegations without independent support in the record do not bear sufficient indicia of reliability to be considered by the court.  *United States v. Gonzalez*, 493 F. App'x 541, 544 (5th Cir. 2012) (unpublished) (citing *United States v. Lghodaro*, 967 F.2d 1028, 1030 (5th Cir. 1992)).  Indeed, the verification under penalty of perjury can be sufficient to warrant a hearing in the absence of competent contradictory evidence.  *United States v. Harger*, 354 F. App'x 151, 152 (5th Cir. 2009) (unpublished) (citing 28 U.S.C. § 1746; *Hart v. Hairston*, 343 F.3d 762, 764 n.1 (5th Cir. 2003)).

Here, Cramer's Section 2255 does not contain a verification.  The previous versions of his motion likewise lacked verification.  Therefore, *no one* has verified under penalty of perjury the allegations made in Cramer's motion.  Without independent indicia of reliability, any unverified allegations should not, standing alone, be considered by the Court, *Gonzalez*, 493 F. App'x at 544, or serve as the basis for an evidentiary hearing, *Harger*, 354 F. App'x at 152.

C.      **Affidavits From Former Counsel**

The Fifth Circuit has long held that a defendant waives the attorney-client privilege with respect to issues related to claims of ineffective assistance of counsel:

> We are met first with the remarkable contention that appellant's rights were infringed upon by reason of the fact that the attorney he charged with failure to represent him adequately at his arraignment and sentencing was called as a witness by the government and permitted by the court to testify in this post-conviction proceeding with respect to the factual issues raised by appellant's motion. Having demanded and obtained a factual judicial inquiry into his claim that the attorney appointed to render him the assistance of counsel for his defense failed to discharge his responsibilities properly, appellant now proposes to invoke the privilege accorded confidential communications between an attorney and his client to eliminate the one source of evidence likely to contradict his allegations. We are unable to subscribe to this proposition. *The privilege is not an inviolable seal upon the attorney's lips. It may be waived by the client; and where, as here, the client alleges a breach of duty to him by the attorney, we have not the slightest scruple about deciding that he thereby waives the privilege as to all communications relevant to that issue.*

*Laughner v. United States*, 373 F.2d 326, 327 and n.1 (5th Cir. 1967) (emphasis added).

The Fifth Circuit later addressed the issue en banc when a defendant tried to prevent his lawyer from responding to a claim that he had not given accurate advice at sentencing:

> *We hold that the truth must out.* It cannot be hidden under a cloak of pseudo-secrecy and hinted at by 'permissible inferences'.
>
> *     *     *
>
> Not only does this specious sophistry fail to protect confidential relationships, it trifles with the truth— it scoffs at justice— and we reject it flatly.

*United States v. Woodall*, 438 F.2d 1317, 1326 (5th Cir 1971) (en banc) (emphasis added); *see also* Restatement (Third) of the Law Governing Lawyers § 80(1)(b) & (2000) (Oct. 2019 Update) ("The attorney-client privilege is waived for any relevant communication if the client asserts as to a material issue in a proceeding that … a lawyer's assistance was ineffective, negligent, or otherwise wrongful."); *id.* at cmt. c and Reporter's Note for cmt. c; *United States v. Bolton*, No. 2:16-CR-7-KS-MTP, 2017 WL 2468806, *3 (S.D. Miss. June 7, 2017) (citing the

Restatement and observing that "[a]s [defendant] 'seeks nothing more than a fair trial in which the *truth* is made known,' he should appreciate the Court's need to receive all sides of the story as to [counsel's] representation in order to *fairly* ascertain what the *truth* is").

Because "Section 2255 motions … routinely allege ineffective assistance by the movant's former trial or appellate counsel," a former "defense attorney may execute and furnish to the Government for submission to the Court a detailed affidavit outlining [information relevant to the claim] without violating the attorney-client privilege." *Harrelson v. United States*, 967 F. Supp. 909, 913, 914-15 (W.D. Tex. 1997). Nevertheless, the government has refrained from seeking disclosure of Cramer's Section 2255 motion to his former trial and appellate counsel and from seeking affidavits from them for practical reasons: Cramer's motion and related exhibits are voluminous, and while some of his ineffective-assistance allegations are plainly marked, others are buried within claims that are procedurally barred. Many of the ineffective-assistance allegations are too conclusory or obscurely worded to merit response. In *Strickland v. Washington*, 466 U.S. 668, 697 (1984), the Supreme Court admonished that "[c]ourts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result." Asking Cramer's former counsel to pore through the motion and exhibits and ferret out every arguable ineffective-assistance-of-counsel claim would require an unduly burdensome amount of work. Therefore, the government urges the Court to first review the claims, so trial or appellate counsel will only have to respond to claims that are not barred or otherwise subject to dismissal.

## GENERAL LAW ON FEDERAL COLLATERAL REVIEW

### A.    Cognizable Claims

Section 2255 permits a prisoner to move to vacate, set aside, or correct his conviction or

sentence on four, limited grounds: "(1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the court was without jurisdiction to impose the sentence; (3) the sentence exceeds the statutory maximum sentence; or (4) the sentence is 'otherwise subject to collateral attack.'" *United States v. Placente*, 81 F.3d 555, 558 (5th Cir. 1996) (citation omitted). Although Section 2255 is considered a comprehensive remedy, "it does not encompass all claimed errors in conviction and sentencing." *United States v. Addonizio*, 442 U.S. 178, 185 (1979); *see United States v. DeLario*, 120 F.3d 580, 582 (5th Cir. 1997); *United States v. Shaid*, 937 F.2d 228, 232 (5th Cir. 1991). Indeed, the grounds for collateral relief under Section 2255 are narrower than those on direct appeal. With limited exceptions, relief may not be based on (1) an error that is not of jurisdictional or constitutional dimension; (2) a procedurally defaulted ground; (3) a claim previously raised and rejected on direct appeal; (4) a "new rule" as defined by *Teague v. Lane*, 489 U.S. 288 (1989); or (5) an error that did not have a substantial and injurious effect or influence on the jury's verdict. Once a defendant has appealed his conviction, the court is "entitled to presume he stands fairly and finally convicted." *United States v. Samuels*, 59 F.3d 526, 528 and n.6 (5th Cir. 1995) (citing *Shaid*, 937 F.2d at 231-32 and *United States v. Frady*, 456 U.S. 152 (1982)).

**B.      Claims Raised on Direct Appeal and Procedurally Defaulted Claims**

A claim raised and rejected on direct appeal generally cannot be relitigated in a Section 2255 proceeding. *United States v. Seyfert*, 67 F.3d 544, 547 (5th Cir. 1995). But under a rare exception, an intervening change in substantive law may justify relitigation of appellate issues in a Section 2255 proceeding. *See*, *e.g.*, *Davis v. United States*, 417 U.S. 333, 342 (1974); *Lang v. United States*, 474 F.3d 348, 354-57 (6th Cir. 2007) (noting relitigation is not permitted for intervening changes in procedural rules).

Likewise, the doctrine of procedural default generally bars consideration of any claim that the movant failed to appropriately raise at trial or on appeal. *Frady*, 456 U.S. at 165; *see United States v. Lopez*, 248 F.3d 427, 433 (5th Cir. 2001). This doctrine applies equally in death penalty cases. *See Battle v. United States*, 419 F.3d 1292, 1298 (11th Cir. 2005). An exception lies for claims of ineffective assistance of counsel, which are usually raised in a collateral attack rather than a direct appeal. *See United States v. Willis*, 273 F.3d 592, 597 n.7 (5th Cir. 2001) (citing *United States v. Marroquin*, 885 F.2d 1240, 1245-46 (5th Cir. 1989)).

Apart from claims of ineffective assistance, courts may consider claims that are procedurally defaulted in two instances: First, courts may consider defaulted claims if the movant demonstrates "that the constitutional error 'has probably resulted in the conviction of one who is actually innocent.'" *United States v. Scruggs*, 691 F.3d 660, 670 and n.34 (5th Cir. 2012) (citing *Bousley v. United States*, 523 U.S. 614, 623-24 (1998)). Second, courts may consider those claims if the movant establishes cause and prejudice. *Id*. To establish prejudice, a movant must show that the alleged errors infected the entire trial, resulting in a conviction that violated due process. *See Lopez*, 248 F.3d at 433 (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).

C.    **New Rules of Criminal Procedure**

Collateral relief is further limited to claims based on established law. *Teague*, 489 U.S. at 310. When the Supreme Court announces a new rule of law, it "applies to all criminal cases still pending on direct review. As to convictions that are already final, however, the rule applies only in limited circumstances." *Schriro v. Summerlin*, 542 U.S. 348, 351 (2004) (citation omitted). New substantive doctrines—those that alter the range of punishable conduct or the class of punishable people—apply retroactively. *Id*. at 351-52. Until recently, courts also recognized an exception for new procedural rules of "watershed" magnitude, but that exception

was eliminated in 2021, *Edwards v. Vannoy*, 141 S.Ct. 1547, 1555, 1557, 1559-60, 1562 (2021).

**D.    Harmless Error**

After reviewing the government's answer and pertinent records, this Court must determine whether an evidentiary hearing is warranted.  Rule 8 of the Rules Governing § 2255 Proceedings.  No hearing is required if the movant does not produce any "independent indicia of the likely merit of [his] allegations."  *United States v. Edward*, 442 F.3d 258, 264 (5th Cir. 2006) (quoting *United States v. Cervantes*, 132 F.3d 1106, 1110 (5th Cir. 1998)).  The movant bears the burden of establishing his claims of error by a preponderance of the evidence.  *See Wright v. United States*, 624 F.2d 557, 558 (5th Cir. 1980).  And for trial errors, the court may grant relief only if the error "had substantial and injurious effect or influence" in determining the outcome of the case.  *Brecht v. Abrahmson*, 507 U.S. 619, 637 (1993); *see also United States v. Chavez*, 193 F.3d 375, 379 (5th Cir. 1999) (applying harmless error standard in a Section 2255 proceeding).

RESPONSE TO CRAMER'S CLAIMS

**CLAIM 1:  CRAMER'S LAWYERS WERE NOT CONSTITUTIONALLY INEFFECTIVE DURING THE GUILT PHASE OF HIS TRIAL.**

**A.    Legal Standards for Ineffective Assistance of Counsel**

"The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect."  *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986).  Allegations of ineffective assistance of counsel are evaluated under the guiding principles of *Strickland v. Washington*, in which the Supreme Court cautioned courts to "strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result."  466 U.S. at 697.  Thus, when a convicted defendant complains of ineffective assistance of counsel, he must show that counsel's representation fell

below an objective standard of reasonableness *and* that the deficit resulted in prejudice:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.  First, the defendant must show that counsel's performance was deficient.  *This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.*  Second, the defendant must show that the deficient performance prejudiced the defense.  *This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.*  Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687 (emphasis added).

As to whether counsel's performance was objectively reasonable, the Court pointed out

that "specific guidelines" are "not appropriate."  *Id.* at 688.  The Court further cautioned that

> [j]udicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable … *A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance*; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."  … There are countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way.

*Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)) (emphasis added; internal

citations omitted)).

Thus, to meet the first prong of the *Strickland* test, a defendant must show that counsel's

performance fell below prevailing professional norms.  *Knowles v. Mirzayance*, 556 U.S. 111,

124 (2009); *Roberts v. Thaler*, 681 F.3d 597, 610 (5th Cir. 2012).  In so doing, he must

**Response to Section 2255 Motion, Page 12**

overcome a presumption that counsel provided effective assistance. *Druey v. Thaler*, 647 F.3d 535, 538 (5th Cir. 2011). "Counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* (quoting *Strickland*, 466 U.S. at 690). Conclusory assertions of ineffectiveness are insufficient. *Day v. Quarterman*, 566 F.3d 527, 540 (5th Cir. 2009) (citing *Lincecum v. Collins*, 958 F.2d 1271, 1279 (5th Cir. 1992)).

To meet the prejudice prong of the *Strickland* test, a defendant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.* at 697. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. "Attorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial … Representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another." *Id.* at 693. Thus, "[w]hen a defendant challenges a death sentence …, the question is whether there is a reasonable probability that, absent the errors, the sentencer … would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695. An ineffectiveness claim must consider the totality of the evidence before the judge or jury. *Id.* The "ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is

unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Id.* at 696.

Cramer argues that his trial team's performance was deficient in several ways, Mtn. 6-36, and then lumps them together to argue prejudice, Mtn. 36-37. But he fails to show either.

**B.      Cramer's allegations of deficient performance lack merit.**

**1.      Cramer's trial team did not err in declining "assistance" from resource counsel.**

Cramer first alleges that his trial team was constitutionally ineffective in declining to work with resource counsel. The record belies this allegation.

As an initial matter, the qualifications of Cramer's appointed counsel exceeded statutory requirements. Under 18 U.S.C. § 3599(a), "in every criminal action in which a defendant is charged with a crime which may be punishable by death, … shall be entitled to the appointment of *one or more attorneys*." (Emphasis added). The statute provides that, "[i]f the appointment is made before judgment, *at least one* attorney so appointed *must have been admitted to practice in the court in which the prosecution is to be tried for not less than five years, and must have had not less than three years experience in the actual trial of felony prosecutions in that court*." 18 U.S.C. § 3599(b) (emphasis added). Another subsection permits the court, for good cause, to "appoint another attorney whose background, knowledge, or experience would otherwise enable him or her to properly represent the defendant, with due consideration to the seriousness of the possible penalty and to the unique and complex nature of the litigation." 18 U.S.C. § 3599(d). And another statute requires counsel to have knowledge in capital litigation and courts to consider a recommendation from the Federal Defender or the Administrative Office of the United States Courts, but it does not change the basic qualifications. 18 U.S.C. § 3005.

Here, the Court appointed Black and Barlow, two lawyers skilled in capital litigation and

longtime members of this Court's bar, well before Cramer was indicted.  Trl. Doc. 4.  There is no doubt that Cramer's legal team was statutorily and professionally qualified to represent him without outside assistance.

Except for a passing reference to a general statement regarding capital cases, Mtn. 7, the only support Cramer provides for this claim are the American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases ("ABA Guidelines"), which he treats as mandatory throughout his motion, *e.g.*, Mtn. xix.  But the Supreme Court has admonished that the ABA guidelines are "only guides and not 'inexorable commands.'"  *Bobby v. Van Hook*, 558 U.S. 4, 8 (2009) (per curiam).  Indeed, "[a]lthough the Supreme Court has endorsed various sets of ABA Guidelines as instructive on the issue of reasonableness in representation, *see Strickland*, 466 U.S. at 688-89, … *neither the Supreme Court nor [the Fifth Circuit] have ever found the Guidelines to be dispositive of a claim of ineffective assistance*."  *Galloway v. Thaler*, 344 F. App'x 64, 68 (5th Cir. 2009) (unpublished) (emphasis added).

And while it is true that *Strickland* referred to ABA guidance, the version cited is *not* the one Cramer cites.  When *Strickland* was decided, the ABA guidelines described "defense counsel's duty to investigate both the merits and mitigating circumstances in general terms: 'It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction.'"  *Van Hook*, 558 U.S. at 7 (quoting 1 ABA Standards for Criminal Justice 4-4.1 (2d ed. 1980)).  The Court pointed out in *Van Hook* that the older version was "[q]uite different" from "the ABA's 131-page 'Guidelines' for capital defense counsel, published in 2003."  *Id.* at 8 (citing ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (rev. ed. 2003)).  The Court further noted that the guidelines "must not be so

**Response to Section 2255 Motion, Page 15**

detailed that they would 'interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions.'" *Id.* at 9 n.1 (quoting *Strickland*, 466 U.S. at 689).

*Van Hook* stated that "the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices.'" *Id.* at 9 (quoting *Roe v. Flores-Ortega*, 528 U.S. 470, 479 (2000)). And Justice Alito's concurring opinion provided additional perspective:

> *I join the Court's per curiam opinion but emphasize my understanding that the opinion in no way suggests that the American Bar Association's Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases ... have special relevance in determining whether an attorney's performance meets the standard required by the Sixth Amendment.* The ABA is a venerable organization with a history of service to the bar, but it is, after all, a private group with limited membership. The views of the association's members, not to mention the views of the members of the advisory committee that formulated the 2003 Guidelines, do not necessarily reflect the views of the American bar as a whole. *It is the responsibility of the courts to determine the nature of the work that a defense attorney must do in a capital case in order to meet the obligations imposed by the Constitution, and I see no reason why the ABA Guidelines should be given a privileged position in making that determination.*

*Id.* at 13-14 (internal citation omitted) (emphasis added).

Here, ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

_____

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████



Response to Section 2255 Motion, Page 17

**2.      Cramer's team was not ineffective in failing to pursue a duress defense because the facts of the case did not support it.**

Based on prison "politics" and the dynamics of the Soldiers of Aryan Culture (SAC)—a prison gang known for violence that Cramer, Fackrell, and Johns belonged to—Cramer argues that his trial team was ineffective in not pursuing a duress defense. This is wrong because Cramer did not meet the legal requirements for a duress defense and counsel is not ineffective in failing to make a frivolous argument. *See United States v. Jackson*, 53 F.3d 1282, 1282 n.1 (5th Cir. 1995) (unpublished) (citing *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994)).

The Fifth Circuit recognizes four elements that must be established for the affirmative defense of duress:

> *First*: That the defendant was under an unlawful and present, imminent, and impending threat of such a nature as to induce a well-grounded fear of death or serious bodily injury to himself [herself] [to a family member];
>
> *Second*: That the defendant had not recklessly or negligently placed himself [herself] in a situation where he [she] would likely be forced to choose the criminal conduct;
>
> *Third*: That the defendant had no reasonable legal alternative to violating the law, that is a reasonable opportunity both to refuse to do the criminal act and also to avoid the threatened harm; and
>
> *Fourth*: That a reasonable person would believe that by committing the criminal action, he [she] would directly avoid the threatened harm.

5TH CIR. PATTERN JURY INSTRUCTIONS (Criminal Cases) § 1.38 (2024 ed.).

"Because duress is an affirmative defense, a defendant must present evidence of each of the elements of the defense before it may be presented to the jury." *United States v. Posada-Rios*, 158 F.3d 832, 873 (5th Cir. 1998) (citing *United States v. Bailey*, 444 U.S. 394, 415 (1980); *United States v. Gant*, 691 F.2d 1159, 1165 (5th Cir.1982)). For the first element—the threat— the Fifth Circuit has made

clear that *the defense only arises if there is a real emergency leaving no time to pursue any legal alternative*.  In stating why the defense requires proof "of absolute and uncontrollable necessity" the Supreme Court explained that "[a]ny rule less stringent than this would open the door to all sorts of fraud."  *The Diana*, 74 U.S. (7 Wall.) 354, 360-61, 19 L.Ed. 165 (1868).

*Posada-Rios*, 158 F.3d at 874 (emphasis added).

In *Posada-Rios*, the court provided examples of "real" emergencies, such as when an inmate flees a burning prison, *id.* at 874 n.20, and held that the appellant failed to meet the first element because she "presented no specific evidence of any threat to her or her family," *id.* at 873.  *See also United States v. Montes*, 602 F.3d 381, 389 (5th Cir. 2010) (defendant did not prove that he was under a "present, imminent, and impending threat" because he did not establish that *any* threat was made).  The court also made the following observations on the third element—whether the defendant had no reasonable legal alternative to violating the law:

> To establish the absence of a legal alternative a defendant must show "that he had actually tried the alternative or had no time to try it, or that a history of futile attempts revealed the illusionary benefit of the alternative." [*United States v. Harper*, 802 F.2d 115, 118 (5th Cir. 1986)] (quoting *Gant*, 691 F.2d at 1164).  In assessing whether reasonable alternatives were available to a defendant a court must objectively evaluate the facts.  A "[d]efendant's subjective belief as to available legal alternatives is not determinative.  As long as defendant's crises permitted 'a selection from among several solutions, some of which did not involve criminal acts,' ... the necessity defense must fail."  *United States v. Meraz-Valeta*, 26 F.3d 992, 995 (10th Cir. 1994).

*Posada-Rios*, 158 F.3d at 874.  The court has also noted that a defendant cannot sustain a duress defense when he has time to notify authorities and fails to do so.  *Montes*, 602 F.3d at 390.

Here, Cramer fails to show that—with any amount of investigation—he could have met even one of the elements for the duress defense.  The government's brief on appeal laid out the events leading to the murder:

> SAC members are expected to follow a certain set of rules.  Drugs, alcohol, and gambling are verboten.  ROA.7643, 7771, 7837.  A member does not lie to a "ranking" member.  ROA.7992.  Debts must be paid.  ROA.7643, 7992-93.  Leo

Johns (known as "Wood"), an inmate at USP Beaumont and an SAC member, broke all those rules.  He bootlegged alcohol (made from fruit or potatoes in the prison) to supplement his income and for his own consumption, used synthetic heroin, gambled, and ran up debts.  ROA.7417-18, 7712-13.  Worst of all he lied to Cramer. [ROA.]7298-99.  In Spring 2014, Cramer and his trusted lieutenant, Fackrell, gave Johns what was known in SAC circles as a "discipline"—a severe beating.  ROA.7295, 7300.  The two men went into Johns's cell and "beat the crap out of him."  ROA.7295, 7627, 7635-36, 8027.  Johns's eyes were "pure red" with blood, and he was left "bleeding out of the nose and mouth."  ROA.7638-39.  A fellow inmate later found Johns in his cell, "sitting at his desk crying."  ROA.7639.

* * *

After beating Johns, Cramer and Fackrell put Johns on "probation"; he had to either stop his gambling, drinking, and drug use—or else.  ROA.7295-96, 7643.  But Johns did not mend his ways.  ROA.7643, 7713-14, 7996, 8011.  The "straw that broke the camel's back" came in early June 2014 when Cramer caught Johns gambling at cards.  ROA.7631, 7644.  Johns was being "real belligerent and loud and hollering" and appeared to be either drunk or high on drugs.  ROA.7631-32.  Cramer was livid.  He yelled to Johns and ordered him to go to his cell.  ROA.7633.  Johns complied, and the two met in Johns's cell.  ROA.7633.  Cramer emerged from the encounter even angrier than before, exclaiming: "I'm gonna kill that fool."  ROA.7633-34.

Cramer had at least three fellow inmates volunteer to punish Johns short of killing him. Michael Shelton (known as "Monk"), an SAC member, asked another inmate, Alex Fetters, to "go with him and beat up Leo Johns so they would take him [Johns] off the yard because [Shelton] was afraid that he was going to be required to go with Christopher Cramer to kill Leo Johns."  ROA.7646.  Another inmate, Jason Thompson, offered to cut off Johns's "patch"—the SAC symbol tattooed on Johns's forehead, ROA.7279, 7997-99.  Cramer declined all offers.  ROA.7646-47, 7997-8000.  He wanted Johns "killed."  ROA.7999, 8045.

Cramer's trusted lieutenant—Fackrell—stepped in and volunteered to kill Johns.  ROA.8000-01.  But Fackrell was soon to receive a visit from his family, and he wanted the killing to take place after the visit because he knew that the prison would be on lockdown "after [the] murder happened[.]"  ROA.7648.

*Fackrell*, 2020 WL 4048268 at *5-*7 (citation to page numbers assigned by the Fifth Circuit).



Cramer ███████████████████████████████████████████ ████████████████████████████████████████████ fails to point to a single specific threat of *imminent* harm. ████████ That failure alone dooms his argument. *E.g.*, *Posada-Rios*, 158 F.3d at 873; *Montes*, 602 F.3d at 389.  Indeed, about a week before he murdered Johns, Cramer

told his cell mate, Otis Carden, "I'm going to kill that fool." Trl. Doc. 591 at 142. Cramer made the same comment to another inmate, Alexander Fetters, after a verbal altercation with Johns in the same time frame. Trl. Doc. 592 at 473. Cramer did not mention any threats to himself. And other inmates even offered to take action to prevent Cramer from proactively harming Johns.

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████ But Cramer voluntarily joined one of the most violent gangs in the federal prison system and, in fact, was the "shot caller," *i.e.*, the person in charge of the SAC at USP-Beaumont. Trl. Doc. 591 at 129; Trl. Doc. 592 at 463. Not only did Cramer place himself in a situation where he would likely engage in criminal conduct, he was the one who got to choose whether the criminal conduct would occur at all.

As for the third element, Cramer had reasonable legal alternatives to violating the law if he had been threatened. In the week (or more) following his decision to murder Johns, Cramer could have reported the situation to BOP authorities, who could have placed Cramer—if he told them that he was under some sort of threat—and Johns in the Special Housing Unit (SHU) until arranging a transfer for one or both. *E.g.*, Trl. Doc. 591 at 207 (Carden testimony on "checking in"); Trl. Doc. 593 at 701-02 (Wasson testimony on same); ████████████████████████ ██████████. Indeed, when authorities at USP-Beaumont heard a rumor regarding a planned attack, they moved the likely victim to the SHU immediately. Trl. Doc. 255-2 at 2 (Childress affidavit). Unfortunately, that rumor led to the wrong victim.

Finally, Cramer fails to meet the fourth element because no reasonable person would believe that murdering Johns would directly avoid threatened harm, given that there was no

**Response to Section 2255 Motion, Page 21**

actual threat.

In short, Cramer's trial team were not ineffective to declining to waste time and money trying to craft an affirmative defense that the evidence would never support. And Cramer did not suffer prejudice because he could not meet any of the requirements for a duress defense.

> **3.    Cramer's team was not ineffective in failing to pursue a voluntary intoxication defense because, aside from hearsay statements allegedly made by Cramer and Fackrell, there was no evidence to support it.**

Cramer contends that his lawyers were ineffective in failing to offer evidence that he was intoxicated when he stabbed Johns in hopes of persuading at least one juror to convict him of second-degree murder instead of first-degree murder. Mtn. 20-21. This is meritless because there was no evidence that Cramer was intoxicated at the time of the murder.

While the government found no recent Fifth Circuit case on point, Cramer pointed out a 1988 case, which stated the following:

> It is well settled that voluntary intoxication is no defense to a general intent crime. It is also the rule in this circuit that where specific intent is an element of the crime charged, *e.g.*, premeditation in the case of first degree murder, evidence of intoxication is proper for consideration by the jury to determine whether a sufficient degree of intoxication existed to negate such intent. *United States v. Romano*, 482 F.2d 1183 (5th Cir. 1973); *United States v. Caples*, 391 F.2d 1018 (5th Cir. 1968). An accused is entitled to a jury instruction on such a theory of defense if the theory has a foundation in the evidence, *Sullivan v. Blackburn*, 804 F.2d 885, 887 (5th Cir. 1986); *United States v. Williams*, 728 F.2d 1402, 1404 (11th Cir. 1984), even though the evidence may be weak, insufficient, inconsistent or of doubtful credibility. *See United States v. Hammons*, 566 F.2d 1301, 1302 (5th Cir. 1978). But no instruction is required where a theory of defense lacks evidentiary support. *United States v. Gentry*, 839 F.2d 1065, 1071 (5th Cir. 1988); *United States v. Brooks*, 611 F.2d 614, 619 (5th Cir. 1980); *United States v. Dobson*, 609 F.2d 840, 843 (5th Cir. 1980). *See also* 8A J. Moore, MOORE'S FEDERAL PRACTICE ¶ 30.03(1) at 30-10 (2d Ed. 1987).

*United States v. Molina-Uribe*, 853 F.2d 1193, 1205-06 (5th Cir. 1988), *overruled on other grounds by United States v. Bachynsky*, 934 F.2d 1349 (5th Cir. 1991).

Cramer's reliance on *Molina-Uribe* shows how weak his argument is. Cramer first points

to witness Carden, who was Cramer's cell mate, claiming that Carden testified that "Cramer made alcohol in his cell (Dkt. 591 at 250-52) and that "80% of the white people" in the BOP use suboxone (Dkt. 591 at 254.)." Mtn. 21.  But even if those statements were true, they do not show that Cramer was intoxicated the morning he murdered Johns



Cramer's final point requires unpacking.

Cramer also cites the selection-phase testimony of his prison consultant, Roy Timothy Gravette, who testified that *Cramer* told him that, on the morning of the murder, "we found out there was shine over there so we figured we would just go get drunk ... I thought I would just do two things while I was there because Johns was still getting high. I went to talk to him." Trl. Doc. 647 at 1320-21.  Significantly, neither Fackrell nor Cramer claimed that Cramer really was drunk when they attacked Johns.

_____

Cramer's trial team was not ineffective in failing to manufacture a defense that turned on testimony from Cramer—who chose not to testify—or ▮▮▮▮. Moreover, Cramer cannot show prejudice because, even if *Molina-Uribe* is good law on this point, he could not argue the defense or get an instruction on it without some evidence to support it. *Molina-Uribe*, 853 F.2d at 1205-06. He had none.

> **4.    Cramer's team was not ineffective regarding evidence from the civil suit filed by Johns's family.**

Cramer criticizes his lawyers for not attempting an end run around the Court's decision to preclude filings from a civil case that Johns's family filed against a warden and other BOP officers. This argument is meritless.

Before trial, Cramer and Fackrell sought evidence under *Brady v. Maryland* from the civil suit filed by Johns's family, *see Brianna Johns et al v. Francisco Lara et al.*, No. 1:16-cv-000198-MAC, EDTX (June 8, 2016) (ECF Doc. 2, complaint) (the "civil suit"), because the warden raised the affirmative defense of contributory negligence. Trl. Doc. 234; Trl. Doc. 212 at 18 and Ex. F. at 23-25. The government opposed relief and sought an order in limine prohibiting "any reference to statements and pleadings in the civil suit brought by the Johns family" without first presenting it to the Court. Trl. Doc. 255. The response included an affidavit from Agent Reshay Childress. Trl. Doc. 255-2 (Childress affidavit and attachments).

The Court denied the defendants' motion and granted the government's motion in limine on February 1, 2018, holding the following:

> The court finds that [Warden] Lara's assertion of an affirmative defense under Texas comparative negligence law in a civil lawsuit does not constitute *Brady* material in the instant criminal prosecution against Defendants. The plaintiffs in the civil action alleged that the negligence and deliberate indifference of certain BOP employees caused Johns's death. Defendants were not parties to the civil case, and their responsibility for Johns's death was not at issue in that litigation. When Johns was killed in the USP in June 2014, Lara was the warden of the MSI,

the medium security facility, at FCC Beaumont, where he served as warden from February 2014 until February 2015.  In that capacity, he would have had no policy-making or supervisory authority over the USP Beaumont or its employees.  None of the inmates involved in the incident at issue were housed in the MSI at that time.  Not surprisingly, Lara is not listed as a witness in the criminal case.  Moreover, Lara's comparative negligence theory in the civil case—that Johns's drug and alcohol use made him more than fifty percent responsible for his death as compared to Lara—does not exculpate Defendants, or mitigate their alleged actions, and is immaterial in this criminal prosecution for premeditated murder and conspiracy to commit premeditated murder.  Furthermore, because Lara will not be a witness in this case, such theory is not impeaching.

* * *

*The court agrees that any reference to the civil lawsuit, as well as any pleadings and motions submitted in that case, are irrelevant and immaterial and would confuse the jury.  See* FED. R. EVID. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."); *id.* 402 ("Irrelevant evidence is not admissible.").  The allegations in the civil and criminal cases are vastly different.  The civil case alleged that the negligence of BOP officials caused Johns's death, while the instant criminal prosecution alleges that Defendants murdered, and conspired to murder, Johns with premeditation and malice aforethought.  The AUSA in the civil lawsuit is unaffiliated with the AUSAs prosecuting the criminal case, and Lara's assertion of an affirmative defense under Texas comparative negligence law in a civil lawsuit has no bearing on this criminal action, a case in which Lara is not involved in any respect.

Trl. Doc. 347 at 5-6, 7-8 (emphasis added).

Cramer and Fackrell revisited the issue during the selection phase, filing a joint bench brief seeking "a ruling from the Court on the admissibility of evidence of the civil lawsuit in this, the Selection Phase of the death penalty trial."  Trl. Doc. 616.  The government responded with a motion in limine.  Trl. Doc. 620.  The Court heard the matter, Trl. Doc. 647 at 1346-61, and denied the defendant's motion, reading a lengthy order into the record that reiterated points from the order quoted above, *id.* at 1355-57.

When asked specifically about the Childress affidavit, the Court made clear that it was included in the order: "I'm not going to have it—introduce an affidavit in some civil lawsuit in this criminal action.  That will not happen."  *Id.* at 1359.  Counsel made sure the issue was

preserved for appeal, *id.* at 1357-61, and the Fifth Circuit made short work of it:

> The Johns family sued a BOP warden, alleging that the BOP was liable for Johns's wrongful death.  In the warden's answer urging the court to dismiss the suit, he said that Johns was primarily responsible for his death because he joined the SAC and defied the rules prohibiting drinking and gambling.  In Defendants' trial, the Government argued that Johns was not responsible for his murder and that Defendants murdered him to maintain their reputations.
>
> *The district court did not err in excluding this evidence as irrelevant and likely to confuse the jury.  The individual warden's response in a lawsuit does not equate to the BOP's own statement on Johns's culpability, as the BOP was not a party to the civil suit.  The evidence is therefore not relevant and the relationship between the two cases is so attenuated as to risk confusing the jury.*

*Fackrell*, 991 F.3d at 607 (emphasis added).

Despite this Court's repeated holdings that evidence about the government's affirmative defense in the civil suit was inadmissible—upheld by the Fifth Circuit—Cramer now argues that counsel was ineffective in not trying to get it in through Childress:

> Although the trial court restricted the defense's use of evidence from the civil case, there were two avenues left to counsel to try to show the jury that the government's narrative about Johns in Cramer's criminal trial was very different from the narrative the government presented when they were sued for Johns' wrongful death.  First, counsel did not call Childress as a witness, and second, they raised no objection to the government's motion in limine prohibiting the defense from remarking on Childress's absence as a government witness during the guilt phase.  Had they pursued either of those actions, the jury would have had a complete picture of the circumstances of Johns' death, and at least one juror would have voted to acquit him or, later, vote for a life sentence.

Mtn. 22.

Cramer fails to meet either prong of the *Strickland* test for these allegations.  Cramer's lawyers tried diligently to get the evidence in, and writ counsel's suggestions would not have succeeded in light of the Court's decision(s) that the evidence was inadmissible.  Moreover, as addressed next, Childress's testimony would have destroyed Cramer's desired duress defense.  This claim is meritless.

**5.    Cramer fails to show that his trial team was ineffective in declining to call Childress or BOP staff member F. O'Connell as witnesses.**

Cramer claims that his lawyers should have called Childress and a BOP laundry supervisor as witnesses to lay the groundwork for admission of the Childress affidavit discussed above and to demonstrate what Cramer believes was "BOP's own role in Johns' death."  Mtn. 22-23.  But Cramer cannot show deficient performance or prejudice.

The Fifth Circuit has long emphasized that "complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy, and because allegations of what a witness would have testified are largely speculative."  *United States v. Cockrell*, 720 F.2d 1423, 1427 (5th Cir. 1983) (quoting *Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978)).  Thus, the standards for ineffective-assistance-of-counsel claims alleging uncalled witnesses are stringent and well-established:

> "To prevail on an ineffective assistance claim based upon uncalled witnesses, an applicant must name the witness, demonstrate that the witness would have testified, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable." *Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir. … 2010).  "An applicant 'who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial.'" *Id.*

*Trevino v. Davis*, 829 F.3d 328, 338 (5th Cir. 2016) (footnote and internal citation omitted).

A decision not to call a witness is presumed to be strategic.  *Murray v. Maggio*, 736 F.2d 279, 282 (5th Cir. 1984).  Courts will not "second-guess counsel's methods," *King v. Davis*, 883 F.3d 577, 588 (5th Cir. 2018), particularly when the testimony would have been cumulative, *Murray*, 736 F.2d at 282.  Indeed, "[t]he decision not to present additional testimony does not constitute ineffective assistance of counsel."  *United States v. Bernard*, 762 F.3d 467, 474 (5th Cir. 2014) (citing *Coble v. Quarterman*, 496 F.3d 430, 436 (5th Cir. 2007)).

Here, the record show that Childress's testimony would have been disastrous for Cramer.

Childress would not have helped Cramer's theory that staff at USP-Beaumont knew that Cramer and Fackrell were planning to kill Johns and failed to prevent the murder. Indeed, it would have shown the opposite. In his affidavit, dated October 4, 2016, Childress made clear that

> no one in my office was aware of a specific plan to harm inmate Johns prior to his death on June 9, 2014. The only information the institution received regarding a potential serious assault was on June 5, 2014. A staff member advised my office that he had overheard a conversation about a planned assault on a white inmate at USP Beaumont who had released from the Special Housing Unit (SHU) within the last 30 days (from June 5, 2014). Inmate Johns was in SHU from April 3, 2014 to April 9, 2014, so he did not meet this criteria. The only inmate who met this criteria was placed in SHU pending an investigation into these claims on June 5, 2014.

Trl. Doc. 255-2 at 2 (Childress affidavit).



According to Childress, the only indication that Johns was having problems with other SAC gang members came five days after the murder in a recorded telephone call placed by former inmate Brian Green to Johns's stepbrother. Trl. Doc. 255-2 at 5.

On January 30, 2018, more than a year after signing his affidavit, Childress testified in a suppression hearing in this case.  Trl. Doc. 348 at 18-51.  Childress described a conversation with Cramer that took place shortly after the murder on June 9, 2014:

> Q. [T]ell us about what happened once Inmate Cramer was brought to your office.
>
> A. Well, at that particular time, we already had got word that Inmate Johns had passed away due to his injuries.  So, I actually was explaining to Inmate Cramer that, "Hey, look, I'm going to be placing you in Special Housing for an investigation into possible homicide charges; and I will be bringing the FBI in in order to talk to you."
>
> * * *
>
> Q. Were you trying to get information from him?
>
> A. The only thing I wanted to know was just to make sure it was internal, no other issue was going on.  And at that time Cramer pretty much explained to me, "Hey, this is internal.  There ain't no issues."
>
> It was personal, and that's all I needed to hear.  But he did make it be known that he did not want to talk to the FBI.
>
> Q. Okay. So, you said that he made some statements to you; and you were trying to find out whether it was internal because, again, you're focused on the safety and security of the prison?
>
> A. ... yes, ma'am.
>
> Q. Okay. And, so, you said that Inmate Cramer made some statements to you.  He told you that it was personal?
>
> A. *It was a personal issue between just him and Johns.  Inmate Fackrell had nothing to do with it, and it was just between him and Fackrell—I mean, him and Johns.*
>
> Q. Okay. So, he told you that Fackrell had nothing to do with it, that it was between himself and Johns?
>
> A. Yeah. That's what he said.
>
> Q. *Did he admit to killing Johns?*
>
> A. *Yes, he did.*

Trl. Doc. 348 at 27-29 (emphasis added).

Nothing about this testimony would have made the Court reconsider its decision to exclude evidence about the civil suit. And it undercuts Cramer's theory that he was under duress. It also includes Cramer's admission that he murdered Johns; Cramer's statement that the murder was "personal"; and the lie he floated that Fackrell was not involved. Cramer's trial team wisely avoided that testimony.

As for O'Connell, Cramer completely fails to meet the standards for uncalled witnesses. Cramer does not even fully name the witness, much less demonstrate that he would have testified; the content of his proposed testimony; or that the testimony would have been favorable to him. *See Trevino*, 829 F.3d at 338 (citing *Gregory*, 601 F.3d at 352). Cramer fails to show that his trial team erred by not calling O'Connell as a witness.

> **6.     Cramer fails to show deficient performance in his lawyers' cross-examination of government witnesses or in their decision not to call witnesses that would not have helped him.**

Cramer contends that Black and Barlow "failed to use readily available evidence to impeach government witnesses, undermine government evidence, and challenge the government's theory of liability." Mtn. 23. Essentially, this claim amounts to a disagreement with how Cramer's trial lawyers handled the case, despite *Strickland*'s admonition that "[t]here are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689. Cramer's criticisms—informed by hindsight and a misguided notion of what would sway the jury—come nowhere close to showing that his trial team "made errors so serious that counsel was not functioning as the 'counsel.'" *Id.* at 687.

> **a.     Cramer's complaints about his lawyers' tactics for handling government witnesses are meritless.**

Cramer complains about his trial team's investigation and cross-examination of eight

witnesses called by the government, but he fails to show that the team's performance was deficient or that the alleged errors prejudiced him.

**(1) Otis Carden:** Cramer argues that his lawyers did not prepare adequately to cross-examine Carden.  First, Cramer finds it "incredible" that his trial team did not depose Carden. Mtn. 23-34.  But Fed. R. Crim. P. 15(a)(1) requires a showing of "exceptional circumstances" and "the interest of justice" for a district court to order a deposition in a criminal case.  The Fifth Circuit has long held that

> [t]he word "may" signifies that the district court retains broad discretion in granting a Rule 15(a) motion and that the court should review these motions on a case-by-case basis, examining whether the particular characteristics of each case constitute "exceptional circumstances." ... The words "exceptional circumstances" bespeak that only in extraordinary cases will depositions be compelled.

*United States v. Dillman*, 15 F.3d 384, 389 (5th Cir. 1994) (quoting *United States v. Bello*, 532 F.2d 422, 423 (5th Cir. 1976)).

Cramer does not refer to Rule 15 or explain how he meets its requirements.  He thus fails to show that his trial team was ineffective in not attempting to depose Carden before trial.

The crux of Cramer's argument is that counsel should have done more in cross-examining Carden.  But the Fifth Circuit rejected a similar plea in *Bernard*:

> [O]utlining a litany of complaints, Bernard alleges counsel performed deficiently in the conduct of the sentencing hearing. ... *A plea for "more of the same" does not, in the circumstances of this case, show that the experienced trial counsel were not functioning as counsel guaranteed to Bernard by the Sixth Amendment.*

*Bernard*, 762 F.3d at 476 (citing *Strickland*, 466 U.S. at 687) (emphasis added).

Here, Cramer argues that his trial team should have cross-examined Carden more thoroughly on his motivation for testifying ████████████████████████████████ ██████████████████████████████████████████████  But this "more"

would not have helped because it turns on Cramer having murdered Johns.  Indeed, this theory would have undercut Cramer's arguments that he did not intentionally murder Johns because he was drunk or under duress.  Moreover, Carden's desire to benefit from testifying was explored several times on direct and cross-examination.  *E.g.*, Trl. Doc. 591 at 187-89, 196-97, 201, 420-21, 425.  Cramer thus fails to show deficient performance or prejudice.

**(2) Alexander Fetters:** Cramer contends that his trial team should have cross-examined Fetters regarding conversations that he allegedly had with Carden after the murder ██████



Cramer does not support his claim with an affidavit from Fetters, and Fetters testified under oath that he did not share information with Carden:

> Q. [] If there is any suggestion at some later point in the trial that you and Otis Carden shared kites and communicated and got your stories together in anticipation of your testimony here today, would that suggestion, if it comes, be accurate or inaccurate?
>
> A.  It would be very inaccurate.
>
> Q. Explain, please.
>
> A. Myself and Otis Carden didn't talk—I mean, we didn't talk about anything getting our stories together.  I believe Otis Carden was agreeing to cooperate with law enforcement long before I was.  So, if me and him would have talked about it, he would have been admitting to me that he was actually hot on this case; and, so, that would put his life in danger.
>
> Q. And, so, at any time that you were in the SHU and in the same vicinity of Otis Carden, were you—or had you decided to cooperate with law enforcement at that point in time?
>
> A.  No.

Q. Okay.  Let me just imagine that you had. Let's imagine that—again, if anybody is suggesting that you were in cahoots with Otis Carden and that you got your stories together that way, if you had written a kite to send to Otis Carden, is there a guarantee that that kite is going to get to the other person that you want it to get to?

A. No.  It could be intercepted from any cell up and down the hallway.

* * *

Q. And if in that note you said, "Hey, let's get our stories straight so we can cooperate together" and somebody intercepted that, what would the result of that interception be for you and Otis Carden?

A.  Our lives would be in danger.

Trl. Doc. 593 at 643-44.

On recross-examination by Fackrell, Fetters made clear how he learned that Carden was

cooperation:

Q. [] How did you know that Otis Carden was cooperating with the United States Government?  Who told you that?

A. ... Otis Carden actually wrote my mom a letter and apologized to me and told me that he was sorry that he was doing this.
Q. So, that's how you knew that he was cooperating before you?

A. Correct.

Trl. Doc. 593 at 654.

████████████████████████████████████████████████████████

████ , Cramer's trial team did not perform ineffectively in failing to ask Fetters about it.

**(3) Bradley Wasson:** Cramer's complaint about his trial team's cross-examination of

Wasson is both confusing and speculative.  Cramer criticizes his lawyers for not questioning

Wasson about Johns's behavior *before* the murder, Mtn. 29-30, but Wasson was not at USP-

Beaumont when Cramer and Fackrell murdered Johns, Trl. Doc. 593 at 665, 723.  Thus, anything

Wasson "knew" about Johns's behavior would have been hearsay.  Rather, Wasson was called to

testify about something he knew personally—statements Fackrell and Cramer made *after* the murder. *E.g.*, Trl. Doc. 593 at 674-84. ███████████████████████████████████ █████████████████████████████████████████████ But Cramer offers no support for this notion except a reference to his Claim 9, which does not mention Wasson.

**(4) Jason Thompson:** Cramer argues that his lawyers were ineffective because they did not cross-examine Thompson ███████████████████████████████████████ ███████████████████████████████████. But Thompson testified—albeit generally—about Johns's debts and the complaints that they triggered on direct. Trl. Doc. 593 at 832-33. Cramer offers nothing indicating what more Thompson might have said. █████ ████████████████████████████████████████████████████████ ██████████ Thus, Cramer completely fails to meet the standards for uncalled witnesses to the extent those standards apply. *See Trevino*, 829 F.3d at 338 (citing *Gregory*, 601 F.3d at 352). Moreover, Cramer's new theory that ███████████████████████████████ ███—even if true—is insufficient to show that Cramer was under a "present, imminent, and impending threat," *Montes*, 602 F.3d at 389, for the purposes of a duress defense. This speculative claim is meritless.

**(5) Andrew Creech:** Cramer's complaint about the cross-examination of Creech offers nothing specific, merely claiming that ████████████████████████████████ ████████████████████████████████████████████████ ███████████████. Cramer does not offer an affidavit from Creech or even speculate on what Creech might have said. Cramer thus wholly fails to show that his lawyers were ineffective or how he might have been prejudiced. Paradoxically, after criticizing the trial team for not raising scattershot, inconsistent defenses—duress (from SAC or other races), voluntary intoxication,

contributory negligence, etc.—Cramer argues here that counsel lacked "a coherent theory of defense at the guilt phase" without identifying which defense counsel should have advanced. Mtn. 31.  This is meritless.

**(6) Travis Blodgett:** Cramer fails to support his claim that trial counsel was ineffective in cross-examining Blodgett based on speculation

But Cramer's trial team was very familiar with the SHU— and how inmates communicated within its confines—from their representation of Mark Isaac Snarr in *United States v. Mark Isaac Snarr*, No. 1:09-CR-15(1) (E.D. Tex.), which involved a murder in that very SHU.  Moreover, the trial team verified Blodgett's cell mate's name during cross-examination, Trl. Doc. 594 at 970-71, and Cramer fails to show that they did not try to talk with him.  Cramer's allegations are meritless.

**(7) Jason Scoggan:** The crux of Cramer's complaints about his trial lawyers' cross-examination of Scoggin is that they did not ask about the alleged

But, as set out above, there is no evidence that                                                  .  And it would not have helped Cramer to manufacture yet another motive for killing Johns because that would simply prove that Cramer did, indeed, intentionally commit the murder.  Cramer fails to show deficient performance or prejudice here.

██████    Cramer makes no effort to show how the failure to cross examine Scoggan regarding

████████████████████████████████████████████████████ shows

ineffective assistance or prejudice.  Nor is either readily apparent.

**(8) Robert Nylen:** Cramer argues that his lawyers were ineffective in failing to turn

seasoned BOP intelligence specialist Nylen into an "expert in matters of prison life" during

cross-examination.  Mtn. 32.  In support, Cramer relies solely on ███████████████

████████████████████████████████████████████████████

████████████████████████    Cramer offers nothing indicating what Nylen would have

testified to regarding Cramer's desired objectives.  *See Trevino*, 829 F.3d at 338 (standards for

uncalled witnesses).  He fails to show deficient performance or prejudice.

**b.    Cramer's complaints about uncalled witnesses are meritless.**

Cramer next complains about his trial team's decision not to call ████ witnesses on

irrelevant, petty, or damaging topics.  He fails to show that his lawyers' performance was

deficient or that the alleged errors prejudiced him.

Again, "[c]omplaints of uncalled witnesses are not favored in federal habeas corpus

review because allegations of what a witness would have testified are largely speculative."

*Sayre v. Anderson*, 238 F.3d 631, 635-36 (5th Cir. 2001) (quoting *Lockhart v. McCotter*, 782

F.2d 1275, 1282 (5th Cir. 1986)).  A decision not to call a witness is strongly presumed to be

strategic.  *Murray*, 736 F.2d at 282.  Courts will not "second-guess counsel's methods," *King*,

883 F.3d at 588, particularly when a witness's testimony would have been cumulative, *Murray*,

736 F.2d at 282.  Indeed, "[t]he decision not to present additional testimony does not constitute

ineffective assistance of counsel." *Bernard*, 762 F.3d at 474 (citing *Coble*, 496 F.3d at 436).

**(1)** ████████████████████████████████████████████████

**Response to Section 2255 Motion, Page 36**



Cramer's trial team was far too savvy to call a witness who would only make their client "look bad" and who would have been subject to withering cross-examination regarding his own history ███████████████████████ ████████████████████████████████████████ ████████████████████████████████.

(2) ███████████: Apparently based on the unrealistic belief that his trial team was obligated to interview every member of the SAC, regardless of their knowledge of the facts of the case, ████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████████████████ Cramer's attorneys were not ineffective in declining to present such speculation.

(3) ███████████: Cramer argues that his lawyers were ineffective in failing to call ████████████████████████████████████████ ████████████████████████████████████. This near-classic "plea for 'more of the same' does not, in the circumstances of this case, show that Cramer's experienced trial team was not functioning as counsel guaranteed ... by the Sixth Amendment." *Bernard*, 762

F.3d at 476 (citing *Strickland*, 466 U.S. at 687).

**(4)** ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████         Cramer's trial team was not ineffective in

keeping ██████████ off the stand.

**(5)** ██████████: Cramer argues that ███ should have been called to testify on a variety

of general issues about life in prison and the characters of Johns and Carden.  Mtn. 34.  Even

assuming that this testimony would be relevant—and admissible under Fed. R. Evid. 608(b)—

the record shows that calling ▮ would not have been wise. ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Bradley Wasson, however, *testified* that, while he and Fackrell were cell mates, Fackrell said that ▮ supplied the knives used to kill Johns.  Trl. Doc. 593 at 667, 670-82; *id.* at 679 ("Q. … I'm going to ask you if you can go through that a little bit more slowly in terms of how Ricky Fackrell said to you it happened. A. *He said—he told me* that they ended up going into the cell, getting the knives from a guy named ▮▮▮ ."). ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ Moreover, ▮ was not a member of the SAC, *id.* at 6 (¶ 17), while Wasson was, Trl. Doc. 593 at 661.  Wasson's testimony showed that his conversations with Fackrell—indeed, why they were cell mates—arose in the context of their mutual gang membership. *Id.* at 673-74.  Had ▮ been called to testify, he would have been subject to cross-examination about Fackrell's claim regarding his involvement in the murder.  It is unlikely that any competent counsel would advise ▮ to testify—or that ▮ would have wanted to testify after hearing what Fackrell said about ▮ involvement.

**(6)** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Response to Section 2255 Motion, Page 39**



In short, no savvy defense lawyer would have put this time-bomb of a witness on the stand—even if they could have persuaded him to testify.

**(7)** ███████████, **(8)** ███████████, **and (9)** ███████████: Cramer's claim that his lawyers were ineffective in not calling ██████, ████, or █████ to spin a tale of ██████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████ Cramer cannot show what either "would have testified," much less "that the testimony would have been favorable." *Trevino*, 829 F.3d at 338 (quoting *Gregory*, 601 F.3d at 352).

**Response to Section 2255 Motion, Page 40**



███████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████   More important, none of this would have helped

Cramer.  A jury may have found ████████ tale—or tales—entertaining, but they also provide

another motive for Cramer's premeditated murder of Johns.  Cramer's trial team was not

ineffective in declining to offer this unhelpful testimony.

     **(10) Olajuwon Quarles:** Cramer criticizes his trial team for failing to interview former

BOP Correctional Officer Quarles and calling him to testify regarding the fanciful notion that

"the prison had advanced knowledge of the attack, thereby supporting a duress defense."  Mtn.

36.  Cramer offers nothing to support his speculation regarding Quarles's testimony.  Thus

Cramer completely fails to meet the standards for ineffective-assistance-of-counsel claims

alleging uncalled witnesses: "To prevail on an ineffective assistance claim based upon uncalled

witnesses, an applicant must name the witness, demonstrate that the witness would have testified,

set out the content of the witness's proposed testimony, and show that the testimony would have

been favorable."  *Trevino*, 829 F.3d at 338 (quoting *Gregory*, 601 F.3d at 352).

     **(11) Reshay Childress:** Cramer revisits subclaims 2, 4, and 5, addressed above, claiming

that counsel should have called Childress for "testimony supporting a duress defense and the

undeveloped theory that the prison had advance warning of the offense."  Mtn. 36.  Here, Cramer

again fails to meet the standards for ineffective-assistance-of-counsel claims alleging uncalled

witnesses set out in *Trevino*, 829 F.3d at 338 (quoting *Gregory*, 601 F.3d at 352).

**Response to Section 2255 Motion, Page 42**

**C.        Cramer does not show prejudice.**

Cramer alleges that his claims of deficient performance, considered together, demonstrate prejudice.  But the Fifth Circuit has noted that, in "assessing prejudice," allegations "ordinarily must be viewed individually."  *United States v. Ebron*, 683 F.3d 105, 140 (5th Cir. 2012) (quoting *United States v. Fields*, 483 F.3d 313, 358 (5th Cir. 2007)).  And even if Cramer's cumulative-error argument were legally viable, it fails because, as shown above, there is no error.

**CLAIM 2:  CRAMER'S ALLEGATIONS THAT HIS LAWYERS WERE INEFFECTIVE AT THE ELIGIBILITY AND SELECTION PHASES ARE MOOT.**

**CLAIM 3:**





Response to Section 2255 Motion, Page 44





Response to Section 2255 Motion, Page 46



Response to Section 2255 Motion, Page 47



**CLAIM 4:**

## CLAIM 5: CRAMER'S CONFLICT OF INTEREST CLAIM IS PROCEDURALLY BARRED AND OTHERWISE MERITLESS.

Cramer alleges that he was denied conflict-free counsel in two ways: first, because an Assistant Federal Defender represented Elizabeth Rose until she became a witness and, second, because ███████████████████████████████████. These claims are both procedurally barred and totally devoid of merit.

### A.    The unexpected possible conflict involving Rose was properly resolved.

#### 1.    The Record Regarding Rose

Cramer's first subclaim focuses on the representation of witness Elizabeth Rose.  In February 2017, Rose was indicted in this District for conspiracy to distribute methamphetamine

and a related firearm violation. *United States v. Rose*, No. 1:17-CR-17(02) (E.D. Tex. Feb. 1, 2017) (ECF Doc. 2). AUSA Michelle Englade—who was not involved in Cramer's prosecution—was assigned to the case, and then-Assistant Federal Defender John McElroy was appointed to represent Rose. Trl. Doc. 551, p. 3; *Rose*, No. 1:17-CR-17(02) (E.D. Tex. Feb. 27, 2017) (ECF Doc. 24). In October 2017, Rose appeared before now-retired Magistrate Judge Giblin and entered a guilty plea to the conspiracy count in accordance with a written plea agreement. *Rose*, No. 1:17-CR-17(02) (E.D. Tex. Oct. 12-29, 2017) (ECF Doc. 65, 66, 67, 68, 77, 83). But the written agreement contained a mistake that went unnoticed until the presentence report was issued. *Rose*, No. 1:17-CR-17(02) (E.D. Tex. Feb. 27, 2017) (ECF Doc. 24). McElroy explained the circumstances leading to the error in a joint motion to withdraw acceptance of that plea. *Rose*, No. 1:17-CR-17(02) (E.D. Tex. Apr. 30, 2018) (ECF Doc. 102 at 1-2). On April 26, 2018, Judge Giblin scheduled a second change-of-plea hearing for 2:00 p.m. on April 30, 2018. *Rose*, No. 1:17-CR-17(02) (E.D. Tex. Apr. 26, 2018) (unnumbered docket entry). That was the first day of the guilt phase of Cramer's trial.

Deputy U.S. Marshals brought Rose, who was detained, to the courthouse after lunch on Monday, April 30, and placed her in one of their three holding cells around 12:30 p.m. Trl. Doc. 595 at 1363-64. Fackrell and Cramer were in the other two cells for the lunch recess. Trl. Doc. 1364-66, 1370-72; Trl. Doc. 591 at 95, ll. 17-19 (time of recess). Rose overheard Fackrell and Cramer make incriminating comments, so when she was taken to court, she told McElroy what she heard and asked him to inform the government.[12] Trl. Doc. 595 at 1373-75. Because McElroy worked for Black, this created a conflict of interest. McElroy followed appropriate

---

[12] Rose admitted that she had been cooperating against her codefendants and others in her case in hopes of receiving a lower sentence and hoped this would also help. Trl. Doc. 595 at 1373-75.

procedures to convey the information, and Rose's plea hearing was rescheduled. *Rose*, No. 1:17-CR-17(02) (E.D. Tex. May 2, 2018) (unnumbered docket entry). The matter was brought before the Court on May 2. Trl. Doc. 551 at 3. The following day, McElroy formally moved to withdraw as counsel for Rose; another lawyer was appointed to represent her; and counsel in this case were notified of the situation, including that the government intended to call Rose as a witness. Trl. Doc. 551 at 3; *Rose*, No. 1:17-CR-17(02) (E.D. Tex. May 3, 2018) (ECF Doc. 104 and unnumbered oral order).

On May 7, Cramer's lawyers filed a motion to prohibit Rose from testifying or, in the alternative, to allow Black and Barlow to withdraw based on the conflict of interest. Trl. Doc. 551. In the motion, Cramer pointed out that "Black is the Federal Defender for the Eastern District of Texas and his assistant Federal Defender, John McElroy, has been the attorney assigned to represent and defend Ms. Rose *until being relieved by this Court upon the notification by the government of its intent to use this surprise witness several days ago* when trial was ongoing." Trl. Doc. 551 at 3 (emphasis added). The Court met with counsel in chambers to discuss the motion, and Rose, represented by new counsel, entered a guilty plea under the Rule 11(c)(1)(C) agreement later that morning. *See Fackrell*, 2020 WL 4048268 at 158 n.31 (U.S. Br.); *Rose*, No. 1:17-CR-17(02) (E.D. Tex. May 7, 2018) (ECF Doc. 105). Before Rose testified against Cramer, the Court put the substance of the *in camera* meeting on the record and Rose's new lawyer stated that she waived the attorney-client privilege, thus submitting herself to full cross-examination by Black. Trl. Doc. 595 at 1270-77. The Court denied Cramer's motion, Trl. Doc. 555, and Rose testified, Trl. Doc. 595 at 1362-85.

### 2.    Procedural Bar

Cramer was represented by highly experienced counsel on appeal. Yet, after carefully

reviewing the full record, they did not raise the issue on direct appeal.  Instead, they joined

Fackrell in complaining about an unrecorded meeting in chambers, an issue rejected by the Fifth

Circuit, which described the facts:

> Defendants assert that the record is missing vital conferences, including the conference about the testimony of Elizabeth Rose, the Government's final witness in the guilt phase of trial.  Rose was in a holding cell near Fackrell and Cramer's cells during their trial.  She testified that she heard them making fun of the prosecutor's opening argument, laughing about stabbing Johns 74 times, and Fackrell saying that "[i]t didn't feel like that many [stabbings] when it was happening."

> Rose was represented by an Assistant Federal Public Defender for the Eastern District of Texas, as was Cramer.  She was facing a life sentence for conspiracy to possess and intent to distribute methamphetamine.  *She contacted her attorney and told him that she wanted him to tell the Government about what she heard. Rose's attorney petitioned to withdraw from her case given the conflict of interest created by her desire to testify against Cramer.*  Defendants' counsel believes that the court discussed Rose's testimony in an unrecorded conference in chambers and that the missing record prejudices their defense.  Counsel also believes that the parties discussed the potential conflict of interest facing the Federal Public Defender.

*Fackrell*, 991 F.3d at 613 (emphasis added); *see also United States v. Cramer*, No. 18-40598,

2020 WL 2061137, at *178 (5th Cir. Apr. 14, 2020) (Cramer's Br.).

Cramer now claims that "McElroy *apparently* advised Rose to testify against Cramer to

secure a sentence reduction" and that "McElroy then *misled the court* about the nature and extent

of his conflict of interest by failing to disclose that he had advised Rose to testify against Cramer

and that he had arranged for her to proffer information to the government by, at the very least,

notifying the government of her desire to cooperate."  Mtn. 101 (emphasis added).  Cramer

points to nothing in the record—or his exhibits—that supports the allegations, and the

speculation is inconsistent with the facts set out above, which *are* based on the record.  More

important, other than his speculative allegations of ineffective assistance of counsel, Cramer

offers no reason for his failure to properly raise the conflict issue he now advances, so the claim

is procedurally defaulted.  *See Massaro v. United States*, 538 U.S. 500, 504 (2003); *Bousley*, 523 U.S. at 622; *Frady*, 456 U.S. at 169; *Coleman v. Thompson*, 501 U.S. 722, 753 (1991); *see also Jackson*, 53 F.3d at 1282 n.1 (citing *Clark*, 19 F.3d at 966) (counsel not ineffective in failing to pursue frivolous items); *see also United States v. Reed*, 719 F.3d 369, 373-74 (5th Cir. 2013) ("Conclusory allegations … do not support the request for an evidentiary hearing.").

### 3.    Lack of Merit

Additionally, Cramer's complaint about Rose's representation is wholly lacking in merit. In *United States v. Burns*, the Fifth Circuit neatly summarized its law on conflicts occasioned by multiple representation:

> The representation to which a defendant is entitled under the Sixth Amendment of the Constitution must be free from any conflict of interest.  *United States v. Garcia-Jasso*, 472 F.3d 239, 243 (5th Cir. 2006).  As a general rule, a conflict exists when defense counsel allows a situation to arise that tempts a division in counsel's loyalties.  *Id.* at 243.  To establish a Sixth Amendment violation on the basis of a conflict of interest the defendant must demonstrate: (1) that his counsel acted under the influence of an actual conflict; and (2) that the conflict adversely affected his performance at trial.  *United States v. Culverhouse*, 507 F.3d 888, 892 (5th Cir. 2007). …
>
> An actual conflict is one that "adversely affects counsel's performance."  [*United States v. Infante*, 404 F.3d 376, 392 (5th Cir. 2005)].  There must be an "actual" conflict and not "a speculative or potential" conflict.  *Id.* at 391.  Only if counsel had to choose between "the divergent or competing interests of a former or current client" is there an actual conflict.  *Garcia-Jasso*, 472 F.3d at 243.
>
> The question of whether a disqualifying conflict exists is highly fact-dependent.  *Id.* at 392.  Factors that this Court has found to be particularly relevant include (1) whether the attorney has confidential information that is helpful to one client but harmful to the other client; (2) whether and how closely related is the subject matter of the multiple representations; (3) how close in time the multiple representations are; and (4) whether the prior representation has been unambiguously terminated.  *Id.*  Furthermore, the defendant must show more than that his attorney cross-examined a former client before a hypothetical conflict will be considered an actual one.  *Perillo v. Johnson*, 205 F.3d 775, 801–02 (5th Cir. 2000).

526 F.3d 852, 856 (5th Cir. 2008).

Here, a conflict of interest arose when Rose told McElroy what she had heard and asked him to inform the government, Trl. Doc. 595 at 1373-75, but McElroy recognized it and followed appropriate procedures to convey the information to the Court, Trl. Doc. 551 at 3. He moved to withdraw as counsel for Rose; another lawyer was appointed to represent her; and counsel in this case were notified. Trl. Doc. 551 at 3; *Rose*, No. 1:17-CR-17(02) (E.D. Tex. May 3, 2018) (ECF Doc. 104 and unnumbered oral order). Before Rose testified, her new lawyer stated that Rose waived the attorney-client privilege, thus submitting herself to full cross-examination by Black. Trl. Doc. 595 at 1270-77; *see also* Trl. Doc. 595 at 1362-85.

Under these circumstances, Cramer cannot show that his counsel acted under the influence of an actual conflict that adversely affected his performance at trial. *Burns*, 526 F.3d at 856 (citing *Culverhouse*, 507 F.3d at 892). This claim should be denied.

**B.      The "conflict" involving ██████ is completely hypothetical.**

**1.      The Record and Cramer's Allegations**

The facts underlying this claim highlight the problem of permitting unappointed counsel—whose ultimate goal appears to be building a case of ineffective assistance of counsel against properly appointed, death-penalty-qualified trial counsel—to operate as shadow counsel. Despite Cramer's current claim that ██████ should have been a witness, Cramer offers nothing beyond wishful thinking that even intimates that ██████ would have admitted *any* involvement in the murder of Johns. Indeed, a timeline shows that ██████ and his writ counsel have continued to challenge both his conviction and sentence throughout Cramer's trial and up to the present:





Response to Section 2255 Motion, Page 54



---

[13] Cramer misidentifies the exhibit as Ex. 57.  *See* Mtn. 104.



### 2.   Procedural Bar

Cramer was represented by highly qualified counsel on appeal.  Yet, after carefully reviewing the full record, they did not raise the alleged conflict issue on direct appeal. Moreover, Cramer makes no effort to avoid the procedural bar in his motion.  Therefore, this claim is procedurally defaulted.  *See Massaro*, 538 U.S. at 504; *Bousley*, 523 U.S. at 622; *Frady*, 456 U.S. at 169; *Coleman*, 501 U.S. at 753; *see also Jackson*, 53 F.3d at 1282 n.1 (citing *Clark*, 19 F.3d at 966) (counsel not ineffective in failing to pursue frivolous objections or claims.); *see also Reed*, 719 F.3d at 373-74 ("Conclusory allegations, unsubstantiated by evidence, do not support the request for an evidentiary hearing.").

### 3.   Lack of Merit

Substantively, Cramer's complaint about his trial team's representation of ▮▮▮ is speculative, hopelessly naive, and ultimately damning to his defense:





Cramer's conflict-of-interest theory thus piles assumption on assumption

That's a lot of speculation.



Given the speculative nature of Cramer's conflict theory and his failure to use readily available means to support it, Cramer cannot show that his trial team acted under the influence of an actual conflict. *Burns*, 526 F.3d at 856 (citing *Culverhouse*, 507 F.3d at 892).

More important, Cramer cannot show that *any* of this affected Black and Barlow's performance at trial because it would have been malpractice to present the testimony writ counsel now wants. ████████████████████████████████████████████████████████████████████████████████████████████, that merely would have *proved* Cramer's guilt.[14]  Therefore, Cramer cannot show that the alleged conflict adversely affected his lawyers' performance at trial. *Burns*, 526 F.3d at 856 (citing *Culverhouse,* 507 F.3d at 892). This claim is meritless.

## CLAIM 6: CRAMER HAS PROCEDURALLY AND STATUTORILY DEFAULTED HIS FAIR CROSS SECTION CLAIM REGARDING THE VENIRE.  MOREOVER, THE CLAIM LACKS MERIT, AND HIS LAWYERS WERE NOT INEFFECTIVE.

Cramer argues that the jury venire in his case did not reflect a fair cross-section of the population in the Beaumont Division and—without citing the statute—violated the Jury

---

[14]  Cramer's duress argument is addressed under Claim 1.

Selection and Service Act, 28 U.S.C. § 1861 *et seq.* (the "Act" or "JSSA") because the panel was drawn from voter registration lists instead of driver's licenses lists. Mtn. 106-15. He further claims that his trial and appellate counsel were ineffective in failing to investigate and challenge the venire. *Id.* These arguments are barred and meritless.

**A.   Cramer has procedurally defaulted this claim, and he fails to show cause or prejudice to excuse the default.**

**1.   "Driver's License" Claim**

To the extent Cramer complains about the district's decision to use voter registration lists instead of driver's license lists in populating the jury wheel, the claim is procedurally defaulted. Cramer raised the issue at trial, but acknowledged that the Fifth Circuit's decision in *United States v. Brummitt*, 665 F.2d 521, at 527-530 (5th Cir. 1981), "makes it extremely difficult for a defendant to prevail on a claim that a venire selected from voter's registration lists exclusively is unconstitutional and in violation of the JSSA." Trl. Doc. 138 at 3-10. The government responded, discussing the requirements set out in *Brummitt* and pointing out that the JSSA "provides that prospective juror shall be selected from voter registration lists, though it also allows for other sources to be used where necessary." Trl. Doc. 198 at 2-6. In denying the motion, the Court noted that Cramer and Fackrell failed to carry their burden under *Brummitt* and that the Fifth Circuit has "repeatedly rejected challenges to venires composed of voter lists," observing that "it has been the court's observation over the past 14 years that African Americans and Hispanics regularly serve on juries in this district and division." Trl. Doc. 247. Cramer declined to raise this issue on appeal, so it is procedurally defaulted. *See Massaro*, 538 U.S. at 504; *Bousley*, 523 U.S. at 622; *Frady*, 456 U.S. at 169; *Coleman*, 501 U.S. at 753.

**2.   "Jury Wheel" Claim**

Cramer's challenge to the jury wheel is also procedurally defaulted. More than a year

before jury selection, the District's jury administrator advised counsel that a new jury wheel was

being populated for this case:

> *We are in the process of building a new jury wheel specially for this case.*  We
> have sent out 1600 jury qualification questionnaires to prospective jurors.  That is
> our first step in our procedure which is outlined by our jury plan.
>
> Names are randomly taken from the voter registration list from the State of Texas.
> Prospective jurors are mailed a qualification questionnaire form to complete and
> return to the court.  After the court determines that they are qualified to serve, the
> names are entered into a pool and then randomly summoned. … The juror names
> are chosen at random from a master registration list that is maintained by the
> Secretary of State of all persons registered to vote.

Criminal ECF Doc. 84 at 4 (status conference hearing on October 31, 2016) (emphasis added).

Cramer did not object to the use of a "new" jury wheel.  Rather, his complaint regarding

the alleged non-random composition of the jury wheel relies on pleadings filed in another

Section 2255 proceedings from a separate multi-defendant capital case tried before this Court.

Mtn. 111 (citing *Garcia v. United States*, No. 1:13-CV-723 (E.D. Tex. Jan. 25, 2023) (ECF Doc.

No. 160); *see also Snarr v. United States*, No. 1:13-CV-724 (E.D. Tex. Jan. 25, 2023) (Doc. No.

146)).  Because Cramer could have raised this issue at trial or on direct appeal but did not, it is

procedurally defaulted.  *See Massaro*, 538 U.S. at 504; *Bousley*, 523 U.S. at 622; *Frady*, 456

U.S. at 169; *Coleman*, 501 U.S. at 753.

### 3.     No Excuse for Default

A collateral attack under Section 2255 is not a substitute for an appeal, *Bousley*, 523 U.S.

at 622, so claims that could have been raised on direct appeal, but were not, are procedurally

barred from review under Section 2255 unless the defendant demonstrates "cause" for his default

and "actual prejudice" or demonstrates actual innocence.  *Id.*  This standard requires Cramer to

show that some objective factor external to the defense impeded his effort to raise the issue and

that the alleged error worked to his actual and substantial disadvantage, infecting his entire trial.

**Response to Section 2255 Motion, Page 60**

*Frady*, 456 U.S. at 169; *Coleman*, 501 U.S. at 753.  If Cramer cannot show cause and prejudice, the Court cannot consider the claims unless he can show actual innocence, *Bousley*, 523 U.S. at 623, which he does not even attempt.

Instead, Cramer tries to excuse his procedural default by arguing that his trial counsel was ineffective in failing to challenge the procedure used to select the panel.  Mtn. 113-15.  The dearth of facts—or law—Cramer offers to support his allegation prompts a reminder of the Supreme Court's caution in *Strickland*: "Judicial scrutiny of counsel's performance must be highly deferential.… There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." 466 U.S. at 689.  Cramer appears to believe that his trial team should have diverted precious time and resources from preparing for trial to continue fighting a losing battle—given *Brummitt*— over use of voter registration lists for the jury wheel.  Moreover, Cramer would have had trial counsel scour records that writ counsel spent years gathering for irregularities in populating the wheel before jury selection without any indication that irregularities existed.

In short, Cramer fails to show that his trial attorneys—both experienced litigators familiar with the Court and juries in the Beaumont Division—"made errors so serious that counsel was not functioning as the 'counsel' guaranteed … by the Sixth Amendment," *Strickland*, 466 U.S. at 687, by not battling *Brummitt* and in declining to search for needles in haystacks without clear indication that the needles or haystacks even existed.  The trial team apparently believed that they selected an impartial, death-qualified jury.  Cramer fails to overcome the strong presumption that they were effective.

Turning to prejudice, Cramer cannot show "by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death

penalty." *Schlup*, 513 U.S. at 323 (quoting *Sawyer*, 505 U.S. at 347).  Nor does he show a reasonable probability of a different outcome but for counsel's alleged errors; indeed, he could not, given the overwhelming evidence supporting his guilt and sentence.  Likewise, Cramer does not show that his trial was fundamentally unfair.  Cramer has procedurally defaulted this claim.

**B.    Cramer's claims regarding the failure to use drivers' license lists and other procedures used to compose the jury wheel are barred by the JSSA.**

In addition to the procedural default, the JSSA statutorily bars Cramer's claims.  The JSSA provides the following remedy for alleged violations and, further, provides that the remedy is exclusive:

> **(a)** In criminal cases, *before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor*, whichever is earlier, the defendant may move to dismiss the indictment or stay the proceedings against him on the ground of substantial failure to comply with the provisions of this title in selecting the grand or petit jury.
>
> * * *
>
> **(d)** … *If the court determines that there has been a substantial failure to comply with the provisions of this title in selecting the petit jury, the court shall stay the proceedings pending the selection of a petit jury in conformity with this title.*
>
> (e) *The procedures prescribed by this section shall be the exclusive means by which a person accused of a Federal crime, the Attorney General of the United States or a party in a civil case may challenge any jury on the ground that such jury was not selected in conformity with the provisions of this title.*  Nothing in this section shall preclude any person or the United States from pursuing any other remedy, civil or criminal, which may be available for the vindication or enforcement of any law prohibiting discrimination on account of race, color, religion, sex, national origin or economic status in the selection of persons for service on grand or petit juries.

28 U.S.C. § 1867.

The Fifth Circuit requires strict adherence to the JSSA's statutory procedures, even when an appellant shows a failure to comply with the Act:

> 28 U.S.C. [§] 1867 sets out the method for challenging jury selection on the basis of substantial noncompliance with the Act.  Section 1867(a) requires a defendant

> prior to the voir dire to move to dismiss the indictment or stay the proceedings. Section 1867(d) requires that the motion be accompanied by a sworn statement of facts that, if true, demonstrate a substantial failure to comply with the Act. Section 1867(e) states that the procedures prescribed in [§] 1867 are the exclusive means by which a defendant may challenge a jury on the basis of noncompliance with the Act.
>
> * * *
>
> The courts have strictly enforced both the timeliness and sworn statement requirements of [§] 1867. This court has refused to consider a statutory challenge raised after the empanelling of a jury. *See United States v. DeAlba-Conrado*, 481 F.2d 1266 (5th Cir. 1973).
>
> * * *
>
> Barring assertion of the statutory claim here visits no great injustice on this appellant. In the Act, Congress set out a uniform, relatively strict scheme for jury selection. Congress included a new remedy for substantial violations of the Act, regardless of whether the litigant challenging the jury had been prejudiced by the jury selection. As a price for this remedy, Congress was entitled to exact strict compliance with formal procedural rules.

*United States v. Kennedy*, 548 F.2d 608, 613 (5th Cir. 1977), *abrogated on other grounds by United States v. Singletary*, 683 F.2d 122, 124 (5th Cir. 1982) (issue barred despite substantial failure to comply with the Act and introduced a "significant element of nonrandomization into the selection process"); *see also United States v. Bearden*, 659 F.2d 590, 595, 598, 600 (5th Cir. 1981) (citing *Kennedy* and rejecting argument that defense counsel's lack of diligence was attributable to lack of cooperation by court).

Here, Cramer did not comply with the time limits or other formal requirements of the JSSA, so Section 1867 bars relief. The Court found as much in denying the motions to recuse filed in *Snarr* and *Garcia* that inform Cramer's allegations. *Snarr v. United States*, No. 1:13-CV-724, at 8-10 (E.D. Tex. June 28, 2023) (Doc. No. 163) ("Because Movant failed to comply with § 1867(a), he is now foreclosed or barred from asserting a claim under the JSSA in this context."); *Garcia v. United States*, No. 1:13-CV-723, at 7-10 (E.D. Tex. June 28, 2023) (ECF Doc. No. 174) (same). And after the Court entered its orders on the motions to recuse, a Magistrate Judge in the District denied Snarr's and Garcia's related motions for discovery from

the Court and its staff, again explaining the lack of merit in the underlying claims. *Snarr v. United States*, No. 1:13-CV-724, at 14-18 (E.D. Tex. July 20, 2023) (Doc. No. 164); *Garcia v. United States*, No. 1:13-CV-723, at 14-18 (E.D. Tex. July 20, 2023) (ECF Doc. No. 175).

**C.      Cramer fails to make a prima facie case for a fair cross-section claim.**

Even if Cramer's fair cross-section claim were not procedurally barred, the claim would fail because he fails to make a prima facie case. The Court found as much in an order related to one of Fackrell's motions. *Fackrell v. United States*, No. 1:23-CV-119, 16-17 (E.D. Tex. Mar. 28, 2024) ("Fackrell has failed to make a *prima facie* showing of a right to relief regarding his Sixth Amendment fair cross-section of the community claims."). The Court is right.

To establish a prima facie violation of the Sixth Amendment right to an impartial jury drawn from a fair cross-section of the community, a defendant must show the following:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Snarr*, 704 F.3d at 384-85 (quoting *Duren v. Missouri*, 439 U.S. 357, 364 (1979); citing *Berghuis v. Smith*, 559 U.S. 314 (2010)).

"The first step is to establish that the group is one that is a recognizable, distinct class." *Snarr*, 704 F.3d at 385. Here, Cramer claims that two groups were underrepresented in his venire: Hispanics and African Americans. Mtn. 107-09. The government does not dispute that both are distinct classes.

The second step requires a showing of underrepresentation of the established distinctive groups. Based on a report from his statistician, Cramer alleges that Hispanics and African Americans were underrepresented on the venire in his case. Mtn. Ex. 41 at 6. But he bases the

conclusion on *comparative*—or, as he calls it, *relative*, Mtn. Ex. 41 at 7—statistical disparities,[15] which is not the measure used by the Fifth Circuit.  Instead, the Fifth Circuit uses *absolute* disparity when assessing underrepresentation.[16]  *United States v. Age*, No. 22-30656, 2025 WL 1201973, at *37 (5th Cir. Apr. 25, 2025) ("[T]he proper test in the Fifth Circuit for distinctive groups that are not a 'less-than-10%-minority' is absolute disparity.") (citing *United States v. Maskeny*, 609 F.2d 183, 189-90 (5th Cir. 1980)); *United States v. Sanders*, 133 F. 4th 341, 373-74 (5th Cir. 2025) (using absolute disparity as the correct measure); *Aranda v. Lumpkin*, No. 20-70008, 2021 WL 5627080, *4 (5th Cir. Nov. 30, 2021) (unpublished) (rejecting argument against use of absolute disparity).  The Fifth Circuit "has repeatedly held that an absolute disparity of less than ten percent is not sufficient to demonstrate underrepresentation."  *Aranda*, 2021 WL 5627080 at *4 (citing *Maskeny*, 609 F.2d at 190; *United States v. Age*, No. 16-cr-32, 2021 WL 2227244, at *10-11 (E.D. La. June 2, 2021) (collecting cases)); *see also Sanders*, 133 F. 4th at 374 ("We are not persuaded that a disparity of 11.28% is sufficient to satisfy the second prong.").

Cramer's expert has calculated absolute disparities of less than 10% for both Hispanics and African Americans.  Mtn. Ex. 41 at 7 (Hispanic at -2.3 and African Americans at -6.59).  Thus, he cannot meet the second requirement for a prima facie case for underrepresentation of either Hispanics or African Americans on his venire.

---

[15]  "Comparative disparity (which represents the decrease in a specific group's representation relative to the size of that group) is determined by dividing the actual disparity percentage by the percentage of the excluded group in the entire community (and multiplying by 100 to obtain a percentage result)."  *Johnson v. McCaughtry*, 92 F.3d 585, 594 n.15 (7th Cir. 1996).

[16]  "Absolute disparity measures the difference between the proportion of the distinctive groups in the population from which the jurors are drawn and the proportion of the groups on the jury list."  *Aranda*, 2021 WL 5627080 at *4 (quoting *United States v. Yanez*, 136 F.3d 1329, 1998 WL 4454, at *2 n.4 (5th Cir. 1998)).

Cramer further argues that absolute disparity is not the correct standard for Hispanics because—by his statistician's calculation—Hispanics constitute 9.44% of the eligible venire in the Beaumont Division.  Mtn. 109; Mtn. Ex. 41 at 6.  But this argument is irrelevant because, as discussed next, Cramer fails to meet the third requirement for a fair-cross-section prima facie case.  Moreover, Cramer selectively edits a quotation from *Mosley v. Dretke*, 370 F.3d 467, 479 n.5 (5th Cir. 2004), to read, "If the distinctive group at issue makes up less than 10% of the population, comparative disparity may be used."  Mtn. 109.  The court actually said, "*We leave open the possibility that* if the distinctive group at issue makes up less than 10% of the population, comparative disparity may be used."  *Mosley*, 370 F.3d at 479 n.5 (citing *United States v. Butler*, 615 F.2d 685, 686 (5th Cir.1980), *denial of petition for rehearing en banc*).  The government did not find a Fifth Circuit case that decides the question, so it remains open.  And it should not be answered here based on Cramer's statistics because his statistician's percentage of Hispanics—which is slightly below 10%—is based on information provided by Cramer and does not even use census data.  Mtn. Ex. 41 at 3-4.  Thus, the relevant data should be reviewed by an independent expert before relying on it to overturn Cramer's conviction.

Cramer also fails to meet the third requirement for a prima facie case.  Cramer's analysis, which is based on the racial composition of his own jury with a passing reference to *Snarr*, Mtn. Ex. 41 at 4-14, falls far short of the proof of systematic discrimination required to support a due process or equal protection challenge to the venire.  *See United States v. Williams*, 264 F.3d 561, 567-70 (5th Cir. 2001) (setting out the standards for due process and equal protection claims related to the jury venire and specifically noting that "[i]n determining whether the venire is a fair and reasonable representation of the community, the relative compositions of Defendant's … venire panel[] is not relevant").  At most, Cramer only shows a disparity for his panel, not other

juries in the Beaumont Division.  *E.g.*, *Aranda,* 2021 WL 5627080 at \*4 ("The sole affidavit on which Aranda bases his cross-section claim focuses on underrepresentation of Hispanics on his venire, but does not demonstrate that any such underrepresentation was the general practice on other venires in Victoria County.") (citing *Williams*, 264 F.3d at 568; *Brummitt*, 665 F.2d at 529); *United States v. Moreno*, 540 F. App'x 276, 276 (5th Cir. 2013) (unpublished) ("Moreno fails to show that his right to an impartial jury drawn from a fair cross-section of the community was violated; he cites only the composition of the randomly chosen venire at his own trial and does not attempt to show a systematic exclusion of minorities from other venires over time.") (citing *Duren*, 439 U.S. at 364; *Williams*, 264 F.3d at 568).

**CLAIM 7: CRAMER'S CLAIMS THAT THE COURT ERRED DURING JURY SELECTION ARE PROCEDURALLY BARRED; FOUR OF HIS FIVE SUBCLAIMS ARE MOOT AND SUBSTANTIVELY WITHOUT MERIT; HIS REMAINING SUBCLAIM IS MERITLESS; AND HIS ALLEGATION OF INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL LACKS MERIT.**

Although difficult to discern, Cramer advances five subclaims in Claim 7.  First, he argues that the Court "denied at least four defense challenges to prospective jurors who should have been excused for cause based on their views on the death penalty" in violation of *Wainwright v. Witt*, 469 U.S. 412 (1985).  Mtn. 116-18.  Second, Cramer claims that the Court "erred in granting the prosecution's for-cause challenges to at least three jurors who were willing to set aside their opposition to the death penalty," contrary to *Witherspoon v. Illinois*, 391 U.S. 510 (1968).  Mtn. 118-20.  Third, he contends that the Court erred by failing to excuse allegedly biased prospective jurors for cause.  Mtn. 120-23.  Fourth, he argues that prosecutors used peremptory challenges to assemble a more "conviction-and-death-prone jury."  Mtn. 123.  Fifth, Cramer contends that the Court erred by removing one sentence from his voir dire PowerPoint presentation.  Mtn. 123.  Cramer follows his subclaims with an argument that his appellate

lawyers were ineffective because they did not raise these claims on direct appeal.  Mtn. 123-24.

These subclaims are procedurally defaulted because they could and should have been raised on direct appeal and Cramer fails to show excuse for the default.  Moreover, four of the subclaims are moot after the clemency order.  And the final claim is meritless.

## A.    This claim is procedurally barred in its entirety.

Claims that a trial court erred in ruling on challenges to the venire are properly raised on direct appeal.  *E.g.*, *Sanders*, 133 F. 4th at 375-78 (direct appeal from now-commuted death penalty); *Snarr*, 704 F.3d at 378-82 (direct appeal from death penalty); *United States v. Bernard*, 299 F.3d 467, 474-5 (5th Cir. 2002) (same); *United States v. Webster*, 162 F.3d 308, 340-45 (5th Cir. 1998) (same); *cf.*, *United States v. Skilling*, 561 U.S. 358, 385-99 (2010) (on writ of certiorari from direct appeal).  Cramer could—and should—have advanced this claim at trial and on direct appeal.  Because he did not, the claim is procedurally defaulted.  *See Massaro*, 538 U.S. at 504; *Bousley*, 523 U.S. at 622; *Frady*, 456 U.S. at 169; *Coleman*, 501 U.S. at 753.

To avoid the procedural bar, Cramer makes a perfunctory allegation that his appellate lawyers "failed to raise the meritorious claim that Cramer's Sixth Amendment rights were violated when the trial court denied defense challenges for cause against biased or death-prone jurors and removed qualified life-leaning jurors" and further argues that the alleged failure resulted in prejudice.  Mtn. 123-24.  But as shown below, not one of Cramer's subclaims has merit.  This dooms his argument.  *Luna v. Davis*, 793 F. App'x 229, 233 (5th Cir. 2019) (unpublished) ("Whether ... appellate counsel was deficient is largely bound up with the merits of the underlying claim, so we look to the merits." (citing *Amador v. Quarterman*, 458 F.3d 397, 410-11 (5th Cir. 2006), which explained that appellate counsel need only bring "[s]olid, meritorious arguments")).  Moreover, "[t]he Constitution does not require appellate counsel to

raise every nonfrivolous ground that might be pressed on appeal." *Ellis v. Lynaugh*, 873 F.2d 830, 840 (5th Cir. 1989) (citing *Jones v. Barnes*, 463 U.S. 745, 751 (1983)).  It is a reasonable tactic for appellate counsel to concentrate on the strongest issues.  *Id.*  Indeed, "[a] brief that raises every colorable issue runs the risk of burying good arguments—those that, in the words of the great advocate John W. Davis, 'go for the jugular,'…—in a verbal mound made up of strong and weak contentions."  *Barnes*, 463 U.S. at 753 (citing Davis, *The Argument of an Appeal*, 26 A.B.A.J. 895, 897 (1940)).

To show prejudice, a defendant must direct the court's attention to "any issues that counsel failed to raise upon which he was likely to prevail on appeal."  *Ellis*, 873 F.2d at 840.  The standard for determining prejudice is stringent:

> *Prejudice results if the attorney's deficient performance would likely render either the defendant's trial fundamentally unfair or the conviction and sentence unreliable* … Where an attorney failed to adequately brief an issue on direct appeal, *appellant must show initially that the appeal would have had, with reasonable probability, a different outcome if the attorney adequately addressed the issue* … "This requires that we counter-factually determine the probable outcome on appeal ...." Appellant must then demonstrate that the attorney's deficient performance led to a fundamentally unfair and unreliable result.

*United States v. Dovalina*, 262 F.3d 472, 474-75 (5th Cir. 2001) (internal citations omitted) (emphasis added).

Under the *Strickland* standard, Cramer fails to show that appellate counsel was ineffective, *Dovalina*, 262 F.3d at 474, so Claim 7 is procedurally barred.

**B.    Most of this claim is moot.**

After Cramer's death sentence was commuted to life imprisonment, Trl. Doc. 827; 2255 Doc. 20, the Court entered an order directing Cramer to identify any claims in his Section 2255 motion that were not moot, 2255 Doc. 21.  Cramer responded to the Court's order, identifying 13 claims that he contended were viable in whole or part after clemency.  2255 Doc. 25.  For this

claim, Cramer cryptically stated: "Claim 7, to the extent that the claim relies on a request for a new penalty phase."  2255 Doc. 25 at 7.  Except for one subclaim, Claim 7 unquestionably focuses on the process of death-qualifying the jury, which is no longer at issue.  *See*, *e.g.*, Mtn. 115 (The claim begins with "A death sentence is unconstitutional [] if …").  So four of Cramer's subclaims are moot.  They also lack merit.

Cramer's first subclaim relies on *Wainwright v. Witt* to argue that the Court "denied at least four defense challenges to prospective jurors who should have been excused for cause based on their views on the death penalty."  Mtn. 116-18.  The four prospective jurors were identified by numbers 14, 53, 114, and 186," but review of the voir dire for the jurors shows that they met the standard set out in *Wainwright v. Witt*, 469 U.S. at 424-26.  Similarly, in his second subclaim, Cramer contends that the Court "erred in granting the prosecution's for-cause challenges" to prospective jurors 10, 130, and 187 under *Witherspoon v. Illinois*.  Mtn. 118-20.  Again, review of the voir dire for each shows that the Court acted well within its substantial discretion.  More important, whether the jury was properly death-qualified does not matter after clemency.

Cramer's fourth subclaim is unsupported by law or fact.  He argues that that government used peremptory challenges to assemble a more "conviction-and-death-prone jury."  Mtn. 123.  The only legal authority Cramer cites is dicta from Justice Stevens's *concurrence* in *Baze v. Rees*, 553 U.S. 35, 84 (2008).  Mtn. 123.  And the only authority Justice Stevens cites for that dicta is his own *dissent* in *Uttecht v. Brown*, 551 U.S. 1, 35 (2007) (Stevens, J., dissenting).  *Baze*, 553 U.S. at 84 n.18.  The majority of the Court has long rejected the proposition:

> The petitioner contends that a State cannot confer upon a jury selected in this matter the power to determine guilt.  He maintains that such a jury, unlike one chosen at random from a cross-section of the community, must necessarily be biased in favor of conviction, for the kind of juror who would be unperturbed by

the prospect of sending a man to his death, he contends, is the kind of juror who would too readily ignore the presumption of the defendant's innocence, accept the prosecution's version of the facts, and return a verdict of guilt.  To support this view, *the petitioner refers to what he describes as 'competent scientific evidence that death-qualified jurors are partial to the prosecution on the issue of guilt or innocence.'  The data adduced by the petitioner, however, are too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt.*  We simply cannot conclude, either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction.

*Witherspoon*, 391 U.S. at 516-18 (emphasis added; internal footnotes omitted).

And even though Cramer points to the voir dire transcripts of a couple of prospective jurors, he wholly fails to explain how the government abused its peremptory challenges by striking these jurors.  Thus, this subclaim is both moot and meritless.

Cramer titled his fifth subclaim, "The trial court's instructions during jury selection were erroneous."  Mtn. 123.  But Cramer does not challenge the Court's instructions; he complains about the Court granting a government objection to a PowerPoint slide that he wanted to show prospective jurors before individual voir dire.  Trl. Doc. 710 at 7-31.  But it is axiomatic that the lawyers do not "instruct" the jury on the law, *Reynolds v. Dunn*, No. 4:18-CV-00236-RDP, 2022 WL 895947, *80 (N.D. Ala. Mar. 25, 2022), *aff'd sub nom. Reynolds v. Comm'r, Alabama Dep't of Corr.*, No. 22-14015, 2024 WL 4431791 (11th Cir. Oct. 7, 2024), so Cramer was not entitled to show his version of the law in the PowerPoint.  Cramer does not point to any deficiencies in the *Court's* instructions, which are the ones that matter.  *E.g.*, *Reynolds*, 2022 WL 895947 at *79-*80.  Indeed, the Court's instructions captured the gist of Cramer's PowerPoint, advising the jury that "a sentence of death is never mandatory under the law."  Trl. Doc. 679 at 2568-69.  And the phrase that was struck—"No juror is ever required to impose a sentence of death"—went solely to the sentencing phase, so this subclaim both moot and substantively meritless.

**C.    Subclaim 3 is meritless in addition to being barred.**

Cramer's third subclaim—contending that the Court erred by failing to excuse allegedly biased prospective jurors for cause—lacks substantive merit.  Mtn. 120-23.

"The failure properly to grant a challenge for cause rises to the level of a constitutional violation and warrants reversal only 'if the defendant exhausts all peremptory challenges and an incompetent juror is forced upon him.'"  *Webster*, 162 F.3d at 342 n.36 (quoting *Ross v. Oklahoma*, 487 U.S. 81, 89 (1988)).  "Absent such a showing, the defendant has not been denied his Sixth Amendment right to an impartial jury."  *Id.*  And the Supreme Court has noted that, "[i]n reviewing claims of this type, the deference due to district courts is at its pinnacle: 'A trial court's findings of juror impartiality may be overturned only for manifest error.'"  *Skilling*, 561 U.S. at 396 (quoting *Mu'Min v. Virginia*, 500 U.S. 415, 428 (1991)).  This is so because "in-the-moment *voir dire* affords the trial court a more intimate and immediate basis for assessing a venire member's fitness for jury service" and the "judge's appraisal is ordinarily influenced by a host of factors impossible to capture fully in the record—among them, the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty."  *Id.* at 386-87 (citing *Reynolds v. United States*, 98 U.S. 145, 156–157 (1879)).

Cramer fails to make the required showing here.  A fair reading of the voir dire for the four jurors he complains about shows that there was no error in seating them.

**Juror 68 (Trl. Doc. 713 at 75-87, 115-17) (also referred to as "MW"):** Juror 68's questionnaire and individual voir dire indicated that she would be an ideal juror for this case.  Trl. Doc. 713 at 75-87.  Cramer does not argue otherwise.  Mtn. 120-21.  Rather, he contends that the Court should have done more after the following:

> THE COURT: ... This is a message from MW.  We talked to her earlier this morning.  So, she called Ms. Harper when she got back; and this is what Ms.

Harper wrote out.

... MW (reading) works at the [redacted] Law Firm for [redacted] and when she got back today, she was approached by one of the legal secretaries and the lady proceeded to tell her that, "Oh, my dad works at the prison and he wakes up the defendant every morning."  And at that point MW said, "Stop.  I cannot talk about anything regarding the case."  The lady didn't say anything else.

Another one of her coworkers, she stated that her husband works at one of the prisons but she doesn't know his name.  And she just remembered that, also.  She felt very concerned and then talked to [redacted] that she works for and he told her he felt she needed to call the court and let us know.

So, I'm letting you know that some legal secretary claims that her husband wakes up the defendant—we don't know which defendant—every morning.  We don't know.  And then she wouldn't talk to her about it.  So, is there any concern?

MR. BOURQUE: I feel badly for her, you know, for that secretary saying that to her.  I don't have a problem as long as the lady doesn't say—

THE COURT: I think the lady knows not to say anything.

MR. BOURQUE: Maybe we need to get that woman in here and explain to her that—

THE COURT: Like not to say anything, right, like the legal secretary with the big mouth.

MR. BOURQUE: So, thank you for the information, judge, Ms. Harper.

THE COURT: Well, anybody want to say anything?

MR. BATTE: Our concern would be if they had a concern, judge.  They don't; so, we don't.

THE COURT: Well, Mr. Bourque doesn't.  I don't know if Mr. Barlow has a concern.

MR. BARLOW: We don't.

THE COURT: All right.  Very well.  I mean, she did the right thing.  She just needs to continue to do the right thing, unlike the other lady who wants to talk about it.

Trl. Doc. 713 at 115-17.

**Response to Section 2255 Motion, Page 73**

Despite the utter lack of concern from counsel, Cramer contends that the Court "should have conducted additional questioning of [MW] or excused her for cause." Mtn. 121.  But he offers no insight into the questions that should have been asked or what, exactly, the cause was for dismissal.  This contention is meritless.

**Juror 68 (Trl. Doc. 717 at 211-57):** Cramer argues that this prospective juror admitted bias based on relatives who worked—or had worked—in state prisons and was "never adequately rehabilitated," Mtn. 121, but the record shows otherwise.  After discussing biases, the following exchange took place between the prosecutor and Juror 68:

> Q. Okay. So, when we talk about biases, it's okay to come in the way you are; but if you get into that box, you have to be willing to not set your bias aside but, rather, not let it affect how you will evaluate the witness as a witness.
>
> Now, some people can't do that.  Some people just say, "Look, he's a cop; and I'm going to believe him even if what he says doesn't sound like it should.  He's a cop.  That's what I'm going to do."  And that kind of bias, which I think is what Mr. Barlow is suggesting, that person can't be a juror in this case and we don't want that person as a juror because it's not fair to these guys here and they deserve a fair trial.  This is a serious case.  You agree with that, right?
>
> A.  Yes, sir, I do.
>
> Q. So, having said all that, can you set aside your thoughts about law enforcement officers to the extent that you won't let it affect how you evaluate them as a witness?
>
> A. Yes, sir.
>
> Q. Now, you're sure about that?
>
> A. I truly believe I can listen to the evidence given and make a decision.  What I was trying to do earlier is just be honest about my feelings, like what you had talked about; but I —I do believe that I can logically listen to both sides and do whatever the law says.
>
>                   \* \* \*
>
> Q. But can you take it one step further for me and promise us that you'll evaluate a law enforcement officer's testimony the same way you do everybody else's?
>
> A. Yes, sir.

* * *

Q. You also said that you have a bias towards inmates. Okay? And, again, looking at it the same way I evaluate it, in order to be a juror, you have to be willing to go into this case with a clean slate and not say in the back of your mind, well, I think they're automatically guilty because they're convicted felons. Okay? Are you able to do that?

A. I believe so, yes, sir.

Q. Okay. Can you give us that assurance that the fact that they're convicted felons will not affect the way you look at the evidence in both parts of the trial?

A. Yes, sir, I can.

Trl. Doc. 717 at 236-38.

The prospective juror stuck with this position through further questioning, so the Court properly denied the challenge for cause, noting that "although she had experiences based on what her brother told her and perhaps biases; but it seemed to me that she then said she could set those aside and not have those affect her and she would follow the law and the facts that were presented and make her decision." Trl. Doc. 717 at 257.

**Juror 8 (Trl. Doc. 710 at 108-32):** Both Juror 8 and her husband worked for a police department: she was a crime scene tech, and he was a sergeant on patrol. Trl. Doc. 710 at 108. But she unequivocally stated that their employment would not affect her ability to be a fair and impartial juror; *id.* at 109; that she would not have a problem voting not guilty, *id.* at 111; and that she would not hesitate "to find someone not guilty" just because "it might cause a problem" with her husband or colleagues, *id.* Thus, the Court did not err in holding that

> [b]ased on the prospective juror's assurances that she can follow the jury instructions and the law and truthfully answer the factual questions, any concern over the issues of allegedly ambiguous or contradictory answers is dispelled. The prospective juror does not indicate that she would automatically vote for the death penalty without regard to any evidence that might be developed at the trial. She also didn't say that she would automatically believe what a police officer had to say. The court does not find that her views and opinions would prevent or substantially impair her performance as a juror in accordance with the court's

instructions and her oath.  The challenge for cause therefore is denied.

*Id.* at 131-32.

**Juror 186 (Trl. Doc. 707 at 182-217):** This juror's long-time neighbor was a U.S. Magistrate Judge, and she was friends with an Assistant United States Attorney who was not assigned to this case.  Trl. Doc. 707 at 182-84.  Once assured that neither were on this case, Juror 186 assured the Court she could be fair.  *Id.* at 185.  Likewise, she assured the Cramer's lawyer that she would not hold the fact that he represented a defendant charged with murdering her former classmate against him.  *Id.* at 193.  The Court did not err in denying dismissal for cause on these grounds, particularly after viewing the juror and instructing the government that the AUSA who was friends with Juror 186 was banned from the trial.  *Id.* at 215-16.

In an effort to show prejudice, Cramer argues that use of peremptory challenges on the jurors cited above resulted in six biased jurors being seated, but he only identifies two: Juror 182 and Juror 200.  Mtn. 122-23.  The record show that these jurors were not biased.  And when a defendant cannot show that a biased person sat on the jury, the claim that he was forced to use peremptory challenges on other jurors he found objectionable falls "short of constitutional requirements":

> "[I]f [a] defendant elects to cure [a trial judge's erroneous for-cause ruling] by exercising a peremptory challenge, and is subsequently convicted by a jury on which no biased juror sat," we have held, "he has not been deprived of any ... constitutional right."  *United States v. Martinez-Salazar*, 528 U.S. 304, 307 … (2000).  Indeed, the "use [of] a peremptory challenge to effect an instantaneous cure of the error" exemplifies "a principal reason for peremptories: to help secure the constitutional guarantee of trial by an impartial jury."  *Id.*, at 316 ….

*Skilling*, 561 U.S. at 395 and n.31; *see also Webster*, 162 F.3d at 341-42.

**Juror 182 (Trl. Doc. 707 at 153-70):** Cramer claims that Juror 182 should have been struck, arguing that the juror "stated that he would base his sentencing decision on whether a

homicide was intentional or accidental, had a 'Support the Police' bumper sticker, and would

have trouble viewing graphic images." Mtn. 123. The following shows that Cramer distorts the

voir dire of this prospective juror:

> Q. And some people are—if you envision a scale, some are at this end (indicating) where they believe in an eye for an eye, that if you take a life, you forfeit your life; and then there's others at the other extreme that believe that the death penalty ought to be used only as a last resort. And can you picture that spectrum?
>
> A. Yes, sir.
>
> Q. Where would you fall on that?
>
> A. Somewhere in the middle.
>
> Q. The middle? Okay. Can you expound on that a little bit, tell me a little bit more?
>
> A. It's not something that—I've never really thought about death or life; but *I think eye for an eye, everyone is going to be blind*. In the other spectrum— actually, I think I'm more closer to if it's—the circumstances are leaning more towards the last resort kind of thing. But I'm more towards the middle where if it needs to be applied, apply it; but if not, you know—
>
> Q. I see. Okay. And you understand we don't have to put on mitigating evidence. But if we did, what in your mind—what does that bring to mind when we talk about "mitigating circumstances"?
>
> A. Well, was it the person's intent to kill him.
>
> Q. Let me tell you. We were already past that—

Trl. Doc. 707 at 155-56 (emphasis added).

The juror then answered questions showing that he would consider mitigating evidence if

it came to that. *Id.* at 156-58. His parents had put the bumper sticker on his car. *Id.* at 162-63.

"[A] very quiet person by nature," *id.* at 162, the juror said that he could respect the other jurors'

views if selected, *id.* at 158-59. And while candidly admitting that he did not care for graphic

materials, the juror was unequivocal that he could "still be fair to a defendant" even if "looking

**Response to Section 2255 Motion, Page 77**

at graphic pictures." *Id.* at 163-64.  Nothing about this juror's voir dire showed bias of any kind.

**Juror 200 (Trl. Doc. 719 at 125-49):** Cramer contends that Juror 200 "was more willing to believe law enforcement officers and would 'probably' find it hard to separate the evidence of the two defendants."  Mtn. 123.  That is not accurate.  Although the juror had indicated there that she "would be more willing to give credibility or credence or believability to a law enforcement officer than just a regular person" on her questionnaire, 719 at 128, she clarified that she could "listen openly and objectively to each and every witness on the same basis," *id.* at 131.  While Juror 200 questioned why the two defendants were being tried together, *id.* at 142-45, when asked whether she would keep it in her mind to keep the defendants separate, she answered with an unequivocal, "Yes, sir," *id.* at 143.  Her response was the same when counsel asked whether she could "[k]eep an extra sharp eye out so that you're looking at what is the deal with each individual." *Id.* at 144.  There is no evidence of bias from this juror.

In summary, Cramer fails to meet either prong of *Strickland* in this subclaim.  As to performance, counsel was not ineffective in declining to challenge any of the allegedly biased jurors for cause because there was no indication that they were biased.  *See Jackson*, 53 F.3d at 1282 n.1 (citing *Clark*, 19 F.3d at 966) (Counsel is not ineffective in declining to make frivolous objections.).  And Cramer cannot demonstrate prejudice.  This claim thus fails in its entirety.

## CLAIM 8: CRAMER'S LAWYERS WERE NOT CONSTITUTIONALLY INEFFECTIVE DURING VOIR DIRE.

Cramer argues that his trial team was ineffective during voir dire by (1) failing to "appropriately consult with retained experts"; (2) failing to make *Batson* objections; and (3) "failing to conduct adequate voir dire."  Mtn. 124, 126, 128.  These claims are meritless.

### A.   Jury Consultant Allegations

In passing, Cramer revisits the arguments raised in Claim 6 and contends that his trial

team was ineffective by not using statistician Jeffrey Martin to challenge the voir dire process. Mtn. 124. But, as addressed above, Martin's analysis does not show error. Thus Cramer's lawyers were not ineffective in declining to retain his services.

The bulk of this subclaim is devoted to Cramer's contention that his lawyers did not properly use the services of their non-lawyer jury consultant, Julie Howe, who was recommended by Donatelli. First, Cramer alleges that his trial team did not use Howe to craft a proposed jury questionnaire and refused to submit her untimely edits to the questionnaire that was used. Mtn. 124-25. He further contends that counsel did not follow Howe's advice that they hold a practice voir dire and meet with her regularly before and during voir dire. Mtn. 125-26. ██████████████████████████████████████████████████████████████. None of these allegations show ineffective assistance of counsel.

As an initial matter, the Supreme Court has "repeatedly emphasized" that "[j]ury selection … is 'particularly within the province of the trial judge.'" *Skilling*, 561 U.S. at 386 (quoting *Ristaino v. Ross*, 424 U.S. 589, 594-595 (1976)). "No hard-and-fast formula dictates the necessary depth or breadth of *voir dire*." *Id.* (citing *United States v. Wood*, 299 U.S. 123, 145-146 (1936)). Rather, "the district court's duty is to conduct a thorough jury-selection process that allows the judge to evaluate whether each prospective juror is 'to be believed when he says he has not formed an opinion about the case.'" *United States v. Tsarnaev*, 595 U.S. 302, 313 (2022) (quoting *Mu'Min*, 500 U.S. at 425). And "[t]he Constitution does not always entitle a defendant to have questions posed during voir dire specifically directed to matters that conceivably might prejudice veniremen against him." *United States v. Jones*, 459 F. App'x 379, 386 (5th Cir. 2012) (quoting *Ristaino*, 424 U.S. at 594).

Here, notwithstanding Howe's desires, *the Court* exercised its authority over voir dire.

*E.g.*, Trl. Doc. 723 at 14-19 (pretrial conference); Trl. Doc. 446 and 447 (voir dire procedures and instructions). And the Court approved the jury questionnaire. Counsel was not ineffective in declining to try to wrest that authority away.

Moreover, counsel was not ineffective in declining to slavishly follow Howe's advice. Jury consultants are just that: consultants. The Fifth Circuit has declined to find them necessary for a defense, pointing out that "jury selection is not a mysterious process to be undertaken by those learned in the law only with the assistance of outside professionals. All competent lawyers are endowed with the 'raw materials' required to pick a jury fairly disposed toward doing substantive justice." *Moore v. Johnson*, 225 F.3d 495, 503 (5th Cir. 2000). And it is certainly not uncommon for experienced trial lawyers to disregard some—if not all—of a consultant's advice when exercising their own professional judgment. The record shows that Cramer's lawyers performed competently—even without hewing to all of Howe's advice. Thus Cramer fails to show ineffective assistance under *Strickland*.

### B.     *Batson* Subclaim

Cramer claims that his lawyers were ineffective by either striking or failing to object to the government's exercise of peremptory challenges on four allegedly qualified Hispanic prospective jurors. Mtn. 126-28. This claim is procedurally defaulted because it could and should have been raised on direct appeal. And Cramer fails to show that his lawyers were ineffective under *Strickland*. Moreover, the claim lacks merit.

Under *Batson v. Kentucky*, 476 U.S. 79 (1986), and its progeny, parties may not exercise peremptory challenges to strike jurors based on race, ethnicity, or sex. *United States v. Ongaga*, 820 F.3d 152, 166 (5th Cir. 2016) (footnote omitted). At trial

> [a] challenge to a peremptory strike proceeds in three steps. First, the challengers
> … make an initial showing that the challenged party made a strike on an

impermissible basis.  Second, the challenged party must offer a neutral reason for the strike.  Third, "the district court must determine whether the [challenger] has carried his burden of proving purposeful discrimination."

*Ongaga*, 820 F.3d at 166 (footnote omitted).

This three-step process takes place before the jury is seated, so a *Batson* issue should be made at trial and challenged on direct appeal; if not, it is subject to procedural default on collateral review.[17] *Prystash v. Davis*, 854 F.3d 830, 836 (5th Cir. 2017) (*Batson* violations "certainly" among trial claims that are procedurally defaulted if not raised at trial or on direct appeal).  Here, Cramer could and should have raised these allegations at trial and on direct appeal.  He did not, so they are procedurally defaulted.  *See Massaro*, 538 U.S. at 504; *Bousley*, 523 U.S. at 622; *Frady*, 456 U.S. at 169; *Coleman*, 501 U.S. at 753.

To avoid the procedural bar, Cramer alleges that his trial lawyers provided ineffective assistance of counsel by failing to object to the government's use of peremptory strikes and, thus, failing to require the government to provide race/ethnicity-neutral justifications for its strikes.  Mtn. 128.  But trial counsel did make a timely *Batson* challenge based on race, albeit not to one of the prospective jurors Cramer complains about.  Trl. Doc. 591 at 7-12, 31-32 (challenge to government strike of Prospective Juror No. 66).  The record shows that Fackrell's lawyers— joined by Cramer's, *id.* at 9—were aware of *Batson* and, after viewing and questioning the venire, did not find any other government strikes objectionable.  Indeed, Cramer and Fackrell also used a preemptory challenge on one of the prospective jurors Cramer now argues was inappropriately challenged by the government.  Mtn. 127 (Prospective Juror No. 97).

---

[17]  Indeed, some courts have held that a "party that does not raise facts or make timely *Batson* claims in the district court waives the right to raise them on appeal."  *United States v. Sillemon*, No. 3:04-CV-2637-H, 2006 WL 2252061 at *3 (N.D. Tex. Aug. 7, 2006) (citing *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 561-62 (5th Cir. 2001)).

Cramer's allegation rests on the raw percentage of prospective jurors who identified as Hispanic. He relies on *Miller-El v. Dretke*, 545 U.S. 231, 240-41 (2005), Mtn. 126-28, but he misunderstands how the statistics cited in *Miller-El* fit in the context of that case or in the overall context of a *Batson* challenge. In *Miller-El*, the Supreme Court cited statistics showing the percentage of African-American venire members excluded by state's peremptory challenges, but pointed out that "*[m]ore powerful than these bare statistics*, however, are side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve." 545 U.S. at 240-41 (emphasis added); *see also Chamberlin v. Fisher*, 885 F.3d 832, 840 (5th Cir. 2018) (en banc) ("The Supreme Court has instructed that, when analyzing *Batson* challenges, 'bare statistics' are not the be-all and end-all." (citing *Miller-El*, *id.*)). The Court included an extensive analysis of the questions posed to the venire and the prosecutors' explanations for the strikes. *Miller-El*, 545 U.S. at 241-266. The Court further noted that the record contained "extensive evidence of purposeful discrimination by the Dallas County District Attorney's Office before and during his trial," *id.* at 237, and that, in addition to the questions posed by prosecutors, other questionable practices that appeared in the record were "confirmed by widely known evidence of the general policy of the Dallas County District Attorney's Office to exclude black venire members from juries at the time," *id.* at 253. Thus *Miller-El* differed significantly from this case.

Here, Cramer does not attempt to make a showing similar to that made in *Miller-El*, and he cites no case in which a court found counsel ineffective and ordered a new trial *on collateral review* based solely on bare statistics. *E.g.*, *Hebert v. Rogers*, No. 15-4950, 2016 WL 8291110 at *14-*15 (E.D. La. Nov. 14, 2016) ("While Hebert does point to a fact that might be troubling on its face and in a vacuum, *i.e.*, that the State used all of its peremptory challenges on women, that

fact alone does not afford her *habeas* relief in the absence of any challenge to the strikes by trial counsel." (emphasis in original; footnote omitted)).  To avoid procedural bar, Cramer must meet both prongs of *Strickland*, yet he makes no effort to meet either.  Cramer simply alleges that counsel failed to object, presumably based on statistics because he points to nothing in the record that even hints at purposeful discrimination.  Mtn. 127.  While Cramer refers to snippets from the voir dire examinations of four jurors—one of which he also struck, Mtn. 127—he fails to show how those examinations compared with non-Hispanic prospective jurors who were not challenged.  And as noted above, counsel *did* make a *Batson* objection, just not the ones Cramer now suggests.  The Second Circuit has observed that "the fact that numerical evidence may have *permitted* an inference of discrimination does not establish that a contrary conclusion *must* be an unreasonable application of *Batson* and its progeny."  *Carmichael v. Chappius*, 848 F.3d 536, 549 and n.80 (2d Cir. 2017) (emphasis in original).  Cramer has not shown that his trial counsel was ineffective.

And even if Cramer's claim was not barred, it fails on the merits.  Cramer argues that he is entitled to a new trial simply because, in his opinion, he offered enough evidence to establish a prima facie case under *Batson* had the issue had been raised during trial.  Mtn. 126.  But, as noted above, "when analyzing *Batson* challenges, 'bare statistics' are not the be-all and end-all." *Chamberlin*, 885 F.3d at 840; *Carmichael*, 848 F.3d at 548 n.74 ("the fact that the State's 'challenge rate' was nearly double the percentage of blacks in the venire would *permit* a court to find that [defendant] had made a *prima facie* showing of race discrimination, … but would not *require* a court to reach that conclusion").  Even if Cramer could have made a prima facie case had he raised these issues at trial, that would have merely shifted the burden to the government to provide race-neutral explanations for the strikes.  *Sheppard v. Davis*, 967 F.3d 458, 471 (5th Cir.

Response to Section 2255 Motion, Page 83

2020).  Simply pointing to a "fact that might be troubling on its face and in a vacuum," *i.e.*, the percentages of peremptory strikes used against Latinos or women, "does not afford … habeas relief in the absence of any challenge to the strikes by trial counsel."  *Hebert*, 2016 WL 8291110 at *15; *cf.*, *Wilson v. United States*, No. W-16-CV-416-LY, 2017 WL 11426574 at *4 (WD Tex. Apr. 7, 2017) ("The fact that a group is statistically under-represented on a jury panel does not establish a violation of the 'fair cross section' requirements.").  Cramer's complete failure to show any evidence of purposeful discrimination dooms his claim on the merits.

For prejudice, Cramer argues that a *Batson* error is "structural," Mtn. 128, which he believes results in presumed prejudice.  Not so.  The Fifth Circuit has "declined to 'hold that a structural error alone is sufficient to warrant a presumption of prejudice in the ineffective assistance of counsel context.'"  *Scott v. Hubert*, 610 F. App'x 433, 434 (5th Cir. 2015) (unpublished) (quoting *Virgil v. Dretke*, 446 F.3d 598, 607 (5th Cir. 2006)).  And the court has further noted that the "Supreme Court has not held that prejudice is presumed in an ineffective assistance of counsel case based upon failing to make a meritorious *Batson* objection."  *Id.* at 435.  Thus, Cramer fails to show ineffective performance of counsel or prejudice.

## C.    Other Complaints About Challenges and Excuses

Based primarily on an affidavit from his jury consultant, Cramer contends that his trial team's "voir dire lacked a defined strategy."  Mtn. 128.  But, as noted above, counsel's strategy during voir dire is entitled to substantial deference: "[b]ecause every attorney will likely conduct voir dire in a different manner, the mere fact that another attorney might have asked different questions [or made different objections] will not support a finding of ineffective assistance."  *Tabler v. Lumpkin*, 543 F. Supp. 3d 461, 488 (W.D. Tex. 2021) (citing *Garza v. Stephens*, 738 F.3d 669, 676 (5th Cir. 2013)); *see also id.* at 492-93 (quoting *Teague v. Scott*, 60 F.3d 1167,

1172 (5th Cir. 1995)).  Here, jury selection was a lengthy process, involving an extensive jury questionnaire, general voir dire of large panels of prospective jurors, and individual questioning of the venire by three lawyers and, at times, the Court.  *Cf.*, *Skilling*, 561 U.S. at 388 ("*Voir dire* thus was, in the court's words, the 'culmination of a lengthy process.'").  Cramer's trial counsel—who had significant experience in selecting juries in capital cases—were able to evaluate the venire throughout the process.  Other than Howe, Cramer offers nothing from his trial team regarding their strategy.  He fails to show that their performance was deficient with respect to the strategic decisions he now complains about.

And Cramer's examples do not prove his point.  For example, the record does not support his characterization of prospective Juror 85 as "life-leaning."  Mtn. 129.  In fact, Juror 85 changed her response from "I believed in the death penalty but I could not give it" to an emphatic, "If the circumstance is right, it would be a serious decision but I could do the death penalty."  Trl. Doc. 713 at 50.  The prospective juror also had serious mobility issues from nerve damage and could not drive for other, undisclosed reasons.  *Id.* at 51-52.  Thus, the record supports Cramer's agreement to excuse her for cause.

Likewise, Cramer's criticism of his trial team for not challenging prospective Juror 200— who sat on the jury—for cause is meritless when one reads her entire voir dire examination.  Trl. Doc. 719 at 125-48.  When the prosecutor explained how her answers regarding law enforcement could give pause, Juror 200 said that she could put aside any bias, pointing out that she had successfully challenged a traffic ticket.  *Id.* at 128-31.  She also stated that the death penalty should only be a "last resort."  *Id.* at 139-42.  Cramer's characterization of this juror as biased, Mtn. 142, is wrong.  Cramer's similar allegation regarding prospective Juror 249, who served as an alternate juror, is even more meritless.  *See* Mtn. 129, 131.  Juror 249 readily admitted his

wife's former employment with the Jefferson County District Attorney's Office and his brother's employment as a prison guard and emphatically denied that either would affect his consideration of the case.  Trl. Doc. 720 at 192-204.  There were no grounds for a challenge for cause.

Finally, Cramer argues that his trial team was ineffective in failing to challenge four prospective jurors for cause.  Mtn. 130.  But review of the voir dire for each reveals no grounds for challenge.  *See* Trl. Doc. 711 at 145-64 (Prospective Juror 33 could be fair, even though he had been arrested for driving under the influence.  He had not been indicted, and the mere arrest was not grounds to challenge for cause.); *id.* at 79-100 (Prospective Juror 27 was not afraid of Cramer or Fackrell; she just thought—in general—that jurors should be identified by number instead of name.); Trl. Doc. 714 at 5-24 (Prospective Juror 100 spoke in evangelical Christian vernacular, which she described as metaphorical, but she gave every appearance of being life-leaning.  Cramer's lawyers would have been foolish to challenge her for cause.); Trl. Doc. 707 at 223-49 (Prospective Juror 188's faith was obviously important to her, but she pointed out that, "in terms of the law, my beliefs really are irrelevant" and made clear that she intended to be fair and open-minded if selected.).

In sum, Cramer fails to show deficient performance or prejudice based on his lawyers' voir dire examinations.

## CLAIM 9: CRAMER'S COMPLAINT THAT COURTHOUSE SECURITY DENIED HIM A FAIR TRIAL IS BARRED AND SUBSTANTIVELY MERITLESS.

Cramer claims that the leg shackles he wore during trial, which were hidden, and the security presence at the courthouse violated the Fifth, Sixth, and Eighth Amendments.  This claim is procedurally barred and lacks any substantive merit.

**A.    The record shows that the security measures were individualized and reasonable.**

This trial warranted specialized security measures, and the Court carefully shielded the

jury from exposure to those measures.  Cramer and Fackrell were dangerous inmates who belonged to the SAC, a prison gang known for violence, so well before trial, the government moved for them to be outfitted with electronic restraints, *i.e.*, stun belts, while being transported and in court.  Trl. Doc. 108.  The motion provided details regarding each defendant's violent history and noted that the SAC was "considered to be one of the most violent prison gangs operating within the BOP."[18]  *Id.* at 2-6; *see also* ██████████████████████████

████████████████████████████████

The defendants opposed the motion, Trl. Doc. 233, but the Court granted it in December 2017, finding that both men presented a security risk and that "'stun belts, which are not visible to jurors and are worn under clothing, are the least obtrusive means for securing' a defendant," Trl. Doc. 244 at 3 (quoting *United States v. Davis*, No. 01-282, 2003 WL 21088097, at *2 (E.D. La. May 9, 2003)).  The Court briefly summarized Cramer's violent past:

> Cramer's history of violence includes a conviction for carrying or using a firearm in relation to a crime of violence.  Further, Cramer has been involved in two incidents in which fellow inmates were stabbed numerous times.  First, in 2008, while Cramer was housed at USP Victorville, Cramer and a co-defendant were charged with, and later convicted of, assault with intent to commit murder, assault with intent to do bodily harm, and assault causing serious bodily injury.  After this incident, Cramer was transferred to USP McCreary, where he was again involved in a stabbing of another inmate.  As a result of this incident, Cramer was convicted of knowingly possessing a prohibited object—specifically, a shank— designed to be used as a weapon.  In addition to these convictions, the

---

[18]  By the time Cramer was prosecuted, the SAC had long engaged in violence against prosecutors, law enforcement, and court staff.  For example, gang founder Swena threatened the lives of prosecutors in one of his prosecutions.  *United States v. Swena*, No. 2:03-CR-933 (D. Utah Dec. 1, 2004) (order of detention).  Other gang members started a brawl in court—shouting obscenities at a magistrate judge and scuffling with federal marshals and courthouse security officers—when the judge cut off their visitation and telephone privileges because of threats made against prosecutors.  *See* Pamela Manson, "Supremacist sentenced to 20 years," The Salt Lake City Tribune, August 11, 2005, at https://archive.sltrib.com/story.php?ref=/utah/ci_2932203;.  And even other SAC members have committed violent acts in federal courthouses.  *E.g.*, Geoffrey Fattah, "Sentencing turns into courthouse violence," Deseret News, July 13, 2005, at https://www.deseret.com/2005/7/13/19902049/sentencing-turns-into-courthouse-violence/.

Government avers that Cramer's institutional misconduct includes several other assaults on inmates as well as destruction of BOP property. *Accordingly, Cramer appears to be a violent individual who is not deterred by confinement.*

Trl. Doc. 244 at 4-5 (emphasis added).

As Cramer notes, he moved to be tried without shackles, Trl. Doc. 121, and the Court granted the motion, Trl. Doc. 168. Shortly before trial, however, the Court reconsidered and ordered that the defendants be shackled, citing "increased concerns about court security and further consultation with the United States Marshals Service." Trl. Doc. 445. The Court did not include the specific concerns about Cramer that it had already documented, but the order noted that Kevlar ankle restraints—which do not make noise—were to be used and that *both* counsel tables were to be covered with table skirts to prevent the jury from viewing the restraints. *Id.*

During the final pre-trial conference—a time when no prospective jurors were present—Fackrell's attorney noted what he believed to be unusual security outside the courthouse:

> MR. MORROW: Judge, just to make a quick record on our concern about the arrival of the clients. We understand today that they were brought to the courthouse with a large motorcade with flashing lights and going through intersections and then there's armed guards at the perimeter of the back of the courthouse, which is where the jurors would park, just on the other side of those secure gates. So, we ask the court to consider some remedy so that the jurors will not see our clients being brought to the courthouse in that way. And I understand the marshals now said they're going to come at 7:00 a.m. on Monday and Tuesday so that hopefully we'll avoid any problem with the jurors seeing our clients in that way.

Trl. Doc. 723 at 5.

The Court replied that prospective jurors were supposed to arrive by 8:00 a.m. and agreed that the defendants were to arrive by 7:00 a.m. *Id.* at 6. The Court further pointed out that "when they arrive, that's inside the building. I mean, the sally port is inside. You don't actually see people in the parking lot." *Id.* Morrow continued to complain about the presence of armed guards outside the courthouse, prompting the following exchange:

**Response to Section 2255 Motion, Page 88**

MR. MORROW: Well, what we saw when we left last time, your Honor, was armed men [with] machine guns standing at all four corners of the back secure parking lot which we think would probably call the jurors' attention to that area and we were concerned they would see our clients coming and going like that.  That's what we're trying to avoid.

THE COURT: Well, if they come at 7:00, they probably won't do that.  Although the court wants security around this courthouse and if that requires armed men with guns, so be it.  That's the way it is.

MR. MORROW: Yes, your Honor.  We understand you're going to let that happen. … We think it's analogous to them just being kept in jail clothes, see the chains out.  We think it's a prejudicial extreme.  So, we'll just make our record and keep going.

THE COURT: Well, if they arrive at 7:00, I think they should be well inside the doors and the people will be dispersed.  Certainly the motorcade will not be there.  There may be armed people on the perimeter.

* * *

[T]he people from the marshal service are here.  Maybe they could advise.

THE MARSHAL: Judge, I can speak on behalf of the motorcade.  As soon as we get them to the facility here, everybody else disperses other than the people that are going to be in the courtroom with us.  *As far as the defendants being seen during the procession, they're in vans with tinted windows.  It would be highly unlikely that anybody is going to be able to identify those clients within either one of the vans.  They're brought into the sally port before they exit the van.  The sally port door is closed.  There's no way that the public can see visually into that sally port or into our area.…*

* * *

THE COURT: Well, will there be armed people positioned outside the courthouse?

THE MARSHAL: Yes.

THE COURT: Like visibly armed people?

THE MARSHAL: They're not machine guns.  We have AR15s.  Yes, we secure the perimeter around the courthouse for external threats.

THE COURT: Okay. Is that throughout the trial?

THE MARSHAL: That will be throughout the trial.  We will maintain the same level of security throughout.

* * *

[T]hat level of security you're speaking of with the AR15s will only be upon arrival and departure of the defendants.  That will not be during the course of the whole trial.  There will be security in unmarked vehicles.  There will be other security that should not be anything outside the norm for what normal courthouse security is during the course of the

**Response to Section 2255 Motion, Page 89**

trial.

\* \* \*

MR. MORROW: I understand that, but that's when the jurors come and go and—

THE COURT: No, they're going to be here earlier; and then we'll have the jurors leave earlier before the defendants depart.

*Id.* at 6-11 (emphasis added).

The issue arose again briefly on the first morning of individual voir dire—when only a small group of prospective jurors were to arrive—because the transport for Cramer and Fackrell was late. Trl. Doc. 710 at 5-6. Morrow complained about seeing the armed guards, but there is no indication that any of the prospective jurors saw the motorcade arrive. *Id.* Likewise, nothing indicates that any of the seated jurors noticed the shackles or any courthouse security during trial.

### B.      This claim is procedurally barred.

Fackrell's trial team raised the issue of courthouse security before any prospective jurors were scheduled to arrive, and the Court made arrangements that—with one exception when only a handful of prospective jurors *may* have seen extra security—appeared to work. Nothing prevented Cramer from challenging the procedures on direct appeal, but after reviewing the full record, his experienced appellate team chose not to. Therefore, this claim is procedurally defaulted. *See Massaro*, 538 U.S. at 504; *Bousley*, 523 U.S. at 622; *Frady*, 456 U.S. at 169; *Coleman*, 501 U.S. at 753.

Cramer argues—in passing—that counsel was ineffective. Mtn. 135. This argument fails because he fails to meet either prong of the *Strickland* test. Cramer's claim rests solely on speculation: he argues that "Cramer was shackled in the courtroom at the ankles, and there was a curtain around the table (Dkt. 445), but *the jury could nonetheless have surmised* that Cramer was restrained and *likely* saw the shackles at least once during the trial." Mtn. 135. That speculation finds no support in the record. Nor does Cramer's speculation that jurors *may* have

seen the security measures outside.  Complaining based on such speculation would have been frivolous, and lawyers are not ineffective in declining to pursue frivolous objections or claims. *Jackson*, 53 F.3d at 1282 n.1 (citing *Clark*, 19 F.3d at 966).  If Cramer intended to include his appellate counsel, this claim also fails as to their performance.  Given the lack of proof that *a single* juror noticed the security, it would have been foolish to raise the issue on appeal.  And even if there had been some evidence to support the claim, "[t]he Constitution does not require appellate counsel to raise every nonfrivolous ground that might be pressed on appeal."  *Ellis*, 873 F.2d at 840 (citing *Jones*, 463 U.S. at 751).  In sum, Cramer has procedurally defaulted Claim 9.

**C.     This claim also lacks substantive merit.**

Cramer argues that the Court failed to make "an individualized determination as to the 'substantial need' or 'essential interest' for shackling Cramer or the heightened security presence."  Mtn. 134.  This is wrong.  As set out above, the Court made individual findings regarding Cramer's criminal history and the danger of the SAC in its order requiring stun belts, Trl. Doc. 244, an order Cramer fails to acknowledge.  Those findings supported the increased security.  In a recent case with security measures similar to the shackling here, the Fifth Circuit affirmed, holding that the prohibition against *visible* shackles set out in *Deck v. Missouri*, 544 U.S. 622, 629  (2005), was not absolute; that even when a district court gives no reasons for shackling a defendant, a reviewing court may consider reasons apparent on the record (citing *United States v. Banegas*, 600 F.3d 342, 345 (5th Cir. 2010).; and that "courts may rely heavily on the recommendation of the Marshals" in security matters.  *United States v. Hill*, 63 F.4th 335, 344-46 (5th Cir. 2023).  Given that Cramer fails to show that a single juror even noticed any of the security measures, this claim fails.  *Cf.*, *Hill*, 63 F.4th at 346 ("defendants bear the burden of affirmatively demonstrating prejudice, which we refused to infer from isolated incidents."

(quoting *United States v. Turner*, 674 F.3d 420, 435 (5th Cir. 2012)).

Cramer next complains about the security outside and inside the court room, essentially arguing that the security in the courtroom—which he never describes and only mentions in passing—somehow exacerbated the speculative "harm" caused by the security outside the courthouse.  Mtn. 134-35.  This argument fails.

In *Holbrook v. Flynn*, 475 U.S. 560 (1986), the Supreme Court considered "whether a criminal defendant was denied his constitutional right to a fair trial when, at his trial with five codefendants, the customary courtroom security force was supplemented by four uniformed state troopers sitting in the first row of the spectator's section," *id.* at 562, and held that the defendant's rights were *not* violated because the challenged practice was not "inherently prejudicial" and the defendant failed to show actual prejudice, *id.* at 572.  While the Court noted that "certain practices pose such a threat to the 'fairness of the factfinding process' that they must be subjected to "close judicial scrutiny," *id.* at 568 (quoting *Estelle v. Williams*, 425 U.S. 501, 503-04 (1976)), it further pointed out that

> [t]his does not mean, however, that every practice tending to single out the accused from everyone else in the courtroom must be struck down.  Recognizing that jurors are quite aware that the defendant appearing before them did not arrive there by choice or happenstance, we have never tried, and could never hope, to eliminate from trial procedures every reminder that the State has chosen to marshal its resources against a defendant to punish him for allegedly criminal conduct.

*Id.* at 567.

The Court held that a case-by-case evaluation is appropriate for claims involving courtroom security:

> [*T*]*he presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable.  Jurors may just as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into*

> *violence. Indeed, it is entirely possible that jurors will not infer anything at all from the presence of the guards.* If they are placed at some distance from the accused, security officers may well be perceived more as elements of an impressive drama than as reminders of the defendant's special status. Our society has become inured to the presence of armed guards in most public places; they are doubtless taken for granted so long as their numbers or weaponry do not suggest particular official concern or alarm. *See Hardee v. Kuhlman*, 581 F.2d 330, 332 (CA2 1978).

> To be sure, it is possible that the sight of a security force within the courtroom might under certain conditions "create the impression in the minds of the jury that the defendant is dangerous or untrustworthy." *Kennedy v. Cardwell*, 487 F.2d 101, 108 (CA6 1973) …. However, "reason, principle, and common human experience," *Williams*, *supra*, 425 U.S., at 504, … counsel against a presumption that any use of identifiable security guards in the courtroom is inherently prejudicial. In view of the variety of ways in which such guards can be deployed, we believe that a case-by-case approach is more appropriate.

*Id.* at 569 (emphasis added).

More recently, the Fifth Circuit evaluated cases applying *Flynn* and found that up to twenty-five uniformed officers in the spectator section of the courtroom did not violate the defendant's rights: "Other courts have declined to find the mere presence of officers in a courtroom sufficient to support inherent prejudice, and the record before us does not suggest the police presence intimidated the jury or disrupted the fact-finding process in any way." *Jones v. Davis*, 890 F.3d 559, 567-71 (5th Cir. 2018).

Here, the security measures were not "inherently prejudicial" or even particularly noticeable. Cramer's violent behavior warranted additional security, but the Court made sure that it was not apparent to the jury. *E.g.*, Trl. Doc. 244, 445. Unlike *Flynn*, the deputy marshals in the courtroom wore plainclothes, attire Flynn's lawyer would not have objected to. *Flynn*, 475 U.S. at 563 ("counsel observed that he would have no objection to the use of any number of plainclothed security personnel"). And the deputies did not escort Cramer into or out of the courtroom in the jury's presence. Cramer points to no instance where a juror found the

courtroom security unusual or even noteworthy.  Nor does he offer proof that any juror noticed the security or that it affected his or her verdict.  Under the case-by-case analysis, this claim fails.

Finally, Cramer complains about the shackles, arguing that, even with the curtain, "the jury could nonetheless *have surmised* that Cramer was restrained and *likely* saw the shackles at least once during the trial."  Mtn. 135.  Nothing in the record supports this speculation.  Like Cramer's other arguments, this is meritless.

### CLAIM 10: CRAMER'S ALLEGATIONS OF PROSECUTORIAL MISCONDUCT ARE PROCEDURALLY BARRED AND SUBSTANTIVELY FRIVOLOUS.

In the introduction to Cramer's tenth claim, he presents a laundry list of general, unsupported allegations of prosecutorial misconduct and then contends that the "conduct includes but is not limited to" three specific instances.  Mtn. 135-36.  This is a startling misunderstanding of how a Section 2255 proceeding works.  Cramer completely fails to meet his pleading obligation for the list of non-specific allegations.  They invite no meaningful response and should be denied as a "conclusory and speculative."  *Murphy v. Johnson*, 205 F.3d 809, 814 (5th Cir. 2000) (quoting *Hughes v. Johnson*, 191 F.3d 607, 629 (5th Cir. 1999)).

Additionally, the three specific claims Cramer raises are procedurally barred because they could have been raised on direct appeal but were not.  Cramer made other allegations of prosecutorial misconduct on direct appeal, which were rejected.  *See Fackrell*, 991 F.3d at 600-02.  Because Cramer declined to raise the specific claims he now advances at trial or on appeal, they are procedurally defaulted.  *See Massaro*, 538 U.S. at 504; *Bousley*, 523 U.S. at 622; *Frady*, 456 U.S. at 169; *Coleman*, 501 U.S. at 753. And as discussed next, the claims are meritless.

A.    **The government did not present false evidence regarding Cramer's position in the SAC or his motive for murdering Johns.**

Cramer argues that the government committed prosecutorial misconduct for pointing out

Cramer's "rank" in the SAC and for identifying Johns's lack of respect for Cramer as a possible

motive for the murder. Mtn. 136-39. The record belies both contentions.

The Fifth Circuit has long adhered to the following standards when evaluating arguments

that a conviction is based on false testimony:

> "[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment.... The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue v. Illinois,* 360 U.S. 264, 269 ... (1959). ... Thus, the grant of a new trial based upon a *Napue* violation is proper only if (1) the statements in question are shown to be actually false; (2) the prosecution knew that they were false; and (3) the statements were material. *United States v. Blackburn,* 9 F.3d 353, 357 (5th Cir. 1993).

*United States v. O'Keefe,* 128 F.3d 885, 893 (5th Cir. 1997)

Cramer fails to meet any of the three requirements.

But more than one witness testified under oath at trial that Cramer was a

"general," and his investigators were told the same thing before trial:

- Alexander Fetters testified that Cramer was promoted to the rank of general after arriving at USP-Beaumont, giving him authority over all SAC members in the federal prison system. Trl. Doc. 592 at 464-65.

- Bradley Wasson, who was an SAC member, testified that he was aware that Cramer was a general with national authority before being transferred to USP-Beaumont. Trl. Doc. 593 at 663-65.

- Jason Scoggan testified that Cramer was a general in the SAC and "had the yard" for USP-Beaumont. Trl. Doc. 594 at 1000-01; *see also id.* at 1023 (cross-examination on hierarchy in the SAC).

Cramer now disagrees with this evidence, but that does not render it false. And he does

not point to anything indicating that the government somehow knew—or even suspected—that it was presenting false testimony.  Thus, this claim is a "non-starter."  *Ruiz v. Davis*, 819 F. App'x 238, 243 n.5 (5th Cir. 2020) (unpublished).  ███████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████

Likewise, Cramer fails to show that his "rank" was material.  In *O'Keefe*, the Fifth Circuit addressed standards for determining materiality:

> The Supreme Court has recently defined materiality in terms of a "reasonable probability" of a different outcome.  *Kyles v. Whitley,* 514 U.S. 419, 434 ... (1995).  Such a reasonable probability results when nondisclosure places the case in a different light so as to undermine confidence in the verdict.  *Id.* at 435....  The relevant inquiry examines the challenged evidence collectively, not on an item-by-item basis.  *Id.* at 436....  "To say that an error did not contribute to the verdict is, rather, to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed by the record."  *Yates v. Evatt,* 500 U.S. 391, 403 ... (1991).

> It is axiomatic that not every lie is material.  Along with other circuits, we have limited material lies to those that occur as a part of the prosecution's case.  *See Hudson v. Blackburn,* 601 F.2d 785, 789 (5th Cir. 1979); *see also United States v. Aichele,* 941 F.2d 761, 766 (9th Cir. 1991) (applying same rule).  The prosecution has a duty only to "refrain from knowingly presenting perjured testimony and from knowingly failing to disclose 'that testimony used to convict a defendant was false.'"  *Aichele,* 941 F.2d at 766 (quoting *United States v. Endicott,* 869 F.2d 452, 455 (9th Cir. 1989)). ... We have adopted this position because it is the duty of the jury to determine the credibility of the witnesses.  *See Little v. Butler,* 848 F.2d 73, 76 (5th Cir.1988) (stating that "prosecutors are seldom able to vouch for their [accomplice witnesses'] credibility" and that courts should instruct juries to carefully scrutinize the testimony of such witness).  Materiality, stated another way, occurs when the falsehood results in "a corruption of the truth-seeking function of the trial process."  *United States v. Agurs,* 427 U.S. 97, 104 ... (1976); *United States v. Meinster,* 619 F.2d 1041, 1042 (4th Cir. 1980) (holding that underlying purpose of *Napue* and *Giglio* is not to punish prosecutor for the misdeeds of a witness, but rather to ensure that jury is not misled by any falsehoods).

*O'Keefe*, 128 F.3d at 894.

Here, ██████████████████████████████████████████████████████

and the testimony certainly supported it:

- Otis Carden testified that Cramer was the "shot caller" for the SAC at USP-Beaumont. Trl. Doc. 591 at 129.

- Alexander Fetters testified that Cramer "had the yard" at Beaumont, meaning that "he was the head SAC guy with rank." Trl. Doc. 592 at 463.

- SAC member Jason Thompson testified that there was no doubt that Cramer "had the yard for SAC" at USP-Beaumont. Trl. Doc. 593 at 829.

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

Thus, even without *any* testimony regarding Cramer's "rank," the jury would have known that he made the decisions for the SAC at USP-Beaumont and could have reasonably concluded that Cramer engaged in premeditated murder.

Cramer's complaint about evidence of motive is even weaker. The jury was properly instructed that statements by lawyers are not evidence. Trl. Doc. 591 at 58 (preliminary instructions); *see also Fields*, 483 F.3d at 360. And the government's opening statement was not as limited as Cramer now contends. The government mentioned Johns's drug and alcohol use in addition to his disregard of Cramer's orders. Trl. Doc. 591 at 68-69; *see also id.* at 80-81 (Cramer's opening statement). Moreover, the evidence showed that Johns violated SAC rules in addition to showing a lack of respect to Cramer. *E.g.*, Trl. Doc. 591 at 202-03 (Johns stole from other SAC members to pay for drugs, ran up drug debts, and abused alcohol); Trl. Doc. 592 at 466 (same); Trl. Doc. 593 at 675 ("Chris was mad at Leo Johns for doing drugs and not paying his bills."); *id.* at 833 (Johns was "buying drugs, running up bills for drugs," and breaking SAC

rules). And Cramer's own exhibits highlighted the importance of respect and rule-following within the SAC. For example, Cramer's Trial Exhibit No. 50 contained the following message, dated in 2001, from Swena (spelling and punctuation as in original):

> In an attempt to clarify, unify and dispel and uncertainties of S.A.C.'s identity and political affiliations; I, as an original founding member of S.A.C. an bound by honor and duty to reestablish the articles an bylaws, that affirm our identities as Aryan Skinheads.
>
> *Once these bylaws are reaffirmed and reestablished they are all pervasive and unquestionable.* It is the duty and responsibility of each, and every established member and new probate to thoroughly learn the precepts that our organization was founded upon.
>
> \* \* \*
>
> *At all times members and probates are bound by oath and loyalty of office to respect, and obey all orders form superiors. Insubordination will not be tolerated.*

Trl. Ex. 50 (emphasis added).

In short, Cramer fails to show that the government presented false or misleading testimony regarding his motive for murdering Johns, much less that it did so intentionally. And Cramer cannot show materiality because motive is *not* an element of murder under 18 U.S.C. 1111. *E.g.*, *United States v. Blue Thunder*, 604 F.2d 550, 553-54 (8th Cir. 1979) ("Even in the absence of proof of motive, the jury is generally allowed to infer premeditation from the fact that the defendant brought the deadly weapon to the scene of the murder."); *see also* 5TH CIR. PATTERN JURY INSTRUCTIONS (Criminal Cases) § 2.52A (2019 ed.) (citing *United States v. Agofsky*, 516 F.3d 280, 282 n.2 (5th Cir. 2008)). This contention fails.

**B.    Cramer fails to show that the government withheld evidence in violation of *Brady v. Maryland*.**

Cramer speculates that the government withheld exculpatory evidence "[r]egarding all witnesses called by the government or otherwise listed in discovery," alleging that "the government failed to disclose cooperation agreements, criminal histories, histories of cooperation

with other prosecutions, psychiatric information, and histories of lying or inconsistent statements." Mtn. 140.  But on collateral review, an inmate must advance *specific* claims relating to an alleged violation of *Brady*.  *See Johnson v. Mitchell*, 585 F.3d 923, 934-935 (6th Cir. 2009).  Mere speculation about the existence of undisclosed records will not satisfy the petitioner's pleading burden.  *See United States v. Price*, 566 F.3d 900, 910 (9th Cir. 2009) (holding the defendant must produce some evidence to support an inference that the government possessed or knew about material evidence it failed to disclose).  In other words, a petitioner may not support a *Brady* claim with "conclusory and speculative allegations."  *Murphy*, 205 F.3d at 814 (quoting *Hughes*, 191 F.3d at 629).  Thus, in addition to being procedurally barred, Cramer's general allegation fails to meet his pleading obligation and should be denied as a "conclusory and speculative."  *Murphy*, 205 F.3d at 814 (quoting *Hughes*, 191 F.3d at 629).

Cramer also provides four specific "examples" of alleged *Brady* violations, Mtn. 139-40, all of which are meritless.  Prosecutors must disclose all substantial material evidence favorable to the defense, whether it relates to guilt, punishment, or the credibility of witnesses.  *Giglio v. United States*, 405 U.S. 150, 154 (1972); *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  To establish a *Brady* violation, a defendant must show that "the prosecution suppressed evidence, the evidence was favorable to the defense, and the evidence was material."  *United States v. Brown*, 650 F.3d 581, 587-88 (5th Cir. 2011).  Evidence is material if there is "'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *United States v. Bagley*, 473 U.S. 667, 682 (1985) (citing *Strickland*, 466 U.S. at 694).  Thus, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  *Kyles*, 514

U.S. at 434.  To prove a reasonable probability of a different result, the "likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter,* 562 U.S. 86, 111 (2011). In short, "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality.'" *Agurs,* 427 U.S. at 109-10; *see also United States v. Caro*, 461 F. Supp. 2d 478, 481 (W.D. VA 2006) (denying discovery from BOP in a capital murder case against an inmate).

Evidence is not "suppressed" if the defendant either knew, should have known, or with the exercise of due diligence could have learned, the essential facts permitting him to take advantage of the exculpatory evidence.  *See Bigby v. Dretke*, 402 F.3d 551, 574-75 (5th Cir. 2005); *Kutzner v. Cockrell*, 303 F.3d 333, 336 (5th Cir. 2002).  By extension, prosecutors have no obligation to discover potentially exculpatory evidence that they do not possess and of which they are not aware.  *United States v. Flores*, 135 F.3d 1000, 1006 (5th Cir. 1998); *United States v. Walker*, 559 F.3d 365, 373 (5th Cir. 1977).  But if a member of the prosecution team knows of *Brady* material, courts will impute that knowledge to the prosecutors.  *Avila v. Quarterman*, 560 F.3d 299, 307 (5th Cir. 2009).  The courts determine on a case-by-case basis whether a given actor belongs to the prosecution team.  *Id*.  Generally, the prosecution team extends to the prosecutors and agents working on the case: it would "stretch *Brady* beyond its scope" to "effectively impose a duty on prosecutors to learn of any favorable evidence known by any government agent." *United States v. Taylor*, 942 F.3d 205, 225 (4th Cir. 2019).

Cramer first revisits his legally insufficient ███████████ from subclaim A.2. of Claim 1, ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████    The evidence was not "suppressed" because Cramer knew the essential facts permitting him to take advantage of the evidence—had it been exculpatory.  *See Bigby*, 402 F.3d at 574-75; *Kutzner,* 303 F.3d at 336 (5th Cir. 2002).

█████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

This is nonsense.  █████████████████████████  Cramer obviously had the information nearly two years before trial, so it was not suppressed.  *See Bigby*, 402 F.3d at 574-75; *Kutzner,* 303 F.3d at 336 (5th Cir. 2002).  And it was not exculpatory.  Indeed, it would have added to the narrative presented regarding Johns's disregard of SAC rules, which gave Cramer a motive for the murder.

Finally, ██████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████  Wasson testified about his efforts to leave the SAC at trial, Trl. Doc. 593 at 685-91, and Cramer's lawyer cross-examined Wasson about it, *id*. at 702-03.  As for Carden, he testified that he had appeared before a federal grand jury in West Virginia in 2006 as a cooperator while under cross-examination by Cramer's

**Response to Section 2255 Motion, Page 101**

lawyer, who was obviously aware that Carden had cooperated.  Trl. Doc. 591 at 201.  Cramer now claims that the grand jury transcript from that unrelated case would  This post-trial speculation regarding a legally insufficient defense in no way triggers an obligation for the government to produce evidence it did not possess and of which prosecutors were not aware.  *Flores*, 135 F.3d at 1006.

In short, Cramer's *Brady* claim is meritless.

**C.     In addition to being procedurally barred, Cramer's complaint based on *Darden v. Wainwright*, is too speculative and conclusory to warrant a meaningful response.**

Finally, Cramer generally alleges that counsel for the government violated *Darden v. Wainwright*, 477 U.S. 168 (1986)—which addressed statements made by a prosecutor during argument—by ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Cramer further claims that the prosecutors ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  These conclusory allegations are frivolous.

The Fifth Circuit has pointed out that it "considers three factors in deciding whether a defendant's substantial rights have been affected by the Government's statement during closing argument: '(1) the magnitude of the prejudicial effect of the prosecutor's remarks, (2) the efficacy of any cautionary instruction by the judge, and (3) the strength of the evidence supporting the conviction.'"  *United States v. Churchwell*, 807 F.3d 107, 120 (5th Cir. 2015) (quoting *United States v. Thompson*, 482 F.3d 781, 785 (5th Cir. 2007)).  "The ultimate question in determining whether a prosecutor's comments amount to reversible error is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a

denial of due process.'" *Id.* (quoting *Darden*, 477 U.S. at 181; *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

Here, Cramer offers no specifics to support his inflammatory allegations, which go well beyond the government's argument. Thus, he completely fails to show a violation of *Darden*. Indeed, this claim is so general that it invites no meaningful response and should be denied as a "conclusory and speculative." *Murphy*, 205 F.3d at 814 (quoting *Hughes*, 191 F.3d at 629).

Finally, Cramer returns to his alleged duress defense, arguing—with no support whatsoever—that the government manipulated the timing of Erik Rekonen's guilty plea to a murder he committed with Fackrell after Johns's murder. Mtn. 141-42. That is not true. And had Rekonen testified during the guilt phase, he would not have helped Cramer. He would have merely ███████████████████████████████████████████████████ ████████████████████ reinforcing Cramer's motive for the murder.

## CLAIM 11: CRAMER FAILS TO SHOW THAT HIS LAWYERS WERE CONSTITUTIONALLY INEFFECTIVE IN SEEKING A SEVERANCE.

Cramer acknowledges that his counsel moved to sever his trial from Fackrell's and raised the issue on direct appeal, but challenges the *quality* of counsel's arguments for severance, claiming that they failed "to present a reasoned argument, specific to the facts of Cramer's case, as to why his trial should be severed from Fackrell's." Mtn. 142 & n.29. This claim fails because Cramer cannot meet either prong of the *Strickland* test.

Cramer's expends little effort on the performance prong of *Strickland*. *See* Mtn. 142-43. He appears to argue that counsel was ineffective because Cramer's motion contained similar arguments to the one filed by Fackrell. But given their positions as codefendants in a two-person murder trial, it is unremarkable that their arguments were similar, if not identical. Likewise, counsel's candor with the Court regarding whether Cramer would testify or point the finger at

Fackrell, Mtn. 143, shows honesty, not incompetence.  And the "omission" Cramer identifies as "most damaging"—an argument "that Fackrell's commission of another murder just a few months after the Johns homicide was bound to make Cramer appear dangerous by association during the penalty phase," Mtn. 143—was rejected by the Fifth Circuit on direct appeal:

> Cramer argues that he was prejudiced *at sentencing* when the Government introduced evidence of Fackrell's involvement in a second prison murder.  After Fackrell was charged in Johns's murder, he was charged in the murder of another inmate, Ronald Griffith.  The jury heard that only three months after Johns's murder, Fackrell brutally stomped on Griffith's head and said that he "didn't really care that he stomped [Griffith] out."

> While evidence of Fackrell's role in the Griffith murder was more shocking than evidence of other crimes and prison incidents, we cannot conclude that this evidence compels severance.  The jury's similar findings on the Defendants' mitigating factors reflect the similarity between the Defendants' mitigating cases rather than any confusion by the jury.  Nothing suggests that the jury failed to follow the district court's instructions and impermissibly considered the Griffith murder when evaluating Cramer's case for life.

*Fackrell*, 991 F.3d at 599 (emphasis added).

In addition to his failure to show ineffective performance, Cramer does not show prejudice.  In a puzzling point, Cramer claims that, "if [Erik] Rekonen had testified during the guilt phase of trial, his testimony could have established that Fackrell was the more violent of the two, and more importantly, that Cramer was under duress when he attacked Johns.  *Despite knowing that Rekonen's testimony could only help their client*, Cramer's counsel did not press for him to testify …."  Mtn. 143 (emphasis added).  But Cramer would not have obtained Rekonen's testimony even if he had made the argument he now advances because Rekonen's lawyer made clear that his client intended to assert his rights under the Fifth Amendment.  Trl. Doc. 648 at 1385-95.  The decision not to testify was Rekonen's.  *Id.* at 1392; *see also* Trl. Doc. 650 at 1447-48 (Court explanation).  Cramer could not force it.

More important, Cramer's claim that his trial lawyers knew that Rekonen's testimony

"could only help their client," is refuted *by his own exhibit.*



Competent defense counsel would not find *any* of this helpful.  Thus Cramer cannot show

prejudice stemming from his lawyers' alleged failure to obtain a severance based on Rekonen's

testimony.  Cramer also repackages the argument for severance he made on direct appeal

regarding Fackrell's propensity for violence as evidence of prejudice.  Mtn. 144-45.  But, as the

Fifth Circuit held, "[n]othing suggests that the jury failed to follow the district court's

instructions and impermissibly considered the Griffith murder [or Fackrell's other acts] when

evaluating Cramer's case for life." *Fackrell*, 991 F.3d at 599.  And as the Fifth Circuit pointed

out, a "spillover effect, by itself, is an insufficient predicate for a motion to sever." *Fackrell*, 991 F.3d at 612 (quoting *United States v. Bieganowski*, 313 F.3d 264, 287 (5th Cir. 2002)).

Finally, Cramer tries to show prejudice during the penalty phase by claiming that the prosecutors and witnesses confused him with Fackrell or conflated the two. Mtn. 145-46. He focuses on one unremarkable slip by the prosecutor near the end of the long trial. And Cramer cites the government's rebuttal mental-health expert, Dr. Jill Hayes, again seizing on one statement. Mtn. 145. But the record shows that Hayes carefully separated her testimony for each defendant. *E.g.*, Trl. Doc. 652 at 2077-2102 (Cramer), 2102-21 (Fackrell). The Court also sustained objections or ordered rephrasing when the testimony went to both defendants. *E.g.*, Trl. Doc. 652 at 293-94, 2101. And the Court allowed Hayes to return to the stand to clarify testimony that she was unsure of. Trl. Doc. 653 at 2208-14 (showing that her testimony the previous day had been correct). The Fifth Circuit pointed out that "[a]ny conflating of the Defendants or the evidence against each of them was remedied by the district court's instructions, and we 'must presume that the jury heard, understood, and followed the district court's instructions.'" *Fackrell*, 991 F.3d at 598-99 (quoting *Bernard*, 299 F.3d at 476). Cramer jumps to the conclusion that a jury note somehow showed that it was confused. Mtn. 146 (citing Trl. Doc. 680 at 4). But that speculation is not supported by the language of the note.[19] This claim is meritless.

**CLAIM 12: CRAMER'S ARGUMENT THAT BANK ROBBERY IS NOT A CRIME OF VIOLENCE AS DEFINED IN 18 U.S.C. § 924(C)(3)(A) IS MOOT.**

**CLAIM 13: CRAMER'S CLAIM REGARDING INEFFECTIVE ASSISTANCE OF COUNSEL AND INSTRUCTIONAL ERROR DURING THE SENTENCING PHASE IS MOOT.**

---

[19]  The note simply asked, "What is the process if we are not unanimous with our verdict?" *Fackrell*, 991 F.3d at 612.

**CLAIM 14: CRAMER FAILS TO IDENTIFY ANY FACTS SUPPORTING HIS SPECULATIVE ALLEGATIONS OF JUROR MISCONDUCT.**

Cramer alleges that the jury committed misconduct "by prematurely deliberating, considering extrinsic evidence (including exposure to pretrial publicity), drawing adverse inferences from Cramer's exercise of his right against self-incrimination, discussing the case or consulting with third parties, failing to follow court instructions not to prejudge the case or Cramer, failing to follow court instructions to consider defendants Cramer and Fackrell separately, allowing bias to influence its decision, allowing considerations of cost to influence its penalty decision, and failing to disclose relevant knowledge and biases." Mtn. 159-60 (internal footnotes omitted). That's it. With the exception of a footnote referencing Claim 7 (addressed above), Cramer fails to allege *any* facts supporting the claim. Mtn. 160 n.33.

As an initial matter, Cramer's vague reference to the sentencing phase—"allowing considerations of cost to influence its penalty decision," Mtn. 160—is moot after the grant of clemency.

For his other hodgepodge of conclusory allegations, Rule 2(b) of the Rules Governing Section 2255 Cases provides that "[t]he motion must … (1) specify all the grounds for relief available to the moving party [and] (2) state the facts supporting each ground." Cramer fails to meet this pleading obligation. This claim invites no meaningful response and should be denied as "conclusory and speculative." *Murphy*, 205 F.3d at 814 (quoting *Hughes*, 191 F.3d at 629).

Implicitly acknowledging the speculative nature of his allegations, Cramer advises that he "intends to seek leave to interview jurors pursuant to L.R. CR-24 and will thereafter amend this petition as required." Mtn. 160 n.34. This demonstrates a misunderstanding of the procedures for Section 2255 proceedings. While Cramer may be able to file an amended motion, the relation-back doctrine curtails broad changes. Under Fed. R. Civ. P. 15(c), a claim raised in an

Response to Section 2255 Motion, Page 107

amended Section 2255 motion filed after the expiration of the one-year limitation period is deemed to have been filed within the one-year period *only* if the claim "relates back" to the original Section 2255 motion. *Mayle v. Felix*, 545 U.S. 644, 649-50, 654-63 (2005); *see United States v. Gonzalez*, 592 F.3d 675, 679-80 (5th Cir. 2009); *United States v. Saenz*, 282 F.3d 354, 355-56 (5th Cir. 2002). Rule 15(c)(1)(B) provides that a claim raised in an amended pleading relates back to the original pleading only if it "arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Despite being given extra time to file his Section 2255 motion, Cramer cites no conduct, transactions, or occurrences in this claim that anything can relate back to. This "claim" is meritless.

**CLAIM 15: CRAMER'S CLAIMS REGARDING RECORDING INFORMAL *IN CAMERA* MEETINGS IS PROCEDURALLY BARRED AND OTHERWISE MERITLESS.**

Cramer claims that "key portions of trial proceedings at issue in his appeal were not recorded or transcribed." Mtn. 160. This claim is both barred and meritless. Likewise, his related ineffective-assistance-of-counsel claim fails because he cannot meet either prong of the *Strickland* test.

**A.     This claim is procedurally barred because it was or could have been raised below.**

Cramer ultimately focuses on four *in camera* meetings: an informal chambers meeting on May 7, 2018, to advise the Court on the status of witness Elizabeth Rose; a meeting on December 14, 2017, in which courtroom attire for officers was briefly discussed; a meeting on April 17, 2018, during which Cramer claims the Court commented on the number of black potential jurors who were struck; and an informal meeting on June 7, 2018, regarding Cramer's refusal to come to the courtroom during which the Court may have mentioned mitigating factors for the selection-phase charge. Mtn. 161-63; *see also* Trl. Doc. 743, 743-1 (proposed statement

regarding Rose), 747, 747-2 (defendants' description of other meetings).  The Court declined to approve Cramer's proposed statement or to supplement the record regarding the meetings because—given that the defendants' requests came more than a year after the meetings—the Court was "unable to remember the specifics of the conference with sufficient clarity to settle and approve" the proposals.  Trl. Doc. 749 at 3-5.

On direct appeal, Cramer and Fackrell complained about the May 7, 2018, meeting on the status of Rose, and they complained about another informal meeting on June 8, 2018, to discuss the charge in the selection phase.  *See* Trl. Doc. 653 at 2459-64 (arranging for attorneys to work together on the charge and then meet with the Court at 5:00 p.m. on the following day, which was June 8).  The Fifth Circuit held that neither meeting was required to be recorded and that the omitted matters were not "substantial or significant."  *Fackrell*, 991 F.3d at 613.  The defendants did not raise the other three informal meetings identified in Appendix A to Trl. Doc. 747.

Cramer's complaint about the Rose meeting is barred because a "claim raised and rejected on direct appeal generally cannot be relitigated in a Section 2255 proceeding."  *Seyfert*, 67 F.3d at 547.  His allegation about the informal meeting on June 7, 2018, regarding his refusal to come to the courtroom during which the Court may have mentioned the selection-phase charge, Mtn. 161-63; *see also* Trl. Doc. 747, 747-2, is moot after the clemency grant.  And Cramer's complaints about the other meetings are barred because he could have raised them at trial and on direct appeal but did not.  *Frady*, 456 U.S. at 165; *see Lopez*, 248 F.3d at 433.  Other than ineffective assistance of counsel—discussed next—Cramer does not argue any of the exceptions to the procedural bar, such as an intervening change in substantive law, *e.g.*, *Davis*, 417 U.S. at 342; *Lang*, 474 F.3d at 354-57; actual innocence, *Scruggs*, 691 F.3d at 670 and n.34; or cause and prejudice, *id*.

**B.    Cramer fails to show ineffective assistance of counsel.**

Cramer expends little effort on the performance prong of *Strickland*, merely claiming that trial counsel failed to "ensure that Cramer had an adequate record on appeal" and complaining that his appellate lawyers joined Fackrell's issue instead of extensively briefing it, an unremarkable occurrence in a joint appeal. Mtn. 163. But Cramer fails to show that his attorneys' performances were deficient, particularly because the omissions were not "substantial or significant." *Fackrell*, 991 F.3d at 613. And, for the most part, the substance of the meetings was addressed on the record.

As set out above, items discussed during the *in camera* meeting regarding Rose were put on the record before she testified. Trl. Doc. 595 at 1270-77. Cramer raised the issue of uniformed officers in the courtroom by motion before trial, Trl. Doc. 123, and the Court granted the portion regarding attire, specifically referencing the December 14, 2017, meeting, Trl. Doc. 268. Cramer's claim that the April 17, 2018, meeting could be used to show that his lawyers were ineffective in failing to make a *Batson* challenge during jury selection is wrong because a timely *Batson* challenge was made on the record, albeit based on race. Trl. Doc. 591 at 7-12 (Cramer joined Fackrell's challenge), 31-32 (challenge to government strike of Juror 66). This shows that both defendant's lawyers were aware of *Batson* and, after viewing and questioning the venire, did not find any other government strikes objectionable. Finally, as the Fifth Circuit pointed out, a charge conference may be conducted in chambers. *Fackrell*, 991 F.3d at 613 (citing *United States v. Jenkins*, 442 F.2d 429, 438 (5th Cir. 1971)). Cramer was given ample opportunity to object to the charge on the record before it was delivered. Trl. Doc. 679 at 2468-72. Counsel was not ineffective.

Because Cramer's counsel did not err, he cannot show prejudice under *Strickland*,

particularly given that the record covered the substance of the items discussed and Fifth Circuit's conclusion that the unrecorded meetings were not "substantial or significant." *Fackrell*, 991 F.3d at 613.  This claim is meritless.

**CLAIM 16: CRAMER FAILS TO MEET HIS BURDEN FOR SHOWING THAT HIS APPELLATE COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE WITH RESPECT TO THE GUILT PHASE.**

In his response to the clemency order, Cramer acknowledges that his claim that his appellate team should have argued "that the trial court erred in denying Cramer's motion to present execution impact evidence," Mtn. 164, is moot.  2255 Doc. 25 at 7.  He further asserts that the allegations of ineffective assistance of appellate counsel in Claims 2, 7 (in part), 12, 13, and 17, which he attempted to incorporate by reference, also are moot.  2255 Doc. 25 at 7.  The government agrees.  2255 Doc. 26.

This leaves Cramer's allegations regarding appellate counsel found in claims 1, 5, 6,[20] 9, 11, and 15, which he attempts to incorporate by reference.  Mtn. 166.  Cramer alleges—without argument—that his appellate counsel was ineffective in failing to advance these claims on appeal.  *Id.*

"A criminal defendant is entitled to constitutionally effective assistance of counsel on direct appeal."  *Dovalina*, 262 F.3d at 474 (citing *Evitts v. Lucey*, 469 U.S. 387, 394 (1985); *Goodwin v. Johnson*, 132 F.3d 162, 170 (5th Cir. 1997); *Lombard v. Lynaugh*, 868 F.2d 1475, 1479 (5th Cir. 1989)).  But, as with trial counsel, appellate counsel's performance is evaluated under the *Strickland* standard.  *Id.*  More important, "[t]he Constitution does not require appellate

---

[20]  For Claim 6, Cramer has nothing to incorporate because he fails to mention appellate counsel in that issue.  Mtn. 113-15.  He thus fails to show that his appellate counsel erred.  And as discussed under Claim 6, given *Brummitt* and the merits of the claims, it would have been foolish for Cramer's appellate lawyers to urge the arguments he advances in that claim.

counsel to raise every nonfrivolous ground that might be pressed on appeal." *Ellis*, 873 F.2d at 840 (citing *Barnes*, 463 U.S. at 751). It is a reasonable tactic for appellate counsel to concentrate on the strongest issues. *Id.* As noted above, "[a] brief that raises every colorable issue runs the risk of burying good arguments—those that, in the words of the great advocate John W. Davis, 'go for the jugular,'…—in a verbal mound made up of strong and weak contentions." *Barnes*, 463 U.S. at 753 (citing Davis, *The Argument of an Appeal*, 26 A.B.A.J. 895, 897 (1940)).

Here, Cramer does not even try to show that his appellate team, which—by his count—included four experienced appellate lawyers, performed deficiently. *E.g.*, *Jackson*, 53 F.3d at 1282 n.1 (counsel is *not* deficient in declining to raise a frivolous issue). He thus fails to meet the performance prong of *Strickland*.

Cramer also fails to show prejudice. To demonstrate prejudice, a defendant must direct the court's attention to "any issues that counsel failed to raise upon which he was likely to prevail on appeal." *Ellis*, 873 F.2d at 840. The standard for determining prejudice is stringent:

> **Prejudice results if the attorney's deficient performance would likely render either the defendant's trial fundamentally unfair or the conviction and sentence unreliable** … Where an attorney failed to adequately brief an issue on direct appeal, **appellant must show initially that the appeal would have had, with reasonable probability, a different outcome if the attorney adequately addressed the issue** … "This requires that we counter-factually determine the probable outcome on appeal ...." Appellant must then demonstrate that the attorney's deficient performance led to a fundamentally unfair and unreliable result.

*Dovalina*, 262 F.3d at 474-75 (internal citations omitted) (emphasis added).

Given the lack of argument on this claim, Cramer cannot show prejudice. This claim is meritless.

As a secondary issue, Cramer launches a gratuitous personal attack on ███████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████. This claim has no legitimate support. Cramer submits it on "information and belief," ███████, which is meaningless because his Section 2255 motion is unverified. *See Gonzalez*, 493 F. App'x at 544 (citing *Lghodaro*, 967 F.2d at 1030) (verification is important because unsworn allegations without independent support in the record do not bear sufficient indicia of reliability to be considered). ██████████

████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

█████████████████████████████████

Equally important, even if Cramer's unverified allegation is true, it has nothing to do with *any* of the grounds for relief under Section 2255—whether "(1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the court was without jurisdiction to impose the sentence; (3) the sentence exceeds the statutory maximum sentence; or (4) the sentence is 'otherwise subject to collateral attack.'" *Placente*, 81 F.3d at 558.

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████



This scurrilous allegation is meritless.

**CLAIM 17: CRAMER'S CLAIM THE FEDERAL DEATH PENALTY ACT IS UNCONSTITUTIONAL IS MOOT.**

**CLAIM 18: CRAMER CANNOT RELY ON THE CUMULATIVE ERROR DOCTRINE BECAUSE THERE ARE NO ERRORS TO CUMULATE AND, EVEN IF THERE WERE, ANY ERROR WOULD BE HARMLESS.**

In his final claim, Cramer argues that the errors he alleges in his other claims, considered cumulatively, warrant a new trial.  Mtn. 169-70.  Not so.

"Under the cumulative error doctrine, relief may be obtained only when constitutional errors so fatally infect the trial that they violate the trial's fundamental fairness." *Fields*, 761 F.3d at 483 (quoting *United States v. Stephens*, 571 F.3d 401, 412 (5th Cir. 2009)); *see also Yohey v. Collins*, 985 F.2d 222, 229 (5th Cir. 1993).  Seldom applied, the Fifth Circuit has "repeatedly emphasized that the cumulative error doctrine necessitates reversal only in rare instances," pointing out that "the possibility of cumulative error is often acknowledged but practically never found persuasive." *United States v. Delgado*, 672 F.3d 320, 343-44 (5th Cir. 2012) (quoting *Derden v. McNeel*, 978 F.2d 1453, 1454, 1456  (5th Cir. 1992).  Habeas relief, in particular, is not appropriate "where the cumulative errors complained of are not of a constitutional dimension." *Livingston v. Johnson*, 107 F.3d 297, 309 (5th Cir. 1997) (quoting *Derden*, 978 F.2d at 1454); *see also Bernard*, 762 F.3d at 482.

Cramer alleges that his claims, considered together, demonstrate prejudice.  This is not

**Response to Section 2255 Motion, Page 114**

the approach taken by the Fifth Circuit, which has noted that, in "assessing prejudice," allegations "ordinarily must be viewed individually." *Ebron*, 683 F.3d at 140 (quoting *Fields*, 483 F.3d at 358).  Nevertheless, Cramer's cumulative-error argument fails, first, because there is no error.  But, even if the alleged errors were cumulated, Cramer cannot show harm because of the overwhelming evidence of his guilt.  The errors he now complains of do not bring into question the fairness of the trial or the validity of the jury's verdict.

## CONCLUSION

For the reasons stated above, the United States urges the Court to deny Cramer's Section 2255 motion.

Respectfully submitted,

Jay R. Combs
Acting United States Attorney
Eastern District of Texas

/s/ Joseph R. Batte
Joseph R. Batte
Assistant United States Attorney
350 Magnolia, Suite 150
Beaumont, Texas 77701
(409) 839-2538
(409) 839-2550 (fax)
Joe.Batte@usdoj.gov
Texas Bar No. 01918070

/s/ Traci L. Kenner
Traci L. Kenner
Assistant United States Attorney
110 N. College, Suite 700
Tyler, Texas 75702
(903) 590-1400
(903) 590-1439 (fax)
Traci.Kenner@usdoj.gov
Texas Bar No. 11307070

**Response to Section 2255 Motion, Page 115**

**Certificate of Service**

I certify that on August 25, 2025, this document was served by the Court's ECF system and by email on Laura Paul and Celeste Bacchi, counsel for Cramer.

/s/ Traci L. Kenner
Traci L. Kenner
Assistant United States Attorney

Response to Section 2255 Motion, Page 116